1  Samuel A. Schwartz, Esq.
   Nevada Bar No. 10985
2  saschwartz@nvfirm.com
   SCHWARTZ LAW, PLLC
3  601 East Bridger Avenue
   Las Vegas, NV 89101
4  Telephone: 702.385.5544
   Facsimile: 702.442.9887
5  *Proposed Attorneys for the Debtor*
6

7                    UNITED STATES BANKRUPTCY COURT
                      FOR THE DISTRICT OF NEVADA
8
9  In re:                                    )   Case No.: 22-14422-nmc
                                             )
10 MUSCLEPHARM CORPORATION,                  )   Chapter 11
                                             )
11                                           )
              Debtor.                        )   Hearing Date: *OST REQUESTED*
12                                           )   Hearing Time: *OST REQUESTED*
13 ─────────────────────────────────────

14    **EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I)
      AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING, (II)
15    GRANTING PRIMING LIENS AND ADMINISTRATIVE EXPENSE CLAIMS, (III)
      AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL, (IV) MODIFYING
16    THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

17         MusclePharm Corporation, ("**MusclePharm**" or the "**Debtor**"), the debtor and debtor-in-

18 possession in the above-captioned Chapter 11 case,[1] by and through its proposed counsel of record,

19 Schwartz Law, PLLC, hereby files this motion (the "**Motion**") for the entry of interim and final

20 orders (the "**Interim Order**" and "**Final Order**," respectively), pursuant to Sections 105, 361, 362,

21 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 4001(b) and 4001(d), and Local Rule

22 4001: (I) Authorizing the Debtor to Obtain Post-Petition Financing, (II) Granting Priming Liens

23 and Administrative Expense Claims, (III) Authorizing the Debtor's Use of Cash Collateral; (IV)

24 Modifying the Automatic Stay; and (V) Granting Related Relief.   The proposed Interim Order

25 ─────────────

26 [1]        Unless otherwise indicated, all chapter and section references are to the Title 11 of the United States
   Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"). All references to a "**Chapter**" or "**Section**" shall
27 be to the Bankruptcy Code. "**Bankruptcy Rule**" references are to the Federal Rules of Bankruptcy
   Procedure Rules 1001-9037. "**Local Rule**" or "**LR**" references are to the Local Rules of Bankruptcy Practice
28 of the United States Bankruptcy Court, District of Nevada.

                                              1

approving this Motion is attached hereto as **Exhibit 1**. A Copy of the proposed debtor-in-possession term sheet (collectively, the "**DIP Financing**") is attached hereto as **Exhibit 2**.

This Motion is made and based on the *Omnibus Declaration in Support of Debtor's Emergency Petition, First Day Motions, and Related Relief* (the "**First Day Declaration**"), the points and authorities set forth below, the pleadings and papers and other records contained in this Court's file, judicial notice of which is respectfully requested, and any evidence or oral argument presented at the time of the hearing on this Motion.

### SUMMARY PURSUANT TO FED. R. BANKR. P. 4001 AND LR 4001

| Summary of Material Terms |
|---|
| **Borrowers:** Debtor MusclePharm Corporation and its affiliates, including Canada MusclePharm Enterprises Corp. (collectively, the "**Borrowers**") |
| **Lender:** White Winston Select Asset Funds, LLC, or its designee (the "**Lender**") |
| **Maximum DIP Loan Commitment:** Up to $2,000,000 in new funding, with $1,000,000 available on an interim basis (the "**DIP Note Facility**") and 80% of all post-petition receivables purchased up to $10,000,000 (the "**DIP Factoring Facility**" and collectively with the DIP Note Facility, the "**DIP Loan**"). |
| **Interest Rate:** Prime Rate as published in the Wall Street Journal, plus 2% on DIP Factoring Facility |
| **Loan Fees:**<br>• Closing Fee – 1% of the DIP Factoring Facility;<br>• Facility Fee – Fifty basis points (0.50%) of each Account purchased for purchased up to $5,000,000, and 2.5% of each Advance<br>• Exit Fee - $125,000 if the loans are paid in full within 6 months of issuance |
| **Maturity Date:** The effective date of the Debtor's ultimate plan of reorganization, or the sale or other disposition of the Lender's collateral. |
| **Proposed Use of DIP Financing:** (1) Immediate working capital needs, (2) general corporate purposes and (3) administrative and professionals costs and expenses in this case. |
| **FRBP 4001(c)(1)(B)(i) - grant of priority or a lien on property the estate under § 364(c) or (d):**<br><br>(1) Grant of allowed super-priority administration claim under § 364(b) and 503(b)(1);<br>(2) Grant of automatically perfected security interests under §§ 364(c); and<br>(3) Grant of liens priming pre-petition liens under § 364(d). |
| **Events of Default include the following:**<br><br>• failure to pay principal or interest on the DIP Note Facility or any fees when due; |

| Summary of Material Terms |
| --- |

- failure of any representation or warranty of any of the Borrowers contained in the Agreement to be true and correct in all material respects when made;

- breach of any covenant, subject to a five (5) day grace period (from the earlier of the date that (i) any Borrower obtains knowledge of such breach and (ii) any Borrower receives written notice of such default from the Lender, provided that the breach of any covenant described herein, or any other covenant so indicated by the Lender, shall not be subject to any grace period;

- failure to comply with the Budget, subject to the permitted variances;

- without the Lender's written consent, which may be granted or withheld in the Lender's sole and absolute discretion, the Lender shall cease to have continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on and security interests in the Collateral with the priorities described above;

- any Borrower or equity holder in any Borrower (i) contests the validity or enforceability of any document executed and delivered to effectuate the DIP Loan in writing or denying in writing that it has any further liability thereunder or (ii) contesting the validity or perfection of the liens and security interests securing the DIP Loan;

- any attempt by any Borrower or any equity holder thereof to invalidate or otherwise impair the DIP Loans or the liens and security interests granted to the Lender with respect to the DIP Loan;

- failure by any Debtor to comply with the Interim DIP Order or Final DIP Order, as applicable;

- the entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim DIP Order or Final DIP Order or any other order of the Bankruptcy Court approving the Debtor's use of Cash Collateral, as applicable, without the express written consent of the Lender;

- any sale or disposition, without the written consent of Lender, which consent may be granted or withheld in the Lender's sole and absolute discretion, of all or a material portion of the assets of the Borrower's bankruptcy estate;

- conversion of, or the filing of any motion by any Borrower or any equity holder thereof to convert, the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

- dismissal of, or the filing of any motion by any Borrower or equity holder thereof to dismiss, the Bankruptcy Case;

- the appointment of a Chapter 11 trustee or an examiner in the Bankruptcy Case;

- failure to retain a Chief Restructuring Officer;

- failure by the Borrower to create the New Board as set forth in this DIP Financing;

- the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to a holder or holders of any security interest or lien on any part of the DIP

3

| Summary of Material Terms |
|---|

> Collateral to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral without the written consent of the Lender, which consent may be granted or withheld in the Lender's sole and absolute discretion;
>
> • the grant of any claim that is pari passu with or senior to those of the Lender;
>
> • termination by the Bankruptcy Court of the use of Cash Collateral;
>
> • the filing of a plan of reorganization or liquidation in the bankruptcy case that does not provide for the payment in full in cash of the obligations related to the DIP Loan;
>
> • expiration of the period of time during which only the Borrower may file a plan pursuant to section 1121 of the Bankruptcy Code; and
>
> • the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any of the DIP Collateral.

Among other remedies to be specified, upon the occurrence of an Event of Default, the Lender shall have all rights and remedies typically available to a lender upon the occurrence of an Event of Default, including, without limitation, the right to seek relief from the automatic stay to foreclose on all or any portion of the Collateral, and apply the proceeds thereof to the obligations of the Borrower or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law.

**FRBP 4001(c)(1)(B)(iv) - waiver/modification of the automatic stay:**

Automatic stay is modified to permit lender to perfect DIP liens and exercise rights upon an event of default.

**FRBP 4001(c)(1)(B)(vii) - waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate:**

Lender's DIP liens will be automatically perfected.

**FRBP 4001(c)(1)(B)(viii) - release/waiver of claims:**

N/A

**FRBP 4001(c)(1)(B)(ix) - the indemnification of any entity:**

N/A

**FRBP 4001(c)(1)(B)(x) - release/waiver of any right under § 506(c):**

The Debtor's rights under Section 506(c) are not waived, however, it is a default under the DIP Loan if surcharge rights are sought.

**FRBP 4001(c)(1)(B)(xi) - lien/claim on avoidance actions:**

Lender will not receive a lien on all avoidance actions.

**Board of Directors:**   Upon the termination of any injunction or court order that prohibits the following, Borrower shall expand its board of directors to five (5) members (the "***New Board***") of which (i) two members shall be designated by Borrower who are persons other than Ryan Drexler, (ii)

4

| Summary of Material Terms |
| --- |
| two members shall be designated by WW, and (iii) the members selected by Borrower and WW shall designate one (1) board member, who shall be approved by WW, with such approval not unreasonably withheld.  WW shall have the right to appoint one (1) observer to all board matters and meetings. |

## MEMORANDUM OF POINTS AND AUTHORITIES

### JURISDICTION

1.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1001(b)(1). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Pursuant to LR 9014.2, the Debtor consents to entry of a final order or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders for judgment consistent with Article III of the U.S. Constitution.

2.        Venue of the Debtor's Chapter 11 case in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.        The statutory bases for the relief requested herein are Sections 105, 361, 362, 363, 364, 1107, and 1108 of the Bankruptcy Code, Bankruptcy Rule 4001 and 6004, and Local Rules 4001(b) and (c).

### BACKGROUND

A.    **The Chapter 11 Case.**

4.        On December 15, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned case (the "**Chapter 11 Case**").

5.        The Debtor continues to operate as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Office of the United States Trustee for Region 17 (the "**UST**"), which includes the District of Nevada, has not appointed a case trustee or examiner in the Chapter 11 Case.

6.        To date, the UST has not appointed a committee of unsecured creditors in the Debtor's Chapter 11 Case.

**B.     The Debtor's Business.**

7.     The background regarding the Debtor's business, prepetition financing and events leading to the instant Chapter 11 Case are set forth in the First Day Declaration.

**C.     The Debtor's Need for Postpetition Financing.**

8.     The Debtor has an immediate and critical need to obtain financing to enable the continuation (and restarting) of business operations, including purchasing materials, shipping goods to customers, paying employees, and to administer and preserve the value of its estate.  The Debtor does not have sufficient available sources of working capital and financing to operate its business in the ordinary course without the DIP Financing and authorized use of Cash Collateral. Most significantly, approval of the DIP Financing on an interim basis pursuant to the budget attached hereto as **Exhibit 3** (the "**Budget**") is necessary to induce the Debtor's vendors to continue providing necessary goods and services to the Debtor during the Chapter 11 Case by providing them assurance that the Debtor will have sufficient working capital to continue operations. Absent such assurances, many vendors will not continue to do business with the Debtor.  In short, absent approval of the DIP Financing and the use of Cash Collateral on an emergency basis, the Debtor will likely be forced to cease operations, jeopardizing its reorganization. *See* First Day Declaration, ¶ 58.

