Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Proposed Attorneys for the Debtor*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re: <br><br> MUSCLEPHARM CORPORATION, <br><br> Debtor. | Case No.: 22-14422-NMC <br><br> Chapter 11 |

**OMNIBUS DECLARATION OF GARY SHIRSHAC IN SUPPORT OF DEBTOR'S EMERGENCY PETITION, FIRST DAY MOTIONS AND RELATED RELIEF**

I, GARY SHIRSHAC, hereby declare as follows:

1. I am over the age of 18 and mentally competent.

2. I am the Chief Financial Officer of MUSCLEPHARM CORPORATION, a Nevada limited liability company ("**Debtor**" or "**MusclePharm**"). In this capacity, I am familiar with the Debtor's daily business, operational, and financial affairs. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtor's management and the Debtor's business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

3. I make this declaration in support of the Debtor's voluntary Emergency Chapter 11 petition (the "**Petition**") and the following motions (collectively, the "**First Day Motions**"):[1]

---

[1] Unless otherwise indicated, all chapter and section references are to the Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"). All references to a "**Chapter**" or "**Section**" shall be to the Bankruptcy Code. "**Bankruptcy Rule**" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. "**Local Rule**" or "**LR**" references are to the Local Rules of

      a. Debtor's Motion For An Order Authorizing Maintenance Of Existing Bank Accounts, Merchant Processing Accounts, And Related Relief (the "**Bank Accounts Motion**");

      b. Motion For Entry Of An Order (I) Authorizing, But Not Directing, Debtor To Pay, Inter Alia, Prepetition Employee Wages And (II) Granting Related Relief (the "**Wage Motion**"); and

      c. Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing Debtor to Obtain Post-Petition Financing. (II) Granting Priming Liens and Administrative Expense Claims, (III) Authorizing the Debtor's Use of Cash Collateral, and (V) Granting Related Relief (the "**DIP Financing Motion**").

4. I also submit this declaration in support of the following motions which will be heard on regular notice:

      a. Debtor's Application for Entry of an Order Under 11 U.S.C. §§ 327(a), 328, 329 and 331 and Fed. R. Bankr. P. 2014 and 2016 Authorizing the Employment and Retention of Schwartz Law, PLLC as Attorneys for the Debtor-in-Possession (the "**Schwartz Law Application**").

      b. Debtor's Application for Entry of an Order: (I) Authorizing Debtor to Employ and Retain Portage Point Partners, LLC to provide Debtor with a Chief Restructuring Officer and Other Financing Advisory and Management Services Pursuant to 11 U.S.C. § 363(b); (II) Authorizing Debtor to Designate Jeff Gasbarra as Chief Restructuring Officer; and (III) Granting Related Relief (the "**PPP Retention Application**").

      c. Debtor's Motion for an Order Granting the Debtor Additional Time Within Which to File Schedules and Statements (the "**Extension Motion**").

Bankruptcy Practice of the United States Bankruptcy Court for the District of Nevada.

5. The Debtor filed its voluntary emergency petition for relief under Chapter 11 of the Bankruptcy Code on December 15, 2022 (the "**Petition Date**"), thereby commencing Case No. 22-14422-NMC (the "**Chapter 11 Case**").

6. The Debtor continues to operate as a debtor-in-possession in accordance with the Bankruptcy Code.

## BACKGROUND

### A. Background of the Debtor's Business.

7. The Debtor was formed in 2008 by Cory Gregory and Bradley Pyatt, and is a scientifically-driven, performance lifestyle company that develops, markets and distributes a range of branded sports nutrition products in 120 countries around the world.

8. The Debtor is a public company and currently has over a dozen employees, and relationships with dozens of co-manufacturers.

9. In or around September 2022, I was retained as the Debtor's Chief Financial Officer.

### B. Financing History.

10. In order to finance the Debtor's purchase of inventory and business operations, the Debtor entered into several prepetition financing arrangements between 2015 and 2022 with five (5) different lenders, summarized as follows:[2]

    a. Crown Equipment Corporation Lease.

11. On December 29, 2015, the Debtor entered into a leasing agreement with Crown Equipment Corporation, f/k/a Crown Credit Company ("**Crown Equipment**"), for the lease of certain equipment (the "**Equipment**") used in the Debtor's business.

