Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, Nevada  89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

*Proposed Attorneys for Debtor*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 22-14422-NMC |
| MUSCLEPHARM CORPORATION, | Chapter 11 |
| Debtor. | Hearing Date: January 24, 2023<br>Hearing Time: 9:30 AM PST |

**DECLARATION OF JEFFREY GASBARRA IN SUPPORT OF
DEBTOR'S APPLICATION FOR ENTRY OF AN ORDER UNDER
11 U.S.C. §§ 327(a), 328, 330, AND 331 AND FED. R. BANKR. P. 2014 AND 2016
AUTHORIZING THE EMPLOYMENT AND RETENTION OF PORTAGE
POINT PARTNERS, LLC AS RESTRUCTURING ADVISORS FOR THE DEBTOR**

JEFFREY GASBARRA, declares as follows:

1.      I am a Managing Director of Portage Point Partners, LLC ("**Portage Point**"), whose office is located at 300 North LaSalle Street, Suite 1420; Chicago, IL 60654.

2.      I am authorized to make this declaration on Portage Point's behalf.  Except as otherwise noted, the facts set forth in this Declaration are personally known to me and, if called as a witness, I could and would testify thereto.

3.      This Declaration is submitted pursuant to Fed. R. Bankr. P. 2014(a) in support of the application of MusclePharm Corporation (the "**Company**" or the "**Debtor**,") in its Chapter 11 case under title 11 of Bankruptcy Code,[1] authorizing the employment and retention of Portage Point

---

[1]      On December 15, 2022 (the "**Petition Date**"), the Debtor filed its voluntary petition under chapter 11 of title 11 of the U.S. Code in this Court, thereby commencing Case No. 22-14422-NMC (the "**Chapter 11 Case**").

1  as restructuring advisors for the Debtor and the appointment of Jeffrey Gasbarra as the CRO for

2  the Debtor (the "**Application**") under the terms and conditions set forth in the Application and that

3  certain engagement agreement by and between Portage Point and the Debtor dated December 21,

4  2022 (the "**Engagement Agreement**").[2] A true and correct copy of the Engagement Agreement is

5  attached hereto as **Exhibit 1**.[3]

6  <div align="center">**QUALIFICATIONS AND SERVICES TO BE PROVIDED**</div>

7      4.    Portage Point has agreed to provide restructuring advisory and CRO services to the

8  Debtor in the Chapter 11 Case pursuant to the terms and conditions of the Engagement Agreement.

9      5.    Portage Point is well qualified to advise the Debtor in connection with the types of

10  services requested herein.  Portage Point is an advisory firm that specializes in financial and

11  operational corporate restructuring, investment banking and asset sales, valuation, forensic

12  accounting, complex litigation support, and computations involved in court proceedings and

13  dispute resolution.  Portage Point serves, among others, middle-market companies and their

14  creditors, stakeholders, and professionals in roles including financial advisor, interim manager,

15  chief restructuring officer, trustee, expert witness, investment banker, and M&A advisor.

16      6.    Since its retention in December 2022, Portage Point's professionals have conducted

17  numerous phone calls and reviewed numerous documents to become familiar with the Debtor's

18  operations, assets, liabilities, expenses, and many of the potential financial and business issues that

19  may arise in the Chapter 11 Case.  Accordingly, Portage Point has the relevant experience,

20  expertise, and relevant knowledge regarding the Debtor's business and financial affairs to assist the

21  Debtor in its Chapter 11 Case in an efficient and timely manner.

22      7.    Subject to the Court's approval of this Application and as memorialized in the

23  Engagement Agreement, Portage Point has agreed to render such professional services to the

24  Debtor:

25  _____

26  [2]    Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them

27  in the Application.

28  [3]    Portage Point has agreed to reduce the retainer set forth in the Engagement Agreement from
$150,000 to $75,000.

<div align="center">2</div>

*CRO and Restructuring Advisory:*

(a) CRO shall be responsible for daily requirements of managing and administering the Company's Chapter 11 Case including, without limitation, serving as declarant and/or fact witness (as necessary and appropriate);

(b) evaluating and/or developing a short-term cash flow model and/or related liquidity management tools for the Company for such purpose(s) as the Company may require;

(c) evaluating and/or developing a business plan and/or such other related forecasts and analyses for the Company for such purpose(s) as the Company may require;

(d) evaluating and/or developing various strategic and/or financial alternatives and financial analyses for such purpose(s) as the Company may require;

(e) engaging and negotiating with the Company's various constituents, including, without limitation, holders of the Company's debt or equity, the Company's employees, and the Company's customers, vendors, and other commercial counterparties (collectively, "Constituents"), which assistance may include, without limitation, meeting with Constituents, developing presentations, and providing management with financial analytical assistance necessary to facilitate such negotiations;

(f) developing and distributing other information that may be required by the Company or the Constituents;

(g) obtaining and presenting information required by parties in interest in the Chapter 11 Case, including any statutory committees appointed in the Chapter 11 Case, or by the court presiding over the Chapter 11 Case (the "**Bankruptcy Court**");

(h) preparing other business, financial and/or other reporting related to the Chapter 11 Case, including, but not limited to, development and execution of asset sales, a chapter 11 plan of reorganization for the Company (a "**Plan**"), and a disclosure statement for the Plan; and

(i) providing the Company with assistance on such other matters as may be requested by the Company that are within Portage Point's expertise and otherwise mutually agreeable to Portage Point and the Company.

*General Services:*

(a) assisting the Company in preparing documentation within Portage Point's area of expertise that is required in connection with any Financing, Restructuring and/or Sale Transaction;

(b) attending Board meetings with respect to matters on which Portage Point has been engaged to advise hereunder;

(c) providing testimony, as necessary, with respect to matters on which Portage Point has been engaged to advise hereunder in any proceeding in the Chapter 11 Case; and

(d) providing the Company with other financial restructuring advice as may be specifically agreed upon in writing by the Company and Portage Point.

