Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Proposed Attorneys for Debtor*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.: 22-14422-nmc |
| MUSCLEPHARM CORPORATION, | Chapter 11 |
| Debtor. | Hearing Date: January 5, 2023<br>Hearing Time: 9:30 a.m. |

STATE OF NEVADA )
          ) ss:
COUNTY OF CLARK )

**DECLARATION OF SAMUEL A. SCHWARTZ, ESQ. IN SUPPORT OF DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) GRANTING PRIMING LIENS AND ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

SAMUEL A. SCHWARTZ, being duly sworn, deposes and says:

1.    I am over the age of 18, mentally competent and unless otherwise indicated, I have personal knowledge of the facts set forth herein.

2.    I am the principal of Schwartz Law, PLLC ("**SL**"), am duly licensed to practice law in the State of Nevada, and am proposed counsel for MusclePharm Corporation (the "**Debtor**"), the debtor and debtor-in-possession in the above-captioned Chapter 11 case.

3.    I make this declaration in support of the Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing Debtor to Obtain Post-Petition Financing, (II) Granting Priming Liens and Administrative Expense Claims, (III) Authorizing the Debtor's Use of Cash

1

Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief (the "**DIP Financing Motion**") (ECF No. 33).

4.      On December 15, 2022 (the "**Petition Date**"), the Debtor hired SL to file its emergency Chapter 11 petition and to prosecute its Chapter 11 case.  Shortly after the Petition Date, my firm conducted a UCC search with the Nevada Secretary of State to determine the various security interests against the Debtor's assets.

5.      The results of the UCC search revealed that there are three main secured creditors who appear to have liens against the Debtor's assets: (i) Prestige Capital Corporation ("**Prestige**"); (ii) Empery Tax Efficient, LP ("**Empery**"); and (iii) Ryan Drexler ("**Drexler**").

6.      Through further investigation into the security interests of the Debtor's lienholders, and in conversations with the Debtor and counsel for the Debtor's lienholders, I believe that the outstanding balance owed to Prestige is approximately $1.2 million, and the outstanding principal balance owed to Empery is approximately $11.2 million,[1] for a total of $12.4 million in senior secured debt between Prestige and Empery.

7.      I also understand that Drexler is prepared to subordinate his secured debt to any debtor-in-possession ("**DIP**") financing loan and consents to the relief requested in the DIP Financing Motion.

8.      After the Petition Date, I, on behalf of the Debtor, also began negotiations with counsel for: (i) White Winston Select Asset Funds, LLC ("**White Winston**"), the proposed debtor-in-possession financing lender, and (ii) Empery, for DIP financing.

9.      Throughout the negotiations with Empery, I understood Empery's proposals to mean the Debtor's assets, including its intellectual property (the "**IP**"), had a value in excess of the secured claims against the estate.

10.      Specifically, Empery's DIP financing proposals included a $2 million priming loan, plus an additional $2 million of its pre-petition debt to be rolled up into the new DIP loan, for a total of $4 million in first priority priming financing.  A true and correct copy of the last received

---

[1]      With interest, default interest, fees and penalties, I understand Empery asserts that it is owed approximately $18 million.

2

1    Empery DIP financing term sheet dated December 30, 2022, is attached hereto as **Exhibit 1**.

2    11.    I also understand there is pending litigation in the Supreme Court of the State of

3    New York between Empery, as plaintiff, and the Debtor, White Winston and Drexler, as

4    defendants, Case No. 654789/2022 (the "**New York Action**").    While the New York Action is

5    stayed against the Debtor, I understand Empery continues to prosecute the New York Action

6    against White Winston and Drexler.

7    12.    On December 27, 2022, Timothy Silver, a portfolio manager with Empery Asset

8    Management, LP, an affiliate of Empery, submitted an affidavit (the "**Silver Affidavit**") in the New

9    York Action, a true and correct copy of which is attached hereto as **Exhibit 2**, regarding, among

10    other things, the proposed sale of, and potential bid amounts for, the Debtor's IP on December 15,

11    2022.

12    13.    The Silver Affidavit confirms my understanding that Empery believes the value of

13    the Debtor's assets exceeds the value of the Debtor's secured debt.    Specifically, Mr. Silver

14    indicated that he attended Empery's scheduled UCC Article 9 sale of the Debtor's intellectual

15    property on December 15, 2022, and stated the following regarding the proposed bids for the

16    Debtor's IP:

17
>    I personally participated in the Article 9 Sale on December 15, 2022 until it was
18    stopped by the MusclePharm bankruptcy filing.  When the Article 9 Sale began on
>    December 15, 2022, **two bidders were present whom I knew to have been**
19    **qualified by Sherwood Partners to bid $30 million or more for the collateral**.
>    Prior to qualifying to bid, those two bidders were aware that Empery had the ability
20    to credit bid up to the full amount of the outstanding Notes, with interest and other
>    amounts due and owing.  The two bidders decided to qualify to participate in the
21    auction well in excess of that amount.  **Indeed, one bidder initially qualified to**
>    **bid only up to $17 million, but later increased its qualified amount to $34**
22    **million**.  As a result, it seemed inevitable that the assets sold at auction on
>    December 15, 2022, would have been for an amount that paid Empery and the
23    Secured Noteholders in full.  Moreover, had the assets been sold at auction,
>    MusclePharm's business could have been revived without significant financial
24    damage to the brand.

25
26    *See* **Exhibit 2**, Silver Affidavit, ¶ 27 (emphasis added).

27    14.    Based on the foregoing, the value of the Debtor's assets, namely its IP, exceeds the

28    value of any secured debt of the Debtor, and Empery and Prestige enjoy a significant equity cushion

in their collateral.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED: January 4, 2023

/s/ *Samuel A. Schwartz*
Samuel A. Schwartz

4

# Exhibit 1

CONFIDENTIAL GTG DRAFT FOR DISCUSSION PURPOSES ONLY
12/30/22 SUBJECT TO FRE 408
ALL RIGHTS RESERVED

## MUSCLEPHARM CORPORATION AND ITS AFFILIATES

## TERM SHEET FOR DEBTOR-IN-POSSESSION FINANCING AND AUTHORIZATION FOR USE OF CASH COLLATERAL

### As of December 30, 2022

This non-binding indicative term sheet (the "DIP Term Sheet") sets forth the principal terms of: (i) a potential superpriority priming senior secured debtor-in-possession note facility (the "DIP Note Facility"; the agreement evidencing the DIP Note Facility, the "DIP Note Agreement" and, together with the other definitive documents governing the DIP Note Facility and the DIP Orders (as defined herein), the "DIP Note Documents," each of which shall be in form and substance acceptable to the DIP Consenting Secured Parties (as defined herein)) to be entered into with the Note Parties (as defined herein); (ii) a potential superpriority priming senior secured debtor-in-possession factoring facility (the "DIP Factoring Facility"; the agreement evidencing the DIP Factoring Facility, the "DIP Factoring Agreement," together with the other definitive documents governing the DIP Factoring Facility and DIP Orders, the "DIP Factoring Documents," and together with the DIP Note Documents, the "DIP Documents," each of which shall be in form and substance acceptable to the DIP Consenting Factoring Parties (as defined herein)) to be entered into with the Debtor (as defined herein); and (iii) the consensual use of the cash collateral (as defined in 11 U.S.C. § 363(a)) of the Prepetition Secured Parties (as defined below) ("Cash Collateral"). The use of Cash Collateral and the DIP Note Facility and DIP Factoring Facility (together, the "DIP Facilities") will be subject to the approval of the Bankruptcy Court (as defined herein) and consummated in the case under chapter 11 (the "Chapter 11 Case") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), in accordance with (a) the interim order (the "Interim DIP Order") and the final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders") of the Bankruptcy Court authorizing the Note Parties to use the Cash Collateral and to enter into the DIP Facilities, each of which shall be in form and substance acceptable to the DIP Consenting Secured Parties and DIP Consenting Factoring Parties (together, the "DIP Consenting Parties"), and (b) the DIP Documents to be executed by the Note Parties. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in (as applicable) (1)(x) Original Issue Discount Senior Secured Notes dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "October Notes") and Original Issue Discount Senior Secured Notes dated as of June 10, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "June Notes" and, together with the October Notes, the "Prepetition Notes"), in each case issued by MusclePharm Corporation, a Nevada corporation (the "Issuer" or the "Debtor"), which Prepetition Notes are described in further detail on Schedule 1 hereto including the Purchasers thereof (the "Prepetition Purchasers"), (2) the Securities Purchase Agreement, dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition SPA"), between the Issuer and each Prepetition Purchaser party thereto and (3) the Pledge and Security Agreement, dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Security Agreement" and, collectively with the Prepetition Notes and the Prepetition SPA, the "Prepetition Transaction Documents"), among the Issuer, Canada MusclePharm Enterprises Corp.,

a British Columbia corporation ("MusclePharm Canada" and, together with the Issuer, the "Note Parties") and Empery Tax Efficient, LP ("Empery"), in its capacity as collateral agent (the "Prepetition Collateral Agent" and, together with the Prepetition Purchasers, the "Prepetition Secured Parties").

This DIP Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protections of Federal Rule of Evidence 408 and any other applicable statutes or doctrines protecting the disclosure of confidential information and information exchanged in the context of settlement discussions. The Issuer and the other Note Parties are not authorized to disclose this DIP Term Sheet to any person other than their professional advisors, who shall agree to maintain its confidentiality.

THIS NON-BINDING DIP TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER OR COMMITMENT WITH RESPECT TO ANY NOTE FACILITY. THE TRANSACTION DESCRIBED HEREIN WILL BE SUBJECT TO CREDIT APPROVAL BY THE DIP AGENT, THE NEGOTIATION AND COMPLETION OF DIP DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DIP DOCUMENTS.

| Issuer/Debtor | MusclePharm Corporation, as debtor in possession in the Chapter 11 Case. |
|---|---|
| Guarantor(s) | MusclePharm Canada and any other subsidiaries of the Issuer (collectively, the "Guarantor(s)," and together with the Issuer, the "Note Parties"). |
| Collateral Agent | Empery Tax Efficient, LP ("Empery") or another entity selected by it shall be the sole collateral agent for the DIP Note Purchasers (as defined herein) and DIP Factoring Purchasers (as defined herein) (in such capacity, the "DIP Agent"). |
| DIP Note Purchasers | The "DIP Note Purchasers" will be Empery, [●] (collectively, the "Initial DIP Note Purchasers") and any other Prepetition Purchasers who choose to participate in the DIP Note Facility by notice in writing to the DIP Agent at least two days prior to entry of the Interim DIP Order or such other time as may be agreed by the DIP Agent (collectively, the "DIP Note Purchasers," and together with the DIP Agent, the "DIP Secured Parties"). |
| | "DIP Consenting Secured Parties" shall mean the DIP Agent and Empery, as a DIP Purchaser. |
| | The obligation of any DIP Note Purchaser to purchase any note issued under the DIP Note Facility may be fulfilled on behalf of such DIP Note Purchaser by any of such DIP Note Purchaser's affiliated or related funds or financing vehicles.  The DIP Note Purchase |

| | |
|---|---|
| | Commitments (as defined below) will be offered for participation to each Prepetition Purchaser in each case based on such Prepetition Purchaser's pro rata share of the amounts outstanding under the Prepetition Notes. To the extent a portion of the DIP Note Purchase Commitments is not provided by a Prepetition Purchaser, such portion shall be allocated to, and added to the DIP Note Purchase Commitments of the Initial DIP Purchasers based on the Initial DIP Purchasers' ratable shares of the Prepetition Notes. |
| **DIP Note Facility** | The DIP Note Facility shall be a superpriority priming senior secured multiple issuance note facility in an aggregate principal amount not to exceed $2 million (the "<u>DIP Note Purchase Commitments</u>", and such loans, the "<u>DIP Notes</u>"), subject to the terms and conditions set forth in this DIP Term Sheet.<br><br>$2 million of principal due under the Prepetition Notes shall roll-up and convert on a cashless dollar-for-dollar basis into DIP Notes upon entry of the Final DIP Order (the "<u>Roll-Up</u>") to be approved in the Final DIP Order.<br><br>The issuance mechanics of the DIP Note Facility shall be on terms mutually agreed upon by the DIP Agent, on behalf of the DIP Note Purchasers, and the Debtor, and in accordance with the Budget (as defined herein). |
| **Availability** | The effectiveness of the DIP Note Agreement (the date of such effectiveness, the "<u>DIP Effective Date</u>") shall be subject to the satisfaction of the Conditions Precedent (as defined herein).<br><br>In addition, the obligation of the DIP Purchasers to purchase DIP Notes shall be subject to the following conditions:<br><br>• At the time of issuance and purchase of any DIP Note and after giving effect thereto, the representations and warranties of the Note Parties contained in the DIP Documents shall be true and correct in all material respects.<br><br>• At the time of issuance and purchase of any DIP Note and after giving effect thereto, no Default or Event of Default shall then exist or result therefrom.<br><br>• All issuances of DIP Notes shall be made subject to and in accordance with the Budget (as defined herein).<br><br>• Up to $350,000 (the "<u>Interim DIP Issuance</u>") to be made available in one or more issuances in accordance with the Budget (as defined below) and the DIP Documents from the |

| | |
|---|---|
| | Interim Closing Date until the Final Closing Date (as defined below). |
| | • If any entity or individual other than the DIP Note Purchasers and DIP Factoring Purchasers are approved to be Debtor's DIP lender at the final hearing on the DIP Motion, then all obligations of the Note Parties under the DIP Facilities shall be paid in full upon the closing of the new DIP Lender's financing. |
| | • Up to an amount equal to the remaining approved unfunded DIP Note Purchase Commitments (the "Final DIP Issuance") to be made available in one or more issuances in accordance with the Budget and the DIP Documents on or after the Final Closing Date. |
| | • Subject to entry of the Final DIP Order, the Roll-Up shall be approved. |
| | Any amounts repaid under the DIP Note Facility may not be reissued or repurchased. |
| **DIP Factoring Purchasers** | The "DIP Factoring Purchasers" will be Empery, [●] (collectively, the "Initial DIP Factoring Purchasers") and any other Prepetition Purchasers who choose to participate in the DIP Factoring Facility by notice in writing to the DIP Agent at least two days prior to entry of the Interim DIP Order or such other time as may be agreed by the DIP Agent (together with the DIP Agent, the "DIP Factoring Parties"). |
| | "DIP Consenting Factoring Parties" shall mean the DIP Agent and Empery, as a DIP Factoring Purchaser. |
| | The obligation of any DIP Factoring Purchaser to participate under the DIP Factoring Facility may be fulfilled on behalf of such DIP Factoring Purchaser by any of such DIP Factoring Purchaser's affiliated or related funds or financing vehicles. The DIP Factoring Purchase Commitments (as defined below) will be offered for participation to each Prepetition Purchaser in each case based on such Prepetition Purchaser's pro rata share of the amounts outstanding under the Prepetition Notes. To the extent a portion of the DIP Factoring Purchase Commitments is not provided by a Prepetition Purchaser, such portion shall be allocated to, and added to the DIP Factoring Purchase Commitments of the Initial DIP Factoring Purchasers based on the Initial DIP Factoring Purchasers' ratable shares of the Prepetition Notes. |

| DIP Factoring Facility | Pursuant to the DIP Factoring Documents, Debtor may sell, transfer, convey, assign and deliver to DIP Factoring Purchasers, and DIP Factoring Purchasers agree to purchase and receive from Debtor, all of Debtor's right, title and interest in and to all eligible post-petition accounts ("Accounts") and purchase orders ("Purchase Orders") arising from the sale of any product or goods or the rendering of services by Debtor in the ordinary course of the Debtor's business (each an "Advance") for up to $10 million (the "DIP Factoring Purchase Commitments", and such factoring, the "DIP Factoring"). |
|---|---|
| | The DIP Factoring Purchasers will only purchase Purchase Orders from Debtor during the period of entry of the Interim DIP Order to entry of the Final DIP Order (the "Interim Period").  During the Interim Period, the DIP Factoring Purchasers will only factor Purchase Orders that: (i) have been approved in writing by Eric Hillman; and (ii) JW Nutritional, LLC has confirmed in writing can be manufactured in accordance with the terms of the purchase order. The DIP Factoring Purchasers will only factor up to $2 million of Purchase Orders during the Interim Period. |
| | IT IS THE INTENTION OF THE PARTIES THAT AS TO ALL ACCOUNTS AND PURCHASE ORDERS (DURING THE INTERIM PERIOD) THAT DIP FACTORING PURCHASERS ELECT TO PURCHASE SHALL CONSTITUTE A TRUE PURCHASE AND SALE OF ACCOUNT(S) UNDER § 9-318 OF THE UNIFORM COMMERCIAL CODE AND AS SUCH, THE DEBTOR SHALL HAVE NO LEGAL OR EQUITABLE INTEREST IN THE ACCOUNTS AND PURCHASE ORDERS SOLD. |
| **Advances on Accounts and Purchase Orders** | The DIP Factoring Purchasers, in the sole discretion of the DIP Agent, may advance up to eighty percent (80%) of the face amount of the Accounts purchased and up to sixty percent (60%) of the face amount of the Purchase Orders purchased during the Interim Period, less the applicable discount fee, and Facility Fee (as defined below) (collectively the "***Aggregate Advances***").  The purchase price of any Account or Purchase Order (during the Interim Period) shall be the amount actually received in payment of such Account or Purchase Order (during the Interim Period), but for the purposes of any Advance, the purchase price shall be equal to the face amount of the Account or Purchase Order (during the Interim Period) less any selling, payment or other discounts offered. |
| **Reserve** | DIP Agent, in its sole discretion, may elect to maintain a reserve from each Advance ("Reserve") of an amount not to exceed 20% of the Aggregate Advances (the "Reserve Cap").  As a general rule, although not a requirement, it is intended that Reserves on paid |

