GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6665
E-mail: ggarman@gtg.legal
WILLIAM M. NOALL
Nevada Bar No. 3549
E-mail: wnoall@gtg.legal
MARK M. WEISENMILLER
Nevada Bar. No. 12128
Email: mweisenmiller@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Empery Tax Efficient, LP as*
*Agent and Collateral Agent for certain*
*Secured Noteholders*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.: 22-14422-NMC |
| MUSCLEPHARM CORPORATION, | Chapter 11 |
| Debtor. | Date:  January 5, 2023<br>Time:  9:30 a.m. |

**OBJECTION TO EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) GRANTING PRIMING LIENS AND ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, AND** <u>**(V) GRANTING RELATED RELIEF**</u>

Empery Tax Efficient, LP, in its capacity as collateral agent (in such capacity, "<u>Empery</u>") of the Secured Noteholders with respect to the Notes (both defined below), by and through its counsel, Garman Turner Gordon LLP, hereby files its objection (the "<u>Objection</u>") to the *Emergency Motion for Entry of Interim and Final Orders: (i) Authorizing Debtor to Obtain Post-Petition Financing, (ii) Granting Priming Lines and Administrative Expense Claims, (iii) Authorizing the Debtor's use of Cash Collateral, (iv) Modifying the Automatic Stay, and (v) Granted Related Relief* [ECF No. 33] (the "<u>Motion</u>"), filed by MusclePharm Corporation (the "<u>Debtor</u>") on January 3, 2023.

This Objection is made and based upon the following Memorandum of Points and

1    Authorities, the declarations of Timothy Silver ("Silver Decl.") and Mark M. Weisenmiller

2    ("Weisenmiller Decl.") both filed concurrently herewith, the papers and pleadings on file, judicial

3    notice of which is respectfully requested pursuant to Federal Rule of Evidence 201, and such

4    further evidence and argument that may be presented and considered by this Court at any hearing

5    on the Motion.

6                                                      **I.**
                                            **INTRODUCTION**

7              Priming DIP loans are like unicorns, mythical creatures that are often spoken of but never

8    seen.  And the reason is simple, the statutory requirements of Section 364(d)(2) mandate that

9    debtors meet an extraordinary burden and priming DIP loans are available only in the most

10   exceptional of circumstances.  Here, those circumstances are not present.

11            Similarly, in order to meet its burden to obtain a priming lien (and the heightened due

12   process requirements that accompany it), a debtor must submit a fulsome record containing

13   admissible and credible evidence.  No such record accompanies the Motion.  And more troubling

14   are the intentional omissions of the relevant facts designed to mislead the Court.  Among others,

15   material (and insurmountable) deficiencies of the Motion include: (i) no evidence or argument as

16   to the value of Empery's collateral; (ii) no description of the impact of the White Winston DIP

17   proposal ("WW DIP Proposal") (attached as Exhibit 2 to the Motion) upon Empery's collateral

18   except the preservation of "going concern"; (iii) no acknowledgement of the existence of the TRO

19   issued by a court of competent jurisdiction, enjoining Debtor, Drexler, and White Winston from

20   consummating the Settlement Agreement and taking any action to dispose of any Debtor assets,

21   which plainly prohibits the WW DIP Proposal; (iv) no disclosure of the fact that within days of

22   the filing of the Chapter 11 Case, White Winston was in active litigation with Debtor and is

23   currently an equity holder of Debtor; and (v) Debtor all but ceased operations prior to the Petition

24   Date.  Moreover, the summary of the terms of the WW DIP Proposal set forth in the Motion is

25   materially different than the actual agreed to terms of the WW DIP Proposal.  Because Debtor

26   failed to meet its extremely high burden of proof and materially misled the Court regarding White

27   Winston and the terms of the WW DIP Proposal among other reasons discussed below, this Court

28

should deny the Motion in its entirety.

## II.
## STATEMENT OF FACTS[1]

**A.      Empery's Loans to Debtor and Debtor's Serial Defaults.**

1.      On October 13, 2021, Empery Master Onshore, LLC ("EMO"), Empery, Empery Tax Efficient III, LP ("ETE3"), and Empery Debt Opportunity Fund, LP ("EDOF," and collectively with EMO, Empery and ETE3, the "Empery Noteholders") with ETE as lead investor, and collateral agent for all of the Secured Noteholders, Ionic Ventures, LLC, Anson Investments Master Fund LP, CVI Investments, Inc., HB Fund LLC, Intracoastal Capital LLC, Bigger Capital Fund, LP, District 2 Capital Fund LP, L1 Capital Global Opportunities Master Fund, and Altium Growth Fund, LP (collectively, the "October Noteholders") entered into a *Securities Purchase Agreement* (the "SPA") with Debtor.  The Principal Amount of the October Noteholders purchase of Debtor securities collectively was $8,197,674.42.  See Silver Decl., Exhibit A.

2.      Each October Noteholder's securities purchase was likewise evidenced by an *Original Issue Discount Senior Secured Note Due April 13, 2022* (collectively, the "October Notes") issued to the October Noteholders by Debtor.  The maturity date of each of the October Notes was April 13, 2022, but the October Notes had built-in maturity extension provisions in response to Debtor's stated concerns relating to potential up-listing delays that allowed for a total extension of not more than 45 days (*i.e.* to May 28, 2022).  See Silver Decl., Exhibits B-N.

3.      Also on October 13, 2021, Empery for the October Noteholders of the October Notes collectively, entered into a *Pledge and Security Agreement* (the "Security Agreement") with Debtor.  As collateral for the October Notes, Debtor and its wholly owned Canadian subsidiary, MusclePharm Enterprises Corp., granted security interests and pledged to Empery, for the benefit of October Noteholders, the following property (hereinafter, the "Collateral"):

(a) all Accounts;
(b) all Chattel Paper (whether tangible or electronic);
(c) the Commercial Tort Claims specified on Schedule VI thereto;
(d) all Deposit Accounts, all cash, and all other property from time to time deposited therein or otherwise credited thereto and the monies and property in the possession

---

[1] For a full recitation of relevant facts, see the Silver Declaration.

or under the control of the Collateral Agent or a Buyer or any affiliate, representative, agent or correspondent of the Collateral Agent or a Buyer;

(e) all Documents;

(f) all Equipment;

(g) all Fixtures;

(h) all General Intangibles (including, without limitation, all Payment Intangibles);

(i) all Goods;

(j) all Instruments (including, without limitation, Promissory Notes and each certificated Security);

(k) all Inventory;

(l) all Investment Property;

(m) all Intellectual Property and all Licenses;

(n) all Letter-of-Credit Rights;

(o) all Supporting Obligations;

(p) all Pledged Interests;

(q) all Additional Collateral;

(r) to the extent not covered by the preceding clauses of this Section 2, all other tangible and intangible personal property of such Grantor (whether or not subject to the Code), including, without limitation, all bank and other accounts and all cash and all investments therein, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of such Grantor described in the preceding clauses of this Section 2 (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by such Grantor in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, Software, data and computer programs in the possession or under the control of such Grantor or any other Person from time to time acting for such Grantor that at any time evidence or contain information relating to any of the property described in the preceding clauses of this Section 2 or are otherwise necessary or helpful in the collection or realization thereof; and

(s) all Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral;

See Silver Decl., Exhibit O.  Expressly, the collateral granted under the Security Agreement was intended to secure all indebtedness due under the October Notes and SPA.  Security Agreement, Section 3.

