GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6654
E-mail:  ggarman@gtg.legal
WILLIAM M. NOALL
Nevada Bar No. 3549
Email:  wnoall@gtg.legal
MARK M. WEISENMILLER
Nevada Bar No. 12128
Email: mweisenmiller@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000
Fax: (725) 777-3112
*Attorneys for Empery Tax Efficient, LP as*
*Agent and Collateral Agent for certain*
*Noteholders*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>MUSCLEPHARM CORPORATION,<br><br>Debtor. | Case No. 22-14422-nmc<br><br>Chapter 11 __<br><br><br>Date:  January 5, 2023<br>Time:  9:30 a.m. |

**DECLARATION OF TIMOTHY SILVER IN SUPPORT OF OBJECTION TO EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) GRANTING PRIMING LIENS AND ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

I, Timothy Silver, make this Declaration under 28 U.S.C. § 1746 and declare as follows:

1.     I am over the age of eighteen (18) years and competent to testify to the matters asserted herein, of which I have personal knowledge, except as to those matters stated upon information and belief.  As to those matters stated upon information and belief, I believe them to be true.

2.     I submit this Declaration for all permissible purposes under the Federal Rules of Civil Procedure and Rules of Evidence in support of the *Objection to Emergency Motion for Entry*

*of Interim and Final Orders: (i) Authorizing Debtor to Obtain Post-Petition Financing, (ii) Granting Priming Liens and Administrative Expense Claims, (iii) Authorizing the Debtor's Use of Cash Collateral, (iv) Modifying the Automatic Stay, and (v) Granting Related Relief* ("Objection"), filed by Empery Tax Efficient, LP, in its capacity as collateral agent (in such capacity, "Empery") of the Secured Noteholders with respect to the Notes (both defined below) in each case issued by MusclePharm Corporation, a Nevada corporation (the "Debtor" or "MusclePharm").

3.    At all relevant times, I have been a Portfolio Manager with Empery Asset Management, LP.  Among other matters, at all relevant times, Empery Asset Management, LP has acted as investment advisor to Empery Master Onshore, LLC ("EMO"), Empery, Empery Tax Efficient III, LP ("ETE3"), and Empery Debt Opportunity Fund, LP ("EDOF," and collectively with EMO, Empery and ETE3, the "Empery Noteholders"), which hold Notes.

**Relevant Background**

4.    On July 26, 2021, I was introduced to MusclePharm's Chief Executive Officer Ryan Drexler ("Drexler"), non-exclusive consultant and co-leader of the MusclePharm beverage team Jason May ("May"), and MusclePharm's President and Chief Financial Officer Sabina Rizvi ("Rizvi") through Roth Capital Partners ("Roth").  Prior to this discussion, I was informed by Roth that MusclePharm was interested in securing financing from Empery.  During discussions with Drexler, Drexler clearly stated to me that he was not running the day-to-day operations of MusclePharm and that he had hired Rizvi for that purpose.  Furthermore, Drexler stated that May and Joe Cannata ("Cannata"), who were identified as former executives at energy drink company Rockstar, would be leading the launch of new energy drink lines for MusclePharm as part of MusclePharm's business plan.

5.    On August 18, 2021, I had a follow up call with Rizvi, during which Rizvi disclosed and outlined MusclePharm's plan to become listed on the National Association of Securities Dealers Automated Quotations Capital Market ("Nasdaq" or the "Trading Market") by the Fourth Quarter of 2021.

6.    On August 25, 2021, a follow up Zoom meeting was organized through Roth including me and one of Empery's Managing Partners, Ryan Lane ("Lane"), in order for

MusclePharm to explain the long list of litigation and dispute settlements as disclosed in Note 9 of Commitments and Contingencies in MusclePharm's quarterly report on Form 10-Q for the period ended June 30, 2021 (the "June 2021 10-Q").  Based upon the disclosure in the June 2021 10-Q, Empery was concerned that MusclePharm had a history of not fulfilling its financial obligations until counterparties pursued legal action against MusclePharm.  The legal settlements discussed were settled matters with City Football Group Limited (settled with MusclePharm agreeing to pay $3 million), Nutrablend (settled with MusclePharm agreeing to pay $3.1 million and issue monthly purchase orders at minimum amounts), and Excelsior Nutrition, Inc. (settled with MusclePharm agreeing to pay $4.75 million).  In addition to the settled matters listed above, we discussed a $1.6 million dollar judgment by Thermolife International against MusclePharm as well as an ongoing derivative action against MusclePharm and its directors from White Winston Select Asset Fund Series MP-18, LLC and White Winston Select Asset Fund, LLC (collectively, "White Winston").

7.    Drexler explained that the litigation was the result of bad deals signed by prior management.  We were told that those contracts needed to be broken for the financial benefit of MusclePharm and that going forward under new management, agreements would be fiscally responsible, MusclePharm would honor the new contracts and MusclePharm would no longer be the target of litigation.  Drexler advised that Rizvi was hired to professionalize MusclePharm, clean up historic issues and prepare it to be listed on Nasdaq.  We later learned that these litigations and subsequent settlements were part of a larger pattern of Drexler refusing to pay MusclePharm's debts.

8.    On October 13, 2021, the Empery Noteholders (with Empery as lead investor, and collateral agent for all of the October Noteholders), Ionic Ventures, LLC, Anson Investments Master Fund LP, CVI Investments, Inc., HB Fund LLC, Intracoastal Capital LLC, Bigger Capital Fund, LP, District 2 Capital Fund LP, L1 Capital Global Opportunities Master Fund, and Altium Growth Fund, LP (collectively, the "October Noteholders") entered into a *Securities Purchase Agreement* (the "SPA") with MusclePharm.  The Principal Amount of the October Noteholders

purchase of MusclePharm securities collectively was $8,197,674.42.  A true and correct copy of the SPA is attached hereto as **Exhibit A**.

9.      Each October Purchaser's securities purchase was likewise evidenced by an *Original Issue Discount Senior Secured Note Due April 13, 2022* (collectively, the "October Notes") issued to the October Purchasers by MusclePharm.  The maturity date of each of the October Notes was April 13, 2022, but the October Notes had built-in maturity extension provisions in response to MusclePharm's stated concerns relating to potential up-listing delays that allowed for a total extension of not more than 45 days (*i.e.* to May 28, 2022).  True and correct copies of the October Notes are attached hereto as **Exhibits B-N**.

