GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6665
E-mail: ggarman@gtg.legal
WILLIAM M. NOALL
Nevada Bar No. 3549
E-mail: wnoall@gtg.legal
MARK M. WEISENMILLER
Nevada Bar. No. 12128
Email: mweisenmiller@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Empery Tax Efficient, LP as Agent and Collateral Agent for certain Secured Noteholders*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| In re:<br><br>MUSCLEPHARM CORPORATION,<br><br>Debtor. | Case No.: 22-14422-NMC<br><br>Chapter 11<br><br>Date: January 13, 2023<br>Time: 9:30 a.m. |
|---|---|

**JOINDER TO EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) GRANTING PRIMING LIENS AND ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, AND <u>(V) GRANTING RELATED RELIEF</u>**

Empery Tax Efficient, LP, in its capacity as collateral agent (in such capacity, "<u>Empery</u>") of the Secured Noteholders with respect to the Notes,[1] by and through its counsel, Garman Turner Gordon LLP, hereby files its joinder (the "<u>Joinder</u>") to the *Emergency Motion for Entry of Interim and Final Orders: (i) Authorizing Debtor to Obtain Post-Petition Financing, (ii) Granting Priming Lines and Administrative Expense Claims, (iii) Authorizing the Debtor's use of Cash Collateral, (iv) Modifying the Automatic Stay, and (v) Granted Related Relief* (the "<u>Motion</u>"), filed by

---

[1] Capitalized terms not defined herein shall be ascribed the definitions set forth in the declaration of Timothy Silver [ECF No. 52] ("<u>Silver Declaration</u>").

MusclePharm Corporation (the "Debtor").

This Joinder is made and based upon the following Memorandum of Points and Authorities, the Silver Declaration and declaration of Mark Weisenmiller ("Weisenmiller Declaration") filed herewith, the papers and pleadings on file, judicial notice of which is respectfully requested pursuant to Federal Rule of Evidence 201, and such further evidence and argument that may be presented and considered by this Court at any hearing on the Motion.

## I.
## JOINDER

**A.  A DIP Loan is Not Subject to Auction in Open Court – the Test is Debtor's Business Judgment.**

In determining whether to grant the Motion and approve the Empery DIP Term Sheet, this Court is required to test that Debtor has satisfied the business judgment rule.  See e.g., In re Simasko Production Co., 47 B.R. 444, 448-9 (D. Colo.1985) (authorizing interim financing agreement where debtor's business judgment indicated financing was necessary and reasonable for benefit of estate); In re Ames Dep Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").  Thus, a DIP loan is not subject to an auction in open court.

**B.  Summary of the Empery DIP Term Sheet.**

On January 8, 2023, Timothy Silver of Empery met with Jeffrey Gasbarra and Ryan Williams of Portage Point Partners, Debtor's proposed chief restructuring officer ("CRO"), to discuss Debtor's budget.  During the meeting, Mr. Silver determined that the amounts proposed under the DIP term sheet previously proposed by Empery and agreed to by Debtor [ECF No. 65] ("Initial Empery DIP Term Sheet") were insufficient during the interim period and after entry of a final order on the Motion.  Consequently, Debtor seeks approval in the Motion of a substantially improved DIP term sheet [ECF No. 89, Exhibit 1] (the "Empery DIP Term Sheet"), the acceptance of which was a sound exercise of Debtor's business judgment.

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

Below is a summary[2] of the material terms of the improved Empery DIP Term Sheet:

