Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
blindsey@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Proposed Attorneys for the Debtor*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 22-14422-nmc |
| MUSCLEPHARM CORPORATION, | Chapter 11 |
| Debtor. | Interim Hearing Date:  January 13, 2023<br>Interim Hearing Time: 9:30 a.m. (PT) |

**AMENDED SUPPLEMENT TO EMERGENCY MOTION FOR INTERIM
AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND
364 AND FED. R. BANKR. P. 4001(B) AND 4001(D): (I) AUTHORIZING
THE DEBTOR TO OBTAIN POST-PETITION FINANCING; (II) GRANTING
PRIMING LIENS AND ADMINISTRATIVE EXPENSE CLAIMS; (III)
DETERMINING ADEQUATE PROTECTION; (IV) MODIFYING
THE AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF[1]**

MusclePharm Corporation (the "**Debtor**"), the debtor and debtor-in-possession in the

above-captioned Chapter 11 case,[2] by and through its proposed counsel of record, Schwartz Law,

---

[1]     The Debtor noted certain of the items in the summary of the relief requested herein was inaccurate and this Amended Supplement corrects the record.  Specifically, (i) the identity of the Lender, (ii) the amounts to be factored, (iii) the loan fees, as set forth in the summary table, and (iv) the approval of the independent director, as set forth in paragraph 10, are each modified to better reflect the terms of the relief requested, and this pleading amends ECF No. 89.

[2]     Unless otherwise indicated, all chapter and section references are to the Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"). All references to a "**Chapter**" or "**Section**" shall be to the Bankruptcy Code. "**Bankruptcy Rule**" references are to the Federal Rules of Bankruptcy Procedure Rules 1001-9037. "**Local Rule**" or "**LR**" references are to the Local Rules of Bankruptcy Practice of the United States Bankruptcy Court, District of Nevada.

PLLC, hereby files this amended supplement (the "**Amended Supplement**") to its motion (the "**Motion**")[3] for the entry of interim and final orders pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 4001(b) and 4001(d), and Local Rule 4001: (I) Authorizing the Debtor to Obtain Post-Petition Financing; (II) Granting Priming Liens and Administrative Expense Claims; (III) Determining Adequate Protection; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief (ECF No. 33). In support of the Amended Supplement, the Debtor relies on the declarations of Samuel A. Schwartz (the "**Schwartz Declaration**") and Paul Karr (the "**Karr Declaration**") filed concurrently herewith, and respectfully states as follows:

<u>SUPPLEMENT</u>

    A.    <u>Relevant Background.</u>

1.    On December 15, 2022, the Debtor filed its voluntary Chapter 11 petition (the "**Petition Date**").

2.    On January 3, 2023, the Debtor filed its Motion, seeking debtor-in-possession financing from White Winston Select Asset Funds, LLC ("**White Winston**").

3.    On January 6, 2023, the Debtor filed that certain Notice of [Proposed] Term Sheet for Debtor-in-Possession Financing and Authorization for Use of Cash Collateral (the "**Empery Term Sheet**") (ECF No. 65), whereby the Debtor selected to move forward with proposed debtor-in-possession financing (the "**DIP Financing**") with Empery Tax Efficient, LP ("**Empery**") in lieu of the White Winston proposal.

4.    On January 6, 2023, this Court held an interim hearing on the Motion and proposed DIP Financing, whereby this Court, among other things: (i) approved the DIP Financing on a limited and interim basis; and (ii) continued the interim hearing on the Motion to January 13, 2023, at 9:30 a.m., all as set forth in that certain first interim order entered on January 9, 2023 (the "**First Interim DIP Order**") (ECF No. 74).

/ / /

---

[3]    Capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the Motion.

5.      Since the entry of the First Interim DIP Order, Empery has provided funding as approved by this Court to fund expenses for the Debtor's payroll and insurance.

**B.      Improved DIP Financing Terms.**

6.      In recent days, the Debtor continued to negotiate and consult with Empery, White Winston and the Official Unsecured Creditors Committee (the "**Committee**") regarding the DIP Financing, which has resulted in better terms than the terms initially proposed in the Empery Term Sheet.  Specifically, the Debtor received a total of 4 term sheets over the last week, culminating in this filing with the Court today.

7.      Ultimately, the Debtor, in the reasonable exercise of its business judgment, decided to pursue the DIP Financing pursuant to the terms of that certain revised Empery term sheet (the "**Revised Empery Term Sheet**"), attached hereto as **Exhibit 1**.  A redline comparing the changes between the original Empery Term Sheet and the Revised Empery Term Sheet is attached hereto as **Exhibit 2**.

8.      Specifically, the Revised Empery Term Sheet modifies the DIP Financing with the following improved terms, among others:

a.      <u>DIP Facility</u>: Increased from $12,000,000 to $12,500,000;

b.      <u>Interim Advance</u>:  Increased from $500,000 to $750,000;

c.      <u>Carve Out</u>: Increased to $500,000 ($250,000 for the Debtor's professionals, and $250,000 for the Committee's professionals);

9.      A summary of the material terms of the Revised Empery Term Sheet is set forth in the table below.

| Summary of Material Terms |
| --- |
| **Borrower:** Debtor MusclePharm Corporation |
| **Guarantor:**  MusclePharm Canada and any other subsidiaries |
| **Lender:** Empery Tax Efficient, LP, as the lead lender and as more fully described in the Revised Empery Term Sheet (the "**Lender**") |
| **Maximum DIP Loan Commitment:** $12,500,000, as follows: |
| **DIP Note Facility**:  Up to $2,500,000 in new funding, with $750,000 available on an interim basis |

| **Summary of Material Terms** |
|---|
| (the "**DIP Note Facility**"); |
| DIP Factoring Facility:  Up to $10,000,000 in new factoring, as follows:  100% of all post-petition purchase orders or accounts purchased up to $1,000,000, with 80% of all post-petition purchase orders or accounts purchased up to $2,000,000 on an interim basis, (the "**DIP Factoring Facility**" and collectively with the DIP Note Facility, the "**DIP Loan**").  The balance of the DIP Factoring Facility of $8,000,000 (for a total of $10,000,000) shall be available upon final approval for accounts receivable up to 80%. |
| **Interest Rate:**<br><br>DIP Note Facility:  Prime Rate as published in the Wall Street Journal, plus 2%<br><br>DIP Factoring Facility:  Prime Rate as published in the Wall Street Journal, plus 2% |
| **Roll-Up:**  $2.5 million of the Prepetition Notes shall roll-up and convert into DIP Notes to be approved in the Final DIP Order. |
| **Loan Fees:**<br><br>DIP Note Facility:  $0.00<br><br>DIP Factoring Facility:  Fifty basis points (0.50%) of each Account purchased |
| **Professional Allocation (Carve Out)**:<br><br>• $250,000 carve out for Debtor's professionals;<br>• $250,000 carve out for Committee's professionals;<br>• Post-carve out trigger notice cap of $25,000 for debtor professionals; and<br>• Post-carve-out trigger notice cap of $25,000 for Committee professionals. |
| **Maturity Date:**  Earliest of: (a) December 31, 2023, (b) the date all DIP Notes become due and payable (whether by acceleration after an event of default or otherwise), (c) the date of the closing of a Sale Transaction, or (d) the filing of a Chapter 11 plan that is not an Acceptable Plan. |
| **Proposed Use of DIP Financing:** (1) Immediate working capital needs, (2) general corporate purposes and (3) administrative and professionals' fees, costs and expenses. |
| **FRBP 4001(c)(1)(B)(i) - grant of priority or a lien on property the estate under § 364(c) or (d):**<br><br>(1) Grant of allowed super-priority administration claim under § 364(b) and 503(b)(1);<br>(2) Grant of automatically perfected security interests under §§ 364(c); and<br>(3) Grant of liens co-priority liens with Prepetition Note Purchasers under § 364(d). |
| **Milestones (subject to entry of the Final DIP Order):**<br><br>• The Debtor shall file an Acceptable Plan by September 30, 2023.<br><br>• An "**Acceptable Plan**" is a plan of reorganization or liquidation acceptable to the Lender |

| Summary of Material Terms |
|---|
| which shall including the following:<br>- Repayment in full in cash of the obligations under the DIP Note Facility, including the Roll-Up;<br>- Be acceptable to the DIP Agent, in its reasonable discretion, with respect to the treatment of the Prepetition Secured Parties, DIP Note Purchasers and DIP Factoring Purchasers.<br><br>• In the event an Acceptable Plan has not been filed by Debtor by September 30, 2023, Debtor shall commence a Section 363 sale process (the "**Sale Transaction**") within 14-days' notice by the DIP Agent that the plan filed is not acceptable.  In the event that no plan is filed by September 30, 2023, Debtor shall commence a Sale Transaction on October 20, 2023.  The procedure and timing of the Sale Transaction shall be satisfactory to the DIP Agent, in its sole discretion.<br><br>• The Bankruptcy Court shall approve an Acceptable Plan by December 15, 2023. |
| **Board of Directors:**<br><br>Upon entry of the Interim DIP Order, the board of directors will be reconstituted with the following members (the "**Board of Directors**"):<br><br>• Eric Hillman;<br>• Paul Karr; and<br>• The Independent Director.<br><br>The Debtor shall nominate an Independent Director on or before January 17, 2023.  The appointment of additional directors is subject to implementation of acceptable directors and officers insurance as set forth in the First Interim DIP Order. |
| **Committee Review/Challenge Period:**  The Committee shall have a period of sixty-days (60) from the entry of the Interim Order to investigate and challenge or otherwise object to the allowance of the Lender's Allowed Claim. |
| **Allowed Claim:**  The Lender shall have an Allowed Claim of no less than $12,840,000. |

10.     The principal changes in the terms proposed by Empery over the last week include: (i) the increase of the lending from $2,000,000 to $2,500,000; (ii) the increase of the roll-up from $2,000,000 to $2,500,000; (iii) the removal of several of the proposed "Acceptable Plan" provisions, leaving principally a requirement that the DIP Facility of $5,000,000, plus fees and costs, and which is inclusive of the roll-up, be repaid upon the effective date; (iv) the right of Empery and the Committee to consent to the appointment of an independent director of the board; and (v) the

expansion of the carve-outs for professionals, including the Committee's professionals.

11.    Further, the Debtor, in concert with the proposed Chief Restructuring Officer, revised its Budget, a true and correct copy of which is attached hereto as **Exhibit 3**.  The Budget is a more accurate reflection of the Debtor's anticipated operations, revenues and expenses and demonstrates the Debtor can operate cash flow positive pursuant to the Revised Empery Term Sheet.

## REPLY TO WHITE WINSTON OBJECTION

12.    Last, the Debtor is in receipt of White Winston objection to the DIP Financing Motion (the "**WW Objection**") (ECF No. 88).  While the Debtor appreciates White Winston's concerns and efforts in providing financing alternatives, at this stage of the case, the Debtor needs financing immediately for business operations and administrative expenses.

13.    Moreover, several of the concerns of White Winston are addressed in the Revised Empery Term Sheet, which removes key "Acceptable Plan" provisions from the original Empery Term Sheet.  *See* **Exhibit 2**, p. 10.  Additionally, Empery will be required to file a proof of claim in the case.  *Id.* at p. 23 (removing the provision that Empery will not be required to file a proof of claim).

14.    Simply put, under the Debtor's current circumstances, the Debtor, in the sound exercise of its business judgment, believes the DIP Financing under the Revised Empery Term Sheet is in the best interests of the Debtor, its creditors and its estate at this stage of the case.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court: (a) enter a second interim order approving the proposed financing as modified by this Amended Supplement, authorizing the Debtor to borrow under the terms of the DIP Financing as set forth above; (b) schedule the Final Hearing on the Motion; (c) following the Final Hearing, enter the Final Order authorizing Debtor to borrow under the terms of the DIP Financing on a final basis; (d) grant the Debtor such other and further relief as is necessary and appropriate.

/ / /

/ / /

/ / /

1

Dated: January 12, 2023.

2
Respectfully Submitted By,

3
SCHWARTZ LAW, PLLC

4
/s/ *Samuel A. Schwartz*

5
Samuel A. Schwartz, Esq.
Bryan A. Lindsey, Esq.

6
601 East Bridger Avenue
Las Vegas, NV 89101

7

8
*Proposed Attorneys for the Debtor*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent electronically via the Court's CM/ECF system on January 12, 2023 to the following:

OGONNA M. BROWN on behalf of Creditor Prestige Capital Finance, LLC
obrown@lewisroca.com; ogonna-brown-4984@ecf.pacerpro.com; dberhanu@lewisroca.com; ombcalendar@lewisroca.com; jhess@lewisroca.com; klopez@lewisroca.com; gmercado1@lewisroca.com; gmercado@lewisroca.com

CHAPTER 11 - LV
USTPRegion17.lv.ecf@usdoj.gov

BART K. LARSEN on behalf of Creditor White Winston Select Asset Funds, LLC
BLARSEN@SHEA.LAW; 3542839420@filings.docketbird.com

WILLIAM M. NOALL on behalf of Creditor EMPERY ASSET MANAGEMENT, LP
wnoall@gtg.legal; bknotices@gtg.legal

TRACY M. O'STEEN on behalf of Interested Party Ryan Drexler
tosteen@carlyoncica.com; crobertson@carlyoncica.com; nrodriguez@carlyoncica.com; ccarlyon@carlyoncica.com

ROBERT T. STEWART on behalf of Creditor NutraBlend Foods
rtstewart@foley.com; mgraham@foley.com

STRETTO
ecf@cases-cr.stretto-services.com; aw01@ecfcbis.com; pacerpleadings@stretto.com

U.S. TRUSTEE - LV - 11
USTPRegion17.lv.ecf@usdoj.gov

MARK M. WEISENMILLER on behalf of Interested Party EMPERY TAX EFFICIENT, LP
mweisenmiller@gtg.legal; bknotices@gtg.legal

MATTHEW C. ZIRZOW on behalf of Attorney JASON H. ROSELL
mzirzow@lzlawnv.com; carey@lzlawnv.com; trish@lzlawnv.com; jennifer@lzlawnv.com; zirzow.matthewc.r99681@notify.bestcase.com

MATTHEW C. ZIRZOW on behalf of Attorney JOHN D. FIERO
mzirzow@lzlawnv.com; carey@lzlawnv.com; trish@lzlawnv.com; jennifer@lzlawnv.com; zirzow.matthewc.r99681@notify.bestcase.com

MATTHEW C. ZIRZOW for OFFICIAL COMMITTEE OF UNSECURED CREDITORS
mzirzow@lzlawnv.com; carey@lzlawnv.com; trish@lzlawnv.com; jennifer@lzlawnv.com; zirzow.matthewc.r99681@notify.bestcase.com


