Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
blindsey@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887
*Proposed Attorneys for the Debtor*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re: | ) | Case No.: 22-14422-NMC |
| | ) | |
| MUSCLEPHARM CORPORATION, | ) | Chapter 11 |
| | ) | |
| | ) | |
| Debtor. | ) | Hearing Date: January 13, 2023 |
| | ) | Hearing Time: 9:30 a.m. (PT) |
| | ) | |

**NOTICE OF ENTRY OF SECOND INTERIM ORDER
PURSUANT TO EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364 AND FED. R. BANKR. P.
4001(B) AND 4001(D): (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION
FINANCING, (II) GRANTING SENIOR SECURED LIENS AND ADMINISTRATIVE
EXPENSE CLAIMS, (III) DETERMINING ADEQUATE PROTECTION, (IV)
MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

PLEASE TAKE NOTICE that a Second Interim Order Pursuant to Emergency Motion for

Interim and Final Orders Pursuant to 11 U.S.C. §§105, 361, 362, 363 and 364 and Fed. R. Bankr.

P. 4001(b) and 4001(d): (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting

Senior Secured Liens and Administrative Expense Claims, (III) Determining Adequate Protection,

(IV) Modifying the Automatic Stay, and (V) Granting Related Relief [ECF No. 139], has been

entered in the above-captioned case on January 24, 2023, a copy of which is attached hereto as

**Exhibit A**.

Dated: January 24, 2023.

1

1   Respectfully Submitted,

2   SCHWARTZ LAW, PLLC

3   By: */s/ Samuel A. Schwartz*

4   Samuel A. Schwartz, Esq.
*Attorneys for the Debtor*

### CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that a true and correct copy of the foregoing was sent electronically via the Court's CM/ECF system on January 24, 2023, to the following:

OGONNA M. BROWN on behalf of Creditors Prestige Capital Corporation and Prestige Capital Finance, LLC
obrown@lewisroca.com, ogonna-brown-4984@ecf.pacerpro.com,dberhanu@lewisroca.com,ombcalendar@lewisroca.com;jhess@lewisroca.com,klopez@lewisroca.com;gmercado1@lewisroca.com,gmercado@lewisroca.com

CHAPTER 11 - LV
USTPRegion17.lv.ecf@usdoj.gov

JOHN D. FIERO on behalf of Creditor Committee OFFICIAL COMMITTEE OF UNSECURED CREDITORS
jfiero@pszjlaw.com

BART K. LARSEN on behalf of Creditor White Winston Select Asset Funds, LLC
BLARSEN@SHEA.LAW, 3542839420@filings.docketbird.com

WILLIAM M. NOALL on behalf of Creditor EMPERY ASSET MANAGEMENT, LP
wnoall@gtg.legal, bknotices@gtg.legal

TRACY M. O'STEEN on behalf of Interested Party Ryan Drexler
tosteen@carlyoncica.com,
crobertson@carlyoncica.com;nrodriguez@carlyoncica.com;ccarlyon@carlyoncica.com

JASON H. ROSELL on behalf of Creditor Committee OFFICIAL COMMITTEE OF UNSECURED CREDITORS
jrosell@pszjlaw.com

ROBERT T. STEWART on behalf of Creditor NutraBlend Foods
rtstewart@foley.com, rgledhill@foley.com;DocketFlow@foley.com

STRETTO
ecf@cases-cr.stretto-services.com, aw01@ecfcbis.com,pacerpleadings@stretto.com

U.S. TRUSTEE - LV - 11
USTPRegion17.lv.ecf@usdoj.gov

MARK M. WEISENMILLER on behalf of Interested Party EMPERY TAX EFFICIENT, LP
mweisenmiller@gtg.legal, bknotices@gtg.legal

MATTHEW C. ZIRZOW on behalf of Attorneys JASON H. ROSELL and JOHN D. FIERO
mzirzow@lzlawnv.com,
carey@lzlawnv.com;trish@lzlawnv.com;jennifer@lzlawnv.com;zirzow.matthewc.r99681@notify.bestcase.com

MATTHEW C. ZIRZOW on behalf of Creditor Committee OFFICIAL COMMITTEE OF UNSECURED CREDITORS
mzirzow@lzlawnv.com,
carey@lzlawnv.com;trish@lzlawnv.com;jennifer@lzlawnv.com;zirzow.matthewc.r99681@notify.bestcase.com

/s/ Susan Roman
Susan Roman, an employee of
Schwartz Law, PLLC

3

# Exhibit A

*Natalie M. Cox*

Honorable Natalie M. Cox
United States Bankruptcy Judge

Entered on Docket
January 23, 2023

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887
*Proposed Attorneys for the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEVADA**

| In re: | ) | Case No.: 22-14422-nmc |
|---|---|---|
| | ) | |
| MUSCLEPHARM CORPORATION, | ) | Chapter 11 |
| | ) | |
| | ) | |
| Debtor. | ) | Interim Hearing Date: January 13, 2023 |
| | ) | Interim Hearing Time: 9:30 a.m. |

**SECOND INTERIM ORDER PURSUANT TO EMERGENCY MOTION**
**FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362,**
**363, AND 364 AND FED. R. BANKR. P. 4001(B) AND 4001(D): (I) AUTHORIZING**
**THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (II) GRANTING**
**SENIOR SECURED LIENS AND ADMINISTRATIVE EXPENSE CLAIMS, (III)**
**DETERMINING ADEQUATE PROTECTION, (IV) MODIFYING THE**
**AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

The motion ("**Motion**")[1] of MusclePharm Corporation, the Chapter 11 debtor and debtor in

possession herein ("**MusclePharm**" or the "**Debtor**") before this court ("**Court**") seeks entry of

---

[1]     Capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the
Motion.

1

1  interim and final orders pursuant to Sections[2] 105, 361, 362, 363, and 364 of the Bankruptcy Code,

2  Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001 to, among other matters,

3  authorize the Debtor to obtain emergency credit and incur debt on an interim basis. The Debtor

4  negotiated and then filed a substitute term sheet (the "**First Interim Term Sheet**") with the Court

5  on January 6, 2023 [ECF No. 65], between the Debtor, as borrower, and the DIP Secured Parties

6  and DIP Factoring Parties (each as defined in the First Interim Term Sheet) by and through the DIP

7  Agent, Empery Tax Efficient, L.P. ("**Empery**"), and collectively with the DIP Secured Parties and

8  DIP Factoring Parties, "**Lender**"), as lender, in lieu of White Winston Select Asset Funds, LLC

9  ("**WW**"), the originally proposed lender in the Motion, with Lender proposing the requested

10  financing on the terms set forth in the First Interim Term Sheet. Sufficient notice of the Motion and

11  a first interim hearing (the "**First Interim Hearing**") was provided under the circumstances by the

12  Debtor; and further, the Court continued the First Interim Hearing from January 5, 2023, at 9:30

13  a.m. to January 6, 2023, at 9:30 a.m. to provide more time for all to review the First Interim Term

14  Sheet, and the Court thereafter entered its first interim order (the "**First Interim Order**") on

15  January 9, 2023 [ECF No. 74], and continued the Motion for a second interim hearing (the "**Second**

16  **Interim Hearing**" and collectively with the First Interim Hearing, the "**Interim Hearings**") to be

17  held on January 13, 2023, at 9:30 a.m. On January 12, 2023, Debtor substituted a revision to the

18  First Interim Term Sheet [ECF No. 102, Ex. 1] (the "**Term Sheet**" and the proposed financing

19  pursuant to the terms and conditions of the Term Sheet, the, "**DIP Financing**"). After considering

20  the Motion and all pleadings and papers filed with, and evidence submitted to, this Court in

21  connection with the Motion, including all formal and informal objections to the Motion, and the

22  argument of counsel at the Second Interim Hearing; and upon the record made by the Debtor and

23  others at the Second Interim Hearing; the Court has found and determined that, subject to the terms

24  of this second interim order (the "**Second Interim Order**"), the relief sought in the Motion (as

25  amended and supplemented by the Term Sheet) on an interim basis, to the extent provided below,

26  _____

27  [2]     Unless otherwise stated, all references to "**Section**" herein shall be to title 11 of the U.S. Code (the "**Bankruptcy Code**"); all references to a "**Bankruptcy Rule**" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to a "**Local Rule**" or "**LR**" shall refer to the Local Rules of Bankruptcy

28  Practice of the U.S. District Court for the District of Nevada.

1    is in the best interests of the Debtor, its estate, creditors, and all parties in interest; and after due

2    deliberation and consideration and good and sufficient cause appearing therefore, the Court hereby

3    finds:[3]

4          A.    **Debtor's Chapter 11 Case**.    On December 15, 2022 (the "**Petition Date**"), the

5    Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby

6    commencing the above-captioned case (the "**Chapter 11 Case**").    The Debtor is continuing to

7    operate its business and manage its affairs as a debtor in possession pursuant to Sections 1107 and

8    1108 of the Bankruptcy Code, and no request has been made for the appointment of a trustee or

9    examiner.

10         B.    **Jurisdiction; Venue**.    This Court has subject matter jurisdiction to consider and rule

11   upon the Motion pursuant to 28 U.S.C. §§ 157 and 1334.    Determination of the Motion is a core

12   proceeding pursuant to 28 U.S.C. § 157(b).    The statutory predicates for the relief sought by the

13   Motion are Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002,

14   4001, 6004, and 9014, and Local Rule 4001.    Venue of the Chapter 11 Case and the Motion in this

15   District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

16         C.    **Notice**.    Notice of the First Interim Hearing and the relief requested in the Motion

17   was provided by the Debtor by electronic mail, overnight courier, hand delivery or electronic

18   delivery through the Court's CM/ECF system, on January 3, 2023, to: (i) the Office of the United

19   States Trustee for the District of Nevada (the "**U.S. Trustee**"), (ii) the Debtor's 20 largest non-

20   insider unsecured creditors, (iii)  the Lender and counsel to the Lender, (iv) all other parties known

21   by the Debtor to assert liens or security interests in the assets of the Debtor, and (v)  all other parties

22   entitled to notice under Bankruptcy Rule 2002 (the "**Noticed Parties**").    Notice of the Second

23   Interim Hearing was provided by the Court on the record in open court at the First Initial Hearing

24   and also on the written record [See, ECF No. 66].    Under all of the circumstances, such notice of

25   the Motion, the relief requested therein, and the Interim Hearings has complied with Bankruptcy

26   

27   ---
[3]         To the extent that the Court stated findings of fact and conclusions of law on the record at the Second
Interim Hearing, such findings and conclusions are incorporated herein by reference in accordance with Fed.
28   R. Civ. P. 52, made applicable pursuant to Fed. R. Bankr. P. 9014.

3

1   Rule 4001(b), (c) and (d) and the Local Rules.  The final hearing ("**Final Hearing**") will be held

2   pursuant to the authorization of Bankruptcy Rule 4001 and Local Rule 4001 on February 9, 2023,

3   at 10:30 a.m.

4            D.      **Debtor's Need for DIP Financing**.  Based upon pleadings and papers filed with,

5   and evidence submitted to, this Court in connection with the Motion, and the record in the Chapter

6   11 Case, the Debtor does not have sufficient available sources of working capital and financing to

7   carry on the operation of its business and affairs without the DIP Financing and authorized use of

8   cash collateral (as defined in Section 363 of the Bankruptcy Code) ("**Cash Collateral**").  As a result

9   of the Debtor's financial condition, the use of Cash Collateral alone will be insufficient to meet the

10  Debtor's immediate postpetition liquidity needs.  The Debtor's ability to maintain business

11  relationships with its suppliers and customers, pay for human resources, purchase materials and

12  otherwise finance its operations is essential to the Debtor's continued viability.  The Debtor's

13  ability to finance its operations and its Chapter 11 Case is essential to preserving the going concern

14  value of the Debtor's business and ultimately maximizing the value of its estate for the benefit of

15  all stakeholders, and for these reasons and others, the approval of the DIP Financing is in the best

16  interests of the Debtor, its estate, and its creditors.

17           E.      **Budget for Necessary DIP Financing**.  Attached hereto as **Exhibit 2** is a revised

18  13-week cash flow forecast setting forth all projected cash receipts and cash disbursements (by line

19  item) for a 13-week period beginning in the week commencing January 9, 2023 (the "**Budget**").

