James Patrick Shea, Esq.
Nevada Bar No. 405
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:  jshea@shea.law
        blarsen@shea.law
        kwyant@shea.law

-and-

**JEFFREY D. STERNKLAR LLC**
Jeffrey D. Sternklar, Esq. (*Admitted Pro Hac Vice*)
Massachusetts Bar No. 549561
101 Federal Street, Suite 1900
Boston, Massachusetts 02110
Telephone:  (617) 207-7800
Email:  jeffrey@sternklarlaw.com

*Attorneys for Creditor White Winston*
*Select Asset Funds, LLC*

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| IN RE:<br><br>MUSCLEPHARM CORPORATION<br><br>Debtor. | Chapter 11<br><br>Case No.: 22-14422-nmc |

**DECLARATION OF TODD M. ENRIGHT IN SUPPORT OF OBJECTION OF CREDITOR WHITE WINSTON SELECT ASSET FUNDS, LLC TO APPROVAL OF DEBTOR IN POSSESSION FINANCING BY EMPERY TAX EFFICIENT, L.P.**

1.      My name is Todd M. Enright.  I am a principal of White Winston Select Asset Funds, LLC ("**WW**").  I am over the age of eighteen (18) years and I am competent to testify to the matters asserted in this declaration.  I have personal knowledge of all facts averred in this Declaration, and could competently testify to the same, except for those facts stated upon information and belief, and would competently testify to the same on information and belief.

2.      I submit this Declaration for all permissible purposes under the Federal Rules of Civil Procedure and Rules of Evidence in support of the *Objection Of Creditor White Winston Select Asset Funds, LLC To Approval Of Debtor In Possession Financing By Empery Tax Efficient*, L.P. ("*Objection*") filed contemporaneously with this Declaration.  Unless otherwise indicated, capitalized terms have the meanings ascribed to them in the Objection.

3.      WW is a Delaware limited liability company with its principal place of business in Boston, Massachusetts.  WW engages in debt and equity investing in private companies and small-cap public companies such as the Debtor.  At all material times, I was the person at WW in charge of the claims of WW against the Debtor.

4.       I am a co-founder of WW. I have extensive experience in underwriting and managing loans and investments in businesses.  Prior to co-founding White Winston, I was a managing member of Middlebury Partners and its affiliates, originally organized in 1995. The Middlebury funds were comprised of four principal investment entities that focused on making investments in expansion and later stage transactions.  I have been responsible for investing in excess of $100 million of capital as a manager of the Middlebury funds. Prior to my involvement as a principal in the Middlebury funds, I was employed for four years as a registered securities broker with State Street Research/MetLife Securities and worked for a boutique investment banking firm in New York upon completing my college studies. I hold a Bachelor of Arts degree, and graduated with honors, from Marlboro College.  I also have extensive experience managing WW's loans in workout, insolvency and chapter 11 bankruptcy cases.

*A.      WW's Background with the Debtor*

5.      WW's tumultuous relationship with the Debtor spawned multiple lawsuits between and among WW and the Debtor in Nevada, Massachusetts and California, and thereafter a separate lawsuit filed by Empery in New York state court, all before the commencement of this bankruptcy case.  Those lawsuits included *White Winston Select Asset Fund Series Fund MP-18, LLC, et al. v. MusclePharm Corporation, et al.*, Case No. 18-OC-00206 (First Judicial District Court in and for Carson City, Nevada) (the "***Nevada Action***"); *White Winston Select Asset Fund Series Fund*

*MP-18, LLC, et al. v. MusclePharm Corporation, et al.*, Case No. 80196 (Nevada Supreme Court); *MusclePharm Corporation, et al. v. The First Judicial District Court of the State of Nevada, et al.*, Case No. 79163 (Nevada Supreme Court); *White Winston Select Asset Fund Series Fund MP-18, LLC v. MusclePharm Corporation*, Case No. 19STCV26426 (Superior Court of the State of California, County of Los Angeles, Central District) (the "*CA Action*"); *MusclePharm Corporation, et al. v. White Winston Select Asset Fund Series Fund MP-18, LLC, et al*, Case No. 1984CV00663-BLS2 (Superior Court, Suffolk County, Commonwealth of Massachusetts) (the "*First Massachusetts Action*") and *White Winston Select Asst Funds LLC, et al v. MusclePharm Corp., et al,* Case No. 2284CV00293-BLS2 (Superior Court, Suffolk County, Massachusetts) (the "*Second Massachusetts Action*").

6.      First, In 2018, WW was concerned that Ryan Drexler and certain other members of the Debtor's board of directors, had engaged in improper transactions.  Accordingly, on August 21, 2018, WW filed a verified complaint to commence the Nevada Action, seeking damages from Mr. Drexler and certain other members of the Debtor's board of directors and the appointment of a receiver for the Debtor.

7.      Second, in February 2019, the Debtor and Drexler sued, *inter alia*, WW and Todd Enright (a principal of WW) in the Massachusetts Superior Court (the "*First Massachusetts Action*").  The Complaint in the First Massachusetts Action alleged that it arose out of a supposed "scheme" by WW to "extract" a settlement by launching the Nevada Action.  The Massachusetts court granted WW's motion to dismiss the First Massachusetts Action on September 20, 2019, specifically holding that the Debtor's complaint failed to make any "specific allegation to back up its claim that [the Nevada Action] was part of an extortionate scheme" and did not "explain how [WW] unfairly used the Nevada litigation to obtain some advantage that [it was] not entitled to have."

8.      Third, on or about July 30, 2019, prior to the Massachusetts court's dismissal of the First Massachusetts Action, WW filed suit in California to commence the CA Action.  WW sought to inspect the Debtor's books and records that had been withheld from it and sought a court order

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

in the CA Action to compel production of the Debtor's books and records.  Ultimately, the Debtor was ordered to pay WW's fees in the CA Action in connection with the request after the Court ordered it to produce those books and records.

9.       Thereafter, Mr. Drexler continued to engage in transactions that WW believed were wrongful and harmful.  After much back and forth, in February, 2020, Mr. Drexler approached Mr. Enright to express his desire for a global resolution of all litigation between WW and the Debtor.  Messrs. Drexler and Enright discussed a settlement in which (1) WW would be compensated for the harm it suffered, including its expenses, and (2) the Debtor would end its dependence on Mr. Drexler as a creditor and receive funding instead from WW and other sources.

10.      After further negotiation, I was involved in discussions of a settlement term sheet on or about March 4, 2020, reflecting their prior discussions.  Among other things, that term sheet contemplated

a.   The Debtor would pay $7,148,333 to WW, consisting of $3,500,000 in cash or cash equivalents and a $3,648,355 convertible bond.

b.   As with the initial term sheet, Drexler would assign his debt to WW.

c.   WW would provide $3 million in interim financing to the Debtor.

d.   The Debtor would issue a warrant to WW for 3,648,355 shares of the Debtor's common stock at a strike price of $0.18 per share.

e.   The Debtor would initiate a rights offering of common stock at $0.40 per share.

f.   The Debtor would agree to essentially the certain corporate governance reforms particularly by adding of independent directors and the resignation of Mr. Drexler and those associated with him from their corporate-officer positions at the Debtor.

g.   The Debtor, Mr. Drexler and WW would enter into an Investor Rights Agreement granting WW a right of first refusal in any issuance of debt, equity, or other securities of the Debtor.

11.      I believed a final agreement was reached and confirmed a complete agreement on all material issues during a telephone call on March 12, 2020.

12.     After agreeing to this settlement, however, one of the Debtor's then lawyers who was not involved in the settlement negotiations subsequently advised the Debtor to repudiate the settlement because that lawyer thought the settlement was not beneficial to the Debtor.

13.     Accordingly, on February 2, 2022, WW commenced the Second Massachusetts Action against the Debtor and Mr. Drexler to enforce the settlement agreement repudiated by the Debtor and breached with the active participation of the Empery Securityholders.

**B.     The Settlement Agreement Among WW, the Debtor and Mr. Drexler**

14.     Settlement discussions resumed after the commencement of the Second Massachusetts Action. Those discussions resulted in a written settlement agreement among WW, the Debtor and Mr. Drexler ("**Settlement Agreement**"), a genuine copy of which is attached as <u>Exhibit A</u>. The Settlement Agreement mimicked the settlement reached by the parties in 2020, and effected a global settlement among WW, the Debtor and Mr. Drexler, including with respect to all of the litigation matters described above.

15.     Among other things, the Settlement Agreement (i) contemplated an initial payment of Four Million Dollars ($4,000,000) to WW (Section 1), and (2) issuance by the Debtor of a bond to WW for $4,630,261.00) (Section 2). The Settlement Agreement prohibited Mr. Drexler from increasing his legacy debt from the Debtor (Section 3) and required Mr. Drexler and WW to enter into an Intercreditor Agreement (Section 4). The Debtor agreed to issue stock warrants to WW (Sections 5 and 6) and commence a rights offering (Section 7). The Settlement Agreement contemplated certain reforms to the management of the Debtor, including the expansion of the board of directors to seven (7) persons and the resignation of Mr. Drexler as an officer of the Debtor. (Section 8). The parties agreed to negotiate and enter into an Investor Rights Agreement providing WW with certain preemptive rights, lock-up rights and certain restrictions on related party transactions. (Section 9). The Settlement Agreement included customary releases and obligations to dismiss pending litigation. (Sections 11 – 14).

16.     There is much in the Declaration of Timothy Silver [ECF No. 52] (the "**Silver Dec.**") about the Settlement Agreement, most of which is false or misleading. The Silver Dec. at

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

¶ 78 incorrectly characterizes WW as "unsecured equity holders in [the Debtor] and a plaintiff against [the Debtor] in various legal actions." In fact, WW is a creditor and a shareholder of the Debtor, and no longer is a plaintiff in any legal actions against the Debtor. Mr. Silver then incorrectly avers (at ¶ 88) that "[u]pon information and belief, [WW] was going to take action in an effort to thwart (or hinder and delay) the imminent foreclosure of [the Debtor's] collateral [by Empery]." No facts are averred to support this misstatement, other than a litany of alleged defaults by the Debtor of its obligations to the Empery Securityholders. Why and how those alleged defaults, if they occurred at all, give the Empery Securityholders any rights against WW rather than a claim for damages against the Debtor, is never stated. In any event, even if true, the averments in the Silver Dec. merely establish that the Debtor defaulted months before this bankruptcy case commenced. The Silver Dec., if true, makes clear that Empery did nothing, let alone something a sophisticated investor would be expected to do, to protect its interests for these many months. Thus, the Empery Securityholders have only Empery's dilatory conduct to blame for their alleged losses.

17.    In point of fact, WW entered into the Settlement Agreement in good faith, without any intent to hinder, delay and defraud Empery. The Settlement Agreement is entirely consistent with the 2020 settlement that WW commenced the Second Massachusetts Action to enforce. The terms of the 2020 settlement, upon which the Settlement Agreement is based, were laid out exhaustively in early February, 2022 in WW's complaint filed in the Second Massachusetts Action, which Empery read or should have read prior to entry into the Securities Purchase Agreement ("*SPA*") and related documents with the Debtor. That the Debtor breached its obligations to Empery by entering into the Settlement Agreement, even if true, does not make the Settlement Agreement fraudulent, wrongful or actionable against WW. If anything, Empery's transactions with the Debtor, described in the Silver Dec., violate the Debtor's 2020 settlement with White Winston.

18.    In any event, after entering into the Settlement Agreement, WW solicited Empery's agreement to postpone its Article 9 sale of the Debtor's assets for 30 days. Empery at first agreed

with me to postpone the sale, but later, at the proverbial eleventh hour, abruptly chose instead to proceed with its Article 9 sale. After Empery breached its agreement to postpone the sale, the Debtor filed this case the same day as the scheduled sale.

### C.    The New York Litigation

19.    The Silver Dec. at ¶¶ 89-94 misstates the litigation among Empery, Mr. Drexler and WW pending in New York that was commenced prior to the commencement of this case. In summary, two actions were filed. First, the Debtor filed a complaint against Empery, claiming its proposed Article 9 sale was improper. Empery responded by filing a separate complaint against the Debtor, Mr. Drexler and WW. Empery's complaint asserted six (6) causes of action. The sole count (Count V) asserted against WW was a claim that a settlement agreement among the Debtor, Mr. Drexler and WW was a fraudulent transfer made in violation of the New York Uniform Voidable Transactions Act ("UFTA"). The Settlement Agreement was not signed in New York and the settlement did not occur in New York at all. Under black letter law, this Debtor acquired exclusive standing to assert this claim after this bankruptcy case was filed. Nevertheless, Empery continued the litigation on this claim after the commencement of this bankruptcy.

20.    Abruptly, and perhaps in response to the Debtor's admonition to Empery regarding ongoing litigation (see Declaration of Mark Weisenmiller [ECF No. 53] ("Weisenmiller Dec.") at ¶29 (referencing ongoing litigation)., Empery amended its complaint in New York. The amended complaint replaced every claim in the original complaint against the Debtor, Mr. Drexler and WW, including Count V. Instead, Empery replaced those claims with two entirely new claims for tortious interference against Mr. Drexler and WW, on the anomalous *non sequitur* that because the Debtor (allegedly) breached its agreements with Empery by entering into the Settlement Agreement, *ipsi dixit* that means Mr. Drexler and WW tortiously interfered with Empery's contractual relationships with the Debtor.

21.    Indeed, Mr. Drexler removed the case to federal court in New York. Empery seeks remand. The matter is pending in the United States District Court for the Southern District of New York.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

### C. The Competition Between WW and Empery for the DIP Loan

22.     Empery and WW have been engaged in a competition to determine which proposal for debtor-in-possession financing ("**DIP Financing**") the Debtor intends to select.  The terms of WW's proposals have changed over time.  I instructed my counsel to send a term sheet to counsel for the Debtor and the Committee on January 30, 2023 (the "**WW Term Sheet**").  A genuine copy of the WW Term Sheet is attached as <u>Exhibit B</u>.

23.     In the WW Term Sheet, WW has offered financing to the Debtor for more money than Empery is offering, without the "poison pills" that appear in the Empery proposal.  The Debtor has stated it believes the Empery deal is better, but the Debtor has never explained the reasons why.  But under any objective analysis, the WW proposal is better and for more money than is the Empery proposal.  Below is a chart summarizing some of the more significant differences between the WW and Empery proposals (Empery's proposal appears at [ECF No. 89]):

| SUBJECT | EMPERY | WW |
|---|---|---|
| Amount of DIP (Non-Factoring) | $2,500,000.00 | $5,250,000.00, comprised of<br>• $3,000,000 DIP Loan<br>• $1,500,000 Inventory Loan<br>• $500,000 Marketing Loan<br>• $250,000 Committee Prof. Fees |
| Factoring | $10,000,000 | $10,000,000.00 |
| Security for DIP | Co-Priority Lien on Prepetition Assets, Senior Lien on Postpetition Assets | Junior Lien on Prepetition Assets, Senior Lien on Postpetition Assets |
| Prepetition Claim | At least $12,840,000 | $8,600,00 (approx.) |
| Priority of Prepetition Claim | • Senior Secured on prepetition assets<br>• Waiver of "equities of the case" under 11 U.S.C. §552(a) for postpetition assets | Consensual subordination of secured claim to general unsecured claim only |

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

| | | | |
|---|---|---|---|
| | | • Undisclosed stipulations in DIP orders "as to, among other things, the amount and priority of the secured indebtedness" of Empery and its cohorts (the "<u>Empery Securityholders</u>") prepetition indebtedness. | |
| | Roll-Up | $2,500,000 of disputed prepetition debt to postpetition debt | None |
| | Maturity Date | Earliest of (a) **December 31, 2023**, (b) the date all DIP Notes become due and payable under the DIP Documents, whether by acceleration after an Event of Default or otherwise, (c) the date of the closing of the Sale Transaction (as defined below) or any other sale(s) of all or substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, and (d) *the filing of a chapter 11 plan that is not an Acceptable Plan* | The Effective Date under a confirmed chapter 11 plan of reorganization in the Bankruptcy Case, or upon Bankruptcy Court approval of a sale or other disposition of any of the DIP Collateral to a person or entity other than the Lender. |
| | Challenge Period | Sixty Days from entry of Interim Order (unclear if Roll-Up can be challenged). Only the Committee may challenge the Empery Securityholders' claims – all other parties, including WW, are not provided equivalent rights to challenge anything | Sixty Days from entry of Final Order |
| | Plan Provisions | Debtor must file an "Acceptable Plan" by Sept. 30, 2023 and Court must confirm an "Acceptable Plan" by Dec. 15, 2023.  An "Acceptable Plan" is a chapter 11 plan that includes | None |
| | | • Repayment in full in cash of the obligations under the DIP Note Facility, including Roll-Up; | |
| | | • Be acceptable to the DIP Agent, in its reasonable discretion, with respect to the treatment of the Prepetition Secured Parties, DIP Note Purchasers, and DIP Factoring Purchasers | |
| | | (<u>cf</u>. plan treatment in ECF 65). | |

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

| | | |
|---|---|---|
| Defaults Regarding Plan | Includes failure to file or confirm Acceptable Plan timely | Customary provisions regarding payment of postpetition DIP loan in full at confirmation or closing of sale. |
| Other Defaults | Any attempt by the Debtor or any equityholder (WW is an equityholder of the Debtor) "to invalidate or otherwise impair the DIP Facilities or the liens" granted to Empery; | Customary provisions and provisions that are relevant to Empery's disputed prepetition secured claim but irrelevant to WW's prepetition unsecured claim. |
| Unique Remedies Upon Default | In the event an Acceptable Plan has not been filed by Debtor by September 30, 2023, Debtor shall commence a Section 363 sale process (the "Sale Transaction") within 14-days of notice by Empery that the plan filed is not acceptable. In the event that no plan is filed by September 30, 2023, Debtor shall commence a Sale Transaction on October 20, 2023. The procedure and timing of the Sale Transaction shall be satisfactory to Empery, in its sole discretion.<br><br> • Other undisclosed remedies to be set forth in loan documents | Termination of exclusivity under 11 U.S.C. §1121 |
| Reporting Provisions | Extensive reporting provisions that contemplate a failure of the Debtor to file an "Acceptable Plan" and therefore requiring the Debtor to sell its assets in a "Sale Transaction" and provide extensive inside information to the Empery Securityholders regarding the status of a Sale Transaction before it occurs. | None |
| Adequate Protection | Empery Securityholders are provided with a lien to secure diminution in value of all prepetition collateral, and not just cash collateral. | None |
| Indemnity of Legal and Financial Advisory Expenses | The Debtor broadly indemnifies the Empery Securityholders for all attorney and financial advisory fees and expenses, including with respect to the anticipated WW challenge to its prepetition liens and claims. The Empery Term Sheet provides | None. Reimbursement limited to advances on DIP loan |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

that the Debtor " in connection with the Chapter 11 Case and the negotiation and documentation of the DIP Facilities and restructuring matters with respect to the Note Parties [defined as the Debtor and its affiliates], all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agent and reasonable and documented legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agent.  In addition, the Note Parties shall pay, in connection with workout proceedings and enforcement costs associated with the DIP Facilities, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agent and reasonable and documented legal fees and out-of-pocket expenses legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agent.  Such fees and expenses shall be added to DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent claim(s).

The Issuer and the Guarantor(s) will indemnify the DIP Agent, DIP Note Purchasers, and DIP Factoring Purchasers and their respective affiliates, and their respective related parties, and hold them harmless from and against all out-of-pocket costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any

| | | | |
|---|---|---|---|
| | | actual or proposed use of the proceeds of any notes issued under the DIP Facilities; <u>provided</u> that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence or willful misconduct of such person." | |
| | Releases | The Debtor releases all claims against Empery and the Empery Securityholders "in their capacities as such" notwithstanding prepetition litigation among the Debtor, Empery, WW and Mr. Drexler pending in New York | None |

24.     Based on my experience with financial transactions generally and distressed transactions specifically, I believe the Empery DIP financing proposal is not a legitimate DIP proposal intended to facilitate the Debtor's reorganization.  Instead, I believe Empery seeks either (i) a sale of the Debtor's assets, to complete its prepetition Article 9 sale, and/or (ii) prompt payment on unreasonable terms of its alleged prepetition debt.  Consistently, the Empery DIP proposal transparently contains numerous poison pills described above that effectively give Empery exclusive control of the Debtor's assets and eliminate any possibility of a successful chapter 11 reorganization plan by eliminating any possibility of a meritorious challenge to the extent, priority and validity of Empery's alleged claims and liens and the nonconsensual treatment of their claims under a plan of those claims and liens.

25.     To that end, the Empery financing proposal mandates that the Debtor file an "Acceptable Plan" it cannot possibly file and that is doomed to failure because Empery alone gets to determine if its treatment is acceptable, thereby preventing any nonconsensual treatment of the Empery Securityholders' disputed prepetition claims.  The prior version of the Empery term sheet (ECF number 65) contained specific and unrealistic requirements for payment of the Empery Securityholders' debt at confirmation that are not feasible and that mean any plan would fail. While the terms are no longer stated, and a plan's treatment of the Empery Securityholders' alleged

debt must only satisfy Empery's "reasonable discretion" nevertheless, it requires a suspension of common sense to believe Empery would ever agree to anything that materially differs from the unfeasible plan treatment it required in earlier iterations of the Term Sheet. I do not believe Empery ever would agree to any payment terms differing materially from those set forth in [ECF No. 65].

26.     Moreover, Empery's proposal requires that if the Debtor fails to file an "Acceptable Plan" timely, then the Debtor must forego its ability to seek confirmation of a plan and instead engage in a 363 sale, referred to as the "Sale Transaction" in Empery's term sheet, which must be acceptable to Empery in its sole discretion. Empery's term sheet virtually assumes that a "Sale Transaction" will occur, and contains numerous provisions whereby the Debtor is required to report to Empery on the Sale Transaction and provide it with inside information regarding such a Sale Transaction before it occurs. The Empery proposal thereby limits parties' potential ability to propose a meaningful plan if the Debtor fails to do so, because the Debtor would be required to conduct a 363 sale regardless of such a plan. Since a sale likely eliminates the ability of the Debtor to monetize its existing net operating losses (NOLs), every effort must be made to avoid a sale. The Term Sheet makes a sale almost certain.

27.     Additionally, the Empery proposal assumes that the Empery Securityholders are prepetition secured creditors when, in point of fact they (i) assert claims I understand may be subject to mandatory subordination (and therefore entitled to a distribution of zero until all general unsecured creditors are paid in full) under 11 U.S.C. §510(b), (ii) assert claims that properly are recharacterized as equity, and (iii) assert claims in a preposterous amount that begs credulity and in any event is not supported by the record in this case. Empery's DIP proposal mandates numerous provisions that foreclose parties from asserting any challenge to its prepetition claims and liens. For example, the Empery proposal requires the Debtor to indemnify all of the Empery Securityholders' current and future legal and financial advisory fees, thereby disincentivizing anyone from challenging Empery's claims. The Empery proposal purports to limit creditor standing to object to Empery's claim in violation of Fed. R. Bankr. P. 3012, requires a partial roll-

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

up of the Empery Securityholders' disputed prepetition debt and payment of that rolled-up amount upon the earlier of a 363 sale or December 31, 2023. Worse, the Term Sheet directly grants Empery a minimum allowed prepetition claim of $12.84 million, and indirectly allows the Empery Securityholders' prepetition claims by blessing credit bidding in any sale. The Empery proposal requires that the final documents contain stipulations regarding the priority of those claims. As belt and suspenders, the Empery proposal grants Empery its disputed prepetition claim by impermissibly limiting creditors' rights to object under, *inter alia*, Fed. R. Bankr. P. 3007 and 3012 by limiting objections to such claims solely to the Committee.

28. Indeed, the Empery proposal effects an increase in the collateral securing Empery's disputed prepetition claim by granting Empery a preferential lien on postpetition assets to secure the disputed prepetition indebtedness. For no apparent reason, the Term Sheet requires the Debtor to waive the "equities of the case" exception to cross-collateralize postpetition assets to secure disputed prepetition claims under 11 U.S.C. § 552. I understand that the effect of this provision is to eliminate the bright line the bankruptcy code draws between prepetition debt and postpetition collateral.

29. Finally, without explanation or evidence demonstrating the reasonableness or necessity for such provisions, Empery requires broad releases to the Empery Securityholders, notwithstanding the existence of litigation pending in New York among Empery, the Debtor, WW and the Debtor's principal Ryan Drexler. Empery requires the Debtor to indemnify counsel to the Empery Securityholders for fees incurred in any such dispute or any newly asserted dispute.

30. Attached as <u>Exhibit D</u> is a redlined version of the Empery term sheet that eliminates its poison pills (the "<u>Alternative Empery Term Sheet</u>"). This is the only financing that should be approved for Empery to provide final postpetition financing. WW is ready, willing and able to provide its superior financing that will satisfy the bankruptcy code if Empery is unwilling to fund on the Alternative Empery Term Sheet. Exclusivity should be terminated so that at a minimum, parties are presented with the option that WW favors (and that apparently the Empery Securityholders oppose) to challenge the prepetition claims of the Empery Securityholders. The

Debtor thereby would be able to reorganize without a sale, preserve its NOL's and increase its value for the benefit of creditors.

31.    Attached as <u>Exhibit E</u> is a copy of the Debtor's 10Q Quarterly Report filed by the Debtor with the United States Securities and Exchange Commission for the period ending March 31, 2022 (the last quarter the Debtor filed a 10Q quarterly report).  As set forth on Exhibit E (at page 8), the Debtor had "an accumulated deficit of $211.8 million resulting from recurring losses from operations.  This "accumulated deficit" may translate into $211.8 million of net operating losses available as a tax attribute.  A sale jeopardizes this potential tax attribute.  The Empery DIP loan would be a dagger aimed at these tax attributes and would risk their destruction, all solely to benefit the Empery Securityholders and their disputed prepetition claims.

### D. Empery's Subordinated and Disallowable Claims

32.    Empery asserts various prepetition claims and liens against the Debtor, but they are all disallowable.  The claims are (i) inflated, (ii) subject to mandatory subordination under 11 U.S.C. § 510(b), and (iii) subject to recharacterization as equity.

33.    First, Empery has inflated the claims of the Empery Securityholders.  Empery, individually and as "collateral agent" for the Empery Securityholders, claims as of the commencement of this case they are owed "not less than $18,155,014."  Silver Dec. at ¶94.

34.    How this amount is calculated is never stated, notwithstanding that approximately six months earlier, in June, 2022, Mr. Silver avers the principal balance of the claim was only $9,759,135.00.  Silver Dec. at ¶30. So, even assuming *arguendo* Mr. Silver properly calculated the principal amounts owed to the Empery Securityholders, somehow, although never explained, from June, 2022 to December 15, 2022 (the Petition Date), Empery's claim implausibly shot up from about $9.7 million to over $18 million.

