Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
blindsey@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887
*Attorneys for the Debtor*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | ) Case No.: BK-22-14422-nmc |
| | ) |
| MUSCLEPHARM CORPORATION, | ) Chapter 11 |
| | ) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |

## EX PARTE MOTION FOR ORDER SHORTENING TIME
## FOR HEARING ON FORM OF FINAL DIP FINANCING ORDER

MusclePharm Corporation, the debtor in the above-referenced Chapter 11 case ("**Debtor**"),

by and through its counsel of record, Schwartz Law, PLLC, hereby files this ex parte motion (the

"**Motion**") for an emergency hearing on the form of that certain Final Order Pursuant to Emergency

Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Fed.

R. Bankr. P. 4001(b) and 4001(d): (I) Authorizing the Debtor to Obtain Postpetition Financing, (II)

Granting Senior Secured Liens and Administrative Expense Claims, (III) Determining Adequate

Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief (the "**Final DIP**

**Financing Order**").

This Motion is made pursuant to Bankruptcy Rule 9006, Local Rule 9006, the declaration

of Samuel A. Schwartz, Esq. (the "**Schwartz Declaration**"), attached hereto as **Exhibit 1**, the

points and authorities set forth below, and the pleadings and papers and other records contained in

this Court's file, judicial notice of which is respectfully requested.

As set forth below, the Debtor asks for a hearing either <u>Thursday, March 2, 2023</u>, or <u>Friday, March 3, 2023</u>, or such other date as this Court is available for a hearing on the form of order for the Final DIP Financing Order.  Counsel for the Debtor and counsel for White Winston Select Asset Funds, LLC ("**WW**") are not available on Wednesday, March 1, 2023.

## BACKGROUND

1.        On February 9, 2023, this Court held a final hearing on the Debtor's *Emergency Motion for Interim and Final Orders: (I) Authorizing the Debtor to Obtain Post-Petition Financing, (II) Granting Priming Liens and Administrative Expense Claims, (III) Authorizing the Debtor's Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [ECF No. 33] (the "**DIP Financing Motion**"), and approved the DIP Financing Motion on a final basis.

2.        On Wednesday, February 15, 2023, counsel for the Debtor circulated a proposed form of the Final DIP Financing Order.

3.        Between February 15, 2023, and February 27, 2023, the Debtor's counsel collected comments from all parties who appeared at the hearing and requested to sign off on the Final DIP Financing Order.

4.        Unfortunately, similar to the proposed form of order for the Second Interim DIP Financing Order, WW has competing views over certain provisions and comments to the Final DIP Financing Order, which the Debtor and its DIP financing lender, Empery Tax Efficient, L.P. ("**Empery**"), were not able to adopt and incorporate into the final form of order.

5.        Counsel for Empery, the Office of the United States Trustee, the Official Committee of Unsecured Creditors and Prestige Capital Finance, LLC, all approved and signed off on the Final DIP Financing Order.  Counsel for WW disapproved.  A copy of the proposed Final DIP Financing Order is attached hereto as **Exhibit 2**.

6.        Importantly, the Debtor (and others) tried to resolve WW's objections over the course of the last week, and ultimately hoped to avoid a hearing on the matter.  Unfortunately, however, the Debtor is now in a cash crunch, as the financing advanced under the interim orders is nearly exhausted.

7.        As the Debtor has an immediate need for financing, the Debtor does not have the

1    time to allow for the normal time periods under Local Rule 9021 to run its course (e.g., five (5)

2    business days for WW to lodge an objection to the proposed Final DIP Financing Order and another

3    five (5) business days for replies thereto).

4          8.      Accordingly, the Debtor respectfully requests that this Court set an emergency

5    hearing as soon as possible to resolve the WW's objection to the Final DIP Financing Order.

6                                    **LEGAL ARGUMENT**

7          Section 105 of the Bankruptcy Code allows this court to issue such orders as are necessary

8    to carry out the provisions of this title.  Bankruptcy Rule 9006(c)(l) permits a bankruptcy court, for

9    cause shown and, in its discretion, to reduce the period during which any notice is given in

10   accordance with the bankruptcy rules.  Bankruptcy Rule 9006(c)(l) provides as follows:

11
12          Except as provided in paragraph 2 of this subdivision, when an act is
             required or allowed to be done at or within a specified time by these
13           rules or by a notice given thereunder or by order of the court, the court
             for cause shown may, in its discretion with or without motion or notice
             order the period reduced.
14
     Fed. R. Bankr. P. 9006(c)(1).

15
          The operative section of the Bankruptcy Code's rules of construction set forth in 11 U.S.C.
16
     § 102(1) define the phrase "after notice and a hearing," or similar phrases used throughout the
17
     Bankruptcy Code and Bankruptcy Rules as follows:
18
19          (A) … after such notice as is appropriate in the particular circumstances,
             and such opportunity for a hearing as is appropriate in the particular
20           circumstances; but (B) authorizes an act without an actual hearing if
             such notice is given properly and if – (i) such a hearing is not requested
21           timely by a party in interest; or (ii) there is insufficient time for a hearing
             to be commenced before such an act must be done, and the court
22           authorizes such an act.

23   11 U.S.C. § 102(1); *see also* Fed. R. Bankr. P. 9001 (making the Bankruptcy Code's rules of

24   construction applicable to the Federal Rules of Bankruptcy Procedure).

25        Relief under Bankruptcy Rule 9006(c)(1) is committed to the Court's discretion.  *See, e.g.,*

26   *In re Phila. Newspapers, LLC*, 690 F.3d 161, 171 (3d Cir. 2012). "In exercising that discretion, [the

27   Court] should consider the prejudice to parties entitled to notice and weigh this against the reasons

28   for hearing the motion on an expedited basis." *Id.*

1       Local Rule 9006 provides further authority for shortening the time for a hearing. According

2 to Local Rule 9006(b), every application for an order shortening time must be accompanied by a

3 declaration stating the reasons for an expedited hearing.

4       As set forth above and in the Schwartz Declaration, there are compelling reasons for an

5 expedited hearing on the motions identified above. The Debtor needs financing, the Debtor needs

6 to make payroll and other business operational expenses. Accordingly, the Debtor does not have

7 the time to wait for the procedures under Local Rule 9021 to run, which could run up to two weeks.

8       WHEREFORE, the Debtor respectfully submits that cause exists both under 11 U.S.C.

9 § 102(1) and under Bankruptcy Rule 9006(c)(1) to grant the relief requested herein, and

10 respectfully prays that the Court set an emergency hearing on the proposed form of Final DIP

11 Financing Order at the Court's earliest convenience.

12       Specifically, the Debtor asks for a hearing either <u>Thursday, March 2, 2023</u>, or <u>Friday, March</u>

13 <u>3, 2023</u>, or such other date as this Court is available for a hearing on the form of order for the Final

14 DIP Financing Order. Counsel for the Debtor and counsel for WW are not available on Wednesday,

15 March 1, 2023.

16       Dated: February 28, 2023.

17                       SCHWARTZ LAW, PLLC

18                       By: <u>/s/ *Samuel A. Schwartz*</u>

19                       Samuel A. Schwartz, Esq.
                           Bryan A. Lindsey, Esq.

20                       601 East Bridger Avenue
                           Las Vegas, NV  89101

21

22                       *Attorneys for the Debtor*

23

24

25

26

27

28

# EXHIBIT 1

# EXHIBIT 1

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
blindsey@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Attorneys for the Debtor*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | ) Case No.: BK-22-14422-nmc |
| | ) |
| MUSCLEPHARM CORPORATION, | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| | ) |

## DECLARATION OF SAMUEL A. SCHWARTZ, ESQ.

Samuel A. Schwartz, being duly sworn, deposes and says:

1.    I, Samuel A. Schwartz, am the principal of Schwartz Law, PLLC ("**SL**"), and I am duly licensed to practice law in the State of Nevada and this Court. I make this declaration (the "**Declaration**") based on my own personal knowledge except as to those matters stated upon information and belief, and as to those matters, I believe them to be true.

2.    I make this Declaration in support of the Debtor's *Ex Parte Motion for Order Shortening Time for Hearing on Form of Final DIP Financing Order* (the "**Ex Parte Motion**"), to which this Declaration is attached as <u>Exhibit 1</u>.

3.    On January 3, 2023, the Debtor filed its *Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing Debtor to Obtain Post-Petition Financing, (II) Granting Priming Liens and Administrative Expense Claims, (III) Authorizing the Debtor's Use of Cash Collateral,*

1

*(IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "**DIP Financing Motion**").  *See* ECF No. 33.

4.       On February 9, 2023, this Court held a final hearing on the Debtor's DIP Financing Motion and approved the DIP Financing Motion on a final basis.

5.       On Wednesday, February 15, 2023, counsel for the Debtor circulated a proposed form of the Final DIP Financing Order.

6.       Between February 15, 2023, and February 27, 2023, the Debtor's counsel collected comments from all parties who appeared at the hearing and requested to sign off on the Final DIP Financing Order.

7.       Unfortunately, similar to the proposed form of order for the Second Interim DIP Financing Order, White Winston Select Asset Funds, LLC ("**WW**") has competing views over certain provisions and comments to the Final DIP Financing Order, which the Debtor and its DIP financing lender, Empery Tax Efficient, L.P. ("**Empery**"), were not able to adopt and incorporate into the final form of order.

8.       Counsel for Empery, the Office of the United States Trustee, the Official Committee of Unsecured Creditors and Prestige Capital Finance, LLC, all approved and signed off on the Final DIP Financing Order.  Counsel for WW disapproved.  A copy of the proposed Final DIP Financing Order is attached to the Ex Parte Motion as Exhibit 2.

9.       Importantly, the Debtor (and others) tried to resolve WW's objections over the course of the last week, and ultimately hoped to avoid a hearing on the matter.  Unfortunately, however, the Debtor is now in a cash crunch, as the financing advanced under the interim orders is nearly exhausted.

10.      As the Debtor has an immediate need for financing, the Debtor does not have the time for allow for the normal time periods under Local Rule 9021 to run its course (e.g., five (5) business days for WW to lodge an objection to the proposed Final DIP Financing Order and another five (5) business days for replies thereto).

11.      Accordingly, the Debtor respectfully requests that this Court set an emergency hearing as soon as possible to resolve the WW's objection to the Final DIP Financing Order.

1     12.    Accordingly, I believe sufficient cause exists for an order shortening time for this

2   Court to set an emergency hearing as soon as possible to resolve the WW's objection to the Final

3   DIP Financing Order.

4          Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

5   and correct.

6          Dated: February 28, 2023.

7                                                              /s/ *Samuel A. Schwartz*
8                                                              Samuel A. Schwartz, Esq.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 2

# EXHIBIT 2

1
2
3
4
5
6
7   Samuel A. Schwartz, Esq.
    Nevada Bar No. 10985
8   saschwartz@nvfirm.com
    SCHWARTZ LAW, PLLC
9   601 East Bridger Avenue
    Las Vegas, NV 89101
10  Telephone: 702.385.5544
    Facsimile: 702.442.9887
11  *Attorneys for the Debtor*
12

13              **UNITED STATES BANKRUPTCY COURT**
                **FOR THE DISTRICT OF NEVADA**
14

15  In re:                              )   Case No.: 22-14422-nmc
                                        )
16  MUSCLEPHARM CORPORATION,            )   Chapter 11
                                        )
17                                      )
                    Debtor.             )   Final Hearing Date:  February 9, 2023
18  _____     )   Final Hearing Time: 10:30 a.m.

19
20          **FINAL ORDER REGARDING EMERGENCY MOTION**
    **FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362,**
21  **363, AND 364 AND FED. R. BANKR. P. 4001(b) AND 4001(d): (I) AUTHORIZING**
    **THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (II) GRANTING**
22  **SENIOR SECURED LIENS AND ADMINISTRATIVE EXPENSE CLAIMS, (III)**
    **DETERMINING ADEQUATE PROTECTION, (IV) MODIFYING THE**
23  **AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

24      The motion ( "**Motion**")[1] of MusclePharm Corporation, the Chapter 11 debtor and debtor

25  in possession herein ("**MusclePharm**" or the "**Debtor**") before this court ("**Bankruptcy Court**")

26
27  _____

28      [1]     Capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the
    Motion.

                                    1

seeks entry of interim and final orders pursuant to Sections[2] 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001 to, among other matters, authorize the Debtor to obtain emergency credit and incur debt on an interim and final basis.  The Debtor negotiated and then filed a substitute term sheet (the "**First Interim Term Sheet**") with the Bankruptcy Court on January 6, 2023 [ECF No. 65] between the Debtor, as borrower, and the DIP Secured Parties and DIP Factoring Parties (each as defined in the Loan Documents (defined below)) by and through the DIP Agent, Empery Tax Efficient, L.P. ("**DIP Agent**" or "**Empery**," and collectively with the DIP Secured Parties and DIP Factoring Parties, "**Lender**"), as lender, in lieu of White Winston Select Asset Funds, LLC ("**White Winston**"), the originally proposed lender in the Motion, with Lender proposing the requested financing on the terms set forth in the First Interim Term Sheet.  Sufficient notice of the Motion and a first interim hearing (the "**First Interim Hearing**") was provided under the circumstances by the Debtor; and further, the Bankruptcy Court continued the First Interim Hearing from January 5, 2023, at 9:30 a.m. to January 6, 2023, at 9:30 a.m. to provide more time for all to review the First Interim Term Sheet, and the Bankruptcy Court thereafter entered its first interim order (the "**First Interim Order**") on January 9, 2023 [ECF No. 74], and continued the Motion for a second interim hearing (the "**Second Interim Hearing**" and collectively with the First Interim Hearing, the "**Interim Hearings**") to be held on January 13, 2023, at 9:30 a.m.  On January 12, 2023, Debtor substituted a revision to the First Interim Term Sheet [ECF No. 102, Ex. 1] (the "**Second Interim Term Sheet**").  Following the Second Interim Hearing, the Bankruptcy Court approved the Second Interim Term Sheet on an interim basis on January 23, 2023 [ECF No. 139] (the "**Second Interim Order**" and together with the Second Interim Order, the "**Interim Orders**") and scheduled a final hearing for final approve of the Motion to occur on February 9, 2023, at 10:30 a.m. (the "**Final Hearing**").  On February 7, 2023, Debtor substituted a revision to the Second Interim Term Sheet [ECF No. 213-1, Ex. 1] (hereinafter, the "**Term Sheet**" and the proposed financing pursuant to the

---

[2]    Unless otherwise stated, all references to "**Section**" herein shall be to title 11 of the U.S. Code (the "**Bankruptcy Code**"); all references to a "**Bankruptcy Rule**" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to a "**Local Rule**" or "**LR**" shall refer to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Nevada.

terms and conditions of the Term Sheet as implemented by the Loan Documents, the, "**DIP Financing**"). After considering the Motion and all pleadings and papers filed with, and evidence submitted to, this Bankruptcy Court in connection with the Motion, including all formal and informal objections to the Motion, and the argument of counsel and evidence submitted at the Final Hearing; and upon the record made by the Debtor and others at the Final Hearing; the Bankruptcy Court has found and determined that, subject to the terms of this final order (the "**Final Order**"), the relief sought in the Motion (as amended and supplemented by the Term Sheet and the Loan Documents) on a final basis, to the extent provided below, is in the best interests of the Debtor, its bankruptcy estate ("**Estate**"), creditors, and all parties in interest; and after due deliberation and consideration and good and sufficient cause appearing therefore,

the Bankruptcy Court hereby finds:[3]

A.    **Debtor's Chapter 11 Case**. On December 15, 2022 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned case (the "**Chapter 11 Case**"). The Debtor is continuing to operate its business and manage its affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code, and no request has been made for the appointment of a trustee or examiner.

B.    **Jurisdiction; Venue**. This Bankruptcy Court has subject matter jurisdiction to consider and rule upon the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Determination of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief sought by the Motion are Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001. Venue of the Chapter 11 Case and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    **Notice**. Notice of the First Interim Hearing and the relief requested in the Motion was provided by the Debtor by electronic mail, overnight courier, hand delivery or electronic

---

[3]    To the extent that the Court stated findings of fact and conclusions of law on the record at the Second Interim Hearing, such findings and conclusions are incorporated herein by reference in accordance with Fed. R. Civ. P. 52, made applicable pursuant to Fed. R. Bankr. P. 9014.

delivery through the Bankruptcy Court's CM/ECF system, on January 3, 2023, to: (i) the Office of the United States Trustee for the District of Nevada ("**U.S. Trustee**"), (ii) the Debtor's 20 largest non-insider unsecured creditors, (iii)  the Lender and counsel to the Lender, (iv) all other parties known by the Debtor to assert liens or security interests in the assets of the Debtor, and (v)  all other parties entitled to notice under Bankruptcy Rule 2002.  Notice of the Second Interim Hearing was provided by the Bankruptcy Court on the record in open court at the First Interim Hearing and also on the written record [See ECF No. 66].  Notice of the Final Hearing was provided by the Bankruptcy Court on the record in open court at the Second Interim Hearing and also on the written record [See ECF Nos. 105 & 146].  Under all of the circumstances, such notice of the Motion, the relief requested therein, the Interim Hearings, and Final Hearing has complied with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules.

D.    **Debtor's Need for DIP Financing**.  Based upon pleadings and papers filed with, and evidence submitted to, this Bankruptcy Court in connection with the Motion, and the record in the Chapter 11 Case, the Debtor does not have sufficient available sources of working capital and financing to carry on the operation of its business and affairs without the DIP Financing and authorized use of all cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever or wherever acquired in which the Debtor and an entity other than the Debtor has an interest, whether existing before or after the commencement of the Chapter 11 Case and inclusive of cash collateral as defined in Section 363 ("**Cash Collateral**.").  As a result of the Debtor's financial condition, the use of Cash Collateral alone will be insufficient to meet the Debtor's immediate postpetition liquidity needs.   The Debtor's ability to maintain business relationships with its suppliers and customers, pay for human resources, purchase materials and otherwise finance its operations is essential to the Debtor's continued viability.   The Debtor's ability to finance its operations and its Chapter 11 Case is essential to preserving the going concern value of the Debtor's business and ultimately maximizing the value of the Estate for the benefit of all stakeholders, and for these reasons and others, the approval of the DIP Financing is in the best interests of the Debtor, the Estate, and its creditors.

E.    **Budget for Necessary DIP Financing**.  Attached hereto as **Exhibit A** is a revised

4

13-week cash flow forecast setting forth all projected cash receipts and cash disbursements (by line item) for a 13-week period beginning in the week commencing January 30, 2023 and for a twelve (12) month period beginning in January 2023 (the "**Budget**").  The Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) prepared by the Debtor and consented to in writing by the Lender, without subsequent notice to or order of the Bankruptcy Court.  The Debtor will deliver a copy of the Budget to the Committee and Prestige Capital Finance, LLC's ("**Prestige**"). The Budget is an integral part of this Final Order and has been relied upon by the Lender in consenting to this Final Order and to provide the DIP Financing.  The Budget includes and contains the Debtor's best current estimate of all operational receipts, and the Budget accounts for operational disbursements, fees, costs and other expenses that were anticipated to be payable, incurred and/or accrued by the Debtor during the period covered by the Budget to be timely paid in the ordinary course of business to the extent allowed and permitted to be paid by an order of this Bankruptcy Court or pursuant to the Bankruptcy Code.  Funding of the Budget is expected to allow the Debtor to operate in the Chapter 11 Case and pay postpetition administrative expenses in the ordinary course of business to the extent allowed and permitted to be paid by the Bankruptcy Court order or pursuant to the Bankruptcy Code, subject to the terms of this Final Order.

F.    **Financing under Section 364**.  Based on the pleadings and papers filed with, and evidence submitted to, this Bankruptcy Court in connection with the Motion, and the record in the Chapter 11 Case, the Debtor is unable to obtain sufficient financing from a source acceptable to Debtor in its business judgment by means of: (i) unsecured credit allowable as an administrative expense under Sections 364(b) and 503(b)(1) of the Bankruptcy Code; or (ii) secured credit under Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) for the purposes set forth in the Term Sheet and the Loan Documents without granting a superpriority priming lien.

G.    **Good Faith Lender and Lending and Good Cause**.  The Lender agreed to provide postpetition financing secured, subject to the priorities described in **Exhibit B** hereto, by: (i) continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected co-priority senior liens on and security interests in the DIP Collateral (defined below) (collectively,

5

the "**DIP Liens**"),  with the same priority as the Prepetition Secured Parties' (as defined in the Loan Documents) current prepetition liens on Debtor's prepetition assets and senior to all other liens existing on and after the Petition Date with the exception of Prestige's prepetition liens and security interests in its prepetition collateral as provided in the prepetition intercreditor agreement ("**Prestige Intercreditor Agreement**") between Prestige, the Debtor and the Prepetition Secured Parties; (ii) superpriority claims under Section 364(c)(1); (iii) automatically perfected liens under Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d); and (iii) the other protections set forth in the Motion and the Term Sheet and the Loan Documents, in each case limited only by this Final Order. As of the Final Hearing, the Lender is prepared to advance secured financing to the Debtor in accordance with the Term Sheet and the Loan Documents to the extent provided in this Final Order and the Budget.  After considering all of its alternatives, including alternative sources of debtor in possession financing, the Debtor has concluded, in an exercise of its sound business judgment, that the DIP Financing provided by Lender represents the best proposed financing available to the Debtor under Debtor's circumstances.  Based on the pleadings and papers filed with, and evidence submitted to, this Bankruptcy Court in connection with the Motion, and the record in the Chapter 11 Case, the terms and conditions of the DIP Financing are fair and reasonable, reflect the Debtor's exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.   Absent granting the relief sought by this Final Order, the Debtor's business, properties and the Estate will be immediately and irreparably harmed.  Accordingly, good cause has been shown that entry of this Final Order is in the best interest of the Debtor and its Estate, employees, creditors, and other parties in interest and that the implementation and consummation of the DIP Financing and authorization of the use of the DIP Collateral (including the Cash Collateral as further provided below) in accordance with this Final Order and the Loan Documents is in the best interests of the  Estate and consistent with the Debtor's fiduciary duties.  Based on the pleadings and papers filed with, and evidence submitted to, this Bankruptcy Court in connection with the Motion, and the record in the Chapter 11 Case, (i) the DIP Financing has been negotiated in good faith and at arm's length among the Debtor and the Lender, and (ii) any credit extended, loans made, and other financial accommodations extended pursuant to this Final Order to the

6

Debtor by the Lender have been extended, issued or made, as the case may be, in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code.

H.    **Use of Cash Collateral**.  An immediate and critical need exists for the Debtor to use the Cash Collateral (in addition to the DIP Financing) in accordance with the Budget to continue to operate its business, pay wages, maintain business relationships with members, suppliers and customers, make capital expenditures, generally conduct its business affairs so as to avoid immediate and irreparable harm to the Estate and the value of its assets, and afford the Debtor adequate time to effectively reorganize.

I.    **Final Approval of the Motion**.  Based upon the Motion, all pleadings and papers filed with and evidence submitted to this Bankruptcy Court in connection with the Motion, and the record made at the Interim Hearings and Final Hearing, all objections being withdrawn, consensually resolved on the record, or overruled by the Bankruptcy Court, the Bankruptcy Court has determined to grant the Motion on a final basis and approve the Debtor's entry into and performance under the DIP Financing under the Loan Documents, as further provided herein, thereby authorizing postpetition financing of (i) up to $4,500,000 (excluding the Roll-Up amounts (defined below) and the DIP Inventory Acquisition Line of Credit) under the DIP Note Facility (as defined in the Loan Documents), (ii) up to $10,000,000 under the DIP Factoring Facility to factor DIP Accounts (as those terms are defined in the Loan Documents), and (iii) up to $1,000,000 under the DIP Inventory Acquisition Line of Credit (as defined in the Loan Documents), and related relief, as provided in the Loan Documents and this Final Order.

Based on the foregoing, and upon the record made before this Bankruptcy Court at the Interim Hearings and Final Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**:

1.    **Final Approval**.  The DIP Financing pursuant to the DIP Facilities (as that term is defined in the Loan Documents) is approved on a final basis and the Debtor is authorized to obtain postpetition financing of (i) up to $4,500,000 (excluding the Roll-Up amounts and the DIP Inventory Acquisition Line of Credit) under the DIP Note Facility, (ii) up to $10,000,000 under the DIP Factoring Facility, and (iii) up to $1,000,000 under the DIP Inventory Acquisition Line of

Credit on a final basis as provided in the Loan Documents and this Final Order.

2.    **Budget**.  Beginning on January 30, 2023 and continuing until the repayment in full in cash of the obligations under the DIP Facilities, the Debtor shall perform in accordance with the Budget, subject to the following with respect to any Review Period (defined below): (i) the Debtor's actual cash receipts shall not be less than 90% of the projected amounts set forth in the Budget on a cumulative basis; and (ii) the Debtor's actual cash disbursements shall not be greater than 110% of the projected amounts therefor set forth in the Budget on a cumulative basis (such variance, the "**Permitted Variances**").  During any Review Period occurring prior to March 15, 2023, the DIP Note Purchasers and DIP Factoring Purchasers (as those terms are defined in the Loan Documents) waive all defaults of the Debtor for failing to comply with the Budget, including the Permitted Variances, solely with respect to (i) Total Receipts and (ii) Total COGS Including Shipping (as those terms are defined in the Budget).  Debtor shall file with the Bankruptcy Court a final Budget agreed to by the DIP Agent on or before March 15, 2023.  Compliance with the Budget shall be reviewed on Monday of every other week on a bi-weekly basis, with such reviews to be conducted on the Monday following each of the second and fourth weeks of the Budget (each, a "**Weekly Review Period**") and thereafter on a rolling 4-week basis (the "**Cumulative Review Period**" and together with the Weekly Review Period, the "**Review Periods**").  Beginning on the second Monday following the Second Interim DIP Order and every other Monday thereafter, the Debtor shall deliver to the DIP Factoring Agent (as defined in the Loan Documents) and the Committee of Unsecured Creditors (the "**Committee**"), not later than 4:00 p.m. Pacific time on each Monday (commencing with the Monday after the one-week anniversary of the Second Interim DIP Order), a weekly line-by-line variance report (the "**Variance Report**"), which Variance Report shall compare actual cash receipts and disbursements of the Debtor with corresponding amounts provided for in the Budget on a line-by-line basis for the prior week and the applicable Review Period (or such shorter period as may have elapsed from the Petition Date), including written descriptions in reasonable detail explaining any material positive or negative variances, and otherwise in form and substance reasonably acceptable to the DIP Note Agent (as defined in the Loan Documents).

3.    **Final Approval of the Loan Documents**.    The *Debtor-In-Possession Notes Purchase and Security Agreement* (as subsequently amended and supplemented and executed by the Debtor and the counterparties thereto ("**DIP Note Agreement**") and *Debtor-In-Possession Factoring Purchase and Security Agreement* (as subsequently amended and supplemented consistent with this Final Order and executed by the Debtor and the counterparties thereto ("**DIP Factoring Agreement**," and collectively with the DIP Note Agreement, and any other documents or agreements, if any, intercreditor agreements, and amendments, schedules, and exhibits to the foregoing delivered or filed pursuant to or in connection with or necessary to implement the DIP Financing, the "**Loan Documents**"), attached hereto as **Exhibit C** and **Exhibit D**, respectively, and all the Lender protections provided therein and herein are approved for all postpetition lending by Lender to Debtor made pursuant to this Final Order.    The Debtor is expressly authorized, empowered, and directed to perform all of its direct and indirect obligations under the Loan Documents from and after December 15, 2022 ("**Petition Date**"), including the execution of such additional documents, instruments and agreements reasonably required or requested by the Lender to implement the terms or effectuate the purposes of the Loan Documents and this Final Order, except as limited hereby (collectively, the "**DIP Obligations**").    In furtherance of the foregoing and without further approval of this Bankruptcy Court, the Debtor is authorized, and the automatic stay imposed by Section 362 of the Bankruptcy Code is modified to the extent necessary, to perform all acts and to make, execute and deliver all instruments and documents and to pay all reasonable fees (when applicable), that may be reasonably required or necessary for the Debtor's performance of its obligations under the Loan Documents and this Final Order, and for  Lender's exercise of remedies set forth in the Loan Documents upon a default.

4.    **Approval of the Challenge Periods**.    The Committee shall have until April 10, 2023 (such period, the "**Committee Challenge Period**") to investigate and challenge and otherwise object to the allowance of the Allowed Claim (defined below).    The Releases (included in this Final Order and which are included in the Loan Documents) are not a defense to a claim objection brought by the Committee during the Committee Challenge Period.    White Winston shall have until March 9, 2023 (such period, "**White Winston Challenge Period,**" and together with the Committee

Challenge Period, the "**Challenge Periods**") to investigate, challenge and otherwise object to the allowance of the Allowed Claim (other than challenges and objections based upon the Debtor's or the Estate's claims). If an objection to the Prepetition Secured Parties' prepetition claim is timely filed during the required Challenge Period in the Bankruptcy Court, then: (i) the Prepetition Secured Parties' prepetition claim shall not be deemed an "allowed claim" to the extent objected to in such objection absent the Prepetition Collateral Agent (as defined in the Loan Documents) obtaining a further order of the Bankruptcy Court, unless the objection is withdrawn; (ii) the Prepetition Collateral Agent shall not be entitled to the Prepetition Collateral Agent Credit Bid Obligations (as defined in the Loan Documents) unless the Prepetition Collateral Agent obtains a further order of the Bankruptcy Court, unless the objection is withdrawn; (iii) if a sale of Debtor's assets occurs before such claim objection is resolved, such sale proceeds will be held by the Estate to the extent of the objection unless the Prepetition Collateral Agent obtains a further order of the Bankruptcy Court, unless the objection is withdrawn; and (iv) the Releases (included in this Final Order and which are included in the Loan Documents) are not a defense to such claim objection brought by White Winston. The Prepetition Collateral Agent's rights to respond on behalf of Prepetition Collateral Agent and the Prepetition Secured Parties to any challenges raised by the Committee or White Winston (or any party) are preserved.

5.  **Committee Challenge Budget**. The Committee may use up to $50,000 of the fees and costs of the Committee in the Budget in connection with a Challenge.

6.  **Approval of the Roll-Up**. Pursuant to this Final Order, except to the extent successfully challenged in a challenge brought in the applicable Challenge Period, the Bankruptcy Court hereby approves the Roll-Up, which provides that for each dollar of principal amount drawn under the DIP Note Facility (excluding the DIP Inventory Acquisition Line of Credit), one dollar of principal due under the Prepetition Notes shall roll-up and convert on a cashless basis into the DIP Notes (the "**Roll-Up**"), provided further, however, to the extent the principal amount of the Allowed Claim is timely challenged during the applicable Challenge Period and such challenge is successful (meaning as determined by final order of the Bankruptcy Court) (such successfully challenged principal amount, the "**Disallowed Principal Amount**") such that the allowed principal

amount of the Allowed Claim ("**Allowed Principal Amount**") is less than the Roll-Up amount, then the Roll-Up amount shall be reduced to the Allowed Principal Amount.

7. **Approval of the Allowed Claim**. Pursuant to this Final Order, the (i) Lender shall have an allowed claim equal to the obligations under the DIP Facilities and post-petition attorneys' fees and expenses, and (ii) except to the extent successfully challenged in a challenge brought in the applicable Challenge Period, Prepetition Secured Parties shall have an allowed claim in an amount not less than $12.84 Million (the "**Allowed Claim**"), which is the principal amount of the Prepetition Notes, including the original issue discount. For the avoidance of doubt, the rights of the Debtor or Committee to object or otherwise contest the Prepetition Secured Parties' prepetition claims in excess of $12.84 Million is not limited by the Challenge Periods and are reserved.

8. **Credit Bidding**. The DIP Agent may submit a credit bid of the obligations under the DIP Facilities in connection with the sale of any asset of the Debtor (in whole or in part), including without limitation, sales occurring pursuant to Section 363 or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(ii)-(iii) ("**DIP Agent Credit Bid Obligations**"). Subject to the express limitations contained in Paragraph numbered 4 above in this Final Order, the Prepetition Collateral Agent may submit a credit bid of an amount not less than the Allowed Claim, or such greater amount as allowed by the Bankruptcy Court, in connection with the sale of any asset of the Debtor (in whole or in part), including without limitation, sales occurring pursuant to Section 363 or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(ii)-(iii) ("**Prepetition Collateral Agent Credit Bid Obligations**"). Any motion filed by the Debtor seeking approval of bid procedures shall contain (i) a request for approval of the right of the DIP Agent to credit bid the DIP Agent Credit Bid Obligations and (ii) unless a timely challenge made within the applicable Challenge Period is pending (and the Bankruptcy Court has not entered an order otherwise allowing the Prepetition Collateral Agent Credit Bid Obligations to be credit bid), a request for approval of the right of the Prepetition Collateral Agent to credit bid the Prepetition Collateral Agent Credit Bid Obligations.

9. **Approval of the Releases**. For good and valuable consideration, including

facilitation of the DIP Financing, the Note Parties' (as defined in the Loan Documents), on behalf of themselves, and Debtor, on behalf of the Estate (the **Estate** collectively with the Note Parties, "**Releasor**s"), hereby release any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or which could be asserted on behalf of the Releasors, whether known or unknown, foreseen or unforeseen, existing in law, equity or otherwise, that the Releasors would have been legally entitled to assert in their own right (whether individually or collectively), including claims based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Case restructuring, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Note Parties, the subject matter of, or the transactions or events giving rise to, any claim or equity security, or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtor, the Prepetition Notes or the Prepetition Liens (as defined in the Loan Documents), taking place on or before the entry of this Final Order against (i) the DIP Agent in its capacity as such, (ii) the DIP Note Purchasers in their capacities as such, (iii) the DIP Factoring Purchasers in their capacities as such,  (iv) except to the extent successfully challenged in a challenge brought in the applicable Challenge Period, the Prepetition Collateral Agent in its capacity as such, and (v) except to the extent successfully challenged in a challenge brought in the applicable Challenge Period, the Prepetition Purchasers (as defined in the Loan Documents) in their capacities as such (collectively, "**Releasees**"), and such Releases are hereby approved and effective upon entry of this Final Order. The Releases (which shall be included in the Loan Documents) are not a defense to an objection to the prepetition claims of the Prepetition Collateral Agent in its capacity as such and the Prepetition Purchasers in their capacity as such brought in the Bankruptcy Court (if such objection is brought during the applicable Challenge Period).  Any claims arising out of the breach of the Loan Documents by any party thereto are excluded from the releases provided in this paragraph, and, in the event of any such breach, the non-breaching party shall be entitled to pursue any and all rights, claims and damages that it may have against the other party as a result of such breach.

10. **Authorization to Borrow/Use of Cash Collateral**.  Pursuant to this Final Order, the Debtor is immediately authorized to (a) (i) borrow from the Lender up to an aggregate amount

of $4,500,000 (excluding the Roll-Up) under the DIP Note Facility and up to $1,000,000 under the DIP Inventory Acquisition Line of Credit, and (ii) factor DIP Accounts (as defined in the Loan Documents) up to $10,000,000 from the Lender under the DIP Factoring Facility, all subject to and in accordance with the terms of this Final Order and the Loan Documents, and (b) use the proceeds of the DIP Financing and the DIP Collateral (including the Cash Collateral) in accordance with the terms of the Loan Documents, this Final Order and the Budget.

11.    **DIP Inventory Acquisition Line of Credit.**  Pursuant to this Final Order, the Debtor is immediately authorized to borrow under the DIP Inventory Acquisition Line of Credit ("**DIP Inventory Acquisition Line of Credit**").  The DIP Inventory Acquisition Line of Credit is a $1.0 Million credit line under the DIP Note Facility available solely to fund Debtor's acquisition of inventory in accordance with the Budget on an as needed basis.  The amounts advanced under this inventory line of credit shall not be included for purposes of calculating the Roll-Up amount. The DIP Inventory Acquisition Line of Credit shall be a revolving facility.  To secure the payment and performance in full of the DIP Inventory Acquisition Line of Credit, and without limiting any other security interest granted herein, Debtor hereby grants to the DIP Note Agent, as collateral agent for the DIP Inventory Acquisition Line of Credit Purchasers, a continuing first priority security interest in, and pledge to, all DIP Inventory Acquisition Line of Credit Purchasers financed inventory ("**DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory**"), wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.  Debtor represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory (subject only to the lien priority set forth on **Exhibit B** attached hereto).  Upon payment in full of the DIP Inventory Acquisition Line of Credit (other than indemnification obligations for which no claim has been made) and at such time as DIP Inventory Acquisition Line of Credit Purchasers obligation to purchase DIP Notes under and fund the DIP Inventory Acquisition Line of Credit has terminated, DIP Note Agent shall release and terminate its liens and security interests in the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory.

12.     **Certain Rights Upon Liquidation of Inventory.**  In the event of a cessation of the Debtor's business whereby Debtor is no longer actively pursuing ongoing sales, DIP Note Agent, on behalf of the DIP Inventory Acquisition Line of Credit Purchasers, shall have the right, without further order of the Bankruptcy Court, after ten (10) days prior written notice to the Debtor and Committee (the "**DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Sale Notice Period**"), to sell the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory at a cost determined by DIP Note Agent in its sole discretion but in accordance with the requirements of Article 9 of the Uniform Commercial Code.  DIP Note Agent, on behalf of the DIP Inventory Acquisition Line of Credit Purchasers, shall have the right, without further order of the Bankruptcy Court, after providing written notice to the Debtor and the expiration of the applicable DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Sale Notice Period, to sell such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory pursuant to Article 9 of the Uniform Commercial Code.  DIP Note Agent may use the Debtor's brand name(s), trademark(s), or trade name(s) and the like, directly and only related to the liquidation of such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory unless, within such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Sale Notice Period, the Debtor notifies the DIP Note Agent in writing that the Debtor will pay off and satisfy in full the outstanding principal balance, together with all accrued and unpaid interest thereon, of the DIP Inventory Acquisition Line of Credit (the "**Borrower DIP Inventory Acquisition Line of Credit Payoff Notice**").  Debtor shall pay as the DIP Note Agent directs the outstanding principal balance of the DIP Inventory Acquisition Line of Credit, together with all accrued and unpaid interest thereon, within five (5) Business Days after delivery of the Borrower DIP Inventory Acquisition Line of Credit Payoff Notice.  If Debtor fails to make such payment, the DIP Note Agent, on behalf of the DIP Inventory Acquisition Line of Credit Purchasers, may proceed to sell such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory pursuant to Article 9 of the Uniform Commercial Code.

13.     **Use of Cash Collateral**.  The Debtor may use the Cash Collateral to pay postpetition ordinary course of business expenses to the extent allowed and permitted to be paid herein, by other

14

Bankruptcy Court order or pursuant to the Bankruptcy Code, and in accordance with, the Budget, subject to: (i) the rights of the Lender and Prestige upon the occurrence of an Event of Default (as defined in the Loan Documents); and (ii) the rights of the Lender and Prestige otherwise available to the Lender and Prestige under this Final Order and the Bankruptcy Code.  The Debtor will not, without the prior written consent of Lender, engage in the use of the Cash Collateral of the Lender other than to pay ordinary and necessary business and administrative expenses as set forth in, and limited by, the Budget and consistent with this Final Order or other order of the Bankruptcy Court. The priority of Lender and Prestige's liens in Cash Collateral is set forth in **Exhibit B** hereto, and any diminution in value of any prepetition collateral, including Cash Collateral of the Prepetition Secured Parties and Prestige shall by secured by postpetition replacement liens under Section 552 of the Bankruptcy Code, with such liens not being subject to the "equities of the case" limitations.

14.     **Maturity and Termination.**  The maturity date of the DIP Financing shall be the earliest of (a) December 31, 2023, (b) the date all DIP Notes become due and payable under the Loan Documents, whether by acceleration after an Event of Default or otherwise, (c) the date of the closing of a Sale Transaction (as defined in the Loan Documents) or any other sale(s) of all or substantially all of the Debtor's assets, including pursuant to Section 363 of the Bankruptcy Code, and (d) the filing of a Chapter 11 plan that is not an Acceptable Plan (as defined in the Loan Documents) (the "**Maturity Date**").  Debtor's authority to use the DIP Financing or any DIP Collateral, including Cash Collateral, and the Lender's commitment to make additional advances under the DIP Financing, shall each terminate upon five (5) days after the date the Lender delivers a written notice of Event of Default to the Debtor, and the U.S. Trustee, unless any such event is waived, cured or extended with the written consent of the Lender.

15.     **Interest on DIP Financing**.  The rate of interest to be charged on advances under the DIP Financing shall be: (i) the prime rate as set in the Wall Street Journal as of the date of the entry of this Final Order, plus two percent (2%) for the DIP Note Facility; (ii) the prime rate as set in the Wall Street Journal as of the date of the entry of this Final Order, plus two percent (2%) for the DIP Factoring Facility; and (iii) the prime rate as set in the Wall Street Journal as of the date of the entry of this Final Order, plus two percent (2%) for the DIP Inventory Acquisition Line of

Credit.

16.    **Payment of DIP Fees and Expenses**.  The Debtor is authorized to pay all costs, expenses and any other fees or other amounts payable under the terms of the Loan Documents and all other reasonable, documented, out-of-pocket costs and expenses of the Lender in accordance with the terms of the Loan Documents (including, without limitation, the costs and expenses of legal counsel).  None of such fees, costs and expenses shall be subject to Bankruptcy Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Bankruptcy Court.  Copies of the first page of invoices (in summary form and redacted, as necessary, for privileged, confidential or otherwise sensitive information) with respect to such fees, expenses and costs shall be provided to the U.S. Trustee, counsel for the Debtor, and counsel to the Committee, and each such party shall have ten (10) days from the date of such notice within which to object in writing to such payment.

17.    **Validity of Loan Documents**.  The Loan Documents have been properly authorized and entered into by Debtor and the other Note Parties, and as may be modified shall constitute, and are hereby deemed on a final basis to be, the legal, valid and binding obligations of the Debtor and the other Note Parties, enforceable against the Debtor and the other Note Parties in accordance with the terms of the Loan Documents for all purposes: (i) during this Chapter 11 Case; (ii) in any subsequently converted Chapter 11 Case of the Debtor under chapter 7 of the Bankruptcy Code; and (iii) after dismissal of this Chapter 11 Case.  None of the legality, validity, perfection, priority, extent or enforceability of the DIP Obligations, the DIP Liens or the Loan Documents shall be subject to any challenge, including, without limitation, an effort to equitably subordinate or avoid the DIP Liens, by or on behalf of any Debtor or the Estate, any other Note Party, or any party in interest in any proceeding, whether in Bankruptcy Court, federal court, state court, or any other proceeding. Proceeds of the DIP Financing and the Cash Collateral shall be applied only to fund allowed postpetition administrative expenses, the Debtor's working capital, and such other amounts as are required or permitted to be paid pursuant to the Loan Documents, this Final Order and any other orders of this Court, all subject to, limited by, and in accordance with, the Budget.  No obligation, payment, transfer or grant of security under the Loan Documents or this Final Order

shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.  The rights to invoke the "equities of the case" exception to Section 552(b) of the Bankruptcy Code, the right to surcharge the DIP Collateral and the Prepetition Secured Parties and the collateral securing the Prepetition Notes, including under Section 506(c) of the Bankruptcy Code and the right to invoke the equitable doctrine of "marshaling" with respect to the DIP Collateral and the collateral securing the Prepetition Notes has been waived and challenges proscribed by this paragraph include any challenge to such waivers.

18.    **Superpriority Claim**.  In accordance with Section 364(c)(1), and subject to the Carve-Out, the Lender shall have a superpriority administrative expense claim under Section 364(c)(1)  (the "**Superpriority Claim**") for the DIP Obligations against the Debtor, with priority as set forth on Exhibit B hereto in payment over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, any and all administrative expenses or other claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including pursuant to Sections 105, 326, 328, 330, 331, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or otherwise, including those resulting from the conversion of this case pursuant to Section 1112, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided however, for purposes of Section 1129(a)(9)(A), the Superpriority Claim shall be considered an administrative expense allowed under Section 503(b) against the Debtor, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtor.  Except as set forth in this Final Order, no other superpriority claims shall be granted or allowed in the Chapter 11 Case.

19.    **DIP Collateral**.  As security for all DIP Obligations pursuant to this Final Order, the Lender is hereby granted (without the necessity of the execution by the Debtor or the filing or recordation of liens, security agreements, lock box or control agreements, financing statements, or any other instruments or otherwise), the DIP Liens, priority of which is set forth on Exhibit B hereto, on all present and after acquired property (whether tangible, intangible, real, personal or

17

mixed) of the Note Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of the Note Parties, including, for the avoidance of doubt, any equity or other interests in the Note Parties' non-Debtor and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, including all causes of action under Section 541 of the Bankruptcy Code (including commercial tort claims), and all additional and accessions thereto and all substitutions and replacements thereof, and all products, accounts and proceeds thereof, including without limitation, all proceeds and accounts from the sale or transfer of the DIP Collateral and of insurance covering the same and of any tort claims in connection therewith, excluding any causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 or 553, including the proceeds thereof (collectively, the "**DIP Collateral**").  All of the DIP Liens shall be created on terms, and pursuant to documentation, satisfactory to the DIP Agent, in its sole discretion.  Proceeds of the DIP Collateral constituting Section 541 causes of action owned by Debtor shall be used to the extent necessary to (i) satisfy the Bankruptcy Court approved, reasonable and documented fees and costs of professionals employed by Debtor and the Committee, respectively, not to exceed the amounts of such professionals, respectively, set forth in the budget, to the extent not otherwise satisfied by the Carve-Out and (ii) any unpaid portion of the DIP Facilities, including the DIP Inventory Acquisition Line of Credit and DIP Factoring Facility, with the balance being paid to the Estate.  The DIP Liens will not be subject to challenge.  Upon entry of this Final Order, the DIP Liens shall be deemed to be automatically perfected as of the Petition Date, without the need for further action of any kind; provided however, that if the Lender determines, in its sole discretion, to file any financing statements, notice of liens, mortgages or any other similar instruments, the Debtor will cooperate and assist in such filings and the automatic stay shall be lifted without the need for further order of this Bankruptcy Court to allow such filings.

20.    **Rights of Prestige**. The liens granted postpetition by the Debtor to Lender and the Prepetition Secured Parties pursuant to this Final Order shall not impair nor have any priority over, and are subject to, the prepetition liens of Prestige that are senior to those prepetition liens of Lender and the Prepetition Secured Parties pursuant to the Prestige Intercreditor Agreement.  To the extent

this Final Order grants any other rights postpetition to Lender (including but not limited to the superpriority administrative expense status), those rights shall not impair nor have any priority over, and are subject to, the prepetition liens of Prestige.  Notwithstanding anything contained in this Order, as additional adequate protection, (i) the automatic stay of Section 362(a) is modified under Section 362(d)(1) to allow Prestige to collect, and apply in partial satisfaction of its prepetition claims, Debtor's prepetition Factored Accounts and any other Prepetition Accounts (as those terms are defined in the Prestige Intercreditor Agreement) from the non-debtor obligors on such Factored Accounts and any other Prepetition Accounts subject to Section 552(a), and apply any reserves in partial satisfaction of it prepetition claims, and (ii) Prestige shall be entitled to reasonable and documented postpetition fees (including attorneys fees) and out-of-pocket expenses as part of its claim in accordance with its loan documents and payable subject to the value of the related collateral.

21.    **Carve Out**.  The DIP Liens and Superpriority Claim granted under this Final Order shall be subject to the prior payment of the (collectively, the "**Carve Out**") of up to $250,000 for unpaid reasonable and documented (and approved on a final basis by the Bankruptcy Court when approval is necessary) postpetition fees and expenses incurred by professionals employed by Debtor and by the Committee, respectively, but in no event shall such carve-out exceed the unpaid Budget amounts (on a line by line basis) for the Debtor's and the Committee's professionals, respectively, prorated up to the date in the Budget coinciding with an Event of Default.  In the absence of a Sale Transaction Notice (as defined in the Loan Documents), there shall be a separate, post Event of Default carve-out, of $125,000 for Debtor's professionals and $65,000 for the Committee's professionals for post Event of Default unpaid, reasonable, and documented fees and expenses (approved on a final basis by the Bankruptcy Court when approval is necessary).  In the event of a Sale Transaction Notice, the aggregate amount of any unpaid fees, costs and expenses, incurred after the delivery of a Sale Transaction Notice, will be paid when allowed and the Sale Transaction is completed from the $190,000 in funds expressly earmarked to fund professional fees and costs in connection with a Sale Transaction.

22.    **Restrictions on Granting Postpetition Liens**.  Except as otherwise provided in this

Final Order and the Loan Documents, no claim having a priority superior or *pari passu* with those granted by the Interim Orders and this Final Order to the Lender shall be granted or permitted without further order of this Bankruptcy Court entered in the Chapter 11 Case, while any portion of the DIP Financing (or refinancing thereof) or any other DIP Obligations are outstanding without the prior written consent of the Lender.  Except as expressly permitted by the Final Order and the Loan Documents, the Debtor will not, at any time during the Chapter 11 Case, grant liens or security interests in the DIP Collateral to any other parties pursuant to Section 364 of the Bankruptcy Code or otherwise without either (i) first obtaining the prior written consent of the Lender or (ii) irrevocably satisfying the DIP Obligations in full in immediately available funds as a condition to the granting of such liens.  Unless all DIP Obligations shall have indefeasibly been paid in full in immediately available funds (or as otherwise provided in this Final Order and the Loan Documents), it shall constitute an Event of Default and terminate the right of the Debtor to use the DIP Financing and Cash Collateral, if the Debtor seeks, or if there is entered, any modification or extension of this Final Order, without the prior written consent of the Lender.

23.    **Automatic Effectiveness of Liens**.  The DIP Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtor or Lender without the necessity of execution by the Debtor, or the filing or recordation, of any financing statements, security agreements, or other documents or the taking of any other actions.  The DIP Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the Loan Documents and this Final Order for so long as any portion of the DIP Financing (or refinancing thereof) is outstanding.  The Debtor is hereby authorized and directed to execute and deliver to the Lender such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents as the Lender requests, and the Lender is hereby authorized to file or record such documents in their respective discretion without seeking modification of the automatic stay under Section 362, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of the Final Order.

24.    **Automatic Stay and Remedies**.  As provided herein, subject only to the provisions

of the Loan Documents, the provisions of Section 362 are vacated and modified to the extent necessary to permit the Lender, following an Event of Default and during the continuance of any Event of Default thereafter, all rights and remedies provided for in the Loan Documents and this Final Order without further order of this Bankruptcy Court.

25.    **Board of Directors; Independent Director**.  In accordance with the Term Sheet and Loan Documents, the Bankruptcy Court approves on a final basis the appointment of Eric Hillman, Paul Karr, and the independent board member, Nicholas Rubin, to comprise Debtor's three (3) member board of directors.  The independent director, Nicholas Rubin (the "**Independent Director**"), is approved on a final basis and shall have sole and exclusive responsibility with respect to the Debtor for: (i) protecting and recovering the assets of the Debtor, including to determine whether it is in the best interest of the Debtor to reorganize under Section 1129 of the Bankruptcy Code, or sell its assets in accordance with Section 363 of the Bankruptcy Code; (ii) reviewing and approving the ultimate debtor-in-possession financing incurred by the Estate, as negotiated by the Debtor's restructuring professionals; (iii) the investigation and determination of which Estate causes of action, if any, should be pursued, prosecuted, or settled; and (iv) the maximization of value for all stakeholders.

26.    **Consent to Limited Inventory Financing by JW Nutritional LLC**.  Unsecured creditor and inventory supplier JW Nutritional LLC ("**JW**") shall have the right to, at its own cost and expense, after the entry of the Final Order, create inventory for the Debtor's business, operations and sale, which inventory shall be held and deemed owned by JW until purchased by Debtor (the "**JW Financed Inventory**").  In the event of a cessation of the Debtor's business whereby Debtor is no longer actively pursuing ongoing sales, JW shall have the right, without further order of the Bankruptcy Court, after ten (10) days prior written notice to the Debtor, Committee and DIP Note Agent (the "**JW Financed Inventory Sale Notice Period**"), to sell the JW Financed Inventory pursuant to Section 2(c)(iii) of the DIP Note Agreement unless, within the JW Financed Inventory Sale Notice Period, Debtor or the DIP Note Agent notifies JW in writing that Debtor or the DIP Note Purchasers will purchase such inventory at the JW Financed Inventory Cost (defined below).  For JW Financed Inventory that was produced by JW at the request of the

Debtor that has been held by JW in excess of four (4) months, JW shall have the right, without further order of the Bankruptcy Court, after providing written notice to the Debtor and the DIP Note Agent and the expiration of the applicable JW Financed Inventory Sale Notice Period, to sell such JW Financed Inventory pursuant to Section 2(c)(iii) of the DIP Note Agreement unless, within the JW Financed Inventory Sale Notice Period, Debtor or the DIP Note Agent notifies JW in writing that Debtor or the DIP Note Purchasers will purchase such inventory at the JW Financed Inventory Cost.  JW may use the Debtor's brand name(s), trademark(s), or trade name(s) and the like, directly and only related to the liquidation of such JW Financed Inventory pursuant to Section 2(c)(iii) of the DIP Note Agreement.  For purposes of this Final Order, the term "**JW Financed Inventory Cost**" shall mean JW's fully loaded cost, including cost of storing product, based on the current pricing to the Borrower as of the most recent quarterly quoted price between JW and the Debtor. In the event of a Sale Transaction, the purchaser shall either (1) buy the JW Financed Inventory from JW at the JW Financed Inventory Cost, or (2) allow JW to sell the JW Financed Inventory on the terms set forth in Section 2(c)(iii) of the DIP Note Agreement.

27.    **Indemnification**.  The "Expense and Indemnification" provisions set forth in the Loan Documents are approved, provided however, such indemnification shall exclude out-of-pocket costs and expenses (including but not limited to reasonable and documented legal fees and expenses) arising out of post-petition litigation between the DIP Agent, on the one hand, and White Winston and/or Ryan Drexler, on the other hand, regarding the Prepetition Notes (as defined in the Loan Documents) or claims between those parties, including any claims that may be prosecuted in the Chapter 11 Case, that are not Debtor or Estate claims. For the avoidance of doubt, the excluded out-of-pocket costs and expenses are intended to be inclusive of discovery concerning claims related to the Prepetition Notes of the DIP Agent, on the one hand, and White Winston and/or Ryan Drexler, on the other hand, conducted by 2004 examination,

28.    **Factoring and Other Reporting.**  Debtor, or another party designated by Debtor and the DIP Factoring Agent, shall provide a weekly factoring report to the DIP Agents and the Committee identifying each DIP account ("**DIP Account**") purchased, the purchase amount of such DIP Account, the date the DIP Account is due and the days overdue of any overdue DIP Account,

the amount of the DIP Account due, and any payments received.  The DIP Agents shall confirm whether or not DIP Agents agree with the information in each weekly factoring report.  Further, the Debtor shall deliver to the DIP Note Agent and the Committee copies of all non-privileged reports of the financial and restructuring advisors of the Debtor as reasonably requested by the DIP Note Agent, including but not limited to: (i) any analysis of cash flows, forecasts, and potential cost savings initiatives; (ii) transaction marketing material (CIMs / MPs); (iii) investor outreach list; (iv) sale process updates; and (v) proposed sources and uses of funds at emergence from bankruptcy.

29.    **Forensic Accountant**.  At the request of the DIP Agent and approval of the Board of Directors, the Debtor shall retain a forensic accountant reasonably acceptable to the DIP Agent (the "**Forensic Accountant**") to review and analyze all Debtor's bank statements for three (3) or more years prior to the Petition Date and any other documents and information necessary to investigate payments and transfers from Debtor to determine whether they are avoidable under federal and state law.  The DIP Agent will increase the DIP Facility in the amount necessary to pay for the forensic accounting in an amount agreed to be the DIP Agent and the Debtor.

30.    **No Creation or Evidence of Liability to Third Parties or Alter Ego Relationship**.  The Lender shall not be found or deemed to be an alter ego of any of the Debtor, in a partnership of any kind with any of the Debtor, in a principal-agent relationship with the Debtor or otherwise liable for any liabilities of any of the Debtor, and the Debtor shall not be found or deemed to be a mere instrumentality of the Lender as a result of the Lender deciding to advance the DIP Financing to the Debtor, negotiating and entering into the Loan Documents and this Final Order, administering the DIP Financing, consenting to the Budget, or taking any other actions permitted by the Final Order or the Loan Documents, and no such action (or conduct taken in furtherance of or comprising an integral part of any such action) shall be admissible in any proceeding as evidence that the Lender is the alter ego, partner, principal of, or otherwise liable for any liability of the Debtor.

31.    **Binding Effect**.  The provisions of this Final Order shall be binding upon and inure to the benefit of the Lender, the Debtor, and all parties in interest, and their respective successors and assigns (including any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected, an

examiner appointed pursuant to Section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the Estate).  To the extent permitted by applicable law, this Final Order shall bind any trustee hereafter appointed for the Estate, whether in this Chapter 11 Case or in the event of the conversion to a liquidation under Chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Final Order.

32.    **Survival**.  The provisions of this Final Order and any actions taken pursuant hereto shall survive the entry of any order, including an order: (a) confirming any plan of reorganization or liquidation in this Chapter 11 Case (and, to the extent not irrevocably satisfied in full in immediately available funds, the DIP Obligations shall not be discharged by the entry of any such order pursuant to Section 1141(d)(4) of the Bankruptcy Code, or otherwise); (b) converting the Chapter 11 Case to a Chapter 7 case; or (c) dismissing the Chapter 11 Case.  The terms and provisions of this Final Order, as well as the DIP Obligations and the DIP Liens granted pursuant to this Final Order and the Loan Documents shall continue in full force and effect notwithstanding the entry of any such order.  The DIP Obligations and the DIP Liens shall maintain their priority as provided by this Final Order and the Loan Documents and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full and discharged.  In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the Loan Documents without the written consent of the Lender.  Unless all DIP Obligations shall have indefeasibly been paid in full, it shall constitute an Event of Default and terminate the right of the Debtor to use Cash Collateral under this Final Order if Debtor seeks, or if there is entered, (x) any modification or extension of this Final Order without the prior written consent of the Lender, or (y) an order converting or dismissing the Chapter 11 Case.

33.    **Non-Material Modifications of the Loan Documents.**  The Debtor and the Lender are hereby authorized to implement, in accordance with the terms of the Loan Documents and this Final Order, any non-material modifications of the Loan Documents without further order of this Bankruptcy Court; *provided* that the Debtor shall provide notice of any such modifications to counsel for the Committee and the U.S. Trustee.

34.    **Protection Under Section 364(e)**.  If any or all of the provisions of this Final Order

are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the (i) validity of any DIP Obligations owing to the Lender incurred prior to the actual receipt by both Lender of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the Loan Documents with respect to any DIP Obligations.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations by the Debtor prior to the actual receipt by both Lender of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Final Order, and the Loan Documents and any paperwork issued pursuant to and in conformance therewith, and the Lender shall be entitled to all of the rights, remedies, protections and benefits granted under Section 364(e) of the Bankruptcy Code, this Final Order  and the Loan Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations.

35.    **Choice of Law; Jurisdiction; Standing**.  The DIP Financing and the Loan Documents and any paperwork issued pursuant to and in conformance therewith, (and the rights and obligations of the parties thereto) shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to the conflict of law principles thereof. Each party to the Loan Documents will waive the rights to trial by jury and will consent to jurisdiction of the Bankruptcy Court for so long as the Chapter 11 Case remains open and, thereafter, the state and federal courts set forth in the Loan Documents executed between and among the parties.  The Lender shall have standing, as a party-in-interest under Section 1109(b) of the Bankruptcy Code, to raise and appear and be heard on any issue in the Chapter 11 Case.

36.    **Findings of Fact and Conclusions of Law**.  This Final Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the entry thereof.  Findings of fact shall be construed as conclusions of law, and conclusions of law be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

37.    **Final Order Effective**.    This Final Order shall take effect immediately notwithstanding anything to the contrary prescribed by applicable law.

25

38.    **Final Order Controlling; Failure to Specify Provisions**.  In the event of a material conflict between this Final Order and the Loan Documents, the Final Order shall control, provided that there shall not be deemed a material conflict as a result of the Loan Documents including additional terms and provisions from this Final Order, and the failure specifically to include any particular provisions of the Loan Documents in this Final Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court, and the Debtor and the Lender, that this Final Order and the Loan Documents be read together and consistent with one another, and that any paperwork issued pursuant to and in conformance therewith, are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Final Order.

39.    **Interim Orders Superseded by this Final Order; Exceptions**.  Except to the extent that that any of the Lender's and the DIP Agent's rights, remedies, claims, security interests and priorities granted by the Bankruptcy Court during the period from the Petition Date to the entry of this Final Order would be diminished in any way, the Interim Orders are superseded by this Final Order.

40.    **Retention of Jurisdiction**.  The Bankruptcy Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Final Order.

**IT IS SO ORDERED.**

[Counsel Signatures on Following Page]

1    Submitted by:

2    SCHWARTZ LAW, PLLC

PACHULSKI STANG ZIEHL & JONES
LLP
3    By: /s/

4    Samuel A. Schwartz, Esq.                        By: /s/
601 East Bridger Avenue                          John Fiero, Esq.
5    Las Vegas, NV 89101                             Jason Rosell, Esq.
*Attorneys for the Debtor*                       Attorneys for the Official Committee
6                                                    of Unsecured Creditors

7    Approved/Disapproved:                          Approved/Disapproved:

8    TRACY HOPE DAVIS                               MANDELBAUM BARRETT PC
UNITED STATES TRUSTEE
9                                                    By: /s/
10   By: /s/                                        Vincent Roldan, Esq.
Jared A. Day, Esq.                              Attorneys for Prestige Capital Finance, LLC
11   United States Department of Justice
Attorney for the United States Trustee

12

13   Approved/Disapproved:                          Approved/Disapproved:

14   GARMAN TURNER GORDON                           JEFFREY D. STERNKLAR LLC

15   By: /s/                                        By: /s/
Gregory Garman, Esq.                            Jeffrey D. Sternklar, Esq.
16   William Noall, Esq.                            Attorneys for White Winston Select
Mark M. Weisenmiller, Esq.                      Asset Funds, LLC
17   Attorneys for Empery Tax Efficient, L.P.

18

19

20

21

22

23

24

25

26

27

28

27

## **LR 9021 CERTIFICATION**

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that:

☐    The court has waived the requirement set forth in LR 9021(b)(1).

☐    No party appeared at the hearing or filed an objection to the motion.

☒    I have delivered a copy of this proposed order to all counsel and any unrepresented parties who appeared at the hearing, except those as to whom review was waived on the record at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated above:

☐    I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of this order.

*###*

# EXHIBIT A

# EXHIBIT A



# Full Year Cash Forecast

| Month | January | February | March | April | May | June | July | August | September | October | November | December | ROY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Factored Receipts¹ | 488,143 | 925,488 | 375,548 | 298,998 | 728,853 | 627,348 | 966,643 | 1,182,558 | 1,360,663 | 1,512,400 | 1,843,238 | 1,625,333 | 11,933,208 |
| Other Receipts | (680) | | | | | | | | | | | | (680) |
| **Total Receipts** | 487,463 | 925,488 | 375,548 | 298,998 | 728,853 | 627,348 | 966,643 | 1,182,558 | 1,360,663 | 1,512,400 | 1,843,238 | 1,625,333 | 11,932,528 |
| COGS | 5,840 | 1,205,633 | 238,000 | 252,000 | 574,000 | 476,000 | 735,000 | 875,000 | 1,015,000 | 1,155,000 | 1,296,000 | 1,148,000 | 8,974,473 |
| Inventory Build | | | | | | | 50,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 1,050,000 |
| **Total COGS²** | 5,840 | 1,205,633 | 238,000 | 252,000 | 574,000 | 476,000 | 785,000 | 1,075,000 | 1,215,000 | 1,355,000 | 1,496,000 | 1,348,000 | 10,024,473 |
| Shipping & Logistics³ | 49,060 | 103,658 | 34,000 | 36,000 | 82,000 | 68,000 | 105,000 | 125,000 | 145,000 | 165,000 | 185,000 | 194,000 | 1,261,717 |
| **Total COGS Including Shipping, Labeling and Testing** | 54,900 | 1,309,291 | 272,000 | 288,000 | 656,000 | 544,000 | 890,000 | 1,200,000 | 1,360,000 | 1,520,000 | 1,680,000 | 1,512,000 | 11,286,191 |
| **SG&A** | | | | | | | | | | | | | |
| Payroll & Benefits⁴ | 119,178 | 165,996 | 120,850 | 105,900 | 126,500 | 95,250 | 110,875 | 126,500 | 95,250 | 110,875 | 126,500 | 95,250 | 1,398,894 |
| Insurance⁵ | 80,592 | 113,300 | 19,800 | 39,600 | | 10,000 | 10,500 | 13,000 | 57,766 | 19,800 | 19,800 | 19,800 | 370,457 |
| General & Administrative⁶ | 24,499 | 33,682 | 22,500 | 89,000 | 13,000 | | 10,500 | | 10,000 | 85,500 | 13,000 | 10,000 | 334,681 |
| Securities Counsel⁷ | | 25,000 | | | | 25,000 | | | | | | | 50,000 |
| Labeling & Testing Costs⁸ | 10,000 | 10,000 | 20,000 | | 20,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Board Fees⁹ | | 68,750 | 70,500 | | 70,500 | 35,250 | 35,250 | 70,500 | 35,250 | 35,250 | 70,500 | | 421,250 |
| eCommerce¹⁰ | 9,561 | 10,126 | 20,252 | | 20,252 | 10,126 | 10,126 | 20,252 | 110,292 | 10,126 | 20,252 | | 120,947 |
| Marketing¹¹ | 20,000 | 10,000 | 20,000 | 10,000 | 20,000 | 10,000 | 10,000 | 20,000 | 10,000 | 10,000 | 20,000 | 10,000 | 140,000 |
| Avalara¹² | | 1,115 | 5,670 | | 2,230 | | 1,115 | 2,230 | | 1,115 | 2,230 | | 15,606 |
| **Total SG&A** | 263,829 | 437,939 | 299,472 | 244,500 | 272,482 | 105,250 | 212,866 | 262,482 | 173,016 | 282,666 | 282,282 | 135,050 | 2,971,835 |
| Net Operating Cash Flow | 168,733 | (822,742) | (195,925) | (233,503) | (202,630) | (21,902) | (156,224) | (279,925) | (172,353) | (290,266) | (119,045) | (21,718) | (2,325,497) |
| Cumulative Net Operating Cash Flow | 168,733 | (652,009) | (847,934) | (1,081,436) | (1,284,066) | (1,305,968) | (1,462,192) | (1,722,116) | (1,894,469) | (2,184,735) | (2,303,780) | (2,325,497) | (2,325,497) |
| **Restructuring Costs** | | | | | | | | | | | | | |
| **Company Advisors¹⁴** | | | | | | | | | | | | | |
| Schwarz Law | | 223,000 | 160,000 | 109,200 | 173,000 | 62,400 | 68,640 | 74,880 | 157,560 | 93,600 | 93,600 | 280,020 | 1,492,900 |
| Portage Point | | 120,000 | 72,000 | 40,000 | 88,000 | 40,000 | 40,000 | 80,000 | 80,000 | 40,000 | 40,000 | 140,000 | 740,000 |
| Claims Agent | | 13,000 | 16,000 | 16,000 | 24,000 | 16,000 | 16,000 | 16,000 | 32,000 | 16,000 | 16,000 | 56,000 | 240,000 |
| **Unsecured Creditor Advisors¹⁶** | | | | | | | | | | | | | |
| UCC Counsel (Includes Local)¹⁶ | | 165,000 | 120,000 | 76,440 | 125,850 | 43,680 | 48,048 | 52,416 | 110,292 | 65,520 | 65,520 | 196,014 | 1,068,780 |
| Creditor Financial Advisor | | | | | | | | | | | | | |
| **Total Professional Fees¹⁵** | | 521,000 | 368,000 | 241,640 | 410,850 | 162,080 | 172,688 | 183,296 | 379,852 | 215,120 | 215,120 | 672,034 | 3,541,680 |
| **Other Restructuring Costs** | | | | | | | | | | | | | |
| Filing Fees | | | | 25,832 | | | 22,796 | | | 50,496 | | 33,180 | 132,304 |
| Trustee Fees¹⁸ | | | | | | | | | | | | | |
| Investigation Costs | | | | | | | | | | | | | |
| Critical Vendors | | | | | | | | | | | | | |
| Utilities Adequate Assurance | | | | | | | | | | | | | |
| **Total Restructuring Costs** | | 521,000 | 368,000 | 267,472 | 410,850 | 162,080 | 195,484 | 183,296 | 379,852 | 265,616 | 265,616 | 705,214 | 3,673,984 |
| Net Cash Flow after Restructuring Costs | 168,733 | (1,341,742) | (563,925) | (500,974) | (613,480) | (183,983) | (351,709) | (463,221) | (552,205) | (555,386) | (384,660) | (726,931) | (5,999,481) |
| Cumulative Net Cash Flow after Restructuring Costs | 168,733 | (1,173,009) | (1,736,934) | (2,237,908) | (2,851,387) | (3,035,370) | (3,387,078) | (3,830,298) | (4,382,503) | (4,887,889) | (5,272,550) | (5,999,481) | (5,999,481) |
| **Financing¹⁹** | | | | | | | | | | | | | |
| DIP Lender Advance | 750,000 | 1,750,000 | | | | | | | | | | | 3,500,000 |
| Interest Expense | | 608 | 12,249 | | 5,383 | 5,700 | 10,282 | 13,458 | 16,625 | 16,467 | 27,867 | 26,917 | 135,565 |
| **Total Cash Flow** | 918,733 | 407,650 | (576,173) | (500,974) | (618,863) | (189,683) | (292,000) | (276,679) | (368,830) | (321,853) | (212,527) | (603,848) | (2,635,046) |
| Cumulative Total Cash Flow | 918,733 | 1,326,383 | 750,209 | 249,235 | (369,628) | (559,312) | (841,311) | (1,117,989) | (1,486,819) | (1,808,673) | (2,020,695) | (2,635,046) | (2,635,046) |
| Starting Cash²⁰ | 10,903 | 929,237 | 1,336,886 | 760,713 | 259,739 | (359,124) | (548,807) | (840,806) | (1,117,485) | (1,486,315) | (1,808,168) | (2,020,695) | 10,903 |
| Change in Cash | 918,733 | 407,650 | (576,173) | (500,974) | (618,863) | (189,683) | (292,000) | (276,679) | (368,830) | (321,853) | (212,527) | (603,848) | (2,635,046) |
| **Ending Cash** | 929,237 | 1,336,886 | 760,713 | 259,739 | (359,124) | (548,807) | (840,806) | (1,117,485) | (1,486,315) | (1,808,168) | (2,020,695) | (2,624,543) | (2,624,543) |

NOTE: Figures shown represent latest estimates and information provided by the Company

1. Accounts receivable assumes $1.51 million of accounts purchased are advanced at 80% with remaining balance advanced at 80% upon generation of the receivable and the remaining 20% when collected. Excludes inflows from Costco and other outstanding currently outstanding AR
2. COGS assumed to be paid out in same week shipment is made per Company estimates and is in line with existing JV Nutritional 48 hour terms
3. Estimate of 10% of total sales based on ship date
4. Inclusive of payroll funding and associated costs, 401k contributions and health insurance
5. Includes D&O and GL insurance payments with Company provided estimates along with contemplated new D&O policy for incoming directors and officers in the week ending 2/19/23
6. Estimate included for general operating expenses
7. Estimated ordinary course securities counsel expenditures for SEC related requirements
8. Estimates provided by management, assumes $10,000 in each week is shipment occurs for potential future needs
9. Payment for existing and new member board fees, weeks ending 2/5/23 and 2/19/23 contemplate catch up payments for partial December and January, as appropriate, plus February fees. Monthly fees to be paid in advance at the beginning of each month
10. Includes Nova, Shopify and Hubmetrix, all of which are service providers supporting eCommerce capabilities
11. Marketing spend included to support eCommerce and online order efforts for non-wholesale customers
12. Avalara provides state filing tax tracking, reporting and payment support. Estimates included monthly filing fees and estimated taxes
13. Forecast excludes audit, tax and SEC filing fees that may be required and are assumed to be paid outside of the forecast period, if necessary
14. Does not constitute agreed fee structure between company and it's professionals and requires board approval for amounts in excess of DIP term sheet
15. All lender advisor fees assumed to be accrued to lender claims and not paid through DIP funding
16. UCC fees inclusive of local counsel and assumed to be 75% of Company counsel fees
17. Unless otherwise noted, restructuring costs based on estimates provided by professionals or based on experience in prior restructuring scenarios
18. Based on total forecasted disbursements and applies the latest US Trustee fee tables
19. Advances, interest and financing costs all based on latest term sheet received from potential DIP lender
20. Starting cash excludes minimal cash that may be in debtors accounts and is subject to reconciliation

CONFIDENTIAL || DRAFT – SUBJECT TO MATERIAL CHANGE

# EXHIBIT B

# EXHIBIT B

## **EXHIBIT B**

| Order of Priority | DIP Collateral Consisting of Pre-Petition Factoring Priority Collateral[4] | DIP Collateral Consisting of Post-Petition Factored Accounts | DIP Collateral Consisting of Post-Petition DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory[5] | DIP Collateral Not Consisting of Factored Accounts or DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory | Third-Party Encumbered Assets[6] | Unencumbered Assets | Superpriority Claims |
|---|---|---|---|---|---|---|---|
| 1st | Carve-Out and Permitted Liens[7] | Carve-Out and Permitted Liens | DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens | Carve-Out and Permitted Liens | Third-Party Existing Liens | Carve-Out | Carve-Out and Permitted Liens |
| 2nd | Prestige Liens[8] | DIP Factoring Liens | Carve-Out and Permitted Liens | DIP Note Liens and Prepetition Notes Adequate Protection Liens | Carve-Out | DIP Note Liens, DIP Factoring Liens, DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens, and Prepetition Notes Adequate Protection Liens | DIP Notes Superpriority Claim and DIP Factoring Superpriority Claim, DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Superpriority Claim |
| 3rd | DIP Note Liens, DIP Factoring Liens, DIP Inventory Acquisition Line of Credit Purchasers | DIP Note Liens, DIP Inventory Acquisition Line of Credit Purchasers Financed | DIP Note Liens, DIP Factoring Liens, and Prepetition Notes Adequate | DIP Factoring Liens, DIP Inventory Acquisition Line of Credit Purchasers Financed | DIP Note Liens, DIP Factoring Liens, DIP Inventory Acquisition Line of Credit | Prestige Adequate Protection Liens[9] | Prepetition Notes Adequate Protection Claim and Prestige Adequate |

---

[4]        As defined in the Intercreditor Agreement, dated as of October 13, 2021 (the "**Prestige Intercreditor Agreement**"), among Prestige, Empery, as Notes Representative on behalf of the Prepetition Noteholders and Prepetition Collateral Agent, and the Note Parties.

[5]        "**DIP Note Purchasers Financed Inventory**" shall mean DIP Collateral made up of the specific inventory items financed by the DIP Inventory Acquisition Line of Credit.

[6]        "**Third-Party Encumbered Assets**" shall mean DIP Collateral that was, as of the Petition Date, subject to valid, properly perfected, non-avoidable, and senior liens or security interests (excluding subordinated liens pursuant to existing agreements) (collectively, the "**Third-Party Existing Liens**") other than the liens and security interests granted pursuant to the Prepetition Security Agreement (the "**Prepetition Notes Liens**") and the Prestige Liens (as defined below).

[7]        "**Permitted Liens**" shall mean any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Notes Liens and Prestige Liens.

[8]        "**Prestige Liens**" shall mean any valid, properly perfected and non-avoidable liens on or security interests in the Factoring Collateral created by the Factoring Security Documents (each as defined in the Prestige Intercreditor Agreement).

| | Financed Inventory Liens, and Prepetition Notes Adequate Protection Liens | Inventory Liens | Protection Liens | Inventory Liens | Purchasers Financed Inventory Liens and Prepetition Notes Adequate Protection Liens | | Protection Claim |
|---|---|---|---|---|---|---|---|
| **4th** | Prepetition Notes Liens | Prestige Adequate Protection Liens | Prepetition Notes Liens | Prepetition Notes Liens | Prestige Adequate Protection Liens[9] | | |
| **5th** | | Prepetition Notes Adequate Protection Liens | Prestige Adequate Protection Liens[9] | Prestige Adequate Protection Liens[9] | | | |
| **6th** | | Prepetition Notes Liens | Prestige Liens | Prestige Liens | | | |

---

[9]      Subject to Prestige's rights under paragraph 20 of this Order.

# EXHIBIT C

# EXHIBIT C

**DEBTOR-IN-POSSESSION NOTES PURCHASE AND SECURITYAGREEMENT**

This DEBTOR-IN-POSSESSION NOTES PURCHASE AND SECURITY AGREEMENT (this "<u>Agreement</u>"), dated as of February [●], 2023, is entered into by and among MusclePharm Corporation, a Nevada corporation, as a debtor-in-possession ("<u>Issuer</u>" or "<u>Borrower</u>"), Canada MusclePharm Enterprises Corporation ("<u>Guarantor</u>"), Empery Tax Efficient, LP ("<u>Empery</u>"), in its capacity as a note purchaser, [●] (each, a "<u>DIP Note Purchaser</u>", and collectively, the "<u>DIP Note Purchasers</u>"), and Empery, in its capacity as collateral agent, its successors and assigns ("<u>DIP Note Agent</u>").

**W I T N E S S E T H:**

**WHEREAS**, on December 15, 2022 (the "<u>Petition Date</u>"), Borrower commenced Chapter 11 Case No. 22-14422-nmc (the "<u>Chapter 11 Case</u>") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "<u>Bankruptcy Code</u>"), with the United States Bankruptcy Court for the District of Nevada (the "<u>Bankruptcy Court</u>"). Borrower continues to operate its business and manage its assets and liabilities as a debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**WHEREAS**, Borrower has requested that the DIP Note Purchasers provide a multiple issuance note facility to Borrower to fund (i) the working capital needs of the Borrower, including, the allowed administrative costs and expenses of the Chapter 11 Case during the pendency of the Chapter 11 Case, and (ii) the satisfaction of interest, fees and costs due under this Agreement;

**WHEREAS**, Borrower is unable to obtain funds or credit on better terms;

**WHEREAS,** each DIP Note Purchaser has agreed to purchase the DIP Notes (as hereinafter defined) from Borrower on the terms and conditions hereunder on a several basis in an amount equal to its DIP Note Purchase Commitment;

**WHEREAS**, subject to Bankruptcy Court approval, Borrower has agreed to provide the DIP Note Purchasers super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, in the Chapter 11 Case, against the Borrower for its obligations to the DIP Note Purchasers under this Agreement, the Interim DIP Orders and the Final Order having the priority specified in the Interim DIP Orders and the Final Order; and

**WHEREAS**, subject to Bankruptcy Court approval, Borrower has agreed to secure all of its obligations under this Agreement by granting to the DIP Note Purchasers, under and pursuant to the Interim DIP Orders and the Final Order, a security interest in and lien upon substantially all of their assets having the priority specified in the Interim DIP Orders and the Final Order.

**NOW, THEREFORE,** in consideration of the foregoing recitals, and of the mutual covenants, conditions and provisions hereinafter set forth, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the DIP Note Agent, each DIP Note Purchaser and Borrower hereby agree as follows:

1.    <u>Definitions</u>.    As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"<u>Acceptable Plan</u>" means a plan of reorganization or liquidation reasonably acceptable to the DIP Note Agent, which shall (i) provide for repayment in full in cash of the obligations under the DIP Note Facility, inclusive of the Roll-Up Amount, and (ii) be acceptable to the DIP Note Agent, in its reasonable discretion, with respect to the treatment of the Prepetition Secured Parties, DIP Note Purchasers and DIP Factoring Purchasers.

"<u>Additional DIP Issuance</u>" means an amount up to Two Million Dollars ($2,000,000.00) of the unfunded Aggregate DIP Note Purchase Commitment after funding of the Interim DIP Issuance and the Primary DIP Issuance, to be made available on a monthly basis commencing in June 2023 in accordance with the Authorized Budget and the terms and conditions of this Agreement after the Final Closing Date.

"<u>Additional DIP Issuance Funding Date</u>" means the fifth (5th) day of each calendar month commencing on the Initial Additional DIP Issuance Funding Date through December 5, 2023.

"<u>Affiliates</u>" of any Person is a Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

"<u>Aggregate DIP Note Purchase Commitments</u>" means Five Million Five Hundred Thousand Dollars ($5,500,000), as such amount may be increased or reduced from time to time pursuant to the terms hereof.

"<u>Agreement</u>" has the meaning set forth in the preamble of this Agreement.

"<u>Allowed Claim</u>" means the claim of the Prepetition Secured Parties of an amount not less than Twelve Million Eight Hundred Forty Thousand Dollars ($12,840,000), which is the principal amount of the Prepetition Notes, including the original issue discount, in addition to the Obligations under the DIP Note Facility and DIP Factoring Facility, and reasonable attorneys' fees and expenses.

"<u>Authorized Budget</u>" means any Proposed Budget for which Borrower has received written consent from the DIP Note Agent approving such Proposed Budget; <u>provided</u>, that upon delivery by Borrower and consent of the DIP Note Agent of any subsequent revised budget, such revised budget shall thereafter constitute the Authorized Budget.  The Authorized Budget as of the date hereof is attached hereto as <u>Exhibit A</u>.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals of this Agreement.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals of this Agreement.

"<u>Bankruptcy Orders</u>" mean, collectively, the Interim DIP Orders and the Final Order.

"Board of Directors" means Eric Hillman, Paul Karr and Nicolas Rubin, who replaced the Interim Board of Directors of Borrower and serve as board of directors of Borrower upon entry of the Second Interim DIP Order.

"Borrower" has the meaning set forth in the preamble of this Agreement.

"Borrower DIP Inventory Acquisition Line of Credit Payoff Notice" has the meaning set forth in Section 2(c)(ii) of this Agreement.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in Las Vegas, Nevada are required or permitted to be closed.

"Carve-Out" means the payment of (a) subject to the Authorized Budget, the aggregate amount of any budgeted and unpaid fees, costs and expenses allowed by an order of the Bankruptcy Court up to an aggregate amount not to exceed $250,000 that were accrued or incurred prior to the Maturity Date by the professionals retained in the Chapter 11 Case by Borrower or on behalf of its estate (collectively, the "Borrower Professionals") and by the professionals retained in the Chapter 11 Case by the Creditors' Committee (collectively, the "Creditors Committee Professionals"), respectively, but in no event shall such carve-out exceed the unpaid Budget amounts (on a line by line basis) for the Borrower Professionals and the Creditors Committee Professionals, respectively, prorated up to the date in the Authorized Budget coinciding with an Event of Default, and (b) in the absence of a Sale Transaction Notice, (i) the aggregate amount of any unpaid fees, costs and expenses allowed by an order of the Bankruptcy Court up to an aggregate amount not to exceed $125,000 that were incurred after an Event of Default by the Borrower Professionals, and (ii) the aggregate amount of any unpaid fees, costs and expenses allowed by an order of the Bankruptcy Court up to an aggregate amount not to exceed $65,000 that were incurred after an Event of Default by the Creditors Committee Professionals, and (c) in the event of a Sale Transaction Notice, the aggregate amount of any unpaid fees, costs and expenses, incurred after the delivery of a Sale Transaction Notice by the Borrower Professionals and the Creditors Committee Professionals, when allowed by an order of the Bankruptcy Court and when the Sale Transaction is completed, from the $190,000 in funds expressly earmarked from the Sale Transaction to fund such fees, costs and expenses of the Borrower Professionals and the Creditors Committee Professionals.

"Cash Collateral" means all cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever or wherever acquired in which the Borrower and an entity other than the Borrower has an interest, whether existing before or after the commencement of the Chapter 11 Case and inclusive of cash collateral as defined in Section 363 of the Bankruptcy Code.

"Cash Management Order" means that certain *Order Authorizing Maintenance of Existing Bank Accounts and Related Relief* [ECF No. 75], entered by the Bankruptcy Court in the Chapter 11 Case on January 9, 2023, and as approved on a final basis on February 9, 2023 [ECF No. ___].

"Chapter 11 Case" has the meaning set forth in the recitals of this Agreement.

"Contingent Obligation" means as to any Person (the "guaranteeing person"), any obligation (determined without duplication) of the guaranteeing person (or any other Person (including any bank under any letter of credit) if the guaranteeing person has issued a

3

reimbursement, counter indemnity or similar obligation in favor of such other Person) guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business consistent with past practice. The amount of any Contingent Obligation of any guaranteeing person shall be deemed to be the lesser of the maximum stated amount of the primary obligations relating to such Contingent Obligation (or, if less, the maximum stated liability set forth in the instrument embodying such Contingent Obligation), or in the absence of any such stated amount or stated liability, the amount of such Contingent Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as reasonably determined by the Borrower in good faith in accordance with GAAP.

"Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case by the U.S. Trustee pursuant to the Bankruptcy Code on January 4, 2023 [ECF No. 49].

"Default" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"Defaulting DIP Note Purchaser" means any DIP Note Purchaser which (i) has failed to purchase all or any portion of its DIP Notes within three (3) Business Days of the date such DIP Notes were required to be purchased hereunder unless such DIP Note Purchaser notifies the DIP Note Agent and the other DIP Note Purchasers, in writing, that such failure is the result of such DIP Note Purchaser's determination that one or more conditions precedent to the purchase (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied or (ii) has, or has any Affiliate that has, become the subject of an Insolvency Event.

"DIP Agents" means, collectively, the DIP Note Agent and DIP Factoring Agent.

"DIP Collateral" means all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Note Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of the Note Parties, including, for the avoidance of doubt, any equity or other interests in the Note Parties' non-Borrower and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, including all causes of action under Section 541 of the Bankruptcy Code (including

commercial tort claims), and all additional and accessions thereto and all substitutions and replacements thereof, and all products, accounts and proceeds thereof, including without limitation, all proceeds and accounts from the sale or transfer of the DIP Collateral and of insurance covering the same and of any tort claims in connection therewith, excluding any causes of action under Bankruptcy Code Sections 502(d), 544, 545, 547, 548, 549, 550 or 553, including the proceeds thereof.

"DIP Consenting Secured Parties" means the DIP Note Agent and Empery, in its capacity as a DIP Note Purchaser.

"DIP Documents" means (i) this Agreement, (ii) the DIP Factoring Agreement, (iii) the DIP Notes, (iv) the Guaranty, (v) the DIP Factoring Guaranty, (vi) the Bankruptcy Orders and (vii) all other security agreements, pledge agreements, patent, trademark and copyright security agreements, control agreements and any other instruments and documents creating or purporting to create a Lien and/or reasonably related to the foregoing, and all amendments, restatements, modifications or supplements thereof or thereto.

"DIP Facilities" means, collectively, the DIP Note Facility, inclusive of the DIP Inventory Acquisition Line of Credit, and the DIP Factoring Facility.

"DIP Factoring Agent" means Empery Tax Efficient, LP, and its successors and assigns, in its capacity as the sole collateral agent for the DIP Factoring Purchasers under the DIP Factoring Agreement.

"DIP Factoring Agreement" means that certain Debtor-in-Possession Factoring Purchase and Security Agreement entered into by and between Borrower and the DIP Factoring Purchasers evidencing the DIP Factoring Facility and the terms and conditions thereof.

"DIP Factoring Facility" means that certain factoring facility entered into by and between Borrower and the DIP Factoring Purchasers simultaneously herewith whereby the DIP Factoring Purchasers have agreed to purchase and receive from Borrower, in an aggregate amount of up to Ten Million Dollars ($10,000,000) all of Borrower's right, title and interest in and to all eligible post-petition accounts and during the Interim Period, purchase orders, arising from the sale of any product or goods or the rendering of services by Borrower in the ordinary course of Borrower's business, pursuant to the terms and conditions set forth in the Debtor-in-Possession Factoring Purchase and Sale and Security Agreement.

"DIP Factoring Guaranty" means that certain Guaranty Agreement executed by Guarantor in favor of the DIP Factoring Purchasers guaranteeing the DIP Factoring Facility.

"DIP Factoring Purchasers" means Empery and **[●].**

"DIP Inventory Acquisition Line Advance" means each advance of funds made available to the Borrower under the DIP Inventory Acquisition Line of Credit, on a revolving basis, in accordance with the Authorized Budget and the terms and conditions of this Agreement on or after the Final Closing Date, but in no event shall the aggregate DIP Inventory Acquisition Line Advances outstanding at any time exceed the amount of the DIP Inventory Acquisition Line of Credit.

5

"DIP Inventory Acquisition Line of Credit" means a revolving line-of-credit in an amount up to One Million Dollars ($1,000,000) under the DIP Note Facility, available solely to fund Borrower's acquisition of inventory for Borrower's business in accordance with the Authorized Budget on an as needed basis.

"DIP Inventory Acquisition Line of Credit Purchasers" means Empery and [●].

"DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory" means that certain inventory of Borrower acquired in whole or in part by funds made available to Borrower through the DIP Inventory Acquisition Line of Credit.

"DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens" means the liens and security interests granted to secure the DIP Inventory Acquisition Line of Credit.

"DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Proceeds" means the proceeds of the DIP Collateral constituting the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory.

"DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Sale Notice Period" has the meaning set forth in Section 2(c)(ii) of this Agreement.

"DIP Motion" means the motion filed by Borrower with the Bankruptcy Court in the Chapter 11 Case, together with all supplements and amendments thereto, seeking Bankruptcy Court approval of the DIP Note Facility and the DIP Factoring Facility.

"DIP Note Agent" means Empery Tax Efficient, LP, and its successors and assigns, in its capacity as the sole collateral agent for the DIP Note Purchasers under this Agreement.

"DIP Note Disbursement Account" means a debtor-in-possession deposit account of Borrower subject to a deposit account control agreement in favor of DIP Note Agent and pursuant to which DIP Note Agent maintains control and shall have a Lien pursuant to the Bankruptcy Orders.

"DIP Note Facility" means the super-priority senior secured multiple issuance note facility in the aggregate principal amount of Five Million Five Hundred Thousand Dollars ($5,500,000), inclusive of the DIP Inventory Acquisition Line of Credit, but excluding the Roll-Up Amount, evidenced by, and subject to the terms and conditions of, this Agreement.

"DIP Note Purchase Commitment" means, for each DIP Note Purchaser, the obligation of such DIP Note Purchaser to purchase the DIP Notes from the Borrower in the aggregate amount not exceeding the amount set forth on Schedule II hereto.

"DIP Note Purchasers" means Empery and [●].

"DIP Notes" means each advance, including without limitation each DIP Inventory Acquisition Line Advance, made under that certain promissory note issued in accordance with the terms of this Agreement and stated on the addendum to such promissory note evidencing the amount of each such advance made.

"EBITDA" means earnings before interest, tax, depreciation and amortization, excluding extraordinary costs and Professional Fees and Other Restructuring Costs (as such terms are defined in the Authorized Budget), calculated on an accrual basis.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Event of Default" has the meaning set forth in Section 7 of this Agreement.

"Final Closing Date" means the date on which all conditions precedent to the Primary DIP Issuance and DIP Inventory Acquisition Line Advance have been satisfied or waived, in DIP Note Agents' reasonable discretion, including, without limitation, entry of the Final Order.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court approving the DIP Note Facility and the DIP Factoring Facility and authorizing the execution and delivery of the DIP Documents by Borrower, the issuance of the DIP Notes and the purchase of the accounts and purchase orders thereunder and the relief provided for thereunder, and the Roll-Up Amount of the Prepetition Notes being converted on a cashless basis into the DIP Notes with one dollar of principal due under the Prepetition Notes to roll-up and convert for each dollar of principal amount drawn under the DIP Note Facility (exclusive of any DIP Inventory Acquisition Line Advance), which order shall stipulate as to the amount and priority of the Prepetition Note Liens and otherwise be reasonably satisfactory in form and substance to the DIP Agents, together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur and guaranty debt, grant Liens and provide for the super priority administrative claim status of the DIP Note Purchasers' claims under this Agreement; provided such order has not been stayed or modified (without the consent of the DIP Note Agent).

"First Interim DIP Order" means that certain *First Interim Order Pursuant to Emergency Motion For Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Fed. R. Bankr. P. 4001(B) and 4001(D): (I) Authorizing the Debtor to Obtain Post-Petition Financing, (II) Granting Priming Liens and Administrative Expense Claims, (III) Determining Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [ECF No. 74], entered by the Bankruptcy Court in the Chapter 11 Case on January 9, 2023, authorizing Borrower, among other things, to borrow up to One Hundred Fifty Thousand ($150,000) from Empery on an interim basis.

"GAAP" is generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other Person as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

"Governmental Authority" means any nation or government, any state, city, province or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guarantor" has the meaning set forth in the preamble of this Agreement.

"Guaranty" means that certain Guaranty Agreement executed by Guarantor in favor of the DIP Note Purchasers guaranteeing the DIP Note Facility.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Contingent Obligations of such Person, (h) all capital lease obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit, letters of guaranty, surety bonds and similar facilities or obligations, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances and (k) all obligations of such Person under sale and leaseback transactions.

"Independent Director" means Nicholas Rubin, nominated by the Interim Board of Directors, approved by the DIP Note Agent, and approved in the Second Interim DIP Order, to serve on the Board of Directors of Borrower.

"Initial Additional DIP Issuance Funding Date" means June 5, 2023.

"Initial Test Date" means May 31, 2023.

"Insolvency Event" means, as to any Person, that such Person has (i) become the subject of a proceeding under the Bankruptcy Code or any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time which proceeding is not dismissed within sixty (60) days after the commencement of the same, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, (iii) has taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment, (iv) become insolvent or been determined by any Governmental Authority having regulatory authority over such Person or its assets, to be insolvent, or the assets or management of which has been taken over by any Governmental Authority, (v) is generally unable to pay its debts as they become due,

or has admitted in writing its inability to pay its debts as they become due or (vi) has made a general assignment for the benefit of creditors.

"<u>Interest Rate</u>" means nine and three-quarters of one percent (9.75%) per annum.

"<u>Interim Board of Directors</u>" means Paul Karr and Eric Hillman, who replaced all members of the Borrower's board of directors as of the Petition Date and serve as board of directors of Borrower through the date that the Second Interim DIP Order was entered.

"<u>Interim Closing Date</u>" means January 23, 2023, the date of the Interim DIP Issuance.

"<u>Interim DIP Issuance</u>" means an amount up to Seven Hundred Fifty Thousand Dollars ($750,000) of the Aggregate DIP Note Purchase Commitment, which was made available in one or more issuances in accordance with the Authorized Budget and the terms and conditions of the Interim DIP Orders during the Interim Period.

"<u>Interim DIP Orders</u>" means, collectively, the First Interim DIP Order and the Second Interim DIP Order.

"<u>Interim Period</u>" means the period of time between the First Interim DIP Order and the Final Order.

"<u>Investment</u>" of a Person means any loan, advance, extension of credit (other than accounts receivable arising in the ordinary course of business on terms customary in the trade), deposit account or contribution of capital by such Person to any other Person or any investment in (including Contingent Obligations of such Person for the benefit of or to support any obligation of such other Person), or purchase or other acquisition of Equity Interests, notes, debentures or other debt or equity securities of any other Person made by such Person.

"<u>JW</u>" means JW Nutritional, LLC.

"<u>JW Financed Inventory</u>" has the meaning set forth in <u>Section 2(c)(iii)</u> of this Agreement.

"<u>JW Financed Inventory Cost</u>" has the meaning set forth in <u>Section 2(c)(iii)</u> of this Agreement.

"<u>JW Financed Inventory Sale Notice Period</u>" has the meaning set forth in <u>Section 2(c)(iii)</u> of this Agreement.

"<u>Lien</u>" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including, without limitation, the interest of a vendor or lessor under any conditional sale, capitalized lease or other title retention agreement or any financing lease having substantially the same economic effect as any of the foregoing) and, in the case of debt, equity or similar instrument, any purchase option, call or similar right of any Person (other than the issuer of such securities) with respect to such debt, equity or similar instrument.

"Maturity Date" means the earliest of (a) December 31, 2023 (the "Scheduled Termination Date"), (b) the date of acceleration of any of the Obligations pursuant to Section 8, (c) the date of the closing of a Sale Transaction or any other sale of all or substantially all of Borrower's assets, and (d) the filing of a chapter 11 plan with respect to Borrower that is not an Acceptable Plan.

"Milestone Requirements" shall mean each of the following:

(a) The Bankruptcy Court shall enter the Final Order, which order shall be in form and substance acceptable to the DIP Note Agent, approving the DIP Note Facility (including the Roll-Up Amount) and the DIP Factoring Facility on a final basis no later than February 21, 2023 (unless waived by the DIP Note Agent).

(b) Borrower shall file an Acceptable Plan by no later than September 30, 2023.

(c) The Bankruptcy Court shall approve an Acceptable Plan by December 15, 2023.

(d) In the event that (i) Borrower fails to satisfy each of the conditions set forth in Section 4(b) and (c) of this Agreement for the DIP Note Purchasers to make any Additional DIP Issuance (excluding the $500,000 Additional DIP Issuance payment made in the event of a Sale Transaction Notice, as defined below) on the Initial Additional DIP Issuance Funding Date and/or any subsequent Additional DIP Issuance Funding Date, or (ii) Borrower fails to file an Acceptable Plan by September 30, 2023, Borrower shall commence a Sale Transaction within fourteen (14) days of receipt of written notice by the DIP Note Agent (the "Sale Transaction Notice"). In the event a Sale Transaction Notice is given to Borrower, Borrower shall commence a Sale Transaction within five (5) days of receipt of such Sale Transaction Notice. Unless otherwise waived by the DIP Note Agent, in its sole discretion, a stalking horse for the Sale Transaction shall be selected within twenty-five (25) days from receipt of the Sale Transaction Notice, and the Sale Transaction shall be completed within sixty (60) days of the commencement of the Sale Transaction. Without limiting the foregoing, the procedure and timing of a Sale Transaction shall be satisfactory to the DIP Note Agent, in its sole discretion.

"Note Parties" means collectively, Borrower and Guarantor.

"Notice of Note Issuance" has the meaning set forth in Section 2(a)(iii).

"Obligations" means all loans, advances, liabilities, obligations, covenants, duties, and debts owing by Borrower (or any one thereof) to the DIP Note Agent and/or any DIP Note Purchaser, arising under or pursuant to this Agreement or any of the other DIP Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, acceptance, loan, guaranty, indemnification, or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, attorneys' fees, filing fees, and any other sums chargeable to Borrower hereunder or under any of the other DIP Documents including, without limitation, all debts, liabilities, and obligations of Borrower now or hereafter arising from or in connection with the DIP Note Facility, including without limitation, the reasonable fees and expenses of the DIP Note Agent and each DIP Note Purchaser incurred in connection with the DIP Note Facility.

"Permitted Encumbrances" means:

(a) Liens imposed by law for taxes, fees, assessments or other charges that are not yet due or are being contested in good faith;

(b) Liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code); and

(c) Liens that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Notes Liens and to any valid, properly perfected and non-avoidable liens on or security interests in collateral granted to Prestige Capital Finance, LLC, and its successors and assigns, in connection with its prepetition factoring agreement with Borrower.

provided, that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness other than as specifically provided in (b) and (c) above.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or Governmental Authority.

"Petition Date" has the meaning set forth in the recitals of this Agreement.

"Prepetition Collateral Agent" means Empery Tax Efficient, LP, in its capacity as collateral agent for the Prepetition Purchasers.

"Prepetition Note Liens" means the liens and security interests granted to secure the Prepetition Notes.

"Prepetition Notes" means those certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time) and Original Issue Discount Senior Secured Notes dated as of June 10, 2022 (as amended, restated, supplemented or otherwise modified from time to time), in each case issued by Borrower, which Prepetition Notes are described in further detail on Schedule III hereto.

"Prepetition Purchasers" means the holders of the Prepetition Notes as described in further detail on Schedule III hereto.

"Prepetition Secured Parties" means collectively, the Prepetition Purchasers and the Prepetition Collateral Agent.

"Prestige" means Prestige Capital Finance, LLC.

"Primary DIP Issuance" means an amount up to One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) of the unfunded Aggregate DIP Note Purchase Commitment, to be made available in one or more issuances in accordance with the Authorized Budget and the terms and conditions of this Agreement on or after the Final Closing Date.

"pro rata share" means, at any time for any DIP Note Purchaser, the ratio at such time that such DIP Note Purchaser's Commitment bears to the Aggregate DIP Note Purchase Commitment which, as of the date hereof, is set forth on Schedule II hereto. If the DIP Note Purchase Commitment of any DIP Note Purchaser has been terminated, the pro rata share of such DIP Note Purchaser will be calculated with respect to the DIP Notes of such DIP Note Purchaser outstanding immediately prior to such DIP Note Purchase Commitment termination.

"Proposed Budget" means a thirteen-week reasonably detailed forecast of Borrower commencing with the week in which the Petition Date occurs, setting forth on a line-item basis the projected cash receipts and disbursements on a weekly basis and shall include separate line items for each of the Borrower's Professionals and the Creditors Committee's Professionals, prepared by the Borrower and submitted to the DIP Note Agent for its consent, and which budget shall be updated on the one-week anniversary of the Second Interim DIP Order and every four weeks on Wednesday (commencing with the Wednesday of the fourth full week commencing after the one-week anniversary of the Second Interim DIP Order).

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Borrower, or any payment (whether in cash, securities or other property), including any distributions of cash in order to pay management fees or taxes attributable to the income of Borrower or any of its subsidiaries, and including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in Borrower or any option, warrant or other right to acquire any such Equity Interests in Borrower.

"Roll-Up Amount" means up to Four Million Five Hundred Thousand Dollars ($4,500,000) of principal due under the Prepetition Notes which shall be deemed to be Obligations under the DIP Note Facility, in a principal amount equal to $1.00 of the Prepetition Notes principal amount outstanding for each $1.00 drawn under the DIP Note Facility (exclusive of any DIP Inventory Acquisition Line Advance), subject to a Disallowed Claim during the Challenge Period, in which case if the Allowed Claim, after being reduced by the amount of the Disallowed Claim, is less than the Roll-Up Amount, then the Roll-Up Amount shall be reduced such that the Roll-Up Amount equals the Allowed Claim.

"Sale Transaction" means a sale under Section 363 of the Bankruptcy Code.

"Scheduled Preexisting Indebtedness" means that certain secured Indebtedness specifically and solely to the extent as set forth on Schedule V hereto which was preexisting as of the date of this Agreement.

"Scheduled Preexisting Liens" means those certain Liens specifically and solely to the extent as set forth on Schedule VI hereto which were preexisting as of the date of this Agreement.

"Second Interim DIP Order" means the *Second Interim Order Pursuant to Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Fed. R. Bankr. P. 4001(B) and 4001(D): (I) Authorizing the Debtor to Obtain Post-Petition Financing, (II) Granting Priming Liens and Administrative Expense Claims, (III) Determining Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [ECF

No. 139] of the Bankruptcy Court entered in the Chapter 11 Case on January 23, 2023, approving the terms set forth in the term sheet presented by Borrower to the Bankruptcy Court for hearing on the DIP Note Facility and DIP Factoring Facility and authorizing up to Seven Hundred Fifty Thousand Dollars ($750,000) to be made available in one or more issuances of the DIP Notes and up to Ten Million Dollars ($10,000,000) under the DIP Factoring Facility, with up to Two Million Dollars ($2,000,000) of the Ten Million Dollars ($10,000,000) available for the purchase of purchase orders during the Interim Period and the relief provided for thereunder, together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur and guaranty debt, grant senior Liens and provide for the super priority administrative claim status of the DIP Note Purchasers' claims under this Agreement; provided such order has not been stayed or modified (without the consent of the DIP Note Agent).

"Section 541 Proceeds" means the proceeds of the DIP Collateral constituting causes of action which are property of the estate under Section 541 of the Bankruptcy Code owned by Borrower.

"Test Date" means the last day of each calendar month commencing on the Initial Test Date through November 30, 2023.

2.    DIP Note Purchase Facility.

(a)    DIP Note Purchase.

(i)    Subject to all of the terms and conditions of this Agreement and the Bankruptcy Orders, each DIP Note Purchaser severally agrees to purchase from Borrower DIP Notes in an aggregate amount not to exceed its DIP Note Purchase Commitment. Upon the entry of the Second Interim DIP Order, Borrower shall be entitled, subject to the terms and conditions of this Agreement, to the issuance of DIP Notes in an amount at any time outstanding not to exceed the lesser of the amount permitted by the Second Interim DIP Order and the Interim DIP Issuance. Upon the entry of the Final Order, Borrower shall be entitled, subject to the terms and conditions of this Agreement, to the issuance of DIP Notes in an amount at any time outstanding not to exceed the lesser of the amount permitted by the Final Order and the Aggregate DIP Note Purchase Commitment. Any amounts repaid under the DIP Note Facility, other than the DIP Inventory Acquisition Line of Credit, may not be reissued or repurchased. The DIP Note Purchase Commitments to purchase hereunder shall expire on the Maturity Date or as otherwise provided herein.

(ii)    The purchase of the DIP Notes shall be made ratably by the DIP Note Purchasers in accordance with their respective pro rata shares.

(iii)    Subject to the prior satisfaction of all other applicable conditions to the issuance and purchase of the DIP Notes set forth in this Agreement, to issue a DIP Note, Borrower shall notify the DIP Note Agent (which notice shall be irrevocable), by delivering to it a written notice in the form attached hereto as Exhibit B (a "Notice of Note Issuance") not less than three (3) Business Days prior to the proposed date of issuance of the DIP Note. Immediately upon receipt of any Notice of Note Issuance, the DIP Note Agent shall

13

confirm receipt of such Notice of Note Issuance by each of the DIP Note Purchasers. DIP Note Purchasers will fund the purchase of the DIP Notes by wire transfer to the DIP Note Disbursement Account. To the extent the DIP Note Purchasers provide funds to the DIP Note Agent, the DIP Note Agent will make the funds so received from the DIP Note Purchasers available to Borrower for the DIP Note purchases by wire transfer to the DIP Note Disbursement Account. Notwithstanding anything in this Agreement to the contrary, Borrower may not issue DIP Notes other than at such times and in such amounts reflected in the Authorized Budget.

(iv)    Subject to the prior satisfaction of all applicable conditions to the Additional DIP Issuance, including without limitation, Section 4(c), the DIP Note Purchasers shall purchase DIP Notes in the amount of $500,000 of the Additional DIP Issuance on the Initial Additional DIP Issuance Funding Date, and the DIP Note Purchasers shall purchase DIP Notes in the amount of $250,000 of the Additional DIP Issuance on each subsequent Additional DIP Issuance Funding Date. Additionally, upon receipt of a Sale Transaction Notice, $500,000 of the Additional DIP Issuance shall be made available to Borrower to fund Borrower and the Borrower Professionals through the completion of a Sale Transaction, with $190,000 of such $500,000 Additional DIP Issuance to be earmarked to pay such fees, costs and expenses of the Borrower Professionals and the Creditors Committee Professionals incurred after the delivery of a Sale Transaction Notice to the extent Borrower does not have funds to otherwise pay such fees, costs and expenses. Such fees, costs and expenses of the Borrower Professionals and the Creditors Committee Professionals shall not be paid until completion of a Sale Transaction.

(v)    The DIP Note Agent shall record on its books the principal amount of the DIP Notes owing to each DIP Note Purchaser from time to time. In addition, each DIP Note Purchaser is authorized, at such DIP Note Purchaser's option, to note the date and amount of each payment or prepayment of principal of such DIP Note Purchaser's DIP Note in its books and records, including computer records, such books and records constituting presumptive evidence, absent manifest error, of the accuracy of the information contained therein.

(b)    Interest.

(i)    The DIP Notes (inclusive of the DIP Inventory Acquisition Line Advances) issued in accordance with this Agreement shall bear interest from the date of issuance until the date of repayment by maturity, acceleration or otherwise. Interest shall accrue on the principal balance of the DIP Notes from time to time outstanding hereunder at the Interest Rate.

(ii)    Interest on the DIP Notes shall accrue based on a year of 360 days and actual days elapsed. All accrued and outstanding interest will be due and payable on the Maturity Date. In addition, on any partial or complete payment or prepayment of principal of the DIP Notes, Borrower shall pay in cash the accrued and unpaid interest on any portion of the DIP Notes so paid or prepaid.

(iii)    Upon the occurrence and during the continuance of an Event of Default, the outstanding principal amount of the DIP Notes (and any accrued but unpaid interest) shall bear interest at the Interest Rate plus 2.0% per annum, computed as provided above and payable in immediately available funds on demand.

(iv)    In no event shall the interest rate under this paragraph (b) exceed the maximum rate permitted under applicable law.

(c)    Inventory Acquisition Financing.

(i)    Borrower may submit a Notice of Note Issuance for each advance of funds requested by Borrower under the DIP Inventory Acquisition Line of Credit, with such request to include a list of the amounts of all inventory being purchased consistent and in accordance with the Authorized Budget.  The DIP Notes issued under the DIP Inventory Acquisition Line of Credit may be reissued and repurchased, on a revolving basis, provided all the terms and conditions of this Agreement have been satisfied, and further provided, that the aggregate DIP Inventory Acquisition Line Advances outstanding at the time Borrower submits its Notice of Note Issuance, together with the requested amount of the DIP Inventory Acquisition Line Advance, does not exceed the amount of the DIP Inventory Acquisition Line of Credit.

(ii)    In the event of a cessation of the Borrower's business whereby Borrower is no longer actively pursuing ongoing sales, DIP Note Agent, on behalf of the DIP Inventory Acquisition Line of Credit Purchasers, shall have the right, without further order of the Bankruptcy Court, after ten (10) days prior written notice to Borrower and the Creditors' Committee (the "DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Sale Notice Period"), to sell the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory at a cost determined by DIP Note Agent in its sole discretion pursuant to this Section 2(c)(ii), but in accordance with the requirements of Article 9 of the Uniform Commercial Code.  DIP Note Agent, on behalf of the DIP Inventory Acquisition Line of Credit Purchasers, shall have the right, without further order of the Bankruptcy Court, after providing written notice to the Borrower and the expiration of the applicable DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Sale Notice Period, to sell such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory pursuant to this Section 2(c)(ii) and pursuant to Article 9 of the Uniform Commercial Code.  DIP Note Agent may use the Borrower's brand name(s), trademark(s), or trade name(s) and the like, directly and only related to the liquidation of such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory unless, within such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Sale Notice Period, the Borrower notifies the DIP Note Agent in writing that the Borrower will pay off and satisfy in full the outstanding principal balance, together with all accrued and unpaid interest thereon, of the DIP Inventory Acquisition Line of Credit (the "Borrower DIP Inventory Acquisition Line of Credit Payoff Notice").  Borrower shall pay as the DIP Note Agent directs the outstanding principal balance of the DIP Inventory Acquisition Line of Credit, together with all accrued and unpaid interest thereon, within five (5) Business Days after delivery of the Borrower DIP Inventory Acquisition Line of Credit Payoff Notice.  If Borrower fails to make such payment, the DIP Note Agent, on behalf of the DIP Inventory Acquisition Line of Credit

15

Purchasers, may proceed to sell such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory pursuant to this <u>Section 2(c)(ii)</u> and Article 9 of the Uniform Commercial Code.

(iii)    JW, an unsecured creditor and existing inventory supplier to the Borrower, shall have the right to, at its own cost and expense, after the entry of the Final Order, create inventory for the Borrower's business, operations and sale, which inventory shall be held and deemed owned by JW until purchased by Borrower (the "<u>JW Financed Inventory</u>"). In the event of a cessation of the Borrower's business whereby Borrower is no longer actively pursuing ongoing sales, JW shall have the right, without further order of the Bankruptcy Court, after ten (10) days prior written notice to the Borrower, the Creditors' Committee and the DIP Note Agent (the "<u>JW Financed Inventory Sale Notice Period</u>"), to sell the JW Financed Inventory pursuant to this <u>Section 2(c)(iii)</u> unless, within the JW Financed Inventory Sale Notice Period, Borrower or the DIP Note Agent notifies JW in writing that Borrower or the DIP Note Purchasers will purchase such inventory at the JW Financed Inventory Cost.  For JW Financed Inventory that was produced by JW at the request of the Borrower that has been held by JW in excess of four (4) months, JW shall have the right, without further order of the Bankruptcy Court, after providing written notice to the Borrower and the DIP Note Agent and the expiration of the applicable JW Financed Inventory Sale Notice Period, to sell such JW Financed Inventory pursuant to this <u>Section 2(c)(iii)</u> unless, within the JW Financed Inventory Sale Notice Period, Borrower or the DIP Note Agent notifies JW in writing that Borrower or the DIP Note Purchasers will purchase such inventory at the JW Financed Inventory Cost.  JW may use the Borrower's brand name(s), trademark(s), or trade name(s) and the like, directly and only related to the liquidation of such JW Financed Inventory pursuant to this <u>Section 2(c)(iii)</u>.  For purposes of this Agreement, the term "<u>JW Financed Inventory Cost</u>" shall mean JW's fully loaded cost, including cost of storing product, based on the current pricing to the Borrower as of the most recent quarterly quoted price between JW and the Borrower.

(iv)    In the event of a Sale Transaction, the purchaser shall either (1) buy the JW Financed Inventory from JW at the JW Financed Inventory Cost, or (2) allow JW to sell the JW Financed Inventory on the terms set forth in <u>Section 2(c)(iii)</u>.

(d)    <u>Defaulting DIP Note Purchaser</u>.    Notwithstanding anything to the contrary contained in this Agreement, if any DIP Note Purchaser becomes a Defaulting DIP Note Purchaser, then, until such time as such DIP Note Purchaser is no longer a Defaulting DIP Note Purchaser (or to the extent permitted by applicable law):

(i)    Such Defaulting DIP Note Purchaser shall have no right to approve or disapprove any amendment, waiver or consent with respect to this Agreement.

(ii)    The remaining DIP Note Purchasers shall have the right to purchase and fund the Defaulting DIP Note Purchaser's pro-rata share of any Interim DIP Issuance, Primary DIP Issuance, Additional DIP Issuance, or DIP Inventory Acquisition Line Advance, as applicable, on a pro-rata basis (the "<u>Defaulting DIP Note Purchaser's Pro-Rata Share</u>").

16

(iii)    The payment waterfall set forth in <u>Section 3(c)</u> below shall be modified such that the Defaulting DIP Note Purchaser shall not participate in any payments received and the Defaulting DIP Note Purchaser's pro-rata share of payments received from Borrower shall be paid on a pro-rata basis to the remaining DIP Note Purchasers who purchased and funded the Defaulting DIP Note Purchaser's Pro-Rata Share.  Further notwithstanding anything to the contrary contained in this Agreement, no Defaulting DIP Note Purchaser shall be entitled to participate in the receipt of payments under the payment waterfall set forth in <u>Section 3(c)</u> below, until (A) such Defaulting DIP Note Purchaser is no longer a Defaulting DIP Note Purchaser, <u>and</u> (B) the remaining DIP Note Purchasers who funded the Defaulting DIP Note Purchaser's Pro-Rata Share pursuant to <u>Section 2(d)(ii)</u> above have been repaid in full, including for such funding of Defaulting DIP Note Purchaser's Pro-Rata Share and repayment of their pro-rata share of the Roll-Up Amount.

3.    <u>Payment Generally</u>.

(a)    <u>Payments</u>.

(i)    <u>DIP Inventory Acquisition Line of Credit</u>.  Borrower shall repay each DIP Inventory Acquisition Line Advance made to Borrower, together with all outstanding accrued interest thereon, at such time as Borrower sells or otherwise disposes of the specific DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory, in whole or in part, acquired by such DIP Inventory Acquisition Line Advance.  Such payment shall be made by Borrower as directed by the DIP Note Agent on the date of the sale or disposition of the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory.  Upon the receipt of such payment, the DIP Note Agent shall cause the release of DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Lien on such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory sold.

(ii)    <u>At Maturity</u>.  Borrower shall repay in full in cash on the Maturity Date the outstanding principal amount of the DIP Notes, together with all accrued and unpaid interest on such principal amount, and all other Obligations.

(iii)    <u>Voluntary Prepayments</u>.  Borrower may, from time to time, optionally prepay, in full or in part, without penalty or premium, the DIP Notes upon not less than three (3) Business Day's prior written notice from Borrower to the DIP Note Agent and the DIP Note Purchasers; provided, however, any such prepayment or repayment of the DIP Notes must be on a pro rata basis.

(iv)    <u>Mandatory Prepayments</u>.  Mandatory prepayments of the DIP Notes and a permanent reduction of the DIP Note Facility shall be required, without penalty or premium, in an amount equal to (i) 100% of the net cash proceeds of the sale or other disposition of any property or assets of the Note Parties or any of their respective subsidiaries, except for any such sales of inventory in the ordinary course of Borrower's business or other de minimis sales, (ii) 100% of insurance and condemnation proceeds and tax refunds, in each case received by Note Parties or any of their respective subsidiaries, and (iii) 100% of the net cash proceeds of any Indebtedness incurred by the Note Parties or any of their respective subsidiaries after the Interim DIP Order (other than indebtedness

17

otherwise permitted under the DIP Documents), up to the outstanding amount of the DIP Note Facility, payable no later than two (2) Business Days after receipt. If the foregoing proceeds exceed the outstanding balance of the DIP Note Facility at the time they are received by Borrower, then any excess proceeds after the mandatory repayment of the DIP Notes is made shall be returned to Borrower. The foregoing mandatory repayments will result in a permanent reduction of the DIP Note Facility, and nothing herein shall constitute an assent to any proposed asset sale.

(b)    <u>Method of Payment</u>.  All payments hereunder, including without limitation all payments of principal of and interest on the DIP Notes, shall be made in immediately available funds, without set-off, deduction or counterclaim, by one or more wire transfer to such account or accounts as directed by the DIP Note Agent.  All payments shall be applied in the manner set forth in <u>Section 3(c)</u> below.  Whenever any payment hereunder becomes due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the interest due.

(c)    <u>Payment Waterfall</u>.

(i)    All payments received from Borrower and all proceeds of DIP Collateral, other than the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Proceeds and the Section 541 Proceeds and subject to any payments made in accordance with the lien priorities described in <u>Schedule IV</u> hereto, shall be applied as follows:

(A)    First, to the payment of accrued and unpaid interest on the DIP Notes on a pro-rata basis;

(B)    Second, to the payment of the principal amount outstanding on the DIP Notes until paid in full on a pro-rata basis; and

(C)    Third, to the payment of all other amounts owing to the DIP Note Purchasers hereunder and under the other DIP Documents on a pro rata basis.

(ii)    All proceeds of the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Proceeds shall be applied as follows:

(A)    First, to the payment of accrued and unpaid interest on the DIP Inventory Acquisition Line of Credit Advances to the DIP Inventory Acquisition Line of Credit Purchasers on a pro-rata basis;

(B)    Second, to the payment of the principal amount outstanding on the DIP Inventory Acquisition Line of Credit until the DIP Inventory Acquisition Line of Credit is paid in full, to the DIP Inventory Acquisition Line of Credit Purchasers on a pro-rata basis; and

(C)    Third, to the payment of the amounts set forth in the Authorized Budget.

18

(iii)    All proceeds of the Section 541 Proceeds shall be applied pari-passu to (i) the Bankruptcy Court approved fees and costs of the Borrower's Professionals and the Creditors Committee's Professionals, respectively, not to exceed the amounts set forth in the Authorized Budget for each of the Borrower's Professionals and the Creditors Committee's Professionals, to the extent not otherwise satisfied by the Carve-Out, and (ii) the outstanding amount due under the DIP Note Facility (exclusive of the DIP Inventory Acquisition Line of Credit), the DIP Factoring Facility and the DIP Inventory Acquisition Line of Credit, respectively; with any remaining proceeds after payment in full of (i) and (ii) above, being paid to the Borrower's bankruptcy estate.

4.    Conditions.

(a)    Conditions to Effectiveness and Interim DIP Issuance.    This Agreement shall become effective as of the date first above written upon, and the obligation of each DIP Note Purchaser to make its pro rata share of the Interim DIP Issuance is subject to, satisfaction of each of the following (unless otherwise waived by the DIP Note Purchasers):

(i)    Approvals.    The DIP Note Purchasers shall have received satisfactory evidence that Borrower has obtained all required consents and approvals of all Persons, including all requisite Governmental Authorities, in connection with the filing of the Chapter 11 Case, and there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the transactions contemplated hereby.

(ii)    Second Interim DIP Order.    On or prior to the date of this Agreement, the Second Interim DIP Order, in form and substance satisfactory to the DIP Note Agent, was entered by the Bankruptcy Court and shall not have been vacated, reversed, modified, amended or stayed in any manner adverse to the DIP Note Purchasers or DIP Factoring Purchasers without the written consent of the DIP Note Agent, or to the extent adversely and disproportionately affecting any particular DIP Note Purchaser or DIP Factoring Purchaser, such adversely affected DIP Note Purchaser or DIP Factoring Purchaser.

(iii)    Automatic Stay.    The automatic stay shall have been modified to permit the creation and perfection of the DIP Note Purchasers' Liens and security interests, as more fully set forth in the Second Interim DIP Order.

(iv)    Orders.    All "first day orders" and "second day orders" and any final versions thereof sought to be entered by any of Borrower shall be in form and substance satisfactory to the DIP Note Agent, including without limitation, any such orders permitting the payment by Issuer and its subsidiaries of any prepetition amounts then (or thereafter becoming) due and owing.

(v)    Liens.    Upon the entry of the Second DIP Order, the DIP Note Agent shall, for the benefit of the DIP Note Purchasers, have valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on the DIP Collateral to the extent set forth in the Second Interim DIP Order, subject to the priorities described in Schedule IV hereto,

19

and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid.

(vi)    _Deliveries_.  The DIP Note Agent and the DIP Note Purchasers shall have received the following supporting documents with respect to Borrower:

(A)    a copy of its articles of incorporation certified as of a date within thirty (30) days of the Final Closing Date, to be a true and accurate copy by the Secretary of State of Nevada;

(B)    a certificate of the Secretary of State of Nevada, dated as of a date within thirty (30) days of the Final Closing Date, to its existence and (if available) good standing;

(C)    a copy of its bylaws, certified by its secretary, to be a true and accurate copy of its bylaws in effect on the Final Closing Date;

(D)    true and correct copies of the corporate resolutions, duly adopted, approved or otherwise delivered by the directors, officers and shareholders (to the extent necessary and applicable), each of which is certified to have been and will be in full force and effect on the Interim Closing Date and the Final Closing Date, as applicable, authorizing the execution and delivery by the Borrower of this Agreement and any other DIP Documents delivered on the Interim Closing Date and the Final Closing Date, as applicable to which it is a party and the performance by it of all its obligations thereunder; and

(E)    such additional supporting documents and other information with respect to its operations and affairs as the DIP Note Agent or any DIP Note Purchaser may reasonably request.

(vii)    _Miscellaneous_.  Delivery of such other DIP Documents (including a deposit account control agreement for the DIP Note Disbursement Account) as the DIP Note Agent may require evidencing the Liens on the DIP Collateral and customary closing deliverables.

(b)    _Conditions to Each Primary DIP Issuance, Additional DIP Issuance and DIP Inventory Acquisition Line Advance_.  The obligation of each DIP Note Purchaser to purchase its pro rata share of DIP Notes for the Primary DIP Issuance, Additional DIP Issuance and DIP Inventory Acquisition Line Advance is subject to satisfaction of each of the following (unless otherwise waived by the DIP Note Purchasers):

(i)    _Interim DIP Orders_.  The Interim DIP Orders shall not have been vacated, reversed, modified, amended or stayed in any manner adverse to the DIP Note Purchasers or DIP Factoring Purchasers without the written consent of the DIP Note Agent, or to the extent adversely and disproportionately affecting any particular DIP Note Purchaser or DIP Factoring Purchaser, such adversely affected DIP Note Purchaser or DIP Factoring Purchaser.

20

(ii)    <u>Final Order</u>.  On or prior to February 21, 2023 (unless waived by the DIP Note Agent), the Final Order, in form and substance satisfactory to the DIP Note Agent shall have been entered by the Bankruptcy Court and shall not have been vacated, reversed, modified, amended or stayed in any manner adverse to the DIP Note Purchasers or DIP Factoring Purchasers without the written consent of the DIP Note Agent, or to the extent adversely and disproportionately affecting any particular DIP Note Purchaser or DIP Factoring Purchaser, such adversely affected DIP Note Purchaser or DIP Factoring Purchaser.

(iii)    <u>Automatic Stay</u>.  The automatic stay shall have been modified to permit the creation and perfection of the DIP Note Purchasers' Liens and security interests, as more fully set forth in the Final Order.

(iv)    <u>Liens</u>.  Upon the entry of the Final Order, the DIP Note Agent shall, for the benefit of the DIP Note Purchasers, have valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on the DIP Collateral to the extent set forth in the Final Order, subject to the priorities described in <u>Schedule IV</u> hereto, and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid.

(v)    <u>No Default</u>.  No Default or Event of Default has occurred and is continuing or would result after giving effect to the DIP Note Purchase.

(vi)    <u>Representations and Warranties</u>.  Each representation and warranty by Borrower set forth in this Agreement is true and correct in all respects.

(vii)    <u>Insurance</u>.  DIP Note Agent shall be reasonably satisfied with the amount, types and terms and conditions of all insurance and bonding maintained by Borrower and its subsidiaries. DIP Note Agent shall receive endorsements naming DIP Note Agent as an additional insured and loss payee under all insurance policies to be maintained with respect to the properties of Borrower and its subsidiaries forming part of the DIP Collateral.

(viii)    <u>Note Issuance Request</u>.  The DIP Note Agent and the DIP Note Purchasers shall have received a Notice of Note Issuance.

(ix)    <u>Authorized Budget</u>.  Following the one-week anniversary of the Second Interim DIP Order, all issuances of DIP Notes shall be made subject to and in accordance with the Authorized Budget, as updated pursuant to the terms of this Agreement.

Issuance by Borrower of any DIP Note shall be deemed to constitute a representation and warranty by Borrower on the date thereof as to satisfaction of each of the conditions specified in this <u>Section 4(b)</u>.

(c)    <u>Additional Conditions to Each Additional DIP Issuance</u>.  The obligation of each DIP Note Purchaser to purchase its pro rata share of DIP Notes for the Additional DIP Issuance is further subject to satisfaction of each of the additional following requirements (unless otherwise waived by the DIP Note Agent):

(i)    <u>Monthly Basis</u>. Funding of the Additional DIP Issuance shall be made available on a monthly basis commencing on the Initial Additional DIP Issuance Funding Date in accordance with the Authorized Budget and upon satisfaction of all terms and conditions of this Agreement after the Final Closing Date.

(ii)    <u>Positive EBITDA</u>.

(A)    If on the Initial Test Date, the Authorized Budget forecasts that the next following calendar month, June 2023, Borrower will have positive EBITDA in such following calendar month and in the following three (3) months, in the aggregate, then on the Initial Additional DIP Issuance Funding Date, the DIP Note Purchasers shall purchase DIP Notes in the amount of $500,000 of the Additional DIP Issuance.

(B)    If on each succeeding Test Date after the Initial Test Date, Borrower had a positive EBITDA for the month ending on such Test Date and the Authorized Budget forecasts that the next following calendar month, Borrower will have positive EBITDA in such following calendar month, then on each applicable succeeding Additional DIP Issuance Funding Date, the DIP Note Purchasers shall purchase DIP Notes in the amount of $250,000 of the Additional DIP Issuance.

5.    <u>Representations and Warranties</u>.  Borrower hereby represents and warrants to each DIP Note Purchaser, as of the date hereof, the date of any Notice of Note Issuance and as of the date of the purchasing of any DIP Note, that:

(a)    <u>Existence</u>.  Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation.

(b)    <u>Power and Authority</u>.  Subject to the entry of the Interim DIP Orders and Final Order, as applicable, by the Bankruptcy Court, Borrower has (i) the power and authority and (ii) all governmental licenses, authorizations, consents and approvals to own its assets, carry on its business and execute, deliver, and perform its obligations under this Agreement and the other DIP Documents.

(c)    <u>No Conflict</u>.  Subject to the entry of the Interim DIP Orders and Final Order, as applicable, by the Bankruptcy Court, the execution, delivery and performance by Borrower of this Agreement and the other DIP Documents has been duly authorized by all necessary action on the part of such Borrower, and does not and will not (i) contravene the terms of any of such Borrower's corporate documents, (ii) violate, conflict with or result in any material breach or contravention of, or result in the creation of any Lien under, any indenture, agreement and other instrument binding upon it or its property the effect of which has not been stayed by the automatic stay or the Bankruptcy Court or (iii) violate or conflict with any law, regulation or order of any Governmental Authority applicable to it or its property.

(d)    <u>Governmental Authorization</u>.  Other than the entry of the Second Interim DIP Order and Final Order, as applicable, by the Bankruptcy Court, no approval, consent, exemption, or authorization of, or other action by, or notice to, or filing, declaration, recording or registration

22

with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, Borrower of this Agreement.

(e)     <u>Due Execution; Binding Effect</u>.  Each of this Agreement and the other DIP Documents have been (or upon execution and delivery will be) duly executed and delivered by Borrower.  Subject to the entry of the Second Interim DIP Order and Final Order, as applicable, by the Bankruptcy Court, each of this Agreement and the other DIP Documents constitutes the legal, valid and binding obligation of Borrower, enforceable against such Borrower in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

(f)     <u>No Default</u>.  No Default or Event of Default has occurred and is continuing.

(g)     <u>Budget</u>.  To the best information and belief of Borrower, the Authorized Budget attached hereto as <u>Exhibit A</u> and all projected consolidated balance sheets, income statements and cash flow statements of Borrower in connection with a Proposed Budget delivered to the DIP Note Agent and/or the DIP Note Purchasers pursuant to <u>Section 6(a)(ii)</u> reasonably presents (or will present), in all material respects, on a pro forma basis, the projected cash receipts and disbursements of Borrower for the period specified therein and such projections, in the reasonable view of the Independent Director of Borrower, are (or will be) reasonably achievable based upon reasonable assumptions and other information available to Borrower as of the date hereof (or thereof).

(h)     <u>Disclosure</u>.  To the best information and knowledge of Borrower, no representation or warranty by Borrower in this Agreement or in any other DIP Document and no certificate, schedule, exhibit, report or other document provided or to be provided by Borrower in connection with the transactions contemplated hereby or thereby (including, without limitation, the negotiation of and compliance with the DIP Documents) contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

(i)     <u>Chapter 11 Case Matters</u>.  Pursuant to and to the extent permitted in the Second Interim DIP Order and Final Order, as applicable, the Obligations will constitute allowed super-priority administrative expense claims in the Chapter 11 Case having priority above all other administrative expense claims (other than the Carve-Out (as defined in the Final Order)) as set forth in the Final Order.  After the entry of the Second Interim DIP Order and Final Order, as applicable, the Obligations will be secured by a valid and perfected, enforceable and unavoidable first priority Lien on the DIP Collateral as more fully set forth in the Second Interim DIP Order and Final Order, as applicable.  The Second Interim DIP Order and Final Order, as applicable, is in full force and effect and has not been reversed, stayed, modified or amended without the prior written consent of the DIP Note Agent.  Subject to the Second Interim DIP Order and Final Order, as applicable, notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the DIP Note Agent and the DIP Note Purchasers shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder and under applicable law, without further application to or order by the Bankruptcy Court, as more fully set forth in the Final Order.

23

(j)     Resignations.  Prior to the effective date of this Agreement, Ryan Drexler resigned from all offices of Borrower and from the board of directors of Borrower, and Eric Hillman was appointed as the Chief Executive Officer of Borrower.

(k)     Interim DIP Issuance Use of Proceeds.  Following the First Interim Order, the initial $150,000 of proceeds from the Interim DIP Issuance was approved for use by the Borrower to pay for only those reasonable expenses associated with: (i) payroll; (ii) insurance; (iii) product labeling; and (iv) other reasonable and necessary operational expenses.  Pursuant to the First Interim Order, as of January 13, 2023, the DIP Note Purchaser has advanced $131,296.31 of the Interim DIP Issuance and as of the date of this Agreement, the DIP Note Purchaser has advanced $750,000.00 of the Interim DIP Issuance to fund the specific requests of Borrower.

(l)     Board of Directors.

(i)     Interim Board of Directors.  The board of directors of the Borrower as of the Petition Date shall have resigned and the Interim Board of Directors shall have been appointed and shall have served as the board of directors of Borrower through the date the Second Interim DIP Order was entered by the Bankruptcy Court.

(ii)     Independent Director.  Upon entry of the Second Interim DIP Order by the Bankruptcy Court, or sooner, the Independent Director shall be Nicolas Rubin, with sole and exclusive responsibility for the Borrower for the following:

(A)     Protect and recover the assets of Borrower, including determine whether it is in the best interest of Borrower to reorganize under Section 1129 of the Bankruptcy Code, or sell its assets in accordance with Section 363 of the Bankruptcy Code;

(B)     Review and approve the ultimate debtor-in-possession financing incurred by the bankruptcy estate, as negotiated by the Borrower's restructuring professionals, which will be approved as part of the Final Order;

(C)     Except as otherwise provided in this Agreement, investigate and determine which estate causes of action, if any, should be pursued, prosecuted, or settled; and

(D)     Maximize value for all stakeholders.

6.     Covenants.  Borrower hereby covenants and agrees that from the date hereof until payment in full of all the Obligations and termination of all DIP Note Purchase Commitments that:

(a)     Reporting.

(i)     Bankruptcy Matters.  Borrower shall provide to the DIP Note Agent and the Creditors' Committee, copies of all projections or other information respecting Borrower's business or financial condition, provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or any creditors' committee, at

24

the time such document is provided by or to the U.S. Trustee (or any monitor or interim receiver, if any appointed in the Chapter 11 Cases) or such committee.

(ii)    <u>Proposed Budget</u>.  Every four weeks on Wednesday commencing with the Wednesday of the fourth full week commencing after the one-week anniversary of the Second Interim DIP Order, Borrower shall prepare and deliver to the DIP Note Agent, the DIP Factoring Agent and the Creditors' Committee for review, and for DIP Note Agent's consent, in DIP Note Agent's sole but reasonable discretion, a Proposed Budget updating the Authorized Budget then in effect at such time.  At such time that such Proposed Budget is consented to by the DIP Note Agent in writing it shall become the Authorized Budget. To the extent any updated Proposed Budget is not acceptable to the DIP Note Agent, the then-existing Authorized Budget will remain the Authorized Budget until replaced by an updated Proposed Budget that is acceptable to the DIP Note Agent. Upon request of the DIP Note Purchasers, Seller shall deliver the Proposed Budget to the DIP Note Purchasers for their review.

(iii)    <u>Intentionally Omitted</u>.

(iv)    <u>Budget Reconciliation</u>.  Compliance with the Authorized Budget shall be reviewed on Monday of every other week on a bi-weekly basis, with such reviews to be conducted on the Monday following each of the second and fourth weeks of the Authorized Budget (each, a "<u>Weekly Review Period</u>") and thereafter on a rolling 4-week basis (the "<u>Cumulative Review Period</u>" and together with the Weekly Review Period, the "<u>Review Periods</u>").  Beginning on the second Monday following the Second Interim DIP Order and every other Monday thereafter, the Borrower shall deliver to the DIP Note Agent and the Creditors' Committee, not later than 4:00 p.m. Pacific time on each Monday (commencing with the Monday after the one-week anniversary of the Second Interim DIP Order), a weekly line-by-line variance report (the "<u>Variance Report</u>"), which Variance Report shall compare actual cash receipts and disbursements of the Borrower with corresponding amounts provided for in the Authorized Budget on a line-by-line basis for the prior week and the applicable Review Period (or such shorter period as may have elapsed from the Petition Date), including written descriptions in reasonable detail explaining any material positive or negative variances, and otherwise in form and substance reasonably acceptable to the DIP Note Agent.

(v)    <u>Financial and Restructuring Advisor Reports</u>.  The Note Parties shall deliver to the DIP Note Agent and the Creditors' Committee copies of all non-privileged reports of the financial and restructuring advisors of the Note Parties as reasonably requested by the DIP Note Agent, including but not limited to:

i.    Any analysis of cash flows, forecasts, and potential cost savings initiatives;

ii.    Transaction marketing material (CIMs / MPs);

iii.    Investor outreach list;

25

iv.    Sale process updates in accordance with the terms of this Agreement and the Bankruptcy Orders; and

v.    Proposed sources and uses at emergence.

(vi)    <u>Additional Information</u>.  Borrower shall, promptly following reasonable advance notice to Borrower, provide (i) the DIP Note Purchasers such additional business, financial, collateral and other information as the DIP Note Purchasers may from time to time reasonably request and (ii) participate in bi-weekly conference calls between the directors or other reasonably requested management representatives of Borrower and the DIP Note Agent during normal business hours at a time to be mutually agreed upon to discuss the business affairs and performance of Borrower (including the Chapter 11 Cases).

(b)    <u>Notice of Event of Default</u>.  Borrower shall, promptly upon obtaining knowledge thereof, notify the DIP Note Agent and the DIP Note Purchasers of the occurrence or existence of any Default or Event of Default.

(c)    <u>Existence</u>.  Borrower shall preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of incorporation.

(d)    <u>Compliance with Laws</u>.  Borrower will comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property.

(e)    <u>Intentionally Omitted</u>.

(f)    <u>Chief Restructuring Officer/Financial Advisor</u>.  Borrower may, at Borrower's election and subject to the approval of the Bankruptcy Court, engage a Chief Restructuring Officer or financial advisor (the "<u>CRO</u>") reasonably satisfactory to the DIP Note Agent pursuant to an engagement letter with a scope and compensation reasonably satisfactory to the DIP Note Agent and otherwise be in form and substance satisfactory to the DIP Note Agent.  All fees and expenses of (and otherwise relating to) the CRO shall be the sole responsibility of Borrower.  The CRO shall not be removed without order of the Bankruptcy Court.  Furthermore, the CRO's fees and costs shall not exceed $50,000 per month, except as otherwise approved by the Board of Directors.

(g)    <u>Access to Information</u>.  At the request of the DIP Note Agent, the Note Parties shall (i) arrange and cause to be held bi-weekly conference calls between representatives of the Note Parties, the CRO, if engaged, and the DIP Note Agent (which may, to the extent practicable, be the same bi-weekly conference that may be requested pursuant to <u>Section 6(a)(vi)</u> above), which shall occur during normal business hours at a time to be mutually agreed for purposes of providing information regarding the status of the Chapter 11 Case, Borrower's business operations, the preparation, filing, and confirmation of an Acceptable Plan, and a Sale Transaction process that, if a stalking horse bidder is part of the sale process, would not be deemed to provide preferential treatment to such bidder; <u>provided</u> that, for the avoidance of doubt, information regarding the number and identity of the parties contacted and the overview of the marketing efforts undertaken in connection with a Sale Transaction shall not be deemed to provide preferential treatment and shall be disclosed; (ii) at all times provide the DIP Note Agent allowing potential purchasers to evaluate a Sale Transaction; and (iii) provide the DIP Note Agent and its professional advisors

26

with all materials and other communications regarding a Sale Transaction process provided and available to all bidders at the time of distribution to any or all bidders. If at any time the stalking horse bidder is not part of the sale process, then Borrower shall arrange and cause to be held weekly conference calls between representatives of the Note Parties, the CRO, if engaged, and the DIP Note Agent (which may, to the extent practicable, be the same bi-weekly conference that may be requested pursuant to Section 6(a)(vi) above), which shall occur during normal business hours at a time to be mutually agreed for purposes of providing full and complete information regarding a Sale Transaction process to the DIP Note Agent.

(h)    Use of Proceeds.  Borrower shall utilize the proceeds of the DIP Note Purchases and Cash Collateral solely to fund, and in each case solely in accordance with the Authorized Budget, this Agreement, the Interim DIP Orders and the Final Order, (i) fees, interest, payments, and expenses associated with this Agreement and the DIP Note Facility, and the DIP Factoring Agreement and the DIP Factoring Facility, (ii) the ongoing working capital and capital expenditure needs of the Note Parties during the pendency of the Chapter 11 Case, (iii) the Carve-Out, (iv) the Forensic Accountant (if retained), and (v) approved expenses of the administration of the Chapter 11 Case (including the payment of the Borrower's Professional Fees and the Creditor's Committee's Professional Fees), and similar costs, with any unpaid amounts in this category (v) subordinated in priority to (i)- (iv) above if the DIP Notes terminate and Borrower lacks sufficient funds to pay in full all amounts required under (i)-(iv) above.  Except as set forth in the Second Interim DIP Order or the Final Order, the Note Parties shall not be permitted to use proceeds of the DIP Note Purchases or Cash Collateral (i) for payment of interest or principal with respect to any Indebtedness (other than the Obligations pursuant to this Agreement), (ii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation challenging, or to object, contest or raise any defense to, the amount, validity, perfection, priority, extent or enforceability of, or to assert any defense, counterclaims or offset to, the Obligations or the Liens and security interests of the DIP Note Agent and/or the DIP Note Purchasers on or in the DIP Collateral or any amount due under, or the liens or claims granted under or in connection with the DIP Note Facility, DIP Factoring Facility or the Prepetition Notes or the Prepetition Note Liens, (iii) to assert any claims, counterclaims, defenses, causes of action, objections or contests (including, without limitation, any claims or causes of action arising under chapter 5 of the Bankruptcy Code) against the DIP Note Purchasers or the DIP Note Agent or any of their agents, affiliates, representatives, attorneys or advisors, arising out of the Prepetition Notes or the Prepetition Note Liens or this Agreement, (iv) to seek to modify any of the rights granted to the DIP Note Purchasers or DIP Note Agent under this Agreement, the DIP Documents, or related documents or (vi) to make any Restricted Payment or Investment.

(i)    Indebtedness.  The Note Parties shall not create, incur, assume or permit to exist any Indebtedness, except the Obligations and the Scheduled Preexisting Indebtedness.

(j)    Liens.  No Note Party shall create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, other than the Permitted Encumbrances and the Scheduled Preexisting Liens.

(k)    Restricted Payments.  The Note Parties shall not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment.

27

(l)    <u>Investments</u>.  The Note Parties shall not make, or agree to make, any Investments.

(m)    <u>Cash Collateral</u>.  The Cash Collateral shall be used only in accordance with <u>Section 6(h)</u> hereto and in a manner consistent with the Authorized Budget.

(n)    <u>Cash Management</u>.  Until the indefeasible repayment of the Obligations in full in cash and the termination of all DIP Note Purchase Commitments under this Agreement, Borrower's cash and cash equivalents shall only be used in accordance with <u>Section 6(i)</u> hereto and the Authorized Budget.

(o)    <u>Dispositions</u>.  No Note Party shall sell, lease, transfer, assign or otherwise dispose of any of its assets or properties other than in the ordinary course of such Note Party's business without the prior written consent of the DIP Consenting Secured Parties, and Borrower acknowledges that any DIP Collateral that is the subject of any sale, lease transfer or assignment that is not sold in in the ordinary course of Borrower's business or does not receive such written consent shall continue to be subject to all Liens of the DIP Note Agent for the benefit of the DIP Note Purchasers.

(p)    <u>Forensic Accounting</u>.  At the request of the DIP Note Agent and approval of the Board of Directors, the Borrower shall retain a forensic accountant reasonably acceptable to the DIP Note Agent (the "<u>Forensic Accountant</u>") to review and analyze all Borrower's bank statements for three (3) or more years prior to the Petition Date and any other documents and information necessary to investigate payments and transfers from Borrower to render an opinion regarding whether they are avoidable under federal and state law.  The DIP Note Agent will, with the consent of the DIP Consenting Secured Parties, increase the DIP Note Facility in the amount necessary to pay for the forensic accounting in an amount mutually agreed to by the DIP Note Agent and the Borrower.

(q)    <u>Budget Variance</u>.  Following the one-week anniversary of the Second Interim DIP Order, the Note Parties shall perform in accordance with the Authorized Budget, subject to the following with respect to any Review Period: (i) the Note Parties' actual cash receipts shall not be less than 90% of the projected amounts therefor set forth in the Authorized Budget on a cumulative basis; and (ii) the Note Parties' actual cash disbursements shall not be greater than 110% of the projected amounts therefor set forth in the Authorized Budget on a cumulative basis (such variance, the "<u>Permitted Variances</u>").  Notwithstanding the foregoing, during any Review Period occurring prior to March 15, 2023, the DIP Note Purchasers waive all defaults of the Note Parties for failing to comply with the Authorized Budget, including the Permitted Variances, <u>solely with respect to</u> (i) top line gross revenue and cash receipts and (ii) all cost of goods sold, including shipping.

(r)    <u>Chapter 11 Case Pleadings</u>. Borrower shall provide DIP Note Agent as soon as is reasonably practical in advance of filing with the Bankruptcy Court, any draft of any motions, orders, amendments, supplements or other pleadings that Borrower proposes to file with the Bankruptcy Court seeking approval of the DIP Facilities. Borrower shall file all pleadings with the Bankruptcy Court as are necessary or appropriate to secure entry of the DIP Documents, shall serve all parties entitled to notice of such pleadings under applicable provisions of the Bankruptcy Code and all related rules and shall diligently pursue the obtaining of such orders. Borrower shall

28

oppose and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, reargument, reconsideration or revocation) if any challenge to such DIP Documents is filed. Borrower shall reasonably cooperate with DIP Note Agent with respect to all such filings and incorporate any reasonable comments of DIP Note Agent and its counsel into such order, amendment, supplement, motion or pleading. Each party hereto shall promptly notify the other party if at any time such party becomes aware that any information provided to the Bankruptcy Court contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

      (s)     <u>Asset Sale and Unconditional Right to Credit Bid.</u>

      (i)     Borrower shall consent to (i) the DIP Note Agent submitting a credit bid of the Obligations under the DIP Facilities (the "<u>DIP Agent Credit Bid Obligations</u>"), and (ii) subject to the express limitations contained in <u>Section 10(i)</u> of this Agreement, the Prepetition Collateral Agent submitting a credit bid of an amount not less than the Allowed Claim, which is the principal amount of the Prepetition Notes, including the original issue discount, or such greater amount as allowed by the Bankruptcy Court (the "<u>Prepetition Collateral Agent Credit Bid Obligations</u>" and together with the DIP Agent Credit Bid Obligations, the "<u>Credit Bid Obligations</u>"), in connection with the sale of any asset of the Note Parties (in whole or in part), including without limitation, sales occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code and any motion filed by Borrower seeking approval of bid procedures shall contain a request for approval of the right of the DIP Note Agent and Prepetition Collateral Agent, as applicable, to credit bid the Credit Bid Obligations and Borrower shall not object to such a provision.

      (ii)     Without limiting the foregoing, if, pursuant to a sale order issued by the Bankruptcy Court, the DIP Note Agent, as collateral agent for the DIP Note Purchasers, or its designee, is the winning bidder, either the assets of Borrower shall be sold to the DIP Note Agent, as collateral agent for the DIP Note Purchasers, or its designee, pursuant to a Sale Transaction, which sale may or may not be a component of the Accepted Plan, for the consideration set forth in the winning bid or a transaction having substantially the same effect shall be consummated as a restructuring of Borrower pursuant to an Accepted Plan; provided, however, that if an Event of Default occurs under this Agreement or the DIP Documents, then, if the DIP Note Agent, as collateral agent for the DIP Note Purchasers, so elects, the assets of Borrower shall be sold to the highest and best offer pursuant to a sale order as a Sale Transaction outside of an Accepted Plan for the consideration set forth in the winning bid. Any Sale Transaction, similar transaction or an Accepted Plan having the same effect, shall permit the DIP Note Agent, as collateral agent for the DIP Note Purchasers to credit bid as set forth in subsection (s)(i) above. The DIP Note Agent, as collateral agent for the DIP Note Purchasers, is and shall be a qualified bidder under any auction or sale procedures and may participate at any auction, sale or other restructuring transaction.

(iii)    No Note Party shall file or support any plan of reorganization that seeks to impair the DIP Note Agent's credit bid rights or terms-out, crams-down or extends the Obligations under the DIP Facilities under Bankruptcy Code section 1129(b) or otherwise.

(t)    <u>Exclusive Period of Time to Confirm Plan of Reorganization</u>. No Note Party may seek extension of the exclusive periods of Borrower to confirm an Acceptable Plan without the prior written approval of the DIP Note Agent, which approval shall not be unreasonably withheld, conditioned, or delayed.

(u)    <u>Intercreditor Agreement</u>.  Upon DIP Note Agent's request, Borrower shall fully cooperate with DIP Note Agent and use its best efforts in assisting DIP Note Agent to obtain an intercreditor agreement from each Prepetition Purchaser and Prestige (or its successor in interest) with respect to the priority of the Liens and Permitted Encumbrances on the DIP Collateral, which intercreditor agreements shall be consistent with the priority of such Liens and Permitted Encumbrances set forth on Schedule IV and the Final Order and satisfactory to DIP Note Agent in its sole discretion.

(v)    <u>Further Assurances</u>.

(i)    Promptly upon request by the DIP Note Agent, Borrower shall take such additional actions and execute such documents as the DIP Note Purchasers may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement, (ii) to subject to the Liens created by the Second Interim DIP Order and Final Order, as applicable, any of the properties, rights or interests covered by the Final Order, (iii) to perfect and maintain the validity, effectiveness and priority of any of the Liens created by the Second Interim DIP Order and Final Order, as applicable, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the DIP Note Agent and the DIP Note Purchasers the rights granted or now or hereafter granted to the DIP Note Agent and the DIP Note Purchasers under this Agreement and the Interim DIP Orders and Final Order, as applicable.  All documented expenses of the DIP Note Agent and the DIP Note Purchasers incurred pursuant to this <u>Section 6(u)</u> shall constitute Obligations under this Agreement.

(ii)    Without limiting <u>Section 6(u)(i)</u> above, the Note Parties shall execute and deliver to the DIP Note Agent security agreements, pledge agreements, control agreements or any such other documents, instruments or agreements as the DIP Note Agent or such DIP Note Purchasers shall reasonably request to further evidence the Liens and security interests in respect of the DIP Collateral.  All of the documents delivered pursuant to this <u>Section 6(u)(ii)</u> shall be in form and substance reasonably satisfactory to the DIP Consenting Secured Parties.

(iii)    Each of the Note Parties hereby authorizes the DIP Note Agent to prepare and file and/or record UCC-1 financing statements with respect to that portion of the DIP Collateral for which the Liens and security interests secure the Obligations can be perfected by such filing or recordation.

(iv)    The Note Parties shall deliver to the DIP Note Agent control agreements in form and substance reasonably acceptable to the DIP Note Agent and the DIP Consenting Secured Parties, with respect to the DIP Note Disbursement Account and each account where such Borrower has cash and cash equivalents. Borrower shall maintain all cash and cash equivalents of Borrower in the DIP Note Disbursement Account or, solely to the extent approved by the Cash Management Order or the Final Order, other segregated accounts consistent with either the Cash Management Order or the Final Order and applicable Bankruptcy Rules and regulations. Each control agreement shall provide, among other things, that, upon notice from the DIP Note Agent to the applicable financial institution that an Event of Default exists hereunder, such financial institution shall only take instructions with respect to the applicable account from the DIP Note Agent and Borrower shall not have access to such account.

7.    <u>Events of Default</u>.  Each of the following events, if it occurs before all of the Obligations have been paid in full and all of the DIP Note Purchase Commitments have been terminated, shall be referred to herein as an "<u>Event of Default</u>":

(a)    failure of Borrower to make any payment of principal of or interest upon the DIP Notes or any fees under the DIP Facilities when due and payable;

(b)    (i) failure of Borrower to perform or observe any term, covenant or agreement contained in <u>Section 6(a)(ii)</u>, (iii) and (iv), (b), (g), (h), (i), (j), (k), (l), (m), (n), (o) or (s), or (ii) failure of Borrower or any other Note Party to perform or observe any other term, covenant or agreement contained in this Agreement, any other DIP Document, the Interim DIP Orders, or the Final Order and, in the case of the foregoing <u>clause (ii)</u>, such default shall continue unremedied for a period of five (5) Business Days from the earlier of the date that (i) any Note Party obtains knowledge of such breach and (ii) any Note Party receives written notice of such default from any DIP Consenting Secured Party;

(c)    any representation, warranty or certification by any Note Party made herein, in any DIP Documents or in any report, certificate, financial or similar statement or other document or instrument furnished in connection with this Agreement or the other DIP Documents shall prove to have been incorrect or misleading in any material respect on or as of the date made or deemed made;

(d)    any Note Party shall have failed to receive, as and when required, any consent or approval from any Governmental Authority necessary in order for such Note Party to perform its obligations hereunder in accordance with all applicable laws, rules and regulations;

(e)    the DIP Note Agent shall cease to have continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected senior liens on and security interests in the DIP Collateral with the priorities described in <u>Schedule IV</u> hereto (other than upon a release by reason of a transaction that is permitted under the DIP Documents);

(f)    any Note Party or equity holder or Affiliate thereof (other than White Winston and/or Ryan Drexler as otherwise permitted herein) (i) contesting the validity or enforceability of any DIP Document in writing or denying in writing that it has any further liability thereunder or

(ii) contesting the validity or perfection of the Liens and security interests securing the DIP Facilities;

(g) any attempt by any Note Party or any equity holder or Affiliate thereof (other than White Winston and/or Ryan Drexler as otherwise permitted herein) to invalidate or otherwise impair the DIP Facilities or the Liens granted to the DIP Note Purchasers or DIP Factoring Purchasers;

(h) The Independent Director shall cease to serve as a director on the board of directors of Borrower pursuant to its corporate documents unless the resignation or removal of the Independent Director and the selection of its successor is made in accordance with the corporate documents of Borrower and is approved in advance by the DIP Note Agent, which approval shall not be unreasonably withheld, conditioned or delayed;

(i) an "Event of Default" occurs under this Agreement, the Interim DIP Orders, Final Order or any other DIP Documents, including without limitation, the failure by any Note Party to comply with the Interim DIP Orders or Final Order, as applicable;

(j) the filing by any Note Party of any motion or proceeding, or the entry of an order by the Bankruptcy Court, which could reasonably be expected to result in material impairment of the DIP Note Agent's or any DIP Note Purchaser's rights under the DIP Documents, the Interim DIP Orders or the Final Order;

(k) the failure to meet any Milestone Requirement;

(l) the occurrence of any of the following in any Chapter 11 Case:

(i) the Interim DIP Orders or the Final Order, as applicable, at any time ceases to be in full force and effect;

(ii) the entry of an order by a court of competent jurisdiction amending, supplementing, staying, vacating, reversing or otherwise modifying this Agreement, the other DIP Documents, the Interim DIP Orders, the Final Order, as applicable, without the express written consent of the DIP Note Agent;

(iii) the appointment of an interim or permanent trustee or the appointment of a responsible person or an examiner with expanded powers to operate or manage the financial affairs, the business, or reorganization of Borrower (powers beyond those expressly set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under sections 1104(d) and 1106(b) of the Bankruptcy Code;

(iv) (x) the dismissal of, or the filing of a motion by any Note Party or any equity holder or Affiliate thereof (other than White Winston and/or Ryan Drexler as otherwise permitted herein) to dismiss, the Chapter 11 Case or (y) conversion of, or the filing of a motion by any Note Party or any equity holder or Affiliate thereof (other than White Winston and/or Ryan Drexler as otherwise permitted herein) to convert, the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(v)      the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any DIP Collateral, including without limitation, to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral having a fair market value in excess of an amount to be agreed in writing by the DIP Note Agent, or (y) to permit the perfection of any Lien on the DIP Collateral unless such Lien is or shall be junior in priority to the Liens securing the Obligations;

(vi)      the entry of an order avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement;

(vii)      the entry of an order granting any super-priority administrative claim (other than the Carve-Out) or Lien (including adequate protection Liens) which are equal or superior to that provided to the DIP Note Purchasers, other than with respect to the Lien priorities set forth on Schedule IV hereof;

(viii)      the filing of any pleading by Borrower seeking or otherwise consenting to or supporting any of the matters set forth in clauses (iii), (iv), (v), (vi) or (vii) of this Section 7(l);

(ix)      any sale or disposition, other than the Sale Transaction, of all or a material portion of the DIP Collateral securing the DIP Facilities pursuant to section 363 of the Bankruptcy Code other than as permitted by the Bankruptcy Orders (or pursuant to a transaction that is permitted under the DIP Documents)

(x)      the filing of any plan of reorganization or a plan of liquidation that is not an Acceptable Plan;

(xi)      the termination or lapse of Borrower's "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization without the prior written consent of the DIP Note Agent;

(xii)      the grant of any adequate protection rights to any holder of a pre-petition claim or interest, unless otherwise consented to by the DIP Note Agent;

(xiii)      a Note Party engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of this Agreement or any other DIP Document or the Liens on or security interests in the assets of Borrower securing the Obligations;

(xiv)      the allowance of any claim or claims under section 506 or 552(b) of the Bankruptcy Code against or with respect to any of the DIP Collateral;

(xv)      Borrower moves the Bankruptcy Court to enter, modify or amend any Bankruptcy Order without the prior written consent of the DIP Note Agent to the form and substance of the proposed order;

(xvi)   the entry by the Bankruptcy Court of a debtor-in-possession financing order or amendment thereto, the form and substance of which is not consented to by the DIP Note Agent;

(xvii)   Borrower shall make any payment of principal or interest on any pre-petition Indebtedness, except for any payments on any pre-petition Indebtedness permitted to be made under the Final Order;

(xviii)   termination by the Bankruptcy Court of the use of Cash Collateral; or

(xix)   the Bankruptcy Court enters an order granting relief from the automatic stay to any Person asserting a claim or other right against any of Borrower relating to any alleged pre-petition actions or omissions unless otherwise consented to by the DIP Note Agent.

8.   <u>Remedies</u>.

(a)   <u>Certain Actions Following a Default</u>.  If any Event of Default shall occur and be continuing, upon compliance with the terms and conditions of the Interim DIP Orders or Final Order, as applicable, then the DIP Note Agent, solely with the consent of the DIP Consenting Secured Parties, shall (i) reduce the amount of, or terminate, any or all of the Aggregate DIP Note Purchase Commitment of the DIP Note Purchasers, (ii) declare all or any part of the unpaid balance of the DIP Notes and other Obligations then outstanding to be immediately due and payable and (iii) exercise any rights and remedies provided to the DIP Note Purchasers under this Agreement, under the Interim DIP Orders, under the Final Order, under any other DIP Document or at law or equity, including, without limitation, to seek relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, and apply the proceeds thereof to the obligations arising under the DIP Documents.

(b)   <u>Cumulative Remedies</u>.  To the extent not prohibited by the provisions of applicable law which cannot be waived, all of the DIP Note Purchasers' rights hereunder and under any other document between the DIP Note Purchasers and Borrower shall be cumulative.  No failure to exercise and no delay in exercising, on the part of the DIP Note Agent or any DIP Note Purchaser, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(c)   <u>Waivers</u>.  To the extent that such waiver is not prohibited by the provisions of applicable law that cannot be waived, Borrower hereby waives (1) all presentments, demands for performance, notices of nonperformance (except to the extent required by this Agreement), protests, notices of protest and notices of dishonor; (2) any requirement of diligence or promptness on the part of the DIP Note Agent or any DIP Note Purchaser in the enforcement of its rights under this Agreement; (3) any and all notices of every kind and description which may be required to be given by any statute or rule of law; and (4) any defense (other than indefeasible payment in full) which it may now or hereafter have with respect to its liability under this Agreement.

9.   <u>Creation of Security Interest</u>.

(a)    <u>Grant of Security Interest</u>.

(i)    To secure the payment and performance in full of all of the Obligations, the Note Parties hereby grant to the DIP Note Agent, as collateral agent for the DIP Note Purchasers, a continuing first priority security interest in, and pledge to Lender, the DIP Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof. Each Note Party represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the DIP Collateral (subject only to the Carve-Out and the lien priority set forth on <u>Schedule IV</u> attached hereto).  Upon payment in full of the Obligations (other than indemnification obligations for which no claim has been made) and at such time as DIP Note Purchasers' obligation to purchase DIP Notes has terminated, DIP Note Agent shall release and terminate its liens and security interests in the DIP Collateral.

(ii)    To secure the payment and performance in full of the DIP Inventory Acquisition Line of Credit, and without limiting any other security interest granted herein, Borrower hereby grants to the DIP Note Agent, as collateral agent for the DIP Inventory Acquisition Line of Credit Purchasers, a continuing first priority security interest in, and pledge to, all DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof. Borrower represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory (subject only to the lien priority set forth on <u>Schedule IV</u> attached hereto).  Upon payment in full of the DIP Inventory Acquisition Line of Credit (other than indemnification obligations for which no claim has been made) and at such time as DIP Inventory Acquisition Line of Credit Purchasers obligation to purchase DIP Notes under and fund the DIP Inventory Acquisition Line of Credit has terminated, DIP Note Agent shall release and terminate its liens and security interests in the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory.

(b)    <u>Subordination of Prepetition Obligations</u>. Subject to Schedule IV and the Final Order, all obligations judicially determined to be due and owing on account of the Prepetition Notes, the Prepetition Note Liens and/or the prepetition factoring facility, if any, and liens granted in the DIP Collateral shall be subject to this Agreement and shall be subordinate in all ways to the Lender's liens on the DIP Collateral hereunder.

(c)    <u>Authorization to File Financing Statements</u>. The Note Parties hereby authorize DIP Note Agent to file financing statements or other security documents, without notice to the Note Parties, with all appropriate jurisdictions to perfect or protect DIP Note Agent's and DIP Note Purchasers' interest or rights hereunder, including a notice that any disposition of the DIP Collateral (other than in accordance with this Agreement or order of the Bankruptcy Court), by either Borrower or any other Note Party, shall be deemed to violate the rights of DIP Note Agent and DIP Note Purchasers under the Code. Without limiting the foregoing, the Note Parties hereby authorize DIP Note Agent to file financing statements and other security documents which describe the collateral as "all assets" and/or "all personal property" of the Note Parties or words of similar import. Nothing in this Agreement shall limit the effectiveness of DIP Note Agent's and

35

DIP Note Purchasers' liens and claims pursuant to the Second Interim DIP Order or the Final Order.

      10.    <u>Administrative Priority; Lien Priority; Adequate Protection</u>.

      (a)    The Obligations of Borrower will, at all times, constitute allowed administrative expenses in the Chapter 11 Case, having priority in payment over all other administrative expenses and unsecured claims against Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, except as to the Carve-Out and the co-priority and subordination of Liens set forth on <u>Schedule IV</u> attached hereto and the Final Order.

      (b)    Pursuant to Section 364(d)(1) of the Bankruptcy Code, the Second Interim Order and the Final Order, all Obligations will be secured by a perfected priming first priority Lien on the DIP Collateral, except as to the Carve-Out and the co-priority and subordination of Liens set forth on <u>Schedule IV</u> attached hereto and the Final Order.

      (c)    The Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall receive, to the extent of any aggregate diminution in the value of their collateral, subject to the Carve-Out: (a) valid, binding, enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "<u>Prepetition Notes Adequate Protection Liens</u>"), subject to the co-priority and subordination of Liens described in <u>Schedule IV</u> attached hereto (which is reflective of existing intercreditor and subordination agreements which shall remain binding with respect to such lien priority) and the Final Order; and (b) allowed super-priority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "<u>Prepetition Notes Adequate Protection Claims</u>"), subject to the co-priority and subordination of Liens described in <u>Schedule IV</u> attached hereto (which is reflective of existing intercreditor and subordination agreements which shall remain binding with respect to such lien priority) and the Final Order.

      (d)    Prestige (or its successor-in-interest) shall receive, to the extent of any aggregate diminution in the value of its pre-petition collateral: (a) valid, binding, enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "<u>Prestige Adequate Protection Liens</u>"), subject to the co-priority and subordination of Liens described in <u>Schedule IV</u> attached hereto (which is reflective of existing intercreditor and subordination agreements which shall remain binding with respect to such lien priority) and the Final Order; and (b) allowed super-priority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "<u>Prestige Adequate Protection Claims</u>"), subject to the co-priority and subordination of Liens described in <u>Schedule IV</u> attached hereto (which is reflective of existing intercreditor and subordination agreements which shall remain binding with respect to such lien priority) and the Final Order.

      (e)    The Prepetition Collateral Agent shall be entitled to reimbursement of its reasonable and documented fees and out- of-pocket expenses.

(f)     The Prepetition Collateral Agent shall be entitled to reimbursement of its respective reasonable and documented fees and out-of-pocket expenses of one primary counsel and one local counsel (if applicable), and one financial advisor.

(g)     The Prepetition Collateral Agent, on behalf of itself and the Prepetition Secured Parties, shall be entitled to performance of the Milestone Requirements.

(h)     Interest at the default rate specified in the Prepetition Notes shall continue to accrue under the terms of the Prepetition Notes.

(i)     The Creditors Committee shall have until April 10, 2023 to investigate and challenge and otherwise object to the allowance of the Allowed Claim (the "Creditors' Committee Challenge Period").  White Winston shall have until March 9, 2023 to investigate and challenge and otherwise object to the allowance of the Allowed Claim (other than challenges and objections based upon Borrower's bankruptcy estate's claims) ("White Winston Challenge Period" and, together with the Creditors' Committee Challenge Period, the "Challenge Period").  To the extent the principal amount of the Allowed Claim is successfully challenged (such amount, the "Disallowed Claim") such that the Allowed Claim is less than the Roll-Up Amount, then the Roll-Up Amount shall be reduced by the amount of the Disallowed Claim such that the Roll-Up Amount equals the Allowed Claim.  If an objection to the Prepetition Secured Parties' prepetition claim is timely filed during the applicable Challenge Period in the Bankruptcy Court, then: (i) the Prepetition Secured Parties' prepetition claim shall not be deemed an "allowed claim" to the extent objected to in such objection absent the Prepetition Collateral Agent obtaining a further order of the Bankruptcy Court, unless the objection is withdrawn; (ii) the Prepetition Collateral Agent shall not be entitled to the Prepetition Collateral Agent Credit Bid Obligations unless the Prepetition Collateral Agent obtains a further order of the Bankruptcy Court, unless the objection is withdrawn; (iii) if a sale of Borrower's assets occurs before such claim objection is resolved, such sale proceeds will be held by the estate to the extent of the objection unless the Prepetition Collateral Agent obtains a further order of the Bankruptcy Court, unless the objection is withdrawn; and (iv) the releases set forth in Section 11(c) of this Agreement are not a defense to such claim objection brought by White Winston in the Bankruptcy Court (if such objection is brought during the Challenge Period).   The Creditors' Committee may use up to Fifty Thousand Dollars ($50,000) of the fees and costs of the Creditors' Committee in the Authorized Budget to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens under the Prepetition Notes.  The DIP Note Agent reserves its' right to respond to any challenge raised by the Creditors' Committee, White Winston or any other party.  For the avoidance of doubt, a challenge by either the Borrower or the Creditors' Committee of the Prepetition Secured Parties' prepetition claims in excess of Twelve Million Eight Hundred Forty Thousand Dollars ($12,840,000) is not limited by the Challenge Period.

(j)     Subject to the express limitations contained in Section 10(i) above, Borrower agrees that in any sale of the DIP Collateral, the Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall have the right to credit bid an amount not less than Twelve Million Eight Hundred Forty Thousand Dollars ($12,840,000) which is the principal amount of the Prepetition Notes, including the original issue discount,  in addition to the obligations under the DIP Facilities, or such greater amount as allowed by the Bankruptcy Court, in accordance with section 363(k) of

37

the Bankruptcy Code, and that any motion filed by Borrower seeking approval of bid procedures shall contain a request for approval of the right of the Prepetition Collateral Agent to credit bid the obligations of the Prepetition Purchasers; provided, however, the DIP Note Agent, the Creditors' Committee and White Winston's rights shall be reserved with respect to the terms of this Section 10(j).

(k)    Except to the extent of the Carve-Out, no costs or expenses of administration or other charge, lien, assessment or claim incurred on or after the Petition Date of any Person or entity shall be imposed against the DIP Note Purchasers, the DIP Factoring Purchaser or the DIP Note Agent, their respective claims or the Prepetition Notes or Prepetition Note Liens under section 506(c) of the Bankruptcy Code or otherwise, and Borrower hereby irrevocably waives any and all such rights, remedies and benefits under section 506(c) of the Bankruptcy Code.

11.    Indemnification; Expenses; Releases; Waivers.

(a)    Indemnification. The Note Parties agree, joint and severally, to indemnify and hold and save harmless the DIP Agents, each DIP Note Purchaser, each DIP Factoring Purchaser, its and their respective Affiliates and each of their respective directors, officers, employees, agents, advisors, or representatives (collectively, "Indemnitees") from and against any and all losses, damages, claims, actions, demands, liabilities or out-of-pocket costs and expenses of any kind whatsoever (including reasonable and documented attorneys' fees and expenses) (collectively, "Claims") incurred by or asserted or awarded against any Indemnitee (including in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith) arising in any way directly or indirectly out of the transactions contemplated by this Agreement, the DIP Documents, and the transactions contemplated by this Agreement and the DIP Documents and any actual or proposed use of the proceeds of any DIP Notes issued under the DIP Note Facility, provided that no such person will be indemnified for such Claims to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence or willful misconduct of such person, and further, provided, the foregoing indemnity shall exclude out-of-pocket costs and expenses (including but not limited to reasonable and documented legal fees and expenses) arising out of post-petition litigation between the DIP Note Agent, on the one hand, and White Winston and/or Ryan Drexler, on the other hand, regarding the Prepetition Notes or claims between those parties that are not the Borrower's or the Borrower's bankruptcy estate's claims, including any claims that may be prosecuted in the Chapter 11 Case. For the avoidance of doubt, the excluded out-of-pocket costs and expenses are intended to be inclusive of discovery concerning claims related to the Prepetition Notes of the DIP Note Agent, on the one hand, and White Winston and/or Ryan Drexler, on the other hand, conducted by 2004 examination. The foregoing indemnity shall be effective whether or not such any such investigation, litigation, or other proceeding to which the indemnity applies is brought by any Note Party, any of their respective directors, officers, managers, security holders, creditors, an Indemnified Party or any other Person and whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

(b)    Expenses. The Note Parties shall pay, in connection with the Chapter 11 Case and the negotiation and documentation of the DIP Facilities and restructuring matters with respect to the Note Parties, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses

of counsel for the DIP Agents and reasonable and documented legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agents; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agents.  In addition, the Note Parties shall pay, in connection with workout proceedings and enforcement costs associated with the DIP Facilities, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agents and reasonable and documented legal fees and out-of-pocket expenses legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agents.  Such fees and expenses shall be part of the Obligations and the DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agents' claim(s).

(c)    Releases.    Pursuant to the Final Order, for good and valuable consideration, including facilitation of the DIP Facilities, the Note Parties, on behalf of themselves, and Borrower, on behalf of its bankruptcy estate (collectively, the "Releasors"), hereby release any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or which could be asserted on behalf of the Releasors, whether known or unknown, foreseen or unforeseen, existing in law, equity or otherwise, that the Releasors would have been legally entitled to assert in their own right, whether individually or collectively, including claims based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Case restructuring, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Note Parties, the subject matter of, or the transactions or events giving rise to, any claim or equity security, or any other act or omission, transaction, agreement, event or other occurrence relating to the Borrower, the Prepetition Notes or the Prepetition Liens, taking place on or before the date of this Agreement, against the DIP Note Agent in its capacity as such, the DIP Note Purchasers in their capacities as such, the DIP Factoring Purchasers in their capacities as such, and, except to the extent successfully challenged in a challenge brought in the applicable Challenge Period, the Prepetition Collateral Agent in its capacity as such, and the Prepetition Purchasers in their capacities as such (collectively, the "Releasees").  The foregoing releases shall not be a defense to an objection to the prepetition claims of the Prepetition Collateral Agent in its capacity as such and the Prepetition Purchasers in their capacity as such brought in the Bankruptcy Court, provided such objection is timely brought during the applicable Challenge Period.  Any claims arising out of the breach of this Agreement by any party are excluded from the releases provided in this Section 11(c), and, in the event of any such breach, the non-breaching party shall be entitled to pursue any and all rights, claims and damages that it may have against the other party as a result of such breach.

(d)    DIP Waivers.    Pursuant to the Final Order, the Releasors hereby waive (i) any and all claims of the Note Parties, on behalf of themselves, and Borrower, on behalf of its bankruptcy estate, arising from or related to (A) the DIP Agents or any DIP Note Purchaser or any DIP Factoring Purchaser, in each of their respective capacities as such, or (B) the DIP Documents; including, without limitation, the waiver of any and all rights to challenge the validity, perfection, priority, extent or enforceability of the claims or Liens securing the Obligations, including without limitation seeking to equitably subordinate or avoid the Liens securing the Obligations, (ii) the "equities of the case" exception to Section 552(b) of the Bankruptcy Code, (iii) the ability to surcharge the DIP Collateral, and subject to entry of the Final Order, the collateral securing the

39

Prepetition Notes, including under Section 506(c) of the Bankruptcy Code, and (iv) the equitable doctrine of "marshaling" with respect to the DIP Collateral, and subject to entry of the Final Order, the collateral securing the Prepetition Notes.

       12.    <u>The DIP Note Agent</u>.

       (a)    <u>Appointment and Authorization</u>.  Each DIP Note Purchaser hereby designates and appoints the DIP Note Agent as its DIP Note Agent and collateral agent under this Agreement and the other DIP Documents and each DIP Note Purchaser hereby irrevocably authorizes the DIP Note Agent to take such action on its behalf under the provisions of this Agreement and each other DIP Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other DIP Document, together with such powers as are reasonably incidental thereto.  The DIP Note Agent agrees to act as such on the express conditions contained in this <u>Section 12</u>.  The provisions of this <u>Section 12</u> are solely for the benefit of the DIP Note Agent and the DIP Note Purchasers, and no Note Party shall have any rights as a third party beneficiary of any of the provisions contained herein.  Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other DIP Document, the DIP Note Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the DIP Note Agent have or be deemed to have any fiduciary relationship with any DIP Note Purchaser, and no implied covenants, functions, responsibilities, duties, obligations, or liabilities shall be read into this Agreement or any other DIP Document or otherwise exist against the DIP Note Agent.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. Except as expressly otherwise provided in this Agreement, the DIP Note Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions which the DIP Note Agent is expressly entitled to take or assert under this Agreement and the other DIP Documents, including the exercise of rights and remedies pursuant to <u>Section 8</u>, and any action so taken or not taken shall be deemed consented to by the DIP Note Purchasers.

       (b)    <u>Delegation of Duties</u>.  The DIP Note Agent may execute any of its duties under this Agreement or any other DIP Document by or through agents, sub-agents, employees, or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The DIP Note Agent shall not be responsible for the negligence or misconduct of any agent, sub-agent, employee, or attorney-in-fact that it selects as long as such selection was made without gross negligence or willful misconduct.

       (c)    <u>Liability of the DIP Note Agent</u>.  The DIP Note Agent shall not (x) be liable for any action taken or omitted to be taken by it under or in connection with this Agreement or any other DIP Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction), or (y) be responsible in any manner to any of the DIP Note Purchasers for any recital, statement, representation, or warranty made by Borrower contained in this Agreement or in any other DIP Document, or in any certificate, report, statement, or other document referred to or provided for in, or received by the DIP Note Agent under or in connection with, this Agreement or any other DIP Document, or the validity, effectiveness, genuineness, enforceability, or sufficiency of this Agreement or any other DIP Document, or for any failure of Borrower to

perform its obligations hereunder or thereunder. The DIP Note Agent shall not be under any obligation to any DIP Note Purchaser to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other DIP Document, or to inspect the properties, books, or records of Borrower or any affiliate of Borrower.

Without limiting the generality of the foregoing, the DIP Note Agent: (i) shall have no duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other DIP Documents that the DIP Note Agent is required to exercise as directed in writing by the DIP Consenting Secured Parties; provided that the DIP Note Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Person to liability or that is contrary to any DIP Document or applicable requirements of law; and (ii) shall, except as expressly set forth herein and in the other DIP Documents, have no duty to disclose, and shall not be liable for the failure to disclose, any information relating to Borrower or any of their affiliates that is communicated to or obtained by the Person serving as DIP Note Agent or any of its affiliates in any capacity.

(d)     Reliance by the DIP Note Agent.

(i)     The DIP Note Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, e-mail, facsimile, telex, or telephone message, statement, or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including, without limitation, counsel to Borrower), independent accountants, and other experts. The DIP Note Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other DIP Document unless it shall first receive such advice or concurrence of the DIP Consenting Secured Parties as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the DIP Note Purchasers against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The DIP Note Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other DIP Document in accordance with a request or consent of the DIP Consenting Secured Parties (or all DIP Note Purchasers if so required by the terms of this Agreement) and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the DIP Note Purchasers.

(ii)     For purposes of determining compliance with the conditions specified in Section 4, each DIP Note Purchaser that has executed this Agreement shall be deemed to have consented to, approved, or accepted or to be satisfied with, each document or other matter either sent by the DIP Note Agent to such DIP Note Purchaser for consent, approval, acceptance, or satisfaction, or required thereunder to be consented to or approved by or acceptable or satisfactory to such DIP Note Purchaser.

(e)     Notice of Default. The DIP Note Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless the DIP Note Agent shall have received written notice from a DIP Note Purchaser or Note Party referring to this Agreement,

describing such Default or Event of Default and stating that such notice is a "notice of default." The DIP Note Agent will notify the DIP Note Purchasers of its receipt of any such notice.

(f)    Credit Decision.  Each DIP Note Purchaser acknowledges that the DIP Note Agent has not made any representation or warranty to it, and that no act by the DIP Note Agent hereinafter taken, including any review of the affairs of Borrower and their affiliates, shall be deemed to constitute any representation or warranty by the DIP Note Agent to any DIP Note Purchaser.  Each DIP Note Purchaser represents to the DIP Note Agent that it has, independently and without reliance upon the DIP Note Agent and based on such documents and information as it has deemed appropriate, made its own appraisal of an investigation into the business, prospects, operations, property, financial and other condition, and creditworthiness of Borrower and their affiliates and made its own decision to enter into this Agreement and to extend credit to Borrower.  Each DIP Note Purchaser also represents that it will, independently and without reliance upon the DIP Note Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals, and decisions in taking or not taking action under this Agreement and the other DIP Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition, and creditworthiness of Borrower.  Except for notices, reports, and other documents expressly herein required to be furnished to the DIP Note Purchasers by the DIP Note Agent, the DIP Note Agent shall not have any duty or responsibility to provide any DIP Note Purchaser with any credit or other information concerning the business, prospects, operations, property, financial and other condition, or creditworthiness of Borrower which may come into the possession of the DIP Note Agent.

(g)    The DIP Note Agent in Individual Capacity.  With respect to its DIP Notes, the DIP Note Agent as a DIP Note Purchaser shall have the same rights and powers under this Agreement as any other DIP Note Purchaser and may exercise the same as though it were not the DIP Note Agent, and the terms "DIP Note Purchaser" and "DIP Note Purchasers" include the DIP Note Agent in its individual capacity as a DIP Note Purchaser hereunder.

(h)    Successor DIP Note Agent.  The DIP Note Agent may resign as the DIP Note Agent upon thirty (30) days' notice to the DIP Note Purchasers and Borrower, such resignation to be effective, subject to the next succeeding paragraph of this Section 12(h), upon the acceptance of a successor agent to its appointment as DIP Note Agent.  If the DIP Note Agent resigns under this Agreement, the DIP Consenting Secured Parties shall appoint a successor agent for the DIP Note Purchasers.  Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers, and duties of the retiring DIP Note Agent and the term "DIP Note Agent" shall mean such successor agent and the retiring DIP Note Agent's appointment, powers, and duties as the DIP Note Agent shall be terminated.  After any retiring DIP Note Agent's resignation hereunder as DIP Note Agent, the provisions of this Section 12(h) shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the DIP Note Agent under this Agreement.

If no such successor DIP Note Agent shall have been so appointed by the DIP Note Purchasers and shall have accepted such appointment within thirty (30) days after the retiring DIP Note Agent gives notice of its resignation then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring DIP Note Agent shall be discharged from its

duties and obligations hereunder and under the other DIP Documents (except that in the case of any DIP Collateral held by the DIP Note Agent on behalf of the DIP Note Purchasers under any of the DIP Documents, the retiring DIP Note Agent shall continue to hold such DIP Collateral as nominee until such time as a successor DIP Note Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through an DIP Note Agent shall instead be made by or to each DIP Note Purchaser directly, until such time as the DIP Note Purchasers appoint a successor DIP Note Agent as provided for above in this Section 12(h).

(i)     After the replaced or retiring DIP Note Agent's replacement or resignation hereunder and under the other DIP Documents, the provisions of this Section 12 and Section 11 shall continue in effect for the benefit of such replaced or retiring DIP Note Agent and its sub-agents in respect of any actions taken or omitted to be taken by any of them while the replaced or retiring DIP Note Agent was acting as DIP Note Agent.

(i)     Restrictions on Actions by the DIP Note Purchasers; Sharing of Payments.

(i)     Each DIP Note Purchaser hereby waives any and all rights to set-off against the Obligations, any amounts owing by such DIP Note Purchaser to Borrower or any accounts unrelated to the DIP Notes of Borrower now or hereafter maintained with such DIP Note Purchaser. Each of the DIP Note Purchasers further agrees that it shall not take or cause to be taken any action to enforce its rights under this Agreement or against Borrower, including the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the DIP Collateral.

(ii)     If at any time or times any DIP Note Purchaser shall receive (i) by payment, foreclosure, setoff or otherwise, any proceeds of DIP Collateral or any payments with respect to the Obligations owing to such DIP Note Purchaser arising under, or relating to, this Agreement or the other DIP Documents, except for any such proceeds or payments received by such DIP Note Purchaser from the DIP Note Agent pursuant to the terms of this Agreement, or (ii) payments from the DIP Note Agent in excess of such DIP Note Purchaser's pro rata share of all such distributions by the DIP Note Agent, such DIP Note Purchaser shall promptly turn the same over to the DIP Note Agent, in kind, and with such endorsements as may be required to negotiate the same to the DIP Note Agent, or in same day funds, as applicable, for the account of all of the DIP Note Purchasers and for application to the Obligations in accordance with the applicable provisions of this Agreement.

(j)     Agency for Perfection. Each DIP Note Purchaser hereby appoints each other DIP Note Purchaser as agent for the purpose of perfecting the DIP Note Purchasers' security interest in assets which, in accordance with Article 9 of the UCC, can be perfected by possession. Should any DIP Note Purchaser (other than the DIP Note Agent) obtain possession of any such DIP Collateral, such DIP Note Purchaser shall notify the DIP Note Agent thereof, and, promptly upon the DIP Note Agent's request therefor shall deliver such DIP Collateral to the DIP Note Agent or otherwise deal with such DIP Collateral in accordance with the DIP Note Agent's instructions.

(k)     Payments by the DIP Note Agent to the DIP Note Purchasers. All payments to be made by the DIP Note Agent to the DIP Note Purchasers shall be made by bank wire transfer of

immediately available funds to each DIP Note Purchaser pursuant to wire transfer instructions delivered in writing to the DIP Note Agent on or prior to the date hereof, or pursuant to such other wire transfer instructions as each party may designate for itself by written notice to the DIP Note Agent.  Concurrently with each such payment, the DIP Note Agent shall identify whether such payment (or any portion thereof) represents principal, premium, or interest on the DIP Notes or otherwise.

(l)    <u>Concerning the DIP Collateral and the Related DIP Documents</u>.  Each DIP Note Purchaser authorizes and directs the DIP Note Agent to enter into this Agreement and the other DIP Documents relating to the DIP Collateral for the benefit of the DIP Note Agent and the DIP Note Purchasers.  Each DIP Note Purchaser agrees that any action taken by the DIP Note Agent in accordance with the terms of this Agreement or the other DIP Documents relating to the DIP Collateral, and the exercise by the DIP Note Agent of its respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the DIP Note Purchasers.

13.    <u>Miscellaneous</u>.

(a)    <u>Notices</u>.

(i)    Any communication, notice or demand required or permitted to be given hereunder shall be in writing and shall be delivered by hand or overnight courier service, or mailed by certified or registered mail at the address set forth in <u>Schedule I</u> hereto. Notices sent by hand or overnight courier service shall be deemed to have been given one (1) Business Day after sent; notices mailed by certified or registered mail, shall be deemed to have been given three (3) Business Days after sent.

(ii)    The DIP Note Agent, any DIP Note Purchaser or Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications sent to an e-mail address shall be deemed received upon delivery (provided that the sender does not receive an automated rejection notice); <u>provided</u> that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient.  Empery, until further notice to the other parties hereto, requires all documentation hereunder to be sent via electronic mail to the email address set forth in <u>Schedule I</u> hereto with the subject line "MusclePharm Corporation DIP Facility/ and the topic (i.e., Notice of Note Issuance, Notice of Payment, Proposed Budget, Budget Reconciliation, etc. as applicable) with a copy sent to the other addresses for the DIP Note Purchasers pursuant to <u>Section 13(a)(i)</u> above.

(iii)    Any party, by notice to the other parties hereto in accordance with this <u>Section 13(a)</u>, may designate additional or different addresses from those described in clause (i) hereof for subsequent notices or communications.

(iv)    Notwithstanding anything in this Agreement to the contrary, any reporting to be provided and delivered under Section 6(a) of this Agreement or bankruptcy pleadings under Section 6(r) of this Agreement may be sent via email without a copy to follow via another approved method pursuant to Section 13(a)(i) above.

DIP Note Agent shall provide notice of any communication, notice or demand it receives from Borrower to the DIP Consenting Secured Parties within one (1) Business Day of receipt.

(b)    Entire Agreement; Severability.  This Agreement together with the DIP Factoring Agreement, the other DIP Documents, the Interim DIP Order and the Final Order, sets forth the parties' entire agreement and understanding in respect of the subject matter contained herein.  Notwithstanding the foregoing, however, the Interim DIP Order and the Final Order, as applicable, shall continue to govern the terms and conditions of the transactions contemplated hereby to the extent materially inconsistent with, or address matters not addressed in, this Agreement or the other DIP Documents.  It shall not be deemed a material inconsistency as a result of this Agreement or the other DIP Documents including additional terms and provisions not included in the Final Order and the failure specifically to include any particular provisions of this Agreement or the other DIP Documents in the Final Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court, the Note Parties, the DIP Note Agent and the DIP Note Purchasers that this Agreement, the DIP Documents and the Final Order be read together and consistent with one another. If any term or provision hereof, or its application to any Person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such terms to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each term hereof shall be valid and enforceable to the fullest extent permitted by applicable law.

(c)    Assignment.  Neither this Agreement nor any of the rights, interests or obligations of Borrower hereunder shall be assigned or otherwise transferred by such Borrower, nor may Borrower delegate performance hereunder, except with each DIP Note Purchaser's prior written consent.  Each DIP Note Purchaser shall be permitted to assign all or any part of its rights and obligations hereunder to any affiliate of such DIP Note Purchaser, bank, financial institution or other entity. Upon such assignment, such affiliate, bank, financial institution, or entity will become a DIP Note Purchaser for all purposes under the DIP Documents. The DIP Note Purchasers also have the right to sell participations in the DIP Notes, provided, the DIP Note Purchaser maintains all consent rights hereunder with respect to its DIP Notes.  Notwithstanding the foregoing, no assignment shall be made or participation sold to the Issuer, any subsidiary of the Issuer or an Affiliate of any of the foregoing.

(d)    Amendments; Waivers.  All amendments, supplements or other modifications to this Agreement or any other DIP Document must be in writing signed by Borrower and the DIP Consenting Secured Parties (or the DIP Note Agent solely at the direction of the DIP Consenting Secured Parties); provided, that, no such amendment, supplement or other modification shall, without the prior written consent of (a) each DIP Note Purchaser affected thereby, (i) change the definition of DIP Consenting Secured Parties, (ii) increase the DIP Note Purchase Commitment of any DIP Note Purchaser (it being understood that waivers or modifications of conditions precedent, covenants or Defaults or Events of Default, or a waiver of a mandatory prepayment

45

shall not constitute an increase in the DIP Note Purchase Commitment of any DIP Note Purchaser), (iii) consent to the assignment by Borrower of their rights and obligations hereunder, (iv) release Borrower from its Obligations owing to such DIP Note Purchaser or all or substantially all of the DIP Collateral or (v) change the super-priority status of the Obligations owing to such DIP Note Purchaser and (b) the DIP Note Agent, amend, supplement or otherwise modify Section 12 of this Agreement.

(e)     APPLICABLE LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEVADA, WITHOUT REGARD TO THE CONFLICT OF LAW PRINCIPLES THEREOF.  EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION OVER THE CHAPTER 11 CASE, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN ANY DIP NOTE PURCHASER AND BORROWER PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT; PROVIDED, THAT THE DIP NOTE PURCHASERS AND BORROWER ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED FURTHER, THAT AFTER THE CHAPTER 11 CASE IS CLOSED, THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN ANY DIP NOTE PURCHASER AND BORROWER PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND PROVIDED FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE DIP NOTE AGENT OR ANY DIP NOTE PURCHASER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON ANY DIP COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE DIP NOTE AGENT OR ANY DIP NOTE PURCHASER.

(f)     WAIVER OF VENUE.     BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN SECTION 13(e). EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(g)     SERVICE OF PROCESS.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 13(a).  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

46

(h) <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(i) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. A facsimile copy of a signature hereto shall have the same effect as the original of such signature.

(j) <u>Reinstatement</u>. In the event that any payment hereunder, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(k) <u>Binding Agreement</u>. Upon the entry of the Second Interim DIP Order and Final Order, as applicable, this Agreement shall be binding upon Borrower, the estate of Borrower and any trustee or successor in interest of Borrower in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. Upon the entry of the Second Interim DIP Order and Final Order, as applicable, this Agreement shall be binding upon, and inure to the benefit of, the successors of the DIP Note Agent and any DIP Note Purchaser and its assigns, transferees and endorsees. The super-priority claims and any Liens that may be created by this Agreement and the Second Interim DIP Order and Final Order, as applicable, shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any DIP Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the DIP Note Agent file financing statements or otherwise perfect any security interests or Liens under applicable law.

[The remainder of this page is intentionally blank.]

      **IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the date first above written.

**DIP NOTE AGENT**

**EMPERY TAX EFFICIENT, LP**

By: _____
Name:
Title:


**DIP NOTE PURCHASERS**

**EMPERY TAX EFFICIENT, LP**

By: _____
Name:
Title:


**[●]**

By: _____
Name:
Title:

**NOTE PARTIES**:

**BORROWER**

MUSCLEPHARM CORPORATION

By: _____
Name:
Title:

**GUARANTOR**

CANADA MUSCLEPHARM ENTERPRISES
CORPORATION

By: _____
Name:
Title:

EXHIBIT A

<u>Authorized Budget</u>

**[To come from Borrower and
be consented to by the DIP Note Agent]**

EXHIBIT B

**FORM OF NOTICE OF NOTE ISSUANCE**

Date: _____, 2023

To:    EMPERY TAX EFFICIENT, LP

_____

_____

_____

Ladies and Gentlemen:

Reference is made to that certain Debtor-in-Possession Notes Purchase Agreement, dated as of January [●], 2023 (as amended, restated, extended, supplemented or otherwise modified from time to time, the "Agreement;" the terms defined therein being used herein as therein defined), among MusclePharm Corporation, as a debtor-in-possession and the Borrower, the DIP Note Purchasers and the DIP Note Agent.

The undersigned hereby requests the issuance of DIP Notes:

1.    On _____ (a Business Day).

2.    In the amount of $_____

Borrower hereby certifies that as of the date hereof:

(i)    no Default or Event of Default has occurred and is continuing or would result after giving effect to the requested DIP Notes;

(ii)    each representation and warranty by Borrower set forth in the Agreement and the other DIP Documents is true and correct in all respects; and

(iii)    the funds from the DIP Note purchase being requested shall be used in accordance with Section 6(f) of the Agreement and in a manner consistent with the Authorized Budget.

BORROWER:

MusclePharm Corporation


By: _____
Name:
Title:

SCHEDULE I

<u>Notice Information</u>

<u>Borrower</u>

MusclePharm Corporation
_____
_____
_____
Attn:  _____
Email:  _____

With a copy to (which shall not constitute notice):

_____
_____
_____
Attn:  _____
Email:  _____

<u>DIP Note Agent</u>

Empery Tax Efficient, LP
_____
_____
_____
Attn:  _____
Email:  _____

<u>DIP Note Purchasers</u>

Empery Tax Efficient, LP
_____
_____
_____
Attn: _____
Email: _____

With copies to (which shall not constitute notice):

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, NV 89119
Attn:  Gregory E. Garman & William Noall
Email:  ggarman@gtg.legal & wnoall@gtg.legal


and


_____
_____
Attn: _____
Email: _____

SCHEDULE II

DIP Note Purchase Commitment Schedule

| DIP Note Purchaser | DIP Note Purchase Commitment/Aggregate DIP Note Purchase Commitment | Pro Rata Share of Additional DIP Note Purchase Commitment | Pro Rata Share of DIP Inventory Acquisition Line of Credit |
|---|---|---|---|
| Empery Tax Efficient, LP | | | |
| [●] | | | |
| | | 100% | 100% |

## SCHEDULE III[1]

| Prepetition Purchaser | Aggregate Principal Amount, including OID, of October Notes (USD) | Aggregate Principal Amount, including OID, of June Notes (USD) |
|---|---|---|
| Altium Growth Fund, LP | 1,384,300.00 | 156,250.00 |
| Anson Investments Master Fund LP | 1,038,225.00 | 312,500.00 |
| Bigger Capital Fund, LP | 692,150.00 | 312,500.00 |
| CVI Investments, Inc. | 692,150.00 | 0.00 |
| District 2 Capital Fund LP | 1,038,225.00 | 312,500.00 |
| Empery Debt Opportunities Fund, LP | 1,245,870.00 | 281,250.00 |
| Empery Master Onshore, LLC | 924,712.40 | 208,750.00 |
| Empery Tax Efficient, LP | 276,860.00 | 62,500.00 |
| Empery Tax Efficient III, LP | 321,157.60 | 72,500.00 |
| HB Fund LLC | 692,150.00 | 156,250.00 |
| Intracostal Capital LLC | 69,214.99 | 0.00 |
| Ionic Ventures | 692,150.00 | 312,500.00 |
| L1 Capital Global Opportunities Master Fund | 692,150.00 | 0.00 |
| Roth Capital Partners, LLC | 0.00 | 269,375.00 |
| Walleye Opportunities Master Fund Ltd. | 0.00 | 625,000.00 |
| **TOTAL** | 9,759,315.00 | 3,081,875.00 |

---

[1] Schedule III to be reviewed and updated, as needed.

## SCHEDULE IV

| Order of Priority | DIP Collateral Consisting of Pre-Petition Factoring Priority Collateral[2] | DIP Collateral Consisting of Post-Petition Factored Accounts | DIP Collateral Consisting of Post-Petition DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory[3] | DIP Collateral Not Consisting of Factored Accounts or DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory | Third-Party Encumbered Assets[4] | Unencumbered Assets | Superpriority Claims |
|---|---|---|---|---|---|---|---|
| **1st** | Carve-Out and Permitted Liens[5] | Carve-Out and Permitted Liens | DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens | Carve-Out and Permitted Liens | Third-Party Existing Liens | Carve-Out | Carve-Out and Permitted Liens |
| **2nd** | Prestige Liens[6] | DIP Factoring Liens | Carve-Out and Permitted Liens | DIP Note Liens and Prepetition Notes Adequate Protection Liens | Carve-Out | DIP Note Liens, DIP Factoring Liens, DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens, and Prepetition Notes Adequate Protection Liens | DIP Notes Superpriority Claim and DIP Factoring Superpriority Claim, DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Superpriority Claim |
| **3rd** | DIP Note Liens, DIP Factoring Liens, DIP Inventory Acquisition Line of Credit Purchasers | DIP Note Liens, DIP Inventory Acquisition Line of Credit Purchasers Financed | DIP Note Liens, DIP Factoring Liens, and Prepetition Notes Adequate | DIP Factoring Liens, DIP Inventory Acquisition Line of Credit Purchasers | DIP Note Liens, DIP Factoring Liens, DIP Inventory Acquisition Line of Credit | Prestige Adequate Protection Liens[7] | Prepetition Notes Adequate Protection Claim and Prestige Adequate |

[2]     As defined in the Intercreditor Agreement, dated as of October 13, 2021 (the "Prestige Intercreditor Agreement"), among Prestige, Empery, as Notes Representative on behalf of the Prepetition Noteholders and Prepetition Collateral Agent, and the Note Parties.

[3]     "DIP Note Purchasers Financed Inventory" shall mean DIP Collateral made up of the specific inventory items financed by the DIP Inventory Acquisition Line of Credit.

[4]     "Third-Party Encumbered Assets" shall mean DIP Collateral that was, as of the Petition Date, subject to valid, properly perfected, non-avoidable, and senior liens or security interests (excluding subordinated liens pursuant to existing agreements) (collectively, the "Third-Party Existing Liens") other than the liens and security interests granted pursuant to the Prepetition Security Agreement (the "Prepetition Notes Liens") and the Prestige Liens (as defined below).

[5]     "Permitted Liens" shall mean any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Notes Liens and Prestige Liens.

[6]     "Prestige Liens" shall mean any valid, properly perfected and non-avoidable liens on or security interests in the Factoring Collateral created by the Factoring Security Documents (each as defined in the Prestige Intercreditor Agreement).

[7]     Subject to Prestige's rights under paragraph 20 of the Final Order.

| | Financed Inventory Liens, and Prepetition Notes Adequate Protection Liens | Inventory Liens | Protection Liens | Financed Inventory Liens | Purchasers Financed Inventory Liens and Prepetition Notes Adequate Protection Liens | | Protection Claim |
|---|---|---|---|---|---|---|---|
| **4th** | Prepetition Notes Liens | Prestige Adequate Protection Liens | Prepetition Notes Liens | Prepetition Notes Liens | Prestige Adequate Protection Liens[8] | | |
| **5th** | | Prepetition Notes Adequate Protection Liens | Prestige Adequate Protection Liens[9] | Prestige Adequate Protection Liens[10] | | | |
| **6th** | | Prepetition Notes Liens | Prestige Liens | Prestige Liens | | | |

---

[8]    Subject to Prestige's rights under paragraph 20 of the Final Order.
[9]    Subject to Prestige's rights under paragraph 20 of the Final Order.
[10]    Subject to Prestige's rights under paragraph 20 of the Final Order.

## <u>SCHEDULE V</u>

**Scheduled Preexisting Indebtedness**

**[See attached list.]**

**NTD: Attached list from Borrower's bankruptcy schedules and statements, and add UCC-1 filed by Crown Equipment Corp. against Borrower.**

## <u>SCHEDULE VI</u>

**Scheduled Preexisting Liens**

**[See attached list.]**

**NTD: Attached list from Borrower's bankruptcy schedules and statements, and add UCC-1 filed by Crown Equipment Corp. against Borrower.**

# EXHIBIT D

# EXHIBIT D

**DEBTOR-IN-POSSESSION**

**FACTORING PURCHASE AND SECURITYAGREEMENT**

This DEBTOR-IN-POSSESSION FACTORING PURCHASE AND SECURITY AGREEMENT (this "Agreement"), dated as of February [●], 2023, is entered into by and among MusclePharm Corporation, a Nevada corporation, as a debtor-in-possession ("Seller"), Canada MusclePharm Enterprises Corporation ("Guarantor"), Empery Tax Efficient, LP ("Empery"), in its capacity as a factoring purchaser, [●] (each, a "DIP Factoring Purchaser", and collectively, the "DIP Factoring Purchasers"), and Empery, in its capacity as collateral agent, its successors and assigns ("DIP Factoring Agent").

**W I T N E S S E T H:**

**WHEREAS**, on December 15, 2022 (the "Petition Date"), Seller commenced Chapter 11 Case No. 22-14422-nmc (the "Chapter 11 Case") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"). Seller continues to operate its business and manage its assets and liabilities as a debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**WHEREAS**, Seller has requested that the DIP Factoring Purchasers provide a factoring facility to Seller to purchase Seller's rights, title and interest in and to (i) all eligible post-Petition accounts, and (ii) to the extent provided in the Interim Period (as hereinafter defined), purchase orders arising from the sale of any product or goods or the rendering of services by Seller in the ordinary course of Seller's business;

**WHEREAS**, Seller is unable to obtain funds or credit on better terms;

**WHEREAS**, each DIP Factoring Purchaser has agreed to purchase the DIP Accounts and DIP Purchase Orders (each as hereinafter defined) from Seller on the terms and conditions hereunder on a several basis in an amount equal to its DIP Factoring Purchase Commitment;

**WHEREAS**, subject to Bankruptcy Court approval, Seller has agreed to provide the DIP Factoring Purchasers super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, in the Chapter 11 Case, against the Seller for its obligations to the DIP Factoring Purchasers under this Agreement, the Interim DIP Orders and the Final Order having the priority specified in the Interim DIP Orders and the Final Order; and

**WHEREAS**, subject to Bankruptcy Court approval, Seller has agreed to secure all of its obligations under this Agreement by granting to the DIP Factoring Purchasers, under and pursuant to the Interim DIP Orders and the Final Order, a security interest in and lien upon substantially all of their assets having the priority specified in the Interim DIP Orders and the Final Order.

**NOW, THEREFORE,** in consideration of the foregoing recitals, and of the mutual covenants, conditions and provisions hereinafter set forth, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the DIP Factoring Agent, each DIP Factoring Purchaser and Seller hereby agree as follows:

1. <u>Definitions</u>.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"<u>Acceptable Plan</u>" means a plan of reorganization or liquidation reasonably acceptable to the DIP Note Agent, which shall (i) provide for repayment in full in cash of the obligations under the DIP Note Facility, inclusive of the Roll-Up Amount, and (ii) be acceptable to the DIP Note Agent, in its reasonable discretion, with respect to the treatment of the Prepetition Secured Parties, DIP Note Purchasers and DIP Factoring Purchasers.

"<u>Affiliates</u>" of any Person is a Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

"<u>Aggregate DIP Factoring Purchase Commitments</u>" means Ten Million Dollars ($10,000,000), as such amount may be increased or reduced from time to time pursuant to the terms hereof.

"<u>Agreement</u>" has the meaning set forth in the preamble of this Agreement.

"<u>Allowed Claim</u>" means the claim of the Prepetition Secured Parties of an amount not less than Twelve Million Eight Hundred Forty Thousand Dollars ($12,840,000), which is the principal amount of the Prepetition Notes, including the original issue discount, in addition to the Obligations under the DIP Factoring Facility and DIP Note Facility, and reasonable attorneys' fees and expenses.

"<u>Authorized Budget</u>" means any Proposed Budget for which Seller has received written consent from the DIP Note Agent approving such Proposed Budget; <u>provided</u>, that upon delivery by Seller and consent of the DIP Note Agent of any subsequent revised budget, such revised budget shall thereafter constitute the Authorized Budget.  The Authorized Budget as of the date hereof is attached hereto as <u>Exhibit A</u>.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals of this Agreement.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals of this Agreement.

"<u>Bankruptcy Orders</u>" mean, collectively, the Interim DIP Orders and the Final Order.

"<u>Board of Directors</u>" means Eric Hillman, Paul Karr and Nicolas Rubin, who replaced the Interim Board of Directors of Borrower and serve as board of directors of Borrower upon entry of the Second Interim DIP Order.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or a day on which banks in Las Vegas, Nevada are required or permitted to be closed.

"<u>Carve-Out</u>" means the payment of (a) subject to the Authorized Budget, the aggregate amount of any budgeted and unpaid fees, costs and expenses allowed by an order of the Bankruptcy

Court up to an aggregate amount not to exceed $250,000 that were accrued or incurred prior to the DIP Notes Maturity Date by the professionals retained in the Chapter 11 Case by Seller or on behalf of its estate (collectively, the "Seller Professionals") and by the professionals retained in the Chapter 11 Case by the Creditors' Committee (collectively, the "Creditors Committee Professionals"), respectively, but in no event shall such carve-out exceed the unpaid Budget amounts (on a line by line basis) for the Seller Professionals and the Creditors Committee Professionals, respectively, prorated up to the date in the Authorized Budget coinciding with an Event of Default, and (b) in the absence of a Sale Transaction Notice, (i) the aggregate amount of any unpaid fees, costs and expenses allowed by an order of the Bankruptcy Court up to an aggregate amount not to exceed $125,000 that were incurred after an Event of Default by the Seller Professionals, and (ii) the aggregate amount of any unpaid fees, costs and expenses allowed by an order of the Bankruptcy Court up to an aggregate amount not to exceed $65,000 that were incurred after an Event of Default by the Creditors Committee Professionals, and (c) in the event of a Sale Transaction Notice, the aggregate amount of any unpaid fees, costs and expenses, incurred after the delivery of a Sale Transaction Notice by the Seller Professionals and the Creditors Committee Professionals, when allowed by an order of the Bankruptcy Court and when the Sale Transaction is completed, from the $190,000 in funds expressly earmarked from the Sale Transaction to fund such fees, costs and expenses of the Seller Professionals and the Creditors Committee Professionals.

"Cash Collateral" means all cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever or wherever acquired in which the Seller and an entity other than the Seller has an interest, whether existing before or after the commencement of the Chapter 11 Case and inclusive of cash collateral as defined in Section 363 of the Bankruptcy Code.

"Cash Management Order" means that certain *Order Authorizing Maintenance of Existing Bank Accounts and Related Relief* [ECF No. 75], entered by the Bankruptcy Court in the Chapter 11 Case on January 9, 2023, and as approved on a final basis on February 9, 2023 [ECF No. ___].

"Chapter 11 Case" has the meaning set forth in the recitals of this Agreement.

"Contingent Obligation" means as to any Person (the "guaranteeing person"), any obligation (determined without duplication) of the guaranteeing person (or any other Person (including any bank under any letter of credit) if the guaranteeing person has issued a reimbursement, counter indemnity or similar obligation in favor of such other Person) guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof provided, however, that the term Contingent Obligation shall not include

3

endorsements of instruments for deposit or collection in the ordinary course of business consistent with past practice. The amount of any Contingent Obligation of any guaranteeing person shall be deemed to be the lesser of the maximum stated amount of the primary obligations relating to such Contingent Obligation (or, if less, the maximum stated liability set forth in the instrument embodying such Contingent Obligation), or in the absence of any such stated amount or stated liability, the amount of such Contingent Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as reasonably determined by the Seller in good faith in accordance with GAAP.

"Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case by the U.S. Trustee pursuant to the Bankruptcy Code on January 4, 2023 [ECF No. 49].

"Default" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"Defaulting DIP Factoring Purchaser" means any DIP Factoring Purchaser which (i) has failed to purchase all or any portion of its DIP Accounts or DIP Purchase Orders within three (3) Business Days of the date such DIP Accounts or DIP Purchase Orders were required to be purchased hereunder unless such DIP Factoring Purchaser notifies the DIP Factoring Agent and the other DIP Factoring Purchasers, in writing, that such failure is the result of such DIP Factoring Purchaser's determination that one or more conditions precedent to the purchase (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied or (ii) has, or has any Affiliate that has, become the subject of an Insolvency Event.

"DIP Accounts" means those specific post-Petition eligible accounts receivable owing to Seller together with all rights of action accrued or to accrue thereon, including without limitation, full power to collect, sue for, compromise, assign or in any other manner enforce collection thereof, which are at any time hereafter assigned by Seller, and accepted by DIP Factoring Agent, as collateral agent on behalf of the DIP Factoring Purchasers, as set forth on the assignment forms provided by DIP Factoring Agent (the "Assignments").

"DIP Agents" means, collectively, the DIP Factoring Agent and the DIP Note Agent.

"DIP Collateral" means all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Seller Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of the Seller Parties, including, for the avoidance of doubt, any equity or other interests in the Seller Parties' non-Seller and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, including all causes of action under Section 541 of the Bankruptcy Code (including commercial tort claims), and all additional and accessions thereto and all substitutions and replacements thereof, and all products, accounts and proceeds thereof, including without limitation, all proceeds and accounts from the sale or transfer of the DIP Collateral and of insurance covering the same

4

and of any tort claims in connection therewith, excluding any causes of action under Bankruptcy Code Sections 502(d), 544, 545, 547, 548, 549, 550 or 553, including the proceeds thereof.

"<u>DIP Consenting Secured Parties</u>" means the DIP Factoring Agent, the DIP Note Agent and Empery, in its capacity as a DIP Factoring Purchaser.

"<u>DIP Documents</u>" means (i) this Agreement, (ii) the DIP Note Purchase Agreement, (iii) (iii) the Assignments, (iv) the DIP Notes, (iv) the Guaranty, (v) the DIP Note Guaranty, (vi) the Bankruptcy Orders, and (vii) all other security agreements, pledge agreements, patent, trademark and copyright security agreements, control agreements and any other instruments and documents creating or purporting to create a Lien and/or reasonably related to the foregoing, and all amendments, restatements, modifications or supplements thereof or thereto.

"<u>DIP Facilities</u>" means, collectively, the DIP Factoring Facility and the DIP Note Facility, inclusive of the DIP Inventory Acquisition Line of Credit.

"<u>DIP Factoring Agent</u>" means Empery Tax Efficient, LP, and its successors and assigns, in its capacity as the sole collateral agent for the DIP Factoring Purchasers under this Agreement.

"<u>DIP Factoring Disbursement Account</u>" means a debtor-in-possession deposit account of Seller subject to a deposit account control agreement in favor of DIP Factoring Agent (or its designated sub-agent) and pursuant to which DIP Factoring Agent (either itself or through its sub-agent) maintains control and shall have a Lien pursuant to the Bankruptcy Orders.

"<u>DIP Factoring Facility</u>" means the factoring facility whereby the DIP Factoring Purchasers have agreed to purchase and receive from Seller, in an aggregate amount of up to Ten Million Dollars ($10,000,000), all of Seller's right, title and interest in and to the DIP Accounts and during the Interim Period, the DIP Purchase Orders, pursuant to the terms and conditions set forth in this Agreement.

"<u>DIP Factoring Purchase Commitment</u>" means, for each DIP Factoring Purchaser, the obligation of such DIP Factoring Purchaser to purchase the DIP Accounts and DIP Purchase Orders from the Seller in the aggregate amount not exceeding the amount set forth on <u>Schedule II</u> hereto.

"<u>DIP Factoring Purchasers</u>" means Empery and **[●].**

"<u>DIP Inventory Acquisition Line Advance</u>" means each advance of funds made available to the Seller under the DIP Inventory Acquisition Line of Credit, on a revolving basis, in accordance with the Authorized Budget and the terms and conditions of the DIP Note Purchase Agreement, but in no event shall the aggregate DIP Inventory Acquisition Line Advances outstanding at any time exceed the amount of the DIP Inventory Acquisition Line of Credit.

"<u>DIP Inventory Acquisition Line of Credit</u>" means a revolving line-of-credit in an amount up to One Million Dollars ($1,000,000) under the DIP Note Facility, available solely to fund Seller's acquisition of inventory for Seller's business in accordance with the Authorized Budget on an as needed basis.

"<u>DIP Inventory Acquisition Line of Credit Purchasers</u>" means Empery and **[●]**.

"<u>DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory</u>" means that certain inventory of Seller acquired in whole or in part by funds made available to Seller through the DIP Inventory Acquisition Line of Credit.

"<u>DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens</u>" means the liens and security interests granted to secure the DIP Inventory Acquisition Line of Credit.

"<u>DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Proceeds</u>" means the proceeds of the DIP Collateral constituting the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory.

"<u>DIP Motion</u>" means the motion filed by Seller with the Bankruptcy Court in the Chapter 11 Case, together with all supplements and amendments thereto, seeking Bankruptcy Court approval of the DIP Factoring Facility and the DIP Note Facility.

"<u>DIP Note Agent</u>" means Empery Tax Efficient, LP, in its capacity as the sole collateral agent for the DIP Note Purchasers under the DIP Note Agreement.

"<u>DIP Note Facility</u>" means that certain super-priority senior secured multiple issuance note facility in the aggregate principal amount of Five Million Five Hundred Thousand Dollars ($5,500,000), inclusive of the DIP Inventory Acquisition Line of Credit, but excluding the Roll-Up Amount, entered into by and between Seller and the DIP Note Purchasers simultaneously herewith, evidenced by, and subject to the terms and conditions of, the DIP Note Purchase Agreement.

"<u>DIP Note Guaranty</u>" means that certain Guaranty Agreement executed by Guarantor in favor of the DIP Note Purchasers guaranteeing the DIP Note Facility.

"<u>DIP Note Purchase Agreement</u>" means that certain Debtor-in-Possession Note Purchase and Security Agreement entered into by and between Seller and the DIP Note Purchasers evidencing the DIP Note Facility and the terms and conditions thereof.

"<u>DIP Note Purchasers</u>" means Empery and **[●]**.

"<u>DIP Notes</u>" means each advance, including without limitation each Inventory Acquisition Line Advance, made under that certain promissory note issued in accordance with the terms of the DIP Note Purchase Agreement and stated on the addendum to such promissory note evidencing the amount of each such advance made.

"<u>DIP Notes Maturity Date</u>" means the earliest of (a) December 31, 2023 (the "<u>Scheduled Termination Date</u>"), (b) the date of acceleration of the DIP Notes under the DIP Note Purchase Agreement, (c) the date of the closing of a Sale Transaction or any other sale of all or substantially all of Seller's assets, including pursuant to Section 363 of the Bankruptcy Code, (d) the filing of a chapter 11 plan with respect to Seller that is not an Acceptable Plan, and (e) the closing date for debtor-in-possession financing with another lending source approved by the Final Order.

6

"DIP Purchase Orders" means those certain purchase orders of Seller arising from the sale of any product or goods or the rendering of services by Seller in the ordinary course of the Seller's business that: (i) have been approved in writing by Eric Hillman; and (ii) JW has confirmed in writing can be manufactured in accordance with the terms of such purchase order.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Event of Default" has the meaning set forth in Section 7 of this Agreement.

"Facility Fee" means fifty basis points (0.50%) of each DIP Account or DIP Purchase Order purchased by DIP Factoring Purchasers, payable at the time of each such purchase.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court approving the DIP Factoring Facility and the DIP Note Facility and authorizing the execution and delivery of the DIP Documents by Seller, the issuance of the DIP Notes and the purchase of the DIP Accounts and DIP Purchase Orders and the relief provided for thereunder, and the Roll-Up Amount of the Prepetition Notes being converted on a cashless basis into the DIP Notes with one dollar of principal due under the Prepetition Notes to roll-up and convert for each dollar of principal amount drawn under the DIP Note Facility (exclusive of any DIP Inventory Acquisition Line Advance), which order shall stipulate as to the amount and priority of the Prepetition Note Liens and otherwise be reasonably satisfactory in form and substance to the DIP Agents, together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Seller to obtain credit, incur and guaranty debt, grant Liens and provide for the super priority administrative claim status of the DIP Factoring Purchasers' claims under this Agreement; provided such order has not been stayed or modified (without the consent of the DIP Note Agent).

"First Interim DIP Order" means that certain *First Interim Order Pursuant to Emergency Motion For Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Fed. R. Bankr. P. 4001(B) and 4001(D): (I) Authorizing the Debtor to Obtain Post-Petition Financing, (II) Granting Priming Liens and Administrative Expense Claims, (III) Determining Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [ECF No. 74], entered by the Bankruptcy Court in the Chapter 11 Case on January 9, 2023, authorizing Borrower, among other things, to borrow up to One Hundred Fifty Thousand ($150,000) from Empery on an interim basis.

"GAAP" is generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other Person as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

7

"Governmental Authority" means any nation or government, any state, city, province or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guarantor" has the meaning set forth in the preamble of this Agreement.

"Guaranty" means that certain Guaranty Agreement executed by Guarantor in favor of the DIP Factoring Purchasers guaranteeing the DIP Factoring Facility.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Contingent Obligations of such Person, (h) all capital lease obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit, letters of guaranty, surety bonds and similar facilities or obligations, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances and (k) all obligations of such Person under sale and leaseback transactions.

"Independent Director" means Nicholas Rubin, nominated by the Interim Board of Directors, approved by the DIP Note Agent, and approved in the Second Interim DIP Order, to serve on the Board of Directors of Seller.

"Insolvency Event" means, as to any Person, that such Person has (i) become the subject of a proceeding under the Bankruptcy Code or any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time which proceeding is not dismissed within sixty (60) days after the commencement of the same, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, (iii) has taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment, (iv) become insolvent or been determined by any Governmental Authority having regulatory authority over such Person or its assets, to be insolvent, or the assets or management of which has been taken over by any Governmental Authority, (v) is generally unable to pay its debts as they become due, or has admitted in writing its inability to pay its debts as they become due or (vi) has made a general assignment for the benefit of creditors.

"Interest Rate" means nine and three-quarters of one percent (9.75%) per annum.

"Interim Board of Directors" means Paul Karr and Eric Hillman, who replaced all members of Seller's board of directors as of the Petition Date and serve as board of directors of Seller through the date that the Second Interim DIP Order was entered.

"Interim DIP Orders" means, collectively, the First Interim DIP Order and the Second Interim DIP Order.

"Interim Period" means the period of time between the First Interim DIP Order and the Final Order.

"Investment" of a Person means any loan, advance, extension of credit (other than accounts receivable arising in the ordinary course of business on terms customary in the trade), deposit account or contribution of capital by such Person to any other Person or any investment in (including Contingent Obligations of such Person for the benefit of or to support any obligation of such other Person), or purchase or other acquisition of Equity Interests, notes, debentures or other debt or equity securities of any other Person made by such Person.

"JW" means JW Nutritional, LLC.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including, without limitation, the interest of a vendor or lessor under any conditional sale, capitalized lease or other title retention agreement or any financing lease having substantially the same economic effect as any of the foregoing) and, in the case of debt, equity or similar instrument, any purchase option, call or similar right of any Person (other than the issuer of such securities) with respect to such debt, equity or similar instrument.

"Milestone Requirements" shall mean each of the following:

(a) The Bankruptcy Court shall enter the Final Order, which order shall be in form and substance acceptable to the DIP Note Agent, approving the DIP Note Facility (including the Roll-Up Amount) and the DIP Factoring Facility on a final basis no later than February 21, 2023 (unless waived by the DIP Note Agent).

(b) Seller shall file an Acceptable Plan by no later than September 30, 2023.

(c) The Bankruptcy Court shall approve an Acceptable Plan by December 15, 2023.

(d) In the event that Borrower fails to file an Acceptable Plan by September 30, 2023, Borrower shall commence a Sale Transaction within fourteen (14) days of receipt of written notice by the DIP Note Agent (the "Sale Transaction Notice").  In the event a Sale Transaction Notice is given to Borrower, Borrower shall commence a Sale Transaction within five (5) days of receipt of such Sale Transaction Notice. Unless otherwise waived by the DIP Note Agent, in its sole discretion, a stalking horse for the Sale Transaction shall be selected within twenty-five (25) days from receipt of the Sale Transaction Notice, and the Sale Transaction shall be completed within sixty (60) days of the commencement of the Sale Transaction.  Without limiting the foregoing, the

procedure and timing of a Sale Transaction shall be satisfactory to the DIP Note Agent, in its sole discretion.

"Note Parties" means collectively, Seller and Guarantor.

"Obligations" means all loans, advances, liabilities, obligations, covenants, duties, and debts owing by Seller (or any one thereof) to the DIP Factoring Agent and/or any DIP Factoring Purchaser, arising under or pursuant to this Agreement or any of the other DIP Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, acceptance, loan, guaranty, indemnification, or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, attorneys' fees, filing fees, and any other sums chargeable to Seller hereunder or under any of the other DIP Documents including, without limitation, all debts, liabilities, and obligations of Seller now or hereafter arising from or in connection with the DIP Factoring Facility, including without limitation, the reasonable fees and expenses of the DIP Factoring Agent and each DIP Factoring Purchaser incurred in connection with the DIP Factoring Facility.

"Permitted Encumbrances" means:

(a)  Liens imposed by law for taxes, fees, assessments or other charges that are not yet due or are being contested in good faith;

(b)  Liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code); and

(c)  Liens that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Notes Liens and to any valid, properly perfected and non-avoidable liens on or security interests in collateral granted to Prestige Capital Finance, LLC, and its successors and assigns, in connection with its prepetition factoring agreement with Seller.

provided, that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness other than as specifically provided in (b) and (c) above.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or Governmental Authority.

"Petition Date" has the meaning set forth in the recitals of this Agreement.

"Prepetition Collateral Agent" means Empery Tax Efficient, LP, in its capacity as collateral agent for the Prepetition Purchasers.

"Prepetition Note Liens" means the liens and security interests granted to secure the Prepetition Notes.

"<u>Prepetition Notes</u>" means those certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 (as amended, restated, supplemented or otherwise modified from time to time) and Original Issue Discount Senior Secured Notes dated as of June 10, 2022 (as amended, restated, supplemented or otherwise modified from time to time), in each case issued by Seller, which Prepetition Notes are described in further detail on <u>Schedule III</u> hereto.

"<u>Prepetition Purchasers</u>" means the holders of the Prepetition Notes as described in further detail on <u>Schedule III</u> hereto.

"<u>Prepetition Secured Parties</u>" means collectively, the Prepetition Purchasers and the Prepetition Collateral Agent.

"<u>Prestige</u>" means Prestige Capital Finance, LLC.

"<u>Proposed Budget</u>" means a thirteen-week reasonably detailed forecast of Seller commencing with the week in which the Petition Date occurs, setting forth on a line-item basis the projected cash receipts and disbursements on a weekly basis and shall include separate line items for each of the Seller's Professionals and the Creditors Committee's Professionals, prepared by the Seller and submitted to the DIP Note Agent for its consent, and which budget shall be updated on the one-week anniversary of the Second Interim DIP Order and every four weeks on Wednesday (commencing with the Wednesday of the fourth full week commencing after the one-week anniversary of the Second Interim DIP Order).

"<u>pro rata share</u>" means, at any time for any DIP Factoring Purchaser, the ratio at such time that such DIP Factoring Purchaser's Commitment bears to the Aggregate DIP Factoring Purchase Commitment which, as of the date hereof, is set forth on Schedule II hereto.  If the DIP Factoring Purchase Commitment of any DIP Factoring Purchaser has been terminated, the pro rata share of such DIP Factoring Purchaser will be calculated with respect to the DIP Accounts and DIP Purchase Orders of such DIP Factoring Purchaser outstanding immediately prior to such DIP Factoring Purchase Commitment termination.

"<u>Purchase Price</u>" means for any DIP Account and DIP Purchase Order sold hereunder, the amount actually received in payment of such DIP Account and DIP Purchase Order; provided, however, for purposes of the Aggregate Advances and the Reserves, the Purchase Price shall be equal to the net face value of the DIP Accounts and the DIP Purchase Orders <u>*less*</u> the applicable returns, credits, allowances, and discounts, <u>*and less*</u> all other sums charged or chargeable to Seller's DIP Accounts and DIP Purchase Orders.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Seller, or any payment (whether in cash, securities or other property), including any distributions of cash in order to pay management fees or taxes attributable to the income of Seller or any of its subsidiaries, and including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in Seller or any option, warrant or other right to acquire any such Equity Interests in Seller.

"<u>Roll-Up Amount</u>" means up to Four Million Five Hundred Thousand Dollars ($4,500,000.) of principal due under the Prepetition Notes which shall be deemed to be Obligations

under the DIP Note Facility, in a principal amount equal to $1.00 of the Prepetition Notes principal amount outstanding for each $1.00 drawn under the DIP Note Facility (exclusive of any DIP Inventory Acquisition Line Advance), subject to a Disallowed Claim during the Challenge Period, in which case if the Allowed Claim, after being reduced by the amount of the Disallowed Claim, is less than the Roll-Up Amount, then the Roll-Up Amount shall be reduced such that the Roll-Up Amount equals the Allowed Claim.

"Sale Transaction" means a sale under Section 363 of the Bankruptcy Code.

"Scheduled Preexisting Indebtedness" means that certain secured Indebtedness specifically and solely to the extent as set forth on Schedule V hereto which was preexisting as of the date of this Agreement.

"Scheduled Preexisting Liens" means those certain Liens specifically and solely to the extent as set forth on Schedule VI hereto which were preexisting as of the date of this Agreement.

"Second Interim DIP Order" means the *Second Interim Order Pursuant to Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Fed. R. Bankr. P. 4001(B) and 4001(D): (I) Authorizing the Debtor to Obtain Post-Petition Financing, (II) Granting Priming Liens and Administrative Expense Claims, (III) Determining Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [ECF No. 139] of the Bankruptcy Court entered in the Chapter 11 Case on January 23, 2023, approving the terms set forth in the term sheet presented by Borrower to the Bankruptcy Court for hearing on the DIP Note Facility and DIP Factoring Facility and authorizing up to Seven Hundred Fifty Thousand Dollars ($750,000) to be made available in one or more issuances of the DIP Notes and up to Ten Million Dollars ($10,000,000) under the DIP Factoring Facility, with up to Two Million Dollars ($2,000,000) of the Ten Million Dollars ($10,000,000) available for the purchase of purchase orders during the Interim Period and the relief provided for thereunder, together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur and guaranty debt, grant senior Liens and provide for the super priority administrative claim status of the DIP Factoring Purchasers' claims under this Agreement; provided such order has not been stayed or modified (without the consent of the DIP Note Agent).

"Section 541 Proceeds" means the proceeds of the DIP Collateral constituting causes of action which are property of the estate under Section 541 of the Bankruptcy Code owned by Seller.

"Seller" has the meaning set forth in the preamble of this Agreement.

"Seller Parties" means collectively, Seller and Guarantor.

"Termination Date" means the earliest of (a) December 31, 2023, (b) the date of acceleration of any of the Obligations pursuant to Section 8, (c) the date of the closing of a Sale Transaction or any other sale of all or substantially all of Seller's assets pursuant to Section 363 of the Bankruptcy Code, (d) the filing of a chapter 11 plan with respect to Borrower that is not an Acceptable Plan, and (e) the closing date for debtor-in-possession financing with another lending source approved by the Final Order.

2.      <u>DIP Factoring Purchase Facility</u>.

(a)      <u>DIP Factoring Purchase</u>.

(i)      Subject to all of the terms and conditions of this Agreement and the Bankruptcy Orders, each DIP Factoring Purchaser severally agrees to purchase from Seller, and Seller hereby agrees to sell, transfer and assign all of Seller's right, title and interest in and to each of those certain DIP Accounts and DIP Purchase Orders set forth on the Assignments, together with all rights of action accrued or to accrue thereon, including without limitation, full power to collect, sue for, compromise, assign or in any other manner enforce collection thereof, to the DIP Factoring Purchasers, either in their name or in the DIP Factoring Agent's name of behalf of such DIP Factoring Purchaser, in an aggregate amount not to exceed its DIP Factoring Purchase Commitment.

(ii)      Upon the entry of the Second Interim DIP Order, during the Interim Period, Seller shall be entitled, subject to the terms and conditions of this Agreement, to sell DIP Accounts and DIP Purchase Orders in an amount at any time outstanding not to exceed the lesser of (i) the amount permitted by the Second Interim DIP Order and (ii) Ten Million Dollars ($10,000,000), with up to Two Million Dollars ($2,000,000) of the Ten Million Dollars ($10,000,000) available with respect to any DIP Purchase Orders (provided that when such DIP Purchase Orders convert to DIP Accounts, the DIP Factoring Facility shall not exceed Ten Million Dollars ($10,000,000)).  It is understood and agreed that Seller shall only be entitled to sell, and the DIP Factoring Purchasers shall only be entitled to purchase, DIP Purchase Orders, during the Interim Period only and not after the entry of the Final Order, and the DIP Factoring Purchasers will only factor up to $2,000,000 of DIP Purchase Orders during the Interim Period.

(iii)      Upon the entry of the Final Order, Seller shall be entitled, subject to the terms and conditions of this Agreement, to sell DIP Accounts in an amount at any time outstanding not to exceed the lesser of (i) the amount permitted by the Final Order and (ii) the Aggregate DIP Factoring Purchase Commitment.

(iv)      The DIP Factoring Purchasers, in the sole discretion of the DIP Factoring Agent, may advance up to (i) one hundred percent (100%) of the face amount of the DIP Accounts and DIP Purchase Orders up to the first One Million Dollars ($1,000,000) purchased, and (ii) eighty percent (80%) of the face amount of the DIP Accounts purchased in excess of One Million Dollars ($1,000,000), less the Facility Fee (each a "<u>Down Payment</u>" and collectively the "<u>Aggregate Advances</u>"). Notwithstanding anything to the contrary contained in this Agreement, the maximum Aggregate Advances shall not exceed the Aggregate DIP Factoring Purchase Commitment.

(v)      The purchase of the DIP Accounts and DIP Purchase Orders shall be made ratably by the DIP Factoring Purchasers in accordance with their respective pro rata shares.

(vi)      Subject to the prior satisfaction of all other applicable conditions to the sale and purchase of the DIP Accounts and DIP Purchase Orders set forth in this Agreement, for purposes of each Assignment, Seller shall notify the DIP Factoring Purchasers of DIP

Accounts and DIP Purchase Orders to be sold not less than three (3) Business Days prior to the proposed date of the Assignment. Immediately upon receipt of any such written notice, the DIP Factoring Agent shall confirm receipt of such written notice by each of the DIP Factoring Purchasers. DIP Factoring Purchasers will fund the purchase of the DIP Accounts and DIP Purchase Orders by wire transfer to the DIP Factoring Disbursement Account. To the extent the DIP Factoring Purchasers provide funds to the DIP Factoring Agent, the DIP Factoring Agent will make the funds so received from the DIP Factoring Purchasers available to Seller by wire transfer to the DIP Factoring Disbursement Account.

(vii)    The DIP Factoring Agent and the DIP Factoring Purchasers, or any of its or their agents, may at any time verify the DIP Accounts and DIP Purchase Orders by any means deemed appropriate by DIP Factoring Agent and the DIP Factoring Purchasers.

(viii)    The DIP Factoring Agent shall record on its books the Purchase Price of the DIP Accounts and DIP Purchase Orders purchased by each DIP Factoring Purchaser from time to time. In addition, each DIP Factoring Purchaser is authorized, at such DIP Factoring Purchaser's option, to note the date and amount of each payment of collection of such DIP Factoring Purchaser's DIP Accounts and DIP Purchase Orders in its books and records, including computer records, such books and records constituting presumptive evidence, absent manifest error, of the accuracy of the information contained therein.

(ix)    Once DIP Factoring Purchasers have purchased the DIP Accounts and DIP Purchase Orders, the payment from account debtors relative to the DIP Accounts and DIP Purchase Orders is the sole property of the DIP Factoring Purchasers. Any interference by Seller with this payment may result in civil and/or criminal liability.

(x)    IT IS THE INTENTION OF THE PARTIES THAT AS TO ALL DIP ACCOUNTS AND DIP PURCHASE ORDERS (DURING THE INTERIM PERIOD) THAT DIP FACTORING PURCHASERS ELECT TO PURCHASE SHALL CONSTITUTE A TRUE PURCHASE AND SALE OF ACCOUNT(S) UNDER § 9-318 OF THE UNIFORM COMMERCIAL CODE AND AS SUCH, THE SELLER SHALL HAVE NO LEGAL OR EQUITABLE INTEREST IN THE DIP ACCOUNTS AND DIP PURCHASE ORDERS SOLD.

(b)    Interest.

(i)    The Aggregate Advances made in accordance with this Agreement shall bear interest from the date of disbursement until the date of collection with respect to each DIP Account and DIP Purchase Order. Interest shall accrue on such Aggregate Advances from time to time outstanding hereunder at the Interest Rate.

(ii)    Interest on the Aggregate Advances shall accrue based on a year of 360 days and actual days elapsed. All accrued and outstanding interest will be due and payable on the earlier to occur of the (i) date of collection with respect to each DIP Account and DIP Purchase Order, or (ii) the Termination Date.

(iii)    Upon the occurrence and during the continuance of an Event of Default, the outstanding amount of the Aggregate Advances (and any accrued but unpaid interest) shall

14

bear interest at the Interest Rate <u>plus</u> 2.0% per annum, computed as provided above and payable in immediately available funds on demand.

      (iv)    In no event shall the interest rate under this <u>paragraph (b)</u> exceed the maximum rate permitted under applicable law.

      (c)    <u>Reserve</u>.  DIP Factoring Agent, in its sole discretion, may elect to maintain a reserve from each Down Payment ("<u>Reserve</u>") of an amount not to exceed twenty percent (20%) of the Aggregate Advances (the "<u>Reserve Cap</u>").  As a general rule, although not a requirement, it is intended that Reserves on paid invoices are released, less any sums due to the DIP Factoring Purchasers, upon the request of the Seller or when the DIP Factoring Purchasers' next purchase of DIP Accounts or DIP Purchase Orders from Seller is funded.  However, DIP Factoring Agent may increase or decrease the amount of such Reserve, up to the Reserve Cap, at any time and from time to time if it deems it necessary in order to protect its interest and to protect DIP Factoring Purchasers from losses or potential losses that DIP Factoring Purchasers may reasonably anticipate might arise in the future due to contingencies, disputes, potential breach of warranties or other potential non-payments, reductions or losses from the purchase of DIP Accounts or DIP Purchase Orders under the Aggregate Advances.

      (d)    <u>Recourse; Charge-Back</u>.

      (i)    In the event that (a) a DIP Account or DIP Purchase Order (during the Interim Period) purchased by DIP Factoring Purchasers is not paid in full by the account debtor, on or before the date when due in accordance with its terms, (b) an account debtor objects to the property sold or service performed by Seller, or rejects or revokes acceptance or fails or refuses to accept or receive any such property or services, (c) an account debtor suspends business, requests a general extension of time within which to pay debts, makes an assignment for the benefit of creditors or becomes a debtor or alleged debtor in any bankruptcy case, or if an event occurs amounting to a general business failure of an account debtor, (d) payment by an account debtor on a DIP Account or DIP Purchase Order must be disgorged after receipt for any reason, or (e) DIP Factoring Agent in its reasonable discretion determines that any DIP Account or DIP Purchase Order is or may become uncollectible (collectively, a "<u>Worthless Account</u>"), the DIP Factoring Agent may require the Seller promptly to repurchase such DIP Account or DIP Purchase Order, it being the intent of the parties that the DIP Factoring Purchasers shall have recourse against Seller for Down Payments made on any such Worthless Account with such credit risk on the DIP Accounts and DIP Purchase Orders to be borne by the Seller and not the DIP Factoring Purchasers.

      (ii)    Seller acknowledges that all amounts chargeable to Seller's account under this Agreement shall be payable by Seller within three (3) Business Days after Seller's receipt of notice of the same.  Upon satisfaction of a chargeback of any DIP Account or DIP Purchase Order and provided there are no other outstanding chargebacks or defaults at such time, DIP Factoring Purchasers shall assign all of their title, rights and interests in and to such DIP Account or DIP Purchase Order to Seller.

(e) <u>Defaulting DIP Factoring Purchaser</u>. Notwithstanding anything to the contrary contained in this Agreement, if any DIP Factoring Purchaser becomes a Defaulting DIP Factoring Purchaser, then, until such time as such DIP Factoring Purchaser is no longer a Defaulting DIP Factoring Purchaser (or to the extent permitted by applicable law):

(i) Such Defaulting DIP Factoring Purchaser shall have no right to approve or disapprove any amendment, waiver or consent with respect to this Agreement.

(ii) The remaining DIP Factoring Purchasers shall have the right to purchase and fund the Defaulting DIP Factoring Note Purchaser's pro-rata share of any DIP Accounts or DIP Purchase Orders, as applicable, on a pro-rata basis (the "<u>Defaulting DIP Factoring Purchaser's Pro-Rata Share</u>").

(iii) The payment waterfall set forth in <u>Section 3(c)</u> below shall be modified such that the Defaulting DIP Factoring Purchaser shall not participate in any payments received and the Defaulting DIP Factoring Purchaser's pro-rata share of payments received from Borrower shall be paid on a pro-rata basis to the remaining DIP Factoring Purchasers who purchased and funded the Defaulting DIP Factoring Purchaser's Pro-Rata Share. Further notwithstanding anything to the contrary contained in this Agreement, no Defaulting DIP Factoring Purchaser shall be entitled to participate in the receipt of payments under the payment waterfall set forth in <u>Section 3(c)</u> below, until (A) such Defaulting DIP Factoring Purchaser is no longer a Defaulting DIP Factoring Purchaser, <u>and</u> (B) the remaining DIP Factoring Purchasers who funded the Defaulting DIP Factoring Purchaser's Pro-Rata Share pursuant to <u>Section 2(e)(ii)</u> above have been repaid in full, including for such funding of Defaulting DIP Factoring Purchaser's Pro-Rata Share.

(f) <u>Term</u>. This Agreement will remain in effect through the Termination Date.

(g) <u>Disputes</u>.

(i) Seller must immediately notify DIP Factoring Agent and the DIP Factoring Purchasers of any disputes between any account debtor and Seller.

(ii) Upon ten (10) days' written notice to Seller, DIP Factoring Agent and the DIP Factoring Purchasers may, at its and their reasonable option, settle any dispute with any account debtor. Such settlement does not relieve Seller of any of its obligations under this Agreement.

(h) <u>Power of Attorney</u>. In order to implement this Agreement, Seller irrevocably appoints DIP Factoring Agent its special attorney in fact or agent with power to:

(i) Strike out Seller's address on any correspondence to any account debtor and put on DIP Factoring Agent's address;

(ii) Receive and open all mail addressed to Seller via DIP Factoring Agent's address;

16

(iii)    Endorse the name of Seller or Seller's trade name or the name of Seller's sub-agent, if applicable, on any checks or other evidences of payment that may come into the possession of DIP Factoring Agent in connection with the DIP Accounts and DIP Purchase Orders;

(iv)    In Seller's name, or otherwise, demand, sue for, collect any and all monies due in connection with the DIP Accounts and DIP Purchase Orders; and

(v)    Compromise, prosecute or defend any action, claim or proceeding relative to the DIP Accounts and DIP Purchase Orders.

The authority granted to DIP Factoring Agent shall remain in full force and effect until the DIP Accounts and DIP Purchase Orders are paid in full and the entire indebtedness of Seller to DIP Factoring Agent and DIP Factoring Purchasers is discharged.

(i)    <u>No Assumption</u>.  Nothing contained in this Agreement shall be deemed to impose any duty or obligation upon DIP Factoring Agent or the DIP Factoring Purchasers in favor of any account debtor and/or any other party in connection with the DIP Accounts and the DIP Purchase Orders.

3.    <u>Collections Generally</u>.

(a)    <u>Payments Held in Trust</u>. Seller will hold in trust and safekeeping, as the property of the DIP Factoring Purchasers and immediately turnover to the DIP Factoring Agent, on behalf of the DIP Factoring Purchasers, the original check or other form of payment received by Seller if payment on the DIP Accounts or DIP Purchase Orders comes into Seller's possession. Should Seller come into possession of a check comprising payments owing to both Seller and DIP Factoring Purchasers, Seller shall turnover said check to DIP Factoring Agent, on behalf of the DIP Factoring Purchasers.  In the event Seller receives a payment, in the form of a check, for a DIP Account or DIP Purchase Order and it is improperly deposited into Seller's bank account or in the event Seller fails to turnover to DIP Factoring Agent, on behalf of the DIP Factoring Purchasers, a wire transfer or ACH payment it receives from DIP Account or DIP Purchase Order within three (3) Business Days of receipt, then DIP Factoring Agent, on behalf of the DIP Factoring Purchasers, reserves the right to impose liquidated damages upon Seller of up to twenty percent (20%) of the amount of any payment so improperly retained.  Notwithstanding the foregoing, with respect to the improperly deposited checks, DIP Factoring Purchasers agree to waive the aforementioned charge on the first two (2) occasions provided that on such occasions Seller remits, in full, the improperly deposited funds to DIP Factoring Agent, on behalf of the DIP Factoring Purchasers within 48 hours of receipt.  In the event the DIP Factoring Agent or the DIP Factoring Purchasers receive a payment for a non-DIP Account or non-DIP Purchase Order of Seller, the DIP Factoring Agent and/or DIP Factoring Purchaser, as applicable, shall wire transfer such payment to Seller within three (3) Business Days of receipt.

(b)    <u>Collections on Purchased DIP Accounts and DIP Purchase Orders</u>.  All payments and collections received on DIP Accounts and DIP Purchase Orders purchased by the DIP Factoring Purchasers hereunder, including without limitation all collections of the Aggregate Advances and payments of interest on the Aggregate Advances, shall be made to the DIP Factoring

Agent in immediately available funds by wire transfer to an account as directed by DIP Factoring Agent pursuant to wire instructions designated by DIP Factoring Agent.  All payments and collections shall be applied in the manner set forth in Section 3(c) below.

(c)    Payment Waterfall.

(i)    All payments and collections received on DIP Accounts and DIP Purchase Orders purchased by the DIP Factoring Purchasers hereunder, including without limitation all collections of the Aggregate Advances and payments of interest on the Aggregate Advances and all proceeds of DIP Collateral, other than the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Proceeds and Section 541 Proceeds and subject to any payments made in accordance with the lien priorities described in Schedule IV hereto, shall be applied as follows:

(A)    First, to the payment of accrued and unpaid interest on the Aggregate Advances on a pro-rata basis;

(B)    Second, to the collections of the amount outstanding of the Aggregate Advances until paid in full on a pro-rata basis; and

(C)    Third, payment of all other amounts owing to the DIP Factoring Purchasers hereunder and under the other applicable DIP Documents on a pro rata basis.

(ii)    All proceeds of the Section 541 Proceeds shall be applied pari-passu to (i) the Bankruptcy Court approved fees and costs of the Seller's Professionals and the Creditors Committee's Professionals, respectively, not to exceed the amounts set forth in the Authorized Budget for each of the Seller's Professionals and the Creditors Committee's Professionals, to the extent not otherwise satisfied by the Carve-Out, and (ii) the outstanding amount due under the DIP Note Facility (exclusive of the DIP Inventory Acquisition Line of Credit), the DIP Factoring Facility and the DIP Inventory Acquisition Line of Credit, respectively; with any remaining proceeds after payment in full of (i) and (ii) above, being paid to the Seller's bankruptcy estate.

4.    Conditions.

(a)    Conditions to Effectiveness.  This Agreement shall become effective as of the date first above written upon, and the obligation of each DIP Factoring Purchaser to purchase its pro rata share of the DIP Accounts and/or DIP Purchase Orders for each Assignment during the Interim Period is subject to, satisfaction of each of the following (unless otherwise waived by the DIP Factoring Purchasers):

(i)    Approvals.  The DIP Factoring Purchasers shall have received satisfactory evidence that Seller has obtained all required consents and approvals of all Persons, including all requisite Governmental Authorities, in connection with the filing of the Chapter 11 Case, and there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the transactions contemplated hereby.

18

(ii)   <u>Second Interim DIP Order</u>.  On or prior to the date of this Agreement, the Second Interim DIP Order, in form and substance satisfactory to the DIP Note Agent, was entered by the Bankruptcy Court and shall not have been vacated, reversed, modified, amended or stayed in any manner adverse to the DIP Factoring Purchasers or DIP Note Purchasers without the written consent of the DIP Note Agent, or to the extent adversely and disproportionately affecting any particular DIP Factoring Purchaser or DIP Note Purchaser, such adversely affected DIP Factoring Purchaser or DIP Note Purchaser.

(iii)   <u>Automatic Stay</u>.  The automatic stay shall have been modified to permit the creation and perfection of the DIP Factoring Purchasers' Liens and security interests, as more fully set forth in the Second Interim DIP Order.

(iv)   <u>Orders</u>.  All "first day orders" and "second day orders" and any final versions thereof sought to be entered by any of Seller shall be in form and substance satisfactory to the DIP Note Agent, including without limitation, any such orders permitting the payment by Seller and its subsidiaries of any prepetition amounts then (or thereafter becoming) due and owing.

(v)   <u>Liens</u>.  Upon the entry of the Second Interim DIP Order, the DIP Factoring Agent shall, for the benefit of the DIP Factoring Purchasers, have valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on the DIP Collateral to the extent set forth in the Second Interim DIP Order, subject to the priorities described in <u>Schedule IV</u> hereto, and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid.

(vi)   <u>Deliveries</u>.  The DIP Factoring Agent and the DIP Factoring Purchasers shall have received the following supporting documents with respect to Seller:

(A)   a copy of its articles of incorporation certified as of a date within thirty (30) days of the date of this Agreement, as applicable, to be a true and accurate copy by the Secretary of State of Nevada;

(B)   a certificate of the Secretary of State of Nevada, dated as of a date within thirty (30) days of the date of this Agreement, to its existence and (if available) good standing;

(C)   a copy of its bylaws, certified by its secretary, to be a true and accurate copy of its bylaws in effect on the date of this Agreement;

(D)   true and correct copies of the corporate resolutions, duly adopted, approved or otherwise delivered by the directors, officers and shareholders (to the extent necessary and applicable), each of which is certified to be in full force and effect on the date of this Agreement, as applicable, authorizing the execution and delivery by the Seller of this Agreement and any other DIP Documents delivered on the date of this Agreement, as applicable to which it is a party and the performance by it of all its obligations thereunder; and

(E)    such additional supporting documents and other information with respect to its operations and affairs as the DIP Factoring Agent or any DIP Factoring Purchaser may reasonably request.

(vii)    <u>Miscellaneous</u>.  Delivery of such other DIP Documents (including a deposit account control agreement for the DIP Factoring Disbursement Account) as the DIP Factoring Agent may require evidencing the Liens on the DIP Collateral and customary closing deliverables.

(b)    <u>Conditions to Each Assignment Following the Interim Period</u>.  The obligation of each DIP Factoring Purchaser to purchase its pro rata share of DIP Accounts for each Assignment following the expiration of the Interim Period is subject to satisfaction of each of the following (unless otherwise waived by the DIP Factoring Purchasers):

(i)    <u>Interim DIP Orders</u>.  The Interim DIP Orders shall not have been vacated, reversed, modified, amended or stayed in any manner adverse to the DIP Factoring Purchasers or DIP Note Purchasers without the written consent of the DIP Note Agent, or to the extent adversely and disproportionately affecting any particular DIP Factoring Purchaser or DIP Note Purchaser, such adversely affected DIP Factoring Purchaser or DIP Note Purchaser.

(ii)    <u>Final Order</u>.  On or prior to February 21, 2023 (unless waived by the DIP Note Agent), the Final Order, in form and substance satisfactory to the DIP Factoring Purchasers shall have been entered by the Bankruptcy Court and shall not have been vacated, reversed, modified, amended or stayed in any manner adverse to the DIP Factoring Purchasers or DIP Note Purchasers without the written consent of the DIP Note Agent, or to the extent adversely and disproportionately affecting any particular DIP Factoring Purchaser or DIP Note Purchaser, such adversely affected DIP Factoring Purchaser or DIP Note Purchaser.

(iii)    <u>Automatic Stay</u>.  The automatic stay shall have been modified to permit the creation and perfection of the DIP Factoring Purchasers' Liens and security interests, as more fully set forth in the Final Order.

(iv)    <u>Liens</u>.  Upon the entry of the Final Order, the DIP Factoring Agent shall, for the benefit of the DIP Factoring Purchasers, have valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on the DIP Collateral to the extent set forth in the Final Order, subject to the priorities described in <u>Schedule IV</u> hereto, and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid.

(v)    <u>No Default</u>.  No Default or Event of Default has occurred and is continuing or would result after giving effect to the DIP Factoring Purchase.

(vi)    <u>Representations and Warranties</u>.  Each representation and warranty by Seller set forth in this Agreement is true and correct in all respects.

20

(vii)    Insurance.    DIP Factoring Agent shall be reasonably satisfied with the amount, types and terms and conditions of all insurance and bonding maintained by Seller and its subsidiaries. DIP Factoring Agent shall receive endorsements naming DIP Factoring Agent as an additional insured and loss payee under all insurance policies to be maintained with respect to the properties of Seller and its subsidiaries forming part of the DIP Collateral.

Assignment by Seller of any DIP Account and any DIP Purchase Order shall be deemed to constitute a representation and warranty by Seller on the date thereof as to satisfaction of each of the conditions specified in this Section 4(b).

5.    Representations and Warranties.    Seller hereby represents and warrants to each DIP Factoring Purchaser, as of the date hereof, and as of the date of each Assignment of a DIP Account or DIP Purchase Order to the DIP Factoring Purchasers, that:

(a)    Existence.    Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation.

(b)    Power and Authority.    Subject to the entry of the Interim DIP Orders and Final Order, as applicable, by the Bankruptcy Court, Seller has (i) the power and authority and (ii) all governmental licenses, authorizations, consents and approvals to own its assets, carry on its business and execute, deliver, and perform its obligations under this Agreement and the other DIP Documents.

(c)    No Conflict.    Subject to the entry of the Interim DIP Orders and Final Order, as applicable, by the Bankruptcy Court, the execution, delivery and performance by Seller of this Agreement and the other DIP Documents has been duly authorized by all necessary action on the part of such Seller, and does not and will not (i) contravene the terms of any of such Seller's corporate documents, (ii) violate, conflict with or result in any material breach or contravention of, or result in the creation of any Lien under, any indenture, agreement and other instrument binding upon it or its property the effect of which has not been stayed by the automatic stay or the Bankruptcy Court or (iii) violate or conflict with any law, regulation or order of any Governmental Authority applicable to it or its property.

(d)    Governmental Authorization.    Other than the entry of the Second Interim DIP Order and Final Order, as applicable, by the Bankruptcy Court, no approval, consent, exemption, or authorization of, or other action by, or notice to, or filing, declaration, recording or registration with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, Seller of this Agreement.

(e)    Due Execution; Binding Effect.    Each of this Agreement and the other DIP Documents have been (or upon execution and delivery will be) duly executed and delivered by the Seller. Subject to the entry of the Second Interim DIP Order and Final Order, as applicable, by the Bankruptcy Court, each of this Agreement and the other DIP Documents constitutes the legal, valid and binding obligation of Seller, enforceable against such Seller in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws

21

affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

(f)      No Default.  No Default or Event of Default has occurred and is continuing.

(g)      Budget.  To the best information and belief of Seller, the Authorized Budget attached hereto as Exhibit A and all projected consolidated balance sheets, income statements and cash flow statements of Seller in connection with a Proposed Budget delivered to the DIP Factoring Agent and/or the DIP Factoring Purchasers pursuant to Section 6(a)(ii) reasonably presents (or will present), in all material respects, on a pro forma basis, the projected cash receipts and disbursements of Seller for the period specified therein and such projections, in the reasonable view of the Independent Director of Seller, are (or will be) reasonably achievable based upon reasonable assumptions and other information available to Seller as of the date hereof (or thereof).

(h)      Disclosure.  To the best information and knowledge of Seller, no representation or warranty by Seller in this Agreement or in any other DIP Document and no certificate, schedule, exhibit, report or other document provided or to be provided by Seller in connection with the transactions contemplated hereby or thereby (including, without limitation, the negotiation of and compliance with the DIP Documents) contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

(i)      Chapter 11 Case Matters.  Pursuant to and to the extent permitted in the Second Interim DIP Order and Final Order, as applicable, the Obligations will constitute allowed super-priority administrative expense claims in the Chapter 11 Case having priority above all other administrative expense claims (other than the Carve-Out (as defined in the Final Order)) as set forth in the Final Order.  After the entry of the Second Interim DIP Order and Final Order, as applicable, the Obligations will be secured by a valid and perfected, enforceable and unavoidable first priority Lien on the DIP Collateral as more fully set forth in the Second Interim DIP Order and Final Order, as applicable.  The Second Interim DIP Order and Final Order, as applicable, is in full force and effect and has not been reversed, stayed, modified or amended without the prior written consent of the DIP Note Agent.  Subject to the Second Interim DIP Order and Final Order, as applicable, notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the DIP Factoring Agent and the DIP Note Purchasers shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder and under applicable law, without further application to or order by the Bankruptcy Court, as more fully set forth in the Final Order.

(j)      DIP Accounts and DIP Purchase Orders.

(i)      Seller is the sole and absolute owner of the DIP Accounts and DIP Purchase Orders and has the full legal right to make said sale, assignment and transfer.

(ii)      The correct amount of each DIP Account and each DIP Purchase Order will be set forth on the Assignments.

22

(iii)    Each DIP Account and each DIP Purchase Order is an accurate and undisputed statement of indebtedness from an account debtor for a sum certain, without offset or counterclaim and which is due and payable in ninety days or less.

(iv)    Each DIP Account and each DIP Purchase Order is an accurate statement of a bona fide sale, delivery and acceptance of merchandise or performance of service by Seller to an account debtor.

(v)    Seller does not own, control or exercise dominion in any way whatsoever, over the business of any account debtor.

(vi)    Seller will not under any circumstance or in any manner whatsoever, interfere with any of DIP Factoring Agent's or DIP Factoring Purchasers' rights under this Agreement.

(vii)    Seller has not and will not, at any time, permit any lien, security interest or encumbrance to be created upon any of its accounts receivable and/or its inventory without the prior written consent of the DIP Consenting Secured Parties except as provided in the Final Order.

(viii)    Seller will not enter into any agreement for a "Merchant Cash Advance" or similar product without the prior written consent of the DIP Factoring Agent and DIP Factoring Purchasers.

(ix)    Seller will not change or modify the terms of the DIP Accounts and DIP Purchase Orders with any account debtor unless the DIP Factoring Agent and DIP Factoring Purchasers first consents, in writing.

(x)    Seller will notify the DIP Factoring Agent and DIP Factoring Purchasers, in advance of: any change in Seller's place of business; Seller having or acquiring more than one place of business; any change in Seller's chief executive office; and/or any change in the office or offices where Seller's books and records concerning accounts receivable are kept.

(xi)    Seller will notify the DIP Factoring Agent and DIP Factoring Purchasers, in writing, in advance of any planned temporary or permanent closure or cessation of Seller's business.

(xii)    Seller will immediately notify the DIP Factoring Agent and DIP Factoring Purchasers of any proposed or actual change of the Seller's and/or any account debtor's identity, legal entity or corporate structure.

(xiii)    A notification letter from Seller and/or all invoices will state on their face that the DIP Accounts and the DIP Purchase Orders represented thereby have been assigned to the DIP Factoring Purchasers and are to be paid as directed by the DIP Factoring Agent, as collateral agent on the behalf of the DIP Factoring Purchasers.

(xiv)   No DIP Account nor DIP Purchase Order shall be on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis.

(k)    <u>Resignations</u>.  Prior to the effective date of this Agreement, Ryan Drexler resigned from all offices of Seller and from the board of directors of Seller, and Eric Hillman was appointed as the Chief Executive Officer of Seller.

(l)    <u>Board of Directors</u>.

(i)    <u>Interim Board of Directors</u>.  The board of directors of the Seller as of the Petition Date shall have resigned and the Interim Board of Directors shall have been appointed and shall have served as the board of directors of Seller through the date the Second Interim DIP Order is entered by the Bankruptcy Court.

(ii)   <u>Independent Director</u>.  Upon entry of the Second Interim DIP Order by the Bankruptcy Court, or sooner, the Independent Director shall be Nicolas Rubin, with sole and exclusive responsibility for the Seller for the following:

(A)    Protect and recover the assets of Seller, including determine whether it is in the best interest of Seller to reorganize under Section 1129 of the Bankruptcy Code, or sell its assets in accordance with Section 363 of the Bankruptcy Code;

(B)    Review and approve the ultimate debtor-in-possession financing incurred by the bankruptcy estate, as negotiated by the Seller's restructuring professionals, which will be approved as part of the Final Order;

(C)    Except as otherwise provided in this Agreement, investigate and determine which estate causes of action, if any, should be pursued, prosecuted, or settled; and

(D)    Maximize value for all stakeholders.

6.    <u>Covenants</u>.  Seller hereby covenants and agrees that from the date hereof until payment in full of all the Obligations and termination of all DIP Factoring Purchase Commitments that:

(a)    <u>Reporting</u>.

(i)    <u>Bankruptcy Matters</u>.  Seller shall provide to the DIP Factoring Agent and the Creditors' Committee, copies of all projections or other information respecting Seller's business or financial condition, provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or any creditors' committee, at the time such document is provided by or to the U.S. Trustee (or any monitor or interim receiver, if any appointed in the Chapter 11 Cases) or such committee.

(ii)   <u>Proposed Budget</u>.  Every four weeks on Wednesday commencing with the Wednesday of the fourth full week commencing after the one-week anniversary of the

Second Interim DIP Order, Seller shall prepare and deliver to the DIP Note Agent, the DIP Factoring Agent and the Creditors' Committee for review, and for DIP Agent's consent, in DIP Note Agent's sole but reasonable discretion, a Proposed Budget updating the Authorized Budget then in effect at such time.  At such time that such Proposed Budget is consented to by the DIP Note Agent in writing it shall become the Authorized Budget. To the extent any updated Proposed Budget is not acceptable to the DIP Note Agent, the then-existing Authorized Budget will remain the Authorized Budget until replaced by an updated Proposed Budget that is acceptable to the DIP Note Agent.  Upon request of the DIP Factoring Purchasers, Seller shall deliver the Proposed Budget to the DIP Factoring Purchasers for their review.

(iii)    <u>Intentionally Omitted.</u>

(iv)    <u>Budget Reconciliation</u>.  Compliance with the Authorized Budget shall be reviewed on Monday of every other week on a bi-weekly basis, with such reviews to be conducted on the Monday following each of the second and fourth weeks of the Authorized Budget (each, a "<u>Weekly Review Period</u>") and thereafter on a rolling 4-week basis (the "<u>Cumulative Review Period</u>" and together with the Weekly Review Period, the "<u>Review Periods</u>").  Beginning on the second Monday following the Second Interim DIP Order and every other Monday thereafter, the Seller shall deliver to the DIP Factoring Agent and the Creditors' Committee, not later than 4:00 p.m. Pacific time on each Monday (commencing with the Monday after the one-week anniversary of the Second Interim DIP Order), a weekly line-by-line variance report (the "<u>Variance Report</u>"), which Variance Report shall compare actual cash receipts and disbursements of the Seller with corresponding amounts provided for in the Authorized Budget on a line-by-line basis for the prior week and the applicable Review Period (or such shorter period as may have elapsed from the Petition Date), including written descriptions in reasonable detail explaining any material positive or negative variances, and otherwise in form and substance reasonably acceptable to the DIP Note Agent.

(v)    <u>Financial and Restructuring Advisor Reports</u>.  The Seller Parties shall deliver to the DIP Note Agent and the Creditors' Committee copies of all non-privileged reports of the financial and restructuring advisors of the Seller Parties as reasonably requested by the DIP Note Agent, including but not limited to:

        i.    Any analysis of cash flows, forecasts, and potential cost savings initiatives;

       ii.    Transaction marketing material (CIMs / MPs);

      iii.    Investor outreach list;

      iv.    Sale process updates in accordance with the terms of this Agreement and the Bankruptcy Orders; and

      v.    Proposed sources and uses at emergence.

25

(vi)    Financial Records. Seller shall furnish on a monthly basis to DIP Factoring Agent bank statements, accounts receivable aging and accounts payable aging monthly.

(vii)    Factoring Reports.  Seller, or another party designated by Seller and the DIP Factoring Agent, shall provide a weekly factoring report to the DIP Agents and the Creditors' Committee identifying each DIP Account purchased, the amount of the Down Payment on the DIP Account, the date the DIP Account is due and the days overdue of any overdue DIP Account, the amount of the DIP Account due, and any payments received. The DIP Agents shall confirm whether or not DIP Agents agree with the information in each weekly factoring report.

(viii)    Additional Information.  Seller shall, promptly following reasonable advance notice to Seller, provide (i) the DIP Factoring Purchasers such additional business, financial, collateral and other information as the DIP Factoring Purchasers may from time to time reasonably request and (ii) participate in bi-weekly conference calls between the directors or other reasonably requested management representatives of Seller and the Note Agent during normal business hours at a time to be mutually agreed upon to discuss the business affairs and performance of Seller (including the Chapter 11 Cases).

(b)    Notice of Event of Default.  Seller shall, promptly upon obtaining knowledge thereof, notify the DIP Factoring Agent and the DIP Factoring Purchasers of the occurrence or existence of any Default or Event of Default.

(c)    Existence.  Seller shall preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of incorporation.

(d)    Compliance with Laws.  Seller will comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property.

(e)    Intentionally Omitted.

(f)    Chief Restructuring Officer/Financial Advisor.  Seller may, at Seller's election and subject to the approval of the Bankruptcy Court, engage a Chief Restructuring Officer or financial advisor (the "CRO") reasonably satisfactory to the DIP Note Agent pursuant to an engagement letter with a scope and compensation reasonably satisfactory to the DIP Note Agent and otherwise be in form and substance satisfactory to the DIP Note Agent.  All fees and expenses of (and otherwise relating to) the CRO shall be the sole responsibility of Seller.  The CRO shall not be removed without order of the Bankruptcy Court.  Furthermore, the CRO's fees and costs shall not exceed $50,000 per month, except as otherwise approved by the Board of Directors.

(g)    Access to Information.  At the request of the DIP Factoring Agent, the Seller Parties shall (i) arrange for the DIP Factoring Agent to join the bi-weekly conference calls between representatives of the Seller Parties, the CRO, if engaged, and the DIP Note Agent (which may, to the extent practicable, be the same bi-weekly conference that may be requested pursuant to Section 6(a)(vi) above), which shall occur during normal business hours at a time to be mutually agreed for purposes of providing information regarding the status of the Chapter 11 Case, Seller's business operations, the preparation, filing, and confirmation of an Acceptable Plan, and a Sale Transaction process that, if a stalking horse bidder is part of the sale process, would not be deemed to provide

preferential treatment to such bidder; provided that, for the avoidance of doubt, information regarding the number and identity of the parties contacted and the overview of the marketing efforts undertaken in connection with a Sale Transaction shall not be deemed to provide preferential treatment and shall be disclosed; (ii) at all times provide the DIP Note Agent and its professional advisors with access to any data room established for purposes of allowing potential purchasers to evaluate a Sale Transaction; and (iii) provide the DIP Note Agent and its professional advisors with all materials and other communications regarding a Sale Transaction process provided and available to all bidders at the time of distribution to any or all bidders. If at any time the stalking horse bidder is not part of the sale process, then Seller shall arrange and cause to be held weekly conference calls between representatives of the Seller Parties, the CRO, if engaged, and the DIP Note Agent (which may, to the extent practicable, be the same bi-weekly conference that may be requested pursuant to Section 6(a)(vi) above), which shall occur during normal business hours at a time to be mutually agreed for purposes of providing full and complete information regarding a Sale Transaction process to the DIP Note Agent.

(h)    Use of Proceeds.  Seller shall utilize the proceeds of the DIP Factoring Purchases and Cash Collateral solely to fund, and in each case solely in accordance with the Authorized Budget, this Agreement the Interim DIP Orders and the Final Order, (i) fees, interest, payments, and expenses associated with this Agreement and the DIP Factoring Facility, and the DIP Note Purchase Agreement and the DIP Note Facility, (ii) the ongoing working capital and capital expenditure needs of the Seller Parties during the pendency of the Chapter 11 Case, (iii) the Carve-Out, (iv) the Forensic Accountant (if retained), and (v) approved expenses of the administration of the Chapter 11 Case (including the payment of the Seller's Professional Fees, and the Creditor's Committee's Professional Fees), and similar costs, with any unpaid amounts in this category (v) subordinated in priority to (i)- (iv) above if the DIP Factoring Facility terminates and Seller lacks sufficient funds to pay in full all amounts required under (i)-(iv) above.  Except as set forth in the Second Interim DIP Order or the Final Order, the Seller Parties shall not be permitted to use proceeds of the DIP Factoring Purchases or Cash Collateral (i) for payment of interest or principal with respect to any Indebtedness (other than the Obligations pursuant to this Agreement and the DIP Note Purchase Agreement), (ii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation challenging, or to object, contest or raise any defense to, the amount, validity, perfection, priority, extent or enforceability of, or to assert any defense, counterclaims or offset to, the Obligations or the Liens and security interests of the DIP Factoring Agent and/or the DIP Factoring Purchasers on or in the DIP Collateral or any amount due under, or the liens or claims granted under or in connection with the DIP Factoring Facility, DIP Note Facility or the Prepetition Notes or the Prepetition Note Liens, (iii) to assert any claims, counterclaims, defenses, causes of action, objections or contests (including, without limitation, any claims or causes of action arising under chapter 5 of the Bankruptcy Code) against the DIP Factoring Purchasers or the DIP Factoring Agent or any of their agents, affiliates, representatives, attorneys or advisors, arising out of the Prepetition Notes or the Prepetition Note Liens or this Agreement, (iv) to seek to modify any of the rights granted to the DIP Factoring Purchasers or DIP Factoring Agent under this Agreement, the DIP Documents, or related documents or (vi) to make any Restricted Payment or Investment.

(i)    Indebtedness.  The Seller Parties shall not create, incur, assume or permit to exist any Indebtedness, except the Obligations and the Scheduled Preexisting Indebtedness.

(j)    <u>Liens</u>.  No Seller Party shall create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, other than the Permitted Encumbrances and the Scheduled Preexisting Liens.

(k)    <u>Restricted Payments</u>.  The Seller Parties shall not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment.

(l)    <u>Investments</u>.  The Seller Parties shall not make, or agree to make, any Investments.

(m)    <u>Cash Collateral</u>.  The Cash Collateral shall be used only in accordance with <u>Section 6(h)</u> hereto and in a manner consistent with the Authorized Budget.

(n)    <u>Cash Management</u>.  Until the indefeasible repayment of the Obligations in full in cash and the termination of all DIP Factoring Purchase Commitments under this Agreement, Seller's cash and cash equivalents shall only be used in accordance with <u>Section 6(i)</u> hereto and the Authorized Budget.

(o)    <u>Dispositions</u>.  No Seller Party shall sell, lease, transfer, assign or otherwise dispose of any of its assets or properties other than in the ordinary course of such Seller Party's business without the prior written consent of the DIP Consenting Secured Parties, and Seller acknowledges that any DIP Collateral that is the subject of any sale, lease transfer or assignment that is not sold in in the ordinary course of Seller's business or does not receive such written consent shall continue to be subject to all Liens of the DIP Factoring Agent for the benefit of the DIP Factoring Purchasers.

(p)    <u>Forensic Accounting</u>.  At the request of the DIP Note Agent and approval of the Board of Directors, the Seller shall retain a forensic accountant reasonably acceptable to the DIP Note Agent (the "<u>Forensic Accountant</u>") to review and analyze all Seller's bank statements for three (3) or more years prior to the Petition Date and any other documents and information necessary to investigate payments and transfers from Seller to render an opinion regarding whether they are avoidable under federal and state law.

(q)    <u>Budget Variance</u>.  Following the one-week anniversary of the Second Interim DIP Order, the Seller Parties shall perform in accordance with the Authorized Budget, subject to the following with respect to any Review Period: (i) the Seller Parties' actual cash receipts shall not be less than 90% of the projected amounts therefor set forth in the Authorized Budget on a cumulative basis; and (ii) the Seller Parties' actual cash disbursements shall not be greater than 110% of the projected amounts therefor set forth in the Authorized Budget on a cumulative basis (such variance, the "<u>Permitted Variances</u>").  Notwithstanding the foregoing, during any Review Period occurring prior to March 15, 2023, the DIP Note Purchasers waive all defaults of the Seller Parties for failing to comply with the Authorized Budget, including the Permitted Variances, <u>solely with respect to</u> (i) top line gross revenue and cash receipts and (ii) all cost of goods sold, including shipping.

(r)    <u>Chapter 11 Case Pleadings</u>. Seller shall provide DIP Factoring Agent as soon as is reasonably practical in advance of filing with the Bankruptcy Court, any draft of any motions, orders, amendments, supplements or other pleadings that Seller proposes to file with the Bankruptcy Court seeking approval of the DIP Facilities. Seller shall file all pleadings with the

Bankruptcy Court as are necessary or appropriate to secure entry of the DIP Documents, shall serve all parties entitled to notice of such pleadings under applicable provisions of the Bankruptcy Code and all related rules and shall diligently pursue the obtaining of such orders. Seller shall oppose and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, reargument, reconsideration or revocation) if any challenge to such DIP Documents is filed. Seller shall reasonably cooperate with DIP Factoring Agent with respect to all such filings and incorporate any reasonable comments of DIP Factoring Agent and its counsel into such order, amendment, supplement, motion or pleading. Each party hereto shall promptly notify the other party if at any time such party becomes aware that any information provided to the Bankruptcy Court contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

(s)    Asset Sale and Unconditional Right to Credit Bid.

(i)    Seller shall consent to (i) the DIP Note Agent submitting a credit bid of the Obligations under the DIP Facilities (the "DIP Agent Credit Bid Obligations"), and (ii) subject to the express limitations contained in Section 10(i) of this Agreement, the Prepetition Collateral Agent submitting a credit bid of an amount not less than the Allowed Claim, which is the principal amount of the Prepetition Notes, including the original issue discount, or such greater amount as allowed by the Bankruptcy Court (the "Prepetition Collateral Agent Credit Bid Obligations" and together with the DIP Agent Credit Bid Obligations, the "Credit Bid Obligations"), in connection with the sale of any asset of the Seller Parties (in whole or in part), including without limitation, sales occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code and any motion filed by Seller seeking approval of bid procedures shall contain a request for approval of the right of the DIP Note Agent and Prepetition Collateral Agent, as applicable, to credit bid the Credit Bid Obligations and Seller shall not object to such a provision.

(ii)    Without limiting the foregoing, if, pursuant to a sale order issued by the Bankruptcy Court, the DIP Note Agent, as collateral agent for the DIP Note Purchasers, or its designee, is the winning bidder, either the assets of Seller shall be sold to the DIP Note Agent, as collateral agent for the DIP Note Purchasers, or its designee, pursuant to a Sale Transaction, which sale may or may not be a component of the Accepted Plan, for the consideration set forth in the winning bid or a transaction having substantially the same effect shall be consummated as a restructuring of Seller pursuant to an Accepted Plan; provided, however, that if an Event of Default occurs under this Agreement or the DIP Documents, then, if the DIP Note Agent, as collateral agent for the DIP Note Purchasers, so elects, the assets of Seller shall be sold to the highest and best offer pursuant to a sale order as a Sale Transaction outside of an Accepted Plan for the consideration set forth in the winning bid. Any Sale Transaction, similar transaction or an Accepted Plan having the same effect, shall permit the DIP Note Agent, as collateral agent for the DIP Note Purchasers to credit bid as set forth in subsection (s)(i) above. The DIP Note Agent, as collateral agent for the DIP Note Purchasers, is and shall be a qualified bidder under any auction or sale procedures and may participate at any auction, sale or other restructuring transaction.

29

(iii)    No Seller Party shall file or support any plan of reorganization that seeks to impair the DIP Note Agent's credit bid rights or terms-out, crams-down or extends the Obligations under the DIP Facilities under Bankruptcy Code section 1129(b) or otherwise.

(t)    <u>Exclusive Period of Time to Confirm Plan of Reorganization</u>. No Seller Party may seek extension of the exclusive periods of Seller to confirm an Acceptable Plan without the prior written approval of the DIP Note Agent, which approval shall not be unreasonably withheld, conditioned, or delayed.

(u)    <u>Book Entry</u>.  Seller will immediately, upon the sale of the DIP Accounts and DIP Purchase Orders, make the proper entry on its books and records disclosing the absolute sale of such DIP Accounts and/or DIP Purchase Orders to the DIP Factoring Purchasers.

(v)    <u>Intercreditor Agreement</u>.  Upon request of either DIP Agent, Seller shall fully cooperate with such DIP Agent and use its best efforts in assisting such DIP Agent to obtain an intercreditor agreement from each Prepetition Purchaser and Prestige (or its successor in interest) with respect to the priority of the Liens and Permitted Encumbrances on the DIP Collateral, which intercreditor agreements shall be consistent with the priority of such Liens and Permitted Encumbrances set forth on Schedule IV and the Final Order and satisfactory to such DIP Agent in its sole discretion.

(w)    <u>Further Assurances</u>.

(i)    Promptly upon request by the DIP Factoring Agent, Seller shall take such additional actions and execute such documents as the DIP Factoring Purchasers may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement, (ii) to subject to the Liens created by the Second Interim DIP Order and Final Order, as applicable, any of the properties, rights or interests covered by the Final Order, (iii) to perfect and maintain the validity, effectiveness and priority of any of the Liens created by the Second Interim DIP Order and Final Order, as applicable, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the DIP Factoring Agent and the DIP Factoring Purchasers the rights granted or now or hereafter granted to the DIP Factoring Agent and the DIP Factoring Purchasers under this Agreement and the Interim DIP Orders and Final Order, as applicable.  All documented expenses of the DIP Factoring Agent and the DIP Factoring Purchasers incurred pursuant to this <u>Section 6(u)</u> shall constitute Obligations under this Agreement.

(ii)    Without limiting <u>Section 6(u)(i)</u> above, the Seller Parties shall execute and deliver to the DIP Factoring Agent security agreements, pledge agreements, control agreements or any such other documents, instruments or agreements as the DIP Factoring Agent or such DIP Factoring Purchasers shall reasonably request to further evidence the Liens and security interests in respect of the DIP Collateral.  All of the documents delivered pursuant to this <u>Section 6(u)(ii)</u> shall be in form and substance reasonably satisfactory to the DIP Consenting Secured Parties.

(iii)    Each of the Seller Parties hereby authorizes the DIP Factoring Agent to prepare and file and/or record UCC-1 financing statements with respect to that portion of

the DIP Collateral for which the Liens and security interests secure the Obligations can be perfected by such filing or recordation.

    (iv)    The Seller Parties shall deliver to the DIP Factoring Agent control agreements in form and substance reasonably acceptable to the DIP Factoring Agent and the DIP Consenting Secured Parties, with respect to the DIP Factoring Disbursement Account and each account where such Seller has cash and cash equivalents.  Seller shall maintain all cash and cash equivalents of Seller in the DIP Factoring Disbursement Account or, solely to the extent approved by the Cash Management Order or the Final Order, other segregated accounts consistent with either the Cash Management Order or the Final Order and applicable Bankruptcy Rules and regulations.  Each control agreement shall provide, among other things, that, upon notice from the DIP Factoring Agent to the applicable financial institution that an Event of Default exists hereunder, such financial institution shall only take instructions with respect to the applicable account from the DIP Factoring Agent and Seller shall not have access to such account.

    7.    <u>Events of Default</u>.  Each of the following events, if it occurs before all of the Obligations have been paid in full and all of the DIP Factoring Purchase Commitments have been terminated, shall be referred to herein as an "<u>Event of Default</u>":

    (a)    failure of Seller to make any payment or any fees under this Agreement or the DIP Facilities when due and payable;

    (b)    (i) failure of Seller to perform or observe any term, covenant or agreement contained in <u>Section 6(a)(ii), (iii), (iv), (b), (g), (h), (i), (j), (k), (l), (m), (n), (o), (s) or (u)</u>, or (ii) failure of Seller or any other Seller Party to perform or observe any other term, covenant or agreement contained in this Agreement, any other DIP Document, the Interim DIP Orders, or the Final Order and, in the case of the foregoing <u>clause (ii)</u>, such default shall continue unremedied for a period of five (5) Business Days from the earlier of the date that (i) any Seller Party obtains knowledge of such breach and (ii) any Seller Party receives written notice of such default from any DIP Consenting Secured Party;

    (c)    any representation, warranty or certification by any Seller Party made herein, in any DIP Documents or in any report, certificate, financial or similar statement or other document or instrument furnished in connection with this Agreement or the other DIP Documents shall prove to have been incorrect or misleading in any material respect on or as of the date made or deemed made;

    (d)    any Seller Party shall have failed to receive, as and when required, any consent or approval from any Governmental Authority necessary in order for such Seller Party to perform its obligations hereunder in accordance with all applicable laws, rules and regulations;

    (e)    the DIP Factoring Agent shall cease to have continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected senior liens on and security interests in the DIP Collateral with the priorities described in <u>Schedule IV</u> hereto (other than upon a release by reason of a transaction that is permitted under the DIP Documents);

(f)      any Seller Party or equity holder or Affiliate thereof (other than White Winston and/or Ryan Drexler as otherwise permitted herein) (i) contesting the validity or enforceability of any DIP Document in writing or denying in writing that it has any further liability thereunder or (ii) contesting the validity or perfection of the Liens and security interests securing the DIP Facilities;

(g)      any attempt by any Seller Party or any equity holder or Affiliate thereof (other than White Winston and/or Ryan Drexler as otherwise permitted herein) to invalidate or otherwise impair the DIP Facilities or the Liens granted to the DIP Factoring Purchasers or DIP Note Purchasers;

(h)      The Independent Director shall cease to serve as a director on the board of directors of Seller pursuant to its corporate documents unless the resignation or removal of the Independent Director and the selection of its successor is made in accordance with the corporate documents of Seller and is approved in advance by the DIP Note Agent, which approval shall not be unreasonably withheld, conditioned or delayed;

(i)      an "Event of Default" occurs under this Agreement, the Interim DIP Orders, Final Order or any other DIP Documents, including without limitation, the failure by any Seller Party to comply with the Interim DIP Orders or Final Order, as applicable;

(j)      the filing by any Seller Party of any motion or proceeding, or the entry of an order by the Bankruptcy Court, which could reasonably be expected to result in material impairment of the DIP Factoring Agent's or any DIP Factoring Purchaser's rights under the DIP Documents, the Interim DIP Orders or the Final Order;

(k)      the failure to meet any Milestone Requirement;

(l)      the occurrence of any of the following in any Chapter 11 Case:

(i)      the Interim DIP Orders or the Final Order, as applicable, at any time ceases to be in full force and effect;

(ii)      the entry of an order by a court of competent jurisdiction amending, supplementing, staying, vacating, reversing or otherwise modifying this Agreement, the other DIP Documents, the Interim DIP Orders, the Final Order, as applicable, without the express written consent of the DIP Note Agent;

(iii)      the appointment of an interim or permanent trustee or the appointment of a responsible person or an examiner with expanded powers to operate or manage the financial affairs, the business, or reorganization of Seller (powers beyond those expressly set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Sections 1104(d) and 1106(b) of the Bankruptcy Code;

(iv)      (x) the dismissal of, or the filing of any motion by any Seller Party or equity holder or Affiliate thereof (other than White Winston and/or Ryan Drexler as otherwise permitted herein) to dismiss, the Chapter 11 Case or (y) the conversion of, or the filing of any motion by any Seller Party or equity holder or Affiliate thereof (other than White

32

Winston and/or Ryan Drexler as otherwise permitted herein) to convert, the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(v)      the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any DIP Collateral, including without limitation, to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral having a fair market value in excess of an amount to be agreed in writing by the DIP Note Agent, or (y) to permit the perfection of any Lien on the DIP Collateral unless such Lien is or shall be junior in priority to the Liens securing the Obligations;

(vi)     the entry of an order avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement;

(vii)    the entry of an order granting any super-priority administrative claim (other than the Carve-Out) or Lien (including adequate protection Liens) which are equal or superior to that provided to the DIP Factoring Purchasers, other than with respect to the Lien priorities set forth on Schedule IV hereof;

(viii)   the filing of any pleading by Seller seeking or otherwise consenting to or supporting any of the matters set forth in clauses (iii), (iv), (v), (vi) or (vii) of this Section 7(l);

(ix)     any sale or disposition, other than the Sale Transaction, of all or a material portion of the DIP Collateral securing the DIP Facilities pursuant to Section 363 of the Bankruptcy Code other than as permitted by the Bankruptcy Orders (or pursuant to a transaction that is permitted under the DIP Documents)

(x)      the filing of any plan of reorganization or a plan of liquidation that is not an Acceptable Plan;

(xi)     the termination or lapse of Seller's "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization without the prior written consent of the DIP Note Agent;

(xii)    the grant of any adequate protection rights to any holder of a pre-petition claim or interest, unless otherwise consented to by the DIP Note Agent;

(xiii)   a Seller Party engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of this Agreement or any other DIP Document or the Liens on or security interests in the assets of Seller securing the Obligations;

(xiv)    the allowance of any claim or claims under section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the DIP Collateral;

(xv)    Seller moves the Bankruptcy Court to enter, modify or amend any Bankruptcy Order without the prior written consent of the DIP Note Agent to the form and substance of the proposed order;

(xvi)    the entry by the Bankruptcy Court of a debtor-in-possession financing order or amendment thereto, the form and substance of which is not consented to by the DIP Note Agent;

(xvii)    Seller shall make any payment of principal or interest on any pre-petition Indebtedness, except for any payments on any pre-petition Indebtedness permitted to be made under the Final Order;

(xviii)    termination by the Bankruptcy Court of the use of Cash Collateral; or

(xix)    the Bankruptcy Court enters an order granting relief from the automatic stay to any Person asserting a claim or other right against any of Seller relating to any alleged pre-petition actions or omissions unless otherwise consented to by the DIP Note Agent.

8.    <u>Remedies</u>.

(a)    <u>Certain Actions Following a Default</u>.  If any Event of Default shall occur and be continuing, upon compliance with the terms and conditions of the Interim DIP Orders or Final Order, as applicable, then the DIP Factoring Agent, solely with the consent of the DIP Consenting Secured Parties, shall (i) reduce the amount of, or terminate, any or all of the Aggregate DIP Factoring Purchase Commitment of the DIP Factoring Purchasers, (ii) terminate this Agreement upon written notice to Seller, (iii) declare all or any part of the unpaid balance of the Obligations then outstanding to be immediately due and payable, (iv) notify any account debtor to make payment on any of Seller's open invoices to DIP Factoring Agent on behalf of the DIP Factoring Purchasers, and (v) exercise any rights and remedies provided to the DIP Factoring Purchasers under this Agreement, under the Interim DIP Orders, under the Final Order, under any other DIP Document or at law or equity, including, without limitation, to seek relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, and apply the proceeds thereof to the obligations arising under the DIP Documents.

(b)    <u>Cumulative Remedies</u>.  To the extent not prohibited by the provisions of applicable law which cannot be waived, all of the DIP Factoring Purchasers' rights hereunder and under any other document between the DIP Factoring Purchasers and Seller shall be cumulative.  No failure to exercise and no delay in exercising, on the part of the DIP Factoring Agent or any DIP Factoring Purchaser, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(c)    <u>Waivers</u>.  To the extent that such waiver is not prohibited by the provisions of applicable law that cannot be waived, Seller hereby waives (1) all presentments, demands for performance, notices of nonperformance (except to the extent required by this Agreement), protests, notices of protest and notices of dishonor; (2) any requirement of diligence or promptness on the part of the DIP Factoring Agent or any DIP Factoring Purchaser in the enforcement of its rights under this Agreement; (3) any and all notices of every kind and description which may be

required to be given by any statute or rule of law; and (4) any defense (other than indefeasible payment in full) which it may now or hereafter have with respect to its liability under this Agreement.

9.    <u>Creation of Security Interest</u>.

(a)    <u>Grant of Security Interest</u>. To secure the payment and performance in full of all of the Obligations, the Note Parties hereby grant to the DIP Factoring Agent, as collateral agent for the DIP Factoring Purchasers, a continuing first priority security interest in, and pledge to Lender, the DIP Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof. Each Note Party represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the DIP Collateral (subject only to the Carve-Out and the lien priority set forth on <u>Schedule IV</u> attached hereto). Upon payment in full of the Obligations (other than indemnification obligations for which no claim has been made) and at such time as DIP Factoring Purchasers' obligation to purchase DIP Accounts and/or DIP Purchase Orders has terminated, DIP Factoring Agent shall release and terminate its liens and security interests in the DIP Collateral.

(b)    <u>Subordination of Prepetition Obligations</u>. Subject to <u>Schedule IV</u> and the Final Order, all obligations judicially determined to be due and owing on account of the Prepetition Notes, the Prepetition Note Liens and/or the prepetition factoring facility, if any, and liens granted in the DIP Collateral shall be subject to this Agreement and shall be subordinate in all ways to the Lender's liens on the DIP Collateral hereunder.

(c)    <u>Authorization to File Financing Statements</u>. The Note Parties hereby authorize DIP Factoring Agent to file financing statements or other security documents, without notice to the Note Parties, with all appropriate jurisdictions to perfect or protect DIP Factoring Agent's and DIP Factoring Purchasers' interest or rights hereunder, including a notice that any disposition of the DIP Collateral (other than in accordance with this Agreement or order of the Bankruptcy Court), by either Seller or any other Note Party, shall be deemed to violate the rights of DIP Factoring Agent and DIP Factoring Purchasers under the Code. Without limiting the foregoing, the Note Parties hereby authorize DIP Factoring Agent to file financing statements and other security documents which describe the collateral as "all assets" and/or "all personal property" of the Note Parties or words of similar import. Nothing in this Agreement shall limit the effectiveness of DIP Factoring Agent's and DIP Factoring Purchasers' liens and claims pursuant to the Second Interim DIP Order or the Final Order.

10.    <u>Administrative Priority; Lien Priority; Adequate Protection</u>.

(a)    The Obligations of Seller will, at all times, constitute allowed administrative expenses in the Chapter 11 Case, having priority in payment over all other administrative expenses and unsecured claims against Seller now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, except as to the Carve-Out and the co-priority and subordination of Liens set forth on <u>Schedule IV</u> attached hereto and the Final Order.

(b)　　Pursuant to Section 364(d)(1) of the Bankruptcy Code, the Second Interim Order and the Final Order, all Obligations will be secured by a perfected priming first priority Lien on the DIP Collateral, except as to the Carve-Out and the co-priority and subordination of Liens set forth on <u>Schedule IV</u> attached hereto and the Final Order.

(c)　　The Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall receive, to the extent of any aggregate diminution in the value of their collateral, subject to the Carve-Out: (a) valid, binding, enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "<u>Prepetition Notes Adequate Protection Liens</u>"), subject to the co-priority and subordination of Liens described in <u>Schedule IV</u> attached hereto (which is reflective of existing intercreditor and subordination agreements which shall remain binding with respect to such lien priority) and the Final Order; and (b) allowed super-priority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "<u>Prepetition Notes Adequate Protection Claims</u>"), subject to the co-priority and subordination of Liens described in <u>Schedule IV</u> attached hereto (which is reflective of existing intercreditor and subordination agreements which shall remain binding with respect to such lien priority) and the Final Order.

(d)　　Prestige (or its successor-in-interest) shall receive, to the extent of any aggregate diminution in the value of its pre-petition collateral, subject to the Carve-Out: (a) valid, binding, enforceable, and automatically and properly perfected replacement liens on and security interests in the DIP Collateral (the "<u>Prestige Adequate Protection Liens</u>"), subject to the co-priority and subordination of Liens described in <u>Schedule IV</u> attached hereto (which is reflective of existing intercreditor and subordination agreements which shall remain binding with respect to such lien priority) and the Final Order; and (b) allowed super-priority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code (the "<u>Prestige Adequate Protection Claims</u>"), subject to the co-priority and subordination of Liens described in <u>Schedule IV</u> attached hereto (which is reflective of existing intercreditor and subordination agreements which shall remain binding with respect to such lien priority) and the Final Order.

(e)　　The Prepetition Collateral Agent shall be entitled to reimbursement of its reasonable and documented fees and out- of-pocket expenses.

(f)　　The Prepetition Collateral Agent shall be entitled to reimbursement of its respective reasonable and documented fees and out-of-pocket expenses of one primary counsel and one local counsel (if applicable), and one financial advisor.

(g)　　The Prepetition Collateral Agent, on behalf of itself and the Prepetition Secured Parties, shall be entitled to performance of the Milestone Requirements.

(h)　　Interest at the default rate specified in the Prepetition Notes shall continue to accrue under the terms of the Prepetition Notes.

(i)　　The Creditors Committee shall have until April 10, 2023 to investigate and challenge and otherwise object to the allowance of the Allowed Claim (the "<u>Creditors' Committee</u>

36

Challenge Period"). White Winston shall have until March 9, 2023 to investigate and challenge and otherwise object to the allowance of the Allowed Claim (other than challenges and objections based upon Seller's bankruptcy estate's claims) ("White Winston Challenge Period" and, together with the Creditors' Committee Challenge Period, the "Challenge Period"). To the extent the principal amount of the Allowed Claim is successfully challenged (such amount, the "Disallowed Claim") such that the Allowed Claim is less than the Roll-Up Amount, then the Roll-Up Amount shall be reduced by the amount of the Disallowed Claim such that the Roll-Up Amount equals the Allowed Claim. If an objection to the Prepetition Secured Parties' prepetition claim is timely filed during the applicable Challenge Period in the Bankruptcy Court, then: (i) the Prepetition Secured Parties' prepetition claim shall not be deemed an "allowed claim" to the extent objected to in such objection absent the Prepetition Collateral Agent obtaining a further order of the Bankruptcy Court, unless the objection is withdrawn; (ii) the Prepetition Collateral Agent shall not be entitled to the Prepetition Collateral Agent Credit Bid Obligations unless the Prepetition Collateral Agent obtains a further order of the Bankruptcy Court, unless the objection is withdrawn; (iii) if a sale of Seller's assets occurs before such claim objection is resolved, such sale proceeds will be held by the estate to the extent of the objection unless the Prepetition Collateral Agent obtains a further order of the Bankruptcy Court, unless the objection is withdrawn; and (iv) the releases set forth in Section 11(c) of this Agreement are not a defense to such claim objection brought by White Winston in the Bankruptcy Court (if such objection is brought during the Challenge Period). The Creditors' Committee may use up to Fifty Thousand Dollars ($50,000) of the fees and costs of the Creditors' Committee in the Authorized Budget to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens under the Prepetition Notes. The DIP Note Agent reserves its' right to respond to any challenge raised by the Creditors' Committee, White Winston or any other party. For the avoidance of doubt, a challenge by either the Seller or the Creditors' Committee of the Prepetition Secured Parties' prepetition claims in excess of Twelve Million Eight Hundred Forty Thousand Dollars ($12,840,000) is not limited by the Challenge Period.

(j)     Subject to the express limitations contained in Section 10(i) above, Seller agrees that in any sale of the DIP Collateral, the Prepetition Collateral Agent, on behalf of the Prepetition Secured Parties, shall have the right to credit bid an amount not less than Twelve Million Eight Hundred Forty Thousand Dollars ($12,840,000) which is the principal amount of the Prepetition Notes, including the original issue discount, in addition to the obligations under the DIP Facilities, or such greater amount as allowed by the Bankruptcy Court, in accordance with section 363(k) of the Bankruptcy Code, and that any motion filed by Seller seeking approval of bid procedures shall contain a request for approval of the right of the Prepetition Collateral Agent to credit bid the obligations of the Prepetition Purchasers; provided, however, the DIP Note Agent, the Creditors' Committee and White Winston's rights shall be reserved with respect to the terms of this Section 10(j).

(k)     Except to the extent of the Carve-Out, no costs or expenses of administration or other charge, lien, assessment or claim incurred on or after the Petition Date of any Person or entity shall be imposed against the DIP Factoring Purchasers, the DIP Note Purchasers or the DIP Factoring Agent, their respective claims or the Prepetition Notes or Prepetition Note Liens under section 506(c) of the Bankruptcy Code or otherwise, and Seller hereby irrevocably waives any and all such rights, remedies and benefits under section 506(c) of the Bankruptcy Code.

11.    <u>Indemnification; Expenses; Releases; Waivers</u>.

(a)    <u>Indemnification</u>.  The Seller Parties agree, joint and severally, to indemnify and hold and save harmless the DIP Agents, each DIP Factoring Purchaser, each DIP Note Purchaser, its and their respective Affiliates and each of their respective directors, officers, employees, agents, advisors, or representatives (collectively, "<u>Indemnitees</u>") from and against any and all losses, damages, claims, actions, demands, liabilities or out-of-pocket costs and expenses of any kind whatsoever (including reasonable and documented attorneys' fees and expenses) (collectively, "<u>Claims</u>") incurred by or asserted or awarded against any Indemnitee (including in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith) arising in any way directly or indirectly out of the transactions contemplated by this Agreement, the DIP Documents, and the transactions contemplated by this Agreement and the DIP Documents and any actual or proposed use of the proceeds from the sale and purchase of any DIP Account or DIP Purchase Order under this DIP Factoring Facility, <u>provided</u> that no such person will be indemnified for such Claims to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence or willful misconduct of such person, <u>and further</u>, <u>provided</u>, the foregoing indemnity shall exclude out-of-pocket costs and expenses (including but not limited to reasonable and documented legal fees and expenses) arising out of post-petition litigation between the DIP Note Agent, on the one hand, and White Winston and/or Ryan Drexler, on the other hand, regarding the Prepetition Notes or claims between those parties that are not the Seller's or the Seller's bankruptcy estate's claims, including any claims that may be prosecuted in the Chapter 11 Case.  For the avoidance of doubt, the excluded out-of-pocket costs and expenses are intended to be inclusive of discovery concerning claims related to the Prepetition Notes of the DIP Note Agent, on the one hand, and White Winston and/or Ryan Drexler, on the other hand, conducted by 2004 examination.  The foregoing indemnity shall be effective whether or not such any such investigation, litigation, or other proceeding to which the indemnity applies is brought by any Seller Party, any of their respective directors, officers, managers, security holders, creditors, an Indemnified Party or any other Person and whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

(b)    <u>Expenses</u>.  The Seller Parties shall pay, in connection with the Chapter 11 Case and the negotiation and documentation of the DIP Facilities and restructuring matters with respect to the Seller Parties, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agents and reasonable and documented legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agents; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agents.  In addition, the Seller Parties shall pay, in connection with workout proceedings and enforcement costs associated with the DIP Facilities, all incurred (i) reasonable and documented legal fees and out-of-pocket expenses of counsel for the DIP Agents and reasonable and documented legal fees and out-of-pocket expenses legal fees and out-of-pocket expenses of Schulte Roth & Zabel, LLP and Garman Turner Gordon LLP, counsel for Empery, in its capacity as a DIP Note Purchaser; and (ii) reasonable and documented fees and out-of-pocket expenses of any financial advisor for the DIP Agents.  Such fees and expenses shall be part of the Obligations and the DIP Note Purchaser, DIP Factoring Purchaser, and the DIP Agents' claim(s).

(c)    Releases.    Pursuant to the Final Order, for good and valuable consideration, including facilitation of the DIP Facilities, the Note Parties, on behalf of themselves, and Seller, on behalf of its bankruptcy estate (collectively, the "Releasors"), hereby release any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or which could be asserted on behalf of the Releasors, whether known or unknown, foreseen or unforeseen, existing in law, equity or otherwise, that the Releasors would have been legally entitled to assert in their own right, whether individually or collectively, including claims based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Case restructuring, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Seller Parties, the subject matter of, or the transactions or events giving rise to, any claim or equity security, or any other act or omission, transaction, agreement, event or other occurrence relating to the Seller, the Prepetition Notes or the Prepetition Liens, taking place on or before the date of this Agreement, against the DIP Note Agent in its capacity as such, the DIP Note Purchasers in their capacities as such, the DIP Factoring Purchasers in their capacities as such, and, except to the extent successfully challenged in a challenge brought in the applicable Challenge Period, the Prepetition Collateral Agent in its capacity as such, and the Prepetition Purchasers in their capacities as such (collectively, the "Releasees").  The foregoing releases shall not be a defense to an objection to the prepetition claims of the Prepetition Collateral Agent in its capacity as such and the Prepetition Purchasers in their capacity as such brought in the Bankruptcy Court, provided such objection is timely brought during the applicable Challenge Period.  Any claims arising out of the breach of this Agreement by any party are excluded from the releases provided in this Section 11(c), and, in the event of any such breach, the non-breaching party shall be entitled to pursue any and all rights, claims and damages that it may have against the other party as a result of such breach.

(d)    DIP Waivers.  Pursuant to the Final Order, the Releasors hereby waive (i) any and all claims of the Seller Parties, on behalf of themselves, and Seller, on behalf of its bankruptcy estate, arising from or related to (A) the DIP Agents or any DIP Note Purchaser or any DIP Factoring Purchaser, in each of their respective capacities as such, or (B) the DIP Documents; including, without limitation, the waiver of any and all rights to challenge the validity, perfection, priority, extent or enforceability of the claims or Liens securing the Obligations, including without limitation seeking to equitably subordinate or avoid the Liens securing the Obligations, (ii) the "equities of the case" exception to Section 552(b) of the Bankruptcy Code, (iii) the ability to surcharge the DIP Collateral, and subject to entry of the Final Order, the collateral securing the Prepetition Notes, including under Section 506(c) of the Bankruptcy Code, and (iv) the equitable doctrine of "marshaling" with respect to the DIP Collateral, and subject to entry of the Final Order, the collateral securing the Prepetition Notes.

12.    The DIP Factoring Agent.

(a)    Appointment and Authorization.  Each DIP Factoring Purchaser hereby designates and appoints the DIP Factoring Agent as its DIP Factoring Agent and collateral agent under this Agreement and the other DIP Documents and each DIP Factoring Purchaser hereby irrevocably authorizes the DIP Factoring Agent to take such action on its behalf under the provisions of this Agreement and each other DIP Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other DIP Document, together with such powers as are reasonably incidental thereto.  The DIP Factoring Agent agrees to act as

39

such on the express conditions contained in this <u>Section 12</u>.  The provisions of this <u>Section 12</u> are solely for the benefit of the DIP Factoring Agent and the DIP Factoring Purchasers and no Seller Party shall have any rights as a third party beneficiary of any of the provisions contained herein.  Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other DIP Document, the DIP Factoring Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the DIP Factoring Agent have or be deemed to have any fiduciary relationship with any DIP Factoring Purchaser, and no implied covenants, functions, responsibilities, duties, obligations, or liabilities shall be read into this Agreement or any other DIP Document or otherwise exist against the DIP Factoring Agent.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.  Except as expressly otherwise provided in this Agreement, the DIP Factoring Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions which the DIP Factoring Agent is expressly entitled to take or assert under this Agreement and the other DIP Documents, including the exercise of rights and remedies pursuant to <u>Section 8</u>, and any action so taken or not taken shall be deemed consented to by the DIP Factoring Purchasers.

(b)    <u>Delegation of Duties</u>.  The DIP Factoring Agent may execute any of its duties under this Agreement or any other DIP Document by or through agents, sub-agents, employees, or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The DIP Factoring Agent shall not be responsible for the negligence or misconduct of any agent, sub-agent, employee, or attorney-in-fact that it selects as long as such selection was made without gross negligence or willful misconduct.

(c)    <u>Liability of the DIP Factoring Agent</u>.  The DIP Factoring Agent shall not (x) be liable for any action taken or omitted to be taken by it under or in connection with this Agreement or any other DIP Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction), or (y) be responsible in any manner to any of the DIP Factoring Purchasers for any recital, statement, representation, or warranty made by Seller contained in this Agreement or in any other DIP Document, or in any certificate, report, statement, or other document referred to or provided for in, or received by the DIP Factoring Agent under or in connection with, this Agreement or any other DIP Document, or the validity, effectiveness, genuineness, enforceability, or sufficiency of this Agreement or any other DIP Document, or for any failure of Seller to perform its obligations hereunder or thereunder.  The DIP Factoring Agent shall not be under any obligation to any DIP Factoring Purchaser to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other DIP Document, or to inspect the properties, books, or records of Seller or any affiliate of Seller.

Without limiting the generality of the foregoing, the DIP Factoring Agent: (i) shall have no duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other DIP Documents that the DIP Factoring Agent is required to exercise as directed in writing by the DIP Consenting Secured Parties; <u>provided</u> that the DIP Factoring Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Person to liability or that is contrary to any DIP Document or applicable requirements of law; and (ii) shall, except as expressly set forth

herein and in the other DIP Documents, have no duty to disclose, and shall not be liable for the failure to disclose, any information relating to Seller or any of their affiliates that is communicated to or obtained by the Person serving as DIP Factoring Agent or any of its affiliates in any capacity.

(d)    <u>Reliance by the DIP Factoring Agent</u>.

(i)    The DIP Factoring Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, e-mail, facsimile, telex, or telephone message, statement, or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including, without limitation, counsel to Seller), independent accountants, and other experts. The DIP Factoring Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other DIP Document unless it shall first receive such advice or concurrence of the DIP Consenting Secured Parties as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the DIP Factoring Purchasers against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The DIP Factoring Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other DIP Document in accordance with a request or consent of the DIP Consenting Secured Parties (or all DIP Factoring Purchasers if so required by the terms of this Agreement) and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the DIP Factoring Purchasers.

(ii)    For purposes of determining compliance with the conditions specified in <u>Section 4</u>, each DIP Factoring Purchaser that has executed this Agreement shall be deemed to have consented to, approved, or accepted or to be satisfied with, each document or other matter either sent by the DIP Factoring Agent to such DIP Factoring Purchaser for consent, approval, acceptance, or satisfaction, or required thereunder to be consented to or approved by or acceptable or satisfactory to such DIP Factoring Purchaser.

(e)    <u>Notice of Default</u>. The DIP Factoring Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless the DIP Factoring Agent shall have received written notice from a DIP Factoring Purchaser or Seller Party referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The DIP Factoring Agent will notify the DIP Factoring Purchasers of its receipt of any such notice.

(f)    <u>Credit Decision</u>. Each DIP Factoring Purchaser acknowledges that the DIP Factoring Agent has not made any representation or warranty to it, and that no act by the DIP Factoring Agent hereinafter taken, including any review of the affairs of Seller and their affiliates, shall be deemed to constitute any representation or warranty by the DIP Factoring Agent to any DIP Factoring Purchaser. Each DIP Factoring Purchaser represents to the DIP Factoring Agent that it has, independently and without reliance upon the DIP Factoring Agent and based on such documents and information as it has deemed appropriate, made its own appraisal of an investigation into the business, prospects, operations, property, financial and other condition, and creditworthiness of Seller and their affiliates and made its own decision to enter into this

41

Agreement and to extend credit to Seller. Each DIP Factoring Purchaser also represents that it will, independently and without reliance upon the DIP Factoring Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals, and decisions in taking or not taking action under this Agreement and the other DIP Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition, and creditworthiness of Seller. Except for notices, reports, and other documents expressly herein required to be furnished to the DIP Factoring Purchasers by the DIP Factoring Agent, the DIP Factoring Agent shall not have any duty or responsibility to provide any DIP Factoring Purchaser with any credit or other information concerning the business, prospects, operations, property, financial and other condition, or creditworthiness of Seller which may come into the possession of the DIP Factoring Agent.

(g)    The DIP Factoring Agent in Individual Capacity. With respect to its DIP Accounts and DIP Purchase Orders, the DIP Factoring Agent as a DIP Factoring Purchaser shall have the same rights and powers under this Agreement as any other DIP Factoring Purchaser and may exercise the same as though it were not the DIP Factoring Agent, and the terms "DIP Factoring Purchaser" and "DIP Factoring Purchasers" include the DIP Factoring Agent in its individual capacity as a DIP Factoring Purchaser hereunder.

(h)    Successor DIP Factoring Agent. The DIP Factoring Agent may resign as the DIP Factoring Agent upon thirty (30) days' notice to the DIP Factoring Purchasers and Seller, such resignation to be effective, subject to the next succeeding paragraph of this Section 12(h), upon the acceptance of a successor agent to its appointment as DIP Factoring Agent. If the DIP Factoring Agent resigns under this Agreement, the DIP Consenting Secured Parties shall appoint a successor agent for the DIP Factoring Purchasers. Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers, and duties of the retiring DIP Factoring Agent and the term "DIP Factoring Agent" shall mean such successor agent and the retiring DIP Factoring Agent's appointment, powers, and duties as the DIP Factoring Agent shall be terminated. After any retiring DIP Factoring Agent's resignation hereunder as DIP Factoring Agent, the provisions of this Section 12(h) shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the DIP Factoring Agent under this Agreement.

If no such successor DIP Factoring Agent shall have been so appointed by the DIP Factoring Purchasers and shall have accepted such appointment within thirty (30) days after the retiring DIP Factoring Agent gives notice of its resignation then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring DIP Factoring Agent shall be discharged from its duties and obligations hereunder and under the other DIP Documents (except that in the case of any DIP Collateral held by the DIP Factoring Agent on behalf of the DIP Factoring Purchasers under any of the DIP Documents, the retiring DIP Factoring Agent shall continue to hold such DIP Collateral as nominee until such time as a successor DIP Factoring Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through an DIP Factoring Agent shall instead be made by or to each DIP Factoring Purchaser directly, until such time as the DIP Factoring Purchasers appoint a successor DIP Factoring Agent as provided for above in this Section 12(h).

(i)      After the replaced or retiring DIP Factoring Agent's replacement or resignation hereunder and under the other DIP Documents, the provisions of this Section 12 and Section 11 shall continue in effect for the benefit of such replaced or retiring DIP Factoring Agent and its sub-agents in respect of any actions taken or omitted to be taken by any of them while the replaced or retiring DIP Factoring Agent was acting as DIP Factoring Agent.

(i)      <u>Restrictions on Actions by the DIP Note Purchasers; Sharing of Payments</u>.

(i)      Each DIP Factoring Purchaser hereby waives any and all rights to set-off against the Obligations, any amounts owing by such DIP Factoring Purchaser to Seller or any accounts unrelated to the DIP Factoring Facility of Seller now or hereafter maintained with such DIP Factoring Purchaser.  Each of the DIP Factoring Purchasers further agrees that it shall not take or cause to be taken any action to enforce its rights under this Agreement or against Seller, including the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the DIP Collateral.

(ii)      If at any time or times any DIP Factoring Purchaser shall receive (i) by payment, foreclosure, setoff or otherwise, any proceeds of DIP Collateral or any payments with respect to the Obligations owing to such DIP Factoring Purchaser arising under, or relating to, this Agreement or the other DIP Documents, except for any such proceeds or payments received by such DIP Factoring Purchaser from the DIP Factoring Agent pursuant to the terms of this Agreement, or (ii) payments from the DIP Factoring Agent in excess of such DIP Factoring Purchaser's pro rata share of all such distributions by the DIP Factoring Agent, such DIP Factoring Purchaser shall promptly turn the same over to the DIP Factoring Agent, in kind, and with such endorsements as may be required to negotiate the same to the DIP Factoring Agent, or in same day funds, as applicable, for the account of all of the DIP Factoring Purchasers and for application to the Obligations in accordance with the applicable provisions of this Agreement.

(j)      <u>Agency for Perfection</u>.  Each DIP Factoring Purchaser hereby appoints each other DIP Factoring Purchaser as agent for the purpose of perfecting the DIP Factoring Purchasers' security interest in assets which, in accordance with Article 9 of the UCC, can be perfected by possession.  Should any DIP Factoring Purchaser (other than the DIP Factoring Agent) obtain possession of any such DIP Collateral, such DIP Note Purchaser shall notify the DIP Factoring Agent thereof, and, promptly upon the DIP Factoring Agent's request therefor shall deliver such DIP Collateral to the DIP Factoring Agent or otherwise deal with such DIP Collateral in accordance with the DIP Factoring Agent's instructions.

(k)      <u>Payments by the DIP Factoring Agent to the DIP Note Purchasers</u>.  All payments to be made by the DIP Factoring Agent to the DIP Factoring Purchasers shall be made by bank wire transfer of immediately available funds to each DIP Factoring Purchaser pursuant to wire transfer instructions delivered in writing to the DIP Factoring Agent on or prior to the date hereof, or pursuant to such other wire transfer instructions as each party may designate for itself by written notice to the DIP Factoring Agent.  Concurrently with each such payment, the DIP Factoring Agent

shall identify what such payment (or any portion thereof) represents, whether for payment of fees, or whether being made on account of a DIP Account or DIP Purchase Order, or otherwise.

(l)    Concerning the DIP Collateral and the Related DIP Documents.    Each DIP Factoring Purchaser authorizes and directs the DIP Factoring Agent to enter into this Agreement and the other DIP Documents relating to the DIP Collateral for the benefit of the DIP Factoring Agent and the DIP Factoring Purchasers.    Each DIP Factoring Purchaser agrees that any action taken by the DIP Factoring Agent in accordance with the terms of this Agreement or the other DIP Documents relating to the DIP Collateral, and the exercise by the DIP Factoring Agent of its respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the DIP Factoring Purchasers.

13.    Miscellaneous.

(a)    Notices.

(i)    Any communication, notice or demand required or permitted to be given hereunder shall be in writing and shall be delivered by hand or overnight courier service, or mailed by certified or registered mail or via email (with a copy to follow via another approved method above) at the address set forth in Schedule I hereto.    Notices sent by hand or overnight courier service shall be deemed to have been given one (1) Business Day after sent; notices mailed by certified or registered mail, shall be deemed to have been given three (3) Business Days after sent; and notices sent by email shall be deemed to have been given on the same Business Day if sent during regular business hours, or one (1) Business Day if sent after regular business hours, in either case so long as the sender does not receive a bounce-back of such email (by automated generated message of non-delivery to such recipient or otherwise).

(ii)    The DIP Factoring Agent, any DIP Factoring Purchaser or Seller may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.    All such notices and other communications sent to an e-mail address shall be deemed received upon delivery (provided that the send does not receive an automated rejection notice); provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient.    Empery, until further notice to the other parties hereto, requires all documentation hereunder to be sent via electronic mail to the email address set forth in Schedule I hereto with the subject line "MusclePharm Corporation DIP Facility/ and the topic (i.e., Notice of Payment, Proposed Budget, Budget Reconciliation, etc. as applicable) with a copy sent to the other addresses for the DIP Factoring Purchasers pursuant to Section 13(a)(i) above.

(iii)    Any party, by notice to the other parties hereto in accordance with this Section 13(a), may designate additional or different addresses from those described in clause (i) hereof for subsequent notices or communications.

(iv)    Notwithstanding anything in this Agreement to the contrary, any reporting to be provided and delivered under Section 6(a) of this Agreement or bankruptcy pleadings under Section 6(r) of this Agreement may be sent via email without a copy to follow via another approved method pursuant to Section 13(a)(i) above.

DIP Factoring Agent shall provide notice of any communication, notice or demand it receives from Seller to the DIP Consenting Secured Parties within one (1) Business Day of receipt.

(b)    Entire Agreement; Severability.  This Agreement together with the DIP Note Purchase Agreement, the other DIP Documents, the Interim DIP Orders and the Final Order, sets forth the parties' entire agreement and understanding in respect of the subject matter contained herein.  Notwithstanding the foregoing, however, the Interim DIP Orders and the Final Order, as applicable, shall continue to govern the terms and conditions of the transactions contemplated hereby to the extent materially inconsistent with, or address matters not addressed in, this Agreement or the other DIP Documents.  It shall not be deemed a material inconsistency as a result of this Agreement or the other DIP Documents including additional terms and provisions not included in the Final Order and the failure specifically to include any particular provisions of this Agreement or the other DIP Documents in the Final Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court, the Seller Parties, the DIP Note Agent and the DIP Note Purchasers that this Agreement, the DIP Documents and the Final Order be read together and consistent with one another.  If any term or provision hereof, or its application to any Person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such terms to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each term hereof shall be valid and enforceable to the fullest extent permitted by applicable law.

(c)    Assignment.  Neither this Agreement nor any of the rights, interests or obligations of Seller hereunder shall be assigned or otherwise transferred by such Seller, nor may Seller delegate performance hereunder, except with each DIP Factoring Purchaser's prior written consent.  Each DIP Factoring Purchaser shall be permitted to assign all or any part of its rights and obligations hereunder to any affiliate of such DIP Factoring Purchaser, bank, financial institution or other entity. Upon such assignment, such affiliate, bank, financial institution, or entity will become a DIP Factoring Purchaser for all purposes under the DIP Documents. Notwithstanding the foregoing, no assignment shall be made or participation sold to the Seller, any subsidiary of the Seller or an Affiliate of any of the foregoing.

(d)    Amendments; Waivers.  All amendments, supplements or other modifications to this Agreement or any other DIP Document must be in writing signed by Seller and the DIP Consenting Secured Parties (or the DIP Factoring Agent solely at the direction of the DIP Consenting Secured Parties); provided, that, no such amendment, supplement or other modification shall, without the prior written consent of (a) each DIP Factoring Purchaser affected thereby, (i) change the definition of DIP Consenting Secured Parties, (ii) increase the DIP Factoring Purchase Commitment of any DIP Factoring Purchaser (it being understood that waivers or modifications of conditions precedent, covenants or Defaults or Events of Default, or a waiver of a mandatory prepayment shall not constitute an increase in the DIP Factoring Purchase Commitment of any DIP Factoring Purchaser), (iii) consent to the assignment by Seller of their

rights and obligations hereunder, (iv) release Seller from its Obligations owing to such DIP Factoring Purchaser or all or substantially all of the DIP Collateral or (v) change the super-priority status of the Obligations owing to such DIP Factoring Purchaser and (b) the DIP Factoring Agent, amend, supplement or otherwise modify <u>Section 12</u> of this Agreement.

(e)    <u>APPLICABLE LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEVADA, WITHOUT REGARD TO THE CONFLICT OF LAW PRINCIPLES THEREOF.  EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION OVER THE CHAPTER 11 CASE, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN ANY DIP NOTE PURCHASER AND SELLER PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT; <u>PROVIDED</u>, THAT THE DIP FACTORING PURCHASERS AND SELLER ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; <u>PROVIDED FURTHER</u>, THAT AFTER THE CHAPTER 11 CASE IS CLOSED, THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN ANY DIP FACTORING PURCHASER AND SELLER PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT, <u>AND PROVIDED FURTHER</u>, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE DIP FACTORING AGENT OR ANY DIP FACTORING PURCHASER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON ANY DIP COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE DIP FACTORING AGENT OR ANY DIP FACTORING PURCHASER.

(f)    <u>WAIVER OF VENUE</u>.  SELLER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN <u>SECTION 13(e)</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(g)    <u>SERVICE OF PROCESS</u>.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 13(a)</u>.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(h)    <u>WAIVER OF JURY TRIAL</u>.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING

DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(i)    Counterparts.  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  A facsimile copy of a signature hereto shall have the same effect as the original of such signature.

(j)    Reinstatement.  In the event that any payment hereunder, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(k)    Binding Agreement.  Upon the entry of the Interim DIP Order and Final Order, as applicable, this Agreement shall be binding upon Seller, the estate of Seller and any trustee or successor in interest of Seller in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code.  Upon the entry of the Second Interim DIP Order and Final Order, as applicable, this Agreement shall be binding upon, and inure to the benefit of, the successors of the DIP Factoring Agent and any DIP Factoring Purchaser and its assigns, transferees and endorsees.  The super-priority claims and any Liens that may be created by this Agreement and the Second Interim DIP Order and Final Order, as applicable, shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of Seller to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any DIP Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the DIP Factoring Agent file financing statements or otherwise perfect any security interests or Liens under applicable law.

[The remainder of this page is intentionally blank.]

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the date first above written.

## DIP FACTORING AGENT

**EMPERY TAX EFFICIENT, LP**

By: _____
Name:
Title:

## DIP FACTORING PURCHASERS

**EMPERY TAX EFFICIENT, LP**

By: _____
Name:
Title:

**[●]**

By: _____
Name:
Title:

**SELLER PARTIES:**

**SELLER**

MUSCLEPHARM CORPORATION

By: _____
Name:
Title:

**GUARANTOR**

CANADA MUSCLEPHARM ENTERPRISES
CORPORATION

By: _____
Name:
Title:

EXHIBIT A

<u>Authorized Budget</u>

**[To come from Seller and
be consented to by the DIP Note Agent]**

EXHIBIT B

SCHEDULE I

<u>Notice Information</u>

<u>Seller</u>

MusclePharm Corporation
_____
_____
_____
Attn:  _____
Email: _____

With a copy to (which shall not constitute notice):

_____
_____
_____
Attn:  _____
Email: _____

<u>DIP Factoring Agent</u>

Empery Tax Efficient, LP
_____
_____
_____
Attn:  _____
Email: _____

DIP Factoring Purchasers

Empery Tax Efficient, LP
_____
_____
_____
Attn: _____
Email: _____

With copies to (which shall not constitute notice):

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, NV 89119
Attn:  Gregory E. Garman & William Noall
Email:  ggarman@gtg.legal & wnoall@gtg.legal


and


_____
_____
Attn: _____
Email: _____

SCHEDULE II

<u>DIP Factoring Purchase Commitment Schedule</u>

| <u>DIP Factoring Purchaser</u> | <u>DIP Factoring Purchase Commitment/Aggregate DIP Factoring Purchase Commitment</u> | <u>Pro Rata Share of Additional DIP Factoring Purchase Commitment</u> |
|---|---|---|
| Empery Tax Efficient, LP | | |
| [●] | | |
| | | 100% |

## SCHEDULE III[1]

| Prepetition Purchaser | Aggregate Principal Amount, including OID, of October Notes (USD) | Aggregate Principal Amount, including OID, of June Notes (USD) |
|---|---|---|
| Altium Growth Fund, LP | 1,384,300.00 | 156,250.00 |
| Anson Investments Master Fund LP | 1,038,225.00 | 312,500.00 |
| Bigger Capital Fund, LP | 692,150.00 | 312,500.00 |
| CVI Investments, Inc. | 692,150.00 | 0.00 |
| District 2 Capital Fund LP | 1,038,225.00 | 312,500.00 |
| Empery Debt Opportunities Fund, LP | 1,245,870.00 | 281,250.00 |
| Empery Master Onshore, LLC | 924,712.40 | 208,750.00 |
| Empery Tax Efficient, LP | 276,860.00 | 62,500.00 |
| Empery Tax Efficient III, LP | 321,157.60 | 72,500.00 |
| HB Fund LLC | 692,150.00 | 156,250.00 |
| Intracostal Capital LLC | 69,214.99 | 0.00 |
| Ionic Ventures | 692,150.00 | 312,500.00 |
| L1 Capital Global Opportunities Master Fund | 692,150.00 | 0.00 |
| Roth Capital Partners, LLC | 0.00 | 269,375.00 |
| Walleye Opportunities Master Fund Ltd. | 0.00 | 625,000.00 |
| **TOTAL** | 9,759,315.00 | 3,081,875.00 |

---

[1] Schedule III to be reviewed and updated, as needed.

## SCHEDULE IV

| Order of Priority | DIP Collateral Consisting of Pre-Petition Factoring Priority Collateral[2] | DIP Collateral Consisting of Post-Petition Factored Accounts | DIP Collateral Consisting of Post-Petition DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory[3] | DIP Collateral Not Consisting of Factored Accounts or DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory | Third-Party Encumbered Assets[4] | Unencumbered Assets | Superpriority Claims |
|---|---|---|---|---|---|---|---|
| 1st | Carve-Out and Permitted Liens[5] | Carve-Out and Permitted Liens | DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens | Carve-Out and Permitted Liens | Third-Party Existing Liens | Carve-Out | Carve-Out and Permitted Liens |
| 2nd | Prestige Liens[6] | DIP Factoring Liens | Carve-Out and Permitted Liens | DIP Note Liens and Prepetition Notes Adequate Protection Liens | Carve-Out | DIP Note Liens, DIP Factoring Liens, DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens, and Prepetition Notes Adequate Protection Liens | DIP Notes Superpriority Claim and DIP Factoring Superpriority Claim, DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Superpriority Claim |
| 3rd | DIP Note Liens, DIP Factoring Liens, DIP Inventory Acquisition Line of Credit Purchasers | DIP Note Liens, DIP Inventory Acquisition Line of Credit Purchasers Financed | DIP Note Liens, DIP Factoring Liens, and Prepetition Notes Adequate | DIP Factoring Liens, DIP Inventory Acquisition Line of Credit Purchasers | DIP Note Liens, DIP Factoring Liens, DIP Inventory Acquisition Line of Credit | Prestige Adequate Protection Liens[7] | Prepetition Notes Adequate Protection Claim and Prestige Adequate |

[2]     As defined in the Intercreditor Agreement, dated as of October 13, 2021 (the "Prestige Intercreditor Agreement"), among Prestige, Empery, as Notes Representative on behalf of the Prepetition Noteholders and Prepetition Collateral Agent, and the Note Parties.

[3]     "DIP Note Purchasers Financed Inventory" shall mean DIP Collateral made up of the specific inventory items financed by the Inventory Acquisition Line of Credit.

[4]     "Third-Party Encumbered Assets" shall mean DIP Collateral that was, as of the Petition Date, subject to valid, properly perfected, non-avoidable, and senior liens or security interests (excluding subordinated liens pursuant to existing agreements) (collectively, the "Third-Party Existing Liens") other than the liens and security interests granted pursuant to the Prepetition Security Agreement (the "Prepetition Notes Liens") and the Prestige Liens (as defined below).

[5]     "Permitted Liens" shall mean any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Notes Liens and Prestige Liens.

[6]     "Prestige Liens" shall mean any valid, properly perfected and non-avoidable liens on or security interests in the Factoring Collateral created by the Factoring Security Documents (each as defined in the Prestige Intercreditor Agreement).

[7]     Subject to Prestige's rights under paragraph 20 of the Final Order.

| | Financed Inventory Liens, and Prepetition Notes Adequate Protection Liens | Inventory Liens | Protection Liens | Financed Inventory Liens | Purchasers Financed Inventory Liens and Prepetition Notes Adequate Protection Liens | | Protection Claim |
|---|---|---|---|---|---|---|---|
| **4th** | Prepetition Notes Liens | Prestige Adequate Protection Liens | Prepetition Notes Liens | Prepetition Notes Liens | Prestige Adequate Protection Liens[8] | | |
| **5th** | | Prepetition Notes Adequate Protection Liens | Prestige Adequate Protection Liens[9] | Prestige Adequate Protection Liens[10] | | | |
| **6th** | | Prepetition Notes Liens | Prestige Liens | Prestige Liens | | | |

---

[8]     Subject to Prestige's rights under paragraph 20 of the Final Order.
[9]     Subject to Prestige's rights under paragraph 20 of the Final Order.
[10]    Subject to Prestige's rights under paragraph 20 of the Final Order.

## SCHEDULE V

### Scheduled Preexisting Indebtedness

### [See attached list.]

**NTD: Attached list from Borrower's bankruptcy schedules and statements, and add UCC-1 filed by Crown Equipment Corp. against Borrower.**

## <u>SCHEDULE VI</u>

**Scheduled Preexisting Liens**

**[See attached list.]**

**NTD: Attached list from Borrower's bankruptcy schedules and statements, and add UCC-1 filed by Crown Equipment Corp. against Borrower.**