James Patrick Shea, Esq.
Nevada Bar No. 405
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:   jshea@shea.law
          blarsen@shea.law
          kwyant@shea.law

-and-

**JEFFREY D. STERNKLAR LLC**
Jeffrey D. Sternklar, Esq. (*Admitted Pro Hac Vice*)
Massachusetts Bar No. 549561
101 Federal Street, Suite 1900
Boston, Massachusetts 02110
Telephone:   (617) 207-7800
Email:  jeffrey@sternklarlaw.com

-and-

**MURPHY & KING, P.C.**
Charles R. Bennett, Jr., Esq. (*Pro Hac Vice Pending*)
Massachusetts Bar No. 362610
28 State Street, Suite 3101
Boston, Massachusetts 02109
Telephone:   (617) 423-0400
Email:  cbennett@murphyking.com

*Attorneys for Creditor White Winston
Select Asset Funds, LLC*

*Attorneys for Creditor White Winston
Select Asset Funds, LLC*

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| IN RE:<br><br>MUSCLEPHARM CORPORATION<br><br>Debtor. | Chapter 11<br><br>Case No.: 22-14422-nmc |

**OBJECTION OF CREDITOR WHITE WINSTON SELECT ASSET FUNDS, LLC TO APPROVAL OF PROPOSED FINAL DIP ORDER**

Creditor White Winston Select Asset Funds, LLC ("**WW**"), by and through its undersigned counsel, hereby files this objection to the form of the proposed Final DIP order (the "**Proposed Order**") [ECF No.265] and respectfully submits the following:

## I.    INTRODUCTION

1.    The parties have no disputes about the terms of financing to be provided to the Debtor.  This dispute narrowly focuses instead largely on the prepetition claims of Empery Tax Efficient, L.P.'s ("**Empery**") and its fellow securityholders. [1]  Unfortunately, although Empery and the Debtor previously agreed to eliminate limitations on WW's right pursuant to 11 U.S.C. §502(a) and Fed. R. Bankr. P. 3012 to bring a claim objection to the Empery Securityholders' prepetition claims (defined in the Proposed Order as a "Challenge"), the Debtor and Empery now seek to limit WW's right to bring such a "Challenge."  Empery and the Debtor additionally seek to change their agreement that the Loan Documents are consistent with the Term Sheet, as represented to the Court by the Debtor at the February 9, 2023 hearing (the "**Hearing**").[2]  WW objects to this bait and switch, and requests that the Court deny approval and entry of the Proposed Order.  If the Court intends to enter any final DIP order at all, then WW requests that the Court approve the form of final DIP Order attached as **Exhibit A** (redlined to the proposed order submitted by the Debtor), which, unlike the Proposed Order, reflects what the Court decided at the Hearing, what the parties agreed to, and applicable law.

## II.    REPRESENTATIONS AT THE HEARING

2.    As a matter of law, 11 U.S.C. §502(a) permits any party in interest to object to allowance of a claim.  Fed. R. Bankr. P. 3012(a) authorizes the Court to determine the amount of

---

[1] Except as otherwise indicated, capitalized terms have the meanings ascribed to them in the Proposed Order and the Opposition.  The Term Sheet and Proposed Order provide for indemnification of Empery's attorney's fees and costs, other than with respect to litigation with WW and Mr. Drexler.  The pending dispute principally concerns Empery's prepetition claim.  Accordingly, WW intends to object to any attempt by Empery to seek or obtain indemnification of its attorney's fees and costs related to this dispute.  Indeed, WW fears those fees, together with the accruing administrative expenses, have made reorganization much more difficult and perhaps unattainable.  WW fears the administrative costs, together with the alleged rights to indemnification that Empery intends to assert, have been staggering.

[2] A transcript of the Hearing is attached as **Exhibit B**.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

a secured claim "[o]n request of a party in interest."  WW is a creditor[3] and equity security holder of the Debtor and thus is a "party in interest."  See, 11 U.S.C. §1109(b); In re Tower Park Properties, LLC, 803 F.3d 450, 457 (9th Cir. 2015) ("a party in interest is one who has a legally protected interest that could be affected by a bankruptcy proceeding"); 4 Collier on Bankruptcy P 502.02 (16th 2022) ("in the context of a chapter 11 case in particular, the term 'party in interest' expressly includes. . . a creditor [and]  an equity security holder. . . . .").

    3.    As relevant here, a core premise of the settlement and "a key part of the [Empery] financing"[4] was that WW intends to assert an objection to Empery's prepetition claim (a "Challenge") "as averred in its prior opposition [ECF No. 186] (the "**Opposition**").[5]  Neither Empery nor the Debtor challenged this representation. *Declaration of Todd M. Enright* ("**Enright Dec.**") at ¶3.

    4.    Prior iterations of the Term Sheet purported to eliminate WW's statutory right to assert a claim objection.  See generally, Opposition, ¶2 at 3.[6]  Later, Empery and the Debtor agreed to eliminate this limitation on WW's rights, and made clear that WW's right to file a claim objection to the Empery Securityholders' prepetition claims – a/k/a, a "Challenge" – was not limited.[7]  Indeed, the Committee also was granted the right to assert a Challenge, but unlike WW's right to do so, the Committee's right is not limited.[8]  This newly found distinction between WW's Challenge and the Committee's Challenge appears nowhere.   The Debtor never drew any

---

[3] The definition of claim in the Bankruptcy Code is broad.  WW's claim was in the fair contemplation of the parties prior to bankruptcy.  Cal. Dep't of Health Servs. v. Jensen (In re Jensen), 995 F.2d 925, 929 (9th Cir. 1993).

[4] Ex. A, at 8, line18 – 21.

[5] *See* Ex. A, at 31, lines 13 – 16. Counsel for WW stated that "[e]ffectively, if a claim objection is filed – and I can assure the Court we intend to file one to the entirely of the claim on the three grounds we outlined on our opposition – essentially nothing happens with respect to the prepetition claim, essentially the status quo is preserved."  Ex. A, at 31, lines 13 – 16.

[6] "Only the Committee may challenge the Empery Securityholders' claims – all other parties, including WW, are not provided equivalent rights to challenge anything."

[7] *Id.* at 10:13-25. (Debtor represents that "the purpose of that language is to make clear that if [WW] objects . . . the purpose of this language from the debtor's perspective is to preserve the parties' rights, that [absent further court order or withdrawal of the objection] the parties would be in front of you and the Court would resolve. . . all those matters, which I think, Your Honor, frankly, is the law.").

[8] *See, e.g.,* Ex. A, at 8:18-21 ("So, Your Honor, so the -- a key part of the financing that's proposed is the ability of the Committee, as well as White Winston, to propose or to file challenges to that financing.").

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

distinctions between the scope of a Challenge by the Committee and a Challenge by WW at the Hearing. At most and at the Hearing, Debtor's counsel speculated on whether WW would object to the entirety of the Empery Noteholders' prepetition claims or only to parts of it, but never expressed any limitation existed on WW's rights or that WW agreed to limit its rights.[9] Enright Dec. at ¶4.

## III.    THE PROPOSED ORDER

5.      The Proposed Order, contrary to the representations made to the Court at the Hearing, purports to limit the scope of any Challenge by WW to the Empery Securityholders' prepetition claims. The Proposed Order provides, at ¶ 4, that "White Winston shall have until March 9, 2023 (such period, "**White Winston Challenge Period,**" and together with the Committee Challenge Period, the "**Challenge Periods**") to investigate, challenge and otherwise object to the allowance of the Allowed Claim (***other than challenges and objections based upon the Debtor's or the Estate's claims***)."[10]

6.      WW objects to the highlighted parenthetical language, which should be deleted. As noted above, WW never agreed to any limitation whatsoever on its right to assert a Challenge and has rejected every attempt by Empery and the Debtor to limit WW's right to a Challenge. To the extent the ambiguous terms ("the Debtor's or the Estate's claims") are meant to limit WW to Challenges based solely on claims for affirmative relief WW could assert directly against Empery, without obtaining derivative standing to do so, such a limitation is absurd. WW never had direct dealings with Empery prior to Empery's investment into the Debtor and never believed its Challenge would have anything to do with any such claims. Enright Dec. at ¶5

7.      In short, a claim objection is different from an affirmative claim for relief. WW has a statutory right to assert a claim objection, regardless of its rights to assert an affirmative claim for relief. See, Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6

---

[9] *Id.* at 9:16.

[10] Emphasis supplied. This newly proposed limitation is ambiguous. Nowhere does the Proposed Order define what are "the Debtor's or the Estate's claims." Despite repeated requests by WW, the Debtor and Empery refuse to define what this limitation would prohibit WW from filing.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  (2000) (a party may lack standing to assert a claim where the bankruptcy code names the party

2  granted the right to invoke its provisions); <u>cf</u>. 11 U.S.C. §502(a), Fed. R. Bankr. P. 3012 (any party

3  in interest may file a claim objection). WW withdrew its Opposition solely based upon the

4  agreement with the Debtor that it could bring a Challenge without limitation, with the

5  consequences as read into the record at the Hearing. Enright Dec. at ¶5. Empery has the right to

6  defend against any such Challenge (Proposed DIP Order, at ¶4, last sentence), but no right to

7  prevent WW from filing any Challenge.[11]  Enright Dec. at ¶5.

8          8.      The Debtor and Empery may argue that they intend to give the Committee exclusive

9  derivative standing to bring claims against Empery, and that should remedy WW's objection.  But

10  first, standing to assert claims is irrelevant to WW's statutory right to assert a Challenge.  Even

11  assuming <u>arguendo</u> that WW lacks standing to file an adversary proceeding to subordinate or

12  recharacterize the Empery Securityholders' prepetition claims, that has nothing to do with and is

13  a *non sequitur* to whether WW can file a separate objection to the prepetition claims.  Second,

14  even if true, granting the Committee derivative standing to assert claims against Empery does not

15  obviate the Debtor's and Empery's agreements with WW that any Challenge by WW would not

16  be subject to any such limitation.  Fundamentally, the Debtor and Empery waived their rights to

17  limit WW's right to file a claim objection for any reason, even if their newly asserted argument

18  that granting the Committee derivative standing matters.  Third, the Committee acquiesced to a

19  $50,000 spending limit for any matters related to any Challenge.  Enright Dec. at ¶6.  This funding

20  restriction makes any rights granted to the Committee illusory, since if past is prologue then

21  $50,000 likely is at most a rounding error in the costs associated with litigation with the Empery

22  Securityholders.

23         9.      Additionally, although the Bankruptcy Code imposes no limit on the timing of the

24  filing of a Challenge, WW previously noted Empery's request, but never agreed, to limit its right

25  to file a Challenge only to March 9, 2023.[12]  WW has requested a two-week extension of time, due

26  _____

27  [11] Ex. A, 33:8-10 (WW has "been transparent in [its] objection as to what [it thinks] the grounds are.  And [WW] and
    Empery hopefully will have a full and fair opportunity to litigate those issues.").

28  [12] Ex. A, at 12, lines 19 – 23 ("Similarly, we may be back in front of you with respect to the timing of March 9th.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

in part to the passage of almost three weeks since the Hearing to the submission of a proposed Final DIP Order. Empery refused any such request or any extension at all. As Empery has reneged on its agreements regarding the Final DIP Order, WW submits it should have at least as much time as the Committee has been granted to April 10, 2023, to file its Challenge and to facilitate greater coordination between WW and the Committee. WW has commenced an investigation of Empery and the Committee has requested an opportunity to participate in any Rule 2004 examinations that WW conducts. WW submits that allowing WW to have as much time as the Committee to file any Challenge facilitates the intended collaboration between WW and the Committee and facilitates the Court's case management by coordinating all hearings regarding such Challenges.

10. Finally, WW is particularly concerned that the Term Sheet requires the Final DIP Order to contain undisclosed stipulations regarding "the amount and priority of the secured indebtedness under the Prepetition Notes." Accordingly, the parties agreed at the Hearing that the "DIP documents . . . will be consistent" with those representations [made at the Hearing][13] and that "these representations and agreements will be incorporated into the final order approving DIP financing. . . ."[14] Nowhere does the Proposed Order provide that, as promised, the DIP documents are consistent with the representations read into the record at the Hearing. Enright Dec. at ¶8.

11. The Proposed Order instead provides at ¶38 only that it is Empery's and the Debtor's "*intent* that the [Proposed Order] and the Loan Documents be read together and consistent with one another. . . ." The "intent" of the Debtor and Empery regarding the construction of the Loan Documents with one another is irrelevant. The Final DIP Order should be unambiguous that it authorizes only Loan Documents consistent with the Term Sheet and the representations made at the Hearing, regardless of the parties' "intent" about the irrelevant mutual reading of the various Loan Documents. The Final DIP Order should be clear that the agreed consequences to the Empery Securityholders arising from any Challenge apply unconditionally.

---

We're probably going to need more time than that. If we can't get it by agreement, we expect we'll be back in front of you on shortened notice seeking more timing than March 9th.").

[13] Ex. A, 11:9-10.

[14] *Id.* at 11:9-13.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

12.     Similarly, WW objects to the language in paragraph 38 of the Proposed Order that has the Court approving the Loan Documents regardless of any inconsistency.  Although the Debtor insists the Loan Documents are consistent with the Term Sheet, the Debtor and Empery nevertheless refuse to so represent to the Court.  The Debtor and Empery refuse to accept the risk they agreed to assume that there is an inconsistency by refusing to condition the Court's approval of Loan Documents only to  the extent they are consistent with those representations.  WW acquiesced to the representations made at the Hearing, particularly with respect to the preservation of its right to assert a Challenge and the consequences that flow from the filing of a Challenge, and not to something else that may suddenly appear in the Loan Documents. WW bargained for the risk of inconsistency being assumed by the Debtor and Empery, and not by the estate and its creditors.  Enright Dec. at ¶9.

## IV.    CONCLUSION

13.     As WW argued in the Opposition, (at ¶3), Empery's entire DIP financing proposal is a pretext by which Empery seeks to legitimize the Empery Securityholders' illegitimate prepetition claims.  At bottom, WW is the only party with the means and incentive to file a Challenge to that claim.  Entering the Proposed Order, which effectively eliminates the Debtor (which has abjectly abdicated its rights to Empery) and the Committee (which is limited to $50,000 to fight Empery), means only WW is left to file a Challenge.  It is a preposterous and absurd result to suggest that WW, too, should be denied or limited in (or ever agreed to be denied or limited in) the right to assert a Challenge, thereby leaving the Empery Securityholders' prepetition claims without any challenge at all.  Enright Dec. at ¶10.  Whatever else was intended, it was not that. Thus, WW objects to entry of the Proposed Order.  WW reserves its rights, including to seek the appointment of a chapter 11 trustee pursuant to 11 U.S.C. § 1104 and to terminate the Debtor's exclusive periods under 11 U.S.C. § 1121.  Enright Dec. at ¶11.

///

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WHEREFORE, WW prays the Court sustain this Objection and decline to enter the Proposed Order, alternatively, authorize and enter at most the form of order attached as **Exhibit A** instead, and further grant WW such other and further relief to which it may be entitled.

DATED this 1st day of March, 2023.

**JEFFREY D. STERNKLAR LLC**

*/s/ Jeffrey D. Sternklar, Esq.*
Jeffrey D. Sternklar, Esq. (*Admitted Pro Hac Vice*)
Massachusetts Bar No. 549561
101 Federal Street, Suite 1900
Boston, Massachusetts 02110
Telephone:     (617) 207-7800
Email: jeffrey@sternklarlaw.com

-and-

**SHEA LARSEN**
James Patrick Shea, Esq.
Nevada Bar No. 405
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for Creditor White Winston Select Asset Funds, LLC*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**CERTIFICATE OF SERVICE**

1.    On March 1, 2023, I served the following document(s): **OBJECTION OF CREDITOR WHITE WINSTON SELECT ASSET FUNDS, LLC TO APPROVAL OF PROPOSED FINAL DIP ORDER**

2.    I served the above document(s) by the following means to the persons as listed below:

☒    a.    ECF System:

SAMUEL A. SCHWARTZ and BRYAN A. LINDSEY on behalf of Debtor MUSCLEPHARM CORPORATION
saschwartz@nvfirm.com, blindsey@nvfirm.com

WILLIAM NOALL and MARK M. WISENMILLER on behalf of Creditor EMPERY ASSET MANAGEMENT, LP
wnoall@gtg.legal, mweisenmiller@gtg.legal

OGONNA M. BROWN on behalf of Creditor PRESTIGE CAPITAL CORPORATION
obrown@lewisroca.com

JOHN D. FIERO, JASON H. ROSELL, and MATTHEW C. ZIRZOW on behalf of the OFFICIAL COMMITTEE OF UNSECURED CREDITORS
jfiero@pszjlaw.com, jrosell@pszjlaw.com, mzirzow@lzlawnv.com

TRACY M O'STEEN on behalf of interested party RYAN DREXLER
tosteen@carlyoncica.com

ROBERT T. STEWART on behalf of Creditor NUTRABLEND FOODS
rstewart@foley.com

☐    b.    United States mail, postage fully prepaid:

☐    c.    Personal Service:

I personally delivered the document(s) to the persons at these addresses:

☐    For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐    For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐    d.    By direct email (as opposed to through the ECF System):
Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

9

☐   e.   By fax transmission:

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐   f.   By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 1, 2023.

