GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6665
E-mail: ggarman@gtg.legal
WILLIAM M. NOALL
Nevada Bar No. 3549
E-mail: wnoall@gtg.legal
DYLAN T. CICILIANO
Nevada Bar No. 12348
E-mail: dciciliano@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Empery Tax Efficient, LP as*
*Agent and Collateral Agent for certain*
*Secured Noteholders*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 22-14422-NMC |
| MUSCLEPHARM CORPORATION, | Chapter 11 |
| Debtor. | Date:  March 22, 2023<br>Time:  9:30 a.m. |

**EMPERY TAX EFFICIENT, LP'S OPPOSITION TO MOTION TO PARTIALLY QUASH RULE 2004 SUBPOENA DIRECTED TO RYAN DREXLER OR IN THE ALTERNATIVE FOR PROTECTIVE ORDER**

Empery Tax Efficient, LP ("Empery"), on behalf of itself and as collateral agent for the holders of certain notes ("Noteholders")  issued by Musclepharm Corporation, debtor and debtor-in-possession ("Debtor"), by its counsel of record, Garman Turner Gordon LLP, respectfully opposes the *Motion to Partially Quash Rule 2004 Subpoena Directed to Ryan Drexler or in the Alternative for Protective Order* [ECF No. 303] (the "Motion").

This opposition ("Opposition") is made and based upon the following Memorandum of Points and Authorities, the *Ex Parte Application for Examination of Ryan Drexler Pursuant to Bankruptcy Rule 2004* [ECF No. 235] (the "2004 Application"), the *Order Granting Examination of Ryan Drexler Pursuant to Bankruptcy Rule 2004* [ECF No. 237] (the "2004 Order"), and the *Subpoena in a Case Under the Bankruptcy Code for an Examination and Production of Documents*

1  *Pursuant to Fed. R. Bankr. P. 2004* (the "<u>Drexler Subpoena</u>").  A true and correct copy of the

2  Drexler Subpoena is attached hereto as **Exhibit A.**  This Opposition is also based upon the

3  pleadings, papers and other records on file with the clerk of the Court in this case, judicial notice

4  of which is respectfully requested pursuant to Rule 201 of the Federal Rules of Evidence, and any

5  argument entertained by the Court at the time of the hearing of the Motion.

6       DATED this <u>20th</u> day of March, 2023.

7                           GARMAN TURNER GORDON LLP

8                            */s/William M. Noall*
                           WILLIAM M. NOALL, ESQ.
9                           GREGORY E. GARMAN, ESQ.
                           DYLAN T. CICILIANO, ESQ.
10                          7251 Amigo Street, Suite 210
                           Las Vegas, Nevada 89119
11                          *Attorneys for Empery Tax Efficient, LP as*
                           *Agent and Collateral Agent for certain*
12                          *Secured Noteholders*

13                   <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

14                            **I.  <u>INTRODUCTION</u>**

15       By the Motion, Ryan Drexler ("<u>Drexler</u>") seeks to partially quash, or in the alternative,

16  obtain a protective order with respect to the Drexler Subpoena.  The Drexler Subpoena was issued

17  pursuant to the 2004 Order, and it was served on Drexler on March 3, 2023 [ECF No. 285].  One

18  of Drexler's attorneys objected to the subpoena and sought to meet and confer, and Drexler and

19  Empery's counsel did meet and confer, on March 8, 2023 concerning Drexler's objections to the

20  subpoena and timing of Drexler's production and examination.

21       In summary, the subpoena contained twenty-five requests for production of documents.

22  There have been no objections to request numbers 6, 7, 9, 10, 11, 15, 16, 17, 20, 21, and 22.  As

23  further discussed below, the parties agreed on modifications to request numbers 8 and 23.  Of the

24  remaining requests, Drexler primarily objects based upon the so-called "pending proceeding rule,"

25  specifically with respect to request numbers 2, 3, 4, 5, and 14 (based upon the New York Litigation

26  (defined below)) and requests 18 and 19 (based upon the Nevada Litigation (defined below)).

27  Finally, Drexler objects to request numbers 1, 12, 13, 24, and 25 primarily on the basis that such

28

1   requests exceed the scope of Bankruptcy Rule 2004 and that they are unfairly prejudicial and
2   burdensome.

3       As discussed below, the "pending proceeding rule" is not a per se rule of exclusion and the
4   Court has the discretion to determine whether Empery's requests for production are within the
5   scope of Bankruptcy Rule 2004 *and are directly related and relevant to issues in the Bankruptcy*—
6   separate and apart from any pending proceeding.  The Court also has the obligation and discretion
7   to determine whether the requests are such that they fall within Bankruptcy Rule 2004 and whether
8   the timing for compliance is reasonable under the circumstances.  Further, the Court can order
9   protections that it deems necessary to protect the rights of a witness to a 2004 Examination, such
10  as permitting a witness to be represented by counsel during an examination, permitting objections
11  and cross examination, and limiting the examination for use in the bankruptcy case.

## II. BACKGROUND

### A. Debtor attempted to prevent Noteholders from exercising their remedies under a series of Notes, leading to pre-Bankruptcy actions in New York.

15      1.      Debtor is the maker of certain (i) Original Issue Discount Senior Secured Notes
16  dated as of October 13, 2021 (the "October Notes") and (ii) Original Issue Discount Senior Secured
17  Notes dated as of June 10, 2022 (the "June Notes," and collectively with the October Notes, the
18  "Notes"), in favor of the Noteholders. Empery is one of more than a dozen Noteholders.

19      2.      The Notes are secured by duly perfected liens on virtually all of Debtor's property.

20      3.      Empery asserted that events of default occurred and were continuing under the
21  Notes and associated security documents and scheduled a foreclosure sale of the collateral securing
22  the Notes under applicable provisions of Article 9 of the Uniform Commercial Code (the "Article
23  9 Sale").

24      4.      Subsequently, on December 14, 2022, Debtor filed a complaint against Empery in
25  the Supreme Court of the State of New York, New York County, seeking a temporary restraining
26  order and preliminary injunction enjoining Empery from proceeding with a sale of Debtor's
27  collateral at the upcoming Article 9 Sale ("Debtor's New York Litigation") on grounds that there
28  were no material defaults under the Notes justifying the Article 9 Sale and, alternatively, that the

Article 9 Sale was commercially unreasonable.

5.      Separately, and on the same day that the Debtor commenced its New York litigation just referenced above, Empery commenced an action in the same court to stop the consummation of the "Settlement Agreement," as defined in the Drexler Subpoena (the "Empery New York Litigation" and collectively with Debtor's New York Litigation, the "New York Litigation").

6.      On December 15, 2022, after holding a hearing, the New York State Court granted Empery's request and entered a temporary restraining order prohibiting Debtor, White Winston, and Drexler from consummating the Settlement Agreement and from taking other action to dispose of any Debtor assets (the "TRO") and denied Debtor's request for a preliminary injunction and permitted the Article 9 Sale to proceed.

7.      After MusclePharm filed for Chapter 11 Bankruptcy protection, Empery filed a notice of voluntary dismissal against it, and amended its complaint against Drexler, White Winston Select Asset Funds, LLC, and White Winston Select Asset Fund Series MP-18, LLC ("White Winston"). The amended complaint asserts a single cause of action for tortious interference with contract and prospective economic advantage. Drexler removed the Empery New York Litigation to the District Court for the Southern District of New York, and Empery thereafter moved to remand the action to the Supreme Court, New York County. The Court has not yet ruled on Empery's motion, and has effectively stayed the proceeding pending a determination on that issue. In any event, discovery has not commenced in this action.

**B. Debtor filed bankruptcy on the morning of the scheduled Article 9 Sale.**

8.      The Debtor filed its petition for relief under chapter 11, title 11, United Sates Code (the "Bankruptcy Code") on December 15, 2022 [ECF No. 1]. The Debtor is operating its business and managing its affairs as a debtor in possession under sections 1107 of the Bankruptcy Code.

**C. The Revolver Action was a retaliatory action that seeks to adjudicate matters before this Court.**

9.      On February 7, 2023, in the Eighth Judicial District Court of Nevada, Drexler filed an action against Empery, in its personal capacity, Case No. A-23-865375-C (the "Revolver Action"). The complaint in the Revolver Action is attached hereto as **Exhibit B**.

10. In the complaint in the Revolver Action, Drexler alleges that he made a series of loans to Debtor to fund its business operations that was initially secured by Debtor's collateral. (*Id.* at ¶¶6-7). Drexler admits that the relationship between Drexler, Debtor and Empery is controlled by a series of agreements, including a Securities Purchase Agreement and Notes. (*Id.* at ¶ 3). The complaint in the Revolver Action alleges that Empery provided Debtor with more than $7,000,000 in financing, which Drexler now contends Debtor would certainly default on. (*Id.* at ¶¶3-4).

11. As part of the transaction, the complaint alleges that an intercreditor agreement, between Debtor, Drexler, and Empery, subordinated Drexler's debts to those of the Noteholders. (*Id.* at ¶7). Drexler alleges that Empery made false representations to Drexler to induce him to "make the subordinated financing under the Drexler Revolver" and enter into the intercreditor agreement. (*Id.* at ¶ 7).

12. Drexler further alleges that under the intercreditor agreement Debtor could not make payments to Drexler if it was in breach of the SPA or Notes. (*Id.* at ¶ 23). In essence, Drexler contends that Empery believed that Debtor (which was controlled by Drexler) would default and therefore the intercreditor agreement would prevent payments to Drexler. (*Id.*). Drexler claims that Empery, in fact, declared events of default, preventing Debtor from making payments to Drexler, and ultimately causing Drexler to file the pending Chapter 11 Bankruptcy in the United States Bankruptcy Court for the District of Nevada on behalf of Debtor. (*Id.* at ¶¶ 5, 12).

13. The Complaint contains three causes of action, all of which rely on an interpretation and determination of the validity of Debtors agreements with Empery, and seek to effectively subordinate Empery claims in the bankruptcy to Drexler:

      a. An Intentional Interference with Contractual Relations, alleging that Empery "manufactured" events of default under the SPA and Notes to prevent Debtor from paying Drexler pursuant to the terms of the Intercreditor Agreement. (*Id.* at ¶¶ 68-73);

      b. Fraud, alleging that Empery induced Drexler into advancing Debtor money under the Drexler Revolver and subordinating his debt to Empery under the Intercreditor Agreement. (*Id.* at ¶¶ 75-77)

c. Negligent Misrepresentation, alleging that Empery induced Drexler into subordinating his debt under the Intercreditor Agreement to Empery. (*Id*. at ¶¶79-82).

14.      Empery has moved to dismiss the Revolver Action on several procedural grounds, including for violating the automatic stay, lack of subject matter jurisdiction, and failure to name indispensable parties, and dismissal has also been sought substantively under NRCP 12(b)(5), based on a failure to state a claim.

15.      Discovery has not begun in the Revolver Action.

**D. The SLAPP Action was brought to harass Empery's employees.**

16.      After issuance of the 2004 Order, on March 3, 2023, Drexler brought an action against Empery Portfolio Manager, Tim Silver, in the Second Judicial District Court of the State of Nevada, in Washoe County, CV23-00381 (the "SLAPP Action" and collectively with the Revolver Litigation, the "Nevada Litigation"). The complaint in the SLAPP Action is attached hereto as **Exhibit C**.

17.      In the SLAPP Action, Drexler brings claims against Mr. Silver based on his negotiation with creditors in the Bankruptcy

> after the filing of MusclePharm's Bankruptcy Petition, and during the course and scope of MusclePharm's bankruptcy proceedings, Silver contacted other creditors of MusclePharm seeking to induce them into participating in Emprey's (sic) scheme to take over MusclePharm and liquidate its assets, and/or alternatively, selling their credit position/debt to Emprey (sic) so that Emprey (sic) could control a greater percentage of MusclePharm's debt owed to creditors for additional leverage in MusclePharm bankruptcy proceedings.

(SLAPP Action complaint at ¶26).

18.      Drexler claims that Mr. Silver made false statements to other creditors during the course of the Bankruptcy related to Drexler. (*Id*. at ¶ 29).

19.      Drexler also claims that Mr. Silver made a false statement to a reporter investigating this bankruptcy case. (*Id*. at ¶¶ 30-31).

20.      Drexler sued Mr. Silver for defamation and invasion of privacy. (*Id*. at ¶¶39-58).

21.      Discovery has not commenced in the SLAPP Action. While Mr. Silver has not responded to the complaint, it is anticipated dispositive motions will be filed on numerous grounds.

**E. The Court granted a 2004 Exam of Drexler.**

22.    On February 17, 2023, Empery filed its *Ex Parte Application for Examination of Ryan Drexler Pursuant to Bankruptcy Rule 2004 [ECF No. 235]* (the *"2004 Application"*).

23.    On February 21, 2023, the Clerk of the Court entered an *Order Granting Examination of Ryan Drexler Pursuant to Bankruptcy Rule 2004 [ECF No. 237] (the "2004 Order")*.  See ECF No. 237.

24.    On March 3, 2023, Drexler was served by Empery with a *Subpoena in a Case Under the Bankruptcy Code for an Examination and Production of Documents Pursuant to Fed. R. Bankr. P. 2004* (the "Drexler Subpoena").

**F. There are Pending deadlines Driving Discovery.**

25.    Pursuant to this Court's *Final Order Regarding Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Fed. R. Bankr. P. 4001(b) and 4001(d): (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting Senior Secured Liens and Administrative Expense Claims, (III) Determining Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [ECF No. 296], docketed on March 8, 2023, Empery also is the collateral agent for debtor-in-possession financing approved by the Court.  The debtor-in-possession financing is secured, by among other matters, a perfected lien on all of Debtor's real and personal (tangible and intangible) property, but excluding avoidance actions.

26.    Debtor's exclusivity period terminates in twenty-five (25) days, on April 14, 2023.

27.    The bar date for filling claims in the case is in thirty (30) days, on April 19, 2023.

28.    Empery incorporates the *Declaration of Timothy Silver in Support of Objection to Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing Debtor to Obtain Post Petition Financing, (II) Granting Priming Liens and Administrative Expense Claims, (III) Authorizing the Debtor's Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [ECF No. 52].

**III. <u>JURISDICTION</u>**

Empery agrees that the Motion concerns "core" matters under to 28 U.S.C. § 157(b)(2)(a),

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

1  and pursuant to LR 9014.2(a), Empery consents to entry of final orders by the Bankruptcy Court

2  with respect to the Motion.

### IV. AUTHORITIES AND LEGAL ARGUMENT

4         Rule 2004 of the Federal Rules of Bankruptcy Procedure allows the Court, on motion of

5  any party in interest, to order the examination of any entity, with such examination relating to,

> the acts, conduct, or <u>property or to the liabilities and financial</u>
> <u>condition of the debtor</u>, or to <u>any matter which may affect the</u>
> <u>administration of the debtor's estate</u>, or to the debtor's right to a
> discharge.  In a … reorganization case under chapter 11 …, the
> examination may also relate to the <u>operation of any business and the</u>
> <u>desirability of its continuance</u>, the <u>source of any money or property</u>
> <u>acquired or to be acquired by the debtor for purposes of</u>
> <u>consummating a plan and the consideration given or offered</u>
> <u>therefore, and any other matter relevant to the case or to the</u>
> <u>formulation of plan.</u>

12  (Emphasis added.)

13         It has been said that the purpose of a Rule 2004 examination is to assist a party in interest

14  in determining the nature and extent of a debtor's bankruptcy estate, revealing assets, examining

15  transactions and assessing whether wrongdoing has occurred.  <u>In re Bennett Funding Group, Inc.</u>

16  203 BR 24, 28 (Bankr. N.D.N.Y. 1996).  Admittedly, the scope of a Rule 2004 examination is

17  broader, even than discovery under the Rules of Civil Procedure.  <u>In re Drexel Burnham Lambert</u>

18  <u>Group, Inc.</u> 123 BR 702, 711 (Bankr. S.D.N.Y. 1991).  Third parties who have or had a relationship

19  with the debtor may be subject to a Rule 2004 examination.  <u>See</u> <u>In re Ionosphere Clubs, Inc.</u> 156

20  BR 414, 432 (S.D.N.Y. 1993).

21  **A.**    **The Pending Proceeding Rule does not Preclude a 2004 Exam When the Discovery**

22        **Sought is Pertinent to the Administration of the Estate.**

23         The pending proceeding rule "may preclude discovery under Rule 2004 based on the

24  'existence of other pending litigation in which such discovery could be obtained.'" <u>In re Oklahoma</u>

25  <u>Automatic Door, Co., Inc.</u>, 599 B.R. 167, 170–71 (Bankr. W.D. Okla. 2019) (quoting <u>In re</u>

26  <u>International Fibercom, Inc.</u>, 283 B.R. 290, 292 (Bankr. D. Ariz. 2002)).  While styled as a "rule,"

27  the bankruptcy court has the "**ultimate discretion**" in deciding whether a Rule 2004 exam should

28  proceed, notwithstanding the existence of a pending proceeding. <u>In re Int'l Fibercom, Inc.</u>, 283

1    B.R. 290, 292–93 (Bankr. D. Ariz. 2002) (citing In re M4 Enters., Inc., 190 B.R. 471

2    (Bankr.N.D.Ga.1995); In re Jasper Pellets, LLC, 647 B.R. 151, 157 (Bankr. D.S.C. 2022); In re

3    Sun Med. Mgmt., Inc., 104 B.R. 522, 524 (Bankr.M.D.Ga.1989)); see also In re Kearney, 590 B.R.

4    913, 921 (Bankr. D.N.M. 2018).  In exercising that discretion, the Court should look to the policy

5    reasons behind the pending proceeding rule, as well as the relevance of the information sought to

6    the bankruptcy. In other words, if, as is the case here, the information is relevant to the bankruptcy

7    court proceedings and there are appropriate procedural restrictions, the pending proceeding rule

8    has no purpose, and the Rule 2004 exam should go forward.