9.     In order to continue operations during the interim period, the Debtor must be able to satisfy ongoing working capital needs and expenses of operation, including employee payroll expenses, and fund the costs of administering its estate, including fees assessed by the Office of the United States Trustee and the Clerk of Court and fees and expenses of estate professionals. As set forth in the Budget, the Debtor projects an operational shortfall of $1,784,672 through March 26, 2023. The Debtor also requires access to sufficient working capital to account for disruptions and delays in the collection of receivables that may follow from the commencement of the Chapter 11 Case, and to provide vendors with assurance of payment for goods and services provided on a post-petition basis in order to induce vendors to provide critically-needed goods and services. *See id.*, ¶ 59.

10.     To pay critical operating expenses, cushion the impact of temporary disruptions in the collection of receivables, and to provide vendors the assurances needed to continue providing goods and services to the Debtor, the Debtor has determined that the DIP Financing is necessary through the Lender. *See id.*, ¶ 60.

11.     Absent immediate access to such funds, the Debtor's operations and value of its estate will be detrimentally impacted because, among other things, it will be unable to pay ongoing operating expenses and critical vendors may refuse to provide necessary goods and services. Accordingly, timely approval of the Interim Order is critical to preserving the value of the Debtor's estate. *See id.*, ¶ 61.

12.     While the Debtor has worked extensively with its existing lenders for financing on terms more favorable than the DIP Financing prior to and after the Petition Date, no financing is available from other sources on more favorable terms. Given its precarious financial condition, lack of liquidity, and capital structure, the Debtor cannot obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtor and its estate that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtor and it's estate that is subject to a lien. *See id.*, ¶ 62.

13.     Further, financing from the Lender on a post-petition basis is not otherwise available without granting the Lender a superpriority claim under Section 364(c)(1), valid, binding, enforceable, and perfected security interests in and liens on all of the Debtor's existing and after-acquired assets not subject to Existing Liens under Section 364(c)(2), junior liens on assets which are subject to any Existing Liens under Section 363(c)(3), a senior priming lien on all Collateral that is subject to the prepetition liens securing the DIP Loan pursuant to Section 364(d), and the other protections set forth in the DIP Financing, and a determination in the Final Order, regarding the validity, priority, and enforceability of the DIP Loan. The DIP Loan was negotiated in good faith between the Debtor and the Lender, and advances under the DIP Loan and Interim and Final Orders will be made in good faith, such that the Lender should be entitled to the protections and benefits Section 364(e) of the Bankruptcy Code. *See id.*, ¶ 63.

14.      Furthermore, the Debtor cannot meet its ongoing post-position obligations without the immediate ability to use Cash Collateral, which consists of cash and cash equivalents, deposit accounts, and the cash generated or received by the Debtor from and after the Petition Date, all of which are subject to prepetition liens. Absent the Debtor's ability to immediately use the Cash Collateral to pay the expenses of operations, immediate and irreparable harm will result to the Debtor, its estate, and its creditors, rendering an effective and orderly reorganization of Debtor's business impossible. *See id.*, ¶ 64.

15.      In short, the ability of the Debtor to finance its operations and preserve and maintain the value of its assets requires the availability of working capital under the terms of the DIP Loan. In the absence of the financing, the Debtor would likely have to cease operations, resulting in immediate and irreparable harm to the Debtor and its bankruptcy estate. *See id.*, ¶ 65.

## RELIEF REQUESTED

16.      By this Motion and as set forth in the First Day Declaration, the Debtor seeks interim and final orders of this Court granting the relief as set forth in the proposed interim Order, attached hereto as **Exhibit 1**, and scheduling interim and final hearings to consider the same.  Moreover, if the Debtor is able to obtain post-petition debtor-in-possession financing on equal to or more favorable terms than the DIP Financing terms contained herein, the Debtor also requests that this Motion be treated as a motion to approve such debtor-in-possession financings, so long as such financing is on equal to or more favorable terms that the DIP Financing proposed in this Motion.

## BASIS FOR RELIEF

**A.      Legal Standards.**

17.      The Debtor proposes to obtain the DIP Financing by providing first priority priming security interests and other liens as set forth above and in the Interim Order pursuant to section 364 of the Bankruptcy Code.  Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate.  *See, e.g., In re Simasko Production Co.,* 47 B.R. 444, 448-9 (D. Colo.1985) (authorizing interim financing agreement where debtor's business judgment indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept.*

*Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").  *See also* 2 Collier on Bankruptcy ¶ 364.04, at 364-9-11 (15th ed. 1991). Section 364(c) provides, in pertinent part. that:

> (c)  If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> > (1)  with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:
> >
> > (2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3)  secured by a junior lien on property of the estate that is subject to a lien.

18.    Section 364(d)(1) of the Bankruptcy Code governs the incurrence of senior secured debt or "priming" loans.  Pursuant to Section 364(d)(1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if—

> (1)    the trustee is unable to obtain such credit otherwise; and
>
> (2)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 .S.C. § 364(d)(1).

19.    In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under § 364(a) and (b).  *See, e.g., In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Ames, supra,* 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lending institutions).

20.    As indicated above, Section 364(c) of the Bankruptcy Code also enumerates certain

incentives that a court may grant to post-petition lenders. The Section 364(c) list, however, is not exhaustive. Courts frequently have authorized the use of inducements not specified in the statute. *See, e.g., In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores,* 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), *aff'd* 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364"); *In re Antico Mfg. Co.*, 31 B.R. 103 (Bankr. E.D.N.Y. 1983) (authorizing lien on pre-petition collateral to secure post-petition indebtedness). The Debtor has granted Lender such enhancements as set forth above and in the Interim Order. The Debtor believes that such enhancements are plainly reasonable requests by Lender in return for the DIP Financing and all potential post-petition lenders that the Debtor negotiated with required that the Debtor prime all other liens.

**B.    Even Absent Consent, Priming Liens Are Authorized by the Bankruptcy Code.**

21.    The proposed priming liens are authorized by the Bankruptcy Code, even absent consent from any prepetition lienholders. Bankruptcy Code § 364(d)(1)(B) requires the furnishing of adequate protection in favor of lien holders which assert an interest in collateral. Neither this nor any other Bankruptcy Code provision specifically defines the term "adequate protection." As discussed below in the cash collateral section of this Motion, however, Bankruptcy Code § 361 provides that adequate protection is furnished to the extent the debtor's "use, sale, lease or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3) (emphasis added). Stated succinctly, adequate protection protects a secured creditor against a decrease in the value of its collateral. *See e.g., In re Planned System, Inc.,* 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987). This standard applies equally with respect to a proposed "priming" financing under section 364(d)(1)(B). *See, e.g., In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests."); *In re Aqua Assoc.,* 123 B.R. 192, 196

(Bankr. E.D. Pa. 1991); *In re Beker Ind. Corp.*, 58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986).

22.    The Court has broad discretion to determine whether adequate protection is furnished. *See e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Whether the party entitled to such protection is over or undersecured is not dispositive of whether adequate protection is furnished. As the court *in Aqua Assoc.,* 123 B.R. 192, noted:

> Therefore, we believe that, while the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any "adequate protection" analysis, and particularly one relating to § 364(d)(1)(B). The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.

*Id.* at 196 (approving priming financing where interest rate was 5% over prime and loan likely would enhance value of estate). *Accord, In re Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1087-90 (4th Cir. 1986).

23.    The infusion of priming and superpriority post-petition financing allows the continued operations of the Debtor and for the Debtor to restructure its business plan to provide for additional operating revenue. The Debtor submits that this will not only maintain the value of the Debtor's collateral value but will likely increase it. Further, any prepetition lender's interest in the Debtor's collateral is adequately protected from diminution by virtue of the DIP Financing, which maintains the value of the Debtor's collateral and preserves the Debtor's assets.

24.    In short, Debtor respectfully submits that the DIP Financing satisfies the Section 363(c) and Section 364(d) standards. As indicated above, no other source of funding on more attractive terms has been found or is available to the Debtor. The best credit available to Debtor is the DIP Financing. Thus, Debtor believes that it is fair, reasonable and necessary to enter into the DIP Financing. In addition to representing the best terms presently available to Debtor, the DIP Financing is also in the best interests of the Debtor's estate. The DIP Financing preserves the going concern value of the Debtor's assets and allows the Debtor to continue its operations and keep employees employed. The DIP Financing therefore is plainly in the best interests of Debtor's estate.

**C.      The Debtor Has Satisfied the Procedural Requirements Regarding Authority for Obtaining Credit.**

25.      Bankruptcy Rule 4001(c) sets forth procedural requirements for obtaining credit. Bankruptcy Rule 4001(c)(1) requires that: "A motion for authority to obtain credit shall be made in accordance with Rule 9014 and shall be served on . . . the creditors included on the list filed pursuant to Rule 1007(d), and on such other entities as the court may direct.  The motion shall be accompanied by the copy of the agreement."  A copy of the Motion has been served by email, overnight mail and/or fax to the Debtor's 20 largest unsecured creditors, the Office of the United States Trustee, and all creditors with an alleged security interest in the Debtor's assets and/or cash collateral.      Accordingly, the Motion complies with the requirements of Bankruptcy Rule 4001(c)(1), and thus the Debtor requests that the Court authorize the Debtor to enter into the DIP Financing.

**THE DEBTOR HAS SATISFIED THE REQUIREMENTS TO USE CASH COLLATERAL**

**A.      Unless Secured Creditors Consent to the Use of Cash Collateral, the Debtor Must Adequately Protect the Secured Creditors' Interest.**

26.      The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(1) provides, in pertinent part:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee [or debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or hearing, and may use property of the estate in the ordinary course of business without notice or hearing.

27.      The Bankruptcy Code establishes a special requirement, however, regarding the debtor-in-possession's use of "cash collateral," defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest . . .."  11 U.S.C. § 363(a).

28.      Bankruptcy Code § 363(c)(2) permits the debtor-in-possession to use, sell or lease "cash collateral" under subsection (c)(1) only if either of two alternative circumstances exist:

12

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale,
    or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

29.    If a secured creditor does not consent to the use of its cash collateral, the Court may authorize the Debtor to use said cash collateral under Bankruptcy Code § 363(c)(2)(B) if the Court determines that the debtor has provided "adequate protection" of the secured creditor's interest in the cash collateral.  11 U.S.C. § 363(e).

30.    In the instant case, to the extent any party has an interest in the Debtor's cash collateral, they are adequately protected pursuant to Section 361 of the Bankruptcy Code by the maintenance of value of their collateral which is made possible by the DIP Financing and Debtor's use of cash collateral.