12. On December 29, 2015, Crown Equipment filed a UCC-1 financing statement with the Nevada Secretary of State (the "**Filing Office**") encumbering the Equipment and all proceeds therefrom.

    b. Prestige Capital Loan.

---

[2] At this time, the Debtor and its counsel have not had the opportunity to review the adequacy and perfection of all purportedly loans and security interests against the Debtor, and therefore, reserve the right to review and if necessary, object to the same.

3

13. On December 31, 2015, Prestige Capital Financing, LLC, as successor by merger to Prestige Capital Corporation ("**Prestige Capital**") entered into a revolving factoring agreement with the Debtor in the initial amount of $2 million (the "**Prestige Loan**"), whereby Prestige Capital would extend credit to the Debtor through the purchase and sale of the Debtor's receivables.

14. The Debtor and Prestige Capital have done business together for nearly 7 years through the factoring of the Debtor's receivables.

15. On December 31, 2015, Prestige Capital filed a UCC-1 financing statement with the Filing Office, encumbering all assets of the Debtor.

    c.    Ryan Drexler Loan.

16. On October 13, 2021, Ryan Drexler made a loan to the Debtor (the "**Drexler Loan**").

17. On October 13, 2021, a UCC-1 financing statement was filed in connection with the Drexler Loan with the Filing Office, encumbering all assets of the Debtor.

    d.    Empery Tax Efficient, LP Loan.

18. On October 14, 2021, Empery Tax Efficient, LP ("**Empery**") entered into a loan agreement with the Debtor, whereby the Debtor sold $8,197,674.42 in principal amount of 14% original issue discount senior secured notes, resulting in gross proceeds to the Debtor in the amount of $7,050,000, exclusive of placement agent commission and fees and other offering expenses, and on June 3, 2022, the Debtor sold $3,081,875 in principal amount of 20% original issue discount senior secured notes, resulting in gross proceeds to the Debtor of $2,465,500, exclusive of placement agent fees and other offering expenses (collectively, the "**Empery Loan**").

19. On October 14, 2021, Empery filed a UCC-1 financing statement with the Filing Office, encumbering all assets of the Debtor.

20. On October 13, 2021, Empery also entered into separate intercreditor agreements with Prestige Capital and Ryan Drexler, thereby, among other things, establishing lien priority amongst such parties with respect to the Empery Loan.

**C.**     **Events Leading to Bankruptcy**

    a.    Prices of Protein Rise.

21. The Debtor's main products, branded sports nutrition products and nutritional supplements (collectively, the "**Products**"), are largely based on protein. As a result, the price of protein largely drives the Debtor's profit margins.

22. For years, the average price of protein remained around $2.50/pound and the Debtor was able to enjoy years of high revenue and profit based on such price. Coming out of the pandemic, however, the price of protein more than doubled to approximately $5.50/pound. As a result, the Debtor's profit margins were compressed, the Debtor sought additional financing for its business in the form of the Empery Loan.

      b.    Potential Financial Restatement.

23. On April 5, 2021, the Debtor named Sabina Rizvi ("**Rizvi**") as chief financial officer and President.

24. On July 6, 2022, Rizvi notified the Debtor's Board that she would be resigning as President and CFO, effective July 22, 2022, but acknowledged that her resignation was not based on "Good Reason" as that term is defined in the Empery Loan documents.

25. In the course of preparing its quarterly report for the second quarter of 2022 (i.e., the quarter ended June 30, 2022), the Debtor discovered that it had not timely approved or recorded certain customer credit memos during Rizvi's tenure. As a result, the Debtor concluded that revenue was potentially overstated by $600,000 to $1 million for the year ended December 31, 2021.

26. On August 22, 2022, the Debtor issued a Form 8-K stating that the Board determined that the Debtor's financial statements for 2021 and the first quarter of 2022 should no longer be relied on due to the credit memo issue, and that the Debtor intended to restate those financial statements.

27. The Debtor has disputed the customer credit memo out of which the alleged accounting error arises, and believes that the credit will be reversed, and that no restatement will be necessary.

      c.    Empery's Alleged Non-Monetary Breaches.

28. Beginning in August 2022 and continuing up to the Petition Date, Empery sent a series of letters to the Debtor in which it purported to allege a number of technical, non-monetary events of default under the Empery Loan, including, but not limited to, Rivzi's resignation from the Board as being for "Good Reason" and the aforementioned financial reporting issue.