8. Portage Point understands that the Debtor has retained, and may further retain, estate professionals during the term of the engagement contemplated by the Application and Engagement

3

Agreement, and Portage Point will work cooperatively with such other estate professionals, as is otherwise appropriate under applicable law and as authorized by Debtor, to avoid any unnecessary duplication of services and their related fees, costs, and charges on behalf of Debtor's bankruptcy estate.

### PROFESSIONAL COMPENSATION

9.      The Debtor has agreed to pay professional fees based on the actual hours charged at Portage Point's standard hourly rates then in effect when the services are rendered. The following are the standard hourly rates of the professionals anticipated to provide services to Debtor in and related to the Chapter 11 Case:

| Title | Hourly Rate |
|---|---|
| Managing Partner | $945 |
| Service Line Leader | $875 |
| CRO | $790 |
| Managing Director | $765 - $795 |
| Director | $645 - $695 |
| Vice President | $545 - $630 |
| Associate | $390 - $425 |

10.      Portage Point generally adjusts its hourly rates on an annual basis and the above rates reflect rates for 2022.[4]

11.      In addition to professional fees, Portage Point will be reimbursed for direct out-of-pocket expenses including, but not limited to, travel, costs of reproduction, research, communications, legal counsel, any applicable sales or excise taxes, and other direct expenses.

12.      Portage Point will file an application with the Bankruptcy Court for an award and allowance of its compensation and reimbursement of expenses in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the guidelines established by the U.S. Trustee, and the terms of any order establishing procedures for interim compensation that may be entered in the Chapter 11 Case.  Portage Point's compensation for services rendered on Debtor's behalf shall be fixed by the Bankruptcy Court after due application,

---

[4]      The hourly rates set forth herein are the 2022 hourly rates of Portage Point.  Portage Point is currently in the process of reviewing and setting its 2023 hourly rates, and will file a supplement to the retention application when such rates are set.

subject to the hourly rate structure and other terms set forth in the Engagement Agreement pursuant to 11 U.S.C. § 328(a).

## DISCLOSURE OF CONNECTIONS AND DISINTERESTED STATUS

13.    Based on the Debtor's disclosure of its equity security holders, officers, directors, affiliates, creditors, customers, and other parties in interest, Portage Point undertook a robust review to determine whether it had any conflicts or relationships and has not identified any connection with the Debtor, its insiders, creditors, any other party or parties in interest, their respective attorneys and accountants, or any person employed in the Office of the United States Trustee, other than those set forth herein, if any.

14.    To the best of my knowledge, information, and belief, Portage Point and its professionals are "disinterested" persons within the meaning of Sections 101(14) and 327 of the Bankruptcy Code, as modified by Section 1107(b). Neither Portage Point nor any of its professionals:

  a.  Holds or represents any interest adverse to the Debtor's estate;

  b.  Is a prepetition creditor, equity holder, or insider of the Debtor;

  c.  Is or has been, within two (2) years before the date of the filing of the petitions herein, a director, officer, or employee of the Debtor;

  d.  Has any interest materially adverse to the interest of the Debtor's estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor, or for any other reason; or

  e.  Is related, through its partners or employees, to the United States Trustee or a Bankruptcy Judge seated on the Bankruptcy Court.

15.    However, as part of its diverse practice, Portage Point appears in numerous cases, proceedings and transactions that involve many different professionals, including attorneys, accountants, and financial consultants, who may represent claimants and parties-in-interest in the Chapter 11 Case. Also, Portage Point has performed in the past, and may perform in the future,

advisory consulting services for various attorneys and law firms, and has been represented by several attorneys and law firms, some of whom may be involved in these proceedings. In addition, Portage Point has in the past, may currently, and will likely in the future, be working with or against other professionals involved in this Chapter 11 Case in matters unrelated to the Debtor and this Chapter 11 Case. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtor in matters upon which Portage Point is to be employed, and none are in connection with this Chapter 11 Case.

16.     To the extent that Portage Point discovers any connection with any interested party or enters into any new relationship with any interested party, Portage Point will promptly supplement its disclosures to the Bankruptcy Court. In addition, if any new material relevant facts or relationships are discovered or arise, Portage Point will promptly file a supplemental declaration in accordance with Bankruptcy Rule 2014(a).

17.     No promises have been received by Portage Point, nor any employee or independent contractor thereof, as to payment or compensation in connection with the Chapter 11 Case other than in accordance with the provisions of the Bankruptcy Code. Except for internal agreements among the employees and independent contractors of Portage Point regarding the sharing of revenue or compensation, neither Portage Point nor any of its employees or independent contractors has entered into an agreement or understanding to share compensation with any other entity as described in Bankruptcy Rule 2016.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED: January 3, 2023.

*/s/ Jeffrey Gasbarra*
JEFFREY GASBARRA

# EXHIBIT 1

PORTAGE POINT PARTNERS

**Portage Point Partners, LLC**
300 North LaSalle, Suite 1420
Chicago, IL 60654
portagepointpartners.com

December 21, 2022

Ryan Drexler
Chairman and Chief Executive Officer
MusclePharm Corporation
8275 South Eastern Avenue
Las Vegas, NV 89123

*Re:  Retention to Provide Interim Management, Restructuring Advisory and Investment Banking Services*

Dear Mr. Drexler:

This letter agreement (this "Agreement") confirms the understanding and agreement between Portage Point Partners, LLC ("Portage Point") and MusclePharm Corporation and its controlled subsidiaries (collectively, the "Company") regarding the Company's engagement of Portage Point to provide certain interim management, restructuring advisory and investment banking services to the Company on the terms and conditions set forth herein (the "Engagement").

All defined terms used in this Agreement shall have the meanings ascribed to them in this Agreement. This Agreement refers to Portage Point and the Company each as a "party" and to Portage Point and the Company together as the "parties."

The Engagement of Portage Point, including any Portage Point personnel who serve in executive officer positions, shall be under the ultimate supervision of the board of directors (or similar governing body) of the Company (the "Board").