| | |
|---|---|
| | invoices are released upon the request of the Debtor or when the DIP Agent's next purchase of Accounts or Purchase Orders from Debtor is funded. However, DIP Agent may increase or decrease the amount of such Reserve, up to the Reserve Cap, at any time and from time to time if it deems it necessary in order to protect its interest and to protect DIP Factoring Purchasers from losses or potential losses that DIP Factoring Purchasers may reasonably anticipate might arise in the future due to contingencies, disputes, potential breach of warranties or other potential non-payments, reductions or losses from the purchase of Accounts or Purchase Orders under the Advances. |
| **Recourse to Borrower of Certain Accounts** | In the event that (a) an Account or Purchase Order (during the Interim Period) purchased by DIP Factoring Purchasers is not paid in full by the account debtor, on or before the date when due in accordance with its terms, (b) an account debtor objects to the property sold or service performed by Debtor, or rejects or revokes acceptance or fails or refuses to accept or receive any such property or services, (c) an account debtor suspends business, requests a general extension of time within which to pay debts, makes an assignment for the benefit of creditors or becomes a debtor or alleged debtor in any bankruptcy case, or if an event occurs amounting to a general business failure of an account debtor, or (d) DIP Agent in its reasonable discretion determines that any Account or Purchase Order is or may become uncollectible (collectively, a "Worthless Account"), the DIP Agent may require the Debtor promptly to repurchase. |
| **Facility Fee** | Fifty basis points (0.50%) of each Account or Purchase Order purchased by DIP Factoring Purchasers, payable at the time of each such purchase. |
| **Closing Dates** | "Interim Closing Date" means the date on which the conditions precedent to the Interim DIP Issuance set forth in the DIP Documents (including entry of the Interim DIP Order) have been satisfied or waived.<br><br>"Final Closing Date" means the date on which the conditions precedent to the Final DIP Issuance set forth in DIP Documents (including entry of the Final DIP Order) have been satisfied or waived. |
| **Amortization** | The DIP Note Facility shall not have any principal amortization prior to the Maturity Date (as defined below). |
| **Maturity Date** | Earliest of (a) November 30, 2023, (b) the date all DIP Notes become due and payable under the DIP Documents, whether by acceleration |

| | |
|---|---|
| | after an Event of Default or otherwise, (c) the date of the closing of the Sale Transaction (as defined below) or any other sale(s) of all or substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, and (d) the filing of a chapter 11 plan that is not an Acceptable Plan (as defined below) (the "<u>Maturity Date</u>"). |
| **Interest Rates** | • <u>DIP Note Facility</u>: A fixed rate of interest equal to 0% per annum.<br><br>• <u>Interest Rate on Aggregate Advances</u>: The prime interest rate as published in the Wall Street Journal plus two percent (2%) per annum.<br><br>• Default interest rate of an additional 2.0% per annum upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Documents), payable in cash on demand. |
| **Payments and Fees** | <u>Upfront Payment</u>: $0<br><br><u>DIP Agent Fee</u>: $0<br><br><u>Closing Fee</u>: $0 |
| **DIP Collateral** | All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Note Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of the Note Parties, including, for the avoidance of doubt, any equity or other interests in the Note Parties' non-Debtor and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the Final DIP Order, including the proceeds thereof (collectively, the "<u>DIP Collateral</u>"). |
| **Priority of DIP Obligations** | All obligations of the Issuer under the DIP Facilities and all amounts owing by the Guarantor(s) in respect thereof at all times shall be, effective as of December 15, 2022 ("<u>Petition Date</u>"), secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected superpriority priming senior liens on and security interests in the DIP Collateral (collectively, the <u>DIP Liens</u>"), subject to the priorities described in <u>Schedule 2</u> hereto. |

| | All of the DIP Liens shall be created on terms, and pursuant to documentation, satisfactory to the DIP Agent, in its sole discretion. |
|---|---|
| **DIP Superpriority Claim** | All obligations of the Debtor under the DIP Facilities and all amounts owing by the Guarantor(s) in respect thereof at all times shall constitute allowed superpriority administrative expense claims, pursuant to section 364(c)(1) of the Bankruptcy Code, in the Chapter 11 Case (the "DIP Superpriority Claims"), having priority over all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provisions of the Bankruptcy Code, subject to the priorities described in Schedule 2 hereto. |
| **Documentation** | The DIP Documents shall be prepared initially by counsel for the DIP Agent, and shall substantially reflect the terms and provisions of this DIP Term Sheet in all material respects and shall be acceptable to the DIP Agent. |
| **Conditions Precedent** | The effectiveness of the DIP Facilities on the DIP Effective Date, the obligations of the DIP Note Purchasers to purchase the DIP Notes, and the obligations of the DIP Factoring Purchasers to purchase Accounts or Purchase Orders (during the Interim Period) shall be subject to customary closing conditions, including, without limitation, the satisfaction of the following conditions precedent (the "Conditions Precedent") (unless waived in writing by the applicable DIP Consenting Parties): <br><br> • All DIP Documents shall have been executed by the Note Parties and the other parties thereto. <br><br> • All documented out-of-pocket fees and expenses (including reasonable and documented out-of-pocket fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agent shall have been paid (or will be paid with the proceeds of the DIP Facilities authorized under the Interim DIP Order or the Final DIP Order, as applicable), including, but not limited to, the reasonable and documented fees and expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP. <br><br> • The DIP Secured Parties and DIP Factoring Parties shall have received, and the DIP Consenting Parties shall be satisfied with, the initial Budget (as defined herein). <br><br> • Upon the entry of the Interim DIP Order, the DIP Agent shall, for the benefit of the DIP Secured Parties and DIP Factoring Parties, have valid, binding, enforceable, non-avoidable, and |

| | |
|---|---|
| | automatically and properly perfected liens on the DIP Collateral to the extent set forth in the Interim DIP Order, subject to the priorities described in <u>Schedule 2</u> hereto, and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid.<br><br>• The form and substance of the "first day" orders permitting the payment by the Issuer and its subsidiaries of any prepetition amounts then (or thereafter becoming) due and owing shall be acceptable to the DIP Agent.<br><br>• The Interim DIP Order and the Final DIP Order (as applicable) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any manner adverse to the DIP Note Purchasers or DIP Factoring Purchasers without the consent of the DIP Agent, or to the extent adversely and disproportionately affecting any particular DIP Note Purchaser or DIP Factoring Purchaser, such adversely affected DIP Note Purchaser or DIP Factoring Purchaser.<br><br>• The satisfaction of other customary terms and conditions (including, without limitation, delivery of secretary and officer certificates, notice of borrowing, evidence of insurance, and legal opinions) and such other customary conditions as shall be required by the DIP Agent. |
| **Milestones** | The Note Parties shall comply with the following deadlines (each, individually, a "<u>Milestone</u>" and, collectively, the "<u>Milestones</u>"), which may be extended or waived by the DIP Agent in its sole discretion:<br><br>• By December 31, 2022, the Note Parties shall file a motion, in form and substance acceptable to the DIP Consenting Parties, seeking initial and final approval of the DIP Facilities (the "<u>DIP Motion</u>").<br><br>• The Bankruptcy Court shall hold a hearing on the DIP Motion by January 5, 2023, and enter a speaking order approving the DIP Motion on an interim basis at the hearing.<br><br>• The Bankruptcy Court shall enter the Interim DIP Order, which order shall be in form and substance acceptable to the DIP Consenting Parties, approving the DIP Facilities on an |

interim basis no later than three (3) business days following the hearing on the DIP Motion.

- The Bankruptcy Court shall enter the Final DIP Order, which order shall be in form and substance acceptable to the DIP Consenting Parties, approving the DIP Facilities (including the Roll-Up on a final basis) no later than 24 days following the filing of the DIP Motion.

- The Debtor shall file an Acceptable Plan by August 31, 2023.

- An "Acceptable Plan" is a plan of reorganization or liquidation reasonably acceptable to the DIP Agent, which shall include the following:

  o Repayment in full in cash of the obligations under the DIP Note Facility, including Roll-Up;

  o Repayment of $10.0 million in cash of the obligations to the Prepetition Secured Parties, inclusive of any repayment of the Roll Up in the DIP Note Facility (for purpose of clarity, if Roll Up is $2mm, the total repayment amount will be $4mm under the DIP Note Facility and $8mm to the Prepetition Secured Parties);

  o Repayment of $4.0 million, amortized over five (5) years from the effective date of the Acceptable Plan, at prime plus 3% interest, compounded annually; and

  o Be acceptable to the DIP Agent, in its reasonable discretion, with respect to the treatment of the Prepetition Secured Parties, DIP Note Purchasers, and DIP Factoring Purchasers.

- In the event an Acceptable Plan has not been filed by Debtor by August 31, 2023, Debtor shall commence a Section 363 sale process (the "Sale Transaction") within 14-days of notice by the DIP Agent that the plan filed is not acceptable. In the event that no plan is filed by August 31, 2023, Debtor shall commence a Sale Transaction on September 14, 2023. The procedure and timing of the Sale Transaction shall be satisfactory to the DIP Agent, in its sole discretion.

- The Bankruptcy Court shall approve an Acceptable Plan by November 15, 2023.

| | To the extent any covenant or obligations under the DIP Documents (including any Milestones) are required to be performed on a day that is not a business day, the deadline for such covenant or obligations shall be automatically extended to the next business day. |
|---|---|
| **Voluntary Prepayment** | Prior to the Maturity Date, the Issuer may, upon at least three business days' notice, prepay in full or in part, the DIP Notes.<br><br>The Issuer shall not be permitted to repurchase DIP Notes or repay or prepay DIP Notes other than on a pro rata basis. |
| **Mandatory Prepayment** | Prior to the Maturity Date, the following mandatory prepayments shall be required:<br><br>1.   Asset Sales: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of the sale or other disposition of any property or assets of the Note Parties or any of their respective subsidiaries, except for ordinary course and de minimis sales and additional exceptions to be agreed on in the DIP Documents;<br><br>2.   Insurance Proceeds: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the Note Parties or any of their respective subsidiaries subject to exceptions to be agreed on in the DIP Documents; and<br><br>3.   Incurrence of Indebtedness: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of any indebtedness incurred by the Note Parties or any of their respective subsidiaries after the DIP Effective Date (other than indebtedness otherwise permitted under the DIP Documents), payable no later than the date of receipt. |
| **Financial Covenants** | Until the repayment in full in cash of the obligations under the DIP Facilities, the Note Parties shall perform in accordance with the Budget, subject to the following with respect to any Testing Period (as defined herein): (i) the Note Parties' actual cash receipts shall not be less than 90% of the projected amounts therefor set forth in the Budget on a line by line basis; and (ii) the Note Parties' actual cash disbursements shall not be greater than 110% of the projected amounts therefor set forth in the Budget on a line by line basis, but not exceed the total budget amount (such variance, the "Permitted Variances").<br><br>During any Testing Period occurring in the Interim Period, if the Note Parties' actual cash disbursements are less than 125% of the projected amounts therefor set forth in the Budget on a line by line |

basis, but do not exceed the total budget amount, such variances shall be considered Permitted Variances.

During the period of entry of the Interim DIP Order and the earlier of (i) 30-days after entry of the Interim DIP Order and (ii) the date that the Debtor has (a) reinstated its general liability insurance and (b) resolved its labelling issues with regard to the Informed Choice certification, the DIP Note Purchasers and DIP Factoring Purchasers waive any defaults of the Note Parties for failing to comply with the Budget, including the Permitted Variances, with respect to (x) top line gross revenue and cash receipts, (y) the cost of general liability insurance and (z) the renewal fees of the Informed Choice certification.

Compliance with the Budget, subject to the Permitted Variances, shall be tested on Monday of every other week on a bi-weekly basis, with such tests to be conducted on the Monday following each of the second and fourth weeks of the Budget (each, a "Weekly Testing Period") and thereafter on a rolling 4-week basis (the "Cumulative Testing Period" and together with the Weekly Testing Period, the "Testing Periods").  Beginning on the second Monday following the DIP Effective Date and every other Monday thereafter, the Note Parties shall deliver to the DIP Agent the Variance Report (as defined herein), which Variance Report shall include variance for the line items consistent with the latest Approved Budget (as defined in the DIP Documents) and be in form and substance acceptable to the DIP Consenting Parties.

"Budget" means the initial cash flow forecast for the 13-week period commencing with the week in which the Petition Date occurs, setting forth on a line-item basis the Note Parties' projected cash receipts and cash disbursements, on a weekly basis, which budget shall be prepared by the Note Parties and in form and substance acceptable to the DIP Consenting Parties, and which budget shall be updated every four weeks on Wednesday (commencing with the Wednesday of the fourth full week commencing after the Petition Date (or if such day is not a business day, the next business day) in substantially the same form as the initial budget delivered and in substance acceptable to the DIP Consenting Parties. The Budget shall include separate line items for each Professional Person (defined below). To the extent that any updated Budget is not acceptable to the DIP Consenting Parties, the then-existing approved budget will remain the "Budget" until replaced by an updated budget that is acceptable to the DIP Consenting Parties.

| | |
|---|---|
| **Reporting** | The Issuer shall deliver to the DIP Agent (and the DIP Agent shall deliver to each DIP Note Purchaser and DIP Factoring Purchaser):<br><br>(a) a weekly line-by-line variance report (the "<u>Variance Report</u>"), which Variance Report shall compare actual cash receipts and disbursements of the Note Parties with corresponding amounts provided for in the Budget on a line-by-line basis for the prior week and the applicable Testing Period (or such shorter period as may have elapsed from the Petition Date), including written descriptions in reasonable detail explaining any material positive or negative variances, and otherwise in form and substance reasonably acceptable to the DIP Consenting Parties;<br><br>(b) all other reports and notices required to be delivered under the DIP Documents as mutually agreed upon by the Debtor and the DIP Agent; and<br><br>(c) copies of non-privileged reports of the financial and restructuring advisors of the Note Parties as reasonably requested by the DIP Agent, including but not limited to:<br><br>    i.   Any analysis of cash flows, forecasts, and potential cost savings initiatives;<br><br>    ii.   Transaction marketing material (CIMs / MPs);<br><br>    iii.   Investor outreach list;<br><br>    iv.   Sale process updates in accordance with the terms of this DIP Term Sheet; and<br><br>    v.   Proposed sources and uses at emergence.<br><br>In addition, management of the Issuer shall, at the request of the DIP Agent, conduct a bi-weekly conference call with the DIP Consenting Parties during normal business hours at a time to be mutually agreed upon to discuss the Issuer's performance. |
| **Board of Directors** | By no later than five (5) days following the entry of the Interim DIP Order, Debtor shall engage an independent director ("<u>Independent Director</u>") selected by the DIP Consenting Parties, who shall be reasonably satisfactory to the Board of Directors, with sole and exclusive responsibility for the following:<br><br>• Protect and recover the assets of the Debtor, including determine whether it is in the best interest of the Debtor to reorganize under Section 1129 of the Bankruptcy Code, or |

|  | sell its assets in accordance with Section 363 of the Bankruptcy Code; |
|  | • Review and approve the ultimate debtor-in-possession financing incurred by the bankruptcy estate, as negotiated by the Debtor's restructuring professionals; |
|  | • Except as otherwise provided herein, investigate and determine which estate causes of action, if any, should be pursued, prosecuted, or settled; and |
|  | • Maximize value for all stakeholders.<br><br>All current members of the board of directors will resign immediately upon entry of the Interim DIP Order.<br><br>Upon entry of the Interim DIP Order, the board of directors will be reconstituted with the following members (the following, the "<u>Board of Directors</u>"):<br><br>  1. The CRO (as defined below) once engaged by Debtor;<br>  2. Eric Hillman; and<br>  3. The Independent Director once engaged by Debtor. |
| **Other Covenants** | By no later than five (5) days following the entry of the Interim DIP Order, Debtor shall engage a Chief Restructuring Officer (the "<u>CRO</u>") reasonably satisfactory to the DIP Consenting Parties pursuant to an engagement letter with a scope and compensation reasonably satisfactory to the DIP Consenting Parties and otherwise be in form and substance satisfactory to the DIP Consenting Parties. All fees and expenses of (and otherwise relating to) the CRO shall be the sole responsibility of the Debtor. The CRO shall not be removed without order of the Bankruptcy Court.<br><br>Ryan Drexler shall resign from all offices of Debtor and from the board of directors of Debtor immediately upon entry of the Interim DIP Order. Eric Hillman shall be appointed as the CEO of Debtor immediately upon entry of the Interim DIP Order.<br><br>The DIP Documents shall contain such other negative and affirmative covenants that are ordinary and customary in debtor-in-possession financings and reasonably acceptable to the DIP Consenting Parties, including, without limitation, compliance with the Budget in accordance with the DIP Documents. Such covenants shall prohibit, inter alia, Issuer from making dividends or other distributions of cash to the direct or indirect equity holders of Issuer, including any distributions of cash in order to pay management fees or pay taxes attributable to the income of Issuer or any of its subsidiaries. |

|  | At the request of the DIP Agent, the Note Parties shall (i) arrange and cause to be held bi-weekly conference calls between representatives of the Note Parties, the CRO and the DIP Consenting Parties (which (a) may, to the extent practicable, be the same weekly conference described above, and (b) shall occur during normal business hours at a time to be mutually agreed) for purposes of providing information regarding the status of the Chapter 11 Case, Debtor's business operations, the preparation, filing, and confirmation of an Acceptable Plan, and the Sale Transaction process that, while a stalking horse bidder remains part of the sale process, would not be deemed to provide preferential treatment to such bidder; provided that, for the avoidance of doubt, information regarding the number and identity of the parties contacted and the overview of the marketing efforts undertaken in connection with the Sale Transaction shall not be deemed to provide preferential treatment and shall be disclosed; (ii) at all times provide the DIP Consenting Parties and their professional advisors with access to any data room established for purposes of allowing potential purchasers to evaluate a Sale Transaction; and (iii) provide the DIP Consenting Parties and their professional advisors with all materials and other communications regarding the Sale Transaction process provided and available to all bidders at the time of distribution to any or all bidders. If at any time the stalking horse bidder is not part of the sale process, then the Issuer shall arrange and cause to be held weekly conference calls between representatives of the Note Parties, the CRO and the DIP Consenting Parties (which (a) may, to the extent practicable, be the same weekly conference described above, and (b) shall occur during normal business hours at a time to be mutually agreed), for purposes of providing full and complete information regarding the Sale Transaction process to the DIP Agent. |
|---|---|
| **Representations & Warranties** | The DIP Documents shall contain such representations and warranties as are usual and customary in debtor-in-possession financing and as are reasonably acceptable to the DIP Consenting Parties. |
| **Use of Proceeds** | The proceeds of the DIP Facilities shall be used solely for the following purposes, subject in all cases to the Budget:<br><br>(a)  pay fees, interest, payments, and expenses associated with the DIP Facilities;<br><br>(b)  provide for the ongoing working capital and capital expenditure needs of the Note Parties during the pendency of the Chapter 11 Case; |

| | |
|---|---|
| | (c)    fund the Carve-Out; |
| | (d)    fund the Forensic Accountant; and |
| | (e)    fund the costs of the administration of the Chapter 11 Case and the consummation of the restructuring. |
| | No Cash Collateral or proceeds of the DIP Facilities shall be used by the Debtor to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the DIP Facilities or the Prepetition Transaction Documents. |
| **Forensic Accounting** | The CRO shall retain a forensic accountant reasonably acceptable to the DIP Consenting Parties (the "<u>Forensic Accountant</u>") to review and analyze all Debtor's bank statements for three (3) or more years prior to the Petition Date and any other documents and information necessary to investigate payments and transfers from Debtor to determine whether they are avoidable under federal and state law. |
| **DIP Disbursement Account** | The Issuer and the Guarantor(s) shall deposit the proceeds of the DIP Note Facility and any Advances in Bankruptcy Court approved debtor-in-possession account that is subject to the control of the DIP Agent pursuant to a deposit account control agreement (the "<u>DIP Disbursement Account</u>"), and that is not subject to the control of any other Person. Proceeds of the DIP Facilities and any other deposits to be provided under the DIP Documents shall be deposited, held and disbursed through the DIP Disbursement Account or otherwise in accordance with the cash management order. For the avoidance of doubt, the factoring commitment will be made but only funded upon receipt of orders, which funding will not be unreasonably withheld or delayed. |
| **Events of Default/Remedies** | Events of Default shall include, without limitation:<br><br>• failure to pay principal or interest on the DIP Notes or any fees under the DIP Facilities when due;<br><br>• failure of any representation or warranty of any Note Party contained in any DIP Document to be true and correct in all material respects when made;<br><br>• breach of any covenant, subject to a five (5) business day grace period (from the earlier of the date that (i) any Note Party obtains knowledge of such breach and (ii) any Note Party receives written notice of such default from any DIP Consenting Party), <u>provided</u> that the breach of any covenant |

described herein, or any other covenant so indicated by the DIP Agent, shall not be subject to any grace period;