4.      The October Noteholder's security interests in the Collateral were timely perfected by Empery's filing of a *UCC-1 Financing Statement* on October 14, 2021, with the Nevada Secretary of State's office.  See Silver Decl., Exhibit P.

5.      Also on October 13, 2021, Empery on behalf of the October Noteholders, Debtor, and receivables factor Prestige Capital Corporation ("Prestige") entered into an *Intercreditor Agreement* (the "Factoring Intercreditor Agreement").  See Silver Decl., Exhibit Q.

6.      Also on October 13, 2021, Empery on behalf of the October Noteholders, Debtor, and Drexler entered into an *Intercreditor Agreement* (the "Drexler Intercreditor Agreement").  See Silver Decl., Exhibit R.

7.      On November 4, 2021, Empery on behalf of the October Noteholders, Debtor, and Wells Fargo NA ("Wells Fargo") entered into that certain *Deposit Account and Sweep Investment Control Agreement* (the "DACA").  See Silver Decl., Exhibit S.

8.      As part of the closing of the sale of the October Notes, certain other documents were executed and exchanged, including a *Trademark Security Agreement*, *Perfection Certificate*, and *Guarantee* by Debtor and Canada MusclePharm Enterprises Corp.  See Silver Decl., Exhibits T, U, and V.

9.      In March 2022, Debtor requested permission from Empery to establish a new revolving credit facility with Drexler to finance inventory to better control Debtor's margins on orders with Debtor's largest customer, Costco.  Empery worked with Debtor to amend the Drexler Intercreditor Agreement, allowing Debtor to issue to Drexler an unsecured promissory note (the "Drexler Unsecured Revolver").  See Silver Decl., Exhibit X.

10.      On March 3, 2022, each of the October Noteholders signed a consent allowing the Drexler Unsecured Revolver to be deemed a Permitted Note with no consideration given to the October Noteholders.  See Silver Decl., Exhibit Y.

11.      Pursuant to the terms of the October Notes, Debtor had the option to extend the maturity date of the October Notes from April 13, 2022 to May 28, 2022 upon the delivery of a certain certificate duly signed by an officer of Debtor.  In this regard, on April 12, 2022, Debtor and Rizvi represented to Empery and each of the October Note Noteholders that Debtor had positive cash flow from operations in March 2022 and expected to have positive cash flow from operations in April 2022, thereby extending the maturity date of the October Notes to May 28, 2022.  See Silver Decl., Exhibit Z.

12.     In early May 2022, Debtor represented to Empery that it would not be able to pay the October Notes by the extended October Notes maturity date of May 28, 2022, and that there was a significant growth opportunity that Debtor would be able to access if it had additional capital to build inventory rather than only manufacturing product to make delivery for specific bulk orders.  Accordingly, Debtor began negotiating an amended SPA and additional notes with Empery.

13.     On June 2, 2022, in conjunction with the proposed amended SPA, Debtor provided Empery with the Disclosure Schedules to the June 2022 Notes (the "June Disclosure Schedules") in which Debtor was required to disclose all litigation, wherein Debtor identified lawsuits that had previously been undisclosed and concealed from Empery.  The newly disclosed lawsuits included multiple lawsuits with prior employees regarding accusations made by the employees such as retaliation, inflating sales and creating false accounts.  Also disclosed were a number of additional cases regarding Debtor's failure to pay its bills, including one from contract manufacturer S.K. Laboratories ("SK Labs" and the "SK Labs Action") alleging that Debtor has defaulted on payments due of $4.6 million, a new lawsuit filed by White Winston against Debtor, and a number of other matters.  In the case of *White Winston Select Asset Fund Series MP-18, LLC et al., v MusclePharm Corp., et al*., filed in Massachusetts on February 8, 2022, White Winston named Debtor and Drexler as defendants, alleging unfair trade practices, abuse of process, malicious prosecution, breach of duty of loyalty and, alternatively, breach of a settlement agreement relating to a prior action filed by White Winston.

14.     On June 3, 2022, Empery negotiated with Drexler a new provision in the Notes, that if Rizvi ceased acting as Debtor's CFO and member of the Board of Directors with Good Reason or *she was not replaced within forty-five (45) days with a CFO and member of the Board of Directors approved by Empery, not to be unreasonably withheld*, an event of default would exist (the "CFO Default").

15.     On June 3, 2022, Debtor and certain of the Noteholders entered into a *Waiver and Amendment* agreement (the "Waiver and Amendment Agreement") that, among other matters,

1    called for an extension of the maturity date of the October Notes six (6) months from the closing

2    date of the June Notes (as defined below).  <u>See</u> Silver Decl., Exhibit AA.

3    16.    On June 3, 2022, Debtor and the Noteholders entered into an *Amended and Restated*

4    *Securities Purchase Agreement* (the "<u>Amended SPA</u>"), whereby the collective principal amount

5    under the October Notes was increased from $8,197,674.42 to $9,759,135.00.  <u>See</u> Silver Decl.,

6    Exhibit BB.  Also, the maturity date of the October Notes was extended to December 10, 2022.

7    17.    Additionally, on June 10, 2022, Debtor issued *Original Issue Discount Senior*

8    *Secured Note Due December 10, 2022* (the "<u>June Notes</u>" and collectively with the October Notes,

9    the "<u>Notes</u>") to Empery Noteholders, Ionic Ventures, LLC, Anson Investments Master Fund LP,

10   HB Fund LLC, Bigger Capital Fund, LP, District 2 Capital Fund LP, Altium Growth Fund, LP,

11   Walleye Opportunities Master Fund Ltd., and Roth Capital Partners, LLC (collectively, the "<u>June</u>

12   <u>Noteholders</u>" and together with the October Noteholders, the "<u>Secured Noteholders</u>") for an

13   aggregate principal amount of $3,081,875.  <u>See</u> Silver Decl., Exhibits CC-NN.  The maturity date

14   of the June Notes was December 10, 2022.  Moreover, the June Notes included the CFO Default

15   provision, and the October Notes were amended to include the CFO Default provision.

16   18.    On June 30, 2022, Ryan Lane of Empery emailed Debtor's board of directors in

17   which he expressed concerns with Drexler's leadership and control (the "<u>Lane Email</u>").  <u>See</u> Silver

18   Decl., Exhibit RR.

19   19.    On July 6, 2022, Rizvi resigned as President and CFO, effective on July 22, 2022.

20   <u>See</u> Silver Decl., Exhibit SS.

21   20.    On July 28, 2022, Eric Chin was named CFO and a member of the Board of

22   Directors of Debtor.  Debtor did not seek and did not request the consent of Empery as was required

23   to cure the CFO Default.