10.      Also on October 13, 2021, Empery, in its capacity as collateral agent, for the October Noteholders of the October Notes collectively, entered into a *Pledge and Security Agreement* (the "Security Agreement") with MusclePharm.  As collateral for the October Notes, MusclePharm and MusclePharm's wholly owned Canadian subsidiary, MusclePharm Enterprises Corp., granted security interests and pledged to Empery, for the benefit of October Noteholders, the following property (hereinafter, the "Collateral"):

> (a) all Accounts;
> (b) all Chattel Paper (whether tangible or electronic);
> (c) the Commercial Tort Claims specified on Schedule VI thereto;
> (d) all Deposit Accounts, all cash, and all other property from time to time deposited therein or otherwise credited thereto and the monies and property in the possession or under the control of the Collateral Agent or a Buyer or any affiliate, representative, agent or correspondent of the Collateral Agent or a Buyer;
> (e) all Documents;
> (f) all Equipment;
> (g) all Fixtures;
> (h) all General Intangibles (including, without limitation, all Payment Intangibles);
> (i) all Goods;
> (j) all Instruments (including, without limitation, Promissory Notes and each certificated Security);
> (k) all Inventory;
> (l) all Investment Property;
> (m) all Intellectual Property and all Licenses;
> (n) all Letter-of-Credit Rights;
> (o) all Supporting Obligations;
> (p) all Pledged Interests;
> (q) all Additional Collateral;
> (r) to the extent not covered by the preceding clauses of this Section 2, all other

tangible and intangible personal property of such Grantor (whether or not subject to the Code), including, without limitation, all bank and other accounts and all cash and all investments therein, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of such Grantor described in the preceding clauses of this Section 2 (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by such Grantor in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, Software, data and computer programs in the possession or under the control of such Grantor or any other Person from time to time acting for such Grantor that at any time evidence or contain information relating to any of the property described in the preceding clauses of this Section 2 or are otherwise necessary or helpful in the collection or realization thereof; and

(s) all Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral;

A true and correct copy of the Security Agreement is attached hereto as **Exhibit O**.  Expressly, the collateral granted under the Security Agreement was intended to secure all indebtedness due under the October Notes and SPA.  Security Agreement, Section 3.

11.     The October Purchaser's security interests in the Collateral were timely perfected by Empery's filing of a *UCC-1 Financing Statement* on October 14, 2021, with the Nevada Secretary of State's office.  A true and correct copy of the filed UCC-1 Financing Statement is attached hereto as **Exhibit P**.

12.     Also on October 13, 2021, Empery on behalf of the October Noteholders, MusclePharm, and receivables factor Prestige Capital Corporation ("Prestige") entered into an *Intercreditor Agreement* (the "Factoring Intercreditor Agreement").  A true and correct copy of the Factoring Intercreditor Agreement is attached hereto as **Exhibit Q**.

13.     Also on October 13, 2021, Empery on behalf of the October Noteholders, MusclePharm, and Drexler entered into an *Intercreditor Agreement* (the "Drexler Intercreditor Agreement").  A true and correct copy of the Drexler Intercreditor Agreement is attached hereto as **Exhibit R**.

14.     On November 4, 2021, Empery on behalf of the Secured Noteholders, MusclePharm, and Wells Fargo NA entered into that certain *Deposit Account and Sweep*

5

*Investment Control Agreement* (the "**DACA**").  A true and correct copy of the DACA is attached hereto as **Exhibit S**.

15.     As part of the closing of the sale of the October Notes, certain other documents were executed and exchanged, including a *Trademark Security Agreement*, *Perfection Certificate*, and *Guarantee* by Musclepharm and Canada MusclePharm Enterprises Corp., true and correct copies of which are attached hereto as **Exhibits T**, **U**, and **V**, respectively.

16.     On December 20, 2021, MusclePharm employee Janice McCarthy sent a letter (the "December 20 Letter") addressed to Drexler and Rizvi, in which McCarthy says she was forced to resign after she refused to participate in fraudulent and illegal activities, namely channel stuffing, where MusclePharm would inflate its revenues and sales by improperly classifying orders as revenue.  A true and correct copy of the December 20 Letter is attached hereto as **Exhibit W**.  In the December 20 Letter, McCarthy further stated that MusclePharm had changed its formula to an inferior product to save money but had concealed this fact from its customers.   McCarthy further contended in the December 20 Letter that she was retaliated against when she would not cooperate with defrauding MusclePharm customers, investors, shareholders and prospective shareholders, and following a certain phone call she felt obligated to resign.

17.     MusclePharm concealed the December 20 Letter (and its contents) from Empery, and Empery did not learn of the December 20 Letter until late September 2022 when it was shared with Empery from its legal counsel in preparation for an interview with the SEC regarding an ongoing investigation into MusclePharm (discussed further below).  A disagreement with McCarthy was first mentioned to Empery on Thursday, June 2, 2022 (the "June 2 Rizvi Call"), when it was brought to Empery's attention at a high level in a phone call from Rizvi in advance of sharing the Disclosure Schedules to the June 2022 Notes (the "June Disclosure Schedules"), in which MusclePharm was required to disclose all litigation.  The June Disclosure Schedules did not disclose details of the accusations made in the December 20 Letter but referenced a lawsuit from McCarthy filed on April 21, 2022.   The events surrounding Empery's receipt of the June Disclosure Schedules are described in detail below.

18.    On March 2, 2022, JW Nutritional, LLC ("JW"), a long-term partner of MusclePharm that functions as its third-party logistics provider, managing manufacturing, packaging, marketing and more for MusclePharm, sent a demand letter to MusclePharm due to "significantly aged past due balance for shipped product, a large amount of components purchased by JWN on [MusclePharm]'s behalf, and JWN's belief that MusclePharm induced JWN to ship finished product with commitments MusclePharm knew it could not have honored." This demand letter led to an agreement being executed between MusclePharm and JW in May 2022 (detailed below). Empery learned of this demand letter and the resulting agreement in November 2022 when it received a copy of the JW Letter (as defined below).

19.    In March 2022, MusclePharm requested permission from Empery to establish a new revolving credit facility with Drexler to finance inventory to better control MusclePharm's margins on orders with MusclePharm's largest customer, Costco.    Empery worked with MusclePharm to amend the Drexler Intercreditor Agreement, allowing MusclePharm to issue to Drexler an unsecured promissory note (the "Drexler Unsecured Revolver").  See *First Amendment to Intercreditor Agreement*, a true and correct copy of which is attached hereto as **Exhibit X**.

20.    On March 3, 2022, each of the October Noteholders signed a consent allowing the Drexler Unsecured Revolver to be deemed a Permitted Note with no consideration given to the October Noteholders.  See Consent, a true and correct copy of which is attached hereto as **Exhibit Y**.

21.    Pursuant to the terms of the October Notes, MusclePharm had the option to extend the maturity date of the October Notes from April 13, 2022 to May 28, 2022 upon the delivery of a certificate duly signed by an officer of MusclePharm certifying that: (x) no Event of Default has occurred and is continuing, and (y) the sum of cash flows from operating and investing activities (but not cash flows from financing activities) of MusclePharm and its subsidiaries, taken as a whole, was greater than zero for the calendar month ended March 31, 2022, and (z) such officer reasonably believes that: (1) no Event of Default is reasonably expected to occur on or before April 30, 2022, and (2) the sum of cash flows from operating and investing activities (but not from

financing activities) of MusclePharm and its subsidiaries, taken as a whole, will be greater than zero for the calendar month ended April 30, 2022 (the "Cash Flow Maturity Extension").