| | |
|---|---|
| **DIP Note Facility** | The DIP Note Facility shall be a superpriority senior secured multiple issuance note facility with co-priority with the Prepetition Secured Parties in an aggregate principal amount not to exceed $2.5 million.<br><br>$2.5 million of principal due under the Prepetition Notes shall roll-up and convert on a cashless dollar-for-dollar basis into DIP Notes upon entry of the Final DIP Order to be approved in the Final DIP Order. |
| **Availability** | Immediately upon entry of the first interim order approving the Initial Empery DIP Term Sheet (the "First Interim Order"), the DIP Lender was authorized to advance $150,000 of the Interim DIP Issuance to Debtor. Since the First Interim Order, the DIP Lender has advanced $123,861.31 of the Interim DIP Issuance to fund the specific requests of the Debtor.<br><br>Up to $750,000 (the "Interim DIP Issuance") less the $150,000 advance after entry of the First Interim Order to be made available to Debtor from the Interim Closing Date until the Final Closing Date.<br><br>Up to $1.75 million (of the total $2.5 million) to be made available to Debtor on or after the Final Closing Date. |
| **DIP Factoring Facility** | Up to $10 million available to Debtor from the purchase of Debtor's eligible post-petition accounts ("Accounts") and, to the extent provided in the next succeeding paragraph, purchase orders ("Purchase Orders").<br><br>The DIP Factoring Purchasers will only purchase Purchase Orders from Debtor during the period of entry of the Interim DIP Order to entry of the Final DIP Order (the "Interim Period") under certain conditions, up to $2 million. |
| **Advances on Accounts and Purchase Orders** | The DIP Factoring Purchasers, in the sole discretion of the DIP Agent, may advance up to (i) one hundred percent (100%) of the first $1,000,000 of Accounts and Purchase Orders purchased during the Interim Period, and (ii) eighty percent (80%) of the face amount of the Accounts purchased in excess of $1,000,000, less the applicable discount fee, and Facility Fee (as defined below) (collectively the "***Aggregate Advances***"). |
| **Facility Fee** | Fifty basis points (0.50%) of each Account or Purchase Order purchased by DIP Factoring Purchasers, payable at the time of each such purchase. |
| **Maturity Date** | Earliest of (a) December 31, 2023, (b) the date all DIP Notes become due and payable under the DIP Documents, whether by acceleration after an Event of Default or otherwise, (c) the date of the closing of the Sale Transaction (as defined below) or any other sale(s) of all or substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, and (d) the filing of a chapter 11 plan that is not an Acceptable Plan (as defined below) (the "Maturity Date"). |
| **Interest Rates** | • DIP Note Facility: The prime interest rate as published in the Wall Street Journal plus two percent (2%) per annum.<br>• Interest Rate on Aggregate Advances: The prime interest rate as published in the Wall Street Journal plus two percent (2.0%) per annum. |

---

[2] This is only a summary. Parties in interest are directed to the Empery DIP Term Sheet for a full recitation of terms.

| | |
|---|---|
| | • Default interest rate of an additional two percent (2.0%) per annum upon the occurrence and during the continuance of an Event of Default, payable in cash on demand. |
| **Payments and Fees** | Upfront Payment: $0<br>DIP Agent Fee: $0<br>Closing Fee: $0 |
| **DIP Collateral** | All present and after acquired property of Debtor, wherever located, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 but, subject to entry of the Final DIP Order, including the proceeds thereof (collectively, the "DIP Collateral"). |
| **Priority of DIP Obligations** | All obligations of the Issuer under the DIP Facilities and all amounts owing by the Guarantor(s) in respect thereof at all times shall be, effective as of December 15, 2022 ("Petition Date"), secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected co-priority senior liens on and security interests in the DIP Collateral (collectively, the DIP Liens"), subject to the priorities described in Schedule 2 to the Empery DIP Term Sheet. |
| **DIP Superpriority Claim** | All obligations of the Debtor under the DIP Facilities and all amounts owing by the Guarantor(s) in respect thereof at all times shall constitute allowed superpriority administrative expense claims, pursuant to Section 364(c)(1), in the Chapter 11 Case (the "DIP Superpriority Claims"), subject to the priorities described in Schedule 2 to the Empery DIP Term Sheet. |
| **Milestones** | Subject to the entry of the Final DIP Order, the Note Parties shall comply with the following deadlines (each, individually, a "Milestone" and, collectively, the "Milestones"), which may be extended or waived by the DIP Agent in its sole discretion:<br>• The Debtor shall file an Acceptable Plan by September 30, 2023.<br>• An "Acceptable Plan" is a plan of reorganization or liquidation reasonably acceptable to the DIP Agent, which shall include the following:<br>    o Repayment in full in cash of the obligations under the DIP Note Facility, including Roll-Up;<br>    o Be acceptable to the DIP Agent, in its reasonable discretion, with respect to the treatment of the Prepetition Secured Parties, DIP Note Purchasers, and DIP Factoring Purchasers.<br>• In the event an Acceptable Plan has not been filed by Debtor by September 30, 2023, Debtor shall commence a Section 363 sale process (the "Sale Transaction") within 14-days of notice by the DIP Agent that the plan filed is not acceptable. In the event that no plan is filed by September 30, 2023, Debtor shall commence a Sale Transaction on October 20, 2023. The procedure and timing of the Sale Transaction shall be satisfactory to the DIP Agent, in its sole discretion.<br>• The Bankruptcy Court shall approve an Acceptable Plan by December 15, 2023. |
| **Financial Covenants** | Following the one-week anniversary of the Interim DIP Order until the repayment in full in cash of the obligations under the DIP Facilities, the Note Parties shall perform in accordance with the Budget, subject to the following with respect to any Review Period: (i) the Note Parties' actual |