/s/ *Brian J. Braud*
Brian J. Braud, an employee of
SCHWARTZ LAW, PLLC

# EXHIBIT 1

# EXHIBIT 1

CONFIDENTIAL GTG DRAFT FOR DISCUSSION PURPOSES ONLY
1/9/23 SUBJECT TO FRE 408
ALL RIGHTS RESERVED

## MUSCLEPHARM CORPORATION AND ITS AFFILIATES

## TERM SHEET FOR DEBTOR-IN-POSSESSION FINANCING AND AUTHORIZATION FOR USE OF CASH COLLATERAL

### As of January 9, 2023

Subject to the terms and conditions stated herein, this binding term sheet (the "DIP Term Sheet") sets forth the principal terms of: (i) a superpriority senior secured debtor-in-possession note facility with co-priority with the Prepetition Secured Parties (the "DIP Note Facility"; the agreement evidencing the DIP Note Facility, the "DIP Note Agreement" and, together with the other definitive documents governing the DIP Note Facility and the DIP Orders (as defined herein), the "DIP Note Documents," each of which shall be in form and substance acceptable to the DIP Consenting Secured Parties (as defined herein)) to be entered into with the Note Parties (as defined herein); (ii) a superpriority senior secured debtor-in-possession factoring facility with co-priority with the Prepetition Secured Parties (the "DIP Factoring Facility"; the agreement evidencing the DIP Factoring Facility, the "DIP Factoring Agreement," together with the other definitive documents governing the DIP Factoring Facility and DIP Orders, the "DIP Factoring Documents," and together with the DIP Note Documents, the "DIP Documents," each of which shall be in form and substance acceptable to the DIP Consenting Factoring Parties (as defined herein)) to be entered into with the Debtor (as defined herein); and (iii) the consensual use of the cash collateral (as defined in 11 U.S.C. § 363(a)) of the Prepetition Secured Parties (as defined below) ("Cash Collateral"). The use of Cash Collateral and the DIP Note Facility and DIP Factoring Facility (together, the "DIP Facilities") will be subject to the approval of the Bankruptcy Court (as defined herein) and consummated in the case under chapter 11 (the "Chapter 11 Case") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), in accordance with (a) the interim order (the "Interim DIP Order") and the final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders") of the Bankruptcy Court authorizing the Note Parties to use the Cash Collateral and to enter into the DIP Facilities, each of which shall be in form and substance acceptable to the DIP Consenting Secured Parties and DIP Consenting Factoring Parties (together, the "DIP Consenting Parties"), and (b) the DIP Documents to be executed by the Note Parties. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in (as applicable) (1)(x) Original Issue Discount Senior Secured Notes dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "October Notes") and Original Issue Discount Senior Secured Notes dated as of June 10, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "June Notes" and, together with the October Notes, the "Prepetition Notes"), in each case issued by MusclePharm Corporation, a Nevada corporation (the "Issuer" or the "Debtor"), which Prepetition Notes are described in further detail on Schedule 1 hereto including the Purchasers thereof (the "Prepetition Purchasers"), (2) the Securities Purchase Agreement, dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition SPA"), between the Issuer and each Prepetition Purchaser party thereto and (3) the Pledge and Security Agreement, dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Security Agreement" and, collectively with the Prepetition Notes and the Prepetition SPA, the

"Prepetition Transaction Documents"), among the Issuer, Canada MusclePharm Enterprises Corp., a British Columbia corporation ("MusclePharm Canada" and, together with the Issuer, the "Note Parties") and Empery Tax Efficient, LP ("Empery"), in its capacity as collateral agent (the "Prepetition Collateral Agent" and, together with the Prepetition Purchasers, the "Prepetition Secured Parties").

| Issuer/Debtor | MusclePharm Corporation, as debtor in possession in the Chapter 11 Case. |
|---|---|
| Guarantor(s) | MusclePharm Canada and any other subsidiaries of the Issuer (collectively, the "Guarantor(s)," and together with the Issuer, the "Note Parties"). |
| Collateral Agent | Empery Tax Efficient, LP ("Empery") or another entity selected by it shall be the sole collateral agent for the DIP Note Purchasers (as defined herein) and DIP Factoring Purchasers (as defined herein) (in such capacity, the "DIP Agent"). |
| DIP Note Purchasers | The "DIP Note Purchasers" will be Empery, [●] (collectively, the "Initial DIP Note Purchasers") and any other Prepetition Purchasers who choose to participate in the DIP Note Facility by notice in writing to the DIP Agent at least two days prior to entry of the Interim DIP Order or such other time as may be agreed by the DIP Agent (collectively, the "DIP Note Purchasers," and together with the DIP Agent, the "DIP Secured Parties"). "DIP Consenting Secured Parties" shall mean the DIP Agent and Empery, as a DIP Note Purchaser. The obligation of any DIP Note Purchaser to purchase any note issued under the DIP Note Facility may be fulfilled on behalf of such DIP Note Purchaser by any of such DIP Note Purchaser's affiliated or related funds or financing vehicles. The DIP Note Purchase Commitments (as defined below) will be offered for participation to each Prepetition Purchaser in each case based on such Prepetition Purchaser's pro rata share of the amounts outstanding under the Prepetition Notes. To the extent a portion of the DIP Note Purchase Commitments is not provided by a Prepetition Purchaser, such portion shall be allocated to, and added to the DIP Note Purchase Commitments of the Initial DIP Purchasers based on the Initial DIP Purchasers' ratable shares of the Prepetition Notes. |
| DIP Note Facility | The DIP Note Facility shall be a superpriority senior secured multiple issuance note facility with co-priority with the Prepetition Secured Parties in an aggregate principal amount not to exceed $2.5 million (the "DIP Note Purchase Commitments", and such loans, the |

| | |
|---|---|
| | "DIP Notes"), subject to the terms and conditions set forth in this DIP Term Sheet.

$2.5 million of principal due under the Prepetition Notes shall roll-up and convert on a cashless dollar-for-dollar basis into DIP Notes upon entry of the Final DIP Order (the "Roll-Up") to be approved in the Final DIP Order.

The issuance mechanics of the DIP Note Facility shall be on terms mutually agreed upon by the DIP Agent, on behalf of the DIP Note Purchasers, and the Debtor, and in accordance with the Budget (as defined herein). |
| **Availability** | Upon entry of Bankruptcy Court's oral approval of this Term Sheet, this binding Term Sheet shall govern the Initial Advance pending the effectiveness of the DIP Note Agreement (the date of such effectiveness, the "DIP Effective Date") and shall be subject to the satisfaction of the Conditions Precedent (as defined herein).

In addition, the obligation of the DIP Purchasers to purchase DIP Notes shall be subject to the following conditions:

- At the time of issuance and purchase of any DIP Note and after giving effect thereto, the representations and warranties of the Note Parties contained in the DIP Documents shall be true and correct in all material respects.

- At the time of issuance and purchase of any DIP Note and after giving effect thereto, no Default or Event of Default shall then exist or result therefrom.

- All issuances of DIP Notes shall be made subject to and in accordance with the Budget (as defined herein).

- Up to $750,000 (the "Interim DIP Issuance") to be made available in one or more issuances in accordance with the Budget (as defined below) and this binding Term Sheet (until it is superseded by the DIP Documents) and the DIP Documents from the Interim Closing Date until the Final Closing Date (as defined below).

- If any entity or individual other than the DIP Note Purchasers and DIP Factoring Purchasers are approved to be Debtor's DIP lender at the final hearing on the DIP Motion, then all obligations of the Note Parties under the DIP Facilities shall |

|  | be paid in full upon the closing of the new DIP Lender's financing. |
|  | • Up to an amount equal to the remaining approved unfunded DIP Note Purchase Commitments (the "Final DIP Issuance") to be made available in one or more issuances in accordance with the Budget and the DIP Documents on or after the Final Closing Date. |
|  | • Subject to entry of the Final DIP Order, the Roll-Up shall be approved. |
|  | • Immediately upon entry of the first interim order approving this Term Sheet by the Bankruptcy Court (the "First Interim Order"), the DIP Lender was authorized to advance $150,000 of the Interim DIP Issuance, which shall be used by the Debtor to pay for only those reasonable expenses associated with: (i) payroll; (ii) insurance; (iii) product labeling; and (iv) other reasonable and necessary operational expenses, and the balance of the Interim DIP Issuance shall be advanced with the entry of the Interim DIP Order.  Since the First Interim Order, the DIP Lender has advanced $123,861.31 of the Interim DIP Issuance to fund the specific requests of the Debtor. |
|  | Any amounts repaid under the DIP Note Facility may not be reissued or repurchased. |
| **DIP Factoring Purchasers** | The "DIP Factoring Purchasers" will be Empery, [●] (collectively, the "Initial DIP Factoring Purchasers") and any other Prepetition Purchasers who choose to participate in the DIP Factoring Facility by notice in writing to the DIP Agent at least two days prior to entry of the Interim DIP Order or such other time as may be agreed by the DIP Agent (together with the DIP Agent, the "DIP Factoring Parties").[1] |
|  | "DIP Consenting Factoring Parties" shall mean the DIP Agent and Empery, as a DIP Factoring Purchaser. |
|  | The obligation of any DIP Factoring Purchaser to participate under the DIP Factoring Facility may be fulfilled on behalf of such DIP Factoring Purchaser by any of such DIP Factoring Purchaser's affiliated or related funds or financing vehicles. The DIP Factoring Purchase Commitments (as defined below) will be offered for participation to each Prepetition Purchaser in each case based on such Prepetition Purchaser's pro rata share of the amounts |

---

[1] A third party may do the factoring under the DIP Factoring Facility.

| | |
|---|---|
| | outstanding under the Prepetition Notes. To the extent a portion of the DIP Factoring Purchase Commitments is not provided by a Prepetition Purchaser, such portion shall be allocated to, and added to the DIP Factoring Purchase Commitments of the Initial DIP Factoring Purchasers based on the Initial DIP Factoring Purchasers' ratable shares of the Prepetition Notes. |
| **DIP Factoring Facility** | Pursuant to the DIP Factoring Documents, Debtor will sell, transfer, convey, assign and deliver to DIP Factoring Purchasers, and DIP Factoring Purchasers agree to purchase and receive from Debtor, all of Debtor's right, title and interest in and to all eligible post-petition accounts ("Accounts") and, to the extent provided in the next succeeding paragraph, purchase orders ("Purchase Orders") arising from the sale of any product or goods or the rendering of services by Debtor in the ordinary course of the Debtor's business (each an "Advance") for up to $10 million (the "DIP Factoring Purchase Commitments", and such factoring, the "DIP Factoring"). <br><br> The DIP Factoring Purchasers will only purchase Purchase Orders from Debtor during the period of entry of the Interim DIP Order to entry of the Final DIP Order (the "Interim Period"). During the Interim Period, the DIP Factoring Purchasers will only factor Purchase Orders that: (i) have been approved in writing by Eric Hillman; and (ii) JW Nutritional, LLC has confirmed in writing can be manufactured in accordance with the terms of the purchase order. The DIP Factoring Purchasers will only factor up to $2 million of Purchase Orders during the Interim Period. <br><br> IT IS THE INTENTION OF THE PARTIES THAT AS TO ALL ACCOUNTS AND PURCHASE ORDERS (DURING THE INTERIM PERIOD) THAT DIP FACTORING PURCHASERS ELECT TO PURCHASE SHALL CONSTITUTE A TRUE PURCHASE AND SALE OF ACCOUNT(S) UNDER § 9-318 OF THE UNIFORM COMMERCIAL CODE AND AS SUCH, THE DEBTOR SHALL HAVE NO LEGAL OR EQUITABLE INTEREST IN THE ACCOUNTS AND PURCHASE ORDERS SOLD. |
| **Advances on Accounts and Purchase Orders** | The DIP Factoring Purchasers, in the sole discretion of the DIP Agent, may advance up to (i) one hundred percent (100%) of the first $1,000,000 of Accounts and Purchase Orders purchased during the Interim Period, and (ii) eighty percent (80%) of the face amount of the Accounts purchased in excess of $1,000,000, less the applicable discount fee, and Facility Fee (as defined below) (collectively the "***Aggregate Advances***"). The purchase price of any Account and Purchase Order (during the Interim Period) shall be the amount actually received in payment of such Account and Purchase Order, |

| | |
|---|---|
| | but for the purposes of any Advance or Purchase Order, the purchase price shall be equal to the face amount of the Account or Purchase Order less any selling, payment or other discounts offered. |
| **Reserve** | DIP Agent, in its sole discretion, may elect to maintain a reserve from each Advance ("Reserve") of an amount not to exceed 20% of the Aggregate Advances (the "Reserve Cap"). As a general rule, although not a requirement, it is intended that Reserves on paid invoices are released upon the request of the Debtor or when the DIP Agent's next purchase of Accounts or Purchase Orders from Debtor is funded. However, DIP Agent may increase or decrease the amount of such Reserve, up to the Reserve Cap, at any time and from time to time if it deems it necessary in order to protect its interest and to protect DIP Factoring Purchasers from losses or potential losses that DIP Factoring Purchasers may reasonably anticipate might arise in the future due to contingencies, disputes, potential breach of warranties or other potential non-payments, reductions or losses from the purchase of Accounts or Purchase Orders under the Advances. |
| **Recourse to Borrower of Certain Accounts** | In the event that (a) an Account or Purchase Order (during the Interim Period) purchased by DIP Factoring Purchasers is not paid in full by the account debtor, on or before the date when due in accordance with its terms, (b) an account debtor objects to the property sold or service performed by Debtor, or rejects or revokes acceptance or fails or refuses to accept or receive any such property or services, (c) an account debtor suspends business, requests a general extension of time within which to pay debts, makes an assignment for the benefit of creditors or becomes a debtor or alleged debtor in any bankruptcy case, or if an event occurs amounting to a general business failure of an account debtor, or (d) DIP Agent in its reasonable discretion determines that any Account or Purchase Order is or may become uncollectible (collectively, a "Worthless Account"), the DIP Agent may require the Debtor promptly to repurchase such Account or Purchase Order. |
| **Facility Fee** | Fifty basis points (0.50%) of each Account or Purchase Order purchased by DIP Factoring Purchasers, payable at the time of each such purchase. |
| **Closing Dates** | "Interim Closing Date" means the date on which the conditions precedent to the Interim DIP Issuance set forth in the DIP Documents (including entry of the Interim DIP Order) have been satisfied or waived.<br><br>"Final Closing Date" means the date on which the conditions precedent to the Final DIP Issuance set forth in DIP Documents |

| | |
|---|---|
| | (including entry of the Final DIP Order) have been satisfied or waived. |
| **Amortization** | The DIP Note Facility shall not have any principal amortization prior to the Maturity Date (as defined below). |
| **Maturity Date** | Earliest of (a) December 31, 2023, (b) the date all DIP Notes become due and payable under the DIP Documents, whether by acceleration after an Event of Default or otherwise, (c) the date of the closing of the Sale Transaction (as defined below) or any other sale(s) of all or substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, and (d) the filing of a chapter 11 plan that is not an Acceptable Plan (as defined below) (the "<u>Maturity Date</u>"). |
| **Interest Rates** | • <u>DIP Note Facility</u>: The prime interest rate as published in the Wall Street Journal plus two percent (2%) per annum.<br><br>• <u>Interest Rate on Aggregate Advances</u>: The prime interest rate as published in the Wall Street Journal plus two percent (2.0%) per annum.<br><br>• Default interest rate of an additional two percent (2.0%) per annum upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Documents), payable in cash on demand. |
| **Payments and Fees** | <u>Upfront Payment</u>: $0<br><br><u>DIP Agent Fee</u>: $0<br><br><u>Closing Fee:</u> $0 |
| **DIP Collateral** | All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Note Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of the Note Parties, including, for the avoidance of doubt, any equity or other interests in the Note Parties' non-Debtor and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the Final DIP Order, including the proceeds thereof (collectively, the "<u>DIP Collateral</u>"). |