20  The Budget may be modified or supplemented from time to time by additional budgets (covering

21  any time period covered by a prior budget or covering additional time periods) prepared by the

22  Debtor and consented to in writing by the Lender and the Committee of Unsecured Creditors (the

23  "**Committee**"), without subsequent notice to or order of the Court (each, the "**Approved Budget**").

24  The Budget is an integral part of this Second Interim Order and has been relied upon by the Lender

25  in consenting to this Second Interim Order and to provide the DIP Financing.  The Budget includes

26  and contains the Debtor's best estimate of all operational receipts, and the Budget accounts for

27  operational disbursements, fees, costs and other expenses that are anticipated to be payable,

28  incurred and/or accrued by any of the Debtor during the period covered by the Budget to be timely

4

1    paid in the ordinary course of business to the extent allowed and permitted to be paid by the Court
2    order or pursuant to the Bankruptcy Code, and in accordance with, the Approved Budget.  Funding
3    of the Budget will allow the Debtor to operate in the Chapter 11 Case and pay postpetition
4    administrative expenses in the ordinary course of business to the extent allowed and permitted to
5    be paid by the Court order or pursuant to the Bankruptcy Code, subject to the terms of this Second
6    Interim Order.

7         F.    **Financing under Section 364**.  Based on the pleadings and papers filed with, and
8    evidence submitted to, this Court in connection with the Motion, and the record in the Chapter 11
9    Case, the Debtor is unable to obtain sufficient financing from a source acceptable to Debtor in its
10   business judgment by means of: (i) unsecured credit allowable as an administrative expense under
11   Sections 364(b) and 503(b)(1) of the Bankruptcy Code; or (ii) secured credit under Sections
12   364(c)(1), 364(c)(2), 364(c)(3) and 364(d) for the purposes set forth in the Term Sheet without
13   granting a super-priority priming lien.

14        G.    **Good Faith Lender and Lending and Good Cause**.  The Lender (who together
15   with Prestige Capital Finance, LLC ("**Prestige**") constitute Debtor's senior prepetition lenders)
16   agreed to provide postpetition financing secured by (i) valid, binding, enforceable and non-
17   avoidable consensual senior postpetition security interests and liens (collectively, the "**DIP Liens**")
18   with the same priority as the Prepetition Secured Parties' (as defined in the Term Sheet) current
19   prepetition liens on Debtor's prepetition assets and senior to all other liens existing on and after the
20   Petition Date with the exception of Prestige's prepetition liens and security interests in its
21   prepetition collateral as provided in the prepetition intercreditor agreement ("**Prestige**
22   **Intercreditor Agreement**") between Prestige, the Debtor and the Prepetition Secured Parties, (ii)
23   superpriority claims under Section 364(c)(1), (iii) automatically perfected liens under 364(c)(1),
24   364(c)(2), 364(c)(3) and 364(d), and (iii) the other protections set forth in the Motion and the Term
25   Sheet, in each case limited only by this Second Interim Order.  As of the Second Interim Hearing,
26   the Lender is prepared to advance secured financing to the Debtor in accordance with the Term
27   Sheet to the extent provided in this Second Interim Order and the Approved Budget.  After
28   considering all of its alternatives, including alternative sources of debtor in possession financing,

1    the Debtor has concluded, in an exercise of its sound business judgment, that the DIP Financing

2    provided by Lender represents the best proposed financing available to the Debtor under Debtor's

3    circumstances.  Based on the pleadings and papers filed with, and evidence submitted to, this Court

4    in connection with the Motion, and the record in the Chapter 11 Case, the terms and conditions of

5    the DIP Financing are fair and reasonable, reflect the Debtor's exercise of prudent business

6    judgment, and are supported by reasonably equivalent value and fair consideration.  Absent

7    granting the relief sought by this Second Interim Order, the Debtor's business, properties and estate

8    will be immediately and irreparably harmed.  Accordingly, good cause has been shown that entry

9    of this Second Interim Order is in the best interest of the Debtor's estate, employees, and creditors

10   and other parties in interest and that the implementation and consummation of the DIP Financing

11   and authorization of the use of the Collateral (including the Cash Collateral as further provided

12   below) in accordance with this Second Interim Order and the Term Sheet is in the best interests of

13   the Debtor's estate and consistent with the Debtor's fiduciary duties.  Based on the pleadings and

14   papers filed with, and evidence submitted to, this Court in connection with the Motion, and the

15   record in the Chapter 11 Case, (i) the DIP Financing has been negotiated in good faith and at arm's

16   length among the Debtor and the Lender, and (ii) any credit extended, loans made, and other

17   financial accommodations extended pursuant to this Second Interim Order to the Debtor by the

18   Lender have been extended, issued or made, as the case may be, in "good faith" within the meaning

19   of Section 364(e) of the Bankruptcy Code.

20          II.    **Use of Cash Collateral**.  An immediate and critical need exists for the Debtor to

21   use the Cash Collateral (in addition to the DIP Financing) in accordance with the Approved Budget

22   to continue to operate its business, pay wages, maintain business relationships with members,

23   suppliers and customers, make capital expenditures, generally conduct its business affairs so as to

24   avoid immediate and irreparable harm to its estate and the value of its assets, and afford the Debtor

25   adequate time to effectively reorganize.

26          I.    **Interim Approval of the Motion**.  Based upon the Motion, all pleadings and papers

27   filed with and evidence submitted to this Court in connection with the Motion, and the record made

28   at the Interim Hearings, and WW having withdrawn its objection on an interim basis only, the Court

6

1    has determined to grant the Motion on an interim basis and approve the Debtor's entry into and

2    performance under the DIP Financing under the Term Sheet, as further provided herein, thereby

3    authorizing postpetition financing of up to $750,000 under the DIP Note Facility (as defined in the

4    Term Sheet), and $10,000,000 under the DIP Factoring Facility to factor Accounts (as those terms

5    are defined in the Term Sheet), with up to $2,000,000 of the $10,000,000 DIP Factoring Facility

6    available for factoring Purchase Orders (as that term is defined in the Term Sheet) during the

7    Interim Period and related relief, as provided in the Term Sheet and this Second Interim Order.

8       Based on the foregoing, and upon the record made before this Court at the Interim Hearings,

9    and good and sufficient cause appearing therefore,

10       **IT IS HEREBY ORDERED, ADJUDGED AND DECREED**:

11       1.     **Interim Approval**. The DIP Financing pursuant to the DIP Facilities (as that term

12    is defined in the Term Sheet) is approved on an interim basis and the Debtor is authorized to obtain

13    postpetition financing of up to $750,000 under the DIP Note Facility (as defined in the Term Sheet),

14    and $10,000,000 under the DIP Factoring Facility (as defined in the Term Sheet), with up to

15    $2,000,000 of the $10,000,000 DIP Factoring Facility available for factoring purchase orders

16    (provided that when such factored purchase orders convert to receivables the DIP Factoring Facility

17    shall not exceed $10,000,000), on an interim basis as provided in the Term Sheet and Second

18    Interim Order.

19       2.     **Interim Approval of Term Sheet; Relief Reserved to Final Hearing**. The Term

20    Sheet attached hereto as **Exhibit 1** and all the Lender protections provided therein and herein is

21    approved for all postpetition lending by Lender to Debtor made prior to entry of the Final Order.

22    The Debtor is expressly authorized, empowered, and directed to perform all of its direct and indirect

23    obligations under the Term Sheet and this Second Interim Order including the execution of such

24    additional documents, instruments and agreements reasonably required or requested by the Lender

25    to implement the terms or effectuate the purposes of the Term Sheet and this Second Interim Order,

26    except as limited hereby (collectively, the "**DIP Obligations**"). In furtherance of the foregoing and

27    without further approval of this Court, the Debtor is authorized, and the automatic stay imposed by

28    Section 362 of the Bankruptcy Code is modified to the extent necessary, to perform all acts and to

1   make, execute and deliver all instruments and documents and to pay all reasonable fees (when

2   applicable), that may be reasonably required or necessary for the Debtor's performance of its

3   obligations under the Term Sheet and this Interim Order.  In open Court, the Term Sheet was

4   amended to provide that in the event a Chapter 11 trustee is appointed during the period

5   commencing on the Petition Date and ending at the Final Hearing (such period, the "**Interim**

6   **Period**"), such Trustee shall step into the shoes of the Committee for purposes of the Challenge

7   Period (as defined in the Term Sheet).  Notwithstanding any term in this Second Interim Order,

8   approval of the following relief (as defined in the Term Sheet) is reserved for determination at the

9   Final Hearing:

10         a)  Whether to approve the Lender advancing additional postpetition funding to the

11              Debtor beyond the Final Hearing;

12         b)  Roll-up;

13         c)  Releases;

14         d)  The Prepetition Secured Parties' allowed claim;

15         e)  The Acceptable Plan and Plan Milestones (other than the deadlines for final

16              approval of the DIP Financing at the February 9, 2023 Final Hearing and entry

17              of the Final Order approving the DIP Financing within three (3) business days of

18              the Final Hearing);

19         f)  The good faith finding for DIP Financing other than during the Interim Period;

20              and

21         g)   The ultimate DIP Documents (as defined in the Term Sheet).

22         3.        **Authorization to Borrow/Use of Cash Collateral**.  Pursuant to this Second Interim

23   Order, the Debtor is immediately authorized to (a) borrow and factor Accounts and Purchase Orders

24   from the Lender up to an aggregate amount of $750,000 for the DIP Note Facility and $10,000,000

25   for the DIP Factoring Facility, with $2,000,000 of the $10,000,000 available for factoring of

26   Purchase Orders during the Interim Period, all subject to and in accordance with the terms of this

27   Second Interim Order and the Term Sheet and (b) use the proceeds of the DIP Financing  and the

28   Collateral (including the Cash Collateral) in accordance with the terms of the Term Sheet, this

1 Second Interim Order and the Budget (and any subsequent Approved Budget) consistent with the
2 terms of this Second Interim Order.

3       4. **Cash Collateral**.  The cash and cash equivalents of the Debtor, whenever or
4 wherever acquired, and the cash and cash equivalents proceeds of all Collateral (defined below),
5 constitutes the cash collateral of the Lender, the Prepetition Secured Parties and Prestige (the "**Cash**
6 **Collateral**").  The Debtor may use the Cash Collateral to pay postpetition ordinary course of
7 business expenses to the extent allowed and permitted to be paid herein, by other Court order or
8 pursuant to the Bankruptcy Code, and in accordance with, the Approved Budget, subject to: (i) the
9 rights of the Lender upon the occurrence of an event of default; and (ii) the rights of the Lender
10 otherwise available to the Lender under this Second Interim Order and the Bankruptcy Code.  The
11 Debtor will not, without the prior written consent of Lender, engage in the use of the Cash Collateral
12 of the Lender other than to pay ordinary and necessary business and administrative expenses as set
13 forth in, and limited by, the Budget (and any subsequent Approved Budget) and consistent with
14 this Second Interim Order or other Order of the Court.  All of Lender's Cash Collateral shall be
15 subject to the first priority senior DIP Liens on the DIP Collateral, and any diminution in value of
16 any prepetition collateral including Cash Collateral of the Prepetition Secured Parties and Prestige
17 shall by secured by postpetition replacement liens under Section 552 of the Bankruptcy Code.

18       5. **Maturity and Termination**.  Debtor's authority to use the DIP Financing or any
19 DIP Collateral, including Cash Collateral, and the Lender's commitment to make additional
20 advances under the DIP Financing, shall each terminate upon the earlier of (x) the Court announcing
21 at the Final Hearing that he DIP Financing is not approved on a Final Basis on the terms set forth
22 in the Term Sheet and (y) the date five (5) days after the Lender delivers a written notice of event
23 of default to the Debtor, and the U.S. Trustee, unless any such event is waived, cured or extended
24 with the written consent of the Lender.

25       6. **Interest on DIP Financing**.  The rate of interest to be charged on advances under
26 the DIP Financing shall be: (i) the prime rate as set in the Wall Street Journal as of the date of the
27 entry of this Second Interim Order, plus two percent (2%) for the DIP Note Facility; and (ii) the
28 prime rate as set in the Wall Street Journal as of the date of the entry of this Second Interim Order,

1   plus two percent (2%) for the DIP Factoring Facility.