35.    But these figures are not correct, since these principal balances do not account for the fact the securities held by the Empery Securityholders were issued subject to original issue discount, and discounted at 14% (for securities issued in October, 2021) (Silver Dec., attachment at [ECF 52-1]) and 20% for securities issued in June, 2022 (Silver Dec., attachment at [ECF 52-

41]).[1] I have instructed my counsel to prepare the spreadsheet attached as <u>Exhibit C</u> to show the amounts asserted by each of the Empery Securityholders, and the equity securities each acquired under the SPA. Assuming <u>arguendo</u> Mr. Silver's methodology is correct, as set forth in <u>Exhibit C</u>, WW calculates that the Debtor only received $7,050,000.00 from the October, 2021 debt securities, even though they carried a notional principal amount of $8,197,674.42 (Silver Dec., at [ECF 52-1]) and the Debtor only received $1,965,500 from the June, 2022 debt securities, even though they carried a notional amount of $2,456,885 (Silver Dec, at [ECF 52-41]). Indeed, simple math demonstrates that the Empery Securityholders' return on the principal actually advanced ($9,015,500.00) if they are granted an allowed claim of $18,155,014 is a staggering and unconscionable 86%.

36.    Empery claims that the Empery Securityholders and the Debtor entered into the SPA whereby the Empery Securityholders purchased securities of the Debtor for their debt (their individual notes, warrants and stock), which I believe was done so they could obtain control over the Debtor. Silver Dec. ¶8, 30, Mr. Silver avers that the Debtor entered into a security agreement with each of the Empery Securityholders granting them a security interest in substantially all of the Debtor's assets to secure "all indebtedness due under the [SPA]." Silver Dec. at 10.

37.    Based upon my extensive experience structuring financial transactions in distress situations generally, I believe that the Empery Securityholders are seeking to impose a coercive DIP Loan to ensure they can acquire the Debtor for no additional monetary consideration. It is clear to me the Empery Securityholders structured their deal with the Debtor as a "loan to own" to achieve precisely this result. I believe the transactions among the Debtor and the Empery Securityholders were little more than a scheme to allow Empery to acquire a controlling amount equity of the Debtor by relying on alleged, inevitable defaults under the SPA so that it could foreclose its alleged security interest on the Debtor's assets, exercise its warrants (granted under

---

[1] The Empery Securityholders also purchased "warrant shares" and stock in the SPA. The amount of original issue discount attributable to the warrant shares and the stock is unclear.

the SPA for a controlling interest in the Debtor) and acquire the Debtor for no additional consideration.

*(Signature Appears on Following Page)*

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1   I declare under penalty of perjury of the laws of the United States that the foregoing is

2   true and correct.

3       Executed on February 1, 2023

4

5   _____

6       TODD M. ENRIGHT

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

## CERTIFICATE OF SERVICE

1.      On February 1, 2023, I served the following document(s): **DECLARATION OF TODD M. ENRIGHT IN SUPPORT OF OBJECTION OF CREDITOR WHITE WINSTON SELECT ASSET FUNDS, LLC TO APPROVAL OF DEBTOR IN POSSESSION FINANCING BY EMPERY TAX EFFICIENT, L.P.**

2.      I served the above document(s) by the following means to the persons as listed below:

☒      a.      ECF System:

SAMUEL A. SCHWARTZ and BRYAN A. LINDSEY on behalf of Debtor MUSCLEPHARM CORPORATION
saschwartz@nvfirm.com, blindsey@nvfirm.com

WILLIAM NOALL and MARK M. WISENMILLER on behalf of Creditor EMPERY ASSET MANAGEMENT, LP
wnoall@gtg.legal, mweisenmiller@gtg.legal

OGONNA M. BROWN on behalf of Creditor PRESTIGE CAPITAL CORPORATION
obrown@lewisroca.com

JOHN D. FIERO, JASON H. ROSELL, and MATTHEW C. ZIRZOW on behalf of the OFFICIAL COMMITTEE OF UNSECURED CREDITORS
jfiero@pszjlaw.com, jrosell@pszjlaw.com, mzirzow@lzlawnv.com

TRACY M O'STEEN on behalf of interested party RYAN DREXLER
tosteen@carlyoncica.com

ROBERT T. STEWART on behalf of Creditor NUTRABLEND FOODS
rstewart@foley.com

☐      b.      United States mail, postage fully prepaid:

☐      c.      Personal Service:

I personally delivered the document(s) to the persons at these addresses:

☐      For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐      For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐      d.      By direct email (as opposed to through the ECF System): Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐      e.      By fax transmission:

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐      f.      By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 1, 2023.

By: /s/ *Bart K. Larsen, Esq,*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

# EXHIBIT A

*Execution Version*

# SETTLEMENT AGREEMENT AND RELEASE

## BETWEEN

## WHITE WINSTON SELECT ASSET FUNDS, LLC AND WHITE WINSTON SELECT ASEET FUND SERIES FUND MP-18, LLC

## AND

## MUSCLEPHARM CORPORATION AND RYAN DREXLER

———————————

This Settlement Agreement and Release ("Agreement") is made by and between, on the one hand, White Winston Select Asset Funds, LLC ("White Winston") and White Winston Select Asset Fund Series Fund MP-18, LLC (the "Series Fund"), and, on the other, MusclePharm Corporation ("MusclePharm") and Ryan Drexler (collectively, the "Parties," and each individually a "Party").

WHEREAS, the Parties have been engaged in litigation in various jurisdictions, namely, the actions captioned *White Winston Select Asset Funds, LLC et al. v. MusclePharm Corporation, et al.*, Case No. 2284cv00293-BLS2 (Superior Court, Suffolk County, Commonwealth of Massachusetts) (the "Pending Massachusetts Action"); *MusclePharm Corporation, et al. v. White Winston Select Asset Fund Series Fund MP-18, LLC, et al*, Case No. 1984cv00663-BLS2 (Superior Court, Suffolk County, Commonwealth of Massachusetts) (the "Prior Massachusetts Action"); *White Winston Select Asset Fund Series Fund MP-18, LLC, et al. v. MusclePharm Corporation, et al.*, Case No. 18-OC-00206 (First Judicial District Court in and for Carson City, Nevada) (the "Nevada Action"); *White Winston Select Asset Fund Series Fund MP-18, LLC, et al. v. MusclePharm Corporation, et al.*, Case No. 80196 (Nevada Supreme Court) (the "First Nevada Appeal"); *MusclePharm Corporation, et al. v. The First Judicial District Court of the State of Nevada, et al.*, Case No. 79163 (Nevada Supreme Court) (the "Second Nevada Appeal"); and *White Winston Select Asset Fund Series Fund MP-18, LLC v. MusclePharm Corporation*, Case No. 19STCV26426 (Superior Court of the State of California, County of Los Angeles, Central District) (the "California Action"); and

WHEREAS, the Parties desire to amicably resolve all claims that were, are, or could have been asserted by any Party in the Pending Massachusetts Action, the Prior Massachusetts Action, the Nevada Action, the First Nevada Appeal, the Second Nevada Appeal, and the California Action (collectively, the "Actions"); and

WHEREAS, the Parties desire that this Agreement be enforceable by the Suffolk County Superior Court presiding over the Pending Massachusetts Action as an Order of that Court;

---

NOW, THEREFORE, intending to be legally bound, and in consideration of the mutual promises and obligations set forth herein, the receipt and legal sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    **Settlement Payment in Cash.** MusclePharm will pay White Winston a total of Four Million and 00/100 Dollars ($4,000,000.00) in cash (the "Cash Settlement Amount"), subject to the following terms and conditions:

a.    MusclePharm shall make an initial payment to White Winston of Five Hundred Thousand and 00/100 Dollars ($500,000.00) in cash within thirty (30) days of the date on which this Agreement has been executed by all Parties (such date of last execution, the "Execution Date"). The payment will be made by wire transfer to an account designated by White Winston.

b.    MusclePharm shall pay the remaining Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00) of the Cash Settlement Amount from the proceeds of the Rights Offering described below in Section 7 of this Agreement, from any insurance proceeds paid to MusclePharm in respect of any of the Actions, and from Available Proceeds, as described further below in Section 4.b of this Agreement, within five (5) business days of the date any such amounts are received by MusclePharm until the Cash Settlement Amount is paid in full. All payments will be made by wire transfer to an account designated by White Winston.

c.    If the Cash Settlement Amount is not paid in full within ninety (90) days of the Execution Date, the remaining unpaid balance of the Cash Settlement Amount shall accrue interest at the rate of five percent (5%) per annum, compounded monthly.

d.    If the Cash Settlement Amount is not paid in full within twelve (12) months of the Execution Date, the remaining unpaid balance of the Cash Settlement Amount, including all accrued and compounded interest pursuant to Section 1.c above, shall be added to the principal of the Convertible Bond described below in Section 2 of this Agreement.

e.    MusclePharm's obligation to pay the Cash Settlement Amount shall be secured by a perfected security interest in favor of White Winston in all of the assets of MusclePharm and of its subsidiaries (the "MusclePharm Assets"). MusclePharm and Drexler hereby authorize White Winston to file UCC-1 financing statements as necessary to perfect its security interest in the MusclePharm Assets granted pursuant to this Section 1.e immediately upon the Parties' execution of this Agreement.

f.    Ryan Drexler agrees that White Winston's security interest in the MusclePharm Assets pursuant to Section 1.e above shall be of equal priority to any security interest he holds in the MusclePharm Assets in connection with the Drexler Legacy Debt (as defined below in Section 3 of this Agreement). White Winston and the Series Fund acknowledge that Ryan Drexler's security interests in connection with the Drexler Legacy Debt, and the security interest

granted to White Winston pursuant to this Section 1.f, are subordinate to security interests held by Empery Tax Efficient, LP and associated noteholders pursuant to secured notes issued by MusclePharm in October 2021 and June 2022.

      2.    **Convertible Bond.** MusclePharm will issue to White Winston a convertible bond (the "Convertible Bond") in the amount of Four Million Six Hundred Thirty Thousand Two Hundred and Sixty One Dollars ($4,630,261.00), subject to the following terms and conditions:

      a.    MusclePharm will issue the Convertible Bond to White Winston within thirty (30) days after the Execution Date.

      b.    The Convertible Bond shall be issued subject to a Master Indenture Agreement (the "Indenture"), which shall contain standard representations, warranties, covenants and other terms and conditions appropriate with respect to the issuance of the Convertible Bond.

      c.    The Convertible Bond shall be secured by a perfected security interest in favor of White Winston in the MusclePharm Assets.

      d.    Ryan Drexler agrees that White Winston's security interest in the MusclePharm Assets pursuant to Section 2.c above shall be of equal priority to any security interest he holds in the MusclePharm Assets in connection with the Drexler Legacy Debt. White Winston and the Series Fund acknowledge that Ryan Drexler's security interests in connection with the Drexler Legacy Debt, and the security interest granted to White Winston pursuant to this Section 2.d, are subordinate to security interests held by Empery Tax Efficient, LP and associated noteholders pursuant to secured notes issued by MusclePharm in October 2021 and June 2022.

      e.    The Convertible Bond shall bear interest at a rate of five percent (5%) per annum, compounded monthly, increasing to eighteen percent (18%) in the event of a default.

      f.    The Convertible Bond shall be convertible in whole or in part at the election of the holder, at any time and upon demand, into shares of MusclePharm common stock at $0.40 per share, subject to full ratchet antidilution adjustment with respect to the issuance of any equity, options, warrants, or other convertible or derivative equity securities by MusclePharm at a lower effective price per share while the Convertible Bond is outstanding.

      g.    MusclePharm shall have no right to pre-pay the principal amount of Convertible Bond except with the written consent of White Winston or as otherwise provided in this Agreement.

      h.    Except as otherwise provided in this Agreement, MusclePharm shall repay all principal and interest owed pursuant to the Convertible Bond sixty (60) months after the date it is issued; provided, however, that in exchange for the payment of a fee by MusclePharm to White Winston equal to ten percent (10%) of the principal of the Convertible Bond then outstanding (the "Extension Fee"), the term of the Convertible Bond may be extended by MusclePharm for a

maximum period of an additional twenty four (24) months. At MusclePharm's option, the Extension Fee may be paid in cash or added to the principal owed under the Convertible Bond.

      i.     The Convertible Bond and the Indenture shall contain standard registration rights, including piggy-back registration rights and the right to demand registration upon not less than 180-days written notice to MusclePharm by the holder of the Convertible Bond or of the shares issuable upon conversion of the Convertible Bond.

      3.     **No Further Increase or Amendment of the Drexler Legacy Debt**. Within five (5) days after the Execution Date, Ryan Drexler and MusclePharm will provide to White Winston a complete accounting of all debts owed to Ryan Drexler by MusclePharm as of the Execution Date, estimated at approximately $15 million, including, but not limited to, the Convertible Secured Promissory Note dated November 29, 2020 in the amount of $2,871,967.00, the Convertible Secured Promissory Note dated August 13, 2021 in the amount of $2,457,549.00, the Unsecured Revolving Promissory Note dated March 8, 2022, and any other debts of any sort that MusclePharm may owe to Ryan Drexler (collectively, the "Drexler Legacy Debt"). MusclePharm and Drexler represent and warrant to White Winston and the Series Fund the completeness and the accuracy of the accounting of the Drexler Legacy Debt. MusclePharm and Drexler covenant and agree that the Drexler Legacy Debt shall not be amended or increased without the written consent of White Winston after the Execution Date.

      4.     **Intercreditor and Priority Agreement.** Within thirty (30) days after the Execution Date, Ryan Drexler and White Winston will enter into an Intercreditor and Priority Agreement (the "Intercreditor Agreement") governing their respective rights with respect to MusclePharm's obligation to pay the Cash Settlement Amount pursuant to Section 1 of this Agreement and its obligation to pay principal and interest under the Convertible Bond pursuant to Section 2 of this Agreement (collectively, the "White Winston Debt") and the Drexler Legacy Debt, as well as any future obligations of MusclePharm to White Winston, the Series Fund or Ryan Drexler or their respective affiliates (collectively, the "Aggregate Indebtedness"). The Intercreditor Agreement shall be subject to, and contain, the following terms and conditions:

      a.     Ryan Drexler shall provide standard representations and warranties with respect to the Drexler Debt and White Winston shall provide standard representations and warranties with respect to the White Winston Debt.

      b.     As indicated in Sections 1.f and 2.d above, the liens securing the White Winston Debt and any liens securing the Drexler Legacy Debt shall be *pari passu*. Subject to and without modification of the initial payment by MusclePharm of Five Hundred Thousand and 00/100 Dollars ($500,000.00) toward the Cash Settlement Amount pursuant to Section 1.a of this Agreement, which shall not be subject to the requirements of this Section 4.b, all Available Proceeds (as defined below) shall be applied (i) *pari passu, i.e.,* fifty percent (50%) to pay down the balance of the White Winston Debt (first to pay down the Cash Settlement Amount and then to pay down the Convertible Bond) and fifty percent (50%) to pay down the balance of the Drexler

Legacy Debt, and then (ii) one hundred percent (100%) to pay down the balance of the White Winston Debt or the Drexler Legacy Debt, as applicable, until the balance is paid in full. As used herein, Available Proceeds means all cash, cash equivalents and other proceeds inuring to the benefit of MusclePharm *other than* amounts received from the sale of MusclePharm's products in the ordinary course of MusclePharm's business or pursuant to any insurance policy paid in respect of any of the Actions.  For avoidance of doubt, Available Proceeds shall include, without limitation, (i) proceeds from the Rights Offering described below in Section 7 of this Agreement; (ii) proceeds from any refinancing of MusclePharm's business or assets, and (iii) proceeds from the sale of MusclePharm or the sale of MusclePharm's assets not in the ordinary course of business. Any insurance proceeds paid in respect of any of the Actions shall not be considered Available Proceeds and shall be applied solely to pay down the White Winston Debt. To the extent any funds from proceeds *other than* Available Proceeds are applied to pay down the White Winston Debt, one hundred percent (100%) of any Available Proceeds shall thereafter be applied to pay down the Drexler Legacy Debt until the amount of such Available Proceeds applied to the Drexler Legacy Debt is equal to the amount paid toward the White Winston Debt from any such proceeds as are not Available Proceeds.

c.    The White Winston Debt and the Drexler Legacy Debt shall be cross collateralized and cross defaulted with each other so that any default under either shall constitute a default under the other, and any security interest securing either shall be deemed also to secure the other.

d.    White Winston shall service and manage the Aggregate Indebtedness, although the consent of Ryan Drexler shall be required with respect to the acceleration of indebtedness arising from a non-monetary default, the appointment of a receiver under the Indenture or with respect to the Convertible Bond, and the exercise of remedies under Article 9 of the Uniform Commercial Code; provided, however, that with respect to any action taken by a third party that constitutes a default with respect to the Aggregate Indebtedness, no consent will be required so long as White Winston acts in a commercially reasonable manner and in good faith to protect the collective interest of Ryan Drexler, White Winston and the Series Fund.

5.    **Issuance of Warrant.** Within thirty (30) days after the Execution Date, MusclePharm will issue White Winston a warrant to purchase 16,666,666 shares of MusclePharm's common stock at $0.18 per share (the "Warrant"), subject to the following terms and conditions:

a.    The Warrant shall be exercisable for a term of seventy-two (72) months and may be exercised in whole, or in part, at any time during the term at the election of the holder.

b.    The strike price of $0.18 per share shall be subject to full ratchet antidilution adjustment with respect to the issuance of any equity, options, warrants, or other convertible or derivative equity securities by MusclePharm at a lower effective price per share while the Warrant is outstanding.

---

c.      The Warrant shall contain standard registration rights including piggy-back registration rights and the right to demand registration upon not less than 180-days written notice by the holder of the Standard Warrant to MusclePharm.

d.      The Warrant shall provide for the cashless-exercise price per share to be paid to MusclePharm at the time of the exercise by the holder.

e.      The Warrant will include standard representations and warranties by MusclePharm with respect to the issuance of the Standard Warrant and the underlying shares of common stock.

6.      **Issuance of Anti-Dilution Warrant.** Within thirty (30) days of the Execution Date, MusclePharm will issue to White Winston an additional warrant to purchase such number of shares of MusclePharm's common stock at $0.18 per share as to equal 23.92% of all equity, options, warrants, or other convertible or derivative equity securities that MusclePharm has issued since March 15, 2020 and that remain outstanding as of the Execution Date, including the Warrant described in Section 5 of this Agreement and the Convertible Bond described in Section 2 of this Agreement (the "Anti-Dilution Warrant"). The Anti-Dilution Warrant shall be subject to the same terms as the Warrant described above in Section 5.a through 5.e of this Agreement.

7.      **Rights Offering.** MusclePharm will make all commercially reasonable efforts to initiate, conduct and consummate a rights offering to give Eligible Shareholders (as defined below) the right to purchase Musclepharm common stock within six (6) months of the Execution Date or as soon thereafter as is reasonably practicable, subject to the following terms and conditions:

a.      Eligible Shareholders shall be shareholders who held Musclepharm common stock, either as a holder of record or as a beneficial owner through either a voting trust or a nominee, as of September 1, 2017, and who still hold such shares as of December 1, 2022.

b.      Neither Ryan Drexler nor White Winston (nor their respective affiliates and/or control entities) shall be Eligible Shareholders.

c.      The rights offering shall allow Eligible Shareholders to purchase Musclepharm common stock at $0.40 per share, subject to a one (1) year lock up.

d.      The total amount of common stock available for purchase by Eligible Shareholders shall be equal to the Aggregate Indebtedness divided by $0.40.

e.      All proceeds of the rights offering shall be applied to repay the Aggregate Indebtedness in the manner set forth in the Intercreditor Agreement.

f.      Nothing in this Section 7 shall be deemed to make any Eligible Shareholder a third-party beneficiary to this Agreement.

8.    **Leadership and Governance Changes.** MusclePharm shall institute a new leadership and corporate governance structure as soon as possible, but no later than ninety (90) days after the Execution Date, as follows:

a.    Within thirty (30) days of the Execution Date, MusclePharm shall expand its board of directors to seven (7) members who shall be designated as follows (the "New Board"):

i.    White Winston shall have the right to designate two (2) persons to be members of the New Board, which persons shall be immediately appointed to fill two (2) of the vacancies created by the expansion of the Board.

ii.    Ryan Drexler shall have the right to designate two (2) persons other than Ryan Drexler to be members of the New Board, which persons, if not already members of the Board, shall be appointed to the Board upon the resignation of the current directors, as provided below.

iii.    The remaining three (3) members of the New Board shall be independent directors (as determined by applicable regulations) mutually agreeable to the four (4) directors selected by White Winston and Ryan Drexler pursuant to items i. and ii. above.

iv.    In addition, the New Board shall have two (2) non-voting observers (the "Observers"). White Winston and Ryan Drexler shall each have the right to appoint one (1) Observer.

b.    Each current director who is not designated to be a member of the New Board pursuant to a.ii. above shall resign as a director within ninety (90) days of the Execution Date or upon the election of his successor, whichever comes first.

c.    Following the election of the New Board and a commercially reasonable transition period determined by the New Board, but in no event later than six (6) months thereafter, Ryan Drexler shall resign as CEO of MusclePharm, and shall not seek or accept another C-Suite, officer, or substantially equivalent position with MusclePharm or its affiliates.

d.    The New Board shall conduct a search to select a new, permanent CEO and thereafter appoint a new, permanent CEO on terms and conditions that are commercially reasonable given the size and financial condition of MusclePharm.

e.    Ryan Drexler shall, and shall cause each of his affiliates to, grant a proxy to White Winston to vote all of his and their shares in MusclePharm in favor of the persons designated as members of the Board pursuant to 8a. above at any annual stockholders' meeting (or by written consent in lieu of the stockholders' meeting) or at any special stockholders' meeting called for the purpose of electing directors for a period of the greater of (i) the period in which any of the White Winston Debt remains outstanding, or (ii) five (5) years from the dismissal of the Actions.

f.      The terms and conditions of the Indenture referenced above in Section 2.b shall include certain negative and affirmative covenants regarding various corporate governance matters including, but not limited to: restrictions on changes in management after the appointment of the new CEO, the amendment of the MusclePharm corporate charter and by-laws without consent of White Winston, and other material matters related to the corporate governance of MusclePharm, each with the intention of developing and implementing "best corporate governance practices."

9.      **Investor Rights Agreement.** Within thirty (30) days, MusclePharm, Ryan Drexler, and White Winston shall enter into an Investor Rights Agreement which shall, include the following provisions: (i) White Winston and Ryan Drexler shall have preemptive rights (50%-50% with right of oversubscription) with respect to the issuance of any future debt, equity, or other securities of MusclePharm, which right shall be exercisable by either for thirty (30) days following receipt of notice of any third-party debt or equity financing; (ii) terms for the lock-up of shares, including shares issued pursuant to the exercise of the Warrants or conversion of the Convertible Bond; (iii) certain terms in favor of the Series Fund and Ryan Drexler, including rights of first refusal and tag-along rights with respect to shares proposed to be transferred by the other parties to the Investor Rights Agreement; and (iv) restrictions regarding so-called "related party transactions" among or between MusclePharm and Ryan Drexler. In addition, the Investor Rights Agreement shall grant customary "drag along" rights in favor of White Winston and vis-à-vis Ryan Drexler and his affiliates in connection with any sale of MusclePharm approved by White Winston and the Board.

10.      **Binding Effect.** The Parties acknowledge that this Agreement is binding and enforceable by and against each of them as of the Execution Date, notwithstanding that this Agreement calls for further agreements to be prepared and executed and for further terms to be resolved in its implementation and performance. The Parties acknowledge that the Suffolk County Superior Court presiding over the Pending Massachusetts Action shall have jurisdiction to enforce the terms of this Agreement, including, but not limited to, ordering specific performance to require any Party to complete the further agreements and documents required by this Agreement. All Parties agree to submit to the jurisdiction of the Suffolk County Superior Court for this purpose. The Parties are obligated to act in good faith to ensure that the further agreements and documents required for the implementation and performance of this Agreement are completed and executed.

11.      **Dismissal of the Pending Massachusetts Action.** Within five (5) days after the Execution Date, the Parties will jointly ask the Suffolk County Superior Court to enter an Order dismissing the Pending Massachusetts Action while retaining jurisdiction with respect to any claims to enforce this Agreement (the "Dismissal Order"). To the extent permitted by the Suffolk County Superior Court, the Dismissal Order shall incorporate the terms of this Agreement. Should the Suffolk County Superior Court decline to retain such enforcement jurisdiction, this Agreement shall nevertheless be binding and enforceable by and against each of the Parties.

12.    **Relinquishment of Attorneys' Fee Judgment Against White Winston.** Within five (5) days of the Execution Date, MusclePharm and Drexler will relinquish their attorneys' fee judgment in the Nevada Action by filing a satisfaction of judgment and a joint motion with White Winston to relinquish the security for that judgment.

13.    **Dismissal of All Other Actions.** Within five (5) days of the Execution Date, White Winston shall file any stipulation or motion necessary *to terminate the Nevada Action, the First Nevada Appeal, the Second Nevada Appeal and the California Action. Ryan Drexler and MusclePharm shall execute and such stipulation or motion as necessary.*

14.    **Mutual Release.**

a.    **Release by Ryan Drexler and MusclePharm.** Effective on the Execution Date, Ryan Drexler and MusclePharm, on their own behalf and on behalf of their affiliates, officers, directors, agents, employees, legal representatives, attorneys, predecessors and successors, assigns, and designees, hereby knowingly, voluntarily, fully, finally, and completely, settle, release, and forever discharge White Winston and the Series Fund and their subsidiaries and affiliates, officers, directors, agents, employees, legal representatives, attorneys, predecessors and successors, assigns, and designees from all claims, disputes, grievances, demands, causes of action, liabilities, injuries, and damages, of whatever kind, character, or nature, known or unknown, arising from, that were, are, or could have been asserted in any of the Actions, with the exception of any claim regarding the breach or enforcement of this Agreement.

b.    **Release by White Winston and the Series Fund.** Effective on the Execution Date, White Winston and the Series Fund, on their own behalf and on behalf of their affiliates, officers, directors, agents, employees, legal representatives, attorneys, predecessors and successors, assigns, and designees, hereby knowingly, voluntarily, fully, finally, and completely, settle, release, and forever discharge Ryan Drexler and MusclePharm and their subsidiaries and affiliates, officers, directors, agents, employees, legal representatives, attorneys, predecessors and successors, assigns, and designees from all claims, disputes, grievances, demands, causes of action, liabilities, injuries, and damages, of whatever kind, character, or nature, known or unknown, arising from, that were, are, or could have been asserted in any of the Actions, with the exception of any claim regarding the breach or enforcement of this Agreement.

15.    **Confidentiality.** This Agreement and the terms contained herein are deemed to be confidential and shall not be disclosed to any person, except that the Parties may disclose the foregoing (i) to the extent required by legal process, court order, or applicable law, rule or regulation, (ii) to their respective attorneys and accountants, and to governmental bodies to the extent necessary to comply with any applicable tax or financial reporting laws, rules or regulations, and (iii) to the extent necessary to assist in the assertion or pursuit of, or defense against, any claim brought by or against a Party to enforce this Agreement. Notwithstanding the confidentiality obligations of this paragraph, the Parties shall be free to state that the dispute, so far as it relates to the Parties to this Agreement, was compromised and settled to their mutual satisfaction.

*Execution Version*

By affixing their signatures below, each Party agrees that he or it has had an opportunity to consult with legal counsel and other professionals on the form and content of this Agreement. Further, the person signing on behalf of each corporate entity – including the Series Fund, White Winston, and MusclePharm – represents and warrants that he or she has the authority to enter into this Agreement on behalf of the entity. White Winston and the Series Fund waive any claim against Ryan Drexler for any breach of his representation and warranty regarding his authority to sign this Agreement on behalf of MusclePharm.