By: /s/ *Bart K. Larsen, Esq,*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

# EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887
*Proposed Attorneys for the Debtor*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| In re: | ) | Case No.: 22-14422-nmc |
|---|---|---|
| | ) | |
| MUSCLEPHARM CORPORATION, | ) | Chapter 11 |
| | ) | |
| | ) | |
| Debtor. | ) | Final Hearing Date:  February 9, 2023 |
| | ) | Final Hearing Time: 10:30 a.m. |

**FINAL ORDER REGARDING EMERGENCY MOTION
FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364 AND FED. R. BANKR. P. 4001(B) AND 4001(D): (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (II) GRANTING SENIOR SECURED LIENS AND ADMINISTRATIVE EXPENSE CLAIMS, (III) DETERMINING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

The motion ( "**Motion**")[1] of MusclePharm Corporation, the chapter 11 debtor and debtor in possession herein ("**MusclePharm**" or the "**Debtor**") before this court ("**Bankruptcy Court**")

---

[1]     Capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the Motion.

1

seeks entry of interim and final orders pursuant to Sections[2] 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001 to, among other matters, authorize the Debtor to obtain emergency credit and incur debt on an interim and final basis.  The Debtor negotiated and then filed a substitute term sheet (the "**First Interim Term Sheet**") with the Bankruptcy Court on January 6, 2023 [ECF No. 65] between the Debtor, as borrower, and the DIP Secured Parties and DIP Factoring Parties (each as defined in the Loan Documents (defined below)) by and through the DIP Agent, Empery Tax Efficient, L.P. ("**DIP Agent**" or "**Empery**," and collectively with the DIP Secured Parties and DIP Factoring Parties, "**Lender**"), as lender, in lieu of White Winston Select Asset Funds, LLC ("**White Winston**"), the originally proposed lender in the Motion, with Lender proposing the requested financing on the terms set forth in the First Interim Term Sheet.  Sufficient notice of the Motion and a first interim hearing (the "**First Interim Hearing**") was provided under the circumstances by the Debtor; and further, the Bankruptcy Court continued the First Interim Hearing from January 5, 2023, at 9:30 a.m. to January 6, 2023, at 9:30 a.m. to provide more time for all to review the First Interim Term Sheet, and the Bankruptcy Court thereafter entered its first interim order (the "**First Interim Order**") on January 9, 2023 [ECF No. 74], and continued the Motion for a second interim hearing (the "**Second Interim Hearing**" and collectively with the First Interim Hearing, the "**Interim Hearings**") to be held on January 13, 2023, at 9:30 a.m.  On January 12, 2023, Debtor substituted a revision to the First Interim Term Sheet [ECF No. 102, Ex. 1] (the "**Second Interim Term Sheet**").  Following the Second Interim Hearing, the Bankruptcy Court approved the Second Interim Term Sheet on an interim basis on January 23, 2023 [ECF No. 139] (the "**Second Interim Order**" and together with the Second Interim Order, the "**Interim Orders**") and scheduled a final hearing for final approve of the Motion to occur on February 9, 2023, at 10:30 a.m. (the "**Final Hearing**").  On February 7, 2023, Debtor substituted a revision to the Second Interim Term Sheet [ECF No. 213-1, Ex. 1] (hereinafter, the "**Term Sheet**" and the proposed financing pursuant to the

---

[2]    Unless otherwise stated, all references to "**Section**" herein shall be to title 11 of the U.S. Code (the "**Bankruptcy Code**"); all references to a "**Bankruptcy Rule**" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to a "**Local Rule**" or "**LR**" shall refer to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Nevada.

terms and conditions of the Term Sheet as implemented by the Loan Documents, the, "**DIP Financing**").  After considering the Motion and all pleadings and papers filed with, and evidence submitted to, this Bankruptcy Court in connection with the Motion, including all formal and informal objections to the Motion, and the argument of counsel and evidence submitted at the Final Hearing; and upon the record made by the Debtor and others at the Final Hearing; the Bankruptcy Court has found and determined that, subject to the terms of this final order (the "**Final Order**"), the relief sought in the Motion (as amended and supplemented by the Term Sheet and the Loan Documents) on a final basis, to the extent provided below, is in the best interests of the Debtor, its bankruptcy estate ("**Estate**"), creditors, and all parties in interest; and after due deliberation and consideration and good and sufficient cause appearing therefore,

the Bankruptcy Court hereby finds:[3]

A.    **Debtor's Chapter 11 Case**.  On December 15, 2022 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned case (the "**Chapter 11 Case**").  The Debtor is continuing to operate its business and manage its affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code, and no request has been made for the appointment of a trustee or examiner.

B.    **Jurisdiction; Venue**.  This Bankruptcy Court has subject matter jurisdiction to consider and rule upon the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Determination of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief sought by the Motion are Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001.  Venue of the Chapter 11 Case and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    **Notice**.  Notice of the First Interim Hearing and the relief requested in the Motion was provided by the Debtor by electronic mail, overnight courier, hand delivery or electronic

---

[3]    To the extent that the Court stated findings of fact and conclusions of law on the record at the Second Interim Hearing, such findings and conclusions are incorporated herein by reference in accordance with Fed. R. Civ. P. 52, made applicable pursuant to Fed. R. Bankr. P. 9014.

delivery through the Bankruptcy Court's CM/ECF system, on January 3, 2023, to: (i) the Office of the United States Trustee for the District of Nevada ("**U.S. Trustee**"), (ii) the Debtor's 20 largest non-insider unsecured creditors, (iii) the Lender and counsel to the Lender, (iv) all other parties known by the Debtor to assert liens or security interests in the assets of the Debtor, and (v) all other parties entitled to notice under Bankruptcy Rule 2002. Notice of the Second Interim Hearing was provided by the Bankruptcy Court on the record in open court at the First Interim Hearing and also on the written record [See ECF No. 66]. Notice of the Final Hearing was provided by the Bankruptcy Court on the record in open court at the Second Interim Hearing and also on the written record [See ECF Nos. 105 & 146]. Under all of the circumstances, such notice of the Motion, the relief requested therein, the Interim Hearings, and Final Hearing has complied with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules.

D. **Debtor's Need for DIP Financing**. Based upon pleadings and papers filed with, and evidence submitted to, this Bankruptcy Court in connection with the Motion, and the record in the Chapter 11 Case, the Debtor does not have sufficient available sources of working capital and financing to carry on the operation of its business and affairs without the DIP Financing and authorized use of all cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever or wherever acquired in which the Debtor and an entity other than the Debtor has an interest, whether existing before or after the commencement of the Chapter 11 Case and inclusive of cash collateral as defined in Section 363 ("**Cash Collateral**."). As a result of the Debtor's financial condition, the use of Cash Collateral alone will be insufficient to meet the Debtor's immediate postpetition liquidity needs. The Debtor's ability to maintain business relationships with its suppliers and customers, pay for human resources, purchase materials and otherwise finance its operations is essential to the Debtor's continued viability. The Debtor's ability to finance its operations and its Chapter 11 Case is essential to preserving the going concern value of the Debtor's business and ultimately maximizing the value of the Estate for the benefit of all stakeholders, and for these reasons and others, the approval of the DIP Financing is in the best interests of the Debtor, the Estate, and its creditors.

E. **Budget for Necessary DIP Financing**. Attached hereto as **Exhibit A** is a revised

4

13-week cash flow forecast setting forth all projected cash receipts and cash disbursements (by line item) for a 13-week period beginning in the week commencing January 30, 2023 and for a twelve (12) month period beginning in January 2023 (the "**Budget**"). The Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) prepared by the Debtor and consented to in writing by the Lender, without subsequent notice to or order of the Bankruptcy Court. The Debtor will deliver a copy of the Budget to the Committee and Prestige Capital Finance, LLC's ("Prestige"). The Budget is an integral part of this Final Order and has been relied upon by the Lender in consenting to this Final Order and to provide the DIP Financing. The Budget includes and contains the Debtor's best current estimate of all operational receipts, and the Budget accounts for operational disbursements, fees, costs and other expenses that were anticipated to be payable, incurred and/or accrued by the Debtor during the period covered by the Budget to be timely paid in the ordinary course of business to the extent allowed and permitted to be paid by an order of this Bankruptcy Court or pursuant to the Bankruptcy Code. Funding of the Budget is expected to allow the Debtor to operate in the Chapter 11 Case and pay postpetition administrative expenses in the ordinary course of business to the extent allowed and permitted to be paid by the Bankruptcy Court order or pursuant to the Bankruptcy Code, subject to the terms of this Final Order.

F.    **Financing under Section 364**. Based on the pleadings and papers filed with, and evidence submitted to, this Bankruptcy Court in connection with the Motion, and the record in the Chapter 11 Case, the Debtor is unable to obtain sufficient financing from a source acceptable to Debtor in its business judgment by means of: (i) unsecured credit allowable as an administrative expense under Sections 364(b) and 503(b)(1) of the Bankruptcy Code; or (ii) secured credit under Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) for the purposes set forth in the Term Sheet and the Loan Documents without granting a superpriority priming lien.

G.    **Good Faith Lender and Lending and Good Cause**. The Lender agreed to provide postpetition financing secured, subject to the priorities described in **Exhibit B** hereto, by: (i) continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected co-priority senior liens on and security interests in the DIP Collateral (defined below) (collectively,

the "**DIP Liens**"), with the same priority as the Prepetition Secured Parties' (as defined in the Loan Documents) current prepetition liens on Debtor's prepetition assets and senior to all other liens existing on and after the Petition Date with the exception of Prestige's prepetition liens and security interests in its prepetition collateral as provided in the prepetition intercreditor agreement ("**Prestige Intercreditor Agreement**") between Prestige, the Debtor and the Prepetition Secured Parties; (ii) superpriority claims under Section 364(c)(1); (iii) automatically perfected liens under Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d); and (iii) the other protections set forth in the Motion and the Term Sheet and the Loan Documents, in each case limited only by this Final Order. As of the Final Hearing, the Lender is prepared to advance secured financing to the Debtor in accordance with the Term Sheet and the Loan Documents to the extent provided in this Final Order and the Budget. After considering all of its alternatives, including alternative sources of debtor in possession financing, the Debtor has concluded, in an exercise of its sound business judgment, that the DIP Financing provided by Lender represents the best proposed financing available to the Debtor under Debtor's circumstances. Based on the pleadings and papers filed with, and evidence submitted to, this Bankruptcy Court in connection with the Motion, and the record in the Chapter 11 Case, the terms and conditions of the DIP Financing are fair and reasonable, reflect the Debtor's exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration. Absent granting the relief sought by this Final Order, the Debtor's business, properties and the Estate will be immediately and irreparably harmed. Accordingly, good cause has been shown that entry of this Final Order is in the best interest of the Debtor and its Estate, employees, creditors, and other parties in interest and that the implementation and consummation of the DIP Financing and authorization of the use of the DIP Collateral (including the Cash Collateral as further provided below) in accordance with this Final Order and the Loan Documents is in the best interests of the Estate and consistent with the Debtor's fiduciary duties. Based on the pleadings and papers filed with, and evidence submitted to, this Bankruptcy Court in connection with the Motion, and the record in the Chapter 11 Case, (i) the DIP Financing has been negotiated in good faith and at arm's length among the Debtor and the Lender, and (ii) any credit extended, loans made, and other financial accommodations extended pursuant to this Final Order to the

Debtor by the Lender have been extended, issued or made, as the case may be, in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code.

H. **Use of Cash Collateral**.  An immediate and critical need exists for the Debtor to use the Cash Collateral (in addition to the DIP Financing) in accordance with the Budget to continue to operate its business, pay wages, maintain business relationships with members, suppliers and customers, make capital expenditures, generally conduct its business affairs so as to avoid immediate and irreparable harm to the Estate and the value of its assets, and afford the Debtor adequate time to effectively reorganize.

I. **Final Approval of the Motion**.  Based upon the Motion, all pleadings and papers filed with and evidence submitted to this Bankruptcy Court in connection with the Motion, and the record made at the Interim Hearings and Final Hearing, all objections being withdrawn, consensually resolved on the record, or overruled by the Bankruptcy Court, the Bankruptcy Court has determined to grant the Motion on a final basis and approve the Debtor's entry into and performance under the DIP Financing under the Loan Documents, as further provided herein, thereby authorizing postpetition financing of (i) up to $4,500,000 (excluding the Roll-Up amounts (defined below) and the DIP Inventory Acquisition Line of Credit) under the DIP Note Facility (as defined in the Loan Documents), (ii) up to $10,000,000 under the DIP Factoring Facility to factor DIP Accounts (as those terms are defined in the Loan Documents), and (iii) up to $1,000,000 under the DIP Inventory Acquisition Line of Credit (as defined in the Loan Documents), and related relief, as provided in the Loan Documents and this Final Order.

Based on the foregoing, and upon the record made before this Bankruptcy Court at the Interim Hearings and Final Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**:

1. **Final Approval**.  The DIP Financing pursuant to the DIP Facilities (as that term is defined in the Loan Documents) is approved on a final basis and the Debtor is authorized to obtain postpetition financing of (i) up to $4,500,000 (excluding the Roll-Up amounts and the DIP Inventory Acquisition Line of Credit) under the DIP Note Facility, (ii) up to $10,000,000 under the DIP Factoring Facility, and (iii) up to $1,000,000 under the DIP Inventory Acquisition Line of

7

Credit on a final basis as provided in the Loan Documents and this Final Order.

2.      **Budget**.  Beginning on January 30, 2023 and continuing until the repayment in full in cash of the obligations under the DIP Facilities, the Debtor shall perform in accordance with the Budget, subject to the following with respect to any Review Period (defined below): (i) the Debtor's actual cash receipts shall not be less than 90% of the projected amounts set forth in the Budget on a cumulative basis; and (ii) the Debtor's actual cash disbursements shall not be greater than 110% of the projected amounts therefor set forth in the Budget on a cumulative basis (such variance, the "**Permitted Variances**").  During any Review Period occurring prior to March 15, 2023, the DIP Note Purchasers and DIP Factoring Purchasers (as those terms are defined in the Loan Documents) waive all defaults of the Debtor for failing to comply with the Budget, including the Permitted Variances, solely with respect to (i) Total Receipts and (ii) Total COGS Including Shipping (as those terms are defined in the Budget).  Debtor shall file with the Bankruptcy Court a final Budget agreed to by the DIP Agent on or before March 15, 2023.  Compliance with the Budget shall be reviewed on Monday of every other week on a bi-weekly basis, with such reviews to be conducted on the Monday following each of the second and fourth weeks of the Budget (each, a "**Weekly Review Period**") and thereafter on a rolling 4-week basis (the "**Cumulative Review Period**" and together with the Weekly Review Period, the "**Review Periods**")**.**  Beginning on the second Monday following the Second Interim DIP Order and every other Monday thereafter, the Debtor shall deliver to the DIP Factoring Agent (as defined in the Loan Documents) and the Committee of Unsecured Creditors (the "**Committee**"), not later than 4:00 p.m. Pacific time on each Monday (commencing with the Monday after the one-week anniversary of the Second Interim DIP Order), a weekly line-by-line variance report (the "**Variance Report**"), which Variance Report shall compare actual cash receipts and disbursements of the Debtor with corresponding amounts provided for in the Budget on a line-by-line basis for the prior week and the applicable Review Period (or such shorter period as may have elapsed from the Petition Date), including written descriptions in reasonable detail explaining any material positive or negative variances, and otherwise in form and substance reasonably acceptable to the DIP Note Agent (as defined in the Loan Documents).

8

3.      **Final Approval of the Loan Documents**.   The *Debtor-In-Possession Notes Purchase and Security Agreement* (as subsequently amended and supplemented and executed by the Debtor and the counterparties thereto ("**DIP Note Agreement**") and *Debtor-In-Possession Factoring Purchase and Security Agreement* (as subsequently amended and supplemented consistent with this Final Order and executed by the Debtor and the counterparties thereto ("**DIP Factoring Agreement**," and collectively with the DIP Note Agreement, and any other documents or agreements, if any, intercreditor agreements, and amendments, schedules, and exhibits to the foregoing delivered or filed pursuant to or in connection with or necessary to implement the DIP Financing, the "**Loan Documents**"), attached hereto as **Exhibit C** and **Exhibit D**, respectively, and all the Lender protections provided therein and herein are approved for all postpetition lending by Lender to Debtor made pursuant to this Final Order.   The Debtor is expressly authorized, empowered, and directed to perform all of its direct and indirect obligations under the Loan Documents from and after December 15, 2022 ("**Petition Date**"), including the execution of such additional documents, instruments and agreements reasonably required or requested by the Lender to implement the terms or effectuate the purposes of the Loan Documents and this Final Order, except as limited hereby (collectively, the "**DIP Obligations**").  In furtherance of the foregoing and without further approval of this Bankruptcy Court, the Debtor is authorized, and the automatic stay imposed by Section 362 of the Bankruptcy Code is modified to the extent necessary, to perform all acts and to make, execute and deliver all instruments and documents and to pay all reasonable fees (when applicable), that may be reasonably required or necessary for the Debtor's performance of its obligations under the Loan Documents and this Final Order, and for  Lender's exercise of remedies set forth in the Loan Documents upon a default.

4.      **Approval of the Challenge Periods**.  The Committee shall have until April 10, 2023 (such period, the "**Committee Challenge Period**") to investigate and challenge and otherwise object to the allowance of the Allowed Claim (defined below).  The Releases (included in this Final Order and which are included in the Loan Documents) are not a defense to a claim objection brought by the Committee during the Committee Challenge Period.  Except as may be set forth in an order of this Court, White Winston shall have until ~~March 9~~April 10, 2023 (such period, "**White Winston**

1  **Challenge Period,**" and together with the Committee Challenge Period, the "**Challenge Periods**")

2  to investigate, challenge and otherwise object to the allowance of the Allowed Claim (other than

3  challenges and objections based upon the Debtor's or the Estate's claims).  If an objection to the

4  Prepetition Secured Parties' prepetition claim is timely filed during the required Challenge Period

5  in the Bankruptcy Court, then: (i) the Prepetition Secured Parties' prepetition claim shall not be

6  deemed an "allowed claim" to the extent objected to in such objection absent the Prepetition

7  Collateral Agent (as defined in the Loan Documents) obtaining a further order of the Bankruptcy

8  Court, unless the objection is withdrawn; (ii) the Prepetition Collateral Agent shall not be entitled

9  to the Prepetition Collateral Agent Credit Bid Obligations (as defined in the Loan Documents)

10 unless the Prepetition Collateral Agent obtains a further order of the Bankruptcy Court, unless the

11 objection is withdrawn; (iii) if a sale of Debtor's assets occurs before such claim objection is

12 resolved, such sale proceeds will be held by the Estate to the extent of the objection unless the

13 Prepetition Collateral Agent obtains a further order of the Bankruptcy Court, unless the objection

14 is withdrawn; and (iv) the Releases (included in this Final Order and which are included in the Loan

15 Documents) are not a defense to such claim objection brought by White Winston.  The Prepetition

16 Collateral Agent's rights to respond on behalf of Prepetition Collateral Agent and the Prepetition

17 Secured Parties to any challenges raised by the Committee or White Winston (or any party) are

18 preserved.