9            1.   The purpose behind the pending proceeding rule does not exist here.

10           The primary purpose for "restricting the use of a Rule 2004 examination under the pending

11   proceeding rule is that a Rule 2004 examination does not provide the examinee the same

12   procedural safeguards as he would have in discovery under either Rule 7026 or [applicable rules

13   of civil procedure]." In re Oklahoma Automatic Door, Co., Inc., 599 B.R. at 171. Specifically, a

14   witness "has no right to be represented by counsel except at the discretion of the court; there is

15   only a limited right to object to immaterial or improper questions; there is no general right to cross-

16   examine witnesses; and no right to have issues defined beforehand." In re Dinubilo, 177 B.R. 932,

17   939-40 (E.D. Cal. 1993).

18           Empery recognizes and acknowledges the policy reasons behind the pending proceeding

19   rule. Respectfully, those policies are not at issue here given the realities of the case and/or the

20   Court may enter appropriate relief to balance the competing interests behind Rule 2004 and the

21   pending proceeding rule. First, Drexler has counsel, and Empery certainly has no objection to their

22   defending the examination and asserting objections on his behalf. Likewise, to the extent that

23   Drexler wishes to be cross-examined by his own counsel, Empery has no objection. Finally,

24   Empery has largely defined the "issues beforehand" through its document requests. While this

25   policy may be more applicable to Drexler's deposition, Empery would not object to the limitation

26   of his deposition to those topics for which the Court permits document discovery, akin to a FRCP

27   30(b)(6) deposition. In re Jasper Pellets, LLC, 647 B.R. 151, 157 (Bankr. D.S.C. 2022)

28   (recognizing a courts authority to place restrictions on an examination).

**2.  The information sought is directly related to the Bankruptcy.**

"Courts have recognized that Rule 2004 examinations are ... in the nature of fishing expeditions." In re Enron Corp., 281 B.R. 836, 840 (Bankr.S.D.N.Y.2002); see also In re Kelton, 389 B.R. 812, 820 (Bankr. S.D. Ga. 2008). Because of their broad nature, parties may be able to use Rule 2004 to seek discovery in the bankruptcy that is largely unrelated to the bankruptcy and may be prohibited in a pending proceeding. In re Enron Corp., 281 B.R. at 842 (recognizing that motions for 2004 exams "were devoid of any invocation of what matters it seeks under Rule 2004(b) and the nexus of those materials to the Regents as a party in interest in this bankruptcy case."); In re Snyder, 52 F.3d 1067 (5th Cir. 1995) (characterizing the use of Rule 2004 to further a state court action as an abuse where appellant's primary motivation was to use those materials in a state court action against the examinee). However, courts have also noted that the "aggressive application of the 'pending proceeding rule' may prevent legitimate Rule 2004 examinations on matters wholly unrelated to the pending proceeding, thereby interfering with the trustee's [or debtor-in possession's] fiduciary duty to maximize estate assets." In re Jasper Pellets, LLC, 647 B.R. 151, 155–56 (Bankr. D.S.C. 2022) (internal citations omitted). Thus, the important question is not whether a pending proceeding exists, but whether the information sought in the 2004 Order or related subpoena is relevant and pertinent to the administration of the estate.

Here, the information sought in the Drexler Subpoena is directly relevant to issues in the Bankruptcy—separate and apart from any pending proceeding." In re Washington Mut., Inc., 408 B.R. 45, 51 (Bankr. D. Del. 2009). As such, the Court looks to whether there is a nexus between the requested materials and the proponent's interest in the bankruptcy case. In re Int'l Fibercom, Inc., 283 B.R. at 293 (citing In re Enron Corp., 281 B.R. at 842 (recognizing that the court did not deny a Rule 2004 order because of a pending proceedings but because the moving party did not establish the need for the information in the bankruptcy). In making this determination, courts look to the primary purpose of the Rule 2004 exam and the intent of the propounding party. In re Oklahoma Automatic Door, Co., Inc., 599 B.R. at 172; In re Snyder, 52 F.3d 1067 (5th Cir. 1995). That is, whether the primary purpose of the exam is to discover information relevant to the bankruptcy or to discover evidence for use in related litigations. In re Sunedison, Inc., 572 B.R.

482, 490 (Bankr. S.D.N.Y. 2017) (noting a "concern that a party to litigation could circumvent his adversary's rights by using Rule 2004 rather than civil discovery to obtain documents or information relevant to the lawsuit"). Accordingly, when a proposed Rule 2004 exam is not designed to circumvent more restrictive discovery rules of a pending proceeding, it may be used to "investigate matters that may affect the administration of the debtor's estate." In re Int'l Fibercom, Inc., 283 B.R. at 293.

While discerning a party's intentions may be difficult, the fact that until recently Drexler was Debtor's CEO and Chairman is outcome determinative. See In re Oklahoma Automatic Door, Co., Inc., 599 B.R. at 172. Unlike a situation where a 2004 exam is sought of a third-party, Drexler signed the bankruptcy petition, purported to provide the corporate authority for the filing, and is certainly the person with the most knowledge of Debtor's financial condition. Furthermore, to the extent the Court has any concern that some of the requests may be for another purpose, the Court can impose reasonable limitations. In re Jasper Pellets, LLC, 647 B.R. at 157 (permitting a Rule 2004 exam but prohibiting requests and testimony related to certain communications).

Moreover, Drexler cannot identify any documents sought or requested on which discovery has been denied in another forum, such that he cannot argue that the Drexler Subpoena is a rouse to obtain here what Empery has been denied elsewhere. Thus, there is no legitimate concern that Empery is seeking to circumvent the more restrictive rules of civil procedure. But even if Drexler could, and to the extent that the Court is concerned that Empery is seeking discovery for another matter, the Court can properly order that the use of information produced in response to the Rule 2004 Exam, including Drexler's testimony, be limited to the bankruptcy case.

Finally, while Drexler implores the Court to order that Empery seek discovery in another forum, it is a relevant consideration that there is not a pending proceeding where Empery could currently seek the discovery. In re Int'l Fibercom, Inc., 283 B.R. at 293 (permitting a 2004 exam where a pending proceeding was stayed). Moreover, it is likely that any action involving Drexler, including the Revolver Action and SLAPP Action, will be dismissed and never proceed to discovery. Thus, the purpose and effect of Drexler's requests are not in furtherance of the pending proceeding rule, but instead to completely thwart discovery of issues relevant to the bankruptcy—

1  namely the administration of the estate.

2  **B.     The Specific Requests That Drexler Contends Are Improper Requests Under**

3  **Bankruptcy Rule 2004.**

4          The Motion asserts that certain of Empery's discovery requests are designed to abuse or

5  harass Drexler.  The Motion also asserts, "It is also clear that Empery's motives in seeking such

6  discovery on an expedited basis is not linked to an examination of the debtor or the administration

7  of the estate, but instead is in furtherance of scorched earth tactics to further its non-bankruptcy

8  litigation with Drexler."   Motion 4:6-8.   The Motion goes on urging the Court to buy-in to

9  Drexler's argument that Empery's discovery is improper contending,

> [A]part from the obvious hope to get discovery for use in non-bankruptcy litigation
> and otherwise retaliate against and harass Drexler for having foiled the Article 9
> auction by filing this bankruptcy case, there is no apparent reason why Empery
> requires discovery from Drexler right now for any chapter 11 reason.  The bar date
> has yet to pass, the first exclusive period has not yet expired, there are no plan
> negotiations taking place, the extent to which there will be anything distributable
> value for creditors is not yet known, and significant time remains for the
> development of estate causes of action.

Motion 5:7-13.

        The obvious problem with all of this speculation as to Empery's motive is that it ignores

(i) the temporal status of the case, (ii) White Winston's allegations raised in connection with the

first day motions, and (iii) the DIP financing proceedings and negotiations and orders with respect

thereto.  Both the bar date and termination of exclusivity are only weeks away. White Winston has

already suggested a motion to terminate exclusivity.  The clock on the deadline to file the plan is

ticking, and Empery, on behalf of the DIP lenders certainly has a right to understand the DIP

collateral, which includes all causes of action owned by the estate against former officers and

directors.

        The material issues to be examined by the Court and which are in the Court's discretion,

are whether the requests are within the scope of Bankruptcy Rule 2004 and are directly related and

relevant to issues in the Bankruptcy—separate and apart from any pending proceeding.  Here, on

balance, the interests of Empery in obtaining the information for purposes of understanding the

assets and liabilities of parties in the case, having information to negotiate its claim and plan

1  treatment and understand the value of its collateral in the chapter 11 case without further delay

2  overrides any harm or prejudice to Drexler in responding to the current requests.  Certainly, the

3  Court has the ability of issuing any protective measures discussed herein necessary to preserve the

4  rights of Drexler.

5  The Motion contends that five requests made by Empery are improper under Bankruptcy

6  Rule 2004.  In this regard, Drexler objects to requests nos. 1, 12, 13, 24, and 25.

7  **1.  Request No. 1.**

8  Request No. 1 reads as,

9  REQUEST FOR PRODUCTION NO. 1:  Please produce all complaints, motions
under Rules 12 or 56 of the Federal Rules of Civil Procedure or any dispositive
10  motions under applicable state rules of civil procedure, and all dispositive orders
and judgments filed or docketed in any action or proceeding involving or related to
11  You and the Debtor, or its Affiliates and Insiders, including but not limited to the
Lawsuits."

12  Drexler contends Request No. 1 is overbroad and unduly burdensome because all

13  documents responsive to the request are public records and all litigation involving the Debtor has

14  been listed in the Debtor's statements and schedules.  See Motion 10:18-21.  Foremost, Drexler

15  need not search for documents that are not in his possession, custody and control. Thus, he is not

16  being asked to obtain documents from other sources, but merely to produce what is already in his

17  control—if anything.

18  Second, while Empery agrees that, absent a sealing order or other localized rules barring

19  access to certain court records, the documents requested should generally be available to the public

20  upon request, it does not mean that the information is reasonably accessible or that Debtors list of

21  litigation in its Statement of Financial Affairs is complete. [ECF No. 176 (pages 87-114)].

22  Certainly, Debtor's list of lawsuits does not necessarily include cases against Mr. Drexler or

23  Debtors other affiliates or insiders.  Not all courts have modernized dockets like the federal system.

24  Empery has also been advised by the Debtor that the Debtor's books and records have proven

25  incomplete.

26  Further, it is evident from the list of litigation filed by Debtor at ECF No. 176 (pages 87-

27  114), that Debtor has been involved in substantial litigation for its size.  Furthermore, Drexler

28

concedes that until recently he was the Chief Executive Officer of Debtor, that he continues to be an affiliate of Debtor and is a lender to Debtor. There may very well be actions against Drexler, personally, as guarantor or otherwise, or other affiliates related to Debtor that are not contained in Debtor's Statement of Financial Affairs—which seemingly omits all claims against Drexler.  As such, Drexler has information regarding the Debtor and its litigation with himself, Debtor's affiliates and insiders, that is not necessarily available in public searches of court records, assuming electronic searches are available for all courts.  This is particularly true with respect to closed cases.  <u>Under the circumstances, Empery would agree to limit the request for production to withdraw Request No. 1 on the condition that Drexler responded to Request No. 1 by providing Empery with a list of any litigation falling within Request No. 1 (by providing the name of the case, case number and court) that is not otherwise set forth on ECF No. 176.</u>

**2. Request No. 12.**

Drexler next objects to Request No. 12, which provides:

REQUEST FOR PRODUCTION NO. 12:  Please produce all documents and communications including emails and text messages, evidencing, referring, or relating to any of payment of funds, by any third-party, to counsel representing You, whether solely or in conjunction with another person or entity, since December 2021.

Empery received a bank statement from Wells Fargo which showed transfers from Debtor's Wells Fargo account to Drexler.  To the extent Drexler received funds from Debtor or others (who in turn received consideration from or claims against Debtor), it is relevant to potential D & O claims (assets) the estate has against Drexler (which is the DIP lender's collateral) as well as potential defenses to liabilities of the Debtor's estate. Additionally, Bankruptcy Rule 2004 expressly permits discovery regarding "the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given or offered therefore."  In this case, White Winston has offered funding for the reorganization of the Debtor, and, among the matters, has indicated it may seek a termination of the Exclusivity period.  There is an obvious level of coordination between White Winston and Drexler immediately preceding the Article 9 Sale and at the time of the bankruptcy filing.  Indeed, White Winston sought to enter into the Settlement Agreement with Drexler and it is appropriate for discovery to probe "the

consideration given or offered therefore." And White Winston's lawyer stated in the NY case that they "assisted it in finding its Nevada bankruptcy counsel."

**3.  Request No. 13.**

Drexler next objects to Request No. 13, which provides:

REQUEST FOR PRODUCTION NO. 13:  Please produce all documents and communications including emails and text messages, evidencing, referring, or relating to any claim, as defined in 11 USC 101(5), against Debtor possessed or acquired by You, whether asserted or unasserted, contingent, liquidated, disputed or undisputed."

Bankruptcy Rule 2004 expressly permits discovery regarding the liabilities of a debtor and Rule 2004 examinations are commonly utilized for the purpose of understanding the basis of claims and the extent and validity of only liens securing those claims.  Drexler's suggestion that discovery of "emails and text messages, evidencing, referring, or relating to any claim, as defined in 11 USC 101(5), against Debtor" is premature because the bar date (which is a mere thirty (30) days away) has not occurred, rings hollow.  The Debtor's schedules show that Drexler has a large claim against the Debtor's estate, and the disposition of the claim is going to be part of plan negotiations. Whether Drexler has or will assert those claims is immaterial, as their existence is material to the administration of the estate.

**4.  Request Nos. 24 and 25.**

Drexler next objects to Requests Nos. 24 and 25 which provide:

REQUEST FOR PRODUCTION NO. 24:  Please produce all documents and communications, including emails and text messages with the New York Post or any other news outlet related to Debtor or Empery, in any way, since January 1, 2022.

REQUEST FOR PRODUCTION NO. 25:  Please produce all documents and communications, including emails and text messages with any private investigators or public relations firms related to Debtor or Empery, in any way, since January 1, 2022.

Empery was contacted by the New York Post before the SLAPP Action was filed about a story involving Empery based on the Revolver Action.  It is apparent that Drexler has used the Revolver Action offensively in conjunction with White Winston to impact negotiations in this bankruptcy case.  Notably, while the aforementioned requests may seem premised on the allegations in the SLAPP action, the requests above (24 and 25) were

drafted approximately 48 hours before Empery became aware of that lawsuit. Additionally, Empery is not a named party to that action.  In any event, Empery is entitled to correspondence and communications relating to the Debtor and Empery by Drexler, who is no longer CEO of Debtor and using the Nevada Litigation to affect the negotiations in the bankruptcy case as they directly relate to plan negotiations and the truth of the story that White Winston and Drexler are jointly trying to urge upon the Court and other constituents in this case.

In summary, there is no evidence in the record to support the allegations made by Drexler that Empery is seeking Rule 2004 discovery for the purpose of abusing or harassing Drexler.

**C.    The Pending Proceeding Rule is Not a Per Se Rule, and Should Not Be Invoked to Quash Requests 2, 3, 4, 5, 14, 18, and 19.**

The Motion states, "the primary purpose of Empery's requests is to improperly attempt to end-run the applicable discovery rules, protections and processes, and judicial oversight by the presiding judges in the [New York and Nevada Litigation] …. Any connection between those requests and this Chapter 11 Case (and Bankruptcy Rule 2004) is largely an accident predicated on the fact that Drexler previously was debtor's CEO." Motion 4:1-5.  With respect to Empery's claim, and plan negotiations regarding the allowance and payment of Empery's claim, Drexler was the one that brought attention to the  Revolver Action and caused the allegations therein to be relevant in this chapter 11 case.  Within twenty-four hours of the Revolver Action being filed, White Winston attached the complaint in the Revolver Action  as Exhibit "B" to the Evidentiary Objection of Creditor White Winston Select Asset Funds, LLC to Declaration of Tim Silver [see ECF No. 216] filed on February 8, 2023, and stated that "The complaint is only the proverbial tip of the iceberg on Mr. Drexler's side of the story."  The complaint was filed in this Court the day after the complaint was filed in state court, before it was even served upon Empery.

**1.    Request Nos. 2 and 3**.

Request No. 2 provides,

REQUEST FOR PRODUCTION NO. 2.   Please produce all documents and

communications, including emails and text messages, related to or referencing White Winston Select Asset Funds, LLC's ("White Winston") claims for relief or causes of action alleged or brought against You or the Debtor from 2018 through the present, whether resolved or unresolved.

Request No. 3 provides,

REQUEST FOR PRODUCTION NO. 3.   Please produce all documents and communications, including emails and text messages, in Your possession, custody, and control for related to or referencing Empery or the Secured Noteholders from August 2020 through the present.

Debtor's Statement of Financial Affairs indicate that White Winston commenced litigation against Debtor several years ago.  Empery believes that White Winston, Drexler and Debtor may have tried to settle that litigation shortly before the scheduled Article 9 Sale.  White Winston has indicated it has claims against Debtor.  If true, these claims would be liabilities of Debtor's bankruptcy estate.  Determining the liabilities in a case is a primary purpose of Rule 2004.  It is axiomatic that obtaining information respecting potential defenses to claims (liabilities) of a bankruptcy estate is also a clear purpose of Rule 2004.  The liabilities in a case are particularly important to the formulation of a plan; the confirmation of a plan is the primary objective of a chapter 11 case.  Empery is collectively representing the largest creditor constituents in the case and accordingly will have a material role in the negotiation and confirmation of any plan.  What matters most is that the information sought is reasonably calculated to inform Empery regarding the Debtor's liabilities and assist it in plan negotiations which are directly pertinent to the plan process.  Additionally, Empery is not taking the Rule 2004 examination of just any third-party. Empery seeks to examine Drexler, who has the most knowledge concerning the Debtor, its business, and its history than any other person.  Drexler recently alleged he owns in excess of 49% of the equity in the case in his *Substantial Equityholder Notice* served on primary counsel in the bankruptcy case on March 16, 2023.  He also  holds a claim in the case, subject to intercreditor agreements with Prestige and Empery.