**B.    The Meaning of Adequate Protection.**

31.    Section 361 of the Bankruptcy Code provides that:

[W]hen adequate protection is required . . . of an interest of an
entity in property, such adequate protection may be provided by
—

(1) requiring the trustee to make a cash payment or periodic cash
payments to such entity, to the extent that the . . . use . . . under
section 363 of this title . . . results in a decrease in the value of
such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to
the extent that such . . . use . . . results in a decrease in the value
of such entity's interest in such property; or

(3) granting such other relief . . . as will result in the realization
by such entity of the indubitable equivalent in such entity's
interest in such property.

11 U.S.C. § 361.

32.    Neither Section 361 nor any other provision of the Bankruptcy Code defines the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under section 361.  However, the statute plainly provides that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property."  11 U.S.C. §§ 361, 363(e). *See also General*

13

*Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 989-90 & n.4 (Bankr. D. Utah 1982); *O'Toole, Adequate Protection and Post-Petition Interest in Chapter 11 Proceedings,* 56 Am. Bankr. L.J. 251, 263 (1982).

33.     The phrase "value of such entity's interest," although not defined in the Bankruptcy Code, was addressed by the Supreme Court in the landmark decision, *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S. Ct. 626 (1988) ("*Timbers*").  For the meaning of "value of such entity's interest," the Supreme Court was guided by section 506(a), which defines a creditor's allowed secured claim:

> The phrase "value of such creditor's interest" in §506(a) means "the value of the collateral."  H.R. Rep. No. 950-595, pp. 181, 356 (1977); see also S. Rep. No. 95-989, p. 68 (1978), U.S. Code Cong. & Admin. News, 1978 pp. 5787, 5854, 6141, 6312.  **We think the phrase "value of such entity's interest" in §361(1) and (2), when applied to secured creditors, means the same.**

*Id.* at 630 (emphasis added).

34.     *Timbers* teaches that a secured creditor is entitled to "adequate protection" only against diminution in the value of the collateral securing the creditor's allowed secured claim. Under *Timbers*, therefore, where the "value of the collateral" is not diminishing by its use, sale, or lease, the creditor's interest is adequately protected.  This conclusion flows directly from the equivalency of "value of such entity's interests" with "value of the collateral."

**C.     The Preservation and Enhancement of the Collateral Resulting From the Debtor's Ongoing Operations Affords Adequate Protection.**

35.     In *McCombs Properties VI, Ltd. v. First Texas Savings Association (In re McCombs Properties, VI, Ltd.),* 88 B.R. 261 (Bankr. C.D. Cal. 1988), the Bankruptcy Court applied the *Timbers* decision in ruling that a secured creditor's interest in the cash and proceeds derived from a debtors' operations was adequately protected where the value of the cash collateral was not declining during the pendency of the bankruptcy case.  On the nature of the protection required, Bankruptcy Judge Ryan noted:

> The analysis of the Supreme Court in *Timbers* is instructive here. The phrase "interest in property" in §363(e) means the value of the collateral.  That is the interest that I am required to protect.  If that

value is likely to diminish during the time of the use, adequate protection must be provided by the debtor.  As the Supreme Court stated in *Timbers*, "thus, it is agreed if the apartment project in this case had been declining in value petitioner would have been entitled, under §362(d)(1) to cash payments or additional security in the amount of the decline, as §361 describes." *Id.* 484 U.S. at 368, 198 S. Ct. at 629, at 748. Id., at 266.

36.    Similarly, in *Robert Neier v. Clark Oil & Refining Corp. (In re Apex Oil Company),* 85 B.R. 538 (Bankr. E.D. Mo. 1988), the Bankruptcy Court, relying exclusively on *Timbers*, denied adequate protection to a husband and wife holding over-secured claims because "[n]o evidence was presented that the value of the [collateral] would diminish during the course of this Chapter 11 proceeding.

37.    In this case, use of cash collateral is necessary to implement the DIP Financing contemplated between the Lender and the Debtor.  The Debtor needs continuing authority to use cash collateral in order to continue to operate and maintain its business.  The Debtor's ongoing business operations provide adequate protection to the secured creditors.

38.    It is well established that a Bankruptcy Court, where possible, should resolve issues presented in favor of preserving reorganization potential.  *In re Hoffman*, 51 B.R. 42, 47 (Bankr. W.D. Ark. 1985) (relief from stay); *In re A&B Heating and Air Conditioning, Inc.,* 48 B.R. 401, 403-04 (Bankr. N.D. Fla. 1985) (injunction); *In re Heatron, Inc.,* 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980) (cash collateral motion).  As the *Heatron* court stated in granting a debtor's motion to use cash collateral:

At the beginning of the reorganization process, the Court must work with less evidence than might be desirable and should resolve issues in favor of the reorganization, where the evidence is conflicting.

*Id*. at 496.

39.    In *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397-98 (10th Cir. 1987), the court summarized the foregoing principle as follows:

Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end.  Thus, while interests of the secured creditor . . . are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during

the early stages of administration.

> The first effort of the court must be to insure the value of the collateral will be preserved. Yet, prior to confirmation of a plan of reorganization, the test of that protection is not by the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard.

*Id.* at 1397-98. The Debtor intends on reorganizing its business and believes that the DIP Financing and use of cash collateral will allow it to operate its business in the most profitable way possible.

40.     Applying the foregoing, courts have frequently allowed a debtor to use cash collateral in circumstances where such use would enhance or preserve the value of the collateral. For example, in *In re Stein*, 19 B.R. 458 (Bankr. E.D. Penn. 1982), the court allowed a debtor to use cash collateral where the secured party was undersecured and had no cushion for protection. As in the present case, the court in *Stein* found that the use of the cash collateral was necessary to the continued operations of the debtor and "the creditor's secured position can only be enhanced by the continued operation of the [debtor's business]." *Id.* at 460. *See also, In re Pine Lake Village Apartment Co.*, 16 B.R. 750 (Bankr. S.D.N.Y. 1982) (debtor permitted to use cash collateral generated from rental income to enhance the value of real property and secured creditor's claim); *In re Karl A. Neise, Inc.,* 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by lien in post-petition property acquired by debtor; debtor can use cash collateral "in the normal course of their business").

41.     A secured creditor is only entitled to adequate protection of the value of the collateral securing the creditor's allowed secured claim. *See Timbers, supra*, at 629-30. Where, as in the present case, the continuation of the Debtor's business preserves the value of the creditor's alleged collateral, the Debtor's continued operations constitute adequate protection of the secured creditor's interests in the collateral. *See, e.g., In re Coody,* 59 B.R. 164, 167 (Bankr. M.D. Ga. 1986).

42.     The Debtor's continued use of cash collateral under the provisions of the DIP Financing will insure that the "going concern" value of its assets are preserved, which value is

1   significantly greater than the Debtor's liquidation value and inures to the benefit of the Debtor's

2   general unsecured creditors in its plan of reorganization.

3   **D.      Emergency Relief is Justified Under the Circumstances.**

4        43.    In this case, emergency relief is required because the Debtor must have immediate

5   use of DIP Financing in order to continue its business operations, and to preserve the value of its

6   business.  In order to enable the Debtor to operate its business to avoid immediate and irreparable

7   harm and to fund operations (including paying employees) upon a final hearing on the Motion, the

8   Debtor respectfully requests that the Court grant the relief requested by the Motion on shortened

9   notice to interested parties.

10        44.    Congress specifically recognized that it might be necessary to schedule hearings on

11  requests for interim authorization to use cash collateral on an expedited basis because of the

12  business exigencies of individual cases when it enacted Bankruptcy Code Section 363.  Section

13  363(b)(2)(B) authorizes the use, sale, or lease of cash collateral "after notice and a hearing."

14  Section 363(c)(3) provides in pertinent part:

15
            Any hearing under paragraph (2)(B) of this subsection may be a
16          preliminary hearing or may be consolidated with a hearing under
            subsection (e) of this section, but shall be scheduled in accordance
17          with the needs of the debtor . . . The court shall act promptly on any
            request for authorization under paragraph (2)(B) of this subsection.

18  11 U.S.C. § 363(b)(3); *see also* 11 U.S.C. § 102(1) (defining "after notice and a hearing" to mean

19  after such notice and such opportunity for a hearing as is appropriate in the particular circumstances

20  of a given case).

21        45.    In this instance, the DIP Financing is necessary to preserve the value of the Debtor's

22  business, and continued use of cash collateral is a necessary component of the DIP Financing

23  agreement the Debtor has reached with the Lender, and is also necessary to preserve the going

24  concern value of the Debtor's business.

25                                    **CONCLUSION**

26        WHEREFORE, the Debtor respectfully requests that the Court: (a) enter the Interim Order,

27  in substantially the form attached hereto as **Exhibit 1**, granting the Motion and authorizing the

28  Debtor to borrow under the terms of the DIP Loan on an interim basis in accordance with the Budget;

                                            17

(b) schedule the Final Hearing on the Motion; (c) following the Final Hearing, enter the Final Order authorizing Debtor to borrow under the terms of the DIP Loan on a final basis; (d) grant the Debtor such other and further relief as is necessary and appropriate.

Dated: January 3, 2023.

SCHWARTZ LAW, PLLC

By: /s/ *Samuel A. Schwartz*
Samuel A. Schwartz, Esq.
601 East Bridger Avenue
Las Vegas, NV  89101

*Proposed Attorneys for the Debtor*

# Exhibit 1

1

2

3

4

5

6

7

8      Samuel A. Schwartz, Esq.
       Nevada Bar No. 10985
9      saschwartz@nvfirm.com
       SCHWARTZ LAW, PLLC
10     601 East Bridger Avenue
       Las Vegas, NV 89101
11     Telephone: 702.385.5544
       Facsimile: 702.442.9887
12     *Proposed Attorneys for the Debtor*

13
                      **UNITED STATES BANKRUPTCY COURT**
14                     **FOR THE DISTRICT OF NEVADA**

15     In re:                              )    Case No.: 22-14422-nmc
                                           )
16     MUSCLEPHARM CORPORATION,            )    Chapter 11
                                           )
17                                         )
                                           )
18                   Debtor.               )    Hearing Date:
                                           )    Hearing Time:
19     _____

20              **[*PROPOSED*] INTERIM ORDER PURSUANT TO EMERGENCY MOTION
          FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
21       363, AND 364 AND FED. R. BANKR. P. 4001(B) AND 4001(D): (I) AUTHORIZING
          THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) GRANTING
22            PRIMING LIENS AND ADMINISTRATIVE EXPENSE CLAIMS, (III)
                DETERMINING ADEQUATE PROTECTION, (IV) MODIFYING THE
23             AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

24            Upon the motion ( "**Motion**")[1] of MusclePharm Corporation, the chapter 11 debtor and

25     debtor in possession herein ("**MusclePharm**" or the "**Debtor**"), for entry of an interim order (the

26

27     _____
       [1]      Capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the
28     Motion.