29. The Debtor disputed these defaults, and Empery continued to assert them. On October 3, 2022, Empery issued an Access Termination Notice to the Debtor's bank, Wells Fargo, N.A., forcing Wells Fargo to remit all funds in the Debtor's account to Empery, under the Deposit Account Control Agreement between the parties.

30. On October 18, 2022, Empery sent the Debtor a Notification of Disposition of Collateral, pursuant to which Empery stated its intention to sell the collateral for the Empery Loan through a public auction under Article 9 of the Uniform Commercial Code (the "**UCC**") on November 1, 2022 (the "**Initial Sale Notice**").

31. The Access Termination Notice and the Initial Sale Notice caused tremendous harm to the Debtor as Prestige Capital did not factor any more receivables after learning of the Initial Sale Notice, which deprived the Debtor of much needed cash to fulfill product orders. As a result, the Debtor's cash and revenue stream came to a halt.

32. The Debtor and Empery negotiated for a resolution of the issues at hand, whereby I personally offered to give collateral to Empery in exchange for Empery's forbearance from pursuing remedies for twelve (12) months.

33. Unfortunately, even after the parties negotiated a binding term sheet, Empery decided it would not enter into a forbearance agreement with the Debtor and on November 22, 2022, issued a second Notification of Disposition of Collateral (the "**Second Sale Notice**"), whereby Empery would sell its collateral at public auction on December 15, 2022, at 1:00 p.m. PST.

34. Upon the issuance of the Second Sale Notice, the Debtor turned to some of its other investors – including White Winston Select Asset Funds, LLC ("**White Winston**"), a private equity firm based on Boston, Massachusetts – for support.

35. On December 5, 2022, the Debtor entered into a settlement agreement (the "**WW Settlement Agreement**") with White Winston, which, among other things, Mr. Drexler agreed to step down as CEO and as a director on the Debtor's Board – two things Empery had indicated it needed before any forbearance could occur.

36. Thereafter, White Winston, Empery and the Debtor negotiated and even drafted documentation to implement the board governance changes. Unfortunately, however, on December 13, 2022, Empery communicated to White Winston and the Debtor that it believed the WW Settlement Agreement was supposedly created to "delay, hinder and defraud" Empery, and that Empery would be moving forward with its UCC Article 9 sale on December 15, 2022.

37. The parties then filed competing temporary restraining orders in New York Superior Court – the Debtor and White Winston seeking to enjoin Empery's UCC Article 9 sale, and Empery seeking to enjoin the actions contemplated by the WW Settlement Agreement.

38. A hearing was held on both TRO requests on the morning of December 15, 2022, whereby the New York Superior Court denied the Debtor's and White Winston's TRO motion, and granted Empery's TRO motion.

39. Thereafter, and before the UCC Article 9 sale and auction of the Debtor's assets, the Debtor filed its voluntary petition before this Court on December 15, 2022, at 1:03 p.m. PST.

## FIRST DAY MOTIONS

A. **Bank Accounts Motion**

40. The Debtor filed the Bank Accounts Motion seeking authorization to maintain its prepetition Bank Accounts (defined below) to avoid immediate and irreparable harm to the Debtor's estates that would ensue if the Debtor's banking procedures were to be disrupted during this Chapter 11 Case.

41. As of the Petition Date, the Debtor holds the following bank accounts (the "**Bank Accounts**") at Wells Fargo Bank, N.A. and JP Morgan Chase Bank, N.A.:

| Account Holder: | Bank Name and Address: | Account No. | Type: |
|---|---|---|---|

| MusclePharm Corporation | JPMorgan Chase Bank, N.A. PO Box 182051 Columbus, OH 43218 - 2051 | *****1512 | Commercial Money Market |
|---|---|---|---|
| MusclePharm Corporation | Wells Fargo Bank, N.A. (182) PO Box 63020 San Francisco, CA 94163 | *****4320 | Operating |
| MusclePharm Corporation | Wells Fargo Bank, N.A. (182) PO Box 63020 San Francisco, CA 94163 | *****4338 | AP |
| MusclePharm Corporation | Wells Fargo Bank, N.A. (182) PO Box 63020 San Francisco, CA 94163 | *****4353 | Payroll |
| MusclePharm Corporation | Wells Fargo Bank, N.A. (182) PO Box 63020 San Francisco, CA 94163 | *****4361 | Factoring |

42. The Debtor routinely deposits, withdraw, and otherwise transfer funds to and from the Bank Accounts and manage all of its cash receipts and disbursements through the Bank Accounts.