Subject to the terms and conditions of this Agreement, Portage Point shall (a) make Jeffrey Gasbarra available to serve as the Company's chief restructuring officer ("CRO"), and (b) provide such other Portage Point personnel (together with the CRO, the "Engagement Personnel") as reasonably required to carry out the Engagement's restructuring advisory and general services. The CRO will report to the Board, and the other Engagement Personnel will report to the CRO; *provided, however*, Portage Point personnel providing Investment Banking services will report to the Board, not the CRO. The Engagement Personnel, in cooperation with the Board, management, and other Company professionals, shall assist the Company with the Restructuring Advisory and General Services described below.

The Company hereby retains Portage Point as its restructuring advisor and sole investment banker to provide the Company with general restructuring advice and to advise it in connection with any Financing, Restructuring and/or Sale Transaction (each as defined below) on the terms and conditions set forth herein. By signing this Agreement, Portage Point hereby accepts its appointment as restructuring advisor and investment banker under the terms and conditions hereof.



**Description of Services**

1. Portage Point agrees, in consideration of the compensation provided for herein, to perform such of the following services as the Company may reasonably request.

*CRO and Restructuring Advisory*

(a) CRO shall be responsible for daily requirements of managing and administering the Company's chapter 11 case (the "Chapter 11 Case") including, without limitation, serving as declarant and / or fact witness (as necessary and appropriate);

(b) evaluating and/or developing a short-term cash flow model and / or related liquidity management tools for the Company for such purpose(s) as the Company may require;

(c) evaluating and/or developing a business plan and/or such other related forecasts and analyses for the Company for such purpose(s) as the Company may require;

(d) evaluating and/or developing various strategic and/or financial alternatives and financial analyses for such purpose(s) as the Company may require;

(e) engaging and negotiating with the Company's various constituents, including, without limitation, holders of the Company's debt or equity, the Company's employees, and the Company's customers, vendors, and other commercial counterparties (collectively, "Constituents"); which assistance may include, without limitation, meeting with Constituents, developing presentations and providing management with financial analytical assistance necessary to facilitate such negotiations;

(f) developing and distributing other information that may be required by the Company or the Constituents;

(g) obtaining and presenting information required by parties in interest in the Chapter 11 Case, including any statutory committees appointed in the Chapter 11 Case, or by the court presiding over the Chapter 11 Case (the "Bankruptcy Court");

(h) preparing other business, financial and/or other reporting related to the Chapter 11 Case, including, but not limited to, development and execution of asset sales, a chapter 11 plan of reorganization for the Company (a "Plan"), and a disclosure statement for the Plan; and

(i) providing the Company with assistance on such other matters as may be requested by the Company that are within Portage Point's expertise and otherwise mutually agreeable to Portage Point and the Company.

*Investment Banking*

(j) reviewing and analyzing the Company's business, operations, and financial projections;

(k) evaluating the Company's potential debt capacity in light of its projected cash flows;

(l) assisting in the determination of a capital structure for the Company;



(m) assisting in the determination of a range of values for the Company on a going-concern basis;

(n) advising and assisting the Company in evaluating any potential Financing by the Company, and, on behalf of the Company, contacting potential sources of capital as the Company may designate and assisting the Company in implementing such Financing;

(o) assisting the Company in identifying and evaluating candidates for any potential Restructuring and/or Sale Transaction, advising the Company in connection with negotiations and aiding in the consummation of any Restructuring and/or Sale Transaction; and

(p) advising the Company on the timing, nature, and terms of new securities, other consideration or other inducements to be offered pursuant to any Financing, Restructuring and/or Sale Transaction.

*General Services*

(q) assisting the Company in preparing documentation within Portage Point's area of expertise that is required in connection with any Financing, Restructuring and/or Sale Transaction;

(r) attending Board meetings  with respect to matters on which Portage Point has been engaged to advise hereunder;

(s) providing testimony, as necessary, with respect to matters on which Portage Point has been engaged to advise hereunder in any proceeding in the Chapter 11 Case; and

(t) providing the Company with other financial restructuring advice as may be specifically agreed upon in writing by the Company and Portage Point.

**Commencement of Engagement**

2. Portage Point shall commence the Engagement on or about December 21, 2022

**Fees, Retainer and Expense Reimbursement**

3. As consideration for the services to be provided, the Company shall pay the following compensation to Portage Point:

(a) *Hourly Fees*: Portage Point's hourly fees (the "Hourly Fees") shall be based on the time worked by Portage Point personnel at Portage Point's hourly rates, which as of the date of this Agreement are as follows.

| Title | Hourly Rate |
|---|---|
| Managing Partner | $945 |
| Service Line Leader | $875 |
| CRO | $790 |
| Managing Director | $765 - $795 |
| Director | $645 - $695 |
| Vice President | $545 - $630 |
| Associate | $390 - $425 |



(b) Portage Point's Hourly Fees shall be calculated separately from, and shall be in addition to, Portage Point's fees in clauses (c) – (e) below Portage Point reserves the right to adjust its hourly billing rates in the ordinary course of the Engagement. Hourly billing rates are typically adjusted quarterly to reflect advancing experience, capabilities and seniority of professionals as well as general economic factors.

(c) *Restructuring Fee*: A fee equal to $700,000, payable upon the consummation of a Restructuring (the "Restructuring Fee").

(d) *Sale Transaction Fee*

    (i) If, whether in connection with the consummation of a Restructuring or otherwise, the Company consummates a Sale Transaction incorporating all or a majority of the Company's assets or all or a majority of or a controlling interest in the Company's equity securities, Portage Point shall be paid a fee (the "Sale Transaction Fee") equal to the Restructuring Fee plus 5% of the Aggregate Consideration (as defined in Schedule I hereto) above $50 million.

    (ii) Any Sale Transaction Fee shall be payable upon consummation of the applicable Sale Transaction.