- failure to comply with the Budget, subject to the Permitted Variances;

- the DIP Agent shall cease to have continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected superpriority priming senior liens on and security interests in the DIP Collateral with the priorities described in Schedule 2 hereto (other than upon a release by reason of a transaction that is permitted under the DIP Documents);

- any Note Party or equityholder or Affiliate thereof (i) contesting the validity or enforceability of any DIP Document in writing or denying in writing that it has any further liability thereunder or (ii) contesting the validity or perfection of the liens and security interests securing the Facilities;

- any attempt by any Note Party or any equityholder or Affiliate thereof to invalidate or otherwise impair the DIP Facilities or the liens granted to the DIP Note Purchasers or DIP Factoring Purchasers;

- failure by any Debtor to comply with the Interim DIP Order or Final DIP Order, as applicable;

- the entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim DIP Order or Final DIP Order or any other order of the Bankruptcy Court approving the Debtor's use of Cash Collateral, as applicable, without the express written consent of the DIP Consenting Parties;

- any sale or disposition, other than the Sale Transaction, of all or a material portion of the DIP Collateral securing the DIP Facilities pursuant to section 363 of the Bankruptcy Code other than as permitted by the DIP Orders (or pursuant to a transaction that is permitted under the DIP Documents);

- conversion of, or the filing of any motion by any Note Party or any equityholder or Affiliate thereof to convert, any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

- dismissal of, or the filing of any motion by any Note Party or equityholder or Affiliate thereof to dismiss, any of the Chapter 11 Case;

- the appointment of a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of any Note Party (powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) under sections 1104(d) and 1106(b) of the Bankruptcy Code;

- failure to meet any Milestone;

- the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to a holder or holders of any security interest or lien on any part of the DIP Collateral securing the DIP Facilities to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral having a fair market value in excess of an amount to be agreed by the DIP Consenting Parties;

- the grant of any superpriority claim that is pari passu with or senior to those of the DIP Note Purchasers or DIP Factoring Purchasers (other than the Carve-Out);

- termination by the Bankruptcy Court of the use of Cash Collateral;

- the filing of a plan of reorganization or liquidation by the Debtor that is not an Acceptable Plan;

- expiration of the period of time during which only the Issuer may file a plan pursuant to section 1121 of the Bankruptcy Code; and

- the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any of the DIP Collateral.

Among other remedies to be specified, upon the occurrence of an Event of Default, the DIP Agent may and, at the direction of the DIP Consenting Parties, shall seek relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, and apply the proceeds thereof to the obligations arising under the DIP Documents or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law.

| | |
|---|---|
| **Cash Collateral Usage** | The Prepetition Secured Parties consent to the use of Cash Collateral, subject to the Budget (subject to Permitted Variances) and the terms of this term sheet and the DIP Orders. |
| **Carve Out** | Carve-out provisions to be customary and appropriate in the context of the proposed DIP Facilities, and as otherwise acceptable to the DIP Agent, including a carve-out of all reasonable and documented fees and expenses up to $200,000 incurred by professionals employed by Debtor, and an investigation budget cap of $100,000 for any committee of unsecured creditors and a post-carve-out trigger notice cap of $25,000 for Debtor's professionals and $25,000 for any committee of unsecured creditors. Nothing in this section is intended or to be construed as limiting the fees and costs of the Issuer's professionals, as approved by the Bankruptcy Court in accordance with the Bankruptcy Code. |
| **Expenses and Indemnification** | The Note Parties shall pay, in connection with the Chapter 11 Case and the negotiation and documentation of the DIP Facilities and restructuring matters with respect to the Note Parties, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agent and reasonable and documented legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agent. In addition, the Note Parties shall pay, in connection with workout proceedings and enforcement costs associated with the DIP Facilities, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agent and reasonable and documented legal fees and out-of-pocket expenses legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agent.<br><br>The Issuer and the Guarantor(s) will indemnify the DIP Agent, DIP Note Purchasers, and DIP Factoring Purchasers and their respective affiliates, and their respective related parties, and hold them harmless from and against all out-of-pocket costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any notes issued under the DIP Facilities; <u>provided</u> that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of |

| | competent jurisdiction to have been incurred solely by reason of the gross negligence or willful misconduct of such person. |
|---|---|
| **Adequate Protection** | (i)    the Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall receive, to the extent of any aggregate diminution in the value of their collateral: (a) valid, binding, enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "<u>Prepetition Notes Adequate Protection Liens</u>"), subject to the priorities described in <u>Schedule 2</u> hereto; and (b) allowed superpriority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "<u>Prepetition Notes Adequate Protection Claims</u>"), subject to the priorities described in <u>Schedule 2</u> hereto; <br><br>(ii)    Prestige Capital Finance, LLC ("<u>Prestige</u>") shall receive, to the extent of any aggregate diminution in the value of its collateral: (a) valid, binding, enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "<u>Prestige Adequate Protection Liens</u>"), subject to the priorities described in <u>Schedule 2</u> hereto; and (b) allowed superpriority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "<u>Prestige Adequate Protection Claims</u>"), subject to the priorities described in <u>Schedule 2</u> hereto; <br><br>(iii)    the Prepetition Collateral Agent shall be entitled to reimbursement of its reasonable and documented fees and out- of-pocket expenses; <br><br>(iv)    the Prepetition Collateral Agent shall be entitled to reimbursement of its respective reasonable and documented fees and out-of-pocket expenses of one primary counsel and one local counsel (if applicable), and one financial advisor; <br><br>(v)    the Prepetition Collateral Agent, on behalf of itself and the Prepetition Secured Parties, shall be entitled to performance of the Milestones set forth herein; <br><br>(vi)    the Debtor agrees that in any sale of the DIP Collateral, the Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall have the right to credit bid an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, plus the obligations under the DIP Facilities, or such greater amount as allowed by the Court, |

|  | in accordance with section 363(k) of the Bankruptcy Code, and that any motion filed by the Debtor seeking approval of bid procedures shall contain a request for approval of the right of the Prepetition Collateral Agent to credit bid the obligations of the Prepetition Purchasers; |
|  | (vii)    the Debtor shall provide the information required by the section entitled "Reporting" set forth herein; |
|  | (viii)   the Final DIP Order shall include the waivers described in the section entitled "Waivers" set forth herein; and |
|  | (ix)    interest at the default rate specified in the Prepetition Notes shall continue to accrue under the terms of the Prepetition Notes. |
| **Stipulations** | The DIP Orders shall contain stipulations as to, among other things, the amount and priority of the secured indebtedness under the Prepetition Notes. |
| **Waivers** | The DIP Orders shall provide for (i) a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code, (ii) a waiver of the ability to surcharge the DIP Collateral, and subject to entry of the Final DIP Order, the collateral securing the Prepetition Notes, including under section 506(c) of the Bankruptcy Code, and (iii) a waiver of the equitable doctrine of "marshaling" with respect to the DIP Collateral, and subject to entry of the Final DIP Order, the collateral securing the Prepetition Notes. |
| **Releases** | Pursuant to the DIP Orders, the Issuer and Guarantor(s) shall release all claims against the DIP Agent in its capacity as such, the DIP Note Purchasers in their capacities as such, the DIP Factoring Purchasers in their capacities as such, the Prepetition Collateral Agent in its capacity as such and the Prepetition Purchasers in their capacities as such. |
| **Allowed Claim** | Prepetition Secured Parties shall have an allowed claim of an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, plus the obligations under the DIP Facilities and attorneys' fees and expenses. |
| **Credit Bid** | Debtor shall consent to (i) the DIP Agent submitting a credit bid of the obligations under the DIP Facilities, and (ii) the Prepetition Collateral Agent submitting a credit bid of an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, or such greater amount as allowed by the Court (together, the "Credit Bid Obligations"), in |

| | |
|---|---|
| | connection with the sale of any asset of the Note Parties (in whole or in part), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code and any motion filed by the Debtor seeking approval of bid procedures shall contain a request for approval of the right of the DIP Agent and Prepetition Collateral Agent, as applicable, to credit bid the Credit Bid Obligations and Debtor shall not object to such a provision. |
| **Governing Law** | The DIP Documents shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to the conflict of law principles thereof. Each party to the DIP Documents will waive the rights to trial by jury and will consent to jurisdiction of the Bankruptcy Court for so long as the Chapter 11 Case remain open and, thereafter, the state and federal courts located in the County of New York in the State of New York. |
| **Amendments** | All amendments, modifications and waivers of the DIP Documents shall require the consent of the Issuer and the DIP Consenting Parties, except in the case of amendments, modifications, or waivers customarily requiring consent from all DIP Note Purchasers and DIP Factoring Purchasers, all affected DIP Note Purchasers, DIP Factoring Purchasers, or the DIP Agent. |
| **Proof of Claim** | The DIP Agent, the DIP Note Purchasers, the DIP Factoring Purchasers, the Prepetition Collateral Agent, and the Prepetition Purchasers will not be required to file a proof of claim in connection with the Chapter 11 Case. |
| **Assignments and Participations** | Each DIP Note Purchaser and DIP Factoring Purchaser may assign all or any part of the DIP Notes or Accounts to one or more affiliate, bank, financial institution, or other entity. Upon such assignment, such affiliate, bank, financial institution, or entity will become a DIP Note Purchaser or DIP Factoring Purchaser, as applicable, for all purposes under the DIP Documents. The DIP Note Purchasers and DIP Factoring Purchasers will also have the right to sell participations, subject to customary limitations on voting rights, in the DIP Notes or Accounts. Notwithstanding the foregoing, no assignment shall be made or participation sold to the Issuer, any subsidiary of the Issuer or an affiliate of any of the foregoing. |
| **Counsel to Empery as DIP Agent and as a DIP Purchaser** | Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP |

## SCHEDULE 1[1]

| Prepetition Purchaser | Aggregate Principal Amount, including OID, of October Notes (USD) | Aggregate Principal Amount, including OID, of June Notes (USD) |
|---|---|---|
| Altium Growth Fund, LP | 1,384,300.00 | 156,250.00 |
| Anson Investments Master Fund LP | 1,038,225.00 | 312,500.00 |
| Bigger Capital Fund, LP | 692,150.00 | 312,500.00 |
| CVI Investments, Inc. | 692,150.00 | 0.00 |
| District 2 Capital Fund LP | 1,038,225.00 | 312,500.00 |
| Empery Debt Opportunities Fund, LP | 1,245,870.00 | 281,250.00 |
| Empery Master Onshore, LLC | 924,712.40 | 208,750.00 |
| Empery Tax Efficient, LP | 276,860.00 | 62,500.00 |
| Empery Tax Efficient III, LP | 321,157.60 | 72,500.00 |
| HB Fund LLC | 692,150.00 | 156,250.00 |
| Intracostal Capital LLC | 69,214.99 | 0.00 |
| Ionic Ventures | 692,150.00 | 312,500.00 |
| L1 Capital Global Opportunities Master Fund | 692,150.00 | 0.00 |
| Roth Capital Partners, LLC | 0.00 | 269,375.00 |
| Walleye Opportunities Master Fund Ltd. | 0.00 | 625,000.00 |
| **TOTAL** | 9,759,315.00 | 3,081,875.00 |

---

[1] Schedule 1 to be reviewed and updated, as needed.

## SCHEDULE 2

| Order of Priority | DIP Collateral Consisting of Pre-Petition Factoring Priority Collateral[2] | DIP Collateral Consisting of Post-Petition Factoring Priority Collateral | DIP Collateral Not Consisting of Factoring Priority Collateral | Third-Party Encumbered Assets[3] | Unencumbered Assets | Superpriority Claims |
|---|---|---|---|---|---|---|
| 1st | Carve-Out and Permitted Liens[4] | Carve-Out and Permitted Liens | Carve-Out and Permitted Liens | Third-Party Existing Liens | Carve-Out | Carve-Out and Permitted Liens |
| 2nd | Prestige Liens[5] | DIP Liens | DIP Liens | Carve-Out | DIP Liens | DIP Superpriority Claim |
| 3rd | DIP Liens | Prestige Adequate Protection Liens | Prepetition Notes Adequate Protection Liens | DIP Liens | Prepetition Notes Adequate Protection Liens and Prestige Adequate Protection Liens | Prepetition Notes Adequate Protection Claim and Prestige Adequate Protection Claim |
| 4th | Prepetition Notes Adequate Protection Liens | Prepetition Notes Adequate Protection Liens | Prepetition Notes Liens | Prepetition Notes Adequate Protection Liens and Prestige Adequate Protection Liens | | |
| 5th | Prepetition Notes Liens | Prepetition Notes Liens | Prestige Adequate Protection Liens | | | |
| 6th | | | Prestige Liens | | | |

---

[2]    As defined in the Intercreditor Agreement, dated as of October 13, 2021 (the "Prestige Intercreditor Agreement"), among Prestige, Empery, as Notes Representative on behalf of the Prepetition Noteholders and Prepetition Collateral Agent, and the Note Parties.

[3]    "Third-Party Encumbered Assets" shall mean DIP Collateral that was, as of the Petition Date, subject to valid, properly perfected and non-avoidable liens or security interests (collectively, the "Third-Party Existing Liens") other than the liens and security interests granted pursuant to the Prepetition Security Agreement (the "Prepetition Notes Liens") and the Prestige Liens (as defined below).

[4]    "Permitted Liens" shall mean any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Notes Liens and Prestige Liens.

[5]    "Prestige Liens" shall mean any valid, properly perfected and non-avoidable liens on or security interests in the Factoring Collateral created by the Factoring Security Documents (each as defined in the Prestige Intercreditor Agreement).

# Exhibit 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------- x

EMPERY TAX EFFICIENT, LP,

                Plaintiff,

            - against -

MUSCLEPHARM CORPORATION, WHITE
WINSTON SELECT ASSET FUNDS, LLC,
WHITE WINSTON SELECT ASSET FUND
SERIES MP-18, LLC, and RYAN DREXLER,

              Defendants.

--------------------------------------------------------------- x

Index No.: 654789/2022

**AFFIDAVIT OF TIMOTHY
SILVER IN SUPPORT OF ORDER
TO SHOW CAUSE FOR
CONTEMPT FOR VIOLATION OF
TEMPORARY RESTRAINING
ORDER**

STATE OF NEW YORK, COUNTY OF NEW YORK

        **TIMOTHY SILVER**, being duly sworn, deposes and states:

    1.     I am a Portfolio Manager with Empery Asset Management, LP ("EAM"), the

investment adviser to Empery Tax Efficient, LP ("Empery" or the "Collateral Agent").  Empery

is collateral agent ("Collateral Agent") to the holders (the "Secured Noteholders") of Original

Issue Discount Senior Secured Notes dated as of October 13, 2021 issued by MusclePharm

Corporation (the "October Notes"), and Original Issue Discount Senior Secured Notes dated as

of June 10, 2022 (the "June Notes," collectively with the October Notes, and as amended, the

"Notes").  Unless otherwise stated, the matters set forth below are based upon my personal

knowledge or information I learned in the ordinary course of my responsibilities for EAM and

Empery.

    2.     I submit this affidavit in support of Plaintiff's Order to Show Cause for Contempt

for Violation of Temporary Restraining Order (the "Contempt Motion") against defendants

White Winston Select Asset Fund Series MP-18, LLC ("White Winston Series Fund"), White

Winston Select Asset Funds, LLC ("White Winston SAF" and collectively with White Winston

Series Fund, "White Winston") and Ryan Drexler ("Drexler") (collectively, "Defendants").

**MusclePharm's Steadfast Refusal to File For Chapter 11 Bankruptcy Protection**

3.      Empery brought this action on behalf of itself as a noteholder and as Collateral Agent to the Secured Noteholders of the Notes, which were issued by MusclePharm Corporation ("MusclePharm" or the "Company").  As I detailed in my affidavit in opposition to MusclePharm's motion for temporary restraining order against Empery, MusclePharm defaulted on the Notes multiple times, culminating in the ultimate default on December 10, 2022—the abject failure to pay the Notes upon maturity.

4.      In addition to the contractual breaches and defaults on the Notes, by mid-November, MusclePharm had alienated all of its vendors and suppliers to the point where they refused to do business with MusclePharm under the current status quo and Drexler's involvement. Specifically, by late November 2022, Mill Haven Foods, LLC ("Mill Haven"), a key supplier of dry dairy powders to MusclePharm, was owed $3.8 million and was threatening legal action.  True and correct copies of letters sent by Mill Haven to MusclePharm, dated November 23, 2022 and November 29, 2022, are attached hereto as Exhibits 1 and 2, respectively.

5.      Mill Haven was not the only MusclePharm vendor to stop doing business with MusclePharm and threaten legal action.  For example, on November 9, 2022, JW Nutritional, a key manufacturer of MusclePharm's products, notified the Company that it had lost confidence in MusclePharm and would not tolerate its breaches so long as Drexler continued to have any operational decision-making authority.  A true and correct copy of this letter is attached hereto as Exhibit 3.

6.      Nonetheless, Empery sought to work with MusclePharm on an organized, voluntary bankruptcy filing so as to avoid the dire situation in which the Company currently finds itself.  On November 28, 2022, Empery emailed MusclePharm's board of directors (the

2

"MusclePharm Board") and encouraged it "to engage in a dialogue for an organized Chapter 11 in order to maximize the value for all stakeholders." Attached hereto as Exhibit 4 is a true and correct copy of an email, dated November 28, 2022, that I sent to the MusclePharm Board.

7. When I sent the email on November 28, 2022, MusclePharm employed a Chief Restructuring Officer ("CRO"). I told the Company that it should consider a Chapter 11 bankruptcy because Empery understood that it was "the recommendation of the [CRO] and we believe that it is the Board's fiduciary responsibility to proceed down this restructuring path."