24   21.    On August 16, 2022, Empery notified Debtor that it was reserving all rights with

25   respect to Rizvi's resignation and the attendant breach of the Notes.  <u>See</u> Silver Decl., Exhibit

26   WW.  Empery received no response from Debtor or its counsel.

27   22.    The next day, on August 17, 2022, Chin resigned as CFO and member of the Board

28   of Directors.  <u>See</u> Silver Decl., Exhibit XX.

23.     On August 22, 2022, Debtor disclosed that its Form 10-K/A for the year ending December 31, 2021 and the Form 10-Q for March 31, 2022 should no longer be relied upon due to an error with credit memos.  Specifically, it stated revenue was overstated by $600,000 to $1,000,000 for the year ending December 31, 2021.  See Silver Decl., Exhibit YY.

24.     As the false and misleading financials were events of default, on August 26, 2022, Empery sent Debtor a second reservation of rights letter.  See Silver Decl., Exhibit ZZ.  Empery received no response from Debtor or its counsel.

25.     At the time of the August 22nd Form 8-K, Empery became concerned about the reliability of all of the information that it had relied on to make its initial debt investment in Debtor, as well as its ability to monitor the ongoing performance of the business.  Needless to say, Empery was even more concerned about how Debtor could properly address the disclosed issues with its financial statements when it did not even have a CFO.

26.     Unbeknownst to Empery, sometime prior to September 1, 2022, also in violation of the Notes, Debtor received a loan from Delta Bridge Funding (the "Delta Loan"), for which it pays $32,790 per week, which was a breach of several provisions of the Notes and resulted in Events of Defaults under the Notes.

27.     On September 5, 2022, forty-five (45) days after Rizvi resigned, Debtor had not replaced Rizvi with a CFO and member of the Board of Directors.  Empery provided Debtor with multiple proposed candidates that Empery would find acceptable but did not hear from Debtor about the proposed candidates or any other candidates.

28.     On September 8, 2022, Empery sent a third reservation of rights letter to Debtor regarding Events of Default caused by Debtor's failure to seek approval of Eric Chin as CFO and then his subsequent resignation causing there to be no CFO on the forty-fifth (45th) day after Rizvi resigned.  See Silver Decl., Exhibit AAA.  Empery likewise requested information from Debtor regarding its cash, schedule of payables, and receivables, among other things.  Empery never heard back from Debtor or its counsel regarding the third reservation of rights letter or information request.

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

29.     On September 9, 2022, in violation of the Notes, Debtor received $458,621.00 loan from Blade Funding Corp (the "Blade Loan"), which Empery did not discover until November 2022, and was a breach of provisions of the Notes, which resulted in an additional Event of Defaults under the Notes.

30.     On September 15, 2022, Empery received a phone call from Jennifer Turner, Senior Counsel, Division of Enforcement in the Denver Regional Office of the SEC. Empery was told that Jennifer Turner wanted to see if Empery could add more detail to an ongoing investigation regarding Debtor (the "SEC Investigation"). See Silver Decl., Exhibit BBB. Debtor had concealed the ongoing SEC Investigation from Empery and even represented in both the SPA and the Amended SPA that there were no ongoing investigations into Debtor. The failure to disclose the SEC Investigation was a breach of the SPA, which constitutes an additional Event of Default under Section 5(a)(iv) of the Notes.

31.     On September 20 and 21, 2022, Debtor, in violation of the Notes, made cash transfers of $150,000 and $50,000 to Drexler (the "Drexler Cash Transfers"). Each of these payments constituted a breach of Section 3(g) of the Notes, each of which resulted in an additional Event of Default under Section 5(a)(iii) of the Notes.

32.     On September 22, 2022, Empery sent an *Event of Default Redemption Notice* to Debtor, which was signed by the Empery Noteholders, L1 Capital Global Opportunities Master Fund, Bigger Capital Fund, LP, District 2 Capital Fund LP, Ionic Ventures, LLC, Walleye Opportunities Master Fund Ltd, and Anson Investments Master Fund LP, representing 73% of the Secured Noteholders based on the principal amount of notes outstanding at the time. See Silver Decl., Exhibit CCC. Empery received no response from Debtor, the board of directors or its counsel.

33.     On September 26, 2022, Debtor hired Gary Shirshac as CFO without first requesting Empery's consent and more than 45-days after Rizvi resigned. Debtor did not even attempt to replace Ms. Rizvi's role on the Board of Directors. See Silver Decl., Exhibit DDD.

34.     On September 28, 2022, the SEC interviewed Lane as part of the SEC Investigation.

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

35.    On October 3, 2022, Empery, pursuant to the Security Agreement and DACA, issued a DACA Access Termination Notice, directing Wells Fargo to sweep Debtor's bank accounts.  See Silver Decl., Exhibit FFF.

36.    Debtor, its board of directors, or counsel did not respond to a single reservation of rights or event of default letter.  They did not timely refute any of the events of default.

37.    In fact, Drexler acknowledged the defaults during an October 7, 2022 phone call with Empery, stating "Defaults are part of the contract… there are defaults. I signed the documents. I am a big boy."

38.    On October 10, 2022, Empery sent notice of additional events of default to Debtor regarding the undisclosed SEC Investigation and Debtor's failure to respond to Empery's September 8 request for information.  See Silver Decl., Exhibit GGG.

39.    On October 14, 2022, pursuant to the Security Agreement, Empery demanded that Debtor assemble all collateral for inspection by no later than October 18, 2022.  See Silver Decl., Exhibit HHH.  Debtor failed to respond to the demand or assemble the collateral as provided in the Security Agreement.

40.    From October 19, 2022 through October 27, 2022, Empery negotiated a forbearance agreement with Debtor.  However, Debtor pulled out of the fully-negotiated forbearance agreement at the last minute and sought to renegotiate a term sheet.  It was at that time that the Chief Restructuring Officer Marc Ross was hired by Debtor (the "CRO") advised Empery that, after weeks of analysis he had concluded that Debtor was insolvent and should seek relief under the Bankruptcy Code.  Based on this information, Empery determined that the proposed forbearance term sheet was not in its best interests.

41.    On October 30, 2022, Drexler advised Empery that he had hired a co-CEO, Eric Hillman ("Hillman"), and that Drexler planned to step down as CEO by year-end.

42.    In an effort to assist Debtor's ability to continue as a going concern, Empery released the DACA account on November 15, 2022, after receipt of confirmation from Wells Fargo that Marc Ross (the CRO) and Harry Malinowksi (a partner of the CRO) were the only signatories on the account.  See Silver Decl., Exhibit LLL.

43.     On November 17, 2022, Empery provided an *Additional Events of Default Notice* to Debtor pertaining to the Blade Loan, the Delta Loan, and Drexler Cash Transfers, which were all in violation of the Notes and only discovered by Empery on November 15, 2022.  See Silver Decl., Exhibit MMM.

44.     On November 30, 2022, after weeks of negotiation and input from the CRO that Debtor was insolvent and the board had adamantly refused to consider a voluntary bankruptcy filing, with no other option, Empery began a public notice campaign for the Article 9 Sale to occur at 1:00 p.m. PST on December 15, 2022 (the "Foreclosure Sale").