22.    In this regard, on April 12, 2022, MusclePharm and Rizvi represented to Empery and each of the October Noteholders that MusclePharm had positive cash flow from operations in March 2022 and expected to have positive cash flow from operations in April 2022.  A true and correct copy of the MusclePharm Certificate containing these representations is attached hereto as **Exhibit Z**.  Empery had no ability nor obligation to audit MusclePharm's financials and instead relied on their representation.

23.    On the same day (April 12, 2022), MusclePharm sued McCarthy in the Nevada District Court ("McCarthy Action").  In the McCarthy Action, Drexler proclaimed that the changes to MusclePharm's formula in 2022 were supported by the fact that "the Company's research found that the new formula with milk protein improves both taste and mixability."  Empery has subsequently learned that the formulation change was price-driven and that the Company's manufacturer made very clear to MusclePharm that the product quality had been materially downgraded.  Empery did not become aware of the McCarthy Action until the June 2 Rizvi Call. Empery was provided with additional detail upon receipt of the June Disclosure Schedules on June 2, 2022.

24.    In early May 2022, MusclePharm represented to me that it would not be able to pay the October Notes by the extended October Notes maturity date of May 28, 2022.  In addition, Rizvi represented to me that there was a significant growth opportunity that MusclePharm would be able to access if it had additional capital to build inventory rather than only manufacturing product to make delivery for specific bulk orders.  Accordingly, MusclePharm began negotiating an amended Securities Purchase Agreement and additional notes with Empery.

25.    Over the past few months, Drexler alleged multiple times that Empery manufactured defaults to "steal" Drexler's company.  Had that been Empery's intention, Empery would not have extended the maturity of the October Notes or invested additional capital.

26.    On June 2, 2022, in conjunction with the proposed amended Securities Purchase Agreement, MusclePharm provided Empery with the June Disclosure Schedules, identifying

lawsuits that had previously been undisclosed and concealed from Empery, including the McCarthy Action, a number of additional cases regarding MusclePharm's failure to pay its bills, including one from contract manufacturer S.K. Laboratories ("SK Labs" and the "SK Labs Action") alleging that MusclePharm has defaulted on payments due of $4.6 million, a new lawsuit filed by White Winston against MusclePharm, and a number of other matters.  In the case of *White Winston Select Asset Fund Series MP-18, LLC et al., v MusclePharm Corp., et al*., filed in Massachusetts on February 8, 2022, White Winston named MusclePharm and Drexler as defendants, alleging unfair trade practices, abuse of process, malicious prosecution, breach of duty of loyalty and, alternatively, breach of a settlement agreement relating to a prior action filed by White Winston.

27.    During a June 3, 2022 telephone call with Drexler and Rizvi, Drexler informed both me and Lane that "Sabina [Rizvi] runs the day-to-day [MusclePharm] operations and that she would explain the lawsuits," but that McCarthy's accusations were all false and that SK Labs is at fault for the ongoing dispute and it was MusclePharm that initially sued SK Labs.  The SK Labs countersuit included a number of direct personal attacks on Drexler, which were not detailed in the June Disclosure Schedules, but Empery was made aware of them after its legal counsel shared the full SK Labs complaint.  The SK Labs Action asserts that "MusclePharm developed a well thought out and planned scheme, and SK Labs was not the only contract manufacturer so treated by MusclePharm as it implemented its scheme.  In fact, Ryan Drexler, the CEO and Chairman of the Board of MusclePharm devised and implemented this scheme to go from contract manufacturer to contract manufacturer, running up the payables with each contract manufacturer into the millions, and then refusing to pay their invoices." As we learned more about the current MusclePharm situation, we have learned that the MusclePharm pattern of behavior outlined by SK Labs is accurate.

28.    On June 3, 2022, following the call mentioned above, Empery negotiated with Drexler a new provision in the Notes, that if Rizvi ceased acting as MusclePharm's CFO or member of the Board of Directors, an event of default would exist (the "CFO Default").  In response to Drexler's concerns, the parties agreed that her resignation or termination would not be

an event of default if (1) she resigns without Good Reason (as defined in the Waiver and Amendment Agreement (defined below)) or (2) she is not CFO and member of the Board of Directors but she is replaced within forty-five (45) days with a CFO and member of the Board of Directors approved by Empery, not to be unreasonably withheld.

29.    On June 3, 2022, MusclePharm, and certain of the Secured Noteholders entered into a *Waiver and Amendment* agreement (the "Waiver and Amendment Agreement") that, among other matters, called for an extension of the maturity date of the parties October Notes six (6) months from the closing date of the June Notes (as defined below).  A true and correct copy of the Waiver and Amendment agreement is attached hereto as **Exhibit AA**.

30.    On June 3, 2022, MusclePharm and the Noteholders entered into an *Amended and Restated Securities Purchase Agreement* (the "Amended SPA"), whereby the Buyer's collective Principal Amount under the October Notes was increased from $8,197,674.42 to $9,759,135.00. A true and correct copy of the Amended SPA is attached hereto as **Exhibit BB**.  Also, the maturity date of the October Notes was extended to December 10, 2022.

31.    Additionally, on June 10, 2022, MusclePharm issued *Original Issue Discount Senior Secured Note Due December 10, 2022* (the "June Notes" and collectively with the October Notes, the "Notes") to Empery Noteholders, Ionic Ventures, LLC, Anson Investments Master Fund LP, HB Fund LLC, Bigger Capital Fund, LP, District 2 Capital Fund LP, Altium Growth Fund, LP, Walleye Opportunities Master Fund Ltd., and Roth Capital Partners, LLC (collectively, the "June Noteholders" and together with the October Noteholders, the "Secured Noteholders") for an aggregate principal amount of $3,081,875.00.  True and correct copies of the June Notes are attached hereto as **Exhibit CC-NN**.  The maturity date of the of the June Notes was December 10, 2022.  Moreover, the June Notes included the CFO Default provision, and the October Notes were amended to include the CFO Default provision.

32.    Thereafter, MusclePharm and each of the October Noteholders executed a *Joinder Agreement* to the SPA.  True and correct copies of the Joinder Agreements are attached hereto as **Exhibit OO**.

33.     At some point in the first half of 2022, SK Labs stopped doing business with MusclePharm due to unpaid invoices of approximately $5 million.  Andreas Padvaiskas, CEO of SK Labs, stated in an affidavit dated December 14, 2022 (the "Andreas Affidavit") that he was hired as CEO of SK Labs primarily to address ongoing contractual issues with MusclePharm as MusclePharm owed SK Labs millions of dollars and had a long history of failing to pay invoices. True and correct copy of the Andreas Affidavit is attached hereto as **Exhibit PP**.