| | |
|---|---|
| | cash receipts shall not be less than 90% of the projected amounts therefor set forth in the Budget on a cumulative basis; and (ii) the Note Parties' actual cash disbursements shall not be greater than 110% of the projected amounts therefor set forth in the Budget on a cumulative basis (such variance, the "Permitted Variances").<br><br>***During any Review Period occurring prior to March 15, 2023, the DIP Note Purchasers and DIP Factoring Purchasers waive all defaults of the Note Parties for failing to comply with the Budget, including the Permitted Variances, solely with respect to (i) top line gross revenue and cash receipts and (ii) all cost of goods sold, including shipping.***<br><br>Debtor shall file with the Bankruptcy Court a final Budget agreed to by the DIP Agent on or before March 15, 2023. |
| **Board of Directors** | As set forth below, the DIP Consenting Parties shall approve an independent director ("Independent Director"), nominated by the Interim Board of Directors (defined below), with sole and exclusive responsibility for the following:<br>• Protect and recover the assets of the Debtor, including determine whether it is in the best interest of the Debtor to reorganize under Section 1129 of the Bankruptcy Code, or sell its assets in accordance with Section 363 of the Bankruptcy Code;<br>• Review and approve the ultimate debtor-in-possession financing incurred by the bankruptcy estate, as negotiated by the Debtor's restructuring professionals;<br>• Except as otherwise provided herein, investigate and determine which estate causes of action, if any, should be pursued, prosecuted, or settled; and<br>• Maximize value for all stakeholders.<br>Except as set forth below, all current members of the board of directors will resign immediately upon entry of the First Interim Order.<br>Upon entry of the First Interim Order, the board of directors will be reconstituted with the following members ("Interim Board of Directors"):<br>1. Paul Karr; and<br>2. Eric Hillman.<br>Upon entry of the Interim DIP Order, the board of directors will be reconstituted with the following members (the following, the "Board of Directors"):<br>1. Eric Hillman;<br>2. Paul Karr; and<br>3. The Independent Director.<br>The Debtor shall nominate an Independent Director on or before January 17, 2023. |
| **Other Covenants** | By no later than five (5) days following the entry of the Interim DIP Order, Debtor shall engage a Chief Restructuring Officer (the "CRO") reasonably satisfactory to the DIP Consenting Parties pursuant to an engagement letter with a scope and compensation reasonably satisfactory to the DIP Consenting Parties and otherwise be in form and substance satisfactory to the DIP Consenting Parties.<br><br>The CRO shall not be removed without order of the Bankruptcy Court. The CRO's fees and costs shall not exceed $50,000 per month, except as |

|  | |
|---|---|
|  | otherwise approved by the Board of Directors.<br><br>Ryan Drexler shall resign from all offices of Debtor and from the board of directors of Debtor immediately upon entry of the First Interim Order.  Eric Hillman shall be appointed as the CEO of Debtor immediately upon entry of the First Interim Order. |
| **Carve Out** | A carve-out of all reasonable and documented fees and expenses up to $250,000 incurred by professionals employed by Debtor, and a carve-out of all reasonable and documented fees and expenses of up to $250,000 for any committee of unsecured creditors and a post-carve-out trigger notice cap of $25,000 for Debtor's professionals and $25,000 for any committee of unsecured creditors. |
| **Expenses** | Debtor shall pay certain reasonable and documented legal fees and out-of-pocket expenses of counsel for Empery, in its capacity as a DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent incurred with respect to the DIP Facilities, *but such fees and expenses shall be added to DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent claim(s).* |
| **Committee Review** | The Committee shall have sixty-days (60) from entry of the Interim Order challenge and otherwise object to the allowance of the Allowed Claim. |

C.  **The Empery DIP Term Sheet is Superior, Acceptance of the Empery DIP Term Sheet was a Sound Exercise of Debtor's Business Judgment, and Approval of the Empery DIP Term Sheet is in the Best Interests of Debtor and the Estate.**

The Empery DIP Term Sheet is superior to all other offers presented to Debtor to date. First, the Empery DIP Term Sheet provides for consensual priming of Empery and Ryan Drexler ("Drexler").  The *Intercreditor Agreement* ("Intercreditor Agreement") between Empery on behalf of the October Noteholders, Debtor, and Drexler, provides Empery a power of attorney to consent to Empery's DIP liens on behalf of Drexler:

> 16. If Subordinated Creditor has any claim against Borrower or any of its subsidiaries in any Insolvency Proceeding, ***Subordinated Creditor hereby irrevocably makes, constitutes and appoints Senior Creditor as Subordinated Creditor's attorney in fact, and grants to Senior Creditor a power of attorney with full power of substitution, in the name of Subordinated Creditor or in the name of Senior Creditor, without notice to Subordinated Creditor, and authorizes Senior Creditor*** (a) to file, in the name of Subordinated Creditor, such claim on behalf of Subordinated Creditor, if Subordinated Creditor does not do so prior to 10 days before the expiration of the time to file claims in such proceeding and if Senior Creditor elects, in its sole discretion, to file such claim or claims, (b) to enforce such claim, either in its own name or in the name of Subordinated Creditor, by proof of claim, suit or otherwise, (c) to vote such claim to accept or reject any plan of reorganization, and (d) ***to take any other action in connection with any such Insolvency Proceeding that Subordinated Creditor would be authorized to take but for this Agreement***, and any sums received by Senior Creditor in connection with such claim shall be applied to the Senior Debt. Senior Creditor

shall remit to Subordinated Creditor any funds remaining after those sums have been so applied, to the extent permitted by applicable law or the proceedings governing any such bankruptcy. In no event shall Senior Creditor be liable to Subordinated Creditor for any failure to prove the Subordinated Debt, to exercise any right with respect thereto or to collect any sums payable thereon.

Intercreditor Agreement, § 16 (emphasis added). Among other prohibitions, Drexler is also prohibited from objecting, directly or indirectly, to the Empery DIP Term Sheet. See Section 15.4 of the Intercreditor Agreement.[3]

Second, the Empery DIP Term Sheet provides for a loan of $2.5 million, up from the $2.0 million proposed in the Initial Empery DIP Term Sheet. The $500,000 increase was necessary to adequately fund the cost of Debtor's business operations and the administration of the Chapter 11 Case.

Third, Empery increased the interim funding amount to $750,000, up from $500,000 from the Initial Empery DIP Term Sheet. This $250,000 increase was necessary to jumpstart operations, pay employees, acquire inventory, and fund professional compensation during the Interim Period.

---

[3] Section 15.4 of the Intercreditor Agreement provides that:

> 15.4 **Subordinated Creditor agrees that Senior Creditor may consent to the use of cash collateral of, or provide debtor-in-possession financing to, Borrower or any of its subsidiaries on such terms and conditions and in such amounts as Senior Creditor, in its sole discretion, may decide and, in connection therewith, Borrower or any of its subsidiaries may grant (or continue to grant) to Senior Creditor liens and security interests upon all of the property of Borrower or any of its subsidiaries, which liens and security interests (a) shall secure payment of all Senior Debt owing to Senior Creditor (whether such Senior Debt arose prior to the commencement of such Insolvency Proceeding or at any time thereafter) and all other financing provided by Senior Creditor during such Insolvency Proceeding and (b) shall be superior in priority to all liens and security interests in favor of Subordinated Creditor on the property of Borrower or any of its subsidiaries. Subordinated Creditor agrees that he/it will not object to or oppose any such cash collateral usage, any debtor-in-possession financing** or any sale or other disposition of any property securing all or any part of the Senior Debt free and clear of security interests, liens, or other claims of Subordinated Creditor under Section 363 of the Bankruptcy Code or any other provision of the Bankruptcy Code, if Senior Creditor has consented to such sale or disposition. Subordinated Creditor agrees not to assert any right he/it may have to "adequate protection" in such Insolvency Proceeding and agrees that he/it will not seek to have the automatic stay lifted in any Insolvency Proceeding. Subordinated Creditor agrees that he/it will not provide, or offer to provide, any debtor-in-possession financing to Borrower or any of its subsidiaries without the prior written consent of Senior Creditor.

Intercreditor Agreement, Section 15.4 (emphasis added).

Moreover, the Empery DIP Term Sheet provides that no attorneys' fees and expenses are to paid at closing to Empery to ensure that the amounts loaned during the Interim Period and after final approval of the Motion are sufficient and benefit the estate.

Fourth, the Empery DIP Term Sheet proposes up to $10 million under the DIP Factoring Facility with no upfront payment, DIP Agent Fee, or closing fee. The Empery DIP Term Sheet proposes factoring of Purchase Orders during the Interim Period of up to $2.0 million to ensure that Debtor has adequate funding during the Interim Period. During the Interim Period and following entry of the Final DIP Order, Accounts can be factored up to $10 million, less the amount of Purchase Orders factored, under the DIP Factoring Facility.