7

| Priority of DIP Obligations | All obligations of the Issuer under the DIP Facilities and all amounts owing by the Guarantor(s) in respect thereof at all times shall be, effective as of December 15, 2022 ("Petition Date"), secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected co-priority senior liens on and security interests in the DIP Collateral (collectively, the DIP Liens"), subject to the priorities described in Schedule 2 hereto.<br><br>All of the DIP Liens shall be created on terms, and pursuant to documentation, satisfactory to the DIP Agent, in its sole discretion. |
|---|---|
| DIP Superpriority Claim | All obligations of the Debtor under the DIP Facilities and all amounts owing by the Guarantor(s) in respect thereof at all times shall constitute allowed superpriority administrative expense claims, pursuant to section 364(c)(1) of the Bankruptcy Code, in the Chapter 11 Case (the "DIP Superpriority Claims"), having priority over all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provisions of the Bankruptcy Code, subject to the priorities described in Schedule 2 hereto. |
| Documentation | The DIP Documents shall be prepared initially by counsel for the DIP Agent, and shall substantially reflect the terms and provisions of this DIP Term Sheet in all material respects and shall be acceptable to the DIP Agent. |
| Conditions Precedent | Notwithstanding the binding nature of this Term Sheet, the effectiveness of the DIP Facilities on the DIP Effective Date, the obligations of the DIP Note Purchasers to purchase the DIP Notes, and the obligations of the DIP Factoring Purchasers to purchase Accounts or Purchase Orders (during the Interim Period) shall be subject to customary closing conditions, including, without limitation, the satisfaction of the following conditions precedent (the "Conditions Precedent") (unless waived in writing by the applicable DIP Consenting Parties):<br><br>• All DIP Documents shall have been executed by the Note Parties and the other parties thereto.<br><br>• The DIP Secured Parties and DIP Factoring Parties shall have received, and the DIP Consenting Parties shall be satisfied with, the initial Budget (as defined herein).<br><br>• Upon the entry of the Interim DIP Order, the DIP Agent shall, for the benefit of the DIP Secured Parties and DIP Factoring Parties, have valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on the DIP |

| | |
|---|---|
| | Collateral to the extent set forth in the Interim DIP Order, subject to the priorities described in Schedule 2 hereto, and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid. |
| | • The form and substance of the "first day" orders permitting the payment by the Issuer and its subsidiaries of any prepetition amounts then (or thereafter becoming) due and owing shall be acceptable to the DIP Agent. |
| | • The Interim DIP Order and the Final DIP Order (as applicable) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any manner adverse to the DIP Note Purchasers or DIP Factoring Purchasers without the consent of the DIP Agent, or to the extent adversely and disproportionately affecting any particular DIP Note Purchaser or DIP Factoring Purchaser, such adversely affected DIP Note Purchaser or DIP Factoring Purchaser. |
| | • The satisfaction of other customary terms and conditions (including, without limitation, delivery of secretary and officer certificates, notice of borrowing, evidence of insurance, and legal opinions) and such other customary conditions as shall be required by the DIP Agent. |
| **Milestones** | Subject to the entry of the Final DIP Order, the Note Parties shall comply with the following deadlines (each, individually, a "Milestone" and, collectively, the "Milestones"), which may be extended or waived by the DIP Agent in its sole discretion: |
| | • The Note Parties filed a motion for approval of a DIP loan on January 3, 2022, and subject the dates set by the Court, the Note Parties shall file a supplemental motion, in form and substance acceptable to the DIP Consenting Parties, seeking final approval of the DIP Facilities (the "DIP Motion"). |
| | • The Bankruptcy Court shall enter the Interim DIP Order, which order shall be in form and substance acceptable to the DIP Consenting Parties, approving the DIP Facilities on an interim basis no later than three (3) business days following the hearing on the DIP Motion. |
| | • The Bankruptcy Court shall enter the Final DIP Order, which order shall be in form and substance acceptable to the DIP Consenting Parties, approving the DIP Facilities (including |

|  | the Roll-Up on a final basis) no later than 24 days following the filing of the DIP Motion. |
|  | • The Debtor shall file an Acceptable Plan by September 30, 2023. |
|  | • An "Acceptable Plan" is a plan of reorganization or liquidation reasonably acceptable to the DIP Agent, which shall include the following:<br><br>o Repayment in full in cash of the obligations under the DIP Note Facility, including Roll-Up;<br><br>o Be acceptable to the DIP Agent, in its reasonable discretion, with respect to the treatment of the Prepetition Secured Parties, DIP Note Purchasers, and DIP Factoring Purchasers. |
|  | • In the event an Acceptable Plan has not been filed by Debtor by September 30, 2023, Debtor shall commence a Section 363 sale process (the "<u>Sale Transaction</u>") within 14-days of notice by the DIP Agent that the plan filed is not acceptable. In the event that no plan is filed by September 30, 2023, Debtor shall commence a Sale Transaction on October 20, 2023. The procedure and timing of the Sale Transaction shall be satisfactory to the DIP Agent, in its sole discretion. |
|  | • The Bankruptcy Court shall approve an Acceptable Plan by December 15, 2023. |
|  | To the extent any covenant or obligations under the DIP Documents (including any Milestones) are required to be performed on a day that is not a business day, the deadline for such covenant or obligations shall be automatically extended to the next business day. |
| **Voluntary Prepayment** | Prior to the Maturity Date, the Issuer may, upon at least three business days' notice, prepay in full or in part, the DIP Notes.<br><br>The Issuer shall not be permitted to repurchase DIP Notes or repay or prepay DIP Notes other than on a pro rata basis. |
| **Mandatory Prepayment** | Prior to the Maturity Date, the following mandatory prepayments shall be required:<br><br>1. <u>Asset Sales</u>: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of the sale or other disposition of any property or assets of the Note Parties or any of their respective |

| | |
|---|---|
| | subsidiaries, except for ordinary course and de minimis sales and additional exceptions to be agreed on in the DIP Documents;<br><br>2.  Insurance Proceeds: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the Note Parties or any of their respective subsidiaries subject to exceptions to be agreed on in the DIP Documents; and<br><br>3.  Incurrence of Indebtedness: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of any indebtedness incurred by the Note Parties or any of their respective subsidiaries after the DIP Effective Date (other than indebtedness otherwise permitted under the DIP Documents), payable no later than the date of receipt. |
| **Financial Covenants** | All lending beyond the advances set forth in the Interim Advance and this Term Sheet shall be subject to final approval of the DIP Facilities, the Budget and entry of the Final DIP Order.<br><br>Following the one-week anniversary of the Interim DIP Order until the repayment in full in cash of the obligations under the DIP Facilities, the Note Parties shall perform in accordance with the Budget, subject to the following with respect to any Review Period: (i) the Note Parties' actual cash receipts shall not be less than 90% of the projected amounts therefor set forth in the Budget on a cumulative basis; and (ii) the Note Parties' actual cash disbursements shall not be greater than 110% of the projected amounts therefor set forth in the Budget on a cumulative basis(such variance, the "Permitted Variances").<br><br>During any Review Period occurring prior to March 15, 2023, the DIP Note Purchasers and DIP Factoring Purchasers waive all defaults of the Note Parties for failing to comply with the Budget, including the Permitted Variances, solely with respect to (i) top line gross revenue and cash receipts and (ii) all cost of goods sold, including shipping.<br><br>Debtor shall file with the Bankruptcy Court a final Budget agreed to by the DIP Agent on or before March 15, 2023.<br><br>Compliance with the Budget shall be reviewed on Monday of every other week on a bi-weekly basis, with such reviews to be conducted on the Monday following each of the second and fourth weeks of the Budget (each, a "Weekly Review Period") and thereafter on a rolling 4-week basis (the "Cumulative Review Period" and together with the Weekly Testing Period, the "Review Periods").  Beginning on the |

| | |
|---|---|
| | second Monday following the DIP Effective Date and every other Monday thereafter, the Note Parties shall deliver to the DIP Agent the Variance Report (as defined herein), which Variance Report shall include variance for the line items consistent with the latest Approved Budget (as defined in the DIP Documents) and be in form and substance acceptable to the DIP Consenting Parties. |
| | "Budget" means the initial cash flow forecast for the 13-week period commencing with the week in which the Petition Date occurs, setting forth on a line-item basis the Note Parties' projected cash receipts and cash disbursements, on a weekly basis, which budget shall be prepared by the Note Parties and in form and substance acceptable to the DIP Consenting Parties, and which budget shall be updated on the one-week anniversary of the Initial DIP Order and every four weeks on Wednesday (commencing with the Wednesday of the fourth full week commencing after the one-week anniversary of the Initial DIP Order (or if such day is not a business day, the next business day) in substantially the same form as the initial budget delivered and in substance acceptable to the DIP Consenting Parties. The Budget shall include separate line items for each Professional Person (defined below). To the extent that any updated Budget is not acceptable to the DIP Consenting Parties, the then-existing approved budget will remain the "Budget" until replaced by an updated budget that is acceptable to the DIP Consenting Parties. |
| **Reporting** | The Issuer shall deliver to the DIP Agent (and the DIP Agent shall deliver to each DIP Note Purchaser and DIP Factoring Purchaser): |
| | (a) a weekly line-by-line variance report (the "Variance Report"), which Variance Report shall compare actual cash receipts and disbursements of the Note Parties with corresponding amounts provided for in the Budget on a line-by-line basis for the prior week and the applicable Review Period (or such shorter period as may have elapsed from the Petition Date), including written descriptions in reasonable detail explaining any material positive or negative variances, and otherwise in form and substance reasonably acceptable to the DIP Consenting Parties; |
| | (b) all other reports and notices required to be delivered under the DIP Documents as mutually agreed upon by the Debtor and the DIP Agent; and |
| | (c) copies of non-privileged reports of the financial and restructuring advisors of the Note Parties as reasonably requested by the DIP Agent, including but not limited to: |

| | |
|---|---|
| | i. Any analysis of cash flows, forecasts, and potential cost savings initiatives;<br><br>ii. Transaction marketing material (CIMs / MPs);<br><br>iii. Investor outreach list;<br><br>iv. Sale process updates in accordance with the terms of this DIP Term Sheet; and<br><br>v. Proposed sources and uses at emergence.<br><br>In addition, management of the Issuer shall, at the request of the DIP Agent, conduct a bi-weekly conference call with the DIP Consenting Parties during normal business hours at a time to be mutually agreed upon to discuss the Issuer's performance. |
| **Board of Directors** | As set forth below, the DIP Consenting Parties shall approve an independent director ("Independent Director"), nominated by the Interim Board of Directors (defined below), with sole and exclusive responsibility for the following:<br><br>• Protect and recover the assets of the Debtor, including determine whether it is in the best interest of the Debtor to reorganize under Section 1129 of the Bankruptcy Code, or sell its assets in accordance with Section 363 of the Bankruptcy Code;<br>• Review and approve the ultimate debtor-in-possession financing incurred by the bankruptcy estate, as negotiated by the Debtor's restructuring professionals;<br>• Except as otherwise provided herein, investigate and determine which estate causes of action, if any, should be pursued, prosecuted, or settled; and<br>• Maximize value for all stakeholders.<br><br>Except as set forth below, all current members of the board of directors will resign immediately upon entry of the First Interim Order.<br><br>Upon entry of the First Interim Order, the board of directors will be reconstituted with the following members ("Interim Board of Directors"):<br><br>1. Paul Karr; and<br>2. Eric Hillman. |

| | |
|---|---|
| | Upon entry of the Interim DIP Order, the board of directors will be reconstituted with the following members (the following, the "<u>Board of Directors</u>"): <br><br> 1. Eric Hillman; <br> 2. Paul Karr; and <br> 3. The Independent Director. <br><br> The Debtor shall nominate an Independent Director on or before January 17, 2023. |
| **Other Covenants** | By no later than five (5) days following the entry of the Interim DIP Order, Debtor shall engage a Chief Restructuring Officer (the "<u>CRO</u>") reasonably satisfactory to the DIP Consenting Parties pursuant to an engagement letter with a scope and compensation reasonably satisfactory to the DIP Consenting Parties and otherwise be in form and substance satisfactory to the DIP Consenting Parties. All fees and expenses of (and otherwise relating to) the CRO shall be the sole responsibility of the Debtor.  The CRO shall not be removed without order of the Bankruptcy Court.  Furthermore, the CRO's fees and costs shall not exceed $50,000 per month, except as otherwise approved by the Board of Directors. <br><br> Ryan Drexler shall resign from all offices of Debtor and from the board of directors of Debtor immediately upon entry of the First Interim Order.  Eric Hillman shall be appointed as the CEO of Debtor immediately upon entry of the First Interim Order. <br><br> The DIP Documents shall contain such other negative and affirmative covenants that are ordinary and customary in debtor-in-possession financings and reasonably acceptable to the DIP Consenting Parties, including, without limitation, compliance with the Budget in accordance with the DIP Documents. Such covenants shall prohibit, inter alia, Issuer from making dividends or other distributions of cash to the direct or indirect equity holders of Issuer, including any distributions of cash in order to pay management fees or pay taxes attributable to the income of Issuer or any of its subsidiaries. <br><br> At the request of the DIP Agent, the Note Parties shall (i) arrange and cause to be held bi-weekly conference calls between representatives of the Note Parties, the CRO and the DIP Consenting Parties (which (a) may, to the extent practicable, be the same weekly conference described above, and (b) shall occur during normal business hours at a time to be mutually agreed) for purposes of providing information regarding the status of the Chapter 11 Case, Debtor's  business  operations,  the  preparation,  filing,  and |