2         7.    **Payment of DIP Fees and Expenses**.  The Debtor is authorized to pay all costs,

3 expenses and any other fees or other amounts payable under the terms of the Term Sheet and all

4 other reasonable, documented, out-of-pocket costs and expenses of the Lender in accordance with

5 the terms of the Term Sheet (including, without limitation, the costs and expenses of legal counsel),

6 other than fees and expenses to be added to the DIP Note Purchaser, DIP Factoring Purchaser and

7 the DIP Agent indebtedness as provided in the Term Sheet.  None of such fees, costs and expenses

8 shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment

9 shall be required to file with respect thereto any interim or final fee application with this Court.

10 Copies of any invoices (in summary form and redacted, as necessary, for privileged, confidential

11 or otherwise sensitive information) with respect to such fees, expenses and costs shall be provided

12 upon request to the U.S. Trustee, counsel for the Debtor, and counsel to any Committee, and each

13 such party shall have ten (10) days from the date of such notice within which to object in writing

14 to such payment.

15         8.    **Superpriority Claim**.  In accordance with Section 364(c)(1) of the Bankruptcy

16 Code, the Lender shall have superpriority administrative expense claim under Section 364(c)(1)

17 (the "**Superpriority Claim**") for the DIP Obligations against the Debtor, with priority in payment

18 over any and all administrative expenses, adequate protection claims, diminution claims and all

19 other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever,

20 including, without limitation, any and all administrative expenses or other claims of the kinds

21 specified or ordered pursuant to any provision of the Bankruptcy Code, including pursuant to

22 Sections 105, 326, 328, 330, 331, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or

23 otherwise, including those resulting from the conversion of this case pursuant to Section 1112 of

24 the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment

25 lien or other non-consensual lien, levy or attachment; provided, however, for purposes of Section

26 1129(a)(9)(A) of the Bankruptcy Code, the Superpriority Claim shall be considered an

27 administrative expense allowed under Section 503(b) of the Bankruptcy Code against the Debtor,

28 and shall be payable from and have recourse to all prepetition and postpetition property of the

1  Debtor.  Except as set forth in this Second Interim Order and Final Order, no other superpriority

2  claims shall be granted or allowed in the Chapter 11 Case.

3        9.    **DIP Liens**.  As security for all DIP Obligations  pursuant to this Second Interim

4  Order, the Lender is hereby granted (without the necessity of the execution by the Debtor or the

5  filing or recordation of liens, security agreements, lock box or control agreements, financing

6  statements, or any other instruments or otherwise), the DIP Liens on all present and after acquired

7  property (whether tangible, intangible, real, personal or mixed) of the Note Parties, wherever

8  located, including, without limitation, all accounts, inventory, equipment, capital stock in

9  subsidiaries of the Note Parties, including, for the avoidance of doubt, any equity or other interests

10  in the Note Parties' non-Debtor and/or jointly-owned subsidiaries (if any), investment property,

11  instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks

12  and other general intangibles, and all products and proceeds thereof, subject to customary

13  exclusions and excluding any causes of action under Bankruptcy Code Sections 502(d), 544, 545,

14  547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable

15  non-bankruptcy law but, subject to entry of the Final DIP Order, including the proceeds thereof

16  (collectively, the "**DIP Collateral**").  The DIP Liens will not be subject to challenge.  Upon entry

17  of this Second Interim Order, the DIP Liens shall be deemed to be automatically perfected as of the

18  Petition Date, without the need for further action of any kind; provided, however, that if the Lender

19  determines, in its sole discretion, to file any financing statements, notice of liens, mortgages or any

20  other similar instruments, the Debtor will cooperate and assist in such filings and the automatic stay

21  shall be lifted without the need for further order of this Court to allow such filings.

22        10.    **Rights of Prestige**.  The liens granted postpetition by the Debtor to Lender and the

23  Prepetition Secured Parties pursuant to this Second Interim Order shall not impair nor have any

24  priority over, and are subject to, the prepetition liens of Prestige that are senior to those prepetition

25  liens of Lender and the Prepetition Secured Parties pursuant to the Prestige Intercreditor

26  Agreement.  To the extent this Second Interim Order grants any other rights postpetition to Lender

27  (including but not limited to the super-priority administrative expense status), those rights shall not

28  impair nor have any priority over, and are subject to, the prepetition liens of Prestige.

11.     **Carve Out**.  The DIP Liens and Superpriority Claim granted under this Second Interim Order shall be subject to the prior payment of the following amounts (collectively, the "**Carve Out**"): (i) all reasonable and documented fees and expenses up to $250,000 incurred by professionals employed by Debtor; and (ii) all reasonable and documented fees and expenses of up to $250,000 for the Committee.  The Carve Out is subject to a post-carve-out trigger notice cap of $25,000 for Debtor's professionals and $25,000 for the Committee.

12.     **Restrictions on Granting Postpetition Liens**.  Except as otherwise provided in this Second Interim Order and the Term Sheet, no claim having a priority superior or *pari passu* with those granted by the Interim Orders to the Lender shall be granted or permitted without further order of this Court entered in the Chapter 11 Case, while any portion of the DIP Financing (or refinancing thereof) or any other DIP Obligations are outstanding without the prior written consent of the Lender.  Except as expressly permitted by the Second Interim Order and the Term Sheet, the Debtor will not, at any time during the Chapter 11 Case, grant liens or security interests in the DIP Collateral to any other parties pursuant to Section 364 of the Bankruptcy Code or otherwise without either (i) first obtaining the prior written consent of the Lender or (ii) irrevocably satisfying the DIP Obligations in full in immediately available funds as a condition to the granting of such liens.  Unless all DIP Obligations shall have indefeasibly been paid in full in immediately available funds (or as otherwise provided in this Second Interim Order and the Term Sheet), it shall constitute an event of default and terminate the right of the Debtor to use the DIP Financing and Cash Collateral, if the Debtor seeks, or if there is entered, any modification or extension of this Second Interim Order or the Court does not enter a Final Order approving the Term Sheet in its entirety within three (3) business days of the February 9, 2023 Final Hearing, without the prior written consent of the Lender.

13.     **Automatic Effectiveness of Liens**.  The DIP Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtor or Lender without the necessity of execution by the Debtor, or the filing or recordation, of any financing statements, security agreements, or other documents or the taking of any other actions.  DIP Collateral shall be

1  free and clear of other liens, claims and encumbrances, except as provided in the Term Sheet and

2  the Interim Orders for so long as any portion of the DIP Financing (or refinancing thereof) is

3  outstanding.  The Debtor is hereby authorized and directed to execute and deliver to the Lender

4  such financing statements, security agreements, mortgages, collateral assignments, instruments,

5  and documents as the Lender requests, and the Lender is hereby authorized to file or record such

6  documents in their respective discretion without seeking modification of the automatic stay under

7  Section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have

8  been filed or recorded at the time and on the date of entry of the Interim Orders.

9      14.    **Automatic Stay and Remedies**.  As provided herein, subject only to the provisions

10  of the Term Sheet, the provisions of Section 362 of the Bankruptcy Code are vacated and modified

11  to the extent necessary to permit the Lender, following an event of default and during the

12  continuance of any event of default thereafter, all rights and remedies provided for in the Term

13  Sheet and this Second Interim Order without further order of this Court.

14      15.    **Board of Directors; Chief Restructuring Officer**.  In accordance with the Term

15  Sheet, the Court approves of the appointment of Eric Hillman, Paul Karr, and an independent board

16  member to comprise Debtor's three (3) member board of directors.  The Independent director

17  selected by the Debtor, Nicholas Rubin, will have sole and exclusive responsibility with respect to

18  the Debtor for: (i) protecting and recovering the assets of the Debtor, including to determine

19  whether it is in the best interest of the Debtor to reorganize under Section 1129 of the Bankruptcy

20  Code, or sell its assets in accordance with Section 363 of the Bankruptcy Code; (ii) reviewing and

21  approving the ultimate debtor-in-possession financing incurred by the bankruptcy estate, as

22  negotiated by the Debtor's restructuring professionals; (iii) the investigation and determination of

23  which estate causes of action, if any, should be pursued, prosecuted, or settled; and (iv) the

24  maximization of value for all stakeholders, is approved.

25      16.    **No Creation or Evidence of Liability to Third Parties or Alter Ego**

26  **Relationship**.  The Lender shall not be found or deemed to be an alter ego of any of the Debtor, in

27  a partnership of any kind with any of the Debtor, in a principal-agent relationship with the Debtor

28  or otherwise liable for any liabilities of any of the Debtor, and the Debtor shall not be found or

deemed to be a mere instrumentality of the Lender as a result of the Lender deciding to advance the DIP Financing to the Debtor, negotiating and entering into the Term Sheet, and this Second Interim Order, administering the DIP Financing, consenting to the Approved Budget, or taking any other actions permitted by the Interim Orders or the Term Sheet, and no such action (or conduct taken in furtherance of or comprising an integral part of any such action) shall be admissible in any proceeding as evidence that the Lender is the alter ego, partner, principal of, or otherwise liable for any liability of the Debtor.

17.  **Binding Effect**.  The provisions of this Second Interim Order shall be binding upon and inure to the benefit of the Lender, the Debtor, and their respective successors and assigns (including any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected, an examiner appointed pursuant to Section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the Debtor's estate).  To the extent permitted by applicable law, this Second Interim Order shall bind any trustee hereafter appointed for the Debtor's estate, whether in this Chapter 11 Case or in the event of the conversion to a liquidation under Chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Second Interim Order.

18.  **Survival**.  The provisions of this Second Interim Order and any actions taken pursuant hereto shall survive the entry of any order, including an order: (a) confirming any plan of reorganization or liquidation in this Chapter 11 Case (and, to the extent not irrevocably satisfied in full in immediately available funds, the DIP Obligations shall not be discharged by the entry of any such order pursuant to Section 1141(d)(4) of the Bankruptcy Code, or otherwise); (b) converting the Chapter 11 Case to a Chapter 7 case; or (c) dismissing the Chapter 11 Case.  The terms and provisions of this Second Interim Order, as well as the DIP Obligations and the DIP Liens granted pursuant to this Second Interim Order and the Term Sheet, shall continue in full force and effect notwithstanding the entry of any such order.  The DIP Obligations and the DIP Liens shall maintain their priority as provided by this Second Interim Order and the Term Sheet, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full and discharged. In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of

14

the DIP Obligations from those set forth in the Term Sheet without the written consent of the

Lender.  Unless all DIP Obligations shall have indefeasibly been paid in full, it shall constitute an

event of default and terminate the right of the Debtor to use Cash Collateral under this Second

Interim Order if Debtor seeks, or if there is entered, (x) any modification or extension of this Second

Interim Order without the prior written consent of the Lender, or (y) an order converting or

dismissing the Chapter 11 Case.

19.    **Modifications of Term Sheet**.  The Debtor and the Lender are hereby authorized

to implement, in accordance with the terms of the Term Sheet and this Second Interim Order, any

non-material modifications of the Term Sheet without further order of this Court; *provided* that the

Debtor shall provide notice of any such modifications to counsel for the Committee and the U.S.

Trustee.

20.    **Protection Under Section 364(e)**.  If any or all of the provisions of this Second

Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification,

vacation or stay shall not affect the (i) validity of any DIP Obligations owing to the Lender incurred

prior to the actual receipt by both Lender of written notice of the effective date of such reversal,

modification, vacation or stay, or (ii) validity or enforceability of any claim, lien, security interest

or priority authorized or created hereby or pursuant to the Term Sheet with respect to any DIP

Obligations.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash

Collateral or the incurrence of DIP Obligations by the Debtor prior to the actual receipt by both

Lender of written notice of the effective date of such reversal, modification, vacation or stay, shall

be governed in all respects by the provisions of this Second Interim Order and the Term Sheet and

any paperwork issued pursuant to and in conformance therewith, and the Lender shall be entitled

to all of the rights, remedies, protections and benefits granted under Section 364(e) of the

Bankruptcy Code, this Second Interim Order, and the Term Sheet with respect to all uses of Cash

Collateral and the incurrence of DIP Obligations.