**MUSCLEPHARM CORPORATION**

By: _CEO_

Printed Name: _Ryan Drexler_

Its: _____

Date: _12/5/22_

**RYAN DREXLER, in his individual and personal capacities, as well as a director and officer of MusclePharm Corporation**

Date: _12/5/22_

**WHITE WINSTON SELECT ASSET FUND SERIES FUND MP-18, LLC**

By: _____

Printed Name: _T.M. Enright, Manager_

Its: _____

Date: _12/5/2022_

**[SIGNATURES CONTINUE ON NEXT PAGE]**

Settlement Agreement and Release Between White Winston, the Series Fund, MusclePharm and Ryan Drexler — Page 10 of 11

*Execution Version*

**WHITE WINSTON SELECT ASSET FUNDS, LLC**

By: _____

Printed Name: __T.M. Enright, Manager__

Its: _____

Date: _____12/5/2022_____

# EXHIBIT B

*JANUARY 30, 2023*

## DEBTOR-IN-POSSESSION FACTORING AND LOAN TERM SHEET

This debtor-in-possession factoring and loan term sheet (the "***Term Sheet***") summarizes the principal terms of the contemplated factoring and loan arrangement ("***DIP Loan***") (as defined below). This Term Sheet (a) **IS** binding on the Borrower and Lender upon its execution by each of them and the entry of interim and Final DIP Orders approving this Term Sheet by the "***Bankruptcy Court***" (as defined below). This Term Sheet does not include descriptions of all of the terms, conditions and other provisions that may be contained in the definitive agreements to be executed by the parties (collectively, the "***Agreement***") and it is not intended to limit the scope of discussion or negotiation of any matters not inconsistent with the specific matters set forth herein. The terms set forth in this Term Sheet are being provided as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of this Term Sheet. This Term Sheet is intended to outline certain key terms of the contemplated DIP Loan, which will be included in, or otherwise be consistent with, and subject to terms of the Agreement and definitive documentation acceptable to the Lender and Borrower.

| | |
|---|---|
| **Borrower:** | MusclePharm Corporation, as debtor-in-possession ("***Borrower***"), and its affiliates, including Canada MusclePharm Enterprises Corp., a British Columbia Corporation ("***MSLP Canada"*** and with Borrower, the "***MSLP Entities***") |
| **Lender:** | Lender Select Asset Funds, LLC, or its designee(s). ("***Lender***" or "***Lender***"). |
| **Bankruptcy Case** | Case Number 22-14422-nmc, <u>In re MusclePharm Corporation</u>, in the United States Bankruptcy Court for the District of Nevada. |
| **Bankruptcy Court** | United States Bankruptcy Court for the District of Nevada. |
| **DIP Loan** | A postpetition loan not to exceed the principal amount of Fifteen Million Two Hundred and Fifty Thousand and No/100ths Dollars ($15,250,000.00) (the ***Maximum Advance***"), inclusive of all amounts as factored Accounts under the factoring facility defined herein, the Immediate Advance and the Second Advance as each is defined herein, the Inventory Loan, the Marketing Loan and the amounts advanced for UCC Professional Fees, all as defined below (collectively, the "***Advances***" and together with the factored Accounts" - the "***DIP Loan***") |
| | Borrower will sell, transfer, convey, assign and deliver to Lender, and Lender agrees to purchase and receive from |

| | |
|---|---|
| | Borrower, all of Borrower's right, title and interest in and to all eligible post-petition accounts and purchase orders ("***Accounts***") arising from the sale of any product or goods or the rendering of services by Borrower in the ordinary course of the Borrower's business.<br><br>**IT IS THE INTENTION OF THE PARTIES THAT AS TO ALL ACCOUNTS THAT Lender ELECTS TO PURCHASE SHALL CONSTITUTE A TRUE PURCHASE AND SALE OF ACCOUNT(S) UNDER §9-318 OF THE UNIFORM COMMERCIAL CODE AND AS SUCH, THE BORROWER SHALL HAVE NO LEGAL OR EQUITABLE INTEREST IN THE ACCOUNTS SOLD; provided, however, that in the event that such purchase and sale were to be recharacterized as a financing, the Borrower shall be deemed to have granted the Lender a duly perfected, senior security interest in such Accounts pursuant to the Interim and Final DIP Orders** |
| **Advances on Accounts** | Lender shall advance the following: (i) up to one hundred percent (100%) of the first $1,000,000 of Accounts purchased after entry of the Interim DIP Order and before entry of the Final DIP Order, less the Immediate Advance, and (ii) up to eighty percent (80%) of the face amount of all other Accounts purchased, in each case less the applicable discount fee, Facility Fee (as defined below) and other similar charges (collectively the "***Aggregate Factoring Advances***"). The total amount advanced in respect to Aggregate Factoring Advances shall at no time exceed the principal amount of $10,000,000. The purchase price of any Account shall be the amount actually received in payment of such Account, but for the purposes of any Advance, the purchase price shall be equal to the face amount of the Account less any selling, payment or other discounts offered. |
| **Immediate Advance** | Upon entry of the Interim DIP Order, Lender shall provide up to an immediate Advance to Borrower (the "***Immediate Advance***") to be used as follows:<br><br>a. Such amount as necessary to repay in full all interim advances (except for factored accounts receivable) received by Borrower from or through Empery Tax Efficient, L.P., and made in accordance with the order from the Bankruptcy Court entered |

|  | on January 23, 2023 [ECF 139] ("**Second Interim Order**") and |
|---|---|
|  | b. expenses of Lender associated with the DIP Loan upon entry of the Interim DIP Order and the execution of the Agreement. |
|  | Notwithstanding the foregoing, the amount of the Immediate Advance shall not exceed One Million Dollard ($1,000,000). |
| **Second Advance** | Upon entry of the "**Final DIP Order**" (as defined below) and satisfaction of the other applicable conditions precedent, Lender shall make a second advance (the, "**Second Advance**") in the net principal amount of an additional Two Million Dollars ($2,000,000) plus any and all unpaid closing costs, fees (including, without limitation, the Facility Fee), and expenses associated with the DIP Loan (the "**Second Advance**") which have not been paid from the Immediate Advance. For the avoidance of doubt, the First Advance and the Second Advance shall be in addition to the up to $10,000,000 which may be advanced in respect to the factored Accounts, the "Marketing Loan" (as defined below), the "Inventory Loan" (as defined below) and the "Plan Payment" (as defined below) pursuant to the terms and conditions contained herein. |
| **Reserve** | Lender, in its sole discretion, may elect to maintain a reserve from each Advance ("**Reserve**"), not to exceed twenty percent (20%) of the face amount of the Accounts purchased by Lender. As a general rule, although not a requirement, it is intended that Reserves on paid invoices are released upon the request of the Borrower or when the Lender's next purchase of Accounts from Borrower is funded, however Lender may increase or decrease the amount of such Reserve at any time and from time to time if it deems it necessary in order to protect its interest and to protect Lender from losses or potential losses that Lender may reasonably anticipate might arise in the future due to contingencies, disputes, potential breach of warranties or other potential non-payments, reductions or losses from the purchase of Accounts under the Aggregate Advances, each pursuant to a borrowing base as set forth in the Agreement |

| | |
|---|---|
| **Conditions to Advances** | The Agreement shall provide that a condition to any advance in respect to factored Accounts (other than the Initial Advance and the Second Advance) shall include the following:<br><br>a. Lender would need to verify each Account with the underlying purchaser to verify it is a bona fide sale, such that if verified, Aggregate Advances are available upon or shortly after entry of the interim order authorizing the DIP Loan ("***Interim DIP Order***"). Among other things, each Account must be an unconditional, valid and enforceable sale and obligation of the account debtor, and the amounts that are due and payable on the selling terms noted on the face of the invoice related to such Account. This requires Lender to confirm that the amount and quantity of each order, price extension, potential offsets/credits, and to verify that such buyer has no other rights to offset any prepetition debts etc. In short, Lender will have to verify that these are bona fide Accounts from creditworthy, solvent customers that are required to take delivery and confirm that they will pay for the product within stated terms without offset.<br><br>b. Each Account would need to have margin that creates a reasonable profit to the Debtor determined by Lender in its sole and absolute discretion to justify the DIP advance.<br><br>c. Lender has confirmed with JW (producer) that JW can (and will), in fact, ship the product related to each Account in a reasonable time period not to exceed 10 days. Lender would require shipping and payment arrangements that are customary and acceptable to Lender and JW, and that no conditions to shipment (such as labeling issues and insurance issues) exist or are at risk of imminently arising. |
| **Recourse to Borrower of Certain Accounts** | In the event that (a) an Account purchased by Lender is not paid in full by the account debtor, on or before the date when due in accordance with its terms, (b) an account debtor objects to the property sold or service performed by Borrower, or rejects, revokes acceptance or fails or refuses |

| | |
|---|---|
| | to accept or receive any such property or services, (c) an account debtor suspends business, requests a general extension of time within which to pay debts, makes an assignment for the benefit of creditors or becomes a debtor or alleged debtor in any bankruptcy case, or if an event occurs amounting to a general business failure of an account debtor, or (d) Lender in its sole and absolute discretion determines that any Account is or may become uncollectible (collectively, a "***Worthless Account***"), the Lender may require the Borrower promptly to repurchase such Account from Lender on terms and conditions reasonably acceptable to Lender. |
| **Inventory Loan** | In addition to the First Advance, from and after entry of the Interim DIP Order, Lender shall make Advances as reasonably verified by Lender for Borrower to purchase Inventory (protein) in the amount of 100% of such Inventory acquisition costs to third parties. and The issuance mechanics of the advances on the Inventory Loan shall be on terms mutually agreed upon by the Lender and Borrower.   Borrower shall use all Inventory to manufacture products for sale in the ordinary course of Borrower's business.   The maximum amount of the Inventory Loan shall be the principal amount of $1,500,000 at any time, and the Inventory Loan shall be a revolver for ongoing purchases of Inventory. |
| **Marketing Loan** | In addition to the Second Advance, from and after entry of the Final DIP Order, Lender shall make Advances in an amount not to exceed $500,000 for use by the Borrower for cooperative marketing expenses as reasonably acceptable to Lender. |
| **UCC Professional Fees** | In addition to the Second Advance, Lender shall advance to counsel for the Official Committee of Unsecured Creditors ("***UCC***") the sum of $250,000 upon entry of the Final DIP Order for use by professionals employed or to be employed by the UCC as a postpetition retainer on account of fees and expenses of such professionals. |
| **Interest Rate on Aggregate Advances** | The prime interest rate as published in the Wall Street Journal plus two percent (2%) per annum. |
| **Closing Fee** | Zero. |

| | |
|---|---|
| **Facility Fee** | Fifty basis points (0.50%) of each Account purchased by Lender, for Advances equal to $5,000,000 in the aggregate, thereafter, each Advance shall carry a Facility Fee of Two and One-Half Percent (2.5%) of each Advance, payable at the time of each such Advance. |
| **Exit Fee** | One Hundred and Twenty-Five Thousand Dollars ($125,000) payable immediately as an administrative expense if the DIP Loan is paid in full within six (6) months. |
| **DIP Loan Disbursement Account** | The Borrower shall deposit the proceeds of the DIP Loan (including all Advances) into an account of the Borrower that is subject to the control of the Borrower pursuant to a deposit account control agreement (the "***DIP Note Disbursement Account***"), and that is not subject to the control of any other Person.  Proceeds of the DIP Loan shall be deposited, held and disbursed through the DIP Note Disbursement Account or otherwise in accordance with the cash management order.<br><br>The Disbursement Account shall be in addition to, and not in lieu of, any and all accounts maintained by Lender on account of the DIP Loan or for the benefit of Borrower, including, without limitation, to hold the Reserves. |
| **Budget** | Borrower shall forthwith prepare and submit a budget reasonably acceptable to Lender ("***Budget***") and file it with the Court no later than March 31, 2023.  The Budget shall include line items for disbursements and shall reflect that the Cash Cushion described above shall not be disbursed without the Lender's consent as set forth above. |
| **Use of Advances by Borrower** | The proceeds of the DIP Loans shall be used solely for the following purposes, subject in all cases to the Budget:<br><br>(a)  pay fees (including Lenders' reasonable attorney's fees and costs), interest, payments, and expenses associated with the DIP Loan;<br><br>(b)  pay principal of the DIP Loan;<br><br>(c)  provide for the ongoing working capital and capital expenditure needs of the Borrower |

6

|  | | during the pendency of the Bankruptcy Case; and |
|  | (d) | fund professional fees the administration of the Bankruptcy Case (including fees of the United States Trustee) and the consummation of the restructuring, ***provided, however***, that fees of the CRO retained by the Borrower shall not exceed the sum of $50,000 per month without the prior consent of Lender. |
| **Collateral** | | All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Borrower, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of any of the Borrowers, including, for the avoidance of doubt, any equity or other interests in any Borrower's non-Debtor and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and tradenames and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding (i) commercial tort claims, and (ii) any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the Final DIP Order (as defined below), including the proceeds thereof (collectively, the "***DIP Collateral***"). |

| | |
|---|---|
| **Priority of Liens on DIP Collateral**: | DIP Lender shall be awarded a (i) valid, perfected, and enforceable first priority, senior lien (subject only to the liens granted to Empery pursuant to the Second Interim Order) pursuant to 11 U.S.C. §§364(c) and (d) in and to all right, title and interest in and to any property of the Borrower or its bankruptcy estate acquired or created from and after the commencement of the Bankruptcy Case, which shall be senior to any and all competing interests, claims, liens and encumbrances, including, without limitation, any and all liens and security interests of record and subject to any intercreditor or subordination agreements, if any, that may be entered into between and among the Lender and holders of prepetition claims against the Borrower and (ii) a junior lien (junior to liens of record) in and to any property of the Borrower or its bankruptcy estate acquired or created prior to the commencement of the Bankruptcy Case, in all cases excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law. |
| **Administrative Claim** | The DIP Loan shall be allowable under 11 U.S.C. §§ 364(b) and 503(b)(1) as a super-priority administrative expense with priority over all other administrative claims, excluding the superpriority claim of Empery awarded pursuant to the Second Interim Order.. |
| **No Assumption of Liabilities** | The Lender shall not assume any liabilities or debts of Borrower. |
| **Maturity Date** | The Effective Date under a confirmed chapter 11 plan of reorganization in the Bankruptcy Case, or upon Bankruptcy Court approval of a sale or other disposition of any of the DIP Collateral to a person or entity other than the Lender. |
| **Borrower Board** | Upon the termination of any injunction or court order that prohibits the following, Borrower shall expand its board of directors to five (5) members (the "**New Board**") by adding two (2) independent board members reasonably acceptable to Lender.  In addition, Lender shall have the right to appoint one (1) observer to all board matters and meetings. |

| | |
|---|---|
| **Events of Default** | Customary, including the following:<br><br>• failure to pay principal or interest on the DIP Loan or any fees under the Agreement when due;<br><br>• failure of any representation or warranty of any of the Borrowers contained in the Agreement to be true and correct in all material respects when made;<br><br>• breach of any covenant, subject to a five (5) day grace period (from the earlier of the date that (i) any Borrower obtains knowledge of such breach and (ii) any Borrower receives written notice of such default from the Lender), <u>provided</u> that the breach of any covenant described herein, or any other covenant so indicated by the Lender, shall not be subject to any grace period;<br><br>• failure to comply with the Budget, subject to the permitted variances;<br><br>• without the Lender's written consent, which may be granted or withheld in the Lender's sole and absolute discretion, the Lender shall cease to have continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on and security interests in the DIP Collateral with the priorities described above;<br><br>• any Borrower or equity holder in any Borrower (i) contests the validity or enforceability of any document executed and delivered to effectuate the DIP Loan in writing or denying in writing that it has any further liability thereunder or (ii) contesting the validity or perfection of the liens and security interests securing the DIP Loan;<br><br>• any attempt by any Borrower or any equity holder thereof to invalidate or otherwise impair the DIP Loans or the liens and security interests granted to the Lender with respect to the DIP Loan;<br><br>• failure by any Debtor to comply with the Interim DIP Order or Final DIP Order, as applicable; |

|  | <ul><li>the entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim DIP Order or Final DIP Order or any other order of the Bankruptcy Court approving the Debtor's use of Cash Collateral, as applicable, without the express written consent of the Lender;</li><li>any sale or disposition, without the written consent of Lender, which consent may be granted or withheld in the Lender's sole and absolute discretion, of all or a material portion of the assets of the Borrower's bankruptcy estate;</li><li>conversion of, or the filing of any motion by any Borrower or any equity holder thereof to convert, the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;</li><li>dismissal of, or the filing of any motion by any Borrower or equity holder thereof to dismiss, the Bankruptcy Case;</li><li>the appointment of a Chapter 11 trustee or an examiner in the Bankruptcy Case;</li><li>failure to retain a Chief Restructuring Officer as set forth in this Term Sheet;</li><li>failure by the Borrower to create the New Board as set forth in this Term Sheet;</li><li>the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to a holder or holders of any security interest or lien on any part of the DIP Collateral to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral without the written consent of the Lender, which consent may be granted or withheld in the Lender's sole and absolute discretion;</li><li>the grant of any s claim that is pari passu with or senior to those of the Borrower;</li></ul> |
|---|---|

|  | • termination by the Bankruptcy Court of the use of Cash Collateral; <br><br> • the filing of a plan of reorganization or liquidation in the Bankruptcy Case that does not provide for the payment in full in cash of the obligations related to the DIP Loan; <br><br> • expiration of the period of time during which only the Borrower may file a plan pursuant to section 1121 of the Bankruptcy Code; and <br><br> • the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any of the DIP Collateral. <br><br> Among other remedies to be specified, upon the occurrence of an Event of Default, the Lender shall have all rights and remedies typically available to a lender upon the occurrence of an Event of Default, including, without limitation, termination of the Borrower's exclusive rights under 11 U.S.C. §1121 so that Lender, and no other person or entity, is excluded from the exclusivity period, the right to seek relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, and apply the proceeds thereof to the obligations of the Borrower or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law. |
|---|---|
| **Court Orders** | In connection with the transactions contemplated by this Term Sheet, Borrower shall file with the Courts within seven (7) days after the execution of the Agreement by each of the parties hereto, at their sole cost and expense, motions and applications for the interim order (the "***Interim DIP Order***") and the Final DIP Order (the "***Final DIP Order***" and, together with the Interim DIP Order, the "***DIP Orders***") of the Bankruptcy Court authorizing the Borrower to use all cash collateral and to enter into the DIP Loan, each of which shall be in form and substance acceptable to the Lender, and (b) all documents executed and delivered by the parties to effectuate and implement the transactions that are the subject of this Term Sheet, as well as any orders of the Bankruptcy Court related thereto (the "***DIP Documents***"). The DIP Orders shall contain customary provisions and stipulations as reasonably required by |

| | |
|---|---|
| | Lender, and shall contain provisions under 11 U.S.C. §364(e) providing that Lender extended the DIP Loan in good faith, whether or not Lender knows of the pendency of any appeal. |
| **Appeal of Orders** | If entry of either or both of the DIP Orders, or any other orders of the Bankruptcy Court relating to the transactions contemplated by this Term Sheet shall be appealed or otherwise challenged by any party (including by petition for *certiorari* or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing, or reargument), the Borrower shall diligently oppose such appeal, challenge, petition, or motion and use all efforts to obtain an expedited resolution thereof. |
| **Cooperation of Borrower Upon Acceptance:** | Upon acceptance of this Term Sheet, Borrower shall cooperate as reasonably requested with Lender in all matters related to the Bankruptcy Case and the DIP Loans, subject to the Borrower's determination, in its sole and absolute discretion, that such cooperation as reasonably requested by Lender violates Borrower's fiduciary duties as debtor-in-possession in the Bankruptcy Case. |
| **Lender Prepetition Claims and Interests** | Lender shall have an allowed general unsecured claim in the amount of not subject to subordination or recharacterization of $8,630,261.00 subject to a 60 day review period from and after entry of the Final DIP Order for Committee objection to allowance. |
| **Assignment/Participation** | Lender may assign, in whole or in part, or otherwise participate its interest in whole or in part to one or more participants, on terms and conditions acceptable to Lender in its sole and absolute discretion. |
| **Conditions Precedent** | Lender's obligation to consummate the DIP Loan shall be subject to satisfaction of the following conditions occurring prior to entry of the Final DIP Order except as otherwise required by this Term Sheet:<br><br>• The final terms and conditions of the Agreement and all related Loan Documents shall be in commercially reasonable form, as prepared by Lender counsel, and acceptable to Lender in its reasonable discretion. |

- The Debtor shall pay all of Lender's reasonable and necessary out-of-pocket costs, fees (including attorney's fees), and expenses arising out of or relating to the DIP Loan except where such costs, fees and expenses are manifestly unreasonable. For the sake of clarity, the costs, fees and expenses of Lender that the Borrower is obligated to pay or reimburse include, but are not limited to: all travel, lodging, and other incidental expenses of Lender personnel paid or incurred by Lender as a result of the consideration and closing of the DIP Loan. In addition, the Borrower shall pay, on demand, all legal fees and expenses of Lender's attorneys for services provided to Lender in connection with this Term Sheet or the Agreement and any action, suit or proceeding arising from Lender's dealing with the Borrower, including for the collection of amounts due to Lender hereunder.

- Prior to entry of the Final DIP Order, Ryan Drexler, Prestige Capital Corporation and Lender shall have entered into a binding and enforceable Intercreditor Agreement governing their respective rights with respect to any and all claims between and among them, including, without limitation, the DIP Loan. The Intercreditor Agreement shall include provisions providing agreed upon collateral to Lender and that Lender shall receive one-half of first proceeds received by Mr. Drexler (or his designee(s) and assignee(s)) on account of any claims against MSLP and such other subordination and intercreditor provisions (including with respect to the liens and claims asserted by Prestige Capital Corporation) as are customary and reasonably acceptable to Lender.

- Notwithstanding the foregoing, the Lender shall make the Immediate Advance upon entry of the Interim DIP Order and the execution of this Term Sheet by the Borrower and the Lender, regardless of whether the other terms and conditions set forth above have been satisfied, but shall not be obligated to make advances in respect to factored receivables, the Plan Payment, or other amounts that are first due and payable upon or after entry

13

|  | of the Final DIP Order, until entry of the set forth above or in the Agreement are satisfied or waived by the Lender. |
|---|---|

**ACCEPTED AND AGREED TO:**      **ACCEPTED AND AGREED TO:**

**Lender SELECT ASSET FUNDS, LLC**      **MUSCLEPHARM CORPORATION**

_____      _____

**BY:  TODD M. ENRIGHT**      **BY:  RYAN DREXLER**
**ITS:**      **ITS**

**DATED: _____, 2023**      **DATED:_____, 2023**

     **ACCEPTED AND AGREED TO:**

     **CANADA MUSCLEPHARM ENTERPRISES CORP.,**

     _____

     **BY:**
     **ITS:**

     **DATED: _____, 2023**

14

# EXHIBIT C

| Securityholder | Subscription Amt | Prin. Amt | Discount | Shares | Warrant Shares | ECF and Page Reference |
|---|---|---|---|---|---|---|
| | | *OCTOBER 2021 SECURITIES* | | | | |
| Empery Master Onshore, LLC, BY Empery Asset Management, LP, its authorized agent | $668,000.00 | $776,744.19 | 14.00% | | 1664483 | 52-1, 49 of 81 |
| Empery Tax Efficient, LP by Empery Asset Management, LP, its authorized agent | $200,000.00 | $232,558.14 | 14.00% | | 492360 | 52-1, 50 of 81 |
| Empery Tax Efficient III, LP | $232,000.00 | $269,767.44 | 14.00% | | 571138 | 52-1, 51 of 81 |
| Empery Debt Opportunity Fund, LP By Empery Asset Management, LP, its authorized Agent | $900,000.00 | $1,046,511.63 | 14.00% | | 2215621 | 52-1, 52 of 81 |
| Ionic Venutres, LLC | $500,000.00 | $581,395.35 | 14.00% | | 1230901 | 52-1, 53 of 81 |
| Anson Investments Master Fund LP | $750,000.00 | $872,093.02 | 14.00% | | 1846351 | 52-1, 54 of 81 |
| CVI Investments, Inc. | $500,000.00 | $581,395.35 | 14.00% | | 1230901 | 52-1, 55 of 81 |
| HB Fund LLC | $500,000.00 | $581,395.35 | 14.00% | | | 52-1, 56 of 81 |
| Intracoastal Capital LLC | $50,000.00 | $58,139.53 | 14.00% | | 123090 | 52-1, 57 of 81 |
| Bigger Capital Fund, LP | $500,000.00 | $581,395.35 | 14.00% | | 1230901 | 52-1, 58 of 81 |
| District 2 Capital Fund LP | $750,000.00 | $872,093.02 | 14.00% | | 1846351 | 52-1, 59 of 81 |
| L1 Capital Global Opportunities Master Fund | $500,000.00 | $581,395.35 | 14.00% | | 1230901 | 52-1, 60 of 81 |
| Altium Growth Fund, LP | $1,000,000.00 | $1,162,790.70 | 14.00% | | 2461801 | 52-1, 61 of 81 |
| | $7,050,000.00 | $8,197,674.42 | | | | |
| | | *JUNE 2022 SECURITIES* | | | | |
| Althim Capital Management LP | $125,000.00 | $156,260.00 | 20.00% | 1562500 | 1116071 | 52-41, 4 of 33 |
| Anson Investments Master Fund LP | $250,000.00 | $312,500.00 | 20.00% | 2604167 | 2232143 | 52-41, 9 of 33 |
| Bigger Capital Fund | $250,000.00 | $312,500.00 | 20.00% | | 2232143 | 52-41, 12 of 33 |
| Bigger Capital Fund (unsigned) | $250,000.00 | $312,500.00 | 20.00% | | 2232143 | 52-41, 16 of 33 |
| HB Fund LLC | $125,000.00 | $156,250.00 | 20.00% | | 1106071 | 52-41, 20 of 33 |
| Ionic Ventures, LLC | $250,000.00 | $312,500.00 | 20.00% | 2604167 | 2232143 | 52-41, 24 of 33 |
| Roth Capital Partners, LLC | $215,500.00 | $269,375.00 | 20.00% | 2244792 | 1924107 | 52-41, 28 of 33 |
| Walleye Opportunities Master Fund Ltd. | $500,000.00 | $625,000.00 | 20.00% | | 4464286 | 52-41, 32 of 33 |
| | $1,965,500.00 | $2,456,885.00 | | | | |
| **TOTAL OCT 2021 AND JUNE 2022** | $9,015,500.00 | $10,654,559.42 | | 9015626 | 33683906 | |