19      5.      **Committee Challenge Budget**.  The Committee may use up to $50,000 of the fees

20 and costs of the Committee in the Budget in connection with a Challenge.

21      6.      **Approval of the Roll-Up**.  Pursuant to this Final Order, except to the extent

22 successfully challenged in a challenge brought in the applicable Challenge Period, the Bankruptcy

23 Court hereby approves the Roll-Up, which provides that for each dollar of principal amount drawn

24 under the DIP Note Facility (excluding the DIP Inventory Acquisition Line of Credit), one dollar

25 of principal due under the Prepetition Notes shall roll-up and convert on a cashless basis into the

26 DIP Notes (the "**Roll-Up**"), provided further, however, to the extent the principal amount of the

27 Allowed Claim is timely challenged during the applicable Challenge Period and such challenge is

28 successful (meaning as determined by final order of the Bankruptcy Court) (such successfully

challenged principal amount, the "**Disallowed Principal Amount**") such that the allowed principal amount of the Allowed Claim ("**Allowed Principal Amount**") is less than the Roll-Up amount, then the Roll-Up amount shall be reduced to the Allowed Principal Amount.

7.    **Approval of the Allowed Claim**.  Pursuant to this Final Order, the (i) Lender shall have an allowed claim equal to the obligations under the DIP Facilities and post-petition attorneys' fees and expenses, and (ii) except to the extent successfully challenged in a challenge brought in the applicable Challenge Period, Prepetition Secured Parties shall have an allowed claim in an amount not less than $12.84 Million (the "**Allowed Claim**"), which is the principal amount of the Prepetition Notes, including the original issue discount.  For the avoidance of doubt, the rights of the Debtor or Committee to object or otherwise contest the Prepetition Secured Parties' prepetition claims in excess of $12.84 Million is not limited by the Challenge Periods and are reserved.

8.    **Credit Bidding**.  The DIP Agent may submit a credit bid of the obligations under the DIP Facilities in connection with the sale of any asset of the Debtor (in whole or in part), including without limitation, sales occurring pursuant to Section 363 or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(ii)-(iii) ("**DIP Agent Credit Bid Obligations**").  Subject to the express limitations contained in Paragraph numbered 4 above in this Final Order, the Prepetition Collateral Agent may submit a credit bid of an amount not less than the Allowed Claim, or such greater amount as allowed by the Bankruptcy Court, in connection with the sale of any asset of the Debtor (in whole or in part), including without limitation, sales occurring pursuant to Section 363 or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(ii)-(iii) ("**Prepetition Collateral Agent Credit Bid Obligations**").  Any motion filed by the Debtor seeking approval of bid procedures shall contain (i) a request for approval of the right of the DIP Agent to credit bid the DIP Agent Credit Bid Obligations and (ii) unless a timely challenge made within the applicable Challenge Period is pending (and the Bankruptcy Court has not entered an order otherwise allowing the Prepetition Collateral Agent Credit Bid Obligations to be credit bid), a request for approval of the right of the Prepetition Collateral Agent to credit bid the Prepetition Collateral Agent Credit Bid Obligations.

9.      **Approval of the Releases.**    For good and valuable consideration, including facilitation of the DIP Financing, the Note Parties' (as defined in the Loan Documents), on behalf of themselves, and Debtor, on behalf of the Estate (the **Estate** collectively with the Note Parties, "**Releasor**s"), hereby release any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or which could be asserted on behalf of the Releasors, whether known or unknown, foreseen or unforeseen, existing in law, equity or otherwise, that the Releasors would have been legally entitled to assert in their own right (whether individually or collectively), including claims based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Case restructuring, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Note Parties, the subject matter of, or the transactions or events giving rise to, any claim or equity security, or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtor, the Prepetition Notes or the Prepetition Liens (as defined in the Loan Documents), taking place on or before the entry of this Final Order against (i) the DIP Agent in its capacity as such, (ii) the DIP Note Purchasers in their capacities as such, (iii) the DIP Factoring Purchasers in their capacities as such,  (iv) except to the extent successfully challenged in a challenge brought in the applicable Challenge Period, the Prepetition Collateral Agent in its capacity as such, and (v) except to the extent successfully challenged in a challenge brought in the applicable Challenge Period, the Prepetition Purchasers (as defined in the Loan Documents) in their capacities as such (collectively, "**Releasees**"), and such Releases are hereby approved and effective upon entry of this Final Order. The Releases (which shall be included in the Loan Documents) are not a defense to an objection to the prepetition claims of the Prepetition Collateral Agent in its capacity as such and the Prepetition Purchasers in their capacity as such brought in the Bankruptcy Court (if such objection is brought during the applicable Challenge Period).  Any claims arising out of the breach of the Loan Documents by any party thereto are excluded from the releases provided in this paragraph, and, in the event of any such breach, the non-breaching party shall be entitled to pursue any and all rights, claims and damages that it may have against the other party as a result of such breach.

10.      **Authorization to Borrow/Use of Cash Collateral**.  Pursuant to this Final Order,

the Debtor is immediately authorized to (a) (i) borrow from the Lender up to an aggregate amount of $4,500,000 (excluding the Roll-Up) under the DIP Note Facility and up to $1,000,000 under the DIP Inventory Acquisition Line of Credit, and (ii) factor DIP Accounts (as defined in the Loan Documents) up to $10,000,000 from the Lender under the DIP Factoring Facility, all subject to and in accordance with the terms of this Final Order and the Loan Documents, and (b) use the proceeds of the DIP Financing and the DIP Collateral (including the Cash Collateral) in accordance with the terms of the Loan Documents, this Final Order and the Budget.

11.    **DIP Inventory Acquisition Line of Credit.**    Pursuant to this Final Order, the Debtor is immediately authorized to borrow under the DIP Inventory Acquisition Line of Credit ("**DIP Inventory Acquisition Line of Credit**").  The DIP Inventory Acquisition Line of Credit is a $1.0 Million credit line under the DIP Note Facility available solely to fund Debtor's acquisition of inventory in accordance with the Budget on an as needed basis.  The amounts advanced under this inventory line of credit shall not be included for purposes of calculating the Roll-Up amount. The DIP Inventory Acquisition Line of Credit shall be a revolving facility.  To secure the payment and performance in full of the DIP Inventory Acquisition Line of Credit, and without limiting any other security interest granted herein, Debtor hereby grants to the DIP Note Agent, as collateral agent for the DIP Inventory Acquisition Line of Credit Purchasers, a continuing first priority security interest in, and pledge to, all DIP Inventory Acquisition Line of Credit Purchasers financed inventory ("**DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory**"), wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.  Debtor represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory (subject only to the lien priority set forth on **Exhibit B** attached hereto).  Upon payment in full of the DIP Inventory Acquisition Line of Credit (other than indemnification obligations for which no claim has been made) and at such time as DIP Inventory Acquisition Line of Credit Purchasers obligation to purchase DIP Notes under and fund the DIP Inventory Acquisition Line of Credit has terminated, DIP Note Agent shall release and terminate its liens and security interests in the DIP Inventory

13

Acquisition Line of Credit Purchasers Financed Inventory.

12. **Certain Rights Upon Liquidation of Inventory.** In the event of a cessation of the Debtor's business whereby Debtor is no longer actively pursuing ongoing sales, DIP Note Agent, on behalf of the DIP Inventory Acquisition Line of Credit Purchasers, shall have the right, without further order of the Bankruptcy Court, after ten (10) days prior written notice to the Debtor and Committee (the "**DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Sale Notice Period**"), to sell the DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory at a cost determined by DIP Note Agent in its sole discretion but in accordance with the requirements of Article 9 of the Uniform Commercial Code . DIP Note Agent, on behalf of the DIP Inventory Acquisition Line of Credit Purchasers, shall have the right, without further order of the Bankruptcy Court, after providing written notice to the Debtor and the expiration of the applicable DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Sale Notice Period, to sell such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory pursuant to Article 9 of the Uniform Commercial Code. DIP Note Agent may use the Debtor's brand name(s), trademark(s), or trade name(s) and the like, directly and only related to the liquidation of such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory unless, within such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Sale Notice Period, the Debtor notifies the DIP Note Agent in writing that the Debtor will pay off and satisfy in full the outstanding principal balance, together with all accrued and unpaid interest thereon, of the DIP Inventory Acquisition Line of Credit (the "**Borrower DIP Inventory Acquisition Line of Credit Payoff Notice**"). Debtor shall pay as the DIP Note Agent directs the outstanding principal balance of the DIP Inventory Acquisition Line of Credit, together with all accrued and unpaid interest thereon, within five (5) Business Days after delivery of the Borrower DIP Inventory Acquisition Line of Credit Payoff Notice. If Debtor fails to make such payment, the DIP Note Agent, on behalf of the DIP Inventory Acquisition Line of Credit Purchasers, may proceed to sell such DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory pursuant to Article 9 of the Uniform Commercial Code.

13. **Use of Cash Collateral**. The Debtor may use the Cash Collateral to pay postpetition

ordinary course of business expenses to the extent allowed and permitted to be paid herein, by other Bankruptcy Court order or pursuant to the Bankruptcy Code, and in accordance with, the Budget, subject to: (i) the rights of the Lender and Prestige upon the occurrence of an Event of Default (as defined in the Loan Documents); and (ii) the rights of the Lender and Prestige otherwise available to the Lender and Prestige under this Final Order and the Bankruptcy Code.  The Debtor will not, without the prior written consent of Lender, engage in the use of the Cash Collateral of the Lender other than to pay ordinary and necessary business and administrative expenses as set forth in, and limited by, the Budget and consistent with this Final Order or other order of the Bankruptcy Court. The priority of Lender and Prestige's liens in Cash Collateral is set forth in **Exhibit B** hereto, and any diminution in value of any prepetition collateral, including Cash Collateral of the Prepetition Secured Parties and Prestige shall by secured by postpetition replacement liens under Section 552 of the Bankruptcy Code, with such liens not being subject to the "equities of the case" limitations.

14.    **Maturity and Termination.**  The maturity date of the DIP Financing shall be the earliest of (a) December 31, 2023, (b) the date all DIP Notes become due and payable under the Loan Documents, whether by acceleration after an Event of Default or otherwise, (c) the date of the closing of a Sale Transaction (as defined in the Loan Documents) or any other sale(s) of all or substantially all of the Debtor's assets, including pursuant to section 363 of the Bankruptcy Code, and (d) the filing of a chapter 11 plan that is not an Acceptable Plan (as defined in the Loan Documents) (the "**Maturity Date**").  Debtor's authority to use the DIP Financing or any DIP Collateral, including Cash Collateral, and the Lender's commitment to make additional advances under the DIP Financing, shall each terminate upon five (5) days after the date the Lender delivers a written notice of Event of Default to the Debtor, and the U.S. Trustee, unless any such event is waived, cured or extended with the written consent of the Lender.

15.    **Interest on DIP Financing**.  The rate of interest to be charged on advances under the DIP Financing shall be: (i) the prime rate as set in the Wall Street Journal as of the date of the entry of this Final Order, plus two percent (2%) for the DIP Note Facility; (ii) the prime rate as set in the Wall Street Journal as of the date of the entry of this Final Order, plus two percent (2%) for the DIP Factoring Facility; and (iii) the prime rate as set in the Wall Street Journal as of the date of

the entry of this Final Order, plus two percent (2%) for the DIP Inventory Acquisition Line of Credit.

16. **Payment of DIP Fees and Expenses**.  The Debtor is authorized to pay all costs, expenses and any other fees or other amounts payable under the terms of the Loan Documents and all other reasonable, documented, out-of-pocket costs and expenses of the Lender in accordance with the terms of the Loan Documents (including, without limitation, the costs and expenses of legal counsel).  None of such fees, costs and expenses shall be subject to Bankruptcy Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Bankruptcy Court.  Copies of the first page of invoices (in summary form and redacted, as necessary, for privileged, confidential or otherwise sensitive information) with respect to such fees, expenses and costs shall be provided to the U.S. Trustee, counsel for the Debtor, and counsel to the Committee, and each such party shall have ten (10) days from the date of such notice within which to object in writing to such payment.

17. **Validity of Loan Documents**.  The Loan Documents have been properly authorized and entered into by Debtor and the other Note Parties, and as may be modified shall constitute, and are hereby deemed on a final basis to be, the legal, valid and binding obligations of the Debtor and the other Note Parties, enforceable against the Debtor and the other Note Parties in accordance with the terms of the Loan Documents for all purposes: (i) during this Chapter 11 Case; (ii) in any subsequently converted Chapter 11 Case of the Debtor under chapter 7 of the Bankruptcy Code; and (iii) after dismissal of this Chapter 11 Case.  None of the legality, validity, perfection, priority, extent or enforceability of the DIP Obligations, the DIP Liens or the Loan Documents shall be subject to any challenge, including, without limitation, an effort to equitably subordinate or avoid the DIP Liens, by or on behalf of any Debtor or the Estate, any other Note Party, or any party in interest in any proceeding, whether in Bankruptcy Court, federal court, state court, or any other proceeding. Proceeds of the DIP Financing and the Cash Collateral shall be applied only to fund allowed postpetition administrative expenses, the Debtor's working capital, and such other amounts as are required or permitted to be paid pursuant to the Loan Documents, this Final Order and any other orders of this Court, all subject to, limited by, and in accordance with, the Budget.  No

obligation, payment, transfer or grant of security under the Loan Documents or this Final Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.  The rights to invoke the "equities of the case" exception to Section 552(b) of the Bankruptcy Code, the right to surcharge the DIP Collateral and the Prepetition Secured Parties and the collateral securing the Prepetition Notes, including under Section 506(c) of the Bankruptcy Code and the right to invoke the equitable doctrine of "marshaling" with respect to the DIP Collateral and the collateral securing the Prepetition Notes has been waived and challenges proscribed by this paragraph include any challenge to such waivers.

18.    **Superpriority Claim**.  In accordance with Section 364(c)(1), and subject to the Carve-Out, the Lender shall have a superpriority administrative expense claim under Section 364(c)(1)  (the "**Superpriority Claim**") for the DIP Obligations against the Debtor, with priority as set forth on Exhibit B hereto in payment over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, any and all administrative expenses or other claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including pursuant to Sections 105, 326, 328, 330, 331, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or otherwise, including those resulting from the conversion of this case pursuant to Section 1112, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided however, for purposes of Section 1129(a)(9)(A), the Superpriority Claim shall be considered an administrative expense allowed under Section 503(b) against the Debtor, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtor.  Except as set forth in this Final Order, no other superpriority claims shall be granted or allowed in the Chapter 11 Case.

19.    **DIP Collateral**.  As security for all DIP Obligations pursuant to this Final Order, the Lender is hereby granted (without the necessity of the execution by the Debtor or the filing or recordation of liens, security agreements, lock box or control agreements, financing statements, or any other instruments or otherwise), the DIP Liens, priority of which is set forth on Exhibit B

17

hereto, on all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Note Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of the Note Parties, including, for the avoidance of doubt, any equity or other interests in the Note Parties' non-Debtor and/or jointly-owned subsidiaries (if any), investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, including all causes of action under section 541 of the Bankruptcy Code (including commercial tort claims), and all additional and accessions thereto and all substitutions and replacements thereof, and all products, accounts and proceeds thereof, including without limitation, all proceeds and accounts from the sale or transfer of the DIP Collateral and of insurance covering the same and of any tort claims in connection therewith, excluding any causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 or 553, including the proceeds thereof (collectively, the "**DIP Collateral**").  All of the DIP Liens shall be created on terms, and pursuant to documentation, satisfactory to the DIP Agent, in its sole discretion.  Proceeds of the DIP Collateral constituting Section 541 causes of action owned by Debtor shall be used to the extent necessary to (i) satisfy the Bankruptcy Court approved, reasonable and documented fees and costs of professionals employed by Debtor and the Committee, respectively, not to exceed the amounts of such professionals, respectively, set forth in the budget, to the extent not otherwise satisfied by the Carve-Out and (ii) any unpaid portion of the DIP Facilities, including the DIP Inventory Acquisition Line of Credit and DIP Factoring Facility, with the balance being paid to the Estate.  The DIP Liens will not be subject to challenge.  Upon entry of this Final Order, the DIP Liens shall be deemed to be automatically perfected as of the Petition Date, without the need for further action of any kind; provided however, that if the Lender determines, in its sole discretion, to file any financing statements, notice of liens, mortgages or any other similar instruments, the Debtor will cooperate and assist in such filings and the automatic stay shall be lifted without the need for further order of this Bankruptcy Court to allow such filings.