Empery's Request No. 3 is pertinent to the bankruptcy case for all of the same reasons as Request No. 2.  The documents sought are relevant or may lead to relevant evidence concerning or supporting the viability of the claims Empery represents. Drexler was the CEO of Debtor and negotiated with Empery for the loans made by the Noteholders to Debtor. He can certainly locate

1  the documents in his possession related to Empery and the Noteholders, and search his emails and

2  text messages for communications with others during the limited time frame requested.  Empery

3  can suggest searches to be performed in this regard.

4  **2.  Request Nos. 4, 14 and 15.**

5  Request No. 4 provides,
   REQUEST FOR PRODUCTION NO. 4.  Please produce all communications,
6  including emails and text messages, between or among You and White Winston,
   including but not limited to those related to or referencing the Settlement
7  Agreement, the UCC Sale, the Chapter 11 Case, White Winston's debtor-in-
   possession financing proposals, or Empery's debtor-in-possession financing
8  proposals."

9  Request No. 5 provides,
   REQUEST FOR PRODUCTION NO.  5.  Please produce all communications.
10 including emails and text messages, between or among You and the Debtor's board
   of directors or any member of the Debtor's board of directors, at any time, related
11 to or referencing the Settlement Agreement, the UCC Sale, the Chapter 11 Case,
   White Winston's debtor-in-possession financing proposals, or Empery's debtor-in-
12 possession financing proposals.

13 Request No. 14 provides,
   REQUEST FOR PRODUCTION NO.  14.  Request No. 14 provides, "Please
14 produce all documents and communications including emails and text messages,
   related to any agreement that refers or relates to Empery, Debtor, White Winston,
15 or any claim for relief or cause of action held by You."

16 Empery Requests No. 4, 5 and 14 all relate to potential liabilities of the Debtor and potential

17 defenses to those liabilities.  Drexler and White Winston have indicated that they have claims

18 against Debtor.  Requests 4 and 5 probe the basis for these claims, as well as the accusation that

19 Empery is responsible for the Debtor's commencement of Debtor's bankruptcy case.

20 Communications between Drexler, which according to the Motion, was CEO of Debtor until

21 sometime in January 2023, and members of Debtor's Board of Directors and White Winston are

22 not privileged communications and may very well document in real time the who, what, where,

23 why, and how White Winston's alleged claim came about, whether it was properly approved by

24 Debtor's board, why the settlement seemed to come into existence when it did, immediately prior

25 to the commencement of the bankruptcy case, and what was given in exchange for the claim and

26 why.  All of these questions are pertinent to the resolution of the Chapter 11 case through a sale or

27 plan process.

28 **3.  Request Nos. 18 and 19.**

1   Request Nos. 18 and 19 provide,

2   REQUEST FOR PRODUCTION NO. 18. Please produce all communications,
    including emails and text messages, in Your possession, custody or control where
3   Sabina Rizvi was also a party from January 1, 2022 to present.

4   REQUEST FOR PRODUCTION NO. 19. Please produce all documents and
    communications, including emails and text messages, related to any performance
5   reviews of Sabina Rizvi, from January 1, 2022 to present.

6   Sabina Rizvi was an employee of Debtor when Empery was introduced to Debtor. She was

7   acting as Debtor's President and Chief Financial Officer, and Empery was told by Drexler that

8   Rizvi was running the day-to-day operations of Debtor. Rizvi had worked for YUM Brands, a

9   Fortune 1000 company that owns, Kentucky Fried Chicken, Taco Bell and Pizza Hut, among its

10  holdings. White Winston aided by Drexler, has asserted wrongdoing by Empery in this bankruptcy

11  case, including wrongfully scheduling the Article 9 Sale. Among other matters involving Rizvi,

12  it has been claimed that Rizvi was induced by Empery to leave her position so that Empery could

13  declare a default—seemingly as a defense to Empery's claims against Debtor.

14  Empery Requests No's 18 and 19 are reasonably calculated to go to the heart of allegations

15  made against Empery and the Noteholders' claims in the Bankruptcy Case. Empery is entitled to

16  have the Rizvi emails while conducting its plan negotiations, particularly with the Debtor and the

17  Committee. Further, the Committee will want to see the Rizvi correspondence in connection with

18  its ongoing investigation of Empery and the allegations against Empery made by Drexler that have

19  been made part of the bankruptcy case by White Winston. In short, the requests go to the liabilities

20  of Debtor and are very important to plan negotiations.

21  **D.    The Parties' Resolution of Request No. 8 and 23.**

22  As reflected in the Motion, the parties have resolved request 8 and 23 as described in

23  footnote 5 of the Motion.

24  **E.    The Timing of Empery's Rule 2004 Discovery is Permissible Under the Rules and**
25  **Reasonable Under the Facts and Circumstances of This Case.**

26  Drexler also disputes the timing of the responses to the Drexler Subpoena. The Drexler

27  Subpoena required him to produce responsive documents two weeks after service of the Drexler

28  Subpoena on Drexler and then to sit for his examination ten (10) days after the scheduled

1    production. Drexler states that this schedule is unreasonable because, (i) he has no staff or

2    assistance to search for documents, computer files, emails, and texts in his possession, custody and

3    control, (ii) because he cannot have his lead litigation attorney review documents for privilege due

4    to his lead litigation counsel's schedule, and (iii) because Empery has not demonstrated any

5    urgency for needing the requested documents at this time.  Motion 3:18-25; 5: 9-13.

6         Drexler's contention that the time required for compliance with the Drexler Subpoena

7    impose an undue burden upon Drexler has no merit.  Drexler is the majority shareholder of Debtor,

8    served as its Chief Executive Officer and member of its board of directors since at least 2017, and

9    is a creditor of Debtor.  No party involved in the Chapter 11 Case other than Drexler disputes that

10   Drexler caused Debtor's financial situation and that Debtor is in Chapter 11 because of Drexler's

11   mismanagement of Debtor.  Thus, the suggestion that Empery seeking discovery from Drexler

12   related to Debtor imposes an *undue* burden upon Drexler is without support.

13        Additionally, the 14-days provided for document production and 31-days' notice of

14   Drexler's 2004 examination ("2004 Exam") are reasonable under the circumstances.  In fact, a

15   subpoena requiring compliance within 14-days of service is presumptively reasonable.  See e.g.,

16   In re Trinh, 2022 WL 1769135, at *4 (Bankr. C.D. Cal. May 31, 2022) ("One court has observed

17   that '[a]lthough Rule 45 does not define 'reasonable time,' many courts have found fourteen days

18   from the date of service as presumptively reasonable in light of the language of Rule 45(c)(2)(B)

19   [now Rule 45(d)(2)(B) providing that a party subpoenaed to produce documents may object

20   'before the earlier of the time specified for compliance or 14 days after the subpoena is served'].).

21   Moreover, Rule 2004 of Local Rules of Practice for the United States Bankruptcy Court District

22   of Nevada provides that "[t]he clerk may sign orders for examination only if the date set for

23   examination is more than fourteen (14) days from the date the motion is filed."  Accordingly, the

24   local rules presumptively establish that setting an examination on 14 days or more is ministerial

25   and does not require leave of court. As such, the time for compliance with the Drexler Subpoena

26   is more than adequate.

27        Further, as noted by Drexler, he must only produce the documents in his possession,

28   custody and control. Moreover, it is Drexler's burden to establish that the subpoena should be

quashed for being oppressive or burdensome. *In re Subpoena Duces Tecum*, 461 B.R. 823, 829 (Bankr. C.D. Cal. 2011). The Motion fails to do so. Notably, it fails to set forth with any specificity the repositories of information that must be searched or their relative size, instead relying on the vague "documents, computer files, emails, and texts in his possession, custody and control." In so admitting that he has to search documents, computer files, emails and texts, however, Drexler is conceding that relevant and discoverable information exists in all referenced repositories. Thus, the requested information is acknowledged to exist.

Second, the Motion fails to establish any burden. Of course, there would be no burden to search a single file cabinet, computer, personal email inbox or cell phone, or even multiples of the aforementioned. Nor does the motion include "hit counts" or some other metric by which the Court can determine if there is any burden whatsoever. It is in fact conspicuously absent from the Motion, either evidencing there is no burden at all or concealing the trove of relevant and discoverable information related to Debtor that Drexler has in possession.

Furthermore, Drexler seriously cannot contend that he lacks the resources to perform the searches. Drexler has multiple attorneys working for him in this case, the New York litigation, and the Nevada Litigation. Not less than four (4) qualified attorneys are set out on the first page of the Motion, as representing him in respect of the subpoenaed documents and the Drexler examination; not to mention the bevy of associates and paraprofessionals behind those attorneys. Additionally, Drexler has retained Nevada firms Bailey Kennedy, LLP in the Revolver Action, and Simmons Hall Johnston PC in the SLAPP Action. Certainly, Drexler's attorneys and their offices can provide Drexler with assistance in the requested production. Drexler's contention that he cannot produce discovery falls flat.

Finally, Empery, representing the largest creditor constituency in this case has the right to obtain documents and undertake reasonable examinations under Bankruptcy Rule 2004 in order to understand the assets and liabilities of the debtor, to negotiate plan treatment, to prosecute and defend its counterparties' claims in the case, to seek to propose a plan of reorganization and to value its collateral, including the DIP collateral. In view of the allegations made in Court by White Winston, which included filing Drexler's state court complaint in the bankruptcy case and stating

1  that "[the] complaint is only the proverbial tip of the iceberg on Mr. Drexler's side of the story",

2  Empery should not be precluded from obtaining evidence to be used in this case for the legitimate

3  purposes specified above.  In this regard, the Court is more than capable of issuing any needed

4  orders to protect the integrity of the process.

5      Further, to the extent that the Court determines to disallow any of the discovery based upon

6  the pending proceeding rule or for any other reason, the Court should explicitly make such decision

7  without prejudice.  Empery does not manage or control the speed of prosecution of other parties'

8  litigation claims, and Empery should not be denied discovery in this proceeding based upon

9  strategic litigation commenced by others, including Drexler.

10  ## V. **CONCLUSION**

11      For the reasons stated above, Empery requests that the Court deny the Motion, and Empery

12  requests that the Court grant such other and further relief that is just and proper under the

13  circumstances.

14      DATED this 20th day of March, 2023.

15                                      GARMAN TURNER GORDON LLP

16                                       */s/  William M. Noall*
17                                      WILLIAM M. NOALL, ESQ.
                                        GREGORY E. GARMAN, ESQ.
18                                      7251 Amigo Street, Suite 210
                                        Las Vegas, Nevada 89119
19                                      *Attorneys for Empery Tax Efficient, LP as*
                                        *Agent and Collateral Agent for certain*
20                                      *Secured Noteholders*

21

22

23

24

25

26

27

28

# EXHIBIT A

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.: 22-14422-NMC |
| MUSCLEPHARM CORPORATION, | Chapter 11 |
| Debtor. | **SUBPOENA IN A CASE UNDER THE BANKRUPTCY CODE FOR AN EXAMINATION AND THE PRODUCTION OF DOCUMENTS PURSUANT TO FED. R. BANKR. P. 2004** |

**TO:   RYAN DREXLER**

☒  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in this involuntary bankruptcy case.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| PLACE[1] | DATE AND TIME: |
|---|---|
| Garman Turner Gordon LLP 7251 Amigo Street, Suite 210 Las Vegas, Nevada 89119 | March 27, 2023 at 9:00 a.m. PST |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the documents and communications requested on **Exhibit B** hereto, subject to the Definitions and Instructions, on **Exhibit A** hereto.

| PLACE | DATE AND TIME |
|---|---|
| Garman Turner Gordon LLP[2] 7251 Amigo Street, Suite 210 Las Vegas, Nevada 89119 | March 17, 2023 at 5:00 p.m. PST |

Any subpoenaed organization not a party to this proceeding case shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify, Fed. R. Civ. P. 30(b)(6) made applicable to this proceeding by Rule 7030, Fed. R. Bankr. P.

---

[1] The examination will be recorded *via* stenographic means and/or videotaped.

[2] Responsive documents may also be provided in electronic format to dciciliano@gtg.legal

1

| **ISSUING OFFICER SIGNATURE AND TITLE** | **DATE** |
|---|---|
| /s/ Mark M. Weisenmiller | March 3, 2023 |

**ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER**

Gregory A. Garman, Esq.
William M. Noall, Esq.
Mark M. Weisenmiller, Esq.
Garman Turner Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, NV 89119
(725) 777-3000
*Attorneys for Empery Tax Efficient, LP as*
*Agent and Collateral Agent for certain*
*Noteholders*

**PROOF OF SERVICE**
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45)**

I received this subpoena for *(name of individual and title, if any)* _____
_____ on *(date)* _____.


☐  I served the subpoena by delivering a copy to the named person as follows: _____
_____
_____ on *(date)* _____; or

☐  I returned the subpoena executed because: _____
_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $_____.

My fees are $_____ for travel and $_____ for services, for a total of $_____.

     I declare under penalty of perjury that this information is true and correct.


Date: _____

                                         _____
                                                  *Server's signature*

                                         _____
                                                 *Printed name and title*

                                         _____
                                                   *Server's address*

Additional information concerning attempted service, etc.:

3

**Federal Rules of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)**
**(made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)**

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises —or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or

modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

**For access to subpoena materials, see Fed. R. Siv. P. 45(a) Committee Note (2013)**

# EXHIBIT A

## DEFINITIONS

1.    "<u>Affiliate</u>" shall mean any individual, general partnership, limited partnership, trust, estate, corporation, limited liability company, or business trust that is owned by, directly or indirectly controlled by, or acts at the direction or for the benefit of the Person or Entity named and includes an affiliate of an affiliate.

2.    "<u>Communication(s)</u>" shall mean, without limitation, any transmittal, conveyance or exchange of a word, statement, fact, thing, idea, document, instruction, information, demand, question or other information by any medium, whether by written, oral or other means, including but not limited to personal conversations, written correspondence, memoranda, letters, reports, publications, electronic communications, text messaging, instant messaging, messages *via* social media and electronic mail.

3.    "<u>Date</u>" means the exact day, month, and year, if known, or if not known, your best approximation thereof.  Exact dates shall be given in all answers except where it is explicitly indicated that an approximate date may be given.

4.    "<u>Debtor</u>" shall mean MusclePharm Corporation, the debtor in the Chapter 11 case of *In re MusclePharm Corporation*, Case No. 22-14422-NMC ("Bankruptcy Case"), pending in the United States Bankruptcy Court District of Nevada (the "<u>Bankruptcy Court</u>").

5.    "<u>Document</u>" is intended to be as broad as it is used in FRCP 26 and 34, and includes, without limitation:

a.    the original (or an identical duplicate if the original is not available) and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description that are fixed in any kind of physical media;[3]

b.    any printed, typewritten, handwritten, electronic, or otherwise recorded matter of whatever character of communications, letters, correspondence, electronic mail, text messages, instant messages, memoranda, notes, Post-Its, media releases or articles, photographs, tape or sound recordings, contracts, agreements, telephone records, diaries, desk calendars, appointment calendar, group scheduler calendars, statements, reports, journal, minutes, working paper, financial report, accounting report, work papers, facsimile, facsimile transmission, drafts, logs, chart, graph, index, directory, scheduling data, databases, spreadsheets, presentations, word processed documents, bulletins, design schedules, supplemental instructions, time cards, drawings, shop drawings, progress payments, progress schedules, estimates, equipment time cards, design calculations, design meeting minutes, coordination meeting minutes, and material

---

[3] Physical media includes, but is not limited to, paper media, photographic media (including pictures, films, slides and microfilm), phonographic media, magnetic media (including, but not limited to hard drives, floppy disks, compact disks, and magnetic tapes of any kind), computer memory, optical media, magneto-optical media, and other physical media on which notations or marking of any kind can be affixed.

similar to any of the foregoing, however denominated and to whomever addressed, computer directory, computer disk, computer tape, or any written, printed, typed, punched, taped, filmed, or graphic matter however produced or reproduced. Documents also include the file, folder tabs, and labels appended to or containing any documents.

c.    For the avoidance of doubt, electronically-stored information with all metadata intact shall be produced whenever available in the format described below.

6.    "Empery" means Empery Tax Efficient, LP, in its capacity as collateral agent of the Secured Noteholders (defined below) with respect to the Notes (as defined in the Silver Declaration [ECF No. 52])[4].

7.    "Entity" includes, without limiting the generality of its meaning, every corporation, partnership, association, limited liability company, joint venture and professional business entity or any iteration, subsidiary, or affiliate thereof.

8.    "Insider" shall mean (i) Your relatives; (ii) partnerships in which You are a general partner; or (iii) corporations, companies or partnerships in which you are a partner, director, officer, or person in control of You.