                                           1

"**Interim Order**") and a final order (the "**Final Order**") pursuant to Sections[2] 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001, requesting the Court to, among other things,

      (i)    authorize the Debtor to obtain credit and incur debt in the form of a multiple draw secured credit facility (the "**DIP Financing**") in the aggregate commitment of up to $12,000,000, comprised of up to $2,000,000 of postpetition funding and $10,000,000 in post-petition accounts receivable and purchase order factoring subject to the terms and provisions of this Interim Order and subsequently, the Final Order;

      (ii)    approve all documents related to the DIP Financing, including, but not limited to, the ultimate loan agreement, promissory note, the collateral documents, if any, intercreditor agreements, and amendments, schedules, and exhibits to the foregoing delivered or filed pursuant to or in connection with or necessary to implement the DIP Financing, collectively, the "**Loan Documents**") by and between the Debtor and White Winston Select Asset Funds, LLC, as lender (the "**Lender**" or "**White Winston**"), and authorize the Debtor to execute and enter into the Loan Documents and to perform such other and further acts as may be required in connection with the Loan Documents;

      (iii)    as security for all obligations of the Debtor under and with respect to this Interim Order (collectively, the "**DIP Obligations**"), the Debtor's use of Cash Collateral, and the priming of the Prepetition Liens by the DIP Liens, grant (i) super-priority administrative expense claims with priority over all other administrative expenses under Section 364(c)(1) of the Bankruptcy Code, (ii) automatically perfected security interests and liens under Section 364(c)(2) and (c)(3) of the Bankruptcy Code in property of the Debtor's estate, including, without limitation, all Cash Collateral, and (iii) valid, binding, continuing, enforceable, fully perfected first priority senior priming liens upon and security interest in all of the Debtor's right, title and interest in, the Collateral;

---

[2]    Unless otherwise stated, all references to "**Section**" herein shall be to title 11 of the U.S. Code (the "**Bankruptcy Code**"); all references to a "**Bankruptcy Rule**" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to a "**Local Rule**" or "**LR**" shall refer to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Nevada.

(iv)    authorize the use of the proceeds of the DIP Financing consistent with the terms and conditions of the Loan Documents and in accordance with, and limited by, the Initial Budget;

(v)    authorize Debtor's use of the Cash Collateral;

(vi)    modify the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Loan Documents and this Interim Order;

(vii)    pursuant to Bankruptcy Rule 4001, hold a hearing (the "**Interim Hearing**") on the Motion for the Court to consider entry of the Interim Order (a) approving the Motion on an interim basis, (b) authorizing the Debtor to enter into and perform its respective obligations under the Loan Documents, and (c) granting the liens and claims provided for therein, which Interim Hearing was held on January 5, 2022, at 9:30 a.m.; and

(viii)    Waive any stay of the effectiveness of the Interim Order and provide for immediate effectiveness of the Interim Order.

Due and sufficient notice of the Motion and the Interim Hearing having been provided by the Debtor; and after considering the Motion and all pleadings and papers filed with this Court in connection with the Motion, including any objections to the Motion, and the argument of counsel at the Interim Hearing; and upon the record made by the Debtor at the Interim Hearing; and the Court having found and determined that, subject to the terms of this Interim Order, the relief sought in the Motion is in the best interests of the Debtor, its estate, creditors, and all parties in interest; and after due deliberation and consideration and good and sufficient cause appearing therefor, the Court hereby finds:[3]

A.    **Debtor's Chapter 11 Case**.  On December 15, 2022 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned case (the "**Chapter 11 Case**").  The Debtor is continuing to

---

[3]    To the extent that the Court stated findings of fact and conclusions of law on the record at the Interim Hearing, such findings and conclusions are incorporated herein by reference in accordance with Fed. R. Civ. P. 52, made applicable pursuant to Fed. R. Bankr. P. 9014.

operate its business and manage its financial affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code, and no request has been made for the appointment of a trustee or examiner.

B. **Jurisdiction; Venue**.  This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief sought herein are Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b), 6004, and 9014, and Local Rule 4001.  Venue of the Chapter 11 Case and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. **Interim Approval of the Motion**.  Based upon the Motion, all relevant pleadings filed with this Court, and the record made at the Interim Hearing, the Court granted the Motion on an interim basis and approved the Debtor's entry into and performance under the Loan Documents, authorized post-petition financing of up to $1,350,000 on an interim basis, and granted related relief.  Notice of the Interim Hearing and the relief requested in the Motion was provided by the Debtor by electronic mail, overnight courier, hand delivery or electronic delivery through the Court's CM/ECF system, on December 3, 2022, to: (i) the Office of the United States Trustee for the District of Nevada (the "**U.S. Trustee**"), (ii) the Debtor's 20 largest non-insider unsecured creditors, (iii) the Lender and counsel to the Lender, (iv) all other parties known by the Debtor to assert liens or security interests in the assets of the Debtor, and (v) all other parties entitled to notice under Bankruptcy Rule 2002 (the "**Noticed Parties**").  Under the circumstances, such notice of the Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules.

D. **Notice**.  The Final Hearing will be held pursuant to the authorization of Bankruptcy Rule 4001 and Local Rule 4001 on _____, 2023, at _____ _.m.

E. **Budget for DIP Financing**.  Attached hereto as **Exhibit A** is the 13-week cash flow forecast setting forth all projected cash receipts and cash disbursements (by line item) for a 13-week period beginning in the week commencing January 1, 2023 (the "**Budget**").  The Budget may be modified or supplemented from time to time, in accordance with the terms of the Loan

4

Documents, by additional budgets (covering any time period covered by a prior budget or covering additional time periods) prepared by the Debtor and consented to by the Lender pursuant to the Loan Documents, without subsequent notice to or order of the Court (each, an "**Approved Budget**").  The Budget is an integral part of this Interim Order and has been relied upon by the Lender in consenting to this Interim Order and to provide the DIP Financing.  The Budget includes and contains the Debtor's best estimate of all operational receipts and allows for operational disbursements, fees, costs and other expenses that will be payable, incurred and/or accrued by any of the Debtor during the period covered by the Budget to be timely paid in the ordinary course of business pursuant to, and in accordance with, the Budget.  The Budget will allow the Debtor to operate in its Chapter 11 Case and pay postpetition administrative expenses as they come due subject to the terms of this Interim Order.

F.      **Need for Funding**.  Based upon the pleadings and proceedings of record in the Chapter 11 Case, the Debtor does not have sufficient available sources of working capital and financing to carry on the operation of its business without the DIP Financing and authorized use of Cash Collateral.  As a result of the Debtor's financial condition, which deteriorated for an extended period of time prior to the Petition Date, the use of Cash Collateral alone will be insufficient to meet the Debtor's immediate postpetition liquidity needs.  The Debtor's ability to maintain business relationships with its members, suppliers and customers, pay its employees, purchase materials and provide services, and otherwise finance its operations is essential to the Debtor's continued viability.  The Debtor's ability to finance its operations and its Chapter 11 Case is essential to preserving the going concern value of the Debtor's business and ultimately maximizing the value of its estate for the benefit of all stakeholders, and approval of the DIP Financing is in the best interests of the Debtor, its estate, and its creditors.

G.      **No Credit on More Favorable Terms**.  Based upon the pleadings and proceedings of record in the Chapter 11 Case, the Debtor is unable to obtain sufficient financing from sources other than from the Lender on terms and subject to conditions more favorable than under the DIP Financing and the Loan Documents, and is not able to obtain unsecured credit allowable as an administrative expense under Sections 364(b) and 503(b)(1) of the Bankruptcy Code.  The Debtor

is also unable to obtain secured credit under Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) for the purposes set forth in the Loan Documents without granting to the Lender (i) priming first priority, valid, biding, enforceable and non-avoidable post-petition security interests and liens (collectively, the "**DIP Liens**"), senior and superior in priority to all other liens existing on the Petition Date in all of the Debtor's assets, (ii) a superpriority claim under Section 364(c)(1), (iii) automatically perfected liens under 364(c)(1), 364(c)(2), 364(c)(3) and 364(d), and (iii)  the other protections set forth in the Motion, in each case under the terms and conditions set forth in this Interim Order and the Loan Documents.

H.    **Use of Cash Collateral**.  An immediate and critical need exists for the Debtor to use the Cash Collateral (in addition to the DIP Financing) in accordance with the Budget to continue to operate its business, pay wages, maintain business relationship with members, suppliers and customers, make capital expenditures, generally conduct its business affairs so as to avoid immediate and irreparable harm to its estate and the value of its assets, and afford the Debtor adequate time to effectively reorganize.

I.    **Good Cause; Best Interests**.  The Lender has indicated a willingness to provide post-petition secured financing but solely on the terms and conditions set forth in this Interim Order, the Loan Documents, and the Budget, and as of the Interim Hearing, the Lender is prepared to advance secured financing to the Debtor in accordance with the Interim Order.  After considering all of its alternatives, the Debtor has concluded, in an exercise of its sound business judgment, that the DIP Financing provided by Lender represents the best financing presently available to the Debtor.  Based upon the pleadings and proceedings of record in the Chapter 11 Case, the terms and conditions of the DIP Financing are fair and reasonable, reflect the Debtor's exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration. Absent granting the relief sought by this Interim Order, the Debtor's business, properties and estate will be immediately and irreparably harmed.  Accordingly, good cause has been shown and that entry of this Interim Order is in the best interest of the Debtor's estate and consummation of the DIP Financing and authorization of the use of the Collateral (including the Cash Collateral) in accordance with this Interim Order, the Loan Documents, and the other Loan Documents are in the

1    best interests of the Debtor's estate and consistent with the Debtor's fiduciary duties.

2         J.    **Good Faith**.  Based upon the pleadings and proceedings of record in the Chapter 11

3    Case, (i) the DIP Financing has been negotiated in good faith and at arm's length among the Debtor

4    and the Lender, and (ii) any credit extended, loans made, and other financial accommodations

5    extended to the Debtor by the Lender have been extended, issued or made, as the case may be, in

6    "good faith" within the meaning of Section 364(e) of the Bankruptcy Code. This Court concludes

7    that good cause has been shown and that entry of this Interim Order is in the best interest of the

8    Debtor's estate, employees and creditors as its implementation will, among other things, allow for

9    the continued operation of the Debtor's businesses and enhance the Debtor's prospects for a

10   successful reorganization.

11        Based on the foregoing, and upon the record made before this Court at the Interim

12   Hearing, and good and sufficient cause appearing therefore,

13        **IT IS HEREBY ORDERED, ADJUDGED AND DECREED**:

14        1.    **Interim Approval**.  The DIP Financing is approved on an interim basis and the

15   Debtor is authorized to borrow and factor accounts receivable and purchase orders in an aggregate

16   amount up to $1,350,000 on an interim basis.