43. Revenue from Debtor's ongoing business operations is deposited into Debtor's checking accounts and generally used to pay the costs of operating and maintaining its business facility and operations as well as other ordinary business expenses.

44. The Debtor seeks authorization to continue using its Bank Accounts and cash management system, which enables the Debtor to centrally control its funds, ensure the availability of funds when necessary to maintain and operate the daily business operations, and conduct its operations efficiently and effectively.

45. Continued use of the Debtor's Bank Accounts and cash management system is essential to the Debtor's continued operations and the administration of this Chapter 11 Case. Requiring the Debtor to open new accounts or implement a new cash management system would complicate its collection of revenue and payment of ordinary course expenses arising after the Petition Date, which would needlessly increasing operating costs.

46. The Debtor believes that any funds deposited into the Bank Accounts are secure, as JPMorgan Chase Bank, N.A. and Wells Fargo Bank, N.A. are both authorized depositories in compliance with Section 345 of the Bankruptcy Code and the Debtor's deposits are federally insured by the FDIC to the same extent it would be in any other authorized depository.

**B.    Employee Wage Motion**

47. The Debtor filed the Employee Wage Motion seeking authorization to pay employee wage claims, employee expense obligations, employee-related taxes, workers' compensation obligations and employee benefits obligations, as well as authorization directing all banks to honor prepetition checks and automatic transfers for payment of the aforementioned employee obligations.

48. As of the Petition Date, Debtor employs a number of individuals to carry out its day-to-day business operations. Debtor's employees rely, almost exclusively, on its wages and salaries provided by Debtor for services rendered on behalf of Debtor to satisfy its daily living expenses. Consequently, Debtor's employees will be exposed to significant financial hardship if Debtor is not permitted to honor its prepetition employee obligations.

49. Furthermore, the Debtor's employees provide Debtor with the services necessary to conduct the Debtor's business. Should Debtor be unable to honor its prepetition employee obligations, it could experience significant turnover and instability and subsequently cause Debtor's business to cease operations and forego revenue.

50. Finally, the Debtor believes that a significant portion of the Debtor's business value is directly tied to the intellectual capital the employees bring to Debtor's business—an intangible asset that cannot be replaced by hiring new employees.

51. As the Debtor was not able to finalize its debtor-in-possession financing terms and request approval for the same from the Court prior to December 21, 2022, Ryan Drexler advanced funds on December 21, 2022, to cover the payroll due on December 23, 2022, in the amount of $53,372.61. I understand the Debtor will request authority to repay this amount out of any debtor-in-possession financing approved by this Court.

**C.     DIP Financing Motion.**

52.     The Debtor filed the DIP Financing Motion seeking authorization to obtain DIP Financing and use cash collateral on an interim basis pursuant to the terms set forth in the proposed interim order in **Exhibit 1** to Debtor's Motion.

53.     Debtor's business involves the production and distribution of its Products to its consumers. As part of the cost of doing business and maintaining operations, Debtor incurs certain avoidable costs.

54.     The Debtor needs immediate access to financing and cash collateral to preserve the Debtor's assets during the pendency of this Chapter 11 Case and requires the financing and the use of cash collateral in the daily operations of Debtor's business and pay on the ongoing Chapter 11 administrative expenses of this case, which will necessarily allow Debtor to avoid immediate and irreparable harm to the estate and for the protection of its creditors.

55.     As such, in the absence of the Debtor obtaining the financing described in the DIP Financing Motion, the Debtor will be forced to cease operations, and the Debtor's estate would suffer immediate and irreparable harm. The preservation, maintenance, and enhancement of the value of the Debtor's estate are of the utmost significance to and importance to any successful restructuring of the Debtor's assets.

56.     In order to continue operations during the interim period, the Debtor must be able to satisfy ongoing working capital needs and expenses of operation, including employee payroll expenses, and fund the costs of administering its estate, including fees assessed by the Office of the United States Trustee and the Clerk of Court and fees and expenses of estate professionals. As set forth in the Budget, the Debtor projects an operational shortfall of $1,784,672 through March 26, 2023. The Debtor also requires access to sufficient working capital to account for disruptions and delays in the collection of receivables that may follow from the commencement of the Chapter 11 Case, and to provide vendors with assurance of payment for goods and services provided on a post-petition basis in order to induce vendors to provide critically-needed goods and services.