(e) *Financing Fee*: A fee, payable upon the consummation of a Financing (the "Financing Fee"), equal to the applicable percentages of gross proceeds as follows based on the security type issued in the Financing: (i) 2.0% of any senior secured debt financing, government financing, or "debtor-in-possession" financing, *plus* (ii) 4.0% of any junior secured or unsecured debt financing, *plus* (iii) 6.0% of any equity, equity-linked or equity-stapled or similarly bundled equity financing; provided that such Financing Fee shall be no less than $250,000. To the extent the Financing is provided by one of the Company's current lenders (as of December 21, 2022), the Financing Fee shall be $100,000.

(f) For the avoidance of any doubt, more than one fee may be payable pursuant to clauses (d), (d) and (f) above; *provided, however*, Portage Point will not be paid both a Restructuring Fee and a Sale Transaction Fee.

(g) Upon the execution of the Agreement, the Company shall pay Portage Point an advance payment retainer in the amount of $150,000. The Company agrees to pay one or more additional advance payment retainers to Portage Point upon request by Portage Point so that the amount of any advance payment retainers remains at or above Portage Point's estimated fees and expenses. Portage Point may apply the advance payment retainers to any outstanding fees as services are rendered and to expenses as they are incurred. The Company understands and acknowledges that any advance payment retainers are earned by Portage Point upon receipt, any advance payment retainers become the property of Portage Point upon receipt, and the Company no longer has a property interest in any advance payment retainers upon Portage Point's receipt thereof.

(h) In addition to the fees payable under this Agreement, and regardless of whether any transaction occurs, the Company shall promptly (i) reimburse Portage Point for all expenses incurred by Portage Point in connection with the Engagement and the fees and expenses of counsel, if any, retained by Portage Point, and (ii) pay to Portage Point an amount equal to three percent (3%) of Portage Point's fees to cover Portage Point's internal expenses that are not billed through as direct



reimbursable expenses. Direct reimbursable expenses include outside copy services, travel, lodging, meals, and services of outside vendors.  Internal expenses that are not billed through as direct reimbursement expenses include database and information services, administrative support, research expenses, and technology and telecommunications expenses. The Company shall also reimburse Portage Point, at such times as Portage Point shall request, for any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with the Engagement (and regardless of whether any transaction occurs). Portage Point will provide the Company with a reasonably itemized statement of expenses incurred in connection with the Engagement upon request.

(i)  Portage Point will submit invoices from time to time setting forth its fees for services rendered and its expenses incurred.  All invoices shall be due and payable immediately upon receipt and paid via wire transfer to Portage Point's bank account, as set forth in the invoice.

(j)  As part of the compensation payable to Portage Point hereunder, the Company agrees to the indemnification, reimbursement, contribution, and other provisions (the "<u>Indemnification Letter</u>") attached to this Agreement as **<u>Addendum A</u>** and incorporated herein in their entirety.

4.  No fee payable to any third party, by the Company or any other person or entity, shall reduce or otherwise affect any fee payable to Portage Point under this Agreement.

## <u>Confidentiality; Use of Information</u>

5.  The Company will furnish or cause to be furnished to Portage Point such current and historical financial information and other information regarding the business of the Company as Portage Point may request in connection with the Engagement. The Company represents and warrants to Portage Point that all of the foregoing information will be accurate and complete at the time it is furnished and agrees to keep Portage Point advised of all developments materially affecting the Company or its financial position. In performing its services pursuant to this Agreement, Portage Point shall be entitled to rely upon information furnished to it on behalf of the Company or any third party and information that is publicly available, may assume the accuracy and completeness of such information and shall not assume any responsibility for independent verification of any such information.

6.  Portage Point shall use reasonable efforts to keep confidential all non-public confidential or proprietary information of the Company obtained during the performance of its services hereunder (the "<u>Company Confidential Information</u>") and will not disclose Company Confidential Information to any other person or entity except as provided in <u>Section 7</u> of this Agreement. This obligation shall survive the termination of this Agreement or Portage Point's Engagement hereunder for a period of one year following the date of such termination.

7.  Portage Point may make such disclosures of Company Confidential Information as Portage Point reasonably believes are required by applicable law or any regulatory requirement or authority. Portage Point may disclose Company Confidential Information to Portage Point personnel who have a need to know the Company Confidential Information as it relates to the services being provided under this Agreement. Portage Point may make reasonable disclosures of Company Confidential Information to third parties, such as the Company's Stakeholders, in connection with the performance of Portage Point's services hereunder if Portage Point reasonably believes that such third party is bound by confidentiality obligations to or for the benefit of the Company.



8.  The Company agrees that Portage Point shall have the right to publish and distribute, at Portage Point's expense, marketing materials that contain a factual summary of Portage Point's Engagement hereunder and indicate generally the results achieved.

9.  All analyses, final reports, presentation materials, and other work product that Portage Point creates or develops specifically for the Company and delivers to the Company as part of the Engagement (collectively, "Work Product") shall be owned by the Company; *provided* that all methodologies, processes, techniques, ideas, concepts, know-how, procedures, software, tools, templates, models, utilities and other intellectual property that Portage Point has created, acquired, or developed or will create, acquire, or develop (collectively, "Engagement Tools"), are, and shall be, the sole and exclusive property of Portage Point and shall not constitute Work Product. The Company shall not acquire any interest in the Engagement Tools other than a limited, worldwide, perpetual, non-transferable license to use the Engagement Tools to the extent they are contained in the Work Product. Unless otherwise specified in this Agreement, any Engagement Tools provided to the Company are provided "as is" and without any warranty or condition of any kind, express, implied or otherwise, including, implied warranties of merchantability or fitness for a particular purpose.

10. The Company shall not disseminate any Work Product to any third parties at any time in any manner or for any purpose without Portage Point's prior approval (not to be unreasonably withheld or delayed), except to the extent required by applicable law.

## Other

11. In performing its services pursuant to this Agreement, Portage Point is not assuming any responsibility for the decision of the Company or any other party to pursue (or not to pursue) any business strategy or to effect (or not to effect) any transaction. In addition, Portage Point shall not be responsible for providing or deemed to have provided any tax, accounting, actuarial, legal, or other specialist advice.