8. Unfortunately, the Company and the MusclePharm Board made it extremely clear to me, Empery and everyone who asked that they would ***never*** file for bankruptcy protection. Instead, the MusclePharm Board refused the CRO's advice, restricted him from communicating with Empery, and, upon information and belief, subsequently stopped compensating the CRO presumably so he would resign. In sum, MusclePharm could have filed for bankruptcy protection long ago in an organized process in which capital was lined up, communication to employees, customers and vendors was clear and the business could be quickly restarted, but its board clearly and unequivocally indicated the Company would not do so.

**The Secured Noteholders Pursue an Article 9 Sale and Obtain a TRO Against Drexler and White Winston**

9. Empery thus had no choice but to pursue the Article 9 Sale to salvage the remaining value of the collateral for a company that had not been operating, was not operating and had no ability to resume operations given the number of lawsuits, judgments and mounting payables and the indications of its critical vendors and suppliers that they would not work with MusclePharm while Drexler was involved with the Company.

10. On November 30, 2022, Empery began its public notice campaign of the Article 9 Sale.

3

11.     After Empery publicly noticed the Article 9 Sale, White Winston, an equity holder of MusclePharm, suddenly appeared and, on December 5, 2022, entered into the Settlement Agreement with Drexler and MusclePharm.  A true and correct copy of the Settlement Agreement is attached to my prior affidavit as Exhibit 5, Dkt. 9.

12.     Under the Settlement Agreement, among other compensation, MusclePharm agreed to grant White Winston an $8,630,261 claim, including a $4,000,000 cash payment, $500,000 of which was to be paid by January 4, 2023.

13.     It is my and my colleagues' belief that the Settlement Agreement was an attempt to financially incentivize White Winston to attack the interests of the Secured Noteholders. Following execution of the Settlement Agreement, White Winston's partner, Todd Enright ("Enright"), reached out to me and others at Empery and—in what would be the first of many times, including at the hearing on the Temporary Restraining Order—implored Empery to delay the Article 9 Sale for 30 days.  Attached hereto as Exhibit 5 is a true and correct copy of an email conversation between Enright, EAM principal Ryan Lane, myself and others.

14.     When Empery refused, believing an immediate sale was necessary to preserve its collateral, Enright stated emphatically that White Winston would "continue to take all action" to protect White Winston's interests and that, without a standstill, the Company was going to file for Chapter 11.

15.     Given MusclePharm's board's adamant and repeated refusal to even consider Chapter 11, Empery understood that MusclePharm would not file for bankruptcy to stop the Article 9 Sale.  Indeed, it did not.  Instead, MusclePharm unsuccessfully sought an eleventh hour temporary restraining order in this Court to enjoin the sale.

4

16.     At the same time, Empery sought and obtained the Temporary Restraining Order specifically to preclude White Winston from exerting control over MusclePharm for the benefit of itself over the many other unsecured creditors and the Secured Noteholders, including orchestrating a Chapter 11 filing.  Empery also sought and obtained the Temporary Restraining Order specifically to preclude White Winston and Drexler from taking other actions to dispose of MusclePharm assets, which would impair the Secured Noteholders' ability to be repaid.

**Drexler and White Winston Ignore the TRO and Subvert the Article 9 Sale**

17.     Approximately 30 minutes before the Article 9 Sale was to begin, I and others at Empery heard rumors that MusclePharm was about to file for bankruptcy protection at the direction and with the assistance of White Winston and Drexler.

18.     Drexler with, upon information and belief, the assistance and the direction of White Winston, caused MusclePharm to file a Petition for Chapter 11 Bankruptcy three minutes after the Article 9 Sale began, which stopped the auction immediately prior to the first bid. Attached hereto as Exhibit 6 is a true and correct copy of the bankruptcy petition MusclePharm filed.  The petition indicates that the proceeding was initiated upon the sworn statement of Drexler as MusclePharm's Chief Executive Officer ("CEO").

19.     Upon information and belief, White Winston and Drexler approved and directed MusclePharm's bankruptcy filing *without any actual authority to do so.*  Specifically, upon information and belief, Drexler resigned his role as CEO and Chairman of the MusclePharm Board and the MusclePharm Board accepted his resignation several days before the initiation of the bankruptcy proceeding.  For example, attached hereto as Exhibit 7 is a true and correct copy of an article dated December 16, 2022 posted on NUTRAingredients-usa.com, noting reports that MusclePharm had recently named another CEO.

5

Case 22-14422-nmc    Doc 45    Entered 01/04/23 10:04:50    Page 36 of 102

20.     Upon information and belief, the MusclePharm Board did not notice or convene a special meeting or execute a written consent in lieu of a meeting in advance of the filing. The bankruptcy petition attaches a purported "Action by Written Consent of Chief Executive Officer of MusclePharm Corporation" that indicates Drexler decided to initiate the bankruptcy on his own and without the consent or approval of the MusclePharm Board.  Moreover, I and my colleagues do not believe that the MusclePharm Board was involved in the preparation or consent of the bankruptcy filing, as the petition listed only Empery, White Winston SAF, and Prestige Capital (the firm with whom the Company had an agreement to factor its accounts receivable) as creditors.  These are the entities that White Winston would know and list as creditors.  But, as is detailed above, the MusclePharm Board was well aware of many unpaid vendors and suppliers who are creditors, including without limitation Mill Haven and JW Nutrition.

21.     Upon information and belief, MusclePharm clearly would not have filed—and did not file—the Petition for Chapter 11 Bankruptcy but for White Winston's and Drexler's ultra vires direction and control.

22.     On December 19, 2022, White Winston and Drexler proposed a Debtor-in-Possession Factoring and Loan Term Sheet (the "December 19 DIP Proposal").  Attached hereto as Exhibit 8 is a true and correct copy of an email, dated December 20, 2022 from MusclePharm's Nevada bankruptcy counsel to Empery's Nevada bankruptcy counsel, attaching the December 19 DIP Proposal and denoting it was received from White Winston on December 19, 2022.

23.     The December 19 DIP Proposal is a term sheet that outlines a proposed agreement between White Winston and MusclePharm, which would dispose of Company assets by conveying them to White Winston.

Case 22-14422-nmc    Doc 45    Entered 01/04/23 10:04:50    Page 37 of 102

24.     White Winston and Drexler revised the December 19 DIP Proposal on December 24 (the "Revised DIP Proposal and, together with the December 19 DIP Proposal, the "DIP Proposals"). Attached hereto as Exhibit 9 is a true and correct copy of the Revised DIP Proposal. Like the December 19 DIP Proposal, the Revised DIP Proposal would dispose of Company assets by conveying them to White Winston. In fact, the Revised DIP Proposal would enrich White Winston even more than the original proposal. For example, it increases the closing fee paid to White Winston from $35,000 to $100,000.

**The Secured Noteholders Suffered Loss as a Result of White Winston and Drexler's Conduct**

25.     White Winston and Drexler's contemptable actions have, in fact, caused Empery and the Secured Noteholders to suffer harm. Specifically, the Secured Noteholders have lost the value of the time and money that they spent on the Article 9 Sale and this action, the diminution in the value of the collateral caused by the delay, as well as the disposition of assets that otherwise would have been available to pay the Secured Noteholders.

26.     Part of my job duties and responsibilities at EAM included engaging Sherwood Partners, Inc. ("Sherwood Partners") to conduct the Article 9 Sale in a commercially reasonable manner. To that end, I regularly communicated with Molly Froschauer ("Froschauer") of Sherwood Partners to understand the status, interest and likely outcome of the Article 9 Sale. Based upon my conversations with Froschauer and the documents and information she provided, the Article 9 sale generated significant interest. When the auction began, eight qualified bidders were present (not including Empery), including four of MusclePharm's competitors and a key vendor.

27.     I also personally participated in the Article 9 Sale on December 15, 2022 until it was stopped by the MusclePharm bankruptcy filing. When the Article 9 Sale began on

7

Case 22-14422-nmc    Doc 45    Entered 01/04/23 10:04:50    Page 38 of 102

December 15, 2022, two bidders were present whom I knew to have been qualified by Sherwood

Partners to bid $30 million or more for the collateral. Prior to qualifying to bid, those two bidders

were aware that Empery had the ability to credit bid up to the full amount of the outstanding Notes,

with interest and other amounts due and owing. The two bidders decided to qualify to participate

in the auction well in excess of that amount. Indeed, one bidder initially qualified to bid only up

to $17 million, but later increased its qualified amount to $34 million. As a result, it seemed

inevitable that the assets sold at auction on December 15, 2022, would have been for an amount

that paid Empery and the Secured Noteholders in full. Moreover, had the assets been sold at

auction, MusclePharm's business could have been revived without significant financial damage to

the brand.

        28.     Unfortunately, White Winston and Drexler stopped the Article 9 Sale and

then, as is detailed above, have undertaken actions to convey MusclePharm assets to White

Winston. White Winston's and Drexler's actions have impaired, impeded and prejudiced (if not

destroyed) the Secured Noteholders' ability to be repaid in full. Given the timing and pace of a

bankruptcy proceeding, particularly at this time of year, there is no hope that MusclePharm's

suppliers and manufacturers will resume doing business with MusclePharm before the current

inventory is largely—if not entirely—depleted from retailers' shelves and online stores. As each

day passes, the value of the Secured Noteholders' collateral is declining and the ability of

MusclePharm to ever again become a going concern grows more remote.

        29.     For example, since the Chapter 11 filing, upon by information and belief

based upon conversations with multiple people, BJ Wholesale Club, a major retailer for

MusclePharm, significantly reduced the size of a pending order and has taken the position that if

MusclePharm does not ship the order within one week (which would be challenging given

Case 22-14422-nmc    Doc 45    Entered 01/04/23 10:04:50    Page 39 of 102

MusclePharm's current situation), it will replace MusclePharm's products with products from competing brands. This is exactly the situation that was and continues to be the greatest concern for the Secured Noteholders. With each passing day, the value of the collateral is deteriorating in tangible ways and restarting the business will continue to be more difficult until it actually becomes impossible.

30.     Moreover, given that the DIP Proposals seek to encumber the Secured Noteholders' collateral, if either DIP Proposal is approved by the bankruptcy court, what is left may not even go to pay the Secured Noteholders. Accordingly, White Winston's and Drexler's thwarting of the Article 9 Sale and actions to dispose of Company assets in White Winston's favor caused actual injury and loss to the Secured Noteholders. The actual losses include the costs of the Article 9 Sale, the attorneys' fees incurred in pursuing this action, the diminution in the value of the collateral given the delay, and the disposition of collateral that otherwise would have been available to pay the Secured Noteholders, which totals not less than $18 million.

31.     Specifically, the amount of the Secured Noteholders losses is based on the Mandatory Default Amount (as defined in the Notes), which includes: (i) 120% of the principal of the October and June 2022 Notes, amounting to $15,409,428, which is what is due and owing under the Notes; (ii) 18% interest on the principal amount, totaling $2,167,115, again, which is due and owing under the Notes; and (iii) fees and expenses incurred by the Secured Noteholders, which to date are estimated to be at least $584,804, but obviously are increasing each day due to White Winston's and Drexler's actions. The fees and expenses are both owed under the Notes and are properly characterized as losses caused directly by White Winston's and Drexler's actions because Empery believes that it would have fully recouped these fees and expenses but for White Winston's and Drexler's actions. A schedule of these losses is attached hereto as Exhibit 10.

Timothy Silver

Sworn to before me this
26th day of December 2022.

This remote notarial act involved the use of
Communication technology.

Notary Public

GAYLE R. KLEIN
Notary Public, State of New York
No. 02KL6292286
Qualified in New York County
Commission Expires November 4, 2025

**ATTORNEY CERTIFICATION PURSUANT TO COMMERCIAL DIVISION RULE 17**

I, Gayle R. Klein, an attorney duly admitted to practice law before the courts of the State of New York, hereby certify that this Affidavit complies with the word count limit set forth in Rule 17 of the Commercial Division of the Supreme Court (22 NYCRR. 202.70(g)) because it contains 2,362 words, excluding the parts of the memorandum exempted by Rule 17. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this Affidavit.

Dated: New York, New York
      December 27, 2022

                    SCHULTE ROTH & ZABEL LLP

                    By: /s/ Gayle R. Klein
                    Gayle R. Klein

# Exhibit 1



**Douglas M. Poland**

222 West Washington Avenue, Suite 900
P.O. Box 1784
Madison, WI 53701-1784
DPoland@staffordlaw.com
608.259.2663

November 23, 2022

## BY CERTIFIED U.S. MAIL AND EMAIL (AS INDICATED)

| | | |
|---|---|---|
| Gary C. Shirshac | Ryan Lane | Ryan Drexler |
| Interim Chief Financial | Chief Operating Officer | 89 Olympia Chase Dr |
| Officer | Empery Asset Management, LP | Las Vegas, NV 89141 |
| MusclePharm Corporation | 1 Rockefeller Plaza, Ste 1205 | ryan.drexler@musclepharm.com |
| 6728 W. Sunset Rd, Ste 130 | New York, NY 10020 | |
| Las Vegas, NV 89119 | | |

Re:     Outstanding amounts due and owing for Mill Haven Foods, LLC/MHF Opco, LLC products
ordered by MusclePharm Corporation

Gentlemen:

We represent MHF Opco, LLC ("MHF"). In June 2022, MHF purchased the assets of Mill Haven Foods, LLC, including Mill Haven Foods' interest in receivables owed by MusclePharm Corporation to Mill Haven Foods for various products that MusclePharm ordered from Mill Haven Foods and received but for which it has not yet paid Mill Haven Foods.

More specifically, between December 2021 and July 2022, MusclePharm submitted to Mill Haven Foods purchase orders for products totaling $3,861,834.92. Copies of the purchase orders are enclosed. Mill Haven Foods confirmed those purchase orders with sales contracts. Copies of the sales contracts confirming the purchase orders submitted by MusclePharm between December 2021 and July 2022 are also enclosed. Mill Haven Foods, and then MHF, issued invoices to MusclePharm for payment of the amounts due under the purchase orders and sales contracts. Copies of the invoices corresponding to the enclosed purchase orders and sales contracts are also enclosed.

To date, MusclePharm has paid $167,201.70 of the total $3,861,834.92 invoiced and due under the purchase orders and sales contracts, leaving an unpaid balance of $3,694,633.22 (all over 90 days past due). MHF has sent weekly reports to MusclePharm identifying the aged receivables and demanding payment, yet no payments have been received since a payment of $50,000 on August 26, 2022. A copy of the most recent weekly aged receivables report (as of November 22, 2022) is enclosed. Given MusclePharm's failure to comply with its contractual obligation to pay MHF for the products it ordered and received, MHF has instructed us to notify you that unless the unpaid balance of $3,694,633.22 is paid to MHF within 30 days of this letter, or unless within that time you present MHF with a specific plan to pay the unpaid balance to MHF within a reasonable time, MHF intends to initiate legal proceedings against MusclePharm in accordance with the terms and conditions of sale under the

**Madison Office**

222 West Washington Avenue     608.256.0226
P.O. Box 1784     888.655.4752
Madison, Wisconsin     Fax 608.259.2600
53701-1784     www.staffordlaw.com

**Milwaukee Office**

1200 North Mayfair Road     414.982.2850
Suite 430     888.655.4752
Milwaukee, Wisconsin     Fax 414.982.2889
53226-3282     www.staffordlaw.com

Case 22-14422-nmc    Doc 45    Entered 01/04/23 10:04:50    Page 44 of 102

November 23, 2022
Page 2

parties' sales contracts and any other applicable laws, and against Ryan Drexler under the terms of the Personal Guaranty under which Mr. Drexler guaranteed payment of the amounts due.  A copy of the Personal Guaranty is enclosed.

We also demand that you take immediate steps to preserve any and all documents, records, and electronic communications and data (including electronic mail, text messages, and any files stored electronically) relating to the purchase orders, sales contracts, invoices, demands for payment by MHF and Mill Haven Foods, and payments made by MusclePharm for products ordered from MHF and Mill Haven Foods.

Please direct any communications regarding this matter directly to me. I look forward to hearing from you soon.

Very truly yours,

STAFFORD ROSENBAUM LLP

By_____
Douglas M. Poland

Encl.

cc:    Brian Slater, MHF Opco LLC (w/encl.)

Case 22-14422-nmc    Doc 45    Entered 01/04/23 10:04:50    Page 45 of 102

# Exhibit 2

FILED: NEW YORK COUNTY CLERK 12/27/2022 12:12 PM
NYSCEF DOC. NO. 24    Case 22-14422-nmc    Doc 45    Entered 01/04/23 10:04:50    Page 46 of 102

INDEX NO. 654789/2022
RECEIVED NYSCEF: 12/27/2022



**Douglas M. Poland**

222 West Washington Avenue, Suite 900
P.O. Box 1784
Madison, WI 53701-1784
DPoland@staffordlaw.com
608.259.2663

November 29, 2022

## BY CERTIFIED U.S. MAIL AND EMAIL (AS INDICATED)

Gary C. Shirshac
Interim Chief Financial
Officer
MusclePharm Corporation
6728 W. Sunset Rd, Ste 130
Las Vegas, NV 89119

Ryan Lane
Chief Operating Officer
Empery Asset Management, LP
1 Rockefeller Plaza, Ste 1205
New York, NY 10020

Ryan Drexler
89 Olympia Chase Dr
Las Vegas, NV 89141
ryan.drexler@musclepharm.com

Re:    Outstanding amounts due and owing for Mill Haven Foods, LLC/MHF Opco, LLC products
ordered by MusclePharm Corporation

Gentlemen:

We represent MHF Opco, LLC. On November 23, 2022, I sent you a letter enclosing copies of
purchase orders that MusclePharm Corporation submitted to Mill Haven Foods between December
2021 and July 2022 for products totaling $3,861,834.92; copies of Mill Haven Foods sales contracts
confirming the purchase orders; and copies of invoices to MusclePharm for payment of the amounts
due under the purchase orders and sales contracts. I also enclosed a copy of the most current weekly
aged receivables report.

I now write for two reasons. *First*, my November 23 letter incorrectly identified the unpaid
balance on the products that MusclePharm ordered and received as $3,694,633.22. That number was
incorrect. Rather, the correct unpaid balance is $3,861,834.92. *Second*, I am furnishing you with a more
recent weekly aged receivables report (dated today), which identifies the correct unpaid balance as
$3,861,834.92.

To reiterate my November 23 letter, given MusclePharm's failure to comply with its contractual
obligation to pay MHF for the products it ordered and received, MHF has instructed us to notify you
that unless the unpaid balance of $3,861,834.92 is paid to MHF within 30 days of my November 23
letter, or unless within that time you present MHF with a specific plan to pay the unpaid balance to
MHF within a reasonable time, MHF intends to initiate legal proceedings against MusclePharm in
accordance with the terms and conditions of sale under the parties' sales contracts and any other
applicable laws, and against Ryan Drexler under the terms of the Personal Guaranty under which Mr.
Drexler guaranteed payment of the amounts due.