45.     On December 5, 2022, Empery provided notice of yet additional events of default to Debtor based on Debtor's failure to file required SEC filings as required under the Amended SPA.  See Silver Decl., Exhibit NNN.

46.     Thus, Debtor defaulted in all the following respects:

- Debtor breached Section 3.1(j) of the SPA by not disclosing a pending SEC investigation;
- Debtor breached Section 3.1(h) of the SPA by filing unreliable financial statements;
- Debtor breached Section 4.3(a) of the SPA by failing to file required Exchange Act reports with the SEC;
- Debtor breached on the June Notes by failing to provide requested information;
- Debtor breached on Section 5(a)(xvi) of the June Notes by failing to retain or replace Sabina Rizvi;
- Debtor breached Section 3(a) and 3(e) of the Notes by improperly receiving additional financing and making payments on those financings; and
- Debtor is plainly in default because no payment on the Notes was made when due on December 10, 2022.

**B.     The Voidable Settlement Between Debtor, Drexler, and White Winston and TRO.**

47.     After Empery publicly noticed the Foreclosure Sale, White Winston, an equity holder of Debtor and a plaintiff against Debtor in various legal actions (material facts omitted by Debtor from the Motion), suddenly appeared and, on December 5, 2022, entered into the Settlement Agreement with Drexler and Debtor days before the Foreclosure Sale.  The Settlement Agreement is clearly a voidable transaction under the UVTA and disregarded the rights of the Secured Noteholders whose secured Notes sit unquestionably above White Winston's equity interest in Debtor in priority.  The Settlement Agreement also sought to give control of Debtor to

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

White Winston on the eve of the Foreclosure Sale, ostensibly to thwart the auction and the rights of the Secured Noteholders.  See Silver Decl., Exhibit OOO.

48.    Under the Settlement Agreement, among other compensation, Debtor agreed to grant White Winston an $8,630,261 claim, including a $4,000,000 cash payment, $500,000 of which was to be paid by January 4, 2023, which concessions plainly violate Debtor's obligation under the Notes, in exchange for White Winston's agreement to drop its claims against Debtor and Drexler.  Empery believes that the Settlement Agreement was simply an attempt to financially incentivize White Winston to attack the interests of the Secured Noteholders.

49.    Moreover, Section 8(a) of Settlement Agreement provides that "MusclePharm shall expand its board of directors to seven (7) members…."  Of the seven board members, two are to be designated by White Winston, two are to be designated by Drexler, three are to be independent directors that are mutually agreeable to the four directors that White Winston and Drexler appoint. Consummation of Section 8 of the Settlement Agreement would constitute a Change of Control Transaction, yet another event of default under the Notes.

50.    Consequently, on December 14, 2022, Empery filed a complaint in the Supreme Court of the State of New York County of New York ("New York State Court") against Debtor, White Winston, and Drexler, seeking a temporary restraining order and permanent injunction enjoining the consummation of the Settlement Agreement, among other things.

51.    On December 15, 2022, after holding a hearing, the New York State Court entered a temporary restraining order prohibiting Debtor, White Winston, and Drexler from consummating the Settlement Agreement and from taking other action to dispose of any Debtor assets ("the "TRO").  See Silver Decl., Exhibit PPP.

52.    The WW DIP Proposal clearly violates the TRO because Debtor, Drexler, and White Winston consummate the change in control provisions of the Settlement Agreement through the WW DIP Proposal and the WW DIP Proposal provides for the disposition of Debtor assets (its accounts) to White Winston.

53.    On December 14, 2022, Debtor filed a complaint against Empery in the New York State Court, seeking a preliminary and permanent injunction enjoining and restraining Empery

from accelerating the Notes and proceeding with a sale of Debtor's collateral at the Foreclosure Sale on grounds that there were no defaults under the Notes and, alternatively, that the Foreclosure Sale was commercially unreasonable.

54.    On December 15, 2022, after holding a hearing, the New York State Court denied Debtor's request for a preliminary injunction.  See Silver Decl., Exhibit QQQ.

55.    Just after the start of the scheduled Foreclosure Sale to be conducted on December 15, 2022 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11, thereby commencing the above-captioned Chapter 11 case (the "Chapter 11 Case").

56.    As of the Petition Date, the Secured Noteholders are owed not less than $18,155,014 under the Notes.

57.    Although Drexler signed the Voluntary Petition, Drexler had resigned as CEO and Chairman prior to the filing of the Chapter 11 Case.  In fact, Drexler all but admitted that there was no board action.  He attached a consent by the CEO to the Voluntary Petition, rather than consent in lieu of a board meeting.  See ECF No. 1 ("Voluntary Petition"), pp. 10-13.

58.    Although the Chapter 11 Case has been pending since December 15, 2023, Debtor has failed to file schedules and statements.  See generally Docket.

**C.    The Motion and WW DIP Proposal.**

59.    The Motion seeks approval of a debtor-in-possession financing term sheet proposed by insider equity holder White Winston Select Asset Funds, LLC ("White Winston" and the proposal attached as Exhibit 2 to the Motion, the "WW DIP Proposal").

60.    The summary of the WW DIP Proposal set forth in the Motion is materially inconsistent with the actual terms of the WW DIIP Proposal.  For example, the summary of material terms set forth on page 2 of the Motion provides that "**Maximum DIP Loan Commitment**: Up to $2,000,000 in new funding, with $1,000,000 available on an interim basis (the "**DIP Note Facility**") and 80% of all post-petition receivables purchased up to $10,000,000 (the "**DIP Factoring Facility**" and collectively with the DIP Note Facility, the "**DIP Loan**")."

61.    However, the actual terms of the WW DIP Proposal provide that:

***WW in its sole discretion, may advance the following***: (i) up to one hundred percent (100%) of the first $1,000,000 of Accounts purchased after entry of the Interim DIP Order and before entry of the Final DIP Order, less the Immediate Advance, and (ii) up to eighty percent (80%) of the face amount of all other Accounts purchased, in each case less the applicable discount fee, Facility Fee (as defined below) and other similar charges (collectively the "Aggregate Advances"), and (iii) upon entry of the first "Final DIP Order" (as defined below), the net principal amount of One Million, Five Hundred Thousand Dollars ($1,500,000) plus all unpaid closing costs, fees (including, without limitation, the Facility Fee), and expenses associated with the DIP Loan (the "Second Advance"). The total Aggregate Advances shall be in the gross amount of Two Million Dollars ($2,000,000). The purchase price of any Account shall be the amount actually received in payment of such Account, but for the purposes of any Advance, the purchase price shall be equal to the face amount of the Account less any selling, payment or other discounts offered.

See WW DIP Term Sheet, "Advances on Accounts." See also id., "Conditions on Advances."

62.     Thus, contrary to the Motion, under the WW DIP Proposal, the only financing required to be provided by White Winston to Debtor is the $350,000 Immediate Advance. See WW DIP Proposal, at "Immediate Advance."  Due to these discrepancies, its difficult, if not impossible, to understand what financing terms Debtor is asking the Court to authorize in the Motion.