34.     In June 2022, Atlantic Grain, a protein provider of MusclePharm, stopped doing business with MusclePharm due to unpaid invoices of over $1 million.  Atlantic Grain wrote that it would not do any further business with MusclePharm until all outstanding debts were satisfied and that going forward, any future business would be strictly on a cash in advance basis.  A true and correct copy of a letter from Atlantic Grain is attached hereto as **Exhibit QQ.**

35.     On June 14, 2022, Drexler had dinner with Lane, me and Bryan Armenta, an analyst at Empery, where Drexler emphasized collaboration with his team, including leveraging the strengths of Rizvi, May, and Cannata to make the next six (6) months as successful as possible and make an up-listing (on Nasdaq) or alternative financing as attractive as possible.  Drexler also emphasized his agreement with Empery that reducing conflict and litigation-related distractions was critical to MusclePharm's success.  Paying bills in compliance with contractual obligations with vendors and service providers was particularly emphasized as this was the most common cause of MusclePharm's litigation.

36.     On June 30, 2022, Lane emailed MusclePharm's board of directors in which he expressed concerns with Drexler's leadership and control (the "Lane Email").  A true and correct copy of the Lane Email is attached hereto as **Exhibit RR**.

37.     On July 6, 2022, Rizvi resigned as President and CFO, effective on July 22, 2022. Attached hereto as **Exhibit SS** is a true and correct copy of MusclePharm's July 12, 2022, Form 8-K filing with the SEC.

38.     On July 12, 2022, on a call with Empery set up to discuss the Lane Email and MusclePharm's response, Paul Karr, a member of MusclePharm's board of directors, and Richard Friedman of Sheppard Mullin, MusclePharm's counsel at the time, stated Rizvi resigned for

personal reasons.  MusclePharm's July 12, 2022, Form 8-K, however, said nothing about Rizvi's resignation taking place for personal reasons, which is a standard disclosure when these facts are true.  MusclePharm's July 28, 2022, Form 8-K reflected that Rizvi had executed a settlement and release with MusclePharm but made no mention of resigning for personal reasons.  Attached hereto as **Exhibit TT** is a true and correct copy of MusclePharm's July 28, 2022, Form 8-K filing with the SEC.  Empery remains skeptical about Rizvi's resignation and believes that it was likely for Good Reason.

39.    Since July 2022, Mill Haven, a dry dairy powder provider to MuslePharm, stopped doing business with MusclePharm as it was owed $3.8 million for product shipped between December 2021 and July 2022.  In an affidavit signed by Brian Slater, CEO of Mill Haven Foods, (the "Slater Affidavit"), Slater states "Although Mill Haven promptly invoiced MusclePharm for the products and repeatedly followed up with MusclePharm about its failure to pay for the products it ordered and received, as of the date of this Affidavit, MusclePharm has failed to pay for $3,861,834.92 of product that was undisputedly delivered and accepted."  Slater also states that "Mill Haven has not shipped any products to MusclePharm since July 2022, and does not intend to ship any additional products to MusclePharm until MusclePharm has paid Opco the outstanding balance of $3,861,834.92 that MusclePharm owes to Opco for products it ordered and accepted."  Empery was not aware of this outstanding balance or the open disagreement until after the June Notes had been funded.  A true and correct copy of the Slater Affidavit is attached hereto as **Exhibit UU.**

40.    In July 2022, Richard Friedman of Sheppard Mullin called Brett Director, General Counsel of Empery Asset Management, LP ("Director"), and advised that he was no longer counsel to MusclePharm.

41.    On July 28, 2022, Eric Chin was named CFO and a member of the Board of Directors of MusclePharm.  MusclePharm did not seek and did not request the consent of Empery as was required to cure the CFO Default.

42.    On August 5, 2022, MusclePharm's patent attorney, Gaston Kroub, withdrew from representing MusclePharm on the basis (stated in writing) that it had become impossible to

represent MusclePharm because MusclePharm had failed to pay for any services performed in 2021, despite pending deadlines. A true and correct copy of the notice of withdrawal is attached here as **Exhibit VV**. Thus, even after receiving $2.5mm from the Secured Noteholders, MusclePharm was not paying its bills, including bills to maintain its intellectual property, which is a critical and valuable Company asset and part of the Secured Noteholders' collateral.

43. On August 16, 2022, Empery notified MusclePharm that it was reserving all rights with respect to Rizvi's resignation and the attendant breach of the Notes. A true and correct copy of the August 16, 2022 notice is attached hereto as **Exhibit WW**. Empery received no response from MusclePharm or its counsel.

44. The next day, on August 17, 2022, Chin resigned as CFO and member of the Board of Directors. Attached hereto as **Exhibit XX** is a true and correct copy of MusclePharm's August 23, 2022 Form 8-K.

45. On August 22, 2022, MusclePharm disclosed that its Form 10-K/A for the year ending December 31, 2021 and the Form 10-Q for March 31, 2022 should no longer be relied upon due to an error with credit memos. Specifically, it stated revenue was overstated by $600,000 to $1,000,000 for the year ending December 31, 2021. Attached hereto as **Exhibit YY** is a true and correct copy of MusclePharm's August 22, 2022 Form 8-K.

46. As the false and misleading financials were events of default, on August 26, 2022, Empery sent a second reservation of rights letter. A true and correct copy of the August 26, 2022 letter is attached hereto as **Exhibit ZZ**.

47. At the time of the August 22nd Form 8-K, Empery became concerned about the reliability of all of the information that it had relied on to make our initial debt investment in MusclePharm, as well as our ability to monitor the ongoing performance of the business.

48. Just one day later, the Company filed a Form 8-K announcing the resignation of Eric Chin as CFO and member of the Board of Directors, for personal reasons. That resignation had apparently taken place on August 17, 2022. Needless to say, Empery was even more concerned about how MusclePharm could properly address the disclosed issues with its financial statements and the required restatements when it did not even have a CFO.

49.     Unbeknownst to Empery, sometime prior to September 1, 2022, in violation of the Notes, MusclePharm received a loan from Delta Bridge Funding (the "Delta Loan"), for which it pays $32,790 per week.  Entering into the Delta Loan agreement was a breach of Section 3(a) of the Notes, which resulted in an additional Event of Default under Section 5(a)(ii) of the Notes.  Additionally, each weekly repayment of the Delta Loan constitutes a breach of Section 3(e) of the Notes, each of which resulted in additional Events of Default under Section 5(a)(ii) of the Notes.  Empery was made aware of the Delta Loan agreement and the weekly repayments in November 2022 upon receipt of a Wells Fargo bank statement for September 2022 (the "Bank Statements").