Fifth, the Empery DIP Term Sheet is superior because it does not require any Empery representative on Debtor's board of directors, requires the appointment of the Independent Director and CRO, and places reasonable Milestones upon Debtor to ensure that the Chapter 11 Case progresses and is not overwhelmed by administrative expenses.

Sixth, the Empery DIP term Sheet includes carve-outs of $250,000 for Debtor's professionals and $250,000 for the official committee of unsecured creditors' committee (the "Creditors Committee") and includes a flexible budget with reasonable restraints.

Consequently, Debtor's acceptance of the Empery DIP Term Sheet meets the business judgment rule.

**D.    The White Winston DIP Proposals Do Not Meet Heightened Insider Scrutiny.**

The WW DIP proposals are not before the Court or proposed by Debtor. However, Empery anticipates that White Winston will argue that its proposals were superior, notwithstanding that the test is Debtor's business judgment rule. All the WW DIP proposals are insider equity deals that do not meet the heightened standard of inherent fairness from the viewpoint of Debtor and its creditors. The case law is clear that the Court must rigorously scrutinize the WW DIP proposals due to the insider nature. See Pepper v. Litton, 308 U.S. 295, 306 (1939); Brewer v. Erwin & Erwin, P.C. (In re Marquam Inv. Corp.), 942 F.2d 1462, 1465 (9th Cir. 1991) ("The Supreme Court has instructed that an insider's dealings with a bankrupt corporation must be "subjected to rigorous scrutiny."). Under the appropriate legal standard, insiders are required to demonstrate, not only

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

their good faith in seeking approval of the motion, but also "[the motion's] inherent fairness from the viewpoint of the corporation and those interested therein." See In re Marquam Inv. Corp., 942 F.2d at 1465.

Here, White Winston is a non-statutory insider because it is an 8.80% equity holder of Debtor. See Exhibit 1 to Weisenmiller Declaration. Moreover, as detailed in Empery's opposition filed at ECF No. 51, which is incorporated by this reference herein, White Winston has a close relationship with Debtor and statutory insider Drexler which is evident by their less than arm's length transactions, including the Settlement Agreement and WW DIP proposals.

White Winston's motives are plain and self-serving. All of the WW DIP proposals have required that White Winston take control of Debtor and the reorganization through board member appointments. It is seeking to obtain through its DIP what it could not obtain through years of unsuccessful litigation with Debtor.

In its newest proposal (which is neither before the Court nor superior in the eyes of Debtor), in addition to placing two members on Debtor's board of directors, White Winston requires that it shall have an allowed general unsecured claim, not subject to subordination or recharacterization, of $8,630,261.00 subject to a 60-day review period. And while White Winston complained at the last hearing about the "Acceptable Plan" requirement in the Initial Empery DIP Term Sheet because it said it dictated plan treatment and Debtor was abdicating its fiduciary duties, White Winston's new proposal takes dictating plan treatment to an entirely new level. First, the new WW DIP proposal allows White Winston not only to dictate its plan treatment, but it also takes the liberty of dictating Empery's plan treatment. Second, the new WW DIP proposal dictates that Debtor cannot sell all of its assets or a material portion of its business, without the prior consent of White Winston. Finally, the new WW DIP proposal states that in order for a plan to be deemed an Acceptable Plan, it must be reasonably acceptable to White Winston, not just with respect to the treatment of White Winston, but in all respects.

All of the WW DIP proposals have violated the Factoring Intercreditor Agreement, Drexler Intercreditor Agreement, and the TRO. See Exhibit 2 to the Weisenmiller Declaration. As such, none of the WW DIP proposals were proposed in good faith and do not meet the heightened

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

scrutiny applicable to insider deals with Debtor. Because Debtor's acceptance of the Empery DIP Term Sheet meets the business judgment rule, this Court should approve the Motion and the Empery DIP Term Sheet.

## II.
## CONCLUSION

WHEREFORE, Empery requests that the Court grant the Motion in its entirety, approve the Empery DIP Term Sheet, and grant further relief as the Court deems just.

DATED this 12th day of January, 2023.

GARMAN TURNER GORDON LLP

/s/ Mark M. Weisenmiller
WILLIAM M. NOALL, ESQ.
GREGORY E. GARMAN, ESQ.
MARK M. WEISENMILLER, ESQ.
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
*Attorneys for Empery Tax Efficient, LP as Agent and Collateral Agent for certain Secured Noteholders*