| | |
|---|---|
| | confirmation of an Acceptable Plan, and the Sale Transaction process that, while a stalking horse bidder remains part of the sale process, would not be deemed to provide preferential treatment to such bidder; provided that, for the avoidance of doubt, information regarding the number and identity of the parties contacted and the overview of the marketing efforts undertaken in connection with the Sale Transaction shall not be deemed to provide preferential treatment and shall be disclosed; (ii) at all times provide the DIP Consenting Parties and their professional advisors with access to any data room established for purposes of allowing potential purchasers to evaluate a Sale Transaction; and (iii) provide the DIP Consenting Parties and their professional advisors with all materials and other communications regarding the Sale Transaction process provided and available to all bidders at the time of distribution to any or all bidders. If at any time the stalking horse bidder is not part of the sale process, then the Issuer shall arrange and cause to be held weekly conference calls between representatives of the Note Parties, the CRO and the DIP Consenting Parties (which (a) may, to the extent practicable, be the same weekly conference described above, and (b) shall occur during normal business hours at a time to be mutually agreed), for purposes of providing full and complete information regarding the Sale Transaction process to the DIP Agent. |
| **Representations & Warranties** | The DIP Documents shall contain such representations and warranties as are usual and customary in debtor-in-possession financing and as are reasonably acceptable to the DIP Consenting Parties. |
| **Use of Proceeds** | The proceeds of the DIP Facilities shall be used solely for the following purposes, subject in all cases to the Budget: <br><br> (a) pay fees, interest, payments, and expenses associated with the DIP Facilities; <br><br> (b) provide for the ongoing working capital and capital expenditure needs of the Note Parties during the pendency of the Chapter 11 Case; <br><br> (c) fund the Carve-Out; <br><br> (d) fund the Forensic Accountant (if retained); and <br><br> (e) fund the costs of the administration of the Chapter 11 Case and the consummation of the restructuring. <br><br> No Cash Collateral or proceeds of the DIP Facilities shall be used by the Debtor to investigate, challenge, object to or contest the validity, |

| | |
|---|---|
| | security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the DIP Facilities or the Prepetition Transaction Documents. |
| **Forensic Accounting** | At the request of the DIP Agent and approval of the Board of Directors, the CRO shall retain a forensic accountant reasonably acceptable to the DIP Consenting Parties (the "<u>Forensic Accountant</u>") to review and analyze all Debtor's bank statements for three (3) or more years prior to the Petition Date and any other documents and information necessary to investigate payments and transfers from Debtor to determine whether they are avoidable under federal and state law. The DIP Agent will increase the DIP Facility in the amount necessary to pay for the forensic accounting in an amount agreed to be the DIP Agent and the CRO. |
| **DIP Disbursement Account** | The Issuer and the Guarantor(s) shall deposit the proceeds of the DIP Note Facility and any Advances in Bankruptcy Court approved debtor-in-possession account that is subject to the control of the DIP Agent pursuant to a deposit account control agreement (the "<u>DIP Disbursement Account</u>"), and that is not subject to the control of any other Person. Proceeds of the DIP Facilities and any other deposits to be provided under the DIP Documents shall be deposited, held and disbursed through the DIP Disbursement Account or otherwise in accordance with the cash management order. For the avoidance of doubt, the factoring commitment will be made but only funded upon receipt of orders, which funding will not be unreasonably withheld or delayed. |
| **Events of Default/Remedies** | Events of Default shall include, without limitation:<br><br>• failure to pay principal or interest on the DIP Notes or any fees under the DIP Facilities when due;<br><br>• failure of any representation or warranty of any Note Party contained in any DIP Document to be true and correct in all material respects when made;<br><br>• breach of any covenant, subject to a five (5) business day grace period (from the earlier of the date that (i) any Note Party obtains knowledge of such breach and (ii) any Note Party receives written notice of such default from any DIP Consenting Party), <u>provided</u> that the breach of any covenant described herein, or any other covenant so indicated by the DIP Agent, shall not be subject to any grace period; |

16

- failure to comply with the Budget, subject to the Permitted Variances;

- the DIP Agent shall cease to have continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected co-priority senior liens on and security interests in the DIP Collateral with the priorities described in <u>Schedule 2</u> hereto (other than upon a release by reason of a transaction that is permitted under the DIP Documents);

- any Note Party or equityholder or Affiliate thereof (i) contesting the validity or enforceability of any DIP Document in writing or denying in writing that it has any further liability thereunder or (ii) contesting the validity or perfection of the liens and security interests securing the Facilities;

- any attempt by any Note Party or any equityholder or Affiliate thereof to invalidate or otherwise impair the DIP Facilities or the liens granted to the DIP Note Purchasers or DIP Factoring Purchasers;

- failure by any Debtor to comply with the Interim DIP Order or Final DIP Order, as applicable;

- the entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim DIP Order or Final DIP Order or any other order of the Bankruptcy Court approving the Debtor's use of Cash Collateral, as applicable, without the express written consent of the DIP Consenting Parties;

- any sale or disposition, other than the Sale Transaction, of all or a material portion of the DIP Collateral securing the DIP Facilities pursuant to section 363 of the Bankruptcy Code other than as permitted by the DIP Orders (or pursuant to a transaction that is permitted under the DIP Documents);

- conversion of, or the filing of any motion by any Note Party or any equityholder or Affiliate thereof to convert, any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

- dismissal of, or the filing of any motion by any Note Party or equityholder or Affiliate thereof to dismiss, any of the Chapter 11 Case;

|  | • the appointment of a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of any Note Party (powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) under sections 1104(d) and 1106(b) of the Bankruptcy Code;<br><br>• failure to meet any Milestone;<br><br>• the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to a holder or holders of any security interest or lien on any part of the DIP Collateral securing the DIP Facilities to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral having a fair market value in excess of an amount to be agreed by the DIP Consenting Parties;<br><br>• the grant of any superpriority claim that is pari passu with or senior to those of the DIP Note Purchasers or DIP Factoring Purchasers (other than the Carve-Out);<br><br>• termination by the Bankruptcy Court of the use of Cash Collateral;<br><br>• the filing of a plan of reorganization or liquidation by the Debtor that is not an Acceptable Plan;<br><br>• expiration of the period of time during which only the Issuer may file a plan pursuant to section 1121 of the Bankruptcy Code; and<br><br>• the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any of the DIP Collateral.<br><br>Among other remedies to be specified, upon the occurrence of an Event of Default, the DIP Agent may and, at the direction of the DIP Consenting Parties, shall seek relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, and apply the proceeds thereof to the obligations arising under the DIP Documents or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law. |
|---|---|
| **Cash Collateral Usage** | The Prepetition Secured Parties consent to the use of Cash Collateral, subject to the Budget (subject to Permitted Variances) and the terms of this term sheet and the DIP Orders. |

| | |
|---|---|
| **Carve Out** | Carve-out provisions to be customary and appropriate in the context of the proposed DIP Facilities, and as otherwise acceptable to the DIP Agent, including a carve-out of all reasonable and documented fees and expenses up to $250,000 incurred by professionals employed by Debtor, and a carve-out of all reasonable and documented fees and expenses of up to $250,000 for any committee of unsecured creditors and a post-carve-out trigger notice cap of $25,000 for Debtor's professionals and $25,000 for any committee of unsecured creditors.  Nothing in this section is intended or to be construed as limiting the fees and costs of the Issuer's professionals, as approved by the Bankruptcy Court in accordance with the Bankruptcy Code. |
| **Expenses and Indemnification** | The Note Parties shall pay, in connection with the Chapter 11 Case and the negotiation and documentation of the DIP Facilities and restructuring matters with respect to the Note Parties, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agent and reasonable and documented legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agent.  In addition, the Note Parties shall pay, in connection with workout proceedings and enforcement costs associated with the DIP Facilities, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agent and reasonable and documented legal fees and out-of-pocket expenses legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agent.  Such fees and expenses shall be added to DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent claim(s). <br><br> The Issuer and the Guarantor(s) will indemnify the DIP Agent, DIP Note Purchasers, and DIP Factoring Purchasers  and their respective affiliates, and their respective related parties, and hold them harmless from and against all out-of-pocket costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any notes issued under the DIP Facilities; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of |

| | |
|---|---|
| | competent jurisdiction to have been incurred solely by reason of the gross negligence or willful misconduct of such person. |
| **Adequate Protection** | (i)      the Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall receive, to the extent of any aggregate diminution in the value of their collateral: (a) valid, binding, enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "<u>Prepetition Notes Adequate Protection Liens</u>"), subject to the priorities described in <u>Schedule 2</u> hereto; and (b) allowed superpriority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "<u>Prepetition Notes Adequate Protection Claims</u>"), subject to the priorities described in <u>Schedule 2</u> hereto;

(ii)      Prestige Capital Finance, LLC ("<u>Prestige</u>") shall receive, to the extent of any aggregate diminution in the value of its collateral: (a) valid, binding, enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "<u>Prestige Adequate Protection Liens</u>"), subject to the priorities described in <u>Schedule 2</u> hereto; and (b) allowed superpriority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "<u>Prestige Adequate Protection Claims</u>"), subject to the priorities described in <u>Schedule 2</u> hereto;

(iii)      the Prepetition Collateral Agent shall be entitled to reimbursement of its reasonable and documented fees and out- of- pocket expenses;

(iv)      the Prepetition Collateral Agent shall be entitled to reimbursement of its respective reasonable and documented fees and out-of-pocket expenses of one primary counsel and one local counsel (if applicable), and one financial advisor;

(v)      the Prepetition Collateral Agent, on behalf of itself and the Prepetition Secured Parties, shall be entitled to performance of the Milestones set forth herein;

(vi)      Subject to Challenge Period set forth below, the Debtor agrees that in any sale of the DIP Collateral, the Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall have the right to credit bid an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, plus the obligations under the DIP Facilities, |

|  | or such greater amount as allowed by the Court, in accordance with section 363(k) of the Bankruptcy Code, and that any motion filed by the Debtor seeking approval of bid procedures shall contain a request for approval of the right of the Prepetition Collateral Agent to credit bid the obligations of the Prepetition Purchasers;<br><br>(vii)   the Debtor shall provide the information required by the section entitled "Reporting" set forth herein;<br><br>(viii)   the Final DIP Order shall include the waivers described in the section entitled "Waivers" set forth herein; and<br><br>(ix)   interest at the default rate specified in the Prepetition Notes shall continue to accrue under the terms of the Prepetition Notes. |
|---|---|
| **Committee Review** | The Office Committee of Unsecured Creditors ("Committee") shall have a period of sixty-days (60) from entry of the Interim Order to investigate and challenge and otherwise object to the allowance of the Allowed Claim (the "Challenge Period") |
| **Stipulations** | The DIP Orders shall contain stipulations as to, among other things, the amount and priority of the secured indebtedness under the Prepetition Notes. |
| **Waivers** | The DIP Orders shall provide for (i) a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code, (ii) a waiver of the ability to surcharge the DIP Collateral, and subject to entry of the Final DIP Order, the collateral securing the Prepetition Notes, including under section 506(c) of the Bankruptcy Code, and (iii) a waiver of the equitable doctrine of "marshaling" with respect to the DIP Collateral, and subject to entry of the Final DIP Order, the collateral securing the Prepetition Notes. |
| **Releases** | Pursuant to the DIP Orders, the Issuer and Guarantor(s) shall release all claims against the DIP Agent in its capacity as such, the DIP Note Purchasers in their capacities as such, the DIP Factoring Purchasers in their capacities as such, the Prepetition Collateral Agent in its capacity as such and the Prepetition Purchasers in their capacities as such. |
| **Allowed Claim** | Subject to Challenge Period, the Prepetition Secured Parties shall have an allowed claim of an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, plus the obligations under the DIP Facilities and attorneys' fees and expenses. |

| | |
|---|---|
| **Credit Bid** | Debtor shall consent to (i) the DIP Agent submitting a credit bid of the obligations under the DIP Facilities, and (ii) subject to Challenge Period, the Prepetition Collateral Agent submitting a credit bid of an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, or such greater amount as allowed by the Court (together, the "<u>Credit Bid Obligations</u>"), in connection with the sale of any asset of the Note Parties (in whole or in part), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code and any motion filed by the Debtor seeking approval of bid procedures shall contain a request for approval of the right of the DIP Agent and Prepetition Collateral Agent, as applicable, to credit bid the Credit Bid Obligations and Debtor shall not object to such a provision. |
| **Governing Law** | The DIP Documents shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to the conflict of law principles thereof. Each party to the DIP Documents will waive the rights to trial by jury and will consent to jurisdiction of the Bankruptcy Court for so long as the Chapter 11 Case remain open and, thereafter, the state and federal courts located in the County of New York in the State of New York. |
| **Amendments** | All amendments, modifications and waivers of the DIP Documents shall require the consent of the Issuer and the DIP Consenting Parties, except in the case of amendments, modifications, or waivers customarily requiring consent from all DIP Note Purchasers and DIP Factoring Purchasers, all affected DIP Note Purchasers, DIP Factoring Purchasers, or the DIP Agent. |
| **Assignments and Participations** | Each DIP Note Purchaser and DIP Factoring Purchaser may assign all or any part of the DIP Notes or Accounts to one or more affiliate, bank, financial institution, or other entity. Upon such assignment, such affiliate, bank, financial institution, or entity will become a DIP Note Purchaser or DIP Factoring Purchaser, as applicable, for all purposes under the DIP Documents. The DIP Note Purchasers and DIP Factoring Purchasers will also have the right to sell participations, subject to customary limitations on voting rights, in the DIP Notes or Accounts. Notwithstanding the foregoing, no assignment shall be made or participation sold to the Issuer, any subsidiary of the Issuer or an affiliate of any of the foregoing. |
| **Counsel to Empery as DIP Agent, DIP Note** | Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP |

| Purchaser, and DIP Factoring Purchaser | |
|---|---|
| | |

## SCHEDULE 1[2]

| Prepetition Purchaser | Aggregate Principal Amount, including OID, of October Notes (USD) | Aggregate Principal Amount, including OID, of June Notes (USD) |
|---|---|---|
| Altium Growth Fund, LP | 1,384,300.00 | 156,250.00 |
| Anson Investments Master Fund LP | 1,038,225.00 | 312,500.00 |
| Bigger Capital Fund, LP | 692,150.00 | 312,500.00 |
| CVI Investments, Inc. | 692,150.00 | 0.00 |
| District 2 Capital Fund LP | 1,038,225.00 | 312,500.00 |
| Empery Debt Opportunities Fund, LP | 1,245,870.00 | 281,250.00 |
| Empery Master Onshore, LLC | 924,712.40 | 208,750.00 |
| Empery Tax Efficient, LP | 276,860.00 | 62,500.00 |
| Empery Tax Efficient III, LP | 321,157.60 | 72,500.00 |
| HB Fund LLC | 692,150.00 | 156,250.00 |
| Intracostal Capital LLC | 69,214.99 | 0.00 |
| Ionic Ventures | 692,150.00 | 312,500.00 |
| L1 Capital Global Opportunities Master Fund | 692,150.00 | 0.00 |
| Roth Capital Partners, LLC | 0.00 | 269,375.00 |
| Walleye Opportunities Master Fund Ltd. | 0.00 | 625,000.00 |
| **TOTAL** | 9,759,315.00 | 3,081,875.00 |

---

[2] Schedule 1 to be reviewed and updated, as needed.