21.    **Choice of Law; Jurisdiction; Standing**.  The DIP Financing and the Term Sheet

and any paperwork issued pursuant to and in conformance therewith, (and the rights and obligations

of the parties thereto) shall be governed by, and construed in accordance with, the laws of the State

15

1   of Nevada, without regard to the conflict of law principles thereof. Each party to the DIP

2   Documents will waive the rights to trial by jury and will consent to jurisdiction of the Bankruptcy

3   Court for so long as the Chapter 11 Case remains open and, thereafter, the state and federal courts

4   set forth in the ultimate loan documents executed between and among the parties. The Lender shall

5   have standing, as a party-in-interest under Section 1109(b) of the Bankruptcy Code, to raise and

6   appear and be heard on any issue in the Chapter 11 Case.

7          22.   **Findings of Fact and Conclusions of Law**. This Second Interim Order constitutes,

8   where applicable, findings of fact and conclusions of law and shall take effect and be fully

9   enforceable immediately upon the entry thereof. Findings of fact shall be construed as conclusions

10   of law, and conclusions of law be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

11          23.   **Second Interim Order Effective**. This Second Interim Order shall take effect

12   immediately notwithstanding anything to the contrary prescribed by applicable law.

13          24.   **Failure to Specify Provisions**. The failure specifically to include any particular

14   provisions of the Term Sheet in this Second Interim Order shall not diminish or impair the

15   effectiveness of such provision, it being the intent of the Bankruptcy Court, and the Debtor and the

16   Lender, that the Term Sheet and any paperwork issued pursuant to and in conformance therewith,

17   are authorized and approved in their entirety with such amendments thereto as may be made by the

18   parties in accordance with this Second Interim Order.

19          25.   **First Interim Order Superseded; Final Hearing**. The First Interim Order is

20   superseded by this Second Interim Order. The Bankruptcy Court shall hold a hearing to determine

21   the final approval of the DIP Financing (including proposed DIP loan documents), the Approved

22   Budget and the relief requested by the Debtor in the Motion at the Final Hearing.

23          26.   **Retention of Jurisdiction**. The Court shall retain jurisdiction to hear and determine

24   all matters arising from the implementation of this Second Interim Order.

25          27.   **No Preclusive Effect on Final Approval.** All issues related to whether the Court

26   may authorize additional financing by Empery on a final basis under 11 U.S.C. §§ 364(c) and (d)

27   are reserved for any necessary determination at the Final Hearing.

28   / / /

1       **IT IS SO ORDERED.**

2   Submitted by:

3   SCHWARTZ LAW, PLLC

4   By: /s/ *Samuel A. Schwartz*

5   Samuel A. Schwartz, Esq.
    601 East Bridger Avenue

6   Las Vegas, NV 89101

7   *Proposed Attorneys for the Debtor*

8   **Approved**/~~Disapproved~~:

9   TRACY HOPE DAVIS
    UNITED STATES TRUSTEE

10

11   By: /s/ *Jared A. Day*
    Jared A. Day, Esq.

12   United States Department of Justice
    Attorney for the United States Trustee

13

14   **Approved**/~~Disapproved~~:

15   GARMAN TURNER GORDON

16   By: /s/ *Mark M. Weisenmiller*
    Gregory Garman, Esq.

17   William Noall, Esq.
    Mark M. Weisenmiller, Esq.

18   Attorneys for Empery Tax Efficient, L.P.

19   **Approved**/~~Disapproved~~:

20   JEFFREY D. STERNKLAR LLC

21   By: /s/ *Jeffrey D. Sternklar*
    Jeffrey D. Sternklar, Esq.

22   Attorneys for White Winston Select
    Asset Funds, LLC

23

24

25

26

27

28

**Approved**/~~Disapproved~~:

PACHULSKI STANG ZIEHL & JONES LLP

By: /s/ *Jason Rosell*
John Fiero, Esq.
Jason Rosell, Esq.
Attorneys for the Official Committee
of Unsecured Creditors

**Approved**/~~Disapproved~~:

MANDELBAUM BARRETT PC

By: /s/ *Vincent J. Roldan*
Vincent J. Roldan, Esq.
Attorneys for Prestige Capital Finance, LLC

17

1                        **LR 9021 CERTIFICATION**

2         In accordance with LR 9021, counsel submitting this document certifies that the order

3 accurately reflects the court's ruling and that:

4      ☐     The court has waived the requirement set forth in LR 9021(b)(1).

5

6      ☐     No party appeared at the hearing or filed an objection to the motion.

7      ☒     I have delivered a copy of this proposed order to all counsel and any unrepresented parties who appeared at the hearing, except those as to whom review was waived on the record at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated above:

8

9

10          Jared A. Day, Esq.                    **Approved**/~~Disapproved~~
         Counsel for Office of US Trustee

11          Mark M. Weisenmiller, Esq.         **Approved**/~~Disapproved~~
         Counsel for Empery Tax Efficient, L.P.

12          Jeffrey D. Sternklar, Esq.           **Approved**/~~Disapproved~~

13          Counsel for White Winston Select
         Asset Funds, LLC

14          Jason Rosell, Esq.                  **Approved**/~~Disapproved~~

15          Counsel for Official Committee
         of Unsecured Creditors

16          Vincent J. Roldan, Esq.            **Approved**/~~Disapproved~~

17          Counsel for for Prestige Capital Finance, LLC

18      ☐     I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of this order.

19

20                                ###

21

22

23

24

25

26

27

28

# EXHIBIT 1

# EXHIBIT 1

CONFIDENTIAL GTG DRAFT FOR DISCUSSION PURPOSES ONLY
1/9/23 SUBJECT TO FRE 408
ALL RIGHTS RESERVED

## MUSCLEPHARM CORPORATION AND ITS AFFILIATES

## TERM SHEET FOR DEBTOR-IN-POSSESSION FINANCING
## AND AUTHORIZATION FOR USE OF CASH COLLATERAL

### As of January 9, 2023

Subject to the terms and conditions stated herein, this binding term sheet (the "DIP Term Sheet") sets forth the principal terms of: (i) a superpriority senior secured debtor-in-possession note facility with co-priority with the Prepetition Secured Parties (the "DIP Note Facility"; the agreement evidencing the DIP Note Facility, the "DIP Note Agreement" and, together with the other definitive documents governing the DIP Note Facility and the DIP Orders (as defined herein), the "DIP Note Documents," each of which shall be in form and substance acceptable to the DIP Consenting Secured Parties (as defined herein)) to be entered into with the Note Parties (as defined herein); (ii) a superpriority senior secured debtor-in-possession factoring facility with co-priority with the Prepetition Secured Parties (the "DIP Factoring Facility"; the agreement evidencing the DIP Factoring Facility, the "DIP Factoring Agreement," together with the other definitive documents governing the DIP Factoring Facility and DIP Orders, the "DIP Factoring Documents," and together with the DIP Note Documents, the "DIP Documents," each of which shall be in form and substance acceptable to the DIP Consenting Factoring Parties (as defined herein)) to be entered into with the Debtor (as defined herein); and (iii) the consensual use of the cash collateral (as defined in 11 U.S.C. § 363(a)) of the Prepetition Secured Parties (as defined below) ("Cash Collateral"). The use of Cash Collateral and the DIP Note Facility and DIP Factoring Facility (together, the "DIP Facilities") will be subject to the approval of the Bankruptcy Court (as defined herein) and consummated in the case under chapter 11 (the "Chapter 11 Case") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), in accordance with (a) the interim order (the "Interim DIP Order") and the final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders") of the Bankruptcy Court authorizing the Note Parties to use the Cash Collateral and to enter into the DIP Facilities, each of which shall be in form and substance acceptable to the DIP Consenting Secured Parties and DIP Consenting Factoring Parties (together, the "DIP Consenting Parties"), and (b) the DIP Documents to be executed by the Note Parties. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in (as applicable) (1)(x) Original Issue Discount Senior Secured Notes dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "October Notes") and Original Issue Discount Senior Secured Notes dated as of June 10, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "June Notes" and, together with the October Notes, the "Prepetition Notes"), in each case issued by MusclePharm Corporation, a Nevada corporation (the "Issuer" or the "Debtor"), which Prepetition Notes are described in further detail on Schedule 1 hereto including the Purchasers thereof (the "Prepetition Purchasers"), (2) the Securities Purchase Agreement, dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition SPA"), between the Issuer and each Prepetition Purchaser party thereto and (3) the Pledge and Security Agreement, dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Security Agreement" and, collectively with the Prepetition Notes and the Prepetition SPA, the

DOC ID - 39689513.6

"Prepetition Transaction Documents"), among the Issuer, Canada MusclePharm Enterprises Corp., a British Columbia corporation ("MusclePharm Canada" and, together with the Issuer, the "Note Parties") and Empery Tax Efficient, LP ("Empery"), in its capacity as collateral agent (the "Prepetition Collateral Agent" and, together with the Prepetition Purchasers, the "Prepetition Secured Parties").

| Issuer/Debtor | MusclePharm Corporation, as debtor in possession in the Chapter 11 Case. |
|---|---|
| Guarantor(s) | MusclePharm Canada and any other subsidiaries of the Issuer (collectively, the "Guarantor(s)," and together with the Issuer, the "Note Parties"). |
| Collateral Agent | Empery Tax Efficient, LP ("Empery") or another entity selected by it shall be the sole collateral agent for the DIP Note Purchasers (as defined herein) and DIP Factoring Purchasers (as defined herein) (in such capacity, the "DIP Agent"). |
| DIP Note Purchasers | The "DIP Note Purchasers" will be Empery, [●] (collectively, the "Initial DIP Note Purchasers") and any other Prepetition Purchasers who choose to participate in the DIP Note Facility by notice in writing to the DIP Agent at least two days prior to entry of the Interim DIP Order or such other time as may be agreed by the DIP Agent (collectively, the "DIP Note Purchasers," and together with the DIP Agent, the "DIP Secured Parties").<br><br>"DIP Consenting Secured Parties" shall mean the DIP Agent and Empery, as a DIP Note Purchaser.<br><br>The obligation of any DIP Note Purchaser to purchase any note issued under the DIP Note Facility may be fulfilled on behalf of such DIP Note Purchaser by any of such DIP Note Purchaser's affiliated or related funds or financing vehicles. The DIP Note Purchase Commitments (as defined below) will be offered for participation to each Prepetition Purchaser in each case based on such Prepetition Purchaser's pro rata share of the amounts outstanding under the Prepetition Notes. To the extent a portion of the DIP Note Purchase Commitments is not provided by a Prepetition Purchaser, such portion shall be allocated to, and added to the DIP Note Purchase Commitments of the Initial DIP Purchasers based on the Initial DIP Purchasers' ratable shares of the Prepetition Notes. |
| DIP Note Facility | The DIP Note Facility shall be a superpriority senior secured multiple issuance note facility with co-priority with the Prepetition Secured Parties in an aggregate principal amount not to exceed $2.5 million (the "DIP Note Purchase Commitments", and such loans, the |

|  | "DIP Notes"), subject to the terms and conditions set forth in this DIP Term Sheet. |
|---|---|
|  | $2.5 million of principal due under the Prepetition Notes shall roll-up and convert on a cashless dollar-for-dollar basis into DIP Notes upon entry of the Final DIP Order (the "Roll-Up") to be approved in the Final DIP Order. |
|  | The issuance mechanics of the DIP Note Facility shall be on terms mutually agreed upon by the DIP Agent, on behalf of the DIP Note Purchasers, and the Debtor, and in accordance with the Budget (as defined herein). |
| **Availability** | Upon entry of Bankruptcy Court's oral approval of this Term Sheet, this binding Term Sheet shall govern the Initial Advance pending the effectiveness of the DIP Note Agreement (the date of such effectiveness, the "DIP Effective Date") and shall be subject to the satisfaction of the Conditions Precedent (as defined herein). |
|  | In addition, the obligation of the DIP Purchasers to purchase DIP Notes shall be subject to the following conditions: |
|  | • At the time of issuance and purchase of any DIP Note and after giving effect thereto, the representations and warranties of the Note Parties contained in the DIP Documents shall be true and correct in all material respects. |
|  | • At the time of issuance and purchase of any DIP Note and after giving effect thereto, no Default or Event of Default shall then exist or result therefrom. |
|  | • All issuances of DIP Notes shall be made subject to and in accordance with the Budget (as defined herein). |
|  | • Up to $750,000 (the "Interim DIP Issuance") to be made available in one or more issuances in accordance with the Budget (as defined below) and this binding Term Sheet (until it is superseded by the DIP Documents) and the DIP Documents from the Interim Closing Date until the Final Closing Date (as defined below). |
|  | • If any entity or individual other than the DIP Note Purchasers and DIP Factoring Purchasers are approved to be Debtor's DIP lender at the final hearing on the DIP Motion, then all obligations of the Note Parties under the DIP Facilities shall |