# EXHIBIT D

**MUSCLEPHARM CORPORATION AND ITS AFFILIATES**

**TERM SHEET FOR DEBTOR-IN-POSSESSION FINANCING
AND AUTHORIZATION FOR USE OF CASH COLLATERAL**

**As of January 9, 2023**

Subject to the terms and conditions stated herein, this binding term sheet (the "DIP Term Sheet") sets forth the principal terms of: (i) a superpriority senior secured debtor-in-possession note facility with co-priority with the Prepetition Secured Parties (the "DIP Note Facility"; the agreement evidencing the DIP Note Facility, the "DIP Note Agreement" and, together with the other definitive documents governing the DIP Note Facility and the DIP Orders (as defined herein), the "DIP Note Documents," each of which shall be in form and substance acceptable to the ~~DIP Consenting Secured Parties~~Consent Parties (as defined herein)) to be entered into with the Note Parties (as defined herein); (ii) a superpriority senior secured debtor-in-possession factoring facility with co-priority with the Prepetition Secured Parties (the "DIP Factoring Facility"; the agreement evidencing the DIP Factoring Facility, the "DIP Factoring Agreement," together with the other definitive documents governing the DIP Factoring Facility and DIP Orders, the "DIP Factoring Documents," and together with the DIP Note Documents, the "DIP Documents," each of which shall be in form and substance acceptable to the ~~DIP Consenting Factoring Parties~~Consent Parties (as defined herein)) to be entered into with the Debtor (as defined herein); and (iii) the consensual use of the cash collateral (as defined in 11 U.S.C. § 363(a)) of the Prepetition Secured Parties (as defined below) ("Cash Collateral"). ~~The use of Cash Collateral and t~~The DIP Note Facility and DIP Factoring Facility (together, the "DIP Loan" and with the use of Cash Collateral, the "DIP Facilities") will be subject to the approval of the Bankruptcy Court (as defined herein) and consummated in the case under chapter 11 (the "Chapter 11 Case") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), in accordance with (a) the interim order (the "Interim DIP Order") and the final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders") of the Bankruptcy Court authorizing the Note Parties to use the Cash Collateral and to enter into the DIP Facilities, each of which shall be in form and substance acceptable to the DIP Consenting Secured Parties and DIP Consenting Factoring Parties (together, the "DIP Consenting Parties"), and (b) the DIP Documents to be executed by the Note Parties. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in (as applicable) (1)(x) Original Issue Discount Senior Secured Notes dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "October Notes") and Original Issue Discount Senior Secured Notes dated as of June 10, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "June Notes" and, together with the October Notes, the "Prepetition Notes"), in each case issued by MusclePharm Corporation, a Nevada corporation (the "Issuer" or the "Debtor"), which Prepetition Notes are described in further detail on Schedule 1 hereto including the Purchasers thereof (the "Prepetition Purchasers"), (2) the Securities Purchase Agreement, dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition SPA"), between the Issuer and each Prepetition Purchaser party thereto and (3) the Pledge and Security Agreement, dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Security Agreement" and, collectively with the Prepetition Notes

and the Prepetition SPA, the "Prepetition Transaction Documents"), among the Issuer, Canada MusclePharm Enterprises Corp., a British Columbia corporation ("MusclePharm Canada" and, together with the Issuer, the "Note Parties") and Empery Tax Efficient, LP ("Empery"), in its capacity as collateral agent (the "Prepetition Collateral Agent" and, together with the Prepetition Purchasers, the "Prepetition Secured Parties").

| | |
|---|---|
| **Issuer/Debtor** | MusclePharm Corporation, as debtor in possession in the Chapter 11 Case. |
| **Guarantor(s)** | MusclePharm Canada and any other subsidiaries of the Issuer (collectively, the "Guarantor(s)," and together with the Issuer, the "Note Parties"). |
| **Collateral Agent** | Empery Tax Efficient, LP ("Empery") or another entity selected by it shall be the sole collateral agent for the DIP Note Purchasers (as defined herein) and DIP Factoring Purchasers (as defined herein) (in such capacity, the "DIP Agent"). |
| **DIP Note Purchasers** | The "DIP Note Purchasers" will be Empery, [●] (collectively, the "Initial DIP Note Purchasers") and any other Prepetition Purchasers who choose to participate in the DIP Note Facility by notice in writing to the DIP Agent at least two days prior to entry of the Interim DIP Order or such other time as may be agreed by the DIP Agent (collectively, the "DIP Note Purchasers," and together with the DIP Agent, the "DIP Secured Parties"). <br><br> "DIP Consenting Secured Parties" shall mean the DIP Agent and Empery, as a DIP Note Purchaser. <br><br> The obligation of any DIP Note Purchaser to purchase any note issued under the DIP Note Facility may be fulfilled on behalf of such DIP Note Purchaser by any of such DIP Note Purchaser's affiliated or related funds or financing vehicles. The DIP Note Purchase Commitments (as defined below) will be offered for participation to each Prepetition Purchaser in each case based on such Prepetition Purchaser's pro rata share of the amounts outstanding under the Prepetition Notes. To the extent a portion of the DIP Note Purchase Commitments is not provided by a Prepetition Purchaser, such portion shall be allocated to, and added to the DIP Note Purchase Commitments of the Initial DIP Purchasers based on the Initial DIP Purchasers' ratable shares of the Prepetition Notes. |
| **DIP Note Facility** | The DIP Note Facility shall be a superpriority senior secured multiple issuance note facility with co-priority with the Prepetition Secured Parties in an aggregate principal amount not to exceed $2.5 million (the "DIP Note Purchase Commitments", and such loans, the |

| | |
|---|---|
| | "DIP Notes"), subject to the terms and conditions set forth in this DIP Term Sheet.<br><br>~~$2.5 million of principal due under the Prepetition Notes shall roll-up and convert on a cashless dollar-for-dollar basis into DIP Notes upon entry of the Final DIP Order (the "Roll-Up") to be approved in the Final DIP Order.~~<br><br>The issuance mechanics of the DIP Note Facility shall be on terms mutually agreed upon by the DIP Agent, on behalf of the DIP Note Purchasers, and the Debtor, and in accordance with the Budget (as defined herein). |
| **Availability** | Upon entry of Bankruptcy Court's oral approval of this Term Sheet, this binding Term Sheet shall govern the Initial Advance pending the effectiveness of the DIP Note Agreement (the date of such effectiveness, the "DIP Effective Date") and shall be subject to the satisfaction of the Conditions Precedent (as defined herein).<br><br>In addition, the obligation of the DIP Purchasers to purchase DIP Notes shall be subject to the following conditions:<br><br>• At the time of issuance and purchase of any DIP Note and after giving effect thereto, the representations and warranties of the Note Parties contained in the DIP Documents shall be true and correct in all material respects.<br><br>• At the time of issuance and purchase of any DIP Note and after giving effect thereto, no Default or Event of Default shall then exist or result therefrom.<br><br>• All issuances of DIP Notes shall be made subject to and in accordance with the Budget (as defined herein).<br><br>• Up to $750,000 (the "Interim DIP Issuance") to be made available in one or more issuances in accordance with the Budget (as defined below) and this binding Term Sheet (until it is superseded by the DIP Documents) and the DIP Documents from the Interim Closing Date until the Final Closing Date (as defined below).<br><br>• If any entity or individual other than the DIP Note Purchasers and DIP Factoring Purchasers are approved to be Debtor's DIP lender at the final hearing on the DIP Motion, then all obligations of the Note Parties under the DIP Facilities shall |

| | |
|---|---|
| | be paid in full upon the closing of the new DIP Lender's financing. |
| | • Up to an amount equal to the remaining approved unfunded DIP Note Purchase Commitments (the "<u>Final DIP Issuance</u>") to be made available in one or more issuances in accordance with the Budget and the DIP Documents on or after the Final Closing Date. |
| | • <s>Subject to entry of the Final DIP Order, the Roll-Up shall be approved.</s> |
| | • Immediately upon entry of the first interim order approving this Term Sheet by the Bankruptcy Court (the "<u>First Interim Order</u>"), the DIP Lender was authorized to advance $150,000 of the Interim DIP Issuance, which shall be used by the Debtor to pay for only those reasonable expenses associated with: (i) payroll; (ii) insurance; (iii) product labeling; and (iv) other reasonable and necessary operational expenses, and the balance of the Interim DIP Issuance shall be advanced with the entry of the Interim DIP Order.  Since the First Interim Order, the DIP Lender has advanced $123,861.31 of the Interim DIP Issuance to fund the specific requests of the Debtor. |
| | Any amounts repaid under the DIP Note Facility may not be reissued or repurchased. |
| **DIP Factoring Purchasers** | The "<u>DIP Factoring Purchasers</u>" will be Empery, [●] (collectively, the "<u>Initial DIP Factoring Purchasers</u>") and any other Prepetition Purchasers who choose to participate in the DIP Factoring Facility by notice in writing to the DIP Agent at least two days prior to entry of the Interim DIP Order or such other time as may be agreed by the DIP Agent (together with the DIP Agent, the "<u>DIP Factoring Parties</u>").[1] |
| | "<u>DIP Consenting Factoring Parties</u>" shall mean the DIP Agent and Empery, as a DIP Factoring Purchaser. |
| | The obligation of any DIP Factoring Purchaser to participate under the DIP Factoring Facility may be fulfilled on behalf of such DIP Factoring Purchaser by any of such DIP Factoring Purchaser's affiliated or related funds or financing vehicles.  The DIP Factoring Purchase Commitments (as defined below) will be offered for participation to each Prepetition Purchaser in each case based on such Prepetition Purchaser's pro rata share of the amounts |

---

[1] A third party may do the factoring under the DIP Factoring Facility.

| | |
|---|---|
| | outstanding under the Prepetition Notes.  To the extent a portion of the DIP Factoring Purchase Commitments is not provided by a Prepetition Purchaser, such portion shall be allocated to, and added to the DIP Factoring Purchase Commitments of the Initial DIP Factoring Purchasers based on the Initial DIP Factoring Purchasers' ratable shares of the Prepetition Notes. |
| **DIP Factoring Facility** | Pursuant to the DIP Factoring Documents, Debtor will sell, transfer, convey, assign and deliver to DIP Factoring Purchasers, and DIP Factoring Purchasers agree to purchase and receive from Debtor, all of Debtor's right, title and interest in and to all eligible post-petition accounts ("Accounts") and, to the extent provided in the next succeeding paragraph, purchase orders ("Purchase Orders") arising from the sale of any product or goods or the rendering of services by Debtor in the ordinary course of the Debtor's business (each an "Advance") for up to $10 million (the "DIP Factoring Purchase Commitments", and such factoring, the "DIP Factoring").

The DIP Factoring Purchasers will only purchase Purchase Orders from Debtor during the period of entry of the Interim DIP Order to entry of the Final DIP Order (the "Interim Period").  During the Interim Period, the DIP Factoring Purchasers will only factor Purchase Orders that: (i) have been approved in writing by Eric Hillman; and (ii) JW Nutritional, LLC has confirmed in writing can be manufactured in accordance with the terms of the purchase order.  The DIP Factoring Purchasers will only factor up to $2 million of Purchase Orders during the Interim Period.

IT IS THE INTENTION OF THE PARTIES THAT AS TO ALL ACCOUNTS AND PURCHASE ORDERS (DURING THE INTERIM PERIOD) THAT DIP FACTORING PURCHASERS ELECT TO PURCHASE SHALL CONSTITUTE A TRUE PURCHASE AND SALE OF ACCOUNT(S) UNDER § 9-318 OF THE UNIFORM COMMERCIAL CODE AND AS SUCH, THE DEBTOR SHALL HAVE NO LEGAL OR EQUITABLE INTEREST IN THE ACCOUNTS AND PURCHASE ORDERS SOLD. |
| **Advances on Accounts and Purchase Orders** | The DIP Factoring Purchasers, in the sole discretion of the DIP Agent, may advance up to (i) one hundred percent (100%) of the first $1,000,000 of Accounts and Purchase Orders purchased during the Interim Period, and (ii) eighty percent (80%) of the face amount of the Accounts purchased in excess of $1,000,000, less the applicable discount fee, and Facility Fee (as defined below) (collectively the "***Aggregate Advances***"). The purchase price of any Account and Purchase Order (during the Interim Period) shall be the amount actually received in payment of such Account and Purchase Order, |

| | but for the purposes of any Advance or Purchase Order, the purchase price shall be equal to the face amount of the Account or Purchase Order less any selling, payment or other discounts offered. |
|---|---|
| **Reserve** | DIP Agent, in its sole discretion, may elect to maintain a reserve from each Advance ("Reserve") of an amount not to exceed 20% of the Aggregate Advances (the "Reserve Cap"). As a general rule, although not a requirement, it is intended that Reserves on paid invoices are released upon the request of the Debtor or when the DIP Agent's next purchase of Accounts or Purchase Orders from Debtor is funded. However, DIP Agent may increase or decrease the amount of such Reserve, up to the Reserve Cap, at any time and from time to time if it deems it necessary in order to protect its interest and to protect DIP Factoring Purchasers from losses or potential losses that DIP Factoring Purchasers may reasonably anticipate might arise in the future due to contingencies, disputes, potential breach of warranties or other potential non-payments, reductions or losses from the purchase of Accounts or Purchase Orders under the Advances. |
| **Recourse to Borrower of Certain Accounts** | In the event that (a) an Account or Purchase Order (during the Interim Period) purchased by DIP Factoring Purchasers is not paid in full by the account debtor, on or before the date when due in accordance with its terms, (b) an account debtor objects to the property sold or service performed by Debtor, or rejects or revokes acceptance or fails or refuses to accept or receive any such property or services, (c) an account debtor suspends business, requests a general extension of time within which to pay debts, makes an assignment for the benefit of creditors or becomes a debtor or alleged debtor in any bankruptcy case, or if an event occurs amounting to a general business failure of an account debtor, or (d) DIP Agent in its reasonable discretion determines that any Account or Purchase Order is or may become uncollectible (collectively, a "Worthless Account"), the DIP Agent may require the Debtor promptly to repurchase such Account or Purchase Order. |
| **Facility Fee** | Fifty basis points (0.50%) of each Account or Purchase Order purchased by DIP Factoring Purchasers, payable at the time of each such purchase. |
| **Closing Dates** | "Interim Closing Date" means the date on which the conditions precedent to the Interim DIP Issuance set forth in the DIP Documents (including entry of the Interim DIP Order) have been satisfied or waived. <br><br> "Final Closing Date" means the date on which the conditions precedent to the Final DIP Issuance set forth in DIP Documents |

| | |
|---|---|
| | (including entry of the Final DIP Order) have been satisfied or waived. |
| **Amortization** | The DIP Note Facility shall not have any principal amortization prior to the Maturity Date (as defined below). |
| **Maturity Date** | Earliest of (a) ~~December 31, 2023, (b)~~ the date all DIP Notes become due and payable under the DIP Documents, whether by acceleration after an Event of Default or otherwise, (~~c~~b) the date of the closing of ~~the Sale Transaction (as defined below) or~~ any ~~other~~ sale(s) of all or substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, and (~~c~~d) the ~~filing~~ occurrence of the Effective Date under a confirmed ~~of~~ a chapter 11 plan of the Debtor ~~that is not an Acceptable Plan (as defined below)~~ (the "Maturity Date"). |
| **Interest Rates** | • DIP Note Facility: The prime interest rate as published in the Wall Street Journal plus two percent (2%) per annum.<br><br>• Interest Rate on Aggregate Advances: The prime interest rate as published in the Wall Street Journal plus two percent (2.0%) per annum.<br><br>• Default interest rate of an additional two percent (2.0%) per annum upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Documents), payable in cash on demand. |
| **Payments and Fees** | Upfront Payment: $0<br><br>DIP Agent Fee: $0<br><br>Closing Fee: $0 |
| **DIP Collateral** | All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Note Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of the Note Parties, including, for the avoidance of doubt, any equity or other interests in the Note Parties' non-Debtor and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the Final DIP |

| | |
|---|---|
| | Order, including the proceeds thereof (collectively, the "DIP Collateral"). |
| **Priority of DIP Obligations** | All obligations of the Issuer under the DIP Facilities and all amounts owing by the Guarantor(s) in respect thereof at all times shall be, effective as of December 15, 2022 ("Petition Date"), secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected co-priority senior liens on and security interests in the DIP Collateral (collectively, the "DIP Liens"), subject to the priorities described in Schedule 2 hereto. |
| | All of the DIP Liens shall be created on terms, and pursuant to documentation, satisfactory to the DIP Agent, ~~in its sole discretion~~, the Debtor, the Official Committee of Unsecured Creditors (the "Committee") and White Winston Select Asset Funds, LLC ("WW") (collectively, the "Consent Parties"). |
| **DIP Superpriority Claim** | All obligations of the Debtor under the DIP Facilities and all amounts owing by the Guarantor(s) in respect thereof at all times shall constitute allowed superpriority administrative expense claims, pursuant to section 364(c)(1) of the Bankruptcy Code, in the Chapter 11 Case (the "DIP Superpriority Claims"), having priority over all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provisions of the Bankruptcy Code, subject to the priorities described in Schedule 2 hereto. |
| **Documentation** | The DIP Documents shall be prepared initially by counsel for the DIP Agent, and shall substantially reflect the terms and provisions of this DIP Term Sheet in all material respects and shall be reasonably acceptable to the ~~DIP Agent~~Consent Parties. |
| **Conditions Precedent** | Notwithstanding the binding nature of this Term Sheet, the effectiveness of the DIP Facilities on the DIP Effective Date, the obligations of the DIP Note Purchasers to purchase the DIP Notes, and the obligations of the DIP Factoring Purchasers to purchase Accounts or Purchase Orders (during the Interim Period) shall be subject to customary closing conditions reasonably satisfactory to the Consent Parties, including, without limitation, the satisfaction of the following conditions precedent (the "Conditions Precedent") (unless waived in writing by the ~~applicable DIP Consenting Parties~~Consent Parties): |
| | • All DIP Documents shall have been executed by the Note Parties and the other parties thereto. |
| | • The DIP Secured Parties and DIP Factoring Parties shall have |

| | |
|---|---|
| | received, and the ~~DIP Consenting Parties~~Consent Parties shall be reasonably satisfied with, the initial Budget (as defined herein). |
| | • Upon the entry of the Interim DIP Order, the DIP Agent shall, for the benefit of the DIP Secured Parties and DIP Factoring Parties, have valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on the DIP Collateral to the extent set forth in the Interim DIP Order, subject to the priorities described in Schedule 2 hereto, and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid. |
| | • The form and substance of the "first day" orders permitting the payment by the Issuer and its subsidiaries of any prepetition amounts then (or thereafter becoming) due and owing shall be acceptable to the ~~DIP Agent~~Consent Parties. |
| | • The Interim DIP Order and the Final DIP Order (as applicable) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any manner adverse to the DIP Note Purchasers or DIP Factoring Purchasers solely with respect to the DIP Loan without the consent of the DIP Agent, or to the extent adversely and disproportionately affecting any particular DIP Note Purchaser or DIP Factoring Purchaser with respect to the DIP Loan, such adversely affected DIP Note Purchaser or DIP Factoring Purchaser. |
| | • The satisfaction of other customary terms and conditions (including, without limitation, delivery of secretary and officer certificates, notice of borrowing, evidence of insurance, and legal opinions) and such other customary conditions as shall be required by the DIP Agent. |
| **Milestones** | Subject to the entry of the Final DIP Order, the Note Parties shall comply with the following deadlines (each, individually, a "Milestone" and, collectively, the "Milestones"), which may be extended or waived by the DIP Agent in its sole discretion: |
| | • The Note Parties shall have filed a motion for approval of ~~a~~the DIP ~~l~~Loan ~~on January 3, 2022~~, and subject the dates set by the Court, the Note Parties shall file a supplemental motion, in form and substance acceptable to the DIP |

Consenting Parties, seeking final approval of the DIP Facilities (the "DIP Motion").

- The Bankruptcy Court shall enter the ~~First~~ Interim DIP Order ~~and the Second Interim DIP Order~~, which orders ~~shall be~~ is ~~in are in~~ form and substance acceptable to the ~~DIP Consenting Parties~~ Consent Parties, approving the DIP Facilities on an interim basis ~~no later than three (3) business days following the hearing on the DIP Motion~~.

- The Bankruptcy Court shall enter the Final DIP Order, which order shall be in form and substance acceptable to the ~~DIP Consenting Parties~~ Consent Parties, approving the DIP Facilities ~~(including the Roll-Up on a final basis) no later than 24 days following the filing of the DIP Motion~~.

- ~~The Debtor shall file an Acceptable Plan by September 30, 2023.~~

- ~~An "Acceptable Plan" is a plan of reorganization or liquidation reasonably acceptable to the DIP Agent, which shall include the following:~~

    - ~~Repayment in full in cash of the obligations under the DIP Note Facility, including Roll-Up;~~

    - ~~Be acceptable to the DIP Agent, in its reasonable discretion, with respect to the treatment of the Prepetition Secured Parties, DIP Note Purchasers, and DIP Factoring Purchasers.~~

- ~~In the event an Acceptable Plan has not been filed by Debtor by September 30, 2023, Debtor shall commence a Section 363 sale process (the "Sale Transaction") within 14 days of notice by the DIP Agent that the plan filed is not acceptable. In the event that no plan is filed by September 30, 2023, Debtor shall commence a Sale Transaction on October 20, 2023. The procedure and timing of the Sale Transaction shall be satisfactory to the DIP Agent, in its sole discretion.~~

- ~~The Bankruptcy Court shall approve an Acceptable Plan by December 15, 2023.~~

To the extent any covenant or obligations under the DIP Documents (including any Milestones) are required to be performed on a day

| | |
|---|---|
| | that is not a business day, the deadline for such covenant or obligations shall be automatically extended to the next business day. |
| **Voluntary Prepayment** | Prior to the Maturity Date, the Issuer may, upon at least three business days' notice, prepay in full or in part, the DIP Notes.<br><br>The Issuer shall not be permitted to repurchase DIP Notes or repay or prepay DIP Notes other than on a pro rata basis. |
| **Mandatory Prepayment** | Prior to the Maturity Date, the following mandatory prepayments shall be required:<br><br>1.    Asset Sales: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of the sale or other disposition of any property or assets of the Note Parties or any of their respective subsidiaries, except for ordinary course and de minimis sales and additional exceptions to be agreed on by the Consent Parties in the DIP Documents;<br><br>2.    Insurance Proceeds: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the Note Parties or any of their respective subsidiaries subject to exceptions to be agreed on by the Consent Parties in the DIP Documents; and<br><br>3.    Incurrence of Indebtedness: Prepayments of the DIP Notes in an amount equal to 100% of the net cash proceeds of any indebtedness incurred by the Note Parties or any of their respective subsidiaries after the DIP Effective Date (other than indebtedness otherwise permitted under the DIP Documents), payable no later than the date of receipt. |
| **Financial Covenants** | All lending beyond the advances set forth in the Interim Advance and this Term Sheet shall be subject to final approval of the DIP Facilities, the Budget and entry of the Final DIP Order.<br><br>Following the one-week anniversary of the Interim DIP Order until the repayment in full in cash of the obligations under the DIP Facilities, the Note Parties shall perform in accordance with the Budget, subject to the following with respect to any Review Period: (i) the Note Parties' actual cash receipts shall not be less than 90% of the projected amounts therefor set forth in the Budget on a cumulative basis; and (ii) the Note Parties' actual cash disbursements shall not be greater than 110% of the projected amounts therefor set forth in the Budget on a cumulative basis(such variance, the "Permitted Variances"). |

| | |
|---|---|
| | During any Review Period occurring prior to March 15, 2023, the DIP Note Purchasers and DIP Factoring Note Purchasers waive all defaults of the Note Parties for failing to comply with the Budget, including the Permitted Variances, solely with respect to (i) top line gross revenue and cash receipts and (ii) all cost of goods sold, including shipping. |
| | Debtor shall file with the Bankruptcy Court a final Budget agreed to by the ~~DIP Agent~~Consent Parties on or before March 15, 2023. |
| | Compliance with the Budget shall be reviewed on Monday of every other week on a bi-weekly basis, with such reviews to be conducted on the Monday following each of the second and fourth weeks of the Budget (each, a "Weekly Review Period") and thereafter on a rolling 4-week basis (the "Cumulative Review Period" and together with the Weekly Testing Period, the "Review Periods").  Beginning on the second Monday following the DIP Effective Date and every other Monday thereafter, the Note Parties shall deliver to the ~~Agent~~Consent Parties the Variance Report (as defined herein), which Variance Report shall include variance for the line items consistent with the latest Approved Budget (as defined in the DIP Documents) and be in form and substance acceptable to the ~~DIP Consenting Parties~~Consent Parties. |
| | "Budget" means the initial cash flow forecast for the 13-week period commencing with the week in which the Petition Date occurs, setting forth on a line-item basis the Note Parties' projected cash receipts and cash disbursements, on a weekly basis, which budget shall be prepared by the Note Parties and in form and substance acceptable to the ~~DIP Consenting Parties~~Consent Parties, and which budget shall be updated on the one-week anniversary of the Initial DIP Order and every four weeks on Wednesday (commencing with the Wednesday of the fourth full week commencing after the one-week anniversary of the Initial DIP Order (or if such day is not a business day, the next business day) in substantially the same form as the initial budget delivered and in substance acceptable to the ~~DIP Consenting Parties~~Consent Parties. The Budget shall include separate line items for each Professional Person (defined below). To the extent that any updated Budget is not acceptable to the ~~DIP Consenting Parties~~Consent Parties, the then-existing approved budget will remain the "Budget" until replaced by an updated budget that is acceptable to the ~~DIP Consenting Parties~~Consent Parties. |
| **Reporting** | The Issuer shall deliver to ~~the DIP Agent~~the Consent Parties (and the DIP Agent shall deliver to each DIP Note Purchaser and DIP Factoring Purchaser): |

| | |
|---|---|
| | (a) a weekly line-by-line variance report (the "Variance Report"), which Variance Report shall compare actual cash receipts and disbursements of the Note Parties with corresponding amounts provided for in the Budget on a line-by-line basis for the prior week and the applicable Review Period (or such shorter period as may have elapsed from the Petition Date), including written descriptions in reasonable detail explaining any material positive or negative variances, and otherwise in form and substance reasonably acceptable to the ~~DIP Consenting Parties~~Consent Parties; |
| | (b) all other reports and notices required to be delivered under the DIP Documents as mutually agreed upon by the ~~Debtor and the DIP Agent~~Consent Parties; and |
| | (c) copies of non-privileged reports of the financial and restructuring advisors of the Note Parties as reasonably requested by the ~~DIP Agent~~Consent Parties, including but not limited to: |
| |     i.   Any analysis of cash flows, forecasts, and potential cost savings initiatives; |
| |     ii.  Transaction marketing material (CIMs / MPs); |
| |     iii. Investor outreach list; |
| |     iv. Sale process updates in accordance with the terms of this DIP Term Sheet; and |
| |     v.  Proposed sources and uses at emergence. |
| | In addition, management of the Issuer shall, at the request of the ~~DIP Agent~~any Consent Party, conduct a bi-weekly conference call with the ~~DIP Consenting Parties~~ Consent Parties during normal business hours at a time to be mutually agreed upon to discuss the Issuer's performance. |
| **Board of Directors** | As set forth below, the DIP Consenting Parties shall approve an independent director ("Independent Director"), nominated by the Interim Board of Directors (defined below), with sole and exclusive responsibility for the following: |
| | • Protect and recover the assets of the Debtor, including perform all of the Debtor's statutory, common law and fiduciary duties, determine whether it is in the best interest of the Debtor to reorganize under Section 1129 of the Bankruptcy Code, or sell its assets in accordance with Section 363 of the Bankruptcy Code; |

|  | • Review and approve the ultimate debtor-in-possession financing incurred by the bankruptcy estate, as negotiated by the Debtor's restructuring professionals;<br>• Except as otherwise provided herein, investigate and determine which estate causes of action, if any, should be pursued, prosecuted, or settled; and<br>• Maximize value for all stakeholders.<br><br>Except as set forth below, all current members of the board of directors will resign immediately upon entry of the <u>First Interim Order</u>.<br><br>Upon entry of the First Interim Order, the board of directors will be reconstituted with the following members ("<u>Interim Board of Directors</u>"):<br><br>   1. Paul Karr; and<br>   2. Eric Hillman.<br><br>Upon entry of the Interim DIP Order, the board of directors will be reconstituted with the following members (the following, the "<u>Board of Directors</u>"):<br><br>   1. Eric Hillman;<br>   2. Paul Karr; and<br>   3. The Independent Director.<br><br>The Debtor shall nominate an Independent Director on or before January 17, 2023. |
| **Other Covenants** | By no later than five (5) days following the entry of the Interim DIP Order, Debtor shall engage a Chief Restructuring Officer (the "CRO") reasonably satisfactory to the ~~DIP Consenting Parties~~Consent Parties pursuant to an engagement letter with a scope and compensation reasonably satisfactory to the ~~DIP Consenting Parties~~Consent Parties and otherwise be in form and substance satisfactory to the ~~DIP Consenting Parties~~Consent Parties. All fees and expenses of (and otherwise relating to) the CRO shall be the sole responsibility of the Debtor. The CRO shall not be removed without order of the Bankruptcy Court. Furthermore, the Budget shall provide that the CRO's fees and costs shall not exceed $50,000 per month, except as otherwise approved by the Board of Directors and agreed to by the Consent Parties.<br><br>Ryan Drexler shall resign from all offices of Debtor and from the board of directors of Debtor immediately upon entry of the First |

Interim Order. Eric Hillman shall be appointed as the CEO of Debtor immediately upon entry of the First Interim Order.