20.    **Rights of Prestige**. The liens granted postpetition by the Debtor to Lender and the Prepetition Secured Parties pursuant to this Final Order shall not impair nor have any priority over, and are subject to, the prepetition liens of Prestige that are senior to those prepetition liens of Lender

and the Prepetition Secured Parties pursuant to the Prestige Intercreditor Agreement. To the extent this Final Order grants any other rights postpetition to Lender (including but not limited to the superpriority administrative expense status), those rights shall not impair nor have any priority over, and are subject to, the prepetition liens of Prestige. Notwithstanding anything contained in this Order, as additional adequate protection, (i) the automatic stay of Section 362(a) is modified under Section 362(d)(1) to allow Prestige to collect, and apply in partial satisfaction of its prepetition claims, Debtor's prepetition Factored Accounts and any other Prepetition Accounts (as those terms are defined in the Prestige Intercreditor Agreement) from the non-debtor obligors on such Factored Accounts and any other Prepetition Accounts subject to Section 552(a), and apply any reserves in partial satisfaction of it prepetition claims, and (ii) Prestige shall be entitled to reasonable and documented postpetition fees (including attorneys fees) and out-of-pocket expenses as part of its claim in accordance with its loan documents and payable subject to the value of the related collateral.

21.    **Carve Out**. The DIP Liens and Superpriority Claim granted under this Final Order shall be subject to the prior payment of the (collectively, the "**Carve Out**") of up to $250,000 for unpaid reasonable and documented (and approved on a final basis by the Bankruptcy Court when approval is necessary) postpetition fees and expenses incurred by professionals employed by Debtor and by the Committee, respectively, but in no event shall such carve-out exceed the unpaid Budget amounts (on a line by line basis) for the Debtor's and the Committee's professionals, respectively, prorated up to the date in the Budget coinciding with an Event of Default. In the absence of a Sale Transaction Notice (as defined in the Loan Documents), there shall be a separate, post Event of Default carve-out, of $125,000 for Debtor's professionals and $65,000 for the Committee's professionals for post Event of Default unpaid, reasonable, and documented fees and expenses (approved on a final basis by the Bankruptcy Court when approval is necessary). In the event of a Sale Transaction Notice, the aggregate amount of any unpaid fees, costs and expenses, incurred after the delivery of a Sale Transaction Notice, will be paid when allowed and the Sale Transaction is completed from the $190,000 in funds expressly earmarked to fund professional fees and costs in connection with a Sale Transaction.

22. **Restrictions on Granting Postpetition Liens**.  Except as otherwise provided in this Final Order and the Loan Documents, no claim having a priority superior or *pari passu* with those granted by the Interim Orders and this Final Order to the Lender shall be granted or permitted without further order of this Bankruptcy Court entered in the Chapter 11 Case, while any portion of the DIP Financing (or refinancing thereof) or any other DIP Obligations are outstanding without the prior written consent of the Lender.  Except as expressly permitted by the Final Order and the Loan Documents, the Debtor will not, at any time during the Chapter 11 Case, grant liens or security interests in the DIP Collateral to any other parties pursuant to Section 364 of the Bankruptcy Code or otherwise without either (i) first obtaining the prior written consent of the Lender or (ii) irrevocably satisfying the DIP Obligations in full in immediately available funds as a condition to the granting of such liens.  Unless all DIP Obligations shall have indefeasibly been paid in full in immediately available funds (or as otherwise provided in this Final Order and the Loan Documents), it shall constitute an Event of Default and terminate the right of the Debtor to use the DIP Financing and Cash Collateral, if the Debtor seeks, or if there is entered, any modification or extension of this Final Order, without the prior written consent of the Lender.

23. **Automatic Effectiveness of Liens**.  The DIP Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtor or Lender without the necessity of execution by the Debtor, or the filing or recordation, of any financing statements, security agreements, or other documents or the taking of any other actions.  The DIP Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the Loan Documents and this Final Order for so long as any portion of the DIP Financing (or refinancing thereof) is outstanding.  The Debtor is hereby authorized and directed to execute and deliver to the Lender such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents as the Lender requests, and the Lender is hereby authorized to file or record such documents in their respective discretion without seeking modification of the automatic stay under Section 362, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of the Final Order.

24.    **Automatic Stay and Remedies**.  As provided herein, subject only to the provisions of the Loan Documents, the provisions of Section 362 are vacated and modified to the extent necessary to permit the Lender, following an Event of Default and during the continuance of any Event of Default thereafter, all rights and remedies provided for in the Loan Documents and this Final Order without further order of this Bankruptcy Court.

25.    **Board of Directors; Independent Director**.  In accordance with the Term Sheet and Loan Documents, the Bankruptcy Court approves on a final basis the appointment of Eric Hillman, Paul Karr, and the independent board member, Nicholas Rubin, to comprise Debtor's three (3) member board of directors.  The independent director, Nicholas Rubin (the "**Independent Director**"), is approved on a final basis and shall have sole and exclusive responsibility with respect to the Debtor for: (i) protecting and recovering the assets of the Debtor, including to determine whether it is in the best interest of the Debtor to reorganize under Section 1129 of the Bankruptcy Code, or sell its assets in accordance with Section 363 of the Bankruptcy Code; (ii) reviewing and approving the ultimate debtor-in-possession financing incurred by the Estate, as negotiated by the Debtor's restructuring professionals; (iii) the investigation and determination of which Estate causes of action, if any, should be pursued, prosecuted, or settled; and (iv) the maximization of value for all stakeholders.

26.    **Consent to Limited Inventory Financing by JW Nutritional LLC**.  Unsecured creditor and inventory supplier JW Nutritional LLC ("**JW**") shall have the right to, at its own cost and expense, after the entry of the Final Order, create inventory for the Debtor's business, operations and sale, which inventory shall be held and deemed owned by JW until purchased by Debtor (the "**JW Financed Inventory**").  In the event of a cessation of the Debtor's business whereby Debtor is no longer actively pursuing ongoing sales, JW shall have the right, without further order of the Bankruptcy Court, after ten (10) days prior written notice to the Debtor, Committee and DIP Note Agent (the "**JW Financed Inventory Sale Notice Period**"), to sell the JW Financed Inventory pursuant to Section 2(c)(iii) of the DIP Note Agreement unless, within the JW Financed Inventory Sale Notice Period, Debtor or the DIP Note Agent notifies JW in writing that Debtor or the DIP Note Purchasers will purchase such inventory at the JW Financed Inventory

Cost (defined below).  For JW Financed Inventory that was produced by JW at the request of the Debtor that has been held by JW in excess of four (4) months, JW shall have the right, without further order of the Bankruptcy Court, after providing written notice to the Debtor and the DIP Note Agent and the expiration of the applicable JW Financed Inventory Sale Notice Period, to sell such JW Financed Inventory pursuant to Section 2(c)(iii) of the DIP Note Agreement unless, within the JW Financed Inventory Sale Notice Period, Debtor or the DIP Note Agent notifies JW in writing that Debtor or the DIP Note Purchasers will purchase such inventory at the JW Financed Inventory Cost.  JW may use the Debtor's brand name(s), trademark(s), or trade name(s) and the like, directly and only related to the liquidation of such JW Financed Inventory pursuant to Section 2(c)(iii) of the DIP Note Agreement.  For purposes of this Final Order, the term "**JW Financed Inventory Cost**" shall mean JW's fully loaded cost, including cost of storing product, based on the current pricing to the Borrower as of the most recent quarterly quoted price between JW and the Debtor. In the event of a Sale Transaction, the purchaser shall either (1) buy the JW Financed Inventory from JW at the JW Financed Inventory Cost, or (2) allow JW to sell the JW Financed Inventory on the terms set forth in Section 2(c)(iii) of the DIP Note Agreement.

27.    **Indemnification**.  The "Expense and Indemnification" provisions set forth in the Loan Documents are approved, provided however, such indemnification shall exclude out-of-pocket costs and expenses (including but not limited to reasonable and documented legal fees and expenses) arising out of post-petition litigation between the DIP Agent, on the one hand, and White Winston and/or Ryan Drexler, on the other hand, regarding the Prepetition Notes (as defined in the Loan Documents) or claims between those parties, including any claims that may be prosecuted in the Chapter 11 Case, that are not Debtor or Estate claims. For the avoidance of doubt, the excluded out-of-pocket costs and expenses are intended to be inclusive of discovery concerning claims related to the Prepetition Notes of the DIP Agent, on the one hand, and White Winston and/or Ryan Drexler, on the other hand, conducted by 2004 examination,

28.    **Factoring and Other Reporting.**  Debtor, or another party designated by Debtor and the DIP Factoring Agent, shall provide a weekly factoring report to the DIP Agents and the Committee identifying each DIP account ("**DIP Account**") purchased, the purchase amount of such

DIP Account, the date the DIP Account is due and the days overdue of any overdue DIP Account, the amount of the DIP Account due, and any payments received.  The DIP Agents shall confirm whether or not DIP Agents agree with the information in each weekly factoring report.  Further, the Debtor shall deliver to the DIP Note Agent and the Committee copies of all non-privileged reports of the financial and restructuring advisors of the Debtor as reasonably requested by the DIP Note Agent, including but not limited to: (i) any analysis of cash flows, forecasts, and potential cost savings initiatives; (ii) transaction marketing material (CIMs / MPs); (iii) investor outreach list; (iv) sale process updates; and (v) proposed sources and uses of funds at emergence from bankruptcy.

29.    **Forensic Accountant**.  At the request of the DIP Agent and approval of the Board of Directors, the Debtor shall retain a forensic accountant reasonably acceptable to the DIP Agent (the "**Forensic Accountant**") to review and analyze all Debtor's bank statements for three (3) or more years prior to the Petition Date and any other documents and information necessary to investigate payments and transfers from Debtor to determine whether they are avoidable under federal and state law.  The DIP Agent will increase the DIP Facility in the amount necessary to pay for the forensic accounting in an amount agreed to be the DIP Agent and the Debtor.

30.    **No Creation or Evidence of Liability to Third Parties or Alter Ego Relationship**.  The Lender shall not be found or deemed to be an alter ego of any of the Debtor, in a partnership of any kind with any of the Debtor, in a principal-agent relationship with the Debtor or otherwise liable for any liabilities of any of the Debtor, and the Debtor shall not be found or deemed to be a mere instrumentality of the Lender as a result of the Lender deciding to advance the DIP Financing to the Debtor, negotiating and entering into the Loan Documents and this Final Order, administering the DIP Financing, consenting to the Budget, or taking any other actions permitted by the Final Order or the Loan Documents, and no such action (or conduct taken in furtherance of or comprising an integral part of any such action) shall be admissible in any proceeding as evidence that the Lender is the alter ego, partner, principal of, or otherwise liable for any liability of the Debtor.

31.    **Binding Effect**.  The provisions of this Final Order shall be binding upon and inure to the benefit of the Lender, the Debtor, and all parties in interest, and their respective successors

23

and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the Estate).  To the extent permitted by applicable law, this Final Order shall bind any trustee hereafter appointed for the Estate, whether in this Chapter 11 Case or in the event of the conversion to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Final Order.

32.    **Survival**.  The provisions of this Final Order and any actions taken pursuant hereto shall survive the entry of any order, including an order: (a) confirming any plan of reorganization or liquidation in this Chapter 11 Case (and, to the extent not irrevocably satisfied in full in immediately available funds, the DIP Obligations shall not be discharged by the entry of any such order pursuant to Section 1141(d)(4) of the Bankruptcy Code, or otherwise); (b) converting the Chapter 11 Case to a chapter 7 case; or (c) dismissing the Chapter 11 Case.  The terms and provisions of this Final Order, as well as the DIP Obligations and the DIP Liens granted pursuant to this Final Order and the Loan Documents shall continue in full force and effect notwithstanding the entry of any such order.  The DIP Obligations and the DIP Liens shall maintain their priority as provided by this Final Order and the Loan Documents and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full and discharged.  In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the Loan Documents without the written consent of the Lender.  Unless all DIP Obligations shall have indefeasibly been paid in full, it shall constitute an Event of Default and terminate the right of the Debtor to use Cash Collateral under this Final Order if Debtor seeks, or if there is entered, (x) any modification or extension of this Final Order without the prior written consent of the Lender, or (y) an order converting or dismissing the Chapter 11 Case.

33.    **Non-Material Modifications of the Loan Documents.**  The Debtor and the Lender are hereby authorized to implement, in accordance with the terms of the Loan Documents and this Final Order, any non-material modifications of the Loan Documents without further order of this Bankruptcy Court; *provided* that the Debtor shall provide notice of any such modifications to counsel for the Committee and the U.S. Trustee.

24

34.   **Protection Under Section 364(e)**.  If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the (i) validity of any DIP Obligations owing to the Lender incurred prior to the actual receipt by both Lender of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the Loan Documents with respect to any DIP Obligations.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations by the Debtor prior to the actual receipt by both Lender of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Final Order, and the Loan Documents and any paperwork issued pursuant to and in conformance therewith, and the Lender shall be entitled to all of the rights, remedies, protections and benefits granted under Section 364(e) of the Bankruptcy Code, this Final Order  and the Loan Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations.

35.   **Choice of Law; Jurisdiction; Standing**.   The DIP Financing and the Loan Documents and any paperwork issued pursuant to and in conformance therewith, (and the rights and obligations of the parties thereto) shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to the conflict of law principles thereof. Each party to the Loan Documents will waive the rights to trial by jury and will consent to jurisdiction of the Bankruptcy Court for so long as the Chapter 11 Case remains open and, thereafter, the state and federal courts set forth in the Loan Documents executed between and among the parties.  The Lender shall have standing, as a party-in-interest under Section 1109(b) of the Bankruptcy Code, to raise and appear and be heard on any issue in the Chapter 11 Case.

36.   **Findings of Fact and Conclusions of Law**.  This Final Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the entry thereof.  Findings of fact shall be construed as conclusions of law, and conclusions of law be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

37.   **Final Order Effective**.   This Final Order shall take effect immediately

notwithstanding anything to the contrary prescribed by applicable law.

38. **Final Order Controlling; Failure to Specify Provisions**. The Loan Documents ar approved only to the extent they are consistent with the Terrm Sheet. In the event of a material conflict between this Final Order and the Loan Documents, the Final Order shall control, provided that there shall not be deemed a material conflict as a result of the Loan Documents including additional terms and provisions ~~from~~ not inconsistent with the Term Sheet and this Final Order, and the failure specifically to include any particular provisions of the Loan Documents in this Final Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court, and the Debtor and the Lender, that this Final Order and the Loan Documents be read together and consistent with one another, and that any paperwork issued pursuant to and in conformance therewith, are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Final Order.

39. **Interim Orders Superseded by this Final Order; Exceptions**. Except to the extent that that any of the Lender's and the DIP Agent's rights, remedies, claims, security interests and priorities granted by the Bankruptcy Court during the period from the Petition Date to the entry of this Final Order would be diminished in any way, the Interim Orders are superseded by this Final Order.

40. **Retention of Jurisdiction**. The Bankruptcy Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Final Order.

**IT IS SO ORDERED.**

Submitted by:

SCHWARTZ LAW, PLLC

By: /s/_____
Samuel A. Schwartz, Esq.
601 East Bridger Avenue
Las Vegas, NV 89101

*Proposed Attorneys for the Debtor*

Approved/Disapproved:

TRACY HOPE DAVIS
UNITED STATES TRUSTEE

By: /s/_____
Jared A. Day, Esq.
United States Department of Justice
Attorney for the United States Trustee

Approved/Disapproved:

GARMAN TURNER GORDON

By: /s/_____
Gregory Garman, Esq.
William Noall, Esq.

26

Mark M. Weisenmiller, Esq.
Attorneys for Empery Tax Efficient, L.P.

PACHULSKI STANG ZIEHL & JONES LLP

By: /s/_____
John Fiero, Esq.
Jason Rosell, Esq.
Attorneys for the Official Committee
of Unsecured Creditors

Approved/Disapproved:

LEWIS ROCA ROTHGERBER CHRISTIE LLP

By: /s/_____
Ogonna Brown, Esq.
Attorneys for Prestige Capital Finance, LLC

Approved/Disapproved:

Approved/Disapproved:

JEFFREY D. STERNKLAR LLC

By: /s/_____
Jeffrey D. Sternklar, Esq.
Attorneys for White Winston Select
Asset Funds, LLC

1
2
3
4

## **LR 9021 CERTIFICATION**

5

In accordance with LR 9021, counsel submitting this document certifies that the order

6

accurately reflects the court's ruling and that:

7

☐        The court has waived the requirement set forth in LR 9021(b)(1).

8
9

☐        No party appeared at the hearing or filed an objection to the motion.

10

☒        I have delivered a copy of this proposed order to all counsel and any unrepresented
parties who appeared at the hearing, except those as to whom review was waived on the
record at the hearing, and each has approved or disapproved the order, or failed to
respond, as indicated above:

11
12
13

☐        I certify that this is a case under Chapter 7 or 13, that I have served a copy of this
order with the motion pursuant to LR 9014(g), and that no party has objected to the form
or content of this order.

14
15

*###*

16
17
18
19
20
21
22
23
24
25
26
27
28

## EXHIBIT B

| Order of Priority | DIP Collateral Consisting of Pre-Petition Factoring Priority Collateral[4] | DIP Collateral Consisting of Post-Petition Factored Accounts | DIP Collateral Consisting of Post-Petition DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory[5] | DIP Collateral Not Consisting of Factored Accounts or DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory | Third-Party Encumbered Assets[6] | Unencumbered Assets | Superpriority Claims |
|---|---|---|---|---|---|---|---|
| 1st | Carve-Out and Permitted Liens[7] | Carve-Out and Permitted Liens | DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens | Carve-Out and Permitted Liens | Third-Party Existing Liens | Carve-Out | Carve-Out and Permitted Liens |
| 2nd | Prestige Liens[8] | DIP Factoring Liens | Carve-Out and Permitted Liens | DIP Note Liens and Prepetition Notes Adequate Protection Liens | Carve-Out | DIP Note Liens, DIP Factoring Liens, DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens, and Prepetition Notes Adequate Protection Liens | DIP Notes Superpriority Claim and DIP Factoring Superpriority Claim, DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Superpriority Claim |
| 3rd | DIP Note Liens, | DIP Note | DIP Note | DIP Factoring | DIP Note | Prestige | Prepetition |

[4]    As defined in the Intercreditor Agreement, dated as of October 13, 2021 (the "**Prestige Intercreditor Agreement**"), among Prestige, Empery, as Notes Representative on behalf of the Prepetition Noteholders and Prepetition Collateral Agent, and the Note Parties.