9.    "Lawsuits" includes, but is not limited to, the following actions:

(i) *White Winston Select Asset Funds, LLC et al. v MusclePharm Corporation, et al.*, Case No. 2284cv00293-BLS2 (Superior Court, Suffolk County, Commonwealth of Massachusetts) (the "Pending Massachusetts Action");

(ii) *MusclePharm Corporation, et al. v. White Winston Select Asset Fund Series Fund MP-18, LLC et al.*, Case No. 1984cv00663-BLS2 (Superior Court, Suffolk County, Commonwealth of Massachusetts (the "Prior Massachusetts Action");

(iii) *White Winston Select Fund Series Fund MP-18, LLC, et al. v. MusclePharm Corporation, et al.*, Case No. 18-OC-00206 (First Judicial District Court in and for Carson City, Nevada) (the "Nevada Action");

(iv) *White Winston Select Fund Series Fund MP-18, LLC et al v. MusclePharm Corporation, et al.*, Case No. 80196 (Nevada Supreme Court) (the "First Nevada Appeal");

(iv) *MusclePharm Corporation, et al. v. The First Judicial District Court of the State of Nevada et al.*, Case No. 79163 (Nevada Supreme Court) (the "Second Nevada Appeal");

---

[4] The reference to "ECF" refers to the Bankruptcy Court's Electronic Filing System and the reference to ECF No. followed by one or more digits refers to a docket item on the Bankruptcy Court's Electronic Filing System with respect to the Bankruptcy Case.

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

(v) *White Winston Select Asset Fund Series Fund MP-18, LLC v. MusclePharm Corporation*, Case No. 19STCV26426 (Superior Court of the State of California, County of Los Angeles, Central District (the "California Action"); and

(vi) any adversary proceeding commenced in the Bankruptcy Case.

10.      "Person" shall mean any natural person, trust, Entity, association of entities and/or natural persons, and/or governmental body.

11.      "Petition Date" means December 15, 2022.

12.      "Relate" or "relating to" means constituting, comprising, containing, setting forth, showing, disclosing, describing, explaining, summarizing, concerning, or referring to directly or indirectly.

13.      "Relevant to" has the same meaning that it has in FRCP 26(b)(1) incorporated by Bankruptcy Rule 7026.

14.      "Secured Noteholders" means collectively the October Noteholders (which are Empery Master Onshore, LLC ("EMO"), Empery, Empery Tax Efficient III, LP ("ETE3"), and Empery Debt Opportunity Fund, LP ("EDOF," and collectively with EMO, Empery and ETE3, the "Empery Noteholders")), Ionic Ventures, LLC, Anson Investments Master Fund LP, CVI Investments, Inc., HB Fund LLC, Intracoastal Capital LLC, Bigger Capital Fund, LP, District 2 Capital Fund LP, L1 Capital Global Opportunities Master Fund, and Altium Growth Fund, LP) and the June Noteholders (which are Empery Noteholders, Ionic Ventures, LLC, Anson Investments Master Fund LP, HB Fund LLC, Bigger Capital Fund, LP, District 2 Capital Fund LP, Altium Growth Fund, LP, Walleye Opportunities Master Fund Ltd., and Roth Capital Partners, LLC).

15.      "Settlement Agreement" means the *Settlement Agreement and Release Between White Winston Select Asset Funds, LLC and White Winston Select Asset Fund Series Fund MP-18, LLC and MusclePharm Corporation and Ryan Drexler*, dated December 5, 2022.

16.      "UCC Sale" means the Article 9 foreclosure sale that was to occur at 1:00 p.m. (Pacific Time) on December 15, 2022, with respect to certain of Debtor's assets.

17.      "You" or "Your" means Ryan Drexler and any Affiliate or Insider thereof and Your agents, servants, employees, attorneys, accountants, representatives, any other Person or Entity over which You have control or have a superior right to compel to do an act or produce an item, and any Entity You were or are an agent, manager, officer, or director or otherwise maintained or maintain a supervisory, advisory, or consulting role.

1

## INSTRUCTIONS

2

1.    You shall produce all Documents in the manner in which they are maintained in the usual course of business and/or shall organize and label Documents to correspond with the categories of this Request.  A Request for Documents shall be deemed to include a Request for any and all file folders within which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the Document in addition to the Document itself.

3

4

5

6

2.    In producing Documents and other materials, You are requested to furnish all Documents or things in Your possession, custody, or control, regardless of whether such Documents or materials are possessed by You directly or Your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, investigators, or by Your attorneys or their agents, employees, representatives, or investigators.

7

8

9

3.    If any of the information contained in the answers to these Requests is not within Your personal knowledge, so state.  The answers to the Requests should identify every Person, Document, and Communication upon which You rely for the information contained in the answer not based solely on Your own personal knowledge.

10

11

12

4.    If You cannot answer any portion of the following Requests in full, after exercising due diligence to secure the information, so state and answer to the extent possible, specifying Your inability to answer the remainder and stating whatever information or knowledge You have concerning the unanswered portion.

13

14

15

5.    You are requested to provide all responsive Documents within Your possession, custody, or control.  In the event that You provide only a portion of the Documents called for by any particular Request, state the reason(s) for Your inability to provide the remainder of the Documents requested and the identity of the Document(s).

16

17

18

6.    In the event the Documents called for by any particular request are no longer in Your possession, custody or control, state the reason(s) why those Documents are no longer in Your possession, custody, or control and the identity of the Document(s) and all Your knowledge regarding who currently has possession, custody or control of the Document(s).

19

20

21

7.    In the event that Documents called for by any particular request have been lost or destroyed, please state: (i) the date on which the Document(s) were lost or destroyed; (ii) the manner in which the Document(s) were lost or destroyed; (iii) the identity of the Document(s); (iv) the information contained within such Document(s) and the nature of the Document(s); and (v) and the identity of any person(s) who has knowledge of the contents of the Document(s) or has received a copy of such Document(s).

22

23

24

25

8.    If You withhold any Document pursuant to a claim of privilege, You shall expressly make the claim of privilege and produce a privilege log in compliance with Fed. R. Civ. P. 26(b)(5), incorporated by Fed. R. Bankr. P. 7026.

26

27

9.    Documents attached to each other should not be separated.

28

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

10.     Documents not otherwise responsive to this discovery Request shall be produced if such Documents mention, discuss, refer to, or explain the Documents that are called for in the discovery request.

11.     The fact that a Document has been produced by another party does not relieve You of Your obligation to produce Your copy of the same Document, even if the two Documents are identical.

12.     The terms "each" and "all" shall be construed as "all and each."

13.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery Request all responses that might otherwise be outside of the scope.

14.     The use of the singular form of any word includes the plural and vice versa.

15.     The use of the feminine form of any word includes the masculine and vice versa.

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

**EXHIBIT B**

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**  Please produce all complaints, motions under Rules 12 or 56 of the Federal Rules of Civil Procedure or any dispositive motions under applicable state rules of civil procedure, and all dispositive orders and judgments filed or docketed in any action or proceeding involving or related to You and the Debtor, or its Affiliates and Insiders, including but not limited to the Lawsuits.

**REQUEST FOR PRODUCTION NO. 2:**  Please produce all documents and communications, including emails and text messages, related to or referencing White Winston Select Asset Funds, LLC's ("White Winston") claims for relief or causes of action alleged or brought against You or the Debtor from 2018 through the present, whether resolved or unresolved.

**REQUEST FOR PRODUCTION NO. 3:** Please produce all documents and communications, including emails and text messages, in Your possession, custody, and control related to or referencing Empery or the Secured Noteholders from August 2020 through the present.

**REQUEST FOR PRODUCTION NO. 4:**  Please produce all communications, including emails and text messages, between or among You and White Winston, including but not limited to those related to or referencing the Settlement Agreement, the UCC Sale, the Chapter 11 Case, White Winston's debtor-in-possession financing proposals, or Empery's debtor-in-possession financing proposals.

**REQUEST FOR PRODUCTION NO. 5:**  Please produce all communications. including emails and text messages, between or among You and the Debtor's board of directors or any member of the Debtor's board of directors, at any time, related to or referencing the Settlement Agreement, the UCC Sale, the Chapter 11 Case, White Winston's debtor-in-possession financing proposals, or Empery's debtor-in-possession financing proposals.

**REQUEST FOR PRODUCTION NO. 6**:  Please produce all documents and communications, including emails and text messages, related to the resignation of Eric Chin.

**REQUEST FOR PRODUCTION NO. 7:** Please produce all communications, including emails and text messages, in Your possession, custody or control where Eric Chin was also a party from January 1, 2022 to present.

**REQUEST FOR PRODUCTION NO. 8:**  Please produce all documents and communications, including emails and text messages, relating to or referencing any criminal or civil investigations, criminal charges or indictments, federal and state securities law investigations, claims or charges, sanctions or civil contempt orders or judgments involving or against You, including, but not limited to, any of Your Affiliates and Insiders.

**REQUEST FOR PRODUCTION NO. 9:**  Please produce all documents and communications including emails and text messages, relating to or referencing any payments or transfers of money or property from Debtor to You or any of Your Affiliates, Insiders, or counsel from six (6) years prior to the Petition Date to the present.

**REQUEST FOR PRODUCTION NO. 10:** Please produce all documents and communications including emails and text messages, evidencing, referring, or relating to any cash disbursements from Debtor to You from October 2021 through the present.

**REQUEST FOR PRODUCTION NO. 11:** Please produce all documents and communications including emails and text messages, evidencing, referring, or relating to each and any of Your personal expenses charged to a Debtor credit card or otherwise paid by Debtor in excess of $500 from October 2021 through the present.

**REQUEST FOR PRODUCTION NO. 12:** Please produce all documents and communications including emails and text messages, evidencing, referring, or relating to any of payment of funds, by any third-party, to counsel representing You, whether solely or in conjunction with another person or entity, since December 2021.

**REQUEST FOR PRODUCTION NO. 13:** Please produce all documents and communications including emails and text messages, evidencing, referring, or relating to any claim, as defined in 11 USC 101(5), against Debtor possessed or acquired by You, whether asserted or unasserted, contingent, liquidated, disputed or undisputed.

**REQUEST FOR PRODUCTION NO. 14:** Please produce all documents and communications including emails and text messages, related to any agreement that refers or relates to Empery, Debtor, White Winston, or any claim for relief or cause of action held by You.

**REQUEST FOR PRODUCTION NO. 15:** Please produce all documents and communications including emails and text messages, in Your possession, custody or control, related or referring to any investigations or inquires by the Security Exchange Commission related or referring to Debtor.

**REQUEST FOR PRODUCTION NO. 16**: Please produce all documents and communications including emails and text messages, in Your possession, custody or control with Jon Alyn related to Debtor.

**REQUEST FOR PRODUCTION NO. 17**: Please produce all documents and communications including emails and text messages, in Your possession, custody or control related to any lines of credit between You and Debtor, including communications with Debtor's board, accountants and financial advisors, Debtor's employees or contractors, Empery, Secured Noteholders, or otherwise, as well as any financial analysis related thereto.

**REQUEST FOR PRODUCTION NO. 18**: Please produce all communications, including emails and text messages, in Your possession, custody or control where Sabina Rizvi was also a party from January 1, 2022 to present.

**REQUEST FOR PRODUCTION NO. 19**: Please produce all documents and communications, including emails and text messages, related to any performance reviews of Sabina Rizvi, from January 1, 2022 to present.

**REQUEST FOR PRODUCTION NO. 20**: Please produce all documents and communications, including emails and text messages, related to Debtor's approval of any wires or cash disbursements from January 1, 2022 to present.

**REQUEST FOR PRODUCTION NO. 21**: Please produce all documents and communications, including emails and text messages, related to Debtor's restatement of any financial statements, from January 1, 2022 to present.

**REQUEST FOR PRODUCTION NO. 22**: Please produce all documents and communications, including emails and text messages, evidencing, referring, or relating to Blade Funding Corp. or Delta Bridge Funding and Debtor.

**REQUEST FOR PRODUCTION NO. 23**: Please produce all documents and communications, including emails and text messages, evidencing, referring, or relating to Your appointment or election as an officer or director of Debtor, as well as Your resignation or reappointment as officer or director.

**REQUEST FOR PRODUCTION NO. 24**: Please produce all documents and communications, including emails and text messages with the New York Post or any other news outlet related to Debtor or Empery, in any way, since January 1, 2022.

**REQUEST FOR PRODUCTION NO. 25**: Please produce all documents and communications, including emails and text messages with any private investigators or public relations firms related to Debtor or Empery, in any way, since January 1, 2022.

**EXHIBIT C**

CERTIFICATION OF CUSTODIAN OF RECORDS

STATE OF _____ }

} ss.

COUNTY OF _____ }

    NOW COMES _____, who after first being duly sworn deposes and says:

    1.  That the deponent is the Custodian of Records of _____.

    2.  That _____ is licensed to do business in the State of _____.

    3.  That on the _____ day of the month of _____ of the year 20__, the deponent was served with a subpoena in connection with the above-entitled cause, calling for the production of records pertaining to _____.

    4.  That the deponent has examined the original of those records and has made or caused to be made a true and exact copy of them, consisting of _____ pages, and that the reproduction of them attached hereto is true and complete.

    5.  That the original of those records was made at or near the time of the act, event, condition, opinion, or diagnosis recited therein by or from information transmitted by a person with knowledge, in the course of a regularly conducted activity of the deponent of _____.

 

                                      By: _____

SUBSCRIBED AND SWORN to before me this _____ day of_____, 2022.

_____
NOTARY PUBLIC in and for said
County and State

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

# EXHIBIT B

# EXHIBIT B

Electronically Filed
2/7/2023 6:33 PM
Steven D. Grierson
CLERK OF THE COURT

1  **COMP (CIV)**
JOHN R. BAILEY

2  Nevada Bar No. 0137
JOSHUA M. DICKEY

3  Nevada Bar No. 6621
JOSEPH A. LIEBMAN

4  Nevada Bar No. 10125
**BAILEY❖KENNEDY**

5  8984 Spanish Ridge Avenue
Las Vegas, Nevada 89148-1302

6  Telephone:  702.562.8820
Facsimile:  702.562.8821

7  JBailey@BaileyKennedy.com
JDickey@BaileyKennedy.com

8  JLiebman@BaileyKennedy.com

9  *Attorneys for Plaintiff*
RYAN DREXLER

10

CASE NO: A-23-865375-C
Department 27

11                    DISTRICT COURT

12              CLARK COUNTY, NEVADA

13

14  RYAN DREXLER, an individual,

15                    Plaintiff,

16  vs.

17  EMPERY TAX EFFICIENT, LP, a Delaware
Limited Partnership,

18

19                    Defendant.

20

Case No.
Dept. No.

**COMPLAINT**

**Jury Trial Demanded**

**Exempt from Arbitration: NAR 3(A)
(Probable Jury Award in Excess of
$50,000)**

21        Plaintiff Ryan Drexler ("Plaintiff" or "Drexler") brings this Complaint against Defendant

22  Empery Tax Efficient, LP ("Empery" or "Defendant"), and alleges as follows:

23                    **I.    PRELIMINARY STATEMENT**

24        1.    MusclePharm Corporation ("MusclePharm" or the "Company") was in financial

25  distress in late 2021, when Empery, a vulture fund operating out of New York, conceived of a

26  scheme to take advantage of its distress and seize effective control of MusclePharm in order to

27  arrogate to itself the substantial value of the Company's intellectual property ("IP") and other assets.

28  MusclePharm's principal business is the manufacture and sale of various branded sports nutrition

products. Prior to the global COVID pandemic, the value of the Company was estimated to be between $50 and $100 million. The formulas for its various products constitute its IP, which is the most valuable part of the business. Drexler is the Company's largest shareholder and, until recently, was the Company's Chief Executive Officer (CEO) and the Chairman of its Board of Directors.

2.      With full knowledge that MusclePharm was unable to obtain needed financing from conventional lending sources, Empery offered to provide capital through a complex series of agreements.  These agreements included a securities purchase agreement for warrants permitting Empery to purchase up to 17,355,700 shares of MusclePharm's common stock at a bargain exercise price of $0.78 per share, that it wrapped into six-month discount "notes" (the "October 2021 Notes"), which it characterized as a short-term loan.  However, in design and effect, the October 2021 Notes were not true loans; instead, they were enhanced equity investments, inextricably intertwined with the securities purchase agreement, and designed to create inevitable conditions of default which would enable Empery to take control of the Company.

3.      Among other things, the October 2021 Notes required repayment in six months of the capital Empery provided as a putative loan to the Company at a rate of return of 14%. The redemption amount of the "notes" to be repaid was $8,197,674.42, but MusclePharm received only $7,050,000. The $7,050,000 worth of discounted proceeds MusclePharm received was *further* discounted, as MusclePharm was required to pay fees to placement agent ROTH Capital Partners, LLC, as well as all of Empery's fees, "including all legal fees, [fees for] documentation and implementation of the [October 2021 Notes,] and due diligence." The October 2021 Notes also began accruing an even higher 18% per annum rate of "interest" when the six-month maturity date was extended in April 2022.

4.      The terms of Empery's purported lending were so onerous that Empery knew it was inevitable that it could manufacture numerous grounds and excuses to declare that MusclePharm was in default. And that is exactly what Empery caused to happen.

5.      Rather than provide legitimate financing to enable the Company to conduct its business, Empery's "lending" terms (including providing another set of "notes" in June 2022 at a 20% rate of return, described more fully below) actually choked off the Company and created a

pretext for Empery to attempt to sell the IP at a private auction. Empery's predatory actions forced MusclePharm to file a petition for relief under chapter 11 of the Bankruptcy Code on December 15, 2022, in the United States Bankruptcy Court for the District of Nevada, Case No. 22-14422-NMC, which stayed the auction sale and preserved the intellectual property assets for the benefit of the Company and all its stakeholders.

6.    In March 2022, as the October 2021 Notes were reaching maturity and in order to save the Company from financial collapse and provide desperately needed funding to manufacture products to fulfill profitable sales orders, Drexler stepped in to save the Company, providing a substantial personal revolving credit facility at an initial amount of approximately $3 million (the "Drexler Revolver"), but which grew to exceed $12 million. In furtherance of its scheme, Empery prevented Drexler from being repaid under the Drexler Revolver through various improper and wrongful acts that were intended to deliberately interfere with the Drexler Revolver, as well as the business of the Company and its management. Empery's wrongful acts included tampering with Company suppliers and vendors, exerting improper control over the Company's Chief Financial Officer ("CFO"), and concocting events of default in bad faith.