17        2.    **Approval of the Loan Documents**.  Effective upon entry of this Interim Order, the

18   Loan Documents are hereby approved and are incorporated herein by reference. The Debtor is

19   expressly authorized to execute the Loan Documents, and the Debtor is authorized, empowered,

20   and directed to perform all of its obligations under the Loan Documents and such additional

21   documents, instruments and agreements reasonably required or requested by the Lender pursuant

22   to the Loan Documents to implement the terms or effectuate the purposes of this Interim Order, as

23   applicable.  In furtherance of the foregoing and without further approval of this Court, the Debtor

24   is authorized, and the automatic stay imposed by Section 362 of the Bankruptcy Code is lifted to

25   the extent necessary, to perform all acts and to make, execute and deliver all instruments and

26   documents and to pay all reasonable fees (when applicable), that may be reasonably required or

27   necessary for the Debtor's performance of its obligations under the Loan Documents and this

28   Interim Order.

3. **Authorization to Borrow/Use of Cash Collateral**.  Pursuant to this Interim Order and subject to the terms and conditions set forth in the Loan Documents, the Debtor is immediately authorized to borrow and factor accounts receivable and purchase orders from the Lender up to an aggregate amount of $1,350,000 (the "**Advance**"), subject to and in accordance with the terms of this Interim Order and the Loan Documents and (b) Debtor is authorized to use the proceeds of the DIP Financing and the Collateral (including the Cash Collateral) in accordance with the terms of the Loan Documents, this Interim Order, and any Approved Budget.

4. **Cash Collateral**.  The cash and cash equivalents of the Debtor, whenever or wherever acquired, and the proceeds of all Collateral (defined below), constitutes the cash collateral of the Lender (the "**Cash Collateral**").  The Debtor may use the Cash Collateral to pay ordinary and necessary business and administrative expenses in accordance with, and limited by, an Approved Budget, subject to: (i) the rights of the Lender upon the occurrence of an event of default; and (ii) the rights of the Lender otherwise available to the Lender under the Bankruptcy Code.  The Debtor will not, without the prior written consent of Lender, engage in the use of the Cash Collateral of the Lender other than to pay ordinary and necessary business and administrative expenses as set forth in, and limited by, an Approved Budget.  All Cash Collateral shall be subject to the first priority priming liens on the Collateral in accordance with Section 364(d), and shall be subject to the terms of this Interim Order.

5. **Maturity and Termination**.  Debtor's authority to use the DIP Financing or any Collateral, including Cash Collateral, and the Lender's commitment to make additional advances under the DIP Financing, shall each terminate upon the earlier to occur of (a) the earlier of (x) the effective date of a plan of reorganization with respect to the Debtor or (y) the date Debtor sells or otherwise disposes of the Lender's collateral (the "**Maturity Date**"), and (b) the date five (5) days after the Lender delivers a written notice of event of default to the Debtor, and the U.S. Trustee, unless any such event is waived, cured or extended with the written consent of the Lender.

6. **Interest on DIP Financing**.  The rate of interest to be charged on advances under the DIP Financing shall be the prime rate as set in the Wall Street Journal, plus two percent (2%) and shall accrue as payment in kind except the Lender's fees and costs, which shall be paid as set

forth in the Loan Documents.

7. **Payment of DIP Fees and Expenses**. The Debtor is authorized to pay all costs, expenses and any other fees or other amounts payable under the terms of the Loan Documents and all other reasonable, documented, out-of-pocket costs and expenses of the Lender in accordance with the terms of the Loan Documents (including, without limitation, the costs and expenses of legal counsel). None of such fees, costs and expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. Copies of any invoices (in summary form and redacted, as necessary, for privileged, confidential or otherwise sensitive information) with respect to such fees, expenses and costs shall be provided upon request to the U.S. Trustee, counsel for the Debtor, and counsel to any Committee, and each such party shall have ten (10) days from the date of such notice within which to object in writing to such payment.

8. **Validity of Loan Documents**. The Loan Documents shall constitute, and are hereby deemed on a final basis to be, the legal, valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with the terms of the Loan Documents for all purposes during this Chapter 11 Case, in any subsequently converted Chapter 11 Case of the Debtor under chapter 7 of the Bankruptcy Code or after dismissal of this Chapter 11 Case. None of the validity, perfection, priority, extent or enforceability of the DIP Obligations or the DIP Liens shall be subject to any challenge by or on behalf of any Debtor or its estate, including, without limitation, an effort to equitably subordinate or avoid the DIP Liens. Proceeds of the DIP Financing and the Cash Collateral shall be applied only to fund allowed postpetition administrative expenses, the Debtor's working capital, and such other amounts as are required or permitted to be paid pursuant to the Loan Documents, this Interim Order and any other orders of this Court, all subject to, limited by, and in accordance with, an Approved Budget. No obligation, payment, transfer or grant of security under the Loan Documents or this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

9. **Superpriority Claim**. In accordance with Section 364(c)(1) of the Bankruptcy

Code, the Lender shall have superpriority administrative expense claim for the DIP Obligations under this Interim Order (the "**Superpriority Claim**") against the Debtor, with priority in payment over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, any and all administrative expenses or other claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including pursuant to Sections 105, 326, 328, 330, 331, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or otherwise, including those resulting from the conversion of this case pursuant to Section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the Superpriority Claim.  For purposes of Section 1129(a)(9)(A) of the Bankruptcy Code, the Superpriority Claim shall be considered an administrative expense allowed under Section 503(b) of the Bankruptcy Code against the Debtor, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtor.  Except as set forth in this Interim Order and the Final Order, no other superpriority claims shall be granted or allowed in this Chapter 11 Case.

10. **DIP Liens**.  As security for all DIP Obligations pursuant to this Interim Order, the Lender is hereby granted (effective upon the date of this Interim Order, without the necessity of the execution by the Debtor or the filing or recordation of liens, security agreements, lock box or control agreements, financing statements, or any other instruments or otherwise) valid, priming, binding and fully perfected, security interests in and liens (the "**DIP Liens**") upon all present and after-acquired property of the Debtor of any nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired, whether existing prior to the Petition Date or arising thereafter, and all other property of the estate within the meaning of Section 541 of the Bankruptcy Code, including, without limitation, the Cash Collateral and the Prepetition Collateral the "**Collateral**"); however, which Collateral does not include (i) the Debtor's commercial tort claims, and (ii) bankruptcy claims and causes of action arising under Sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and state law equivalents and the proceeds thereof (collectively, the "**Avoidance**

10

**Actions**"), consisting of:

> a)    First Lien on Unencumbered Property.  Pursuant to Section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior lien upon and security interest in all of the Debtor's right, title and interest in, to and under all Collateral; and

> b)    Priming Liens.  Pursuant to Section 364(d) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority priming lien upon and security interest in all of the Debtor's right, title and interest in, to and under all Collateral senior to the Lender's DIP Liens.

The DIP Liens will not be subject to challenge and the Collateral will be free and clear of other liens, claims and encumbrances.  Upon entry of this Interim Order, the DIP Liens shall be deemed to be automatically perfected as of the Petition Date, without the need for further action of any kind; provided, however, that if the Lender determines, in its sole discretion, to file any financing statements, notice of liens, mortgages or any other similar instruments, the Debtor will cooperate and assist in such filings and the automatic stay shall be lifted without the need for further order of this Court to allow such filings.

11.    **Restrictions on Granting Post-Petition Liens**.  Except as otherwise provided in this Interim Order or the Loan Documents, no claim having a priority superior or *pari passu* with those granted by this Interim Order to the Lender shall be granted or permitted without further order of this Court entered in the Chapter 11 Case, while any portion of the DIP Financing (or refinancing thereof) or any other Obligation is outstanding without the prior written consent of the Lender. Except as expressly permitted by this Interim Order and the Loan Documents, the Debtor will not, at any time during the Chapter 11 Case, grant liens or security interests in the Collateral to any other parties pursuant to Section 364 of the Bankruptcy Code or otherwise without the prior written consent of the Lender or if the grant of such liens or security interests are in satisfaction of the DIP Obligations in full.  Unless all Obligations shall have indefeasibly been paid in full in cash (or as otherwise provided in this Interim Order and the Loan Documents), it shall constitute an event of default and terminate the right of the Debtor to use the DIP Financing and Cash Collateral, if the

Debtor seeks, or if there is entered, any modification or extension of this Interim Order without the prior written consent of the Lender.

12.    **Automatic Effectiveness of Liens**.  The DIP Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtor or Lender without the necessity of execution by the Debtor, or the filing or recordation, of any financing statements, security agreements, or other documents or the taking of any other actions.  All Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the Loan Documents and this Interim Order for so long as any portion of the DIP Financing (or refinancing thereof) is outstanding.  Debtor is hereby authorized and directed to execute and deliver to the Lender such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents as the Lender requests, and the Lender is hereby authorized to file or record such documents in their respective discretion without seeking modification of the automatic stay under Section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

13.    **Automatic Stay and Remedies**.  As provided herein, subject only to the provisions of the Loan Documents, the provisions of Section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Lender, following an event of default and during the continuance of any event of default thereafter, all rights and remedies provided for in the Loan Documents and this Interim Order without further order of this Court.  Following an event of default notice by the Lender, the Debtor, and the U.S. Trustee shall be entitled to seek an emergency hearing exclusively before this Court.  This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

14.    **No Creation or Evidence of Liability to Third Parties or Alter Ego Relationship**.  The Lender shall not be found or deemed to be an alter ego of any of the Debtor, in a partnership of any kind with any of the Debtor, in a principal-agent relationship with the Debtor or otherwise liable for any liabilities of any of the Debtor, and the Debtor shall not be found or

deemed to be a mere instrumentality of the Lender as a result of the Lender deciding to advance the DIP Financing to the Debtor, negotiating and entering into the Loan Documents, and this Interim Order, administering the DIP Financing, consenting to the Budget or any future Approved Budget, or taking any other actions permitted by this Interim Order or the Loan Documents, and no such action (or conduct taken in furtherance of or comprising an integral part of any such action) shall be admissible in any proceeding as evidence that the Lender is the alter ego, partner, principal of, or otherwise liable for any liability of the Debtor.

15.    **Binding Effect**.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the Lender, the Debtor, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the Debtor's estate).  To the extent permitted by applicable law, this Interim Order shall bind any trustee hereafter appointed for the Debtor's estate, whether in this Chapter 11 Case or in the event of the conversion to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

16.    **Survival**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (a) confirming any plan of reorganization or liquidation in this Chapter 11 Case (and, to the extent not satisfied in full in cash, the DIP Obligations shall not be discharged by the entry of any such order pursuant to Section 1141(d)(4) of the Bankruptcy Code), (b) converting this case to a chapter 7 case, or (c) dismissing this case.  The terms and provisions of this Interim Order, as well as the DIP Obligations and the DIP Liens granted pursuant to this Interim Order and the Loan Documents, shall continue in full force and effect notwithstanding the entry of any such order.  The DIP Obligations and the DIP Liens shall maintain their priority as provided by this Interim Order and the Loan Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full and discharged. In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the Loan Documents without the written consent of the Lender.  Unless all DIP Obligations shall have indefeasibly been paid in full, it shall constitute an

event of default and terminate the right of the Debtor to use Cash Collateral under this Interim Order if Debtor seeks, or if there is entered, (x) any modification or extension of this Interim Order without the prior written consent of the Lender, or (y) an order converting or dismissing this case.