57.     To pay critical operating expenses, cushion the impact of temporary disruptions in the collection of receivables, and to provide vendors the assurances needed to continue providing

goods and services to the Debtor, the Debtor has determined that the DIP Financing is necessary through the Lender.

58. Absent immediate access to such funds, the Debtor's operations and value of its estate will be detrimentally impacted because, among other things, it will be unable to pay ongoing operating expenses and critical vendors may refuse to provide necessary goods and services. Accordingly, timely approval of the Interim Order is critical to preserving the value of the Debtor's estate.

59. While the Debtor has negotiated extensively with its existing lenders for financing on terms more favorable than the DIP Financing prior to and after the Petition Date, no financing is available from other sources on more favorable terms. Given its precarious financial condition, lack of liquidity, and capital structure, the Debtor cannot obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtor and its estate that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtor and it's estate that is subject to a lien.

60. Further, financing from the Lender on a post-petition basis is not otherwise available without granting the Lender a superpriority claim under Section 364(c)(1), valid, binding, enforceable, and perfected security interests in and liens on all of the Debtor's existing and after-acquired assets not subject to Existing Liens under Section 364(c)(2), junior liens on assets which are subject to any Existing Liens under Section 363(c)(3), a senior priming lien on all Collateral that is subject to the Prepetition Liens securing the Prepetition Obligations pursuant to Section 364(d), and the other protections set forth in the Loan Agreement, and a determination in the Final Order, regarding the validity, priority, and enforceability of the Prepetition Liens and Prepetition Obligations. The Loan Agreement was negotiated in good faith between the Debtor and the Lender, and advances under the Loan Agreement and Interim and Final Orders will be made in good faith, such that the Lender should be entitled to the protections and benefits Section 364(e) of the Bankruptcy Code.

61. Furthermore, the Debtor cannot meet its ongoing post-position obligations without the immediate ability to use Cash Collateral, which consists of cash and cash equivalents, deposit accounts, and the cash generated or received by the Debtor from and after the Petition Date, all of which are subject to prepetition liens. Absent the Debtor's ability to immediately use the Cash Collateral to pay the expenses of operations, immediate and irreparable harm will result to the Debtor, its estate, and its creditors, rendering an effective and orderly reorganization of Debtor's business impossible.

62. In short, the ability of the Debtor to finance its operations and preserve and maintain the value of its assets requires the availability of working capital under the terms of the Loan Agreement. In the absence of the financing, the Debtor would likely have to cease operations, resulting in immediate and irreparable harm to the Debtor and its bankruptcy estate.

## EMPLOYMENT APPLICATIONS AND RELATED RELIEF

### A. Schwartz Law, PLLC Employment Application

63. The Debtor seeks Court approval of the employment and retention of Schwartz Law, PLLC ("**SL**") as its attorneys in the Chapter 11 Case under the terms and conditions of the letter agreement dated December 15, 2022.

64. The Debtor selected SL as its attorneys because of the firm's experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code. SL's attorneys have served as counsel for debtors or significant creditors in many of the largest and most complex bankruptcy cases filed in this District during the last 15 years. Moreover, SL has extensive knowledge of the Debtor's business and financial affairs as a result of its representation of the Debtor prior to the commencement of this Chapter 11 Case. Accordingly, the Debtor believes SL is well qualified to provide the legal services that will be required in connection with the Chapter 11 Case.

65. To the best of the Debtor's knowledge, based on the Debtor's disclosure of its equity security holders, officers, directors, affiliates, creditors, customers, and other parties in interest, the attorneys of SL: (a) do not have any present or prior connection with the Debtor, its affiliates, its creditors, any person employed in the Office of the UST, or any other party in interest, or its

respective attorneys and accountants; (b) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code; and (c) do not hold or represent any interest adverse to the Estate.

66. Neither SL nor any attorney at the firm is or was a creditor, an equity holder or an insider of the Debtor.

67. Neither SL nor any attorney at the firm is or was, within two (2) years before the Petition Date, a director, officer, or employee of the Debtor.