12. Portage Point has been retained under this Agreement as an independent contractor to the Company, and nothing herein is intended to confer any rights or remedies as against Portage Point upon any person or entity (including the Company's governing body, management, employees, creditors, and securityholders) other than the Company. It is further understood and agreed that this Agreement and the Engagement do not create any fiduciary relationship between Portage Point and any person or entity. No one, other than senior management or the Board (in their capacities as such), is authorized to rely upon the Company's Engagement of Portage Point or any statements, advice, opinions or conduct by Portage Point. Without limiting the foregoing, any advice, written or oral, rendered in the course of the Company's Engagement of Portage Point is solely for the purpose of assisting senior management and / or the Board of the Company (in their capacities as such) in evaluating potential strategic, operational and / or financial initiatives and/or relevant potential transaction(s), including any Restructuring, Sale Transaction and / or Financing and does not constitute a recommendation to any stakeholder of the Company that such stakeholder might or should take in connection with any such potential strategic, operational and / or financial initiative and / or transactions, including any Restructuring, Sale Transaction and / or Financing. The Company agrees that, notwithstanding any termination of Portage Point's Engagement, any advice, written or oral, rendered by Portage Point and the terms of our Engagement hereunder may not be disclosed publicly or made available to third parties without Portage Point's prior written consent. This Section 12 shall survive the termination of Portage Point's Engagement.



13. To coordinate efforts on behalf of the Company during the period of Portage Point's Engagement hereunder, the Company will promptly inform Portage Point of any discussions, negotiations and / or inquiries regarding any potential strategy, operational and / or financial initiatives and / or transactions, including any Restructuring, Sale Transaction and / or Financing, including any such discussions or inquiries that have occurred during the six-month period prior to the date of this Agreement. If Portage Point receives an inquiry concerning any transaction, Portage Point will promptly inform the Company of such inquiry.

14. If, as a result of or in connection with Portage Point's Engagement hereunder, Portage Point becomes involved in any legal proceeding or investigation or is required by government regulation, subpoena, or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, the Company will reimburse Portage Point for the reasonable fees and expenses of its counsel incurred in responding to such a request. Nothing in this <u>Section 14</u> shall affect in any way the Company's obligations under the Indemnification Letter.

15. The Portage Point Parties (as defined below) shall not be liable to the Company, or to any party asserting any claims on behalf of the Company, except for direct damages found in a final determination by a court of competent jurisdiction to be the direct result of the gross negligence, bad faith, self- dealing or intentional misconduct of Portage Point. The Portage Point Parties shall not be liable for incidental, consequential, or special damages, lost profits, lost data, reputational damages, punitive damages, or any other similar damages under any circumstances, even if they have been advised of the possibility of such damages. The Portage Point Parties' aggregate liability, whether in tort, contract, or otherwise, is limited to the amount of fees paid to Portage Point for services under this Agreement (the "<u>Liability Cap</u>"). The Liability Cap is the total limit of the Portage Point Parties' aggregate liability for any and all claims or demands by anyone pursuant to or in connection with this Agreement, including liability to the Company, to any other parties hereto, and to any others making claims relating to the work performed by Portage Point pursuant to this Agreement. Any such claimants shall allocate any amounts payable by the Portage Point Parties among themselves as appropriate, but if they cannot agree on the allocation it will not affect the enforceability of the Liability Cap. Under no circumstances shall the aggregate of all such allocations or other claims against the Portage Point Parties pursuant to this Agreement exceed the Liability Cap. The "<u>Portage Point Parties</u>" comprise Portage Point, its current and future affiliates, and its and their respective directors, managers, officers, members, employees, agents, and other personnel.

16. Subject to <u>Section 17</u> and <u>Section 26</u> of this Agreement, any claim arising out of or relating to the Agreement, or the breach thereof, shall be resolved by arbitration. In any such arbitration, Portage Point shall appoint one non-neutral arbitrator, and the Company shall appoint one non-neutral arbitrator. The two party arbitrators shall select a third arbitrator. If within thirty days after their appointment the two party arbitrators do not select a third arbitrator, the third arbitrator shall be selected by the American Arbitration Association ("<u>AAA</u>"). The arbitration shall be conducted in Chicago, Illinois under the AAA Commercial Arbitration Rules, and the arbitrators shall issue a reasoned award. The arbitrators may award costs and attorneys' fees to the prevailing party. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

17. Notwithstanding <u>Section 16</u> of this Agreement, Portage Point may in its sole discretion proceed directly to a court of competent jurisdiction to (a) enforce the terms of this Agreement for any claim (and any subsequent counterclaim) against the Company relating to either the non-payment of fees or expenses due under this Agreement or (b) enforce the Company's obligations under the Indemnification

DocuSign Envelope ID: 8AE84188-DF8D-4178-B50E-E7A9496421B1



Letter. **In any court action or proceeding arising out of this Agreement, the Company waives any right to trial by jury**.

18. The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the Company, Portage Point, and any other person or entity entitled to indemnity under the Indemnification Letter. The Company's obligations pursuant to this Agreement shall be joint and several. This Agreement and the related Indemnification Letter embody the entire agreement and understanding among the parties hereto and supersede any and all prior agreements, arrangements, and understandings, related to the matters provided for herein. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound.

19. For the convenience of the parties hereto, any number of counterparts of this Agreement may be executed by the parties hereto, each of which shall be an original instrument and all of which taken together shall constitute one and the same Agreement. Delivery of a signed counterpart of this Agreement by facsimile transmission or in the form of an electronic signature shall constitute valid, sufficient delivery thereof.

20. This Agreement is governed by and shall be construed in accordance with the laws of the State of Illinois with respect to contracts made and to be performed entirely therein and without regard to choice of law principles.