**Madison Office**

222 West Washington Avenue
P.O. Box 1784
Madison, Wisconsin
53701-1784

608.256.0226
888.655.4752
Fax 608.259.2600
www.staffordlaw.com

**Milwaukee Office**

1200 North Mayfair Road
Suite 430
Milwaukee, Wisconsin
53226-3282

414.982.2850
888.655.4752
Fax 414.982.2889
www.staffordlaw.com

November 29, 2022
Page 2

Please direct any communications regarding this matter directly to me. I look forward to hearing from you soon.

Very truly yours,

STAFFORD ROSENBAUM LLP

By_____
Douglas M. Poland

Encl.

cc:    Brian Slater, MHF Opco LLC (w/encl.)

# Mill Haven Foods Opco, LLC
## Aged Receivables
### As of Nov 29, 2022

Filter Criteria includes: 1) IDs from Muscle Pharm to Muscle Pharm; 2) Includes Drop Shipments. Report order is by ID. Report is printed in Detail Format.

| Customer ID / Customer / Bill To Contact / Telephone 1 | Invoice/c | 0-30 | 31-60 | 61-90 | Over 90 days | Amount Due | P.O. No | Date | Terms | Date Due |
|---|---|---|---|---|---|---|---|---|---|---|
| Muscle Pharm | 19309 | | | | 71,806.74 | 71,806.74 | PO-MP-9103 | 1/20/22 | Net 30 Days | |
| Muscle Pharm | 19341 | | | | 196,134.45 | 196,134.45 | PO-MP-9172 | 12/12/21 | Net 30 Days | 1/22/22 |
| 303-396-6125 | 19392 | | | | 202,540.09 | 202,540.09 | PO-MP-9210 | 12/23/21 | Net 30 Days | 1/30/22 |
| | 19446 | | | | 203,325.51 | 203,325.51 | PO-MP-9009 | 12/31/21 | Net 30 Days | 2/3/22 |
| | 19441 | | | | 29,230.44 | 29,230.44 | | 1/4/22 | Net 30 Days | 2/6/22 |
| | 19453 | | | | 192,728.96 | 192,728.96 | PO-MP-9236 | 1/6/22 | Net 30 Days | 2/6/22 |
| | 19472 | | | | 205,664.35 | 205,664.35 | PO-MP-9104 | 1/6/22 | Net 30 Days | 3/2/22 |
| | 19608 | | | | 21,021.22 | 21,021.22 | | 1/31/22 | Net 30 Days | 3/11/22 |
| | 19602 | | | | 105,238.15 | 105,238.15 | PO-MP-9271 | 2/9/22 | Net 30 Days | 3/11/22 |
| | 19601 | | | | 118,535.96 | 118,535.96 | PO-MP-9105-01 | 2/9/22 | Net 30 Days | 3/11/22 |
| | 19593 | | | | 65,560.94 | 65,560.94 | PO-MP-9445-01 | 2/9/22 | Net 30 Days | 3/12/22 |
| | 19594 | | | | 72,847.21 | 72,847.21 | PO-MP-9105-02 | 2/10/22 | Net 30 Days | 3/12/22 |
| | 19595 | | | | 191,764.36 | 191,764.36 | PO-MP-9444 | 2/10/22 | Net 30 Days | 3/12/22 |
| | 19600 | | | | 58,574.49 | 58,574.49 | PO-MP-9445-20 | 2/10/22 | Net 30 Days | 3/12/22 |
| | 19598 | | | | 107,619.11 | 107,619.11 | PO-MP-9272 | 2/10/22 | Net 30 Days | 3/12/22 |
| | 19606 | | | | 33,526.37 | 33,526.37 | | 2/10/22 | Net 30 Days | 4/3/22 |
| | 19819 | | | | 70,479.73 | 70,479.73 | PO-MP-9472-01 | 3/4/22 | Net 30 Days | 4/5/22 |
| | 19818 | | | | 72,082.14 | 72,082.14 | PO-MP-9472-02 | 3/6/22 | Net 30 Days | 4/5/22 |
| | 19867 | | | | 202,079.68 | 202,079.68 | PO-MP-9529 | 3/6/22 | Net 30 Days | 4/13/22 |
| | 19861 | | | | 209,463.90 | 209,463.90 | PO-MP-9648 | 3/14/22 | Net 30 Days | 4/26/22 |
| | 20015 | | | | 42,521.11 | 42,521.11 | | 3/27/22 | Net 30 Days | 5/9/22 |
| | 20145 | | | | 213,686.89 | 213,686.89 | PO-MP-9673-01 | 4/9/22 | Net 30 Days | 5/25/22 |
| | 20210 | | | | 207,604.40 | 207,604.40 | PO-MP-9673-02 | 4/25/22 | Net 30 Days | 6/9/22 |

# Mill Haven Foods Opco, LLC
## Aged Receivables
### As of Nov 29, 2022

Filter Criteria includes: 1) IDs from Muscle Pharm to Muscle Pharm. 2) Includes Drop Shipments. Report order is by ID. Report is printed in Detail Format.

**Customer ID / Invoice/C — Bill To Contact / Telephone 1**

| Invoice/C | 0-30 | 31-60 | 61-90 | Over 90 days | Amount Due | P.O. No | Date | Terms | Date Due |
|---|---|---|---|---|---|---|---|---|---|
| 20190 | | | | 45,681.14 | 45,681.14 | | 5/7/22 | Net 30 Days | 6/9/22 |
| 20431 | | | | 51,715.31 | 51,715.31 | | 5/3/22 / 5/17/22 | Net 30 Days | 7/3/22 |
| 20439 | | | | 192,139.06 | 192,139.06 | PO-MP-9727 | 6/3/22 / 6/5/22 | Net 30 Days | 7/7/22 |
| 20453 | | | | 192,201.07 | 192,201.07 | PO-MP-9730 | 6/9/22 / 6/13/22 | Net 30 Days | 7/12/22 |
| 20485 | | | | 180,027.76 | 180,027.76 | PO-MP-9746-02 | 6/12/22 | Net 30 Days | 7/16/22 |
| 20482 | | | | 6,713.07 | 6,713.07 | PO-MP-9746-01 | 6/16/22 | Net 30 Days | 7/16/22 |
| 20559 | | | | 28,622.00 | 28,622.00 | SO-MP-81693/1116 | 6/16/22 / 6/19/22 | Net 30 Days | 7/29/22 |
| 20560 | | | | 1,443.50 | 1,443.50 | SO-MP-80600/2900 | 6/29/22 | Net 30 Days | 7/29/22 |
| 20561 | | | | 5,990.65 | 5,990.65 | SO-MP-81764/1117 | 6/29/22 | Net 30 Days | 7/29/22 |
| 20689 | | | | 47.60 | 47.60 | Po-MP-9714-01-03 | 6/29/22 / 6/30/22 | Net 30 Days | 7/30/22 |
| 20607 | | | | 44,709.26 | 44,709.26 | | 7/1/22 | Net 30 Days | 7/31/22 |
| 20777 | | | | 51,706.62 | 51,706.62 | | 8/8/22 | Net 30 Days | 9/6/22 |
| 20948 | | | 55,691.86 | | 55,691.86 | | 9/1/22 | Net 30 Days | 10/1/22 |
| 21154 | | 55,230.38 | | | 55,230.38 | | 10/4/22 | Net 30 Days | 11/3/22 |
| 21310 | 36.03 | | | | 36.03 | | 10/31/22 | Net 30 Days | 11/30/22 |
| 21345 | 56,243.43 | | | | 56,243.43 | | 11/1/22 | Net 30 Days | 12/7/22 |
| **Muscle Pharm** | 56,279.46 | 55,230.38 | 55,691.86 | 3,694,633.22 | 3,861,834.92 | | | | |
| **Report Total** | 56,279.46 | 55,230.38 | 55,691.86 | 3,694,633.22 | 3,861,834.92 | | | | |

# Exhibit 3



November 09, 2022

MusclePharm Inc.
Attn: Management & Board of Directors
6728 W. Sunset Rd. STE 130
Las Vegas, NV 89118

     RE:    MusclePharm Breach of Agreement

Dear MusclePharm Management and Board of Directors:

MusclePharm Inc. ("MusclePharm") is in breach of the "Agreement" between MusclePharm and JW Nutritional ("JWN") which was executed May 26th 2022 by Ryan Drexler, on behalf of MusclePharm and Jesse Windrix, on behalf of JWN.

By way of background, the Agreement arose following a demand letter from JWN sent on March 2, 2022 to Sabina Rizvi, Bill McLauglin and Mr. Drexler. The reason for the demand letter was due to a significantly aged past due balance for shipped product, a large amount of components purchased by JWN on MP's behalf, and JWN's belief that MusclePharm induced JWN to ship finished product with commitments MusclePharm knew it could not have honored.

In May of this year Mr. Drexler made contact with me and Peter Jungsberger with the intent of having JWN reengage and produce product for MusclePharm again. The Agreement was the result of JWN's good faith attempt to again make this business relationship work. The Agreement is simple. MusclePharm locks prices for protein to be used by JWN to produce MusclePharm product ("MP Product"). JWN orders and pays for such protein to use to produce MP Product. MusclePharm orders and JWN produces MP Product. MusclePharm pays JWN the agreed pricing no later than seven (7) days after JWN produces finished MP Product and JWN releases the MP Product for pickup or shipment upon receipt of payment.

JWN's reengagement under the terms of Agreement has not gone as planned. JWN has produced MP Product and MusclePharm has consistently not paid for product prior to pickup. Finished MP Product has set in JWN's warehouse well beyond the agreed seven (7) days limit set forth in the Agreement.



Rather than exercise JWN's clear right under the Agreement to sell the MP Product to "any willing buyer," JWN agreed in good faith to extend 48 hour trade credit terms to MusclePharm , releasing product so long as MusclePharm paid JWN within 48 hours.  Throughout September, MusclePharm shipments were placed on hold multiple times due to exceeding the 48 hours terms.  Despite the multiple shipment holds, JWN continued to incur overtime and pull large amounts of material in order to help MusclePharm reach their quarter-end goals.  However, even with JWN's efforts to work with MusclePharm in good faith to find amicable paths forward, JWN is continually met with asks that are far outside the scope of what was previously agreed to.

MusclePharm's persistent breaches of the Agreement and other arrangements with JWN have led to an unstable business relationship.  This has all occurred under Mr. Drexler's leadership of MusclePharm.  JWN has lost confidence in the commitments and promises made to JWN by MusclePharm and is unwilling to tolerate further breaches of the Agreement so long as Mr. Drexler continues to lead MusclePharm or have operational decision-making authority.  Without prompt changes in MusclePharm's leadership and management, JWN is unwilling to excuse the continuing breaches of the Agreement and will not hesitate to move swiftly to exercise its rights under the Agreement to liquidate MP Product and limit its financial exposure.

Sincerely,

Jesse Windrix

# Exhibit 4

| **From:** | Tim Silver <tim.silver@emperyam.com> |
|---|---|
| **Sent:** | Monday, November 28, 2022 4:18 PM |
| **To:** | Paul Karr; Ryan Drexler; mheller@talentresources.com; bige@erichillman.com; Marc Ross; Viscount, Michael J. |
| **Cc:** | Notices |
| **Subject:** | Mill Haven Payment Notice |
| **Attachments:** | Mill Haven Letter 2022.11.23.pdf; Mill Haven - Drexler Terms and Personal Guaranty.pdf |

MusclePharm Board of Directors, Eric, Michael, Marc,

We were copied on the attached letter that was sent to the Company from Stafford Rosenbaum on behalf of MHF Opco, LLC and Mill Haven Foods, LLC, which states that the Company owes them $3.7mm and if they do not receive payment within 30 days they will initiate legal proceedings against the Company and Ryan Drexler personally pursuant to his Personal Guaranty. We did not hear back from any of you following the board meeting last week but we want to reiterate that we encourage the Board to engage in a dialogue for an organized Chapter 11 in order to maximize the value for all stakeholders. We understand that this is the recommendation of the Chief Restructuring Officer and we believe that it is the Board's fiduciary responsibility to proceed down this restructuring path.

You have our contact information and we are available at any time to discuss the possibility of a Debtor in Possession financing.

Best,
Tim

Tim Silver
Empery Asset Management, LP
O: 212-608-3300
C: 203-247-6942

# Exhibit 5

| From: | Todd Enright <tenright@whitewinston.com> |
|---|---|
| Sent: | Tuesday, December 13, 2022 5:05 PM |
| To: | Ryan Lane |
| Cc: | Tim Silver; Robert P. Mahoney; Brett Director; Ben Hron; Stephen Fogdall |
| Subject: | Re: MSLP |

**[[ External Email ]]**

Ryan, you have had a copy of the settlement agreement since last Thursday so let not engage in who is "playing games" and "twisting facts." If you were so offended by the settlement terms, you could have easily rejected any settlement discussions and sent your suprious lawyers e-mail last week—but you didn't, you went on to negoocate the provisions for a definative standstill agreement including the provisions for a board seat for yourself. When I delivered the conditions precedent to that agreement, you decided to re-trade—so please do't lecture me about what you agreed to—we both know what went down—you got cold feet cowboy, lawyered-up, and now want to hide behind your lawyers skirt demanding "cease and desist."

As to the personal attacks, you really must be a bit more original, we have been doing this for a long-time and our track-record for dealing with people who say-one thing and do the other is excellent. So call me a "bottom feeder," tell me I haven't done my homework (and I don't know what I'm taking about) but I do know this— your version of the facts isn't supported by the documents or the record and, absent of resolving this ahead of a hearing, well let a finder of fact determine who is creditable and whose actions are "haphazard."

Again, absent addressing the standstill were are going nowhere but Court. If that is the case, as Agent, you can explain to the other Noteholders, how you blew a standstill that would have bought them down 35% in cash and likely averted a Chapter 11. Sadly, however, you personal naïveté, hubris and an apparent distain for typos make you incapable of dealing with any-thing but self-denial—I guess, in the end, well wait and see if that self-respect is, indeed, preserved; I'm not sure the over-under is running in your favor based on your conduct to date.

With all right reserved.

T.M. Enright, Partner

**White Winston**
Select Asset Funds

850.570.4793 (Direct Dial)
617.830.2200 (Administrative)
tenright@whitewinston.com

On Dec 13, 2022, at 4:19 PM, Ryan Lane <ryan.lane@emperyam.com> wrote:

Todd,
Let's be extremely clear! I never agreed to anything. I specifically said that if you want talk about a standstill, we would have some conditions before we would ever consider engaging in such a discussion. We then reviewed your settlement agreement, and it became very clear to us that you are playing

1

games. We expressed this to you yesterday on a call. So, that is far from an agreement or commitment. You can twist the situation for your benefit, but it is simply a lie. Yes, your litigation record is clear. You try to extort value by inserting yourself into chaotic and desperate situations. I hope you sleep well at night making money like this. Society refers to people like you as bottom feeders. You have not done your homework yet you proport to have the answers. You are slow and late to engage with us in this situation, and you are careless and haphazard just like you have demonstrated with your numerous typos and errors below.

Before we can talk, the record should be clear….and it is not your twisted version.

All rights and self-respect preserved.

---

**From:** Todd Enright <tenright@whitewinston.com>
**Sent:** Tuesday, December 13, 2022 3:49 PM
**To:** Ryan Lane <ryan.lane@emperyam.com>
**Cc:** Tim Silver <tim.silver@emperyam.com>; Robert P. Mahoney <rmahoney@whitewinston.com>; Brett Director <brett.director@emperyam.com>; Ben Hron <BHron@brownrudnick.com>; Stephen Fogdall <SFogdall@schnader.com>
**Subject:** Re: MSLP

**[[ External Email ]]**

Ryan, thank for your email but please save me the hyperbole—the settlement document speaks for itself and any first-year law student can read the plane language of the subordination in the settlement document and the basis for the future payments being made from DO claim payments, which don not "prime" your position and are demonstrably not your collateral. The record is clear as to the parties security interest and who is interfering with whom. We were a party of record long-before you were ever involved in this matter and the fact that now wish to "reinvent history" and our discussions and negotiations regarding the standstill is comical. I'm happy to have a call but lets be clear, you simply want to re-trade a deal we made on Friday (and performed-on by delivering the what we discussed)-- including the board seat that you personally demanded for yourself.

If you want to have a discussion with our respective counsel on the phone this afternoon to document what we already agreed to regarding the standstill that is fine. If your plan is to simply tell me why you think your diligence as a senior lien holder on IP should substitute for our review of the business operations over a 30-day period, I don't think its going to be a productive call. Frankly, a 30-day standstill (which we both agreed to based on the conditions we have delivered), when Prestige and White Winston stand ready to fund a new board and management team based on that Forbearance, doesn't crate the "melting ice-cube" you have tried to portray. Indeed, once questions the good faith nature your intentions in light of our discussions and actions to date.

The fact remains that you are a senior secured lender and we are a bona fide creditor who reached a settlement with the company in 2020--long before your involvement—your initial diligence made you aware of our litigation and original settlement. We think the smart play is to work cooperatively as we discussed on Friday. If you have now changed your mind, don't assume any amount of hollow threat of cease and desist (in caps, no less) is going to effect our decision to continue to take all action to protect out interest as a bona fide creditor. We are seasoned troubled debt investors and our experience in complicated litigation matters is well documented decades of reported cases—we are very comfortable with our position in the current situation and advise you consider your position carefully in light of the actual facts in this case.

Thank you again and I will have our counsel be in touch with your to determine if setting up a call makes sense. That certainly seems entirely up to you as the gating issue will be over ratifying what we already agreed to. Thank you again.

With all rights reserved.

T.M. Enright, Partner

<image001.png>

850.570.4793 (Direct Dial)
617.830.2200 (Administrative)
tenright@whitewinston.com

On Dec 13, 2022, at 3:22 PM, Ryan Lane <ryan.lane@emperyam.com> wrote:

Todd,

Thank you for the email and we do appreciate you reaching out and trying to keep the lines of communication open. That said, we are very concerned that the words in all of the documents are wholly inconsistent with what you tell us on the phone in each conversation. It feels to us that you are giving us lip service while you orchestrate a change of control and extract value from MusclePharm Corporation (the "Company") and damage the collateral of Secured Noteholders. If you had approached us with this plan 2 months ago, we would have been happy to listen and likely engage.  At this stage, the collateral agent for the Secured Noteholders have hired a firm to run an auction process. We attempted many months ago to run a chapter 11 process with the Company and they emphatically rejected every effort even after a Prestige placed CRO recommended bankruptcy….after a month long deep dive into the books and records of the Company. Now, White Winston is interfering with the monetization of the Collateral of the Secured Noteholders that is deteriorating in value every day. The Company cannot buy raw materials, the Company cannot produce or ship product because they have stiffed substantially all industry vendors.  Soon the products will be depleted from the shelves and the customers will shift to alternate products and they may not be able to be converted back. So, we reiterate, CEASE and DESIST your collateral damaging activities or we will be forced to exercise remedies against your firm and those that assist your efforts in this collateral damaging endeavor.