### III.
### LEGAL ARGUMENT

**A.      Generally Applicable Law.**

Section 364 provides that:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
    (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
    (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
    (3) secured by a junior lien on property of the estate that is subject to a lien.
(d)(1) ***The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--***
        **(A)** ***the trustee is unable to obtain such credit otherwise; and***
        **(B)** ***there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.***

**(2)** ***In any hearing under this subsection,*** <u>***the trustee has the burden of proof***</u> <u>***on the issue of adequate protection***</u>***.***

(e) The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(c)-(e) (emphasis added).  Thus, Debtor must prove that it was unable to obtain credit without priming liens and the liens in the collateral are adequate protected.

"The § 364(d) process, which allows a debtor in possession to 'prime' an existing lien is 'considered ***rare and extraordinary***, which is why 'the trustee or debtor in possession must establish ***an inability to obtain the necessary credit by any method other than having such credit secured by a senior or equal lien on previously encumbered property***.'"  <u>See</u> <u>In re Thurston Highland Associates, LLC</u>, 09-44002, 2010 WL 148683, at *4 (Bankr. W.D. Wash. Jan. 13, 2010) (emphasis added) (not for publication) (citing <u>Bland v. Farmworker Creditors</u>, 308 B.R. 109 (S.D.Ga.2009) (quoting 2 Norton Bankruptcy Law and Practice 2d § 38:7 (Sep.2003)).  <u>See also</u> <u>In re McClure</u>, 1:13-BK-10386-GM, 2015 WL 1607365, at *6 (Bankr. C.D. Cal. Apr. 2, 2015) ("Bankruptcy Code § 364(d) allows the debtor to prime a secured creditor (i.e. deprive it of collateral by giving another lender a higher priority security interest in the same collateral) so long as the existing secured lender is adequately protected.").  According to the bankruptcy court in <u>Tamarack</u>:

The ability to prime an existing lien is extraordinary, and in addition to the requirement that the trustee be unable to otherwise obtain the credit, the trustee must provide adequate protection for the interest of the holder of the existing lien or obtain such lien holder's consent....

In most cases, adequate protection is provided by conditioning or limiting the borrowing in order to maintain a sufficient equity in the subject property to protect the existing lienholder....

***When the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied absent the lien holder's consent***. The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the existing lender in order to provide additional protection for a new, postpetition

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

lender.

In re Tamarack Resort, LLC, 09-03911-TLM, 2010 WL 4117459, at *11 (Bankr. D. Idaho Oct. 19, 2010) (emphasis added) (citing Collier at ¶ 364.05[1]).[2]

**B.** **Debtor Has Not and Cannot Show it was "Unable to Obtain Such Credit Otherwise."**

Debtor requests in the Motion that White Winston's DIP liens prime the liens of all Debtor's secured creditors in all assets of Debtor. However, because the Secured Noteholders do not consent to their liens being primed, Debtor must prove that it was unable to otherwise obtain credit and that the Secured Noteholders' security interests are adequately protected for this Court to even consider granting the extraordinary relief requested by Debtor.

Yet, Debtor has not and cannot meet its high burden. Notwithstanding that the Motion requests approval of a loan under Section 364(d), seeking rare and extraordinary non-consensual priming liens, the Motion failed to include: (i) any evidence or argument regarding the value of Empery's collateral; and (ii) a description of the impact of the WW DIP Proposal upon Empery's collateral except the preservation of going concern. Although Debtor suggests that the WW DIP Proposal should be approved under Section 364(d) because Debtor was unable to obtain "more favorable terms" than the WW DIP Proposal, the test under Section 364(d) is that Debtor could not obtain financing other than under Section 364(d). Section 364 does not include a "more favorable terms" component as part of its gatekeeping language.

Furthermore, as detailed in the Weisenmiller Declaration, Empery has been ready and willing to provide DIP financing to Debtor and remains so. However, because Drexler and White Winston desired to maintain control of Debtor, Debtor refused to negotiate in good faith with

---

[2] "The concept of adequate protection is derived from the Fifth Amendment protection of property interests." S. REP. 95-989, 49, 1978 U.S.C.C.A.N. 5787, 5835. The Supreme Court has long recognized that the Bankruptcy Code's powers are subject to the Fifth Amendment. See, e.g., Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 166–67 (1974) (elimination of secured creditors' rights in their collateral by bankruptcy statute in exchange for securities in new company of uncertain value constituted a taking of property requiring just compensation under the Fifth Amendment); Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589–90 (1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment" and cannot be used to effectuate "the taking of substantive rights in specific property"). Indeed, a "secured creditor has a constitutional right to have the value of its secured claim on the petition date preserved." In re Keystone Camera Prods. Corp., 126 B.R. 177, 183–84 (Bankr. D.N.J. 1991) (citing Wright v. Union Cent. Life Ins. Co., 311 U.S. 273 (1940)).

Empery, refusing to even markup its DIP proposal for a week, then allowing White Winston an opportunity to match all Empery's DIP proposals, before suddenly adjourning for the weekend and determining to accept the WW DIP Proposal without first offering Empery an opportunity to match the WW DIP Proposal, claiming that it ran out of time to negotiate.  Nevertheless, none of Empery's DIP proposals require non-consensual priming liens.  As such, Debtor cannot meet its burden of showing that it was unable to obtain credit other than under Section 364(d).  Therefore, the Court should deny the Motion because Debtor has not and cannot prove that it was unable to otherwise obtain credit as required by Section 364(d).

**C.    Debtor Did Not, and Cannot, Show that Empery is Adequately Protected.**

Debtor contends that the WW DIP Proposal provides adequate protection to the Secured Noteholders.  However, Debtor's argument that the preservation and enhancement of Empery's collateral resulting from Debtor's operations affords adequate protection has no merit.  The argument is not supported by any evidence.  The WW DIP Proposal here proposes to grant priming liens to White Winston but confers upon White Winston sole discretion to determine whether to provide to Debtor the Aggregate Advances and the Second Advance.  Thus, under the WW DIP Proposal, the only financing required to be provided by White Winston to Debtor is the $350,000 Immediate Advance, which is insufficient to funds Debtor's operations and the administration of the Chapter 11 Case as is clear from the Budget (discussed below).  And there are no real budget restrictions to ensure that whatever debtor-in-possession financing is provided by White Winston actually preserves and enhances the value of the of collateral, rather than pays, for instance, only Debtor's professionals.  At bottom, the Motion and approval of the WW DIP Proposal should be denied because they shift the risk of loss upon the Secured Noteholders.