50.     On September 5, 2022, forty-five (45) days after Rizvi resigned, MusclePharm had not replaced Rizvi with a CFO and member of the Board of Directors.  While Empery believes Rizvi's resignation was likely for Good Reason, regardless of the reason for Rizvi's resignation, following the resignation, even if MusclePharm were able to show that Rizvi resigned without Good Reason, MusclePharm had forty-five (45) days to cure this Event of Default by replacing Rizvi with another CFO and member of the Board of Directors, in each case that is not objectionable to Empery.  The forty-five (45) day period expired and Rizvi had not been replaced with another CFO and member of the Board of Directors.  Additionally, Empery provided MusclePharm with proposed candidates that Empery would find acceptable but did not hear from MusclePharm about the proposed candidates or any other candidates.

51.     On September 8, 2022, Empery sent a third reservation of rights letter regarding Events of Default caused by MusclePharm's failure to request approval of Eric Chin as CFO and then his subsequent resignation causing there to be no CFO on the forty-fifth (45th) day after Sabina Rizvi resigned.  Attached hereto as **Exhibit AAA** is a true and correct copy of the September 8, 2022 reservation of rights letter.  Empery likewise requested information from MusclePharm regarding its cash, schedule of payables, and receivables, among other things.  Empery never heard back from MusclePharm or its counsel regarding the third reservation of rights letter or information request. MusclePharm ignored this request without explanation, depriving Empery of its right to confirm MusclePharm's compliance with the terms and conditions of the Notes. And, since

14

MusclePharm had ceased making SEC filings, Empery had no way to gain information about MusclePharm's financial condition.

52.     On September 9, 2022, in violation of the Notes, MusclePharm received a $458,621.00 loan from Blade Funding Corp (the "Blade Loan"), which Empery did not discover until November 2022 upon receipt of the Bank Statements.  Entering into the Blade Loan agreement was a breach of Section 3(a) of the Notes, which resulted in an additional Event of Default under Section 5(a)(ii) of the Notes.  Additionally, each weekly repayment of the Blade Loan constituted a breach of Section 3(e) of the Notes, each of which resulted in additional Events of Default under Section 5(a)(ii) of the Notes.

53.     On September 15, 2022, Empery received a phone call from Jennifer Turner, Senior Counsel, Division of Enforcement in the Denver Regional Office of the SEC. Empery was told that Jennifer Turner wanted to see if Empery could add more detail to an ongoing investigation regarding MusclePharm (the "SEC Investigation").  True and correct copies of the correspondence are attached hereto as **Exhibit BBB**.

54.     On September 20 and 21, 2022, Debtor, in violation of the Notes, made cash transfers of $150,000 and $50,000 from Drexler (the "Drexler Cash Transfers").  The Drexler Cash Transfers were unknown to Empery until they received the Bank Statements on November 15, 2022.  Each of these payments constituted a breach of Section 3(g) of the Notes, each of which resulted in an additional Event of Default under Section 5(a)(iii) of the Notes.

55.     On September 22, 2022, Empery sent an *Event of Default Redemption Notice*, which was signed by Empery Noteholders, L1 Capital Global Opportunities Master Fund, Bigger Capital Fund, LP, District 2 Capital Fund LP, Ionic Ventures, LLC, Walleye Opportunities Master Fund Ltd, and Anson Investments Master Fund LP, representing 73% of the Secured Noteholders based on the principal amount of notes outstanding at the time.  Empery received no response from MusclePharm, the board of directors or its counsel.  A true and correct copy of the Event of Default Redemption is attached hereto as **Exhibit CCC**.

56. On September 26, 2022, MusclePharm hired Gary Shirshac as CFO without first obtaining Empery's consent and more than 45-days after Rizvi resigned. A true and correct copy of MusclePharm's September 29, 2022 Form 8-K is attached hereto as **Exhibit DDD**.

57. On September 28, 2022, the SEC interviewed Lane as part of the SEC Investigation.

58. On September 29, 2022, I sent an email to the MusclePharm board of directors, including Drexler, Paul Karr, Michael Heller and Adam Bult of Brownstein Hyatt Farber Schreck, LLP ("Bult"), MusclePharm's counsel at the time. My email stated the following: "It has been one week since we sent you the attached Event of Default Redemption Notice and we have not heard from you. We are also surprised that we have not seen an 8-K disclosing this Redemption Notice to the market. Under the transaction documents we have certain rights and we will begin to take action to secure our collateral if we do not hear from you. If the company would like to be involved in the process, please respond and we can set up a call to discuss the situation." Empery received no response from MusclePharm or its counsel. A true and correct copy of the correspondence is attached hereto as **Exhibit EEE**.

59. On October 3, 2022, Empery, pursuant to the Security Agreement and DACA, issued a DACA Access Termination Notice, directing Wells Fargo to sweep MusclePharm's bank accounts. A true and correct copy of the DACA Access Termination Notice is attached hereto as **Exhibit FFF**.

60. On October 7, 2022, Drexler acknowledged the defaults during a phone call with me, stating "Defaults are part of the contract… there are defaults. I signed the documents. I am a big boy."

61. On October 10, 2022, Empery sent notice of additional events of default regarding an undisclosed SEC Investigation and MusclePharm's failure to respond to Empery's September 8 request for information. See October 10, 2022 Additional Events of Default Notice, a true and correct copy of which is attached hereto as **Exhibit GGG**.

62. On October 14, 2022, pursuant to the Security Agreement, Empery demanded that MusclePharm assemble all collateral for inspection by no later than October 18, 2022. A true and correct copy of the October 14, 2022 letter to MusclePharm is attached hereto as **Exhibit HHH**.

MusclePharm failed to respond to the demand or assemble the collateral as required in the Security Agreement.

63.    On October 17, 2022, I followed up over email to Drexler, and the members of the MusclePharm board of directors, Paul Karr and Michael Heller, reiterating that the line of communication over email remained open.  As part of that email, I stated "So we are crystal clear, the foreclosure process is not the only option. It is the path that we are taking because nothing we have discussed has yielded any tangible results. At any point during the foreclosure process, we will accept an appropriate cash purchase / repayment." I received no response from MusclePharm or its counsel. True and correct copies of the correspondence are attached hereto as **Exhibit III**.

64.    From October 19, 2022 through October 27, 2022, Empery negotiated a forbearance agreement with MusclePharm.  MusclePharm accuses Empery of reneging on a term sheet regarding forbearance at the last minute.  MusclePharm, however, omits the key fact that, prior to determining that it did not want to enter into MusclePharm's term sheet, Empery had been engaged in good faith negotiations with MusclePharm for a month that, in fact, resulted in a fully-negotiated forbearance agreement.  A true and correct copy of the email in which Empery provided all necessary signatures for the forbearance agreement is attached hereto as **Exhibit JJJ**.  However, MusclePharm pulled out of the fully-negotiated forbearance agreement at the last minute and sought to renegotiate a term sheet.  It was during these subsequent term sheet negotiations that Marc Ross, the Chief Restructuring Officer hired by the Debtor ("Ross" or the "CRO"), advised Empery that after weeks of analysis he had concluded that the Debtor was insolvent and should seek relief under the bankruptcy code.  Based on this information, Empery determined that the proposed term sheet was not in its best interests.