DOC ID - 39689513.6

## SCHEDULE 2

| Order of Priority | DIP Collateral Consisting of Pre-Petition Factoring Priority Collateral[3] | DIP Collateral Consisting of Post-Petition Factoring Priority Collateral | DIP Collateral Not Consisting of Factoring Priority Collateral | Third-Party Encumbered Assets[4] | Unencumbered Assets | Superpriority Claims |
|---|---|---|---|---|---|---|
| 1st | Carve-Out and Permitted Liens[5] | Carve-Out and Permitted Liens | Carve-Out and Permitted Liens | Third-Party Existing Liens | Carve-Out | Carve-Out and Permitted Liens |
| 2nd | Prestige Liens[6] | DIP Liens | DIP Liens | Carve-Out | DIP Liens | DIP Superpriority Claim |
| 3rd | DIP Liens | Prestige Adequate Protection Liens | Prepetition Notes Adequate Protection Liens | DIP Liens | Prepetition Notes Adequate Protection Liens and Prestige Adequate Protection Liens | Prepetition Notes Adequate Protection Claim and Prestige Adequate Protection Claim |
| 4th | Prepetition Notes Adequate Protection Liens | Prepetition Notes Adequate Protection Liens | Prepetition Notes Liens | Prepetition Notes Adequate Protection Liens and Prestige Adequate Protection Liens | | |
| 5th | Prepetition Notes Liens | Prepetition Notes Liens | Prestige Adequate Protection Liens | | | |
| 6th | | | Prestige Liens | | | |

---

[3]   As defined in the Intercreditor Agreement, dated as of October 13, 2021 (the "Prestige Intercreditor Agreement"), among Prestige, Empery, as Notes Representative on behalf of the Prepetition Noteholders and Prepetition Collateral Agent, and the Note Parties.

[4]   "Third-Party Encumbered Assets" shall mean DIP Collateral that was, as of the Petition Date, subject to valid, properly perfected and non-avoidable liens or security interests (collectively, the "Third-Party Existing Liens") other than the liens and security interests granted pursuant to the Prepetition Security Agreement (the "Prepetition Notes Liens") and the Prestige Liens (as defined below).

[5]   "Permitted Liens" shall mean any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Notes Liens and Prestige Liens.

[6]   "Prestige Liens" shall mean any valid, properly perfected and non-avoidable liens on or security interests in the Factoring Collateral created by the Factoring Security Documents (each as defined in the Prestige Intercreditor Agreement).

# EXHIBIT 2

# EXHIBIT 2

**CONFIDENTIAL GTG DRAFT FOR DISCUSSION PURPOSES ONLY**
**1/~~5~~9/23 SUBJECT TO FRE 408**
**ALL RIGHTS RESERVED**

### MUSCLEPHARM CORPORATION AND ITS AFFILIATES

### TERM SHEET FOR DEBTOR-IN-POSSESSION FINANCING
### AND AUTHORIZATION FOR USE OF CASH COLLATERAL

### As of January ~~5, 2022~~9, 2023

Subject to the terms and conditions stated herein, this binding term sheet (the "DIP Term Sheet") sets forth the principal terms of: (i) a superpriority senior secured debtor-in-possession note facility with co-priority with the Prepetition Secured Parties (the "DIP Note Facility"; the agreement evidencing the DIP Note Facility, the "DIP Note Agreement" and, together with the other definitive documents governing the DIP Note Facility and the DIP Orders (as defined herein), the "DIP Note Documents," each of which shall be in form and substance acceptable to the DIP Consenting Secured Parties (as defined herein)) to be entered into with the Note Parties (as defined herein); (ii) a superpriority senior secured debtor-in-possession factoring facility with co-priority with the Prepetition Secured Parties (the "DIP Factoring Facility"; the agreement evidencing the DIP Factoring Facility, the "DIP Factoring Agreement," together with the other definitive documents governing the DIP Factoring Facility and DIP Orders, the "DIP Factoring Documents," and together with the DIP Note Documents, the "DIP Documents," each of which shall be in form and substance acceptable to the DIP Consenting Factoring Parties (as defined herein)) to be entered into with the Debtor (as defined herein); and (iii) the consensual use of the cash collateral (as defined in 11 U.S.C. § 363(a)) of the Prepetition Secured Parties (as defined below) ("Cash Collateral"). The use of Cash Collateral and the DIP Note Facility and DIP Factoring Facility (together, the "DIP Facilities") will be subject to the approval of the Bankruptcy Court (as defined herein) and consummated in the case under chapter 11 (the "Chapter 11 Case") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), in accordance with (a) the interim order (the "Interim DIP Order") and the final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders") of the Bankruptcy Court authorizing the Note Parties to use the Cash Collateral and to enter into the DIP Facilities, each of which shall be in form and substance acceptable to the DIP Consenting Secured Parties and DIP Consenting Factoring Parties (together, the "DIP Consenting Parties"), and (b) the DIP Documents to be executed by the Note Parties. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in (as applicable) (1)(x) Original Issue Discount Senior Secured Notes dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "October Notes") and Original Issue Discount Senior Secured Notes dated as of June 10, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "June Notes" and, together with the October Notes, the "Prepetition Notes"), in each case issued by MusclePharm Corporation, a Nevada corporation (the "Issuer" or the "Debtor"), which Prepetition Notes are described in further detail on Schedule 1 hereto including the Purchasers thereof (the "Prepetition Purchasers"), (2) the Securities Purchase Agreement, dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition SPA"), between the Issuer and each Prepetition Purchaser party thereto and (3) the Pledge and Security Agreement, dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Security Agreement" and, collectively with the Prepetition Notes and the Prepetition SPA, the

"Prepetition Transaction Documents"), among the Issuer, Canada MusclePharm Enterprises Corp., a British Columbia corporation ("MusclePharm Canada" and, together with the Issuer, the "Note Parties") and Empery Tax Efficient, LP ("Empery"), in its capacity as collateral agent (the "Prepetition Collateral Agent" and, together with the Prepetition Purchasers, the "Prepetition Secured Parties").

| Issuer/Debtor | MusclePharm Corporation, as debtor in possession in the Chapter 11 Case. |
|---|---|
| Guarantor(s) | MusclePharm Canada and any other subsidiaries of the Issuer (collectively, the "Guarantor(s)," and together with the Issuer, the "Note Parties"). |
| Collateral Agent | Empery Tax Efficient, LP ("Empery") or another entity selected by it shall be the sole collateral agent for the DIP Note Purchasers (as defined herein) and DIP Factoring Purchasers (as defined herein) (in such capacity, the "DIP Agent"). |
| DIP Note Purchasers | The "DIP Note Purchasers" will be Empery, [●] (collectively, the "Initial DIP Note Purchasers") and any other Prepetition Purchasers who choose to participate in the DIP Note Facility by notice in writing to the DIP Agent at least two days prior to entry of the Interim DIP Order or such other time as may be agreed by the DIP Agent (collectively, the "DIP Note Purchasers," and together with the DIP Agent, the "DIP Secured Parties").<br><br>"DIP Consenting Secured Parties" shall mean the DIP Agent and Empery, as a DIP Note Purchaser.<br><br>The obligation of any DIP Note Purchaser to purchase any note issued under the DIP Note Facility may be fulfilled on behalf of such DIP Note Purchaser by any of such DIP Note Purchaser's affiliated or related funds or financing vehicles. The DIP Note Purchase Commitments (as defined below) will be offered for participation to each Prepetition Purchaser in each case based on such Prepetition Purchaser's pro rata share of the amounts outstanding under the Prepetition Notes. To the extent a portion of the DIP Note Purchase Commitments is not provided by a Prepetition Purchaser, such portion shall be allocated to, and added to the DIP Note Purchase Commitments of the Initial DIP Purchasers based on the Initial DIP Purchasers' ratable shares of the Prepetition Notes. |
| DIP Note Facility | The DIP Note Facility shall be a superpriority senior secured multiple issuance note facility with co-priority with the Prepetition Secured Parties in an aggregate principal amount not to exceed $2.5 |

|  | million (the "<u>DIP Note Purchase Commitments</u>", and such loans, the "<u>DIP Notes</u>"), subject to the terms and conditions set forth in this DIP Term Sheet. |
|  | $2.<u>5</u> million of principal due under the Prepetition Notes shall roll-up and convert on a cashless dollar-for-dollar basis into DIP Notes upon entry of the Final DIP Order (the "<u>Roll-Up</u>") to be approved in the Final DIP Order. |
|  | The issuance mechanics of the DIP Note Facility shall be on terms mutually agreed upon by the DIP Agent, on behalf of the DIP Note Purchasers, and the Debtor, and in accordance with the Budget (as defined herein). |
| **Availability** | Upon entry of Bankruptcy Court's oral approval of this Term Sheet, this binding Term Sheet shall govern the Initial Advance pending the effectiveness of the DIP Note Agreement (the date of such effectiveness, the "<u>DIP Effective Date</u>") and shall be subject to the satisfaction of the Conditions Precedent (as defined herein). |
|  | In addition, the obligation of the DIP Purchasers to purchase DIP Notes shall be subject to the following conditions: |
|  | • At the time of issuance and purchase of any DIP Note and after giving effect thereto, the representations and warranties of the Note Parties contained in the DIP Documents shall be true and correct in all material respects. |
|  | • At the time of issuance and purchase of any DIP Note and after giving effect thereto, no Default or Event of Default shall then exist or result therefrom. |
|  | • All issuances of DIP Notes shall be made subject to and in accordance with the Budget (as defined herein). |
|  | • Up to $<s>500</s>750,000 (the "<u>Interim DIP Issuance</u>") to be made available in one or more issuances in accordance with the Budget (as defined below) and this binding Term Sheet (until it is superseded by the DIP Documents) and the DIP Documents from the Interim Closing Date until the Final Closing Date (as defined below). |
|  | • If any entity or individual other than the DIP Note Purchasers and DIP Factoring Purchasers are approved to be Debtor's DIP lender at the final hearing on the DIP Motion, then all obligations of the Note Parties under the DIP Facilities shall |

|  | be paid in full upon the closing of the new DIP Lender's financing. |
|--|--|
|  | • Up to an amount equal to the remaining approved unfunded DIP Note Purchase Commitments (the "Final DIP Issuance") to be made available in one or more issuances in accordance with the Budget and the DIP Documents on or after the Final Closing Date. |
|  | • Subject to entry of the Final DIP Order, the Roll-Up shall be approved. |
|  | • Immediately upon ~~oral approval~~entry of the first interim order approving this Term Sheet by the Bankruptcy Court, (the "First Interim Order"), the DIP Lender ~~will~~was authorized to advance $~~70~~150,000 of the Interim DIP Issuance, which shall be used by the Debtor to pay for ~~employee wages~~only those reasonable expenses associated with: (i) payroll; (ii) insurance; (iii) product labeling; and ~~benefits~~(iv) other reasonable and necessary operational expenses, and the balance of the Interim DIP Issuance shall be advanced with the entry of the Interim DIP Order. Since the First Interim Order, the DIP Lender has advanced $123,861.31 of the Interim DIP Issuance to fund the specific requests of the Debtor. |
|  | Any amounts repaid under the DIP Note Facility may not be reissued or repurchased. |
| **DIP Factoring Purchasers** | The "DIP Factoring Purchasers" will be Empery, [●] (collectively, the "Initial DIP Factoring Purchasers") and any other Prepetition Purchasers who choose to participate in the DIP Factoring Facility by notice in writing to the DIP Agent at least two days prior to entry of the Interim DIP Order or such other time as may be agreed by the DIP Agent (together with the DIP Agent, the "DIP Factoring Parties"). [1]

"DIP Consenting Factoring Parties" shall mean the DIP Agent and Empery, as a DIP Factoring Purchaser.

The obligation of any DIP Factoring Purchaser to participate under the DIP Factoring Facility may be fulfilled on behalf of such DIP Factoring Purchaser by any of such DIP Factoring Purchaser's affiliated or related funds or financing vehicles. The DIP Factoring Purchase Commitments (as defined below) will be offered for |

---

[1] A third party may do the factoring under the DIP Factoring Facility.

| | |
|---|---|
| | participation to each Prepetition Purchaser in each case based on such Prepetition Purchaser's pro rata share of the amounts outstanding under the Prepetition Notes. To the extent a portion of the DIP Factoring Purchase Commitments is not provided by a Prepetition Purchaser, such portion shall be allocated to, and added to the DIP Factoring Purchase Commitments of the Initial DIP Factoring Purchasers based on the Initial DIP Factoring Purchasers' ratable shares of the Prepetition Notes. |
| **DIP Factoring Facility** | Pursuant to the DIP Factoring Documents, Debtor will sell, transfer, convey, assign and deliver to DIP Factoring Purchasers, and DIP Factoring Purchasers agree to purchase and receive from Debtor, all of Debtor's right, title and interest in and to all eligible post-petition accounts ("Accounts") and, to the extent provided in the next succeeding paragraph, purchase orders ("Purchase Orders") arising from the sale of any product or goods or the rendering of services by Debtor in the ordinary course of the Debtor's business (each an "Advance") for up to $10 million (the "DIP Factoring Purchase Commitments", and such factoring, the "DIP Factoring").

The DIP Factoring Purchasers will only purchase Purchase Orders from Debtor during the period of entry of the Interim DIP Order to entry of the Final DIP Order (the "Interim Period"). During the Interim Period, the DIP Factoring Purchasers will only factor Purchase Orders that: (i) have been approved in writing by Eric Hillman; and (ii) JW Nutritional, LLC has confirmed in writing can be manufactured in accordance with the terms of the purchase order. The DIP Factoring Purchasers will only factor up to $2 million of Purchase Orders during the Interim Period.