|  | be paid in full upon the closing of the new DIP Lender's financing. |
|---|---|
|  | • Up to an amount equal to the remaining approved unfunded DIP Note Purchase Commitments (the "<u>Final DIP Issuance</u>") to be made available in one or more issuances in accordance with the Budget and the DIP Documents on or after the Final Closing Date. |
|  | • Subject to entry of the Final DIP Order, the Roll-Up shall be approved. |
|  | • Immediately upon entry of the first interim order approving this Term Sheet by the Bankruptcy Court (the "<u>First Interim Order</u>"), the DIP Lender was authorized to advance $150,000 of the Interim DIP Issuance, which shall be used by the Debtor to pay for only those reasonable expenses associated with: (i) payroll; (ii) insurance; (iii) product labeling; and (iv) other reasonable and necessary operational expenses, and the balance of the Interim DIP Issuance shall be advanced with the entry of the Interim DIP Order.  Since the First Interim Order, the DIP Lender has advanced $123,861.31 of the Interim DIP Issuance to fund the specific requests of the Debtor. |
|  | Any amounts repaid under the DIP Note Facility may not be reissued or repurchased. |
| **DIP Factoring Purchasers** | The "<u>DIP Factoring Purchasers</u>" will be Empery, [●] (collectively, the "<u>Initial DIP Factoring Purchasers</u>") and any other Prepetition Purchasers who choose to participate in the DIP Factoring Facility by notice in writing to the DIP Agent at least two days prior to entry of the Interim DIP Order or such other time as may be agreed by the DIP Agent (together with the DIP Agent, the "<u>DIP Factoring Parties</u>").[1] |
|  | "<u>DIP Consenting Factoring Parties</u>" shall mean the DIP Agent and Empery, as a DIP Factoring Purchaser. |
|  | The obligation of any DIP Factoring Purchaser to participate under the DIP Factoring Facility may be fulfilled on behalf of such DIP Factoring Purchaser by any of such DIP Factoring Purchaser's affiliated or related funds or financing vehicles.  The DIP Factoring Purchase Commitments (as defined below) will be offered for participation to each Prepetition Purchaser in each case based on such Prepetition Purchaser's pro rata share of the amounts |

---

[1] A third party may do the factoring under the DIP Factoring Facility.

| | |
|---|---|
| | outstanding under the Prepetition Notes.  To the extent a portion of the DIP Factoring Purchase Commitments is not provided by a Prepetition Purchaser, such portion shall be allocated to, and added to the DIP Factoring Purchase Commitments of the Initial DIP Factoring Purchasers based on the Initial DIP Factoring Purchasers' ratable shares of the Prepetition Notes. |
| **DIP Factoring Facility** | Pursuant to the DIP Factoring Documents, Debtor will sell, transfer, convey, assign and deliver to DIP Factoring Purchasers, and DIP Factoring Purchasers agree to purchase and receive from Debtor, all of Debtor's right, title and interest in and to all eligible post-petition accounts ("Accounts") and, to the extent provided in the next succeeding paragraph, purchase orders ("Purchase Orders") arising from the sale of any product or goods or the rendering of services by Debtor in the ordinary course of the Debtor's business (each an "Advance") for up to $10 million (the "DIP Factoring Purchase Commitments", and such factoring, the "DIP Factoring").

The DIP Factoring Purchasers will only purchase Purchase Orders from Debtor during the period of entry of the Interim DIP Order to entry of the Final DIP Order (the "Interim Period").  During the Interim Period, the DIP Factoring Purchasers will only factor Purchase Orders that: (i) have been approved in writing by Eric Hillman; and (ii) JW Nutritional, LLC has confirmed in writing can be manufactured in accordance with the terms of the purchase order. The DIP Factoring Purchasers will only factor up to $2 million of Purchase Orders during the Interim Period.

IT IS THE INTENTION OF THE PARTIES THAT AS TO ALL ACCOUNTS AND PURCHASE ORDERS (DURING THE INTERIM PERIOD) THAT DIP FACTORING PURCHASERS ELECT TO PURCHASE SHALL CONSTITUTE A TRUE PURCHASE AND SALE OF ACCOUNT(S) UNDER § 9-318 OF THE UNIFORM COMMERCIAL CODE AND AS SUCH, THE DEBTOR SHALL HAVE NO LEGAL OR EQUITABLE INTEREST IN THE ACCOUNTS AND PURCHASE ORDERS SOLD. |
| **Advances on Accounts and Purchase Orders** | The DIP Factoring Purchasers, in the sole discretion of the DIP Agent, may advance up to (i) one hundred percent (100%) of the first $1,000,000 of Accounts and Purchase Orders purchased during the Interim Period, and (ii) eighty percent (80%) of the face amount of the Accounts purchased in excess of $1,000,000, less the applicable discount fee, and Facility Fee (as defined below) (collectively the "***Aggregate Advances***"). The purchase price of any Account and Purchase Order (during the Interim Period) shall be the amount actually received in payment of such Account and Purchase Order, |

| | |
|---|---|
| | but for the purposes of any Advance or Purchase Order, the purchase price shall be equal to the face amount of the Account or Purchase Order less any selling, payment or other discounts offered. |
| **Reserve** | DIP Agent, in its sole discretion, may elect to maintain a reserve from each Advance ("Reserve") of an amount not to exceed 20% of the Aggregate Advances (the "Reserve Cap").  As a general rule, although not a requirement, it is intended that Reserves on paid invoices are released upon the request of the Debtor or when the DIP Agent's next purchase of Accounts or Purchase Orders from Debtor is funded.  However, DIP Agent may increase or decrease the amount of such Reserve, up to the Reserve Cap, at any time and from time to time if it deems it necessary in order to protect its interest and to protect DIP Factoring Purchasers from losses or potential losses that DIP Factoring Purchasers may reasonably anticipate might arise in the future due to contingencies, disputes, potential breach of warranties or other potential non-payments, reductions or losses from the purchase of Accounts or Purchase Orders under the Advances. |
| **Recourse to Borrower of Certain Accounts** | In the event that (a) an Account or Purchase Order (during the Interim Period) purchased by DIP Factoring Purchasers is not paid in full by the account debtor, on or before the date when due in accordance with its terms, (b) an account debtor objects to the property sold or service performed by Debtor, or rejects or revokes acceptance or fails or refuses to accept or receive any such property or services, (c) an account debtor suspends business, requests a general extension of time within which to pay debts, makes an assignment for the benefit of creditors or becomes a debtor or alleged debtor in any bankruptcy case, or if an event occurs amounting to a general business failure of an account debtor, or (d) DIP Agent in its reasonable discretion determines that any Account or Purchase Order is or may become uncollectible (collectively, a "Worthless Account"), the DIP Agent may require the Debtor promptly to repurchase such Account or Purchase Order. |
| **Facility Fee** | Fifty basis points (0.50%) of each Account or Purchase Order purchased by DIP Factoring Purchasers, payable at the time of each such purchase. |
| **Closing Dates** | "Interim Closing Date" means the date on which the conditions precedent to the Interim DIP Issuance set forth in the DIP Documents (including entry of the Interim DIP Order) have been satisfied or waived.<br><br>"Final Closing Date" means the date on which the conditions precedent to the Final DIP Issuance set forth in DIP Documents |

| | |
|---|---|
| | (including entry of the Final DIP Order) have been satisfied or waived. |
| **Amortization** | The DIP Note Facility shall not have any principal amortization prior to the Maturity Date (as defined below). |
| **Maturity Date** | Earliest of (a) December 31, 2023, (b) the date all DIP Notes become due and payable under the DIP Documents, whether by acceleration after an Event of Default or otherwise, (c) the date of the closing of the Sale Transaction (as defined below) or any other sale(s) of all or substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, and (d) the filing of a chapter 11 plan that is not an Acceptable Plan (as defined below) (the "Maturity Date"). |
| **Interest Rates** | • DIP Note Facility: The prime interest rate as published in the Wall Street Journal plus two percent (2%) per annum.<br><br>• Interest Rate on Aggregate Advances: The prime interest rate as published in the Wall Street Journal plus two percent (2.0%) per annum.<br><br>• Default interest rate of an additional two percent (2.0%) per annum upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Documents), payable in cash on demand. |
| **Payments and Fees** | Upfront Payment: $0<br><br>DIP Agent Fee: $0<br><br>Closing Fee: $0 |
| **DIP Collateral** | All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Note Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of the Note Parties, including, for the avoidance of doubt, any equity or other interests in the Note Parties' non-Debtor and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the Final DIP Order, including the proceeds thereof (collectively, the "DIP Collateral"). |

| | |
|---|---|
| **Priority of DIP Obligations** | All obligations of the Issuer under the DIP Facilities and all amounts owing by the Guarantor(s) in respect thereof at all times shall be, effective as of December 15, 2022 ("Petition Date"), secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected co-priority senior liens on and security interests in the DIP Collateral (collectively, the DIP Liens"), subject to the priorities described in Schedule 2 hereto.<br><br>All of the DIP Liens shall be created on terms, and pursuant to documentation, satisfactory to the DIP Agent, in its sole discretion. |
| **DIP Superpriority Claim** | All obligations of the Debtor under the DIP Facilities and all amounts owing by the Guarantor(s) in respect thereof at all times shall constitute allowed superpriority administrative expense claims, pursuant to section 364(c)(1) of the Bankruptcy Code, in the Chapter 11 Case (the "DIP Superpriority Claims"), having priority over all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provisions of the Bankruptcy Code, subject to the priorities described in Schedule 2 hereto. |
| **Documentation** | The DIP Documents shall be prepared initially by counsel for the DIP Agent, and shall substantially reflect the terms and provisions of this DIP Term Sheet in all material respects and shall be acceptable to the DIP Agent. |
| **Conditions Precedent** | Notwithstanding the binding nature of this Term Sheet, the effectiveness of the DIP Facilities on the DIP Effective Date, the obligations of the DIP Note Purchasers to purchase the DIP Notes, and the obligations of the DIP Factoring Purchasers to purchase Accounts or Purchase Orders (during the Interim Period) shall be subject to customary closing conditions, including, without limitation, the satisfaction of the following conditions precedent (the "Conditions Precedent") (unless waived in writing by the applicable DIP Consenting Parties):<br><br>• All DIP Documents shall have been executed by the Note Parties and the other parties thereto.<br><br>• The DIP Secured Parties and DIP Factoring Parties shall have received, and the DIP Consenting Parties shall be satisfied with, the initial Budget (as defined herein).<br><br>• Upon the entry of the Interim DIP Order, the DIP Agent shall, for the benefit of the DIP Secured Parties and DIP Factoring Parties, have valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on the DIP |

|  | Collateral to the extent set forth in the Interim DIP Order, subject to the priorities described in Schedule 2 hereto, and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid. |
|---|---|
|  | • The form and substance of the "first day" orders permitting the payment by the Issuer and its subsidiaries of any prepetition amounts then (or thereafter becoming) due and owing shall be acceptable to the DIP Agent. |
|  | • The Interim DIP Order and the Final DIP Order (as applicable) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any manner adverse to the DIP Note Purchasers or DIP Factoring Purchasers without the consent of the DIP Agent, or to the extent adversely and disproportionately affecting any particular DIP Note Purchaser or DIP Factoring Purchaser, such adversely affected DIP Note Purchaser or DIP Factoring Purchaser. |
|  | • The satisfaction of other customary terms and conditions (including, without limitation, delivery of secretary and officer certificates, notice of borrowing, evidence of insurance, and legal opinions) and such other customary conditions as shall be required by the DIP Agent. |
| **Milestones** | Subject to the entry of the Final DIP Order, the Note Parties shall comply with the following deadlines (each, individually, a "Milestone" and, collectively, the "Milestones"), which may be extended or waived by the DIP Agent in its sole discretion: |
|  | • The Note Parties filed a motion for approval of a DIP loan on January 3, 2022, and subject the dates set by the Court, the Note Parties shall file a supplemental motion, in form and substance acceptable to the DIP Consenting Parties, seeking final approval of the DIP Facilities (the "DIP Motion"). |
|  | • The Bankruptcy Court shall enter the Interim DIP Order, which order shall be in form and substance acceptable to the DIP Consenting Parties, approving the DIP Facilities on an interim basis no later than three (3) business days following the hearing on the DIP Motion. |
|  | • The Bankruptcy Court shall enter the Final DIP Order, which order shall be in form and substance acceptable to the DIP Consenting Parties, approving the DIP Facilities (including |