The DIP Documents shall contain such other negative and affirmative covenants that are ordinary and customary in debtor-in-possession financings and reasonably acceptable to the ~~DIP Consenting Parties~~Consent Parties, including, without limitation, compliance with the Budget in accordance with the DIP Documents. Such covenants shall prohibit, inter alia, Issuer from making dividends or other distributions of cash to the direct or indirect equity holders of Issuer, including any distributions of cash in order to pay management fees or pay taxes attributable to the income of Issuer or any of its subsidiaries.

At the request of the DIP Agent, the Note Parties shall (i) arrange and cause to be held bi-weekly conference calls between representatives of the Note Parties, the CRO and the ~~DIP Consenting Parties~~Consent Parties (which (a) may, to the extent practicable, be the same weekly conference described above, and (b) shall occur during normal business hours at a time to be mutually agreed) for purposes of providing information regarding the status of the Chapter 11 Case, Debtor's business operations, the preparation, filing, and confirmation of ~~an Acceptable Plan~~a chapter 11 plan~~, and the Sale Transaction process that, while a stalking horse bidder remains part of the sale process, would not be deemed to provide preferential treatment to such bidder; provided that, for the avoidance of doubt, information regarding the number and identity of the parties contacted and the overview of the marketing efforts undertaken in connection with the Sale Transaction shall not be deemed to provide preferential treatment and shall be disclosed~~; (ii) at all times provide the ~~DIP Consenting Parties~~Consent Parties and their professional advisors with access to any data room established for purposes of allowing potential purchasers to evaluate a ~~Sale Transaction~~sale of assets; and (iii) provide the ~~DIP Consenting Parties~~Consent Parties and their professional advisors with all materials and other communications regarding ~~the Sale Transaction~~a sale of assets ~~process~~provided and available to all bidders at the time of distribution to any or all bidders. If at any time the stalking horse bidder is not part of the sale process, then the Issuer shall arrange and cause to be held weekly conference calls ~~between~~ among representatives of the Note Parties, the CRO and the ~~DIP Consenting Parties~~ Consent Parties (which (a) may, to the extent practicable, be the same weekly conference described above, and (b) shall occur during normal business hours at a time to be mutually agreed), for purposes of providing full and complete information~~regarding the Sale Transaction process to the DIP Agent~~.

| | |
|---|---|
| **Representations & Warranties** | The DIP Documents shall contain such representations and warranties as are usual and customary in debtor-in-possession financing and as are reasonably acceptable to the ~~DIP Consenting Parties.~~Consent Parties. |
| **Use of Proceeds** | The proceeds of the DIP Facilities shall be used solely for the following purposes, subject in all cases to the Budget: |
| | (a) pay fees, interest, payments, and expenses associated with the DIP Facilities; |
| | (b) provide for the ongoing working capital and capital expenditure needs of the Note Parties during the pendency of the Chapter 11 Case; |
| | (c) fund the Carve-Out; |
| | (d) fund the Forensic Accountant (if retained); and |
| | (e) fund the costs of the administration of the Chapter 11 Case and the consummation of the restructuring. |
| | ~~No Cash Collateral or proceeds of the DIP Facilities shall be used by the Debtor to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the DIP Facilities or the Prepetition Transaction Documents.~~ |
| **Forensic Accounting** | At the request of the ~~DIP Agent~~Consent Parties and approval of the Board of Directors, the CRO shall retain a forensic accountant reasonably acceptable to the DIP Consenting Parties (the "<u>Forensic Accountant</u>") to review and analyze all Debtor's bank statements for three (3) or more years prior to the Petition Date and any other documents and information necessary to investigate payments and transfers from Debtor to determine whether they are avoidable under federal and state law.  The DIP Agent will increase the DIP Facility in the amount necessary to pay for the forensic accounting in an amount agreed to be the ~~DIP Agent~~Consent Parties and the CRO. |
| **DIP Disbursement Account** | The Issuer and the Guarantor(s) shall deposit the proceeds of the DIP Note Facility and any Advances in Bankruptcy Court approved debtor-in-possession account that is subject to the control of the DIP Agent pursuant to a deposit account control agreement (the "<u>DIP Disbursement Account</u>"), and that is not subject to the control of any other Person.  Proceeds of the DIP Facilities and any other deposits to be provided under the DIP Documents shall be deposited, held and disbursed through the DIP Disbursement Account or otherwise in |

| | |
|---|---|
| | accordance with the cash management order.  For the avoidance of doubt, the factoring commitment will be made but only funded upon receipt of orders, which funding will not be unreasonably withheld or delayed. |
| **Events of Default/Remedies** | Events of Default shall include, without limitation:<br><br>• failure to pay principal or interest on the DIP Notes or any fees under the DIP Facilities when due;<br><br>• failure of any representation or warranty of any Note Party contained in any DIP Document to be true and correct in all material respects when made;<br><br>• breach of any covenant, subject to a five (5) business day grace period (from the earlier of the date that (i) any Note Party obtains knowledge of such breach and (ii) any Note Party receives written notice of such default from any DIP Consenting Party), provided that the breach of any covenant described herein, or any other covenant so indicated by the DIP Agent, shall not be subject to any grace period;<br><br>• failure to comply with the Budget, subject to the Permitted Variances;<br><br>• the DIP Agent shall cease to have continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected co-priority senior liens on and security interests in the DIP Collateral with the priorities described in Schedule 2 hereto (other than upon a release by reason of a transaction that is permitted under the DIP Documents);<br><br>• any Note Party or equityholder or Affiliate thereof (i) contesting the validity or enforceability of any DIP Document in writing or denying in writing that it has any further liability thereunder or (ii) contesting the validity or perfection of the liens and security interests securing the DIP Facilities;<br><br>• any attempt by any Note Party or any equityholder or Affiliate thereof to invalidate or otherwise impair the DIP Facilities or the liens granted to the DIP Note Purchasers or DIP Factoring Purchasers by the DIP Orders solely with respect to the DIP Facilities; |

- failure by any Debtor to comply with the Interim DIP Order or Final DIP Order, as applicable;

- the entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim DIP Order or Final DIP Order or any other order of the Bankruptcy Court approving the Debtor's use of Cash Collateral, as applicable, without the express written consent of the DIP Consenting Parties;

- any sale or disposition, other than the Sale Transaction, of all or a material portion of the DIP Collateral securing the DIP Facilities pursuant to section 363 of the Bankruptcy Code other than as permitted by the DIP Orders (or pursuant to a transaction that is permitted under the DIP Documents);

- conversion of, or the filing of any motion by any Note Party or any equityholder or Affiliate thereof to convert, any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

- dismissal of, or the filing of any motion by any Note Party or equityholder or Affiliate thereof to dismiss, any of the Chapter 11 Case;

- the appointment of a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of any Note Party (powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) under sections 1104(d) and 1106(b) of the Bankruptcy Code;

- failure to meet any Milestone;

- the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to a holder or holders of any security interest or lien on any part of the DIP Collateral securing the DIP Facilities to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral having a fair market value in excess of an amount to be reasonably agreed by the ~~DIP Consenting Parties~~Consent Parties;

- the grant of any superpriority claim that is pari passu with or senior to those of the DIP Note Purchasers or DIP Factoring Purchasers (other than the Carve-Out);

|  | • termination by the Bankruptcy Court of the use of Cash Collateral; |
|  | • ~~the filing of a plan of reorganization or liquidation by the Debtor that is not an Acceptable Plan;~~ |
|  | • ~~expiration of the period of time during which only the Issuer may file a plan pursuant to section 1121 of the Bankruptcy Code; and~~ |
|  | • the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any of the DIP Collateral. |
|  | Among other remedies to be specified, upon the occurrence of an Event of Default, the DIP Agent may and, at the direction of the DIP Consenting Parties, shall seek relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, and apply the proceeds thereof to the obligations arising under the DIP Documents or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law. |
| **Cash Collateral Usage** | The Prepetition Secured Parties consent to the use of Cash Collateral, subject to the Budget (subject to Permitted Variances) and the terms of this term sheet and the DIP Orders. |
| **Carve Out** | Carve-out provisions to be customary and appropriate in the context of the proposed DIP Facilities, and as otherwise acceptable to the DIP Agent, including a carve-out of all reasonable and documented fees and expenses up to $250,000 incurred by professionals employed by Debtor, and a carve-out of all reasonable and documented fees and expenses of up to $250,000 for any committee of unsecured creditors and a post-carve-out trigger notice cap of $25,000 for Debtor's professionals and $25,000 for any committee of unsecured creditors. Nothing in this section is intended or to be construed as limiting the fees and costs of the Issuer's professionals, as approved by the Bankruptcy Court in accordance with the Bankruptcy Code. |
| **Expenses and Indemnification** | The Note Parties shall pay, in connection with the Chapter 11 Case and the negotiation and documentation of the DIP Facilities and restructuring matters with respect to the Note Parties, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agent and reasonable and documented legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent; |

and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agent.  In addition, the Note Parties shall pay, in connection with workout proceedings and enforcement costs associated with the DIP Facilities, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agent and reasonable and documented legal fees and out-of-pocket expenses legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agent.  Such fees and expenses shall be added to DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agent claim(s).

The Issuer and the Guarantor(s) will indemnify the DIP Agent, DIP Note Purchasers, and DIP Factoring Purchasers  and their respective affiliates, and their respective related parties, and hold them harmless from and against all out-of-pocket costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any notes issued under the DIP Facilities; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence or willful misconduct of such person.

Notwithstanding the foregoing, the Debtor and its estate do not indemnify and shall not be liable pursuant to the indemnity provisions for any fees or expenses incurred by the Empery Noteholders with respect to any objection to the allowance of all or any of their respective prepetition claims, or challenges to the extent, priority and validity of all or any of their alleged liens securing any of such prepetition claims.

| | |
|---|---|
| **Adequate Protection** | (i)     the Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall receive, to the extent of any aggregate diminution in the value of their Cash eCollateral: (a) valid, binding, enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "Prepetition Notes Adequate Protection Liens"), subject to the priorities described in Schedule 2 hereto; and (b) allowed superpriority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the |

"Prepetition Notes Adequate Protection Claims"), subject to the priorities described in Schedule 2 hereto;

(ii)    Prestige Capital Finance, LLC ("Prestige") shall receive, to the extent of any aggregate diminution in the value of its collateral: (a) valid, binding, and enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "Prestige Adequate Protection Liens"), subject to the priorities described in Schedule 2 hereto; and (b) allowed superpriority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "Prestige Adequate Protection Claims"), subject to the priorities described in Schedule 2 hereto;

(iii)    the Prepetition Collateral Agent shall be entitled to reimbursement of its reasonable and documented fees and out-of-pocket expenses;

(iv)    the Prepetition Collateral Agent shall be entitled to reimbursement of its respective reasonable and documented fees and out-of-pocket expenses of one primary counsel and one local counsel (if applicable), and one financial advisor;

(v)    the Prepetition Collateral Agent, on behalf of itself and the Prepetition Secured Parties, shall be entitled to performance of the Milestones set forth herein;

(vi)(iii) Subject to Challenge Period set forth below, the Debtor agrees that in any sale of the DIP Collateral, the Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall have the right to credit bid an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, plus the obligations under the DIP Facilities, or such greater amount as allowed by the Court, in accordance with section 363(k) of the Bankruptcy Code, and that any motion filed by the Debtor seeking approval of bid procedures shall contain a request for approval of the right of the Prepetition Collateral Agent to credit bid the obligations of the Prepetition Purchasers;

(vii)(iv)    the Debtor shall provide the information required by the section entitled "Reporting" set forth herein;

(viii)(v)    the Final DIP Order shall include the waivers described in the section entitled "Waivers" set forth herein; and

| | |
|---|---|
| | (ix)    ~~interest at the default rate specified in the Prepetition Notes shall continue to accrue under the terms of the Prepetition Notes.~~ |
| **Committee Review** | ~~The Office Committee of Unsecured Creditors ("Committee")~~All parties in interest, including the Committee, shall have a period of sixty-days (60) from entry of the ~~Interim~~ Final Order to investigate and challenge and otherwise object to the allowance of ~~the Allowed Claim~~any and all prepetition claims of the Empery Securityholders and the extent, priority and validity of any and all liens allegedly securing any such prepetition claim (the "Challenge Period") |
| ~~**Stipulations**~~ | ~~The DIP Orders shall contain stipulations as to, among other things, the amount and priority of the secured indebtedness under the Prepetition Notes.~~ |
| **Waivers** | The DIP Orders shall provide for (i) a waiver of ~~the "equities of the case" exception to section 552(b) of the Bankruptcy Code, (ii) a waiver of the ability to surcharge the DIP Collateral, and subject to entry of the Final DIP Order, the collateral securing the Prepetition Notes, including under~~claims under section 506(c) of the Bankruptcy Code, and (iii) a waiver of the equitable doctrine of "marshaling" with respect to the DIP Collateral~~, and subject to entry of the Final DIP Order, the collateral securing the Prepetition Notes~~. |
| ~~**Releases**~~ | ~~Pursuant to the DIP Orders, the Issuer and Guarantor(s) shall release all claims against the DIP Agent in its capacity as such, the DIP Note Purchasers in their capacities as such, the DIP Factoring Purchasers in their capacities as such, the Prepetition Collateral Agent in its capacity as such and the Prepetition Purchasers in their capacities as such.~~ |
| ~~**Allowed Claim**~~ | ~~Subject to Challenge Period, the Prepetition Secured Parties shall have an allowed claim of an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, plus the obligations under the DIP Facilities and attorneys' fees and expenses.~~ |
| ~~**Credit Bid**~~ | ~~Debtor shall consent to (i) the DIP Agent submitting a credit bid of the obligations under the DIP Facilities, and (ii) subject to Challenge Period, the Prepetition Collateral Agent submitting a credit bid of an amount not less than $12.84mm, which is the principal and original issue discount obligations of the Prepetition Purchasers, or such greater amount as allowed by the Court (together, the "Credit Bid Obligations"), in connection with the sale of any asset of the Note Parties (in whole or in part), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation~~ |

| | |
|---|---|
| | ~~under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code and any motion filed by the Debtor seeking approval of bid procedures shall contain a request for approval of the right of the DIP Agent and Prepetition Collateral Agent, as applicable, to credit bid the Credit Bid Obligations and Debtor shall not object to such a provision.~~ |
| **Governing Law** | The DIP Documents shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to the conflict of law principles thereof. Each party to the DIP Documents will waive the rights to trial by jury and will consent to jurisdiction of the Bankruptcy Court for so long as the Chapter 11 Case remain open and, thereafter, the state and federal courts located in the County of New York in the State of New York. |
| **Amendments** | All amendments, modifications and waivers of the DIP Documents shall require the consent of the Issuer and the ~~DIP Consenting Parties~~Consent Parties, and shall include, as applicable, ~~except in the case of~~ amendments, modifications, or waivers customarily requiring consent from all DIP Note Purchasers and DIP Factoring Purchasers, all affected DIP Note Purchasers, DIP Factoring Purchasers, or the DIP Agent. |
| **Assignments and Participations** | Each DIP Note Purchaser and DIP Factoring Purchaser may assign all or any part of the DIP Notes or Accounts to one or more affiliate, bank, financial institution, or other entity. Upon such assignment, such affiliate, bank, financial institution, or entity will become a DIP Note Purchaser or DIP Factoring Purchaser, as applicable, for all purposes under the DIP Documents. The DIP Note Purchasers and DIP Factoring Purchasers will also have the right to sell participations, subject to customary limitations on voting rights, in the DIP Notes or Accounts. Notwithstanding the foregoing, no assignment shall be made or participation sold to the Issuer, any subsidiary of the Issuer or an affiliate of any of the foregoing. |
| **Counsel to Empery as DIP Agent, DIP Note Purchaser, and DIP Factoring Purchaser** | Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP |

## SCHEDULE 1[2]

| Prepetition Purchaser | Aggregate Principal Amount, including OID, of October Notes (USD) | Aggregate Principal Amount, including OID, of June Notes (USD) |
|---|---|---|
| Altium Growth Fund, LP | 1,384,300.00 | 156,250.00 |
| Anson Investments Master Fund LP | 1,038,225.00 | 312,500.00 |
| Bigger Capital Fund, LP | 692,150.00 | 312,500.00 |
| CVI Investments, Inc. | 692,150.00 | 0.00 |
| District 2 Capital Fund LP | 1,038,225.00 | 312,500.00 |

[2] Schedule 1 to be reviewed and updated, as needed.

| | | |
|---|---:|---:|
| Empery Debt Opportunities Fund, LP | 1,245,870.00 | 281,250.00 |
| Empery Master Onshore, LLC | 924,712.40 | 208,750.00 |
| Empery Tax Efficient, LP | 276,860.00 | 62,500.00 |
| Empery Tax Efficient III, LP | 321,157.60 | 72,500.00 |
| HB Fund LLC | 692,150.00 | 156,250.00 |
| Intracostal Capital LLC | 69,214.99 | 0.00 |
| Ionic Ventures | 692,150.00 | 312,500.00 |
| L1 Capital Global Opportunities Master Fund | 692,150.00 | 0.00 |
| Roth Capital Partners, LLC | 0.00 | 269,375.00 |
| Walleye Opportunities Master Fund Ltd. | 0.00 | 625,000.00 |
| **TOTAL** | 9,759,315.00 | 3,081,875.00 |

**SCHEDULE 2**

| Order of Priority | DIP Collateral Consisting of Pre-Petition Factoring Priority Collateral[3] | DIP Collateral Consisting of Post-Petition Factoring Priority Collateral | DIP Collateral Not Consisting of Factoring Priority Collateral | Third-Party Encumbered Assets[4] | Unencumbered Assets | Superpriority Claims |
|---|---|---|---|---|---|---|
| 1st | Carve-Out and Permitted Liens[5] | Carve-Out and Permitted Liens | Carve-Out and Permitted Liens | Third-Party Existing Liens | Carve-Out | Carve-Out and Permitted Liens |
| 2nd | Prestige Liens[6] | DIP Liens | DIP Liens | Carve-Out | DIP Liens | DIP Superpriority Claim |
| 3rd | DIP Liens | Prestige Adequate Protection Liens | Prepetition Notes Adequate Protection Liens | DIP Liens | Prepetition Notes Adequate Protection Liens and Prestige Adequate Protection Liens | Prepetition Notes Adequate Protection Claim and Prestige Adequate Protection Claim |
| 4th | Prepetition Notes Adequate Protection Liens | Prepetition Notes Adequate Protection Liens | Prepetition Notes Liens | Prepetition Notes Adequate Protection Liens and Prestige Adequate Protection Liens | | |
| 5th | Prepetition Notes Liens | Prepetition Notes Liens | Prestige Adequate Protection Liens | | | |
| 6th | | | Prestige Liens | | | |
| 7th | | | All liens of record | | | |

---

[3]    As defined in the Intercreditor Agreement, dated as of October 13, 2021 (the "Prestige Intercreditor Agreement"), among Prestige, Empery, as Notes Representative on behalf of the Prepetition Noteholders and Prepetition Collateral Agent, and the Note Parties.

[4]    "Third-Party Encumbered Assets" shall mean DIP Collateral that was, as of the Petition Date, subject to valid, properly perfected and non-avoidable liens or security interests (collectively, the "Third-Party Existing Liens") other than the liens and security interests granted pursuant to the Prepetition Security Agreement (the "Prepetition Notes Liens") and the Prestige Liens (as defined below).

[5]    "Permitted Liens" shall mean any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Notes Liens and Prestige Liens.

[6]    "Prestige Liens" shall mean any valid, properly perfected and non-avoidable liens on or security interests in the Factoring Collateral created by the Factoring Security Documents (each as defined in the Prestige Intercreditor Agreement).

# EXHIBIT E

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

**(Mark one)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended: March 31, 2022**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number: 000-53166**



# MusclePharm Corporation
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Nevada** | **77-0664193** |
| **(State or other jurisdiction of** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Identification No.)** |

| | |
|---|---|
| **6728 W. Sunset Rd. Ste. 130** | |
| **Las Vegas, NV** | **89118** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(800) 859-3010**
**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| N/A | | |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller

reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

The number of shares of the issuer's common stock, $0.001 par value per share, outstanding at May 10, 2022 was 34,348,891.

**MusclePharm Corporation**
**Form 10-Q**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PART I – FINANCIAL INFORMATION** | | 4 |
| Item 1. | Financial Statements | 4 |
| | Consolidated Balance Sheets as of March 31, 2022 (unaudited) and December 31, 2021 | 4 |
| | Consolidated Statements of Operations for the three months ended March 31, 2022 and 2021 (unaudited) | 5 |
| | Consolidated Statements of Changes in Stockholders' Deficit for the three months ended March 31, 2022 and 2021 (unaudited) | 6 |
| | Consolidated Statements of Cash Flows for the three months ended March 31, 2022 and 2021 (unaudited) | 7 |
| | Notes to Consolidated Financial Statements (unaudited) | 8 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 23 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 30 |
| Item 4. | Controls and Procedures | 30 |
| **PART II – OTHER INFORMATION** | | 32 |
| Item 1. | Legal Proceedings | 32 |
| Item 1A. | Risk Factors | 32 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 32 |
| Item 3. | Defaults Upon Senior Securities. | 32 |
| Item 4. | Mine Safety Disclosures | 32 |
| Item 5. | Other Information | 32 |
| Item 6. | Exhibits | 32 |
| | Signatures | 33 |

-2-

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS AND INDUSTRY DATA

This Quarterly Report on Form 10-Q contains certain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Any statements in this Quarterly Report on Form 10-Q about our expectations, beliefs, plans, objectives, assumptions or future events or performance are not historical facts and are forward-looking statements. These statements are often, but not always, made through the use of words or phrases such as "believe," "will," "expect," "anticipate," "estimate," "intend," "plan" and "would." For example, statements concerning financial condition, possible or assumed future results of operations, growth opportunities, industry ranking, plans and objectives of management, markets for our common stock and future management and organizational structure are all forward-looking statements. Forward-looking statements are not guarantees of performance. They involve known and unknown risks, uncertainties and assumptions that may cause actual results, levels of activity, performance or achievements to differ materially from any results, levels of activity, performance or achievements expressed or implied by any forward-looking statement.

Any forward-looking statements are qualified in their entirety by reference to the risk factors discussed throughout this Quarterly Report on Form 10-Q. Some of the risks, uncertainties and assumptions that could cause actual results to differ materially from estimates or projections contained in the forward-looking statements include, but are not limited to:

- our business strategies;

- the timing of regulatory submissions;

- our ability to obtain and maintain regulatory approval of our existing product candidates and any other product candidates we may develop, and the labeling under any approval we may obtain;

- risks relating to the timing and costs of clinical trials and the timing and costs of other expenses;

- risks related to market acceptance of products;

- intellectual property risks;

- risks associated to our reliance on third party organizations;

- our competitive position;

- our industry environment;

- our anticipated financial and operating results, including anticipated sources of revenues;

- assumptions regarding the size of the available market, benefits of our products, product pricing and timing of product launches;

- management's expectation with respect to future acquisitions;

- statements regarding our goals, intentions, plans and expectations, including the introduction of new products and markets; and

- our cash needs and financing plans.

All of our forward-looking statements are as of the date of this Quarterly Report on Form 10-Q only. In each case, actual results may differ materially from such forward-looking information. We can give no assurance that such expectations or forward-looking statements will prove to be correct. An occurrence of, or any material adverse change in, one or more of the risk factors or risks and uncertainties referred to in this Quarterly Report on Form 10-Q or included in our other public disclosures or our other periodic reports or other documents or filings filed with or furnished to the U.S. Securities and Exchange Commission (the "SEC") could materially and adversely affect our business, prospects, financial condition and results of operations. Except as required by law, we do not undertake or plan to update or revise any such forward-looking statements to reflect actual results, changes in plans, assumptions, estimates or projections or other circumstances affecting such forward-looking statements occurring after the date of this Quarterly Report on Form 10-Q, even if such results, changes or circumstances make it clear that any forward-looking information will not be realized. Any public statements or disclosures by us following this Quarterly Report on Form 10-Q that modify or impact any of the forward-looking statements contained in this Quarterly Report on Form 10-Q will be deemed to

modify or supersede such statements in this Quarterly Report on Form 10-Q.

This Quarterly Report on Form 10-Q may include market data and certain industry data and forecasts, which we may obtain from internal company surveys, market research, consultant surveys, publicly available information, reports of governmental agencies and industry publications, articles and surveys. Industry surveys, publications, consultant surveys and forecasts generally state that the information contained therein has been obtained from sources believed to be reliable, but the accuracy and completeness of such information is not guaranteed. While we believe that such studies and publications are reliable, we have not independently verified market and industry data from third-party sources.