[5]    "**DIP Note Purchasers Financed Inventory**" shall mean DIP Collateral made up of the specific inventory items financed by the DIP Inventory Acquisition Line of Credit.

[6]    "**Third-Party Encumbered Assets**" shall mean DIP Collateral that was, as of the Petition Date, subject to valid, properly perfected, non-avoidable, and senior liens or security interests (excluding subordinated liens pursuant to existing agreements) (collectively, the "**Third-Party Existing Liens**") other than the liens and security interests granted pursuant to the Prepetition Security Agreement (the "**Prepetition Notes Liens**") and the Prestige Liens (as defined below).

[7]    "**Permitted Liens**" shall mean any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Notes Liens and Prestige Liens.

[8]    "**Prestige Liens**" shall mean any valid, properly perfected and non-avoidable liens on or security interests in the Factoring Collateral created by the Factoring Security Documents (each as defined in the Prestige Intercreditor Agreement).

|  | | | | | | | |
|---|---|---|---|---|---|---|---|
|  | DIP Factoring Liens, DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens, and Prepetition Notes Adequate Protection Liens | Liens, DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens | Liens, DIP Factoring Liens, and Prepetition Notes Adequate Protection Liens | Liens, DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens | Liens, DIP Factoring Liens, DIP Inventory Acquisition Line of Credit Purchasers Financed Inventory Liens and Prepetition Notes Adequate Protection Liens | Adequate Protection Liens[9] | Notes Adequate Protection Claim and Prestige Adequate Protection Claim |
| 4th | Prepetition Notes Liens | Prestige Adequate Protection Liens | Prepetition Notes Liens | Prepetition Notes Liens | Prestige Adequate Protection Liens[9] | | |
| 5th | | Prepetition Notes Adequate Protection Liens | Prestige Adequate Protection Liens[9] | Prestige Adequate Protection Liens[9] | | | |
| 6th | | Prepetition Notes Liens | Prestige Liens | Prestige Liens | | | |

[9] Subject to Prestige's rights under paragraph 20 of this Order.

# EXHIBIT B

                    UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEVADA (LAS VEGAS)

                                        .
IN RE:                                  .   Case No. 22-14422-nmc
                                        .   Chapter 11
MUSCLEPHARM CORPORATION,                .
                                        .   300 Las Vegas Blvd. South
                                        .   Las Vegas, NV 89101
                    Debtor.             .
                                        .   Thursday, February 9, 2023
. . . . . . . . . . . . . . . . .       .   10:39 a.m.


TRANSCRIPT OF CHAPTER 11 FIRST DAY MOTIONS EMERGENCY MOTION FOR
  ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTOR TO
OBTAIN POST-PETITION FINANCING, (II) GRANTING PRIMING LIENS AND
  ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE DEBTORS
USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, AND
(V) GRANTING RELATED RELIEF WITH PROPOSED ORDER FILED BY SAMUEL
      A. SCHWARTZ ON BEHALF OF MUSCLEPHARM CORPORATION [33];
  CHAPTER 11 FIRST DAY MOTIONS MOTION FOR AN ORDER AUTHORIZING
  MAINTENANCE OF EXISTING BANK ACCOUNTS, MERCHANT PROCESSING
  ACCOUNTS, AND RELATED RELIEF WITH PROPOSED ORDER FILED BY
SAMUEL A. SCHWARTZ ON BEHALF OF MUSCLEPHARM CORPORATION [13];
  CHAPTER 11 FIRST DAY MOTIONS DEBTORS MOTION FOR ENTRY OF AN
ORDER (I) AUTHORIZING, BUT NOT DIRECTING, DEBTOR TO PAY, INTER
  ALIA, PREPETITION EMPLOYEE WAGES AND (II) GRANTING RELATED
  RELIEF WITH PROPOSED ORDER FILED BY SAMUEL A. SCHWARTZ ON
              BEHALF OF MUSCLEPHARM CORPORATION [14];
      APPLICATION TO EMPLOY PORTAGE POINT PARTNERS, LLC AS
RESTRUCTURING ADVISORS APPLICATION FOR ENTRY OF AN ORDER UNDER
11 U.S.C. 327(A), 328, 330, AND 331 AND FED. R. BANKR. P. 2014
 AND 2016 AUTHORIZING THE EMPLOYMENT AND RETENTION OF PORTAGE
 POINT PARTNERS, LLC AS RESTRUCTURING ADVISORS FOR THE DEBTOR
WITH PROPOSED ORDER FILED BY SAMUEL A. SCHWARTZ ON BEHALF OF
              MUSCLEPHARM CORPORATION [41]
          BEFORE THE HONORABLE NATALIE M. COX
          UNITED STATES BANKRUPTCY COURT JUDGE


Audio Operator:          Benji Rawling, ECR

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES:

For the Debtor:                   Schwartz Law, PLLC
                                  By:  SAMUEL A. SCHWARTZ, ESQ.
                                       BRYAN A. LINDSEY, ESQ.
                                       ATHANASIOS AGELAKOPOULOS, ESQ.
                                  601 East Bridger Avenue
                                  Las Vegas, NV 89101
                                  (702) 802-2207


For the Official                 Pachulski Stang Ziehl & Jones
Committee of Unsecured           By:  JOHN FIERO, ESQ.
Creditors:                            JASON ROSELL, ESQ.
                                 One Sansome Street, Suite 3430
                                 San Francisco, CA 94104
                                 (415) 263-7000


For Ryan Drexler:                Carlyon Cica Chtd.
                                 By:  DAWN CICA, ESQ.
                                 265 E. Warm Springs, Suite 107
                                 Las Vegas, NV  89119
                                 (702) 685-4444


                                 Steinhilber Swanson LLP
                                 By:  MICHAEL RICHMAN, ESQ.
                                 122 W. Washington Avenue, #850
                                 Madison, WI 58703
                                 (608) 406-6508


For Empery Tax                   Garman Turner Gordon
Efficient, LP:                   By:  GREG GARMAN, ESQ.
                                      MARK WEISENMILLER, ESQ.
                                      WILLIAM M. NOALL, ESQ.
                                 7251 Amigo Street, Suite 210
                                 Las Vegas, NV 89119
                                 (725) 777-3000


For Prestige Capital             Mandelbaum Barrett, Attorneys at Law
Corporation:                     By:  VINCENT J. ROLDAN, ESQ.
                                 3 Becker Farm Road, Suite 105
                                 Roseland, NJ 07068
                                 (973) 974-9815


For the U.S. Trustee:            Office of the United States Trustee
                                 By:  JARED DAY, ESQ.
                                 300 Booth Street, Room 3009
                                 Reno, NV 89509
                                 (775) 784-5335

APPEARANCES (Continued):

For White Winston              BART K. LARSEN, ESQ.
Select Asset Funds,            1731 Village Ctr. Cr., Suite 150
LLC                            Las Vegas, NV  89134
                               (702) 471-7432

                               Jeffrey D. Sternklar, LLC
                               By:  JEFFREY D. STERNKLAR, ESQ.
                               101 Federal Street, Suite 1900
                               Boston, MA 02210
                               (617) 396-4515

For Excelsior                  Sylvester & Polednak
Nutrition:                     By:  ALLYSON R. JOHNSON, ESQ.
                               1731 Village Center Circle
                               Las Vegas, NV 89134
                               (702) 952-5200

Also Present:                  RYAN LANE
                               TIM SILVER
                               Empery Tax Efficient LP

                               TODD ENRIGHT
                               White Winston

                               NICHOLAS RUBIN
                               PAUL KARR
                               ERIC HILLMAN
                               MusclePharm Corporation

1          (Proceedings commence at 10:39 a.m.)

2          THE CLERK:  MusclePharm Corporation, Case Number

3  22-14422.

4          THE COURT:  All right.  Good morning.  I'll just go

5  through here as I see you on the screen and you can make your

6  appearance.  Next to me there is somebody who is not on video,

7  so I'm assuming they're not making an appearance.

8          So I'll move to John Fiero.  If you would, please,

9  make your appearance.

10         MR. FIERO:  Good morning, Your Honor.  It's John

11  Fiero of Pachulski, Stang, Ziehl & Jones, for the Creditors'

12  Committee.  And with me today in the virtual courtroom is Jason

13  Rosell.

14         MR. ROSELL:  Good morning, Your Honor.

15         THE COURT:  Good morning to you both.

16         All right, Mr. Sternklar.

17         MR. STERNKLAR:  Good morning, Your Honor.  Jeffrey

18  Sternklar for White Winston Select Asset Funds, LLC.  And with

19  me in the courtroom -- virtual courtroom today is Mr. Larsen,

20  our Nevada co-counsel; Mr. Todd Enright, our affiant; and also

21  with me are two attorneys who are going to be litigation co-

22  counsel, Mr. Harry Murphy and Mr. Charlie Bennett.  They are on

23  the telephone.  They are not licensed in Nevada.  Their pro hac

24  vice motions should be filed shortly.  I would ask, if

25  necessary, Your Honor, if you'll allow them to be heard today.

```
1              THE COURT:  Yes, that's fine.

2              MR. STERNKLAR:  Thank you, Your Honor.

3              THE COURT:  You're welcome.

4              All right.  Mr. Day.

5              MR. DAY:  Good morning, Your Honor.  Jared Day,

6    Department of Justice, appearing for the United States Trustee.

7              THE COURT:  Good morning.

8              All right.  Ms. Cica, please make your appearance.

9              MS. CICA:  Good morning, Your Honor.  Dawn Cica for

10   Ryan Drexler.  And also on the phone is Michael Richman,

11   litigation counsel.

12             MR. RICHMAN:  Good morning, Your Honor.

13             THE COURT:  Good morning.

14             All right.  Mr. Larsen.

15             MR. LARSEN:  Good morning, Your Honor.  Bart Larsen,

16   local counsel for White Winston Select Asset Funds, LLC.

17             THE COURT:  All right.  Mr. Schwartz.

18             MR. SCHWARTZ:  Good morning, Your Honor.  Sam

19   Schwartz and Schwartz Law on behalf of the debtor.  Also on the

20   line today, I believe, is Mr. Nicholas Rubin and Mr. Paul Karr,

21   two of the directors.  I believe Mr. Eric Hillman will also be

22   on the line, but -- I did not see him on when we started, but

23   he may be here, as well.

24             THE COURT:  All right.  Good morning.

25             And Mr. Garman.
```

1          MR. GARMAN:  Good morning, Your Honor.  Greg Garman,

2    Bill Noall, and Mark Weisenmiller, on behalf of Empery.  Also

3    on the call are Tim Silver, who is our declarant, and then

4    Mr. Ryan Lane, who's a principal of Empery.

5          THE COURT:  Good morning.

6          Mr. Roldan.

7          MR. ROLDAN:  Good morning, Your Honor.  This is

8    Vincent Roldan at Mandelbaum Barrett, counsel to Prestige

9    Capital Finance.

10          THE COURT:  Good morning.

11          All right.  Mr. Richman, I've heard from you.

12          Mr. Weisenmiller, did you want to make your

13    appearance, as well?

14          MR. WEISENMILLER:  Good morning, Your Honor.  Mark

15    Weisenmiller of Garman Turner Gordon, here on behalf of Empery

16    Tax Efficient, LP.  Thank you.

17          THE COURT:  Thank you.

18          Ms. Johnson.

19       (No audible response)

20          THE COURT:  Ms. Johnson, I'll come back.  I have one

21    other person on the screen.

22          Mr. Rubin, I apologize.  I don't recall if you're an

23    attorney or which party you're with.  So, if you would let me

24    know; and if you are an attorney and want to make your

25    appearance, please do so.

1          MR. RUBIN:  I'm not an attorney, Your Honor.

2   Nicholas Rubin.  I'm the independent director for MusclePharm.

3          THE COURT:  Oh, okay.  All right.  Thank you.

4          All right.  Ms. Johnson, I see that -- your

5   appearance.  Do you want to work on your sound?  Do you need to

6   be heard today?

7      (No audible response)

8          THE COURT:  Okay.  All right then.

9          All right.  Well, Mr. Schwartz, why don't you give me

10  an idea of where we're at and what's going to happen today.

11         MR. SCHWARTZ:  Certainly.  Thank you, Your Honor.

12  And I just want to clarify that Ms. Gabby Hamm, Bryan Lindsey,

13  and Athanasios Agelakopoulos of Schwartz Law are also on the

14  line.

15         So, Your Honor, I'm happy to report that, with a lot

16  of back and forth, we have an agreement in principal with

17  respect to the DIP financing, which I believe is Item 1 on your

18  calendar.

19         My plan today was to put that agreement on the

20  record; walk through what I think are some of the improved and

21  finer points of the financing that's been negotiated since last

22  we were in front of you; answer any questions the Court may

23  have; allow parties to make any statements they may need to

24  make.  And then, I think, Your Honor, the balance of your

25  docket is fairly uncontroversial, what's left.  So, if that

1    pleases the Court, I would proceed in that fashion.

2            THE COURT:  So it is a settlement with all parties

3    then, all of -- I mean, I know White Winston filed an

4    objection.  The Committee had a limited objection.  Is that

5    resolved, with what you're going to tell me today?

6            MR. SCHWARTZ:  Thank you, Your Honor.  Yes.  That is

7    my understanding, as well, that the Committee's objection is

8    resolved.  The White Winston objection, with the

9    representations on the record, will be withdrawn.  And we will

10   be able to proceed forward, Your Honor, with respect to the

11   financing as proposed.

12           THE COURT:  I really didn't expect that, but that's

13   good news.  I would like to hear that.

14           MR. SCHWARTZ:  Thank you, Your Honor.  I don't know

15   that any of us did.  I think I said to Mr. Sternklar last night

16   that I was pretty sure a pig just flew by my window, but (audio

17   interference) to confirm it first before we said that for sure.

18           So, Your Honor, so the -- a key part of the financing

19   that's proposed is the ability of the Committee, as well as

20   White Winston, to propose or to file challenges to that

21   financing.  And so the term sheet that's in front of you has a

22   carveout of 60 days for the Committee to file its challenge,

23   and 30 days for White Winston to file a challenge.  And it

24   would be to the prepetition claims, Your Honor.  Certainly no

25   one is raising a challenge to the post-petition financing.  The

1   Court will be approving.  However, if there is a challenge to

2   the prepetition claims, want to be clear what that effect will

3   have as the case goes forward.  And so we'll put those in the

4   record for you, Your Honor.

5           If -- and I think, Your Honor, the Committee's

6   challenge rights and the effect of that are subsumed in the

7   term sheet and the documents.  I don't think there's any

8   dispute about what happens if the term sheet -- or, I'm sorry

9   -- if the Committee files a challenge.  But if White Winston

10  files a challenge or an objection to Empery's prepetition

11  claim:  number one, that prepetition claim would -- shall not

12  be deemed allowed, to the extent objected to, absent Empery

13  obtaining a further order of the Court, or unless the objection

14  is withdrawn.  So, if White Winston files an objection, Your

15  Honor, to the prepetition claim, to the extent of that

16  objection -- they may not object to everything -- to the extent

17  of that objection, then Empery's claim would not be allowed,

18  unless there's a further order of the Court.

19          Two, if White Winston objects to Empery's prepetition

20  claim, Empery shall not be entitled to credit bid that

21  prepetition claim.  Again, to the extent objected to, absent a

22  final order of the Court resolving it -- or some (audio

23  interference) I should say -- further order of the Court, not

24  final order, or unless the objection is withdrawn.

25          Three, if White Winston objects to the Empery

1  prepetition claim and a sale of the debtor's assets occurs

2  before the claim is resolved, the proceeds will be held by the

3  estate, to the extent of the objection, absent Empery obtaining

4  further order of the bankruptcy court, or unless the objection

5  is withdrawn.

6          And last, the releases that are contained in the term

7  sheet, which are intended to be incorporated into the DIP loan

8  documents, are not a defense to a claim objection brought by

9  White Winston in the bankruptcy court.  Again, if such

10 objection is brought during the challenge period, as defined in

11 the term sheet -- so White Winston doesn't want to hear Empery

12 say, well, that's nice that you objected, but we have releases.

13         So, generally speaking, Your Honor, the purpose of

14 that language is to make clear that if White Winston objects --

15 and they have under the term sheet presently until March 9th to

16 do that -- they object, and there's a sale that comes along --

17 I know the Court was concerned about the timing of when a sale

18 may occur -- the poison pills you've heard about, I think those

19 issues -- the purpose of the language from the debtor's

20 perspective is to preserve the parties' rights, that while a

21 sale was going forward or some other matter, absent further

22 order of the Court or a withdrawal of the objection, the

23 parties would be in front of you and the Court would resolve

24 issues related to credit bidding, to payment of claims, all

25 those matters, which I think, Your Honor, frankly, is the law.

1           So we were happy to get that accommodation done and

2  there's been quite a bit up and back.  So, Your Honor, a couple

3  of points of clarification to make sure it's clear.  The

4  parties agree that any money that would be rolled up is part of

5  the prepetition claim.  To the extent there's an objection to

6  the prepetition claim, that would -- could have an impact on

7  the rollup, again, to the extent of the objection and subject

8  to further order of the Court.