7.    Under the terms of a certain intercreditor agreement among Drexler, MusclePharm, and Empery dated October 13, 2021, repayment of the Drexler Revolver was purportedly subordinated to the October 2021 Notes. However, Empery needed Drexler to provide the revolver financing in order to enhance the Company's value and give Empery time to sell the IP at a going concern price, which it intended to do after declaring defaults under its "notes." Thus, in a second intercreditor agreement dated March 8, 2022, Empery memorialized representations it made to Drexler in order to induce Drexler to make the subordinated financing under the Drexler Revolver, by promising and agreeing that, so long as there was no "Event of Default" under their purported senior secured "note" position, Drexler could be repaid his advances under the Drexler Revolver (characterized as a "Permitted Note") on a regular basis. Empery's promises, which were false when made, fraudulently induced Drexler to agree to provide the Drexler Revolver. Empery had no intention to let Drexler be repaid before Empery under any circumstances.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

8.      Empery also told Drexler that it would not extend the maturity of the October 2021 Notes or provide additional capital to MusclePharm, unless Drexler first proceeded with the subordinated Drexler Revolver. Once Empery had induced Drexler to provide substantial financing under the Drexler Revolver, Empery took many additional actions to ensure that Drexler would not be paid.  First, Empery provided in an amended securities purchase agreement that the redemption amount of the October 2021 Notes would increase from $8,197,674.42 to $9,759,135, **doubling** the rate of return Empery would realize from 14% to 28%. But the additional "redemption" amounts were simply tacked on to the October 2021 Notes with no apparent benefit to MusclePharm. Those additional amounts were not paid to or received by MusclePharm. Second, Empery compelled MusclePharm to sell it a new set of six-month notes (the "June 2022 Notes"), for which the rate of return shot up from 14% to 20%, compared to the October 2021 Notes. On these new "notes," Empery expected to realize a redemption amount of $3,081,875, even though the discounted proceeds to the Company amounted to only $2,465,500. Again, the $2,465,500 worth of discounted proceeds MusclePharm received was *further* discounted, as MusclePharm was required to pay fees to placement agent ROTH Capital Partners, LLC, as well as all of Empery's fees, "including all legal fees, [fees for] documentation and implementation of the [June 2022 Notes,] and due diligence." As part of the June 2022 Notes, Empery also extracted additional warrants from MusclePharm permitting Empery to purchase up to an additional 22,013,393 shares of the Company's common stock at a bargain exercise price of $0.78.

9.      Empery insisted that the June 2022 Notes include certain non-monetary events of default—having nothing to do with MusclePharm's ability to repay—that it knew were already in existence or could easily be concocted and manufactured on various bases. Empery did this because it intended to declare defaults to prevent Drexler from being repaid under the Drexler Revolver, and to conduct a private sale of the Company's valuable IP in order to reward itself and its investors with outsized returns, and with no regard to the future of the Company. Indeed, the entire design and scheme of Empery appears to have been to crush MusclePharm under a mountain of financial obligations that it knew MusclePharm could never (at least not within the less than one-year term of

1  the obligations imposed) meet, so that it could foreclose on the collateral and take the Company's

2  assets for itself and its investors.

3          10.     That Empery put MusclePharm in a condition from which it could never recover

4  financially was still not enough for Empery. Empery also imposed intolerable non-economic

5  conditions, and it took other steps to hasten the Company's downfall by interfering with Company

6  management, customers, and vendors.

7          11.     One notable example of this was when Empery required MusclePharm (as a condition

8  of the June 2022 Notes) to continue to employ Sabina Rizvi as a member of the Board of Directors,

9  Chief Financial Officer (CFO), and President, even though it knew that Drexler wished to terminate

10 her on the basis that she: (i) was unqualified and incompatible with MusclePharm's business; (ii)

11 failed to record essential financial information needed to prepare financial statements; (iii) failed to

12 pay vendors on time; and (iv) caused (perhaps in coordination and cooperation with Empery, as

13 discussed below) many of the defaults declared by Empery.

14         12.     Empery waited only two months after the June 2022 Notes were signed to start

15 concocting defaults in bad faith. In August 2022, Empery began sending letters to MusclePharm

16 reserving their rights to declare defaults based on events that Empery already knew had happened

17 before the June 2022 Notes were executed, or otherwise concocted. These events included

18 MusclePharm's forced disavowal of prior financial statements as a result of the Rizvi's failure to

19 approve or record credit memos, and the Empery-induced resignation of Rizvi. Then, in September

20 2022, Empery officially declared defaults based on these events and others, including: (i)

21 MusclePharm's alleged failure to respond to Empery's request for financial information already in

22 Empery's possession, and within Empery's artificial, self-imposed one-week deadline; (ii)

23 MusclePharm's alleged failure to disclose to Empery an SEC investigation Empery already knew

24 about; (iii) Empery's deliberate misrepresentation of a receivables sale as the incurrence of

25 prohibited debt; (iv) entirely proper limited payments to Drexler under the Drexler Revolver; and (v)

26 MusclePharm's alleged failure to make SEC filings, a direct cause of the financial misfeasance of

27 the CFO.

28

13.     Throughout this time, despite being stymied by Empery's declarations of technical and manufactured defaults, Drexler continued to put the interests of MusclePharm first, and eventually loaned the Company over $12 million under the Drexler Revolver. But for Empery's bad faith conduct, including deliberate and improper interference with the management of the Company and the Drexler Revolver, Drexler would have been repaid all or a substantial portion of the Drexler Revolver in the ordinary course of business, and the Company would not have been driven into bankruptcy.

## II.     PARTIES

14.     Drexler is an individual who at all relevant times was residing in Clark County, Nevada.

15.     Empery is a Delaware limited partnership with its principal place of business in New York, New York. Empery is the primary putative secured lender to MusclePharm and serves as the Collateral Agent for other participants under the subject loan agreements.

## III.     JURISDICTION AND VENUE

16.     Venue is proper in the Eighth Judicial District Court for the State of Nevada, County of Clark, pursuant to NRS 13.010(1) and/or NRS 13.040.

17.     This Court may exercise jurisdiction over Defendant pursuant to NRS 14.065(1).

## IV.     FACTUAL ALLEGATIONS

18.     Drexler is MusclePharm's largest shareholder and, until recently, was MusclePharm's Chief Executive Officer and Chairman of its Board of Directors. In addition, Drexler made a series of loans to MusclePharm to fund its business operations.

19.     On October 13, 2021, MusclePharm "borrowed" $8,197,674.42 from Empery in the form of secured discount notes "sold" to Empery; however, MusclePharm only received $7,050,000. The more than $1 million difference (14%) between the redemption amount of the October 2021 Notes and the proceeds actually received by the Company was characterized as a premium that MusclePharm was required to pay to Empery upon the maturity date in six months of the October 2021 Notes, which Empery and its investors considered an appropriate rate of return for what was clearly an equity investment (the "October 2021 Investment"). The $7,050,000 worth of discounted

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1  proceeds MusclePharm received was *further* discounted, as MusclePharm was required to pay fees

2  to placement agent ROTH Capital Partners, LLC, as well as all of Empery's fees, "including all legal

3  fees, [fees for] documentation and implementation of the [October 2021 Notes,] and due diligence."

4  Furthermore, as a further condition of providing these funds, Empery also extracted warrants from

5  MusclePharm permitting Empery to purchase up to 17,355,700 shares of Company's common stock

6  at a bargain exercise price of $0.78 per share. The October 2021 Investment was characterized as a

7  loan set to mature on April 13, 2022.

8          20.    The October 2021 Investment was documented through (i) the October 2021 Notes,

9  issued by MusclePharm in favor of Empery; (ii) a Securities Purchase Agreement (the "SPA")

10  between MusclePharm, as grantor, Empery (as Lender and Collateral Agent); and (iii) a Pledge and

11  Security Agreement between MusclePharm and Empery. True and correct copies of the October

12  2021 Notes, SPA, and Pledge and Security Agreement are attached hereto as Exhibits A, B, and C,

13  respectively.

14          21.    On October 13, 2021, Empery entered into a certain Intercreditor and Subordination

15  Agreement with Drexler and MusclePharm ("2021 Intercreditor Agreement"). The 2021

16  Intercreditor Agreement established the October 2021 Investment's asserted lien and payment

17  priority over previous and future notes that MusclePharm had given—or would later give—to

18  Drexler. Specifically, it provided that "[a]ll loans, advances, debts, liabilities, obligations, debit

19  balances, covenants and duties at any time or times owed by [MusclePharm] to [Drexler] are

20  subordinated in right of payment to [a]ll loans, advances, debts liabilities, obligations, debit

21  balances, covenants and duties at any time or times owed by [MusclePharm] to [Empery.]" A true

22  and correct copy of the 2021 Intercreditor Agreement is attached hereto as Exhibit D.

23          22.    As the October 2021 Investment was nearing maturity, the Company remained in

24  desperate need for funds to operate and fulfill valuable and profitable sales orders from its largest

25  customer. ***Empery was not willing to provide such additional financing unless Drexler first***

26  ***provided substantial financing subordinated to Empery.*** Because the 2021 Intercreditor Agreement

27  purported to subordinate to Empery any additional loans from Drexler to MusclePharm, Drexler was

28  reluctant to take the substantial risk of lending millions of dollars that might never be paid back.

23.     Empery wanted Drexler to provide subordinated financing because doing so would enhance the value of the IP, which was pledged to them as collateral under the October 2021 Notes. Empery expected that MusclePharm's IP would be the principal source for the repayment of its bloated positions in an eventual foreclosure. Empery therefore told Drexler that if he issued an unsecured credit facility to the Company (beginning with $3 million and later increasing to more than $12 million), Empery would permit Drexler to be paid back on a regular basis so long as there was no default in the obligation to repay the October 2021 and June 2022 Notes (defined below). But Empery had no intention to ever permit any payments to Drexler. Empery knew that the Company would almost certainly default on the October 2021 Notes at maturity, and it also knew and intended to declare other non-monetary and technical defaults in the October 2021 Notes and the June 2022 Notes (defined below) in order to block Drexler from getting repaid under this new credit facility.

24.     Nonetheless, on March 8, 2022, and with Empery's blessing, MusclePharm entered into the Drexler Revolver, an Unsecured Revolving Promissory Note dated March 8, 2022, under which MusclePharm agreed to repay Drexler promptly for advances made to finance the production of orders placed by MusclePharm's most critical customer. Drexler was to be repaid upon "receipt of collections on the Costco Account Receivable in connection with the Advance[,]" "three (3) days following any [written] demand of [Drexler,]" upon certain events of default, or upon a notice of acceleration. In accordance with the October 2021 Intercreditor Agreement, however, the Drexler Revolver provided that "no payments shall be made by [MusclePharm] if [MusclePharm] is in default under the [October 2021 Notes.]" A true and correct copy of the Drexler Revolver is attached hereto as Exhibit E.

25.     To memorialize Empery's promise that Drexler could be repaid on a regular basis absent a default on the October 2021 Notes, on March 8, 2022, Empery, Drexler, and MusclePharm entered into a certain First Amendment to Intercreditor and Subordination Agreement ("2022 Intercreditor Agreement Amendment"), designating the Drexler Revolver as a "Permitted Note," and allowing MusclePharm to make "Permitted Note Payments" on the Drexler Revolver's balance as long as MusclePharm was not in default of its obligations under the October 2021 Investment. A true and correct copy of the 2022 Intercreditor Agreement Amendment is attached hereto as Exhibit F.

26.     At the time the parties entered into the 2022 Intercreditor Agreement Amendment, Sabina Rizvi ("Rizvi") was MusclePharm's CFO. Rizvi's performance had raised many concerns, including allegations of misfeasance. Near the time of the Drexler Revolver and the 2022 Intercreditor Agreement Amendment, Drexler wanted to terminate her employment. However, between October 2021 to March 2022, Rizvi had grown close to Empery's principals and had regular electronic and live communications with them about the status of MusclePharm's business and financial condition. She had become in essence an agent of Empery operating within MusclePharm. Empery consequently pressured Drexler (who was then unaware of the extent of the close relationship between Rizvi and Empery) to retain Rizvi.

27.     Empery then set out to make sure that Drexler could not terminate Rizvi, whether or not her termination was in the best interests of the Company. Empery insisted that her termination would constitute an event of default—a level of control over management that no commercially reasonable lender would require.

28.     In June 2022, Empery and MusclePharm entered into a new one-sided investment arrangement. As an initial first step, Empery and MusclePharm entered into an Amended and Restated Securities Purchase Agreement on June 3, 2022 ("Amended SPA"), which provided that the redemption amount of the October 2021 Notes would increase from $8,197,674.42 to $9,759,135, *doubling* the rate of return Empery would realize on the October 2021 Notes from 14% to 28%. A true and correct copy of the Amended SPA is attached hereto at Exhibit G.

29.     On June 10, 2022, MusclePharm "sold" another series of "notes" to Empery with a redemption amount of $3,081,875, but resulting in proceeds to the Company of only $2,465,500. Again, the roughly $600,000 difference (now 20%), reflected a huge premium that would have to be paid to Empery upon the maturity date of the June 2022 Notes (collectively, the June 2022 Notes and the October 2021 Notes are referred to herein as the "Notes"), which Empery and its investors considered an appropriate rate of return for their equity investment (the "June 2022 Investment," and together with the October 2021 Investment, the "Empery Investments"). Again, the $2,465,500 worth of discounted proceeds MusclePharm received was *further* discounted, as MusclePharm was required to pay fees to placement agent ROTH Capital Partners, LLC, as well as all of Empery's

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1    fees, "including all legal fees, [fees for] documentation and implementation of the [June 2022

2    Notes,] and due diligence." Empery also extracted warrants from MusclePharm permitting Empery

3    to purchase up to an additional 22,013,393 shares of the Company's common stock at a bargain

4    exercise price of $0.78. In connection with the June 2022 Investment, the maturity of the October

5    2021 Investment was extended six months, with all Empery Investments (characterized as loans) due

6    in December 2022. The alleged loans were again secured by virtually all of MusclePharm's assets,

7    including the valuable IP. A true and correct copy of the June 2022 Notes is attached hereto at

8    Exhibit H.

9        30.    The terms of the June 2022 Investment evidenced Empery's increased level of undue

10    control over MusclePharm and interference with the Drexler Revolver agreement between

11    MusclePharm and Drexler. The terms limited Drexler's salary, required MusclePharm to retain Rizvi

12    as CFO and appoint her as a member of the Company's Board, and provided that Rizvi's departure

13    as CFO or Director would constitute an event of default in certain circumstances, even though

14    MusclePharm already had abundant cause to terminate her employment for cause.

15        31.    This was a significant problem for MusclePharm. Rizvi had substantial conflicts of

16    interest and she took actions on Empery's behalf to the detriment of the Company. Rizvi, as the

17    Company's CFO, was already damaging her relationships with MusclePharm employees. In June

18    2022, a number of employees expressed dissatisfaction with Rizvi's management style. In a June 4,

19    2022 email, a member of the Company's Sales team recounted that Rizvi had created a toxic work

20    environment and treated employees disrespectfully.

21        32.    In a June 5, 2022 email, another employee recalled a demand from Rizvi to fly to

22    Canada to meet a contract manufacturer despite having significant back surgery only a few days

23    before the scheduled flight. That same employee also expressed concern that Rizvi's actions and

24    inactions had caused MusclePharm to miss important production dates, causing millions in lost sales.

25        33.    MusclePharm also heard from critical trade vendors who indicated that they had

26    experienced multiple instances with Rizvi's late or nonexistent payments of invoices. Indeed, one

27    vendor complained to a significant customer (responsible for more than 30% of MusclePharm's

28    revenue) that MusclePharm had breached that customer's code of ethics for its suppliers. Another

1    vendor wrote to Drexler to further complain that Rizvi was not making necessary payments and was

2    not returning calls.

3        34.    Rizvi eventually abandoned her financial responsibilities as CFO of MusclePharm

4    and appeared to be serving primarily Empery's interests. One trade vendor expressed considerable

5    confusion as to who at MusclePharm was responsible for the Company's checkbook.

6        35.    Thus, while MusclePharm and Empery knew that Rizvi was affirmatively harming

7    the business, Empery's requirement that her termination be considered an event of default meant, as

8    a practical matter, that MusclePharm had to continue suffering harm and declining performance on

9    pain of Empery commencing enforcement and foreclosure proceedings under the Notes.

10       36.    Drexler fought back against this and tried to convince Empery that Rizvi's continued

11   employment was causing substantial harm and that she should be terminated without causing a

12   default under the Notes. Drexler's attempts to persuade Empery were met with disgusting threats and

13   bullying that further evidenced Empery's improper control over MusclePharm. On June 29, 2022,

14   Empery principal Ryan Lane ("Lane") texted Drexler that "[w]e are very close to activating the

15   nuclear option based on ur behavior – we know u are lying to and undermining [Rizvi] – u are the

16   problem, not [Rizvi] . . . Trust me – u don't want to see this side of me – we will hit you so hard with

17   litigation on so many fronts ur head will spin . . . If you box out [Rizvi] AT ALL we will file a

18   lawsuit." A true and correct copy of the text message string between Lane and Drexler starting on

19   June 29, 2022, is attached hereto as Exhibit I.

20       37.    Drexler persisted in marginalizing Rizvi for the sake of the Company. According to

21   Lane, in a writing to the Company's Board on June 30, 2022, the day after his nuclear option

22   litigation threats were made, "[s]ince the lenders recent additional investment, . . . the president and

23   CFO has been sidelined and therefore excluded from almost all meetings and decisions." Lane

24   attempted to defend Empery's decision to add Rizvi to the Board, describing Empery as an investor

25   seeking to protect its investment position, but essentially admitting that Rizvi was acting as

26   Empery's agent. He wrote that Empery's "intention of adding [Rizvi] to the Board was simply to

27   increase the flow of information [from MusclePharm management] to the finance team *and give the*

28   *finance team access to board discussions and thinking. This was my idea and came from a place of a*

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1  *well intentioned investor trying to help make the operations work more efficiently.*" (Emphasis

2  supplied.) A true and correct copy of the June 30, 2020 email is attached hereto at Exhibit J.