17. **Modifications of Loan Documents**. The Debtor and the Lender are hereby authorized to implement, in accordance with the terms of the Loan Documents, any non-material modifications of the Loan Documents without further order of this Court; *provided* that the Debtor shall provide notice of any such modifications to the U.S. Trustee.

18. **Protection Under Section 364(e)**. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the (i) validity of any DIP Obligations owing to the Lender incurred prior to the actual receipt by both Lender of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the Loan Documents with respect to any DIP Obligations. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations by the Debtor prior to the actual receipt by both Lender of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order and the other Loan Documents, and the Lender shall be entitled to all of the rights, remedies, protections and benefits granted under Section 364(e) of the Bankruptcy Code, this Interim Order, and the Loan Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations.

19. **Choice of Law; Jurisdiction; Standing**. The DIP Financing and the Loan Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of Nevada, and, to the extent applicable, the Bankruptcy Code. This Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Financing or the Loan Documents. The Lender shall have standing, as a party-in-interest under Section 1109(b) of the Bankruptcy Code, to raise and appear and be heard on any issue in the Chapter 11 Case.

20.    **Findings of Fact and Conclusions of Law**.  This Interim Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the entry thereof.  Findings of fact shall be construed as conclusions of law, and conclusions of law be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

21.    **Interim Order Effective**.    This Interim Order shall take effect immediately notwithstanding anything to the contrary prescribed by applicable law.

22.    **Failure to Specify Provisions**.  The failure specifically to include any particular provisions of the Loan in this Interim Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court, and the Debtor and the Lender, that the Loan Documents and any related Loan Documents are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Interim Order.

23.    **Final Hearing**.  The Bankruptcy Court shall hold a hearing to determine the final approval of the Loan Documents, the Budget and the relief requested by the Debtor in the Motion on _____, 2023, at _____ _.m., which hearing shall include that the relief approved in this Interim Order is approved in accordance with the Final Order.

24.    **Retention of Jurisdiction**.  The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Interim Order.

**IT IS SO ORDERED.**

Submitted by:

SCHWARTZ LAW, PLLC

By: /s/ *Samuel A. Schwartz*
Samuel A. Schwartz, Esq.
601 East Bridger Avenue
Las Vegas, NV 89101

*Proposed Attorneys for the Debtor*

## **LR 9021 CERTIFICATION**

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that:

☐    The court has waived the requirement set forth in LR 9021(b)(1).

☐    No party appeared at the hearing or filed an objection to the motion.

☐    I have delivered a copy of this proposed order to all counsel and any unrepresented parties who appeared at the hearing, except those as to whom review was waived on the record at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below:

☐    I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of this order.

###

# Exhibit 2

## DEBTOR-IN-POSSESSION FACTORING AND LOAN TERM SHEET

This debtor-in-possession factoring and loan term sheet (the "***Term Sheet***") summarizes the principal terms of the contemplated factoring and loan arrangement ("***DIP Loan***") (as defined below). This Term Sheet (a) shall be binding on the Borrower and Lender to use their respective reasonable good faith efforts to agree on and execute a DIP Loan Factoring and Financing Agreement and such other documents as may be necessary to enable completion of the DIP Loan in accordance with the terms of this Term Sheet (collectively, the "***Agreement***") and the entry of interim and final orders approving this Term Sheet; and (b) shall be subject to entry of the Interim Order and DIP Order by the "***Bankruptcy Court***" (as defined below). This Term Sheet does not include descriptions of all of the terms, conditions and other provisions that are to be contained in the Agreement and it is not intended to limit the scope of discussion or negotiation of any matters not inconsistent with the specific matters set forth herein. The terms set forth in this Term Sheet are being provided on preliminary basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of this Term Sheet. This Term Sheet is not meant to be, nor shall it be construed as an attempt to describe all of, or the specific phrasing for, the provisions of the definitive documentation; rather, it is intended only to outline certain key terms to be included in, or otherwise be consistent with, and subject to terms of the Agreement and definitive documentation acceptable to the Lender and Borrower.

| | |
|---|---|
| **Borrower:** | MusclePharm Corporation, as debtor-in-possession ("***Borrower***"), and its affiliates, including Canada MusclePharm Enterprises Corp., a British Columbia Corporation ("***MSLP Canada***" and with Borrower, the "***MSLP Entities***") |
| **Lender:** | White Winston Select Asset Funds, LLC, or its designee(s). ("***WW***" or "***Lender***"). |
| **Bankruptcy Case** | Case Number 22-14422-nmc, <u>In re MusclePharm Corporation</u>, in the United States Bankruptcy Court for the District of Nevada. |
| **Bankruptcy Court** | United States Bankruptcy Court for the District of Nevada. |
| **DIP Loan** | A postpetition loan not to exceed the principal amount of Ten Million and No/100ths Dollars ($10,000,000.00, inclusive of all amounts as factored Accounts under the factoring facility defined herein (the ***Maximum Advance***") (with the Advances, collectively the "***DIP Loan***") |

| | |
|---|---|
| **Factoring of Accounts Receivable** | Pursuant to the Agreement, Borrower will sell, transfer, convey, assign and deliver to Lender, and Lender agrees to purchase and receive from Borrower, all of Borrower's right, title and interest in and to all eligible post-petition accounts and purchase orders ("***Accounts***") arising from the sale of any product or goods or the rendering of services by Borrower in the ordinary course of the Borrower's business.<br><br>**IT IS THE INTENTION OF THE PARTIES THAT AS TO ALL ACCOUNTS THAT WW ELECTS TO PURCHASE SHALL CONSTITUTE A TRUE PURCHASE AND SALE OF ACCOUNT(S) UNDER §9-318 OF THE UNIFORM COMMERCIAL CODE AND AS SUCH, THE BORROWER SHALL HAVE NO LEGAL OR EQUITABLE INTEREST IN THE ACCOUNTS SOLD.** |
| **Advances on Accounts** | WW in its sole discretion, may advance the following: (i) up to one hundred percent (100%) of the first $1,000,000 of Accounts purchased after entry of the Interim DIP Order and before entry of the Final DIP Order, less the Immediate Advance, and (ii) up to eighty percent (80%) of the face amount of all other Accounts purchased, in each case less the applicable discount fee, Facility Fee (as defined below) and other similar charges (collectively the "***Aggregate Advances***"), and (iii) upon entry of the "Final DIP Order" (as defined below), the net principal amount of One Million, Five Hundred Thousand Dollars ($1,500,000) plus all unpaid closing costs, fees (including, without limitation, the Facility Fee), and expenses associated with the DIP Loan  (the "***Second Advance***"). The total Aggregate Advances shall be in the gross amount of Two Million Dollars ($2,000,000). The purchase price of any Account shall be the amount actually received in payment of such Account, but for the purposes of any Advance, the purchase price shall be equal to the face amount of the Account less any selling, payment or other discounts offered. |
| **Reserve** | WW, in its sole discretion, may elect to maintain a reserve from each Advance ("***Reserve***"), not to exceed twenty percent (20%) of the face amount of the Accounts purchased by WW.  As a general rule, although not a requirement, it is intended that Reserves on paid invoices are released upon the request of the Borrower or when the Lender's next purchase of Accounts from Borrower is |

| | |
|---|---|
| | funded, however WW may increase or decrease the amount of such Reserve at any time and from time to time if it deems it necessary in order to protect its interest and to protect WW from losses or potential losses that WW may reasonably anticipate might arise in the future due to contingencies, disputes, potential breach of warranties or other potential non-payments, reductions or losses from the purchase of Accounts under the Aggregate Advances, each pursuant to a borrowing base as set forth in the Agreement |
| **Conditions to Advances** | The Agreement shall provide that a condition to any Advance (other than the Initial Advance) for factored Accounts shall include the following:<br><br>a. WW would need to verify each Account with the underlying purchaser to verify it is a bona fide sale, and has verified the first $1,000,000 of purchase orders, such that if verified, Aggregate Advances are available upon or shortly after entry of the interim order.  Among other things, each Account must be an unconditional, valid and enforceable sale and obligation of the account debtor, and the amounts that are due and payable on the selling terms noted on the face of the invoice related to such Account.  This requires WW to confirm that the amount and quantity of each order, price extension, potential offsets/credits, and to verify that such buyer has no other rights to offset any prepetition debts etc. In short, WW will have to verify that these are bona fide Accounts from creditworthy, solvent customers that are required to take delivery and confirm that they will pay for the product within stated terms without offset.<br><br>b. Each Account would need to have margin that creates a reasonable profit to the Debtor determined by WW in its sole and absolute discretion to justify the DIP advance.<br><br>c. WW has confirmed with JW (producer) that JW can (and will), in fact, ship the product related to each Account in a reasonable time period not to exceed 10 days. WW would require shipping and payment arrangements that are customary and acceptable to WW and JW, and that no conditions to shipment |

DocuSign Envelope ID: 06D41EB3-5080-4151-A1E3-21B7AA98DE93

| | |
|---|---|
| | (such as labeling issues and insurance issues) exist or are at risk of imminently arising. |
| **Recourse to Borrower of Certain Accounts** | In the event that (a) an Account purchased by WW is not paid in full by the account debtor, on or before the date when due in accordance with its terms, (b) an account debtor objects to the property sold or service performed by Borrower, or rejects, revokes acceptance or fails or refuses to accept or receive any such property or services, (c) an account debtor suspends business, requests a general extension of time within which to pay debts, makes an assignment for the benefit of creditors or becomes a debtor or alleged debtor in any bankruptcy case, or if an event occurs amounting to a general business failure of an account debtor, or (d) Lender in its sole and absolute discretion determines that any Account is or may become uncollectible (collectively, a "***Worthless Account***"), the Lender may require the Borrower promptly to repurchase such Account from Lender on terms and conditions reasonably acceptable to Lender. |
| **Advances on Inventory** | Advances on Inventory in excess of the Initial Advance and the Second Advance shall be based on a formula of fifty percent (50%) of the cost of finished inventory and approved packaging materials, not to exceed the Maximum Advance.  The issuance mechanics of the advances shall be on terms mutually agreed upon by the Lender and Borrower, and in accordance with the Budget (as defined herein). |
| **Immediate Advance** | Notwithstanding the foregoing, WW shall make an immediate Advance to Borrower in the amount of Three Hundred, Fifty Thousand Dollars ($350,000.00) plus all closing costs, fees (including, without limitation, the Facility Fee), and expenses associated with the DIP Loan upon entry of the Interim DIP Order (the "***Immediate Advance***") and the execution of the Agreement. |
| **Second Advance** | Notwithstanding the foregoing, WW shall make the Second Advance to Borrower upon entry of the Final DIP Order and after the execution of the Agreement. |
| **Interest Rate on Aggregate Advances** | The prime interest rate as published in the Wall Street Journal plus two percent (2%) per annum. |