68. Neither SL nor any attorney at the firm has an interest materially adverse to the interest of the Estates or of any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in the Debtor or for any other reason.

69. Debtor understands that SL hereafter intends to apply to the Court for allowances of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including, but not limited to Sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Guidelines for Professional Compensation established by the Office of the United States Trustee, and further orders of this Court, for all services performed and expenses incurred after the Petition Date. It is contemplated that SL may seek interim compensation during this case as permitted by Section 331 of the Bankruptcy Code and Bankruptcy Rule 2016.

B. **PPP Retention Application.**

70. The Debtor filed its CRO Retention Application seeking entry of an order: (i) Authorizing Debtor To Employ And Retain Portage Point Partners, LLC ("**Portage Point**") To Provide Debtor With A Chief Restructuring Officer And Other Financial Advisory And Management Services Pursuant To 11 U.S.C. § 363(b); (ii) Authorizing Debtor To Designate Jeffrey Gasbarra ("**Gasbarra**") As Chief Restructuring Officer; And (iii) Granting Related Relief.

71. Debtor has determined it requires the services of a CRO and Debtor and the CRO require financial advisory and management services. The Debtor now seeks the retention of PPP to provide financial advisory and management services. Gasbarra and Portage Point have extensive experience in providing financial advisory and management in restructuring matters. Gasbarra and

Portage Point are also well-versed in Chapter 11 proceedings and have extensive experience in bankruptcy restructurings. Gasbarra has agreed to serve as the CRO of the Debtor. Portage Point has agreed to provide financial advisory and management services to the Debtor and Gasbarra—as the CRO—pursuant to the terms set forth in the CRO Retention Application.

72. Debtor has determined that it is in its best interest—as well as the creditors and all other parties in interest—to: (a) employ Gasbarra as the CRO; and (b) retain Portage Point as an advisor to the CRO and the Debtor's management. These services are necessary and essential to Debtors' restructuring efforts, and the Debtors' employment of Portage Point and the appointment of Mr. Gasbarra as CRO are based on a sound exercise of business judgment.

73. In addition to the specific knowledge the restructuring professionals have acquired regarding Debtors' business, Portage Point also has extensive experience providing financial and management services to distressed companies in similar circumstances. Debtor submits that commencing after the Petition Date, Portage Point and Gasbarra have devoted substantial time to dealing with various exigent matters that arose following the commencement of these cases. The services Portage Point provided were necessary to the efficient and effective administration of this case and benefited the estate.

C. **Motion to Extend Time to File Schedules and Statements.**

74. On December 15, 2022, the Debtor filed its Chapter 11 Case. Due to the emergency nature of the filing, the Debtor's petition provided limited pertinent information necessary to file. Since the Petition Date, the Debtor has been diligently working to stabilize the business, file first day motions and negotiate with lenders and creditors regarding debtor-in-possession financing and use of cash collateral. As such, the Debtor has not been able to compile all the pertinent documents and financial information necessary to complete the Debtor's schedules and statements. The Debtor's professionals are working diligently to finalize the schedules and statements.

75. Due to the emergency nature of the case, the fourteen (14) day automatic extension of time to file the schedules and statements under Bankruptcy Rule 1007(c) is simply insufficient for completion of the schedules and statements. Therefore, the Debtor requires and requests

additional time to assemble and compile the information necessary to complete the schedules and statements.

76. At this juncture, the Debtor estimates that thirty (30) additional days from the initial deadline of December 29, 2022, or to **January 30, 2023**, will provide sufficient time to prepare and file the schedules and statements. As a result, the Debtor requests that the Court grant such an extension, without prejudice to the Debtor's right to seek any further extensions from the Court, to file all schedules and statements not previously filed, pursuant to Fed. R. Bankr. P. 1007(b) and (c), or to seek waivers with respect to the filing of certain schedules and statements.

77. It is my understanding that extension, such as the one sough in the Extension Motion, are routinely granted in Chapter 11 cases. If approved, the accuracy of the Debtor's filed schedules and statements will be greatly enhanced to the collective benefit of the Debtor, the Debtor's creditors, other parties in interest in this Chapter 11 Case, the Court, and the U.S. Trustee.

*[No Further Text. Signature Page Follows.]*

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

Dated: January 3, 2023.

*Gary Shirshac*
RSHAC

[Signature Page to First Day Declaration]