21. Portage Point's Engagement hereunder and may be terminated by the Company or by Portage Point at any time only upon written notice by the terminating party to the other party (and not by any other action, conduct, or event), without liability or continuing obligation to either party following any such termination, except that (a) following any termination of the Engagement, Portage Point shall remain entitled to any fees accrued pursuant to Section 3 but not yet paid prior to such termination and to reimbursement of expenses incurred prior to such termination; and (b) if Portage Point's Engagement is terminated by the Company pursuant to this Agreement, Portage Point shall remain entitled to full payment of all fees described in Section 3 in respect of any Restructuring, any Financing, and/or any Sale Transaction announced or resulting from negotiations occurring during the period from the date of this Agreement until eighteen months following such termination.

22. Simultaneously herewith, the Company and Portage Point are entering into the Indemnification Letter. The Indemnification Letter shall survive any termination of this Agreement or Portage Point's Engagement hereunder.

23. The Company acknowledges and agrees that Portage Point has made a significant monetary investment recruiting, hiring, and training its personnel. Accordingly, the Company acknowledges and agrees to the following:

    (a) During the term of this Agreement and for a period of two years after the final invoice is rendered by Portage Point with respect to the Engagement (the "Restrictive Period"), the Company and its affiliates shall not directly or indirectly hire, contract with, or solicit the employment of any Portage Point personnel.

    (b) If during the Restrictive Period the Company or any of its affiliates directly or indirectly hires or contracts with any Portage Point personnel in violation of Section 23(a) above, the Company agrees to pay to Portage Point as liquidated damages and not as a penalty the sum total of (i) $1,000,000

DocuSign Envelope ID: 8AE84188-DE8D-4178-B50E-E7A9406421B1



for a Managing Director or higher, (ii) $700,000 for a Director, (iii) $600,000 for a Vice President, (iv) $500,000 for an Associate, and (v) $250,000 for any other Portage Point personnel.

(c) Liquidated damages in the amounts set forth in <u>Section 23(b)</u> above are (i) fair, reasonable and necessary under the circumstances to reimburse Portage Point for the costs of recruiting, hiring and training its personnel as well as the lost profits and opportunity costs related to such personnel, and to protect the significant investment that Portage Point has made in its personnel and (ii) appropriate due to the difficulty of calculating the exact amount and value of that investment.

(d) <u>Section 23</u> of this Agreement shall survive the termination of Portage Point's Engagement.

**Retention Related Matters**

24. If the Company obtains support commitments from one or more of the Company's key Constituents (as defined below) with respect to a transaction (such Constituents, the "Supporting Constituents," and any documentation of such support commitments, a "Support Agreement"), the Company agrees that it will use best efforts to include in the Support Agreement a provision that the Supporting Constituents affirmatively agree to support and will not object to or in any way oppose (a) the retention of Portage Point, (b) the terms and conditions set forth in this Agreement, including the fee and expense structure set forth herein, and (c) any fee statement or application submitted by Portage Point to the Bankruptcy Court for allowance of the fees and expenses payable to Portage Point under the terms of this Agreement.

25. The Company shall use its best efforts to obtain prompt authorization from the Bankruptcy Court to retain Portage Point on the terms and conditions set forth in this Agreement under the provisions of sections 363, 327 and 328(a) of the Bankruptcy Code (or other such sections as mutually agreed upon by Portage Point and the Company), with such retention to be effective as of the date of this Agreement. Subject to being so retained, Portage Point agrees that during the pendency of any Chapter 11 Case, it shall continue to perform its obligations under the Agreement and that it shall file statements and/or applications for allowance of the fees and expenses payable to it under the terms of this Agreement pursuant to the applicable Federal Rules of Bankruptcy Procedure and the local rules and order of the Bankruptcy Court. The Company shall supply Portage Point with a draft of the application and proposed retention order authorizing Portage Point's retention sufficiently in advance of the filing of such application and proposed order to enable Portage Point and its counsel (if any) to review and comment thereon. Portage Point shall be under no obligation to provide any services under this Agreement unless Portage Point's retention under the terms of this Agreement is approved under sections 363, 327 and 328(a) of the Bankruptcy Code (or other such sections as mutually agreed upon by Portage Point and the Company) by final order of the Bankruptcy Court, which order is acceptable to Portage Point.

26. If the Company commences or otherwise becomes the subject of a Chapter 11 Case, the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement during the pendency of the Chapter 11 Case.

**Indemnification and D&O Insurance**

27. In addition to the indemnification provided for under the Indemnification Letter, any Engagement Personnel serving as directors/managers or officers of the Company ("<u>D&O Engagement Personnel</u>") will receive the benefit of the most favorable indemnification provisions provided by the Company to

DocuSign Envelope ID: 8AE84188-DF8D-4178-B50F-E7A9496421B1



its directors/managers, officers, and any equivalently placed personnel, whether under the Company's charter or by-laws, by contract, or otherwise.

28. The Company shall specifically include and cover any D&O Engagement Personnel with direct coverage under the Company's policy for liability insurance covering its directors/managers, officers, and any equivalently placed personnel ("D&O Insurance"). Prior to Portage Point's accepting any director/manager or officer position, the Company shall, at the request of Portage Point, provide a copy of its current D&O Insurance policy, a certificate(s) of insurance evidencing the policy is in full force and effect, and a copy of the signed Board resolutions (or signed Board consent) and any other documents as Portage Point may reasonably request evidencing the appointment and coverage of the D&O Engagement Personnel. The Company will maintain such D&O Insurance coverage for the period through which claims can be made against such persons. The Company disclaims a right to distribution from the D&O Insurance coverage with respect to such persons. If the Company is unable to include D&O Engagement Personnel under the Company's D&O Insurance policy or does not have first dollar coverage acceptable to Portage Point in effect for at least $10 million (*e.g.*, there are outstanding or threatened claims against officers and directors/managers alleging prior acts that may give rise to a claim), Portage Point may, at its option, undertake to purchase a separate directors-and-officers insurance policy that will cover D&O Engagement Personnel only. The cost of such policy, if purchased, shall be invoiced to, and payable by, the Company as an out-of-pocket expense. If Portage Point is unable or unwilling to purchase such separate insurance, then Portage Point reserves the right to terminate the Engagement.