As collateral agent, we will make every effort under the law to protect and preserve the Secured Noteholders' Collateral.

I am happy to get on a call, but it will be more of this discussion.

Respectfully,
Ryan

**From:** Todd Enright <tenright@whitewinston.com>
**Sent:** Tuesday, December 13, 2022 2:10 PM
**To:** Ryan Lane <ryan.lane@emperyam.com>
**Cc:** Tim Silver <tim.silver@emperyam.com>; Robert P. Mahoney
<rmahoney@whitewinston.com>
**Subject:** MSLP

**[[ External Email ]]**
Ryan, I'm in receipt of your lawyers most recent missive which, frankly, is as inaccurate
as it is contrary to our discussions regarding a 30-day standstill (which is based on the
very provisions your lawyer now seems to object to.) Experience tells me that principals
work though issues and sending self-serving lawyer's emails threatening legal action
based on hollow accusations is largely unproductive.

Please be in contact with me by phone to address. As I indicated to you, we had our
counsel prepare a 30-day standstill based on the conditions that we discussed regarding
the Drexler resignation and other board considerations—all of which documents have
been prepared and largely executed (including the Drexler documents). At this point, I
don't think it helpful for the parties to threaten each other with legal action, however,
its suffice to say that any action to interferer with White Winston's bona fide settlement
agreemnt will be met with a fulsome legal response, including recovery for damages and
costs.

Please be in contact to ensure that this matter is not unnecessarily escalated. Thank you

With all rights reserved.

T.M. Enright, Partner

<image001.png>


850.570.4793 (Direct Dial)
617.830.2200 (Administrative)
tenright@whitewinston.com

# Exhibit 6

---

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

DISTRICT OF NEVADA

Case number *(if known)* _____  Chapter  **11**

☐ Check if this an amended filing

---

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy                06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | | |
|---|---|---|---|
| 1. | Debtor's name | **MusclePharm Corporation** | |

| | | |
|---|---|---|
| 2. | All other names debtor used in the last 8 years <br><br> Include any assumed names, trade names and *doing business as* names | |

| | | |
|---|---|---|
| 3. | Debtor's federal Employer Identification Number (EIN) | **77-0664193** |

| | | | |
|---|---|---|---|
| 4. | Debtor's address | **Principal place of business** | **Mailing address, if different from principal place of business** |
| | | **8275 South Eastern Avenue** <br> **Las Vegas, NV 89123** <br> Number, Street, City, State & ZIP Code | <br><br> P.O. Box, Number, Street, City, State & ZIP Code |
| | | **Clark** <br> County | **Location of principal assets, if different from principal place of business** <br><br> Number, Street, City, State & ZIP Code |

| | | |
|---|---|---|
| 5. | Debtor's website (URL) | |

| | | |
|---|---|---|
| 6. | Type of debtor | ■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) <br> ☐ Partnership (excluding LLP) <br> ☐ Other. Specify: _____ |

| Debtor | **MusclePharm Corporation** | | Case number (*if known*) | |
|---|---|---|---|---|
| | Name | | | |

**7.  Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes.

___

**8.  Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check **all** that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.  Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| District | | When | | Case number | |
|---|---|---|---|---|---|
| District | | When | | Case number | |

Case 22-14422-nmc Doc 45   Entered 01/04/23 10:04:55   Page 63 of 102

| Debtor | **MusclePharm Corporation** | | Case number (*if known*) | |
|---|---|---|---|---|
| | Name | | | |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

■ No
☐ Yes.

List all cases. If more than 1, attach a separate list

Debtor _____    Relationship _____

District _____ When _____ Case number, if known _____

**11. Why is the case filed in *this district*?**    *Check all that apply:*

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No
☐ Yes.    Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes.    Insurance agency _____

Contact name _____

Phone _____

---

**Statistical and administrative information**

**13. Debtor's estimation of available funds**    *Check one:*

■ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| ■ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
|---|---|---|
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**15. Estimated Assets**

| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
|---|---|---|
| ☐ $50,001 - $100,000 | ■ $10,000,001 - $50  million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
|---|---|---|

Debtor    **MusclePharm Corporation**                                    Case number (*if known*)
          Name

☐ $50,001 - $100,000            ■ $10,000,001 - $50  million        ☐ $1,000,000,001 - $10 billion
☐ $100,001 - $500,000           ☐ $50,000,001 - $100 million        ☐ $10,000,000,001 - $50 billion
☐ $500,001 - $1 million         ☐ $100,000,001 - $500 million       ☐ More than $50 billion

Case 22-14422-mkn    Doc 45    Entered 01/04/23 10:04:55    Page 65 of 102

| Debtor | **MusclePharm Corporation** | | Case number (*if known*) | |
|---|---|---|---|---|
| | Name | | | |

---

| | **Request for Relief, Declaration, and Signatures** |
|---|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **December 15, 2022**
           MM / DD / YYYY

**X** /s/ Ryan Drexler            **Ryan Drexler**
Signature of authorized representative of debtor     Printed name

Title   **Chief Executive Officer**

---

**18. Signature of attorney**

**X** /s/ Samuel A. Schwartz       Date **December 15, 2022**
Signature of attorney for debtor            MM / DD / YYYY

**Samuel A. Schwartz**
Printed name

**Schwartz Law, PLLC**
Firm name

**601 East Bridger Avenue**
**Las Vegas, NV 89101**
Number, Street, City, State & ZIP Code

Contact phone   **702-385-5544**     Email address   **saschwartz@nvfirm.com**

**10985 NV**
Bar number and State

---

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **MusclePharm Corporation** |
| United States Bankruptcy Court for the: | **DISTRICT OF NEVADA** |
| Case number (if known): | |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

**12/15**

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Empery Tax Efficient, LP c/o Empery GP, LLC 1 Rockefeller Plaza, Ste 1205 New York, NY 10020** | | | | | | **$0.00** |
| **Prestige Capital 400 Kelby Street – 10th Floor Fort Lee, NJ 07024** | | | | | | **$0.00** |
| **White Winston Select Asset Funds, LLC 265 Franklin St, Ste 1702 Boston, MA 02110** | | | | | | **$0.00** |

Case 22-14422-nmc   Doc 45   Entered 01/04/23 10:04:55   Page 67 of 102

## United States Bankruptcy Court
### District of Nevada

In re  **MusclePharm Corporation**

Debtor(s)

Case No. _____

Chapter  **11**

# VERIFICATION OF CREDITOR MATRIX

I, the Chief Executive Officer of the corporation named as the debtor in this case, hereby verify that the attached list of creditors is true and correct to the best of my knowledge.

Date:  **December 15, 2022**

**/s/ Ryan Drexler**

**Ryan Drexler**/**Chief Executive Officer**
Signer/Title

Case 22-14422-nmc Doc 45 Entered 01/04/23 10:04:56 Page 68 of 102

MusclePharm Corporation
8275 South Eastern Avenue
Las Vegas, NV 89123

Samuel A. Schwartz
Schwartz Law, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

United States Trustee
300 Las Vegas Blvd. South, #4300
Las Vegas, NV 89101

Clark County Assessor
c/o Bankruptcy Clerk
500 S. Grand Central Pkwy
Box 551401
Las Vegas, NV 89155-1401

Clark County Treasurer
c/o Bankruptcy Clerk
500 S. Grand Central Pkwy
PO Box 551220
Las Vegas, NV 89155-1220

Dept. of Employment, Training and Rehab
Employment Security Division
500 E. Third Street
Carson City, NV 89713

Nevada Dept of Taxation, BK Section
555 E. Washington Ave #1300
Las Vegas, NV 89101

Social Security Administration
Regional Chief Counsel, Region IX
160 Spear Street, Suite 800
San Francisco, CA 94105-1545

Empery Tax Efficient, LP
c/o Empery GP, LLC
1 Rockefeller Plaza, Ste 1205
New York, NY 10020

Prestige Capital
400 Kelby Street – 10th Floor
Fort Lee, NJ 07024

White Winston Select Asset Funds, LLC
265 Franklin St, Ste 1702
Boston, MA 02110

Case 22-14422-nmc    Doc 451    Entered 01/04/23 10:04:55    Page 69 of 102

# United States Bankruptcy Court
## District of Nevada

In re  **MusclePharm Corporation**

Debtor(s)

Case No.

Chapter  **11**

## CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for **MusclePharm Corporation** in the above captioned action, certifies that the following is a (are) corporation(s), other than the debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's(s') equity interests, or states that there are no entities to report under FRBP 7007.1:

■ None [*Check if applicable*]

December 15, 2022

Date

/s/ Samuel A. Schwartz

**Samuel A. Schwartz**

Signature of Attorney or Litigant

Counsel for  **MusclePharm Corporation**

**Schwartz Law, PLLC**

**601 East Bridger Avenue
Las Vegas, NV 89101
702-385-5544 Fax:702-201-1330
saschwartz@nvfirm.com**

## ACTION BY WRITTEN CONSENT OF
## CHIEF EXECUTIVE OFFICER OF
## MUSCLEPHARM CORPORATION, A NEVADA CORPORATION

Dated as of December 15, 2022

The UNDERSIGNED, constituting the Chief Executive Officer (the "**CEO**") of MUSCLEPHARM CORPORATION, a Nevada corporation (the "**Company**"), hereby consents in writing to the adoption of the following resolutions, as if they were adopted at a duly convened meeting of the officers at which a quorum was present and acting throughout, which actions are hereby deemed effective as of the date set forth above:

**WHEREAS**, the CEO has reviewed and considered the financial and operational condition of the Company and the Company's business on the date hereof, including the historical performance of the Company, the assets of the Company, the current and long-term liabilities of the Company, the viability of the Company's business, and the strategic alternatives available to the Company;

**WHEREAS**, the CEO had the opportunity to consult with the management of the Company and the Company's advisors and to fully consider the strategic alternatives available to the Company, including, without limitation, the relative risks and benefits of pursuing a bankruptcy proceeding under the provisions of Chapter 11 of Title 11 of the United States Code (as amended, the "**Bankruptcy Code**"); and

**WHEREAS**, the CEO deems it advisable and in the best interests of the Company and its creditors, interest holders, and other parties in interest, to consent to and adopt, in the name of and on behalf of the Company, the following resolutions:

**NOW, THEREFORE, IT IS:**

**RESOLVED**, that it is desirable and in the best interests of the Company and its creditors, employees, and other interested parties that a voluntary Chapter 11 bankruptcy petition be filed by the Company, seeking relief under the provisions of Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the District of Nevada; and it is further

**RESOLVED**, that the Chief Executive Officer of the Company, RYAN DREXLER (the "**Authorized Person**"), be, and is, authorized and directed to execute and file on behalf of the Company, all petitions, schedules, lists, motions, applications, and other papers or documents with the appropriate court under the Bankruptcy Code and to take any and all action that is necessary, proper, or

advisable to obtain such relief under the Bankruptcy Code, including, without limitation, any action necessary to maintain the ordinary course operation of the Company's business; and it is further

**RESOLVED**, that the law firm of SCHWARTZ LAW, PLLC ("**Schwartz Law**") be employed as counsel to the Company to represent and assist the Company in carrying out the Company's duties under the Bankruptcy Code and to take any and all actions to advance the Company's rights including the preparation of pleadings and filings in connection with the Chapter 11 Case, and the Authorized Person of the Company is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Chapter 11 Case, and to cause to be filed an appropriate application for authority to retain the services of Schwartz Law; and it is further

**RESOLVED**, that the Authorized Person of the Company be, and hereby is, authorized and directed to employ any other individual and/or firm as professionals or consultants to the Company as are deemed necessary or advisable to represent and assist the Company in carrying out the Company's duties under the Bankruptcy Code, and in connection therewith, the Authorized Person of the Company is hereby authorized and directed to execute appropriate retention agreements, and to cause to be filed an appropriate application for authority to retain the services of such firms; and it is further

**RESOLVED**, that the Authorized Person is hereby authorized and empowered to execute, deliver, file, and perform any agreement, document, or any amendment to the foregoing, in the name and on behalf of the Company, as may be necessary or advisable for the Company to obtain post-petition, all on such terms as the Authorized Person deems necessary or advisable in order to carry out the purpose and intent of the foregoing resolutions; and it is further

**RESOLVED**, that the Authorized Person is hereby authorized, empowered, and directed, in the name and on behalf of the Company, to take such additional actions, to perform all acts and deed, and to execute, ratify, certify, deliver, file, and record such additional agreements, notices, certificates, instruments, applications, payments, letters, and documents as any of them may deem necessary or advisable to implement the provisions of the foregoing resolutions, and to appoint such agents on behalf of the Company as such Authorized Person may deem necessary or advisable in connection with any financing arrangement, lending or the sale of assets, and the transactions contemplated by any of the foregoing, the authority for the taking of such action to be conclusive evidence thereof; and it is further

**RESOLVED**, that the Authorized Person is hereby authorized, empowered and directed, in the name and on behalf of the Company, to open and maintain one or more debtor-in-possession bank accounts for the Company, at such banks as the Authorized Person may determine, and that in connection therewith the Authorized Person may sign checks, authorize wire transfers and execute and deliver on behalf of the Company, such forms of banking resolutions as such banks may request and the Authorized Person may approve, which resolutions, when executed by such Authorized Person and inserted into the minute book of the Company, shall be deemed to be adopted by the Company with the same full force and effect as if such resolutions had been set forth herein in their entirety; and it is further

**RESOLVED**, that all of the acts and transactions taken by the Authorized Person or other authorized entities, in the name and on behalf of the Company, relating to matters contemplated by the foregoing resolutions, which acts would have been approved by the foregoing resolutions except that such acts were taken prior to the execution of these resolutions, are hereby in all respects confirmed, approved, and ratified; and it is further

**RESOLVED**, that this written consent may be executed in any number of counterparts and by facsimile, portable document format, or other reproduction, and such execution shall be considered valid, binding, and effective for all purposes.

*[No Further Text.  Signature Page Follows.]*

IN WITNESS WHEREOF, the undersigned has executed this written consent as of the date first written above.

**MUSCLEPHARM CORPORATION**
**a Nevada corporation**

By: _____
Name: RYAN DREXLER
        Chief Executive Officer

Case 22-14422-nmc    Doc 45    Entered 01/04/23 10:04:50    Page 74 of 102

# Exhibit 7



## NUTRA
ingredients-usa.com

# MusclePharm finally crashes to earth with bankruptcy filing

**By Hank Schultz** 🔗

16-Dec-2022 - Last updated on 16-Dec-2022 at 19:10 GMT

RELATED TAGS: Sports nutrition sector



**Iconic sports nutrition brand MusclePharm declared Chapter 11 bankruptcy yesterday, forestalling an auction of the company's intellectual property and other assets.**

The bankruptcy was filed in Nevada Bankruptcy Court.  Despite some reports that the company had named another CEO recently, Ryan Drexler, who has headed the company for a number of years, was listed on the bankruptcy documents in that role.

The fling lists the company's assets at between $10 and $50 million, and puts the liabilities in the same range, too.

Three major creditors are listing in the filing: Emery Tax Efficient, LP, Prestige Capital, and White Winston Select Assets Funds.  The filing, which may updated in the near future, did not list dollar amounts as to how much each creditor is owed.

## Rapid rise and fall

MusclePharm rose like a meteor in the early 2010s and crashed just as spectacularly.  Its products have been sold in more than 100 countries and nationwide in the United States, including Costco and Walmart, as well as through more than 100 online stores, notably, bodybuilding.com and Amazon.

A founding team that included Denver resident and former NFL player Brad Pyatt rapidly built the brand, which featured bold lime green packaging, to annual sales of more than $150 million.

Part of that strategy was to sign up high profile athletes and influencers, including at one time Tiger Woods and Arnold Schwarzenegger.

However, the company failed to keep costs under control, whether as a result of poor business practices or as a matter of subterfuge.  In 2015 the Securities and Exchange Commission charged the company with a series of accounting and disclosure violations, including undisclosed payments in funds and in kind services to Pyatt and other executives.

This website uses cookies. By continuing to browse our website, you are agreeing to our use of cookies. You can learn more about cookies by visiting our **privacy & cookies policy** page.

**I Agree**

Case 22-14422-nmc    Doc 45    Entered 01/04/23 10:04:50    Page 76 of 102

**ON-DEMAND WEBINAR**

## 2023 Sports & Active Nutrition Summit USA

Join us for the 2023 Sports & Active Nutrition Summit USA in San Diego from February 15-17 to discuss the US Military opportunity, sports nutrition for mood and mental health, he CBD products, esports supplements & much more... Book Now... **Click here**

Pyatt was ousted as CEO and agreed to pay a $150,000 fine.  The company itself was assessed a $700,000 levy.

## Unraveling endorsement contracts

Drexler, a veteran from Country Life Vitamins, who was one of the company's main shareholders, subsequently took over as CEO. He struggled with unraveling Pyatt's lavish influencer and athlete endorsement contracts as well as dealing with a lawsuit filed by a contract manufacturing partner.

The brand never really recovered from the debacle, and Drexler was forced to seek outside capital, which reportedly came with some strict conditions. More recently the company was hit by supply chain disruptions brought on by the global pandemic.

## Losses continued

The company reported $13.1 million in quarterly revenue in its most recent earnings statement, which covered the first quarter of 2022.  The filing also included notice of a loss of $2.5 million for the period. It had not reported earnings since then.  The company's stock traded above $2 a share briefly in 2021 but sank below the $1 mark later that year.  It was recently trading at between 18 and 22 cents a share before the stock became essentially worthless at the end of November.

## Consultant: Having one major retailer was big risk

Consultant Joshua Schall, who was once MusclePharm's chief strategy officer in its early years of rapid growth, had this to say:

*"MusclePharm deteriorated significantly since the early 2010s golden years when I was a part of the sports nutrition brand's hyper growth phase. The fact is, the MusclePharm of today is unrecognizable to the one that I left a decade ago,"* he said.

*"MusclePharm had key customer risk with one retailer (i.e. Costco) that was at an alarmingly high rate. Costco is an ideal pandemic-era retail partner, especially in the HABA category, but they want operational excellence and*

This website uses cookies. By continuing to browse our website, you are agreeing to our use of cookies. You can learn more about cookies by visiting our **privacy & cookies policy** page.

**I Agree**

*"This won't be the last we hear about MusclePharm. The company's assets (i.e. intellectual property) still has value in the marketplace, but it will obviously be a shell of its dynamic vibrant lime green MP former self,"* Schall added.