**D.    The Motion Should be Denied Because the WW DIP Proposal is Not Supported by an Accurate or Appropriate Budget Evidencing that Empery's Interests are Adequate Protected.**

Debtor has made it crystal clear that it believes it is impossible to predict the timing of upcoming purchase orders until they resolve (i) the lack of general liability insurance and (ii) an issue regarding a third-party product certification currently part of the existing labels.  The lack of

general liability insurance acknowledged in the Budget alone proves that the Secured Noteholder's interests are not adequate protected.  Until those two items have been resolved, Debtor cannot possibly predict the timing of upcoming purchase orders, making the Factored Receipts that Debtor is relying on in the Budget inaccurate and unreliable.  As set forth in the Weisenmiller Declaration, Empery's requirement that Debtor comply with its Budget, subject to permitted variances, was the primary reason provided by Debtor for rejecting Empery's 4th Revised DIP Term Sheet (defined in the Weisenmiller Declaration) without giving Empery the opportunity to discuss key issues in the Budget or match the WW DIP Proposal.

Eric Hillman, Debtor's co-CEO, has advised that if the third party product certification issue is not resolved, then new labels are required before product will be available to ship.  In this situation, new labels will take five to six weeks to be made and there will be no product available to ship for five to six weeks.  Without product available to ship, there will be no purchase orders or accounts receivable to factor, so the only committed financing in the WW DIP Proposal is the Immediate Advance of $350,000 (or $500,000 if $150,000 is paid directly to Drexler as reimbursement for advancing Debtor counsel fees or to Debtor's professionals).  In weeks one through six of the Budget, cumulative Total SG&A is equal to $590,052, far in excess of the $350,000 Immediate Advance provided by the WW DIP Proposal.  If Debtor had to reduce Total SG&A by Shipping cost of $100,000 because product will not be shipped, $490,052 is still far in excess of the $350,000 Immediate Advance provided by the WW DIP Proposal.  The $500,000 of cash will be used up by SG&A and Restructuring Costs by week 4.

With the timing of these sales put aside, Eric Hillman has suggested he is confident in sales of $1.5 million to $1.8 million over the next 13 weeks with no assurance on anything incremental.  Thus, the budgeted sales of $2.3 million are not validated by existing purchase orders or reliable projections based on conversations with Eric Hillman.

JW Nutritional, LLC ("JW"), a long-term partner of Debtor that functions as its third-party logistics provider, managing manufacturing, packaging, marketing and more for Debtor has suggested that it is not sure if it is willing to continue to manufacture for Debtor based upon historic breaches of contract.  Without JW as a manufacturer, there is no alternative manufacturer available

to quickly produce MusclePharm products and there is concern that any sales in the next 13 weeks may be impossible. In addition, JW does not currently have Debtor on its manufacturing schedule and until it does, it will not know the exact cost of goods sold or potential availability on its manufacturing lines for MusclePharm products. As such, the amounts and timing of the COGS line of the Budget are inaccurate and unreliable.

Debtor's Budget also provides that Debtor's counsel is to be paid $150,000 during the interim period. It is inappropriate for Debtor's counsel to be paid on an interim emergency basis. Debtor's counsel took the case without a meaningful retainer and now seeks to shift the risk upon the Secured Noteholders on an interim emergency basis. Debtor's counsel cannot be retained on the Petition Date, then threaten to resign if an emergency interim DIP is not approved.

Moreover, the Budget evidences that, even with the WW DIP Proposal, Debtor will not have sufficient cash to cover its budgeted expenses as the Budget shows negative cash balances from week 1 through week 6. For these reasons among others, the Budget is inaccurate and unreliable and shows that the WW DIP Proposal fails to provide the Secured Noteholders' adequate protection of their security interests.

### E. Debtor Has Not Met its Heightened Burden of Showing Inherent Fairness from the Viewpoint of Debtor and Those Interested Therein.

The Motion should be denied because the WW DIP Proposal is an insider equity deal that does not meet the heightened standard of inherent fairness from the viewpoint of Debtor and its creditors. The case law is clear that the Court must rigorously scrutinize the Motion and the WW DIP Proposal due to its insider nature. Because the lender in the proposed loan transaction is White Winston – a non-statutory insider of Debtor – the Motion can only be approved after being "subjected to rigorous scrutiny." See Pepper v. Litton, 308 U.S. 295, 306 (1939); Brewer v. Erwin & Erwin, P.C. (In re Marquam Inv. Corp.), 942 F.2d 1462, 1465 (9th Cir. 1991) ("The Supreme Court has instructed that an insider's dealings with a bankrupt corporation must be "subjected to rigorous scrutiny."). Under the appropriate legal standard, insiders are required to demonstrate, not only their good faith in seeking approval of the motion, but also "[the motion's] inherent fairness from the viewpoint of the corporation and those interested therein." See In re Marquam

<u>Inv. Corp.</u>, 942 F.2d at 1465.

According to the Ninth Circuit in <u>Lakeridge</u>:

A non-statutory insider is a person who is not explicitly listed in § 101(31), but who has a sufficiently close relationship with the debtor to fall within the definition…. A creditor is not a non-statutory insider unless: (1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in § 101(31), and (2) the relevant transaction is negotiated at less than arm's length. … Having—or being subject to—some degree of control is one of many indications that a creditor may be a non-statutory insider, but actual control is not required to find non-statutory insider status. Likewise, access to the debtor's inside information may—but not shall—warrant a finding of non-statutory insider status.

<u>See</u> <u>In re The Vill. at Lakeridge, LLC</u>, 814 F.3d 993, 999-1002 (9th Cir. 2016), *aff'd sub nom*. <u>U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC</u>, 138 S. Ct. 960 (2018) (citations omitted).

Here, White Winston is a non-statutory insider because it is an 8.80% equity holder and has a sufficiently close relationship with Debtor and statutory insider Drexler and as a result of its less than arm's length transactions with Debtor, including the Settlement Agreement and WW DIP Proposal. White Winston is an equity holder of Debtor that cut a settlement deal with Debtor and *Drexler* just days prior to the filing of the Chapter 11 Case that granted White Winston a $8,630,261 claim, including a $4,000,000 cash payment, $500,000 of which was to be paid by January 4, 2023, in exchange for White Winston's agreement to drop its claims against Debtor and *Drexler*. The Settlement Agreement also expanded Debtor's board of directors to seven board members, of which White Winston was to designate two members, Drexler was to designate two members, and White Winston and Drexler were to appoint three independent directors. Settlement Agreement, Section 8(a). Further, pursuant to the Settlement Agreement, Drexler agreed to grant White Winston a proxy of effective control in excess of 33% of the voting securities of Debtor, which constituted a Change in Control Transaction and Event of Default under the Notes. Settlement Agreement, Section 8(e).