65.    On October 30, 2022, Drexler informed Empery on a phone call that he was unable to agree to the negotiated forbearance proposal because he would not be able to meet the near-term installments, even though the installment payments were in-line with the original installment payments presented by Drexler.  Moreover, Drexler advised Empery that he had hired a co-CEO, Eric Hillman ("Hillman"), and that Drexler planned to step down as CEO by year-end.

66.     On November 3, 2022, Empery had an introductory call with Hillman, organized by Drexler.

67.     On November 8, 2022, Empery had an introductory call with Pete Jungsberger ("Jungsberger") of JW.  The call was organized as we were told JW was an unsecured creditor and a vendor that was critical to MusclePharm operations, and they wanted to get to know Empery to better understand its intentions due to financial exposure that it had to MusclePharm.  Empery learned about an agreement that was signed between JW and MusclePharm that allowed JW to liquidate inventory under the MusclePharm brand name, via a license, based on certain terms not being met (the "JW Agreement").  Empery also learned that JW had been communicating with additional unsecured vendors to limit concerns about financial exposure to MusclePharm in an attempt to prevent additional pressure on MusclePharm.  JW mentioned multiple vendors with significant unsecured trade debt that had been threatening MusclePharm and emphasized that it had been using its relationships to keep these parties from taking action, but that frustration had been building throughout the industry due to financial commitments and contractual obligations not being met.  JW also mentioned that Drexler had significantly downgraded ingredients (protein quality) in the product from the premium product that the brand has been associated with historically.  Jungsberger expressed to us that he believed MusclePharm would benefit from a bankruptcy reorganization process in which MusclePharm could get relief from its creditors.

68.     On November 9, 2022, MusclePharm creditor JW sent a letter to the MusclePharm board of directors (the "JW Letter"), asserting that MusclePharm breached its agreements with JW and that "[JW] has lost confidence in the commitments and promises made to [JW] by MusclePharm and is unwilling to tolerate further breaches of the Agreement so long as Mr. Drexler continues to lead MusclePharm or have operational decision-making authority."  The JW Letter stated that the JW Agreement arose following a demand letter from JW sent to MusclePharm on March 2, 2022 due to a significantly past due balance for shipped product, a large amount of components purchased by JW on MusclePharm's behalf, and JW's belief that MusclePharm induced JW to ship finished product with commitments MusclePharm knew it could not have honored.  JW sent the JW Letter because "even with [JW]'s efforts to work with MusclePharm in

good faith to find amicable paths forward, [JW] is continually met with asks that are far outside the scope of what was previously agreed to."  The JW Letter states that "MusclePharm's persistent breaches of the agreement and other arrangements with JW have led to an unstable business relationship.  This has all occurred under Drexler's leadership of MusclePharm."  Attached hereto as **Exhibit KKK** is a true and correct copy of the JW Letter.

69.     On November 14, 2022, Empery had a call with Junsberger and Jesse Windrix ("Windrix") from JW and Ross to discuss the JW Letter.  Windrix advised that it would make business challenging if Drexler remained involved at either the company-level or the board-level. Ross advised that after building and reviewing the cash flow model projections for MusclePharm, he concluded that MusclePharm was insolvent and needed a bankruptcy reorganization process to get relief from its creditors.  Ross made clear that even with forbearance from Empery and additional cash invested into the business, there were too many creditors that could put MusclePharm into an involuntary bankruptcy and too many judgement creditors that were coming after any available money.  Windrix advised that JW would continue to work with MusclePharm in bankruptcy as a critical vendor if it knew that its contractual agreements with MusclePharm would be binding and he believed that with Drexler involved with any authority, that will not be possible.

70.     In an effort to assist MusclePharm's ability to continue as a going concern, Empery released the DACA account on November 15, 2022, after receipt of confirmation from Wells Fargo that Ross and Harry Malinowksi, Ross's partner, were the only signatories on the account. Attached hereto as **Exhibit LLL** is a true and correct copy of the DACA Termination Request.

71.     On November 15, 2022, Empery received copies of the Bank Statements from Ross. The Bank Statements showed numerous events of default, including the Blade Loan, subsequent weekly repayments of the Blade Loan, the Delta Loan, subsequent weekly repayments of the Delta Loan, and the Drexler Cash Transfers.

72.     On November 17, 2022, Empery provided an *Additional Events of Default Notice* pertaining to the Blade Loan, the Delta Loan, and Drexler Cash Transfers, which were all in

violation of the Notes and only discovered by Empery on November 15, 2022. A true and correct copy of the November 17, 2022 Additional Events of Default is attached hereto as **Exhibit MMM**.

73.     On November 17, 2022, Drexler cancelled a MusclePharm board meeting one minute before it started. Prior to that time, Ross made clear to Empery that at that board meeting he would present to the board of directors the need for MusclePharm to file for relief under Chapter 11 based on his analysis. Empery believes that Michael Viscount of Fox Rothschild LLP ("Viscount") and Hillman were also attending this board meeting. Empery was advised that Drexler had sought independent counsel to advise him with regard to the decision to file for relief under Chapter 11 due to the conflict of being the CEO and Chairman of MusclePharm while also being a lender and majority equity holder. Empery believes the board meeting was held in the absence of Drexler and the need for MusclePharm to file for relief under Chapter 11 was discussed with Paul Karr and Michael Heller.

74.     On November 22 or 23, 2022, a board meeting took place including Marc Ross, Viscount, and Hillman. Empery was expecting a follow up from Ross, Viscount or Hillman to discuss the potential for a cooperative filing for relief under Chapter 11, which Empery had advised it was open to financing through a debtor-in-possession financing. Empery received no phone calls and was advised from Ross on a later phone call that Drexler had directed the board of directors, Ross, Viscount and Hillman to cease all communication with Empery.

75.     On November 30, 2022, Empery began a public notice campaign for a Uniform Commercial Code Article 9 Secured Party Sale (the "Foreclosure Sale") for 1:00 p.m. PST on December 15, 2022.