IT IS THE INTENTION OF THE PARTIES THAT AS TO ALL ACCOUNTS AND PURCHASE ORDERS (DURING THE INTERIM PERIOD) THAT DIP FACTORING PURCHASERS ELECT TO PURCHASE SHALL CONSTITUTE A TRUE PURCHASE AND SALE OF ACCOUNT(S) UNDER § 9-318 OF THE UNIFORM COMMERCIAL CODE AND AS SUCH, THE DEBTOR SHALL HAVE NO LEGAL OR EQUITABLE INTEREST IN THE ACCOUNTS AND PURCHASE ORDERS SOLD. |
| **Advances on Accounts and Purchase Orders** | The DIP Factoring Purchasers, in the sole discretion of the DIP Agent, may advance up to (i) one hundred percent (100%) of the first $1,000,000 of Accounts and Purchase Orders purchased during the Interim Period, and (ii) eighty percent (80%) of the face amount of the Accounts purchased in excess of $1,000,000, less the applicable discount fee, and Facility Fee (as defined below) (collectively the "***Aggregate Advances***"). The purchase price of any Account and |

|  | Purchase Order (during the Interim Period) shall be the amount actually received in payment of such Account and Purchase Order, but for the purposes of any Advance or Purchase Order, the purchase price shall be equal to the face amount of the Account or Purchase Order less any selling, payment or other discounts offered. |
|---|---|
| **Reserve** | DIP Agent, in its sole discretion, may elect to maintain a reserve from each Advance ("Reserve") of an amount not to exceed 20% of the Aggregate Advances (the "Reserve Cap"). As a general rule, although not a requirement, it is intended that Reserves on paid invoices are released upon the request of the Debtor or when DIP Agent's next purchase of Accounts or Purchase Orders from Debtor is funded. However, DIP Agent may increase or decrease the amount of such Reserve, up to the Reserve Cap, at any time and from time to time if it deems it necessary in order to protect its interest and to protect DIP Factoring Purchasers from losses or potential losses that DIP Factoring Purchasers may reasonably anticipate might arise in the future due to contingencies, disputes, potential breach of warranties or other potential non-payments, reductions or losses from the purchase of Accounts or Purchase Orders under the Advances. |
| **Recourse to Borrower of Certain Accounts** | In the event that (a) an Account or Purchase Order (during the Interim Period) purchased by DIP Factoring Purchasers is not paid in full by the account debtor, on or before the date when due in accordance with its terms, (b) an account debtor objects to the property sold or service performed by Debtor, or rejects or revokes acceptance or fails or refuses to accept or receive any such property or services, (c) an account debtor suspends business, requests a general extension of time within which to pay debts, makes an assignment for the benefit of creditors or becomes a debtor or alleged debtor in any bankruptcy case, or if an event occurs amounting to a general business failure of an account debtor, or (d) DIP Agent in its reasonable discretion determines that any Account or Purchase Order is or may become uncollectible (collectively, a "Worthless Account"), the DIP Agent may require the Debtor promptly to repurchase such Account or Purchase Order. |
| **Facility Fee** | Fifty basis points (0.50%) of each Account or Purchase Order purchased by DIP Factoring Purchasers, payable at the time of each such purchase. |
| **Closing Dates** | "Interim Closing Date" means the date on which the conditions precedent to the Interim DIP Issuance set forth in the DIP Documents (including entry of the Interim DIP Order) have been satisfied or waived. |

| | |
|---|---|
| | "Final Closing Date" means the date on which the conditions precedent to the Final DIP Issuance set forth in DIP Documents (including entry of the Final DIP Order) have been satisfied or waived. |
| **Amortization** | The DIP Note Facility shall not have any principal amortization prior to the Maturity Date (as defined below). |
| **Maturity Date** | Earliest of (a) December 31, 2023, (b) the date all DIP Notes become due and payable under the DIP Documents, whether by acceleration after an Event of Default or otherwise, (c) the date of the closing of the Sale Transaction (as defined below) or any other sale(s) of all or substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, and (d) the filing of a chapter 11 plan that is not an Acceptable Plan (as defined below) (the "Maturity Date"). |
| **Interest Rates** | • DIP Note Facility: ~~A fixed rate of~~The prime interest ~~equal to zero~~rate as published in the Wall Street Journal plus two percent (~~0~~2%) per annum.<br><br>• Interest Rate on Aggregate Advances: The prime interest rate as published in the Wall Street Journal plus two percent (2.0%) per annum.<br><br>• Default interest rate of an additional two percent (2.0%) per annum upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Documents), payable in cash on demand. |
| **Payments and Fees** | Upfront Payment: $0<br><br>DIP Agent Fee: $0<br><br>Closing Fee: $0 |
| **DIP Collateral** | All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Note Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of the Note Parties, including, for the avoidance of doubt, any equity or other interests in the Note Parties' non-Debtor and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the Final DIP |

| | |
|---|---|
| | Order, including the proceeds thereof (collectively, the "DIP Collateral"). |
| **Priority of DIP Obligations** | All obligations of the Issuer under the DIP Facilities and all amounts owing by the Guarantor(s) in respect thereof at all times shall be, effective as of December 15, 2022 ("Petition Date"), secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected co-priority senior liens on and security interests in the DIP Collateral (collectively, the DIP Liens"), subject to the priorities described in Schedule 2 hereto.<br><br>All of the DIP Liens shall be created on terms, and pursuant to documentation, satisfactory to the DIP Agent, in its sole discretion. |
| **DIP Superpriority Claim** | All obligations of the Debtor under the DIP Facilities and all amounts owing by the Guarantor(s) in respect thereof at all times shall constitute allowed superpriority administrative expense claims, pursuant to section 364(c)(1) of the Bankruptcy Code, in the Chapter 11 Case (the "DIP Superpriority Claims"), having priority over all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provisions of the Bankruptcy Code, subject to the priorities described in Schedule 2 hereto. |
| **Documentation** | The DIP Documents shall be prepared initially by counsel for the DIP Agent, and shall substantially reflect the terms and provisions of this DIP Term Sheet in all material respects and shall be acceptable to the DIP Agent. |
| **Conditions Precedent** | Notwithstanding the binding nature of this Term Sheet, the effectiveness of the DIP Facilities on the DIP Effective Date, the obligations of the DIP Note Purchasers to purchase the DIP Notes, and the obligations of the DIP Factoring Purchasers to purchase Accounts or Purchase Orders (during the Interim Period) shall be subject to customary closing conditions, including, without limitation, the satisfaction of the following conditions precedent (the "Conditions Precedent") (unless waived in writing by the applicable DIP Consenting Parties):<br><br>• All DIP Documents shall have been executed by the Note Parties and the other parties thereto.<br><br>• All documented out-of-pocket fees and expenses (including reasonable and documented out-of-pocket fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agent shall have been paid (or will be paid with the proceeds of the DIP Facilities authorized under the |

<table>
<tr><td></td><td>

~~Interim DIP Order or the Final DIP Order, as applicable), including, but not limited to, the reasonable and documented fees and expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP.~~

• The DIP Secured Parties and DIP Factoring Parties shall have received, and the DIP Consenting Parties shall be satisfied with, the initial Budget (as defined herein).

• Upon the entry of the Interim DIP Order, the DIP Agent shall, for the benefit of the DIP Secured Parties and DIP Factoring Parties, have valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on the DIP Collateral to the extent set forth in the Interim DIP Order, subject to the priorities described in <u>Schedule 2</u> hereto, and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid.

• The form and substance of the "first day" orders permitting the payment by the Issuer and its subsidiaries of any prepetition amounts then (or thereafter becoming) due and owing shall be acceptable to the DIP Agent.

• The Interim DIP Order and the Final DIP Order (as applicable) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any manner adverse to the DIP Note Purchasers or DIP Factoring Purchasers without the consent of the DIP Agent, or to the extent adversely and disproportionately affecting any particular DIP Note Purchaser or DIP Factoring Purchaser, such adversely affected DIP Note Purchaser or DIP Factoring Purchaser.

• The satisfaction of other customary terms and conditions (including, without limitation, delivery of secretary and officer certificates, notice of borrowing, evidence of insurance, and legal opinions) and such other customary conditions as shall be required by the DIP Agent.

</td></tr>
<tr><td>

**Milestones**

</td><td>

Subject to the entry of the Final <u>DIP</u> Order, the Note Parties shall comply with the following deadlines (each, individually, a "<u>Milestone</u>" and, collectively, the "<u>Milestones</u>"), which may be extended or waived by the DIP Agent in its sole discretion:

• The Note Parties filed a motion for approval of a DIP loan on January 3, 2022, and subject the dates set by the Court, the

</td></tr>
</table>

Note Parties shall file a supplemental motion, in form and substance acceptable to the DIP Consenting Parties, seeking final approval of the DIP Facilities (the "DIP Motion").

- The Bankruptcy Court shall enter the Interim DIP Order, which order shall be in form and substance acceptable to the DIP Consenting Parties, approving the DIP Facilities on an interim basis no later than three (3) business days following the hearing on the DIP Motion.

- The Bankruptcy Court shall enter the Final DIP Order, which order shall be in form and substance acceptable to the DIP Consenting Parties, approving the DIP Facilities (including the Roll-Up on a final basis) no later than 24 days following the filing of the DIP Motion.

- The Debtor shall file an Acceptable Plan by September 30, 2023.

- An "Acceptable Plan" is a plan of reorganization or liquidation reasonably acceptable to the DIP Agent, which shall include the following:

  - o  Repayment in full in cash of the obligations under the DIP Note Facility, including Roll-Up;

  - o  ~~On the effective date of the Acceptable Plan, repayment of $6.5 million, representing the DIP Facility, Roll-up and a portion of the Prepetition Notes in cash; Repayment of an incremental $6.0 million of Prepetition Notes, paid at $1.0 million per month for 6 consecutive months from effective date of the Acceptable Plan;~~

  - o  ~~Repayment of the balance of all allowed claims, amortized over five (5) years from the effective date of the Acceptable Plan, at prime plus 3% interest, compounded annually, or as the parties may otherwise agree; and~~

  - o  Be acceptable to the DIP Agent, in its reasonable discretion, with respect to the treatment of the Prepetition Secured Parties, DIP Note Purchasers, and DIP Factoring Purchasers.

- In the event an Acceptable Plan has not been filed by Debtor by September 30, 2023, Debtor shall commence a Section

|  | 363 sale process (the "<u>Sale Transaction</u>") within 14-days of notice by the DIP Agent that the plan filed is not acceptable. In the event that no plan is filed by September 30, 2023, Debtor shall commence a Sale Transaction on October 20, 2023. The procedure and timing of the Sale Transaction shall be satisfactory to the DIP Agent, in its sole discretion. |
|  | • The Bankruptcy Court shall approve an Acceptable Plan by December 15, 2023. |
|  | To the extent any covenant or obligations under the DIP Documents (including any Milestones) are required to be performed on a day that is not a business day, the deadline for such covenant or obligations shall be automatically extended to the next business day. |
| **Voluntary Prepayment** | Prior to the Maturity Date, the Issuer may, upon at least three business days' notice, prepay in full or in part, the DIP Notes. <br><br> The Issuer shall not be permitted to repurchase DIP Notes or repay or prepay DIP Notes other than on a pro rata basis. |
| **Mandatory Prepayment** | Prior to the Maturity Date, the following mandatory prepayments shall be required: <br><br> 1.  <u>Asset Sales</u>: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of the sale or other disposition of any property or assets of the Note Parties or any of their respective subsidiaries, except for ordinary course and de minimis sales and additional exceptions to be agreed on in the DIP Documents; <br><br> 2.  <u>Insurance Proceeds</u>: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the Note Parties or any of their respective subsidiaries subject to exceptions to be agreed on in the DIP Documents; and <br><br> 3.  <u>Incurrence of Indebtedness</u>: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of any indebtedness incurred by the Note Parties or any of their respective subsidiaries after the DIP Effective Date (other than indebtedness otherwise permitted under the DIP Documents), payable no later than the date of receipt. |
| **Financial Covenants** | ~~Until the repayment in full in cash of the obligations under the DIP Facilities, the Note Parties shall perform in accordance with the Budget.~~ All lending beyond the advances set forth in the Interim |

Advance and this Term Sheet shall be subject to final approval of the DIP Facilities, the Budget and entry of the Final DIP Order.

Following the one-week anniversary of the Interim DIP Order until the repayment in full in cash of the obligations under the DIP Facilities, the Note Parties shall perform in accordance with the Budget, subject to the following with respect to any Review Period: (i) the Note Parties' actual cash receipts shall not be less than 90% of the projected amounts therefor set forth in the Budget on a cumulative basis; and (ii) the Note Parties' actual cash disbursements shall not be greater than 110% of the projected amounts therefor set forth in the Budget on a cumulative basis, but not exceed the total budget amount (such variance, the "Permitted Variances").

During any Review Period occurring prior to March 15, 2023, the DIP Note Purchasers and DIP Factoring Purchasers waive all defaults of the Note Parties for failing to comply with the Budget, including the Permitted Variances, solely with respect to (i) top line gross revenue and cash receipts and (ii) all cost of goods sold, including shipping.

Debtor shall file with the Bankruptcy Court a final Budget agreed to by the DIP Agent on or before March 15, 2023.

Compliance with the Budget shall be reviewed on Monday of every other week on a bi-weekly basis, with such reviews to be conducted on the Monday following each of the second and fourth weeks of the Budget (each, a "Weekly Review Period") and thereafter on a rolling 4-week basis (the "Cumulative Review Period" and together with the Weekly Testing Period, the "Review Periods").  Beginning on the second Monday following the DIP Effective Date and every other Monday thereafter, the Note Parties shall deliver to the DIP Agent the Variance Report (as defined herein), which Variance Report shall include variance for the line items consistent with the latest Approved Budget (as defined in the DIP Documents) and be in form and substance acceptable to the DIP Consenting Parties.

"Budget" means the initial cash flow forecast for the 13-week period commencing with the week in which the Petition Date occurs, setting forth on a line-item basis the Note Parties' projected cash receipts and cash disbursements, on a weekly basis, which budget shall be prepared by the Note Parties and in form and substance acceptable to the DIP Consenting Parties, and which budget shall be updated on the one-week anniversary of the Initial DIP Order and every four weeks on Wednesday (commencing with the Wednesday of the fourth full week commencing after the one-week anniversary of the Initial DIP Order (or if such day is not a business day, the next

| | |
|---|---|
| | business day) in substantially the same form as the initial budget delivered and in substance acceptable to the DIP Consenting Parties. The Budget shall include separate line items for each Professional Person (defined below). To the extent that any updated Budget is not acceptable to the DIP Consenting Parties, the then-existing approved budget will remain the "Budget" until replaced by an updated budget that is acceptable to the DIP Consenting Parties. |
| **Reporting** | The Issuer shall deliver to the DIP Agent (and the DIP Agent shall deliver to each DIP Note Purchaser and DIP Factoring Purchaser): |
| | (a) a weekly line-by-line variance report (the "<u>Variance Report</u>"), which Variance Report shall compare actual cash receipts and disbursements of the Note Parties with corresponding amounts provided for in the Budget on a line-by-line basis for the prior week and the applicable Review Period (or such shorter period as may have elapsed from the Petition Date), including written descriptions in reasonable detail explaining any material positive or negative variances, and otherwise in form and substance reasonably acceptable to the DIP Consenting Parties; |
| | (b) all other reports and notices required to be delivered under the DIP Documents as mutually agreed upon by the Debtor and the DIP Agent; and |
| | (c) copies of non-privileged reports of the financial and restructuring advisors of the Note Parties as reasonably requested by the DIP Agent, including but not limited to: |
| |     i.   Any analysis of cash flows, forecasts, and potential cost savings initiatives; |
| |     ii.   Transaction marketing material (CIMs / MPs); |
| |     iii.   Investor outreach list; |
| |     iv.   Sale process updates in accordance with the terms of this DIP Term Sheet; and |
| |     v.   Proposed sources and uses at emergence. |
| | In addition, management of the Issuer shall, at the request of the DIP Agent, conduct a bi-weekly conference call with the DIP Consenting Parties during normal business hours at a time to be mutually agreed upon to discuss the Issuer's performance. |
| **Board of Directors** | As set forth below, the DIP Consenting Parties shall approve an independent director ("<u>Independent Director</u>"), nominated by the |

| | |
|---|---|
| | Interim Board of Directors (defined below), with sole and exclusive responsibility for the following:<br><br>• Protect and recover the assets of the Debtor, including determine whether it is in the best interest of the Debtor to reorganize under Section 1129 of the Bankruptcy Code, or sell its assets in accordance with Section 363 of the Bankruptcy Code;<br>• Review and approve the ultimate debtor-in-possession financing incurred by the bankruptcy estate, as negotiated by the Debtor's restructuring professionals;<br>• Except as otherwise provided herein, investigate and determine which estate causes of action, if any, should be pursued, prosecuted, or settled; and<br>• Maximize value for all stakeholders.<br><br>Except as set forth below, all current members of the board of directors will resign immediately upon entry of the First Interim ~~DIP~~ Order.<br><br>Upon entry of the First Interim Order, the board of directors will be reconstituted with the following members ("Interim Board of Directors"):<br><br>1.  Paul Karr; and<br>2.  Eric Hillman.<br><br>Upon entry of the Interim DIP Order, the board of directors will be reconstituted with the following members (the following, the "Board of Directors"):<br><br>~~1.   The CRO (as defined below);~~<br>1.  Eric Hillman;<br>2.  Paul Karr; and<br>3.  The Independent Director.<br><br>~~The Interim Order shall designate the CRO, Paul Karr and Eric Hillman as Directors (the following, the "Interim Board of Directors").~~ The Debtor shall nominate an Independent Director on or before January ~~12~~17, 2023~~, to replace Eric Hillman~~. |
| **Other Covenants** | By no later than five (5) days following the entry of the Interim DIP Order, Debtor shall engage a Chief Restructuring Officer (the "CRO") reasonably satisfactory to the DIP Consenting Parties pursuant to an engagement letter with a scope and compensation reasonably satisfactory to the DIP Consenting Parties and otherwise be in form and substance satisfactory to the DIP Consenting Parties. |

All fees and expenses of (and otherwise relating to) the CRO shall be the sole responsibility of the Debtor. The CRO shall not be removed without order of the Bankruptcy Court. Furthermore, the CRO's fees and costs shall not exceed $50,000 per month, except as otherwise approved by the Board of Directors.