| | |
|---|---|
| | the Roll-Up on a final basis) no later than 24 days following the filing of the DIP Motion. |
| | • The Debtor shall file an Acceptable Plan by September 30, 2023. |
| | • An "Acceptable Plan" is a plan of reorganization or liquidation reasonably acceptable to the DIP Agent, which shall include the following: |
| |     o Repayment in full in cash of the obligations under the DIP Note Facility, including Roll-Up; |
| |     o Be acceptable to the DIP Agent, in its reasonable discretion, with respect to the treatment of the Prepetition Secured Parties, DIP Note Purchasers, and DIP Factoring Purchasers. |
| | • In the event an Acceptable Plan has not been filed by Debtor by September 30, 2023, Debtor shall commence a Section 363 sale process (the "Sale Transaction") within 14-days of notice by the DIP Agent that the plan filed is not acceptable. In the event that no plan is filed by September 30, 2023, Debtor shall commence a Sale Transaction on October 20, 2023. The procedure and timing of the Sale Transaction shall be satisfactory to the DIP Agent, in its sole discretion. |
| | • The Bankruptcy Court shall approve an Acceptable Plan by December 15, 2023. |
| | To the extent any covenant or obligations under the DIP Documents (including any Milestones) are required to be performed on a day that is not a business day, the deadline for such covenant or obligations shall be automatically extended to the next business day. |
| **Voluntary Prepayment** | Prior to the Maturity Date, the Issuer may, upon at least three business days' notice, prepay in full or in part, the DIP Notes. |
| | The Issuer shall not be permitted to repurchase DIP Notes or repay or prepay DIP Notes other than on a pro rata basis. |
| **Mandatory Prepayment** | Prior to the Maturity Date, the following mandatory prepayments shall be required: |
| | 1. Asset Sales: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of the sale or other disposition of any property or assets of the Note Parties or any of their respective |

| | |
|---|---|
| | subsidiaries, except for ordinary course and de minimis sales and additional exceptions to be agreed on in the DIP Documents; |
| | 2.   Insurance Proceeds: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the Note Parties or any of their respective subsidiaries subject to exceptions to be agreed on in the DIP Documents; and |
| | 3.   Incurrence of Indebtedness: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of any indebtedness incurred by the Note Parties or any of their respective subsidiaries after the DIP Effective Date (other than indebtedness otherwise permitted under the DIP Documents), payable no later than the date of receipt. |
| **Financial Covenants** | All lending beyond the advances set forth in the Interim Advance and this Term Sheet shall be subject to final approval of the DIP Facilities, the Budget and entry of the Final DIP Order. |
| | Following the one-week anniversary of the Interim DIP Order until the repayment in full in cash of the obligations under the DIP Facilities, the Note Parties shall perform in accordance with the Budget, subject to the following with respect to any Review Period: (i) the Note Parties' actual cash receipts shall not be less than 90% of the projected amounts therefor set forth in the Budget on a cumulative basis; and (ii) the Note Parties' actual cash disbursements shall not be greater than 110% of the projected amounts therefor set forth in the Budget on a cumulative basis(such variance, the "Permitted Variances"). |
| | During any Review Period occurring prior to March 15, 2023, the DIP Note Purchasers and DIP Factoring Purchasers waive all defaults of the Note Parties for failing to comply with the Budget, including the Permitted Variances, solely with respect to (i) top line gross revenue and cash receipts and (ii) all cost of goods sold, including shipping. |
| | Debtor shall file with the Bankruptcy Court a final Budget agreed to by the DIP Agent on or before March 15, 2023. |
| | Compliance with the Budget shall be reviewed on Monday of every other week on a bi-weekly basis, with such reviews to be conducted on the Monday following each of the second and fourth weeks of the Budget (each, a "Weekly Review Period") and thereafter on a rolling 4-week basis (the "Cumulative Review Period" and together with the Weekly Testing Period, the "Review Periods").  Beginning on the |

11

|  | second Monday following the DIP Effective Date and every other Monday thereafter, the Note Parties shall deliver to the DIP Agent the Variance Report (as defined herein), which Variance Report shall include variance for the line items consistent with the latest Approved Budget (as defined in the DIP Documents) and be in form and substance acceptable to the DIP Consenting Parties.<br><br>"Budget" means the initial cash flow forecast for the 13-week period commencing with the week in which the Petition Date occurs, setting forth on a line-item basis the Note Parties' projected cash receipts and cash disbursements, on a weekly basis, which budget shall be prepared by the Note Parties and in form and substance acceptable to the DIP Consenting Parties, and which budget shall be updated on the one-week anniversary of the Initial DIP Order and every four weeks on Wednesday (commencing with the Wednesday of the fourth full week commencing after the one-week anniversary of the Initial DIP Order (or if such day is not a business day, the next business day) in substantially the same form as the initial budget delivered and in substance acceptable to the DIP Consenting Parties. The Budget shall include separate line items for each Professional Person (defined below). To the extent that any updated Budget is not acceptable to the DIP Consenting Parties, the then-existing approved budget will remain the "Budget" until replaced by an updated budget that is acceptable to the DIP Consenting Parties. |
|---|---|
| **Reporting** | The Issuer shall deliver to the DIP Agent (and the DIP Agent shall deliver to each DIP Note Purchaser and DIP Factoring Purchaser):<br><br>(a) a weekly line-by-line variance report (the "Variance Report"), which Variance Report shall compare actual cash receipts and disbursements of the Note Parties with corresponding amounts provided for in the Budget on a line-by-line basis for the prior week and the applicable Review Period (or such shorter period as may have elapsed from the Petition Date), including written descriptions in reasonable detail explaining any material positive or negative variances, and otherwise in form and substance reasonably acceptable to the DIP Consenting Parties;<br><br>(b) all other reports and notices required to be delivered under the DIP Documents as mutually agreed upon by the Debtor and the DIP Agent; and<br><br>(c) copies of non-privileged reports of the financial and restructuring advisors of the Note Parties as reasonably requested by the DIP Agent, including but not limited to: |

|  | i.   Any analysis of cash flows, forecasts, and potential cost savings initiatives; |
|---|---|
|  | ii.   Transaction marketing material (CIMs / MPs); |
|  | iii.   Investor outreach list; |
|  | iv.   Sale process updates in accordance with the terms of this DIP Term Sheet; and |
|  | v.   Proposed sources and uses at emergence.<br><br>In addition, management of the Issuer shall, at the request of the DIP Agent, conduct a bi-weekly conference call with the DIP Consenting Parties during normal business hours at a time to be mutually agreed upon to discuss the Issuer's performance. |
| **Board of Directors** | As set forth below, the DIP Consenting Parties shall approve an independent director ("<u>Independent Director</u>"), nominated by the Interim Board of Directors (defined below), with sole and exclusive responsibility for the following:<br><br>• Protect and recover the assets of the Debtor, including determine whether it is in the best interest of the Debtor to reorganize under Section 1129 of the Bankruptcy Code, or sell its assets in accordance with Section 363 of the Bankruptcy Code;<br>• Review and approve the ultimate debtor-in-possession financing incurred by the bankruptcy estate, as negotiated by the Debtor's restructuring professionals;<br>• Except as otherwise provided herein, investigate and determine which estate causes of action, if any, should be pursued, prosecuted, or settled; and<br>• Maximize value for all stakeholders.<br><br>Except as set forth below, all current members of the board of directors will resign immediately upon entry of the <u>First Interim Order</u>.<br><br>Upon entry of the First Interim Order, the board of directors will be reconstituted with the following members ("<u>Interim Board of Directors</u>"):<br><br>1. Paul Karr; and<br>2. Eric Hillman. |

| | Upon entry of the Interim DIP Order, the board of directors will be reconstituted with the following members (the following, the "Board of Directors"): |
|---|---|
| | 1. Eric Hillman;<br>2. Paul Karr; and<br>3. The Independent Director.<br><br>The Debtor shall nominate an Independent Director on or before January 17, 2023. |
| **Other Covenants** | By no later than five (5) days following the entry of the Interim DIP Order, Debtor shall engage a Chief Restructuring Officer (the "CRO") reasonably satisfactory to the DIP Consenting Parties pursuant to an engagement letter with a scope and compensation reasonably satisfactory to the DIP Consenting Parties and otherwise be in form and substance satisfactory to the DIP Consenting Parties. All fees and expenses of (and otherwise relating to) the CRO shall be the sole responsibility of the Debtor. The CRO shall not be removed without order of the Bankruptcy Court. Furthermore, the CRO's fees and costs shall not exceed $50,000 per month, except as otherwise approved by the Board of Directors.<br><br>Ryan Drexler shall resign from all offices of Debtor and from the board of directors of Debtor immediately upon entry of the First Interim Order. Eric Hillman shall be appointed as the CEO of Debtor immediately upon entry of the First Interim Order.<br><br>The DIP Documents shall contain such other negative and affirmative covenants that are ordinary and customary in debtor-in-possession financings and reasonably acceptable to the DIP Consenting Parties, including, without limitation, compliance with the Budget in accordance with the DIP Documents. Such covenants shall prohibit, inter alia, Issuer from making dividends or other distributions of cash to the direct or indirect equity holders of Issuer, including any distributions of cash in order to pay management fees or pay taxes attributable to the income of Issuer or any of its subsidiaries.<br><br>At the request of the DIP Agent, the Note Parties shall (i) arrange and cause to be held bi-weekly conference calls between representatives of the Note Parties, the CRO and the DIP Consenting Parties (which (a) may, to the extent practicable, be the same weekly conference described above, and (b) shall occur during normal business hours at a time to be mutually agreed) for purposes of providing information regarding the status of the Chapter 11 Case, Debtor's business operations, the preparation, filing, and |

| | |
|---|---|
| | confirmation of an Acceptable Plan, and the Sale Transaction process that, while a stalking horse bidder remains part of the sale process, would not be deemed to provide preferential treatment to such bidder; *provided* that, for the avoidance of doubt, information regarding the number and identity of the parties contacted and the overview of the marketing efforts undertaken in connection with the Sale Transaction shall not be deemed to provide preferential treatment and shall be disclosed; (ii) at all times provide the DIP Consenting Parties and their professional advisors with access to any data room established for purposes of allowing potential purchasers to evaluate a Sale Transaction; and (iii) provide the DIP Consenting Parties and their professional advisors with all materials and other communications regarding the Sale Transaction process provided and available to all bidders at the time of distribution to any or all bidders. If at any time the stalking horse bidder is not part of the sale process, then the Issuer shall arrange and cause to be held weekly conference calls between representatives of the Note Parties, the CRO and the DIP Consenting Parties (which (a) may, to the extent practicable, be the same weekly conference described above, and (b) shall occur during normal business hours at a time to be mutually agreed), for purposes of providing full and complete information regarding the Sale Transaction process to the DIP Agent. |
| **Representations & Warranties** | The DIP Documents shall contain such representations and warranties as are usual and customary in debtor-in-possession financing and as are reasonably acceptable to the DIP Consenting Parties. |
| **Use of Proceeds** | The proceeds of the DIP Facilities shall be used solely for the following purposes, subject in all cases to the Budget:<br><br>(a) pay fees, interest, payments, and expenses associated with the DIP Facilities;<br><br>(b) provide for the ongoing working capital and capital expenditure needs of the Note Parties during the pendency of the Chapter 11 Case;<br><br>(c) fund the Carve-Out;<br><br>(d) fund the Forensic Accountant (if retained); and<br><br>(e) fund the costs of the administration of the Chapter 11 Case and the consummation of the restructuring.<br><br>No Cash Collateral or proceeds of the DIP Facilities shall be used by the Debtor to investigate, challenge, object to or contest the validity, |