-3-

**PART I—FINANCIAL INFORMATION**

**ITEM 1. FINANCIAL STATEMENTS**

**MusclePharm Corporation**
**Consolidated Balance Sheets**
*(In thousands, except share and per share data)*

| | (Unaudited) March 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash | $ | 534 | $ | 1,223 |
| Accounts receivable, net of allowances of $536 and $639 at March 31, 2022 and December 31, 2021, respectively | | 9,277 | | 6,388 |
| Inventory | | 975 | | 1,830 |
| Prepaid expenses and other current assets | | 1,052 | | 1,046 |
| Total current assets | | 11,838 | | 10,487 |
| Property and equipment, net | | 4 | | 5 |
| Intangible assets, net | | — | | 35 |
| Operating lease right-of-use assets | | 135 | | 203 |
| Total Assets | $ | 11,977 | $ | 10,730 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 18,877 | $ | 17,980 |
| Accrued and other liabilities | | 6,654 | | 5,942 |
| Obligation under secured borrowing arrangement | | 6,592 | | 6,446 |
| Operating lease liability | | 233 | | 342 |
| Senior notes payable | | 7,738 | | 4,555 |
| Convertible notes with a related party | | 5,330 | | 5,330 |
| Revolving line of credit, related party | | 2,747 | | — |
| Total Current Liabilities | | 48,171 | | 40,595 |
| Other long term liabilities | | 1,861 | | 2,326 |
| Total Liabilities | | 50,032 | | 42,921 |
| Commitments and contingencies (Note 8) | | | | |
| Stockholders' deficit: | | | | |
| Common stock, par value of $0.001 per share; 100,000,000 shares authorized, 33,386,200 and 33,386,200 shares issued as of March 31, 2022 and December 31, 2021, respectively; and 33,386,200 and 33,386,200 shares outstanding as of March 31, 2022 and December 31, 2021, respectively | | 32 | | 32 |
| Additional paid-in capital | | 183,792 | | 183,355 |
| Treasury Stock at Cost, 875,621 shares | | (10,039) | | (10,039) |
| Accumulated deficit | | (211,840) | | (205,539) |
| Total Stockholders' Deficit | | (38,055) | | (32,191) |
| Total Liabilities and Stockholders' Deficit | $ | 11,977 | $ | 10,730 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

-4-

**MusclePharm Corporation**
**Consolidated Statements of Operations**
*(In thousands, except share and per share data)*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Revenue, net | $ 13,101 | $ 13,121 |
| Cost of revenue | 11,592 | 9,432 |
| Gross profit | 1,509 | 3,689 |
| Operating expenses: | | |
| Selling and promotion | 1,160 | 1,149 |
| General and administrative | 2,829 | 2,268 |
| Total operating expenses | 3,989 | 3,417 |
| Income (loss) from operations | (2,480) | 272 |
| Other (expense) income: | | |
| Gain on settlements | 12 | 200 |
| Interest expense | (3,821) | (510) |
| Other (expense) income, net | (12) | 132 |
| Income (loss) before provision for income taxes | (6,301) | 94 |
| Net income (loss) | $ (6,301) | $ 94 |
| Net income (loss) per share, basic | $ (0.19) | $ 0.00 |
| Net income (loss) per share, diluted | $ (0.19) | $ 0.00 |
| Weighted average shares used to compute net income (loss) per share, basic | 33,386,200 | 33,119,549 |
| Weighted average shares used to compute net income (loss) per share, diluted | 33,386,200 | 45,492,620 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

-5-

**MusclePharm Corporation**
**Consolidated Statements of Changes in Stockholders' Deficit**
*(In thousands, except share and per share data)*

| | Common Stock | | Treasury Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | | | |
| Balance at December 31, 2020 | 33,105,284 | 32 | 875,621 | (10,039) | 178,261 | (192,673) | (24,419) |
| Net income | | | | | | 94 | 94 |
| Stock-based compensation for issuance and amortization of restricted stock awards to employees, executives, and directors | 280,916 | - | - | - | - | - | - |
| Balance at March 31, 2021 | 33,386,200 | 32 | 875,621 | (10,039) | 178,261 | (192,579) | (24,325) |

| | Common Stock | | Treasury Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | | | |
| Balance at December 31, 2021 | 33,386,200 | 32 | 875,621 | (10,039) | 183,355 | (205,539) | (32,191) |
| Net loss | | | | | | (6,301) | (6,301) |
| Stock-based compensation | - | - | - | - | 437 | - | 437 |
| Balance at March 31, 2022 | 33,386,200 | 32 | 875,621 | (10,039) | 183,792 | (211,840) | (38,055) |

The accompanying notes are an integral part of these Consolidated Financial Statements.

-6-

**MusclePharm Corporation**
**Consolidated Statements of Cash Flows**
*(In thousands)*

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2022 | 2021 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income/(loss) | $ (6,301) | $ 94 |
| Adjustments to reconcile net income/(loss) to net cash provided by/(used in) operating activities: | | |
| Depreciation and amortization of property and equipment | 1 | 4 |
| Amortization of intangible assets | 35 | 80 |
| Bad debt expense | (355) | (11) |
| Provision for inventory write down | — | 86 |
| Stock-based compensation | 437 | — |
| Amortization of debt issue cost | 419 | — |
| OID Interest | 568 | — |
| Amortization of debt discount | 2,196 | — |
| **Changes in operating assets and liabilities:** | | |
| Accounts receivable, net | (2,534) | 1,278 |
| Inventory | 855 | (406) |
| Prepaid expenses and other current assets | (6) | 527 |
| Operating lease assets and liabilities | (41) | 87 |
| Accounts payable | 897 | (1,641) |
| Other long-term liabilities | (465) | — |
| Accrued and other liabilities | 712 | — |
| **Net cash provided by/(used in) operating activities** | (3,582) | 98 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchase of property and equipment | — | (4) |
| Net cash provided by/(used in) investing activities | — | (4) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from line of credit | — | 1,061 |
| Payments on lines of credit | — | (100) |
| Proceeds from secured borrowing arrangement, net of reserves | 6,293 | 11,423 |
| Payments to secured borrowing arrangement, net of fees | (6,147) | (13,781) |
| Proceeds from revolving line of credit, related party | 7,366 | — |
| Payments on revolving line of credit, related party | (4,619) | — |
| Repayment of notes payable | — | (108) |
| Net cash provided by/(used in) financing activities | 2,893 | (1,505) |
| Net increase/(decrease) in cash and cash equivalents | (689) | (1,411) |
| Cash and cash equivalents, beginning of period | 1,223 | 2,003 |
| Cash and cash equivalents, end of period | $ 534 | $ 592 |
| | | |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION: | | |
| Cash paid for interest | $ 3,467 | $ 101 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

**MusclePharm Corporation**
**Notes to the Consolidated Financial Statements**
*(dollars in thousands, unless otherwise indicated)*

### Note 1. Description of Business

*Description of Business*

MusclePharm Corporation, together with its subsidiaries (the "Company" or "MusclePharm") is a scientifically-driven, performance lifestyle company that develops, markets and distributes branded sports nutrition products and nutritional supplements that are manufactured by the Company's contract manufacturers. The Company's portfolio of recognized brands, including MusclePharm, FitMiss and MP Combat Energy is marketed and sold globally. As of March 31, 2022, the Company had the following wholly-owned subsidiary which did not have any operations or assets as of and for the three months ended March 31, 2022: MusclePharm Canada Enterprises Corp.

In 2021, the Company announced its entrance into the functional energy space in collaboration with former Rockstar Energy executives. The Company launched three flavors of MP Combat Energy in September 2021 for domestic distribution and three additional flavors for international distribution. The Company believes the launch of its new energy products, reductions in operating costs and continued focus on gross profit and revenue growth will allow it to ultimately achieve sustained profitability. However, the Company can give no assurances that this will occur, especially with the cost to launch new energy products along with the recent increase in the cost of protein, which may have a material impact on the Company's profitability. Additionally, the Company's profitability may be materially impacted by the ability of the Company's contract manufacturers to meet customers' demands. Although, the Company believes entering the functional energy space will help to increase sales and gross margin, and reduce exposure to commodity prices, the Company can give no assurances that this will occur. To manage cash flow, the Company has entered into multiple financing arrangements. The entry into the Energy Drink business has created a second segment, which is presented in detail in Note 12.

*Information About Our Segments*

We are engaged in global sales of products that fall into two operating segments: Protein Products and Energy Drinks. Information regarding our operating segments and geographic and product information is contained in Note 12 to these consolidated financial statements.

*Going Concern*

The Company has historically incurred significant losses and experienced negative cash flows since inception. As of March 31, 2022, the Company had cash of $0.5 million, a working capital deficit of $36.3 million, a stockholders' deficit of $38.1 million and an accumulated deficit of $211.8 million resulting from recurring losses from operations. As a result of a history of losses and financial condition, there is substantial doubt about the Company's ability to continue as a going concern.

The Company's ability to continue as a going concern is dependent upon it generating profits in the future and/or obtaining the necessary financing to meet its obligations and repay liabilities arising from normal business operations when they come due. The Company is evaluating different strategies to obtain financing to fund its operations to cover expenses and focus on achieving a level of revenue adequate to support its current cost structure. Financing strategies may include, but are not limited to, issuances of capital stock, debt borrowings, partnerships and/or collaborations.

The Company has been focused on cost containment and improving gross margins by focusing on customers with higher margins, reducing product discounts and promotional activity, along with reducing the number of SKU's and negotiating improved pricing for raw materials. In addition, the Company has worked to negotiate lower production costs with its contract manufacturers. Although these steps improved gross margins through the first quarter of 2022, with the recent further increases in commodity prices, primarily protein, the Company's gross margins have been impacted and will continue to be impacted unless commodity prices return the same levels that were seen in 2021. The Company expects overall margins to improve as we ramp up energy sales with stronger gross margins in the energy drink segment.

-8-

### COVID-19

The Company's results of operations are affected by economic conditions, including macroeconomic conditions and levels of business confidence. There continues to be significant volatility and economic uncertainty in many markets and the ongoing COVID-19 pandemic contributes to that level of volatility and uncertainty and has created economic disruption. The Company is actively managing its business to respond to the impact. There were no adjustments recorded in the financial statements that might result from the outcome of these uncertainties.

The ultimate impact of the COVID-19 pandemic on the Company's operations is unknown and will depend on future developments, which are highly uncertain and cannot be predicted with confidence, including the duration of the COVID-19 outbreak, new information which may emerge concerning the severity of the COVID-19 pandemic, and any additional preventative and protective actions that governments, or the Company, may direct, which may result in an extended period of continued business disruption, reduced customer traffic and reduced operations. Any resulting financial impact cannot be reasonably estimated at this time but may have a material impact on the Company's business, financial condition and results of operations. Management continues to monitor the business environment for any significant changes that could impact the Company's operations. The Company has taken proactive steps to manage costs and discretionary spending, such as remote working and reducing facility related expense.

### Note 2. Summary of Significant Accounting Policies

#### Basis of Presentation and Principles of Consolidation

The accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States ("U.S. GAAP") for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, these statements do not include all the information and notes required by U.S. GAAP for complete financial statements. The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation.

The Company's management believes the unaudited interim consolidated financial statements include all adjustments of a normal recurring nature necessary for the fair presentation of the Company's financial position as of March 31, 2022, results of operations and cash flows for the three months ended March 31, 2022 and 2021. The results of operations for the three ended March 31, 2022 are not necessarily indicative of the results to be expected for the year ended December 31, 2022.

These unaudited interim consolidated financial statements should be read in conjunction with the consolidated financial statements and related notes included in the Company's Annual Report on Form 10-K as amended for the year ended December 31, 2021, filed with the SEC on May 4, 2022.

#### Use of Estimates

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported and disclosed in the consolidated financial statements and accompanying notes. Such estimates include, but are not limited to, allowance for doubtful accounts, revenue discounts and allowances, the valuation of inventory, the calculation of the Company's effective tax rate and deferred tax assets, valuation of stock based compensation, warrants, likelihood and range of possible losses on contingencies and present value of lease liabilities. Actual results could differ from those estimates.

#### Disaggregation of Revenue

The following shows the disaggregation of revenue by distribution channel for the three months ended March 31, 2022 and 2021 (in thousands).

| | For the Three Months Ended March 31, | | | |
| | 2022 | % of Total | 2021 | % of Total |
|---|---|---|---|---|
| **Distribution Channel** | | | | |
| Specialty | $ 3,383 | 26% | $ 6,795 | 52% |
| International | 733 | 6% | 3,847 | 29% |
| FDM | 8,985 | 68% | 2,479 | 19% |
| **Total** | $ 13,101 | 100% | $ 13,121 | 100% |

-9-

*Concentrations*

Financial instruments that potentially subject the Company to concentrations of credit risk consist primarily of cash and accounts receivable. The Company minimizes its credit risk associated with cash by periodically evaluating the credit quality of its primary financial institution. The cash balance at times may exceed federally insured limits. Management believes the financial risk associated with these balances is minimal and has not experienced any losses to date. Significant customers and vendors are those that represent more than 10% of the Company's net revenue or accounts receivable for each period presented.

During the three months ended March 31, 2022, we had three customers who individually accounted for 59%, 13%, and 12% of our net revenue, and two customers that individually accounted for 59% and 17% of accounts receivable. During the three months ended March 31, 2021, we had three customers who individually accounted for 28%, 17% and 14% of our net revenue, and two customers that individually accounted for 32% and 21% of accounts receivable.

The Company uses a limited number of non-affiliated suppliers for contract manufacturing its products. The Company has quality control and manufacturing agreements in place with its primary manufacturers to ensure consistency in production and quality. The agreements ensure products are manufactured to the Company's specifications and the contract manufacturers will bear the costs of recalled products due to defective manufacturing. During the three months ended March 31, 2022, the Company had four vendors who individually accounted for 17%, 12%, 12%, and 11% of net purchases, respectively. During the three months ended March 31, 2021, the Company had three vendors who individually accounted for 32%, 21% and 21% of net purchases.

The Company has a geographic concentration in the United States, with 94% and 71% of revenue from domestic customers during the three months ended March 31, 2022 and 2021, respectively. International customers, primarily in Canada and Asia, comprised 6% and 29% for the three months ended March 31, 2022 and 2021, respectively.

*Segments*

Historically, the Company's chief operating decision maker ("CODM") reviews financial information presented on a consolidated basis for purposes of allocating resources and evaluating financial performance. As such, the Company has had two reporting segments and operating unit structures. During the fourth quarter of 2021, the Company introduced a functional energy beverages line under the MusclePharm and FitMiss brands, so the CODM now reviews financial information and makes resource and opportunity decisions on a disaggregated basis with the functional energy drink business separate from protein products.

*Litigation Estimates and Accruals*

In the normal course of business or otherwise, the Company may become involved in legal proceedings. The Company will accrue a liability for such matters when it is probable that a liability has been incurred and the amount can be reasonably estimated. When only a range of possible loss can be established, the most probable amount in the range is accrued. If no amount within this range is a better estimate than any other amount within the range, the minimum amount in the range is accrued. The accrual for a litigation loss contingency might include, for example, estimates of potential damages, outside legal fees and other directly related costs expected to be incurred. The Company provides disclosures for material contingencies when there is a reasonable possibility that a loss or an additional loss may be incurred. In assessing whether a loss is a reasonable possibility, the Company may consider the following factors, among others: the nature of the litigation, claim or assessment, available information, opinions or views of legal counsel and other advisors, and the experience gained from similar cases.

*Income Taxes*

Income taxes are accounted for using the asset and liability method. Income tax expense includes the current tax liability from operations and the change in deferred income taxes during the year. Interest income, interest expense and penalties associated with income taxes are reflected in (Benefit) provision for income taxes on the consolidated statements of operations. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the consolidated financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carry-forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

A valuation allowance is required to be established unless management determines that it is more likely than not that the Company will ultimately realize the tax benefit associated with a deferred tax asset. The Company recognizes the effect of income tax positions only if those positions are more likely than not to be sustained. Recognized income tax positions are measured at the largest amount that is greater than 50% likely to be realized. Changes in recognition or measurement are reflected in the period in which the change in judgment occurs.

-10-

*Recent Accounting Pronouncements*

In July 2016, the FASB issued ASU No. 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"), which requires the measurement of all expected credit losses of financial assets held at the reporting date based on historical experience, current conditions, and reasonable and supportable forecasts. Financial institutions and other organizations will now use forward-looking information to better inform their credit loss estimates. In addition, the ASU amends the accounting for credit losses on available-for-sale debt securities and purchased financial assets with credit deterioration. ASU 2016-13 is effective for periods beginning after December 15, 2022, and interim periods within those fiscal years. The Company is currently evaluating the impact this ASU may have on its consolidated financial statements.

In March 2020, the FASB issued ASU No. 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting* ("ASU 2020-04"). The amendments in this ASU apply only to contracts, hedging relationships, and other transactions that reference LIBOR or another reference rate that is expected to be discontinued because of reference rate reform. The amendments in this update provide optional expedients and exceptions for applying GAAP to contracts, hedging relationships, and other transactions affected by reference rate reform if certain criteria are met. The expedients and exceptions provided by the amendments do not apply to contract modifications made and hedging relationships entered into or evaluated after December 31, 2022, except for hedging relationships existing as of December 31, 2022, that an entity has elected certain optional expedients for and that are retained through the end of the hedging relationship. The amendments in this ASU are effective for all entities as of March 12, 2020, through December 31, 2022. The Company has not modified any material contracts due to reference rate reform. The Company will continue to evaluate the impact this guidance will have on its consolidated financial statements for all future transactions affected by reference rate reform during the time permitted.

In August 2020, the FASB issued ASU No. 2020-06, *Debt - Debt with Conversion and Other Options (Subtopic 470-20)* and *Derivatives and Hedging - Contracts in Entity's Own Equity (Subtopic 815-40)*. The ASU eliminates the beneficial conversion and cash conversion accounting models for convertible instruments. It also amends the accounting for certain contracts in an entity's own equity that are currently accounted for as derivatives because of specific settlement provisions. In addition, the new guidance modifies how particular convertible instruments and certain contracts that may be settled in cash or shares impact the diluted EPS computation. This guidance is effective for fiscal years beginning after December 15, 2023, including interim periods within those fiscal years. Early adoption is permitted, but not earlier than fiscal years beginning after December 15, 2020, including interim periods within those fiscal years. The FASB also specified that an entity should adopt the guidance as of the beginning of its annual fiscal year and is not permitted to adopt the guidance in an interim period. The Company is currently evaluating the impact this ASU may have on its consolidated financial statements.

In May 2021, the FASB issued ASU 2021-04, *Earnings Per Share (Topic 260), Debt-Modifications and Extinguishments (Subtopic 470-50), Compensation-Stock Compensation (Topic 718), and Derivatives and Hedging-Contracts in Entity's Own Equity (Subtopic 815-40)*. The ASU addresses issuer's accounting for certain modifications or exchanges of freestanding equity-classified written call options. This amendment is effective for all entities, for fiscal years beginning after December 15, 2021, including interim periods within those fiscal years. There has not been a significant impact from the adoption of this ASU on the consolidated financial statements.

*Reclassifications*

Certain prior period amounts have been reclassified to conform to the current period financial statement presentation, including classification of certain operating expenses.

**Note 3. Inventory**

Inventory consists of finished goods and raw materials used to manufacture the Company's products by one of our contract manufacturers for the three months ended March 31, 2022 and 2021. The Company records charges for obsolete and slow-moving inventory based on the age of the product as determined by the expiration date or otherwise determined to be obsolete. Products within one year of their expiration dates are considered for write-off purposes. Inventory write-downs, once established, are not reversed as they establish a new cost basis for the inventory. Historically, the Company has had minimal returns with established customers. The Company accounts for its inventory on a First-in First-out basis.

-11-

The components of inventory as of March 31, 2022 and December 31, 2021 were as follows (in thousands):

|  | March 31, 2022 | December 31, 2021 |
|---|---|---|
| Raw Materials | $ 746 | $ 694 |
| Finished Goods | 229 | 1,144 |
| Inventory | 975 | 1,838 |
| Less: inventory writedown | — | (8) |
| Inventory | $ 975 | $ 1,830 |

### Note 4. Accrued and Other Liabilities

As of March 31, 2022 and December 31, 2021, the Company's accrued and other liabilities consisted of the following (in thousands):

|  | March 31, 2022 | December 31, 2021 |
|---|---|---|
| Accrued professional fees | $ 342 | $ 236 |
| Accrued interest | 1,151 | 797 |
| Accrued payroll and bonus | 702 | 695 |
| Settlements — short term (Nutrablend and 4Excelsior) | 2,102 | 2,104 |
| Accrued expenses — ThermoLife | 1,364 | 1,364 |
| Accrued and other short-term liabilities | 993 | 746 |
| Total accrued and other liabilities | $ 6,654 | $ 5,942 |

### Note 5. Interest Expense

For the three months ended March 31, 2022 and March 31, 2021, interest expense consisted of the following:

|  | For the Three Months Ended March 31, | |
|---|---|---|
|  | 2022 | 2021 |
| Interest expense, related party | $ (313) | $ (120) |
| Interest expense, other | (254) | (227) |
| Interest expense, secured borrowing arrangement | (71) | (163) |
| Amortization of debt issue cost associated with related warrants | (2,615) | - |
| Amortization of debt issue cost - OID | (568) | - |
| Total interest expense | $ (3,821) | $ (510) |

### Note 6. Other Long -Term Liabilities

As of March 31, 2022 and December 31, 2021 the Company's other long-term liabilities consisted of the following (in thousands):

|  | As of March 31, 2022 | As of December 31, 2021 |
|---|---|---|
| Settlements — long term (Nutrablend and 4Excelsior) | $ 1,861 | $ 2,326 |
| Total other long term liabilities | $ 1,861 | $ 2,326 |

-12-

**Note 7. Debt**

As of March 31, 2022 and December 31, 2021, the Company's debt consisted of the following (in thousands):

| | March 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| Senior notes payable | $ | 7,798 | $ | 5,034 |
| Debt issue costs, net | | (60) | | (479) |
| Refinanced convertible note, related party | | 5,330 | | 5,330 |
| Revolving line of credit, related party | | 2,747 | | - |
| Obligations under secured borrowing arrangement | | 6,592 | | 6,446 |
| Total current debt | $ | 22,407 | $ | 16,331 |

*Senior Notes Payable*

On October 13, 2021, the Company entered into a Securities Purchase Agreement (the "Securities Purchase Agreement") with certain institutional investors as purchasers (the "Investors"). Pursuant to the Securities Purchase Agreement, the Company sold, and the Investors purchased, $8.2 million (the "Purchase Price") in principal amount of senior notes (the "Senior Notes") and warrants (the "Warrants").

The Senior Notes were issued with an original issue discount of 14%, bear no interest and mature after 6 months, on April 13, 2022. To secure its obligations thereunder and under the Securities Purchase Agreement, the Company has granted a security interest over substantially all of its assets to the collateral agent for the benefit of the Investors, pursuant to a pledge and security agreement.

The maturity date of the Senior Notes was extended to May 28, 2022, on April 12, 2022. The maturity date of the Senior Notes also may be extended under other circumstances specified therein. Subsequent to the extension, interest accrued from April 13, 2022 at 18% per annum until the Senior Notes are paid in full. The Company is undertaking various initiatives to improve gross margins to become cash flow positive prior to the maturity of the Senior Notes. These initiatives include improving cost of goods sold on certain raw materials. There can be no assurance the Company will be able to successfully implement such initiatives on a timely basis or at all or that it otherwise will meet the conditions required to extend the Senior Notes. If the Company is unable to extend the Senior Notes or elects not to do so, the Company will be required to repay the Senior Notes through equity issuances, additional borrowings, cash flows from operations and/or other sources of liquidity.

-13-

The Warrants are exercisable for five (5) years to purchase 18,463,511 shares of the Company's common stock, par value $0.001 per share, at an exercise price of $0.78, subject to adjustment under certain circumstances described in the Warrants. The Warrants have a face value of $4.4 million which is recorded in Additional Paid-In Capital.

In conjunction with the private placement of Senior Notes and Warrants, each of the directors and officers of the Company entered into lock-up agreements, which prohibited sales of the Common Stock until after April 11, 2022, subject to certain exceptions.

The issuance of the Senior Notes and Warrants was made in reliance on the exemption provided by Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act"), for the offer and sale of securities not involving a public offering, and Regulation D promulgated under the Securities Act. In accordance with ASC 470-20-25-2, proceeds from the sale of a debt instrument with stock purchase warrants (detachable call options) are allocated to the two elements based on the relative fair values of the debt instrument without the warrants and of the warrants themselves at time of issuance. The portion of the proceeds so allocated to the warrants shall be accounted for as additional paid-in capital. The remainder of the proceeds shall be allocated to the debt instrument portion of the transaction.

*November 2020 Convertible Note, Related Party*

On November 29, 2020, the Company entered into a refinancing agreement with Mr. Ryan Drexler, (the "November 2020 Refinancing"), in which the Company issued to Mr. Drexler a convertible secured promissory note (the November 2020 "Convertible Note") in the original principal amount of $2.9 million, which amended and restated a convertible secured promissory note dated as of August 21, 2020. The $2.9 million November 2020 Convertible Note bears interest at the rate of 12% per annum. Unless earlier converted or repaid, all outstanding principal and any accrued but unpaid interest under the November 2020 Convertible Note shall be due and payable on July 1, 2021, however the Company and Mr. Drexler agreed to an extension on August 13, 2021 until July 14, 2022. Any interest not paid when due shall be capitalized and added to the principal amount of the November 2020 Convertible Note and bear interest on the applicable interest payment date along with all other unpaid principal, capitalized interest, and other capitalized obligations.

Mr. Drexler may, at any time, and from time to time, upon written notice to the Company, convert the outstanding principal and accrued interest into shares of Common Stock, at a conversion price of $0.23 per share. At the election of the Company, one-sixth of the interest may be paid in kind ("PIK Interest") by adding such amount to the principal amount of the note, or through the issuance of shares of the Company's common stock to Mr. Drexler. The PIK Interest is convertible to common stock at the closing price per share on the last business day of each calendar quarter. In no event will the conversion price of such PIK Interest be less than $0.10. The Company may prepay the Note by giving Mr. Drexler between 15-days' and 60-days' notice depending upon the specific circumstances, subject to Mr. Drexler's conversion right.

The November 2020 Convertible Note contains customary restrictions on the ability of the Company to, among other things, grant liens or incur indebtedness other than certain obligations incurred in the ordinary course of business. The restrictions are also subject to certain additional qualifications and carveouts, as set forth in the November 2020 Convertible Note. The November 2020 Convertible Note is subordinated to certain other indebtedness of the Company held by Prestige Capital Corporation ("Prestige") and the Senior Notes.

-14-

For the three months ended March 31, 2022 and 2021, interest expense related to the related party convertible secured promissory note was $0.085 million and $0.085 million, respectively. During the three months ended March 31, 2022, no interest was paid in cash to Mr. Drexler; during the three months ended March 31, 2021 $0.085 million of interest was paid in cash to Mr. Drexler.

***August 2021 Convertible Note, Related Party***

On October 15, 2020, the Company entered into a secured revolving promissory note (the "Revolving Note") with Mr. Ryan Drexler. Under the terms of the Revolving Note, the Company can borrow up to $3.0 million. The Revolving Note bears interest at the rate of 12% per annum. The funds were used for the purchase of whey protein and other general corporate purposes. Both the outstanding principal, if any, and all accrued interest under the Revolving Note were due on March 31, 2021, which was not paid.

On August 13, 2021, the Company issued to Ryan Drexler (the "Holder") a convertible secured promissory note (the "August 2021 Convertible Note") in the original principal amount of $2.5 million, replacing the Revolving Note.