9           The DIP documents, as I highlighted earlier, will be

10  consistent with these representations.  And Your Honor -- and

11  the parties have agreed these representations and agreements

12  will be incorporated into the final order approving DIP

13  financing, and everyone's rights under Rule 9021 are preserved,

14  of course.

15           So, with that as a backdrop, Your Honor, and subject

16  to maybe what perhaps Mr. Garman, Mr. Sternklar, or Mr. Fiero

17  or Mr. Rosell -- whichever is going to speak for the Committee,

18  wish to say, that's the crux of the agreement, Your Honor, that

19  allows us to resolve or withdraw objections today; and then I

20  can go forward maybe into a little more of the meat of the

21  revised term sheet.

22           THE COURT:  All right.  Yes, Mr. Sternklar.  You want

23  to respond?

24           MR. STERNKLAR:  Thank you, Your Honor.  I think

25  Mr. Schwartz accurately set forth the terms of our deal in

1  principal.  We obviously still have always believed our

2  proposal was superior, but the debtor clearly is going in a

3  different direction, and we think that this proposal eliminates

4  our principal concerns for what we call the poison pills.

5          Your Honor, just to emphasize some of the points I

6  believe Mr. Schwartz noted, the proposed order will say that

7  essentially notwithstanding anything in the term sheet, these

8  provisions will govern the scope of the authorization the Court

9  is going to be asked to give.

10          We may need to come back to you if we find we have

11  disputes about the form of order.  We hope we can avoid that.

12  It wasn't fun the last time, and no one thinks it's fun this

13  time.  But you know, I don't want to be confronted with an

14  order that we have no input into.  So, if that happens and

15  we're back in front of you, or for any reason we're back in

16  front of you, I particularly -- as someone who doesn't practice

17  regularly in your court, if there's something in particular you

18  want done, we'd like to be sure we do it.

19          Similarly, we may be back in front of you with

20  respect to the timing of March 9th.  We're probably going to

21  need more time than that.  If we can't get it by agreement, we

22  expect we'll be back in front of you on shortened notice

23  seeking more timing than March 9th.

24          And of lesser importance, but still things that I

25  think need to be done, there were -- I assume Mr. Schwartz will

1    get to this -- a couple other things he was going to clarify.

2    Particularly, there's a reference in the term sheet to Section

3    541 claims, and I for one have no earthly idea what that refers

4    to.  And Mr. Schwartz was going to clarify that -- what that

5    meant, on the record.

6              And in terms of timing, Your Honor, on a more

7    personal matter, I had a longstanding family vacation scheduled

8    beginning tomorrow that will keep me out of the office until

9    Wednesday, so I'd be grateful for any accommodations Your Honor

10   can give me, so I don't have to interrupt a family vacation.

11             I think that's largely it, Your Honor.  Thank you.

12   And I'll answer any questions you have.

13             THE COURT:  All right.  Thank you.  I don't have any

14   at the moment.

15             Mr. Fiero, are you speaking or is it going to be

16   Mr. Rosell?

17             MR. FIERO:  Yes, Your Honor.  It's John Fiero for the

18   Committee.  Mr. Schwartz accurately described the Committee's

19   position.  We did file a limited objection.  The vast majority

20   of our concerns have been addressed.  And to the extent that

21   they have not been, we're okay with the outcome at this point,

22   subject to two things, which we raised in our very brief

23   pleading and which Mr. Sternklar has a similar concern about.

24   And that's simply what do the DIP loan documents say, and what

25   does the DIP order say.

1          And so, on those two, we may need to pick a nit or

2   two, but we're hopeful that that won't be the case.  In the

3   first go-round, Your Honor, the Committee had no issues with

4   the order, and instead found itself trying to convince others

5   that, you know, the language in the order was acceptable.

6          So we're here to work with the debtor, we look

7   forward to this financing being in place, and we don't intend

8   to raise any objections today at today's hearing.

9          THE COURT:  All right.  Thank you.

10         Mr. Day, I don't believe that the U.S. Trustee's

11  office had filed any opposition, but I'll give you an

12  opportunity to be heard, if you'd like, on this.

13         MR. DAY:  Thank you, Your Honor.  And that's correct.

14  We did not and we don't have anything further to add with

15  regard to this particular motion.

16         THE COURT:  All right.  Thank you.

17         Mr. Garman.

18         MR. GARMAN:  Yes, Your Honor.  Quickly, I think I'm

19  going to address these a bit separately.  So we've made

20  meaningful concessions allowing White Winston to object to our

21  claim.  More money.  The independent director came in and made

22  certain requests.  We had really, really constructive,

23  face-to-face meetings with the Committee, I think, to alleviate

24  their concerns.  I think those are -- I think these are pretty

25  strong working relationships.  I do think everyone's working

1   towards this debtor getting its feet back under it, and

2   hopefully working towards a positive resolution here.

3           The words that Mr. Schwartz read were careful.  I can

4   assure the Court that the order will faithfully put those words

5   into it.  I believe -- we have a 28-day page binding term sheet

6   here.  This isn't a one-page term sheet.  We know what these

7   terms are.  I am confident that you're going to see loan

8   documents that are faithful to this term sheet, faithful to the

9   resolution that was put on the record this morning.

10          I, like Mr. Sternklar, am optimistic that we're not

11  going to be back in front of you.  I think we all know where

12  we're going.  But the parties worked late -- worked late into

13  the night, early in the morning, to find a resolution to get us

14  here, because this debtor needs to get moving if it's going to

15  get out of bankruptcy.  And I just wanted to highlight that

16  we've made a lot of meaningful, additional concessions.  And I

17  think Mr. Sternklar's concerns -- again, I know he doesn't like

18  it, but I think his concerns have been addressed in those

19  careful words that Mr. Schwartz addressed, and they will be in

20  the order, and we will all live to either get along or fight

21  another day moving this debtor forward.

22          THE COURT:  All right.  Thank you.

23          Is there anybody that I've missed that wanted to be

24  heard?  Mr. Roldan, go ahead.

25          MR. ROLDAN:  Yes, Your Honor.  Hi there.  I have no

1   comment on the resolution with White Winston.  I did have --

2   I'm pleased to hear that the objections have been resolved.

3          If we're -- I did have separate comments to the DIP

4   in general and the proposed order.  I wasn't sure if right now

5   is the appropriate time to do that.  These are issues

6   pertaining strictly to Prestige and adequate protection.  I'm

7   happy to wait and allow the debtor to present the rest of its

8   case with respect to the DIP motion, or I'll just bring up our

9   issues right now.  I do believe that these issues have been

10  resolved.

11         THE COURT:  That's fine.  You can go ahead and state

12  it now.

13         MR. ROLDAN:  Yes.  Thank you, Your Honor.  My issues

14  are pretty discrete with respect to the adequate protection.

15  Prestige is a prepetition factor.  We have a first lien on all

16  prepetition accounts receivable.  We had -- the first -- the

17  initial DIP orders had provisions with respect to adequate

18  protection and use of cash collateral.  Those DIP orders didn't

19  contemplate use of prepetition AR.

20         Now that there is AR that is being collected, we had

21  discussion with the debtor that we're not protected with

22  respect to if the debtor were to use that prepetition AR.  And

23  so we had some informal discussions with the debtor, and I

24  believe there's a resolution that Prestige is able to collect

25  that prepetition AR and allow it to reduce its prepetition

 1  claim.

 2          There was one other adequate protection comment.  The

 3  existing term sheet gives Empery reasonable fees and expenses

 4  with respect to its -- on the prepetition portion of its claim,

 5  and we just ask the debtor for likewise protection as further

 6  adequate protection for Prestige.  And I believe that the

 7  debtor is amenable to that.

 8          THE COURT:  Anything else, Mr. Roldan?

 9          MR. ROLDAN:  All right.  Thank you.

10          All right, Mr. Schwartz.  I believe it's back to you

11  now, if you want to --

12          MR. SCHWARTZ:  Thank you.

13          THE COURT:  -- continue on with the term sheet.

14          MR. SCHWARTZ:  Thank you, Your Honor.  So I think the

15  key highlights of the improvements that were made are in the

16  chart that we had on Pages 2 to 3 of our reply at Docket 213.

17          THE COURT:  Hold on one second.  So you're not

18  looking at the Exhibit 1, the redline.

19          MR. SCHWARTZ:  I was going to give, Your Honor, the

20  summary of what occurred, and see what questions the Court may

21  have.  We have, generally, the parties confirming that there's

22  an agreement today.  I thought I would go through the

23  highlights.  And then, Your Honor, I'd go as far into the weeds

24  as the Court would like.

25          THE COURT:  Just let me get there.  I only have the

1    chart up.  I don't have everything else up.  So one second.

2        (Pause)

3            THE COURT:  All right.  I'm there.  Go ahead.

4            MR. SCHWARTZ:  So, Your Honor, as the Court, I'm

5    sure, recalls from the prior hearing, one of the concerns that

6    White Winston and I think the Committee voiced were fears that

7    what happens to this debtor, you know, after April, May of next

8    year, and that it was forecasting to be -- forecast to be cash

9    flow negative.  We're starting up in general, Your Honor.  We

10   have startup costs.  We have to build inventory.  And I'll come

11   back to that.  You know, we have overhead.  We have revenues

12   that are just beginning to pick back up.  I mean, the company

13   really had stopped operating at the end of last year.

14           So we have negotiated a transaction that allows the

15   debtor to be funded, and I would submit, Your Honor, throughout

16   the year, provided it hits certain benchmarks.  So the first,

17   Your Honor, is that the revised term sheet provides $2 million

18   of additional financing if the debtor becomes EBITDA positive.

19   And what's important about -- I applaud Mr. Rubin here in

20   actually proposing and helping negotiate this particular term

21   -- in that, you know, the fear of all parties is that -- and

22   including the Committee -- is that the debtor operates and

23   continues to just turn losses, and we're just paying

24   restructuring costs, and what are we really doing in this case

25   if the debtor's not beginning to turn around and operate

1  successfully.

2        So what we developed -- was a good thing, actually,

3  Your Honor, the Turnaround Management Association was here last

4  week, and allowed us to have an in-person meeting to flesh out

5  some of these things.  Funny how that works.  And so we fleshed

6  out the EBITDA test, which -- it's an accrual-based test that

7  will be used to -- initially to forecast what the debtor

8  anticipates will be profitability, excluding extraordinary

9  items, you know, restructuring costs, the things that would not

10  be involved in the debtor's operations, if you will, if it

11  wasn't in bankruptcy.

12        So, assuming the debtor's beginning to move in the

13  right direction there, the debtor can unlock financing.  The

14  first test will be at the end of May.  And so -- and it has to

15  forecast that, at the end of June, the debtor will be, again,

16  EBITDA positive, on an accrual basis, excluding all of these

17  matters.  It also has to forecast that the debtor would be

18  EBITDA positive, again on this accrual basis, from June, July,

19  and August.  We're looking at a 30-day period and at a 90-day

20  period.

21        And assuming the debtor can achieve that forecast,

22  then Empery will unlock $500,000 of financing, on or about June

23  5th of this year, which largely fills what the projected

24  negative balance will be from an estate perspective, what's in

25  the budget.

1            Then, on every month going forward, in June --

2  again, we have then next the June test.  There was a May test,

3  Your Honor, that is for June forecast; and then the three

4  months, June-July-August forecast.  Then, again, in June, we

5  look at what was June actual.  And then we forecast August.

6  And we do that every month, so -- for the rest of the case.

7            So, as long as in each month that actual month is

8  EBITDA positive under the test, and then forecast the following

9  month to be EBITDA positive, Empery will unlock another half

10  million dollars of funding each month.  So at a half million

11  dollars in June, and a quarter of a million dollars per month

12  through December, it's a total of $2 million in financing.

13            So it allows, you know, for some thoughtful testing.

14  It allows us to get the company moving.  It excludes the costs

15  that will go away when the company comes out of bankruptcy, and

16  allows us to get to a thoughtful place, you know, throughout

17  the case.

18            If not, Your Honor, then we swing to a sale.  Empery

19  will put up up to a half million dollars in financing if we

20  have to swing to a sale.  There are some carveouts that go with

21  that, depending where we are in the budget.  But so there's

22  money that if we have to swing to a sale, we swing to a sale.

23            So, largely, Your Honor, we think -- I think from the

24  professionals' perspective, it's sufficient financing.  If

25  things don't look good in May and we have to go to a sale,

1    we'll go to a sale.  So -- or anywhere along that arc.  But

2    you know, the -- probably the lowest point, Your Honor, in the

3    arc will be May-June, when the company projects to be between

4    5- and $600,000 cash flow negative, and the first 500 would

5    come in.  That's about the low point, we think.  But you know,

6    from the professionals' perspective, again, it's manageable.

7    So that's part one.

8             Two, Empery's also providing a million dollars of

9    inventory financing.  And so that's important, Your Honor, just

10   from a pure operational perspective.  You know, when you talk

11   to the sales team, and certainly Mr. Hillman, you know, he

12   thinks our forecast and sales are readily achievable provided

13   we have inventory we can actually sell to people.

14            So, you know, one of the biggest concerns the company

15   had was, well, great, we can sell, but when can we deliver?

16   And so Empery has agreed that as soon as the debtor asks for or

17   says it's ready for inventory financing, it will provide it, on

18   an as-needed basis, up to a million dollars.

19            In addition, Your Honor, what was negotiated in the

20   term sheet is that our supplier and co-packer, JW Nutritional,

21   who's holding inventory now, has also said it will provide the

22   debtor at its cost not only $1 million of inventory, it will

23   hold it for us.

24            So the debtor now has effectively inventory

25   facilities that allow it to build up to $2 million of inventory

1   at a cost basis.  And so, when you start talking about

2   $2 million of inventory, that the debtor could ultimately sell

3   and deliver, we believe -- you know, talking again with the

4   company and just looking at the overall prospects, the debtor

5   can ramp up inventory production quicker and then begin to

6   deliver quicker.  We think the sale projections that are in the

7   budget now can be exceeded.

8           So what's important about that, Your Honor, is that

9   the debtor believes it has something between a 20 and 30

10  percent margin with its products.  And that margin needs to

11  move up.  The debtor decided to forego rate increases and price

12  increases during the pandemic when competitors were raising

13  prices, and so there are some price increases we need to push

14  through into the market, and I think -- our understanding is

15  everyone expects those price increases are coming.  As the

16  Court knows, the cost of everything is up, so -- especially the

17  protein.

18          So cost increases will come.  We think our margins

19  will expand.  What that margin on $2 million of inventory,

20  Your Honor, basically fills, if you were to walk through the

21  budget, what is another roughly 5- or $600,000 gap.  Our 20 to

22  30 percent margin on that $2 million of inventory, which is 4-

23   to $600,000, now begins if not entirely fills the gap that we

24  forecast may exist through the course of the year, if we can

25  make it that far.  And if we can accelerate sales, because now

1  we can deliver, then suddenly we think we can exceed everything

2  that's in the budget.  And if not, Your Honor, again, we can't

3  pass the EBITDA test early in the year, we swing to a sale.

4         So, as you sit here, Your Honor, in the beginning of

5  February, with a company that's starting up, I'm not sure that

6  this particular debtor could ask for a whole lot more in terms

7  of what it would hope to have and the ability to turn its

8  business around, to operate, to manufacture, and to deliver.

9         So, Your Honor, those were, Your Honor, the big

10 financial components of what were negotiated over the course

11 of the last few weeks, with the help of everyone and it's --

12 you know, as the Court said, as much as you were surprised,

13 Your Honor, I will say all the parties have tried hard.  I

14 think there is a real belief there is a real business here.

15 And while, you know, the parties may not necessarily like each

16 other a whole lot, they certainly see the upside of the

17 operation and, you know, the economic interest of the parties,

18 I think, prevailed in this negotiation, which is encouraging,

19 at least for debtor's counsel.

20        I'll stop there for a second, you know, and highlight

21 -- I think that kind of tells you how the budget unfolds and

22 how we think it will play out through the course of the year.

23 The monthly operating reports will tell the story, I think, as

24 we work our way through the case.  The rest has remained the

25 same in terms of the plan filing and timing.  We still have

1  until September 30th to file a plan.  It needs to be confirmed

2  by December 15th.  We have until March 15th to provide the

3  final budget that we have to stick to on variances, of

4  90 percent of sales and 110 percent of expenses.  So all of

5  those types of benchmarks and components have not moved, at

6  all, in terms of what's in front of you; and the parties have

7  agreed, you know, we'll deal with it through the course of the

8  case.  Let's see how -- let's get the business going, and we

9  can decide what else we really need to fight about.

10         So, Your Honor, let me pause there and then --

11  because I think we've talked about credit bidding, which is

12  next in the chart, and I want to go to some of the other

13  pieces, unless the Court has questions.

14         THE COURT:  I don't have anything right now, so go

15  ahead.

16         MR. SCHWARTZ:  Thank you, Your Honor.  I was going to

17  let the record reflect you were shaking your head, so -- since

18  -- for the transcript.

19         So next, Your Honor, as Mr. Sternklar called them,

20  the "poison pills," we have reduced defaults and reduced

21  indemnity obligations.  If you recall, a real concern for I

22  think White Winston and for us was that it was a default if any

23  equity holders objected to Empery's claim.  And in addition,

24  the debtor had to pay Empery's fees and costs related to that.

25         So the term sheet and ultimately the DIP documents

1   now have carved those things out, so it is no longer a default

2   for White Winston to file its objection to the claim, for

3   Mr. Drexler to file litigation, which as the Court may have

4   seen at Docket 216, he has done this week.  The debtor no

5   longer has to pay for those costs.  So now it's an issue

6   between those parties.

7            So those were material changes, Your Honor.  Because

8   if those didn't come out, we would be in default today.  Right?

9   I mean, we would be having a much different discussion, not to

10  mention the costs that would be incurred necessarily to cover

11  that likely would tip over the budget again.