3      38.    At Empery's insistence, and consistent with Lane's strategy as outlined in his June 30

4  email above, Rizvi regularly divulged sensitive and confidential information about MusclePharm to

5  Lane and his fellow Empery principal Tim Silver ("Silver"). The extent to which Rizvi was

6  functioning at this time as Empery's inside agent was reflected in communications that Rizvi made

7  to MusclePharm employees to the effect that she was overseeing MusclePharm operations for

8  Empery. Indeed, one employee reported that, during an exchange with Rizvi regarding the

9  deteriorating relationship with vendors and customers, she stated she had designs to take over the

10  Company along with an investment company. These statements suggest that Rizvi's mishandling of

11  vendor and customer relationships was done deliberately, at Empery's direction, in order to harm the

12  Company and create the conditions for default and foreclosure which would benefit Empery.

13      39.    Shortly thereafter, on July 6, 2022, after discussions with Empery, Rizvi notified

14  MusclePharm's Board that she would be resigning as President and CFO, effective July 22, 2022.

15  This appears to have been the initial activation of the "nuclear option" that Lane had threatened only

16  a week earlier.

17      40.    Rizvi's resignation was instigated by Empery to create an event of default under the

18  Empery Investments. Rizvi "acknowledge[d] that her resignation as an officer and director of

19  [MusclePharm] is not based on 'Good Reason' as that term is defined in the Notes." According to

20  the June 2022 Notes, "Good Reason" meant a "material diminution in [Rizvi's] job title, salary,

21  reporting relationships, responsibilities or authority." A true and correct copy of Rizvi's Separation

22  and Release Agreement dated July 22, 2022, is attached hereto as Exhibit K.

23      41.    Right after Rizvi left the Company, additional instances of her misfeasance came to

24  light, some of which may have been known to Empery. In the course of preparing its report for the

25  second quarter of 2022 (ending June 30, 2022), MusclePharm discovered that Rizvi had not timely

26  approved or record certain 2021 customer credit memos. As a result, MusclePharm concluded that

27  its 2021 revenue was potentially overstated by $600,000 to $1 million, and it filed a form 8-K

28

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1  disclosing the error on August 22, 2022, with the United States Securities and Exchange

2  Commission.

3       42.    Because of its control of Rizvi and her regular course of communications with

4  Empery, Empery likely knew about this substantial financial error (which would also be cause for or

5  a contributing factor to another event of default) at the time it closed the June 2022 Investment. That

6  it chose to consummate the June 2022 Investment with such knowledge confirms that Empery's

7  strategy was to drive the Company to fail in order to take over and arrogate to itself the value of the

8  Company's IP. Consistent with that strategy, Empery waited only four days after Rizvi resigned

9  before they reserved their rights to declare a default on the basis of the Company's form 8-K

10  disclosure of Rizvi's credit memo errors.

11       43.    On August 26, 2022, Empery wrote to MusclePharm asserting that the 8-K was a

12  "public disclosure about the non-reliance on, and restatement of, the above referenced financial

13  statements demonstrat[ing] a breach of the representations set forth in Section 3.1(h) of the

14  [Amended SPA]," that "any event of default in any one Note will result in a cross default in all other

15  Notes," and that Empery and the noteholders "reserve their rights under paragraph (iv) of Section

16  5(a) of the Notes." A true and correct copy of the August 26 Letter is attached hereto as Exhibit L.

17       44.    However, the relevant portion of Section 3.1(h) of the [Amended SPA] represented

18  only that "none of the SEC Reports when filed . . . omitted to state a material fact required to be

19  stated therein or necessary in order to make the statements therein, *in light of the circumstances*

20  *under which they were made*, not misleading." (Emphasis supplied.) At the time the financial

21  statements for 2021 and 1Q 2022 were made, MusclePharm did not know Rizvi had failed to

22  approve or record the customer credit memos. Thus, the circumstances under which the SEC reports

23  were filed were such that the reports were not misleading.

24       45.    The same day Empery began reserving its rights to declare concocted defaults in bad

25  faith, Drexler reached out to Lane in a good faith attempt to resolve what Drexler thought was a

26  misunderstanding, writing in an August 26, 2022 text message that "I think we should meet in

27  person to talk about everything." Lane responded, "[n]o chance[.]" Exhibit I.

28

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

46.     Empery continued to rebuff Drexler's attempts to amicably resolve the issues. On August 29, 2022, Silver emailed Drexler, "I understand that you reached out to [Lane] last week to schedule a face-to-face meeting. . . . At this time, we do not believe that it would be productive to have a conversation as we do not believe that our prior conversations were in-line with reality." A true and correct copy of the August 29, 2022 email is attached hereto at Exhibit M.

47.     On September 8, 2022, Empery sent another letter (the "September 8 Letter") purporting to reserve its rights to declare a default with regard to Rizvi's resignation, which Empery itself appears to have engineered in response to her being marginalized by Drexler. A true and correct copy of the September 8 Letter is attached hereto as Exhibit N. Empery primarily asserted that Rizvi had resigned with Good Reason, in violation of the terms of the Notes. However, as Empery was aware, in her Separation and Release Agreement, Rizvi herself explicitly "acknowledge[d] that her resignation as an officer and director of [MusclePharm] is not based on 'Good Reason' as that term is defined in the Notes." In the September 8 Letter, Empery also asserted as a default that MusclePharm failed to replace Rizvi with another CFO and director that was not objectionable to Empery within the 45-day period after Rizvi's resignation.

48.     However, MusclePharm hired Eric Chin as CFO on July 28, 2022, only one week after Rizvi's resignation became effective. However, Empery unreasonably withheld its approval of Chin in bad faith, again to concoct a default under the Empery Investments. Specifically, Empery claimed Chin did not have sufficient "distressed company" experience. However, no such criterion was required in the Empery Investments. Furthermore, the Notes provided that approval of Rizvi's replacement as CFO "shall not be unreasonably withheld by [Empery.]" This underscores the enormously inappropriate degree of control that Empery exercised over the Company and highlights their frustration at losing their inside "agent."

49.     On September 22, 2022, Empery sent another letter (the "September 22 Letter") officially declaring defaults based on the 8-K filing and Rizvi's resignation and accelerating payments of the Notes. A true and correct copy of the September 22 Letter is attached hereto as Exhibit O.

50.    MusclePharm disputed the defaults, but Empery continued to assert them in bad faith. On October 3, 2022, Empery effectively and unilaterally shut down MusclePharm's entire business by issuing an access termination notice to the MusclePharm's bank, Wells Fargo, N.A., forcing Wells Fargo to remit all funds in the MusclePharm's account to Empery, under the deposit account control agreement between the parties. Obviously, MusclePharm could not operate without the funds in its bank account.

51.    On October 10, 2022, Empery sent another letter (the "October 10 Letter"), in which it declared a default under Sections 5(a)(ii) and 7(g) of the Notes based on MusclePharm's alleged failure to respond to an information and documentation request for certain financial information, which Empery made on September 8th under an artificially concocted one-week deadline. A true and correct copy of the October 10 Letter is attached hereto as Exhibit P. Section 7(g) of the Notes required only that MusclePharm provide information if it is necessary "to enable the Holder to confirm the Company's compliance with the terms and conditions of [the Notes]." Empery has (and at all times has had) access to all information and documentation necessary to enable it to confirm MusclePharm's compliance with the Notes. Indeed, according to Empery, it possessed sufficient information to declare the multiple purported defaults it attempted to manufacture.

52.    Also in the October 10 Letter, Empery claimed that MusclePharm had breached its representations in Section 3.1(j) of the Amended SPA and defaulted under Section 5(a)(iv) of the Notes by allegedly failing to disclose an SEC investigation that was commenced in 2019. However, apart from the fact that Empery was fully aware of the investigation, Section 3.1(j) of the Amended SPA only required MusclePharm to disclose an SEC investigation that can "reasonably be expected to result in a Material Adverse Effect."

53.    After the October 10 Letter, Drexler again reached out to Empery in an attempt to negotiate a forbearance with Empery whereby Drexler would provide Empery with an additional $6 million in art collateral. In order to memorialize Drexler's personal pledge of collateral, give the Company access to its bank account, and give the Company the ability to operate, the parties negotiated a proposed binding term sheet. However, at the last minute, Empery reneged and refused to enter into a forbearance agreement with MusclePharm. Instead, they ramped up their total assault

1    on the business in order to complete their takeover. On October 15, 2022, Lane emailed Drexler with

2    another offensive personal attack: "[y]ou have very little understanding of basic business and legal

3    concepts and you are disorganized and lack attention to detail." A true and correct copy of the

4    October 15, 2022 email is attached hereto at Exhibit Q.

5         54.    Then, on October 18, 2022, Empery sent MusclePharm a Notification of Disposition

6    of Collateral, pursuant to which Empery stated its intention to sell the collateral for the Empery Loan

7    through a public auction under article 9 of the Uniform Commercial Code on November 1, 2022

8    ("Sale Notice"). Empery knew that unless MusclePharm filed for bankruptcy protection, it could not

9    recover from the cutoff of its bank account, and that its most valuable assets would be siphoned

10   away in a private auction sale.

11        55.    To make sure that MusclePharm and Drexler were completely crushed with no

12   avenue of recovery, Empery principals called Prestige Capital Corporation ("Prestige"), a firm that

13   provided a significant source of cash flow to MusclePharm through factored receivables for nearly

14   seven years. The purpose of those calls was to persuade Prestige to stop factoring, and therefore

15   choke off another avenue of financial resources on which MusclePharm could operate. Empery told

16   Prestige that Empery had concerns about the flow of information from MusclePharm to Empery now

17   that Rizvi was no longer CFO and President.

18        56.    As a direct result of Empery's issuance of the access termination notice, the Sale

19   Notice, and the subsequent phone calls to Prestige, Prestige halted its factoring of MusclePharm

20   receivables.

21        57.    Drexler, in the meantime, faced with the loss of MusclePharm's bank account and

22   financing from Prestige's factoring, continued to try and rescue MusclePharm from complete

23   collapse. On October 30, 2022, Drexler informed Lane he would resign as CEO by the end of 2022,

24   and that MusclePharm hired a new CEO (Eric Hillman) who would take over upon Drexler's

25   resignation. Hillman had prior success in the sports nutrition space, including co-founding a

26   company named Europa Sports Products to distribute nutritional supplements, sports drinks, and

27   other accessories.

28

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

58.     Because Empery had no interest in anything other than taking over the Company by forcing the sale of its IP, Lane responded to Drexler telling him, in effect, that anyone he would pick would likely be a horrible choice.

59.     Drexler then hired lawyers at his personal expense to try and continue forbearance negotiations, and postpone Empery's auction of MusclePharm's valuable IP. There were some discussions, but they were ended abruptly by Empery on November 11, 2022, after a critical vendor (JW Nutritional) sent a letter to MusclePharm explaining that that it was considering ending its business relationship with MusclePharm unless changes were made to management.  Given the tenor and timing of the JW Nutritional letter, and the fact that when Empery later attempted to sell the Company IP at auction (before the automatic stay of bankruptcy interrupted that auction), JW Nutritional was a leading bidder to purchase the Company's assets where the proceeds would have gone to Empery, it is reasonable to infer that the letter was solicited by and planned with Empery in order to create a further pretext to refuse to negotiate.

60.     On November 12, 2022, Drexler again tried to reach out to Lane to resolve their issues in good faith, asking Lane to "call me when your [sic] around[.]" In response, Lane wrote "So I can listen to ur lies?" Lane continued with more vitriolic messages, calling Drexler "a pathetic excuse for a human[,]" a "moron" who "don't [sic] even know how to spell[,]" and the "dumbest person I know[.]" Exhibit I.

61.     Empery also concocted additional declarations of default by deliberately misrepresenting a series of receivables sales as the incurrence of debt that was allegedly prohibited under the applicable agreements.

62.     On November 17, 2022, Empery sent a letter declaring an additional default under Section 5(a)(iv) of the Notes (the "November 17 Letter"), this time based on a purported breach of Section 3(a) and Section 3(e) of the Notes because MusclePharm allegedly entered into – and partially repaid – two Merchant Cash Advance transactions (the "MCA Transactions"). A true and correct copy of the November 17 Letter is attached hereto as Exhibit R. Empery specifically claimed that on September 9, 2022, MusclePharm "received a cash payment of $458,621 from Blade Funding Corp," that at "some point prior to September 1, 2022," MusclePharm received a loan, "in

1    an unknown amount" from Delta Bridge Financing, and that on September 26, 2022, MusclePharm

2    received $32,790 from Delta Bridge Financing.

3           63.    The November 17 Letter further claimed that on each of September 16, 2022,

4    September 23, 2022, and September 30, 2022, MusclePharm made a payment of $26,767.85 to

5    Blade Funding Corp. and that on each of September 8, 2022, September 15, 2022, September 22,

6    2022, and September 29, 2022, MusclePharm made a payment of $32,790 to Delta Bridge Funding.

7    There was never an event of default since the MCA Transactions were receivables sales, not

8    "Indebtedness" under Sections 3(a) and (e) of the Notes.

9           64.    The November 17 Letter also declared an event of default under Sections 5(a)(ii) and

10   5(a)(iii) and Section 3(g) of the Notes, based on payments MusclePharm allegedly made to Drexler

11   on September 20 and September 21, 2022. However, the Notes expressly permitted these payments,

12   which were made pursuant to the Drexler Revolver. The Drexler Revolver and 2022 Intercreditor

13   Agreement Amendment only prohibited MusclePharm from repaying Drexler "if the Company is in

14   default under the Existing Notes" – something that indisputably had not occurred here, since Empery

15   did not officially declare any of its manufactured defaults under the existing Notes until September

16   22, 2022, the day after the second of the two payments to Drexler. Empery had only previously

17   repeatedly "reserved" its rights to declare defaults.

18          65.    On December 5, 2022, Empery sent another letter declaring additional purported

19   defaults (the "December 5 Letter"). A true and correct copy of the December 5 Letter is attached

20   hereto as Exhibit S. Specifically, Empery declared an additional default under Section 5(a)(ii) of the

21   Notes because MusclePharm purportedly "has not made any filings pursuant to the Exchange Act

22   since September 29, 2022," including "(A) one or more Quarterly Reports on Form 10-Q and (B)

23   one or more Current Reports on Form 8-K." However, the Notes and Amended SPA merely required

24   MusclePharm to use "reasonable best efforts" to make timely filings – something MusclePharm

25   indisputably did, including by seeking to promptly complete (or challenge the need for) a

26   restatement of its recent financial statements, which is necessary for MusclePharm to file its

27   outstanding quarterly reports.

28

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

66.     Empery also claimed in the December 5 Letter that MusclePharm was required to file a Form 8-K for various events. The conclusory and self-serving determination that MusclePharm was required to publicly disclose various facts is unsupported by law.

67.     Moreover, in the December 5 Letter, Empery declared a default under Section 5(a)(ii) of the Notes because MusclePharm purportedly failed to make "Public Information Failure" payments to Empery, which are required when MusclePharm fails to satisfy the "current public information requirement" under Rule 144(c) of the Securities Act. But MusclePharm never had a Public Information Failure, and Empery's conclusory and self-serving determination that MusclePharm was required to publicly disclose various facts is unsupported by law.

## FIRST CLAIM FOR RELIEF

### Intentional Interference with Contractual Relations

68.     Drexler restates and incorporates the allegations in paragraphs 1 through 67.

69.     The Drexler Revolver is a valid and binding agreement.

70.     Empery had actual knowledge of the Drexler Revolver.

71.     Empery willfully, intentionally, maliciously, and without reasonable justification, interfered with, and induced and procured breaches by MusclePharm of the Drexler Revolver.

72.     Specifically, Empery manufactured technical, preexisting, and/or nonexistent events of default in bad faith for the purpose of causing MusclePharm to breach its obligations to repay Drexler under the Drexler Revolver, thereby depriving Drexler of over $12,000,000.

73.     As a result of Empery's wrongful actions, Drexler has been damaged by an amount in excess of $15,000, and is entitled to recover compensatory damages, consequential damages, punitive damages, pre-judgment and post-judgment interest, and the attorneys' fees and costs Drexler incurred, and is incurring, in prosecuting this action in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### Fraud

74.     Drexler restates and incorporates the allegations in paragraphs 1 through 73.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

75.     Empery made a false representation to Drexler that, as long as there was no default under the Empery Investments, Drexler would be repaid the advances made under the Drexler Revolver on a regular basis.

76.     Empery knew this representation was false when made because it intended to declare certain non-monetary events of default under the Empery Investments that it already knew were in existence, or could easily be concocted and manufactured on various bases.

77.     Empery intended, through its misrepresentation, to induce Drexler to lend money to MusclePharm, enter into the Drexler Revolver, and subordinate the Drexler Revolver to the Empery Investments.

78.     Drexler justifiably relied on Empery's misrepresentation when he agreed to subordinate the Drexler Revolver and make advances to MusclePharm and, as a result, suffered damages in excess of $15,000 when those advances went unpaid.