4

| Closing Fee | One percent (1%) of the Maximum Advance, that is, One Hundred Thousand and No/100ths Dollars ($100,000.00), payable at the closing of the DIP Loan. |
|---|---|
| Facility Fee | Fifty basis points (0.50%) of each Account purchased by WW, for Advances equal to $5,000,000 in the aggregate, thereafter, each Advance shall carry a Facility Fee of Two and One-Half Percent (2.5%) of each Advance, payable at the time of each such Advance. |
| Exit Fee | One Hundred and Twenty-Five Thousand Dollars ($125,000) payable immediately as an administrative expense if the DIP Loan is paid in full within six (6) months. |
| DIP Loan Disbursement Account | The Borrower shall deposit the proceeds of the DIP Loan (including all Advances) into an account of the Borrower that is subject to the control of the Borrower pursuant to a deposit account control agreement (the "***DIP Note Disbursement Account***"), and that is not subject to the control of any other Person.  Proceeds of the DIP Loan shall be deposited, held and disbursed through the DIP Note Disbursement Account or otherwise in accordance with the cash management order.<br><br>The Disbursement Account shall be in addition to, and not in lieu of, any and all accounts maintained by Lender on account of the DIP Loan or for the benefit of Borrower, including, without limitation, to hold the Reserves. |
| Budget | Except as may be permitted by the Lender in its sole and absolute discretion, the use of all proceeds of the DIP Loan (including all Advances) shall be solely in accordance with a budget, approved by the Lender, and that may be amended from time to time as requested, each as approved by the Lender in its reasonable discretion (the "***Budget***"). |

| | |
|---|---|
| **Use of Advances by Borrower** | The proceeds of the DIP Loan shall be used solely for the following purposes, subject in all cases to the Budget: |
| | (a)  to the extent Ryan Drexler has advanced a retainer to counsel for the Borrower, then the proceeds of the Immediate Advance shall be earmarked to reimburse Mr. Drexler for such advance in an amount not to exceed One Hundred, Fifty Thousand Dollars ($150,000.00), which shall increase the Immediate Advance to $500,000. |
| | (b)  pay fees, interest, payments, and expenses associated with the DIP Loan; |
| | (c)  pay principal of the DIP Loan; |
| | (d)  provide for the ongoing working capital and capital expenditure needs of the Borrower during the pendency of the Bankruptcy Case; and |
| | (e)  fund professional fees the administration of the Bankruptcy Case (including fees of the United States Trustee) and the consummation of the restructuring, ***provided, however***, that fees of the CRO retained by the Borrower shall not exceed the .sum of $50,000 per month without the prior consent of WW. |
| **Collateral** | All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Borrower, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of any of the Borrowers, including, for the avoidance of doubt, any equity or other interests in any Borrower's non-Debtor and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and tradenames and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the |

| | Final DIP Order (as defined below), including the proceeds thereof (collectively, the "**_DIP Collateral_**"). |
|---|---|
| **Priority of Liens on DIP Collateral**: | DIP Lender shall be awarded a valid, perfected, and enforceable first priority, senior lien pursuant to 11 U.S.C. §§364(c) and (d) in and to all right, title and interest in and to any property of the Borrower or its bankruptcy estate from and after the Petition Date, acquired or created at any time, excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law, which shall be senior to any and all competing interests, claims, liens and encumbrances, including, without limitation, any and all liens and security interests of record and subject to any subordination agreements, if any, between and among the Lender and holders of prepetition claims against the Borrower; |
| **Administrative Claim** | The DIP Loan shall be allowable under 11 U.S.C. §§ 364(b) and 503(b)(1) as an administrative expense. |
| **No Assumption of Liabilities** | The Lender shall not assume any liabilities or debts of Borrower. |
| **Maturity Date** | The Effective Date under a confirmed chapter 11 plan of reorganization in the Bankruptcy Case, or upon Bankruptcy Court approval of a sale or other disposition of any of the DIP Collateral to a person or entity other than the Lender. |
| **Chief Restructuring Officer** | Within thirty (30) days of entry of the Interim Order, Borrower shall obtain entry of an order by the Bankruptcy Court authorizing Borrower to retain a Chief Restructuring Officer. |
| **Borrower Board** | Upon the termination of any injunction or court order that prohibits the following, Borrower shall expand its board of directors to five (5) members (the "**_New Board_**") of which (i) two members shall be designated by Borrower who are persons other than Ryan Drexler, (ii) two members shall be designated by WW, and (iii) the members selected by Borrower and WW shall designate one (1) board member, who shall be approved by WW, with such approval not |

| | |
|---|---|
| | unreasonably withheld. WW shall have the right to appoint one (1) observer to all board matters and meetings. |
| **Chief Executive Officer of MSLP** | No later than entry of the Interim DIP Order, MSLP shall appoint, retain and compensate Eric Hillman as its Chief Executive Officer, who shall report to the Chief Restructuring Officer and the Board of Directors. |
| **Events of Default** | Customary, including the following:<br><br>• failure to pay principal or interest on the DIP Loan or any fees under the Agreement when due;<br><br>• failure of any representation or warranty of any of the Borrowers contained in the Agreement to be true and correct in all material respects when made;<br><br>• breach of any covenant, subject to a five (5) day grace period (from the earlier of the date that (i) any Borrower obtains knowledge of such breach and (ii) any Borrower receives written notice of such default from the Lender), provided that the breach of any covenant described herein, or any other covenant so indicated by the Lender, shall not be subject to any grace period;<br><br>• failure to comply with the Budget, subject to the permitted variances;<br><br>• without the Lender's written consent, which may be granted or withheld in the Lender's sole and absolute discretion, the Lender shall cease to have continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on and security interests in the DIP Collateral with the priorities described above;<br><br>• any Borrower or equity holder in any Borrower (i) contests the validity or enforceability of any document executed and delivered to effectuate the DIP Loan in writing or denying in writing that it has any further liability thereunder or (ii) |

*EXECUTION VERSION*

|  | contesting the validity or perfection of the liens and security interests securing the DIP Loan; |
|  |  |

contesting the validity or perfection of the liens and security interests securing the DIP Loan;

- any attempt by any Borrower or any equity holder thereof to invalidate or otherwise impair the DIP Loans or the liens and security interests granted to the Lender with respect to the DIP Loan;

- failure by any Debtor to comply with the Interim DIP Order or Final DIP Order, as applicable;

- the entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim DIP Order or Final DIP Order or any other order of the Bankruptcy Court approving the Debtor's use of Cash Collateral, as applicable, without the express written consent of the Lender;

- any sale or disposition, without the written consent of Lender, which consent may be granted or withheld in the Lender's sole and absolute discretion, of all or a material portion of the assets of the Borrower's bankruptcy estate;

- conversion of, or the filing of any motion by any Borrower or any equity holder thereof to convert, the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

- dismissal of, or the filing of any motion by any Borrower or equity holder thereof to dismiss, the Bankruptcy Case;

- the appointment of a Chapter 11 trustee or an examiner in the Bankruptcy Case;

- failure to retain a Chief Restructuring Officer as set forth in this Term Sheet;

- failure by the Borrower to create the New Board as set forth in this Term Sheet;

- the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to a holder or holders of any security interest

9

|  | or lien on any part of the DIP Collateral to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral without the written consent of the Lender, which consent may be granted or withheld in the Lender's sole and absolute discretion;
<br><br>• the grant of any s claim that is pari passu with or senior to those of the Borrower;
<br><br>• termination by the Bankruptcy Court of the use of Cash Collateral;
<br><br>• the filing of a plan of reorganization or liquidation in the Bankruptcy Case that does not provide for the payment in full in cash of the obligations related to the DIP Loan;
<br><br>• expiration of the period of time during which only the Borrower may file a plan pursuant to section 1121 of the Bankruptcy Code; and
<br><br>• the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any of the DIP Collateral.
<br><br>Among other remedies to be specified, upon the occurrence of an Event of Default, the Lender shall have all rights and remedies typically available to a lender upon the occurrence of an Event of Default, including, without limitation, the right to seek relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, and apply the proceeds thereof to the obligations of the Borrower or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law. |
|---|---|
| **Court Orders** | In connection with the transactions contemplated by this Term Sheet, Borrower shall file with the Courts within seven (7) days after the execution of the Agreement by each of the parties hereto, at their sole cost and expense, motions and applications for the interim order (the "*Interim DIP Order*") and the final order (the "*Final DIP Order*" and, together with the Interim DIP Order, the "*DIP Orders*") of the Bankruptcy Court authorizing the Borrower to use all cash collateral and to enter into the DIP Loan, each of which shall be in form and |

| | |
|---|---|
| | substance acceptable to the Lender, and (b) all documents executed and delivered by the parties to effectuate and implement the transactions that are the subject of this Term Sheet, as well as any orders of the Bankruptcy Court related thereto (the "**DIP Documents**"). The DIP Orders shall contain customary provisions and stipulations as reasonably required by Lender, and shall contain provisions under 11 U.S.C. §364(e) providing that Lender extended the DIP Loan in good faith, whether or not Lender knows of the pendency of any appeal. |
| **Appeal of Orders** | If entry of either or both of the DIP Orders, or any other orders of the Bankruptcy Court relating to the transactions contemplated by this Term Sheet shall be appealed or otherwise challenged by any party (including by petition for *certiorari* or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing, or reargument), the Borrower shall diligently oppose such appeal, challenge, petition, or motion and use all efforts to obtain an expedited resolution thereof. |
| **Cooperation of Borrower Upon Acceptance:** | Upon acceptance of this Term Sheet, Borrower shall cooperate as reasonably requested with Lender in all matters related to the Bankruptcy Case, subject to the Borrower's determination, in its sole and absolute discretion, that such cooperation as reasonably requested by Lender violates Borrower's fiduciary duties as debtor-in-possession in the Bankruptcy Case. |
| **WW Prepetition Claims and Interests** | All rights, claims, interests, liens and encumbrances, if any, of WW that arose prior to the commencement of the Bankruptcy Case shall not be affected by the transactions contemplated by this Term Sheet, and WW and Borrower reserve all rights and remedies related thereto. |
| **Assignment/Participation** | WW may assign, in whole or in part, or otherwise participate its interest in whole or in part to one or more participants, on terms and conditions acceptable to WW in its sole and absolute discretion. |
| **Conditions Precedent** | WW's obligation consummate the DIP Loan shall be subject to satisfaction of the following conditions: |

DocuSign Envelope ID: 05D41EB3-5080-4151-A1E3-21B77A98DE93

- The Debtor shall have prepared the Budget and its provisions shall be acceptable to WW in its sole and absolute discretion.

- The final terms and conditions of the Agreement and all related Loan Documents shall be in commercially reasonable form, as prepared by WW counsel, and acceptable to WW in its reasonable discretion.

- The Debtor shall pay all of WW's reasonable and necessary out-of-pocket costs, fees, and expenses arising out of or relating to the DIP Loan except where such costs, fees and expenses are manifestly unreasonable. For the sake of clarity, the costs, fees and expenses of WW that the Borrower is obligated to pay or reimburse include, but are not limited to: all travel, lodging, and other incidental expenses of WW personnel paid or incurred by WW as a result of the consideration and closing of the DIP Loan. In addition, the Borrower shall pay, on demand, all legal fees and expenses of WW's attorneys for services provided to WW in connection with this Term Sheet or the Agreement and any action, suit or proceeding arising from WW's dealing with the Borrower, including for the collection of amounts due to WW hereunder.