29. The Company's D&O Insurance coverage for D&O Engagement Personnel shall be specifically primary to, and without allocation against, any other valid and collectible insurance coverage that may apply to the D&O Engagement Personnel (whether provided by Portage Point or otherwise). Portage Point is not responsible for any third-party products or services separately procured by the Company. The Company's sole and exclusive rights and remedies with respect to any such third-party products or services are against the third-party vendor and not against Portage Point, whether or not Portage Point is instrumental in procuring such third-party product or service.

## Key Definitive Terms

30. As used in this Agreement, the following defined terms have the meanings specified below:

    (a) "Restructuring" means, collectively, any restructuring, reorganization (whether or not pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")), and/or recapitalization of all or a portion of the Company's outstanding indebtedness (including bank debt, bond debt, and other on and off balance sheet indebtedness), trade claims, leases (both on and off balance sheet), litigation-related claims and obligations, unfunded pension and retiree medical liabilities, or other liabilities (collectively, the "Existing Obligations") that is achieved, without limitation, through a solicitation of waivers and consents from the holders of Existing Obligations (collectively, the "Stakeholders," and together with the Company's other constituents, the "Constituents"); a rescheduling of the maturities of Existing Obligations; a change in interest rates, repurchase, settlement, or forgiveness of Existing Obligations; a conversion of Existing Obligations into equity or other securities; an exchange offer involving the issuance of new securities in exchange for Existing Obligations; the issuance of new securities, sale or disposition of assets, sale of debt or equity securities or other interests; or otherwise through another similar transaction or series of transactions.



(b) "Financing" means any transaction or series of transactions involving the public or private issuance, sale, or placement of newly-issued (including securities held in treasury) equity, equity-linked or debt securities, instruments, or obligations of the Company, as well as any federal, state or local government loan, grant or investment, and including any debtor-in-possession financing or exit financing in connection with a case under the Bankruptcy Code.

(c) "Sale Transaction" means any transaction or series of transactions involving (1) an acquisition, merger, consolidation, or other business combination pursuant to which the business or assets of the Company are, directly or indirectly, combined with another company; (2) the acquisition, directly or indirectly, by a buyer or buyers (which term shall include a "group" of persons as defined in section 13(d) of the Securities Exchange Act of 1934, as amended), of equity interests or options, or any combination thereof constituting a majority of the Company's then-outstanding stock or possessing a majority of the Company's then-outstanding voting power (except as may occur with current Stakeholders pursuant to a Restructuring); (3) any other purchase or acquisition or agreement or commitment to sell, directly or indirectly, by a buyer or buyers (including, without limitation, any liquidator that participates in a sale process) of significant assets, securities, or other interests of the Company or (4) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purpose of effecting a transfer of an interest in the Company to a third party. For purposes of this Agreement, any sale of newly issued securities (including securities held in treasury) shall be deemed a "Financing" and not a "Sale Transaction."

[*Signature Page Follows*]

DocuSign Envelope ID: 8AE84188-DF8D-4478-B50F-E7A9406421B4



If the above is in accordance with your understanding of the terms of Portage Point's Engagement, please sign and return this Agreement at your earliest convenience.

We look forward to our work together.

<div style="margin-left: 50%;">

Sincerely,

Portage Point Partners, LLC


Matthew D. Ray
Founder & Managing Partner

</div>

*Acknowledged and agreed to as of the date first written above:*

MusclePharm Corporation, on behalf of itself and its controlled subsidiaries

By: _____

Title: _____

DocuSign Envelope ID: 8AE84188-DF8D-4178-B50F-E7A9406421B1



## Schedule I

For purposes hereof, the term "Aggregate Consideration" means (1) the total amount of cash and the fair market value (on the date of payment) of all of the property paid and payable (including amounts paid into escrow) in connection with the Sale Transaction (or any related transaction), including amounts paid and payable in respect of convertible securities, preferred equity securities, warrants, stock appreciation rights, option or similar rights, whether or not vested, *plus* (2) the principal amount of all indebtedness for borrowed money or other liabilities of the Company or relevant Company entity, as applicable, as set forth on the most recent balance sheet, or, in case of the sale of assets, all indebtedness for borrowed money or other liabilities (including pension liabilities and guarantees of borrowings) assumed, cancelled, exchanged or forgiven directly or indirectly by a third party. Aggregate Consideration shall also include the aggregate amount of any dividends or other distributions declared by the Company or relevant Company entity, as applicable, after the date hereof other than normal quarterly cash dividends, and, in the case of the sale of assets, the net value of any current assets not sold by the Company or relevant Company entity, as applicable.

For purposes of calculating Aggregate Consideration, (1) all shares will be deemed transferred where a Sale Transaction is effected by the transfer of shares, (a) constituting more than 30% of the then outstanding equity securities of or equity interest in the Company or relevant Company entity, as applicable, or (b) possessing more than 30% of the then outstanding voting power of the outstanding equity securities of or equity interest in the Company or relevant Company entity, as applicable, (2) in the case of a "credit bid" or other contribution or exchange of Existing Obligations, the value of such Existing Obligations shall be the face value, and (3) the value of securities (whether debt or equity) that are freely tradable in an established public market will be determined on the basis of the average closing price in such market for the ten trading days prior to the closing of the Sale Transaction (the "Valuation Date"); *provided* that the value of securities that have no established public market or other property will be the fair market value of such securities or other property on such Valuation Date, and any restricted stock (*i.e.*, stock in a public company not freely tradeable) received shall be valued at 85% of the public market price of such stock. If the Aggregate Consideration is subject to increase by contingent payments related to future events, the portion of Portage Point's fee relating thereto shall be calculated by Portage Point in good faith and paid to Portage Point upon consummation of the Sale Transaction.