Copyright - Unless otherwise stated all contents of this web site are © 2022 - William Reed Ltd - All Rights Reserved - Full details for the use of materials on this site can be found in the Terms & Conditions

RELATED TOPICS: Markets

This website uses cookies. By continuing to browse our website, you are agreeing to our use of cookies. You can learn more about cookies by visiting our **privacy & cookies policy** page.

**I Agree**

Case 22-14422-nmc    Doc 45    Entered 01/04/23 10:04:50    Page 78 of 102

# Exhibit 8

| | |
|---|---|
| **From:** | Samuel A. Schwartz <saschwartz@nvfirm.com> |
| **Sent:** | Tuesday, December 20, 2022 1:53 PM |
| **To:** | Mark Weisenmiller; Gregory Garman; William Noall |
| **Cc:** | Bryan Lindsey; Athanasios Agelakopoulos |
| **Subject:** | Alternative DIP Term Sheet |
| **Attachments:** | WW DIP Term Sheet to MSLP Dec 19 2022.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Gentlemen, good morning. We received the attached term sheet yesterday and prefer traditional lending at this point in the case.  Comments invited.

**Samuel A. Schwartz, Esq.**
Schwartz Law, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
702.802.2207 tel
SASchwartz@nvfirm.com

**\*\*CONFIDENTIALITY NOTICE\*\***
This email message is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged.  It is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

Case 22-14422-nmc Doc 245 Entered 01/04/23 10:04:50 Page 80 of 102

*DECEMBER 19, 2022 DRAFT*

*CONFIDENTIAL – SUBJECT TO FRE 408*

## DEBTOR-IN-POSSESSION FACTORING AND LOAN TERM SHEET

This debtor-in-possession term sheet (the "***Term Sheet***") summarizes the principal terms of the contemplated factoring and loan arrangement ("***DIP Loan***") (as defined below).  This Term Sheet (a) shall be binding on the Borrower and Lender to use their respective reasonable good faith efforts to agree on and execute a DIP Loan Factoring and Financing Agreement and such other documents as may be necessary to enable completion of the DIP Loan in accordance with the terms of this Term Sheet (collectively, the "***Agreement***"); and (b) shall be subject to entry of the Interim Order and DIP Order by the "***Bankruptcy Court***" (as defined below).  This Term Sheet does not include descriptions of all of the terms, conditions and other provisions that are to be contained in the Agreement and it is not intended to limit the scope of discussion or negotiation of any matters not inconsistent with the specific matters set forth herein. The terms set forth in this Term Sheet are being provided on preliminary basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of this Term Sheet.  This Term Sheet is not meant to be, nor shall it be construed as an attempt to describe all of, or the specific phrasing for, the provisions of the definitive documentation; rather, it is intended only to outline certain key terms to be included in, or otherwise be consistent with, and subject to terms of the Agreement and definitive documentation acceptable to the Lender and Borrower.

| | |
|---|---|
| **Borrower:** | MusclePharm Corporation, as debtor-in-possession, and its affiliates. |
| **Lender:** | White Winston Select Asset Funds, LLC, or its designee(s). ("***WW***" or "***Lender***"). |
| **Bankruptcy Case** | Case Number 22-14422-nmc, <u>In re MusclePharm Corporation</u>, in the United States Bankruptcy Court for the District of Nevada. |
| **Bankruptcy Court** | United States Bankruptcy Court for the District of Nevada. |
| **Factoring of Accounts Receivable** | Pursuant to the Agreement, Borrower will sell, transfer, convey, assign and deliver to Lender, and Lender agrees to purchase and receive from Borrower, all of Borrower's right, title and interest in and to all eligible post-petition accounts ("***Accounts***") arising from the sale of any product or goods or the rendering of services by Borrower in the ordinary course of the Borrower's business.  **IT IS THE INTENTION OF THE PARTIES THAT AS TO ALL ACCOUNTS THAT WW ELECTS TO PURCHASE SHALL CONSTITUTE A TRUE PURCHASE AND SALE OF ACCOUNT(S) UNDER** |

DECEMBER 2022 DRAFT
CONFIDENTIAL – SUBJECT TO FRE 408

| | §9-318 OF THE UNIFORM COMMERCIAL CODE AND AS SUCH, THE BORROWER SHALL HAVE NO LEGAL OR EQUITABLE INTEREST IN THE ACCOUNTS SOLD. |
|---|---|
| **Advances on Accounts** | WW in its sole discretion, may advance up to eighty percent (80%) of the face amount of the Accounts purchased, less the applicable discount fee, Facility Fee (as defined below) and other similar charges (collectively the "**Aggregate Advances**"). The purchase price of any Account shall be the amount actually received in payment of such Account, but for the purposes of any Advance, the purchase price shall be equal to the face amount of the Account less any selling, payment or other discounts offered. |
| **Reserve** | WW, in its sole discretion, may elect to maintain a reserve from each Advance ("**Reserve**"). As a general rule, although not a requirement, it is intended that Reserves on paid invoices are released upon the request of the Borrower or when the Lender's next purchase of Accounts from Borrower is funded, however WW may increase or decrease the amount of such Reserve at any time and from time to time if it deems it necessary in order to protect its interest and to protect WW from losses or potential losses that WW may reasonably anticipate might arise in the future due to contingencies, disputes, potential breach of warranties or other potential non-payments, reductions or losses from the purchase of Accounts under the Aggregate Advances, each pursuant to a borrowing base as set forth in the Agreement |
| **Recourse to Borrower of Certain Accounts** | In the event that (a) an Account purchased by WW is not paid in full by the account debtor, on or before the date when due in accordance with its terms, (b) an account debtor objects to the property sole or service performed by Borrower, or rejects, revokes acceptance or fails or refuses to accept or receive any such property or services, (c) an account debtor suspends business, requests a general extension of time within which to pay debts, makes an assignment for the benefit of creditors or becomes a debtor or alleged debtor in any bankruptcy case, or if an event occurs amounting to a general business failure of an account debtor, or (d) Lender in its sole and absolute discretion determines that any Account is or may become uncollectible (collectively, a "**Worthless Account**"), the Lender may require the Borrower promptly to repurchase |

DECEMBER 14, 2022 DRAFT

CONFIDENTIAL – SUBJECT TO FRE 408

Case 22-11150-mdc   Doc 45   Entered 01/04/23 10:04:50   Page 82 of 102

| | |
|---|---|
| | such Account from Lender on terms and conditions reasonably acceptable to Lender. |
| **DIP Loan** | A postpetition loan not to exceed the principal amount of Three Million Five Hundred Thousand and No/100ths Dollars ($3,500,000.00, inclusive of all amounts as factored Accounts under the factoring facility defined herein (the ***Maximum Advance***")) (with the Advances, collectively the "***DIP Loan***") |
| **Advances on Inventory** | Advances shall be based on a formula of thirty-five percent (35%) of the cost of finished inventory and approved packaging materials, not to exceed the Maximum Advance. The issuance mechanics of the advances shall be on terms mutually agreed upon by the Lender and Borrower, and in accordance with the Budget (as defined herein). |
| **Immediate Advance** | Notwithstanding the foregoing, WW shall make an immediate Advance to Borrower in the amount of One Hundred Thousand and No/1ooths Dollars ($100,000.00) plus all closing costs, fees (including, without limitation, the Facility Fee), and expenses associated with the DIP Loan upon entry of the Interim DIP Order (the "***Immediate Advance***") and the execution of the Agreement. |
| **Interest Rate on Aggregate Advances** | The prime interest rate as published in the Wall Street Journal plus two percent (2%) per annum. |
| **Closing Fee** | One percent (1%) of the Maximum Advance, that is, Thirty-Five Thousand and No/100ths Dollars ($35,000.00), payable at the closing of the DIP Loan. |
| **Facility Fee** | Fifty basis points (0.50%) of each Account purchased by WW, payable at the time of each such purchase. |
| **DIP Loan Disbursement Account** | The Borrower shall deposit the proceeds of the DIP Loan (including all Advances) into an account of the Borrower that is subject to the control of the Borrower pursuant to a deposit account control agreement (the "***DIP Note Disbursement Account***"), and that is not subject to the control of any other Person. Proceeds of the DIP Loan shall be deposited, held and disbursed through the DIP Note Disbursement Account or otherwise in accordance with the cash management order. |

*CONFIDENTIAL – SUBJECT TO FRE 408*

| | |
|---|---|
| | The Disbursement Account shall be in addition to, and not in lieu of, any and all accounts maintained by Lender on account of the DIP Loan or for the benefit of Borrower, including, without limitation, to hold the Reserves. |
| **Budget** | The use of all proceeds of the DIP Loan (including all Advances) shall be solely in accordance with a budget, approved by the Lender, and that may be amended from time to time as requested, and approved by, the Lender each as approved by the Lender in its reasonable discretion (the "***Budget***"). |
| **Use of Advances by Borrower** | The proceeds of the DIP Loan shall be used solely for the following purposes, subject in all cases to the Budget: <br><br> (a) pay fees, interest, payments, and expenses associated with the DIP Loan; <br><br> (b) pay principal of the DIP Loan; <br><br> (c) provide for the ongoing working capital and capital expenditure needs of the Borrower during the pendency of the Bankruptcy Case; and <br><br> (d) fund agreed carve-outs in the Budget for the costs of the administration of the Bankruptcy Case (including fees of the United States Trustee) and the consummation of the restructuring. |
| **Collateral** | All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Borrower, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of any of the Borrowers, including, for the avoidance of doubt, any equity or other interests in any Borrower's non-Debtor and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and tradenames and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or |

Page 84 of 102

*DECEMBER 14, 2022 DRAFT*

*CONFIDENTIAL – SUBJECT TO FRE 408*

| | |
|---|---|
| | applicable non-bankruptcy law but, subject to entry of the Final DIP Order (as defined below), including the proceeds thereof (collectively, the "*DIP Collateral*"). |
| **Priority of Liens on DIP Collateral**: | DIP Lender shall be awarded a valid, perfected, and enforceable lien and security interest in and to the following DIP Collateral: <br><br> (a) All right, title and interest in and to any property of the Borrower or its bankruptcy estate acquired prior to the commencement of the Bankruptcy Case, subject only to valid, perfected and enforceable liens and security interests of record and subject to any subordination agreements, if any, between and among the Lender and holders of prepetition claims against the Borrower; <br><br> (b) All right, title and interest in and to any property of the Borrower or its bankruptcy estate acquired or created after the commencement of the Bankruptcy Case, which shall be a lien senior to any and all competing claims, interests or encumbrances. |
| **Administrative Claim** | The DIP Loan shall be allowable under 11 U.S.C. §503(b)(1) as an administrative expense. |
| **No Assumption of Liabilities** | The Lender shall not assume any liabilities or debts of Borrower. |
| **Maturity Date** | The Effective Date under a confirmed chapter 11 plan of reorganization in the Bankruptcy Case, or upon approval of a sale or other disposition of any of the DIP Collateral to a person or entity other than the Lender. |
| **Chief Restructuring Officer** | Within thirty (30) days of entry of the Interim Order, Borrower shall obtain entry of an order by the Bankruptcy Court authorizing Borrower to retain a Chief Restructuring Officer that WW in its sole discretion does not oppose and with such powers as are reasonably acceptable to WW. |
| **Borrower Board** | Upon the termination of any injunction or court order that prohibits the following, Borrower shall expand its board of directors to seven (7) members (the "*New Board*") who |

DECEMBER 19, 2022 DRAFT

CONFIDENTIAL – SUBJECT TO FRE 408

| | |
|---|---|
| | shall be designated as set forth in paragraph 8 of that certain "*Settlement Agreement and Release Between White Winston Select Asset Funds, LLC and White Winston Select Asset Fund Series Fund MP-18, LLC and MusclePharm Corporation and Ryan Drexler*" a copy of which is attached hereto as ***Exhibit A***. |
| **Events of Default** | Customary, including the following:<br><br>• failure to pay principal or interest on the DIP Loan or any fees under the Agreement when due;<br><br>• failure of any representation or warranty of any of the Borrowers contained in the Agreement to be true and correct in all material respects when made;<br><br>• breach of any covenant, subject to a five (5) day grace period (from the earlier of the date that (i) any Borrower obtains knowledge of such breach and (ii) any Borrower receives written notice of such default from the Lender), <u>provided</u> that the breach of any covenant described herein, or any other covenant so indicated by the Lender, shall not be subject to any grace period;<br><br>• failure to comply with the Budget, subject to the permitted variances;<br><br>• without the Lender's written consent, which may be granted or withheld in the Lender's sole and absolute discretion, the Lender shall cease to have continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on and security interests in the DIP Collateral with the priorities described above;<br><br>• any Borrower or equity holder in any Borrower (i) contests the validity or enforceability of any document executed and delivered to effectuate the DIP Loan in writing or denying in writing that it has any further liability thereunder or (ii) contesting the validity or perfection of the liens and security interests securing the DIP Loan; |

DECEMBER 22, 2022 DRAFT
CONFIDENTIAL – SUBJECT TO FRE 408

|  | - any attempt by any Borrower or any equity holder thereof to invalidate or otherwise impair the DIP Loans or the liens and security interests granted to the Lender with respect to the DIP Loan;<br><br>- failure by any Debtor to comply with the Interim DIP Order or Final DIP Order, as applicable;<br><br>- the entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim DIP Order or Final DIP Order or any other order of the Bankruptcy Court approving the Debtor's use of Cash Collateral, as applicable, without the express written consent of the Lender;<br><br>- any sale or disposition, without the written consent of Lender, which consent may be granted or withheld in the Lender's sole and absolute discretion, of all or a material portion of the assets of the Borrower's bankruptcy estate;<br><br>- conversion of, or the filing of any motion by any Borrower or any equity holder thereof to convert, the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;<br><br>- dismissal of, or the filing of any motion by any Borrower or equity holder thereof to dismiss, the Bankruptcy Case;<br><br>- the appointment of a Chapter 11 trustee or an examiner in the Bankruptcy Case;<br><br>- failure to retain a Chief Restructuring Officer as set forth in this Term Sheet;<br><br>- failure by the Borrower to create the New Board as set forth in this Term Sheet;<br><br>- the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to a holder or holders of any security interest or lien on any part of the DIP Collateral to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral |
|---|---|

*DECEMBER 19, 2022 DRAFT*

*CONFIDENTIAL – SUBJECT TO FRE 408*

| | |
|---|---|
| | without the written consent of the Lender, which consent may be granted or withheld in the Lender's sole and absolute discretion; |
| | • the grant of any s claim that is pari passu with or senior to those of the Borrower; |
| | • termination by the Bankruptcy Court of the use of Cash Collateral; |
| | • the filing of a plan of reorganization or liquidation in the Bankruptcy Case that does not provide for the payment in full in cash of the obligations related to the DIP Loan; |
| | • expiration of the period of time during which only the Borrower may file a plan pursuant to section 1121 of the Bankruptcy Code; and |
| | • the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any of the DIP Collateral. |
| | Among other remedies to be specified, upon the occurrence of an Event of Default, the Lender shall have all rights and remedies typically available to a lender upon the occurrence of an Event of Default, including, without limitation, the right to seek relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, and apply the proceeds thereof to the obligations of the Borrower or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law. |
| **Court Orders** | In connection with the transactions contemplated by this Term Sheet, Borrower shall file with the Courts within seven (7) days after the execution of the Agreement by each of the parties hereto, at their sole cost and expense, motions and applications for the interim order (the "***Interim DIP Order***") and the final order (the "***Final DIP Order***" and, together with the Interim DIP Order, the "***DIP Orders***") of the Bankruptcy Court authorizing the Borrower to use all cash collateral and to enter into the DIP Loan, each of which shall be in form and substance acceptable to the Lender, and (b) all documents executed and delivered by the parties to effectuate and implement the transactions that are the subject of this |

8

| | Term Sheet, as well as any orders of the Bankruptcy Court related thereto (the "**DIP Documents**"). The DIP Orders shall contain customary provisions and stipulations as reasonably required by Lender, and shall contain provisions under 11 U.S.C. §364(e) providing that Lender extended the DIP Loan in good faith, whether or not Lender knows of the pendency of any appeal. |
|---|---|
| **Appeal of Orders** | If entry of either or both of the DIP Orders, or any other orders of the Bankruptcy Court relating to the transactions contemplated by this Term Sheet shall be appealed or otherwise challenged by any party (including by petition for *certiorari* or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing, or reargument), the Borrower shall diligently oppose such appeal, challenge, petition, or motion and use all efforts to obtain an expedited resolution thereof. |
| **Cooperation of Borrower Upon Acceptance:** | Upon acceptance of this Term Sheet, Borrower shall cooperate as reasonably requested with Lender in all matters related to the Bankruptcy Case, subject to the Borrower's determination, in its sole and absolute discretion, that such cooperation as reasonably requested by Lender violates Borrower's fiduciary duties as debtor-in-possession in the Bankruptcy Case. |
| **WW Prepetition Claims and Interests** | All rights, claims, interests, liens and encumbrances, if any, of WW that arose prior to the commencement of the Bankruptcy Case shall not be affected by the transactions contemplated by this Term Sheet, and WW and Borrower reserve all rights and remedies related thereto. |
| **Assignment/Participation** | WW may assign, in whole or in part, or otherwise participate its interest in whole or in part to one or more participants, on terms and conditions acceptable to WW in its sole and absolute discretion. |
| **Conditions Precedent** | WW's obligation consummate the DIP Loan shall be subject to satisfaction of the following conditions:<br><br>• The Debtor shall have prepared the Budget and its provisions shall be acceptable to WW in its sole and absolute discretion.<br><br>• The final terms and conditions of the Agreement shall be in commercially reasonable form, as |

DECEMBER 19, 2022 DRAFT

Case 22-14422-nmc   Doc 45   Entered 01/04/23 10:04:50   Page 89 of 102

**CONFIDENTIAL – SUBJECT TO FRE 408**

|  | prepared by WW counsel, and acceptable to WW in its reasonable discretion. |
|---|---|
|  | • The Debtor shall pay all of WW's reasonable and necessary out-of-pocket costs, fees, and expenses arising out of or relating to the DIP Loan except where such costs, fees and expenses are manifestly unreasonable. For the sake of clarity, the costs, fees and expenses of WW that the Borrower is obligated to pay or reimburse include, but are not limited to: all travel, lodging, and other incidental expenses of WW personnel paid or incurred by WW as a result of the consideration and closing of the DIP Loan. In addition, the Borrower shall pay, on demand, all legal fees and expenses of WW's attorneys for services provided to WW in connection with this Term Sheet or the Agreement and any action, suit or proceeding arising from WW's dealing with the Borrower, including for the collection of amounts due to WW hereunder. |

**ACCEPTED AND AGREED TO:**                    **ACCEPTED AND AGREED TO:**

**WHITE WINSTON SELECT ASSET**                **MUSCLEPHARM CORPORATION**
**FUNDS, LLC**


_____              _____
**BY: TODD M. ENRIGHT**                       **BY: RYAN DREXLER**
**ITS:**                                       **ITS**