Separately, the WW DIP Proposal requires that Drexler and White Winston remain in control of Debtor and the reorganization through board member appointments, grants extraordinary priming liens to White Winston with priority over the liens of all Debtor's

prepetition secured lenders, including the Secured Noteholders and Prestige, with respect to all Debtor's pre and post-Petition Date assets, in exchange for financing provided by White Winston, in its sole and absolute discretion, with no real budget restrictions to ensure that whatever debtor-in-possession financing is provided by White Winston actually benefits Debtor and the estate. The WW DIP Proposal also requires payment to White Winston of interest at prime plus 2%, a closing fee of $100,000, a Facility Fee, and an Exit Fee of $125,000, and payment to Drexler of up to $150,000 from the Immediate Advance when Debtor desperately needs financing to upstart its operations.[3]

What's more, the WW DIP Proposal includes a provision which requires that Drexler and White Winston execute an intercreditor agreement whereby Drexler will agree "that WW shall receive one-half of first proceeds received by Mr. Drexler … on account of any claims against [Debtor] and such other subordination and intercreditor provisions (including with respect to the liens and claims asserted by Prestige Capital Corporation) as are customary and reasonably acceptable to WW." See WW DIP Term Sheet, at "Conditions Precedent." There is no question that Drexler is a statutory insider and the nexus between Drexler and White Winston and the deals they negotiated elevate White Winston to a non-statutory insider. Consequently, the Motion and WW DIP Proposal is subject to the heightened standard of inherent fairness from the viewpoint of Debtor and its creditors.

The Motion and WW DIP Proposal cannot be approved because Debtor has not met its high burden of demonstrating that the loan terms are inherently fair to Debtor and its creditors. The WW DIP Proposal does not insure in any way that Debtor is provided adequate funding to kickstart Debtor's operations, make sales, manufacture product, generate accounts receivable to be factored, and maintain the value of its assets. Instead, the WW DIP Proposal is economically

---

[3] The WW DIP Proposal also requires that Debtor pay to White Winston "on demand, all legal fees and expenses of WW's attorneys for services provided to WW in connection with this Term Sheet or the Agreement *and any action, suit or proceeding arising from WW's dealing with the Borrower, including for the collection of amounts due to WW hereunder."* WW DIP Proposal, at "Conditions Precedent" (emphasis added). Thus, the WW DIP Proposal requires that Debtor pay White Winston's attorneys' fees and expenses incurred during years of prepetition litigation between Debtor and White Winston.

1  inadequate and burdens Debtor and prejudices its creditors, including Empery and the Secured

2  Noteholders. The WW DIP Proposal confers superpriority status upon White Winston and grants

3  the extraordinary relief of priming the Secured Noteholders' security interests in all Debtor's

4  assets, while conferring substantial monetary benefits upon White Winston and Drexler and

5  requiring that they remain in control of Debtor.  Consequently, the Motion should be denied.

6  **F.      The Motion Should be Denied Because the WW DIP Proposal Leverages the Process and Unfairly Cedes Control of the Reorganization to Equity Holder White Winston.**

7

8          When contemplating whether to approve a proposed DIP financing facility, courts should

9  only "defer to a debtor's business judgment so long as a request for financing does not leverage

10 the bankruptcy process and unfairly cede control of the reorganization to one party in interest." In

11 re Barbara K. Enters., Inc., No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16,

12 2008)).  Bankruptcy courts should "not allow terms in financing arrangements which convert the

13 bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted

14 benefit of the post-petition lender."  In re Berry Good, LLC, 400 B.R. 741, 747 (Bankr. D. Ariz.

15 2008). See also In re General Growth Properties, Inc., 423 B.R. 716, 725 (Bankr. S.D.N.Y. 2010).

16 Accordingly, when considering whether a proposed DIP facility is within the debtor's business

17 judgment, courts should not ignore the basic injustice of an agreement in which the debtor, acting

18 out of desperation, has compromised the rights of unsecured creditors.  In re FCX, Inc., 54 B.R.

19 833, 838 (Bankr. E.D.N.C. 1985).

20          Here, the Court should deny approval of the Motion because approval of the WW DIP

21 Proposal leverages the bankruptcy process and unfairly cedes control of the reorganization to one

22 party in interest – equity holder White Winston – with no guaranteed benefit to Debtor and its

23 estate.  For example, the WW DIP Proposal requires that Debtor cede control of its board of

24 directors and of the Chapter 11 Case to Drexler and White Winston:

25          Upon the termination of any injunction or court order that prohibits the following,
           Borrower shall expand its board of directors to five (5) members (the "New Board")
26          of which (i) two members shall be designated by Borrower who are persons other
           than Ryan Drexler, (ii) two members shall be designated by WW, and (iii) the
27          members selected by Borrower and WW shall designate one (1) board member,
           who shall be approved by WW, with such approval not unreasonably withheld.

28

WW shall have the right to appoint one (1) observer to all board matters and meetings.

See WW DIP Proposal, at "Borrower Board." The failure by Debtor to create the New Board as set forth in the WW DIP Proposal is an event of default. See WW DIP Proposal, at "Events of Default."

Furthermore, the WW DIP Proposal confers upon White Winston sole discretion to determining whether to provide to Debtor the Aggregate Advances and the Second Advance. See WW DIP Proposal, at "Advances of Accounts" & "Conditions to Advances." In fact, under the WW DIP Proposal, the only financing required to be provided by White Winston to Debtor is the $350,000 Immediate Advance. See WW DIP Proposal, at "Immediate Advance." The control outlined above clearly constitutes an attempt "to take grossly unfair advantage of other creditors." See In re TMT Procurement Corp., 764 F. 3d 512, 521 (5th Cir. 2014). Therefore, the Court should deny approval of the Motion and WW DIP Proposal because approval of the WW DIP Proposal leverages the bankruptcy process and unfairly cedes control of the reorganization to equity holder White Winston with no guaranteed tangible benefit to Debtor.

**G.    The Motion Should be Denied Because the WW WIP Proposal is a Clear Violation of the TRO.**

The WW DIP Proposal is a clear violation of and end-run around the TRO and should be denied on that ground alone. On December 5, 2022, with full knowledge of the impending Foreclosure Sale, Debtor and its CEO Drexler entered into the Settlement Agreement with White Winston in a blatant and transparent attempt to subvert the Secured Noteholders' rights in favor of White Winston and Drexler's, designed by White Winston and Drexler to gain control of the Debtor's board and Debtor and preclude the imminent auction at the Foreclosure Sale.

As such, on December 14, 2022, Empery sought a temporary restraining order to enjoin the consummation of the Settlement Agreement and any actions to dispose of any Debtor assets. At the same time, Debtor filed a separate action seeking to enjoin the Foreclosure Sale on grounds that it never defaulted on the Notes and the Foreclosure Sale was commercially unreasonable. The New York State Court entertained evidence and heard argument on both requests for temporary

restraining orders on the morning of December 15, 2022, just hours before the Foreclosure Sale was to begin and, at the end of the argument, the New York State Court denied Debtor's request for a temporary restraining order, clearing the way for the Foreclosure Sale, and granted Empery's TRO, thereby prohibiting Debtor, Drexler, and White Winston from consummating the Settlement Agreement and taking any actions to dispose of any Debtor assets.

Over the course of the several hours immediately following the New York State Court's orders, White Winston and Drexler, who had days before resigned as CEO, exerted unauthorized control over Debtor, and without any authority or the required board action, White Winston and Drexler caused Debtor to file a petition for Chapter 11 bankruptcy to stop the Foreclosure Sale. And now, under the guise of providing debtor-in-possession financing, White Winston and Drexler continue to knowingly violate the TRO through the WW DIP Proposal that is not the result of an arms-length negotiation and benefits equity holders White Winston and Drexler, to the detriment of Debtor and its estate. Because Debtor, Drexler, and White Winston are prohibited under the TRO from agreeing to the WW DIP Proposal, this Court should deny the Motion.