76.     On December 5, 2022, Empery provided notice of yet additional events of default based on MusclePharm's failure to file required SEC filings as is required under the Amended SPA. MusclePharm has not complied with its obligations to file (A) one or more Quarterly Reports on Form 10-Q and (B) one or more Current Reports on Form 8-K, including without limitation, those requiring MusclePharm to publicly disclose the fact that (i) the undersigned delivered to MusclePharm multiple notices of default, (ii) the undersigned delivered to MusclePharm a notice accelerating payment of the outstanding balances under the Notes, (iii) MusclePharm took out two

separate loans, one with Blade Funding Corp and one with Delta Bridge Financing, (iv) MusclePharm hired a Chief Restructuring Officer and the Chief Restructuring Officer subsequently terminated his role with MusclePharm, (v) MusclePharm hired Eric Hillman as co-CEO of MusclePharm, (vi) MusclePharm terminated its relationships with Jason May and Joseph Cannata.  These reporting failures constituted a breach of Section 3(a) of the SPA, which resulted in an additional Event of Default under Section 5(a)(ii) of the Notes, since these events are not curable.  As of December 21, 2022, MusclePharm has still not disclosed any of the previously mentioned events and has not disclosed the bankruptcy filing that took place on December 15, 2022. A true and correct copy of the December 5, 2022 letter from Empery is attached hereto as **Exhibit NNN**.

77.     Thus, MusclePharm defaulted in all the following respects:

- MusclePharm breached Section 3.1(j) of the SPA by not disclosing a pending SEC investigation;
- MusclePharm breached Section 3.1(h) of the SPA by filing unreliable financial statements;
- MusclePharm breached Section 4.3(a) of the SPA by failing to file required Exchange Act reports with the SEC;
- MusclePharm breached on the June Notes by failing to provide requested information;
- MusclePharm breached on Section 5(a)(xvi) of the June Notes by failing to retain or replace Sabina Rizvi;
- MusclePharm breached Section 3(a) and 3(e) of the Notes by improperly receiving additional financing and making payments on those financings; and
- MusclePharm is plainly in default because no payment on the Notes was made when due on December 10, 2022.

## Settlement Between MusclePharm, Drexler, and White Winston

78.     MusclePharm and Drexler thereafter entered into a settlement agreement with White Winston and White Winston Select Asset Fund Series MP-18, LLC days before the Foreclosure Sale.  White Winston are unsecured equity holders in MusclePharm and a plaintiff against MusclePharm in various legal actions.

79.     MusclePharm, Drexler, and White Winston were and had been well aware of the impending Foreclosure Sale, both through conversations with Empery and through numerous press articles.  Nevertheless, with knowledge of the pending foreclosure proceeding, White Winston and

MusclePharm chose to enter into a settlement agreement that not only seeks to disregard the rights of the Secured Noteholders, whose secured Notes sit unquestionably above White Winston's equity interest in MusclePharm in priority, but also seeks to give control of MusclePharm to White Winston on the eve of the auction, ostensibly to thwart the auction and the rights of the Secured Noteholders.

80.     Specifically, MusclePharm, Drexler and White Winston entered into the Settlement Agreement, in which White Winston agreed to drop its claims against MusclePharm and Drexler in exchange for concessions from them that plainly violate MusclePharm's obligation under the Notes.  A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit OOO**.

81.     By the Settlement Agreement, MusclePharm agreed to pay White Winston a total of $4,000,000, which cash payments would be secured by junior liens on all assets of MusclePharm and its subsidiaries.  The Settlement Agreement also contains a provision compelling MusclePharm to pay $500,000 of the consideration in cash on or before January 4, 2023 (the "Settlement Installment").  Despite the allegations against Drexler, the Settlement Agreement does not require that he pay anything.

82.     MusclePharm did not seek the Purchaser's consent prior to agreeing to incur (or repay) this Indebtedness as it is required to do under Section 3 of the Notes.  Moreover, MusclePharm agreed to incur the Indebtedness and make the upcoming Settlement Installment notwithstanding the fact that MusclePharm has failed and refused to pay the Secured Noteholders a single dollar despite the declaration of an event of default and the acceleration of the amounts owed under the Notes on September 22, 2022.

83.     As an additional payment to White Winston, MusclePharm agreed in the Settlement Agreement to issue a convertible bond to White Winston in the amount of $4,630,261 (the "Convertible Bond"), which bond would be secured by junior liens on all assets of MusclePharm and its subsidiaries.  MusclePharm's issuance of the Convertible Bond violates Section 3(a) of the Notes, which prohibits MusclePharm from incurring any Indebtedness other than what is expressly permitted under the Notes.  The Notes allow MusclePharm to incur Indebtedness that is expressly subordinated to the Notes pursuant to a written subordination agreement approved by Empery.

However, neither MusclePharm nor White Winston have entered into any such written subordination agreement with Empery with respect to the Convertible Bond.

84.    Moreover, MusclePharm's incurrence of junior liens to secure the cash payments and the Convertible bond violates Section 3(b) of the Notes, which prohibits MusclePharm from incurring any liens except as expressly permitted under the Notes.  None of the categories of liens permitted under the Notes are applicable here.

85.    Section 8(a) of the Settlement Agreement provides that "MusclePharm shall expand its board of directors to seven (7) members…."  Of the seven board members, two are to be designated by White Winston, two are to be designated by Drexler, three are to be independent directors that are mutually agreeable to the four directors that White Winston and Drexler appoint. Additionally, White Winston and Drexler may appoint two non-voting observers.

86.    MusclePharm and Drexler also agreed to terms in Section 8 of the Settlement Agreement, which when consummated, would constitute a Change of Control Transaction, yet another event of default under the Notes.

87.    MusclePharm, White Winston, and Drexler were well aware of MusclePharm's obligations to the Secured Noteholders and their priority.  In addition to MusclePharm and Drexler's knowledge by virtue of their participation in the negotiation and execution of the SPA, the Amended and Restated SPA and the Notes, White Winston was aware of MusclePharm's obligations to the Secured Noteholders because those agreements are publicly available through MusclePharm's filings with the Securities and Exchange Commission.  Additionally, Empery has had discussions with White Winston in which it confirmed it is aware of the Amended and Restated SPA and the Notes but nevertheless intends to proceed to consummate the Settlement Agreement.

88.    Upon information and belief, White Winston was going to take action in an effort to thwart (or hinder and delay) the imminent foreclosure of MusclePharm's collateral, which would have provided the Secured Noteholders an opportunity to monetize collateral on behalf of the Secured Noteholders and potentially other creditors of MusclePharm, as well as prevent the ongoing deterioration of the collateral.  Without the ability to produce and ship product due to

MusclePharm's insolvency, MusclePharm products will be replaced at retailers by competitive products.

89.     Consequently, on December 14, 2022, Empery filed a complaint in the Supreme Court of the State of New York County of New York ("New York State Court") against MusclePharm, White Winston, and Drexler, seeking a temporary restraining order and permanent injunction enjoying the consummation of the Settlement Agreement, among other things.