Ryan Drexler shall resign from all offices of Debtor and from the board of directors of Debtor immediately upon entry of the First Interim ~~DIP~~ Order. Eric Hillman shall be appointed as the CEO of Debtor immediately upon entry of the First Interim ~~DIP~~ Order.

The DIP Documents shall contain such other negative and affirmative covenants that are ordinary and customary in debtor-in-possession financings and reasonably acceptable to the DIP Consenting Parties, including, without limitation, compliance with the Budget in accordance with the DIP Documents. Such covenants shall prohibit, inter alia, Issuer from making dividends or other distributions of cash to the direct or indirect equity holders of Issuer, including any distributions of cash in order to pay management fees or pay taxes attributable to the income of Issuer or any of its subsidiaries.

At the request of the DIP Agent, the Note Parties shall (i) arrange and cause to be held bi-weekly conference calls between representatives of the Note Parties, the CRO and the DIP Consenting Parties (which (a) may, to the extent practicable, be the same weekly conference described above, and (b) shall occur during normal business hours at a time to be mutually agreed) for purposes of providing information regarding the status of the Chapter 11 Case, Debtor's business operations, the preparation, filing, and confirmation of an Acceptable Plan, and the Sale Transaction process that, while a stalking horse bidder remains part of the sale process, would not be deemed to provide preferential treatment to such bidder; provided that, for the avoidance of doubt, information regarding the number and identity of the parties contacted and the overview of the marketing efforts undertaken in connection with the Sale Transaction shall not be deemed to provide preferential treatment and shall be disclosed; (ii) at all times provide the DIP Consenting Parties and their professional advisors with access to any data room established for purposes of allowing potential purchasers to evaluate a Sale Transaction; and (iii) provide the DIP Consenting Parties and their professional advisors with all materials and other communications regarding the Sale Transaction process provided and available to all bidders at the time of distribution to any or all bidders. If at any time the stalking horse bidder is not part of the sale process, then the Issuer shall arrange and cause to be held weekly conference calls between representatives of the Note Parties, the

| | |
|---|---|
| | CRO and the DIP Consenting Parties (which (a) may, to the extent practicable, be the same weekly conference described above, and (b) shall occur during normal business hours at a time to be mutually agreed), for purposes of providing full and complete information regarding the Sale Transaction process to the DIP Agent. |
| **Representations & Warranties** | The DIP Documents shall contain such representations and warranties as are usual and customary in debtor-in-possession financing and as are reasonably acceptable to the DIP Consenting Parties. |
| **Use of Proceeds** | The proceeds of the DIP Facilities shall be used solely for the following purposes, subject in all cases to the Budget:<br><br>(a)  pay fees, interest, payments, and expenses associated with the DIP Facilities;<br><br>(b)  provide for the ongoing working capital and capital expenditure needs of the Note Parties during the pendency of the Chapter 11 Case;<br><br>(c)  fund the Carve-Out;<br><br>(d)  fund the Forensic Accountant (if retained); and<br><br>(e)  fund the costs of the administration of the Chapter 11 Case and the consummation of the restructuring.<br><br>No Cash Collateral or proceeds of the DIP Facilities shall be used by the Debtor to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the DIP Facilities or the Prepetition Transaction Documents. |
| **Forensic Accounting** | At the request of the DIP Agent and approval of the Board of Directors, the CRO shall retain a forensic accountant reasonably acceptable to the DIP Consenting Parties (the "<u>Forensic Accountant</u>") to review and analyze all Debtor's bank statements for three (3) or more years prior to the Petition Date and any other documents and information necessary to investigate payments and transfers from Debtor to determine whether they are avoidable under federal and state law.  The DIP Agent will increase the DIP Facility in the amount necessary to pay for the forensic accounting in an amount agreed to be the DIP Agent and the CRO. |
| **DIP Disbursement Account** | The Issuer and the Guarantor(s) shall deposit the proceeds of the DIP Note Facility and any Advances in Bankruptcy Court approved debtor-in-possession account that is subject to the control of the DIP |

| | |
|---|---|
| | Agent pursuant to a deposit account control agreement (the "DIP Disbursement Account"), and that is not subject to the control of any other Person. Proceeds of the DIP Facilities and any other deposits to be provided under the DIP Documents shall be deposited, held and disbursed through the DIP Disbursement Account or otherwise in accordance with the cash management order. For the avoidance of doubt, the factoring commitment will be made but only funded upon receipt of orders, which funding will not be unreasonably withheld or delayed. |
| **Events of Default/Remedies** | Events of Default shall include, without limitation:<br><br>• failure to pay principal or interest on the DIP Notes or any fees under the DIP Facilities when due;<br><br>• failure of any representation or warranty of any Note Party contained in any DIP Document to be true and correct in all material respects when made;<br><br>• breach of any covenant, subject to a five (5) business day grace period (from the earlier of the date that (i) any Note Party obtains knowledge of such breach and (ii) any Note Party receives written notice of such default from any DIP Consenting Party), provided that the breach of any covenant described herein, or any other covenant so indicated by the DIP Agent, shall not be subject to any grace period;<br><br>• failure to comply with the Budget, subject to the Permitted Variances;<br><br>• the DIP Agent shall cease to have continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected co-priority senior liens on and security interests in the DIP Collateral with the priorities described in Schedule 2 hereto (other than upon a release by reason of a transaction that is permitted under the DIP Documents);<br><br>• any Note Party or equityholder or Affiliate thereof (i) contesting the validity or enforceability of any DIP Document in writing or denying in writing that it has any further liability thereunder or (ii) contesting the validity or perfection of the liens and security interests securing the Facilities;<br><br>• any attempt by any Note Party or any equityholder or Affiliate thereof to invalidate or otherwise impair the DIP |

|  | Facilities or the liens granted to the DIP Note Purchasers or DIP Factoring Purchasers;<br><br>• failure by any Debtor to comply with the Interim DIP Order or Final DIP Order, as applicable;<br><br>• the entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim DIP Order or Final DIP Order or any other order of the Bankruptcy Court approving the Debtor's use of Cash Collateral, as applicable, without the express written consent of the DIP Consenting Parties;<br><br>• any sale or disposition, other than the Sale Transaction, of all or a material portion of the DIP Collateral securing the DIP Facilities pursuant to section 363 of the Bankruptcy Code other than as permitted by the DIP Orders (or pursuant to a transaction that is permitted under the DIP Documents);<br><br>• conversion of, or the filing of any motion by any Note Party or any equityholder or Affiliate thereof to convert, any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;<br><br>• dismissal of, or the filing of any motion by any Note Party or equityholder or Affiliate thereof to dismiss, any of the Chapter 11 Case;<br><br>• the appointment of a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of any Note Party (powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) under sections 1104(d) and 1106(b) of the Bankruptcy Code;<br><br>• failure to meet any Milestone;<br><br>• the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to a holder or holders of any security interest or lien on any part of the DIP Collateral securing the DIP Facilities to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral having a fair market value in excess of an amount to be agreed by the DIP Consenting Parties; |
|--|--|

| | |
|---|---|
| | • the grant of any superpriority claim that is pari passu with or senior to those of the DIP Note Purchasers or DIP Factoring Purchasers (other than the Carve-Out);<br><br>• termination by the Bankruptcy Court of the use of Cash Collateral;<br><br>• the filing of a plan of reorganization or liquidation by the Debtor that is not an Acceptable Plan;<br><br>• expiration of the period of time during which only the Issuer may file a plan pursuant to section 1121 of the Bankruptcy Code; and<br><br>• the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any of the DIP Collateral.<br><br>Among other remedies to be specified, upon the occurrence of an Event of Default, the DIP Agent may and, at the direction of the DIP Consenting Parties, shall seek relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, and apply the proceeds thereof to the obligations arising under the DIP Documents or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law. |
| **Cash Collateral Usage** | The Prepetition Secured Parties consent to the use of Cash Collateral, subject to the Budget (subject to Permitted Variances) and the terms of this term sheet and the DIP Orders. |
| **Carve Out** | Carve-out provisions to be customary and appropriate in the context of the proposed DIP Facilities, and as otherwise acceptable to the DIP Agent, including a carve-out of all reasonable and documented fees and expenses up to $~~200~~250,000 incurred by professionals employed by Debtor, and ~~an investigation budget cap~~a carve-out of ~~$100~~all reasonable and documented fees and expenses of up to $250,000 for any committee of unsecured creditors and a post-carve-out trigger notice cap of $25,000 for Debtor's professionals and $25,000 for any committee of unsecured creditors.  Nothing in this section is intended or to be construed as limiting the fees and costs of the Issuer's professionals, as approved by the Bankruptcy Court in accordance with the Bankruptcy Code. |
| **Expenses and Indemnification** | The Note Parties shall pay, in connection with the Chapter 11 Case and the negotiation and documentation of the DIP Facilities and restructuring matters with respect to the Note Parties, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of |

| | |
|---|---|
| | counsel for the DIP Agent and reasonable and documented legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agent.  In addition, the Note Parties shall pay, in connection with workout proceedings and enforcement costs associated with the DIP Facilities, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agent and reasonable and documented legal fees and out-of-pocket expenses legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agent.  Such fees and expenses shall be added to DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent claim(s). <br><br> The Issuer and the Guarantor(s) will indemnify the DIP Agent, DIP Note Purchasers, and DIP Factoring Purchasers  and their respective affiliates, and their respective related parties, and hold them harmless from and against all out-of-pocket costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any notes issued under the DIP Facilities; _provided_ that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence or willful misconduct of such person. |
| **Adequate Protection** | (i)      the Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall receive, to the extent of any aggregate diminution in the value of their collateral: (a) valid, binding, enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "Prepetition Notes Adequate Protection Liens"), subject to the priorities described in Schedule 2 hereto; and (b) allowed superpriority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "Prepetition Notes Adequate Protection Claims"), subject to the priorities described in Schedule 2 hereto; <br><br> (ii)     Prestige Capital Finance, LLC ("Prestige") shall receive, to the extent of any aggregate diminution in the value of its collateral: (a) valid, binding, enforceable, and automatically and properly |

perfected replacement liens on and security interests in the DIP Collateral (the "<u>Prestige Adequate Protection Liens</u>"), subject to the priorities described in <u>Schedule 2</u> hereto; and (b) allowed superpriority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "<u>Prestige Adequate Protection Claims</u>"), subject to the priorities described in <u>Schedule 2</u> hereto;

(iii)    the Prepetition Collateral Agent shall be entitled to reimbursement of its reasonable and documented fees and out- of-pocket expenses;

(iv)    the Prepetition Collateral Agent shall be entitled to reimbursement of its respective reasonable and documented fees and out-of-pocket expenses of one primary counsel and one local counsel (if applicable), and one financial advisor;

(v)    the Prepetition Collateral Agent, on behalf of itself and the Prepetition Secured Parties, shall be entitled to performance of the Milestones set forth herein;

(vi)    Subject to Challenge Period set forth below, the Debtor agrees that in any sale of the DIP Collateral, the Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall have the right to credit bid an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, plus the obligations under the DIP Facilities, or such greater amount as allowed by the Court, in accordance with section 363(k) of the Bankruptcy Code, and that any motion filed by the Debtor seeking approval of bid procedures shall contain a request for approval of the right of the Prepetition Collateral Agent to credit bid the obligations of the Prepetition Purchasers;

(vii)    the Debtor shall provide the information required by the section entitled "Reporting" set forth herein;

(viii)    the Final DIP Order shall include the waivers described in the section entitled "Waivers" set forth herein; and

(ix)    interest at the default rate specified in the Prepetition Notes shall continue to accrue under the terms of the Prepetition Notes.