| | |
|---|---|
| | security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the DIP Facilities or the Prepetition Transaction Documents. |
| **Forensic Accounting** | At the request of the DIP Agent and approval of the Board of Directors, the CRO shall retain a forensic accountant reasonably acceptable to the DIP Consenting Parties (the "<u>Forensic Accountant</u>") to review and analyze all Debtor's bank statements for three (3) or more years prior to the Petition Date and any other documents and information necessary to investigate payments and transfers from Debtor to determine whether they are avoidable under federal and state law. The DIP Agent will increase the DIP Facility in the amount necessary to pay for the forensic accounting in an amount agreed to be the DIP Agent and the CRO. |
| **DIP Disbursement Account** | The Issuer and the Guarantor(s) shall deposit the proceeds of the DIP Note Facility and any Advances in Bankruptcy Court approved debtor-in-possession account that is subject to the control of the DIP Agent pursuant to a deposit account control agreement (the "<u>DIP Disbursement Account</u>"), and that is not subject to the control of any other Person. Proceeds of the DIP Facilities and any other deposits to be provided under the DIP Documents shall be deposited, held and disbursed through the DIP Disbursement Account or otherwise in accordance with the cash management order. For the avoidance of doubt, the factoring commitment will be made but only funded upon receipt of orders, which funding will not be unreasonably withheld or delayed. |
| **Events of Default/Remedies** | Events of Default shall include, without limitation:<br><br>• failure to pay principal or interest on the DIP Notes or any fees under the DIP Facilities when due;<br><br>• failure of any representation or warranty of any Note Party contained in any DIP Document to be true and correct in all material respects when made;<br><br>• breach of any covenant, subject to a five (5) business day grace period (from the earlier of the date that (i) any Note Party obtains knowledge of such breach and (ii) any Note Party receives written notice of such default from any DIP Consenting Party), <u>provided</u> that the breach of any covenant described herein, or any other covenant so indicated by the DIP Agent, shall not be subject to any grace period; |

- failure to comply with the Budget, subject to the Permitted Variances;

- the DIP Agent shall cease to have continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected co-priority senior liens on and security interests in the DIP Collateral with the priorities described in Schedule 2 hereto (other than upon a release by reason of a transaction that is permitted under the DIP Documents);

- any Note Party or equityholder or Affiliate thereof (i) contesting the validity or enforceability of any DIP Document in writing or denying in writing that it has any further liability thereunder or (ii) contesting the validity or perfection of the liens and security interests securing the Facilities;

- any attempt by any Note Party or any equityholder or Affiliate thereof to invalidate or otherwise impair the DIP Facilities or the liens granted to the DIP Note Purchasers or DIP Factoring Purchasers;

- failure by any Debtor to comply with the Interim DIP Order or Final DIP Order, as applicable;

- the entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim DIP Order or Final DIP Order or any other order of the Bankruptcy Court approving the Debtor's use of Cash Collateral, as applicable, without the express written consent of the DIP Consenting Parties;

- any sale or disposition, other than the Sale Transaction, of all or a material portion of the DIP Collateral securing the DIP Facilities pursuant to section 363 of the Bankruptcy Code other than as permitted by the DIP Orders (or pursuant to a transaction that is permitted under the DIP Documents);

- conversion of, or the filing of any motion by any Note Party or any equityholder or Affiliate thereof to convert, any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

- dismissal of, or the filing of any motion by any Note Party or equityholder or Affiliate thereof to dismiss, any of the Chapter 11 Case;

- the appointment of a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of any Note Party (powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) under sections 1104(d) and 1106(b) of the Bankruptcy Code;

- failure to meet any Milestone;

- the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to a holder or holders of any security interest or lien on any part of the DIP Collateral securing the DIP Facilities to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral having a fair market value in excess of an amount to be agreed by the DIP Consenting Parties;

- the grant of any superpriority claim that is pari passu with or senior to those of the DIP Note Purchasers or DIP Factoring Purchasers (other than the Carve-Out);

- termination by the Bankruptcy Court of the use of Cash Collateral;

- the filing of a plan of reorganization or liquidation by the Debtor that is not an Acceptable Plan;

- expiration of the period of time during which only the Issuer may file a plan pursuant to section 1121 of the Bankruptcy Code; and

- the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any of the DIP Collateral.

Among other remedies to be specified, upon the occurrence of an Event of Default, the DIP Agent may and, at the direction of the DIP Consenting Parties, shall seek relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, and apply the proceeds thereof to the obligations arising under the DIP Documents or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law.

| | |
|---|---|
| **Cash Collateral Usage** | The Prepetition Secured Parties consent to the use of Cash Collateral, subject to the Budget (subject to Permitted Variances) and the terms of this term sheet and the DIP Orders. |

| Carve Out | Carve-out provisions to be customary and appropriate in the context of the proposed DIP Facilities, and as otherwise acceptable to the DIP Agent, including a carve-out of all reasonable and documented fees and expenses up to $250,000 incurred by professionals employed by Debtor, and a carve-out of all reasonable and documented fees and expenses of up to $250,000 for any committee of unsecured creditors and a post-carve-out trigger notice cap of $25,000 for Debtor's professionals and $25,000 for any committee of unsecured creditors. Nothing in this section is intended or to be construed as limiting the fees and costs of the Issuer's professionals, as approved by the Bankruptcy Court in accordance with the Bankruptcy Code. |
|---|---|
| Expenses and Indemnification | The Note Parties shall pay, in connection with the Chapter 11 Case and the negotiation and documentation of the DIP Facilities and restructuring matters with respect to the Note Parties, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agent and reasonable and documented legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agent. In addition, the Note Parties shall pay, in connection with workout proceedings and enforcement costs associated with the DIP Facilities, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agent and reasonable and documented legal fees and out-of-pocket expenses legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agent. Such fees and expenses shall be added to DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent claim(s).<br><br>The Issuer and the Guarantor(s) will indemnify the DIP Agent, DIP Note Purchasers, and DIP Factoring Purchasers and their respective affiliates, and their respective related parties, and hold them harmless from and against all out-of-pocket costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any notes issued under the DIP Facilities; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of |

| | |
|---|---|
| | competent jurisdiction to have been incurred solely by reason of the gross negligence or willful misconduct of such person. |
| **Adequate Protection** | (i)      the Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall receive, to the extent of any aggregate diminution in the value of their collateral: (a) valid, binding, enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "Prepetition Notes Adequate Protection Liens"), subject to the priorities described in Schedule 2 hereto; and (b) allowed superpriority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "Prepetition Notes Adequate Protection Claims"), subject to the priorities described in Schedule 2 hereto;

(ii)      Prestige Capital Finance, LLC ("Prestige") shall receive, to the extent of any aggregate diminution in the value of its collateral: (a) valid, binding, enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "Prestige Adequate Protection Liens"), subject to the priorities described in Schedule 2 hereto; and (b) allowed superpriority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "Prestige Adequate Protection Claims"), subject to the priorities described in Schedule 2 hereto;

(iii)     the Prepetition Collateral Agent shall be entitled to reimbursement of its reasonable and documented fees and out- of-pocket expenses;

(iv)     the Prepetition Collateral Agent shall be entitled to reimbursement of its respective reasonable and documented fees and out-of-pocket expenses of one primary counsel and one local counsel (if applicable), and one financial advisor;

(v)      the Prepetition Collateral Agent, on behalf of itself and the Prepetition Secured Parties, shall be entitled to performance of the Milestones set forth herein;

(vi)     Subject to Challenge Period set forth below, the Debtor agrees that in any sale of the DIP Collateral, the Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall have the right to credit bid an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, plus the obligations under the DIP Facilities, |

| | |
|---|---|
| | or such greater amount as allowed by the Court, in accordance with section 363(k) of the Bankruptcy Code, and that any motion filed by the Debtor seeking approval of bid procedures shall contain a request for approval of the right of the Prepetition Collateral Agent to credit bid the obligations of the Prepetition Purchasers;<br><br>(vii)    the Debtor shall provide the information required by the section entitled "Reporting" set forth herein;<br><br>(viii)   the Final DIP Order shall include the waivers described in the section entitled "Waivers" set forth herein; and<br><br>(ix)    interest at the default rate specified in the Prepetition Notes shall continue to accrue under the terms of the Prepetition Notes. |
| **Committee Review** | The Office Committee of Unsecured Creditors ("Committee") shall have a period of sixty-days (60) from entry of the Interim Order to investigate and challenge and otherwise object to the allowance of the Allowed Claim (the "Challenge Period") |
| **Stipulations** | The DIP Orders shall contain stipulations as to, among other things, the amount and priority of the secured indebtedness under the Prepetition Notes. |
| **Waivers** | The DIP Orders shall provide for (i) a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code, (ii) a waiver of the ability to surcharge the DIP Collateral, and subject to entry of the Final DIP Order, the collateral securing the Prepetition Notes, including under section 506(c) of the Bankruptcy Code, and (iii) a waiver of the equitable doctrine of "marshaling" with respect to the DIP Collateral, and subject to entry of the Final DIP Order, the collateral securing the Prepetition Notes. |
| **Releases** | Pursuant to the DIP Orders, the Issuer and Guarantor(s) shall release all claims against the DIP Agent in its capacity as such, the DIP Note Purchasers in their capacities as such, the DIP Factoring Purchasers in their capacities as such, the Prepetition Collateral Agent in its capacity as such and the Prepetition Purchasers in their capacities as such. |
| **Allowed Claim** | Subject to Challenge Period, the Prepetition Secured Parties shall have an allowed claim of an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, plus the obligations under the DIP Facilities and attorneys' fees and expenses. |

| Credit Bid | Debtor shall consent to (i) the DIP Agent submitting a credit bid of the obligations under the DIP Facilities, and (ii) subject to Challenge Period, the Prepetition Collateral Agent submitting a credit bid of an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, or such greater amount as allowed by the Court (together, the "Credit Bid Obligations"), in connection with the sale of any asset of the Note Parties (in whole or in part), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code and any motion filed by the Debtor seeking approval of bid procedures shall contain a request for approval of the right of the DIP Agent and Prepetition Collateral Agent, as applicable, to credit bid the Credit Bid Obligations and Debtor shall not object to such a provision. |
|---|---|
| Governing Law | The DIP Documents shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to the conflict of law principles thereof. Each party to the DIP Documents will waive the rights to trial by jury and will consent to jurisdiction of the Bankruptcy Court for so long as the Chapter 11 Case remain open and, thereafter, the state and federal courts located in the County of New York in the State of New York. |
| Amendments | All amendments, modifications and waivers of the DIP Documents shall require the consent of the Issuer and the DIP Consenting Parties, except in the case of amendments, modifications, or waivers customarily requiring consent from all DIP Note Purchasers and DIP Factoring Purchasers, all affected DIP Note Purchasers, DIP Factoring Purchasers, or the DIP Agent. |
| Assignments and Participations | Each DIP Note Purchaser and DIP Factoring Purchaser may assign all or any part of the DIP Notes or Accounts to one or more affiliate, bank, financial institution, or other entity. Upon such assignment, such affiliate, bank, financial institution, or entity will become a DIP Note Purchaser or DIP Factoring Purchaser, as applicable, for all purposes under the DIP Documents. The DIP Note Purchasers and DIP Factoring Purchasers will also have the right to sell participations, subject to customary limitations on voting rights, in the DIP Notes or Accounts. Notwithstanding the foregoing, no assignment shall be made or participation sold to the Issuer, any subsidiary of the Issuer or an affiliate of any of the foregoing. |
| Counsel to Empery as DIP Agent, DIP Note | Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP |

| | |
|---|---|
| **Purchaser, and DIP Factoring Purchaser** | |

**SCHEDULE 1[2]**

| Prepetition Purchaser | Aggregate Principal Amount, including OID, of October Notes (USD) | Aggregate Principal Amount, including OID, of June Notes (USD) |
|---|---|---|
| Altium Growth Fund, LP | 1,384,300.00 | 156,250.00 |
| Anson Investments Master Fund LP | 1,038,225.00 | 312,500.00 |
| Bigger Capital Fund, LP | 692,150.00 | 312,500.00 |
| CVI Investments, Inc. | 692,150.00 | 0.00 |
| District 2 Capital Fund LP | 1,038,225.00 | 312,500.00 |
| Empery Debt Opportunities Fund, LP | 1,245,870.00 | 281,250.00 |
| Empery Master Onshore, LLC | 924,712.40 | 208,750.00 |
| Empery Tax Efficient, LP | 276,860.00 | 62,500.00 |
| Empery Tax Efficient III, LP | 321,157.60 | 72,500.00 |
| HB Fund LLC | 692,150.00 | 156,250.00 |
| Intracostal Capital LLC | 69,214.99 | 0.00 |
| Ionic Ventures | 692,150.00 | 312,500.00 |
| L1 Capital Global Opportunities Master Fund | 692,150.00 | 0.00 |
| Roth Capital Partners, LLC | 0.00 | 269,375.00 |
| Walleye Opportunities Master Fund Ltd. | 0.00 | 625,000.00 |
| **TOTAL** | 9,759,315.00 | 3,081,875.00 |

---

[2] Schedule 1 to be reviewed and updated, as needed.