The August 2021 Convertible Note bears interest at the rate of 12% per annum. Interest payments are due on the last day of each calendar quarter. At the Company's option (as determined by its independent directors), the Company may repay up to one sixth of any interest payment by either adding such amount to the principal amount of the August 2021 Convertible Note or by converting such interest amount into an equivalent amount of the Company's common stock, $0.001 par value per share (the "Common Stock"). Any interest not paid when due shall be capitalized and added to the principal amount of the August 2021 Convertible Note and bear interest on the applicable interest payment date along with all other unpaid principal, capitalized interest, and other capitalized obligations. Both the principal and any accrued but unpaid interest under the August 2021 Convertible Note will be due on July 14, 2022, unless converted or repaid earlier.

The Holder may, at any time, and from time to time, upon written notice to the Company, convert the outstanding principal and accrued interest into shares of Common Stock, at a conversion price equal to the closing price of the common stock on October 15, 2021. The Company may prepay the August 2021 Convertible Note by giving the Holder between 15 and 60 days' notice depending upon the specific circumstances, subject to the Holder's conversion right.

The August 2021 Convertible Note contains customary events of default, including, among others, the failure by the Company to make a payment of principal or interest when due. Following an event of default, at the option of the Holder and upon written notice to the Company, or automatically under certain circumstances, all outstanding principal and accrued interest will become due and payable. The August 2021 Convertible Note also contains customary restrictions on the ability of the Company to, among other things, grant liens or incur indebtedness other than certain obligations incurred in the ordinary course of business. The restrictions are also subject to certain additional qualifications and carveouts, as set forth in the August 2021 Convertible Note. The August 2021 Convertible Note is subordinated to certain other indebtedness of the Company held by Prestige Corporation ("Prestige") and the Senior Notes.

-15-

For the three months ended March 31, 2022, interest expense related to the related party convertible secured promissory note was $0.122 million and there was no interest expense related to this note for the three months ended March 31, 2021. During the three months ended March 31, 2022 and 2021 no interest was paid in cash to Mr. Drexler.

*Revolving Line of Credit, Related Party*

On March 8, 2022, the Company entered into an Unsecured Revolving Promissory Note (the "Note") with the Mr. Ryan Drexler. Under the terms of the Note, proceeds may be used solely to finance the production of orders from its largest customer or any of its affiliates or subsidiaries. The Note does not contain a cap on borrowings thereunder. However, further advances under the Note are at the discretion of the Lender. Outstanding balances under the Note accrue interest at the rate of 18% per annum. Prior to maturity, the Company generally may pay down principal balances and re-borrow under the Note, subject to the discretion of the Lender to advance funds under the Note. The Note contains customary events of default and acceleration provisions.

The Note is subordinate to the 14% Original Issue Discount Senior Secured Notes previously issued by the Company. Under the terms of the First Amendment to Intercreditor and Subordination Agreement, dated as of March 8, 2022, between the Company, Ryan Drexler and Empery Tax Efficient, LP (the "Amendment"), principal but not interest due under the Note generally may be repaid out of payments received by the Company in respect of accounts receivable financed pursuant to the Note.

The related party revolving line of credit balance as of March 31, 2022 was $2.7 million and was zero on at March 31, 2021.

For the three months ended March 31, 2022 and 2021 total related party debt was $8.1 million and $4.6 million, respectively.

For the three months ended March 31, 2022, interest expense related to the revolving line of credit, related party was $0.106 million.

*Obligations Under Secured Borrowing Arrangement*

In January 2016, the Company entered into a Purchase and Sale Agreement (the "Purchase and Sale Agreement") with Prestige, pursuant to which the Company agreed to sell and assign, and Prestige agreed to buy and accept, certain accounts receivable owed to the Company ("Accounts"). Under the terms of the Purchase and Sale Agreement, upon the receipt and acceptance of each assignment of Accounts, Prestige will pay the Company 80% of the net face amount of the assigned Accounts, up to a maximum total borrowing of $12.5 million subject to sufficient amounts of accounts receivable to secure the loan. The remaining 20% will be paid to the Company upon collection of the assigned Accounts, less any chargebacks (including chargebacks for any customer amounts that remain outstanding for over 90 days), disputes, or other amounts due to Prestige. Prestige's purchase of the assigned Accounts from the Company will be at a discount fee which varies from 0.7% to 4%, based on the number of days outstanding from the assignment of Accounts to collection of the assigned Accounts. In addition, the Company granted Prestige a continuing security interest in and first priority lien upon all accounts receivable, inventory, fixed assets, general intangibles, and other assets. Prestige will have no recourse against the Company if payments are not made due to the insolvency of an account debtor within 90 days of invoice date, with the exception of international and certain domestic customers. On April 10, 2019, the Company and Prestige amended the terms of the agreement. The agreement was extended until April 1, 2020 and automatically renews for one (1) year periods unless either party receives written notice of cancellation from the other, at minimum, thirty (30) days prior to the expiration date thereafter.

On June 14, 2021, Prestige advanced the Company $1.0 million with a six-month term, 15% interest rate and 2% accommodation fee.

On July 26, 2021, Prestige advanced the Company $1.0 million with a six-month term and a 15% interest rate. In addition, there was an accommodation fee equal to 1% of the amount advanced plus 18,750 stock options.

On October 12, 2021, the June 14, 2021 and July 26, 2021 the total Prestige advance $2.0 million was extended to the date of the termination of the senior secured note offering, which is in April 2022, and was extended to May 28 2022.

For the three months ended March 31, 2022 and 2021, the Company assigned Prestige accounts with an aggregate face amount of approximately $6.3 million and $11.4 million, respectively. For the three months ended March 31, 2022 and 2021, the Company made payments to Prestige in the amounts of $6.1 million and $13.8 million, respectively, in cash. As of March 31, 2022 and December 31, 2021, we had outstanding borrowings of approximately $6.6 million and $6.4 million, respectively.

-16-

*Paycheck Protection Program Loan*

Due to economic uncertainty as a result of the ongoing pandemic ("COVID-19"), on May 14, 2020, the Company received an aggregate principal amount of $964,910 pursuant to the borrowing arrangement ("Note") with Harvest Small Business Finance, LLC ("HSBF") and agreed to pay the principal amount plus interest at a 1% fixed interest rate per year, on the unpaid principal balance. The Note includes forgiveness provisions in accordance with the requirements of the Paycheck Protection Program, Section 1106 of the CARES Act.

The Note was expected to mature on May 16, 2025. Payments were due by November 16, 2020 (the "Deferment Period") and interest was accrued during the Deferment Period. However, the Flexibility Act, which was signed into law on June 5, 2020, extended the Deferment Period to the date that the forgiven amount is remitted by the United States Small Business Administration ("SBA") to HSBF.

On October 25, 2021, the Company received a letter from HSBF indicating the Company's SBA PPP loan has been forgiven in full by HSBF and was recorded as a $964,910 gain on forgiveness of debt located in other income-loan forgiveness.

### Note 8. Commitments and Contingencies

*Contingencies*

In the normal course of business or otherwise, the Company may become involved in legal proceedings. The Company will accrue a liability for such matters when it is probable that a liability has been incurred and the amount can be reasonably estimated. When only a range of possible loss can be established, the most probable amount in the range is accrued. If no amount within this range is a better estimate than any other amount within the range, the minimum amount in the range is accrued. The accrual for a litigation loss contingency might include, for example, estimates of potential damages, outside legal fees and other directly related costs expected to be incurred. The Company provides disclosures for material contingencies when there is a reasonable possibility that a loss or an additional loss may be incurred. In assessing whether a loss is a reasonable possibility, the Company may consider the following factors, among others: the nature of the litigation, claim or assessment, available information, opinions or views of legal counsel and other advisors, and the experience gained from similar cases. As of December 31, 2021, the Company was involved in the following material legal proceedings described below:

**White Winston Select Asset Fund Series MP-18, LLC et al., v MusclePharm Corp., et al., (Nev. Dist. Ct.; Cal. Superior Court; Colorado Dist. Ct.; Mass. Super. Ct.)**

On August 21, 2018, White Winston Select Asset Fund Series MP-18, LLC and White Winston Select Asset Fund, LLC (together "White Winston") initiated a derivative action against the Company and its directors (the "director defendants"). White Winston alleges that the director defendants breached their fiduciary duties by improperly approving the refinancing of three promissory notes issued by the Company to Mr. Drexler (the "Amended Note") in exchange for $18.0 million in loans. White Winston alleges that this refinancing improperly diluted their economic and voting power and constituted an improper distribution in violation of Nevada law. In its complaint, White Winston sought the appointment of a receiver over the Company, a permanent injunction against the exercise of Mr. Drexler's conversion right under the Amended Note, and other unspecified monetary damages. On September 13, 2018, White Winston filed an amended complaint, which added a former executive of the Company, as a plaintiff (together with White Winston, the "White Winston Plaintiffs"). On December 9, 2019, the White Winston Plaintiffs filed a Second Amended Complaint, in which they added allegations relating to the resignation of the Company's auditor, Plante & Moran PLLC ("Plante Moran"). the Company has moved to dismiss the Second Amended Complaint. That motion has not yet been fully briefed.

Along with its complaint, White Winston also filed a motion for a temporary restraining order ("TRO") and preliminary injunction enjoining the exercise of Mr. Drexler's conversion right under the Amended Note. On August 23, 2018, the Nevada district court issued an ex parte TRO. On September 14, 2018, the court let the TRO expire and denied White Winston's request for a preliminary injunction, finding, among other things, that White Winston did not show a likelihood of success on the merits of the underlying action and failed to establish irreparable harm. Following the court's decision, the Company filed a motion seeking to recoup the legal fees and costs it incurred in responding to the preliminary injunction motion. On October 31, 2019, the court awarded the Company $56,000 in fees and costs.

Due to the uncertainty associated with determining our liability, if any, and due to our inability to ascertain with any reasonable degree of likelihood, as of the date of this report, the outcome of the trial, the Company has not recorded an estimate for its potential liability.

-17-

On June 17, 2019, White Winston moved for the appointment of a temporary receiver over the Company, citing Plante Moran's resignation. The court granted White Winston's request to hold an evidentiary hearing on the motion, but subsequently stayed the action pending the parties' attempts to resolve their dispute. Although the parties have been unable to reach a resolution, the litigation has not yet resumed. On July 30, 2019, White Winston filed an action in the Superior Court of the State of California in and for the County of Los Angeles, seeking access to the Company's books and records and requesting the appointment of an independent auditor for the Company. On February 25, 2021, the court ordered the Company to produce certain documents, denied White Winston's request for an auditor, and ordered the Company to pay a $1,500 penalty. On July 20, 2021 the California court awarded White Winston $93,000 in attorneys' fees and cost relating to the books-and-records action. The Company paid the amounts due on July 30, 2021, and on August 4, 2021 White Winston submitted a filing acknowledging that the California court's judgment has been fully satisfied.

The Company and its Chief Executive Officer have been named as defendants in a new lawsuit filed on February 8, 2022 by White Winston Select Asset Funds, LLC and White Winston Select Asset Fund Series Fund MP-18, LLC (collectively, "White Winston") in the Superior Court of Suffolk County Massachusetts. White Winston is bringing claims alleging unfair trade practices, abuse of process, malicious prosecution, breach of duty of loyalty and, in the alternative, for breach of the settlement agreement relating to the prior action filed by White Winston in Nevada. The Company has not yet responded to complaint and at this time cannot reasonably estimate any loss that may arise from this matter.

**Bakery Barn, LLC v. MusclePharm Corporation**

On January 24, 2022, Bakery Barn ("Bakery Barn") filed suit against Company in Allegheny County, Pennsylvania court. Company received the Complaint on February 16, 2022. Bakery Barn alleges that the Company owes Bakery Barn over $1.9 million dollars for breach of contract. Parties operated on an open account basis with payment terms established by mutual verbal agreement, custom and usage. Beginning in late 2020, Bakery Barn resumed production for Company and operated under a verbal agreement until August 2021. Bakery Barn contends that Company is required to reimburse Bakery Barn for foil wraps ordered by Bakery Barn in the amount of $77,800, specific ingredients totaling $42,400, and products manufactured under purchase order Invoice no. 59192 delivered to Company in the amount of $1,816,017.

On February 24, 2022, Flaherty Fardo Rogel & Amick, LLC ("Company Counsel") filed a Praecipe for Appearance on behalf of the Company. On February 28, 2022, Company Counsel filed Preliminary Objections to Complaint and Brief In Support Thereof. Bakery Barn filed an Amended Complaint in Civil Action on March 14, 2022. Company Counsel is in the process of filing Preliminary Objections to this Amended Complaint. The Company intends to continue to vigorously litigate the matter.

**Bar Bakers, LLC v. CFC/Flavor Producers, LLC. Vs MusclePharm**

On March 18, 2022, the Company retained Barnes & Thornburg to represent it in connection with a Cross-Complaint filed in the Superior Court of California, County of Orange, Case No. 30-2019-01073098-CU-BC-CJC in the matter Bar Bakers LLC v. Creative Flavor Concepts, Inc. et al.. According to the pleadings, the matter arises from an agreement between the plaintiffs and defendants in which the plaintiff agreed to manufacturer energy bars and sell them to the defendants. The defendants then sold the energy bars to various retailers, including the Company. On May 29, 2019, the plaintiff sued the defendants alleging that the defendants were responsible for unpaid invoices – nine for bars manufactured and delivered to the Company and one invoice for raw materials. According to the pleadings, the unpaid invoices total $885,163.72. The invoice for the raw materials is allegedly $4,658,593.02. On January 31, 2022, one of the defendants, Flavor Producers LLC, filed and served a cross claim against the Company alleging that it was partially responsible for any damages that may befall on it. Specifically, Flavor Producers is asking the Court to award it $389,989.60 in compensatory damages. On March 25, 2022, the Company filed an answer to that cross claim denying the factual allegations and Flavor Producers' assertion that it is entitled to any damages, including but not limited to, compensatory damages.

**ThermoLife International**

In January 2016, ThermoLife International LLC ("ThermoLife"), a supplier of nitrates to the Company, filed a complaint against the Company in Arizona state court. ThermoLife alleged that the Company failed to meet minimum purchase requirements contained in the parties' supply agreement. The court held a bench trial on the issue of damages in October 2019, and on December 4, 2019, the court entered judgment in favor of ThermoLife and against the Company in the amount of $1.6 million, comprised of $0.9 million in damages, interest in the amount of $0.3 million and attorneys' fees and costs in the amount of $0.4 million. The Company recorded $1.6 million in accrued expenses in 2018. The Company has filed an appeal and posted bonds in the total amount of $0.6 million in order to stay execution on the judgment pending appeal. Of the $0.6 million, $0.25 million (including fees) was paid by Mr. Drexler on behalf of the Company. See "Note 7. Debt" for additional information. The balance of $0.35 million was secured by a personal guaranty from Mr. Drexler, the associated fees of $12,500 and $2,500 have been paid by the Company. On April 27, 2021, the appellate court issued a decision largely affirming the trial court judgement, except vacating the

judgement's $0.3 million prejudgment interest award and remanding for a recalculation of prejudgment interest. On May 18, 2021, ThermoLife filed a motion asking the trial court to increase the Company's appeal bond to the full amount of the judgment, or $1.9 million, which the Court denied on June 2, 2021.

-18-

As of March 31, 2022, the total amount accrued, including interest, was $1.9 million. For the three months ended March 31, 2022 and 2021, interest expense recognized on the awarded damages was $0.022 million and $0.022 million, respectfully.

On May 4, 2022, the Arizona Supreme Court denied the Company's petition for review of the decision of the appellate court and granted ThermoLife's request for attorney's fees.

*Settlements*

**Manchester City Football Group**

The Company was engaged in a dispute with City Football Group Limited ("CFG"), the owner of Manchester City Football Group, concerning amounts allegedly owed by the Company under a sponsorship agreement with CFG (the "Sponsorship Agreement"). In August 2016, CFG commenced arbitration in the United Kingdom against the Company, seeking approximately $8.3 million for the Company's purported breach of the Sponsorship Agreement.

On July 28, 2017, the Company approved a Settlement Agreement (the "CFG Settlement Agreement") with CFG effective July 7, 2017. The CFG Settlement Agreement represents a full and final settlement of all litigation between the parties. Under the terms of the agreement, the Company agreed to pay CFG a sum of $3 million, which was recorded as accrued expenses in 2017. The settlement consists of a $1.0 million payment that was advanced by a related party on July 7, 2017, a $1.0 million installment paid on July 7, 2018 and a subsequent $1.0 million installment payment to paid by July 7, 2019. Of this amount, the Company has remitted $0.3 million.

During the three months ended March 31, 2022 and 2021, the Company recorded a charge of $0.018 million and $0.018 million, respectively. This charge, representing imputed interest, is included in "Interest expense" in the Company's consolidated statements of operations.

**Nutrablend Matter**

On February 27, 2020, Nutrablend, a manufacturer of MusclePharm products, filed an action against the Company in the United States District Court for the Eastern District of California, claiming approximately $3.1 million in allegedly unpaid invoices. These invoices relate to the third and fourth quarter of 2019, and a liability has been recorded for the related periods.

On September 25, 2020, the parties successfully mediated the case to a settlement (the "Nutrablend Agreement") and the Company agreed to (i) pay approximately $3.1 million ("Owed Amount") in monthly payments ("Monthly Payments") from September 1, 2020 through June 30, 2023 and (ii) issue monthly purchase orders ("Purchase Orders") at minimum amounts accepted by Nutrablend.

The Company agreed to issue Purchase Orders in a combined total amount of at least (i) $1.5 million from September 1, 2020 through November 30, 2020; (ii) $1.8 million from December 1, 2020 through February 28, 2021; (iii) $2.1 million from March 31, 2021 through May 31, 2021; (iv) $2.1 million from June 1, 2021 through August 31, 2021; and (v) $1.4 million from September 1, 2021 through October 30, 2021. Beginning on November 1, 2021, the Company will be required to issue monthly Purchase Orders to Nutrablend in a minimum amount of $0.7 million until the Owed Amount is paid in full to Nutrablend. In the event that the Company pays the Owed Amount in full before September 1, 2021, it's entitled to a rebate on all completed Purchase Orders. Further, once the monthly payments, and any additional payments that the Company has made on the Owed Amount, reduce the outstanding balance of the Owed Amount to below $2.0 million, the Company is eligible for an extension of a line of credit from Nutrablend in an amount of up to $3.0 million.

On July 7, 2021, the Company commenced an action against Nutrablend in the Central District of California, seeking (i) a declaration that the Nutrablend Agreement purchase order provisions have been terminated due to Nutrablend's failure to provide the Company with reasonable assurances of its ability to fulfill its purchase orders; (ii) a declaration that approximately $2.0 million in purchase orders that the Company placed in July and August 2020 were intended to and do count towards the minimums set forth in the Nutrablend Agreement; and (iii) damages based on Nutrablend's failure to fulfill purchase orders. The case is ongoing.

As of March 31, 2022, the Company determined that approximately $0.998 million of the owed amount was due within a year, and this amount was recorded in "Accrued and other liabilities" in the consolidated balance sheets. The present value of the remaining Owed Amount that was due after a year was $0.250 million, and the amount was recorded in "Other long-term liabilities" in the consolidated balance sheets. The Company made payments of $0.303 million and $0.189 million during the three months ended March 31, 2022 and 2021, respectively.

-19-

On September 23, 2021, the Company entered into an Amendment to a Settlement Agreement that was originally entered into on September 25, 2020. Pursuant to the Amended Agreement, the Company is no longer obligated to issue Purchase Orders to Nutrablend as stated in the Settlement Agreement, which, as stated in the Form 8-K dated September 25, 2020, consisted of at least (i) $1.5 million from September 1, 2020 through November 30, 2020; (ii) $1.8 million from December 1, 2020 through February 28, 2021; (iii) $2.0 million from March 1, 2021 through May 31, 2021; (iv) $2.1 million from June 1, 2021 through August 31, 2021; and (v) $1.4 million from September 1, 2021 through October 30, 2021. The Monthly Payments provision of the Settlement Agreement remains unchanged.

**4Excelsior Matter**

On March 18, 2019, Excelsior Nutrition, Inc. ("4Excelsior"), a manufacturer of MusclePharm products, filed an action against the Company in the Superior Court of the State of California for the County of Los Angeles, claiming approximately $6.2 million in damages relating to allegedly unpaid invoices, as well as approximately $7.8 million in consequential damages.

On December 16, 2020, the Company and 4Excelsior entered into a Settlement Agreement and Mutual Release ("the Agreement"), pursuant to which the parties resolved and settled the civil action pending in the Superior Court of the State of California for the County of Los Angeles (the "Litigation"). The parties agreed to a mutual general release of claims and to jointly file within 10 business days of the effective date of the Agreement a stipulation and proposed order of dismissal, dismissing with prejudice all claims and counterclaims asserted in the Litigation. The Company agreed to pay $4.75 million (the "Settlement Amount") in four monthly payments of $70,000, beginning January 5, 2021, and thereafter in monthly payments of $100,000 until the Settlement Amount is fully paid. The Company may prepay all or any portion of the Settlement Amount at any time without penalty or premium. The Agreement provides that, in the event of a Default (as defined in the Agreement) by the Company, the entire outstanding balance of the Settlement Amount will become immediately due and payable, plus accrued interest at a rate of 18% per annum, commencing from the date of default.

The Company determined that approximately $1.1 million of the Settlement Amount was due within a year, and this amount was recorded in "Accrued and other liabilities" in the consolidated balance sheets. The present value of the remaining Settlement Amount that was due after a year was $1.6 million, and the amount was recorded in "Other long-term liabilities" in the consolidated balance sheets. The Company made payments of $0.3 million and $0.2 million during the three months ended March 31, 2022 and 2021, respectively.

The table below summarizes accrued expenses and interest expense incurred in for the three months ended March 31, 2022 and 2021 (in thousands):

| Cases | Accrued Amount as of March 31, 2022 | | Accrued Amount as of December 31, 2021 | | Interest Expense for Period Ending March 31, 2022 | | Interest Expense for Period Ending March 31, 2021 | |
|---|---|---|---|---|---|---|---|---|
| Manchester City Football Group | $ | 730 | $ | 730 | $ | (18) | $ | (18) |
| Nutrablend Matter | | 1,248 | | 2,318 | | (55) | | (64) |
| 4Excelsior Matter | | 2,715 | | 3,597 | | (77) | | (98) |
| ThermoLife International | | 1,364 | | 1,364 | | (22) | | (22) |
| Total | $ | 6,057 | $ | 8,009 | $ | (172) | $ | (202) |

**Note 9. Stock-Based Compensation**

The Company's stock-based compensation for the three months ended March 31, 2022 and 2021 consisted primarily of stock option awards, and there was no activity other than vesting for the three months ended March 31, 2022.

For the three months ended March 31, 2022, the Company recorded approximately $0.4 million of stock-based compensation expense related to stock options. The Company did not record stock-based compensation expense for the three months ended March 31, 2021.

-20-

**Note 10. Net Income (Loss) per Share**

The following table sets forth the computation of the Company's basic and diluted net income (loss) per share for the years presented (in thousands, except share and per share data):

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Net Income (loss) | $ (6,301) | $ 94 |
| Weighted average common shares used in computing net income (loss) per share, basic | 33,386,200 | 33,119,549 |
| Potentially diluted securities | -- | 12,373,071 |
| Weighted average common shares used in computing net income (loss) per share, diluted | 33,386,200 | 45,492,620 |
| Net income (loss) per share, basic | $ (0.19) | $ 0.00 |
| Net income (loss) per share, diluted | $ (0.19) | $ 0.00 |

Basic net income (loss) per share is computed by dividing net income (loss) for the period by the weighted average number of shares of common stock outstanding during each period.

Diluted net income (loss) per share is computed by dividing net income (loss) for the period by the weighted average number of shares of common stock, common stock equivalents and potentially dilutive securities outstanding during each period. The Company uses the treasury stock method to determine whether there is a dilutive effect of outstanding potentially dilutive securities, and the if-converted method to assess the dilutive effect of the convertible notes.

As of March 31, 2022, there were fully vested stock options of 1,651,884 that would have been dilutive had the Company had net income.

The following securities were excluded from the computations of the diluted net income (loss) per share, for the three months ended March 31, 2022 and 2021 as the effect of the securities would be anti-dilutive:

| | As of March 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Stock options | 5,399,441 | 171,703 |
| Warrants | 18,463,511 | - |
| Convertible notes | 16,473,549 | 12,373,071 |
| Total common stock equivalents | 40,336,501 | 12,544,774 |

The average exercise price of the stock options and warrants as of March 31, 2022 is $0.77.

**Note 11. Income Taxes**

The Company's tax expense for the three months ended March 31, 2022 and 2021 was zero.

Income taxes are provided for the tax effects of transactions reported in the consolidated financial statements and consist of taxes currently due. Deferred taxes relate to differences between the basis of assets and liabilities for financial and income tax reporting which will be either taxable or deductible when the assets or liabilities are recovered or settled. In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred income tax assets will not be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible.

Management considers the scheduled reversal of deferred income tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Based on consideration of these items, management has determined that enough uncertainty exists relative to the realization of the deferred income tax asset balances to warrant the application of a full valuation allowance as of March 31, 2022.

-21-

**Note 12. Segment Information and Geographic Data**

Historically, the Company's chief operating decision maker reviews financial information presented on a consolidated basis for purposes of allocating resources and evaluating financial performance. As such, the Company has had a single reporting segment and operating unit structure. During the third quarter of 2021, the Company introduced a functional energy beverages line under the MusclePharm and FitMiss brands, at which time, the CODM commenced reviewing financial information on a disaggregated basis with the functional energy drink business separate from base business of protein products. During 2021, revenues for the functional energy drink segment were not material, but it is anticipated to become a more significant segment of the Company's business going forward. (All amounts below are in thousands):

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2022** | | **2021** | |
| Revenue, net | | | | |
| Protein products | $ | 12,000 | $ | 13,121 |
| Energy drinks | | 1,101 | | — |
| Total revenue, net | $ | 13,101 | $ | 13,121 |

| | Three Months Ended March 31, 2022 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **Revenue** | | **Cost of Revenue** | | **Gross Profit** | |
| Protein products | $ | 12,000 | $ | 10,875 | $ | 1,125 |
| Energy drinks | | 1,101 | | 717 | | 384 |
| Total | $ | 13,101 | $ | 11,592 | $ | 1,509 |

As the Company's products are made through contract manufacturers', there were no capital expenditures related to either segment during the three months ended March 31, 2022 and 2021. Energy segment assets were not material as of March 31, 2022.

All of the Company's assets are located in the United States.

**Geographic Information:**

Revenue, classified by the major geographic areas in which our customers are located is as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| United States | 94% | 71% |
| Other Countries | 6% | 29% |
| Total revenue | 100% | 100% |

No other country accounted for more than 5% of revenue during the three months ended March 31, 2022 and 2021. Geographically, sales to other countries are diverse – spanning every continent except Antarctica.