12           So those are material concessions, Your Honor,

13  because they're real issues that are happening.  And with White

14  Winston's, you know, upcoming objection, going to happen.  So

15  those changes occurred, Your Honor, and that was certainly a

16  win for the estate or two wins for the estate.

17           And then, to touch on Mr. Sternklar's 541 causes of

18  action comment, so the Chapter 5 causes of action are

19  necessarily carved out of the DIP collateral.  So the

20  collateral that belongs to Empery, that's been carved out.

21  547s, 548s, 544s.  That's all carved out.

22           What is -- not -- what is Empery's collateral would

23  be the commercial torts and the D&O claims, arguably, are

24  Empery's collateral.  However, Empery has agreed -- and that's

25  what are called the 541 claims, so it's basically everything

1   else that isn't carved out of DIP collateral.

2           So, if you look at the definition, the definition

3   says DIP collateral excludes Chapter 5 causes of action.  And

4   then the catch-all says to the extent the DIP collateral

5   includes 541 claims, which would be everything else, those

6   claims then are earmarked -- I think as Mr. Noall would call

7   it, or I would say subject to a waterfall -- they go to pay

8   unpaid professional fees, to the extent there are any, subject

9   to the budget.  There are then -- would pay then Empery's

10  post-petition claims, to the extent they were unpaid for any

11  reason.  And then it would waterfall, third, to unsecured

12  creditors.

13          So that's the concession to split what Mr. Sternklar

14  was asking about the 541s.  So, again, Chapter 5s are excluded

15  altogether.  Everything else, waterfalls.

16          So that, Your Honor, really are the key components of

17  the DIP financing that have changed since last we were here.

18  More money, fewer defaults, better rights for the parties to go

19  forward, and -- one other caveat, Your Honor, I forgot to

20  mention.

21          The debtor is going to agree with JW -- it's in the

22  term sheet -- and with Empery that they're going to help us

23  build inventory.  In the event we're building inventory and

24  there's a default along that arc that cannot be resolved and we

25  have to go to a sale, the debtor will give both JW and Empery a

1  license to use its intellectual property -- meaning really its

2  name -- to sell the product, because the product does expire.

3  It is not product that can sit on a shelf forever.

4         So, if there is a default and things go sideways, we

5  -- and there's a liquidation, if you will, Your Honor, and a

6  sale, then both those parties can liquidate their inventory and

7  protect themselves, so they don't run into, you know, expired

8  inventory and they're stuck.

9         And I think there are going to be some negotiations

10  between the parties that -- Empery, for example, if for

11  whatever reason it didn't want JW to be selling its inventory

12  at a cost or a price it wouldn't accept, it can buy it from JW,

13  and turn around and sell it itself.  So those parties may have

14  a side agreement in terms of how they'll handle the liquidation

15  of the inventory, but the debtor's amenable to that.

16         To the extent we're in a place where we're

17  liquidating, we don't want to see anyone suffer an unnecessary

18  loss, so the debtor will certainly license its name for the

19  limited purpose of selling that inventory to the extent it

20  exists.

21         And then with Prestige, Your Honor, to cover their --

22  we do believe that Prestige has a perfected first priority

23  interest in not only the debtor's receivables, but of -- really

24  a blanket lien in other assets.  They're, I think, behind

25  Empery in some senses, but -- with respect to intellectual

1    property.  But did have a blanket lien.  And it does appear

2    that Prestige is -- for lack of a better word, or expression --

3    over-advanced.  And so there are some receivables they did not

4    factor that are coming in that we do believe they have a lien

5    on.  So we have been working with Prestige from that

6    perspective.

7            We also agree that, to the extent Prestige has fees

8    and costs related to its collection of its prepetition -- its

9    prepetition claims, on the prepetition assets, it would be

10   entitled to those in accordance with its loan documents.  So

11   there's no dispute there.  And Mr. Roldan is right.  We've

12   agreed from that perspective; and actually, we've been working

13   together to collect a meaningful amount of AR that has been out

14   in the market now.

15           So we did look at that issue.  Thought maybe, Your

16   Honor, there might be a 552, you know, discussion to have

17   there.  But we don't think the equities tip in our favor in

18   terms of why Prestige is over-advanced.  So we didn't think

19   that was a hill to die on.

20           Also, Your Honor, Prestige, I believe, is working

21   with Empery with factoring for the debtor post-petition.  So we

22   will be doing work with Prestige -- it's anticipated we will,

23   anyway.  So, ultimately, back to just getting this debtor up

24   and running, and not just litigating to litigate.  We didn't

25   think that was the right place to pick a fight.

1          So, with that as a -- those additions, Your Honor,

2    and subject to questions of the Court, I think we are in a ripe

3    place to approve the financing.  I think, as the Court can

4    tell, there has been a good deal of negotiations, shuttle

5    diplomacy, up and back, to get to where we are today.  And the

6    parties I think -- to the extent they've got issues, they've

7    held their nose and said let's get this done and get moving.

8    And so, subject to Your Honor's questions, I think we're ready

9    to go.

10          THE COURT:  So then the chart on 213-1, all of those

11   changes, other than what you've -- to the extent they conflict

12   with what you've just told me -- are all agreed upon by all

13   parties.  Nobody's objecting to any of the other terms.  The

14   acceptable plan language, which was obviously a large part of

15   the objection, White Winston, all of those are as they are

16   now in this term sheet?  I'm looking at Page 13 of 31 on

17   Docket 213-1.

18          MR. SCHWARTZ:  Thank you, Your Honor.  Yes, they are.

19   As my understanding, either -- you know, White Winston, given

20   the representations on the record, is withdrawing its

21   objection.  The Committee is deeming its objection resolved.

22   And I think, Your Honor, what we gave you -- this is the

23   redline that shows from the last term sheet.  These are,

24   subject to the statements on the record today, are all approved

25   and agreed upon.  And the acceptable plan has been carved back,

1   as well, Your Honor, to be more we think what -- reasonable and

2   what the Court might expect to see.  And it's our view that if

3   there's a fight over whether there's a reasonable plan in front

4   of you, and we think there is and Empery thinks there isn't,

5   we'll be here, Your Honor.  You'll be deciding whether someone

6   is being reasonable or not.

7            So we don't think that's a material issue,

8   ultimately, because we know how it will get resolved.  So, yes,

9   Your Honor, that's right.  Our understanding is that the

10  acceptable plan provisions are all (indiscernible).

11           THE COURT:  All right.  Does anybody else want to be

12  heard on that?  Mr. Sternklar.

13           MR. STERNKLAR:  Thank you, Your Honor.  Jeffrey

14  Sternklar for White Winston.  We did object to the acceptable

15  plan language.  And every time we objected, they changed it.

16  We were happy to see that.

17           Right now, as we see it, there are really only two

18  significant components remaining in the acceptable plan

19  language that are potentially troublesome, but we think that we

20  can manage them.  One is the timing that the debtor must go to

21  a sale in September.  But we think September is probably enough

22  time for us to figure out what to do.  And if not, frankly,

23  we'll take Empery out or come to the debtor with money to try

24  to take them out.

25           Your Honor, before there is any sale, we obviously

1    want to protect and preserve any ability of this debtor to

2    monetize net operating losses.  And we expect between now and

3    September, well before September, we will get our arms around

4    what those net operating losses may be, and how to preserve

5    them -- if they can be preserved in a sale; if so, what

6    structure is necessary -- and come, hopefully, back to the

7    Court with a reasoned analysis and approach of those NOLs,

8    confirm they exist at all.

9            The second thing that is somewhat problematic in the

10   acceptable plan language is the right of Empery to object to

11   non-consensual plan treatment of its prepetition claim.  That

12   has been ameliorated to a large extent by the provisions that

13   Mr. Schwartz read into the record earlier.  Effectively, if a

14   claim objection is filed -- and I can assure the Court we

15   intend to file one to the entirety of the claim on the three

16   grounds we outlined in our opposition -- essentially nothing

17   happens with respect to the prepetition claim, essentially the

18   status quo is preserved.

19           And so we expect ultimately any plan will comport

20   with whatever the results of that challenge are.  And if Empery

21   objects to treatment consistent with that plan -- challenge, we

22   anticipate we'll be before you claiming it's not reasonable and

23   they are limited by reasonableness as to what they can object

24   to.

25           Rather than deal with hypotheticals, which prove to

1   be more than most people can chew at this point, we kick that

2   can down the road and we'll deal with it when a real issue --

3   if a real issue arises.  So long as the status quo is

4   preserved, if there's a claim objection filed, and we

5   understand that is the effect of the provisions that

6   Mr. Schwartz read in the record, we think we can handle that

7   issue, as well.

8          One of our bigger concerns, Your Honor, is with the

9   EBITDA test.  As written, we don't understand it, frankly.  It

10  says it will be on an accrual basis, but then the budget's

11  prepared on a cash flow basis.  I fully expect the debtor and

12  Empery will work that out in real time, and whatever happens

13  will be reasonable and will make sense.

14         And certainly if we find that's not the case, again,

15  we'll try to take Empery out, if we have to.  But we'll monitor

16  that closely.  I anticipate the Committee will monitor it

17  closely, and make sure that the EBITDA test is something that

18  makes sense, is something that the debtor in good faith

19  believes it can comply with, and not just a reason to, as

20  Mr. Schwartz indicated, switch to a sale quickly in this

21  process before we're ready, because, as we said, we don't want

22  any sale under any circumstances unless and until we know what

23  the NOL situation is.

24         But we're prepared to live with the term sheet,

25  however unclear it is to us.  Mr. Schwartz assures us it's not

1    unclear to him.  We'll take him at his word, and I'm sure it

2    will be worked out in real time, in a way that makes sense.

3    But I don't want the Court to be under a misimpression that

4    there's any ambiguity or question.  We do plan to file that

5    challenge, timely.  And if we don't -- can't get an agreement

6    on some slight additional time, we'll probably be back in front

7    of you, on that.  But you know, that's coming.  We've not --

8    we've been transparent in our objection as to what we think

9    the grounds are.  And we and Empery hopefully will have a full

10   and fair opportunity to litigate the issues.  Thank you,

11   Your Honor.

12            THE COURT:  Thank you.

13            Mr. Schwartz, is there some sort of notice

14   requirement with the EBITDA decision -- you know,

15   determinations, as it goes along?  Are you providing notice or

16   is that called for in your term sheet?

17            MR. SCHWARTZ:  No, Your Honor.  There wouldn't be

18   notice.  It's reporting that would be done within the first

19   week of each following month.  It will be -- that timeline, if

20   you will, Your Honor, need to be drilled down on a final basis

21   with respect to the DIP documents.  But what we discussed was

22   that, you know, at the end of each month, we just really need a

23   little bit of time to make sure we get all the numbers

24   together.  And (indiscernible) split the hair a little between

25   budget and EBITDA tests for the Court, as well.  But so, you

1  know, within roughly the first week of the following month, the
2  EBITDA test would be provided to Empery; and then, you know, it
3  would be reviewed by the independent director, who would be
4  making that determination of, you know, is it right and
5  accurate.
6          I mean, so, ultimately, it would flow through from
7  that perspective, Your Honor, the independent director.  And it
8  would be the independent director's decision to say -- well,
9  one, to say yes, these are right, we're not making any money;
10 and if not, you know, we need to swing to a sale.  That's all
11 (indiscernible) that goes, as well, Your Honor.  So there's a
12 check and balance along the route of -- and we'll get to
13 Portage Point, but, you know, I would think that the test would
14 be, you know, the actual report, if you will, will be done by
15 Portage Point.
16         And then that would flow up through the independent
17 director, off to Empery.  And if we're showing EBITDA positive,
18 off we go.  And if not, then either we have a new negotiation
19 or we're swinging to a sale.  And again, that decision of which
20 way to go belongs and rests with the independent director.  So
21 I think that there's a check and balance.
22         So -- and then ultimately, there isn't like a filing
23 with the Court, if you will, Your Honor, that's required.  It's
24 just -- it's a loan term.  And I would submit to Your Honor --
25 there were some questions about the EBITDA tests.  It's

1  something that's -- it's a covenant, if you will, Your Honor.

2  It's something we negotiated as a way to keep, you know, to

3  unlock financing and have some gating and have some controls as

4  we go through the case.

5          I would submit to Your Honor it's not anything that

6  would be uncommon that you would see on a regular loan

7  financing, like a debt service coverage ratio or an inventory,

8  you know, requirement or any kind of a balancing that you might

9  see in terms of how (indiscernible) reported their assets and

10  their profits.  And so it's just something that we think, for

11  this particular case, given the position the operations are in,

12  it made a lot of sense to give the parties comfort that they

13  weren't funding into something that wasn't turning around.  So

14  it's a turnaround test, if you will.

15          Then, Your Honor, the budget, which the debtor will

16  have to comply with after March 15, is a total overall look at

17  what is the debtor's revenue, expenses, restructuring costs.

18  What do those all look like?  So that's one key component.  And

19  then, of course, there'll be monthly operating reports, right?

20  But that's not on a cash basis, that the debtor will have to

21  comply with variances.  And I know the Court's accustomed to

22  seeing that.

23          The EBITDA test is different.  First of all, it

24  excludes many of the things that are in the budget.  So

25  it's different.  It has an accrual nature to it; and after

1  June 30th, an actual basis.  But so they are two different

2  things, really, altogether, and the EBITDA test would have

3  elements that are inside the budget, but they're exclusive.  So

4  the debtor could be certainly EBITDA positive under the test,

5  but cash flow negative under the budget, and be in compliance

6  with both.

7          So, in that, Your Honor, they wouldn't -- they don't

8  and shouldn't necessarily conflict, but it certainly would be

9  possible for the debtor to have an exceptional, extraordinary

10 cost that no one saw coming that could be a budget buster, if

11 you will, and we're going to have a different issue that's --

12 the company may be making money, but oof, look what we just

13 found.  So --

14         THE COURT:  Well, Mr. Schwartz, what I was getting at

15 is if under these terms -- if, you know, the trigger happens,

16 that the EBITDA is not what was expected, the company isn't

17 making money, and that triggers then the immediate sale, is the

18 first time that all the parties are going to find out about

19 this is on a motion to approve a sale or for procedures -- sale

20 procedures?  Is that how -- is that how it would work?  Is that

21 how everybody would find out that things are -- have gone south

22 and now the sale trigger has happened?

23         Mr. Garman, do you --

24         MR. SCHWARTZ:  Mr. Garman can go first.  But

25 Your Honor, we would be talking to the parties and telling them

1    what had happened.  I don't -- but there wouldn't be an

2    affirmative requirement to file anything, if you will,

3    Your Honor.  But I mean, ultimately, if we had to swing to a

4    sale, that would be a meaningful discussion with the parties

5    about here's what happened, here's the report, here's where

6    are.

7              As Mr. Sternklar said, his client may step in and say

8    they'd like to fund, if there's a problem at that point.  So,

9    Your Honor, there'd be, I think, again, ample negotiations

10   before we just ran off in the direction without -- you know,

11   without talking to parties.

12             THE COURT:  Thank you.

13             Mr. Garman.

14             MR. GARMAN:  Yeah.  Your Honor, I think there's a

15   little bit of misunderstanding here.  What happened is that the

16   debtor came to us and said we have a budget shortfall based

17   upon the amount of the current DIP.  We're going to need more

18   money.  And so Empery said, okay, how much money are you going

19   to need to see us through this case?  And they came up with,

20   you know, a larger amount.  And I think, reasonably, Empery

21   replied with, fine, we will fund you the shortfall, provided

22   you can show us that we're not funding into a black hole.

23             And so, first, this is additional money.  This isn't

24   an event of default.  So if they don't -- we don't move to a

25   sale in the event that they're not EBITDA positive.  What

1  happens is -- you know, in bankruptcy, we tend to deal with

2  things on a cash basis.  And meeting a budget on a cash basis

3  can both be good and bad for a debtor.  You can have

4  extraordinary expenses that make you lose money in a particular

5  period of time, that make a profitable business look negative

6  because you had to make investment or, you know, something

7  similar.

8          And so what we said was we will provide you

9  additional cash over and above our already existing commitment

10  to see your way through the case, if you can provide us a

11  forecast -- an EBITDA forecast that shows that this business is

12  turning the corner and making money.

13          And so, from my perspective, the defaults that exist

14  are things like compliance with the budget meeting its revenue

15  marks, those sorts of things.  And this EBITDA component is

16  additional cash that's a benefit to the debtor.  And so I don't

17  think this is a "gotcha" moment.  I think this is a benefit to

18  the debtor moment in which we provided something of real value

19  that doesn't have a lot of downside to the debtor over what had

20  been seen by the parties before.

21          And so there's that.  And then I have a couple of

22  other points, but I'll pause to see if the Court wants to talk

23  about this further.

24          THE COURT:  No.  That was helpful, because I did

25  misunderstand that.  So (audio interference) for that

1  clarification.  But go ahead and make your points.

2            MR. GARMAN:  I just want to say Mr. Schwartz

3  summarized the document well.  I'll agree with 99.5 percent.

4  But I guess there's just part of me that can't let a few minor

5  errors -- not respond with, you know, the term sheet controls.

6            Mr. Schwartz, I think, inverted a 250,000 and a

7  500,000 here or there in his explanation.  What he said -- it's

8  500 the first additional and I think 250 in the months

9  thereafter.

10            I did want to say that I hadn't heard of this

11  Prestige issue until today in open court.  None of what I heard

12  gave me a great deal of concern.  We have a very good working

13  relationship with Prestige.  I'm just going to need to circle

14  back with the debtor and Prestige to make sure I understand

15  what the agreement was before I'd consented to it going in the

16  order.  I think it sounded fine.  I just don't know what that

17  is.