## THIRD CLAIM FOR RELIEF

### Negligent Misrepresentation

79.     Drexler restates and incorporates the allegations in paragraphs 1 through 78.

80.     Empery made a false representation to Drexler that, as long as there was no default under the Empery Investments, Drexler would be repaid the advances made under the Drexler Revolver on a regular basis.

81.     Empery failed to exercise reasonable care in communicating this information because it should have known by the exercise of reasonable care or competence that non-monetary events of default under the Empery Investments were in existence, or could easily be concocted and manufactured on various bases.

82.     Drexler relied on Empery's misrepresentation when he agreed to subordinate the Drexler Revolver and make advances to MusclePharm and, as a result, suffered damages in excess of $15,000 when those advances went unpaid.

Page **20** of **21**

1

## **PRAYER FOR RELIEF**

2    WHEREFORE, Ryan Drexler requests a judgment as follows:

3    a.  For a monetary judgment in excess of $15,000.00;

4    b.  For an award of attorneys' fees;

5    c.  For an award of costs and interest as provide by law; and

6    d.  For such other and further relief as deemed proper and appropriate.

7

## **JURY DEMAND**

8    Pursuant to NRCP 38, Plaintiff hereby demands a jury trial on all issues so triable.

9    DATED this 7th day of February, 2023.

10                  BAILEY ❖ KENNEDY

11

12                  By: */s/ John R. Bailey*

13                        JOHN R. BAILEY
                              JOSHUA M. DICKEY

14                              JOSEPH A. LIEBMAN

15                  *Attorneys for Plaintiff*
                  RYAN DREXLER

16

17

18

19

20

21

22

23

24

25

26

27

28

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

# EXHIBIT C

# EXHIBIT C

1   Code: 4085

2

3           IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

4                       IN AND FOR THE COUNTY OF WASHOE

5   RYAN DREXLER,
                                                      ,
6          Plaintiff / Petitioner / Joint Petitioner,

                                          Case. No.  CV23-00381
7   vs.

                                          Dept. No.  8
8   TIM SILVER, et al.
                                                      ,
9          Defendant / Respondent / Joint Petitioner.

                                                      /
10

11                              SUMMONS

12      **TO THE DEFENDANT: YOU HAVE BEEN SUED.  THE COURT MAY DECIDE
    AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU <u>RESPOND IN</u>
13  <u>WRITING</u> WITHIN 21 DAYS.   READ THE INFORMATION BELOW VERY
    CAREFULLY.**
14      A civil complaint or petition has been filed by the plaintiff(s) against you for the relief as set
15  forth in that document (see complaint or petition).  When service is by publication, add a brief
    statement of the object of the action.
16  The object of this action is:  Declaratory Relief
                                                                                              .

17      1.  If you intend to defend this lawsuit, you must do the following within 21 days after service
18          of this summons, exclusive of the day of service:
            a.  File with the Clerk of the Court, whose address is shown below, **a formal written**
19              **answer** to the complaint or petition, along with the appropriate filing fees, in
                accordance with the rules of the Court, and;
20          b.  Serve a copy of your answer upon the attorney or plaintiff(s) whose name and address
                is shown below.
21      2.  Unless you respond, a default will be entered upon application of the plaintiff(s) and this
22          Court may enter a judgment against you for the relief demanded in the complaint or
            petition.

23      Dated this  2ND   day of        MARCH              , 20 23  .

24
    Issued on behalf of Plaintiff(s):              ALICIA L. LERUD
25      Mark G. Simons / Duncan G. Burke          CLERK OF THE COURT
    Name:  Simons Hall Johnston PC                By:  /S/ Y. VILORIA
26  Address: 690 Sierra Rose Drive                    Deputy Clerk
27         Reno, NV 89511                          Second Judicial District Court
    Phone Number: 775-785-0088                     75 Court Street
28  Email:  MSimons@SHJNevada.com                 Reno, Nevada 89501
           DBurke@SHJNevada.com

    REV 4/27/21 JDB                                                           SUMMONS

F I L E D
Electronically
CV23-00381
2023-03-02 02:44:38 PM
Alicia L. Lerud
Clerk of the Court
Transaction # 9538103 : csulezic

$1425
Mark G. Simons, Esq. (SBN 5132)
Duncan G. Burke, Esq. (SBN 13081)
SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, Nevada 89511
Telephone:    (775) 785-0088
Facsimile:    (775) 785-0087
Email: msimons@shjnevada.com;
          dburke@shjnevada.com

*Attorneys for Plaintiff*

# IN THE SECOND JUDICIAL DISTRICT FOR THE STATE OF NEVADA

## IN AND FOR THE COUNTY OF WASHOE

| | |
|---|---|
| RYAN DREXLER, an individual, | **CASE NO:** CV23-00381 |
| Plaintiff, | **DEPT. NO:** 8 |
| v. | |
| TIM SILVER, an individual, DOES 1 to 10; and ROE CORPORATIONS 1-10, inclusive, | |
| Defendants. | |

## COMPLAINT

{Arbitration Exempt NAR 3; Excess of $50,000, Declaratory Relief, Unusual Circumstances}

Plaintiff Ryan Drexler ("Drexler"), by and through his attorneys, SIMONS HALL

JOHNSTON PC, hereby complains and alleges as follows:

### PARTIES AND JURISDICTION

1.    Drexler is a resident of Washoe County, State of Nevada.

2.    Defendant Tim Silver is believed to be a resident of New York ("Silver").

3.    Plaintiff does not know the true names and capacities of defendants sued herein as

DOES 1 through 10, inclusive, and therefore sues these defendants by fictitious names (the "Doe

Defendants" and together with Silver, the "Defendants"). Plaintiff is informed and believes, and

thereon alleges, that each of these fictitiously named defendants are responsible in some actionable

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
- Reno, NV 89511
Phone: (775) 785-0088

manner for the events and occurrences referred to in this Complaint. Plaintiff requests leave of Court to amend his Complaint to name the defendants specifically when their identities become known.

4.      Plaintiff does not know the true names and capacities of defendants sued herein as ROE CORPORATIONS 1-10, inclusive, and therefore sues these defendants by fictitious names (the "Roe Defendants"). Plaintiffs are informed and believe, and thereon allege, that each of these fictitiously named defendants are responsible in some actionable manner for the events and occurrences referred to in this Complaint. Plaintiffs request leave of Court to amend their Complaint to name the defendants specifically when their identities become known.

5.      Jurisdiction is proper in the Second Judicial District Court of the State of Nevada, in and for the County of Washoe pursuant to Nevada Constitution Article 6 § 6, because this matter is excluded from the original jurisdiction of the justice courts, involves injuries and events directed to Washoe County and seeks declaratory relief.

6.      Venue is proper in this Court pursuant to NRS 13.040 as this action is brought to by Drexler in the county in which he resided.

7.      Plaintiff's suit seeks damages in excess of $50,000, seeks declaratory relief and this action presents unusual circumstances establishing good cause for exemption from the Nevada's Arbitration Program pursuant to NAR 3.

## PRELIMINARY STATEMENT

8.      Drexler is the founding member of MusclePharm Corporation ("**MusclePharm**" or the "**Company**") and is the current majority member of the Company holding 49.1%.

9.      MusclePharm is a Nevada company.

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

10.     MusclePharm's principal business is the manufacture and sale of various branded sports nutrition products.  Prior to the pandemic, the value of the Company was estimated to be in excess of $50 million a year.

11.     In late 2021, MusclePharm was in financial distress when Empery Tax Efficient, LP ("Emprey"), a vulture fund operating out of New York, conceived of a scheme to take advantage of its distress and seize effective control of MusclePharm.  Emprey's scheme was to capture the substantial value of the Company's intellectual property ("**IP**") and other assets.

12.     With full knowledge that MusclePharm could not obtain financing from conventional lending sources, Empery offered to provide capital through a complex series of agreements (generally the "Emprey Loans").

13.     In design and effect, Emprey Loans were not true loans, but were instead enhanced equity investments, inextricably intertwined with the securities purchase agreement, and designed to create inevitable conditions of default which would enable Empery to take control of the Company.

14.     The terms of Empery's Loans were so onerous that Empery knew it was inevitable that it could manufacture numerous grounds and excuses to declare that MusclePharm was in default.

15.     In March 2022, as the Emprey Loans were reaching maturity and in order to save the Company from financial collapse and provide desperately needed funding to manufacture products to fulfill profitable sales orders, Drexler provided to the Company a substantial personal revolving credit facility at an initial amount of approximately $3 million (the "**Drexler Revolver**").

16.     The Drexler Revolver grew over time to exceed $12 million.

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

17.    Empery needed and wanted Drexler to provide the revolver financing in order to enhance the Company's value and give Empery time to sell the IP at a going concern price, which it intended to do after declaring defaults under its "loans."

18.    In order to induce Drexler into continuing to loan his personal funds to the Company, Empery made numerous representations to Drexler, including but not limited to, promising and agreeing that, so long as there was no "Event of Default" under the Emprey Loans, Drexler could be repaid his advances under the Drexler Revolver on a regular basis.

19.    Accordingly, Drexler loaned in excess of $12 million to the Company, with the knowledge, agreement and approval of Emprey, and over time, the Company repaid portions of the money owed under the Drexler Revolver as agreed and allowed pursuant to the agreement of the parties.

20.    Subsequently, after Emprey induced Drexler to engage in advancing and repaying himself millions of dollars of his own funds to MusclePharm with the intention of subsequently declaring an event of default so as to prevent Drexler from receiving any further payments from MusclePharm at a time when the debt owed by MusclePharm was at an extremely high balance of $10,872,081.00 (the "Drexler Debt").

21.    As a result of Emprey's predatory lending scheme to take over MusclePharm and exploit its assets, Emprey sought to declare manufactured events of default so as to, among other things, foreclose upon MusclePharm's assets.

22.    In response to Emprey's predatory lending scheme and abusive actions, on December 15, 2022, MusclePharm was forced to file for bankruptcy protection in the United States Bankruptcy Court for the District of Nevada in Case Number CV22-14422 -nmc (the "Bankruptcy Petition"). A true and correct copy of MusclePharm's Bankruptcy Petition is attached hereto as **Exhibit 1**.

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

Page 4

23. MusclePharm identifies in its schedules of assets and liabilities the Drexler Revolver and identifies (19) different payments on the Drexler Revolver from MusclePharm to Drexler totaling the amount of $6,358,350.69. A true and correct copy of the excerpts of MusclePharm's Bankruptcy schedules filed on January 30, 2023 are attached hereto as **Exhibit 2**.

24. MusclePharm also identifies in its schedules of assets and liabilities it is indebted to Drexler under the Drexler Revolver and the Drexler Debt in the amount of $10,872,081. A true and correct copy of the excerpts of MusclePharm's Bankruptcy schedules filed on January 30, 2023 identifying the Drexler Debt are attached hereto as **Exhibit 2**.

25. Drexler is informed and believes Silver is employed by Emprey as its Chief Financial Officer.

26. After the filing of MusclePharm's Bankruptcy Petition, and during the course and scope of MusclePharm's bankruptcy proceedings, Silver contacted other creditors of MusclePharm seeking to induce them into participating in Emprey's scheme to take over MusclePharm and liquidate its assets, and/or alternatively, selling their credit position/debt to Emprey so that Emprey could control a greater percentage of MusclePharm's debt owed to creditors for additional leverage in MusclePharm's bankruptcy proceedings.

27. Drexler is informed and believes that Silver contacted a number of MusclePharm's creditors, including but not limited to a creditor identified as Prestige Capital ("Prestige"), a holder of a debt owed by MusclePharm in the amount of $1,731,000 (the "Prestige Debt").

28. MusclePharm's debt owed to Prestige is secured by a personal guaranty executed by Drexler (the "Prestige PG").

29. Drexler is informed and believes that Silver made false and defamatory statements to Prestige about Drexler including but not limited to: Drexler misappropriated funds from MusclePharm by making payments to himself; Drexler overcharged MusclePharm for advances he

Page 5

made to MusclePharm; and Drexler took unauthorized money from MusclePharm and put it in into his own bank account.

30.    In addition, Drexler is informed and believes that Silver has been in contact with reporters seeking to generate publicity *against* Drexler so as to leverage and enhance Emprey's litigation position and creditor position in the Nevada bankruptcy proceedings.

31.    Drexler is informed and believes that Silver has made additional false and defamatory statements to the third-party reporter that Drexler acted criminally and/or with a lack of fitness in his trade, business and profession.

32.    In addition, Drexler is informed and believes that Silver disclosed a number of personal and private facts about Drexler to a third-party media representative relating to information that was private and/or confidential that Silver would not have access to in the normal course of events.

33.    At all relevant times, Silver knew Drexler was residing in and/or a resident of the State of Nevada.

34.    At all relevant times, Silver knew MusclePharm is a Nevada entity and a resident of the State of Nevada.

35.    At all relevant times, Silver knew MusclePharm had filed its Bankruptcy Petition in the United States Bankruptcy Court for the District of Nevada.

36.    At all relevant times, Silver knew MusclePharm's schedules identified the Drexler Revolver as a debt owed by MusclePharm, a Nevada company, to Drexler individually, a resident of the State of Nevada.

37.    At all relevant times, Silver knew MusclePharm's debt owed to Prestige was secured by a personal guaranty executed by Drexler, a resident of the State of Nevada.

38.    At all relevant times, Silver knew the Drexler Revolver, the Drexler Debt, the Prestige Debt and the Prestige PG were all subject to the jurisdiction of the Nevada bankruptcy proceedings.

## FIRST CLAIM FOR RELIEF
### (Defamation)

39.    Plaintiff incorporates all prior allegations as if fully set forth herein.

40.    Silver made false and defamatory statements about Drexler.

41.    Silver's statements to third-parties constitutes an unprivileged publication.

42.    When Silver made his statements, he was at least negligent in making the statements.

43.    Silver's statements about Drexler imputed criminal conduct and/or a lack of fitness for trade, business, and/or profession and was intended to injure Drexler in his business endeavors.

44.    When Silver's actions complained of were performed, he acted with spite and ill-will towards Drexler.

45.    Drexler has sustained both actual and presumed damages as a result of Silver's statement in an amount in excess of $50,000 to be proven at trial.

46.    When Silver's actions complained of were performed, he acted with oppression, fraud and malice and/or with the willful, intentional and reckless disregard of Drexler's rights and interests and, therefore, Drexler is entitled to punitive damages in excess of $15,000.00.

## SECOND CLAIM FOR RELIEF
### (Invasion of Privacy--False Light)

47.    Plaintiff incorporates all prior allegations as if fully set forth herein.

48.    Based upon information and belief, Silver has communicated private and confidential information about Drexler to media representatives for the purpose of giving publicity to a matter concerning Drexler that places Drexler before the public in a false light.

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

49.    The false light that Silver has sought to portray Drexler in would be highly offensive to a reasonable person.

50.    When Silver's actions complained of were performed, he acted negligently and/or had knowledge of and/or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Drexler would be placed.

51.    Drexler has sustained damages as a result of Silver's conduct in an amount in excess of $50,000 to be proven at trial.

52.    When Silver's actions complained of were performed, he acted with oppression, fraud and malice and/or with the willful, intentional and reckless disregard of Drexler's rights and interests and, therefore, Drexler is entitled to punitive damages in excess of $15,000.00.

## THIRD CLAIM FOR RELIEF
### (Invasion of Privacy – Public Disclosure of Private Facts)

53.    Plaintiff incorporates all prior allegations as if fully set forth herein.

54.    As stated, Silver has made public disclosure of private facts and information concerning Drexler.

55.    Silver's disclosure of Drexler's private facts and information would be offensive and objectionable to a reasonable person of ordinary sensibilities.

56.    When Silver's actions complained of were performed, he acted negligently and/or had knowledge of and/or acted in reckless disregard as to the falsity of the publicized matter and the effect the disclosure of such information would have on the public's perception of Drexler.

57.    Drexler has sustained damages as a result of Silver's conduct in an amount in excess of $50,000 to be proven at trial.

58.    When Silver's actions complained of were performed, he acted with oppression, fraud and malice and/or with the willful, intentional and reckless disregard of Drexler's rights and interests and, therefore, Drexler is entitled to punitive damages in excess of $15,000.00.

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

**FOURTH CLAIM FOR RELIEF**
**(Injunctive Relief)**

59.    Plaintiff incorporates all prior allegations as if fully set forth herein.

60.    Silver continues to publish defamatory statements about Drexler, and/or continues to portray Drexler in a false light and/or discloses public disclosure of private facts and information concerning Drexler.

61.    Without injunctive relief, Plaintiff will suffer irreparable harm for which compensatory damages are inadequate.

62.    Plaintiff is entitled to an injunction enjoining Silver from further harmful and injurious conduct as referenced and incorporated herein.

**FIFTH CLAIM FOR RELIEF**
**(Declaratory Relief)**

63.    Plaintiff incorporates all prior allegations as if fully set forth herein.

64.    A justiciable controversy exists between Drexler and Silver relating to the matters stated herein.

65.    The determination of the respective rights of Drexler and the liability of Silver is ripe and requires judicial intervention to resolve given Drexler's reputation and name and ongoing business relationships that have been harmed by Silver's conduct.

66.    The Court should declare and decree and enter an Order of Declaratory Relief that Silver's statements were/are defamatory in order for Drexler to mitigate against the harm sustained and continuing to be sustained by him due to Silver's conduct.

**WHEREFORE,** Plaintiff requests judgment against the Defendants as follows:

1.    For presumed damages in excess of $15,000 to be determined at trial;

2.    For compensatory damages in excess of $15,000 to be determined at trial;

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

3.    For punitive damages in excess of $15,000 to be determined at trial;

4.    For declaratory relief;

5.    For injunctive relief;.

6.    For an award of reasonable attorneys' fees and costs; and

7.    For such other and further relief as the Court may deem just and proper.

**AFFIRMATION:** The undersigned do hereby affirm that the preceding document does not contain the social security number of any person.