- Prior to entry of the Final DIP Order, Ryan Drexler, Prestige Capital Corporation and WW shall have entered into a binding and enforceable Intercreditor Agreement governing their respective rights with respect to any and all claims between and among them, including, without limitation, the DIP Loan. The Intercreditor Agreement shall include provisions providing that WW shall receive one-half of first proceeds received by Mr. Drexler (or his designee(s) and assignee(s)) on account of any claims against MSLP and such other subordination and intercreditor provisions (including with respect to the liens and claims asserted by Prestige Capital Corporation) as are customary and reasonably acceptable to WW.

DocuSign Envelope ID: 05D41EB2-5090-4154-A1E3-21B7AA98DE93

ACCEPTED AND AGREED TO:

WHITE WINSTON SELECT ASSET
FUNDS, LLC


BY: TODD M. ENRIGHT
ITS:

DATED: January 2, 2023


ACCEPTED AND AGREED TO:

MUSCLEPHARM CORPORATION


BY: GARY SHIRSHAC
ITS

DATED: January 2, 2023

ACCEPTED AND AGREED TO:

CANADA MUSCLEPHARM
ENTERPRISES CORP.,


BY:
ITS:

DATED: January 2, 2023

13

# Exhibit 3

*MusclePharm*
*Thirteen-Week Cash Flow Forecast*
*1/3/2023*

CONFIDENTIAL – SUBJECT TO NDA
DRAFT - SUBJECT TO MATERIAL CHANGE
SUBJECT TO FRE 408 AND STATE LAW ANALOGUES

| Week Ending | 1/1/2023 | 1/8/2023 | 1/15/2023 | 1/22/2023 | 1/29/2023 | 2/5/2023 | 2/12/2023 | 2/19/2023 | 2/26/2023 | 3/5/2023 | 3/12/2023 | 3/19/2023 | 3/26/2023 | 13-Week Total |
| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Factored Receipts[1] | - | 440,637 | 519,598 | 355,639 | 340,416 | 122,343 | 52,560 | - | 8,640 | 343,860 | 85,104 | - | - | 2,268,797 |
| | | | | | | | | | | | | | | |
| Total COGS[2] | - | 692,298 | 385,673 | 340,968 | 355,207 | - | - | - | - | - | - | - | - | 1,774,146 |
| | | | | | | | | | | | | | | |
| **SG&A** | | | | | | | | | | | | | | |
| Payroll & Benefits[3] | 5,650 | 66,935 | 15,000 | - | 71,960 | 15,625 | 66,310 | - | 71,960 | 15,625 | 66,310 | - | 15,625 | 411,000 |
| Europa - Shipping[4] | - | - | - | - | 100,000 | - | - | - | 100,000 | - | - | - | - | 200,000 |
| Insurance[5] | 39,600 | 10,000 | - | 39,600 | - | 10,000 | - | - | 39,600 | 10,000 | - | - | 10,000 | 158,800 |
| Securities Counsel[6] | 25,000 | - | - | - | - | 50,000 | - | - | - | 50,000 | - | - | - | 125,000 |
| Labeling Costs[7] | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 97,500 |
| General & Administrative[8] | 2,500 | 8,000 | 7,200 | 2,500 | 2,500 | 5,500 | 4,500 | 2,500 | 2,500 | 5,500 | 4,500 | 2,500 | 2,500 | 52,700 |
| Board Fees[9] | - | 12,500 | - | - | - | 12,500 | - | - | - | 12,500 | - | - | 12,500 | 50,000 |
| eCommerce[10] | - | 10,126 | - | - | - | 10,126 | - | - | - | 10,126 | - | - | 10,126 | 40,504 |
| Marketing[11] | - | 10,000 | - | - | - | 10,000 | - | - | - | 10,000 | - | - | 10,000 | 40,000 |
| Avalara[12] | - | 1,115 | - | - | - | 1,115 | - | - | - | 1,115 | - | 11,747 | 1,115 | 16,208 |
| **Total SG&A[13]** | 80,250 | 126,176 | 29,700 | 49,600 | 181,960 | 122,366 | 78,310 | 10,000 | 221,560 | 122,366 | 78,310 | 21,747 | 69,366 | 1,191,712 |
| **Net Operating Cash Flow** | (80,250) | (377,837) | 104,225 | (34,928) | (196,751) | (24) | (25,750) | (10,000) | (212,920) | 221,494 | 6,794 | (21,747) | (69,366) | (697,061) |
| **Cumulative Net Operating Cash Flow** | (80,250) | (458,087) | (353,862) | (388,790) | (585,542) | (585,565) | (611,315) | (621,315) | (834,235) | (612,742) | (605,948) | (627,695) | (697,061) | (697,061) |
| | | | | | | | | | | | | | | |
| **Restructuring Costs** | | | | | | | | | | | | | | |
| *Professional Fees* | | | | | | | | | | | | | | |
| Schwartz Law | - | 150,000 | - | - | - | - | - | - | 200,000 | - | - | - | 120,000 | 470,000 |
| Portage Point[14] | - | 75,000 | - | - | - | - | - | - | 100,000 | - | - | - | 60,000 | 235,000 |
| Claims Agent | - | - | - | - | - | - | - | - | 16,000 | - | - | - | 16,000 | 32,000 |
| Creditor Counsel[15] | - | - | - | - | - | - | - | - | 40,000 | - | - | - | 40,000 | 80,000 |
| Creditor Financial Advisor[15] | - | - | - | - | - | - | - | - | 20,000 | - | - | - | 20,000 | 40,000 |
| Restructuring Board Fees[16] | | | | | | | | | | | | | | |
| **Total Professional Fees[17]** | - | 225,000 | - | - | - | - | - | - | 376,000 | - | - | - | 256,000 | 857,000 |
| *Other Restructuring Costs* | | | | | | | | | | | | | | |
| Filing Fees | | | | | | | | | | | | | | |
| Trustee Fees[18] | - | - | - | - | 321 | - | - | - | - | - | - | - | - | 321 |
| Critical Vendors | | | | | | | | | | | | | | |
| Utilities Adequate Assurance | | | | | | | | | | | | | | |
| **Total Restructuring Costs** | - | 225,000 | - | - | 321 | - | - | - | 376,000 | - | - | - | 256,000 | 857,321 |
| **Net Cash Flow after Restructuring Costs** | (80,250) | (602,837) | 104,225 | (34,928) | (197,072) | (24) | (25,750) | (10,000) | (588,920) | 221,494 | 6,794 | (21,747) | (325,366) | (1,554,382) |
| **Cumulative Net Cash Flow after Restructuring Costs** | (80,250) | (683,087) | (578,862) | (613,790) | (810,863) | (810,886) | (836,636) | (846,636) | (1,435,556) | (1,214,063) | (1,207,269) | (1,229,016) | (1,554,382) | (1,554,382) |
| | | | | | | | | | | | | | | |
| **Financing[19]** | | | | | | | | | | | | | | |
| DIP Lender Advance | - | 500,000 | - | - | - | - | 1,500,000 | - | - | - | - | - | - | 2,000,000 |
| **Total Cash Flow** | (80,250) | (102,837) | 104,225 | (34,928) | (197,072) | (24) | 1,474,250 | (10,000) | (588,920) | 221,494 | 6,794 | (21,747) | (325,366) | 445,618 |
| **Cumulative Total Cash Flow** | (80,250) | (183,087) | (78,862) | (113,790) | (310,863) | (310,886) | 1,163,364 | 1,153,364 | 564,444 | 785,937 | 792,731 | 770,984 | 445,618 | 445,618 |
| Starting Cash | - | (80,250) | (183,087) | (78,862) | (113,790) | (310,863) | (310,886) | 1,163,364 | 1,153,364 | 564,444 | 785,937 | 792,731 | 770,984 | - |
| Change in Cash | (80,250) | (102,837) | 104,225 | (34,928) | (197,072) | (24) | 1,474,250 | (10,000) | (588,920) | 221,494 | 6,794 | (21,747) | (325,366) | 445,618 |
| Ending Cash | (80,250) | (183,087) | (78,862) | (113,790) | (310,863) | (310,886) | 1,163,364 | 1,153,364 | 564,444 | 785,937 | 792,731 | 770,984 | 445,618 | 445,618 |

NOTE: Figures shown represent latest estimates and information provided by the Company

1. Assumes first $1 million of accounts purchased are advanced at 100% with remaining advanced at 80% upon generation of the receivable and the remaining 20% when collected. For the avoidance of doubt, the first $1 million of purchase order monetization event is forecasted as $500k in DIP Lender Advances and $500k Factored Receipts in Week 2. Upon collection of the $1 million in receivables, the company will receive the balance of the Factored Receipts that were reduced for the DIP Lender Advances. The end result is the company will have received an outstanding $500k of DIP Lender Advances and $1 million of cash for its factored purchase orders. Assumes no reserve put in place by DIP lender. No delays from labeling issues or lack of GL insurance contemplated
2. COGs assumed to be paid out in same week shipment is made per Company estimates and in line with existing JW Nutritional 48 hour terms
3. Inclusive of payroll funding and associated costs, 401k contributions and health insurance
4. Estimate provided by management for outgoing freight spend based on previous provider
5. Includes D&O and GL insurance payments under D&O policy is still under review to determine if it is satisfactory for coverage of proposed CRO and reconstituted board which may require purchase of additional coverage. GL policy currently in process of being quoted, which may require an additional upfront payment
6. Estimated ordinary course securities counsel expenditures for SEC related requirements
7. Per management, estimate of $7,500 per month for labeling costs factoring in arrangement made with provider
8. Estimate included for general operating expenses
9. Payment for existing board fees
10. Includes Nova, Shopify and Hubmatrix, all of which are service providers supporting eCommerce capabilities
11. Marketing spend included to support eCommerce and online order efforts for non-wholesale customers
12. Avalara provides sales tax tracking, reporting and payment support. Estimates include monthly filing fees and estimated taxes
13. Forecast excludes audit, tax and SEC filing fees that may be required and are assumed to be paid outside of the forecast period, if necessary
14. Amount proposed per term sheet and shown for illustrative purposes, does not constitute agreed upon and contracted fee structure between Portage Point Partners and Company
15. Placeholder for secured lender and UCC fees, as necessary
16. Currently assumes no incremental board fees required for independent directors or special committees
17. Unless otherwise noted, based on estimates provided by professionals or based on experience in prior restructuring scenarios
18. Based on total forecasted disbursements and applies the latest US Trustee fee rates
19. Advances, interest and financing costs all based on latest term sheet received from potential DIP lender. Interest, financing fee, closing cost and DIP Lender counsel assumed to be PIK'd against loan balance