\* \* \* \* \*

**PORTAGE POINT PARTNERS**

Portage Point Partners, LLC
300 North LaSalle, Suite 1420
Chicago, IL 60654
portagepointpartners.com

**Addendum A**

December 21, 2022

Ryan Drexler
Chairman and Chief Executive Officer
MusclePharm Corporation
8275 South Eastern Avenue
Las Vegas, NV 89123

Ladies and Gentlemen:

1.      In connection with the engagement of Portage Point Partners, LLC ("Portage Point") to advise and assist MusclePharm Corporation and its controlled subsidiaries (collectively the "Company") as to the matters set forth in the engagement letter of even date herewith, the Company and Portage Point are entering into this letter agreement. It is understood and agreed that in the event that Portage Point or any of its current or future affiliates, or any of its or their respective directors, officers, members, employees, agents or controlling persons, if any (each of the foregoing, including Portage Point, being an "Indemnified Person"), become involved in any capacity in any action, claim, proceeding or investigation brought or threatened by or against any person, including the Company's securityholders, related to, arising out of or in connection with our engagement, the Company will promptly reimburse each such Indemnified Person for its legal and other expenses (including the cost of any investigation and preparation) as and when they are incurred in connection therewith. The Company will indemnify and hold harmless each Indemnified Person from and against any losses, claims, damages, liabilities or expenses to which any Indemnified Person may become subject under any applicable federal or state law, or otherwise, related to, arising out of or in connection with Portage Point's engagement, whether or not any pending or threatened action, claim, proceeding or investigation giving rise to such losses, claims, damages, liabilities or expenses is initiated or brought by the Company or on the Company's behalf and whether or not in connection with any action, claim, proceeding or investigation in which the Company or any such Indemnified Person are a party, except to the extent that any such loss, claim, damage, liability or expense is found by a court of competent jurisdiction in a judgment which has become final (in that it is no longer subject to appeal or review) to have resulted solely from such Indemnified Person's bad faith or gross negligence. The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its securityholders or creditors related to, arising out of or in connection with our engagement except to the extent that any loss, claim, damage or liability is found by a court of competent jurisdiction in a judgment which has become final (in that it is no longer subject to appeal or review) to have resulted solely from such Indemnified Person's bad faith or gross negligence. If multiple claims are brought against any Indemnified Person in an arbitration related to, arising out of or in connection with Portage Point's engagement, and indemnification is permitted under applicable law with respect to at least one such claim, the Company agrees that any arbitration award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for hereunder, except to the extent the arbitration award expressly states that the award, or any portion thereof, is based solely on a claim as to which indemnification is not available.

2.      If for any reason the foregoing indemnification is held unenforceable or is otherwise unavailable, then the Company shall contribute to the loss, claim, damage, liability or expense for which such indemnification is held unenforceable in such proportion as is appropriate to reflect the relative benefits received, or sought to be received, by the Company and its securityholders and creditors, on the one hand, and the Indemnified Persons, on the other hand, in the matters contemplated by Portage Point's



engagement as well as the relative fault of the Company and such persons with respect to such loss, claim, damage, liability or expense and any other relevant equitable considerations. The Company agrees that for the purposes hereof the relative benefits received, or sought to be received, by the Company and its securityholders and creditors and the Indemnified Persons shall be deemed to be in the same proportion as (a) the total value paid or proposed to be paid by or to the Company and its securityholders and creditors, as the case may be, pursuant to any transaction (whether or not consummated) for which Portage Point has been engaged to perform interim management, financial advisory and investment banking services bears to (b) the fees paid or proposed to be paid to Portage Point in connection with such engagement; *provided, however*, that, to the extent permitted by applicable law, in no event shall Portage Point or any other Indemnified Person be required to contribute an aggregate amount in excess of the aggregate fees actually paid to Portage Point for such interim management, restructuring advisory and investment banking services. The Company's reimbursement, indemnity and contribution obligations under this agreement shall be joint and several, shall be in addition to any liability that the Company may otherwise have, shall not be limited by any rights Portage Point or any other Indemnified Person may otherwise have, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, Portage Point, and any other Indemnified Persons.

3.      The Company agrees that, without Portage Point's prior written consent (which will not be unreasonably withheld), the Company will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action, proceeding or investigation in respect of which indemnification or contribution could be sought hereunder (whether or not Portage Point or any other Indemnified Persons are an actual or potential party to such claim, action, proceeding or investigation), unless such settlement, compromise or consent includes an unconditional release of each Indemnified Person from all liability arising out of such claim, action, proceeding or investigation. No waiver, amendment or other modification of this agreement shall be effective unless in writing and signed by each party to be bound thereby.

4.      This agreement and any claim related directly or indirectly to this agreement shall be governed and construed in accordance with the laws of the State of Illinois (without giving regard to the conflicts of law provisions thereof). Any such claim shall be resolved by arbitration. In any such arbitration, Portage Point shall appoint one non-neutral arbitrator, and the Company shall appoint one non-neutral arbitrator. The two party arbitrators shall select a third arbitrator. If within thirty days after their appointment the two party arbitrators do not select a third arbitrator, the third arbitrator shall be selected by the American Arbitration Association ("AAA"). The arbitration shall be conducted in Chicago, Illinois under the AAA Commercial Arbitration Rules, and the arbitrators shall issue a reasoned award. The arbitrators may award costs and attorneys' fees to the prevailing party. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

5.      Notwithstanding Section 4 of this agreement, Portage Point may in its sole discretion proceed directly to a court of competent jurisdiction to enforce the terms of this agreement and the Company's obligations hereunder. In any court action or proceeding related to, arising out of, or in connection with this agreement, the Company waives any right to trial by jury.

6.      This agreement shall remain in effect indefinitely, notwithstanding any termination of Portage Point's engagement.

*[Signature Page Follows]*



Very truly yours,

Portage Point Partners, LLC

_____

Matthew D. Ray
Founder & Managing Partner

*Agreed to and accepted as of the date first above written*:

MusclePharm Corporation, on behalf of itself and its controlled subsidiaries

DocuSigned by:

483B3A8EC3654A6... _____

Title:_____