**DATED: _____, 2022**            **DATED:_____, 2022**

                                              **ACCEPTED AND AGREED TO:**

                                              **(/S/ FOR ALL OTHER AFFILIATES)**

                                              _____

# Exhibit 9

*DECEMBER 26 2022 DRAFT*
*CONFIDENTIAL – SUBJECT TO FRE 408*

## DEBTOR-IN-POSSESSION FACTORING AND LOAN TERM SHEET

This debtor-in-possession term sheet (the "***Term Sheet***") summarizes the principal terms of the contemplated factoring and loan arrangement ("***DIP Loan***") (as defined below). This Term Sheet (a) shall be binding on the Borrower and Lender to use their respective reasonable good faith efforts to agree on and execute a DIP Loan Factoring and Financing Agreement and such other documents as may be necessary to enable completion of the DIP Loan in accordance with the terms of this Term Sheet (collectively, the "***Agreement***"); and (b) shall be subject to entry of the Interim Order and DIP Order by the "***Bankruptcy Court***" (as defined below). This Term Sheet does not include descriptions of all of the terms, conditions and other provisions that are to be contained in the Agreement and it is not intended to limit the scope of discussion or negotiation of any matters not inconsistent with the specific matters set forth herein. The terms set forth in this Term Sheet are being provided on preliminary basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of this Term Sheet. This Term Sheet is not meant to be, nor shall it be construed as an attempt to describe all of, or the specific phrasing for, the provisions of the definitive documentation; rather, it is intended only to outline certain key terms to be included in, or otherwise be consistent with, and subject to terms of the Agreement and definitive documentation acceptable to the Lender and Borrower.

| | |
|---|---|
| **Borrower:** | MusclePharm Corporation, as debtor-in-possession, and its affiliates. |
| **Lender:** | White Winston Select Asset Funds, LLC, or its designee(s). ("***WW***" or "***Lender***"). |
| **Bankruptcy Case** | Case Number 22-14422-nmc, In re MusclePharm Corporation, in the United States Bankruptcy Court for the District of Nevada. |
| **Bankruptcy Court** | United States Bankruptcy Court for the District of Nevada. |
| **Factoring of Accounts Receivable** | Pursuant to the Agreement, Borrower will sell, transfer, convey, assign and deliver to Lender, and Lender agrees to purchase and receive from Borrower, all of Borrower's right, title and interest in and to all eligible post-petition accounts ("***Accounts***") arising from the sale of any product or goods or the rendering of services by Borrower in the ordinary course of the Borrower's business.<br><br>IT IS THE INTENTION OF THE PARTIES THAT AS TO ALL ACCOUNTS THAT WW ELECTS TO PURCHASE SHALL CONSTITUTE A TRUE PURCHASE AND SALE OF ACCOUNT(S) UNDER §9-318 OF THE UNIFORM |

*DECEMBER 20 2022 DRAFT*
*CONFIDENTIAL – SUBJECT TO FRE 408*

| | COMMERCIAL CODE AND AS SUCH, THE BORROWER SHALL HAVE NO LEGAL OR EQUITABLE INTEREST IN THE ACCOUNTS SOLD. |
|---|---|
| **Advances on Accounts** | WW in its sole discretion, may advance the following: (i) up to one hundred percent (100%) of the first $1,000,000 of Accounts purchased after entry of the Interim DIP Order and before entry of the Final DIP Order, and (ii) up to eighty percent (80%) of the face amount of all other Accounts purchased, in each case less the applicable discount fee, Facility Fee (as defined below) and other similar charges (collectively the "***Aggregate Advances***"). The purchase price of any Account shall be the amount actually received in payment of such Account, but for the purposes of any Advance, the purchase price shall be equal to the face amount of the Account less any selling, payment or other discounts offered. |
| **Reserve** | WW, in its sole discretion, may elect to maintain a reserve from each Advance ("***Reserve***"), not to exceed twenty percent (20%) of the face amount of the Accounts purchased by WW. As a general rule, although not a requirement, it is intended that Reserves on paid invoices are released upon the request of the Borrower or when the Lender's next purchase of Accounts from Borrower is funded, however WW may increase or decrease the amount of such Reserve at any time and from time to time if it deems it necessary in order to protect its interest and to protect WW from losses or potential losses that WW may reasonably anticipate might arise in the future due to contingencies, disputes, potential breach of warranties or other potential non-payments, reductions or losses from the purchase of Accounts under the Aggregate Advances, each pursuant to a borrowing base as set forth in the Agreement |
| **Recourse to Borrower of Certain Accounts** | In the event that (a) an Account purchased by WW is not paid in full by the account debtor, on or before the date when due in accordance with its terms, (b) an account debtor objects to the property sole or service performed by Borrower, or rejects, revokes acceptance or fails or refuses to accept or receive any such property or services, (c) an account debtor suspends business, requests a general extension of time within which to pay debts, makes an assignment for the benefit of creditors or becomes a debtor or alleged debtor in any bankruptcy case, or if an event occurs amounting to a general business failure of an account debtor, or (d) Lender in its sole and absolute discretion determines that any Account is or may become uncollectible (collectively, a "***Worthless Account***"), the Lender |

DECEMBER 26 2022 DRAFT

CONFIDENTIAL – SUBJECT TO FRE 408

| | |
|---|---|
| | may require the Borrower promptly to repurchase such Account from Lender on terms and conditions reasonably acceptable to Lender. |
| DIP Loan | A postpetition loan not to exceed the principal amount of Ten Million and No/100ths Dollars ($10,000,000.00, inclusive of all amounts as factored Accounts under the factoring facility defined herein (the *Maximum Advance*") (with the Advances, collectively the "*DIP Loan*") |
| Advances on Inventory | Advances on Inventory shall be based on a formula of thirty-five percent (35%) of the cost of finished inventory and approved packaging materials, not to exceed the Maximum Advance. The issuance mechanics of the advances shall be on terms mutually agreed upon by the Lender and Borrower, and in accordance with the Budget (as defined herein). |
| Immediate Advance | Notwithstanding the foregoing, WW shall make an immediate Advance to Borrower in the amount of One Hundred Thousand and No/1ooths Dollars ($100,000.00) plus all closing costs, fees (including, without limitation, the Facility Fee), and expenses associated with the DIP Loan upon entry of the Interim DIP Order (the "*Immediate Advance*") and the execution of the Agreement. |
| Interest Rate on Aggregate Advances | The prime interest rate as published in the Wall Street Journal plus two percent (2%) per annum. |
| Closing Fee | One percent (1%) of the Maximum Advance, that is, One Hundred Thousand and No/100ths Dollars ($100,000.00), payable at the closing of the DIP Loan. |
| Facility Fee | Fifty basis points (0.50%) of each Account purchased by WW, for Advances equal to $5,000,000 in the aggregate, thereafter, each Advance shall carry a Facility Fee of Two and One-Half Percent (2.5%) of each Advance, payable at the time of each such Advance. |
| DIP Loan Disbursement Account | The Borrower shall deposit the proceeds of the DIP Loan (including all Advances) into an account of the Borrower that is subject to the control of the Borrower pursuant to a deposit account control agreement (the "*DIP Note Disbursement Account*"), and that is not subject to the control of any other Person. Proceeds of the DIP Loan shall be deposited, held and disbursed through the DIP Note Disbursement Account or otherwise in accordance with the cash management order. |

*DECEMBER 26 2022 DRAFT*
*CONFIDENTIAL – SUBJECT TO FRE 408*

| | |
|---|---|
| | The Disbursement Account shall be in addition to, and not in lieu of, any and all accounts maintained by Lender on account of the DIP Loan or for the benefit of Borrower, including, without limitation, to hold the Reserves. |
| **Budget** | The use of all proceeds of the DIP Loan (including all Advances) shall be solely in accordance with a budget, approved by the Lender, and that may be amended from time to time as requested, and approved by, the Lender each as approved by the Lender in its reasonable discretion (the "*Budget*"). |
| **Use of Advances by Borrower** | The proceeds of the DIP Loan shall be used solely for the following purposes, subject in all cases to the Budget:<br><br>(a)    pay fees, interest, payments, and expenses associated with the DIP Loan;<br><br>(b)    pay principal of the DIP Loan;<br><br>(c)    provide for the ongoing working capital and capital expenditure needs of the Borrower during the pendency of the Bankruptcy Case; and<br><br>(d)    fund professional fees the administration of the Bankruptcy Case (including fees of the United States Trustee) and the consummation of the restructuring. |
| **Collateral** | All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Borrower, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of any of the Borrowers, including, for the avoidance of doubt, any equity or other interests in any Borrower's non-Debtor and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and tradenames and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the Final DIP Order (as defined below), including the proceeds thereof (collectively, the "*DIP Collateral*"). |

FILED: NEW YORK COUNTY CLERK 12/27/2022 12:12 PM INDEX NO. 654789/2022
NYSCEF DOC. NO. 45 RECEIVED NYSCEF: 12/27/2022

DECEMBER 26 2022 DRAFT Case 22-10943-vfp Doc 45 Entered 01/04/23 10:04:50 Page 95 of 102
CONFIDENTIAL – SUBJECT TO FRE 408

| | |
|---|---|
| **Priority of Liens on DIP Collateral:** | DIP Lender shall be awarded a valid, perfected, and enforceable lien and security interest in and to the following DIP Collateral:<br><br>(a) All right, title and interest in and to any property of the Borrower or its bankruptcy estate acquired prior to the commencement of the Bankruptcy Case, subject only to valid, perfected and enforceable liens and security interests of record and subject to any subordination agreements, if any, between and among the Lender and holders of prepetition claims against the Borrower;<br><br>(b) All right, title and interest in and to any property of the Borrower or its bankruptcy estate acquired or created after the commencement of the Bankruptcy Case, which shall be a lien senior to any and all competing claims, interests or encumbrances. |
| **Administrative Claim** | The DIP Loan shall be allowable under 11 U.S.C. §503(b)(1) as an administrative expense. |
| **No Assumption of Liabilities** | The Lender shall not assume any liabilities or debts of Borrower. |
| **Maturity Date** | The Effective Date under a confirmed chapter 11 plan of reorganization in the Bankruptcy Case, or upon approval of a sale or other disposition of any of the DIP Collateral to a person or entity other than the Lender. |
| **Chief Restructuring Officer** | Within thirty (30) days of entry of the Interim Order, Borrower shall obtain entry of an order by the Bankruptcy Court authorizing Borrower to retain a Chief Restructuring Officer that WW in its sole discretion does not oppose and with such powers as are reasonably acceptable to WW. |
| **Borrower Board** | Upon the termination of any injunction or court order that prohibits the following, Borrower shall expand its board of directors to five (5) members (the "*New Board*") of which (i) two members shall be designated by MSLP, (ii) two members shall be designated by WW, and (iii) the members selected by MSLP and WW shall designate one (1) board member, who |

DECEMBER 26 2022 DRAFT

CONFIDENTIAL – SUBJECT TO FRE 408

|  |  |
|---|---|
|  | shall be approved by WW, with such approval not unreasonably withheld. |
| **Events of Default** | Customary, including the following: |

- failure to pay principal or interest on the DIP Loan or any fees under the Agreement when due;

- failure of any representation or warranty of any of the Borrowers contained in the Agreement to be true and correct in all material respects when made;

- breach of any covenant, subject to a five (5) day grace period (from the earlier of the date that (i) any Borrower obtains knowledge of such breach and (ii) any Borrower receives written notice of such default from the Lender), underlined provided that the breach of any covenant described herein, or any other covenant so indicated by the Lender, shall not be subject to any grace period;

- failure to comply with the Budget, subject to the permitted variances;

- without the Lender's written consent, which may be granted or withheld in the Lender's sole and absolute discretion, the Lender shall cease to have continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on and security interests in the DIP Collateral with the priorities described above;

- any Borrower or equity holder in any Borrower (i) contests the validity or enforceability of any document executed and delivered to effectuate the DIP Loan in writing or denying in writing that it has any further liability thereunder or (ii) contesting the validity or perfection of the liens and security interests securing the DIP Loan;

- any attempt by any Borrower or any equity holder thereof to invalidate or otherwise impair the DIP Loans or the liens and security interests granted to the Lender with respect to the DIP Loan;

DECEMBER 26 2022 DRAFT

*CONFIDENTIAL – SUBJECT TO FRE 408*

|  | <ul><li>failure by any Debtor to comply with the Interim DIP Order or Final DIP Order, as applicable;</li><li>the entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim DIP Order or Final DIP Order or any other order of the Bankruptcy Court approving the Debtor's use of Cash Collateral, as applicable, without the express written consent of the Lender;</li><li>any sale or disposition, without the written consent of Lender, which consent may be granted or withheld in the Lender's sole and absolute discretion, of all or a material portion of the assets of the Borrower's bankruptcy estate;</li><li>conversion of, or the filing of any motion by any Borrower or any equity holder thereof to convert, the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;</li><li>dismissal of, or the filing of any motion by any Borrower or equity holder thereof to dismiss, the Bankruptcy Case;</li><li>the appointment of a Chapter 11 trustee or an examiner in the Bankruptcy Case;</li><li>failure to retain a Chief Restructuring Officer as set forth in this Term Sheet;</li><li>failure by the Borrower to create the New Board as set forth in this Term Sheet;</li><li>the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to a holder or holders of any security interest or lien on any part of the DIP Collateral to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral without the written consent of the Lender, which consent may be granted or withheld in the Lender's sole and absolute discretion;</li><li>the grant of any s claim that is pari passu with or senior to those of the Borrower;</li></ul> |
|---|---|

|  |  |
|---|---|
|  | • termination by the Bankruptcy Court of the use of Cash Collateral; |
|  | • the filing of a plan of reorganization or liquidation in the Bankruptcy Case that does not provide for the payment in full in cash of the obligations related to the DIP Loan; |
|  | • expiration of the period of time during which only the Borrower may file a plan pursuant to section 1121 of the Bankruptcy Code; and |
|  | • the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any of the DIP Collateral. |
|  | Among other remedies to be specified, upon the occurrence of an Event of Default, the Lender shall have all rights and remedies typically available to a lender upon the occurrence of an Event of Default, including, without limitation, the right to seek relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, and apply the proceeds thereof to the obligations of the Borrower or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law. |
| **Court Orders** | In connection with the transactions contemplated by this Term Sheet, Borrower shall file with the Courts within seven (7) days after the execution of the Agreement by each of the parties hereto, at their sole cost and expense, motions and applications for the interim order (the "*Interim DIP Order*") and the final order (the "*Final DIP Order*" and, together with the Interim DIP Order, the "*DIP Orders*") of the Bankruptcy Court authorizing the Borrower to use all cash collateral and to enter into the DIP Loan, each of which shall be in form and substance acceptable to the Lender, and (b) all documents executed and delivered by the parties to effectuate and implement the transactions that are the subject of this Term Sheet, as well as any orders of the Bankruptcy Court related thereto (the "*DIP Documents*"). The DIP Orders shall contain customary provisions and stipulations as reasonably required by Lender, and shall contain provisions under 11 U.S.C. §364(e) providing that Lender extended the DIP Loan in good faith, whether or not Lender knows of the pendency of any appeal. |

DECEMBER 26 2022 DRAFT

CONFIDENTIAL – SUBJECT TO FRE 408

| | |
|---|---|
| **Appeal of Orders** | If entry of either or both of the DIP Orders, or any other orders of the Bankruptcy Court relating to the transactions contemplated by this Term Sheet shall be appealed or otherwise challenged by any party (including by petition for *certiorari* or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing, or reargument), the Borrower shall diligently oppose such appeal, challenge, petition, or motion and use all efforts to obtain an expedited resolution thereof. |
| **Cooperation of Borrower Upon Acceptance:** | Upon acceptance of this Term Sheet, Borrower shall cooperate as reasonably requested with Lender in all matters related to the Bankruptcy Case, subject to the Borrower's determination, in its sole and absolute discretion, that such cooperation as reasonably requested by Lender violates Borrower's fiduciary duties as debtor-in-possession in the Bankruptcy Case. |
| **WW Prepetition Claims and Interests** | All rights, claims, interests, liens and encumbrances, if any, of WW that arose prior to the commencement of the Bankruptcy Case shall not be affected by the transactions contemplated by this Term Sheet, and WW and Borrower reserve all rights and remedies related thereto. |
| **Assignment/Participation** | WW may assign, in whole or in part, or otherwise participate its interest in whole or in part to one or more participants, on terms and conditions acceptable to WW in its sole and absolute discretion. |
| **Conditions Precedent** | WW's obligation consummate the DIP Loan shall be subject to satisfaction of the following conditions:<br><br>• The Debtor shall have prepared the Budget and its provisions shall be acceptable to WW in its sole and absolute discretion.<br><br>• The final terms and conditions of the Agreement shall be in commercially reasonable form, as prepared by WW counsel, and acceptable to WW in its reasonable discretion.<br><br>• The Debtor shall pay all of WW's reasonable and necessary out-of-pocket costs, fees, and expenses arising out of or relating to the DIP Loan except where such costs, fees and expenses are manifestly unreasonable.  For the sake of clarity, the costs, fees |

*DECEMBER 20 2022 DRAFT*

*CONFIDENTIAL – SUBJECT TO FRE 408*

|  | and expenses of WW that the Borrower is obligated to pay or reimburse include, but are not limited to: all travel, lodging, and other incidental expenses of WW personnel paid or incurred by WW as a result of the consideration and closing of the DIP Loan. In addition, the Borrower shall pay, on demand, all legal fees and expenses of WW's attorneys for services provided to WW in connection with this Term Sheet or the Agreement and any action, suit or proceeding arising from WW's dealing with the Borrower, including for the collection of amounts due to WW hereunder. |
|---|---|

ACCEPTED AND AGREED TO:                    ACCEPTED AND AGREED TO:

WHITE WINSTON SELECT ASSET               MUSCLEPHARM CORPORATION
FUNDS, LLC


_____          _____
BY: TODD M. ENRIGHT                        BY: RYAN DREXLER
ITS:                                       ITS

DATED: _____, 2022          DATED:_____, 2022

                                           ACCEPTED AND AGREED TO:

                                           (/S/ FOR ALL OTHER AFFILIATES)


                                           _____

# Exhibit 10

## Loss Calculation

| | |
|---|---:|
| Date | 12/16/2022 |
| | |
| October 2021 Principal | 9,759,315 |
| June 2022 Principal | 3,081,875 |
| Total Principal | 12,841,190 |
| **(a) 120% of Principal** | **15,409,428** |
| | |
| **Total Interest** | **2,167,115** |
| | |
| **Net Fees** | **584,804** |
| | |
| **Mandatory Default Amount** | **18,161,347** |