**H.     The Motion Should be Denied Because the WW DIP Proposal is a Violation of the Intercreditor Agreement Between Debtor, Empery, and Prestige.**

On October 13, 2021, Prestige, Empery, and Debtor executed the Factoring Intercreditor Agreement, which provides in part that:

> 5.2 <u>Financing Matters</u>. (a) The Factoring Representative agrees, on behalf of itself and the other Factoring Secured Parties, that if any Financing Party becomes subject to any Insolvency Proceeding in the United States at any time prior to the Factoring Obligations Payment Date or the Notes Obligations Payment Date, and the Notes Secured Parties desire to provide financing to any Financing Party under the Bankruptcy Code (any such financing, "<u>Notes DIP Financing</u>"), the Notes Secured Parties shall not be obligated to obtain the consent of any other party hereto (other than as set out in the proviso to this clause (a)) to such Notes DIP Financing and may provide such Notes DIP Financing in any amount or manner as it so determines (other than as set out in the proviso to this clause (a)); provided, that, the Notes Secured Parties shall not, without the written consent of the Factoring Representative, provide any Notes DIP Financing under Section 364(d) of the Bankruptcy Code that would result in the creation of a Lien senior to the Factoring Secured Parties' Lien over the Factoring Priority Collateral.
>
>     (b) All Liens granted to the Notes Representative or the Factoring Representative in any Insolvency Proceeding, whether as adequate protection or

otherwise, are intended to be and shall be deemed to be subject to the Lien Priority and the other terms and conditions of this Agreement.

Factoring Intercreditor Agreement, Section 5.2.  Thus, Empery has the right to provide Debtor debtor-in-possession financing expressly.  Debtor is a party to the Factoring Intercreditor Agreement.  The WW DIP Proposal contains a condition that "[p]rior to entry of the Final DIP Order, Ryan Drexler, Prestige Capital Corporation and WW shall have entered into a binding and enforceable Intercreditor Agreement governing their respective rights with respect to any and all claims between and among them, including, without limitation, the DIP Loan."  WW DIP Proposal, "Conditions Precedent."  This condition is contrary of the express terms of the Factoring Intercreditor Agreement such that the Motion should be denied.

I.    **Debtor's Request for A "Good Faith Lender" Order Under Section 364(e) Should be Denied.**

This Court should not grant White Winston "good faith lender" protections under Section 364(e) because of White Winston's misconduct.  While courts addressing Section 364(e) note that there is no specific definition of what constitutes good or bad faith, courts typically note that fraud, collusion between lenders, or an attempt to take grossly unfair advantage of other creditors will "destroy a [lender's] good faith status…." See In re TMT Procurement Corp., 764 F.3d 512, 521 (5th Cir. 2014).  The protections and benefits of Section 364(e) are reserved for independent, good faith lenders, who enter into arms-length loan transactions with debtors.  To be entitled to the protections of Section 364(e), White Winston is subjected to rigorous scrutiny as an insider. See Litton; Marquam.  And good faith cannot be presumed based upon a scant record.  See In re Revco Drug Stores, Inc., 901 F.2d 1359, 1366 (6th Cir. 1990) (holding that "an implicit finding of good faith in a section 364(e) context is insufficient.")

Here, because White Winston is knowingly violating the TRO in attempting to consummate the Settlement Agreement and purchase Debtor's assets under the WW DIP Proposal, as well as its failure to negotiate an arm's length transaction with Debtor, Debtor's request that White Winston be granted "good faith lender" protections should be denied.

…

**J.      The Motion Should be Denied Because the WW DIP Proposal Purports to Give White Winston a Lien on Proceeds of Avoidance Actions.**

Courts have long recognized that avoidance actions and their proceeds are unencumbered and should be reserved for the benefit of a debtor's unsecured creditors.  See Gaudet v. Babin (In re Zedda), 103 F.3d 1195, 1203 (5th Cir. 1997) ("A trustee's avoidance powers are intended to benefit the debtor's creditors, as such powers facilitate a trustee's recovery of as much property as possible for distribution to the creditors."); McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.), 52 F.3d 1330, 1335-36 (5th Cir. 1995) (noting that "the proceeds recovered in an avoidance action satisfy the claims of priority and general unsecured creditors before the debtor benefits") (internal citations and quotations omitted); In re Professional Inv. Properties of America, 955 F.2d 623, 626 (9th Cir. 1992) (recognizing courts should refrain from allowing creditors acting for their sole benefit from obtaining right to pursue or right to sole benefit of trustee avoidance actions under Chapter 5 of the Bankruptcy Code).  As a result, courts restrict a debtor's ability to pledge avoidance actions and proceeds as security interests.  See Texas Gen. Petroleum Corp. v. Evans (In re Texas Gen. Petroleum Corp.), 58 B.R. 357, 358 (Bankr. S.D. Tex. 1986) ("neither a trustee in bankruptcy nor a debtor-in-possession can assign, sell, or otherwise transfer, the right to maintain a suit to avoid a preference. If a trustee or a debtor-in-possession makes such an assignment, the assignment is of no effect.").

Here, the WW DIP Proposal provides that:

All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Borrower, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of any of the Borrowers, including, for the avoidance of doubt, any equity or other interests in any Borrower's non-Debtor and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and tradenames and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law ***but, subject to entry of the Final DIP Order (as defined below), including the proceeds thereof (collectively, the "DIP Collateral").***

WW DIP Proposal, at "Collateral" (emphasis added).  Because the WW DIP Proposal purports to

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

1   grant a lien on proceeds of avoidance actions, the Motion should be denied.

2   **K.      Debtor's Request in the Motion that it be Authorized to Use Cash Collateral Should be also Denied for Lack of Adequate Protection.**

3

4          Empery has an interest in Debtor's cash collateral as established above.  However, Empery

5   does not consent to the use of cash collateral and, as explained herein, Debtor has failed to meet

6   its burden of showing that Empery's interests in cash collateral are adequately protected.

7   Consequently, this Court should deny Debtor's request for authorization to use cash collateral.

8                                            **IV.**
                                        **CONCLUSION**

9          **WHEREFORE**, Empery requests that the Court deny the Motion in its entirety and grant

10  such different and further relief as the Court deems just.

11         DATED this <u>4th</u> day of January, 2023.

12                                              GARMAN TURNER GORDON LLP

13

14                                              _/s/ Mark M. Weisenmiller_____
                                                WILLIAM M. NOALL, ESQ.
15                                              GREGORY E. GARMAN, ESQ.
                                                MARK M. WEISENMILLER, ESQ.
16                                              7251 Amigo Street, Suite 210
                                                Las Vegas, Nevada 89119
17                                              *Attorneys for Empery Tax Efficient, LP as*
                                                *Agent and Collateral Agent for certain*
18                                              *Secured Noteholders*

19

20

21

22

23

24

25

26

27

28