90.     On December 15, 2022, the New York State Court entered a temporary restraining order prohibiting MusclePharm, White Winston, and Drexler from consummating the Settlement Agreement and from taking other action to dispose of any MusclePharm assets.  A true and correct copy of the *Order to Show Cause with Temporary Restraining Order* ("TRO") is attached hereto as **Exhibit PPP.**

91.     On December 14, 2022, MusclePharm filed a complaint against Empery in the New York State Court, seeking a preliminary and permanent injunction enjoining and restraining Empery and all other persons in active concert or participation with Empery from accelerating the Notes and proceeding with a sale of MusclePharm's collateral at a public auction or UCC Article 9 sale on grounds that there were no defaults under the Notes and, alternatively, that the Foreclosure Sale was commercially unreasonable.

92.     On December 15, 2022, the New York State Court denied MusclePharm's request for a preliminary injunction.  A true and correct copy of the *Order to Show Cause for Temporary Restraining Order and Preliminary Injunction (No TRO)* is attached hereto as **Exhibit QQQ.**

93.     Prior to the scheduled UCC sale on December 15, 2022 (the "Petition Date"), MusclePharm filed its voluntary petition for relief under Chapter 11, thereby commencing the above-captioned Chapter 11 case (the "Chapter 11 Case").

94.     As of the Petition Date, the Secured Noteholders are owed not less than $18,155,014 under the Notes.

95.     Although Drexler signed the voluntary petition, by information and belief, Drexler had resigned as CEO and Chairman prior to the filing of the Chapter 11 Case.

96.     Empery has received written support for its debtor-in-possession financing proposals.  Attached hereto as **Exhibits RRR**, **SSS**, **TTT**, and **UUU** are true and correct copies of letters Empery received from unsecured creditors JW Nutritional, Mill Haven Foods, SK Laboratories, and Atlantic Grain & Trade, respectively.

### The DIP Budget is Not Reliable

97.     On December 29, 2022, while negotiating the DIP financing, I had a call with Eric Hillman, Debtor's co-CEO, to discuss the budget.  On this call I learned that Debtor cannot project the timing of its near-term sales because (i) MusclePharm does not currently have general liability insurance and (ii) MusclePharm labels currently show a third-party a certification that Debtor needs to confirm it can continue to use prior to selling with this certification on its labels.  If Debtor cannot use the third-partycertification, then it will be required to produce new labels, a process that can take five to six weeks, before it can ship any product.  For that reason, Debtor cannot commit to near-term revenue projections until these two issues are resolved, MusclePharm does not know the cost and payment terms required to instate a general liability insurance policy and MusclePharm does not know the cost of the third-party certification renewal or the new labels that would be required if renewal is not an option.

98.     In my conversation, Eric Hillman stated that he is confident in sales of $1.5 million to $1.8 million over the next 13 weeks with no assurance on anything incremental.  The budgeted sales of $2.3 million are validated by existing purchase orders or reliable projections based on its conversations with Eric Hillman.

99.     On a series of phone calls with Jungsberger, Jungsberger stated that JW has not decided if it will continue to manufacture MusclePharm products.  Without JW as a manufacturer, there is no alternative manufacturer available to quickly produce MusclePharm products and there is concern that any sales in the next 13 weeks may be impossible.  In addition, JW has also mentioned that it does not currently have MusclePharm on its manufacturing schedule and until it does, it will not know the exact cost of goods sold or potential availability on its manufacturing lines for MusclePharm products. For these reasons, the amounts and timing of Total COGS and Factored Receivables are inaccurate and unreliable.

100.    The DIP budget does not show positive Ending Cash until the Final DIP Order is approved and the $1.5mm is funded. This budget clearly does not work with the contemplated WW DIP Proposal.

**Response to Gary Shirshac First Day Declaration**

101.    I have revied the *Omnibus Declaration of Gary Shirshac in Support of Debtor's Emergency Petition, First Day Motions and Related Relief* [ECF No. 34] ("First Day Declaration") and respond as follows.

102.    Nobody at Empery has ever spoken to or interacted with Gary Shirshac ("Shirshac") in any respect.

103.    Shirshac testifies in the First Day Declaration that "the Debtor disputed the defaults, and Empery continued to assert them." This assertion is false. The Debtor, the board of directors and Debtor's counsel did not respond to a single reservation of rights letter or event of default letter. The first response received by Empery was from Adam Bult, Debtor's counsel at the time, on October 3, 2022, in response to the DACA Access Termination Notice. In fact, as mentioned above, Drexler himself acknowledged the defaults during our October 7, 2022 phone call in which he stated "Defaults are part of the contract… there are defaults. I signed the documents. I am a big boy."

104.    Shirshac also testifies in the First Day Declaration that the "Access Termination Notice and Initial Sale Notice caused tremendous harm to the Debtor as Prestige Capital did not factor any more receivables." As mentioned above, Debtor had already been in default on its agreements with its key vendors, many of which stopped doing business with Debtor well before the Access Termination Notice and Initial Sale Notice. In addition, prior to the Access Termination Notice and Initial Sale Notice, Debtor had liquidity issues having nothing to do with actions by Empery which required them to take out merchant loans (the Delta Loan and the Blade Loan in August 2022 and September 2022, respectively), in breach of the Notes. In addition, on information and belief, Prestige did continue to factor following the Access Termination Notice and the Initial Sale Notice and this assertion is not true.

105.    It is clear that Shirshac does not have personal knowledge of the testimony set forth in the First Day Declaration and that the First Day Declaration was in fact written by or for Drexler based on Shirshac's testimony in the First Day Declaration that "I personally offered to give collateral to Empery in exchange for Empery's forbearance from pursuing remedies for twelve (12) months."  As stated above, Empery has never interacted with Shirshac in any capacity and he did not personally offer to give Empery collateral.

106.    Shirshac's assertion in the First Day Declaration that "even after the parties negotiated a binding term sheet, Empery decided it would not enter into a forbearance agreement…" is misleading and false.  As stated in paragraph 64 above, this comment relates to a term sheet that Drexler began negotiating after walking away from a fully-negotiated forbearance agreement that his counsel stated he was prepared to sign and Empery was able to gather signature pages from all of the Secured Noteholders.  In addition, his use of the word "binding" suggests that an agreement was reached in a binding document. There was no agreement reached with regard to this subsequent term sheet as Empery became aware of the CRO's conclusion that the Debtor was insolvent and Empery believed the term sheet was not in its best interests.

107.    Shirshac also testifies in the First Day Declaration that "the Debtor has negotiated extensively with its existing lenders for financing on terms more favorable than the DIP Financing prior to and after the Petition Date, no financing is available from other sources on more favorable terms."  This is not accurate.  Debtor refused to negotiate in good faith with Empery, refusing to even markup our DIP proposal for a week, then allowing White Winston an opportunity to match all of Empery's DIP proposals, before suddenly adjourning for the weekend and determining to accept the WW DIP Proposal without first offering Empery an opportunity to match the WW DIP Proposal, claiming that it ran out of time to negotiate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of January 2023.

        _/s/ Timothy Silver_____
        TIMOTHY SILVER