| | |
|---|---|
| **Committee Review** | The Office Committee of Unsecured Creditors ("<u>Committee</u>") shall have a period of sixty-days (60) from entry of the Interim Order to investigate and challenge and otherwise object to the allowance of the Allowed Claim (the "<u>Challenge Period</u>") |

| | |
|---|---|
| **Stipulations** | The DIP Orders shall contain stipulations as to, among other things, the amount and priority of the secured indebtedness under the Prepetition Notes. |
| **Waivers** | The DIP Orders shall provide for (i) a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code, (ii) a waiver of the ability to surcharge the DIP Collateral, and subject to entry of the Final DIP Order, the collateral securing the Prepetition Notes, including under section 506(c) of the Bankruptcy Code, and (iii) a waiver of the equitable doctrine of "marshaling" with respect to the DIP Collateral, and subject to entry of the Final DIP Order, the collateral securing the Prepetition Notes. |
| **Releases** | Pursuant to the DIP Orders, the Issuer and Guarantor(s) shall release all claims against the DIP Agent in its capacity as such, the DIP Note Purchasers in their capacities as such, the DIP Factoring Purchasers in their capacities as such, the Prepetition Collateral Agent in its capacity as such and the Prepetition Purchasers in their capacities as such. |
| **Allowed Claim** | Subject to Challenge Period, the Prepetition Secured Parties shall have an allowed claim of an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, plus the obligations under the DIP Facilities and attorneys' fees and expenses. |
| **Credit Bid** | Debtor shall consent to (i) the DIP Agent submitting a credit bid of the obligations under the DIP Facilities, and (ii) subject to Challenge Period, the Prepetition Collateral Agent submitting a credit bid of an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, or such greater amount as allowed by the Court (together, the "Credit Bid Obligations"), in connection with the sale of any asset of the Note Parties (in whole or in part), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code and any motion filed by the Debtor seeking approval of bid procedures shall contain a request for approval of the right of the DIP Agent and Prepetition Collateral Agent, as applicable, to credit bid the Credit Bid Obligations and Debtor shall not object to such a provision. |
| **Governing Law** | The DIP Documents shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to the conflict of law principles thereof. Each party to the DIP Documents will waive the rights to trial by jury and will consent to jurisdiction of the Bankruptcy Court for so long as the Chapter 11 |

| | |
|---|---|
| | Case remain open and, thereafter, the state and federal courts located in the County of New York in the State of New York. |
| **Amendments** | All amendments, modifications and waivers of the DIP Documents shall require the consent of the Issuer and the DIP Consenting Parties, except in the case of amendments, modifications, or waivers customarily requiring consent from all DIP Note Purchasers and DIP Factoring Purchasers, all affected DIP Note Purchasers, DIP Factoring Purchasers, or the DIP Agent. |
| ~~**Proof of Claim**~~ | ~~The DIP Agent, the DIP Note Purchasers, the DIP Factoring Purchasers, the Prepetition Collateral Agent, and the Prepetition Purchasers will not be required to file a proof of claim in connection with the Chapter 11 Case.~~ |
| **Assignments and Participations** | Each DIP Note Purchaser and DIP Factoring Purchaser may assign all or any part of the DIP Notes or Accounts to one or more affiliate, bank, financial institution, or other entity. Upon such assignment, such affiliate, bank, financial institution, or entity will become a DIP Note Purchaser or DIP Factoring Purchaser, as applicable, for all purposes under the DIP Documents. The DIP Note Purchasers and DIP Factoring Purchasers will also have the right to sell participations, subject to customary limitations on voting rights, in the DIP Notes or Accounts. Notwithstanding the foregoing, no assignment shall be made or participation sold to the Issuer, any subsidiary of the Issuer or an affiliate of any of the foregoing. |
| **Counsel to Empery as DIP Agent, DIP Note Purchaser, and DIP Factoring Purchaser** | Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP |

**SCHEDULE 1**[2]

| Prepetition Purchaser | Aggregate Principal Amount, including OID, of October Notes (USD) | Aggregate Principal Amount, including OID, of June Notes (USD) |
|---|---|---|
| Altium Growth Fund, LP | 1,384,300.00 | 156,250.00 |
| Anson Investments Master Fund LP | 1,038,225.00 | 312,500.00 |
| Bigger Capital Fund, LP | 692,150.00 | 312,500.00 |
| CVI Investments, Inc. | 692,150.00 | 0.00 |
| District 2 Capital Fund LP | 1,038,225.00 | 312,500.00 |

[2] Schedule 1 to be reviewed and updated, as needed.

| | | |
|---|---|---|
| Empery Debt Opportunities Fund, LP | 1,245,870.00 | 281,250.00 |
| Empery Master Onshore, LLC | 924,712.40 | 208,750.00 |
| Empery Tax Efficient, LP | 276,860.00 | 62,500.00 |
| Empery Tax Efficient III, LP | 321,157.60 | 72,500.00 |
| HB Fund LLC | 692,150.00 | 156,250.00 |
| Intracostal Capital LLC | 69,214.99 | 0.00 |
| Ionic Ventures | 692,150.00 | 312,500.00 |
| L1 Capital Global Opportunities Master Fund | 692,150.00 | 0.00 |
| Roth Capital Partners, LLC | 0.00 | 269,375.00 |
| Walleye Opportunities Master Fund Ltd. | 0.00 | 625,000.00 |
| **TOTAL** | 9,759,315.00 | 3,081,875.00 |

DOC ID - 39689513.6

## SCHEDULE 2

| Order of Priority | DIP Collateral Consisting of Pre-Petition Factoring Priority Collateral[3] | DIP Collateral Consisting of Post-Petition Factoring Priority Collateral | DIP Collateral Not Consisting of Factoring Priority Collateral | Third-Party Encumbered Assets[4] | Unencumbered Assets | Superpriority Claims |
|---|---|---|---|---|---|---|
| 1st | Carve-Out and Permitted Liens[5] | Carve-Out and Permitted Liens | Carve-Out and Permitted Liens | Third-Party Existing Liens | Carve-Out | Carve-Out and Permitted Liens |
| 2nd | Prestige Liens[6] | DIP Liens | DIP Liens | Carve-Out | DIP Liens | DIP Superpriority Claim |
| 3rd | DIP Liens | Prestige Adequate Protection Liens | Prepetition Notes Adequate Protection Liens | DIP Liens | Prepetition Notes Adequate Protection Liens and Prestige Adequate Protection Liens | Prepetition Notes Adequate Protection Claim and Prestige Adequate Protection Claim |
| 4th | Prepetition Notes Adequate Protection Liens | Prepetition Notes Adequate Protection Liens | Prepetition Notes Liens | Prepetition Notes Adequate Protection Liens and Prestige Adequate Protection Liens | | |
| 5th | Prepetition Notes Liens | Prepetition Notes Liens | Prestige Adequate Protection Liens | | | |
| 6th | | | Prestige Liens | | | |

---

[3] As defined in the Intercreditor Agreement, dated as of October 13, 2021 (the "Prestige Intercreditor Agreement"), among Prestige, Empery, as Notes Representative on behalf of the Prepetition Noteholders and Prepetition Collateral Agent, and the Note Parties.

[4] "Third-Party Encumbered Assets" shall mean DIP Collateral that was, as of the Petition Date, subject to valid, properly perfected and non-avoidable liens or security interests (collectively, the "Third-Party Existing Liens") other than the liens and security interests granted pursuant to the Prepetition Security Agreement (the "Prepetition Notes Liens") and the Prestige Liens (as defined below).

[5] "Permitted Liens" shall mean any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Notes Liens and Prestige Liens.

[6] "Prestige Liens" shall mean any valid, properly perfected and non-avoidable liens on or security interests in the Factoring Collateral created by the Factoring Security Documents (each as defined in the Prestige Intercreditor Agreement).

# EXHIBIT 3

# EXHIBIT 3

DRAFT - SUBJECT TO CHANGE

**MusclePharm**
Thirteen-Week Cash Flow Forecast
1/12/2023

| Week Ending | 1/15/2023 | 1/22/2023 | 1/29/2023 | 2/5/2023 | 2/12/2023 | 2/19/2023 | 2/26/2023 | 3/5/2023 | 3/12/2023 | 3/19/2023 | 3/26/2023 | 4/2/2023 | 4/9/2023 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **Factored Receipts**[1] | | 1,078,257 | 20,814 | 319,992 | 19,104 | - | - | - | - | - | 60,894 | - | - | 1,499,061 |
| | | | | | | | | | | | | | | |
| **Total COGS**[2] | - | 859,364 | - | 326,538 | - | - | - | - | - | - | - | - | - | 1,185,902 |
| Shipping & Logistics[3] | | 110,459 | | 40,200 | | | | | | | | | | 150,659 |
| Labeling & Testing Costs[4] | | 10,000 | | 10,000 | | | 10,000 | | | | | | | 30,000 |
| **Total COGS Including Shipping, Labeling and Testing** | - | 979,823 | - | 376,738 | - | - | 10,000 | - | - | - | - | - | - | 1,366,561 |
| | | | | | | | | | | | | | | |
| **SG&A** | | | | | | | | | | | | | | |
| Payroll & Benefits[5] | 64,345 | 77,620 | | 15,625 | 66,310 | | 84,484 | 15,625 | 66,310 | | 81,935 | | 66,310 | 544,194 |
| Insurance[6] | 60,792 | | 19,800 | | | 150,000 | 19,800 | | | | 19,800 | | | 270,192 |
| General & Administrative[7] | 24,864 | 10,000 | 2,500 | 5,500 | 4,500 | 7,500 | | 5,500 | 4,500 | 7,500 | 2,500 | 2,500 | | 82,384 |
| Securities Counsel[8] | | | | | | 50,000 | | | | | | | | 50,000 |
| Board Fees[9] | | | | | | 41,250 | | 22,250 | | | 22,250 | | | 85,750 |
| eCommerce[10] | 10,126 | | | 10,126 | | | | 10,126 | | | 10,126 | | | 40,504 |
| Marketing[11] | 10,000 | | | 10,000 | | | | 10,000 | | | 10,000 | | | 40,000 |
| Avalara[12] | 1,115 | | | | | | | | | 11,747 | 1,115 | | | 13,977 |
| **Total SG&A**[13] | 150,000 | 108,861 | 27,950 | 41,251 | 70,810 | 248,750 | 106,764 | 63,501 | 70,810 | 19,247 | 125,476 | 24,750 | 68,810 | 1,126,980 |
| | | | | | | | | | | | | | | |
| **Net (Decrease) Increase in Operating Cash Flow** | (150,000) | (10,427) | (7,136) | (97,997) | (51,706) | (248,750) | (116,764) | (63,501) | (70,810) | (19,247) | (64,582) | (24,750) | (68,810) | (994,480) |
| **Cumulative Net Operating Cash Flow** | (150,000) | (160,427) | (167,563) | (265,560) | (317,266) | (566,016) | (682,780) | (746,281) | (817,091) | (836,338) | (900,920) | (925,670) | (994,480) | (994,480) |
| | | | | | | | | | | | | | | |
| **Restructuring Costs** | | | | | | | | | | | | | | |
| **Company Advisors**[14] | | | | | | | | | | | | | | |
| Schwartz Law | | 150,000 | | | | | 70,000 | | | | 120,000 | | | 340,000 |
| Portage Point | | 75,000 | | | | | 45,000 | | | | 64,000 | | | 184,000 |
| Claims Agent | | | | | | | 16,000 | | | | 16,000 | | | 32,000 |
| **Lender Advisors**[15] | | | | | | | | | | | | | | |
| Emptey - Garman Turner Gordon[15] | | | | | | | 52,500 | | | | | | | 52,500 |
| Prestige - Mandelbaum Barrett[15] | | | | | | | | | | | | | | |
| Prestige Local - Lewis Roca Rothgerber Christie[15] | | 112,500 | | | | | | | | | | | | 112,500 |
| **Unsecured Creditor Advisors**[16] | | | | | | | | | | | | | | |
| UCC Counsel (Includes Local)[16] | | | | | | | | | | | 90,000 | | | 255,000 |
| Creditor Financial Advisor | | | | | | | | | | | | | | |
| **Total Restructuring Fees**[17] | | 337,500 | | | | | 183,500 | | | | 290,000 | | | 811,000 |
| | | | | | | | | | | | | | | |
| **Other Restructuring Costs** | | | | | | | | | | | | | | |
| Filing Fees | | | | | | | | | | | | | | |
| Trustee Fees[18] | | | | | | | | | | | | | 24,243 | 24,243 |
| Investigation Costs | | | | | | | | | | | | | | |
| Critical Vendors | | | | | | | | | | | | | | |
| Utilities Adequate Assurance | | | | | | | | | | | | | | |
| **Total Restructuring Costs** | | 337,500 | | | | | 183,500 | | | | 290,000 | | 24,243 | 835,243 |
| | | | | | | | | | | | | | | |
| **Net Cash Flow after Restructuring Costs** | (150,000) | (347,927) | (7,136) | (97,997) | (51,706) | (248,750) | (300,264) | (63,501) | (70,810) | (19,247) | (354,582) | (24,750) | (93,053) | (1,829,723) |
| **Cumulative Net Cash Flow after Restructuring Costs** | (150,000) | (497,927) | (505,063) | (603,060) | (654,766) | (903,516) | (1,203,780) | (1,267,281) | (1,338,091) | (1,357,338) | (1,711,920) | (1,736,670) | (1,829,723) | (1,829,723) |
| | | | | | | | | | | | | | | |
| **Financing**[19] | | | | | | | | | | | | | | |
| DIP Lender Advance[19] | 150,000 | 600,000 | | | | 1,750,000 | | | | | | | | 2,500,000 |
| Interest Expense[20] | | 7,090 | | | | 22,651 | | | | | 36,666 | | | 66,408 |
| | | | | | | | | | | | | | | |
| **Total Cash Flow** | (0) | 244,983 | (7,136) | (97,997) | (51,706) | 1,478,599 | (300,264) | (63,501) | (70,810) | (19,247) | (391,248) | (24,750) | (93,053) | 603,870 |
| Starting Cash[20] | (0) | (0) | 244,983 | 237,847 | 139,850 | 88,144 | 1,566,742 | 1,266,478 | 1,202,977 | 1,132,167 | 1,112,920 | 721,672 | 696,922 | (0) |
| **Ending Cash**[21] | (0) | 244,983 | 237,847 | 139,850 | 88,144 | 1,566,742 | 1,266,478 | 1,202,977 | 1,132,167 | 1,112,920 | 721,672 | 696,922 | 603,870 | 603,870 |

NOTE: Figures shown represent latest estimates and information provided by the Company

1. Assumes first $1 million of accounts purchased are advanced at 100% with remaining advanced at 80% upon generation of the receivable and the remaining 20% when collected.
2. COGS assumed to be paid out in same week shipment is made per Company estimates and in line with existing JW Nutritional 48 hour terms
3. Estimated net 10% of total sales based on ship date
4. Estimate provided by management, assumes $10,000 in each week a shipment occurs with $10,000 additional to account for potential future needs
5. Inclusive of payroll funding and associated costs, 401k contributions and health insurance
6. Includes D&O and GL insurance payments with Company provided estimates along with contemplated new D&O policy for incoming directors and officers in the week ending 2/19/23
7. Estimate included for general operating expenses
8. Estimated ordinary course securities counsel expenditures for SEC related requirements
9. Payment for existing and new member board fees, week ending 2/19/23 contemplates catch up payment for partial December and January, as appropriate, plus February fees. Monthly fees to be paid in advance at the beginning of each month
10. Includes Nova, Shopify and Hubnomix, all of which are service providers supporting eCommerce capabilities
11. Marketing spend included to support eCommerce and online order efforts for non-wholesale customers
12. Avalara provides sales tax tracking, reporting and payment support. Estimates included monthly filing fees and estimated taxes
13. Forecast excludes audit, tax and SEC filing fees that may be required and are assumed to be paid outside of the forecast period, if necessary
14. Does not constitute agreed fee structure between company and it's professionals
15. All lender advisor fees assumed to be accrued on latest claims and not paid through DIP funding
16. UCC fees exclude of local counsel and assumed to be 75% of Company counsel fees
17. Unless otherwise noted, restructuring costs based on estimates provided by professionals or based on experience in prior restructuring scenarios
18. Based on total forecasted disbursements and applies the latest US Trustee fee rates
19. Advances, interest and financing costs all based on latest term sheet received from potential DIP lender
20. Starting cash excludes minimal cash that may be in debtors accounts and is subject to reconciliation