## SCHEDULE 2

| Order of Priority | DIP Collateral Consisting of Pre-Petition Factoring Priority Collateral[3] | DIP Collateral Consisting of Post-Petition Factoring Priority Collateral | DIP Collateral Not Consisting of Factoring Priority Collateral | Third-Party Encumbered Assets[4] | Unencumbered Assets | Superpriority Claims |
|---|---|---|---|---|---|---|
| 1st | Carve-Out and Permitted Liens[5] | Carve-Out and Permitted Liens | Carve-Out and Permitted Liens | Third-Party Existing Liens | Carve-Out | Carve-Out and Permitted Liens |
| 2nd | Prestige Liens[6] | DIP Liens | DIP Liens | Carve-Out | DIP Liens | DIP Superpriority Claim |
| 3rd | DIP Liens | Prestige Adequate Protection Liens | Prepetition Notes Adequate Protection Liens | DIP Liens | Prepetition Notes Adequate Protection Liens and Prestige Adequate Protection Liens | Prepetition Notes Adequate Protection Claim and Prestige Adequate Protection Claim |
| 4th | Prepetition Notes Adequate Protection Liens | Prepetition Notes Adequate Protection Liens | Prepetition Notes Liens | Prepetition Notes Adequate Protection Liens and Prestige Adequate Protection Liens | | |
| 5th | Prepetition Notes Liens | Prepetition Notes Liens | Prestige Adequate Protection Liens | | | |
| 6th | | | Prestige Liens | | | |

---

[3] As defined in the Intercreditor Agreement, dated as of October 13, 2021 (the "Prestige Intercreditor Agreement"), among Prestige, Empery, as Notes Representative on behalf of the Prepetition Noteholders and Prepetition Collateral Agent, and the Note Parties.

[4] "Third-Party Encumbered Assets" shall mean DIP Collateral that was, as of the Petition Date, subject to valid, properly perfected and non-avoidable liens or security interests (collectively, the "Third-Party Existing Liens") other than the liens and security interests granted pursuant to the Prepetition Security Agreement (the "Prepetition Notes Liens") and the Prestige Liens (as defined below).

[5] "Permitted Liens" shall mean any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Notes Liens and Prestige Liens.

[6] "Prestige Liens" shall mean any valid, properly perfected and non-avoidable liens on or security interests in the Factoring Collateral created by the Factoring Security Documents (each as defined in the Prestige Intercreditor Agreement).

# EXHIBIT 2

# EXHIBIT 2

DRAFT - SUBJECT TO CHANGE

**MusclePharm**
Thirteen-Week Cash Flow Forecast
1/12/2023

| Week Ending / Week # | 1/15/23 (1) | 1/22/23 (2) | 1/29/23 (3) | 2/5/23 (4) | 2/12/23 (5) | 2/19/23 (6) | 2/26/23 (7) | 3/5/23 (8) | 3/12/23 (9) | 3/19/23 (10) | 3/26/23 (11) | 4/2/23 (12) | 4/9/23 (13) | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Factored Receipts[1] | - | 1,078,257 | 20,814 | 311,992 | 19,104 | - | - | - | - | - | 60,894 | - | - | 1,499,061 |
| Total COGS[2] | | 859,364 | | 326,538 | | | | | | | | | | 1,185,902 |
| Shipping & Logistics[3] | | 110,459 | | 40,200 | | | | | | | | | | 150,659 |
| Labeling & Testing Costs[4] | | 10,000 | | 10,000 | | 10,000 | | | | | | | | 30,000 |
| Total COGS including Shipping, Labeling and Testing | | 979,823 | | 376,738 | | 10,000 | | | | | | | | 1,366,561 |
| **SG&A** | | | | | | | | | | | | | | |
| Payroll & Benefits[5] | 64,345 | 77,620 | | | 66,310 | | 84,464 | 15,625 | 66,310 | | 81,935 | | 66,310 | 544,194 |
| Insurance[6] | 60,792 | | | | | | | | | | | | | 270,192 |
| General & Administrative[7] | 24,864 | | | | | | | | | | | | | 82,394 |
| Securities Counsel[8] | | | | | | | | | | | | | | 50,000 |
| Board Fees[9] | | | | | | | | | | | | | | 85,750 |
| eCommerce[10] | | | | | | | | | | | | | | 40,504 |
| Marketing[11] | | | | | | | | | | | | | | 40,000 |
| Avatara[12] | 1,115 | | | | | | | | | 11,747 | 1,115 | | | 13,977 |
| **Total SG&A[13]** | 150,000 | 108,861 | 27,950 | 33,251 | 70,810 | 238,750 | 116,764 | 63,501 | 70,810 | 19,247 | 125,476 | 24,750 | 68,810 | 1,126,980 |
| **Net Operating Cash Flow** | (150,000) | (10,427) | (7,136) | (97,997) | (51,706) | (248,750) | (116,764) | (63,501) | (70,810) | (19,247) | (64,582) | (24,750) | (68,810) | (994,480) |
| **Cumulative Net Operating Cash Flow** | (150,000) | (160,427) | (167,563) | (265,560) | (317,266) | (566,016) | (682,780) | (746,281) | (817,091) | (836,338) | (900,920) | (925,670) | (994,480) | (994,480) |
| **Restructuring Costs** | | | | | | | | | | | | | | |
| *Company Advisors[14]* | | | | | | | | | | | | | | |
| Schwartz Law | | 150,000 | | | | | 70,000 | | | | 120,000 | | | 340,000 |
| Portage Point | | 75,000 | | | | | 45,000 | | | | 64,000 | | | 184,000 |
| Claims Agent | | | | | | | 16,000 | | | | 16,000 | | | 32,000 |
| *Lender Advisors* | | | | | | | | | | | | | | |
| Emery - Garman Turner Gordon[15] | | | | | | | | | | | | | | |
| Perkins - Meland & Budwick[16] | | | | | | | | | | | | | | |
| Prestige Local - Lewis Roca Rothgerber Christie[16] | | 112,500 | | | | | 52,500 | | | | 90,000 | | | 255,000 |
| *Unsecured Creditor Advisors[14]* | | | | | | | | | | | | | | |
| UCC Counsel (includes Local)[16] | | | | | | | | | | | | | | |
| Creditor Financial Advisor | | | | | | | | | | | | | | |
| **Total Professional Fees[17]** | | 337,500 | | | | | 183,500 | | | | 290,000 | | | 811,000 |
| **Other Restructuring Costs** | | | | | | | | | | | | | | |
| Filing Fees | | | | | | | | | | | | | | |
| Trustee Fees[18] | | | | | | | | | | | | | 24,243 | 24,243 |
| Investigation Costs | | | | | | | | | | | | | | |
| Critical Vendors | | | | | | | | | | | | | | |
| Utilities Adequate Assurance | | | | | | | | | | | | | | |
| **Total Restructuring Costs** | | 337,500 | | | | | 183,500 | | | | 290,000 | | 24,243 | 835,243 |
| **Net Cash Flow after Restructuring Costs** | (150,000) | (347,927) | (7,136) | (97,997) | (51,706) | (248,750) | (300,264) | (63,501) | (70,810) | (19,247) | (354,582) | (24,750) | (93,053) | (1,829,723) |
| **Cumulative Net Cash Flow after Restructuring Costs** | (150,000) | (497,927) | (505,063) | (603,060) | (654,766) | (903,516) | (1,203,780) | (1,267,281) | (1,338,091) | (1,357,338) | (1,711,920) | (1,736,670) | (1,829,723) | (1,829,723) |
| **Financing[19]** | | | | | | | | | | | | | | |
| DIP Lender Advance | 150,000 | 600,000 | | | | 1,750,000 | | | | | | | | 2,500,000 |
| Interest Expense | | 7,090 | | | | 22,651 | | | | | 36,666 | | | 66,408 |
| **Total Cash Flow** | 0 | 244,983 | (7,136) | (97,997) | (51,706) | 1,478,599 | (300,264) | (63,501) | (70,810) | (19,247) | (391,248) | (24,750) | (93,053) | 603,870 |
| **Cumulative Total Cash Flow** | 0 | 244,983 | 237,847 | 139,850 | 88,144 | 1,566,743 | 1,266,479 | 1,202,978 | 1,132,168 | 1,112,921 | 721,673 | 696,923 | 603,870 | 603,870 |
| Starting Cash[20] | | 0 | 244,983 | 237,847 | 139,850 | 88,144 | 1,566,743 | 1,266,478 | 1,202,977 | 1,132,167 | 1,112,920 | 721,672 | 696,922 | |
| Change in Cash | (0) | 244,983 | (7,136) | (97,997) | (51,706) | 1,478,599 | (300,264) | (63,501) | (70,810) | (19,247) | (391,248) | (24,750) | (93,053) | 603,870 |
| **Ending Cash** | (0) | 244,983 | 237,847 | 139,850 | 88,144 | 1,566,743 | 1,266,478 | 1,202,977 | 1,132,167 | 1,112,920 | 721,672 | 696,922 | 603,870 | 603,870 |

NOTE: Figures shown represent latest estimates and information provided by the Company
1. Assumes first $1 million of accounts purchased are advanced at 100% with remaining advanced at 80% upon generation of the receivable and the remaining 20% when collected.
2. COGS assumed to be paid out in same week shipment is made per Company estimates and in line with existing JW Nutritional 48 hour terms
3. Estimate of 10% of total sales based on ship date
4. Estimate provided by management  assumes $10,000 a week shipment occurs with $10,000 additional to account for potential future needs
5. Inclusive of payroll funding and associated costs, 401k contributions and health insurance
6. Includes D&O and GL insurance payments with Company provided estimates along with contemplated new D&O policy for incoming directors and officers in the week ending 2/19/23
7. Estimate inclusive for general operating expenses
8. Estimated ordinary course securities counsel expenditures for SEC related requirements
9. Payment for existing and new member board fees, week ending 2/19/23 contemplates catch up payment for partial December and January, plus February fees. Monthly fees to be paid in advance at the beginning of each month
10. Includes Nova, Shopify and Hallmark, all of which are service providers supporting eCommerce capabilities
11. Marketing based included to support eCommerce and online order efforts for non-wholesale customers
12. Avalara provides sales tax tracking, reporting and payment support. Estimates included monthly filing fees and estimated taxes
13. Forecast excludes audit, tax and SEC filing fees that may be required and are assumed to be paid outside of the forecast period, if necessary
14. Does not constitute agreed fee structure between company and its professionals
15. All lender advisor fees assumed to be accrued to lender claims and not paid through DIP funding
16. UCC fees inclusive of local counsel and assumed to be 75% of Company counsel fees
17. Unless otherwise noted, restructuring costs based on estimates provided by professionals or based on experience in prior restructuring scenarios
18. Trustee fees estimated and applies the latest US Trustee fee rates
19. Advances, interest and financing costs all based on latest term sheet received from potential DIP lender
20. Starting cash excludes minimal cash that may be in debtors accounts and is subject to reconciliation