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2022** | | **2021** | |
| Revenue, net | | | | |
| Protein products | | | | |
| United States | $ | 11,297 | $ | 9,274 |
| International | | 703 | | 3,847 |
| Total Protein Products | $ | 12,000 | $ | 13,121 |
| | | | | |
| Energy drinks | | | | |
| United States | | 1,070 | | - |
| International | | 31 | | - |
| Total energy drinks | $ | 1,101 | $ | - |
| Total revenue, net | $ | 13,101 | $ | 13,121 |

-22-

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read the following discussion and analysis of our financial condition and results of operations together with and our financial statements and the related notes appearing elsewhere in this Quarterly Report on Form 10-Q. In addition to historical information, this discussion and analysis contains forward-looking statements that involve risks, uncertainties and assumptions. Our actual results may differ materially from those discussed below. Factors that could cause or contribute to such differences include, but are not limited to, those identified below, and those discussed in the section titled "Risk Factors" included in our Annual Report on Form 10-K as amended for the fiscal year ended December 31, 2021 as may be amended, supplemented or superseded from time to time by other reports we file with the SEC. All amounts in this report are in U.S. dollars, unless otherwise noted.*

### Overview

MusclePharm is a scientifically-driven, performance lifestyle company that develops, manufactures, markets and distributes branded sports nutrition products and nutritional supplements. We offer a broad range of performance powders, capsules, tablets, gels and on-the-go ready to eat snacks that satisfy the needs of enthusiasts and professionals alike. Our portfolio of recognized brands, MusclePharm and FitMiss, is marketed and sold to over 100 countries globally.

Our offerings are clinically developed through a six-stage research process, and all of our manufactured products are rigorously vetted for banned substances by the leading quality assurance program, Informed-Choice. While we initially drove growth in the Specialty retail channel, in recent years we have expanded our focus to drive sales and retailer growth across leading e-commerce, Food Drug & Mass ("FDM"), Specialty and International channels.

|  | For the Months Ended March 31, | | | |
|  | 2022 | % of Total | 2021 | % of Total |
|---|---|---|---|---|
| **Distribution Channel** |  |  |  |  |
| Specialty | $ 3,383 | 26% | $ 6,795 | 52% |
| International | $ 733 | 6% | 3,847 | 29% |
| FDM | $ 8,985 | 68% | $ 2,479 | 19% |
| **Total** | $ 13,101 | 100% | $ 13,121 | 100% |

Our consolidated financial statements are prepared using the accrual method of accounting in accordance with generally accepted accounting principles in the United States ("GAAP") and have been prepared on a going concern basis, which contemplates the realization of assets and the settlement of liabilities in the normal course of business.

Our results of operations are affected by economic conditions, including macroeconomic conditions and levels of business confidence. There continues to be significant volatility and economic uncertainty in many markets and the ongoing COVID-19 pandemic has increased that level of volatility and uncertainty and has created economic disruption. We are actively managing our business to respond to the impact. There were no adjustments recorded in the financial statements that might result from the outcome of these uncertainties.

### COVID-19

The worldwide spread of COVID-19, including the emergence of variants, has resulted, and may continue to result in a global slowdown of economic activity, which may decrease demand for a broad variety of goods and services, while also disrupting supply channels, sales channels and advertising and marketing activities for an unknown period of time until the COVID-19 pandemic is contained, or economic activity normalizes. With the current uncertainty in economic activity, the impact on our revenue and results of operations is likely to continue and the size and duration of the impact we are currently unable to accurately predict. The extent of the impact of the COVID-19 pandemic on our operational and financial performance will depend on a variety of factors, including the duration and spread of COVID-19 and its variants, and its impact on our customers, contract manufacturers, vendors, industry and employees, all of which are uncertain at this time and cannot be accurately predicted. See "*Item 1.A Risk Factors*" for further discussion of the adverse impacts of the COVID-19 pandemic on our business.

-23-

**Factors Affecting Our Performance**

As we continue to execute our growth strategy and focus on our core products, we believe that we can, over time, continue to improve our operating margins and expense structure. In addition, we have implemented plans focused on cost containment, customer profitability, product and pricing controls that we believe will improve our gross margin and reduce our losses.

We expect that our advertising and promotion expense will continue to decrease as we focus on reducing our expenses and shifting our promotional costs, in part, from general branding and product awareness to acquiring customers and driving sales from existing customers. We expect that our discounts and allowances will continue to decrease, both overall and as a percentage of revenue, as we further reduce certain discretionary promotional activity that does not result in a commensurate increase in revenues.

**Results of Operations**

**Comparison of the Three Months Ended March 31, 2022 to the Three Months Ended March 31, 2021:**

The following table sets forth certain financial information from our consolidated statements of operations along with a percentage of net revenue and should be read in conjunction with the consolidated financial statements and related notes (in thousands).

| | For the Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2022 | | 2021 | |
| | Amount | % of Revenue | Amount | % of Revenue |
| Revenue, net | $ 13,101 | 100% | $ 13,121 | 100% |
| Cost of revenue | 11,592 | 88% | 9,432 | 72% |
| Gross profit | 1,509 | 12% | 3,689 | 28% |
| Operating expenses: | | | | |
| Selling and promotion | 1,160 | 9% | 1,149 | 9% |
| General and administration | 2,829 | 22% | 2,268 | 17% |
| Total operating expenses | 3,989 | 30% | 3,417 | 26% |
| Income (loss) from operations | (2,480) | -19% | 272 | 2% |
| Other (expense) income: | | | | |
| Gain on settlements | 12 | 0% | 200 | 2% |
| Interest expense | (3,821) | -29% | (510) | -4% |
| Other (expense) income, net | (12) | 0% | 132 | 1% |
| Income (loss) before provision for income taxes | (6,301) | -48% | 94 | 1% |
| Net income (loss) | $ (6,301) | -48% | $ 94 | 1% |

*Revenue, net*

We derive our revenue through the sales of our various branded sports nutrition products, nutritional supplements and energy drinks. Revenue is recognized when control of a promised good is transferred to a customer in an amount that reflects the consideration the Company expects to be entitled to in exchange for the good. This usually occurs when finished goods are delivered to the Company's customers or when finished goods are picked up by a customer's carrier.

Net revenue reflects the transaction prices for contracts, which includes goods shipped at selling list prices reduced by discounts and sales allowances. We record discounts and sales allowances as a direct reduction of revenue for various discounts provided to our customers, consisting primarily of promotional related credits. Sales discounts are a significant part of our marketing plan to our customers as they help drive increased sales and brand awareness with end users through promotions that we support through our distributors and re-sellers.

-24-

For the three months ended March 31, 2022, our net revenues were approximately $13.1 million compared to $13.1 million for the three months ended March 31, 2021, a decline of approximately $20,000 or 0%. Net revenue for the energy segment was up $1 million, primarily driven by volume, while net revenue for the protein products segment was down $1 million. During the three months ended March 31, 2022, the Company had three customers who individually accounted for 59%, 13% and 12% of our net revenue. During the three months ended March 31, 2021, the Company had three customers who individually accounted for 28%, 17% and 14% of our net revenue. During the 1st Quarter of 2022 the Company instituted a price increase with select customers, contributing to 7.4 % of revenue for the three months ended March 31, 2022.

Discounts and sales allowances declined to approximately 11% of gross revenue, or $1.6 million, for the three months ended March 31, 2022, compared to approximately 15% of gross revenue, or $2.4 million, for the three months ended March 31, 2021. Discounts and sales allowances fluctuate based on customer mix and changes in discretionary promotional activity. We continue to monitor our discounts and allowances, reducing where practical to continue to meet our gross margin expectation.

### Cost of Revenue and Gross Profit

Cost of revenue for our products is related to the production, manufacturing, and freight-in of the related products purchased from third-party manufacturers. We primarily use contract manufacturers to drop ship products directly to our customers.

We experienced cost increases for raw materials during the three months ended March 31, 2022 primarily due to industry shortages in supply and consistent with market demand. Compared to the prior year, commodity protein costs have increased 90% negatively affecting our gross margin. We are taking steps to manage the increase and shortages by entering into agreements with additional protein brokers to diversify our protein sources, along with working with new vendors to source other component such as tubs, trays and bags.

We have focused on cost containment and improving gross margins by concentrating on customers with higher margins, reducing product discounts and promotional activity, along with reducing the number of SKU's and negotiating improved pricing for raw materials. With recent increases in commodity prices, our gross margins have eroded and will continue to be impacted.

We are focusing on growing the energy segment which contributed to two points of margin in the three months ended March 31, 2022.

### Selling and promotion

Our selling and promotion expense consists primarily of expenses related to freight-out, print and online advertising, club demonstrations, and stock-based compensation. Historically, advertising and promotions were a large part of both our growth strategy and brand awareness, in particular strategic partnerships with sports athletes and fitness enthusiasts and endorsements, licensing, and co-branding agreements. Additionally, we co-developed products with sports athletes and teams. In connection with our restructuring plan, we terminated most of these contracts in a strategic shift away from such costly arrangements and moved toward digital advertising, ambassador programs and sampling promotional materials.

For the three months ended March 31, 2022, our selling and promotion expenses were approximately $1.2 million compared to $1.1 million for the three months ended March 31, 2021, an increase of $11,000 or 1%. The increase was primarily related to an increase in freight-out and stock-based compensation related to our Energy business and offset by decreases in Club Demonstrations. Freight out is up $77,000 or 11% and Stock based compensation is up $142,000 or 100%. Club demonstrations were down $222,000 or 75%. All other selling and promotion expenses represent an increase of $14,000.

-25-

*General and Administrative*

Our general and administrative expenses consist primarily of salaries and benefits, professional fees, depreciation and amortization, research and development, information technology equipment and network costs, facilities related expenses, directors' fees, legal fees, accounting and audit fees, consulting fees, stock-based compensation, investor relations costs, insurance, bad debt and other corporate expenses.

For the three months ended March 31, 2022, our general and administrative expenses were approximately $2.8 million compared $2.3 million for the three months ended March 31, 2021, or an increase of approximately $561,000 or 25%. This was due to an increase in professional fees associated with accounting fees, an increase in salaries and benefits associated with stock-based compensation and an increase in bad debt expense, offset by a reduction in office and IT expenses. Professional fees are up $213,000 or 41%, salaries and benefits are up $176,000 or 17%, and bad debt expense is up $344,000 or 3100% and office/IT expenses are down $96,000 or 39%. All other general and administrative expenses represent a decrease of $76,000.

*Gain on Settlements*

For the three months ended March 31, 2022 and 2021, gain on settlements was $12,000 and $200,000 respectively.

*Interest Expense*

For the three months ended March 31, 2022, interest expense was approximately $3.8 million compared to $0.5 million for the three months ended March 31, 2021, or an increase of $3.3 million or 645%.

Interest expense increased primarily due to the $3.2 million amortization of stock warrants associated with the issuance of the Senior Secured debt offering during the year ended December 31, 2021.

*Other (Expense) Income, Net*

For the three months ended March 31, 2022 and 2021, other expense was $12,000, compared to other income of $132,000 respectively.

*Provision for Income Taxes*

For the three months ended March 31, 2022 and 2021, tax expense was zero. Our provision for income taxes consists primarily of federal and state income taxes in the U.S. and income taxes in foreign jurisdictions in which we conduct business. Due to uncertainty, as to the realization of benefits from our deferred tax assets, including net operating loss carryforwards, research and development and other tax credits, we have a full valuation allowance reserved against such assets. We expect to maintain this full valuation allowance at least in the near term.

**Liquidity and Capital Resources**

We have incurred significant losses and experienced negative cash flows since inception. As of March 31, 2022, we had cash of $0.5 million, a decline of $0.7 million from the December 31, 2021 balance of $1.2 million. As of March 31, 2022, we had a working capital deficit of $36.3 million, a stockholders' deficit of $38.1 million and an accumulated deficit of $211.8 million resulting from recurring losses from operations. As a result of our history of losses and financial condition, there is substantial doubt about our ability to continue as a going concern.

Our ability to continue as a going concern is dependent upon us generating profitable operations in the future and/or obtaining the necessary financing to meet our obligations and repay our liabilities arising from normal business operations when they come due. We are evaluating different strategies to obtain financing to fund our expenses and achieve a level of revenue adequate to support our current cost structure. Financing strategies may include, but are not limited to, issuances of capital stock, debt borrowings, partnerships and/or collaborations.

-26-

We have funded our operations from proceeds from the sale of equity and debt securities. We will require significant additional capital to make the investments we need to execute our longer-term business plan. Our ability to successfully raise sufficient funds through the sale of debt or equity securities when needed is subject to many risks and uncertainties and, even if it were successful, future equity issuances would result in dilution to our existing shareholders and future debt securities may contain covenants that limit our operations or ability to enter into certain transactions.

We will need to raise additional funding through strategic relationships, public or private equity or debt financings, grants or other arrangements to develop and seek regulatory approvals for our existing and new product candidates. If such funding is not available, or not available on terms acceptable to us, our current development plan and plans for expansion of our general and administrative infrastructure may be curtailed.

*Cash Flows*

A summary of our cash flows is as follows (in thousands):

| | For the Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2022** | | **2021** | |
| Consolidated Statements of Cash Flows Data: | | | | |
| Net cash (used in) provided by operating activities | $ | (3,582) | $ | 98 |
| Net cash used in investing activities | | - | | (4) |
| Net cash provided by (used in) financing activities | | 2,893 | | (1,505) |
| Net change in cash | $ | (689) | $ | (1,411) |

*Net Cash Operating Activities*

Our net cash used in operating activities was $3.6 million for the three months ended March 31, 2022, compared to net cash provided by operating activities of $0.1 million for the three months ended March 31, 2021. The primary drivers include a $6.1 million net loss, and an increase in accounts receivable, net of $2.5 million.

*Net Cash Investing Activities*

Our net cash used in investing activities for the three months ended March 31, 2022, was zero compared to net cash used in investing activities of $0.004 million for the three months ended March 31, 2021.

*Net Cash Financing Activities*

Our net cash provided by financing activities for the three months ended March 31, 2022, was $2.9 million compared to net cash used by financing activities of $1.5 million for the three months ended March 31, 2021.

**Non-GAAP Adjusted EBITDA**

In addition to disclosing financial results calculated in accordance with GAAP, this Form 10-Q discloses Adjusted EBITDA, which is net loss adjusted for stock-based compensation, (gain) on settlement of accounts payable, interest expense, depreciation of property and equipment, amortization of intangible assets, and (gain) or loss on foreign currency.

Management uses Adjusted EBITDA as a supplement to GAAP measures to further evaluate period-to-period operating performance, as well as the Company's ability to meet future working capital requirements. Management believes this non-GAAP measures will provide investors with important additional perspectives in evaluating the Company's ongoing business performance.

-27-

The GAAP measure most directly comparable to Adjusted EBITDA is net income (loss). The non-GAAP financial measure of Adjusted EBITDA should not be considered as an alternative to net income (loss). Adjusted EBITDA is not a presentation made in accordance with GAAP and has important limitations as an analytical tool and should not be considered in isolation or as a substitute for analysis of our results as reported under GAAP. Because Adjusted EBITDA excludes some, but not all, items that affect net income (loss) and is defined differently by different companies, our definition of Adjusted EBITDA may not be comparable to similarly titled measures of other companies.

Set forth below are reconciliations of our reported GAAP net income (loss) to Adjusted EBITDA (in thousands):

|  | For the Three Months Ended March 31, | |
|  | 2022 | 2021 |
| --- | ---: | ---: |
| Net income (loss) (GAAP) | $ (6,301) | $ 94 |
| **Non-GAAP adjustments:** | | |
| Gain on settlements | (12) | (200) |
| Stock compensation expense | 437 | - |
| Interest expense and other income | 3,821 | 510 |
| Depreciation of Property and Equipment | 1 | 3 |
| Amortization of Intangible Assets | 35 | 80 |
| (Gain) loss from foreign currency | 12 | (11) |
| **Adjusted EBITDA (non-GAAP)** | $ (2,007) | $ 476 |

### Critical Accounting Policies and Estimates

Our consolidated financial statements have been prepared in accordance with GAAP and form the basis for the following discussion and analysis on critical accounting policies and estimates. The preparation of the consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. We evaluate our estimates and assumptions on a regular basis. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results could differ from these estimates and those differences could have a material effect on our business, financial condition and results of operations.

The preparation of our Financial Statements and the related disclosures in conformity with GAAP, requires our management to make judgments, assumptions, and estimates that affect the amounts of revenue, expenses, income, assets, and liabilities, reported in our Financial Statements and accompanying notes. Understanding our accounting policies and the extent to which our management uses judgment, assumptions, and estimates in applying these policies is integral to understanding our Financial Statements.

We describe our most significant accounting policies in "Note 2, Significant Accounting Policies" of our consolidated notes to our Financial Statements and found elsewhere in this Quarterly Report. These policies are considered critical because they may result in fluctuations in our reported results from period to period due to the significant judgments, estimates, and assumptions about highly complex and inherently uncertain matters. In addition, the use of different judgments, assumptions, or estimates could have a material impact on our financial condition or results of operations. We evaluate our critical accounting estimates and judgments required by our policies on an ongoing basis and update them as appropriate based on changing conditions.

### *Revenue Recognition*

Our revenue represents sales of finished goods inventory and is recognized when control of the promised goods is transferred to our customers in an amount that reflects the consideration we expect to be entitled to in exchange for those goods. The reserves for trade promotions and product discounts, including sales incentives, are established based on our best estimate of the amounts necessary to settle existing credits for products sold as of the balance sheet date.

-28-

All such costs are netted against sales. These costs include end-aisle or other in-store displays, contractual advertising fees and product discounts, and other customer specific promotional activity. We provide reimbursement to our customers for such amounts as credits against amounts owed. To determine the appropriate timing of recognition of consideration payable to a customer, all consideration that is payable to our customers is reflected in the transaction price at inception and reassessed routinely.

### *Accounts Receivable and Allowance for Doubtful Accounts*

Accounts receivable represents trade obligations from customers that are subject to normal trade collection terms and are recorded at the invoiced amount, net of any sales discounts and allowance for doubtful accounts, and do not typically bear interest. We assess the collectability of the accounts by taking into consideration the aging of accounts receivable, changes in customer credit worthiness, general market and economic conditions, and historical experience. Bad debt expenses are recorded as part of "General and administrative" expenses in the consolidated statements of operations. We reserve the receivable balance against the allowance when management determines a balance is uncollectible. We also review our customer discounts, and an accrual is made for discounts earned but not yet utilized at each period end.

### *Litigation Estimates and Accruals*

In the normal course of business or otherwise, we may become involved in legal proceedings. We will accrue a liability for such matters when it is probable that a liability has been incurred and the amount can be reasonably estimated. When only a range of possible loss can be established, the most probable amount in the range is accrued. If no amount within this range is a better estimate than any other amount within the range, the minimum amount in the range is accrued. The accrual for a litigation loss contingency might include, for example, estimates of potential damages, outside legal fees and other directly related costs expected to be incurred. We provide disclosures for material contingencies when there is a reasonable possibility that a loss or an additional loss may be incurred. In assessing whether a loss is a reasonable possibility, we may consider the following factors, among others: the nature of the litigation, claim or assessment, available information, opinions or views of legal counsel and other advisors, and the experience gained from similar cases.

### *Share-Based Payments and Stock-Based Compensation*

Share-based compensation awards, including stock options and restricted stock awards, are recorded at estimated fair value on the applicable awards' grant date, based on the estimated number of awards that are expected to vest. The grant date fair value is amortized on a straight-line basis over the time in which the awards are expected to vest, or immediately if no vesting is required. Share-based compensation awards issued to non-employees for services are also recorded at fair value on the grant date. The fair value of restricted stock awards is based on the fair value of the stock underlying the awards on the grant date as there is no exercise price.

The fair value of stock options is estimated using the Black-Scholes option-pricing model. The determination of the fair value of each stock award using this option-pricing model is affected by our assumptions regarding a number of complex and subjective variables. These variables include, but are not limited to, the expected stock price volatility over the term of the awards and the expected term of the awards based on an analysis of the actual and projected employee stock option exercise behaviors and the contractual term of the awards. Due to our limited experience with the expected term of options, the simplified method was utilized in determining the expected option term as prescribed in ASC 718 Compensation – Stock Compensation.

We recognize our stock-based compensation expense over the requisite service period, which is generally consistent with the vesting of the awards, based on the estimated fair value of all stock-based payments issued to employees and directors that are expected to vest.

There have been no material changes to our critical accounting policies during the period covered by this report.

-29-

### Warrants

In conjunction with the Securities Purchase Agreement ("SPA"), we issued 18,463,511 warrants to the senior note holders. The warrants entitle the holder to purchase one share of our common stock at an exercise price equal to $.7794 per share at any time on or after October 13, 2021 (the "Initial Exercise Date") and on or prior to the close of business on October 13, 2026 the "Termination Date"). We determined that these warrants are free standing financial instruments that are legally detachable and separately exercisable from the debt instruments. Management also determined that the warrants are puttable for cash upon a fundamental transaction at the option of the holder and as such required classification as equity pursuant to ASC 470. In accordance with the accounting guidance, the outstanding warrants are recognized as equity on the balance sheet. The proceeds from the sale of a debt instrument with stock purchase warrants (detachable call options) shall be allocated to the two elements based on the relative fair values of the debt instrument without the warrants, and of the warrants themselves at time of issuance. The allocation of the portion of the value resulted in a discount of the debt instrument. The fair value of the warrants were measured using the Black Scholes option pricing model.

### Recently Issued Accounting Pronouncements

See Note 2 to the accompanying consolidated financial statements for a discussion of recent accounting pronouncements or changes in accounting pronouncements that are of significance, or potential significance, to us.

### ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The Company is not required to provide the information required by this Item as it is a "smaller reporting company," as defined in Rule 12b-2 of the Exchange Act.

### ITEM 4. CONTROLS AND PROCEDURES

### Background

### Evaluation of Disclosure Controls and Procedures

Our principal executive officer and principal financial officer have evaluated disclosure controls and procedures as of March 31, 2022. Based on this evaluation, they concluded that because of the material weaknesses in our internal control over financial reporting discussed below, our internal controls and procedures were not effective as required under Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

Disclosure controls and procedures are designed to ensure that the information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

### Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Exchange Act Rule 13a-15(f). Our internal control over financial reporting is a process affected by our management to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our financial statements for external purposes in accordance with GAAP.

In designing and evaluating our internal controls and procedures, our management recognized that internal controls and procedures, no matter how well conceived and operated, can provide only a reasonable, not absolute, assurance that the objectives of the internal controls and procedures are met. In addition, any evaluation of the effectiveness of internal controls over financial reporting in future periods is subject to risk that those internal controls may become inadequate because of changes in conditions or the degree of compliance with the policies or procedures may deteriorate. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

-30-

Our management assessed the effectiveness of its internal control over financial reporting as of March 31, 2022. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations (COSO) of the Treadway Commission's 2013 Internal Control-Integrated Framework. Based on its assessment, as well as factors identified during the Audit Committee investigation and subsequent audit process, management has concluded that our internal control over financial reporting as of December 31, 2021 was not effective due to the existence of the material weaknesses in internal control over financial reporting described below.

### Material Weaknesses

The Company has deficiencies in the design and operation of its internal controls in the financial processes related to the accounting for cash, accounts receivable, accounts payable, inventory, accrued liabilities, income taxes, debt, equity, revenue, costs of sales, stock-based compensation, and expenses classification. In addition, the Company has insufficient controls over the financial close and reporting process, including account reconciliations and preparation and review of financial statements and related disclosures. Significant employee turnover and lack of technical expertise in the accounting function, has led to a lack of documentation and inconsistent practices in the implementation and execution of internal controls, including those at the entity level, information technology general controls, segregation of duties controls, and business process controls.

### Remediation

Our remedial actions to date and remediation plans to be undertaken in response to the material weaknesses on internal control over financial reporting and our conclusions reached in evaluating the effectiveness of our disclosure controls and procedures and internal controls over financial reporting as of March 31, 2022 and 2021, are described below.

- We are in the process of designing and expect to implement, measures that we believe address or will address these control weaknesses, we continue to develop our internal controls, processes and reporting systems by, among other things, hiring qualified personnel with expertise to perform specific functions, and designing and implementing improved processes and internal controls, including ongoing senior management review and audit committee oversight. We plan to remediate the identified material weakness through the redistribution of job responsibilities, after hiring additional senior accounting staff, with additional technical accounting expertise and through the design and implementation of additional internal controls in order to promote adequate segregation of duties. Additionally, we intend to designate a member of management to review and improve our internal control processes. We expect to complete the remediation in 2022. We expect to incur additional costs to remediate the material weaknesses, primarily personnel costs for both internal and external resources.

- We may not be successful in implementing these changes or in developing other internal controls, which may undermine our ability to provide accurate, timely and reliable reports on our financial and operating results. Further, we will not be able to fully assess whether the steps we are taking will remediate the material weakness in our internal control over financial reporting until we have completed our implementation efforts and sufficient time passes in order to evaluate their effectiveness. In addition, if we identify additional material weaknesses in our internal control over financial reporting, we may not detect errors on a timely basis and our financial statements may be materially misstated. Moreover, in the future we may engage in business transactions, such as acquisitions, reorganizations or implementation of new information systems that could negatively affect our internal control over financial reporting and result in material weaknesses.

We expect to progress on our remediation efforts during the remainder of 2022.

Notwithstanding the material weaknesses described in this Item 4, Management has concluded that the consolidated financial statements and related financial information included in this Quarterly Report on Form 10-Q presents fairly, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with GAAP. Management's position is based on a number of factors, including, but not limited to:

- With the substantial resources expended (including the use of external consultants);

- The reconsideration of significant accounting policies and accounting practices previously employed by the Company, resulting in other adjustments to previously issued consolidated financial statements; and

- Based on the actions described above, we have updated, and in some cases corrected, our accounting policies and have applied those to our consolidated financial statements for all periods presented.

### Changes in Internal Control Over Financial Reporting

There have not been any changes in our internal control over financial reporting during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

-31-

## PART II—OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

From time to time, we may be subject to litigation and claims arising in the ordinary course of business. For information regarding legal proceedings, see Note 8 to the Notes to Consolidated Financial Statements (unaudited) contained herein, which is incorporated by reference into this part II, Item 1.

### ITEM 1A. RISK FACTORS

Risk factors that affect our business and financial results are discussed in Part I, Item 1A "Risk Factors," in our Annual Report on Form 10-K as amended for the year ended December 31, 2021("Annual Report"). There have been no material changes in our risk factors from those previously disclosed in our Annual Report. You should carefully consider the risks described in our Annual Report, which could materially affect our business, financial condition or future results. The risks described in our Annual Report are not the only risks we face. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial condition, and/or operating results. If any of the risks actually occur, our business, financial condition, and/or results of operations could be negatively affected.

### ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

None.

### ITEM 3. DEFAULTS UPON SENIOR SECURITIES

None.

### ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

### ITEM 5. OTHER INFORMATION

None

### ITEM 6. EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 31.1* | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Certification of Principal Executive Officer and Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes- Oxley Act of 2002 |
| 101.INS* | Inline XBRL Instance Document |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |

| 104* | Cover Page Interactive Data File - the cover page from the Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2022 is formatted in Inline XBRL |

\*     Filed herewith.
\*\*   Furnished herewith.

-32-

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**MUSCLEPHARM CORPORATION**

Date: May 16, 2022                                By: */s/ Ryan Drexler*
                                                 Ryan Drexler
                                                 Chief Executive Officer and Chairman of the Board of Directors
                                                 (Principal Executive Officer)

Date: May 16, 2022                                By: */s/ Sabina Rizvi*
                                                 Sabina Rizvi
                                                 Chief Financial Officer
                                                 (Principal Financial Officer and Principal Accounting Officer)

-33-