18            And then I do want to address this 541 issue real

19  quick.  We thought we were being elegant in the description of

20  the 541, and apparently we created confusion with it.  We draw

21  a distinction between avoidance actions and what's found under

22  property of the estate under 541.  And so what we were

23  attempting to do -- and I think there is universal agreement in

24  what we were attempting to do.  I just want to clarify it.

25            Mr. Schwartz said, arguably, we would be secured in

```
 1   commercial torts and D&O.  I don't think that's arguably.  I
 2   think that's pretty clear we would be secured in those, subject
 3   to the waterfall.  And so we carved out avoidance actions, a
 4   term I think we as bankruptcy practitioners all know what those
 5   mean.  And then the other claims that would belong to the
 6   estate under 541, we are secured in, that they are subject to
 7   the waterfall and it wasn't -- I mean, really, we thought we
 8   were being helpful, and it turns out we were creating
 9   confusion.
10            And so I think we're all in agreement as to what that
11   means and can sort that out by way of the subsequent documents
12   in the order.  But that is what we intended.
13            THE COURT:  All right.  Thank you.  Anything else?
14            MR. GARMAN:  No, ma'am.
15            THE COURT:  Thank you.
16            All right.  Is there anybody else before we move back
17   to Mr. Schwartz?
18        (No audible response)
19            MR. SCHWARTZ:  Mr. Schwartz, any last comments?  I
20   expect that because there is agreement by everyone, you're not
21   anticipating putting any witnesses on, that the declarations
22   will be sufficient.
23            MR. SCHWARTZ:  That's correct, Your Honor.  Yes.
24   While we were -- I think everyone has ready to put their
25   witnesses on, I think that's right, Your Honor.  We would
```

1  submit that the proposed financing is certainly necessary.  I

2  think that the declaration of Mr. Rubin detailing why the

3  debtor went in one direction with Empery versus the other, I

4  think is more than sufficient to satisfy the business judgment

5  test.  I don't think there's any dispute that the debtor

6  actually needs the money.  There's really no dispute that the

7  budget is the best, you know, budget we have at the moment.

8  Obviously, there'll be another one on March 15th.

9          So, yes, Your Honor, absent questions or other

10 questions from the Court, we would submit that the motion is

11 now ripe for approval.

12          THE COURT:  All right.

13          MR. STERNKLAR:  Your Honor?

14          THE COURT:  Yes.  Go ahead, Mr. Sternklar.

15          MR. STERNKLAR:  I'm sorry.  We had filed evidentiary

16 objections to the declarations which are largely mooted by the

17 sale.  But just to -- excuse me -- by the agreement among the

18 parties in the settlement.  But if Your Honor is going to allow

19 the declarations to be admitted into evidence, we would not

20 pursue those objections if Your Honor made it clear that the

21 declarations are only -- only binding on us with respect to

22 this motion, and for no other purpose.

23          If there's a risk that the affidavits or the

24 declarations will be admissible evidence in any other

25 proceeding, then, you know, we almost have to go forward with

```
 1   our objection.  That was why we filed it.  But not that we care

 2   to, and not that we think the Court cares to, but -- we think

 3   this could be approved with -- by consent, without the need to

 4   enter the declarations.  And we think that's a better way to

 5   go, Your Honor.

 6            THE COURT:  Mr. Garman.

 7            MR. GARMAN:  Yes, sir.

 8            If Mr. Sternklar will agree that that goes both ways,

 9   and we equally are not bound by the declarations that were

10   submitted, I would consent to that and -- that makes sense to

11   me.

12            MR. STERNKLAR:  Your Honor --

13            THE COURT:  So, essentially, a reservation to object

14   in the future --

15            MR. GARMAN:  Yes.

16            THE COURT:  -- by both parties.  All right.

17            Mr. Sternklar.

18            MR. STERNKLAR:  Yeah.  Your Honor, we would obviously

19   accept Mr. Garman's proposal.  We think that makes sense, too.

20   I think I'd characterize it more -- not as a reservation

21   object, but as an agreement that neither party will take the

22   position that what's in their respective declarations is

23   admissible evidence -- or inadmissible evidence, but is nothing

24   with respect to future matters.

25            THE COURT:  Well, I have to make findings.  If you
```

1  want me to approve this and not challenge my findings, I've got

2  to at least have the declarations, or you've got to put your

3  clients on the stand.  If you want to do that, you can.  I'm

4  going to -- we're set up to do it.

5           I mean, I would say to your -- without ruling on it,

6  to give you a preview of where I would think I would go if I

7  were to rule on that today is that -- I understand the

8  objections.  And to the extent that, you know, this is not a

9  jury that you're talking to, but the Court, the Court would

10  just give whatever weight was necessary.  If there are --

11  irrelevant, I would disregard them.  You know, I mean, that's

12  how I would be looking at this.

13           I suppose, if nobody is going to object to this, I

14  will go ahead and find that for today there's no objections to

15  the declarations, but that does not bind any future proceeding

16  as to whether or not the parties find something objectionable

17  and then I will -- again, I think it's a reservation of your

18  rights to resurrect your objections in the future.

19           MR. STERNKLAR:  Very good, Your Honor.

20           THE COURT:  I'll make that ruling here.  But I

21  obviously need to find -- I need to be able to utilize the

22  declarations in order to make my own findings.  So I will do

23  so.

24           All right.  Anything else?

25      (No audible response)

1          THE COURT:  All right.  Well, I believe that the

2    debtor has met its burden of proving that the proposed

3    post-petition financing is an exercise of its reasonable

4    business judgment; that the financing is in the best interest

5    of both the estate and the creditors; the transaction is both

6    necessary to preserve estate assets and necessary and essential

7    for the continued operation of the debtor's business; and that

8    the terms of the proposed transactions are fair and reasonable

9    given the circumstances; and that the proposed facility was

10    negotiated in good faith and at arm's length.

11          All right.  Mr. Schwartz, am I missing anything?

12          MR. SCHWARTZ:  Thank you, Your Honor.  No, I believe

13    we will prepare an order and circulate it to the parties, and

14    try to be thoughtful.  I know Mr. Sternklar is traveling.

15    Hopefully, we can get something from him today.

16          THE COURT:  All right.  I guess I should finish my

17    last thought and actually grant the motion.  So, in the absence

18    of an opposition, the Court will grant the requested relief on

19    a final basis.

20          MR. SCHWARTZ:  Thank you, Your Honor.

21          THE COURT:  All right.  Thank you.  Let's -- and I am

22    -- again, express my surprise to hear that it was settled.  I'm

23    very happy that it was.  That made for a much easier hearing

24    today, for sure, and I think it's going to be good for this

25    debtor.

```
 1              MR. SCHWARTZ:  Thank you, Your Honor.

 2              THE COURT:  Let's move on to the next --

 3              UNIDENTIFIED:  Your Honor, I'm sorry to interrupt.

 4   Do we know who's signing off on the order?

 5              THE COURT:  Is there anybody on here that is going to

 6   waive their signature?

 7         (No audible response)

 8              THE COURT:  Okay.  So the Committee will sign.

 9   Mr. Sternklar will sign.  Let's see.  Who else am I missing

10   here?  Mr. Roldan will sign off.  Mr. Garman.  Let's see.  Am I

11   missing somebody?

12              MR. SCHWARTZ:  If I may, Your Honor, it may be better

13   -- let me try to do a list here, if I may.  Empery will sign

14   off.  Mr. Drexler will sign off.  The Committee will sign off.

15   White Winston, Prestige, and the U.S. Trustee, and of course

16   the debtor.

17              I believe that's the universe of folks who are on the

18   phone who have opined previously; but if I've missed anyone,

19   then I would ask them to please tell us.

20         (No audible response)

21              THE COURT:  All right.  I don't hear anybody, so that

22   sounds like you've got it all.

23              MR. SCHWARTZ:  Thank you, Your Honor.

24              THE COURT:  All right.  Hold on one second for me.  I

25   need to pull up the rest of the docket.  So, just moving in the
```

1  order that's on the docket, the next hearing would be on the

2  cash management, I believe.

3          MR. SCHWARTZ:  Yes.  Thank you, Your Honor.  And

4  Your Honor, I just would like to note, once in front of Judge

5  Riegle, we had a similar surprise, and she said she was

6  pleasantly pleased.  So I try to adopt that.  So I was also

7  pleasantly pleased that we were able to get to this point

8  today.

9          So, Your Honor, next up is the bank accounts motion.

10  I believe the debtor has -- you know, we've been working with

11  Wells Fargo and our lenders.  I don't believe the U.S.

12  Trustee's office has any ongoing, continuing concerns with

13  respect to the motion.  So, subject to what Mr. Day may have to

14  say, Your Honor, I believe this motion is also ripe for final

15  approval.

16          THE COURT:  All right.  Mr. Day, did you want to be

17  heard?

18          MR. DAY:  Thank you, Your Honor.  Jared Day,

19  Department of Justice, for the U.S. Trustee.  Yes, we would

20  agree.  The interim order indicates that the debtor will

21  designate its prepetition accounts as debtor-in-possession

22  accounts.  Wells Fargo requires a court order to do that.  And

23  with that interim order, it's our understanding that the

24  debtors are making progress and on their way to having that

25  completed.

1          And as long as the prepetition accounts are

2    designated as debtor-in-possession, U.S. Trustee has no

3    objection to final order being entered.

4          THE COURT:  All right.  And I don't see any other

5    opposition on the record.  So, in the absence of an opposition

6    and good cause appearing, the Court will grant that motion on a

7    final basis.

8          MR. SCHWARTZ:  Thank you, Your Honor.

9          THE COURT:  All right.  And then we have the wages

10    motion.  And let's see.  I also -- I don't see an opposition

11    there.  Mr. Schwartz, did you want to --

12          MR. SCHWARTZ:  Thank you, Your Honor.  I believe we

13    did have some -- a matter to produce for the U.S. Trustee's

14    office, which was completed.  I believe we've made the

15    representations on the record of, that, you know, no insiders

16    are being paid for any prepetition debt, which included,

17    actually, Mr. Hillman, who is still technically a consultant.

18          So Your Honor's aware, subject to final approval of

19    the financing today, the debtor's prepared to bind its

20    directors and officers insurance, but we didn't want to do that

21    because a payment would be -- would come due.  And if, for some

22    reason, final approval didn't occur, we didn't want to find

23    ourselves in a place where we actually had insurance that we

24    never paid for.

25          So we'll now bind that insurance, I think, given what

1  the Court's ruling was today with respect to financing.  But,

2  just by agreement with the Committee, even Mr. Hillman --

3  although he was not technically the CEO, and still technically

4  is not the CEO yet, we did not pay his prepetition wages.  So,

5  with that as a backdrop, Your Honor, I believe we've resolved

6  any concerns the U.S. Trustee's office had, provided a list of

7  employees, titles, salaries, that information.

8           So, again, subject to Mr. Day's comments, I believe,

9  Your Honor, we are also set for final approval here.

10           THE COURT:  All right.  Thank you.

11           Mr. Day.

12           MR. DAY:  Thank you, Your Honor.  The U.S. Trustee is

13  satisfied that no 503(c) payments are being made under the

14  prepetition wages and benefits motion.  (Audio interference)

15  KERPs, KEIPs, anything like that.  We're also satisfied that no

16  (audio interference) and we have been able to review and look

17  at the proposed claims for each of the employees, and we're

18  satisfied that all of the payments would fall under the

19  relevant priority caps.  And we have no opposition to entry of

20  a final order.

21           THE COURT:  All right.  Well, in the absence of any

22  opposition and good cause appearing, the Court will grant the

23  wages motion on a final basis.

24           And that gets us to the employment application for

25  Portage Point Partners.  And I know that, Mr. Schwartz, you and

1   Mr. Day were trying to work out issues related to J. Alix

2   Protocol.  Has that been resolved?

3              MR. SCHWARTZ:  It has, Your Honor.  Thank you.  The

4   parties -- in connection also (indiscernible) our lenders and

5   working through concerns about the budget -- have agreed that

6   we would withdraw the request that Mr. Gasbarra be seated as

7   the debtor's chief restructuring officer, and simply request

8   that Portage Point be authorized to go forward as the debtor's

9   financial advisor under Section 327.

10             We have worked through already a form of order with

11  Mr. Day's office and Mr. Day.  I believe Mr. Agelakopoulos and

12  he agreed on a form just this morning.  So not only, Your Honor

13  -- I think we've resolved the CRO issue by just simply

14  withdrawing it.  We have an independent director, Your Honor,

15  and we have a lot of pieces here that I think make sense from

16  an operational perspective.  Mr. Hillman will now likely take

17  the seat as the CEO.

18             So, getting those things out of the way, and just

19  concerns about the budget, Your Honor, that I think the Court

20  raised even at the last hearing, this was a thoughtful way, we

21  found, to try to find some middle ground.  And then, of course,

22  resolved concerns about the J. Alix Protocol and resolved the

23  U.S. Trustee's objections.

24             So, with that, Your Honor, subject to what Mr. Day

25  may say, I don't believe there's any opposition to Portage

1   Point being approved as the debtor's financial advisor.  And

2   with that, Your Honor, we would just simply move forward under

3   327, eliminate the issues that would arise under the J. Alix

4   Protocol, and allow us to then go forward with this motion or

5   application.

6           THE COURT:  Because it is so different than the

7   initial motion, have all of the other parties -- has the

8   Committee been made aware of this agreement and so on, in terms

9   of an opportunity to oppose it if they wanted to?

10          Mr. Fiero, do you want to speak to that?

11          MR. FIERO:  There we go.  Your Honor, we're up to

12  speed, and we're okay with what Mr. Schwartz has worked out.

13          THE COURT:  All right.  Does anybody else want to be

14  heard?

15          Mr. Day, did you want to be heard?

16          MR. DAY:  Thank you, Your Honor.  Just briefly.  That

17  was our concern, as well, Your Honor.  There is a pending

18  application that was filed on -- I believe a full 28 days'

19  notice.  And the U.S. Trustee opposed it in writing timely.

20  But with the revision to the application, we think that it --

21  the current application on file does request that Portage Point

22  be authorized to be employed as the financial advisor.  So we

23  think notice is satisfactory.  I think any party that had an

24  issue with that could have spoken up 14 days prior to the

25  preliminary hearing.

1                And there will be a few provisions that we've

2       requested in the proposed order.  If I can just go through them

3       really quickly.  It will indicate that Mr. Gasbarra's

4       application to be employed as CRO is withdrawn; that Portage

5       Point's application to be employed as a restructuring -- I

6       believe they've termed it "advisor" or "consultant," will be

7       withdrawn; and Portage Point will then just proceed forward

8       with an application to employ -- to be employed as financial

9       advisor.  And again, I think that's already set forth in the

10      current application.

11               And then we have a provision indicating that there

12      will be no preapproval of any terms and conditions of Portage

13      Point's employment under Section 228(a); in other words, no

14      finding at the retention stage that the hourly rates or fee

15      structure is reasonable or appropriate.  And debtor has agreed

16      to that.

17               And then the last provision is just a carveout for

18      indemnification for Portage Point, as to any acts of gross

19      negligence or willful misconduct.  And that provision will be

20      in the proposed order, as well.

21               But with those four provisions and the withdrawal of

22      the request for a CRO and/or restructuring advisor, the U.S.

23      Trustee is fine with entry of the order that Mr. Schwartz has

24      described.

25               THE COURT:  All right.  Mr. Schwartz, I did notice in

1  the agreement -- the employment agreement, there was reference

2  to investment banking services.  And I take it that's not --

3  it's solely financial advising.

4          MR. SCHWARTZ:  Portage Point is being approved as the

5  financial advisor today, Your Honor.  I think the parties

6  reserved their rights with respect to investment banking, and

7  that -- what we would ask the Court to do -- thank you for

8  raising that, Your Honor.  I apologize.  I forgot to mention

9  that.

10          In the event that the company does move to a sale,

11  and in the event the debtor elected to use Portage Point for

12  those services, for investment banking, then we would provide a

13  notice that Portage Point was being asked to do that work and

14  allow parties a further opportunity to object, in the event

15  there's concerns.  Because if we swing to a sale, Your Honor,

16  we'll need some sort of a banker, we expect, to do the work.

17          So that was the anticipation.  We have their

18  contract, we have their agreement.  It's one of the reasons

19  Portage Point was chosen at the outset of the case, was because

20  we made need to run a sale, and we thought best to just not

21  have to change horses at that point in time.  But so the

22  anticipation was we would just do a notice if need be, and

23  tackle that issue, if we don't select someone else to do the

24  work.

25          THE COURT:  Okay.  All right.  Anybody else want to

```
1   be heard?

2        (No audible response)

3             THE COURT:  In the absence of an opposition and in

4   conjunction with the terms that were just stated on the record

5   by the U.S. Trustee, with those terms included in any order,

6   the Court will grant the application to employ Portage Point

7   Partners as a financial advisor.  All right.

8             MR. SCHWARTZ:  Thank you, Your Honor.  I believe

9   we've resolved the order of Mr. Day.  Does any other party wish

10  to see the order?

11            THE COURT:  It's fine with just getting Mr. Day's

12  signature.  There's no other objection being lodged.

13            All right, then.  Well, I think we've covered

14  everything.  Does anybody have anything else that we need to go

15  over?

16       (No audible response)

17            THE COURT:  All right.  Then we'll go ahead and

18  conclude these hearings.

19            MR. STERNKLAR:  Thank you, Your Honor.

20            MR. SCHWARTZ:  Thank you, Your Honor.

21            THE COURT:  All right.  Ms. Rawling, we can go off

22  record.

23       (Proceedings concluded at 11:48 a.m.)

24                            * * * * *

25
```

1                        **C E R T I F I C A T I O N**

2

3           I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   _____

11   ALICIA JARRETT, AAERT NO. 428      DATE: February 22, 2023

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25