DATED this ____ day of March, 2023.

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511

MARK G. SIMONS (SBN #5132)
DUNCAN G. BURKE (SBN #13081)
*Attorneys for Plaintiff*

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

Page 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SIMONS HALL JOHNSTON PC
690 Sierra Rose Drive
Reno, NV 89511
Phone: (775) 785-0088

## EXHIBIT LIST

| NO. | DESCRIPTION | PAGES |
|-----|-------------|-------|
| 1 | Bankruptcy Petition | 13 |
| 2 | Bankruptcy Schedule Excerpts | 3 |

Page 11

F I L E D
Electronically
CV23-00381
2023-03-02 02:44:38 PM
Alicia L. Lerud
Clerk of the Court
Transaction # 9538103 : csulezic

# EXHIBIT 1

# EXHIBIT 1

Case 22-14422-nmc    Doc 1    Entered 12/15/22 13:03:05    Page 1 of 13

Docket #1

Date Filed: 12/15/2022

Fill in this information to identify your case:

United States Bankruptcy Court for the:

DISTRICT OF NEVADA

Case number *(if known)* _____ Chapter **11**

☐ Check if this an amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | |
|---|---|---|
| 1. | Debtor's name | **MusclePharm Corporation** |
| 2. | All other names debtor used in the last 8 years<br>Include any assumed names, trade names and *doing business as* names | |
| 3. | Debtor's federal Employer Identification Number (EIN) | 77-0664193 |
| 4. | Debtor's address | **Principal place of business**<br><br>**8275 South Eastern Avenue**<br>**Las Vegas, NV 89123**<br>Number, Street, City, State & ZIP Code<br><br>**Clark**<br>County | **Mailing address, if different from principal place of business**<br><br>P.O. Box, Number, Street, City, State & ZIP Code<br><br>**Location of principal assets, if different from principal place of business**<br><br>Number, Street, City, State & ZIP Code |
| 5. | Debtor's website (URL) | |
| 6. | Type of debtor | ■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br>☐ Partnership (excluding LLP)<br>☐ Other. Specify: _____ |

Debtor  **MusclePharm Corporation**                                             Case number *(if known)* _____
        <sub>Name</sub>

---

**7.  Describe debtor's business**    A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
   http://www.uscourts.gov/four-digit-national-association-naics-codes.

___  ___

---

**8.  Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check all that apply:*

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

---

**9.  Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| | | | | | |
|---|---|---|---|---|---|
| District | _____ | When | _____ | Case number | _____ |
| District | _____ | When | _____ | Case number | _____ |

---

Debtor    **MusclePharm Corporation**                                        Case number (if known) _____
     Name

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

    ☑ No
    ☐ Yes.

List all cases. If more than 1, attach a separate list

    Debtor _____
    District _____    When _____    Relationship _____
                                        Case number, if known _____

**11. Why is the case filed in this district?**

Check all that apply:

    ☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

    ☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

    ☑ No
    ☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

    **Why does the property need immediate attention?** (Check all that apply.)

    ☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.
    What is the hazard? _____

    ☐ It needs to be physically secured or protected from the weather.

    ☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

    ☐ Other _____

    **Where is the property?** _____
                               Number, Street, City, State & ZIP Code

    **Is the property insured?**

    ☐ No
    ☐ Yes.    Insurance agency _____
               Contact name _____
               Phone _____

---

**Statistical and administrative information**

**13. Debtor's estimation of available funds**

Check one:

    ☑ Funds will be available for distribution to unsecured creditors.
    ☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☑ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☑ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |

| Debtor | MusclePharm Corporation | Case number (if known) |
|---|---|---|
| | Name | |

☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☑ $10,000,001 - $50 million
☐ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

Case 22-14422-nmc    Doc 1    Entered 12/15/22 13:03:05    Page 5 of 13

Debtor    **MusclePharm Corporation**                                          Case number (if known)
          Name

█████   **Request for Relief, Declaration, and Signatures**

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature**
**of authorized**                The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.
**representative of debtor**
                                  I have been authorized to file this petition on behalf of the debtor.

                                  I have examined the information in this petition and have a reasonable belief that the information is true and correct.

                                  I declare under penalty of perjury that the foregoing is true and correct.

                                  Executed on    **December 15, 2022**
                                                 MM / DD / YYYY

                          X  **/s/ Ryan Drexler**                              **Ryan Drexler**
                             Signature of authorized representative of debtor   Printed name

                             Title    **Chief Executive Officer**


**18. Signature of attorney**    X  **/s/ Samuel A. Schwartz**              Date  **December 15, 2022**
                                    Signature of attorney for debtor               MM / DD / YYYY

                                    **Samuel A. Schwartz**
                                    Printed name

                                    **Schwartz Law, PLLC**
                                    Firm name

                                    **601 East Bridger Avenue**
                                    **Las Vegas, NV 89101**
                                    Number, Street, City, State & ZIP Code

                                    Contact phone  **702-385-5544**    Email address  **saschwartz@nvfirm.com**

                                    **10985 NV**
                                    Bar number and State

Fill in this information to identify the case:

Debtor name **MusclePharm Corporation**

United States Bankruptcy Court for the:    **DISTRICT OF NEVADA**

Case number (if known):

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | **Total claim, if partially secured** | **Deduction for value of collateral or setoff** | **Unsecured claim** |
| Empery Tax Efficient, LP c/o Empery GP, LLC 1 Rockefeller Plaza, Ste 1205 New York, NY 10020 | | | | | | $0.00 |
| Prestige Capital 400 Kelby Street – 10th Floor Fort Lee, NJ 07024 | | | | | | $0.00 |
| White Winston Select Asset Funds, LLC 265 Franklin St, Ste 1702 Boston, MA 02110 | | | | | | $0.00 |

## United States Bankruptcy Court
### District of Nevada

In re   __MusclePharm Corporation__
                                    __Debtor(s)__          Case No. _____
                                                           Chapter      11

# VERIFICATION OF CREDITOR MATRIX

I, the Chief Executive Officer of the corporation named as the debtor in this case, hereby verify that the attached list of creditors is true and correct to the best of my knowledge.

Date:   __December 15, 2022__          /s/ Ryan Drexler
                                       __Ryan Drexler/Chief Executive Officer__
                                       Signer/Title

MusclePharm Corporation
8275 South Eastern Avenue
Las Vegas, NV 89123

Samuel A. Schwartz
Schwartz Law, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

United States Trustee
300 Las Vegas Blvd. South, #4300
Las Vegas, NV 89101

Clark County Assessor
c/o Bankruptcy Clerk
500 S. Grand Central Pkwy
Box 551401
Las Vegas, NV 89155-1401

Clark County Treasurer
c/o Bankruptcy Clerk
500 S. Grand Central Pkwy
PO Box 551220
Las Vegas, NV 89155-1220

Dept. of Employment, Training and Rehab
Employment Security Division
500 E. Third Street
Carson City, NV 89713

Nevada Dept of Taxation, BK Section
555 E. Washington Ave #1300
Las Vegas, NV 89101

Social Security Administration
Regional Chief Counsel, Region IX
160 Spear Street, Suite 800
San Francisco, CA 94105-1545

Empery Tax Efficient, LP
c/o Empery GP, LLC
1 Rockefeller Plaza, Ste 1205
New York, NY 10020

Prestige Capital
400 Kelby Street – 10th Floor
Fort Lee, NJ 07024

White Winston Select Asset Funds, LLC
265 Franklin St, Ste 1702
Boston, MA 02110

## United States Bankruptcy Court
### District of Nevada

In re    MusclePharm Corporation

_____ Case No.
                        Debtor(s)    Chapter    11


## CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for __MusclePharm Corporation__ in the above captioned action, certifies that the following is a (are) corporation(s), other than the debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's(s') equity interests, or states that there are no entities to report under FRBP 7007.1:


■ None [Check if applicable]


December 15, 2022
_____
Date

/s/ Samuel A. Schwartz
_____
Samuel A. Schwartz
Signature of Attorney or Litigant
Counsel for   MusclePharm Corporation
Schwartz Law, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
702-385-5544 Fax:702-201-1330
saschwartz@nvfirm.com

ACTION BY WRITTEN CONSENT OF
CHIEF EXECUTIVE OFFICER OF
MUSCLEPHARM CORPORATION, A NEVADA CORPORATION

Dated as of December 15, 2022

The UNDERSIGNED, constituting the Chief Executive Officer (the "CEO") of MUSCLEPHARM CORPORATION, a Nevada corporation (the "Company"), hereby consents in writing to the adoption of the following resolutions, as if they were adopted at a duly convened meeting of the officers at which a quorum was present and acting throughout, which actions are hereby deemed effective as of the date set forth above:

WHEREAS, the CEO has reviewed and considered the financial and operational condition of the Company and the Company's business on the date hereof, including the historical performance of the Company, the assets of the Company, the current and long-term liabilities of the Company, the viability of the Company's business, and the strategic alternatives available to the Company;

WHEREAS, the CEO had the opportunity to consult with the management of the Company and the Company's advisors and to fully consider the strategic alternatives available to the Company, including, without limitation, the relative risks and benefits of pursuing a bankruptcy proceeding under the provisions of Chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code"); and

WHEREAS, the CEO deems it advisable and in the best interests of the Company and its creditors, interest holders, and other parties in interest, to consent to and adopt, in the name of and on behalf of the Company, the following resolutions:

NOW, THEREFORE, IT IS:

RESOLVED, that it is desirable and in the best interests of the Company and its creditors, employees, and other interested parties that a voluntary Chapter 11 bankruptcy petition be filed by the Company, seeking relief under the provisions of Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the District of Nevada; and it is further

RESOLVED, that the Chief Executive Officer of the Company, RYAN DREXLER (the "Authorized Person"), be, and is, authorized and directed to execute and file on behalf of the Company, all petitions, schedules, lists, motions, applications, and other papers or documents with the appropriate court under the Bankruptcy Code and to take any and all action that is necessary, proper, or

advisable to obtain such relief under the Bankruptcy Code, including, without limitation, any action necessary to maintain the ordinary course operation of the Company's business; and it is further

**RESOLVED**, that the law firm of SCHWARTZ LAW, PLLC ("**Schwartz Law**") be employed as counsel to the Company to represent and assist the Company in carrying out the Company's duties under the Bankruptcy Code and to take any and all actions to advance the Company's rights including the preparation of pleadings and filings in connection with the Chapter 11 Case, and the Authorized Person of the Company is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Chapter 11 Case, and to cause to be filed an appropriate application for authority to retain the services of Schwartz Law; and it is further

**RESOLVED**, that the Authorized Person of the Company be, and hereby is, authorized and directed to employ any other individual and/or firm as professionals or consultants to the Company as are deemed necessary or advisable to represent and assist the Company in carrying out the Company's duties under the Bankruptcy Code, and in connection therewith, the Authorized Person of the Company is hereby authorized and directed to execute appropriate retention agreements, and to cause to be filed an appropriate application for authority to retain the services of such firms; and it is further

**RESOLVED**, that the Authorized Person is hereby authorized and empowered to execute, deliver, file, and perform any agreement, document, or any amendment to the foregoing, in the name and on behalf of the Company, as may be necessary or advisable for the Company to obtain post-petition, all on such terms as the Authorized Person deems necessary or advisable in order to carry out the purpose and intent of the foregoing resolutions; and it is further

**RESOLVED**, that the Authorized Person is hereby authorized, empowered, and directed, in the name and on behalf of the Company, to take such additional actions, to perform all acts and deed, and to execute, ratify, certify, deliver, file, and record such additional agreements, notices, certificates, instruments, applications, payments, letters, and documents as any of them may deem necessary or advisable to implement the provisions of the foregoing resolutions, and to appoint such agents on behalf of the Company as such Authorized Person may deem necessary or advisable in connection with any financing arrangement, lending or the sale of assets, and the transactions contemplated by any of the foregoing, the authority for the taking of such action to be conclusive evidence thereof; and it is further

**RESOLVED**, that the Authorized Person is hereby authorized, empowered and directed, in the name and on behalf of the Company, to open and maintain one or more debtor-in-possession bank accounts for the Company, at such banks as the Authorized Person may determine, and that in connection therewith the Authorized Person may sign checks, authorize wire transfers and execute and deliver on behalf of the Company, such forms of banking resolutions as such banks may request and the Authorized Person may approve, which resolutions, when executed by such Authorized Person and inserted into the minute book of the Company, shall be deemed to be adopted by the Company with the same full force and effect as if such resolutions had been set forth herein in their entirety; and it is further

**RESOLVED**, that all of the acts and transactions taken by the Authorized Person or other authorized entities, in the name and on behalf of the Company, relating to matters contemplated by the foregoing resolutions, which acts would have been approved by the foregoing resolutions except that such acts were taken prior to the execution of these resolutions, are hereby in all respects confirmed, approved, and ratified; and it is further

**RESOLVED**, that this written consent may be executed in any number of counterparts and by facsimile, portable document format, or other reproduction, and such execution shall be considered valid, binding, and effective for all purposes.

*[No Further Text. Signature Page Follows.]*

IN WITNESS WHEREOF, the undersigned has executed this written consent as of the date first written above.

**MUSCLEPHARM CORPORATION**
**a Nevada corporation**

By: _____
Name: RYAN DREXLER
      Chief Executive Officer

F I L E D
Electronically
CV23-00381
2023-03-02 02:44:38 PM
Alicia L. Lerud
Clerk of the Court
Transaction # 9538103 : csulezic

# EXHIBIT 2

# EXHIBIT 2

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **MusclePharm Corporation** |
| United States Bankruptcy Court for the: | DISTRICT OF NEVADA |
| Case number (if known) | **22-14422-NMC** |

☐ Check if this is an amended filing

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors

12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

■ Schedule A/B: Assets–Real and Personal Property (Official Form 206A/B)

■ Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)

■ Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)

■ Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)

■ Schedule H: Codebtors (Official Form 206H)

■ Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)

☐ Amended Schedule _____

☐ Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (Official Form 204)

☐ Other document that requires a declaration _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **January 30, 2023**        X /s/ Gary Shirshac
_____            _____
                                            Signature of individual signing on behalf of debtor

                                            **Gary Shirshac**
                                            _____
                                            Printed name

                                            **CFO**
                                            _____
                                            Position or relationship to debtor

Official Form 202                    Declaration Under Penalty of Perjury for Non-Individual Debtors

Debtor    **MusclePharm Corporation**
         Name

Case number (if known)    **22-14422-NMC**

■ No
☐ Yes. Specify each creditor,
  including this creditor and its relative
  priority.

■ Contingent
■ Unliquidated
■ Disputed

---

| 2.3 | **Empery Tax Efficient, LP** | Describe debtor's property that is subject to a lien | $12,840,000.00 | Unknown |
|---|---|---|---|---|

Creditor's Name

**c/o Empery GP, LLC
1 Rockefeller Plaza, Ste
1205
New York, NY 10020**
Creditor's mailing address

Describe debtor's property that is subject to a lien
**All Assets**

Describe the lien

Is the creditor an insider or related party?
■ No
☐ Yes
Creditor's email address, if known

Is anyone else liable on this claim?
■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

Date debt was incurred

Last 4 digits of account number

Do multiple creditors have an
interest in the same property?
■ No
☐ Yes. Specify each creditor,
  including this creditor and its relative
  priority.

As of the petition filing date, the claim is:
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

---

| 2.4 | **Prestige Capital** | Describe debtor's property that is subject to a lien | $1,731,000.00 | Unknown |
|---|---|---|---|---|

Creditor's Name

**400 Kelby Street – 10th
Floor
Fort Lee, NJ 07024**
Creditor's mailing address

Describe debtor's property that is subject to a lien
**Accounts Receivable**

Describe the lien

Is the creditor an insider or related party?
■ No
☐ Yes
Creditor's email address, if known

Is anyone else liable on this claim?
■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

Date debt was incurred

Last 4 digits of account number

Do multiple creditors have an
interest in the same property?
■ No
☐ Yes. Specify each creditor,
  including this creditor and its relative
  priority.

As of the petition filing date, the claim is:
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

---

| 2.5 | **Ryan Drexler** | Describe debtor's property that is subject to a lien | $10,872,081.00 | Unknown |
|---|---|---|---|---|

Creditor's Name

**724 Marewood Trl
Reno, NV 89511**
Creditor's mailing address

Describe debtor's property that is subject to a lien
**All Assets**

Describe the lien

Is the creditor an insider or related party?
☐ No

---

Official Form 206D    Additional Page of Schedule D: Creditors Who Have Claims Secured by Property    page 2 of 3

Debtor   **MusclePharm Corporation**                                Case number *(if known)*  **22-14422-NMC**

may be adjusted on 04/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None.

| Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.1.   Ryan Drexler<br>724 Marewood Trl<br>Reno, NV 89511<br>Officer | 2/22/2022,<br>2/24/2022,<br>2/28/2022,<br>3/1/2022,<br>3/2/2022,<br>3/7/2022,<br>3/7/2022,<br>3/9/2022,<br>3/10/2022,<br>3/15/2022,<br>3/30/2022,<br>3/31/2022,<br>4/21/2022,<br>6/10/2022,<br>6/23/2022,<br>7/8/2022,<br>7/18/2022,<br>9/20/2022,<br>9/21/2022. | $6,358,350.69 | Repayments for revolving line of credit |

**5.  Repossessions, foreclosures, and returns**
List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

■ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

**6.  Setoffs**
List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

■ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

**Part 3:   Legal Actions or Assignments**

**7.  Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**
List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None.

| Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| 7.1.   SEE ATTACHED LIST | | | ☐ Pending<br>☐ On appeal<br>☐ Concluded |

**8.  Assignments and receivership**
List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.