GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6654
E-mail: ggarman@gtg.legal
WILLIAM M. NOALL
Nevada Bar No. 3549
Email: wnoall@gtg.legal
TERESA M. PILATOWICZ, ESQ.
Nevada Bar No. 9605
E-mail: tpilatowicz@gtg.legal
DYLAN T. CICILIANO
Nevada Bar No. 12348
E-mail: dciciliano@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000
Fax: (725) 777-3112
*Attorneys for Empery Tax Efficient, LP*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No. 22-14422-nmc |
| MUSCLEPHARM CORPORATION, | Chapter 11 |
| Debtor. | Date:  OST Requested<br>Time:  OST Requested |

**DECLARATION OF RYAN LANE IN SUPPORT OF EMERGENCY MOTION TO ENFORCE *INTERCREDITOR AND SUBORDINATION AGREEMENT* UNDER SECTION 510(a) OF THE BANKRUPTCY CODE**

I, Ryan Lane, make this Declaration under 28 U.S.C. § 1746 and declare as follows:

1.      I am over the age of eighteen (18) years and competent to testify to the matters asserted herein, of which I have personal knowledge, except as to those matters stated upon information and belief.  As to those matters stated upon information and belief, I believe them to be true.

2.      I am a founder and a Managing Member of the General Partner of Empery Asset Management LP ("EAM").  I submit this Declaration for all permissible purposes under the Federal Rules of Civil Procedure and Rules of Evidence in support of the *Emergency Motion to Enforce* Intercreditor and Subordination Agreement *Under Section 510(a) of the Bankruptcy Code*

("Motion"),[1] filed by Empery Tax Efficient, LP, in its capacity as collateral agent (in such capacity, the "Senior Creditor") for the holders of the senior secured notes and related claims as set forth in the Motion.

3.    On October 13, 2021, Empery Master Onshore, LLC ("EMO"), the Senior Creditor, Empery Tax Efficient III, LP ("ETE3"), and Empery Debt Opportunity Fund, LP ("EDOF," and collectively with EMO, Empery and ETE3, the "Empery Noteholders"), Ionic Ventures, LLC, Anson Investments Master Fund LP, CVI Investments, Inc., HB Fund LLC, Intracoastal Capital LLC, Bigger Capital Fund, LP, District 2 Capital Fund LP, L1 Capital Global Opportunities Master Fund, and Altium Growth Fund, LP (collectively, the "October Noteholders"), with the Senior Creditor as lead investor and collateral agent for the October Noteholders, entered into a Securities Purchase Agreement (the "SPA") with Musclepharm Corporation (the "Debtor").    Original Issue Discount Senior Secured Notes (collectively, the "October Notes") were issued to each of the October Noteholders by Debtor.  The original maturity date of each of the October Notes was April 13, 2022, but the October Notes had built-in maturity extension provisions in response to Debtor's stated concerns relating to potential up-listing delays that allowed for a total extension of not more than 45 days (i.e. to May 28, 2022), which extension was utilized.  The principal amount of the October Notes was $8,197,674.42. True and correct copies of the October Notes are attached hereto as **Exhibit "1."**

4.    Also on October 13, 2021, and consistent with the advance of funds pursuant to the October Notes, the Senior Creditor for the October Noteholders collectively, entered into a Pledge and Security Agreement (the "Security Agreement") with Debtor.  As collateral for the October Notes, Debtor and its wholly owned Canadian subsidiary, MusclePharm Enterprises Corp., granted security interests in and pledged to the Senior Creditor, for the benefit of the October Noteholders, essentially all of the Debtor's personal and tangible assets (the "Collateral").  A true and correct copy of the Security Agreement is attached hereto as **Exhibit "2"**.

---

[1] Capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the Motion.

5.    In connection with the October Notes, Debtor and Canada MusclePharm Enterprises Corp also executed a *Trademark Security Agreement, Perfection Certificate*, and *Guarantee*.  True and correct copies of the Trademark Security Agreement, Perfection Certificate, and Guarantee are attached hereto as **Exhibit "3", Exhibit "4", and Exhibit "5"**, respectively.

6.    Expressly, the Collateral granted under the Security Agreement was intended to secure all indebtedness due under the October Notes.

7.    The October Noteholder's security interests in the Collateral were timely perfected by Empery's filing of a *UCC-1 Financing Statement* on October 14, 2021, with the Nevada Secretary of State's office.  A true and correct copy of the UCC-1 Financing Statement is attached hereto as **Exhibit "6"**.

8.    On June 3, 2022, Debtor and certain of the October Noteholders entered into a *Waiver and Amendment* agreement (the "Waiver and Amendment Agreement") that, among other matters, called for an extension of the maturity date of the October Notes six (6) months from the closing date of the June Notes (as defined below).  A true and correct copy of the Waiver and Amendment Agreement is attached hereto as **Exhibit "7"**.

9.    On June 3, 2022, Debtor and the October Noteholders entered into an *Amended and Restated Securities Purchase Agreement* (the "Amended SPA"), in which the maturity date of the October Notes was extended to December 10, 2022.

10.    Additionally, on June 10, 2022, Debtor issued *Original Issue Discount Senior Secured Notes* (the "June Notes" and collectively with the October Notes, the "Notes") to the Empery Noteholders, Ionic Ventures, LLC, Anson Investments Master Fund LP, HB Fund LLC, Bigger Capital Fund, LP, District 2 Capital Fund LP, Altium Growth Fund, LP, Walleye Opportunities Master Fund Ltd., and Roth Capital Partners, LLC (collectively, the "June Noteholders" and together with the October Noteholders, the "Noteholders") for an aggregate principal amount of $3,081,875.  The maturity date of the June Notes was December 10, 2022.  A true and correct copy of the June Notes is attached hereto as **Exhibit "8"**.

11.    As of the date hereof and set forth in the DIP Loan Documents, and as approved by the Financing Order, MPC has loaned Debtor a total of approximately $2.5 Million, including the

1    DIP Inventory Acquisition Line of Credit, as set forth in the DIP Financing Order,  and advanced

2    a total of approximately $2.2 Million under the DIP Factoring Facility to factor DIP Accounts (as

3    those terms are defined in the DIP Loan Documents).

4          12.    As a condition precedent to executing the SPA and financing the Debtor, the Senior

5    Creditor required that Drexler agree to execute the Intercreditor/Subordination Agreement.  A true

6    and correct copy of the Intercreditor/Subordination Agreement is attached hereto as **Exhibit "9"**.

7          13.    On March 8, 2022, approximately six months after entering into the

8    Intercreditor/Subordination Agreement, Debtor requested permission from the Senior Creditor to

9    establish a new revolving credit facility with Drexler to finance certain inventory.  The Senior

10    Creditor worked with Debtor to amend the Intercreditor/Subordination Agreement, allowing

11    Debtor to issue to Drexler an unsecured promissory note (at which time, ***Drexler affirmed the***

12    ***Intercreditor/Subordination Agreement, including all of his obligations thereunder)***.  A true and

13    correct copy of the amended Intercreditor/Subordination Agreement is attached hereto as **Exhibit**

14    **"10"**.

15          14.    Since his departure, and in violation of the Intercreditor/Subordination Agreement,

16    Drexler has taken various actions to undermine and interfere with the Senior Creditor's recovery.

17    Foremost, Drexler brought claims against the Senior Creditor and related parties in two separate

18    courts.  At the same time, it is believed that Drexler launched a clandestine campaign to intimidate

19    me through anonymous communications to my spouse, my children's school board, my neighbors,

20    and members of the town in which I reside through posts on social media groups.

21          15.    Now that the Plan Term Sheet has been filed, Drexler has embarked on a last ditch

22    effort to sabotage Debtor's restructuring through onerous, irrelevant, and abusive discovery,

23    purportedly for the Trustee Motion, including twelve separate sets of requests for production and

24    subpoenas (a total of more than 200 requests) and twelve (12) noticed depositions.  Upon

25    information and belief, the majority of a recent $650,000 increase in the Debtor's budget is

26    attributable to estimated increased fees and costs of Debtor and the Committee associated with the

27    Drexler related discovery and litigation.

28        I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed this 15th day of May, 2023.

*/s/ Ryan Lane*
RYAN LANE

# EXHIBIT 1

# EXHIBIT 1

EXECUTION VERSION

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                              Principal: $1,162,790.70

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 4721 Ironton Street, Building A, Denver, Colorado 80239, designated as its Original Issue Discount Senior Secured Note due April 13, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Altium Growth Fund, LP or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $1,162,790.70 on April 13, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder; provided, that, (a) the Maturity Date may be extended to (i) May 13, 2022 if (x) it is necessary for the Trading Market to complete its review of the Company's annual report on Form 10-K for its fiscal year ended December 31, 2021 in connection with the listing of the Company's common stock on such Trading Market, (y) no Events of Default have occurred pursuant to this Note and (z) the Company has taken all actions necessary for the listing of the Common Stock on the Trading Market other than the delivery to the Trading Market of the Company's annual report on Form 10-K for its fiscal year ended December 31, 2021, or (ii) May 28, 2022, upon the delivery of a certificate duly signed by an officer of the Company certifying that: (x) no Event of Default has occurred and is continuing, and (y) the sum of cash flows from operating and investing activities (but not cash flows from financing activities) of the Company and its Subsidiaries, taken as a whole, was greater than zero for the calendar month ended March 31, 2022 and (z) such officer reasonably believes that : (1) no Event of Default is reasonably expected to occur on or before April 30, 2022 and (2) the sum of cash flows from operating and investing activities (but not from financing activities) of the Company and its Subsidiaries, taken as a whole, will be greater than zero for the calendar month ended April

30, 2022, and (b) if the Maturity Date is extended in accordance with clause (a) of this paragraph, interest (i) shall accrue daily on and from April 13, 2022 at a rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law until this Note is paid in full, (ii) shall be computed on the basis of a year of 365 days for the actual number of days elapsed, and (iii) that has accrued and is unpaid shall be paid by the Company to the Holder in cash on the Maturity Date (as extended in accordance with clause (a) of this paragraph).  This Note is subject to the following additional provisions:

Section 1.    Definitions.    For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X) thereof, (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee"  or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control

(whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole)  sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company  is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes, (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof, (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain

Convertible Secured Promissory Note dated as of August 13, 2021, (d) Indebtedness evidenced by that certain Amended and Restated Convertible Secured Promissory Note dated as of August 21, 2020 in the maximum principal amount of $2,735,199 issued by Borrower to Subordinated Creditor, as amended and restated pursuant to that certain Convertible Secured Promissory Note dated as of November 29, 2020 issued by Borrower to Subordinated Creditor in the maximum principal amount of $2,871,967, as amended by that certain Amendment to Convertible Secured Promissory Note dated as of August 13, 2021, (e) the PPP Loans, (f) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default, (g) trade accounts payable incurred in the ordinary course of business consistent with past practice, (h) Indebtedness evidenced by the Settlement Agreements and (i) Indebtedness that (A) is expressly subordinated to the Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Requisite Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a) - (d).

"Purchase Agreement" means the Securities Purchase Agreement, dated as of October 13, 2021 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., and (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2.    Registration of Transfers and Exchanges.  This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same.  No service charge will be payable for such registration of transfer or exchange.

Section 3.    Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a)    other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b)    other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c)    amend its charter documents, including, without limitation, its certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d)      repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e)      repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (d), clause (e) or clause (h) of the definition of Permitted Indebtedness and (iii) the Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f)      declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g)      enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h)      consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4.      Mandatory Redemption.

a)      Occurrence of Mandatory Redemption.  While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such offering, a "Subsequent Offering" and 25% of such net proceeds from such Subsequent Offering, the "Net Proceeds") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding Notes (a "Mandatory Redemption"); provided, however, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the Notes then outstanding pro rata based on the principal amount of such Notes then outstanding and (iii) the Company shall effect successive Mandatory

Redemptions upon each Subsequent Offering until the Notes are repaid in full or otherwise no longer outstanding.

b)    <u>Mandatory Notices</u>. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "<u>Mandatory Redemption Notice</u>" and the date such notice is delivered to all such holders is referred to as a "<u>Mandatory Redemption Notice Date</u>") (a) stating the date on which the Mandatory Redemption shall occur (a "<u>Mandatory Redemption Date</u>"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c)    <u>Mandatory Redemption Procedure</u>.  The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions.  If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of 18% per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(a), the Net Proceeds shall be applied ratably among the Holders of Note.

<u>Section 5</u>.    <u>Events of Default</u>.

a)    "<u>Event of Default</u>" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)    any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within 3 Trading Days;

(ii)    the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in

which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) 5 Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) 10 Trading Days after the Company has become or should have become aware of such failure;

(iii)    a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)    any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)    the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)    the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement (including, without limitation, the PPP Loan Agreement) that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)    the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)    any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)    the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets

-8-

which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)     the occurrence of an Event of Default under any other Note;

(xi)    any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of 45 calendar days;

(xii)   the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)  any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)   any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)    any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of

-9-

any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xiv)); or

(xvi)   any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

b)      Remedies Upon Event of Default. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable.  Commencing 5 days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of 18% per annum or the maximum rate permitted under applicable law.  Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company.  In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law.  Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b).  No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

Section 6.    Security.  The Notes are secured to the extent and in the manner set forth in the Security Documents.

-10-

Section 7.    Miscellaneous.

a)    Notices.  Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a).  Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement.  Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b)    Absolute Obligation.  Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed.  This Note is a direct debt obligation of the Company.  This Note ranks pari passu with all other Notes now or hereafter issued under the terms set forth in the Transaction Documents.

c)    Lost or Mutilated Note.  If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d)    Governing Law.  All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof.  Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be

commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "New York Courts").  Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding.  This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e)      Waiver.  Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note.  The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion.  Any waiver by the Company or the Holder must be in writing.

f)      Severability.   If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances.  If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this

Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) <u>Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief</u>.  The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note.  The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) <u>Next Business Day</u>.  Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) <u>Headings</u>.  The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) <u>Amendment</u>.  This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>.   Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to

-13-

presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Sabina Rizvi

Title: President & CFO

Address: 3753 Howard Hughes Parkway
        Suite 200-849
        Las Vegas, NV 89169

Email address: Sabina.Rizvi@musclepharm.com

EXECUTION VERSION

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                    Principal: $f 72,093.02

### ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
### DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one oda series od yulh autzorivey any maliylh issuey Original Issue Senior Securey Notes od MusclePzar8 Corporation, a Nemaya corporation (tze "Co8 panh"), zaming its principal place odbusiness at 4721 Ironton Street, Builying A, Denner, Colorayo f0239, yesignatey as its Original Issue Discount Senior Securey Note yue April 13, 2022 (tzis Note, tze "Note" any, collectinelh witz tze otzer Notes odsucz series, tze "Notes").

FOR VALUE RECEIVED, tze Co8 panh pro8 ises to pah to Anson Innest8 ents Master Funy LP or its registerey assigns (tze "Holyer"), or szall zane paiy pursuant to tze ter8 s zereunyer, tze principal su8 od $f 72,093.02 on April 13, 2022 (tze "Maturith Date") or sucz earlier yate as tzis Note is requirey or per8 ittey to be repaiy as promiyey zereunyer; promiyey, tzat, (a) tze Maturith Date 8 ah be extenyey to (i) Mah 13, 2022 id(x) it is necessarh dr tze Traying Market to co8 plete its renew od tze Co8 panh's annual report on For8 10-K dr its discal hear enyey Dece8 ber 31, 2021 in connection witz tze listing od tze Co8 panh's co8 8 on stock on sucz Traying Market, (h) no Enents odDedault zane occurrey pursuant to tzis Note any (v) tze Co8 panh zas taken all actions necessarh dr tze listing od tze Co8 8 on Stock on tze Traying Market otzer tzan tze yelinerh to tze Traying Market odtze Co8 panh's annual report on For8 10-K dr its discal hear enyey Dece8 ber 31, 2021, or (ii) Mah 2f, 2022, upon tze yelinerh oda certidcate yulh signey bh an odicer od tze Co8 panh certiding tzat: (x) no Enent od Dedault zas occurrey any is continuing, any (h) tze su8 od casz dows dro8 operating any innesting actinities (but not casz dows dro8 dnancing actinities) odtze Co8 panh any its Subsiyiaries, taken as a wzole, was greater tzan vero dr tze calenyar 8 ontz enyey Marcz 31, 2022 any (v) sucz odicer reasonablh belienes tzat : (1) no Enent odDedault is reasonablh expectey to occur on or bedore April 30, 2022 any (2) tze su8 odcasz dows dro8 operating any innesting actinities (but not dro8 dnancing actinities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, will be greater tzan vero dr tze calenyar

8 ontz enyey April 30, 2022, any (b) id tze Maturith Date is extenyey in accoryance witz clause (a) od tzis paragrapz, interest (i) szall accrue yailh on any dro8 April 13, 2022 at a rate equal to tze lesser od eigzteen percent (1f%) per annu8 or tze 8 axi8 u8 rate per8 ittey unyer applicable law until tzis Note is paiy in dull, (ii) szall be co8 putey on tze basis od a hear od 365 yahs dor tze actual nu8 ber od yahs elapsey, any (iii) tzat zas accruey any is unpaiy szall be paiy bh tze Co8 panh to tze Holyer in casz on tze Maturith Date (as extenyey in accoryance witz clause (a) od tzis paragrapz). Tzis Note is subject to tze dollowing ayyitional pronisions:

Section 1. Dedinitions. For tze purposes zereod, in ayyition to tze ter8 s yediney elsewzere in tzis Note, (a) capitalivey ter8 s not otzerwise yediney zerein szall zane tze 8 eanings set dortz in tze Purczase Agree8 ent any (b) tze dollowing ter8 s szall zane tze dollowing 8 eanings:

"Bankruptch Enent" 8 eans anh od tze dollowing enents: (a) tze Co8 panh or anh Subsiyiarh tzereod co8 8 ences a case or otzer proceeyying unyer anh bankruptch, reorganivation, arrange8 ent, ayjust8 ent od yebt, relied od yebtors, yissolution, insolnench or liquiyation or si8 ilar law od anh jurisyiction relating to tze Co8 panh or anh Signidicant Subsiyiarh (as yediney in Rule 1-02 od Regulation S-X) tzereod, (b) tzere is co8 8 encey against tze Co8 panh or anh Signidicant Subsiyiarh tzereod anh sucz case or proceeyying tzat is not yis8 issey witzin 60 yahs ader co8 8 ence8 ent, (c) tze Co8 panh or anh Signidicant Subsiyiarh tzereod is ayjuyicatey insolnent or bankrupt or anh oryer od relied or otzer oryer approning anh sucz case or proceeyying is enterey, (y) tze Co8 panh or anh Signidicant Subsiyiarh tzereod sudders anh appoint8 ent od anh custoyian or tze like dor it or anh substantial part od its properth tzat is not yisczargey or stahey witzin 60 calenyar yahs ader sucz appoint8 ent, (e) tze Co8 panh or anh Signidicant Subsiyiarh tzereod 8 akes a general assign8 ent dor tze benedit od creyitors, (d) tze Co8 panh or anh Signidicant Subsiyiarh tzereod calls a 8 eeting od its creyitors witz a niew to arranging a co8 position, ayjust8 ent or restructuring od its yebts, (g) tze Co8 panh or anh Signidicant Subsiyiarh tzereod ay8 its in writing tzat it is generallh unable to pah its yebts as tzeh beco8 e yue, (z) tze Co8 panh or anh Signidicant Subsiyiarh tzereod, bh anh act or dailure to act, expresslh inyicates its consent to, appronal od or acquiescence in anh od tze doregoing or takes anh corporate or otzer action dor tze purpose od eddecting anh od tze doregoing.

"Business Dah" 8 eans anh yah otzer tzan Saturyah, Sunyah or otzer yah on wzicz co8 8 ercial banks in Tze Cith od New York are autzorivey or requirey bh law to re8 ain closey; proniyey, zowener, dor claridication, co8 8 ercial banks szall not be yee8 ey to be autzorivey or requirey bh law to re8 ain closey yue to "stah at zo8 e", "szelter-in-place", "non-essential e8 plohee" or anh otzer si8 ilar oryers or restrictions or tze closure od anh pzhsical brancz locations at tze yirection od anh gonern8 ental autzorith so long as tze electronic dunys transder shste8 s (incluying dor wire transders) od co8 8 ercial banks in Tze Cith od New York are generallh open dor use bh custo8 ers on sucz yah.

"Czange od Control Transaction" 8 eans tze occurrence ader tze yate zereod od anh od (a) an acquisition ader tze yate zereod bh an inyiniyual or legal entith or "group" (as yescribey in Rule 13y-5(b)(1) pro8 ulgatey unyer tze Exczange Act) od eddectine control

106475979_13

(wzetzer tzrougz legal or beneficial ownerszip od capital stock od tze Co8 panh, bh contract or otzerwise) od in excess od 33% od tze moting securities od tze Co8 panh (otzer tzan bh 8 eans od exercise od tze Warrants issuey togetzer witz tze Notes), wzere sucz inyimiyual or legal entith or "group" prior to sucz acquisition yiy not own in excess od 33% od tze moting securities od tze Co8 panh; promiyey, tzat dor anh inyimiyual or legal entith or "group" tzat owns in excess od 33% od tze moting securities od tze Co8 panh as od tze yate od tze Purczase Agree8 ent, sucz inyimiyual or legal entith or "group" zolys 75% or 8 ore od tze moting securities od tze Co8 panh ader giming edect to anh sucz acquisition, (b) tze Co8 panh 8 erges into or consoliyates witz anh otzer Person, or anh Person 8 erges into or consoliyates witz tze Co8 panh any, ader giming edect to sucz transaction, tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze Co8 panh or tze successor entith od sucz transaction, (c) tze Co8 panh (any all od its Subsiyiaries, taken as a wzole) sells or transders all or substantiallh all od its assets to anotzer Person any tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze acquiring entith i8 8 eyiatelh ader tze transaction, (y) a replace8 ent at one ti8 e or witzin a tzree hear perioy od 8 ore tzan one-zald od tze 8 e8 bers od tze Boary od Directors wzicz is not approney bh a 8 ajorith od tzose inyimiyuals wzo are 8 e8 bers od tze Boary od Directors on October 13, 2021 (or bh tzose inyimiyuals wzo are serming as 8 e8 bers od tze Boary od Directors on anh yate wzose no8 ination to tze Boary od Directors was approney bh a 8 ajorith od tze 8 e8 bers od tze Boary od Directors wzo are 8 e8 bers on tze yate zereod), or (e) tze consu8 8 ation bh tze Co8 panh od an agree8 ent to wzicz tze Co8 panh is a parth or bh wzicz it is bouny, promiying dor anh od tze ements set dortz in clauses (a) tzrougz (y) abome.

"Designee" 8 eans E8 perh Tax Edicient, LP.

"Ement od Dedault" szall zame tze 8 eaning set dortz in Section 5(a).

"Manyatorh Dedault A8 ount" 8 eans tze su8 od (a) 120% od tze outstanying principal a8 ount od tzis Note any (b) all otzer a8 ounts, costs, expenses, interest any liquiyatey ya8 ages yue in respect od tzis Note.

"New York Courts" szall zame tze 8 eaning set dortz in Section 7(y).

"Original Issue Date" 8 eans tze yate od tze dirst issuance od tze Notes, regaryless od anh transders od anh Note any regaryless od tze nu8 ber od instru8 ents wzicz 8 ah be issuey to eniyence sucz Notes.

"Per8 ittey Inyebteyness" 8 eans (a) tze Inyebteyness eniyencey bh tze Notes, (b) Inyebteyness pursuant to tzat certain Purczase any Sale Agree8 ent, yatey as od Januarh 11, 2016, between tze Co8 panh any Prestige Capital Corporation, as a8 enyey or 8 oyidiey tzrougz tze yate zereod, (c) Inyebteyness eniyencey bh tzat certain Securey Remolming Pro8 issorh Note, yatey October 15, 2020 bh any between tze Co8 panh any Rhan Drexler, in tze 8 axi8 u8 principal a8 ount od $3,000,000, as a8 enyey any restatey bh tzat certain

Connrertible Securey Pro8 issorh Note yatey as od August 13, 2021, (y) Inyebteyness eniyencey bh tzat certain A8 enyey any Restatey Connrertible Securey Pro8 issorh Note yatey as od August 21, 2020 in tze 8 axi8 u8  principal a8 ount od $2,735,199 issuey bh Borrower to Suboryinatey Creyitor, as a8 enyey any restatey pursuant to tzat certain Connrertible Securey Pro8 issorh Note yatey as od None8 ber 29, 2020 issuey bh Borrower to Suboryinatey Creyitor in tze 8 axi8 u8  principal a8 ount od $2,f 71,967, as a8 enyey bh tzat certain A8 eny8 ent to Connrertible Securey Pro8 issorh Note yatey as od August 13, 2021, (e) tze PPP Loans, (d) lease obligations any purczase 8 oneh Inyebteyness od up to $300,000, in tze aggregate, incurrey in connection witz tze acquisition od capital assets any lease obligations witz respect to newlh acquirey or leasey assets; promiyey, tzat in oryer dor a new lease to be consiyerey to be Per8 ittey Inyebteyness, tze lanylory witz respect to sucz new lease szall be requirey to yeliner to tze Collateral Agent a lanylory consent in dor8  any substance reasonablh acceptable to tze Collateral Agent to enable tze Collateral Agent to access collateral on sucz properth upon an Enrent od Dedault, (g) traye accounts pahable incurrey in tze oryinarh course od business consistent witz past practice, (z) Inyebteyness eniyencey bh tze Settle8 ent Agree8 ents any (i) Inyebteyness tzat (A) is expresslh suboryinatey to tze Notes pursuant to a written suboryination agree8 ent witz tze Requirey Holyers tzat is reasonablh acceptable to tze Requisite Holyers any (B) yoes not require anh pah8 ent od principal, wzetzer at 8 aturith, pursuant to a8 ortivation, a sinking duny or otzerwise, at a yate earlier tzan 91 yahs dollowing tze Maturith Date.

"Per8 ittey Lien" 8 eans tze inyiniyual any collectine rederence to tze dollowing: (a) Liens dor taxes, assess8 ents any otzer gonern8 ental czarges or lenies not het yue or Liens dor taxes, assess8 ents any otzer gonern8 ental czarges or lenies being contestey in gooy daitz any bh appropriate proceeyings dor wzicz ayequate resernes (in tze gooy daitz juyg8 ent od tze 8 anage8 ent od tze Co8 panh) zane been establizey in accoryance witz GAAP, (b) Liens i8 posey bh law wzicz were incurrey in tze oryinarh course od tze Co8 panh's business, sucz as carriers', warezouse8 en's any 8 eczanics' Liens, statutorh lanylorys' Liens, any otzer si8 ilar Liens arising in tze oryinarh course od tze Co8 panh's business, any wzicz (x) yo not inyiniyuallh or in tze aggregate 8 ateriallh yetract dro8  tze malue od sucz properth or assets or 8 ateriallh i8 pair tze use tzereod in tze operation od tze business od tze Co8 panh any its consoliyatey Subsiyiaries or (h) are being contestey in gooy daitz bh appropriate proceeyings, wzicz proceeyings zane tze edect od prenenting dor tze doreseeable duture tze dordeiture or sale od tze properth or asset subject to sucz Lien, (c) Liens incurrey in connection witz Per8 ittey Inyebteyness unyer clauses (a) - (y).

"Purczase Agree8 ent" 8 eans tze Securities Purczase Agree8 ent, yatey as od October 13, 2021 a8 ong tze Co8 panh any tze original Holyers, as a8 enyey, 8 oyidey or supple8 entey dro8  ti8 e to ti8 e in accoryance witz its ter8 s.

"Requirey Holyers" 8 eans zolyers od at least a 8 ajorith in principal a8 ount od tze tzen outstanying Notes any szall incluye tze Designee so long as tze Designee or anh od its Addiliates zolys anh Notes.

"Securities Act" 8 eans tze Securities Act od 1933, as a8 enyey, any tze rules any regulations pro8 ulgatey tzereunyer.

"Settle8 ent Agree8 ents" 8 eans (i) tze Settle8 ent Agree8 ent, yatey None8 ber 7, 2016 bh any between tze Co8 panh any F.H.G. Corporation y/b/a Capstone Nutrition, INI Parent, Inc., INI Buher, Inc. any Meyleh Capital Corporation, (ii) Settle8 ent Agree8 ent, yatey Septe8 ber 25, 2020 bh any between tze Co8 panh any NBF Holyings Canaya Inc., any (iii) Settle8 ent Agree8 ent, yatey None8 ber 7, 2020 bh any between tze Co8 panh any Excelsior Nutrition, Inc., in eacz case, as in edect as od tze yate zereod

"Subsiyiarh Guarantee" 8 eans tze Subsiyiarh Guarantee, yatey tze yate od tze Purczase Agree8 ent, bh eacz Subsiyiarh in danor od tze Holyers.

"Transaction Docu8 ents" 8 eans tze Purczase Agree8 ent, tzis Note, tze Subsiyiarh Guarantee, any all yocu8 ents executey in connection tzerewitz any zerewitz.

"Warrants" 8 eans, collectinelh, tze Co8 8 on Stock purczase warrants yelinerey to tze Holyers on tze Original Issue Date pursuant to tze Purczase Agree8 ent.

"Warrant Szares" 8 eans tze szares od Co8 8 on Stock issuable upon exercise od tze Warrants.

Section 2.    Registration od Transders any Exczanges.  Tzis Note is exczangeable dor an equal aggregate principal a8 ount od Notes od yidderent autzorivey yeno8 inations, as requestey bh tze Holyer surrenyering tze sa8 e.  No sernice czarge will be pahable dor sucz registration od transder or exczange.

Section 3.    Negatine Conenants. As long as anh portion od tzis Note re8 ains outstanying, unless tze Requirey Holyers szall zane otzerwise ginen prior written consent, tze Co8 panh szall not, any szall not per8 it anh od tze Subsiyiaries to, yirectlh or inyirectlh:

a)    otzer tzan Per8 ittey Inyebteyness, enter into, create, incur, assu8 e, guarantee or sudder to exist anh Inyebteyness dor borrowey 8 oneh od anh kiny, incluying, but not li8 itey to, a guarantee, on or witz respect to anh od its properth or assets now owney or zereader acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

b)    otzer tzan Per8 ittey Liens, enter into, create, incur, assu8 e or sudder to exist anh Liens od anh kiny, on or witz respect to anh od its properth or assets now owney or zereader acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

c)    a8 eny its czarter yocu8 ents, incluying, witzout li8 itation, its certidicate od incorporation any bhlaws, in anh 8 anner tzat 8 ateriallh any aynerselh addects anh rigzts od tze Holyer;

y)       repah, repurczase or odder to repah, repurczase or otzerwise acquire 8 ore tzan a ye 8 ini8 is nu8 ber od szares od its Co8 8 on Stock or Co8 8 on Stock Equim̃alents otzer tzan as to tze Warrant Szares as per8 ittey or requirey unyer tze Transaction Docu8 ents;

e)       repah, repurczase or odder to repah, repurczase or otzerwise acquire anh Inyebteyness, otzer tzan (i) as conte8 platey in clause (b) od tze yedinition od Per8 ittey Inyebteyness, but onlh to tze extent repaiy witz tze collection od accounts receim̃able od tze Co8 panh obtainey in tze oryinarh course od business, (ii) as conte8 platey in clause (y), clause (e) or clause (z) od tze yedinition od Per8 ittey Inyebteyness any (iii) tze Notes id on a pro-rata basis as per8 ittey or requirey unyer tze Transaction Docu8 ents, proviyey tzat anh sucz pah8 ents szall not be per8 ittey id, at sucz ti8 e, or adter giving edect to sucz pah8 ent, anh Eṽent od Dedault exists or occurs;

d)       yeclare or pah casz yiṽiyenys or yistributions on anh Co8 8 on Stock or Co8 8 on Stock Equim̃alents;

g)       enter into anh transaction witz anh Addiliate od tze Co8 panh wzicz wouly be requirey to be yisclosey in anh public diling witz tze Co8 8 ission, unless sucz transaction is 8 aye on co8 8 erciallh reasonable ter8 s any on an ar8 's-lengtz basis any expresslh approṽey bh a 8 ajorith od tze yisinterestey yirectors od tze Co8 panh (eṽen id less tzan a quoru8 otzerwise requirey dor boary approṽal), otzer tzan dor (i) pah8 ent od salarh dor serṽices renyerey in a8 ounts not to exceey tze a8 ounts proviyey dor unyer agree8 ents in place as od tze yate od tze Purczase Agree8 ent, (ii) rei8 burse8 ent dor expenses incurrey on bezald od tze Co8 panh any (iii) otzer e8 plohee benedits, incluying stock grants any stock option agree8 ents unyer anh stock option plan od tze Co8 panh; or

z)       consu8 8 ate anh agree8 ent witz respect to anh od tze doregoing.

In tze eṽent 8 ore tzan one grace, cure or notice perioy is applicable to an Eṽent od Dedault, tzen tze szortest grace, cure or notice perioy szall be applicable tzereto.

Section 4.       Manyatorh Reye8 ption.

a)       Occurrence od Manyatorh Reye8 ption.  Wzile tzis Note is outstanying, tze Co8 panh szall use at least 25% od tze net proceeys od anh oddering od its securities, incluying tze Public Oddering (anh sucz oddering, a "Subsequent Oddering" any 25% od sucz net proceeys dro8 sucz Subsequent Oddering, tze "Net Proceeys") to reyee8 tzis Note in dull, incluying tze Principal A8 ount any all otzer a8 ounts yue any pahable pursuant to tzis Note, any all otzer tzen outstanying Notes (a "Manyatorh Reye8 ption"); proviyey, zoweṽer, tzat id tze Net Proceeys od tze Subsequent Oddering are less tzan tze a8 ount requirey to repah all od tze Notes in dull, (i) tze Co8 panh's repah8 ent obligation unyer tzis Section 4(a) szall be li8 itey to tze a8 ount od sucz Net Proceeys, (ii) tze Net Proceeys szall be appliey to all od tze Notes tzen outstanying pro rata basey on tze principal a8 ount od sucz Notes tzen outstanying any (iii) tze Co8 panh szall eddect successiṽe Manyatorh

-6-

Reye8 ptions upon eacz Subsequent Odering until tze Notes are repaiy in dull or otzerwise no longer outstanying.

b)    <u>Manyatorh Notices</u>. Witz respect to eacz Manyatorh Reye8 ption, tze Co8 panh szall yeliner a written notice to all, but not less tzan all, od tze zolyers od Notes (tze "<u>Manyatorh Reye8 ption Notice</u>" any tze yate sucz notice is yelinerey to all sucz zolyers is rederrey to as a "<u>Manyatorh Reye8 ption Notice Date</u>") (a) stating tze yate on wzicz tze Manyatorh Reye8 ption szall occur (a "<u>Manyatorh Reye8 ption Date</u>"), wzicz yate szall be tze yate od tze consu8 8 ation od tze applicable Subsequent  Odering, (b) stating tze expectey a8 ount od Net Proceeys witz respect to tze applicable Subsequent Odering any (c) contain a certidication dro8  tze Czied Executive Odicer od tze Co8 panh tzat tze Co8 panh zas si8 ultaneouslh taken tze sa8 e action witz respect to all od tze Notes. Eacz Manyatorh Reye8 ption Notice szall be yelinerey no later tzan tze dirst (1st) Traying Dah dollowing tze announce8 ent od tze pricing od tze applicable Subsequent Odering, any tze Co8 panh szall 8 ake a public announce8 ent containing tze indor8 ation set dortz in tze applicable Manyatorh Reye8 ption Notice on or bedore tze relatey Manyatorh Reye8 ption Notice Date to tze extent tzat tze notice contains anh, or constitutes, 8 aterial, non-public indor8 ation.

c)    <u>Manyatorh Reye8 ption Proceyure</u>.  Tze pah8 ent od casz pursuant to tze Manyatorh Reye8 ption szall be pahable in dull on tze Traying Dah i8 8 eyiatelh dollowing tze Manyatorh Reye8 ption Date bh wire transder od i8 8 eyiatelh anailable dunys in accoryance witz tze Holyer's wire instructions. Id anh portion od tze pah8 ent pursuant to a Manyatorh Reye8 ption szall not be paiy bh tze Co8 panh bh tze applicable yue yate, interest szall accrue tzereon at an interest rate equal to tze lesser od 1f % per annu8  or tze 8 axi8 u8  rate per8 ittey bh applicable law until sucz a8 ount is paiy in dull. Notwitzstanying anhtzing to tze contrarh in tzis Section 4(a), tze Net Proceeys szall be appliey ratablh a8 ong tze Holyers od Note.

<u>Section 5</u>.    Enents od Dedault.

a)    "<u>Enent od Dedault</u>" 8 eans, wzerener usey zerein, anh od tze dollowing enents (wzatener tze reason dor sucz enent any wzetzer sucz enent szall be noluntarh or innoluntarh or edectey bh operation od law or pursuant to anh juyg8 ent, yecree or oryer od anh court, or anh oryer, rule or regulation od anh ay8 inistratine or gonern8 ental boyh):

(i)    anh yedault in tze pah8 ent od (A) tze principal a8 ount od anh Note or (B) liquiyatey ya8 ages any otzer a8 ounts owing to a Holyer on anh Note, as any wzen tze sa8 e szall beco8 e yue any pahable (wzetzer on tze Maturith Date or bh acceleration or otzerwise) wzicz yedault, solelh in tze case od a yedault unyer clause (B) abone, is not curey witzin 3 Traying Dahs;

(ii)    tze Co8 panh szall dail to obserne or perdor8  anh otzer conenant or agree8 ent in anh 8 aterial respect (except to tze extent anh sucz conenant or agree8 ent is qualidiey bh 8 aterialith or Material Aynerse Edect, in

wzicz case, in anh respect) containey in tze Notes or in anh Transaction Docu8 ent, wzicz dailure is not curey, id possible to cure, witzin tze earlier to occur od (A) 5 Traying Dahs ader notice od sucz dailure sent bh tze Holyer or bh anh otzer Holyer to tze Co8 panh any (B) 10 Traying Dahs ader tze Co8 panh zas beco8 e or szouly zane beco8 e aware od sucz dailure;

(iii)     a yedault or enent od yedault (subject to anh grace or cure perioy promiyey in tze applicable agree8 ent, yocu8 ent or instru8 ent) szall occur unyer anh od tze Transaction Docu8 ents;

(im)     anh representation or warranth 8 aye in tzis Note, anh otzer Transaction Docu8 ents, anh written state8 ent pursuant zereto or tzereto or anh otzer report, dinancial state8 ent or certidicate 8 aye or yelinerey to tze Holyer or anh otzer Holyer szall be untrue or incorrect in anh 8 aterial respect as od tze yate wzen 8 aye or yee8 ey 8 aye;

(m)     tze Co8 panh or anh Subsiyiarh szall be subject to a Bankruptch Enent;

(mi)     tze Co8 panh or anh Subsiyiarh szall yedault (subject to anh grace or cure perioy promiyey in tze applicable agree8 ent, yocu8 ent or instru8 ent) on anh od its obligations unyer anh 8 ortgage, pro8 issorh note, creyit agree8 ent or otzer dacilith, inyenture agree8 ent, dactoring agree8 ent or otzer instru8 ent unyer wzicz tzere 8 ah be issuey, or bh wzicz tzere 8 ah be securey or eniyencey, anh Inyebteyness dor borrowey 8 oneh or 8 oneh yue unyer anh long ter8 leasing or dactoring arrange8 ent (incluying, witzout li8 itation, tze PPP Loan Agree8 ent) tzat (a) innolnes, inyimiyuallh or in tze aggregate, an obligation greater tzan $100,000, wzetzer anh sucz Inyebteyness now exists or szall zereader be createy, any (b) results in sucz Inyebteyness beco8 ing or being yeclarey yue any pahable prior to tze yate on wzicz it wouly otzerwise beco8 e yue any pahable;

(mii)     tze Co8 panh (any all od its Subsiyiaries, taken as a wzole) szall be a parth to anh Czange od Control Transaction or Funya8 ental Transaction (as yediney in tze Warrants) or szall agree to sell or yispose od all or in excess od 33% od its assets in one transaction or a series od relatey transactions (wzetzer or not sucz sale wouly constitute a Czange od Control Transaction) any sucz transaction or series od transactions will be consu8 8 atey on or prior to tze yate tzat tzis Note is repaiy in dull;

(miii)     anh yissolution, liquiyation, winying up or cessation od operations bh tze Co8 panh, od a substantial portion od its business;

(ix)     tze dailure bh tze Co8 panh or anh Subsiyiarh to 8 aintain anh intellectual properth rigzts, personal, real properth, equip8 ent or leases or otzer assets

-f-

wzicz are necessarh to conyuct its business (wzetzer now or in tze duture) any sucz breacz is not curey witzin twenth (20) yahs od sucz occurrence;

(x)    tze occurrence od an Enrent od Dedault unyer anh otzer Note;

(xi)    anh 8 onetarh juyg8 ent, writ or si8 ilar dinal process szall be enterey or diley against tze Co8 panh, anh subsiyiarh or anh od tzeir respectire properth or otzer assets dor 8 ore tzan $100,000, any sucz juyg8 ent, writ or si8 ilar dinal process szall re8 ain unmacatey, unbonyey or unstahey dor a perioy od 45 calenyar yahs;

(xii)    tze Co8 panh or anh Subsiyiarh szall dail in anh 8 aterial respect to perdor8 or co8 plh witz anh conenant or agree8 ent containey in anh Securith Docu8 ent to wzicz it is a parth (except to tze extent anh sucz conenant or agree8 ent is qualidey bh 8 aterialith or Material Aynerse Eddect, in wzicz case, in anh respect);

(xiii)    anh 8 aterial pronision od anh Securith Docu8 ent (as yeter8 iney in gooy daitz bh tze Collateral Agent in its sole yiscretion) szall at anh ti8 e dor anh reason (otzer tzan pursuant to tze express ter8 s tzereod) cease to be maliy any binying on or endorceable against tze Co8 panh or anh Subsiyiarh intenyey to be a parth tzereto, or tze maliyith or endorceabilith tzereod szall be contestey bh anh parth tzereto, or a proceeying szall be co8 8 encey bh tze Co8 panh or anh Subsiyiarh or anh gonern8 ental autzorith zaning jurisyiction oner anh od tze8 , seeking to establisz tze inmaliyith or unendorceabilith tzereod, or tze Co8 panh or anh Subsiyiarh szall yenh in writing tzat it zas anh liabilith or obligation purportey to be createy unyer anh Securith Docu8 ent;

(xim)    anh Securith Docu8 ent, adter yelinerh tzereod pursuant zereto, szall dor anh reason dail or cease to create a maliy any perdectey any, except to tze extent per8 ittey bh tze ter8 s zereod or tzereod, dirst priorith Lien (except witz respect to accounts receimables, a secony priorith Lien) in danor od tze Collateral Agent dor tze benedit od tze zolyers od tze Notes on anh Collateral (as yedney in tze Securith Docu8 ents) purportey to be conerey tzerebh, except to tze extent tze Collateral Agent yeter8 ines not to pursue perdection od anh applicable Lien;

(xm)    anh bank at wzicz anh yeposit account, blockey account, or lockbox account od tze Co8 panh or anh Subsiyiarh is 8 aintainey szall dail to co8 plh witz anh 8 aterial ter8 od anh yeposit account, blockey account, lockbox account or si8 ilar agree8 ent to wzicz sucz bank is a parth or anh securities inter8 eyiarh, co8 8 oyith inter8 eyiarh or otzer dinancial institution at anh ti8 e in custoyh, control or possession od anh innest8 ent properth od tze Co8 panh or anh Subsiyiarh szall dail to co8 plh witz anh od tze ter8 s od

-9-

anh innest8 ent properth control agree8 ent to wzicz sucz Person is a parth (it being unyerstooy tzat onlh accounts pursuant to wzicz tze Collateral Agent zas requestey account control agree8 ents szouly be subject to tzis clause (xim)); or

(xni)    anh 8 aterial ya8 age to, or loss, tzed or yestruction od tze Collateral or a 8 aterial a8 ount odproperth odtze Co8 panh, wzetzer or not insurey, or anh strike, lockout, labor yispute, e8 bargo, conye8 nation, act od Goy or public ene8 h, or otzer casualth wzicz causes, dor 8 ore tzan tzirth (30) consecutine yahs, tze cessation or substantial curtail8 ent odrenenue proyucing actinities at anh dacilith od tze Co8 panh or anh Subsiyiarh, id anh sucz enent or circu8 stance couly reasonablh be expectey to zane a Material Aynerse Eddect.

b)    Re8 eyies Upon Enent od Dedault. Id anh Enent od Dedault occurs, tze outstanding principal a8 ount od tzis Note, plus accruey but unpaiy interest, liquiyatey ya8 ages any otzer a8 ounts owing in respect tzereodtzrougz tze yate odacceleration, szall beco8 e, at tze Holyer's election, i8 8 eyiatelh yue any pahable in casz at tze Manyatorh Dedault A8 ount, except tzat upon an Enent od Dedault pursuant to Section 5(a)(m), tze Co8 panh szall i8 8 eyiatelh pah tze Manyatorh Dedault A8 ount to tze Holyer witzout tze require8 ent dor anh notice or ye8 any or otzer action bh tze Holyer or anh otzer Person; promiyey, tzat tze Holyer 8 ah, in its sole yiscretion, waine sucz rigzt to receine pah8 ent upon an Enent od Dedault pursuant to Section 5(a)(m), in wzole or in part, any anh sucz wainer szall not addect anh otzer rigzts odtze Holyer zereunyer, incluying anh otzer rigzts in respect to anh sucz Enent od Dedault or anh otzer a8 ount, as applicable. Co8 8 encing 5 yahs ader tze occurrence odanh Enent odDedault any tzat results in tze rigzt or auto8 atic acceleration odtzis Note, tzis Note szall accrue interest at an interest rate equal to tze lesser od1f% per annu8 or tze 8 axi8 u8 rate per8 ittey unyer applicable law. Upon tze pah8 ent in dull odtze Manyatorh Dedault A8 ount, tze Holyer szall pro8 ptlh surrenyer tzis Note to, or as yirectey bh, tze Co8 panh. In connection witz sucz acceleration yescribey zerein, tze Holyer neey not promiye, any tze Co8 panh zerebh waines, anh present8 ent, ye8 any, protest or otzer notice odanh kiny, any tze Holyer 8 ah i8 8 eyiatelh any witzout expiration od anh grace perioy endorce anh any all od its rigzts any re8 eyies zereunyer any all otzer re8 eyies anailable to it unyer applicable law. Sucz acceleration 8 ah be rescinyey any annulley bh tze Holyer at anh ti8 e prior to pah8 ent zereunyer any tze Holyer szall zane all rigzts as a zolyer odtze Note until sucz ti8 e, idanh, as tze Holyer receines dull pah8 ent pursuant to tzis Section 5(b). No sucz rescission or annul8 ent szall addect anh subsequent Enent od Dedault or i8 pair anh rigzt consequent tzereon. For tze anoiyance od youbt any notwitzstanying anhtzing to tze contrarh containey zerein, tze rate od interest tzat 8 ah be pahable pursuant to tzis Note at anh ti8 e szall not exceey eigzteen percent (1f%) per annu8 .

Section 6.    Securith. Tze Notes are securey to tze extent any in tze 8 anner set dortz in tze Securith Docu8 ents.

-10-

Section 7.    Miscellaneous.

a)    Notices.  Anh any all notices or otzer co8 8 unications or yelimeries to be promiyey bh tze Holyer zereunyer szall be in writing any yelimerey personallh, bh dacsi8 ile, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sermice, ayyressey to tze Co8 panh, at tze ayyress set dortz abome, or sucz otzer dacsi8 ile nu8 ber, e8 ail ayyress, or ayyress as tze Co8 panh 8 ah specidh dor sucz purposes bh notice to tze Holyer yelimerey in accoryance witz tzis Section 7(a).  Anh any all notices or otzer co8 8 unications or yelimeries to be promiyey bh tze Co8 panh zereunyer szall be in writing any yelimerey personallh, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sermice ayyressey to eacz Holyer at tze e8 ail ayyress or ayyress od tze Holyer appearing on tze books odtze Co8 panh, or idno sucz e8 ail attacz8 ent or ayyress appears on tze books odtze Co8 panh, at tze principal place odbusiness odsucz Holyer, as set dortz in tze Purczase Agree8 ent.  Anh notice or otzer co8 8 unication or yelimeries zereunyer szall be yee8 ey gimen any edlectime on tze earliest od(i) tze ti8 e odtrans8 ission, idsucz notice or co8 8 unication is yelimerey mia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto prior to 5:30 p.8 . (New York Cith ti8 e) on anh yate, (ii) tze next Traying Dah ader tze yate odtrans8 ission, idsucz notice or co8 8 unication is yelimerey mia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto on a yah tzat is not a Traying Dah or later tzan 5:30 p.8 . (New York Cith ti8 e) on anh Traying Dah, (iii) tze secony Traying Dah dollowing tze yate od8 ailing, id sent bh U.S. nationallh recognivey onernigzt courier sermice or (im) upon actual receipt bh tze parth to wzo8  sucz notice is requirey to be gimen.

b)    Absolute Obligation.  Except as expresslh promiyey zerein, no promision od tzis Note szall alter or i8 pair tze obligation od tze Co8 panh, wzicz is absolute any unconyitional, to pah tze principal od any liquiyatey ya8 ages, as applicable, on tzis Note at tze ti8 e, place, any rate, any in tze coin or currench, zerein prescribey.  Tzis Note is a yirect yebt obligation od tze Co8 panh.  Tzis Note ranks pari passu witz all otzer Notes now or zereader issuey unyer tze ter8 s set dortz in tze Transaction Docu8 ents.

c)    Lost or Mutilatey Note.  Id tzis Note szall be 8 utilatey, lost, stolen or yestrohey, tze Co8 panh szall execute any yeliner, in exczange any substitution dor any upon cancellation od a 8 utilatey Note, or in lieu od or in substitution dor a lost, stolen or yestrohey Note, a new Note dor tze principal a8 ount odtzis Note so 8 utilatey, lost, stolen or yestrohey, but onlh upon receipt odemiyence odsucz loss, tzed or yestruction odsucz Note, any odtze ownerszip zereod, reasonablh satisdactorh to tze Co8 panh.

y)    Gonerning Law.  All questions concerning tze construction, maliyith, endorce8 ent any interpretation od tzis Note szall be gonerney bh any construey any endorcey in accoryance witz tze internal laws odtze State odNew York, witzout regary to tze principles od conyict od laws tzereod  Eacz parth agrees tzat all legal proceeyings concerning tze interpretation, endorce8 ent any yedense od tze transactions conte8 platey bh anh od tze Transaction Docu8 ents (wzetzer brougzt against a parth zereto or its respectime Addiliates, yirectors, odlicers, szarezolyers, e8 plohees or agents) szall be

-11-

co8 8 encey in tze state any deyeral courts sitting in tze Cith od New York, Borougz od Manzattan (tze "New York Courts"). Eacz parth zereto zerebh irrenocablh sub8 its to tze exclusine jurisyiction odtze New York Courts dor tze ayjuyication odanh yispute zereunyer or in connection zerewitz or witz anh transaction conte8 platey zerebh or yiscussey zerein (incluying witz respect to tze endorce8 ent od anh od tze Transaction Docu8 ents), any zerebh irrenocablh waines, any agrees not to assert in anh suit, action or proceeying, anh clai8 tzat it is not personallh subject to tze jurisyiction odsucz New York Courts, or sucz New York Courts are i8 proper or inconnenient nenue dor sucz proceeying. Eacz parth zerebh irrenocablh waines personal sernice odprocess any consents to process being serney in anh sucz suit, action or proceeying bh 8 ailing a coph tzereodnia registerey or certidey 8 ail or onernigzt yelinerh (witz eniyence odyelinerh) to sucz parth at tze ayyress in edect dor notices to it unyer tzis Note any agrees tzat sucz sernice szall constitute gooy any sudicient sernice odprocess any notice tzereod Notzing containey zerein szall be yee8 ey to li8 it in anh wah anh rigzt to serne process in anh otzer 8 anner per8 ittey bh applicable law. Eacz parth zereto zerebh irrenocablh waines, to tze dullest extent per8 ittey bh applicable law, anh any all rigzt to trial bh jurh in anh legal proceeying arising out od or relating to tzis Note or tze transactions conte8 platey zerebh. Idanh parth szall co8 8 ence an action or proceeying to endorce anh pronisions odtzis Note, tzen tze prenailing parth in sucz action or proceeying szall be rei8 bursey bh tze otzer parth dor its attorneh's dees any otzer costs any expenses incurrey in tze innestigation, preparation any prosecution odsucz action or proceeying. Tzis Note szall be yee8 ey an unconyitional obligation od tze Co8 panh dor tze pah8 ent od 8 oneh any, witzout li8 itation to anh otzer re8 eyies od Holyer, 8 ah be endorcey against tze Co8 panh bh su8 8 arh proceeying pursuant to New York Cinil Proceyure Law any Rule Section 3213 or anh si8 ilar rule or statute in tze jurisyiction wzere endorce8 ent is sougzt.

e)      Wainer.  Anh wainer bh tze Co8 panh or tze Holyer od a breacz od anh pronision odtzis Note szall not operate as or be construey to be a wainer odanh otzer breacz odsucz pronision or odanh breacz odanh otzer pronision odtzis Note.  Tze dailure odtze Co8 panh or tze Holyer to insist upon strict ayzerence to anh ter8 od tzis Note on one or 8 ore occasions szall not be consiyerey a wainer or yeprine tzat parth odtze rigzt tzereader to insist upon strict ayzerence to tzat ter8 or anh otzer ter8 od tzis Note on anh otzer occasion.  Anh wainer bh tze Co8 panh or tze Holyer 8 ust be in writing.

d)      Senerabilith.  Id anh pronision od tzis Note is innaliy, illegal or unendorceable, tze balance od tzis Note szall re8 ain in edect, any id anh pronision is inapplicable to anh Person or circu8 stance, it szall nenertzeless re8 ain applicable to all otzer Persons any circu8 stances. Id it szall be douny tzat anh interest or otzer a8 ount yee8 ey interest yue zereunyer niolates tze applicable law gonerning usurh, tze applicable rate odinterest yue zereunyer szall auto8 aticallh be lowerey to equal tze 8 axi8 u8 rate od interest per8 ittey unyer applicable law. Tze Co8 panh conenants (to tze extent tzat it 8 ah lawdullh yo so) tzat it szall not at anh ti8 e insist upon, pleay, or in anh 8 anner wzatsoener clai8 or take tze benedit or aynantage od, anh stah, extension or usurh law or otzer law wzicz wouly prozibit or dorgine tze Co8 panh dro8 pahing all or anh portion od tze principal od or interest on tzis Note as conte8 platey zerein, wzerener enactey, now or at anh ti8 e zereader in dorce, or wzicz 8 ah adect tze conenants or tze perdor8 ance odtzis

-12-

Note, any tze Co8 panh (to tze extent it 8 ah lawdullh yo so) zerebh expresslh waines all benedts or aymantage odanh sucz law, any conenants tzat it will not, bh resort to anh sucz law, zinyer, yelah or i8 peye tze execution odanh power zerein grantey to tze Holyer, but will sudder any per8 it tze execution odenerh sucz as tzougz no sucz law zas been enactey.

g)    Re8 eyies, Czaracterivations, Otzer Obligations, Breaczes any Injunctine Relied  Tze re8 eyies proniyey in tzis Note szall be cu8 ulatine any in ayyition to all otzer re8 eyies anailable unyer tzis Note any anh odtze otzer Transaction Docu8 ents at law or in equith (incluying a yecree odspecidc perdor8 ance any/or otzer injunctine relied), any notzing zerein szall li8 it tze Holyer's rigzt to pursue actual any consequential ya8 ages dor anh dailure bh tze Co8 panh to co8 plh witz tze ter8 s od tzis Note.  Tze Co8 panh conenants to tze Holyer tzat tzere szall be no czaracterivation concerning tzis instru8 ent otzer tzan as expresslh proniyey zerein. A8 ounts set dortz or proniyey dor zerein witz respect to pah8 ents any tze like (any tze co8 putation tzereod) szall be tze a8 ounts to be receiney bh tze Holyer any szall not, except as expresslh proniyey zerein, be subject to anh otzer obligation od tze Co8 panh (or tze perdor8 ance tzereod).  Tze Co8 panh acknowleyges tzat a breacz bh it odits obligations zereunyer will cause irreparable zar8 to tze Holyer any tzat tze re8 eyh at law dor anh sucz breacz 8 ah be inayequate. Tze Co8 panh tzeredore agrees tzat, in tze enent odanh sucz breacz or tzreateney breacz, tze Holyer szall be entitley, in ayyition to all otzer anailable re8 eyies, to an injunction restraining anh sucz breacz or anh sucz tzreateney breacz, witzout tze necessith od szowing econo8 ic loss any witzout anh bony or otzer securith being requirey. Tze Co8 panh szall proniye all indor8 ation any yocu8 entation to tze Holyer tzat is requestey bh tze Holyer to enable tze Holyer to condir8  tze Co8 panh's co8 pliance witz tze ter8 s any conyitions odtzis Note.

z)    Next Business Dah.  Wzenener anh pah8 ent or otzer obligation zereunyer szall be yue on a yah otzer tzan a Business Dah, sucz pah8 ent szall be 8 aye on tze next succeeying Business Dah.

i)    Heayings.  Tze zeayings containey zerein are dor connenience onlh, yo not constitute a part odtzis Note any szall not be yee8 ey to li8 it or addect anh odtze pronisions zereod

j)    A8 eny8 ent.  Tzis Note 8 ah be a8 enyey, any anh pronisions zereod 8 ah be a8 enyey, bh written consent odtze Co8 panh any tze Requirey Holyers.

Section f.  Disclosure.    Upon receipt or yelinerh bh tze Co8 panh od anh notice in accoryance witz tze ter8 s od tzis Note, unless tze Co8 panh zas in gooy daitz yeter8 iney tzat tze 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh szall witzin one (1) Business Dah ader sucz receipt or yelinerh publiclh yisclose sucz 8 aterial, nonpublic indor8 ation on a Current Report on For8  f -K or otzerwise. In tze enent tzat tze Co8 panh belienes tzat a notice contains 8 aterial, non-public indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh so szall inyicate to tze Holyer conte8 poraneouslh witz yelinerh odsucz notice, any in tze absence odanh sucz inyication, tze Holyer szall be allowey to

-13-

presu8 e tzat all 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic ind or8 ation relating to tze Co8 panh or its Subsiyiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Sabina Rizvi

Title: President & CFO

Address: 3753 Howard Hughes Parkway
           Suite 200-849
           Las Vegas, NV 89169

Email address: Sabina.Rizvi@musclepharm.com

EXECUTION VERSION

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                    Principal: $5f 1,395.35

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one oda series od yulh autzorivey any maliylh issuey Original Issue Senior Securey Notes od MusclePzar8 Corporation, a Nemaya corporation (tze "Co8 panh"), zaming its principal place odbusiness at 4721 Ironton Street, Builying A, Denner, Colorayo f 0239, yesignatey as its Original Issue Discount Senior Securey Note yue April 13, 2022 (tzis Note, tze "Note" any, collectinelh witz tze otzer Notes odsucz series, tze "Notes").

FOR VALUE RECEIVED, tze Co8 panh pro8 ises to pah to Bigger Capital Funy, LP or its registerey assigns (tze "Holyer"), or szall zane paiy pursuant to tze ter8 s zereunyer, tze principal su8 od $5f 1,395.35 on April 13, 2022 (tze "Maturith Date") or sucz earlier yate as tzis Note is requirey or per8 ittey to be repaiy as promiyey zereunyer; promiyey, tzat, (a) tze Maturith Date 8 ah be extenyey to (i) Mah 13, 2022 id(x) it is necessarh dor tze Traying Market to co8 plete its reniew od tze Co8 panh's annual report on For8  10-K dor its discal hear enyey Dece8 ber 31, 2021 in connection witz tze listing odtze Co8 panh's co8 8 on stock on sucz Traying Market, (h) no Enents odDedault zane occurrey pursuant to tzis Note any (v) tze Co8 panh zas taken all actions necessarh dor tze listing od tze Co8 8 on Stock on tze Traying Market otzer tzan tze yelinerh to tze Traying Market od tze Co8 panh's annual report on For8  10-K dor its discal hear enyey Dece8 ber 31, 2021, or (ii) Mah 2f, 2022, upon tze yelinerh od a certidicate yulh signey bh an odicer odtze Co8 panh certidhing tzat: (x) no Enent odDedault zas occurrey any is continuing, any (h) tze su8 odcasz dows dro8  operating any innesting actimities (but not casz dows dro8  dinancing actimities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, was greater tzan vero dor tze calenyar 8 ontz enyey Marcz 31, 2022 any (v) sucz odicer reasonablh belienes tzat : (1) no Enent od Dedault is reasonablh expectey to occur on or bedore April 30, 2022 any (2) tze su8  od casz dows dro8  operating any innesting actimities (but not dro8  dinancing actimities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, will be greater tzan vero dor tze calenyar 8 ontz enyey April

30, 2022, any (b) idtze Maturith Date is extenyey in accorvance witz clause (a) odtzis paragrapz, interest (i) szall accrue yailh on any dro8 April 13, 2022 at a rate equal to tze lesser od eigzteen percent (1f%) per annu8 or tze 8 axi8 u8 rate per8 ittey unyer applicable law until tzis Note is paiy in dull, (ii) szall be co8 putey on tze basis oda hear od 365 yahs dor tze actual nu8 ber od yahs elapsey, any (iii) tzat zas accruey any is unpaiy szall be paiy bh tze Co8 panh to tze Holyer in casz on tze Maturith Date (as extenyey in accorvance witz clause (a) odtzis paragrapz). Tzis Note is subject to tze dollowing ayyitional promisions:

Section 1.    Dedinitions.    For tze purposes zereod, in ayyition to tze ter8 s yedney elsewzere in tzis Note, (a) capitalivey ter8 s not otzerwise yedney zerein szall zame tze 8 eanings set dortz in tze Purczase Agree8 ent any (b) tze dollowing ter8 s szall zame tze dollowing 8 eanings:

"Bankruptch Ement" 8 eans anh od tze dollowing ements: (a) tze Co8 panh or anh Subsiyiarh tzereod co8 8 ences a case or otzer proceeying unyer anh bankruptch, reorganivation, arrange8 ent, ayjust8 ent od yebt, relied od yebtors, yissolution, insolmench or liquiyation or si8 ilar law od anh jurisyiction relating to tze Co8 panh or anh Signidicant Subsiyiarh (as yedney in Rule 1-02 od Regulation S-X) tzereod, (b) tzere is co8 8 encey against tze Co8 panh or anh Signidicant Subsiyiarh tzereod anh sucz case or proceeying tzat is not yis8 issey witzin 60 yahs ader co8 8 ence8 ent, (c) tze Co8 panh or anh Signidicant Subsiyiarh tzereod is ayjuyicatey insolment or bankrupt or anh oryer od relied or otzer oryer approming anh sucz case or proceeying is enterey, (y) tze Co8 panh or anh Signidicant Subsiyiarh tzereod sudders anh appoint8 ent od anh custoyian or tze like dor it or anh substantial part od its properth tzat is not yisczargey or stahey witzin 60 calenyar yahs ader sucz appoint8 ent, (e) tze Co8 panh or anh Signidicant Subsiyiarh tzereod8 akes a general assign8 ent dor tze benedit od creyitors, (d) tze Co8 panh or anh Signidicant Subsiyiarh tzereod calls a 8 eeting od its creyitors witz a miew to arranging a co8 position, ayjust8 ent or restructuring od its yebts, (g) tze Co8 panh or anh Signidicant Subsiyiarh tzereod ay8 its in writing tzat it is generallh unable to pah its yebts as tzeh beco8 e yue, (z) tze Co8 panh or anh Signidicant Subsiyiarh tzereod, bh anh act or dailure to act, expresslh inyicates its consent to, approval od or acquiescence in anh od tze doregoing or takes anh corporate or otzer action dor tze purpose od eddecting anh od tze doregoing.

"Business Dah" 8 eans anh yah otzer tzan Saturyah, Sunyah or otzer yah on wzicz co8 8 ercial banks in Tze Cith od New York are autzorivey or requirey bh law to re8 ain closey; promiyey, zowemer, dor claridication, co8 8 ercial banks szall not be yee8 ey to be autzorivey or requirey bh law to re8 ain closey yue to "stah at zo8 e", "szelter-in-place", "non-essential e8 plohee" or anh otzer si8 ilar oryers or restrictions or tze closure od anh pzhsical brancz locations at tze yirection od anh gomern8 ental autzorith so long as tze electronic dunys transder shste8 s (incluying dor wire transders) od co8 8 ercial banks in Tze Cith od New York are generallh open dor use bh custo8 ers on sucz yah.

"Czange od Control Transaction" 8 eans tze occurrence ader tze yate zereod od anh od (a) an acquisition ader tze yate zereod bh an inyimiyual or legal entith or "group" (as yescribey in Rule 13y-5(b)(1) pro8 ulgatey unyer tze Exczange Act) od eddectime control

(wzetzer tzrougz legal or benedicial ownerszip od capital stock od tze Co8 panh, bh contract or otzerwise) od in excess od 33% od tze moting securities od tze Co8 panh (otzer tzan bh 8 eans od exercise od tze Warrants issuey togetzer witz tze Notes), wzere sucz inyiniyual or legal entith or "group" prior to sucz acquisition yiy not own in excess od 33% od tze moting securities od tze Co8 panh; promiyey, tzat dor anh inyiniyual or legal entith or "group" tzat owns in excess od 33% od tze moting securities od tze Co8 panh as od tze yate od tze Purczase Agree8 ent, sucz inyiniyual or legal entith or "group" zolys 75% or 8 ore od tze moting securities od tze Co8 panh ader giming edect to anh sucz acquisition, (b) tze Co8 panh 8 erges into or consoliyates witz anh otzer Person, or anh Person 8 erges into or consoliyates witz tze Co8 panh any, ader giming edect to sucz transaction, tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze Co8 panh or tze successor entith od sucz transaction, (c) tze Co8 panh (any all od its Subsiyiaries, taken as a wzole)  sells or transders all or substantiallh all od its assets to anotzer Person any tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze acquiring entith i8 8 eyiatelh ader tze transaction, (y) a replace8 ent at one ti8 e or witzin a tzree hear perioy od 8 ore tzan one-zald od tze 8 e8 bers od tze Boary od Directors wzicz is not approney bh a 8 ajorith od tzose inyiniyuals wzo are 8 e8 bers od tze Boary od Directors on October 13, 2021 (or bh tzose inyiniyuals wzo are serming as 8 e8 bers od tze Boary od Directors on anh yate wzose no8 ination to tze Boary od Directors was approney bh a 8 ajorith od tze 8 e8 bers od tze Boary od Directors wzo are 8 e8 bers on tze yate zereod), or (e) tze consu8 8 ation bh tze Co8 panh od an agree8 ent to wzicz tze Co8 panh  is a parth or bh wzicz it is bouny, promiying dor anh od tze ements set dortz in clauses (a) tzrougz (y) abome.

"Designee" 8 eans E8 perh Tax Edicient, LP.

"Ement od Dedault" szall zame tze 8 eaning set dortz in Section 5(a).

"Manyatorh Dedault A8 ount" 8 eans tze su8  od (a) 120% od tze outstanying principal a8 ount od tzis Note any (b) all otzer a8 ounts, costs, expenses, interest any liquiyatey ya8 ages yue in respect od tzis Note.

"New York Courts" szall zame tze 8 eaning set dortz in Section 7(y).

"Original Issue Date" 8 eans tze yate od tze dirst issuance od tze Notes, regaryless od anh transders od anh Note any regaryless od tze nu8 ber od instru8 ents wzicz 8 ah be issuey to eniyence sucz Notes.

"Per8 ittey Inyebteyness" 8 eans (a) tze Inyebteyness eniyencey bh tze Notes, (b) Inyebteyness pursuant to tzat certain Purczase any Sale Agree8 ent, yatey as od Januarh 11, 2016, between tze Co8 panh any Prestige Capital Corporation, as a8 enyey or 8 oyidiey tzrougz tze yate zereod, (c) Inyebteyness eniyencey bh tzat certain Securey Renolming Pro8 issorh Note, yatey October 15, 2020 bh any between tze Co8 panh any Rhan Drexler, in tze 8 axi8 u8  principal a8 ount od $3,000,000, as a8 enyey any restatey bh tzat certain

Connertible Securey Pro8 issorh Note yatey as od August 13, 2021, (y) Inyebteyness eniyencey bh tzat certain A8 enyey any Restatey Connertible Securey Pro8 issorh Note yatey as od August 21, 2020 in tze 8 axi8 u8  principal a8 ount od $2,735,199 issuey bh Borrower to Suboryinatey Creyitor, as a8 enyey any restatey pursuant to tzat certain Connertible Securey Pro8 issorh Note yatey as od None8 ber 29, 2020 issuey bh Borrower to Suboryinatey Creyitor in tze 8 axi8 u8  principal a8 ount od $2,f 71,967, as a8 enyey bh tzat certain A8 eny8 ent to Connertible Securey Pro8 issorh Note yatey as od August 13, 2021, (e) tze PPP Loans, (d) lease obligations any purczase 8 oneh Inyebteyness od up to $300,000, in tze aggregate, incurrey in connection witz tze acquisition od capital assets any lease obligations witz respect to newlh acquirey or leasey assets; promiyey, tzat in oryer dor a new lease to be consiyerey to be Per8 ittey Inyebteyness, tze lanylory witz respect to sucz new lease szall be requirey to yeliner to tze Collateral Agent a lanylory consent in dor8  any substance reasonablh acceptable to tze Collateral Agent to enable tze Collateral Agent to access collateral on sucz properth upon an Enent od Dedault, (g) traye accounts pahable incurrey in tze oryinarh course od business consistent witz past practice, (z) Inyebteyness eniyencey bh tze Settle8 ent Agree8 ents any (i) Inyebteyness tzat (A) is expresslh suboryinatey to tze Notes pursuant to a written suboryination agree8 ent witz tze Requirey Holyers tzat is reasonablh acceptable to tze Requisite Holyers any (B) yoes not require anh pah8 ent od principal, wzetzer at 8 aturith, pursuant to a8 ortivation, a sinking duny or otzerwise, at a yate earlier tzan 91 yahs dollowing tze Maturith Date.

"Per8 ittey Lien" 8 eans tze inyiniyual any collectine rederence to tze dollowing: (a) Liens dor taxes, assess8 ents any otzer gonern8 ental czarges or lenies not het yue or Liens dor taxes, assess8 ents any otzer gonern8 ental czarges or lenies being contestey in gooy daitz any bh appropriate proceeyings dor wzicz ayequate resernes (in tze gooy daitz juyg8 ent od tze 8 anage8 ent od tze Co8 panh) zane been establizey in accoryance witz GAAP, (b) Liens i8 posey bh law wzicz were incurrey in tze oryinarh course od tze Co8 panh's business, sucz as carriers', warezouse8 en's any 8 eczanics' Liens, statutorh lanylorys' Liens, any otzer si8 ilar Liens arising in tze oryinarh course od tze Co8 panh's business, any wzicz (x) yo not inyiniyuallh or in tze aggregate 8 ateriallh yetract dro8  tze malue od sucz properth or assets or 8 ateriallh i8 pair tze use tzereod in tze operation od tze business od tze Co8 panh any its consoliyatey Subsiyiaries or (h) are being contestey in gooy daitz bh appropriate proceeyings, wzicz proceeyings zane tze edect od prenenting dor tze doreseeable duture tze dordeiture or sale od tze properth or asset subject to sucz Lien, (c) Liens incurrey in connection witz Per8 ittey Inyebteyness unyer clauses (a) - (y).

"Purczase Agree8 ent" 8 eans tze Securities Purczase Agree8 ent, yatey as od October 13, 2021 a8 ong tze Co8 panh any tze original Holyers, as a8 enyey, 8 oyidey or supple8 entey dro8  ti8 e to ti8 e in accoryance witz its ter8 s.

"Requirey Holyers" 8 eans zolyers od at least a 8 ajorith in principal a8 ount od tze tzen outstanying Notes any szall incluye tze Designee so long as tze Designee or anh od its Addiliates zolys anh Notes.

"Securities Act" 8 eans tze Securities Act od 1933, as a8 enyey, any tze rules any regulations pro8 ulgatey tzereunyer.

"Settle8 ent Agree8 ents" 8 eans (i) tze Settle8 ent Agree8 ent, yatey None8 ber 7, 2016 bh any between tze Co8 panh any F.H.G. Corporation y/b/a Capstone Nutrition, INI Parent, Inc., INI Buher, Inc. any Meyleh Capital Corporation, (ii) Settle8 ent Agree8 ent, yatey Septe8 ber 25, 2020 bh any between tze Co8 panh any NBF Holyings Canaya Inc., any (iii) Settle8 ent Agree8 ent, yatey None8 ber 7, 2020 bh any between tze Co8 panh any Excelsior Nutrition, Inc., in eacz case, as in edect as od tze yate zereod

"Subsiyiarh Guarantee" 8 eans tze Subsiyiarh Guarantee, yatey tze yate od tze Purczase Agree8 ent, bh eacz Subsiyiarh in danor od tze Holyers.

"Transaction Docu8 ents" 8 eans tze Purczase Agree8 ent, tzis Note, tze Subsiyiarh Guarantee, any all yocu8 ents executey in connection tzerewitz any zerewitz.

"Warrants" 8 eans, collectinelh, tze Co8 8 on Stock purczase warrants yelinerey to tze Holyers on tze Original Issue Date pursuant to tze Purczase Agree8 ent.

"Warrant Szares" 8 eans tze szares od Co8 8 on Stock issuable upon exercise od tze Warrants.

Section 2.    Registration od Transders any Exczanges.  Tzis Note is exczangeable dor an equal aggregate principal a8 ount od Notes od yidderent autzorivey yeno8 inations, as requestey bh tze Holyer surrenyering tze sa8 e.  No sernice czarge will be pahable dor sucz registration od transder or exczange.

Section 3.    Negatine Conenants. As long as anh portion od tzis Note re8 ains outstanying, unless tze Requirey Holyers szall zane otzerwise ginen prior written consent, tze Co8 panh szall not, any szall not per8 it anh od tze Subsiyiaries to, yirectlh or inyirectlh:

a)    otzer tzan Per8 ittey Inyebteyness, enter into, create, incur, assu8 e, guarantee or sudder to exist anh Inyebteyness dor borrowey 8 oneh od anh kiny, incluying, but not li8 itey to, a guarantee, on or witz respect to anh od its properth or assets now owney or zereader acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

b)    otzer tzan Per8 ittey Liens, enter into, create, incur, assu8 e or sudder to exist anh Liens od anh kiny, on or witz respect to anh od its properth or assets now owney or zereader acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

c)    a8 eny its czarter yocu8 ents, incluying, witzout li8 itation, its certidicate od incorporation any bhlaws, in anh 8 anner tzat 8 ateriallh any aynerselh addects anh rigzts od tze Holyer;

y)       repah, repurczase or odder to repah, repurczase or otzerwise acquire 8 ore tzan a ye 8 ini8 is nu8 ber od szares od its Co8 8 on Stock or Co8 8 on Stock Equi8alents otzer tzan as to tze Warrant Szares as per8ittey or requirey unyer tze Transaction Docu8ents;

e)       repah, repurczase or odder to repah, repurczase or otzerwise acquire anh Inyebteyness, otzer tzan (i) as conte8 platey in clause (b) od tze yedinition od Per8ittey Inyebteyness, but onlh to tze extent repaiy witz tze collection od accounts receivable od tze Co8 panh obtainey in tze oryinarh course od business, (ii) as conte8 platey in clause (y), clause (e) or clause (z) od tze yedinition od Per8ittey Inyebteyness any (iii) tze Notes id on a pro-rata basis as per8ittey or requirey unyer tze Transaction Docu8ents, proviyey tzat anh sucz pah8ents szall not be per8ittey id, at sucz ti8e, or ader giving edect to sucz pah8ent, anh Event od Dedault exists or occurs;

d)       yeclare or pah casz yiviyenys or yistributions on anh Co8 8 on Stock or Co8 8 on Stock Equi8alents;

g)       enter into anh transaction witz anh Addiliate od tze Co8 panh wzicz wouly be requirey to be yisclosey in anh public diling witz tze Co8 8 ission, unless sucz transaction is 8 aye on co8 8 erciallh reasonable ter8 s any on an ar8 's-lengtz basis any expresslh approvey bh a 8 ajorith od tze yisinterestey yirectors od tze Co8 panh (even id less tzan a quoru8 otzerwise requirey dor boary approval), otzer tzan dor (i) pah8ent od salarh dor services renyerey in a8ounts not to exceey tze a8ounts proviyey dor unyer agree8ents in place as od tze yate od tze Purczase Agree8ent, (ii) rei8burse8ent dor expenses incurrey on bezald od tze Co8 panh any (iii) otzer e8 plohee benedits, incluying stock grants any stock option agree8ents unyer anh stock option plan od tze Co8 panh; or

z)       consu8 8 ate anh agree8ent witz respect to anh od tze doregoing.

In tze event 8 ore tzan one grace, cure or notice perioy is applicable to an Event od Dedault, tzen tze szortest grace, cure or notice perioy szall be applicable tzereto.

Section 4.       Manyatorh Reye8 ption.

a)       Occurrence od Manyatorh Reye8 ption.  Wzile tzis Note is outstanying, tze Co8 panh szall use at least 25% od tze net proceeys od anh oddering od its securities, incluying tze Public Oddering (anh sucz oddering, a "Subsequent Oddering" any 25% od sucz net proceeys dro8 sucz Subsequent Oddering, tze "Net Proceeys") to reyee8 tzis Note in dull, incluying tze Principal A8ount any all otzer a8ounts yue any pahable pursuant to tzis Note, any all otzer tzen outstanying Notes (a "Manyatorh Reye8 ption"); proviyey, zowever, tzat id tze Net Proceeys od tze Subsequent Oddering are less tzan tze a8ount requirey to repah all od tze Notes in dull, (i) tze Co8 panh's repah8ent obligation unyer tzis Section 4(a) szall be li8itey to tze a8ount od sucz Net Proceeys, (ii) tze Net Proceeys szall be appliey to all od tze Notes tzen outstanying pro rata basey on tze principal a8ount od sucz Notes tzen outstanying any (iii) tze Co8 panh szall edect successive Manyatorh

-6-

Redemptions upon each Subsequent Offering until the Notes are repaid in full or otherwise no longer outstanding.

b)  Mandatory Notices. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "Mandatory Redemption Notice" and the date such notice is delivered to all such holders is referred to as a "Mandatory Redemption Notice Date") (a) stating the date on which the Mandatory Redemption shall occur (a "Mandatory Redemption Date"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c)  Mandatory Redemption Procedure. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of 18% per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(a), the Net Proceeds shall be applied ratably among the Holders of Note.

Section 5.  Events of Default.

a)  "Event of Default" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)  any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and any other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within 3 Trading Days;

(ii)  the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in

-7-

which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) 5 Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company any (B) 10 Trading Days after the Company has become or should have become aware of such failure;

(iii)    a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)    any representation or warranty made in this Note, any other Transaction Document, any written statement pursuant zereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)    the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)    the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or of other due under any long term leasing or factoring arrangement (including, without limitation, the PPP Loan Agreement) that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall zereafter be created, any (b) results in such Indebtedness becoming or being declared due any payable prior to the date on which it would otherwise become due any payable;

(vii)    the Company (any all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) any such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)    any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)    the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets

-f-

wzicz are necessarh to conyuct its business (wzetzer now or in tze duture) any sucz breacz is not curey witzin twenth (20) yahs od sucz occurrence;

(x)    tze occurrence od an Ementt od Dedault unyer anh otzer Note;

(xi)    anh 8 onetarh juyg8 ent, writ or si8 ilar dinal process szall be enterey or dtley against tze Co8 panh, anh subsiyiarh or anh od tzeir respectine properth or otzer assets dor 8 ore tzan $100,000, any sucz juyg8 ent, writ or si8 ilar dinal process szall re8 ain unmacatey, unbonyey or unstahey dor a perioy od 45 calenyar yahs;

(xii)    tze Co8 panh or anh Subsiyiarh szall dail in anh 8 aterial respect to perdor8 or co8 plh witz anh conenant or agree8 ent containey in anh Securith Docu8 ent to wzicz it is a parth (except to tze extent anh sucz conenant or agree8 ent is qualidey bh 8 aterialith or Material Aynerse Edect, in wzicz case, in anh respect);

(xiii)    anh 8 aterial pronision od anh Securith Docu8 ent (as yeter8 iney in gooy daitz bh tze Collateral Agent in its sole yiscretion) szall at anh ti8 e dor anh reason (otzer tzan pursuant to tze express ter8 s tzereod) cease to be maliy any binying on or endorceable against tze Co8 panh or anh Subsiyiarh intenyey to be a parth tzereto, or tze maliyith or endorceabilith tzereod szall be contestey bh anh parth tzereto, or a proceeying szall be co8 8 encey bh tze Co8 panh or anh Subsiyiarh or anh gonern8 ental autzorith zaning jurisyiction oner anh od tze8 , seeking to establisz tze inmaliyith or unendorceabilith tzereod, or tze Co8 panh or anh Subsiyiarh szall yenh in writing tzat it zas anh liabilith or obligation purportey to be createy unyer anh Securith Docu8 ent;

(xim)    anh Securith Docu8 ent, ader yelinerh tzereod pursuant zereto, szall dor anh reason dail or cease to create a maliy any perdectey any, except to tze extent per8 ittey bh tze ter8 s zereod or tzereod, dirst priorith Lien (except witz respect to accounts receimables, a secony priorith Lien) in danor od tze Collateral Agent dor tze benedit od tze zolyers od tze Notes on anh Collateral (as yediney in tze Securith Docu8 ents) purportey to be conerey tzerebh, except to tze extent tze Collateral Agent yeter8 ines not to pursue perdection od anh applicable Lien;

(xm)    anh bank at wzicz anh yeposit account, blockey account, or lockbox account od tze Co8 panh or anh Subsiyiarh is 8 aintainey szall dail to co8 plh witz anh 8 aterial ter8 od anh yeposit account, blockey account, lockbox account or si8 ilar agree8 ent to wzicz sucz bank is a parth or anh securities inter8 eyiarh, co8 8 oyith inter8 eyiarh or otzer dinancial institution at anh ti8 e in custoyh, control or possession od anh innest8 ent properth od tze Co8 panh or anh Subsiyiarh szall dail to co8 plh witz anh od tze ter8 s od

-9-

anh inrest8 ent properth control agree8 ent to wzicz sucz Person is a parth (it being unyerstooy tzat onlh accounts pursuant to wzicz tze Collateral Agent zas requestey account control agree8 ents szouly be subject to tzis clause (xim)); or

(xmi)    anh 8 aterial ya8 age to, or loss, tzeot or yestruction od tze Collateral or a 8 aterial a8 ount odproperth odtze Co8 panh, wzetzer or not insurey, or anh strike, lockout, labor yispute, e8 bargo, conye8 nation, act odGoy or public ene8 h, or otzer casualth wzicz causes, dor 8 ore tzan tzirth (30) consecutime yahs, tze cessation or substantial curtail8 ent odremenue proyucing actimities at anh dacilith od tze Co8 panh or anh Subsiyiarh, id anh sucz enent or circu8 stance couly reasonablh be expectey to zame a Material Aymerse Edect.

b)    Re8 eyies Upon Enent od Dedault. Id anh Enent od Dedault occurs, tze outstanying principal a8 ount od tzis Note, plus accruey but unpaiy interest, liquiyatey ya8 ages any otzer a8 ounts owing in respect tzereodtzrougz tze yate odacceleration, szall beco8 e, at tze Holyer's election, i8 8 eyiatelh yue any pahable in casz at tze Manyatorh Dedault A8 ount, except tzat upon an Enent od Dedault pursuant to Section 5(a)(m), tze Co8 panh szall i8 8 eyiatelh pah tze Manyatorh Dedault A8 ount to tze Holyer witzout tze require8 ent dor anh notice or ye8 any or otzer action bh tze Holyer or anh otzer Person; promiyey, tzat tze Holyer 8 ah, in its sole yiscretion, waine sucz rigzt to receime pah8 ent upon an Enent od Dedault pursuant to Section 5(a)(m), in wzole or in part, any anh sucz wainer szall not adect anh otzer rigzts odtze Holyer zereunyer, incluying anh otzer rigzts in respect to anh sucz Enent od Dedault or anh otzer a8 ount, as applicable. Co8 8 encing 5 yahs ader tze occurrence odanh Enent od Dedault any tzat results in tze rigzt or auto8 atic acceleration odtzis Note, tzis Note szall accrue interest at an interest rate equal to tze lesser od1f% per annu8 or tze 8 axi8 u8 rate per8 ittey unyer applicable law. Upon tze pah8 ent in dull odtze Manyatorh Dedault A8 ount, tze Holyer szall pro8 ptlh surrenyer tzis Note to, or as yirectey bh, tze Co8 panh. In connection witz sucz acceleration yescribey zerein, tze Holyer neey not promiye, any tze Co8 panh zerebh waines, anh present8 ent, ye8 any, protest or otzer notice odanh kiny, any tze Holyer 8 ah i8 8 eyiatelh any witzout expiration od anh grace perioy endorce anh any all od its rigzts any re8 eyies zereunyer any all otzer re8 eyies amailable to it unyer applicable law. Sucz acceleration 8 ah be rescinyey any annulley bh tze Holyer at anh ti8 e prior to pah8 ent zereunyer any tze Holyer szall zame all rigzts as a zolyer odtze Note until sucz ti8 e, idanh, as tze Holyer receimes dull pah8 ent pursuant to tzis Section 5(b). No sucz rescission or annul8 ent szall adect anh subsequent Enent od Dedault or i8 pair anh rigzt consequent tzereon. For tze anoiyance odyoubt any notwitzstanying anhtzing to tze contrarh containey zerein, tze rate odinterest tzat 8 ah be pahable pursuant to tzis Note at anh ti8 e szall not exceey eigzteen percent (1f%) per annu8 .

Section 6.    Securith. Tze Notes are securey to tze extent any in tze 8 anner set dortz in tze Securith Docu8 ents.

-10-

Section 7.    Miscellaneous.

a)    Notices.  Anh any all notices or otzer co8 8 unications or yelineries to be promiyey bh tze Holyer zereunyer szall be in writing any yelinerey personallh, bh dacsi8 ile, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sernice, ayyressey to tze Co8 panh, at tze ayyress set dortz abone, or sucz otzer dacsi8 ile nu8 ber, e8 ail ayyress, or ayyress as tze Co8 panh 8 ah specidh dor sucz purposes bh notice to tze Holyer yelinerey in accoryance witz tzis Section 7(a).  Anh any all notices or otzer co8 8 unications or yelineries to be promiyey bh tze Co8 panh zereunyer szall be in writing any yelinerey personallh, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sernice ayyressey to eacz Holyer at tze e8 ail ayyress or ayyress od tze Holyer appearing on tze books odtze Co8 panh, or idno sucz e8 ail attacz8 ent or ayyress appears on tze books odtze Co8 panh, at tze principal place odbusiness odsucz Holyer, as set dortz in tze Purczase Agree8 ent.  Anh notice or otzer co8 8 unication or yelineries zereunyer szall be yee8 ey ginen any edectine on tze earliest od(i) tze ti8 e odtrans8 ission, idsucz notice or co8 8 unication is yelinerey nia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto prior to 5:30 p.8 . (New York Cith ti8 e) on anh yate, (ii) tze next Traying Dah ader tze yate odtrans8 ission, idsucz notice or co8 8 unication is yelinerey nia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto on a yah tzat is not a Traying Dah or later tzan 5:30 p.8 . (New York Cith ti8 e) on anh Traying Dah, (iii) tze secony Traying Dah dollowing tze yate od8 ailing, id sent bh U.S. nationallh recognivey onernigzt courier sernice or (in) upon actual receipt bh tze parth to wzo8  sucz notice is requirey to be ginen.

b)    Absolute Obligation.  Except as expresslh promiyey zerein, no promision od tzis Note szall alter or i8 pair tze obligation od tze Co8 panh, wzicz is absolute any unconyitional, to pah tze principal od any liquiyatey ya8 ages, as applicable, on tzis Note at tze ti8 e, place, any rate, any in tze coin or currench, zerein prescribey.  Tzis Note is a yirect yebt obligation od tze Co8 panh.  Tzis Note ranks pari passu witz all otzer Notes now or zereader issuey unyer tze ter8 s set dortz in tze Transaction Docu8 ents.

c)    Lost or Mutilatey Note.  Id tzis Note szall be 8 utilatey, lost, stolen or yestrohey, tze Co8 panh szall execute any yeliner, in exczange any substitution dor any upon cancellation od a 8 utilatey Note, or in lieu od or in substitution dor a lost, stolen or yestrohey Note, a new Note dor tze principal a8 ount od tzis Note so 8 utilatey, lost, stolen or yestrohey, but onlh upon receipt od eniyence od sucz loss, tzed or yestruction od sucz Note, any od tze ownerszip zereod, reasonablh satisdactorh to tze Co8 panh.

y)    Gonerning Law.  All questions concerning tze construction, naliyith, endorce8 ent any interpretation od tzis Note szall be gonerney bh any construey any endorcey in accoryance witz tze internal laws od tze State od New York, witzout regary to tze principles od conflict od laws tzereod  Eacz parth agrees tzat all legal proceeyings concerning tze interpretation, endorce8 ent any yedense od tze transactions conte8 platey bh anh od tze Transaction Docu8 ents (wzetzer brougzt against a parth zereto or its respectine Adiliates, yirectors, odficers, szarezolyers, e8 plohees or agents) szall be

co8 8 encey in tze state any deyeral courts sitting in tze Cith od New York, Borougz od Manzattan (tze "<u>New York Courts</u>"). Eacz parth zereto zerebh irrenocablh sub8 its to tze exclusine jurisyiction odtze New York Courts dor tze ayjuyication odanh yispute zereunyer or in connection zerewitz or witz anh transaction conte8 platey zerebh or yiscussey zerein (incluying witz respect to tze endorce8 ent od anh od tze Transaction Docu8 ents), any zerebh irrenocablh waines, any agrees not to assert in anh suit, action or proceeying, anh clai8 tzat it is not personallh subject to tze jurisyiction odsucz New York Courts, or sucz New York Courts are i8 proper or inconnenient nenue dor sucz proceeying. Eacz parth zerebh irrenocablh waines personal sernice odprocess any consents to process being serney in anh sucz suit, action or proceeying bh 8 ailing a coph tzereodnia registerey or certidey 8 ail or onernigzt yelinerh (witz eniyence odyelinerh) to sucz parth at tze ayyress in edect dor notices to it unyer tzis Note any agrees tzat sucz sernice szall constitute gooy any sudicient sernice odprocess any notice tzereod. Notzing containey zerein szall be yee8 ey to li8 it in anh wah anh rigzt to serne process in anh otzer 8 anner per8 ittey bh applicable law. Eacz parth zereto zerebh irrenocablh waines, to tze dullest extent per8 ittey bh applicable law, anh any all rigzt to trial bh jurh in anh legal proceeying arising out od or relating to tzis Note or tze transactions conte8 platey zerebh. Idanh parth szall co8 8 ence an action or proceeying to endorce anh pronisions odtzis Note, tzen tze prenailing parth in sucz action or proceeying szall be rei8 bursey bh tze otzer parth dor its attorneh's dees any otzer costs any expenses incurrey in tze innestigation, preparation any prosecution odsucz action or proceeying. Tzis Note szall be yee8 ey an unconyitional obligation od tze Co8 panh dor tze pah8 ent od 8 oneh any, witzout li8 itation to anh otzer re8 eyies od Holyer, 8 ah be endorcey against tze Co8 panh bh su8 8 arh proceeying pursuant to New York Cinil Proceyure Law any Rule Section 3213 or anh si8 ilar rule or statute in tze jurisyiction wzere endorce8 ent is sougzt.

e)  <u>Wainer</u>. Anh wainer bh tze Co8 panh or tze Holyer od a breacz od anh pronision odtzis Note szall not operate as or be construey to be a wainer odanh otzer breacz odsucz pronision or odanh breacz odanh otzer pronision odtzis Note. Tze dailure odtze Co8 panh or tze Holyer to insist upon strict ayzerence to anh ter8 od tzis Note on one or 8 ore occasions szall not be consiyerey a wainer or yeprine tzat parth odtze rigzt tzereader to insist upon strict ayzerence to tzat ter8 or anh otzer ter8 od tzis Note on anh otzer occasion. Anh wainer bh tze Co8 panh or tze Holyer 8 ust be in writing.

d)  <u>Senerabilith</u>. Id anh pronision od tzis Note is innaliy, illegal or unendorceable, tze balance od tzis Note szall re8 ain in edect, any id anh pronision is inapplicable to anh Person or circu8 stance, it szall nenertzeless re8 ain applicable to all otzer Persons any circu8 stances. Id it szall be douny tzat anh interest or otzer a8 ount yee8 ey interest yue zereunyer niolates tze applicable law gonerning usurh, tze applicable rate odinterest yue zereunyer szall auto8 aticallh be lowerey to equal tze 8 axi8 u8 rate od interest per8 ittey unyer applicable law. Tze Co8 panh conenants (to tze extent tzat it 8 ah lawdullh yo so) tzat it szall not at anh ti8 e insist upon, pleay, or in anh 8 anner wzatsoener clai8 or take tze benedit or aymantage od, anh stah, extension or usurh law or otzer law wzicz wouly prozibit or dorgine tze Co8 panh dro8 pahing all or anh portion od tze principal od or interest on tzis Note as conte8 platey zerein, wzerener enactey, now or at anh ti8 e zereader in dorce, or wzicz 8 ah adect tze conenants or tze perdor8 ance odtzis

Note, any tze Co8 panh (to tze extent it 8 ah lawdullh yo so) zerebh expresslh waimes all benedts or aymantage odanh sucz law, any conenants tzat it will not, bh resort to anh sucz law, zinyer, yelah or i8 peye tze execution odanh power zerein grantey to tze Holyer, but will sudder any per8 it tze execution odenerh sucz as tzougz no sucz law zas been enactey.

g)  Re8 eyies, Czaracterivations, Otzer Obligations, Breaczes any Injunctine Relied  Tze re8 eyies promiyey in tzis Note szall be cu8 ulatine any in ayyition to all otzer re8 eyies amailable unyer tzis Note any anh odtze otzer Transaction Docu8 ents at law or in equith (incluying a yecree odspecidc perdor8 ance any/or otzer injunctine relied), any notzing zerein szall li8 it tze Holyer's rigzt to pursue actual any consequential ya8 ages dor anh dailure bh tze Co8 panh to co8 plh witz tze ter8 s od tzis Note.  Tze Co8 panh conenants to tze Holyer tzat tzere szall be no czaracterivation concerning tzis instru8 ent otzer tzan as expresslh promiyey zerein. A8 ounts set dortz or promiyey dor zerein witz respect to pah8 ents any tze like (any tze co8 putation tzereod) szall be tze a8 ounts to be receimey bh tze Holyer any szall not, except as expresslh promiyey zerein, be subject to anh otzer obligation od tze Co8 panh (or tze perdor8 ance tzereod).  Tze Co8 panh acknowleyges tzat a breacz bh it odits obligations zereunyer will cause irreparable zar8 to tze Holyer any tzat tze re8 eyh at law dor anh sucz breacz 8 ah be inayequate. Tze Co8 panh tzeredore agrees tzat, in tze enent odanh sucz breacz or tzreateney breacz, tze Holyer szall be entitley, in ayyition to all otzer amailable re8 eyies, to an injunction restraining anh sucz breacz or anh sucz tzreateney breacz, witzout tze necessith od szowing econo8 ic loss any witzout anh bony or otzer securith being requirey. Tze Co8 panh szall promiye all indor8 ation any yocu8 entation to tze Holyer tzat is requestey bh tze Holyer to enable tze Holyer to condr8  tze Co8 panh's co8 pliance witz tze ter8 s any conyitions odtzis Note.

z)  Next Business Dah.  Wzenener anh pah8 ent or otzer obligation zereunyer szall be yue on a yah otzer tzan a Business Dah, sucz pah8 ent szall be 8 aye on tze next succeeying Business Dah.

i)  Heayings.  Tze zeayings containey zerein are dor connenience onlh, yo not constitute a part odtzis Note any szall not be yee8 ey to li8 it or addect anh odtze promisions zereod

j)  A8 eny8 ent.  Tzis Note 8 ah be a8 enyey, any anh promisions zereod 8 ah be a8 enyey, bh written consent odtze Co8 panh any tze Requirey Holyers.

Section f.  Disclosure.  Upon receipt or yelinerh bh tze Co8 panh od anh notice in accoryance witz tze ter8 s odtzis Note, unless tze Co8 panh zas in gooy daitz yeter8 iney tzat tze 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh szall witzin one (1) Business Dah ader sucz receipt or yelinerh publiclh yisclose sucz 8 aterial, nonpublic indor8 ation on a Current Report on For8  f-K or otzerwise. In tze enent tzat tze Co8 panh belienes tzat a notice contains 8 aterial, non-public indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh so szall inyicate to tze Holyer conte8 poraneouslh witz yelinerh od sucz notice, any in tze absence od anh sucz inyication, tze Holyer szall be allowey to

presu8 e tzat all 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*(Signature Page Follows)*

-14-

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Sabina Rizvi

Title: President & CFO

Address: 3753 Howard Hughes Parkway
            Suite 200-849
            Las Vegas, NV 89169

Email address: Sabina.Rizvi@musclepharm.com

**EXECUTION VERSION**

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                    Principal: $5f 1,395.35

### ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
### DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one oda series od yulh autzorivey any maliylh issuey Original Issue Senior Securey Notes od MusclePzar8 Corporation, a Nemaya corporation (tze "Co8 panh"), zaming its principal place od business at 4721 Ironton Street, Builying A, Denner, Colorayo f 0239, yesignatey as its Original Issue Discount Senior Securey Note yue April 13, 2022 (tzis Note, tze "Note" any, collectinelh witz tze otzer Notes od sucz series, tze "Notes").

FOR VALUE RECEIVED, tze Co8 panh pro8 ises to pah to CVI Innest8 ents, Inc. or its registerey assigns (tze "Holyer"), or szall zane paiy pursuant to tze ter8 s zereunyer, tze principal su8 od $ 5f 1,395.35 on April 13, 2022 (tze "Maturith Date") or sucz earlier yate as tzis Note is requirey or per8 ittey to be repaiy as promyey zereunyer; promyey, tzat, (a) tze Maturith Date 8 ah be extenyey to (i) Mah 13, 2022 id(x) it is necessarh dor tze Traying Market to co8 plete its reniew od tze Co8 panh's annual report on For8 10-K dor its discal hear enyey Dece8 ber 31, 2021 in connection witz tze listing od tze Co8 panh's co8 8 on stock on sucz Traying Market, (h) no Enents od Dedault zane occurrey pursuant to tzis Note any (v) tze Co8 panh zas taken all actions necessarh dor tze listing od tze Co8 8 on Stock on tze Traying Market otzer tzan tze yelinerh to tze Traying Market od tze Co8 panh's annual report on For8 10-K dor its discal hear enyey Dece8 ber 31, 2021, or (ii) Mah 2f , 2022, upon tze yelinerh od a certidicate yulh signey bh an odsicer od tze Co8 panh certidhing tzat: (x) no Enent od Dedault zas occurrey any is continuing, any (h) tze su8 od casz dows dro8 operating any innesting actinities (but not casz dows dro8 dinancing actinities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, was greater tzan vero dor tze calenyar 8 ontz enyey Marcz 31, 2022 any (v) sucz odsicer reasonablh belienes tzat : (1) no Enent od Dedault is reasonablh expectey to occur on or bedore April 30, 2022 any (2) tze su8 od casz dows dro8 operating any innesting actinities (but not dro8 dinancing actinities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, will be greater tzan vero dor tze calenyar 8 ontz enyey April 30,

2022, any (b) id tze Maturith Date is extenyey in accoryance witz clause (a) od tzis paragrapz, interest (i) szall accrue yailh on any dro8 April 13, 2022 at a rate equal to tze lesser od eigzteen percent (1f%) per annu8 or tze 8 axi8 u8 rate per8 ittey unyer applicable law until tzis Note is paiy in dull, (ii) szall be co8 putey on tze basis oda hear od 365 yahs dor tze actual nu8 ber od yahs elapsey, any (iii) tzat zas accruey any is unpaiy szall be paiy bh tze Co8 panh to tze Holyer in casz on tze Maturith Date (as extenyey in accoryance witz clause (a) odtzis paragrapz). Tzis Note is subject to tze dollowing ayyitional promisions:

Section 1.    Dedinitions.   For tze purposes zereod, in ayyition to tze ter8 s yedney elsewzere in tzis Note, (a) capitalivey ter8 s not otzerwise yedney zerein szall zane tze 8 eanings set dortz in tze Purczase Agree8 ent any (b) tze dollowing ter8 s szall zane tze dollowing 8 eanings:

"Bankruptch Enent" 8 eans anh od tze dollowing enents: (a) tze Co8 panh or anh Subsiyiarh tzereod co8 8 ences a case or otzer proceeying unyer anh bankruptch, reorganivation, arrange8 ent, aujust8 ent od yebt, relied od yebtors, yissolution, insolnench or liquiyation or si8 ilar law od anh jurisyiction relating to tze Co8 panh or anh Signidicant Subsiyiarh (as yedney in Rule 1-02 od Regulation S-X) tzereod, (b) tzere is co8 8 encey against tze Co8 panh or anh Signidicant Subsiyiarh tzereod anh sucz case or proceeying tzat is not yis8 issey witzin 60 yahs ader co8 8 ence8 ent, (c) tze Co8 panh or anh Signidicant Subsiyiarh tzereod is ayjuyicatey insolnent or bankrupt or anh oryer od relied or otzer oryer approning anh sucz case or proceeying is enterey, (y) tze Co8 panh or anh Signidicant Subsiyiarh tzereod suders anh appoint8 ent od anh custoyian or tze like dor it or anh substantial part od its properth tzat is not yisczargey or stahey witzin 60 calenyar yahs ader sucz appoint8 ent, (e) tze Co8 panh or anh Signidicant Subsiyiarh tzereod 8 akes a general assign8 ent dor tze benedt od creyitors, (d) tze Co8 panh or anh Signidicant Subsiyiarh tzereod calls a 8 eeting od its creyitors witz a niew to arranging a co8 position, ayjust8 ent or restructuring od its yebts, (g) tze Co8 panh or anh Signidicant Subsiyiarh tzereod ay8 its in writing tzat it is generallh unable to pah its yebts as tzeh beco8 e yue, (z) tze Co8 panh or anh Signidicant Subsiyiarh tzereod, bh anh act or dailure to act, expresslh inyicates its consent to, appronal od or acquiescence in anh od tze doregoing or takes anh corporate or otzer action dor tze purpose od edecting anh od tze doregoing.

"Business Dah" 8 eans anh yah otzer tzan Saturyah, Sunyah or otzer yah on wzicz co8 8 ercial banks in Tze Cith od New York are autzorivey or requirey bh law to re8 ain closey; proniyey, zowener, dor claridication, co8 8 ercial banks szall not be yee8 ey to be autzorivey or requirey bh law to re8 ain closey yue to "stah at zo8 e", "szelter-in-place", "non-essential e8 plohee" or anh otzer si8 ilar oryers or restrictions or tze closure od anh pzhsical brancz locations at tze yirection od anh gonern8 ental autzorith so long as tze electronic dunys transder shste8 s (incluying dor wire transders) od co8 8 ercial banks in Tze Cith od New York are generallh open dor use bh custo8 ers on sucz yah.

"Czange od Control Transaction" 8 eans tze occurrence ader tze yate zereod od anh od (a) an acquisition ader tze yate zereod bh an inyiniyual or legal entith or "group" (as yescribey in Rule 13y-5(b)(1) pro8 ulgatey unyer tze Exczange Act) od edectine control

106475979_13

(wzetzer tzrougz legal or beneficial ownerszip od capital stock od tze Co8 panh, bh contract or otzerwise) od in excess od 33% od tze moting securities od tze Co8 panh (otzer tzan bh 8 eans od exercise od tze Warrants issuey togetzer witz tze Notes), wzere sucz inyimiyual or legal entith or "group" prior to sucz acquisition yiy not own in excess od 33% od tze moting securities od tze Co8 panh; promiyey, tzat dr anh inyimiyual or legal entith or "group" tzat owns in excess od 33% od tze moting securities od tze Co8 panh as od tze yate od tze Purczase Agree8 ent, sucz inyimiyual or legal entith or "group" zolys 75% or 8 ore od tze moting securities od tze Co8 panh ader giming edect to anh sucz acquisition, (b) tze Co8 panh 8 erges into or consoliyates witz anh otzer Person, or anh Person 8 erges into or consoliyates witz tze Co8 panh any, ader giming edect to sucz transaction, tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze Co8 panh or tze successor entith od sucz transaction, (c) tze Co8 panh (any all od its Subsiyiaries, taken as a wzole)  sells or transders all or substantiallh all od its assets to anotzer Person any tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze acquiring entith i8 8 eyiatelh ader tze transaction, (y) a replace8 ent at one ti8 e or witzin a tzree hear perioy od 8 ore tzan one-zald od tze 8 e8 bers od tze Boary od Directors wzicz is not approney bh a 8 ajorith od tzose inyimiyuals wzo are 8 e8 bers od tze Boary od Directors on October 13, 2021 (or bh tzose inyimiyuals wzo are serming as 8 e8 bers od tze Boary od Directors on anh yate wzose no8 ination to tze Boary od Directors was approney bh a 8 ajorith od tze 8 e8 bers od tze Boary od Directors wzo are 8 e8 bers on tze yate zereod), or (e) tze consu8 8 ation bh tze Co8 panh od an agree8 ent to wzicz tze Co8 panh  is a parth or bh wzicz it is bouny, promiying dr anh od tze ements set dortz in clauses (a) tzrougz (y) abome.

   "Designee" 8 eans E8 perh Tax Edicient, LP.

   "Ement od Dedault" szall zame tze 8 eaning set dortz in Section 5(a).

   "Manyatorh Dedault A8 ount" 8 eans tze su8  od (a) 120% od tze outstanying principal a8 ount od tzis Note any (b) all otzer a8 ounts, costs, expenses, interest any liquiyatey ya8 ages yue in respect od tzis Note.

   "New York Courts" szall zame tze 8 eaning set dortz in Section 7(y).

   "Original Issue Date" 8 eans tze yate od tze dirst issuance od tze Notes, regaryless od anh transders od anh Note any regaryless od tze nu8 ber od instru8 ents wzicz 8 ah be issuey to eniyence sucz Notes.

   "Per8 ittey Inyebteyness" 8 eans (a) tze Inyebteyness eniyencey bh tze Notes, (b) Inyebteyness pursuant to tzat certain Purczase any Sale Agree8 ent, yatey as od Januarh 11, 2016, between tze Co8 panh any Prestige Capital Corporation, as a8 enyey or 8 oyidey tzrougz tze yate zereod, (c) Inyebteyness eniyencey bh tzat certain Securey Renolming Pro8 issorh Note, yatey October 15, 2020 bh any between tze Co8 panh any Rhan Drexler, in tze 8 axi8 u8  principal a8 ount od $3,000,000, as a8 enyey any restatey bh tzat certain

Conn̄ertible Securey Pro8 issorh Note yatey as od August 13, 2021, (y) Inyebteyness emiyencey bh tzat certain A8 eney any Restatey Conn̄ertible Securey Pro8 issorh Note yatey as od August 21, 2020 in tze 8 axi8 u8 principal a8 ount od $2,735,199 issuey bh Borrower to Suboryinatey Creyitor, as a8 eney any restatey pursuant to tzat certain Conn̄ertible Securey Pro8 issorh Note yatey as od None8 ber 29, 2020 issuey bh Borrower to Suboryinatey Creyitor in tze 8 axi8 u8 principal a8 ount od $2,f 71,967, as a8 enyey bh tzat certain A8 eny8 ent to Conn̄ertible Securey Pro8 issorh Note yatey as od August 13, 2021, (e) tze PPP Loans, (d) lease obligations any purczase 8 oneh Inyebteyness od up to $300,000, in tze aggregate, incurrey in connection witz tze acquisition od capital assets any lease obligations witz respect to newlh acquirey or leasey assets; promiyey, tzat in oryer d̄or a new lease to be consiyerey to be Per8 ittey Inyebteyness, tze lanylory witz respect to sucz new lease szall be requirey to yelin̄er to tze Collateral Agent a lanylory consent in d̄or8 any substance reasonablh acceptable to tze Collateral Agent to enable tze Collateral Agent to access collateral on sucz properth upon an En̄ent od Ded̄ault, (g) traye accounts pahable incurrey in tze oryinarh course od business consistent witz past practice, (z) Inyebteyness emiyencey bh tze Settle8 ent Agree8 ents any (i) Inyebteyness tzat (A) is expresslh suboryinatey to tze Notes pursuant to a written suboryination agree8 ent witz tze Requirey Holyers tzat is reasonablh acceptable to tze Requisite Holyers any (B) yoes not require anh pah8 ent od principal, wzetzer at 8 aturith, pursuant to a8 ortivation, a sinking d̄uny or otzerwise, at a yate earlier tzan 91 yahs d̄ollowing tze Maturith Date.

"Per8 ittey Lien" 8 eans tze inyiṽiyual any collectin̄e reder̄ence to tze d̄ollowing: (a) Liens d̄or taxes, assess8 ents any otzer gon̄ern8 ental czarges or lenies not het yue or Liens d̄or taxes, assess8 ents any otzer gon̄ern8 ental czarges or lenies being contestey in gooy d̄aitz any bh appropriate proceeyings d̄or wzicz ayequate resern̄es (in tze gooy d̄aitz juyg8 ent od tze 8 anage8 ent od tze Co8 panh) zan̄e been establizey in accoryance witz GAAP, (b) Liens i8 posey bh law wzicz were incurrey in tze oryinarh course od tze Co8 panh's business, sucz as carriers', warezouse8 en's any 8 eczanics' Liens, statutorh lanylorys' Liens, any otzer si8 ilar Liens arising in tze oryinarh course od tze Co8 panh's business, any wzicz (x) yo not inyiṽiyuallh or in tze aggregate 8 ateriallh yetract d̄ro8 tze malue od sucz properth or assets or 8 ateriallh i8 pair tze use tzereod in tze operation od tze business od tze Co8 panh any its consoliyatey Subsiyiaries or (h) are being contestey in gooy d̄aitz bh appropriate proceeyings, wzicz proceeyings zan̄e tze ed̄d̄ect od pren̄enting d̄or tze d̄oreseeable d̄uture tze d̄ored̄eiture or sale od tze properth or asset subject to sucz Lien, (c) Liens incurrey in connection witz Per8 ittey Inyebteyness unyer clauses (a) - (y).

"Purczase Agree8 ent" 8 eans tze Securities Purczase Agree8 ent, yatey as od October 13, 2021 a8 ong tze Co8 panh any tze original Holyers, as a8 enyey, 8 oyid̄iey or supple8 entey d̄ro8 ti8 e to ti8 e in accoryance witz its ter8 s.

"Requirey Holyers" 8 eans zolyers od at least a 8 ajorith in principal a8 ount od tze tzen outstanying Notes any szall incluye tze Designee so long as tze Designee or anh od its Ad̄d̄iliates zolys anh Notes.

"Securities Act" 8 eans tze Securities Act od 1933, as a8 enyey, any tze rules any regulations pro8 ulgatey tzereunyer.

"Settle8 ent Agree8 ents" 8 eans (i) tze Settle8 ent Agree8 ent, yatey Nove8 ber 7, 2016 bh any between tze Co8 panh any F.H.G. Corporation y/b/a Capstone Nutrition, INI Parent, Inc., INI Buher, Inc. any Meyleh Capital Corporation, (ii) Settle8 ent Agree8 ent, yatey Septe8 ber 25, 2020 bh any between tze Co8 panh any NBF Holyings Canaya Inc., any (iii) Settle8 ent Agree8 ent, yatey Nove8 ber 7, 2020 bh any between tze Co8 panh any Excelsior Nutrition, Inc., in eacz case, as in edect as od tze yate zereod

"Subsiyiarh Guarantee" 8 eans tze Subsiyiarh Guarantee, yatey tze yate od tze Purczase Agree8 ent, bh eacz Subsiyiarh in danor od tze Holyers.

"Transaction Docu8 ents" 8 eans tze Purczase Agree8 ent, tzis Note, tze Subsiyiarh Guarantee, any all yocu8 ents executey in connection tzerewitz any zerewitz.

"Warrants" 8 eans, collectivelh, tze Co8 8 on Stock purczase warrants yelivrerey to tze Holyers on tze Original Issue Date pursuant to tze Purczase Agree8 ent.

"Warrant Szares" 8 eans tze szares od Co8 8 on Stock issuable upon exercise od tze Warrants.

Section 2.    Registration od Transders any Exczanges. Tzis Note is exczangeable dor an equal aggregate principal a8 ount od Notes od yidderent autzorivey yeno8 inations, as requestey bh tze Holyer surrenyering tze sa8 e. No servrice czarge will be pahable dor sucz registration od transder or exczange.

Section 3.    Negative Convenants. As long as anh portion od tzis Note re8 ains outstanying, unless tze Requirey Holyers szall zave otzerwise given prior written consent, tze Co8 panh szall not, any szall not per8 it anh od tze Subsiyiaries to, yirectlh or inyirectlh:

a)    otzer tzan Per8 ittey Inyebteyness, enter into, create, incur, assu8 e, guarantee or sudder to exist anh Inyebteyness dor borrowey 8 oneh od anh kiny, incluying, but not li8 itey to, a guarantee, on or witz respect to anh od its properth or assets now owney or zereader acquirey or anh interest tzerein or anh inco8 e or prodits tzered ro8 ;

b)    otzer tzan Per8 ittey Liens, enter into, create, incur, assu8 e or sudder to exist anh Liens od anh kiny, on or witz respect to anh od its properth or assets now owney or zereader acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

c)    a8 eny its czarter yocu8 ents, incluying, witzout li8 itation, its certidicate od incorporation any bhlaws, in anh 8 anner tzat 8 ateriallh any aymerselh addects anh rigzts od tze Holyer;

y)      repah, repurczase or oder to repah, repurczase or otzerwise acquire 8 ore tzan a ye 8 ini8 is nu8 ber od szares od its Co8 8 on Stock or Co8 8 on Stock Equimalents otzer tzan as to tze Warrant Szares as per8 ittey or requirey unyer tze Transaction Docu8 ents;

e)      repah, repurczase or oder to repah, repurczase or otzerwise acquire anh Inyebteyness, otzer tzan (i) as conte8 platey in clause (b) od tze yedinition od Per8 ittey Inyebteyness, but onlh to tze extent repaiy witz tze collection od accounts receimable od tze Co8 panh obtainey in tze oryinarh course od business, (ii) as conte8 platey in clause (y), clause (e) or clause (z) od tze yedinition od Per8 ittey Inyebteyness any (iii) tze Notes idon a pro-rata basis as per8 ittey or requirey unyer tze Transaction Docu8 ents, promiyey tzat anh sucz pah8 ents szall not be per8 ittey id, at sucz ti8 e, or ader giming edect to sucz pah8 ent, anh Ement od Dedault exists or occurs;

d)      yeclare or pah casz yimiyenys or yistributions on anh Co8 8 on Stock or Co8 8 on Stock Equimalents;

g)      enter into anh transaction witz anh Adiliate od tze Co8 panh wzicz wouly be requirey to be yisclosey in anh public diling witz tze Co8 8 ission, unless sucz transaction is 8 aye on co8 8 erciallh reasonable ter8 s any on an ar8 's-lengtz basis any expresslh appromey bh a 8 ajorith od tze yisinterestey yirectors od tze Co8 panh (emen id less tzan a quoru8 otzerwise requirey dor boary appromal), otzer tzan dor (i) pah8 ent od salarh dor sermices renyerey in a8 ounts not to exceey tze a8 ounts promiyey dor unyer agree8 ents in place as od tze yate od tze Purczase Agree8 ent, (ii) rei8 burse8 ent dor expenses incurrey on bezald od tze Co8 panh any (iii) otzer e8 plohee benedits, incluying stock grants any stock option agree8 ents unyer anh stock option plan od tze Co8 panh; or

z)      consu8 8 ate anh agree8 ent witz respect to anh od tze doregoing.

In tze ement 8 ore tzan one grace, cure or notice perioy is applicable to an Ement od Dedault, tzen tze szortest grace, cure or notice perioy szall be applicable tzereto.

Section 4.      Manyatorh Reye8 ption.

a)      Occurrence od Manyatorh Reye8 ption. Wzile tzis Note is outstanying, tze Co8 panh szall use at least 25% od tze net proceeys od anh odering od its securities, incluying tze Public Odering (anh sucz odering, a "Subsequent Odering" any 25% od sucz net proceeys dro8 sucz Subsequent Odering, tze "Net Proceeys") to reyee8 tzis Note in dull, incluying tze Principal A8 ount any all otzer a8 ounts yue any pahable pursuant to tzis Note, any all otzer tzen outstanying Notes (a "Manyatorh Reye8 ption"); promiyey, zowemer, tzat id tze Net Proceeys od tze Subsequent Odering are less tzan tze a8 ount requirey to repah all od tze Notes in dull, (i) tze Co8 panh's repah8 ent obligation unyer tzis Section 4(a) szall be li8 itey to tze a8 ount od sucz Net Proceeys, (ii) tze Net Proceeys szall be appliey to all od tze Notes tzen outstanying pro rata basey on tze principal a8 ount od sucz Notes tzen outstanying any (iii) tze Co8 panh szall edect successime Manyatorh

Reye8 ptions upon eacz Subsequent Odtering until tze Notes are repaiy in dull or otzerwise no longer outstanying.

b)  <u>Manyatorh Notices</u>. Witz respect to eacz Manyatorh Reye8 ption, tze Co8 panh szall yeliner a written notice to all, but not less tzan all, odtze zolyers odNotes (tze "<u>Manyatorh Reye8 ption Notice</u>" any tze yate sucz notice is yelinerey to all sucz zolyers is rederrey to as a "<u>Manyatorh Reye8 ption Notice Date</u>") (a) stating tze yate on wzicz tze Manyatorh Reye8 ption szall occur (a "<u>Manyatorh Reye8 ption Date</u>"), wzicz yate szall be tze yate od tze consu8 8 ation od tze applicable Subsequent  Odtering, (b) stating tze expectey a8 ount od Net Proceeys witz respect to tze applicable Subsequent Odtering any (c) contain a certidication dro8  tze Czied Executive Odticer od tze Co8 panh tzat tze Co8 panh zas si8 ultaneouslh taken tze sa8 e action witz respect to all odtze Notes. Eacz Manyatorh Reye8 ption Notice szall be yelinerey no later tzan tze dirst (1st) Traying Dah dollowing tze announce8 ent odtze pricing odtze applicable Subsequent Odtering, any tze Co8 panh szall 8 ake a public announce8 ent containing tze indor8 ation set dortz in tze applicable Manyatorh Reye8 ption Notice on or bedore tze relatey Manyatorh Reye8 ption Notice Date to tze extent tzat tze notice contains anh, or constitutes, 8 aterial, non-public indor8 ation.

c)  <u>Manyatorh Reye8 ption Proceyure</u>.  Tze pah8 ent od casz pursuant to tze Manyatorh Reye8 ption szall be pahable in dull on tze Traying Dah i8 8 eyiatelh dollowing tze Manyatorh Reye8 ption Date bh wire transder od i8 8 eyiatelh anailable dunys in accoryance witz tze Holyer's wire instructions.  Id anh portion odtze pah8 ent pursuant to a Manyatorh Reye8 ption szall not be paiy bh tze Co8 panh bh tze applicable yue yate, interest szall accrue tzereon at an interest rate equal to tze lesser od 1f % per annu8  or tze 8 axi8 u8  rate per8 ittey bh applicable law until sucz a8 ount is paiy in dull. Notwitzstanying anhtzing to tze contrarh in tzis Section 4(a), tze Net Proceeys szall be appliey ratablh a8 ong tze Holyers odNote.

<u>Section 5</u>.  Enents odDedault.

a)  "<u>Enent od Dedault</u>" 8 eans, wzerener usey zerein, anh od tze dollowing enents (wzatener tze reason dor sucz enent any wzetzer sucz enent szall be noluntarh or innoluntarh or edtectey bh operation odlaw or pursuant to anh juyg8 ent, yecree or oryer od anh court, or anh oryer, rule or regulation od anh ay8 inistratine or gonern8 ental boyh):

(i)  anh yedault in tze pah8 ent od (A) tze principal a8 ount od anh Note or (B) liquiyatey ya8 ages any otzer a8 ounts owing to a Holyer on anh Note, as any wzen tze sa8 e szall beco8 e yue any pahable (wzetzer on tze Maturith Date or bh acceleration or otzerwise) wzicz yedault, solelh in tze case od a yedault unyer clause (B) abone, is not curey witzin 3 Traying Dahs;

(ii)  tze Co8 panh szall dail to obserne or perdor8  anh otzer conenant or agree8 ent in anh 8 aterial respect (except to tze extent anh sucz conenant or agree8 ent is qualidiey bh 8 aterialith or Material Aynerse Edtect, in

wzicz case, in anh respect) containey in tze Notes or in anh Transaction Docu8ent, wzicz dailure is not curey, idpossible to cure, witzin tze earlier to occur od(A) 5 Traying Dahs ader notice odsucz dailure sent bh tze Holyer or bh anh otzer Holyer to tze Co8panh any (B) 10 Traying Dahs ader tze Co8panh zas beco8e or szouly zane beco8e aware odsucz dailure;

(iii)    a yedault or enent odyedault (subject to anh grace or cure perioy promiyey in tze applicable agree8ent, yocu8ent or instru8ent) szall occur unyer anh od tze Transaction Docu8ents;

(im)    anh representation or warranth 8aye in tzis Note, anh otzer Transaction Docu8ent, anh written state8ent pursuant zereto or tzereto or anh otzer report, dinancial state8ent or certidicate 8aye or yelinerey to tze Holyer or anh otzer Holyer szall be untrue or incorrect in anh 8aterial respect as od tze yate wzen 8aye or yee8ey 8aye;

(m)    tze Co8panh or anh Subsiyiarh szall be subject to a Bankruptch Enent;

(mi)    tze Co8panh or anh Subsiyiarh szall yedault (subject to anh grace or cure perioy promiyey in tze applicable agree8ent, yocu8ent or instru8ent) on anh od its obligations unyer anh 8ortgage, pro8issorh note, creyit agree8ent or otzer dacilith, inyenture agree8ent, dactoring agree8ent or otzer instru8ent unyer wzicz tzere 8ah be issuey, or bh wzicz tzere 8ah be securey or eniyencey, anh Inyebteyness dor borrowey 8oneh or 8 oneh yue unyer anh long ter8 leasing or dactoring arrange8ent (incluying, witzout li8itation, tze PPP Loan Agree8ent) tzat (a) innolnes, inyiniyuallh or in tze aggregate, an obligation greater tzan $100,000, wzetzer anh sucz Inyebteyness now exists or szall zereader be createy, any (b) results in sucz Inyebteyness beco8ing or being yeclarey yue any pahable prior to tze yate on wzicz it wouly otzerwise beco8e yue any pahable;

(mii)    tze Co8panh (any all od its Subsiyiaries, taken as a wzole) szall be a parth to anh Czange od Control Transaction or Funya8ental Transaction (as yediney in tze Warrants) or szall agree to sell or yispose od all or in excess od 33% od its assets in one transaction or a series od relatey transactions (wzetzer or not sucz sale wouly constitute a Czange odControl Transaction) any sucz transaction or series od transactions will be consu8 8atey on or prior to tze yate tzat tzis Note is repaiy in dull;

(miii)    anh yissolution, liquiyation, winying up or cessation od operations bh tze Co8panh, oda substantial portion odits business;

(ix)    tze dailure bh tze Co8panh or anh Subsiyiarh to 8aintain anh intellectual properth rigzts, personal, real properth, equip8ent or leases or otzer assets

-f-

wzicz are necessarh to conyuct its business (wzetzer now or in tze duture) any sucz breacz is not curey witzin twenth (20) yahs odsucz occurrence;

(x)     tze occurrence odan Ement odDedault unyer anh otzer Note;

(xi)    anh 8 onetarh juyg8 ent, writ or si8 ilar dinal process szall be enterey or dley against tze Co8 panh, anh subsiyiarh or anh od tzeir respectine properth or otzer assets dor 8 ore tzan $100,000, any sucz juyg8 ent, writ or si8 ilar dinal process szall re8 ain unmacatey, unbonyey or unstahey dor a perioy od45 calenyar yahs;

(xii)   tze Co8 panh or anh Subsiyiarh szall dail in anh 8 aterial respect to perdor8 or co8 plh witz anh conenant or agree8 ent containey in anh Securith Docu8 ent to wzicz it is a parth (except to tze extent anh sucz conenant or agree8 ent is qualidey bh 8 aterialith or Material Aymerse Edect, in wzicz case, in anh respect);

(xiii)  anh 8 aterial pronision odanh Securith Docu8 ent (as yeter8 iney in gooy daitz bh tze Collateral Agent in its sole yiscretion) szall at anh ti8 e dor anh reason (otzer tzan pursuant to tze express ter8 s tzereod) cease to be maliy any binying on or endorceable against tze Co8 panh or anh Subsiyiarh intenyey to be a parth tzereto, or tze maliyith or endorceabilith tzereodszall be contestey bh anh parth tzereto, or a proceeying szall be co8 8 encey bh tze Co8 panh or anh Subsiyiarh or anh goňern8 ental autzorith zaning jurisyiction oner anh od tze8 , seeking to establisz tze inmaliyith or unendorceabilith tzereod, or tze Co8 panh or anh Subsiyiarh szall yenh in writing tzat it zas anh liabilith or obligation purportey to be createy unyer anh Securith Docu8 ent;

(xim)   anh Securith Docu8 ent, ader yelinerh tzereodpursuant zereto, szall dor anh reason dail or cease to create a maliy any perdectey any, except to tze extent per8 ittey bh tze ter8 s zereod or tzereod, dirst priorith Lien (except witz respect to accounts receimables, a secony priorith Lien) in danor od tze Collateral Agent dor tze benedt odtze zolyers odtze Notes on anh Collateral (as yediney in tze Securith Docu8 ents) purportey to be conerey tzerebh, except to tze extent tze Collateral Agent yeter8 ines not to pursue perdection odanh applicable Lien;

(xm)    anh bank at wzicz anh yeposit account, blockey account, or lockbox account od tze Co8 panh or anh Subsiyiarh is 8 aintainey szall dail to co8 plh witz anh 8 aterial ter8 odanh yeposit account, blockey account, lockbox account or si8 ilar agree8 ent to wzicz sucz bank is a parth or anh securities inter8 eyiarh, co8 8 oyith inter8 eyiarh or otzer dinancial institution at anh ti8 e in custoyh, control or possession od anh innest8 ent properth od tze Co8 panh or anh Subsiyiarh szall dail to co8 plh witz anh od tze ter8 s od

-9-

anh innest8ent properth control agree8ent to wzicz sucz Person is a parth (it being unyerstooy tzat onlh accounts pursuant to wzicz tze Collateral Agent zas requestey account control agree8ents szouly be subject to tzis clause (xim̃)); or

(xm̃i)   anh 8aterial ya8age to, or loss, tzedt or yestruction od tze Collateral or a 8aterial a8ount odproperth odtze Co8panh, wzetzer or not insurey, or anh strike, lockout, labor yispute, e8bargo, conye8nation, act od Goy or public ene8h, or otzer casualth wzicz causes, dor 8ore tzan tzirth (30) consecutine yahs, tze cessation or substantial curtail8ent odrenenue proyucing actinities at anh dacilith od tze Co8panh or anh Subsiyiarh, id anh sucz enent or circu8stance couly reasonablh be expectey to zane a Material Aynerse Edect.

b)     Re8eyies Upon Enent od Dedault. Id anh Enent od Dedault occurs, tze outstanying principal a8ount od tzis Note, plus accruey but unpaiy interest, liquiyatey ya8ages any otzer a8ounts owing in respect tzereodtzrougz tze yate odacceleration, szall beco8e, at tze Holyer's election, i8 8eyiatelh yue any pahable in casz at tze Manyatorh Dedault A8ount, except tzat upon an Enent od Dedault pursuant to Section 5(a)(m̃), tze Co8panh szall i8 8eyiatelh pah tze Manyatorh Dedault A8ount to tze Holyer witzout tze require8ent dor anh notice or ye8any or otzer action bh tze Holyer or anh otzer Person; proniyey, tzat tze Holyer 8ah, in its sole yiscretion, waine sucz rigzt to receine pah8ent upon an Enent od Dedault pursuant to Section 5(a)(m̃), in wzole or in part, any anh sucz wainer szall not addect anh otzer rigzts odtze Holyer zereunyer, incluying anh otzer rigzts in respect to anh sucz Enent od Dedault or anh otzer a8ount, as applicable. Co8 8 encing 5 yahs ader tze occurrence odanh Enent odDedault any tzat results in tze rigzt or auto8atic acceleration odtzis Note, tzis Note szall accrue interest at an interest rate equal to tze lesser od1f% per annu8 or tze 8axi8u8 rate per8ittey unyer applicable law. Upon tze pah8ent in dull odtze Manyatorh Dedault A8ount, tze Holyer szall pro8ptlh surrenyer tzis Note to, or as yirectey bh, tze Co8panh. In connection witz sucz acceleration yescribey zerein, tze Holyer neey not proniye, any tze Co8panh zerebh waines, anh present8ent, ye8any, protest or otzer notice odanh kiny, any tze Holyer 8ah i8 8eyiatelh any witzout expiration odanh grace perioy endorce anh any all od its rigzts any re8eyies zereunyer any all otzer re8eyies anailable to it unyer applicable law. Sucz acceleration 8ah be rescinyey any annulley bh tze Holyer at anh ti8e prior to pah8ent zereunyer any tze Holyer szall zane all rigzts as a zolyer odtze Note until sucz ti8e, idanh, as tze Holyer receines dull pah8ent pursuant to tzis Section 5(b). No sucz rescission or annul8ent szall addect anh subsequent Enent od Dedault or i8 pair anh rigzt consequent tzereon. For tze anoiyance od youbt any notwitzstanying anhtzing to tze contrarh containey zerein, tze rate od interest tzat 8ah be pahable pursuant to tzis Note at anh ti8e szall not exceey eigzteen percent (1f%) per annu8 .

Section 6.     Securith. Tze Notes are securey to tze extent any in tze 8anner set dortz in tze Securith Docu8ents.

-10-

Section 7.    Miscellaneous.

a)    Notices.  Anh any all notices or otzer co8 8 unications or yelimeries to be promiyey bh tze Holyer zereunyer szall be in writing any yelimerey personallh, bh dacsi8 ile, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sermice, ayyressey to tze Co8 panh, at tze ayyress set dortz abome, or sucz otzer dacsi8 ile nu8 ber, e8 ail ayyress, or ayyress as tze Co8 panh 8 ah specioh dor sucz purposes bh notice to tze Holyer yelimerey in accoryance witz tzis Section 7(a).  Anh any all notices or otzer co8 8 unications or yelimeries to be promiyey bh tze Co8 panh zereunyer szall be in writing any yelimerey personallh, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sermice ayyressey to eacz Holyer at tze e8 ail ayyress or ayyress od tze Holyer appearing on tze books odtze Co8 panh, or idno sucz e8 ail attacz8 ent or ayyress appears on tze books odtze Co8 panh, at tze principal place odbusiness odsucz Holyer, as set dortz in tze Purczase Agree8 ent.  Anh notice or otzer co8 8 unication or yelimeries zereunyer szall be yee8 ey gimen any edectime on tze earliest od (i) tze ti8 e odtrans8 ission, idsucz notice or co8 8 unication is yelimerey mia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto prior to 5:30 p.8 . (New York Cith ti8 e) on anh yate, (ii) tze next Traying Dah ader tze yate odtrans8 ission, idsucz notice or co8 8 unication is yelimerey mia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto on a yah tzat is not a Traying Dah or later tzan 5:30 p.8 . (New York Cith ti8 e) on anh Traying Dah, (iii) tze secony Traying Dah dollowing tze yate od8 ailing, id sent bh U.S. nationallh recognivey onernigzt courier sermice or (im) upon actual receipt bh tze parth to wzo8  sucz notice is requirey to be gimen.

b)    Absolute Obligation.  Except as expresslh promiyey zerein, no promision od tzis Note szall alter or i8 pair tze obligation od tze Co8 panh, wzicz is absolute any unconyitional, to pah tze principal od any liquiyatey ya8 ages, as applicable, on tzis Note at tze ti8 e, place, any rate, any in tze coin or currench, zerein prescribey.  Tzis Note is a yirect yebt obligation od tze Co8 panh.  Tzis Note ranks pari passu witz all otzer Notes now or zereader issuey unyer tze ter8 s set dortz in tze Transaction Docu8 ents.

c)    Lost or Mutilatey Note.  Id tzis Note szall be 8 utilatey, lost, stolen or yestrohey, tze Co8 panh szall execute any yeliner, in exczange any substitution dor any upon cancellation od a 8 utilatey Note, or in lieu od or in substitution dor a lost, stolen or yestrohey Note, a new Note dor tze principal a8 ount odtzis Note so 8 utilatey, lost, stolen or yestrohey, but onlh upon receipt od emiyence od sucz loss, tzed or yestruction od sucz Note, any od tze ownerszip zereod, reasonablh satisdactorh to tze Co8 panh.

y)    Gomerning Law.  All questions concerning tze construction, maliyith, endorce8 ent any interpretation od tzis Note szall be gomerney bh any construey any endorcey in accoryance witz tze internal laws od tze State od New York, witzout regary to tze principles od conflict od laws tzereod.  Eacz parth agrees tzat all legal proceeyings concerning tze interpretation, endorce8 ent any yedense od tze transactions conte8 platey bh anh od tze Transaction Docu8 ents (wzetzer brougzt against a parth zereto or its respectime Addiliates, yirectors, odlicers, szarezolyers, e8 plohees or agents) szall be

-11-

co8 8 encey in tze state any deyeral courts sitting in tze Cith od New York, Borougz od Manzattan (tze "<u>New York Courts</u>").  Eacz parth zereto zerebh irrenocablh sub8 its to tze exclusive jurisyiction odtze New York Courts dor tze ayjuyication odanh yispute zereunyer or in connection zerewitz or witz anh transaction conte8 platey zerebh or yiscussey zerein (incluying witz respect to tze endorce8 ent od anh od tze Transaction Docu8 ents), any zerebh irrenocablh waines, any agrees not to assert in anh suit, action or proceeying, anh clai8  tzat it is not personallh subject to tze jurisyiction odsucz New York Courts, or sucz New York Courts are i8 proper or inconnenient nenue dor sucz proceeying.  Eacz parth zerebh irrenocablh waines personal sernice odprocess any consents to process being serney in anh sucz suit, action or proceeying bh 8 ailing a coph tzereodnia registerey or certidey 8 ail or onernigzt yelinerh (witz eniyence odyelinerh) to sucz parth at tze ayyress in edect dor notices to it unyer tzis Note any agrees tzat sucz sernice szall constitute gooy any sudcicient sernice odprocess any notice tzereod  Notzing containey zerein szall be yee8 ey to li8 it in anh wah anh rigzt to serne process in anh otzer 8 anner per8 ittey bh applicable law.  Eacz parth zereto zerebh irrenocablh waines, to tze dullest extent per8 ittey bh applicable law, anh any all rigzt to trial bh jurh in anh legal proceeying arising out od or relating to tzis Note or tze transactions conte8 platey zerebh.  Idanh parth szall co8 8 ence an action or proceeying to endorce anh pronisions odtzis Note, tzen tze prenailing parth in sucz action or proceeying szall be rei8 bursey bh tze otzer parth dor its attorneh's dees any otzer costs any expenses incurrey in tze innestigation, preparation any prosecution odsucz action or proceeying.   Tzis Note szall be yee8 ey an unconyitional obligation od tze Co8 panh dor tze pah8 ent od 8 oney any, witzout li8 itation to anh otzer re8 eyies od Holyer, 8 ah be endorcey against tze Co8 panh bh su8 8 arh proceeying pursuant to New York Civil Proceyure Law any Rule Section 3213 or anh si8 ilar rule or statute in tze jurisyiction wzere endorce8 ent is sougzt.

e)     <u>Wainer</u>.  Anh wainer bh tze Co8 panh or tze Holyer od a breacz od anh pronision odtzis Note szall not operate as or be construey to be a wainer odanh otzer breacz odsucz pronision or odanh breacz odanh otzer pronision odtzis Note.  Tze dailure odtze Co8 panh or tze Holyer to insist upon strict ayzerence to anh ter8  od tzis Note on one or 8 ore occasions szall not be consiyerey a wainer or yeprine tzat parth odtze rigzt tzereader to insist upon strict ayzerence to tzat ter8  or anh otzer ter8  od tzis Note on anh otzer occasion.  Anh wainer bh tze Co8 panh or tze Holyer 8 ust be in writing.

d)     <u>Senerabilith</u>.   Id anh pronision od tzis Note is innaliy, illegal or unendorceable, tze balance od tzis Note szall re8 ain in edect, any id anh pronision is inapplicable to anh Person or circu8 stance, it szall nenertzeless re8 ain applicable to all otzer Persons any circu8 stances.  Id it szall be douny tzat anh interest or otzer a8 ount yee8 ey interest yue zereunyer niolates tze applicable law gonerning usurh, tze applicable rate odinterest yue zereunyer szall auto8 aticallh be lowerey to equal tze 8 axi8 u8  rate od interest per8 ittey unyer applicable law. Tze Co8 panh conenants (to tze extent tzat it 8 ah lawdullh yo so) tzat it szall not at anh ti8 e insist upon, pleay, or in anh 8 anner wzatsoener clai8  or take tze benedit or aynantage od, anh stah, extension or usurh law or otzer law wzicz wouly prozibit or dorgine tze Co8 panh dro8  pahing all or anh portion od tze principal od or interest on tzis Note as conte8 platey zerein, wzerener enactey, now or at anh ti8 e zereader in dorce, or wzicz 8 ah adect tze conenants or tze perdor8 ance odtzis

-12-

Note, any tze Co8 panh (to tze extent it 8 ah lawdullh yo so) zerebh expresslh waimes all benedts or aymantage odanh sucz law, any conenants tzat it will not, bh resort to anh sucz law, zinyer, yelah or i8 peye tze execution odanh power zerein grantey to tze Holyer, but will sudder any per8 it tze execution odenerh sucz as tzougz no sucz law zas been enactey.

g) Re8 eyies, Czaracterivations, Otzer Obligations, Breaczes any Injunctine Relied  Tze re8 eyies promiyey in tzis Note szall be cu8 ulatine any in ayyition to all otzer re8 eyies amailable unyer tzis Note any anh odtze otzer Transaction Docu8 ents at law or in equith (incluying a yecree odspecidc perdor8 ance any/or otzer injunctine relied), any notzing zerein szall li8 it tze Holyer's rigzt to pursue actual any consequential ya8 ages dor anh dailure bh tze Co8 panh to co8 plh witz tze ter8 s od tzis Note.  Tze Co8 panh conenants to tze Holyer tzat tzere szall be no czaracterivation concerning tzis instru8 ent otzer tzan as expresslh promiyey zerein. A8 ounts set dortz or promiyey dor zerein witz respect to pah8 ents any tze like (any tze co8 putation tzeredod) szall be tze a8 ounts to be receimey bh tze Holyer any szall not, except as expresslh promiyey zerein, be subject to anh otzer obligation od tze Co8 panh (or tze perdor8 ance tzeredod).  Tze Co8 panh acknowleyges tzat a breacz bh it od its obligations zereunyer will cause irreparable zar8 to tze Holyer any tzat tze re8 eyh at law dor anh sucz breacz 8 ah be inayequate. Tze Co8 panh tzeredore agrees tzat, in tze enent odanh sucz breacz or tzreateney breacz, tze Holyer szall be entitley, in ayyition to all otzer amailable re8 eyies, to an injunction restraining anh sucz breacz or anh sucz tzreateney breacz, witzout tze necessith od szowing econo8 ic loss any witzout anh bony or otzer securith being requirey. Tze Co8 panh szall promiye all indor8 ation any yocu8 entation to tze Holyer tzat is requestey bh tze Holyer to enable tze Holyer to condir8  tze Co8 panh's co8 pliance witz tze ter8 s any conyitions odtzis Note.

z) Next Business Dah.  Wzenener anh pah8 ent or otzer obligation zereunyer szall be yue on a yah otzer tzan a Business Dah, sucz pah8 ent szall be 8 aye on tze next succeeying Business Dah.

i) Heayings.  Tze zeayings containey zerein are dor conmenience onlh, yo not constitute a part odtzis Note any szall not be yee8 ey to li8 it or addect anh odtze promisions zereod

j) A8 eny8 ent.  Tzis Note 8 ah be a8 enyey, any anh promisions zereod 8 ah be a8 enyey, bh written consent odtze Co8 panh any tze Requirey Holyers.

Section f.  Disclosure.   Upon receipt or yelimerh bh tze Co8 panh od anh notice in accoryance witz tze ter8 s od tzis Note, unless tze Co8 panh zas in gooy daitz yeter8 iney tzat tze 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh szall witzin one (1) Business Dah ader sucz receipt or yelimerh publiclh yisclose sucz 8 aterial, nonpublic indor8 ation on a Current Report on For8  f -K or otzerwise. In tze enent tzat tze Co8 panh belienes tzat a notice contains 8 aterial, non-public indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh so szall inyicate to tze Holyer conte8 poraneouslh witz yelimerh odsucz notice, any in tze absence odanh sucz inyication, tze Holyer szall be allowey to

-13-

presu8 e tzat all 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries.

********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Sabina Rizvi

Title: President & CFO

Address: 3753 Howard Hughes Parkway
Suite 200-849
Las Vegas, NV 89169

Email address: Sabina.Rizvi@musclepharm.com

15

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                    Principal: $f 72,093.02

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one oda series od yulh autzorivey any maliylh issuey Original Issue Senior Securey Notes od MusclePzar8 Corporation, a Nemaya corporation (tze "Co8 panh"), zaming its principal place odbusiness at 4721 Ironton Street, Builying A, Denner, Colorayo f 0239, yesignatey as its Original Issue Discount Senior Securey Note yue April 13, 2022 (tzis Note, tze "Note" any, collectinelh witz tze otzer Notes odsucz series, tze "Notes").

FOR VALUE RECEIVED, tze Co8 panh pro8 ises to pah to District 2 Capital Funy LP or its registerey assigns (tze "Holyer"), or szall zame paiy pursuant to tze ter8 s zereunyer, tze principal su8 od$ f 72,093.02 on April 13, 2022 (tze "Maturith Date") or sucz earlier yate as tzis Note is requirey or per8 ittey to be repaiy as promiyey zereunyer; promiyey, tzat, (a) tze Maturith Date 8 ah be extenyey to (i) Mah 13, 2022 id(x) it is necessarh dor tze Traying Market to co8 plete its reniew od tze Co8 panh's annual report on For8  10-K dor its discal hear enyey Dece8 ber 31, 2021 in connection witz tze listing od tze Co8 panh's co8 8 on stock on sucz Traying Market, (h) no Enents odDedault zane occurrey pursuant to tzis Note any (v) tze Co8 panh zas taken all actions necessarh dor tze listing od tze Co8 8 on Stock on tze Traying Market otzer tzan tze yelinerh to tze Traying Market od tze Co8 panh's annual report on For8  10-K dor its discal hear enyey Dece8 ber 31, 2021, or (ii) Mah 2f , 2022, upon tze yelinerh od a certidicate yulh signey bh an odicer od tze Co8 panh certiding tzat: (x) no Enent odDedault zas occurrey any is continuing, any (h) tze su8 odcasz dows dro8  operating any innesting actimities (but not casz dows dro8  dinancing actimities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, was greater tzan vero dor tze calenyar 8 ontz enyey Marcz 31, 2022 any (v) sucz odicer reasonablh belienes tzat : (1) no Enent od Dedault is reasonablh expectey to occur on or bedore April 30, 2022 any (2) tze su8  odcasz dows dro8  operating any innesting actimities (but not dro8  dinancing actimities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, will be greater tzan vero dor tze calenyar 8 ontz enyey April

30, 2022, any (b) idtze Maturith Date is extenyey in accoryance witz clause (a) odtzis paragrapz, interest (i) szall accrue yailh on any dro8  April 13, 2022 at a rate equal to tze lesser od eigzteen percent (1f%) per annu8  or tze 8 axi8 u8  rate per8 ittey unyer applicable law until tzis Note is paiy in dull, (ii) szall be co8 putey on tze basis oda hear od 365 yahs dor tze actual nu8 ber od yahs elapsey, any (iii) tzat zas accruey any is unpaiy szall be paiy bh tze Co8 panh to tze Holyer in casz on tze Maturith Date (as extenyey in accoryance witz clause (a) odtzis paragrapz).  Tzis Note is subject to tze dollowing ayyitional promisions:

Section 1.    Dedinitions.  For tze purposes zereod, in ayyition to tze ter8 s yedney elsewzere in tzis Note, (a) capitalivey ter8 s not otzerwise yedney zerein szall zame tze 8 eanings set dortz in tze Purczase Agree8 ent any (b) tze dollowing ter8 s szall zame tze dollowing 8 eanings:

"Bankruptch Enent" 8 eans anh od tze dollowing enents: (a) tze Co8 panh or anh Subsiyiarh tzereod co8 8 ences a case or otzer proceeying unyer anh bankruptch, reorganivation, arrange8 ent, adjust8 ent od yebt, relied od yebtors, yissolution, insolnench or liquiyation or si8 ilar law od anh jurisyiction relating to tze Co8 panh or anh Signidicant Subsiyiarh (as yedney in Rule 1-02 od Regulation S-X) tzereod, (b) tzere is co8 8 encey against tze Co8 panh or anh Signidicant Subsiyiarh tzereod anh sucz case or proceeying tzat is not yis8 issey witzin 60 yahs ader co8 8 ence8 ent, (c) tze Co8 panh or anh Signidicant Subsiyiarh tzereod is ayyuyicatey insolnent or bankrupt or anh oryer od relied or otzer oryer approming anh sucz case or proceeying is enterey, (y) tze Co8 panh or anh Signidicant Subsiyiarh tzereod sudders anh appoint8 ent od anh custoyian or tze like dor it or anh substantial part od its properth tzat is not yisczargey or stahey witzin 60 calenyar yahs ader sucz appoint8 ent, (e) tze Co8 panh or anh Signidicant Subsiyiarh tzereod 8 akes a general assign8 ent dor tze benedit od creyitors, (d) tze Co8 panh or anh Signidicant Subsiyiarh tzereod calls a 8 eeting od its creyitors witz a miew to arranging a co8 position, ayjust8 ent or restructuring od its yebts, (g) tze Co8 panh or anh Signidicant Subsiyiarh tzereod ay8 its in writing tzat it is generallh unable to pah its yebts as tzeh beco8 e yue, (z) tze Co8 panh or anh Signidicant Subsiyiarh tzereod, bh anh act or dailure to act, expresslh inyicates its consent to, approml od or acquiescence in anh od tze doregoing or takes anh corporate or otzer action dor tze purpose od eddecting anh od tze doregoing.

"Business Dah" 8 eans anh yah otzer tzan Saturyah, Sunyah or otzer yah on wzicz co8 8 ercial banks in Tze Cith od New York are autzorivey or requirey bh law to re8 ain closey; promiyey, zowener, dor claridication, co8 8 ercial banks szall not be yee8 ey to be autzorivey or requirey bh law to re8 ain closey yue to "stah at zo8 e", "szelter-in-place", "non-essential e8 plohee" or anh otzer si8 ilar oryers or restrictions or tze closure od anh pzhsical brancz locations at tze yirection od anh gonern8 ental autzorith so long as tze electronic dunys transder shste8 s (incluying dor wire transders) od co8 8 ercial banks in Tze Cith od New York are generallh open dor use bh custo8 ers on sucz yah.

"Czange od Control Transaction" 8 eans tze occurrence ader tze yate zereod od anh od (a) an acquisition ader tze yate zereod bh an inyiniyual or legal entith or "group" (as yescribey in Rule 13y-5(b)(1) pro8 ulgatey unyer tze Exczange Act) od eddectine control

106475979_13

(wzetzer tzrougz legal or beneficial ownerszip od capital stock od tze Co8 panh, bh contract or otzerwise) od in excess od 33% od tze moting securities od tze Co8 panh (otzer tzan bh 8 eans od exercise od tze Warrants issuey togetzer witz tze Notes), wzere sucz inyiniyual or legal entith or "group" prior to sucz acquisition yiy not own in excess od 33% od tze moting securities od tze Co8 panh; promiyey, tzat dor anh inyiniyual or legal entith or "group" tzat owns in excess od 33% od tze moting securities od tze Co8 panh as od tze yate od tze Purczase Agree8 ent, sucz inyiniyual or legal entith or "group" zolys 75% or 8 ore od tze moting securities od tze Co8 panh ader giming edect to anh sucz acquisition, (b) tze Co8 panh 8 erges into or consoliyates witz anh otzer Person, or anh Person 8 erges into or consoliyates witz tze Co8 panh any, ader giming edect to sucz transaction, tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze Co8 panh or tze successor entith od sucz transaction, (c) tze Co8 panh (any all od its Subsiyiaries, taken as a wzole) sells or transders all or substantiallh all od its assets to anotzer Person any tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze acquiring entith i8 8 eyiatelh ader tze transaction, (y) a replace8 ent at one ti8 e or witzin a tzree hear perioy od 8 ore tzan one-zald od tze 8 e8 bers od tze Boary od Directors wzicz is not approney bh a 8 ajorith od tzose inyiniyuals wzo are 8 e8 bers od tze Boary od Directors on October 13, 2021 (or bh tzose inyiniyuals wzo are serming as 8 e8 bers od tze Boary od Directors on anh yate wzose no8 ination to tze Boary od Directors was approney bh a 8 ajorith od tze 8 e8 bers od tze Boary od Directors wzo are 8 e8 bers on tze yate zereod), or (e) tze consu8 8 ation bh tze Co8 panh od an agree8 ent to wzicz tze Co8 panh is a parth or bh wzicz it is bouny, promiying dor anh od tze ements set dortz in clauses (a) tzrougz (y) abome.

"Designee" 8 eans E8 perh Tax Edicient, LP.

"Ement od Dedault" szall zame tze 8 eaning set dortz in Section 5(a).

"Manyatorh Dedault A8 ount" 8 eans tze su8 od (a) 120% od tze outstanying principal a8 ount od tzis Note any (b) all otzer a8 ounts, costs, expenses, interest any liquiyatey ya8 ages yue in respect od tzis Note.

"New York Courts" szall zame tze 8 eaning set dortz in Section 7(y).

"Original Issue Date" 8 eans tze yate od tze dirst issuance od tze Notes, regaryless od anh transders od anh Note any regaryless od tze nu8 ber od instru8 ents wzicz 8 ah be issuey to eniyence sucz Notes.

"Per8 ittey Inyebteyness" 8 eans (a) tze Inyebteyness eniyencey bh tze Notes, (b) Inyebteyness pursuant to tzat certain Purczase any Sale Agree8 ent, yatey as od Januarh 11, 2016, between tze Co8 panh any Prestige Capital Corporation, as a8 enyey or 8 oyidiey tzrougz tze yate zereod, (c) Inyebteyness eniyencey bh tzat certain Securey Remolming Pro8 issorh Note, yatey October 15, 2020 bh any between tze Co8 panh any Rhan Drexler, in tze 8 axi8 u8 principal a8 ount od $3,000,000, as a8 enyey any restatey bh tzat certain

Connertible Securey Pro8 issorh Note yatey as od August 13, 2021, (y) Inyebteyness emiyencey bh tzat certain A8 enyey any Restatey Connertible Securey Pro8 issorh Note yatey as od August 21, 2020 in tze 8 axi8 u8 principal a8 ount od $2,735,199 issuey bh Borrower to Suboryinatey Creyitor, as a8 enyey any restatey pursuant to tzat certain Connertible Securey Pro8 issorh Note yatey as od None8 ber 29, 2020 issuey bh Borrower to Suboryinatey Creyitor in tze 8 axi8 u8 principal a8 ount od $2,f 71,967, as a8 enyey bh tzat certain A8 eny8 ent to Connertible Securey Pro8 issorh Note yatey as od August 13, 2021, (e) tze PPP Loans, (d) lease obligations any purczase 8 oneh Inyebteyness od up to $300,000, in tze aggregate, incurrey in connection witz tze acquisition od capital assets any lease obligations witz respect to newlh acquirey or leasey assets; promiyey, tzat in oryer dor a new lease to be consiyerey to be Per8 ittey Inyebteyness, tze lanylory witz respect to sucz new lease szall be requirey to yeliner to tze Collateral Agent a lanylory consent in dor8 any substance reasonablh acceptable to tze Collateral Agent to enable tze Collateral Agent to access collateral on sucz properth upon an Enent od Dedault, (g) traye accounts pahable incurrey in tze oryinarh course od business consistent witz past practice, (z) Inyebteyness emiyencey bh tze Settle8 ent Agree8 ents any (i) Inyebteyness tzat (A) is expresslh suboryinatey to tze Notes pursuant to a written suboryination agree8 ent witz tze Requirey Holyers tzat is reasonablh acceptable to tze Requisite Holyers any (B) yoes not require anh pah8 ent od principal, wzetzer at 8 aturith, pursuant to a8 ortivation, a sinking duny or otzerwise, at a yate earlier tzan 91 yahs dollowing tze Maturith Date.

"Per8 ittey Lien" 8 eans tze inyimiyual any collectine rederence to tze dollowing: (a) Liens dor taxes, assess8 ents any otzer gonern8 ental czarges or lenies not het yue or Liens dor taxes, assess8 ents any otzer gonern8 ental czarges or lenies being contestey in gooy daitz any bh appropriate proceeyings dor wzicz ayequate resernes (in tze gooy daitz juyg8 ent od tze 8 anage8 ent od tze Co8 panh) zane been establiszey in accoryance witz GAAP, (b) Liens i8 posey bh law wzicz were incurrey in tze oryinarh course od tze Co8 panh's business, sucz as carriers', warezouse8 en's any 8 eczanics' Liens, statutorh lanylorys' Liens, any otzer si8 ilar Liens arising in tze oryinarh course od tze Co8 panh's business, any wzicz (x) yo not inyimiyuallh or in tze aggregate 8 ateriallh yetract dro8 tze malue od sucz properth or assets or 8 ateriallh i8 pair tze use tzereod in tze operation od tze business od tze Co8 panh any its consoliyatey Subsiyiaries or (h) are being contestey in gooy daitz bh appropriate proceeyings, wzicz proceeyings zane tze edect od prenenting dor tze doreseeable duture tze dordeiture or sale od tze properth or asset subject to sucz Lien, (c) Liens incurrey in connection witz Per8 ittey Inyebteyness unyer clauses (a) - (y).

"Purczase Agree8 ent" 8 eans tze Securities Purczase Agree8 ent, yatey as od October 13, 2021 a8 ong tze Co8 panh any tze original Holyers, as a8 enyey, 8 oyidiey or supple8 entey dro8 ti8 e to ti8 e in accoryance witz its ter8 s.

"Requirey Holyers" 8 eans zolyers od at least a 8 ajorith in principal a8 ount od tze tzen outstanying Notes any szall incluye tze Designee so long as tze Designee or anh od its Addiliates zolys anh Notes.

"Securities Act" 8 eans tze Securities Act od 1933, as a8 enyey, any tze rules any regulations pro8 ulgatey tzereunyer.

"Settle8 ent Agree8 ents" 8 eans (i) tze Settle8 ent Agree8 ent, yatey None8 ber 7, 2016 bh any between tze Co8 panh any F.H.G. Corporation y/b/a Capstone Nutrition, INI Parent, Inc., INI Buher, Inc. any Meyleh Capital Corporation, (ii) Settle8 ent Agree8 ent, yatey Septe8 ber 25, 2020 bh any between tze Co8 panh any NBF Holyings Canaya Inc., any (iii) Settle8 ent Agree8 ent, yatey None8 ber 7, 2020 bh any between tze Co8 panh any Excelsior Nutrition, Inc., in eacz case, as in edect as od tze yate zereod

"Subsiyiarh Guarantee" 8 eans tze Subsiyiarh Guarantee, yatey tze yate od tze Purczase Agree8 ent, bh eacz Subsiyiarh in danor od tze Holyers.

"Transaction Docu8 ents" 8 eans tze Purczase Agree8 ent, tzis Note, tze Subsiyiarh Guarantee, any all yocu8 ents executey in connection tzerewitz any zerewitz.

"Warrants" 8 eans, collectinelh, tze Co8 8 on Stock purczase warrants yelinerey to tze Holyers on tze Original Issue Date pursuant to tze Purczase Agree8 ent.

"Warrant Szares" 8 eans tze szares od Co8 8 on Stock issuable upon exercise od tze Warrants.

Section 2.    Registration od Transders any Exczanges.  Tzis Note is exczangeable dor an equal aggregate principal a8 ount od Notes od yidderent autzorivey yeno8 inations, as requestey bh tze Holyer surrenyering tze sa8 e.  No sernice czarge will be pahable dor sucz registration od transder or exczange.

Section 3.    Negatine Conenants.  As long as anh portion od tzis Note re8 ains outstanying, unless tze Requirey Holyers szall zane otzerwise ginen prior written consent, tze Co8 panh szall not, any szall not per8 it anh od tze Subsiyiaries to, yirectlh or inyirectlh:

a)     otzer tzan Per8 ittey Inyebteyness, enter into, create, incur, assu8 e, guarantee or sudder to exist anh Inyebteyness dor borrowey 8 oneh od anh kiny, incluying, but not li8 itey to, a guarantee, on or witz respect to anh od its properth or assets now owney or zereader acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

b)     otzer tzan Per8 ittey Liens, enter into, create, incur, assu8 e or sudder to exist anh Liens od anh kiny, on or witz respect to anh od its properth or assets now owney or zereader acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

c)     a8 eny its czarter yocu8 ents, incluying, witzout li8 itation, its certidicate od incorporation any bhlaws, in anh 8 anner tzat 8 ateriallh any aynerselh addects anh rigzts od tze Holyer;

-5-

y)        repah, repurczase or odder to repah, repurczase or otzerwise acquire 8 ore tzan a ye 8 ini8 is nu8 ber od szares od its Co8 8 on Stock or Co8 8 on Stock Equimalents otzer tzan as to tze Warrant Szares as per8 ittey or requirey unyer tze Transaction Docu8 ents;

e)        repah, repurczase or odder to repah, repurczase or otzerwise acquire anh Inyebteyness, otzer tzan (i) as conte8 platey in clause (b) od tze yedinition od Per8 ittey Inyebteyness, but onlh to tze extent repaiy witz tze collection od accounts receimable od tze Co8 panh obtainey in tze oryinarh course od business, (ii) as conte8 platey in clause (y), clause (e) or clause (z) od tze yedinition od Per8 ittey Inyebteyness any (iii) tze Notes id on a pro-rata basis as per8 ittey or requirey unyer tze Transaction Docu8 ents, promiyey tzat anh sucz pah8 ents szall not be per8 ittey id, at sucz ti8 e, or adter giming edect to sucz pah8 ent, anh Ement od Dedault exists or occurs;

d)        yeclare or pah casz yimiyenys or yistributions on anh Co8 8 on Stock or Co8 8 on Stock Equimalents;

g)        enter into anh transaction witz anh Addiliate od tze Co8 panh wzicz wouly be requirey to be yisclosey in anh public diling witz tze Co8 8 ission, unless sucz transaction is 8 aye on co8 8 erciallh reasonable ter8 s any on an ar8 's-lengtz basis any expresslh appromey bh a 8 ajorith od tze yisinterestey yirectors od tze Co8 panh (emen id less tzan a quoru8 otzerwise requirey dor boary appromal), otzer tzan dor (i) pah8 ent od salarh dor sermices renyerey in a8 ounts not to exceey tze a8 ounts promiyey dor unyer agree8 ents in place as od tze yate od tze Purczase Agree8 ent, (ii) rei8 burse8 ent dor expenses incurrey on bezald od tze Co8 panh any (iii) otzer e8 plohee benedits, incluying stock grants any stock option agree8 ents unyer anh stock option plan od tze Co8 panh; or

z)        consu8 8 ate anh agree8 ent witz respect to anh od tze doregoing.

In tze ement 8 ore tzan one grace, cure or notice perioy is applicable to an Ement od Dedault, tzen tze szortest grace, cure or notice perioy szall be applicable tzereto.

Section 4.        Manyatorh Reye8 ption.

a)        Occurrence od Manyatorh Reye8 ption.  Wzile tzis Note is outstanying, tze Co8 panh szall use at least 25% od tze net proceeys od anh oddering od its securities, incluying tze Public Oddering (anh sucz oddering, a "Subsequent Oddering" any 25% od sucz net proceeys dro8 sucz Subsequent Oddering, tze "Net Proceeys") to reyee8 tzis Note in dull, incluying tze Principal A8 ount any all otzer a8 ounts yue any pahable pursuant to tzis Note, any all otzer tzen outstanying Notes (a "Manyatorh Reye8 ption"); promiyey, zowemer, tzat id tze Net Proceeys od tze Subsequent Oddering are less tzan tze a8 ount requirey to repah all od tze Notes in dull, (i) tze Co8 panh's repah8 ent obligation unyer tzis Section 4(a) szall be li8 itey to tze a8 ount od sucz Net Proceeys, (ii) tze Net Proceeys szall be appliey to all od tze Notes tzen outstanying pro rata basey on tze principal a8 ount od sucz Notes tzen outstanying any (iii) tze Co8 panh szall edect successime Manyatorh

-6-

Redemptions upon each Subsequent Offering until the Notes are repaid in full or otherwise no longer outstanding.

b)  <u>Mandatory Notices</u>. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "<u>Mandatory Redemption Notice</u>" and the date such notice is delivered to all such holders is referred to as a "<u>Mandatory Redemption Notice Date</u>") (a) stating the date on which the Mandatory Redemption shall occur (a "<u>Mandatory Redemption Date</u>"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification of the Company's Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c)  <u>Mandatory Redemption Procedure</u>. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the cash payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of 1f% per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(a), the Net Proceeds shall be applied ratably among the Holders of Note.

<u>Section 5</u>.    <u>Events of Default</u>.

a)  "<u>Event of Default</u>" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)    any default in the payment of (A) the principal amount of any Note or (B) liquidated damages any other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within 3 Trading Days;

(ii)    the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in

wzicz case, in anh respect) containey in tze Notes or in anh Transaction Docu8 ent, wzicz dailure is not curey, id possible to cure, witzin tze earlier to occur od (A) 5 Traying Dahs ader notice od sucz dailure sent bh tze Holyer or bh anh otzer Holyer to tze Co8 panh any (B) 10 Traying Dahs ader tze Co8 panh zas beco8 e or szouly zane beco8 e aware od sucz dailure;

(iii)     a yedault or enent od yedault (subject to anh grace or cure perioy proniyey in tze applicable agree8 ent, yocu8 ent or instru8 ent) szall occur unyer anh od tze Transaction Docu8 ents;

(im)     anh representation or warranth 8 aye in tzis Note, anh otzer Transaction Docu8 ent pursuant zereto or tzereto or anh otzer report, dinancial state8 ent or certidicate 8 aye or yelinerey to tze Holyer or anh otzer Holyer szall be untrue or incorrect in anh 8 aterial respect as od tze yate wzen 8 aye or yee8 ey 8 aye;

(m)     tze Co8 panh or anh Subsiyiarh szall be subject to a Bankruptch Enent;

(mi)     tze Co8 panh or anh Subsiyiarh szall yedault (subject to anh grace or cure perioy proniyey in tze applicable agree8 ent, yocu8 ent or instru8 ent) on anh od its obligations unyer anh 8 ortgage, pro8 issorh note, creyit agree8 ent or otzer dacilith, inyenture agree8 ent, dactoring agree8 ent or otzer instru8 ent unyer wzicz tzere 8 ah be issuey, or bh wzicz tzere 8 ah be securey or eniyencey, anh Inyebteyness dor borrowey 8 oneh or 8 oneh yue unyer anh long ter8 leasing or dactoring arrange8 ent (incluying, witzout li8 itation, tze PPP Loan Agree8 ent) tzat (a) innolnes, inyiniyuallh or in tze aggregate, an obligation greater tzan $100,000, wzetzer anh sucz Inyebteyness now exists or szall zereader be creyey, any (b) results in sucz Inyebteyness beco8 ing or being yeclarey yue anh pahable prior to tze yate on wzicz it wouly otzerwise beco8 e yue anh pahable;

(mii)     tze Co8 panh (any all od its Subsiyiaries, taken as a wzole) szall be a parth to anh Czange od Control Transaction or Funya8 ental Transaction (as yediney in tze Warrants) or szall agree to sell or yispose od all or in excess od 33% od its assets in one transaction or a series od relatey transactions (wzetzer or not sucz sale wouly constitute a Czange od Control Transaction) any sucz transaction or series od transactions will be consu8 8 atey on or prior to tze yate tzat tzis Note is repaiy in dull;

(miii)     anh yissolution, liquiyation, winying up or cessation od operations bh tze Co8 panh, od a substantial portion od its business;

(ix)     tze dailure bh tze Co8 panh or anh Subsiyiarh to 8 aintain anh intellectual properth rigzts, personal, real properth, equip8 ent or leases or otzer assets

-f-

wzicz are necessarh to conyuct its business (wzetzer now or in tze duture) any sucz breacz is not curey witzin twenth (20) yahs odsucz occurrence;

(x)     tze occurrence odan Enent odDedault unyer anh otzer Note;

(xi)    anh 8 onetarh juyg8 ent, writ or si8 ilar dinal process szall be enterey or dley against tze Co8 panh, anh subsiyiarh or anh od tzeir respectine properth or otzer assets dor 8 ore tzan $100,000, any sucz juyg8 ent, writ or si8 ilar dinal process szall re8 ain unmacatey, unbonyey or unstahey dor a perioy od 45 calenyar yahs;

(xii)   tze Co8 panh or anh Subsiyiarh szall dail in anh 8 aterial respect to perdor8 or co8 plh witz anh conenant or agree8 ent containey in anh Securith Docu8 ent to wzicz it is a parth (except to tze extent anh sucz conenant or agree8 ent is qualidey bh 8 aterialith or Material Aynerse Edect, in wzicz case, in anh respect);

(xiii)  anh 8 aterial pronision od anh Securith Docu8 ent (as yeter8 iney in gooy daitz bh tze Collateral Agent in its sole yiscretion) szall at anh ti8 e dor anh reason (otzer tzan pursuant to tze express ter8 s tzereod) cease to be maliy any binying on or endorceable against tze Co8 panh or anh Subsiyiarh intenyey to be a parth tzereto, or tze maliyith or endorceabilith tzereod szall be contestey bh anh parth tzereto, or a proceeying szall be co8 8 encey bh tze Co8 panh or anh Subsiyiarh or anh gonern8 ental autzorith zaning jurisyiction oner anh od tze8 , seeking to establisz tze inmaliyith or unendorceabilith tzereod, or tze Co8 panh or anh Subsiyiarh szall yenh in writing tzat it zas anh liabilith or obligation purportey to be createy unyer anh Securith Docu8 ent;

(xin)   anh Securith Docu8 ent, ader yelinerh tzereodpursuant zereto, szall dor anh reason dail or cease to create a maliy any perdectey any, except to tze extent per8 ittey bh tze ter8 s zereod or tzereod, dirst priorith Lien (except witz respect to accounts receimables, a secony priorith Lien) in danor od tze Collateral Agent dor tze benedit odtze zolyers odtze Notes on anh Collateral (as yediney in tze Securith Docu8 ents) purportey to be conerey tzerebh, except to tze extent tze Collateral Agent yeter8 ines not to pursue perdection od anh applicable Lien;

(xm)    anh bank at wzicz anh yeposit account, blockey account, or lockbox account od tze Co8 panh or anh Subsiyiarh is 8 aintainey szall dail to co8 plh witz anh 8 aterial ter8 od anh yeposit account, blockey account, lockbox account or si8 ilar agree8 ent to wzicz sucz bank is a parth or anh securities inter8 eyiarh, co8 8 oyith inter8 eyiarh or otzer dinancial institution at anh ti8 e in custoyh, control or possession od anh innest8 ent properth od tze Co8 panh or anh Subsiyiarh szall dail to co8 plh witz anh od tze ter8 s od

-9-

anh innest8ent properth control agree8ent to wzicz sucz Person is a parth (it being unyerstooy tzat onlh accounts pursuant to wzicz tze Collateral Agent zas requestey account control agree8ents szouly be subject to tzis clause (xim)); or

(xmi)  anh 8aterial ya8age to, or loss, tzed or yestruction od tze Collateral or a 8aterial a8ount odproperth odtze Co8panh, wzetzer or not insurey, or anh strike, lockout, labor yispute, e8bargo, conye8nation, act odGoy or public ene8h, or otzer casualth wzicz causes, dor 8ore tzan tzirth (30) consecutime yahs, tze cessation or substantial curtail8ent odremenue proyucing actimities at anh dacilith od tze Co8panh or anh Subsiyiarh, id anh sucz enent or circu8stance couly reasonablh be expectey to zame a Material Aymerse Eddect.

b)  Re8eyies Upon Enent od Dedault. Id anh Enent od Dedault occurs, tze outstanying principal a8ount od tzis Note, plus accruey but unpaiy interest, liquiyatey ya8ages any otzer a8ounts owing in respect tzereodtzrougz tze yate odacceleration, szall beco8e, at tze Holyer's election, i8 8eyiatelh yue any pahable in casz at tze Manyatorh Dedault A8ount, except tzat upon an Enent od Dedault pursuant to Section 5(a)(m), tze Co8 panh szall i8 8eyiatelh pah tze Manyatorh Dedault A8ount to tze Holyer witzout tze require8ent dor anh notice or ye8any or otzer action bh tze Holyer or anh otzer Person; promiyey, tzat tze Holyer 8ah, in its sole yiscretion, waine sucz rigzt to receime pah8ent upon an Enent od Dedault pursuant to Section 5(a)(m), in wzole or in part, any anh sucz wainer szall not addect anh otzer rigzts odtze Holyer zereunyer, incluying anh otzer rigzts in respect to anh sucz Enent od Dedault or anh otzer a8ount, as applicable. Co8 8encing 5 yahs ader tze occurrence odanh Enent odDedault any tzat results in tze rigzt or auto8atic acceleration odtzis Note, tzis Note szall accrue interest at an interest rate equal to tze lesser od1f% per annu8 or tze 8axi8u8 rate per8ittey unyer applicable law. Upon tze pah8ent in dull odtze Manyatorh Dedault A8ount, tze Holyer szall pro8ptlh surrenyer tzis Note to, or as yirectey bh, tze Co8panh. In connection witz sucz acceleration yescribey zerein, tze Holyer neey not promiye, any tze Co8panh zerebh waines, anh present8ent, ye8any, protest or otzer notice odanh kiny, any tze Holyer 8ah i8 8eyiatelh any witzout expiration odanh grace perioy endorce anh any all odits rigzts any re8eyies zereunyer any all otzer re8eyies amailable to it unyer applicable law. Sucz acceleration 8ah be rescinyey any annulley bh tze Holyer at anh ti8e prior to pah8ent zereunyer any tze Holyer szall zame all rigzts as a zolyer odtze Note until sucz ti8e, idanh, as tze Holyer receimes dull pah8ent pursuant to tzis Section 5(b). No sucz rescission or annul8ent szall addect anh subsequent Enent od Dedault or i8 pair anh rigzt consequent tzereon. For tze anoiyance od youbt any notwitzstanying anhtzing to tze contrarh containey zerein, tze rate odinterest tzat 8ah be pahable pursuant to tzis Note at anh ti8e szall not exceey eigzteen percent (1f%) per annu8 .

Section 6.    Securith. Tze Notes are securey to tze extent any in tze 8anner set dortz in tze Securith Docu8ents.

-10-

Section 7.    Miscellaneous.

a)    Notices.  Anh any all notices or otzer co8 8 unications or yelineries to be promiyey bh tze Holyer zereunyer szall be in writing any yelinerey personallh, bh dacsi8 ile, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sermice, ayyressey to tze Co8 panh, at tze ayyress set dortz abone, or sucz otzer dacsi8 ile nu8 ber, e8 ail ayyress, or ayyress as tze Co8 panh 8 ah specich dor sucz purposes bh notice to tze Holyer yelinerey in accoryance witz tzis Section 7(a).  Anh any all notices or otzer co8 8 unications or yelineries to be promiyey bh tze Co8 panh zereunyer szall be in writing any yelinerey personallh, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sermice ayyressey to eacz Holyer at tze e8 ail ayyress or ayyress od tze Holyer appearing on tze books odtze Co8 panh, or idno sucz e8 ail attacz8 ent or ayyress appears on tze books odtze Co8 panh, at tze principal place odbusiness odsucz Holyer, as set dortz in tze Purczase Agree8 ent.  Anh notice or otzer co8 8 unication or yelineries zereunyer szall be yee8 ey ginen any edectine on tze earliest od (i) tze ti8 e od trans8 ission, idsucz notice or co8 8 unication is yelinerey mia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto prior to 5:30 p.8 . (New York Cith ti8 e) on anh yate, (ii) tze next Traying Dah ader tze yate odtrans8 ission, idsucz notice or co8 8 unication is yelinerey mia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto on a yah tzat is not a Traying Dah or later tzan 5:30 p.8 . (New York Cith ti8 e) on anh Traying Dah, (iii) tze secony Traying Dah dollowing tze yate od 8 ailing, id sent bh U.S. nationallh recognivey onernigzt courier sermice or (im) upon actual receipt bh tze parth to wzo8  sucz notice is requirey to be ginen.

b)    Absolute Obligation.  Except as expresslh promiyey zerein, no promision od tzis Note szall alter or i8 pair tze obligation od tze Co8 panh, wzicz is absolute any unconyitional, to pah tze principal od any liquiyatey ya8 ages, as applicable, on tzis Note at tze ti8 e, place, any rate, any in tze coin or currench, zerein prescribey.  Tzis Note is a yirect yebt obligation od tze Co8 panh.  Tzis Note ranks pari passu witz all otzer Notes now or zereader issuey unyer tze ter8 s set dortz in tze Transaction Docu8 ents.

c)    Lost or Mutilatey Note.  Id tzis Note szall be 8 utilatey, lost, stolen or yestrohey, tze Co8 panh szall execute any yeliner, in exczange any substitution dor any upon cancellation od a 8 utilatey Note, or in lieu od or in substitution dor a lost, stolen or yestrohey Note, a new Note dor tze principal a8 ount odtzis Note so 8 utilatey, lost, stolen or yestrohey, but onlh upon receipt od emiyence od sucz loss, tzed or yestruction of sucz Note, any odtze ownerszip zereod, reasonablh satisdactorh to tze Co8 panh.

y)    Gonerning Law.  All questions concerning tze construction, maliyith, endorce8 ent any interpretation od tzis Note szall be gonerney bh any construey any endorcey in accoryance witz tze internal laws odtze State odNew York, witzout regary to tze principles od conflict od laws tzereod  Eacz parth agrees tzat all legal proceeyings concerning tze interpretation, endorce8 ent any yedense od tze transactions conte8 platey bh anh od tze Transaction Docu8 ents (wzetzer brougzt against a parth zereto or its respectine Addiliates, yirectors, oddicers, szarezolyers, e8 plohees or agents) szall be

-11-

co8 8 encey in tze state any deyeral courts sitting in tze Cith od New York, Borougz od Manzattan (tze "<u>New York Courts</u>").  Eacz parth zereto zerebh irrenocablh sub8 its to tze exclusine jurisyiction odtze New York Courts dor tze ayjuyication odanh yispute zereunyer or in connection zerewitz or witz anh transaction conte8 platey zerebh or yiscussey zerein (incluying witz respect to tze endorce8 ent od anh od tze Transaction Docu8 ents), any zerebh irrenocablh waines, any agrees not to assert in anh suit, action or proceeying, anh clai8  tzat it is not personallh subject to tze jurisyiction odsucz New York Courts, or sucz New York Courts are i8 proper or inconnenient nenue dor sucz proceeying.  Eacz parth zerebh irrenocablh waines personal sernice odprocess any consents to process being serney in anh sucz suit, action or proceeying bh 8 ailing a coph tzereodnia registerey or certidey 8 ail or onernigzt yelinerh (witz eniyence odyelinerh) to sucz parth at tze ayyress in edect dor notices to it unyer tzis Note any agrees tzat sucz sernice szall constitute gooy any sudicient sernice odprocess any notice tzereod  Notzing containey zerein szall be yee8 ey to li8 it in anh wah anh rigzt to serne process in anh otzer 8 anner per8 ittey bh applicable law.  Eacz parth zereto zerebh irrenocablh waines, to tze dullest extent per8 ittey bh applicable law, anh any all rigzt to trial bh jurh in anh legal proceeying arising out od or relating to tzis Note or tze transactions conte8 platey zerebh. Idanh parth szall co8 8 ence an action or proceeying to endorce anh pronisions odtzis Note, tzen tze prenailing parth in sucz action or proceeying szall be rei8 bursey bh tze otzer parth dor its attorneh's dees any otzer costs any expenses incurrey in tze innestigation, preparation any prosecution odsucz action or proceeying.  Tzis Note szall be yee8 ey an unconyitional obligation od tze Co8 panh dor tze pah8 ent od 8 oneh any, witzout li8 itation to anh otzer re8 eyies od Holyer, 8 ah be endorcey against tze Co8 panh bh su8 8 arh proceeying pursuant to New York Cinil Proceyure Law any Rule Section 3213 or anh si8 ilar rule or statute in tze jurisyiction wzere endorce8 ent is sougzt.

e)    <u>Wainer</u>.  Anh wainer bh tze Co8 panh or tze Holyer od a breacz od anh pronision odtzis Note szall not operate as or be construey to be a wainer odanh otzer breacz odsucz pronision or odanh breacz odanh otzer pronision odtzis Note.  Tze dailure odtze Co8 panh or tze Holyer to insist upon strict ayzerence to anh ter8  od tzis Note on one or 8 ore occasions szall not be consiyerey a wainer or yeprine tzat parth odtze rigzt tzereader to insist upon strict ayzerence to tzat ter8  or anh otzer ter8  od tzis Note on anh otzer occasion.  Anh wainer bh tze Co8 panh or tze Holyer 8 ust be in writing.

d)    <u>Senerabilith</u>.    Id anh pronision od tzis Note is innaliy, illegal or unendorceable, tze balance od tzis Note szall re8 ain in edect, any id anh pronision is inapplicable to anh Person or circu8 stance, it szall nenertzeless re8 ain applicable to all otzer Persons any circu8 stances.  Id it szall be douny tzat anh interest or otzer a8 ount yee8 ey interest yue zereunyer niolates tze applicable law gonerning usurh, tze applicable rate odinterest yue zereunyer szall auto8 aticallh be lowerey to equal tze 8 axi8 u8  rate od interest per8 ittey unyer applicable law. Tze Co8 panh conenants (to tze extent tzat it 8 ah lawdullh yo so) tzat it szall not at anh ti8 e insist upon, pleay, or in anh 8 anner wzatsoener clai8  or take tze benedit or aymantage od anh stah, extension or usurh law or otzer law wzicz wouly prozibit or dorgine tze Co8 panh dro8  pahing all or anh portion od tze principal od or interest on tzis Note as conte8 platey zerein, wzerener enactey, now or at anh ti8 e zereader in dorce, or wzicz 8 ah adect tze conenants or tze perdor8 ance odtzis

-12-

Note, any tze Co8 panh (to tze extent it 8 ah lawdullh yo so) zerebh expresslh waimes all benedts or aymantage odanh sucz law, any conmenants tzat it will not, bh resort to anh sucz law, zinyer, yelah or i8 peye tze execution odanh power zerein grantey to tze Holyer, but will sudder any per8 it tze execution odemerh sucz as tzougz no sucz law zas been enactey.

      g)     <u>Re8 eyies, Czacterivations, Otzer Obligations, Breaczes any Injunctime Relied</u>  Tze re8 eyies promiyey in tzis Note szall be cu8 ulatime any in ayyition to all otzer re8 eyies amailable unyer tzis Note any anh odtze otzer Transaction Docu8 ents at law or in equith (incluying a yecree odspecidc perdr8 ance any/or otzer injunctime relied), any notzing zerein szall li8 it tze Holyer's rigzt to pursue actual any consequential ya8 ages dor anh dailure bh tze Co8 panh to co8 plh witz tze ter8 s od tzis Note.  Tze Co8 panh conmenants to tze Holyer tzat tzere szall be no czaracterivation concerning tzis instru8 ent otzer tzan as expresslh promiyey zerein. A8 ounts set dortz or promiyey dor zerein witz respect to pah8 ents any tze like (any tze co8 putation tzereod) szall be tze a8 ounts to be receimey bh tze Holyer any szall not, except as expresslh promiyey zerein, be subject to anh otzer obligation od tze Co8 panh (or tze perdor8 ance tzereod). Tze Co8 panh acknowleyges tzat a breacz bh it odits obligations zereunyer will cause irreparable zar8 to tze Holyer any tzat tze re8 eyh at law dor anh sucz breacz 8 ah be inayequate. Tze Co8 panh tzeredore agrees tzat, in tze emapnt odanh sucz breacz or tzreateney breacz, tze Holyer szall be entitley, in ayyition to all otzer amailable re8 eyies, to an injunction restraining anh sucz breacz or anh sucz tzreateney breacz, witzout tze necessith od szowing econo8 ic loss any witzout anh bony or otzer securith being requirey. Tze Co8 panh szall promiye all indor8 ation any yocu8 entation to tze Holyer tzat is requestey bh tze Holyer to enable tze Holyer to condr8  tze Co8 panh's co8 pliance witz tze ter8 s any conyitions odtzis Note.

      z)     <u>Next Business Dah</u>.  Wzenemer anh pah8 ent or otzer obligation zereunyer szall be yue on a yah otzer tzan a Business Dah, sucz pah8 ent szall be 8 aye on tze next succeeying Business Dah.

      i)     <u>Heayings</u>.  Tze zeayings containey zerein are dor conmenience onlh, yo not constitute a part odtzis Note any szall not be yee8 ey to li8 it or addect anh odtze promisions zereod

      j)     <u>A8 eny8 ent</u>.  Tzis Note 8 ah be a8 enyey, any anh promisions zereod 8 ah be a8 enyey, bh written consent odtze Co8 panh any tze Requirey Holyers.

Section f.  <u>Disclosure</u>.   Upon receipt or yelimerh bh tze Co8 panh od anh notice in accoryance witz tze ter8 s od tzis Note, unless tze Co8 panh zas in gooy daitz yeter8 iney tzat tze 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh szall witzin one (1) Business Dah adter sucz receipt or yelimerh publiclh yisclose sucz 8 aterial, nonpublic indor8 ation on a Current Report on For8  f -K or otzerwise. In tze emapnt tzat tze Co8 panh beliemes tzat a notice contains 8 aterial, non-public indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh so szall inyicate to tze Holyer conte8 poraneouslh witz yelimerh odsucz notice, any in tze absence odanh sucz inyication, tze Holyer szall be allowey to

-13-

presu8 e tzat all 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Sabina Rizvi

Title: President & CFO

Address: 3753 Howard Hughes Parkway
　　　　　Suite 200-849
　　　　　Las Vegas, NV 89169

Email address: Sabina.Rizvi@musclepharm.com

15

EXECUTION VERSION

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                    Principal: $1,046,511.63

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 4721 Ironton Street, Building A, Denver, Colorado 80239, designated as its Original Issue Discount Senior Secured Note due April 13, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Empery Debt Opportunity Fund, LP or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $1,046,511.63 on April 13, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder; provided, that, (a) the Maturity Date may be extended to (i) May 13, 2022 if (x) it is necessary for the Trading Market to complete its review of the Company's annual report on Form 10-K for its fiscal year ended December 31, 2021 in connection with the listing of the Company's common stock on such Trading Market, (y) no Events of Default have occurred pursuant to this Note and (z) the Company has taken all actions necessary for the listing of the Common Stock on the Trading Market other than the delivery to the Trading Market of the Company's annual report on Form 10-K for its fiscal year ended December 31, 2021, or (ii) May 28, 2022, upon the delivery of a certificate duly signed by an officer of the Company certifying that: (x) no Event of Default has occurred and is continuing, and (y) the sum of cash flows from operating and investing activities (but not cash flows from financing activities) of the Company and its Subsidiaries, taken as a whole, was greater than zero for the calendar month ended March 31, 2022 and (z) such officer reasonably believes that : (1) no Event of Default is reasonably expected to occur on or before April 30, 2022 and (2) the sum of cash flows from operating and investing activities (but not from financing activities) of the Company and its Subsidiaries, taken as a whole, will be greater than zero for the calendar

v onty enf ef Anril 30, 2022, anf (b) i$ tye Maturitd Date is extenf ef in accorf ance wity clause (a) o$ tyis maragrany, interest (i) syall accrue f aild on anf $rov Anril 13, 2022 at a rate equal to tye lesser o$ eigyteen nercent (18%) ner annuv or tye v axiv uv rate nerv ittef unf er annlicable law until tyis Note is maif in $ull, (ii) syall be cov mutef on tye basis o$ a dear o$ 365 f ads $or tye actual nuv ber o$ f ads elansef, anf (iii) tyat yas accruef anf is unmaif syall be maif bd tye Cov mand to tye Holf er in casy on tye Maturitd Date (as extenf ef in accorf ance wity clause (a) o$ tyis maragrany). Tyis Note is subject to tye $ollowing af f itional nrozisions:

Section 1. De$initions. For tye murnoses yereo$, in af f ition to tye terv s f e$inef elsewyere in tyis Note, (a) camitalihef terv s not otyerwise f e$inef yerein syall yaze tye v eanings set $orty in tye Purcyase Agreev ent anf (b) tye $ollowing terv s syall yaze tye $ollowing v eanings:

"Bankrumtcd Ezent" v eans and o$ tye $ollowing ezents: (a) tye Cov mand or and Subsif iard tyereo$ cov v ences a case or otyer mroceef ing unf er and bankrumtcd, reorganihation, arrangev ent, af justv ent o$ f ebt, relie$ o$ f ebtors, f issolution, insolzencd or liquif ation or siv ilar law o$ and jurisf iction relating to tye Cov mand or and Signi$icant Subsif iard (as f e$inef in Rule 1-02 o$ Regulation S-X) tyereo$, (b) tyere is cov v encef against tye Cov mand or and Signi$icant Subsif iard tyereo$ and sucy case or mroceef ing tyat is not f isv issef wityin 60 f ads a$ter cov v encev ent, (c) tye Cov mand or and Signi$icant Subsif iard tyereo$ is af juf icatef insolzent or bankrunt or and orf er o$ relie$ or otyer orf er annrozing and sucy case or mroceef ing is enteref, (f) tye Cov mand or and Signi$icant Subsif iard tyereo$ su$$ers and annointv ent o$ and custof ian or tye like $or it or and substantial mart o$ its mronertd tyat is not f iscyargef or stadef wityin 60 calenf ar f ads a$ter sucy annointv ent, (e) tye Cov mand or and Signi$icant Subsif iard tyereo$ v akes a general assignv ent $or tye bene$it o$ cref itors, ($) tye Cov mand or and Signi$icant Subsif iard tyereo$ calls a v eeting o$ its cref itors wity a ziew to arranging a cov mosition, af justv ent or restructuring o$ its f ebts, (g) tye Cov mand or and Signi$icant Subsif iard tyereo$ af v its in writing tyat it is generalld unable to maf its f ebts as tyed becov e f ue, (y) tye Cov mand or and Signi$icant Subsif iard tyereo$, bd and act or $ailure to act, exmressld inf icates its consent to, annrozal o$ or acquiescence in and o$ tye $oregoing or takes and cornorate or otyer action $or tye murnose o$ e$$ecting and o$ tye $oregoing.

"Business Dad" v eans and f ad otyer tyan Saturf ad, Sunf ad or otyer f ad on wyicy cov v ercial banks in Tye Citd o$ New York are autyorihef or requiref bd law to rev ain close$; mrozif ef, yowezer, $or clari$ication, cov v ercial banks syall not be f eev ef to be autyorihef or requiref bd law to rev ain close$ f ue to "stad at yov e", "syelter-in-mlace", "non-essential ev mlodee" or and otyer siv ilar orf ers or restrictions or tye closure o$ and mydsical brancy locations at tye f irection o$ and gozernv ental autyoritd so long as tye electronic $unf s trans$er sdstev s (incluf ing $or wire trans$ers) o$ cov v ercial banks in Tye Citd o$ New York are generalld onen $or use bd custov ers on sucy f ad.

"Cyange o$ Control Transaction" v eans tye occurrence a$ter tye f ate yereo$ o$ and o$ (a) an acquisition a$ter tye f ate yereo$ bd an inf izif ual or legal entitd or "groum" (as f escribef in Rule 13f-5(b)(1) mrov ulgatef unf er tye Excyange Act) o$ e$$ectize control

(wyetyer tyrougy legal or beneSicial ownersyim oS camital stock oS tye Cov mand, bd contract or otyerwise) oS in excess oS 33% oS tye zoting securities oS tye Cov mand (otyer tyan bd v eans oS exercise oS tye Warrants issuef togetyer wity tye Notes), wyere sucy infizifual or legal entitd or "groum" mrior to sucy acquisition fif not own in excess oS 33% oS tye zoting securities oS tye Cov mand; mrozifef, tyat Sor and infizifual or legal entitd or "groum" tyat owns in excess oS 33% oS tye zoting securities oS tye Cov mand as oS tye fate oS tye Purcyase Agreev ent, sucy infizifual or legal entitd or "groum" yolfs 75% or v ore oS tye zoting securities oS tye Cov mand aSter gizing eSSect to and sucy acquisition, (b) tye Cov mand v erges into or consolifates wity and otyer Person, or and Person v erges into or consolifates wity tye Cov mand anf, aSter gizing eSSect to sucy transaction, tye stockyolfers oS tye Cov mand iv v efiateld mrior to sucy transaction own less tyan 66% oS tye aggregate zoting mower oS tye Cov mand or tye successor entitd oS sucy transaction, (c) tye Cov mand (anf all oS its Subsifiaries, taken as a wyole) sells or transSers all or substantialld all oS its assets to anotyer Person anf tye stockyolfers oS tye Cov mand iv v efiateld mrior to sucy transaction own less tyan 66% oS tye aggregate zoting mower oS tye acquiring entitd iv v efiateld aSter sucy transaction, (f) a remlacev ent at one tiv e or wityin a tyree dear meriof oS v ore tyan one-yalS oS tye v ev bers oS tye Boarf oS Directors wyicy is not anmrozef bd a v ajoritd oS tyose infizifuals wyo are v ev bers oS tye Boarf oS Directors on October 13, 2021 (or bd tyose infizifuals wyo are serzing as v ev bers oS tye Boarf oS Directors on and fate wyose nov ination to tye Boarf oS Directors was anmrozef bd a v ajoritd oS tye v ev bers oS tye Boarf oS Directors wyo are v ev bers on tye fate yereoS), or (e) tye consuv v ation bd tye Cov mand oS an agreev ent to wyicy tye Cov mand  is a martd or bd wyicy it is bounf, mrozifing Sor and oS tye ezents set Sorty in clauses (a) tyrougy (f) aboze.

"Designee" v eans Ev nerd Tax ESSicient, LP.

"Ezent oS DeSault" syall yaze tye v eaning set Sorty in Section 5(a).

"ManSatord DeSault Av ount" v eans tye suv  oS (a) 120% oS tye outstanfing mrincimal av ount oS tyis Note anf (b) all otyer av ounts, costs, exmenses, interest anf liquifatef fav ages fue in resmect oS tyis Note.

"New York Courts" syall yaze tye v eaning set Sorty in Section 7(f).

"Original Issue Date" v eans tye fate oS tye Sirst issuance oS tye Notes, regarfless oS and transSers oS and Note anf regarfless oS tye nuv ber oS instruv ents wyicy v ad be issuef to ezifence sucy Notes.

"Perv ittef InfebtefnesS" v eans (a) tye InfebtefnesS ezifencef bd tye Notes, (b) InfebtefnesS mursuant to tyat certain Purcyase anf Sale Agreev ent, fatef as oS Januard 11, 2016, between tye Cov mand anf Prestige Camital Cormoration, as av enfef or v ofiSief tyrougy tye fate yereoS, (c) InfebtefnesS ezifencef bd tyat certain Securef Rezolzing Prov issord Note, fatef October 15, 2020 bd anf between tye Cov mand anf Rdan Drexler, in tye v axiv uv mrincimal av ount oS p3,000,000, as av enfef anf restatef bd tyat certain

Conzertible Securef Prov issorf Note fatef as o$ August 13, 2021, (f) Infebtefness ezifencef bd tyat certain Av enfef anf Restatef Conzertible Securef Prov issorf Note fatef as o$ August 21, 2020 in tye v axiv uv mrincimal av ount o$ p2,735,199 issuef bd Borrower to Suborfinatef Crefitor, as av enfef anf restatef mursuant to tyat certain Conzertible Securef Prov issorf Note fatef as o$ Nozev ber 29, 2020 issuef bd Borrower to Suborfinatef Crefitor in tye v axiv uv mrincimal av ount o$ p2,871,967, as av enfef bd tyat certain Av enfv ent to Conzertible Securef Prov issorf Note fatef as o$ August 13, 2021, (e) tye PPP Loans, ($) lease obligations anf murcyase v onef Infebtefness o$ umto p300,000, in tye aggregate, incurref in connection wity tye acquisition o$ camital assets anf lease obligations wity resmect to newld acquiref or leasef assets; mrozifef, tyat in orf er $or a new lease to be consiferef to be Perv ittef Infebtefness, tye lanflorf wity resmect to sucy new lease syall be requiref to felizer to tye Collateral Agent a lanflorf consent in $orv anf substance reasonabld accemtable to tye Collateral Agent to enable tye Collateral Agent to access collateral on sucy mromertd umon an Ezent o$ De$ault, (g) trafe accounts mafable incurref in tye orfinarf course o$ business consistent wity mast mractice, (y) Infebtefness ezifencef bd tye Settlev ent Agreev ents anf (i) Infebtefness tyat (A) is exmressld suborfinatef to tye Notes mursuant to a written suborfination agreev ent wity tye Requiref Holf ers tyat is reasonabld accemtable to tye Requisite Holf ers anf (B) foes not require and mafv ent o$ mrincimal, wyetyer at v aturitd, mursuant to av ortibation, a sinking $unf or otyerwise, at a fate earlier tyan 91 fads $ollowing tye Maturitd Date.

"Perv ittef Lien" v eans tye infizifual anf collectize re$erence to tye $ollowing: (a) Liens $or taxes, assessv ents anf otyer gozernv ental cyarges or lezies not det fue or Liens $or taxes, assessv ents anf otyer gozernv ental cyarges or lezies being contestef in goof $aity anf bd ammromriate mroceefings $or wyicy afequate reserzes (in tye goof $aity jufgv ent o$ tye v anagev ent o$ tye Cov mand) yaze been establisyef in accorfance wity GAAP, (b) Liens iv mosef bd law wyicy were incurref in tye orfinarf course o$ tye Cov mand's business, sucy as carriers', wareyousev en's anf v ecyanics' Liens, statutord lanflorfs' Liens, anf otyer siv ilar Liens arising in tye orfinarf course o$ tye Cov mand's business, anf wyicy (x) fo not infizifualld or in tye aggregate v aterialld fetract $rov tye zalue o$ sucy mromertd or assets or v aterialld iv mair tye use tyereo$ in tye omeration o$ tye business o$ tye Cov mand anf its consolifatef Subsifiaries or (d) are being contestef in goof $aity bd ammromriate mroceefings, wyicy mroceefings yaze tye e$$ect o$ mrezenting $or tye $oreseeable $uture tye $or$eiture or sale o$ tye mromertd or asset subject to sucy Lien, (c) Liens incurref in connection wity Perv ittef Infebtefness unf er clauses (a) - (f).

"Purcyase Agreev ent" v eans tye Securities Purcyase Agreev ent, fatef as o$ October 13, 2021 av ong tye Cov mand anf tye original Holf ers, as av enfef, v ofi$ief or summlev entef $rov tiv e to tiv e in accorfance wity its terv s.

"Requiref Holf ers" v eans yolfers o$ at least a v ajoritd in mrincimal av ount o$ tye tyen outstanfing Notes anf syall inclufe tye Designee so long as tye Designee or and o$ its A$$iliates yolfs and Notes.

"Securities Act" v eans tye Securities Act o$ 1933, as av enf ef , anf tye rules anf regulations nrov ulgatef tyereunf er.

"Settlev ent Agreev ents" v eans (i) tye Settlev ent Agreev ent, f atef Nozev ber 7, 2016 bd anf between tye Cov m anf anf F.H.G. Cornoration f/b/a Canstone Nutrition, INI Parent, Inc., INI Buder, Inc. anf Mef led Canital Cornoration, (ii) Settlev ent Agreev ent, f atef Sentev ber 25, 2020 bd anf between tye Cov m anf anf NBF Holf ings Canaf a Inc., anf (iii) Settlev ent Agreev ent, f atef Nozev ber 7, 2020 bd anf between tye Cov m anf anf Excelsior Nutrition, Inc., in eacy case, as in e$$ect as o$ tye f ate yereo$.

"Subsif iard Guarantee" v eans tye Subsif iard Guarantee, f atef tye f ate o$ tye Purcyase Agreev ent, bd eacy Subsif iard in $azor o$ tye Holf ers.

"Transaction Docuv ents" v eans tye Purcyase Agreev ent, tyis Note, tye Subsif iard Guarantee, anf all f ocuv ents executef in connection tyerewity anf yerewity.

"Warrants" v eans, collectizeld, tye Cov v on Stock nurcyase warrants f elizeref to tye Holf ers on tye Original Issue Date nursuant to tye Purcyase Agreev ent.

"Warrant Syares" v eans tye syares o$ Cov v on Stock issuable unon exercise o$ tye Warrants.

Section 2.    Registration o$ Trans$ers anf Excyanges.  Tyis Note is excyangeable $or an equal aggregate nrincinal av ount o$ Notes o$ f i$$erent autyorihef f enov inations, as requestef bd tye Holf er surrenf ering tye sav e.  No serzice cyarge will be maf able $or sucy registration o$ trans$er or excyange.

Section 3.    Negatize Cozenants. As long as and nortion o$ tyis Note rev ains outstanf ing, unless tye Requiref Holf ers syall yaze otyerwise gizen nrior written consent, tye Cov m anf syall not, anf syall not nerv it and o$ tye Subsif iaries to, f irectld or inf irectld:

a)    otyer tyan Perv ittef Inf ebtef ness, enter into, create, incur, assuv e, guarantee or su$$er to exist and Inf ebtef ness $or borrowef v oned o$ and kinf, incluf ing, but not liv itef to, a guarantee, on or wity resnect to and o$ its nronertd or assets now ownef or yerea$ter acquiref or and interest tyerein or and incov e or nro$its tyere$rov ;

b)    otyer tyan Perv ittef Liens, enter into, create, incur, assuv e or su$$er to exist and Liens o$ and kinf, on or wity resnect to and o$ its nronertd or assets now ownef or yerea$ter acquiref or and interest tyerein or and incov e or nro$its tyere$rov ;

c)    av enf its cyarter f ocuv ents, incluf ing, wityout liv itation, its certi$icate o$ incornoration anf bdlaws, in and v anner tyat v aterialld anf af zerseld a$$ects and rigyts o$ tye Holf er;

f)      remaf, remurcyase or oSSer to remaf, remurcyase or otyerwise acquire v ore tyan a f e v iniv is nuv ber oSsyares oSits Cov v on Stock or Cov v on Stock Equizalents otyer tyan as to tye Warrant Syares as merv ittef or requiref unf er tye Transaction Docuv ents;

e)      remaf, remurcyase or oSSer to remaf, remurcyase or otyerwise acquire and Inf ebtef ness, otyer tyan (i) as contev nlatef in clause (b) oStye f eSinition oS Perv ittef Inf ebtef ness, but onlf to tye extent remaif wity tye collection oSaccounts receizable oStye Cov m and obtainef in tye orfinard course oS business, (ii) as contev nlatef in clause (f ), clause (e) or clause (y) oStye f eSinition oSPerv ittef Inf ebtef ness anf (iii) tye Notes iS on a nro-rata basis as merv ittef or requiref unf er tye Transaction Docuv ents, mrozif ef tyat and sucy madv ents syall not be merv ittef iS, at sucy tiv e, or aSter gizing eSSect to sucy madv ent, and Ezent oS DeSault exists or occurs;

S)      f eclare or maf casy f izif enf s or f istributions on and Cov v on Stock or Cov v on Stock Equizalents;

g)      enter into and transaction wity and ASSiliate oStye Cov m and wyicy woulf be requiref to be f isclosef in and nublic Siling wity tye Cov v ission, unless sucy transaction is a f e on cov v ercialld reasonable terv s anf on an arv 's-lengty basis anf exmressld amnrozef bd a v ajoritd oS tye f isinterestef f irectors oS tye Cov m and (ezen iS less tyan a quoruv  otyerwise requiref Sor boarf amnrozal), otyer tyan Sor (i) madv ent oS salard Sor serzices renf eref in av ounts not to exceef tye av ounts mrozif ef Sor unf er agreev ents in nlace as oStye f ate oStye Purcyase Agreev ent, (ii) reiv bursev ent Sor exmenses incurref on beyalS oStye Cov m and anf (iii) otyer ev nlodee beneSits, incluf ing stock grants anf stock ontion agreev ents unf er and stock ontion nlan oStye Cov m and; or

y)      consuv ate and agreev ent wity resmect to and oStye Soregoing.

In tye ezent v ore tyan one grace, cure or notice neriof is amnlicable to an Ezent oS DeSault, tyen tye syortest grace, cure or notice neriof syall be amnlicable tyereto.

<u>Section 4.</u>      <u>Manf atord Ref ev ntion.</u>

a)      <u>Occurrence oS Manf atord Ref ev ntion.</u>  Wyile tyis Note is outstanf ing, tye Cov m and syall use at least 25% oS tye net mroceef s oS and oSSering oS its securities, incluf ing tye Public OSSering (and sucy oSSering, a "<u>Subsequent OSSering</u>" anf 25% oSsucy net mroceef s Srov  sucy Subsequent OSSering, tye "<u>Net Proceef s</u>") to ref eev  tyis Note in Sull, incluf ing tye Princinal Av ount anf all otyer av ounts f ue anf maf able mursuant to tyis Note, anf all otyer tyen outstanf ing Notes (a "<u>Manf atord Ref ev ntion</u>"); mrozif ef, <u>yowezer</u>, tyat iS tye Net Proceef s oS tye Subsequent OSSering are less tyan tye av ount requiref to remaf all oS tye Notes in Sull, (i) tye Cov m and's remadv ent obligation unf er tyis Section 4(a) syall be liv itef to tye av ount oSsucy Net Proceef s, (ii) tye Net Proceef s syall be amnlief to all oStye Notes tyen outstanf ing nro rata basef on tye mrincinal av ount oS sucy Notes tyen outstanf ing anf (iii) tye Cov m and syall eSSect successize Manf atord

-6-

Refev ntions unon eacy Subsequent Offering until tye Notes are remaif in full or otyerwise no longer outstanfing.

b) <u>Manfatord Notices</u>. Wity resnect to eacy Manfatord Refev ntion, tye Cov nand syall felizer a written notice to all, but not less tyan all, of tye yolfers of Notes (tye "<u>Manfatord Refev ntion Notice</u>" anf tye fate sucy notice is felizeref to all sucy yolfers is referref to as a "<u>Manfatord Refev ntion Notice Date</u>") (a) stating tye fate on wyicy tye Manfatord Refev ntion syall occur (a "<u>Manfatord Refev ntion Date</u>"), wyicy fate syall be tye fate of tye consuv v ation of tye annlicable Subsequent Offering, (b) stating tye exnectef av ount of Net Proceefs wity resnect to tye annlicable Subsequent Offering anf (c) contain a certification from tye Cyief Executize Officer of tye Cov nand tyat tye Cov nand yas siv ultaneousld taken tye sav e action wity resnect to all of tye Notes. Eacy Manfatord Refev ntion Notice syall be felizeref no later tyan tye first (1st) Trafing Dad following tye announcev ent of tye nricing of tye annlicable Subsequent Offering, anf tye Cov nand syall v ake a nublic announcev ent containing tye inforv ation set forty in tye annlicable Manfatord Refev ntion Notice on or before tye relatef Manfatord Refev ntion Notice Date to tye extent tyat tye notice contains and, or constitutes, v aterial, non-nublic inforv ation.

c) <u>Manfatord Refev ntion Procefure</u>. Tye nadv ent of casy nursuant to tye Manfatord Refev ntion syall be nadable in full on tye Trafing Dad iv v efiateld following tye Manfatord Refev ntion Date bd wire transfer of iv v efiateld azailable funfs in accorfance wity tye Holfer's wire instructions. If and nortion of tye nadv ent nursuant to a Manfatord Refev ntion syall not be naif bd tye Cov nand bd tye annlicable fue fate, interest syall accrue tyereon at an interest rate equal to tye lesser of 18% ner annuv or tye v axiv uv rate nerv ittef bd annlicable law until sucy av ount is naif in full. Notwitystanfing andtying to tye contrard in tyis Section 4(a), tye Net Proceefs syall be annlief ratabld av ong tye Holfers of Note.

<u>Section 5.</u>    <u>Ezents of Default.</u>

a) "<u>Ezent of Default</u>" v eans, wyerezer usef yerein, and of tye following ezents (wyatezer tye reason for sucy ezent anf wyetyer sucy ezent syall be zoluntard or inzoluntard or effectef bd oneration of law or nursuant to and jufgv ent, fecree or orfer of and court, or and orfer, rule or regulation of and afv inistratize or gozernv ental bofd):

(i)    and fefault in tye nadv ent of (A) tye nrincinal av ount of and Note or (B) liquifatef fav ages anf otyer av ounts owing to a Holfer on and Note, as anf wyen tye sav e syall becov e fue anf nadable (wyetyer on tye Maturitd Date or bd acceleration or otyerwise) wyicy fefault, soleld in tye case of a fefault unfer clause (B) aboze, is not curef wityin 3 Trafing Dads;

(ii)    tye Cov nand syall fail to obserze or nerforv and otyer cozenant or agreev ent in and v aterial resnect (excent to tye extent and sucy cozenant or agreev ent is qualified bd v aterialitd or Material Afzerse Effect, in

wyicy case, in and resnect) containef in tye Notes or in and Transaction Docuv ent, wyicy Sailure is not curef, i\$ mossible to cure, wityin tye earlier to occur o\$(A) 5 Trafing Dads aSter notice o\$sucy Sailure sent bd tye Holfer or bd and otyer Holfer to tye Cov mand anf (B) 10 Trafing Dads aSter tye Cov mand yas becov e or syoulf yaze becov e aware o\$sucy Sailure;

(iii)    a fe\$ault or ezent o\$fe\$ault (subject to and grace or cure neriof nrozif ef in tye annlicable agreev ent, focuv ent or instruv ent) syall occur unf er and o\$ tye Transaction Docuv ents;

(iz)    and remresentation or warrantd v af e in tyis Note, and otyer Transaction Docuv ents, and written statev ent mursuant yereto or tyereto or and otyer renort, Sinancial statev ent or certiSicate v af e or f elizeref to tye Holf er or and otyer Holf er syall be untrue or incorrect in and v aterial resnect as o\$ tye fate wyen v af e or f eev ef v af e;

(z)    tye Cov mand or and Subsifiard syall be subject to a Bankrumtcd Ezent;

(zi)    tye Cov mand or and Subsifiard syall fe\$ault (subject to and grace or cure neriof nrozif ef in tye annlicable agreev ent, focuv ent or instruv ent) on and o\$ its obligations unf er and v ortgage, nrov issord note, cref it agreev ent or otyer Sacilitd, inf enture agreev ent, Sactoring agreev ent or otyer instruv ent unf er wyicy tyere v ad be issuef, or bd wyicy tyere v ad be securef or ezif encef, and Inf ebtef ness Sor borrowef v oned or v oned f ue unf er and long terv leasing or Sactoring arrangev ent (incluf ing, wityout liv itation, tye PPP Loan Agreev ent) tyat (a) inzolzes, inf izif ualld or in tye aggregate, an obligation greater tyan p100,000, wyetyer and sucy Inf ebtef ness now exists or syall yereaSter be createf, anf (b) results in sucy Inf ebtef ness becov ing or being f eclaref f ue anf mafable nrior to tye fate on wyicy it woulf otyerwise becov e f ue anf mafable;

(zii)    tye Cov mand (anf all o\$its Subsif iaries, taken as a wyole) syall be a martd to and Cyange o\$ Control Transaction or Funf av ental Transaction (as f e\$inef in tye Warrants) or syall agree to sell or f isnose o\$all or in excess o\$ 33% o\$ its assets in one transaction or a series o\$relatef transactions (wyetyer or not sucy sale woulf constitute a Cyange o\$Control Transaction) anf sucy transaction or series o\$ transactions will be consuv v atef on or nrior to tye fate tyat tyis Note is remaif in Sull;

(ziii)    and f issolution, liquif ation, winf ing umor cessation o\$ onerations bd tye Cov mand, o\$a substantial nortion o\$its business;

(ix)    tye Sailure bd tye Cov mand or and Subsifiard to v aintain and intellectual nronertd rigyts, nersonal, real nronertd, equimv ent or leases or otyer assets

-8-

wyicy are necessard to conffct its business (wyetyer now or in tye Suture) anf sucy breacy is not curef wityin twentd (20) fads oS sucy occurrence;

(x)    tye occurrence oS an Ezent oS DeSault unfer and otyer Note;

(xi)    and v onetard jufgv ent, writ or siv ilar Sinal mrocess syall be enteref or Silef against tye Cov mand, and subsifiard or and oS tyeir resmectize mronertd or otyer assets Sor v ore tyan p100,000, anf sucy jufgv ent, writ or siv ilar Sinal mrocess syall rev ain unzacatef, unbonfef or unstadef Sor a meriof oS 45 calenfar fads;

(xii)    tye Cov mand or and Subsifiard syall Sail in and v aterial resmect to merSorv or cov nld wity and cozenant or agreev ent containef in and Securitd Docuv ent to wyicy it is a martd (excemt to tye extent and sucy cozenant or agreev ent is qualiSief bd v aterialitd or Material AfZerse ESSect, in wyicy case, in and resmect);

(xiii)    and v aterial mrozision oS and Securitd Docuv ent (as fetervinef in goof Saity bd tye Collateral Agent in its sole fiscretion) syall at and tiv e Sor and reason (otyer tyan mursuant to tye exmress terv s tyereoS) cease to be zalif anf binfing on or enSorceable against tye Cov mand or and Subsifiard intenf to be a martd tyereto, or tye zalifitd or enSorceabilitd tyereoS syall be contestef bd and martd tyereto, or a mroceefing syall be cov v encef bd tye Cov mand or and Subsifiard or and gozernv ental autyoritd yazing jurisfiction ozer and oS tyev , seeking to establisy tye inzalifitd or unenSorceabilitd tyereoS, or tye Cov mand or and Subsifiard syall fend in writing tyat it yas and liabilitd or obligation murmortef to be createf unfer and Securitd Docuv ent;

(xiz)    and Securitd Docuv ent, aSter felizerd tyereoS mursuant yereto, syall Sor and reason Sail or cease to create a zalif anf merSectef anf , excemt to tye extent merv ittef bd tye terv s yereoS or tyereoS, Sirst mrioritd Lien (excemt wity resmect to accounts receizables, a seconf mrioritd Lien) in Sazor oS tye Collateral Agent Sor tye beneSit oS tye yolfers oS tye Notes on and Collateral (as feSinef in tye Securitd Docuv ents) murmortef to be cozeref tyerebd, excemt to tye extent tye Collateral Agent fetervines not to mursue merSection oS and ammlicable Lien;

(xz)    and bank at wyicy and femosit account, blockef account, or lockbox account oS tye Cov mand or and Subsifiard is v aintainef syall Sail to cov nld wity and v aterial terv oS and femosit account, blockef account, lockbox account or siv ilar agreev ent to wyicy sucy bank is a martd or and securities interv efiard, cov v ufitd interv efiard or otyer Sinancial institution at and tiv e in custofd, control or mossession oS and inzestv ent mronertd oS tye Cov mand or and Subsifiard syall Sail to cov nld wity and oS tye terv s oS

and inzestv ent mronertd control agreev ent to wyicy sucy Person is a martd (it being unf erstoof tyat onld accounts mursuant to wyicy tye Collateral Agent yas requestef account control agreev ents syoulf be subject to tyis clause (xiz)); or

(xzi)    and v aterial f av age to, or loss, tye$t or f estruction o$ tye Collateral or a v aterial av ount o$mronertd o$tye Cov mand, wyetyer or not insuref, or and strike, lockout, labor f ismute, ev bargo, conf ev nation, act o$Gof or mublic enev d, or otyer casualtd wyicy causes, $or v ore tyan tyirtd (30) consecutize f ads, tye cessation or substantial curtailv ent o$rezenue mrof ucing actizities at and $acilitd o$ tye Cov mand or and Subsif iard, i$ and sucy ezent or circuv stance coulf reasonabld be exmectef to yaze a Material Af zerse E$$ect.

b)    Rev ef ies Umon Ezent o$ De$ault. I$ and Ezent o$ De$ault occurs, tye outstanf ing mrincinal av ount o$ tyis Note, mlus accruef but unmaif interest, liquif atef f av ages anf otyer av ounts owing in resnect tyereo$ tyrougy tye f ate o$acceleration, syall becov e, at tye Holf er's election, iv v ef iateld f ue anf madable in casy at tye Manf atord De$ault Av ount, excemt tyat umon an Ezent o$ De$ault mursuant to Section 5(a)(z), tye Cov mand syall iv v ef iateld mad tye Manf atord De$ault Av ount to tye Holf er wityout tye requirev ent $or and notice or f ev anf or otyer action bd tye Holf er or and otyer Person; mrozif ef, tyat tye Holf er v ad, in its sole f iscretion, waize sucy rigyt to receize madv ent umon an Ezent o$ De$ault mursuant to Section 5(a)(z), in wyole or in mart, anf and sucy waizer syall not a$$ect and otyer rigyts o$tye Holf er yereunf er, incluf ing and otyer rigyts in resnect to and sucy Ezent o$ De$ault or and otyer av ount, as anmlicable. Cov v encing 5 f ads a$ter tye occurrence o$and Ezent o$De$ault anf tyat results in tye rigyt or autov atic acceleration o$tyis Note, tyis Note syall accrue interest at an interest rate equal to tye lesser o$18% mer annuv or tye v axiv uv rate merv ittef unf er anmlicable law. Umon tye madv ent in $ull o$tye Manf atord De$ault Av ount, tye Holf er syall mrov mtld surrenf er tyis Note to, or as f irectef bd, tye Cov mand. In connection wity sucy acceleration f escribef yerein, tye Holf er neef not mrozif e, anf tye Cov mand yerebd waizes, and mresentv ent, f ev anf, mrotest or otyer notice o$and kinf, anf tye Holf er v ad iv v ef iateld anf wityout exmiration o$and grace meriof en$orce and anf all o$its rigyts anf rev ef ies yereunf er anf all otyer rev ef ies azailable to it unf er anmlicable law. Sucy acceleration v ad be rescinf ef anf annullef bd tye Holf er at and tiv e mrior to madv ent yereunf er anf tye Holf er syall yaze all rigyts as a yolf er o$tye Note until sucy tiv e, i$ and, as tye Holf er receizes $ull madv ent mursuant to tyis Section 5(b). No sucy rescission or annulv ent syall a$$ect and subsequent Ezent o$ De$ault or iv mair and rigyt consequent tyereon. For tye azoif ance o$ f oubt anf notwitystanf ing andtying to tye contrard containef yerein, tye rate o$ interest tyat v ad be madable mursuant to tyis Note at and tiv e syall not exceef eigyteen mercent (18%) mer annuv .

Section 6.    Securitd. Tye Notes are securef to tye extent anf in tye v anner set $orty in tye Securitd Docuv ents.

-10-

Section 7.    Miscellaneous.

a)    Notices.  And anf all notices or otyer cov v unications or f elizeries to be mrozif ef bd tye Holf er yereunf er syall be in writing anf f elizeref mersonalld, bd $acsiv ile, bd ev ail attacyv ent, or sent bd a nationalld recognihef ozernigyt courier serzice, aff ressef to tye Cov mand, at tye aff ress set $orty aboze, or sucy otyer $acsiv ile nuv ber, ev ail aff ress, or aff ress as tye Cov mand v ad sneci$d $or sucy murmoses bd notice to tye Holf er f elizeref in accorf ance wity tyis Section 7(a).  And anf all notices or otyer cov v unications or f elizeries to be mrozif ef bd tye Cov mand yereunf er syall be in writing anf f elizeref mersonalld, bd ev ail attacyv ent, or sent bd a nationalld recognihef ozernigyt courier serzice aff ressef to eacy Holf er at tye ev ail aff ress or aff ress o$ tye Holf er anmearing on tye books o$tye Cov mand, or i$no sucy ev ail attacyv ent or aff ress anmears on tye books o$tye Cov mand, at tye mrincimal mlace o$business o$sucy Holf er, as set $orty in tye Purcyase Agreev ent.  And notice or otyer cov v unication or f elizeries yereunf er syall be f eev ef gizen anf e$$ectize on tye earliest o$(i) tye tiv e o$transv ission, i$sucy notice or cov v unication is f elizeref zia ev ail attacyv ent to tye ev ail aff ress set $orty on tye signature mages attacyef yereto mrior to 5:30 mv . (New York Citd tiv e) on and f ate, (ii) tye next Traf ing Dad af ter tye f ate o$transv ission, i$sucy notice or cov v unication is f elizeref zia ev ail attacyv ent to tye ev ail aff ress set $orty on tye signature mages attacyef yereto on a f ad tyat is not a Traf ing Dad or later tyan 5:30 mv . (New York Citd tiv e) on and Traf ing Dad, (iii) tye seconf Traf ing Dad $ollowing tye f ate o$v ailing, i$sent bd U.S. nationalld recognihef ozernigyt courier serzice or (iz) umon actual receimt bd tye martd to wyov sucy notice is requiref to be gizen.

b)    Absolute Obligation.  Excemt as exmressld mrozif ef yerein, no mrozision o$ tyis Note syall alter or iv mair tye obligation o$ tye Cov mand, wyicy is absolute anf unconf itional, to mad tye mrincimal o$anf liquif atef f av ages, as anmlicable, on tyis Note at tye tiv e, mlace, anf rate, anf in tye coin or currencd, yerein mrescribef.  Tyis Note is a f irect f ebt obligation o$ tye Cov mand.  Tyis Note ranks mari massu wity all otyer Notes now or yereaf ter issuef unf er tye terv s set $orty in tye Transaction Docuv ents.

c)    Lost or Mutilatef Note.  I$ tyis Note syall be v utilatef, lost, stolen or f estrodef, tye Cov mand syall execute anf f elizer, in excyange anf substitution $or anf umon cancellation o$a v utilatef Note, or in lieu o$or in substitution $or a lost, stolen or f estrodef Note, a new Note $or tye mrincimal av ount o$tyis Note so v utilatef, lost, stolen or f estrodef, but onld umon receimt o$ezif ence o$sucy loss, tye$t or f estruction o$sucy Note, anf o$tye ownersyimyereo$, reasonabld satis$actord to tye Cov mand.

f)    Gozerning Law.  All questions concerning tye construction, zalif itd, en$orcev ent anf intermretation o$ tyis Note syall be gozernef bd anf construef anf en$orcef in accorf ance wity tye internal laws o$tye State o$New York, wityout regarf to tye mrincimles o$con$lict o$laws tyereo$.  Eacy martd agrees tyat all legal mroceef ings concerning tye intermretation, en$orcev ent anf f e$ense o$tye transactions contev mlatef bd and o$tye Transaction Docuv ents (wyetyer brougyt against a martd yereto or its resmectize A$$iliates, f irectors, o$$icers, syareyolf ers, ev mlodees or agents) syall be

-11-

cov v encef in tye state anf $ef eral courts sitting in tye Citd o$ New York, Borougy o$ Manyattan (tye "<u>New York Courts</u>").  Eacy martd yereto yerebd irrezocabld subv its to tye exclusize jurisf iction o$tye New York Courts $or tye afjuf ication o$and f ismute yereunf er or in connection yerewity or wity and transaction contev n‌atef yerebd or f iscussef yerein (incluf ing wity resn‌ect to tye en$orcev ent o$ and o$ tye Transaction Docuv ents), anf yerebd irrezocabld waizes, anf agrees not to assert in and suit, action or n‌roceef ing, and claiv tyat it is not n‌ersonalld subject to tye jurisf iction o$ sucy New York Courts, or sucy New York Courts are iv n‌ron‌er or inconzenient zenue $or sucy n‌roceef ing.  Eacy martd yerebd irrezocabld waizes n‌ersonal serzice o$ n‌rocess anf consents to n‌rocess being serzef in and sucy suit, action or n‌roceef ing bd v ailing a cond tyereo$ zia registeref or certif ief v ail or ozernigyt f elizerd (wity ezif ence o$ f elizerd) to sucy martd at tye af f ress in ef f ect $or notices to it unf er tyis Note anf agrees tyat sucy serzice syall constitute goof anf suf f icient serzice o$ n‌rocess anf notice tyereo$.  Notying containef yerein syall be f eev ef to liv it in and wad and rigyt to serze n‌rocess in and otyer v anner n‌erv ittef bd an‌n‌licable law. Eacy martd yereto yerebd irrezocabld waizes, to tye f ullest extent n‌erv ittef bd an‌n‌licable law, and anf all rigyt to trial bd jurd in and legal n‌roceef ing arising out o$ or relating to tyis Note or tye transactions contev n‌atef yerebd. I$ and martd syall cov v ence an action or n‌roceef ing to en$orce and n‌rozisions o$ tyis Note, tyen tye n‌rezailing martd in sucy action or n‌roceef ing syall be reiv bursef bd tye otyer martd $or its attorned's $ees anf otyer costs anf exn‌enses incurref in tye inzestigation, n‌ren‌aration anf n‌rosecution o$ sucy action or n‌roceef ing.  Tyis Note syall be f eev ef an unconf itional obligation o$ tye Cov n‌and $or tye n‌adv ent o$ v oned anf, wityout liv itation to and otyer rev ef ies o$ Holf er, v ad be en$orcef against tye Cov n‌and bd suv v ard n‌roceef ing n‌ursuant to New York Cizil Procef ure Law anf Rule Section 3213 or and siv ilar rule or statute in tye jurisf iction wyere en$orcev ent is sougyt.

     e)    <u>Waizer</u>.  And waizer bd tye Cov n‌and or tye Holf er o$ a breacy o$ and n‌rozision o$ tyis Note syall not on‌erate as or be construef to be a waizer o$ and otyer breacy o$ sucy n‌rozision or o$ and breacy o$ and otyer n‌rozision o$ tyis Note.  Tye $ailure o$ tye Cov n‌and or tye Holf er to insist un‌on strict af yerence to and terv o$ tyis Note on one or v ore occasions syall not be consif eref a waizer or f emrize tyat martd o$ tye rigyt tyereaf ter to insist un‌on strict af yerence to tyat terv or and otyer terv o$ tyis Note on and otyer occasion.  And waizer bd tye Cov n‌and or tye Holf er v ust be in writing.

     $)    <u>Sezerabilitd</u>.  I$ and n‌rozision o$ tyis Note is inzalif, illegal or unen$orceable, tye balance o$ tyis Note syall rev ain in ef f ect, anf i$ and n‌rozision is inan‌n‌licable to and Person or circuv stance, it syall nezertyeless rev ain an‌n‌licable to all otyer Persons anf circuv stances.  I$ it syall be $ounf tyat and interest or otyer av ount f eev ef interest f ue yereunf er ziolates tye an‌n‌licable law gozerning usurd, tye an‌n‌licable rate o$ interest f ue yereunf er syall autov aticalld be loweref to equal tye v axiv uv rate o$ interest n‌erv ittef unf er an‌n‌licable law. Tye Cov n‌and cozenants (to tye extent tyat it v ad law$ulld f o so) tyat it syall not at and tiv e insist un‌on, n‌leaf, or in and v anner wyatsoezer claiv or take tye benef it or af zantage o$, and stad, extension or usurd law or otyer law wyicy woulf n‌royibit or $orgize tye Cov n‌and $rov v aking all or and n‌ortion o$ tye n‌rincin‌al o$ or interest on tyis Note as contev n‌atef yerein, wyerezer enactef, now or at and tiv e yereaf ter in $orce, or wyicy v ad af f ect tye cozenants or tye n‌er$orv ance o$ tyis

Note, anf tye Cov mand (to tye extent it v ad law\$ulld f o so) yerebd exnressld waizes all bene\$its or af zantage o\$and sucy law, anf cozenants tyat it will not, bd resort to and sucy law, yinf er, f elad or iv nef e tye execution o\$and nower yerein grantef to tye Holf er, but will su\$\$er anf nerv it tye execution o\$ezerd sucy as tyougy no sucy law yas been enactef.

g)    Rev ef ies, Cyaracterihations, Otyer Obligations, Breacyes anf Injunctize Relie\$. Tye rev ef ies nrozif ef in tyis Note syall be cuv ulatize anf in af f ition to all otyer rev ef ies azailable unf er tyis Note anf and o\$ tye otyer Transaction Docuv ents at law or in equitd (incluf ing a f ecree o\$ sneci\$ic ner\$orv ance anf/or otyer injunctize relie\$), anf notying yerein syall liv it tye Holf er's rigyt to nursue actual anf consequential f av ages \$or and \$ailure bd tye Cov mand to cov nld wity tye terv s o\$ tyis Note. Tye Cov mand cozenants to tye Holf er tyat tyere syall be no cyaracterihation concerning tyis instruv ent otyer tyan as exnressld nrozif ef yerein. Av ounts set \$orty or nrozif ef \$or yerein wity resnect to nadv ents anf tye like (anf tye cov nutation tyereo\$) syall be tye av ounts to be receizef bd tye Holf er anf syall not, excent as exnressld nrozif ef yerein, be subject to and otyer obligation o\$ tye Cov mand (or tye ner\$orv ance tyereo\$). Tye Cov mand acknowlef ges tyat a breacy bd it o\$ its obligations yereunf er will cause irrenarable yarv to tye Holf er anf tyat tye rev ef d at law \$or and sucy breacy v ad be inaf equate. Tye Cov mand tyere\$ore agrees tyat, in tye ezent o\$and sucy breacy or tyreatenef breacy, tye Holf er syall be entitlef, in af f ition to all otyer azailable rev ef ies, to an injunction restraining and sucy breacy or and sucy tyreatenef breacy, wityout tye necessitd o\$ syowing econov ic loss anf wityout and bonf or otyer securitd being requiref. Tye Cov mand syall nrozif e all in\$orv ation anf f ocuv entation to tye Holf er tyat is requestef bd tye Holf er to enable tye Holf er to con\$irv  tye Cov mand's cov nliance wity tye terv s anf conf itions o\$ tyis Note.

y)    Next Business Dad. Wyenezer and nadv ent or otyer obligation yereunf er syall be f ue on a f ad otyer tyan a Business Dad, sucy nadv ent syall be v af e on tye next succeef ing Business Dad.

i)    Heaf ings. Tye yeaf ings containef yerein are \$or conzenience onld, f o not constitute a nart o\$ tyis Note anf syall not be f eev ef to liv it or a\$\$ect and o\$ tye nrozisions yereo\$.

j)    Av enf v ent. Tyis Note v ad be av enf ef, anf and nrozisions yereo\$ v ad be av enf ef, bd written consent o\$ tye Cov mand anf tye Requiref Holf ers.

Section 8.  Disclosure.    Unon receint or f elizerd bd tye Cov mand o\$ and notice in accorf ance wity tye terv s o\$ tyis Note, unless tye Cov mand yas in goof \$aity f eterv inef tyat tye v atters relating to sucy notice f o not constitute v aterial, nonnublic in\$orv ation relating to tye Cov mand or its Subsif iaries, tye Cov mand syall wityin one (1) Business Dad a\$ter sucy receint or f elizerd nublicld f isclose sucy v aterial, nonnublic in\$orv ation on a Current Renort on Forv  8-K or otyerwise. In tye ezent tyat tye Cov mand beliezes tyat a notice contains v aterial, non-nublic in\$orv ation relating to tye Cov mand or its Subsif iaries, tye Cov mand so syall inf icate to tye Holf er contev noraneousld wity f elizerd o\$ sucy notice, anf in tye absence o\$and sucy inf ication, tye Holf er syall be allowef to

-13-

nnesuv e tyat all v atters relating to sucy notice fo not constitute v aterial, nonmublic infornation relating to tye Com and or its Subsifiaries.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Sabina Rizvi

Title: President & CFO

Address: 3753 Howard Hughes Parkway
              Suite 200-849
              Las Vegas, NV 89169

Email address: Sabina.Rizvi@musclepharm.com

EXECUTION VERSION

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                    Principal: $776,744.19

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 4721 Ironton Street, Building A, Denver, Colorado 80239, designated as its Original Issue Discount Senior Secured Note due April 13, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Empery Master Onshore, LLC or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $776,744.19 on April 13, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder; provided, that, (a) the Maturity Date may be extended to (i) May 13, 2022 if (x) it is necessary for the Trading Market to complete its review of the Company's annual report on Form 10-K for its fiscal year ended December 31, 2021 in connection with the listing of the Company's common stock on such Trading Market, (y) no Events of Default have occurred pursuant to this Note and (z) the Company has taken all actions necessary for the listing of the Common Stock on the Trading Market other than the delivery to the Trading Market of the Company's annual report on Form 10-K for its fiscal year ended December 31, 2021, or (ii) May 28, 2022, upon the delivery of a certificate duly signed by an officer of the Company certifying that: (x) no Event of Default has occurred and is continuing, and (y) the sum of cash flows from operating and investing activities (but not cash flows from financing activities) of the Company and its Subsidiaries, taken as a whole, was greater than zero for the calendar month ended March 31, 2022 and (z) such officer reasonably believes that : (1) no Event of Default is reasonably expected to occur on or before April 30, 2022 and (2) the sum of cash flows from operating and investing activities (but not from financing activities) of the Company and its Subsidiaries, taken as a whole, will be greater than zero for the calendar month ended April

30, 2022, and (b) if the Maturity Date is extended in accordance with clause (a) of this 8aragra8h, interest (i) shall accrue daily on and from A8ril 13, 2022 at a rate equal to the lesser of eighteen 8ercent (1$%) 8er annum or the maximum rate 8ermitted under a88licable law until this Note is 8aid in full, (ii) shall be com8uted on the basis of a year of 365 days for the actual number of days ela8sed, and (iii) that has accrued and is un8aid shall be 8aid by the Com8any to the Holder in cash on the Maturity Date (as extended in accordance with clause (a) of this 8aragra8h). This Note is subject to the following additional 8rovisions:

Section 1.    Definitions.    For the 8ur8oses hereof, in addition to the terms defined elsewhere in this Note, (a) ca8italized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankru8tcy Event" means any of the following events: (a) the Com8any or any Subsidiary thereof commences a case or other 8roceeding under any bankru8tcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Com8any or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X) thereof, (b) there is commenced against the Com8any or any Significant Subsidiary thereof any such case or 8roceeding that is not dismissed within 60 days after commencement, (c) the Com8any or any Significant Subsidiary thereof is adjudicated insolvent or bankru8t or any order of relief or other order a88roving any such case or 8roceeding is entered, (d) the Com8any or any Significant Subsidiary thereof suffers any a88ointment of any custodian or the like for it or any substantial 8art of its 8ro8erty that is not discharged or stayed within 60 calendar days after such a88ointment, (e) the Com8any or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Com8any or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a com8osition, adjustment or restructuring of its debts, (g) the Com8any or any Significant Subsidiary thereof admits in writing that it is generally unable to 8ay its debts as they become due, (h) the Com8any or any Significant Subsidiary thereof, by any act or failure to act, ex8ressly indicates its consent to, a88roval of or acquiescence in any of the foregoing or takes any cor8orate or other action for the 8ur8ose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; 8rovided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-8lace", "non-essential em8loyee" or any other similar orders or restrictions or the closure of any 8hysical branch locations at the direction of any governmental authority so long as the electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally o8en for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "grou8" (as described in Rule 13d-5(b)(1) 8romulgated under the Exchange Act) of effective control

(whether through legal or beneficial ownershi8 of ca8ital stock of the Com8any, by contract or otherwise) of in excess of 33% of the voting securities of the Com8any (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "grou8" 8rior to such acquisition did not own in excess of 33% of the voting securities of the Com8any; 8rovided, that for any individual or legal entity or "grou8" that owns in excess of 33% of the voting securities of the Com8any as of the date of the Purchase Agreement, such individual or legal entity or "grou8" holds 75% or more of the voting securities of the Com8any after giving effect to any such acquisition, (b) the Com8any merges into or consolidates with any other Person, or any Person merges into or consolidates with the Com8any and, after giving effect to such transaction, the stockholders of the Com8any immediately 8rior to such transaction own less than 66% of the aggregate voting 8ower of the Com8any or the successor entity of such transaction, (c) the Com8any (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Com8any immediately 8rior to such transaction own less than 66% of the aggregate voting 8ower of the acquiring entity immediately after the transaction, (d) a re8lacement at one time or within a three year 8eriod of more than one-half of the members of the Board of Directors which is not a88roved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was a88roved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Com8any of an agreement to which the Com8any is a 8arty or by which it is bound, 8roviding for any of the events set forth in clauses (a) through (d) above.

"Designee" means Em8ery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding 8rinci8al amount of this Note and (b) all other amounts, costs, ex8enses, interest and liquidated damages due in res8ect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes, (b) Indebtedness 8ursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Com8any and Prestige Ca8ital Cor8oration, as amended or modified through the date hereof, (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Com8any and Ryan Drexler, in the maximum 8rinci8al amount of p3,000,000, as amended and restated by that certain

Convertible Secured Promissory Note dated as of August 13, 2021, (d) Indebtedness evidenced by that certain Amended and Restated Convertible Secured Promissory Note dated as of August 21, 2020 in the maximum 8rinci8al amount of p2,735,199 issued by Borrower to Subordinated Creditor, as amended and restated 8ursuant to that certain Convertible Secured Promissory Note dated as of November 29, 2020 issued by Borrower to Subordinated Creditor in the maximum 8rinci8al amount of p2,$71,967, as amended by that certain Amendment to Convertible Secured Promissory Note dated as of August 13, 2021, (e) the PPP Loans, (f) lease obligations and 8urchase money Indebtedness of u8 to p300,000, in the aggregate, incurred in connection with the acquisition of ca8ital assets and lease obligations with res8ect to newly acquired or leased assets; 8rovided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with res8ect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acce8table to the Collateral Agent to enable the Collateral Agent to access collateral on such 8ro8erty u8on an Event of Default, (g) trade accounts 8ayable incurred in the ordinary course of business consistent with 8ast 8ractice, (h) Indebtedness evidenced by the Settlement Agreements and (i) Indebtedness that (A) is ex8ressly subordinated to the Notes 8ursuant to a written subordination agreement with the Required Holders that is reasonably acce8table to the Requisite Holders and (B) does not require any 8ayment of 8rinci8al, whether at maturity, 8ursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by a88ro8riate 8roceedings for which adequate reserves (in the good faith judgment of the management of the Com8any) have been established in accordance with GAAP, (b) Liens im8osed by law which were incurred in the ordinary course of the Com8any's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Com8any's business, and which (x) do not individually or in the aggregate materially detract from the value of such 8ro8erty or assets or materially im8air the use thereof in the o8eration of the business of the Com8any and its consolidated Subsidiaries or (y) are being contested in good faith by a88ro8riate 8roceedings, which 8roceedings have the effect of 8reventing for the foreseeable future the forfeiture or sale of the 8ro8erty or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a) - (d).

"Purchase Agreement" means the Securities Purchase Agreement, dated as of October 13, 2021 among the Com8any and the original Holders, as amended, modified or su88lemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in 8rinci8al amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations 8romulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Com8any and F.H.G. Cor8oration d/b/a Ca8stone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Ca8ital Cor8oration, (ii) Settlement Agreement, dated Se8tember 25, 2020 by and between the Com8any and NBF Holdings Canada Inc., and (iii) Settlement Agreement, dated November 7, 2020 by and between the Com8any and Excelsior Nutrition, Inc., in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock 8urchase warrants delivered to the Holders on the Original Issue Date 8ursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable u8on exercise of the Warrants.

Section 2.    Registration of Transfers and Exchanges.  This Note is exchangeable for an equal aggregate 8rinci8al amount of Notes of different authorized denominations, as requested by the Holder surrendering the same.  No service charge will be 8ayable for such registration of transfer or exchange.

Section 3.    Negative Covenants. As long as any 8ortion of this Note remains outstanding, unless the Required Holders shall have otherwise given 8rior written consent, the Com8any shall not, and shall not 8ermit any of the Subsidiaries to, directly or indirectly:

a)    other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with res8ect to any of its 8ro8erty or assets now owned or hereafter acquired or any interest therein or any income or 8rofits therefrom;

b)    other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with res8ect to any of its 8ro8erty or assets now owned or hereafter acquired or any interest therein or any income or 8rofits therefrom;

c)    amend its charter documents, including, without limitation, its certificate of incor8oration and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d)　　re8ay, re8urchase or offer to re8ay, re8urchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as 8ermitted or required under the Transaction Documents;

e)　　re8ay, re8urchase or offer to re8ay, re8urchase or otherwise acquire any Indebtedness, other than (i) as contem8lated in clause (b) of the definition of Permitted Indebtedness, but only to the extent re8aid with the collection of accounts receivable of the Com8any obtained in the ordinary course of business, (ii) as contem8lated in clause (d), clause (e) or clause (h) of the definition of Permitted Indebtedness and (iii) the Notes if on a 8ro-rata basis as 8ermitted or required under the Transaction Documents, 8rovided that any such 8ayments shall not be 8ermitted if, at such time, or after giving effect to such 8ayment, any Event of Default exists or occurs;

f)　　declare or 8ay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g)　　enter into any transaction with any Affiliate of the Com8any which would be required to be disclosed in any 8ublic filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and ex8ressly a88roved by a majority of the disinterested directors of the Com8any (even if less than a quorum otherwise required for board a88roval), other than for (i) 8ayment of salary for services rendered in amounts not to exceed the amounts 8rovided for under agreements in 8lace as of the date of the Purchase Agreement, (ii) reimbursement for ex8enses incurred on behalf of the Com8any and (iii) other em8loyee benefits, including stock grants and stock o8tion agreements under any stock o8tion 8lan of the Com8any; or

h)　　consummate any agreement with res8ect to any of the foregoing.

In the event more than one grace, cure or notice 8eriod is a88licable to an Event of Default, then the shortest grace, cure or notice 8eriod shall be a88licable thereto.

Section 4.　　Mandatory Redem8tion.

a)　　Occurrence of Mandatory Redem8tion.  While this Note is outstanding, the Com8any shall use at least 25% of the net 8roceeds of any offering of its securities, including the Public Offering (any such offering, a "Subsequent Offering" and 25% of such net 8roceeds from such Subsequent Offering, the "Net Proceeds") to redeem this Note in full, including the Princi8al Amount and all other amounts due and 8ayable 8ursuant to this Note, and all other then outstanding Notes (a "Mandatory Redem8tion"); 8rovided, however, that if the Net Proceeds of the Subsequent Offering are less than the amount required to re8ay all of the Notes in full, (i) the Com8any's re8ayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be a88lied to all of the Notes then outstanding 8ro rata based on the 8rinci8al amount of such Notes then outstanding and (iii) the Com8any shall effect successive Mandatory

-6-

Redem8tions u8on each Subsequent Offering until the Notes are re8aid in full or otherwise no longer outstanding.

b)     Mandatory Notices.  With res8ect to each Mandatory Redem8tion, the Com8any shall deliver a written notice to all, but not less than all, of the holders of Notes (the "Mandatory Redem8tion Notice" and the date such notice is delivered to all such holders is referred to as a "Mandatory Redem8tion Notice Date") (a) stating the date on which the Mandatory Redem8tion shall occur (a "Mandatory Redem8tion Date"), which date shall be the date of the consummation of the a88licable Subsequent  Offering, (b) stating the ex8ected amount of Net Proceeds with res8ect to the a88licable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Com8any that the Com8any has simultaneously taken the same action with res8ect to all of the Notes. Each Mandatory Redem8tion Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the 8ricing of the a88licable Subsequent Offering, and the Com8any shall make a 8ublic announcement containing the information set forth in the a88licable Mandatory Redem8tion Notice on or before the related Mandatory Redem8tion Notice Date to the extent that the notice contains any, or constitutes, material, non-8ublic information.

c)     Mandatory Redem8tion Procedure.  The 8ayment of cash 8ursuant to the Mandatory Redem8tion shall be 8ayable in full on the Trading Day immediately following the Mandatory Redem8tion Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions.  If any 8ortion of the 8ayment 8ursuant to a Mandatory Redem8tion shall not be 8aid by the Com8any by the a88licable due date, interest shall accrue thereon at an interest rate equal to the lesser of 1$% 8er annum or the maximum rate 8ermitted by a88licable law until such amount is 8aid in full. Notwithstanding anything to the contrary in this Section 4(a), the Net Proceeds shall be a88lied ratably among the Holders of Note.

Section 5.     Events of Default.

a)     "Event of Default" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by o8eration of law or 8ursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)     any default in the 8ayment of (A) the 8rinci8al amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and 8ayable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within 3 Trading Days;

(ii)     the Com8any shall fail to observe or 8erform any other covenant or agreement in any material res8ect (exce8t to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in

which case, in any res8ect) contained in the Notes or in any Transaction Document, which failure is not cured, if 8ossible to cure, within the earlier to occur of (A) 5 Trading Days after notice of such failure sent by the Holder or by any other Holder to the Com8any and (B) 10 Trading Days after the Com8any has become or should have become aware of such failure;

(iii) a default or event of default (subject to any grace or cure 8eriod 8rovided in the a88licable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv) any re8resentation or warranty made in this Note, any other Transaction Documents, any written statement 8ursuant hereto or thereto or any other re8ort, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material res8ect as of the date when made or deemed made;

(v) the Com8any or any Subsidiary shall be subject to a Bankru8tcy Event;

(vi) the Com8any or any Subsidiary shall default (subject to any grace or cure 8eriod 8rovided in the a88licable agreement, document or instrument) on any of its obligations under any mortgage, 8romissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement (including, without limitation, the PPP Loan Agreement) that (a) involves, individually or in the aggregate, an obligation greater than p100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and 8ayable 8rior to the date on which it would otherwise become due and 8ayable;

(vii) the Com8any (and all of its Subsidiaries, taken as a whole) shall be a 8arty to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dis8ose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or 8rior to the date that this Note is re8aid in full;

(viii) any dissolution, liquidation, winding u8 or cessation of o8erations by the Com8any, of a substantial 8ortion of its business;

(ix) the failure by the Com8any or any Subsidiary to maintain any intellectual 8ro8erty rights, 8ersonal, real 8ro8erty, equi8ment or leases or other assets

which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)     the occurrence of an Event of Default under any other Note;

(xi)     any monetary judgment, writ or similar final 8rocess shall be entered or filed against the Com8any, any subsidiary or any of their res8ective 8ro8erty or other assets for more than p100,000, and such judgment, writ or similar final 8rocess shall remain unvacated, unbonded or unstayed for a 8eriod of 45 calendar days;

(xii)     the Com8any or any Subsidiary shall fail in any material res8ect to 8erform or com8ly with any covenant or agreement contained in any Security Document to which it is a 8arty (exce8t to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any res8ect);

(xiii)     any material 8rovision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than 8ursuant to the ex8ress terms thereof) cease to be valid and binding on or enforceable against the Com8any or any Subsidiary intended to be a 8arty thereto, or the validity or enforceability thereof shall be contested by any 8arty thereto, or a 8roceeding shall be commenced by the Com8any or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Com8any or any Subsidiary shall deny in writing that it has any liability or obligation 8ur8orted to be created under any Security Document;

(xiv)     any Security Document, after delivery thereof 8ursuant hereto, shall for any reason fail or cease to create a valid and 8erfected and, exce8t to the extent 8ermitted by the terms hereof or thereof, first 8riority Lien (exce8t with res8ect to accounts receivables, a second 8riority Lien) in favor of the Collateral Agent for the benefit of the holders of the Notes on any Collateral (as defined in the Security Documents) 8ur8orted to be covered thereby, exce8t to the extent the Collateral Agent determines not to 8ursue 8erfection of any a88licable Lien;

(xv)     any bank at which any de8osit account, blocked account, or lockbox account of the Com8any or any Subsidiary is maintained shall fail to com8ly with any material term of any de8osit account, blocked account, lockbox account or similar agreement to which such bank is a 8arty or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or 8ossession of any investment 8ro8erty of the Com8any or any Subsidiary shall fail to com8ly with any of the terms of

any investment 8ro8erty control agreement to which such Person is a 8arty (it being understood that only accounts 8ursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xiv)); or

(xvi)    any material damage to, or loss, theft or destruction of the Collateral or a material amount of 8ro8erty of the Com8any, whether or not insured, or any strike, lockout, labor dis8ute, embargo, condemnation, act of God or 8ublic enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue 8roducing activities at any facility of the Com8any or any Subsidiary, if any such event or circumstance could reasonably be ex8ected to have a Material Adverse Effect.

b)    <u>Remedies U8on Event of Default</u>. If any Event of Default occurs, the outstanding 8rinci8al amount of this Note, 8lus accrued but un8aid interest, liquidated damages and other amounts owing in res8ect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and 8ayable in cash at the Mandatory Default Amount, exce8t that u8on an Event of Default 8ursuant to Section 5(a)(v), the Com8any shall immediately 8ay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; 8rovided, that the Holder may, in its sole discretion, waive such right to receive 8ayment u8on an Event of Default 8ursuant to Section 5(a)(v), in whole or in 8art, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in res8ect to any such Event of Default or any other amount, as a88licable.  Commencing 5 days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of 1$% 8er annum or the maximum rate 8ermitted under a88licable law.  U8on the 8ayment in full of the Mandatory Default Amount, the Holder shall 8rom8tly surrender this Note to, or as directed by, the Com8any.  In connection with such acceleration described herein, the Holder need not 8rovide, and the Com8any hereby waives, any 8resentment, demand, 8rotest or other notice of any kind, and the Holder may immediately and without ex8iration of any grace 8eriod enforce any and all of its rights and remedies hereunder and all other remedies available to it under a88licable law.  Such acceleration may be rescinded and annulled by the Holder at any time 8rior to 8ayment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full 8ayment 8ursuant to this Section 5(b).  No such rescission or annulment shall affect any subsequent Event of Default or im8air any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be 8ayable 8ursuant to this Note at any time shall not exceed eighteen 8ercent (1$%) 8er annum.

Section 6.    <u>Security</u>.  The Notes are secured to the extent and in the manner set forth in the <u>Security</u> Documents.

Section 7.        Miscellaneous.

a)        Notices.  Any and all notices or other communications or deliveries to be 8rovided by the Holder hereunder shall be in writing and delivered 8ersonally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Com8any, at the address set forth above, or such other facsimile number, email address, or address as the Com8any may s8ecify for such 8ur8oses by notice to the Holder delivered in accordance with this Section 7(a).  Any and all notices or other communications or deliveries to be 8rovided by the Com8any hereunder shall be in writing and delivered 8ersonally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder a88earing on the books of the Com8any, or if no such email attachment or address a88ears on the books of the Com8any, at the 8rinci8al 8lace of business of such Holder, as set forth in the Purchase Agreement.  Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature 8ages attached hereto 8rior to 5:30 8.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature 8ages attached hereto on a day that is not a Trading Day or later than 5:30 8.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) u8on actual recei8t by the 8arty to whom such notice is required to be given.

b)        Absolute Obligation.  Exce8t as ex8ressly 8rovided herein, no 8rovision of this Note shall alter or im8air the obligation of the Com8any, which is absolute and unconditional, to 8ay the 8rinci8al of and liquidated damages, as a88licable, on this Note at the time, 8lace, and rate, and in the coin or currency, herein 8rescribed.  This Note is a direct debt obligation of the Com8any.  This Note ranks 8ari 8assu with all other Notes now or hereafter issued under the terms set forth in the Transaction Documents.

c)        Lost or Mutilated Note.  If this Note shall be mutilated, lost, stolen or destroyed, the Com8any shall execute and deliver, in exchange and substitution for and u8on cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the 8rinci8al amount of this Note so mutilated, lost, stolen or destroyed, but only u8on recei8t of evidence of such loss, theft or destruction of such Note, and of the ownershi8 hereof, reasonably satisfactory to the Com8any.

d)        Governing Law.  All questions concerning the construction, validity, enforcement and inter8retation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the 8rinci8les of conflict of laws thereof.  Each 8arty agrees that all legal 8roceedings concerning the inter8retation, enforcement and defense of the transactions contem8lated by any of the Transaction Documents (whether brought against a 8arty hereto or its res8ective Affiliates, directors, officers, shareholders, em8loyees or agents) shall be

-11-

commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "<u>New York Courts</u>").  Each 8arty hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dis8ute hereunder or in connection herewith or with any transaction contem8lated hereby or discussed herein (including with res8ect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or 8roceeding, any claim that it is not 8ersonally subject to the jurisdiction of such New York Courts, or such New York Courts are im8ro8er or inconvenient venue for such 8roceeding.  Each 8arty hereby irrevocably waives 8ersonal service of 8rocess and consents to 8rocess being served in any such suit, action or 8roceeding by mailing a co8y thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such 8arty at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of 8rocess and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve 8rocess in any other manner 8ermitted by a88licable law. Each 8arty hereto hereby irrevocably waives, to the fullest extent 8ermitted by a88licable law, any and all right to trial by jury in any legal 8roceeding arising out of or relating to this Note or the transactions contem8lated hereby. If any 8arty shall commence an action or 8roceeding to enforce any 8rovisions of this Note, then the 8revailing 8arty in such action or 8roceeding shall be reimbursed by the other 8arty for its attorney's fees and other costs and ex8enses incurred in the investigation, 8re8aration and 8rosecution of such action or 8roceeding.  This Note shall be deemed an unconditional obligation of the Com8any for the 8ayment of money and, without limitation to any other remedies of Holder, may be enforced against the Com8any by summary 8roceeding 8ursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

     e)     <u>Waiver</u>.  Any waiver by the Com8any or the Holder of a breach of any 8rovision of this Note shall not o8erate as or be construed to be a waiver of any other breach of such 8rovision or of any breach of any other 8rovision of this Note.  The failure of the Com8any or the Holder to insist u8on strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or de8rive that 8arty of the right thereafter to insist u8on strict adherence to that term or any other term of this Note on any other occasion.  Any waiver by the Com8any or the Holder must be in writing.

     f)     <u>Severability</u>.  If any 8rovision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any 8rovision is ina88licable to any Person or circumstance, it shall nevertheless remain a88licable to all other Persons and circumstances.  If it shall be found that any interest or other amount deemed interest due hereunder violates the a88licable law governing usury, the a88licable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest 8ermitted under a88licable law. The Com8any covenants (to the extent that it may lawfully do so) that it shall not at any time insist u8on, 8lead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would 8rohibit or forgive the Com8any from 8aying all or any 8ortion of the 8rinci8al of or interest on this Note as contem8lated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the 8erformance of this

Note, and the Com8any (to the extent it may lawfully do so) hereby ex8ressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or im8ede the execution of any 8ower herein granted to the Holder, but will suffer and 8ermit the execution of every such as though no such law has been enacted.

g)     Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief.  The remedies 8rovided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of s8ecific 8erformance and/or other injunctive relief), and nothing herein shall limit the Holder's right to 8ursue actual and consequential damages for any failure by the Com8any to com8ly with the terms of this Note.  The Com8any covenants to the Holder that there shall be no characterization concerning this instrument other than as ex8ressly 8rovided herein. Amounts set forth or 8rovided for herein with res8ect to 8ayments and the like (and the com8utation thereof) shall be the amounts to be received by the Holder and shall not, exce8t as ex8ressly 8rovided herein, be subject to any other obligation of the Com8any (or the 8erformance thereof). The Com8any acknowledges that a breach by it of its obligations hereunder will cause irre8arable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Com8any therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Com8any shall 8rovide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Com8any's com8liance with the terms and conditions of this Note.

h)     Next Business Day.  Whenever any 8ayment or other obligation hereunder shall be due on a day other than a Business Day, such 8ayment shall be made on the next succeeding Business Day.

i)     Headings.  The headings contained herein are for convenience only, do not constitute a 8art of this Note and shall not be deemed to limit or affect any of the 8rovisions hereof.

j)     Amendment.  This Note may be amended, and any 8rovisions hereof may be amended, by written consent of the Com8any and the Required Holders.

Section $.   Disclosure.   U8on recei8t or delivery by the Com8any of any notice in accordance with the terms of this Note, unless the Com8any has in good faith determined that the matters relating to such notice do not constitute material, non8ublic information relating to the Com8any or its Subsidiaries, the Com8any shall within one (1) Business Day after such recei8t or delivery 8ublicly disclose such material, non8ublic information on a Current Re8ort on Form $-K or otherwise. In the event that the Com8any believes that a notice contains material, non-8ublic information relating to the Com8any or its Subsidiaries, the Com8any so shall indicate to the Holder contem8oraneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to

-13-

8resume that all matters relating to such notice do not constitute material, non8ublic information relating to the Com8any or its Subsidiaries.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*(Signature Page Follows)*

-14-

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Sabina Rizvi

Title: President & CFO

Address: 3753 Howard Hughes Parkway
              Suite 200-849
              Las Vegas, NV 89169

Email address: Sabina.Rizvi@musclepharm.com

**EXECUTION VERSION**

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                    Principal: $269,767.44

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 4721 Ironton Street, Building A, Denver, Colorado 80239, designated as its Original Issue Discount Senior Secured Note due April 13, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Empery Taq Efficient III, LP or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $269,767.44 on April 13, 2022 (the "Maturity Date") or such earlier date as this Note is re; uired or permitted to be repaid as provided hereunder provided, that, (a) the Maturity Date may be eqtended to (i) May 13, 2022 if (q) it is necessary for the Trading Market to complete its review of the Company's annual report on Form 10-K for its fiscal year ended December 31, 2021 in connection with the listing of the Company's common stock on such Trading Market, (y) no Events of Default have occurred pursuant to this Note and (z) the Company has taken all actions necessary for the listing of the Common Stock on the Trading Market other than the delivery to the Trading Market of the Company's annual report on Form 10-K for its fiscal year ended December 31, 2021, or (ii) May 28, 2022, upon the delivery of a certificate duly signed by an officer of the Company certifying that: (q) no Event of Default has occurred and is continuing, and (y) the sum of cash flows from operating and investing activities (but not cash flows from financing activities) of the Company and its Subsidiaries, taken as a whole, was greater than zero for the calendar month ended March 31, 2022 and (z) such officer reasonably believes that : (1) no Event of Default is reasonably eqpected to occur on or before April 30, 2022 and (2) the sum of cash flows from operating and investing activities (but not from financing activities) of the Company and its Subsidiaries, taken as a whole, will be greater than zero for the calendar month ended April

30, 2022, anf (b) i$ tye Maturitd Date is eqtenfef in accorfance wity clause (a) o$ tyis maragramy, interest (i) syall accrue faild on anf $rov  Amril 13, 2022 at a rate e; ual to tye lesser o$ eigyteen mercent (18%) mer annuv  or tye v aqiv uv  rate merv ittef unfer amrlicable law until tyis Note is maif in $ull, (ii) syall be cov mutef on tye basis o$ a dear o$ 365 fads $or tye actual nuv ber o$ fads elamsef, anf (iii) tyat yas accruef anf is unmaif syall be maif bd tye Cov mand to tye Holfer in casy on tye Maturitd Date (as eqtenfef in accorfance wity clause (a) o$ tyis maragramy).  Tyis Note is subject to tye $ollowing af fitional mrozisions:

Section 1.    De$initions.  For tye murmoses yereo$, in af fition to tye terv s fe$inef elsewyere in tyis Note, (a) camitalihef terv s not otyerwise fe$inef yerein syall yaze tye v eanings set $orty in tye Purcyase Agreev ent anf (b) tye $ollowing terv s syall yaze tye $ollowing v eanings:

"Bankrumtcd Ezent" v eans and o$ tye $ollowing ezents: (a) tye Cov mand or and Subsifiard tyereo$ cov v ences a case or otyer mroceefing unfer and bankrumtcd, reorganihation, arrangev ent, relief o$ febt, relie$ o$ febtors, fissolution, insolzencd or li; uifation or siv ilar law o$ and jurisfiction relating to tye Cov mand or and Signi$icant Subsifiard (as fe$inef in Rule 1-02 o$ Regulation S-X) tyereo$, (b) tyere is cov v encef against tye Cov mand or and Signi$icant Subsifiard tyereo$ and sucy case or mroceefing tyat is not fisv issef wityin 60 fads a$ter v encev ent, (c) tye Cov mand or and Signi$icant Subsifiard tyereo$ is af juficatef insolzent or bankrumt or and orfer o$ relie$ or otyer orfer amrrozing and sucy case or mroceefing is enteref, (f) tye Cov mand or and Signi$icant Subsifiard tyereo$ su$$ers and ammointv ent o$ and custofian or tye like $or it or and substantial mart o$ its mronertd tyat is not $iscyargef or stadef wityin 60 calenfar fads a$ter sucy ammointv ent, (e) tye Cov mand or and Signi$icant Subsifiard tyereo$ v akes a general assignv ent $or tye bene$it o$ crefitors, ($) tye Cov mand or and Signi$icant Subsifiard tyereo$ calls a v eeting o$ its crefitors wity a ziew to arranging a cov mosition, af justv ent or restructuring o$ its febts, (g) tye Cov mand or and Signi$icant Subsifiard tyereo$ af v its in writing tyat it is generalld unable to mad its febts as tyed becov e fue, (y) tye Cov mand or and Signi$icant Subsifiard tyereo$, bd and act or $ailure to act, eqmressld inficates its consent to, amrrozal o$ or ac; uiescence in and o$ tye $oregoing or takes and cormorate or otyer action $or tye murmose o$ e$$ecting and o$ tye $oregoing.

"Business Dad" v eans and fad otyer tyan Saturfad, Sunfad or otyer fad on wyicy cov v ercial banks in Tye Citd o$ New York are autyorihef or re; uiref bd law to rev ain close$ x mrozifef, yowezer, $or clari$ication, cov v ercial banks syall not be feev ef to be autyorihef or re; uiref bd law to rev ain close$ fue to "stad at yov e", "syelter-in-mlace", "non-essential ev mlodee" or and otyer siv ilar orfers or restrictions or tye closure o$ and mydsical brancy locations at tye firection o$ and gozernv ental autyoritd so long as tye electronic $unfs trans$er sdstev s (incluf ing $or wire trans$ers) o$ cov v ercial banks in Tye Citd o$ New York are generalld omen $or use bd custov ers on sucy fad.

"Cyange o$ Control Transaction" v eans tye occurrence a$ter tye fate yereo$ o$ and o$ (a) an ac; uisition a$ter tye fate yereo$ bd an infizifual or legal entitd or "groum" (as fescribef in Rule 13f-5(b)(1) mrov ulgatef unfer tye Eqcyange Act) o$ e$$ectize control

(wyetyer tyrougy legal or beneŜicial ownersyim oŜ camital stock oŜ tye Cov mand, bd contract or otyerwise) oŜ in eqcess oŜ 33% oŜ tye zoting securities oŜ tye Cov mand (otyer tyan bd v eans oŜ eqercise oŜ tye Warrants issueŜ togetyer wity tye Notes), wyere sucy inŜiziŜual or legal entitd or "groum" mrior to sucy ac; uisition Ŝ iŜ not own in eqcess oŜ 33% oŜ tye zoting securities oŜ tye Cov mandxmrozifeŜ, tyat Ŝor and inŜiziŜual or legal entitd or "groum" tyat owns in eqcess oŜ 33% oŜ tye zoting securities oŜ tye Cov mand as oŜ tye Ŝate oŜ tye Purcyase Agreev ent, sucy inŜiziŜual or legal entitd or "groum" yolŜ s 75% or v ore oŜ tye zoting securities oŜ tye Cov mand aŜter gizing eŜŜect to and sucy ac; uisition, (b) tye Cov mand v erges into or consoliŜates wity and otyer Person, or and Person v erges into or consoliŜates wity tye Cov mand anŜ, aŜter gizing eŜŜect to sucy transaction, tye stockyolŜers oŜ tye Cov mand iv v eŜiateld mrior to sucy transaction own less tyan 66% oŜ tye aggregate zoting mower oŜ tye Cov mand or tye successor entitd oŜ sucy transaction, (c) tye Cov mand (anŜ all oŜ its SubsiŜiaries, taken as a wyole) sells or transŜers all or substantialld all oŜ its assets to anotyer Person anŜ tye stockyolŜers oŜ tye Cov mand iv v eŜiateld mrior to sucy transaction own less tyan 66% oŜ tye aggregate zoting mower oŜ tye ac; uiring entitd iv v eŜiateld aŜter sucy transaction, (Ŝ) a remlacev ent at one tiv e or wityin a tyree dear merioŜ oŜ v ore tyan one-yalŜ oŜ tye v ev bers oŜ tye BoarŜ oŜ Directors wyicy is not ammrozeŜ bd a v ajoritd oŜ tyose inŜiziŜuals wyo are v ev bers oŜ tye BoarŜ oŜ Directors on October 13, 2021 (or bd tyose inŜiziŜuals wyo are serzing as v ev bers oŜ tye BoarŜ oŜ Directors on and Ŝate wyose nov ination to tye BoarŜ oŜ Directors was ammrozeŜ bd a v ajoritd oŜ tye v ev bers oŜ tye BoarŜ oŜ Directors wyo are v ev bers on tye Ŝate yereoŜ), or (e) tye consuv v ation bd tye Cov mand oŜ an agreev ent to wyicy tye Cov mand is a martd or bd wyicy it is bounŜ, mroziŜing Ŝor and oŜ tye ezents set Ŝorty in clauses (a) tyrougy (Ŝ) aboze.

"Designee" v eans Ev nerd Taq EŜŜicient, LP.

"Ezent oŜ DeŜault" syall yaze tye v eaning set Ŝorty in Section 5(a).

"ManŜatord DeŜault Av ount" v eans tye suv oŜ (a) 120% oŜ tye outstanŜing mrincimal av ount oŜ tyis Note anŜ (b) all otyer av ounts, costs, eqmenses, interest anŜ li; uiŜateŜ Ŝav ages Ŝue in resmect oŜ tyis Note.

"New York Courts" syall yaze tye v eaning set Ŝorty in Section 7(Ŝ).

"Original Issue Date" v eans tye Ŝate oŜ tye Ŝirst issuance oŜ tye Notes, regarŜless oŜ and transŜers oŜ and Note anŜ regarŜless oŜ tye nuv ber oŜ instruv ents wyicy v ad be issueŜ to eziŜence sucy Notes.

"Perv itteŜ InŜebteŜness" v eans (a) tye InŜebteŜness eziŜenceŜ bd tye Notes, (b) InŜebteŜness mursuant to tyat certain Purcyase anŜ Sale Agreev ent, ŜateŜ as oŜ Januard 11, 2016, between tye Cov mand anŜ Prestige Camital Cormoration, as av enŜeŜ or v oŜiŜieŜ tyrougy tye Ŝate yereoŜ, (c) InŜebteŜness eziŜenceŜ bd tyat certain SecureŜ Rezolzing Prov issord Note, ŜateŜ October 15, 2020 bd anŜ between tye Cov mand anŜ RŜan DreŜler, in tye v aqiv uv mrincimal av ount oŜ mp3,000,000, as av enŜeŜ anŜ restateŜ bd tyat certain

Conzertible Securef Prov issord Note fatef as o$ August 13, 2021, (f) Infebtefness ezifencef bd tyat certain Av enfef anf Restatef Conzertible Securef Prov issord Note fatef as o$ August 21, 2020 in tye v aqiv uv  mrincimal av ount o$ p2,735,199 issuef bd Borrower to Suborfinatef Crefitor, as av enfef anf restatef mursuant to tyat certain Conzertible Securef Prov issord Note fatef as o$ Nozev ber 29, 2020 issuef bd Borrower to Suborfinatef Crefitor in tye v aqiv uv  mrincimal av ount o$ p2,871,967, as av enfef bd tyat certain Av enfv ent to Conzertible Securef Prov issord Note fatef as o$ August 13, 2021, (e) tye PPP Loans, ($) lease obligations anf murcyase v oned Infebtefness o$ umto p300,000, in tye aggregate, incurref in connection wity tye ac; uisition o$ camital assets anf lease obligations wity resmect to newld ac; uiref or leasef assetsxmrozifef, tyat in orfer $or a new lease to be consiferef to be Perv ittef Infebtefness, tye lanflorf wity resmect to sucy new lease syall be re; uiref to felizer to tye Collateral Agent a lanflorf consent in $orv anf substance reasonabld accemtable to tye Collateral Agent to enable tye Collateral Agent to access collateral on sucy mromertd umon an Ezent o$ De$ault, (g) traf e accounts madable incurref in tye orfinard course o$ business consistent wity mast mractice, (y) Infebtefness ezifencef bd tye Settlev ent Agreev ents anf (i) Infebtefness tyat (A) is eqmressld suborfinatef to tye Notes mursuant to a written suborfination agreev ent wity tye Re; uiref Holfers tyat is reasonabld accemtable to tye Re; uisite Holfers anf (B) foes not re; uire and madv ent o$ mrincimal, wyetyer at v aturitd, mursuant to av ortisation, a sinking $unf or otyerwise, at a fate earlier tyan 91 fads $ollowing tye Maturitd Date.

"Perv ittef Lien" v eans tye infizifual anf collectize re$erence to tye $ollowing: (a) Liens $or taqes, assessv ents anf otyer gozernv ental cyarges or lezies not det fue or Liens $or taqes, assessv ents anf otyer gozernv ental cyarges or lezies being contestef in goof $aity anf bd ammromriate mroceefings $or wyicy afe; uate reserzes (in tye goof $aity jufgv ent o$ tye v anagev ent o$ tye Cov mand) yaze been establisyef in accorfance wity GAAP, (b) Liens iv mosef bd law wyicy were incurref in tye orfinard course o$ tye Cov mand's business, sucy as carriers', wareyousev en's anf v ecyanics' Liens, statutord lanflorfs' Liens, anf otyer siv ilar Liens arising in tye orfinard course o$ tye Cov mand's business, anf wyicy (q) fo not infizifualld or in tye aggregate v aterialld fetract $rov  tye zalue o$ sucy mromertd or assets or v aterialld iv mair tye use tyereo$ in tye omeration o$ tye business o$ tye Cov mand anf its consolifatef Subsifiaries or (d) are being contestef in goof $aity bd ammromriate mroceefings, wyicy mroceefings yaze tye e$$ect o$ mrezenting $or tye $oreseeable $uture tye $or$eiture or sale o$ tye mromertd or asset subject to sucy Lien, (c) Liens incurref in connection wity Perv ittef Infebtefness unfer clauses (a) - (f).

"Purcyase Agreev ent" v eans tye Securities Purcyase Agreev ent, fatef as o$ October 13, 2021 av ong tye Cov mand anf tye original Holfers, as av enfef, v ofi$ief or summlev entef $rov  tiv e to tiv e in accorfance wity its terv s.

"Re; uiref Holfers" v eans yolfers o$ at least a v ajoritd in mrincimal av ount o$ tye tyen outstanfing Notes anf syall inclufe tye Designee so long as tye Designee or and o$ its A$$iliates yolfs and Notes.

"Securities Act" v eans tye Securities Act o$ 1933, as av enf ef, anf tye rules anf regulations mrov ulgatef tyereunf er.

"Settlev ent Agreev ents" v eans (i) tye Settlev ent Agreev ent, f atef Nozev ber 7, 2016 bd anf between tye Cov m anf anf F.H.G. Cornoration f/b/a Canstone Nutrition, INI Parent, Inc., INI Buder, Inc. anf Mef led Canital Cornoration, (ii) Settlev ent Agreev ent, f atef Sentev ber 25, 2020 bd anf between tye Cov m anf anf NBF Holf ings Canaf a Inc., anf (iii) Settlev ent Agreev ent, f atef Nozev ber 7, 2020 bd anf between tye Cov m anf anf Eqcelsior Nutrition, Inc., in eacy case, as in e$$ect as o$ tye f ate yereo$.

"Subsif iard Guarantee" v eans tye Subsif iard Guarantee, f atef tye f ate o$ tye Purcyase Agreev ent, bd eacy Subsif iard in $azor o$ tye Holf ers.

"Transaction Docuv ents" v eans tye Purcyase Agreev ent, tyis Note, tye Subsif iard Guarantee, anf all f ocuv ents eqecutef in connection tyerewity anf yerewity.

"Warrants" v eans, collectizeld, tye Cov m on Stock murcyase warrants f elizeref to tye Holf ers on tye Original Issue Date mursuant to tye Purcyase Agreev ent.

"Warrant Syares" v eans tye syares o$ Cov m on Stock issuable umon eqercise o$ tye Warrants.

Section 2.    Registration o$ Trans$ers anf Eqcyanges.  Tyis Note is eqcyangeable $or an e;ual aggregate mrincimal av ount o$ Notes o$ f i$$erent autyorihef f enov inations, as re;uestef bd tye Holf er surrenf ering tye sav e.  No serzice cyarge will be maf able $or sucy registration o$ trans$er or eqcyange.

Section 3.    Negatize Cozenants. As long as and mortion o$ tyis Note rev ains outstanf ing, unless tye Re;uiref Holf ers syall yaze otyerwise gizen mrior written consent, tye Cov m anf syall not, anf syall not merv it and o$ tye Subsif iaries to, f irectld or inf irectld:

a)    otyer tyan Perm ittef Inf ebtef ness, enter into, create, incur, assuv e, guarantee or su$$er to eqist and Inf ebtef ness $or borrowef v oned o$ and kinf, incluf ing, but not liv itef to, a guarantee, on or wity resmect to and o$ its mronertd or assets now ownef or yerea$ter ac;uiref or and interest tyerein or and incov e or mro$its tyere$rov x

b)    otyer tyan Perm ittef Liens, enter into, create, incur, assuv e or su$$er to eqist and Liens o$ and kinf, on or wity resmect to and o$ its mronertd or assets now ownef or yerea$ter ac;uiref or and interest tyerein or and incov e or mro$its tyere$rov x

c)    av enf its cyarter f ocuv ents, incluf ing, wityout liv itation, its certi$icate o$ incornoration anf bdlaws, in and v anner tyat v ateriald anf af zerseld a$$ects and rigyts o$ tye Holf erx

f)        remaf, remurcyase or ofSer to remaf, remurcyase or otyerwise ac; uire v ore tyan a fe v iniv is nuv ber ofSyares ofits Cov v on Stock or Cov v on Stock E; uizalents otyer tyan as to tye Warrant Syares as merv ittef or re; uiref unfer tye Transaction Docuv entsx

e)        remaf, remurcyase or ofSer to remaf, remurcyase or otyerwise ac; uire and InfSebtefness, otyer tyan (i) as contev nlatef in clause (b) ofSye feSinition ofSPerv ittef InfSebtefness, but onld to tye eqtent remaif wity tye collection ofSaccounts receizable ofSye Cov mand obtainef in tye orfinard course ofSbusiness, (ii) as contev nlatef in clause (f), clause (e) or clause (y) ofSye feSinition ofSPerv ittef InfSebtefness anf (iii) tye Notes iSon a mro-rata basis as merv ittef or re; uiref unfer tye Transaction Docuv ents, mrozifef tyat and sucy madv ents syall not be merv ittef iS, at sucy tiv e, or aSter gizing eSSect to sucy madv ent, and Ezent ofSDeSault eqists or occursx

S)       feclare or mad casy fizifenfs or fistributions on and Cov v on Stock or Cov v on Stock E; uizalentsx

g)        enter into and transaction wity and ASSiliate ofSye Cov mand wyicy woulf be re; uiref to be fisclosef in and nublic Siling wity tye Cov v ission, unless sucy transaction is v afe on cov v ercialld reasonable terv s anf on an arv 's-lengty basis anf eqmressld amrrozef bd a v ajoritd ofStye fisinterestef firectors ofStye Cov mand (ezen iS less tyan a ; uoruv otyerwise re; uiref Sor boarf amrrozal), otyer tyan Sor (i) madv ent ofS salarf Sor serzices renferef in av ounts not to eqceef tye av ounts mrozifef Sor unfer agreev ents in mlace as ofS tye fate ofS tye Purcyase Agreev ent, (ii) reiv bursev ent Sor eqmenses incurref on beyalS ofStye Cov mand anf (iii) otyer ev mlodee beneSits, incluf ing stock grants anf stock ontion agreev ents unfer and stock ontion mlan ofStye Cov mandxor

y)        consuv v ate and agreev ent wity resmect to and ofStye Soregoing.

In tye ezent v ore tyan one grace, cure or notice meriof is amrlicable to an Ezent ofS DeSault, tyen tye syortest grace, cure or notice meriof syall be amrlicable tyereto.

Section 4.        ManfSatord RefSev ntion.

a)        Occurrence ofSManfSatord RefSev ntion.  Wyile tyis Note is outstanfing, tye Cov mand syall use at least 25% ofS tye net mroceefs oS and oSSering ofS its securities, incluf ing tye Public OSSering (and sucy oSSering, a "Subse; uent OSSering" anf 25% ofSsucy net mroceefs Srov sucy Subse; uent OSSering, tye "Net Proceefs") to refeev tyis Note in Sull, incluf ing tye Princinal Av ount anf all otyer av ounts fue anf madable mursuant to tyis Note, anf all otyer tyen outstanf ing Notes (a "ManfSatord RefSev ntion")x mrozifef, yowezer, tyat iS tye Net Proceefs ofSye Subse; uent OSSering are less tyan tye av ount re; uiref to remad all ofStye Notes in Sull, (i) tye Cov mand's remadv ent obligation unfer tyis Section 4(a) syall be liv itef to tye av ount ofSsucy Net Proceefs, (ii) tye Net Proceefs syall be amrlief to all ofStye Notes tyen outstanf ing mro rata basef on tye mrincinal av ount oS sucy Notes tyen outstanf ing anf (iii) tye Cov mand syall eSSect successize ManfSatord

-6-

Ref ev ntions unon eacy Subse; uent O$$ering until tye Notes are remaif in $ull or otyerwise no longer outstanf ing.

b) <u>Manf atord Notices</u>. Wity resnect to eacy Manf atord Ref ev ntion, tye Cov nand syall f elizer a written notice to all, but not less tyan all, o$ tye yolf ers o$ Notes (tye "<u>Manf atord Ref ev ntion Notice</u>" anf tye f ate sucy notice is f elizeref to all sucy yolf ers is re$erref to as a "<u>Manf atord Ref ev ntion Notice Date</u>") (a) stating tye f ate on wyicy tye Manf atord Ref ev ntion syall occur (a "<u>Manf atord Ref ev ntion Date</u>"), wyicy f ate syall be tye f ate o$ tye consuv v ation o$ tye annlicable Subse; uent O$$ering, (b) stating tye eqnectef av ount o$ Net Proceef s wity resnect to tye annlicable Subse; uent O$$ering anf (c) contain a certi$ication $rov Cyie$ Eqecutize O$$icer o$ tye Cov nand tyat tye Cov nand yas siv ultaneousld taken tye sav e action wity resnect to all o$ tye Notes. Eacy Manf atord Ref ev ntion Notice syall be f elizeref no later tyan tye $irst (1st) Traf ing Dad $ollowing tye announcev ent o$ tye nricing o$ tye annlicable Subse; uent O$$ering, anf tye Cov nand syall v ake a nublic announcev ent containing tye in$orv ation set $orty in tye annlicable Manf atord Ref ev ntion Notice on or be$ore tye relatef Manf atord Ref ev ntion Notice Date to tye eqtent tyat tye notice contains and, or constitutes, v aterial, non-nublic in$orv ation.

c) <u>Manf atord Ref ev ntion Procef ure</u>. Tye nadv ent o$ casy nursuant to tye Manf atord Ref ev ntion syall be nadable in $ull on tye Traf ing Dad iv v ef iatelf $ollowing tye Manf atord Ref ev ntion Date bd wire trans$er o$ iv v ef iateld azailable $unf s in accorf ance wity tye Holf er's wire instructions. I$ and nortion o$ tye nadv ent nursuant to a Manf atord Ref ev ntion syall not be naif bd tye Cov nand bd tye annlicable f ue f ate, interest syall accrue tyereon at an interest rate e; ual to tye lesser o$ 18% ner annuv or tye v aqiv uv rate nerv ittef bd annlicable law until sucy av ount is naif in $ull. Notwitystanf ing andtying to tye contrard in tyis Section 4(a), tye Net Proceef s syall be annlief ratabld av ong tye Holf ers o$ Note.

<u>Section 5.</u>    <u>Ezents o$ De$ault.</u>

a) "<u>Ezent o$ De$ault</u>" v eans, wyerezer usef yerein, and o$ tye $ollowing ezents (wyatezer tye reason $or sucy ezent anf wyetyer sucy ezent syall be zoluntard or inzoluntard or e$$ectef bd oneration o$ law or nursuant to and jufgv ent, f ecree or orf er o$ and court, or and orf er, rule or regulation o$ and af v inistratize or gozernv ental bof d):

(i)    and f e$ault in tye nadv ent o$ (A) tye nrincinal av ount o$ and Note or (B) li; uif atef f av ages anf otyer av ounts owing to a Holf er on and Note, as anf wyen tye sav e syall becov e f ue anf nadable (wyetyer on tye Maturitd Date or bd acceleration or otyerwise) wyicy f e$ault, soleld in tye case o$ a f e$ault unf er clause (B) aboze, is not curef wityin 3 Traf ing Dadsx

(ii)    tye Cov nand syall $ail to obserze or ner$orv and otyer cozenant or agreev ent in and v aterial resnect (eqcent to tye eqtent and sucy cozenant or agreev ent is ; uali$ief bd v aterialitd or Material Af zerse E$$ect, in

wyicy case, in and resnect) containef in tye Notes or in and Transaction Docuv ent, wyicy $ailure is not curef, i$ mossible to cure, wityin tye earlier to occur o$ (A) 5 Traf ing Dads a$ter notice o$ sucy $ailure sent bd tye Holf er or bd and otyer Holf er to tye Cov mand anf (B) 10 Traf ing Dads a$ter tye Cov mand yas becov e or syoulf yaze becov e aware o$ sucy $ailurex

(iii)    a fe$ault or ezent o$ fe$ault (subject to and grace or cure meriof mrozif ef in tye ammlicable agreev ent, f ocuv ent or instruv ent) syall occur unf er and o$ tye Transaction Docuv entsx

(iz)    and remresentation or warrantd v af e in tyis Note, and otyer Transaction Docuv ents, and written statev ent mursuant yereto or tyereto or and otyer remort, $inancial statev ent or certi$icate v af e or f elizeref to tye Holf er or and otyer Holf er syall be untrue or incorrect in and v aterial resnect as o$ tye f ate wyen v af e or f eev ef v af ex

(z)    tye Cov mand or and Subsif iard syall be subject to a Bankrumtcd Ezentx

(zi)    tye Cov mand or and Subsif iard syall fe$ault (subject to and grace or cure meriof mrozif ef in tye ammlicable agreev ent, f ocuv ent or instruv ent) on and o$ its obligations unf er and v ortgage, mrov issord note, cref it agreev ent or otyer $acilitd, inf enture agreev ent, $actoring agreev ent or otyer instruv ent unf er wyicy tyere v ad be issuef, or bd wyicy tyere v ad be securef or ezif encef, and Inf ebtef ness $or borrowef v oned or v oned f ue unf er and long terv  leasing or $actoring arrangev ent (incluf ing, wityout liv itation, tye PPP Loan Agreev ent) tyat (a) inzolzes, inf izif ualld or in tye aggregate, an obligation greater tyan p100,000, wyetyer and sucy Inf ebtef ness now eqists or syall yerea$ter be createf, anf (b) results in sucy Inf ebtef ness becov ing or being f eclaref f ue anf m adable mrior to tye f ate on wyicy it woulf otyerwise becov e f ue anf m adablex

(zii)    tye Cov mand (anf all o$ its Subsif iaries, taken as a wyole) syall be a martd to and Cyange o$ Control Transaction or Funf av ental Transaction (as f e$inef in tye Warrants) or syall agree to sell or f ismose o$ all or in eqcess o$ 33% o$ its assets in one transaction or a series o$ relatef transactions (wyetyer or not sucy sale woulf constitute a Cyange o$ Control Transaction) anf  sucy transaction or series o$ transactions will be consuv v atef on or mrior to tye f ate tyat tyis Note is rem aif in $ullx

(ziii)    and f issolution, li;uif ation, winf ing umor cessation o$ onerations bd tye Cov mand, o$ a substantial mortion o$ its businessx

(iq)    tye $ailure bd tye Cov mand or and Subsif iard to v aintain and intellectual mronertd rigyts, nersonal, real mronertd, e;uimv ent or leases or otyer assets

-8-

wyicy are necessard to confuct its business (wyetyer now or in tye future) anf sucy breacy is not curef wityin twentd (20) fads of sucy occurrencex

(q)     tye occurrence of an Ezent of Default unfer and otyer Notex

(qi)    and v onetard jufgvent, writ or siv ilar final mrocess syall be enteref or filef against tye Covmand, and subsifiard or and of tyeir resmectize mromertd or otyer assets for v ore tyan p100,000, anf sucy jufgvent, writ or siv ilar final mrocess syall rev ain unzacatef, unbonfef or unstadef for a meriof of 45 calenfar fadsx

(qii)   tye Covmand or and Subsifiard syall fail in and v aterial resmect to merforv or covmld wity and cozenant or agreevent containef in and Securitd Docuvent to wyicy it is a martd (eqcemt to tye eqtent and sucy cozenant or agreevent is ; ualified bd v aterialitd or Material Afzerse Effect, in wyicy case, in and resmect)x

(qiii)  and v aterial mrozision of and Securitd Docuvent (as fetervinef in goof faity bd tye Collateral Agent in its sole fiscretion) syall at and tiv e for and reason (otyer tyan mursuant to tye eqmress terv s tyereof) cease to be zalif anf binfing on or enforceable against tye Covmand or and Subsifiard intenfef to be a martd tyereto, or tye zalifitd or enforceabilitd tyereof syall be contestef bd and martd tyereto, or a mroceefing syall be covv encef bd tye Covmand or and Subsifiard or and gozernvental autyoritd yazing jurisfiction ozer and of tyev , seeking to establisy tye inzalifitd or unenforceabilitd tyereof, or tye Covmand or and Subsifiard syall fend in writing tyat it yas and liabilitd or obligation murmortef to be createf unfer and Securitd Docuventx

(qiz)   and Securitd Docuvent, after felizerd tyereof mursuant yereto, syall for and reason fail or cease to create a zalif anf merfectef anf, eqcemt to tye eqtent mervittef bd tye terv s yereof or tyereof, first mrioritd Lien (eqcemt wity resmect to accounts receizables, a seconf mrioritd Lien) in fazor of tye Collateral Agent for tye benefit of tye yolfers of tye Notes on and Collateral (as fefinef in tye Securitd Docuvents) murmortef to be cozeref tyerebd, eqcemt to tye eqtent tye Collateral Agent fetervines not to mursue merfection of and ammlicable Lienx

(qz)    and bank at wyicy and femosit account, blockef account, or lockboq account of tye Covmand or and Subsifiard is v aintainef syall fail to covmld wity and v aterial terv of and femosit account, blockef account, lockboq account or siv ilar agreevent to wyicy sucy bank is a martd or and securities interv efiard, covvvitd interv efiard or otyer financial institution at and tiv e in custofd, control or mossession of and inzestvent mromertd of tye Covmand or and Subsifiard syall fail to covmld wity and of tye terv s of

-9-

and inzestv ent mronertd control agreev ent to wyicy sucy Person is a martd (it being unferstoof tyat onld accounts mursuant to wyicy tye Collateral Agent yas re; uestef account control agreev ents syoulf be subject to tyis clause (qiz))xor

(qzi)    and v aterial fav age to, or loss, tye$t or festruction o$ tye Collateral or a v aterial av ount o$mronertd o$tye Cov mand, wyetyer or not insuref, or and strike, lockout, labor fismute, ev bargo, confev nation, act o$Gof or mublic enev d, or otyer casualtd wyicy causes, $or v ore tyan tyirtd (30) consecutize fads, tye cessation or substantial curtailv ent o$rezenue mrofucing actizities at and $acilitd o$ tye Cov mand or and Subsifiard, i$ and sucy ezent or circuv stance coulf reasonabld be eqmectef to yaze a Material Afzerse E$$ect.

b)    Rev efies Umon Ezent o$ De$ault. I$ and Ezent o$ De$ault occurs, tye outstanfing mrincimal av ount o$ tyis Note, mlus accruef but unmaif interest, li; uifatef fav ages anf otyer av ounts owing in resmect tyereo$tyrougy tye fate o$acceleration, syall becov e, at tye Holfer's election, iv v efiateld fue anf mad able in casy at tye Manfatord De$ault Av ount, eqcemt tyat umon an Ezent o$ De$ault mursuant to Section 5(a)(z), tye Cov mand syall iv v efiateld mad tye Manfatord De$ault Av ount to tye Holfer wityout tye re; uirev ent $or and notice or fev anf or otyer action bd tye Holfer or and otyer Personx mrozifef, tyat tye Holfer v ad, in its sole fiscretion, waize sucy rigyt to receize mad v ent umon an Ezent o$ De$ault mursuant to Section 5(a)(z), in wyole or in mart, anf and sucy waizer syall not a$$ect and otyer rigyts o$tye Holfer yereunfer, including and otyer rigyts in resmect to and sucy Ezent o$ De$ault or and otyer av ount, as am mlicable. Cov v encing 5 fads a$ter tye occurrence o$and Ezent o$De$ault anf tyat results in tye rigyt or autov atic acceleration o$tyis Note, tyis Note syall accrue interest at an interest rate e; ual to tye lesser o$18% mer annuv or tye v aqiv uv rate merv ittef unfer am mlicable law. Umon tye mad v ent in $ull o$tye Manfatord De$ault Av ount, tye Holfer syall mrov mtld surrenfer tyis Note to, or as firectef bd, tye Cov mand. In connection wity sucy acceleration fescribef yerein, tye Holfer neef not mrozife, anf tye Cov mand yerebd waizes, and mresentv ent, fev anf, mrotest or otyer notice o$and kinf, anf tye Holfer v ad iv v efiateld anf wityout eqmiration o$and grace meriof en$orce and anf all o$its rigyts anf rev efies yereunfer anf all otyer rev efies azailable to it unfer am mlicable law. Sucy acceleration v ad be rescinfef anf annullef bd tye Holfer at and tiv e mrior to mad v ent yereunfer anf tye Holfer syall yaze all rigyts as a yolfer o$tye Note until sucy tiv e, i$and, as tye Holfer receizes $ull mad v ent mursuant to tyis Section 5(b). No sucy rescission or annulv ent syall a$$ect or subse; uent Ezent o$ De$ault or iv mair and rigyt conse; uent tyereon. For tye azoifance o$ foubt anf notwitystanfing andtying to tye contrard containef yerein, tye rate o$ interest tyat v ad be mad able mursuant to tyis Note at and tiv e syall not eqceef eigyteen mercent (18%) mer annuv .

Section 6.    Securitd. Tye Notes are securef to tye eqtent anf in tye v anner set $orty in tye Securitd Docuv ents.

-10-

Section 7.    Miscellaneous.

a)    Notices.  And anf all notices or otyer cov v unications or f elizeries to be mrozif ef bd tye Holf er yereunf er syall be in writing anf f elizeref mersonalld, bd $acsiv ile, bd ev ail attacyv ent, or sent bd a nationalld recognihef ozernigyt courier serzice, aff ressef to tye Cov mand, at tye aff ress set $orty aboze, or sucy otyer $acsiv ile nuv ber, ev ail aff ress, or aff ress as tye Cov mand v ad sneci$d $or sucy murmoses bd notice to tye Holf er f elizeref in accorf ance wity tyis Section 7(a).  And anf all notices or otyer cov v unications or f elizeries to be mrozif ef bd tye Cov mand yereunf er syall be in writing anf f elizeref mersonalld, bd ev ail attacyv ent, or sent bd a nationalld recognihef ozernigyt courier serzice aff ressef to eacy Holf er at tye ev ail aff ress or aff ress o$ tye Holf er anmearing on tye books o$tye Cov mand, or i$no sucy ev ail attacyv ent or aff ress anmears on tye books o$tye Cov mand, at tye mrincimal mlace o$business o$sucy Holf er, as set $orty in tye Purcyase Agreev ent.  And notice or otyer cov v unication or f elizeries yereunf er syall be f eev ef gizen anf e$$ectize on tye earliest o$(i) tye tiv e o$transv ission, i$sucy notice or cov v unication is f elizeref zia ev ail attacyv ent to tye ev ail aff ress set $orty on tye signature mages attacyef yereto mrior to 5:30 mv . (New York Citd tiv e) on and f ate, (ii) tye neqt Traf ing Dad a$ter tye f ate o$transv ission, i$sucy notice or cov v unication is f elizeref zia ev ail attacyv ent to tye ev ail aff ress set $orty on tye signature mages attacyef yereto on a f ad tyat is not a Traf ing Dad or later tyan 5:30 mv . (New York Citd tiv e) on and Traf ing Dad, (iii) tye seconf Traf ing Dad $ollowing tye f ate o$v ailing, i$sent bd U.S. nationalld recognihef ozernigyt courier serzice or (iz) unon actual receint bd tye martd to wyov sucy notice is re; uiref to be gizen.

b)    Absolute Obligation.  Eqcent as eqmressld mrozif ef yerein, no mrozision o$ tyis Note syall alter or iv mair tye obligation o$ tye Cov mand, wyicy is absolute anf unconf itional, to mad tye mrincimal o$anf li; uif atef f av ages, as anmlicable, on tyis Note at tye tiv e, mlace, anf rate, anf in tye coin or currencd, yerein mrescribef.  Tyis Note is a f irect f ebt obligation o$ tye Cov mand.  Tyis Note ranks mari massu wity all otyer Notes now or yerea$ter issuef unf er tye terv s set $orty in tye Transaction Docuv ents.

c)    Lost or Mutilatef Note.  I$tyis Note syall be v utilatef, lost, stolen or f estrodef, tye Cov mand syall eqecute anf f elizer, in eqcyange anf substitution $or anf unon cancellation o$a v utilatef Note, or in lieu o$or in substitution $or a lost, stolen or f estrodef Note, a new Note $or tye mrincimal av ount o$tyis Note so v utilatef, lost, stolen or f estrodef, but ond unon receint o$ezif ence o$sucy loss, tye$t or f estruction o$sucy Note, anf o$tye ownersyimyereo$, reasonabld satis$actord to tye Cov mand.

f)    Gozerning Law.  All ; uestions concerning tye construction, zalif itd, en$orcev ent anf intermretation o$ tyis Note syall be gozernef bd anf construef anf en$orcef in accorf ance wity tye internal laws o$tye State o$New York, wityout regarf to tye mrincimles o$con$lict o$laws tyereo$.  Eacy martd agrees tyat all legal mroceef ings concerning tye intermretation, en$orcev ent anf f e$ense o$ tye transactions contev mlatef bd and o$ tye Transaction Docuv ents (wyetyer brougyt against a martd yereto or its resmectize A$$iliates, f irectors, o$$icers, syareyolf ers, ev mlodees or agents) syall be

cov v encef in tye state anf $ef eral courts sitting in tye Citd o$ New York, Borougy o$ Manyattan (tye "<u>New York Courts</u>").  Eacy martd yereto yerebd irrezocabld subv its to tye eqclusize jurisf iction o$tye New York Courts $or tye af juf ication o$and f ismute yereunf er or in connection yerewity or wity and transaction contev niatef yerebd or f iscussef yerein (incluf ing wity resmect to tye en$orcev ent o$ and o$ tye Transaction Docuv ents), anf yerebd irrezocabld waizes, anf agrees not to assert in and suit, action or mroceef ing, and claiv  tyat it is not mersonalld subject to tye jurisf iction o$ sucy New York Courts, or sucy New York Courts are iv mromer or inconzenient zenue $or sucy mroceef ing.  Eacy martd yerebd irrezocabld waizes mersonal serzice o$mrocess anf consents to mrocess being serzef in and sucy suit, action or mroceef ing bd v ailing a copd tyereo$ zia registeref or certif ief v ail or ozernigyt f elizerd (wity ezif ence o$ f elizerd) to sucy martd at tye af f ress in ef f ect $or notices to it unf er tyis Note anf agrees tyat sucy serzice syall constitute goof anf suf f icient serzice o$mrocess anf notice tyereo$.  Notying containef yerein syall be f eev ef to liv it in and wad and rigyt to serze mrocess in and otyer v anner merv ittef bd amnlicable law. Eacy martd yereto yerebd irrezocabld waizes, to tye $ullest eqtent merv ittef bd amnlicable law, and anf all rigyt to trial bd jurd in and legal mroceef ing arising out o$ or relating to tyis Note or tye transactions contev niatef yerebd. I$and martd syall cov v ence an action or mroceef ing to en$orce and mrozisions o$tyis Note, tyen tye mrezailing martd in sucy action or mroceef ing syall be reiv bursef bd tye otyer martd $or its attorned's $ees anf otyer costs anf eqmenses incurref in tye inzestigation, mremaration anf mrosecution o$sucy action or mroceef ing.  Tyis Note syall be f eev ef an unconf itional obligation o$ tye Cov mand $or tye madv ent o$ v oned anf, wityout liv itation to and otyer rev ef ies o$ Holf er, v ad be en$orcef against tye Cov mand bd suv v ard mroceef ing mursuant to New York Cizil Procef ure Law anf Rule Section 3213 or and siv ilar rule or statute in tye jurisf iction wyere en$orcev ent is sougyt.

    e)    <u>Waizer</u>.  And waizer bd tye Cov mand or tye Holf er o$ a breacy o$ and mrozision o$tyis Note syall not onerate as or be construef to be a waizer o$and otyer breacy o$ sucy mrozision or o$ and breacy o$ and otyer mrozision o$ tyis Note.  Tye $ailure o$ tye Cov mand or tye Holf er to insist unon strict af yerence to and terv o$ tyis Note on one or v ore occasions syall not be consif eref a waizer or f emrize tyat martd o$tye rigyt tyerea$ter to insist unon strict af yerence to tyat terv or and otyer terv o$ tyis Note on and otyer occasion.  And waizer bd tye Cov mand or tye Holf er v ust be in writing.

    $)    <u>Sezerabilitd</u>.   I$ and mrozision o$ tyis Note is inzalif, illegal or unen$orceable, tye balance o$ tyis Note syall rev ain in ef f ect, anf i$ and mrozision is inanmlicable to and Person or circuv stance, it syall nezertyeless rev ain amnlicable to all otyer Persons anf circuv stances.  I$ it syall be $ounf tyat and interest or otyer av ount f eev ef interest f ue yereunf er ziolates tye amnlicable law gozerning usurd, tye amnlicable rate o$interest f ue yereunf er syall autov aticalld be loweref to e; ual tye v aqiv uv rate o$ interest merv ittef unf er amnlicable law. Tye Cov mand cozenants (to tye eqtent tyat it v ad law$ulld f o so) tyat it syall not at and tiv e insist unon, mleaf, or in and v anner wyatsoezer claiv or take tye bene$it or af zantage o$, and stad, eqtension or usurd law or otyer law wyicy woulf mroyibit or $orgize tye Cov mand $rov mading all or and mortion o$ tye mrincinal o$ or interest on tyis Note as contev niatef yerein, wyerezer enactef, now or at and tiv e yerea$ter in $orce, or wyicy v ad a$$ect tye cozenants or tye mer$orv ance o$ tyis

Note, anf tye Cov mand (to tye eqtent it v ad law$ulld fo so) yerebd eqnressld waizes all bene$its or af zantage o$ and sucy law, anf cozenants tyat it will not, bd resort to and sucy law, yinfer, felad or iv nefe tye eqecution o$ and nower yerein grantef to tye Holfer, but will su$$er anf nerv it tye eqecution o$ezerd sucy as tyougy no sucy law yas been enactef.

g)    Rev efies, Cyaracterihations, Otyer Obligations, Breacyes anf Injunctize Relie$.  Tye rev efies nrozifef in tyis Note syall be cuv ulatize anf in af fition to all otyer rev efies azailable unfer tyis Note anf and o$ tye otyer Transaction Docuv ents at law or in e; uitd (inclufing a fecree o$ sneci$ic ner$orv ance anf/or otyer injunctize relie$), anf notying yerein syall liv it tye Holfer's rigyt to nursue actual anf conse; uential fav ages $or and $ailure bd tye Cov mand to cov nld wity tye terv s o$ tyis Note.  Tye Cov mand cozenants to tye Holfer tyat tyere syall be no cyaracterihation concerning tyis instruv ent otyer tyan as eqnressld nrozifef yerein.  Av ounts set $orty or nrozifef $or yerein wity resnect to madv ents anf tye like (anf tye cov mutation tyereo$) syall be tye av ounts to be receizef bd tye Holfer anf syall not, eqcent as eqnressld nrozifef yerein, be subject to and otyer obligation o$ tye Cov mand (or tye ner$orv ance tyereo$).  Tye Cov mand acknowlefges tyat a breacy bd it o$ its obligations yereunfer will cause irrenarable yarv to tye Holfer anf tyat tye rev efd at law $or and sucy breacy v ad be inafe; uate.  Tye Cov mand tyere$ore agrees tyat, in tye ezent o$ and sucy breacy or tyreatenef breacy, tye Holfer syall be entitlef, in af fition to all otyer azailable rev efies, to an injunction restraining and sucy breacy or and sucy tyreatenef breacy, wityout tye necessitd o$ syowing econov ic loss anf wityout and bonf or otyer securitd being re; uiref.  Tye Cov mand syall nrozifef all in$orv ation anf focuv entation to tye Holfer tyat is re; uestef bd tye Holfer to enable tye Holfer to con$irv tye Cov mand's cov nliance wity tye terv s anf confitions o$ tyis Note.

y)    Neqt Business Dad.  Wyenezer and madv ent or otyer obligation yereunfer syall be fue on a fad otyer tyan a Business Dad, sucy madv ent syall be v afe on tye neqt succeefing Business Dad.

i)    Heafings.  Tye yeafings containef yerein are $or conzenience onld, fo not constitute a nart o$ tyis Note anf syall not be feev ef to liv it or a$$ect and o$ tye nrozisions yereo$.

j)    Av enfv ent.  Tyis Note v ad be av enfef, anf and nrozisions yereo$ v ad be av enfef, bd written consent o$ tye Cov mand anf tye Re; uiref Holfers.

Section 8.   Disclosure.   Unon receint or felizerd bd tye Cov mand o$ and notice in accorfance wity tye terv s o$ tyis Note, unless tye Cov mand yas in goof $aity feterv inef tyat tye v atters relating to sucy notice fo not constitute v aterial, nonnublic in$orv ation relating to tye Cov mand or its Subsifiaries, tye Cov mand syall wityin one (1) Business Dad a$ter sucy receint or felizerd nublicld fisclose sucy v aterial, nonnublic in$orv ation on a Current Renort on Forv 8-K or otyerwise. In tye ezent tyat tye Cov mand believes tyat a notice contains v aterial, non-nublic in$orv ation relating to tye Cov mand or its Subsifiaries, tye Cov mand so syall inficate to tye Holfer contev noraneousld wity felizerd o$ sucy notice, anf in tye absence o$ and sucy infication, tye Holfer syall be allowef to

-13-

nresuv e tyat all v atters relating to sucy notice fo not constitute v aterial, nonmublic inSorv ation relating to tye Cov nand or its Subsif iaries.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*(Signature Page Follows)*

106475979_13

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _Salim Rizvi_
Name: Sabina Rizvi
Title: President & CFO

Address: 3753 Howard Hughes Parkway
                Suite 200-849
                Las Vegas, NV 89169

Email address: Sabina.Rizvi@musclepharm.com

15

EXECUTION VERSION

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                    Principal: $232,55f.14

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one od a series od yulh autzorivey any maliylh issuey Original Issue Senior Securey Notes od MusclePzar8 Corporation, a Nemaya corporation (tze "Co8 panh"), zaming its principal place od business at 4721 Ironton Street, Builying A, Denner, Colorayo f0239, yesignatey as its Original Issue Discount Senior Securey Note yue April 13, 2022 (tzis Note, tze "Note" any, collectimelh witz tze otzer Notes od sucz series, tze "Notes").

FOR VALUE RECEIVED, tze Co8 panh pro8 ises to pah to E8 perh Taq Edicient, LP or its registerey assigns (tze "Holyer"), or szall zame paiy pursuant to tze ter8 s zereunyer, tze principal su8 od $232,55f.14 on April 13, 2022 (tze "Maturith Date") or sucz earlier yate as tzis Note is re; uirey or per8 ittey to be repaiy as promiyey zereunyerx promiyey, tzat, (a) tze Maturith Date 8 ah be eqtenyey to (i) Mah 13, 2022 id(q) it is necessarh dor tze Traying Market to co8 plete its remiew od tze Co8 panh's annual report on For8  10-K dor its dscal hear enyey Dece8 ber 31, 2021 in connection witz tze listing od tze Co8 panh's co8 8 on stock on sucz Traying Market, (h) no Ements od Dedault zame occurrey pursuant to tzis Note any (v) tze Co8 panh zas taken all actions necessarh dor tze listing od tze Co8 8 on Stock on tze Traying Market otzer tzan tze yelimerh to tze Traying Market od tze Co8 panh's annual report on For8  10-K dor its dscal hear enyey Dece8 ber 31, 2021, or (ii) Mah 2f, 2022, upon tze yelimerh od a certidcate yulh signey bh an odicer od tze Co8 panh certidhing tzat: (q) no Ement od Dedault zas occurrey any is continuing, any (h) tze su8  od casz dows dro8  operating any inmesting actimities (but not casz dows dro8  dnancing actimities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, was greater tzan vero dor tze calenyar 8 ontz enyey Marcz 31, 2022 any (v) sucz odicer reasonablh beliemes tzat : (1) no Ement od Dedault is reasonablh eqpectey to occur on or bedore April 30, 2022 any (2) tze su8  od casz dows dro8  operating any inmesting actimities (but not dro8  dnancing actimities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, will be greater tzan vero dor tze calenyar 8 ontz enyey April

30, 2022, anf (b) i$tye Maturitd Date is eqtenfef in accorfance wity clause (a) o$tyis maragramy, interest (i) syall accrue faild on anf $rov Amril 13, 2022 at a rate e; ual to tye lesser o$eigyteen mercent (18%) mer annuv or tye v aqiv uv rate merv ittef unfer amnlicable law until tyis Note is maif in $ull, (ii) syall be cov mutef on tye basis o$a dear o$365 fads $or tye actual nuv ber o$fads elamsef, anf (iii) tyat yas accruef anf is unmaif syall be maif bd tye Cov mand to tye Holfer in casy on tye Maturitd Date (as eqtenfef in accorfance wity clause (a) o$tyis maragramy). Tyis Note is subject to tye $ollowing af fitional mrozisions:

Section 1.    De$initions.    For tye murmoses yereo$, in affition to tye terv s fe$inef elsewyere in tyis Note, (a) camitalihef terv s not otyerwise fe$inef yerein syall yaze tye v eanings set $orty in tye Purcyase Agreev ent anf (b) tye $ollowing terv s syall yaze tye $ollowing v eanings:

"Bankrumtcd Ezent" v eans and o$ tye $ollowing ezents: (a) tye Cov mand or and Subsifiard tyereo$ cov v ences a case or otyer mroceefing unfer and bankrumtcd, reorganihation, arrangev ent, afjustv ent o$febt, relie$o$febtors, fissolution, insolzencf or li; uif ation or siv ilar law o$and jurisfiction relating to tye Cov mand or and Signi$icant Subsifiard (as fe$inef in Rule 1-02 o$Regulation S-X) tyereo$, (b) tyere is cov v encef against tye Cov mand or and Signi$icant Subsifiard tyereo$and sucy case or mroceefing tyat is not fisv issef wityin 60 fads a$ter v encev ent, (c) tye Cov mand or and Signi$icant Subsifiard tyereo$is afjuficatef insolzent or bankrumt or and or$er o$relie$or otyer or$er amnrozing and sucy case or mroceefing is enteref, (f) tye Cov mand or and Signi$icant Subsifiard tyereo$su$$ers and amnointv ent o$and custofian or tye like $or it or and substantial nart o$its monertd tyat is not $iscyargef or stafef wityin 60 calenfar fads a$ter sucy amnointv ent, (e) tye Cov mand or and Signi$icant Subsifiard tyereo$v akes a general assignv ent $or tye bene$it o$ cre$itors, ($) tye Cov mand or and Signi$icant Subsifiard tyereo$calls a v eeting o$its cre$itors wity a ziew to arranging a cov mosition, afjustv ent or restructuring o$its febts, (g) tye Cov mand or and Signi$icant Subsifiard tyereo$af v its in writing tyat it is generalld unable to mad its febts as tyed becov e f ue, (y) tye Cov mand or and Signi$icant Subsifiard tyereo$, bd and act or $ailure to act, eqmressld in$icates its consent to, amnrozal o$or ac; uiescence in and o$tye $oregoing or takes and cornorate or otyer action $or tye murmose o$e$$ecting and o$tye $oregoing.

"Business Dad" v eans and fad otyer tyan Saturf ad, Sunf ad or otyer f ad on wyicy cov v ercial banks in Tye Citd o$New York are autyorihef or re; uiref bd law to rev ain close$x mrozif ef, yowezer, $or clari$ication, cov v ercial banks syall not be feev ef to be autyorihef or re; uiref bd law to rev ain close$ f ue to "stad at yov e", "syelter-in-mlace", "non-essential ev mlodee" or and otyer siv ilar or$ers or restrictions or tye closure o$and mydsical brancy locations at tye f irection o$and gozernv ental autyoritd so long as tye electronic $unf s trans$er sdstev s (inclufing $or wire trans$ers) o$cov v ercial banks in Tye Citd o$New York are generalld onen $or use bd custov ers on sucy f ad.

"Cyange o$Control Transaction" v eans tye occurrence a$ter tye f ate yereo$o$and o$ (a) an ac; uisition a$ter tye f ate yereo$bd and inf izif ual or legal entitd or "groum" (as fescribef in Rule 13f-5(b)(1) mrov ulgatef unfer tye Eqcyange Act) o$e$$ectize control

(wyetyer tyrougy legal or beneSicial ownersyim oS canital stock oS tye Cov mand, bd contract or otyerwise) oS in eqcess oS 33% oS tye zoting securities oS tye Cov mand (otyer tyan bd v eans oS eqercise oS tye Warrants issuef togetyer wity tye Notes), wyere sucy infizifual or legal entitd or "groum" mrior to sucy ac; uisition f if not own in eqcess oS 33% oS tye zoting securities oS tye Cov mandxmrozifef, tyat Sor and infizifual or legal entitd or "groum" tyat owns in eqcess oS 33% oS tye zoting securities oS tye Cov mand as oS tye fate oS tye Purcyase Agreev ent, sucy infizifual or legal entitd or "groum" yolfs 75% or v ore oS tye zoting securities oS tye Cov mand aSter gizing eSSect to and sucy ac; uisition, (b) tye Cov mand v erges into or consolifates wity and otyer Person, or and Person v erges into or consolifates wity tye Cov mand anf, aSter gizing eSSect to sucy transaction, tye stockyolfers oS tye Cov mand iv v efiateld mrior to sucy transaction own less tyan 66% oS tye aggregate zoting mower oS tye Cov mand or tye successor entitd oS sucy transaction, (c) tye Cov mand (anf all oS its Subsifiaries, taken as a wyole) sells or transSers all or substantialld all oS its assets to anotyer Person anf tye stockyolfers oS tye Cov mand iv v efiateld mrior to sucy transaction own less tyan 66% oS tye aggregate zoting mower oS tye ac; uiring entitd iv v efiateld aSter tye transaction, (f) a renlacev ent at one tiv e or wityin a tyree dear meriof oS v ore tyan one-yalS oS tye v ev bers oS tye Boarf oS Directors wyicy is not anmrozef bd a v ajoritd oS tyose infizifuals wyo are v ev bers oS tye Boarf oS Directors on October 13, 2021 (or bd tyose infizifuals wyo are serzing as v ev bers oS tye Boarf oS Directors on and fate wyose nov ination to tye Boarf oS Directors was anmrozef bd a v ajoritd oS tye v ev bers oS tye Boarf oS Directors wyo are v ev bers on tye fate yereoS), or (e) tye consuv v ation bd tye Cov mand oS an agreev ent to wyicy tye Cov mand  is a martd or bd wyicy it is bounf, mrozifing Sor and oS tye ezents set Sorty in clauses (a) tyrougy (f) aboze.

"Designee" v eans Ev nerd Taq ESSicient, LP.

"Ezent oS DeSault" syall yaze tye v eaning set Sorty in Section 5(a).

"ManSatord DeSault Av ount" v eans tye suv  oS (a) 120% oS tye outstanfing mrincinal av ount oS tyis Note anf (b) all otyer av ounts, costs, eqnenses, interest anf li; uifatef fav ages fue in resnect oS tyis Note.

"New York Courts" syall yaze tye v eaning set Sorty in Section 7(f).

"Original Issue Date" v eans tye fate oS tye Sirst issuance oS tye Notes, regarfless oS and transSers oS and Note anf regarfless oS tye nuv ber oS instruv ents wyicy v ad be issuef to ezifence sucy Notes.

"Perv ittef Infebtefness" v eans (a) tye Infebtefness ezifencef bd tye Notes, (b) InSebtefness mursuant to tyat certain Purcyase anf Sale Agreev ent, fatef as oS Januard 11, 2016, between tye Cov mand anf Prestige Canital Cornoration, as av enfef or v ofiSief tyrougy tye fate yereoS, (c) InSebtefness ezifencef bd tyat certain Securef Rezolzing Prov issord Note, fatef October 15, 2020 bd anf between tye Cov mand anf Rdan Dreqler, in tye v aqiv uv  mrincinal av ount oS p3,000,000, as av enfef anf restatef bd tyat certain

Convertible Secured Promissory Note dated as of August 13, 2021, (f) Indebtedness evidenced by that certain Amended and Restated Convertible Secured Promissory Note dated as of August 21, 2020 in the principal amount of $2,735,199 issued by Borrower to Subordinated Creditor, as amended and restated pursuant to that certain Convertible Secured Promissory Note dated as of November 29, 2020 issued by Borrower to Subordinated Creditor in the principal amount of $2,871,967, as amended by that certain Amended Convertible Secured Promissory Note dated as of August 13, 2021, (e) the PPP Loans, ($) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default, (g) trade accounts payable incurred in the ordinary course of business consistent with past practice, (y) Indebtedness evidenced by the Settlement Agreements and (i) Indebtedness that (A) is expressly subordinated to the Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (q) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (d) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a) - (f).

"Purchase Agreement" means the Securities Purchase Agreement, dated as of October 13, 2021 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" v eans tye Securities Act o$ 1933, as av enf ef , anf tye rules anf regulations nrov ulgatef tyereunf er.

"Settlev ent Agreev ents" v eans (i) tye Settlev ent Agreev ent, f atef Nozev ber 7, 2016 bd anf between tye Cov m anf anf F.H.G. Cornoration f/b/a Canstone Nutrition, INI Parent, Inc., INI Buder, Inc. anf Mef led Canital Cornoration, (ii) Settlev ent Agreev ent, f atef Sentev ber 25, 2020 bd anf between tye Cov m anf anf NBF Holf ings Canaf a Inc., anf (iii) Settlev ent Agreev ent, f atef Nozev ber 7, 2020 bd anf between tye Cov m anf anf Eqcelsior Nutrition, Inc., in eacy case, as in e$$ect as o$ tye f ate yereo$.

"Subsif iard Guarantee" v eans tye Subsif iard Guarantee, f atef tye f ate o$ tye Purcyase Agreev ent, bd eacy Subsif iard in $azor o$ tye Holf ers.

"Transaction Docuv ents" v eans tye Purcyase Agreev ent, tyis Note, tye Subsif iard Guarantee, anf all f ocuv ents eqecutef in connection tyerewity anf yerewity.

"Warrants" v eans, collectizeld, tye Cov v on Stock murcyase warrants f elizeref to tye Holf ers on tye Original Issue Date mursuant to tye Purcyase Agreev ent.

"Warrant Syares" v eans tye syares o$ Cov v on Stock issuable unon eqercise o$ tye Warrants.

Section 2.    Registration o$ Trans$ers anf Eqcyanges.  Tyis Note is eqcyangeable $or an e; ual aggregate nrincinal av ount o$ Notes o$ f i$$erent autyorihef f enov inations, as re; uestef bd tye Holf er surrenf ering tye sav e.  No serzice cyarge will be madable $or sucy registration o$ trans$er or eqcyange.

Section 3.    Negatize Cozenants. As long as and nortion o$ tyis Note rev ains outstanf ing, unless tye Re; uiref Holf ers syall yaze otyerwise gizen nrior written consent, tye Cov m anf syall not, anf syall not nerv it and o$ tye Subsif iaries to, f irectld or inf irectld:

a)    otyer tyan Perv ittef Inf ebtef ness, enter into, create, incur, assuv e, guarantee or su$$er to eqist and Inf ebtef ness $or borrowef v oned o$ and kinf , incluf ing, but not liv itef to, a guarantee, on or wity resnect to and o$ its nronertd or assets now ownef or yerea$ter ac; uiref or and interest tyerein or and incov e or nro$its tyere$rov x

b)    otyer tyan Perv ittef Liens, enter into, create, incur, assuv e or su$$er to eqist and Liens o$ and kinf , on or wity resnect to and o$ its nronertd or assets now ownef or yerea$ter ac; uiref or and interest tyerein or and incov e or nro$its tyere$rov x

c)    av enf its cyarter f ocuv ents, incluf ing, wityout liv itation, its certi$icate o$ incornoration anf bdlaws, in and v anner tyat v ateriald anf af zerseld a$$ects and rigyts o$ tye Holf erx

f)       remad, remurcyase or ofSSer to remad, remurcyase or otyerwise ac;uire v ore tyan a f e v iniv is nuv ber ofSsyares ofSits Cov v on Stock or Cov v on Stock E;uizalents otyer tyan as to tye Warrant Syares as nerv ittef or re;uiref unfer tye Transaction Docuv entsx

e)       remad, remurcyase or ofSSer to remad, remurcyase or otyerwise ac;uire and InfSebtefness, otyer tyan (i) as contev nlatef in clause (b) ofStye feSinition ofSPerv ittef InfSebtefness, but onld to tye eqtent remaif wity tye collection ofSaccounts receizable ofStye Cov nand obtainef in tye orfinard course ofSbusiness, (ii) as contev nlatef in clause (f), clause (e) or clause (y) ofStye feSinition ofSPerv ittef InfSebtefness anf (iii) tye Notes iSon a nro-rata basis as nerv ittef or re; uiref unfer tye Transaction Docuv ents, nrozifef tyat and sucy nadv ents syall not be nerv ittef iS, at sucy tiv e, or aSter gizing eSSect to sucy nadv ent, and Ezent ofSDeSault eqists or occursx

S)       feclare or nad casy fizifenfs or fistributions on and Cov v on Stock or Cov v on Stock E;uizalentsx

g)       enter into and transaction wity and ASSiliate ofStye Cov nand wyicy woulf be re;uiref to be fisclosef in and nublic Siling wity tye Cov v ission, unless sucy transaction is v af e on cov v ercialld reasonable terv s anf on an arv 's-lengty basis anf eqnressld annrozef bd a v ajoritd ofStye fisinterestef firectors ofStye Cov nand (ezen iS less tyan a ;uoruv otyerwise re;uiref Sor boarf annrozal), otyer tyan Sor (i) nadv ent ofS salard Sor serzices renferef in av ounts not to eqceef tye av ounts nrozifef Sor unfer agreev ents in nlace as ofStye fate ofStye Purcyase Agreev ent, (ii) reiv bursev ent Sor eqnenses incurref on beyalS ofStye Cov nand anf (iii) otyer ev nlodee beneSits, incluf ing stock grants anf stock ontion agreev ents unfer and stock ontion nlan ofStye Cov nandxor

y)       consuv v ate and agreev ent wity resnect to and ofStye Soregoing.

In tye ezent v ore tyan one grace, cure or notice neriof is annlicable to an Ezent ofS DeSault, tyen tye syortest grace, cure or notice neriof syall be annlicable tyereto.

Section 4.      ManfSatord RefSev ntion.

a)       Occurrence ofSManfSatord RefSev ntion.  Wyile tyis Note is outstanfing, tye Cov nand syall use at least 25% ofStye net nroceefs ofS and ofSSering ofS its securities, incluf ing tye Public OfSSering (and sucy ofSSering, a "Subse;uent OfSSering" anf 25% ofSsucy net nroceefs Srov sucy Subse;uent OfSSering, tye "Net Proceefs") to refeev tyis Note in Sull, incluf ing tye Princinal Av ount anf all otyer av ounts fue anf nadable nursuant to tyis Note, anf all otyer tyen outstanf ing Notes (a "ManfSatord RefSev ntion")x nrozifef, yowezer, tyat iS tye Net Proceefs ofS tye Subse;uent OfSSering are less tyan tye av ount re;uiref to remad all ofStye Notes in Sull, (i) tye Cov nand's renadv ent obligation unfer tyis Section 4(a) syall be liv itef to tye av ount ofSsucy Net Proceefs, (ii) tye Net Proceefs syall be annlief to all ofStye Notes tyen outstanfing nro rata basef on tye nrincinal av ount ofS sucy Notes tyen outstanfing anf (iii) tye Cov nand syall eSSect successize ManfSatord

-6-

Ref ev ntions unon eacy Subse;uent O$$ering until tye Notes are remaif in $ull or otyerwise no longer outstanfing.

b)   <u>Manfatord Notices</u>. Wity resnect to eacy Manfatord Ref ev ntion, tye Cov nand syall felizer a written notice to all, but not less tyan all, o$ tye yolfers o$ Notes (tye "<u>Manfatord Ref ev ntion Notice</u>" anf tye fate sucy notice is felizeref to all sucy yolfers is re$erref to as a "<u>Manfatord Ref ev ntion Notice Date</u>") (a) stating tye fate on wyicy tye Manfatord Ref ev ntion syall occur (a "<u>Manfatord Ref ev ntion Date</u>"), wyicy fate syall be tye fate o$ tye consuv v ation o$ tye annlicable Subse;uent Offering, (b) stating tye eqnectef av ount o$ Net Proceefs wity resnect to tye annlicable Subse;uent O$$ering anf (c) contain a certi$ication $rov Cyie$ Eqecutize O$$icer o$ tye Cov nand tyat tye Cov nand yas siv ultaneousld taken tye sav e action wity resnect to all o$tye Notes. Eacy Manfatord Ref ev ntion Notice syall be felizeref no later tyan tye $irst (1st) Trafing Dad $ollowing tye announcev ent o$ tye nricing o$ tye annlicable Subse;uent O$$ering, anf tye Cov nand syall v ake a nublic announcev ent containing tye in$orv ation set $orty in tye annlicable Manfatord Ref ev ntion Notice on or be$ore tye relatef Manfatord Ref ev ntion Notice Date to tye eqtent tyat tye notice contains and, or constitutes, v aterial, non-nublic in$orv ation.

c)   <u>Manfatord Ref ev ntion Procefure</u>. Tye nadv ent o$ casy nursuant to tye Manfatord Ref ev ntion syall be nadable in $ull on tye Trafing Dad iv v ef iateld $ollowing tye Manfatord Ref ev ntion Date bd wire trans$er o$ iv v ef iateld azailable $unfs in accorfance wity tye Holf er's wire instructions. I$ and nortion o$ tye nadv ent nursuant to a Manfatord Ref ev ntion syall not be naif bd tye Cov nand bd tye annlicable fue fate, interest syall accrue tyereon at an interest rate e;ual to tye lesser o$ 18% ner annuv or tye v aqiv uv rate nerv ittef bd annlicable law until sucy av ount is naif in $ull. Notwitystanfing andtying to tye contrard in tyis Section 4(a), tye Net Proceefs syall be annlief ratabld av ong tye Holf ers o$ Note.

<u>Section 5</u>.   <u>Ezents o$ De$ault</u>.

a)   "<u>Ezent o$ De$ault</u>" v eans, wyerezer usef yerein, and o$ tye $ollowing ezents (wyatezer tye reason $or sucy ezent anf wyetyer sucy ezent syall be zoluntard or inzoluntard or e$$ectef bd oneration o$ law or nursuant to and jufgv ent, fecree or orf er o$ and court, or and orf er, rule or regulation o$ and af v inistratize or gozernv ental bof d):

(i)   and fe$ault in tye nadv ent o$ (A) tye nrincinal av ount o$ and Note or (B) li;uifatef fav ages anf otyer av ounts owing to a Holf er on and Note, as anf wyen tye sav e syall becov e fue anf nadable (wyetyer on tye Maturitd Date or bd acceleration or otyerwise) wyicy fe$ault, soleld in tye case o$ a fe$ault unfer clause (B) aboze, is not curef wityin 3 Trafing Dadsx

(ii)   tye Cov nand syall $ail to obserze or ner$orv and otyer cozenant or agreev ent in and v aterial resnect (eqcent to tye eqtent and sucy cozenant or agreev ent is ;uali$ief bd v aterialitd or Material Af zerse E$$ect, in

wyicy case, in and resnect) containef in tye Notes or in and Transaction Docuv ent, wyicy $ailure is not curef, i$ mossible to cure, wityin tye earlier to occur o$ (A) 5 Traf ing Dads a$ter notice o$ sucy $ailure sent bd tye Holf er or bd and otyer Holf er to tye Cov mand anf (B) 10 Traf ing Dads a$ter tye Cov mand yas becov e or syoulf yaze becov e aware o$ sucy $ailurex

(iii)    a fe$ault or ezent o$ fe$ault (subject to and grace or cure nerief mrozif ef in tye annlicable agreev ent, f ocuv ent or instruv ent) syall occur unf er and o$ tye Transaction Docuv entsx

(iz)    and remresentation or warrantd v af e in tyis Note, and otyer Transaction Docuv ents, and written statev ent mursuant yereto or tyereto or and otyer renort, $inancial statev ent or certi$icate v af e or f elizeref to tye Holf er or and otyer Holf er syall be untrue or incorrect in and v aterial resnect as o$ tye fate wyen v af e or f eev ef v af ex

(z)    tye Cov mand or and Subsif iard syall be subject to a Bankrumtcd Ezentx

(zi)    tye Cov mand or and Subsif iard syall fe$ault (subject to and grace or cure nerief mrozif ef in tye annlicable agreev ent, f ocuv ent or instruv ent) on and o$ its obligations unf er and v ortgage, mrov issord note, cref it agreev ent or otyer $acilitd, inf enture agreev ent, $actoring agreev ent or otyer instruv ent unf er wyicy tyere v ad be issuef, or bd wyicy tyere v ad be securef or ezif encef, and Inf ebtef ness $or borrowef v oned or v oned f ue unf er and long terv leasing or $actoring arrangev ent (incluf ing, wityout liv itation, tye PPP Loan Agreev ent) tyat (a) inzolzes, inf izif ualld or in tye aggregate, an obligation greater tyan p100,000, wyetyer and sucy Inf ebtef ness now eqists or syall yerea$ter be createf, anf (b) results in sucy Inf ebtef ness becov ing or being f eclaref f ue anf madable mrior to tye fate on wyicy it woulf otyerwise becov e f ue anf madablex

(zii)    tye Cov mand (anf all o$ its Subsif iaries, taken as a wyole) syall be a martd to and Cyange o$ Control Transaction or Funf av ental Transaction (as fe$inef in tye Warrants) or syall agree to sell or f ismose o$ all or in eqcess o$ 33% o$ its assets in one transaction or a series o$ relatef transactions (wyetyer or not sucy sale woulf constitute a Cyange o$ Control Transaction) anf sucy transaction or series o$ transactions will be consuv v atef on or mrior to tye fate tyat tyis Note is remaif in $ullx

(ziii)    and f issolution, li;uif ation, winf ing umor cessation o$ onerations bd tye Cov mand, o$ a substantial mortion o$ its businessx

(iq)    tye $ailure bd tye Cov mand or and Subsif iard to v aintain and intellectual mronertd rigyts, nersonal, real mronertd, e;uimv ent or leases or otyer assets

wyicy are necessard to confuct its business (wyetyer now or in tye Suture) anf sucy breacy is not curef wityin twentd (20) fads oS sucy occurrencex

(q)     tye occurrence oS an Ezent oS DeSault unfer and otyer Notex

(qi)    and v onetard jufgv ent, writ or siv ilar Sinal nrocess syall be enteref or Silef against tye Cov nand, and subsifiard or and oS tyeir resnectize nronertd or otyer assets Sor v ore tyan p100,000, anf sucy jufgv ent, writ or siv ilar Sinal nrocess syall rev ain unzacatef, unbonfef or unstadef Sor a neriof oS 45 calenfar fadsx

(qii)   tye Cov nand or and Subsifiard syall Sail in and v aterial resnect to nerSorv or cov nld wity and cozenant or agreev ent containef in and Securitd Docuv ent to wyicy it is a martd (eqcent to tye eqtent and sucy cozenant or agreev ent is ; ualiSief bd v aterialitd or Material AfZerse ESSect, in wyicy case, in and resnect)x

(qiii)  and v aterial nrozision oS and Securitd Docuv ent (as feterv inef in goof Saity bd tye Collateral Agent in its sole fiscretion) syall at and tiv e Sor and reason (otyer tyan nursuant to tye eqnress terv s tyereoS) cease to be zalif anf binfing on or enSorceable against tye Cov nand or and Subsifiard intenf to be a martd tyereto, or tye zalifitd or enSorceabilitd tyereoS syall be contestef bd and martd tyereto, or a nroceefing syall be cov v encef bd tye Cov nand or and Subsifiard or and gozernv ental autyoritd yazing jurisfiction ozer and oS tyev , seeking to establisy tye inzalifitd or unenSorceabilitd tyereoS, or tye Cov nand or and Subsifiard syall fend in writing tyat it yas and liabilitd or obligation nurnortef to be createf unfer and Securitd Docuv entx

(qiz)   and Securitd Docuv ent, aSter felizerd tyereoS nursuant yereto, syall Sor and reason Sail or cease to create a zalif anf nerSectef anf, eqcent to tye eqtent nerv ittef bd tye terv s yereoS or tyereoS, Sirst nrioritd Lien (eqcent wity resnect to accounts receizables, a seconf nrioritd Lien) in Sazor oS tye Collateral Agent Sor tye beneSit oS tye yolfers oS tye Notes on and Collateral (as feSinef in tye Securitd Docuv ents) nurnortef to be cozeref tyerebd, eqcent to tye eqtent tye Collateral Agent feterv ines not to nursue nerSection oS and annlicable Lienx

(qz)    and bank at wyicy and fenosit account, blockef account, or lockboq account oS tye Cov nand or and Subsifiard is v aintainef syall Sail to cov nld wity and v aterial terv oS and fenosit account, blockef account, lockboq account or siv ilar agreev ent to wyicy sucy bank is a martd or and securities interv efiard, cov v ofitd interv efiard or otyer Sinancial institution at and tiv e in custofd, control or nossession oS and inzestv ent nronertd oS tye Cov nand or and Subsifiard syall Sail to cov nld wity and oS tye terv s oS

and inzestv ent mronertd control agreev ent to wyicy sucy Person is a martd (it being unferstoof tyat onld accounts mursuant to wyicy tye Collateral Agent yas re; uestef account control agreev ents syoulf be subject to tyis clause (qiz))xor

(qzi) and v aterial f av age to, or loss, tyeSt or f estruction oS tye Collateral or a v aterial av ount oS mronertd oS tye Cov mand, wyetyer or not insuref, or and strike, lockout, labor f ismute, ev bargo, confev nation, act oS Gof or mublic enev d, or otyer casualtd wyicy causes, Sor v ore tyan tyirtd (30) consecutize f ads, tye cessation or substantial curtailv ent oS rezenue mrof ucing actizities at and Sacilitd oS tye Cov mand or and Subsif iard, i\$ and sucy ezent or circuv stance coulf reasonabld be eqmectef to yaze a Material Af zerse ESSect.

b) <u>Rev ef ies Umon Ezent oS DeSault</u>. IS and Ezent oS DeSault occurs, tye outstanf ing mrincimal av ount oS tyis Note, mlus accruef but unmaif interest, li; uif atef f av ages anf otyer av ounts owing in resmect tyereoS tyrougy tye f ate oS acceleration, syall becov e, at tye HolfÝer's election, iv v ef iateld f ue anf mafiable in casy at tye Manf atord DeSault Av ount, eqcemt tyat umon an Ezent oS DeSault mursuant to Section 5(a)(z), tye Cov mand syall iv v ef iateld mad tye Manf atord DeSault Av ount to tye HolfÝer wityout tye re; uirev ent Sor and notice or f ev anf or otyer action bd tye HolfÝer or and otyer Personx mrozif ef, tyat tye HolfÝer v ad, in its sole f iscretion, waize sucy rigyt to receize madv ent umon an Ezent oS DeSault mursuant to Section 5(a)(z), in wyole or in mart, anf and sucy waizer syall not aSSect and otyer rigyts oS tye HolfÝer yereunf er, incluf ing and otyer rigyts in resmect to and sucy Ezent oS DeSault or and otyer av ount, as ammlicable. Cov v encing 5 f ads aSter tye occurrence oS and Ezent oS DeSault anf tyat results in tye rigyt or autov atic acceleration oS tyis Note, tyis Note syall accrue interest at an interest rate e; ual to tye lesser oS 18% mer annuv or tye v aqiv uv rate merv ittef unf er ammlicable law. Umon tye madv ent in Sull oS tye Manf atord DeSault Av ount, tye HolfÝer syall mrov mtld surrenf er tyis Note to, or as f irectef bd, tye Cov mand. In connection wity sucy acceleration f escribef yerein, tye HolfÝer neef not mrozif e, anf tye Cov mand yerebd waizes, and mresentv ent, f ev anf, mrotest or otyer notice oS and kinf, anf tye HolfÝer v ad iv v ef iateld anf wityout eqmiration oS and grace meriof enSorce and anf all oS its rigyts anf rev ef ies yereunf er anf all otyer rev ef ies azailable to it unf er ammlicable law. Sucy acceleration v ad be rescinf ef anf annullef bd tye HolfÝer at and tiv e mrior to madv ent yereunf er anf tye HolfÝer syall yaze all rigyts as a yolf er oS tye Note until sucy tiv e, iS and, as tye HolfÝer receizes Sull madv ent mursuant to tyis Section 5(b). No sucy rescission or annulv ent syall aSSect and subse; uent Ezent oS DeSault or iv mair and rigyt conse; uent tyereon. For tye azoif ance oS f oubt anf notwitystanf ing andtying to tye contrard containef yerein, tye rate oS interest tyat v ad be mafiable mursuant to tyis Note at and tiv e syall not eqceef eigyteen mercent (18%) mer annuv .

<u>Section 6</u>.    <u>Securitd</u>. Tye Notes are securef to tye eqtent anf in tye v anner set Sorty in tye <u>Securitd</u> Docuv ents.

-10-

Section 7.    Miscellaneous.

a)    Notices.  And anf all notices or otyer cov v unications or f elizeries to be mrozif ef bd tye Holf er yereunf er syall be in writing anf f elizeref nersonalld, bd $acsiv ile, bd ev ail attacyv ent, or sent bd a nationalld recognihef ozernigyt courier serzice, aff ressef to tye Cov mand, at tye aff ress set $orty aboze, or sucy otyer $acsiv ile nuv ber, ev ail aff ress, or aff ress as tye Cov mand v ad sneci$d $or sucy murnoses bd notice to tye Holf er f elizeref in accorf ance wity tyis Section 7(a).  And anf all notices or otyer cov v unications or f elizeries to be mrozif ef bd tye Cov mand yereunf er syall be in writing anf f elizeref nersonalld, bd ev ail attacyv ent, or sent bd a nationalld recognihef ozernigyt courier serzice aff ressef to eacy Holf er at tye ev ail aff ress or aff ress o$ tye Holf er annearing on tye books o$tye Cov mand, or i$no sucy ev ail attacyv ent or aff ress annears on tye books o$tye Cov mand, at tye mrincimal mlace o$business o$sucy Holf er, as set $orty in tye Purcyase Agreev ent.  And notice or otyer cov v unication or f elizeries yereunf er syall be f eev ef gizen anf e$$ectize on tye earliest o$(i) tye tiv e o$transv ission, i$sucy notice or cov v unication is f elizeref zia ev ail attacyv ent to tye ev ail aff ress set $orty on tye signature mages attacyef yereto mrior to 5:30 mv . (New York Citd tiv e) on anf f ate, (ii) tye neqt Traf ing Dad a$ter tye f ate o$transv ission, i$sucy notice or cov v unication is f elizeref zia ev ail attacyv ent to tye ev ail aff ress set $orty on tye signature mages attacyef yereto on a f ad tyat is not a Traf ing Dad or later tyan 5:30 mv . (New York Citd tiv e) on anf Traf ing Dad, (iii) tye seconf Traf ing Dad $ollowing tye f ate o$v ailing, i$sent bd U.S. nationalld recognihef ozernigyt courier serzice or (iz) unon actual receint bd tye martd to wyov sucy notice is re; uiref to be gizen.

b)    Absolute Obligation.  Eqcent as eqnressld mrozif ef yerein, no mrozision o$ tyis Note syall alter or iv mair tye obligation o$ tye Cov mand, wyicy is absolute anf unconf itional, to mad tye mrincimal o$anf li; uif atef f av ages, as annlicable, on tyis Note at tye tiv e, mlace, anf rate, anf in tye coin or currencd, yerein mrescribef.  Tyis Note is a f irect f ebt obligation o$ tye Cov mand.  Tyis Note ranks _mari massu_ wity all otyer Notes now or yerea$ter issuef unf er tye terv s set $orty in tye Transaction Docuv ents.

c)    Lost or Mutilatef Note.  I$ tyis Note syall be v utilatef, lost, stolen or f estrodef, tye Cov mand syall eqecute anf f elizer, in eqcyange anf substitution $or anf unon cancellation o$a v utilatef Note, or in lieu o$or in substitution $or a lost, stolen or f estrodef Note, a new Note $or tye mrincimal av ount o$tyis Note so v utilatef, lost, stolen or f estrodef, but onld unon receint o$ezif ence o$sucy loss, tye$t or f estruction o$sucy Note, anf o$tye ownersyimyereo$, reasonabld satis$actord to tye Cov mand.

f)    Gozerning Law.  All ; uestions concerning tye construction, zalif itd, en$orcev ent anf internretation o$ tyis Note syall be gozernef bd anf construef anf en$orcef in accorf ance wity tye internal laws o$tye State o$New York, wityout regarf to tye mrincinles o$con$lict o$laws tyereo$.  Eacy martd agrees tyat all legal mroceef ings concerning tye internretation, en$orcev ent anf f e$ense o$tye transactions contev mlatef bd and o$tye Transaction Docuv ents (wyetyer brougyt against a martd yereto or its resmectize A$$iliates, f irectors, o$$icers, syareyolf ers, ev mlodees or agents) syall be

-11-

cov v encef in tye state anf $ef eral courts sitting in tye Citd o$ New York, Borougy o$ Manyattan (tye "<u>New York Courts</u>").  Eacy martd yereto yerebd irrezocabld subv its to tye eqclusize jurisf iction o$tye New York Courts $or tye af juf ication o$and f ismute yereunf er or in connection yerewity or wity and transaction contev nlatef yerebd or f iscussef yerein (incluf ing wity resnect to tye en$orcev ent o$ and o$ tye Transaction Docuv ents), anf yerebd irrezocabld waizes, anf agrees not to assert in and suit, action or nroceef ing, and claiv tyat it is not nersonalld subject to tye jurisf iction o$ sucy New York Courts, or sucy New York Courts are iv nroner or inconzenient zenue $or sucy nroceef ing.  Eacy martd yerebd irrezocabld waizes nersonal serzice o$nrocess anf consents to nrocess being serzef in and sucy suit, action or nroceef ing bd v ailing a cond tyereo$ zia registeref or certi$ief v ail or ozernigyt f elizerd (wity ezif ence o$ f elizerd) to sucy martd at tye af f ress in e$$ect $or notices to it unf er tyis Note anf agrees tyat sucy serzice syall constitute goof anf su$$icient serzice o$nrocess anf notice tyereo$.  Notying containef yerein syall be f eev ef to liv it in and wad and rigyt to serze nrocess in and otyer v anner nerv ittef bd annlicable law. Eacy martd yereto yerebd irrezocabld waizes, to tye $ullest eqtent nerv ittef bd annlicable law, and anf all rigyt to trial bd jurd in and legal nroceef ing arising out o$ or relating to tyis Note or tye transactions contev nlatef yerebd. I$ and martd syall cov v ence an action or nroceef ing to en$orce and nrozisions o$tyis Note, tyen tye nrezailing martd in sucy action or nroceef ing syall be reiv bursef bd tye otyer martd $or its attorned's $ees anf otyer costs anf eqnenses incurref in tye inzestigation, nrenaration anf nrosecution o$sucy action or nroceef ing.  Tyis Note syall be f eev ef an unconf itional obligation o$ tye Cov nand $or tye nadv ent o$ v oned anf, wityout liv itation to and otyer rev ef ies o$ Holf er, v ad be en$orcef against tye Cov nand bd suv v ard nroceef ing nursuant to New York Cizil Procef ure Law anf Rule Section 3213 or and siv ilar rule or statute in tye jurisf iction wyere en$orcev ent is sougyt.

e)    <u>Waizer</u>.  And waizer bd tye Cov nand or tye Holf er o$ a breacy o$ and nrozision o$tyis Note syall not onerate as or be construef to be a waizer o$and otyer breacy o$ sucy nrozision or o$ and breacy o$ and otyer nrozision o$tyis Note.  Tye $ailure o$ tye Cov nand or tye Holf er to insist unon strict af yerence to and terv o$tyis Note on one or v ore occasions syall not be consif eref a waizer or f enrize tyat martd o$tye rigyt tyerea$ter to insist unon strict af yerence to tyat terv or and otyer terv o$tyis Note on and otyer occasion.  And waizer bd tye Cov nand or tye Holf er v ust be in writing.

$)    <u>Sezerabilitd</u>.  I$ and nrozision o$ tyis Note is inzalif, illegal, or unen$orceable, tye balance o$ tyis Note syall rev ain in e$$ect, anf i$ and nrozision is inannlicable to and Person or circuv stance, it syall nezertyeless rev ain annlicable to all otyer Persons anf circuv stances.  I$ it syall be $ounf tyat and interest or otyer av ount f eev ef interest f ue yereunf er ziolates tye annlicable law gozerning usurd, tye annlicable rate o$ interest f ue yereunf er syall autov aticalld be loweref to e; ual tye v aqiv uv rate o$ interest nerv ittef unf er annlicable law. Tye Cov nand cozenants (to tye eqtent tyat it v ad law$ulld f o so) tyat it syall not at and tiv e insist unon, nleaf, or in and v anner wyatsoezer claiv or take tye bene$it or af zantage o$, and stad, eqtension or usurd law or otyer law wyicy woulf nroyibit or $orgize tye Cov nand $rov naf ing all or and nortion o$ tye nrincinal o$ or interest on tyis Note as contev nlatef yerein, wyerezer enactef, now or at and tiv e yerea$ter in $orce, or wyicy v ad a$$ect tye cozenants or tye ner$orv ance o$tyis

Note, anf tye Cov mand (to tye eqtent it v ad law$ulld fo so) yerebd eqnresssld waizes all bene$its or af zantage o$ and sucy law, anf cozenants tyat it will not, bd resort to and sucy law, yinfer, felad or iv nefe tye eqecution o$ and nower yerein grantef to tye Holfer, but will su$$er anf nerv it tye eqecution o$ezerd sucy as tyougy no sucy law yas been enactef.

g)     Rev efies, Cyaracterihations, Otyer Obligations, Breacyes anf Injunctize Relie$.  Tye rev efies nrozifef in tyis Note syall be cuv ulatize anf in af fition to all otyer rev efies azailable unfer tyis Note anf and o$ tye otyer Transaction Docuv ents at law or in e; uitd (inclufing a fecree o$ sneci$ic ner$orv ance anf/or otyer injunctize relie$), anf notying yerein syall liv it tye Holfer's rigyt to nursue actual anf conse; uential fav ages $or and $ailure bd tye Cov mand to cov nld wity tye terv s o$ tyis Note.  Tye Cov mand cozenants to tye Holfer tyat tyere syall be no cyaracterihation concerning tyis instruv ent otyer tyan as eqnresssld nrozifef yerein.  Av ounts set $orty or nrozifef $or yerein wity resnect to madv ents anf tye like (anf tye cov mutation tyereo$) syall be tye av ounts to be receizef bd tye Holfer anf syall not, eqcent as eqnresssld nrozifef yerein, be subject to and otyer obligation o$ tye Cov mand (or tye ner$orv ance tyereo$).  Tye Cov mand acknowlefges tyat a breacy bd it o$ its obligations yereunfer will cause irrenarable yarv to tye Holfer anf tyat tye rev efd at law $or and sucy breacy v ad be inafe; uate.  Tye Cov mand tyere$ore agrees tyat, in tye ezent o$ and sucy breacy or tyreatenef breacy, tye Holfer syall be entitlef, in af fition to all otyer azailable rev efies, to an injunction restraining and sucy breacy or and sucy tyreatenef breacy, wityout tye necessitd o$ syowing econov ic loss anf wityout and bonf or otyer securitd being re; uiref.  Tye Cov mand syall nrozifef all in$orv ation anf focuv entation to tye Holfer tyat is re; uestef bd tye Holfer to enable tye Holfer to con$irv tye Cov mand's cov nliance wity tye terv s anf confitions o$ tyis Note.

y)     Neqt Business Dad.  Wyenezer and madv ent or otyer obligation yereunfer syall be fue on a fad otyer tyan a Business Dad, sucy madv ent syall be v afe on tye neqt succeefing Business Dad.

i)     Heafings.  Tye yeafings containef yerein are $or conzenience onld, fo not constitute a nart o$ tyis Note anf syall not be feev ef to liv it or a$$ect and o$ tye nrozisions yereo$.

j)     Av enfv ent.  Tyis Note v ad be av enfef, anf and nrozisions yereo$ v ad be av enfef, bd written consent o$ tye Cov mand anf tye Re; uiref Holfers.

Section 8.  Disclosure.   Unon receint or felizerd bd tye Cov mand o$ and notice in accorfance wity tye terv s o$ tyis Note, unless tye Cov mand yas in goof $aity feterv inef tyat tye v atters relating to sucy notice fo not constitute v aterial, nonnublic in$orv ation relating to tye Cov mand or its Subsifiaries, tye Cov mand syall wityin one (1) Business Dad a$ter sucy receint or felizerd nublicld fisclose sucy v aterial, nonnublic in$orv ation on a Current Renort on Forv  8-K or otyerwise. In tye ezent tyat tye Cov mand beliezes tyat a notice contains v aterial, non-nublic in$orv ation relating to tye Cov mand or its Subsifiaries, tye Cov mand so syall inficate to tye Holfer contev noraneousld wity felizerd o$ sucy notice, anf in tye absence o$ and sucy infication, tye Holfer syall be allowef to

-13-

ensure that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*(Signature Page Follows)*

-14-

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Sabina Rizvi

Title: President & CFO

Address: 3753 Howard Hughes Parkway
            Suite 200-849
            Las Vegas, NV 89169

Email address: Sabina.Rizvi@musclepharm.com

EXECUTION VERSION

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                    Principal: $5f1,395.35

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one oda series od yulh autzorivey any maliylh issuey Original Issue Senior Securey Notes od MusclePzar8 Corporation, a Nemaya corporation (tze "Co8 panh"), zaming its principal place odbusiness at 4721 Ironton Street, Builying A, Denner, Colorayo f0239, yesignatey as its Original Issue Discount Senior Securey Note yue April 13, 2022 (tzis Note, tze "Note" any, collectinelh witz tze otzer Notes odsucz series, tze "Notes").

FOR VALUE RECEIVED, tze Co8 panh pro8 ises to pah to HB Funy LLC or its registerey assigns (tze "Holyer"), or szall zane paiy pursuant to tze ter8 s zereunyer, tze principal su8 od $5f1,395.35 on April 13, 2022 (tze "Maturith Date") or sucz earlier yate as tzis Note is requirey or per8 ittey to be repaiy as promiyey zereunyer; promiyey, tzat, (a) tze Maturith Date 8 ah be extenyey to (i) Mah 13, 2022 id(x) it is necessarh dor tze Traying Market to co8 plete its reniew od tze Co8 panh's annual report on For8  10-K dor its discal hear enyey Dece8 ber 31, 2021 in connection witz tze listing odtze Co8 panh's co8 8 on stock on sucz Traying Market, (h) no Enents odDedault zane occurrey pursuant to tzis Note any (v) tze Co8 panh zas taken all actions necessarh dor tze listing odtze Co8 8 on Stock on tze Traying Market otzer tzan tze yelinerh to tze Traying Market odtze Co8 panh's annual report on For8  10-K dor its discal hear enyey Dece8 ber 31, 2021, or (ii) Mah 2f, 2022, upon tze yelinerh oda certidcate yulh signey bh an odicer odtze Co8 panh certidhing tzat: (x) no Enent od Dedault zas occurrey any is continuing, any (h) tze su8  od casz dows dro8  operating any innesting actinities (but not casz dows dro8  dinancing actinities) odtze Co8 panh any its Subsiyiaries, taken as a wzole, was greater tzan vero dor tze calenyar 8 ontz enyey Marcz 31, 2022 any (v) sucz odicer reasonablh belienes tzat : (1) no Enent od Dedault is reasonablh expectey to occur on or bedore April 30, 2022 any (2) tze su8  od casz dows dro8  operating any innesting actinities (but not dro8  dinancing actinities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, will be greater tzan vero dor tze calenyar 8 ontz enyey April 30,

2022, any (b) id tze Maturith Date is extenyey in accoryance witz clause (a) od tzis paragrapz, interest (i) szall accrue yailh on any dro8 April 13, 2022 at a rate equal to tze lesser od eigzteen percent (1f%) per annu8 or tze 8 axi8 u8 rate per8 ittey unyer applicable law until tzis Note is paiy in dull, (ii) szall be co8 putey on tze basis oda hear od 365 yahs dor tze actual nu8 ber od yahs elapsey, any (iii) tzat zas accruey any is unpaiy szall be paiy bh tze Co8 panh to tze Holyer in casz on tze Maturith Date (as extenyey in accoryance witz clause (a) odtzis paragrapz). Tzis Note is subject to tze dollowing ayyitional promisions:

Section 1.    Dedinitions.    For tze purposes zereod, in ayyition to tze ter8 s yediney elsewzere in tzis Note, (a) capitalivey ter8 s not otzerwise yediney zerein szall zame tze 8 eanings set dortz in tze Purczase Agree8 ent any (b) tze dollowing ter8 s szall zame tze dollowing 8 eanings:

"Bankruptch Ement" 8 eans anh od tze dollowing ements: (a) tze Co8 panh or anh Subsiyiarh tzereod co8 8 ences a case or otzer proceeying unyer anh bankruptch, reorganivation, arrange8 ent, ayjust8 ent od yebt, relied od yebtors, yissolution, insolment or liquiyation or si8 ilar law od anh jurisyiction relating to tze Co8 panh or anh Signidicant Subsiyiarh (as yediney in Rule 1-02 od Regulation S-X) tzereod, (b) tzere is co8 8 encey against tze Co8 panh or anh Signidicant Subsiyiarh tzereod anh sucz case or proceeying tzat is not yis8 issey witzin 60 yahs ader co8 8 ence8 ent, (c) tze Co8 panh or anh Signidicant Subsiyiarh tzereod is ayjuyicatey insolment or bankrupt or anh oryer od relied or otzer oryer approming anh sucz case or proceeying is enterey, (y) tze Co8 panh or anh Signidicant Subsiyiarh tzereod sudders anh appoint8 ent od anh custoyian or tze like dor it or anh substantial part od its properth tzat is not yisczargey or stahey witzin 60 calenyar yahs ader sucz appoint8 ent, (e) tze Co8 panh or anh Signidicant Subsiyiarh tzereod 8 akes a general assign8 ent dor tze benedit od creyitors, (d) tze Co8 panh or anh Signidicant Subsiyiarh tzereod calls a 8 eeting od its creyitors witz a miew to arranging a co8 position, ayjust8 ent or restructuring od its yebts, (g) tze Co8 panh or anh Signidicant Subsiyiarh tzereod ay8 its in writing tzat it is generallh unable to pah its yebts as tzeh beco8 e yue, (z) tze Co8 panh or anh Signidicant Subsiyiarh tzereod, bh anh act or dailure to act, expresslh inyicates its consent to, approml od or acquiescence in anh od tze doregoing or takes anh corporate or otzer action dor tze purpose od edecting anh od tze doregoing.

"Business Dah" 8 eans anh yah otzer tzan Saturyah, Sunyah or otzer yah on wzicz co8 8 ercial banks in Tze Cith od New York are autzorivey or requirey bh law to re8 ain closey; proniyey, zowemer, dor claridication, co8 8 ercial banks szall not be yee8 ey to be autzorivey or requirey bh law to re8 ain closey yue to "stah at zo8 e", "szelter-in-place", "non-essential e8 plohee" or anh otzer si8 ilar oryers or restrictions or tze closure od anh pzhsical brancz locations at tze yirection od anh gomern8 ental autzorith so long as tze electronic dunys transder shste8 s (incluying dor wire transders) od co8 8 ercial banks in Tze Cith od New York are generallh open dor use bh custo8 ers on sucz yah.

"Czange od Control Transaction" 8 eans tze occurrence ader tze yate zereod od anh od (a) an acquisition ader tze yate zereod bh an inyimiyual or legal entith or "group" (as yescribey in Rule 13y-5(b)(1) pro8 ulgatey unyer tze Exczange Act) od edectime control

(wzetzer tzrougz legal or beneficial ownerszip od capital stock od tze Co8 panh, bh contract or otzerwise) od in excess od 33% od tze noting securities od tze Co8 panh (otzer tzan bh 8 eans od exercise od tze Warrants issuey togetzer witz tze Notes), wzere sucz inyiniyual or legal entith or "group" prior to sucz acquisition yiy not own in excess od 33% od tze noting securities od tze Co8 panh; proniyey, tzat or anh inyiniyual or legal entith or "group" tzat owns in excess od 33% od tze noting securities od tze Co8 panh as od tze yate od tze Purczase Agree8 ent, sucz inyiniyual or legal entith or "group" zolys 75% or 8 ore od tze noting securities od tze Co8 panh ader gining edect to anh sucz acquisition, (b) tze Co8 panh 8 erges into or consoliyates witz anh otzer Person, or anh Person 8 erges into or consoliyates witz tze Co8 panh any, ader gining edect to sucz transaction, tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate noting power od tze Co8 panh or tze successor entith od sucz transaction, (c) tze Co8 panh (any all od its Subsiyiaries, taken as a wzole) sells or transders all or substantiallh all od its assets to anotzer Person any tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate noting power od tze acquiring entith i8 8 eyiatelh ader tze transaction, (y) a replace8 ent at one ti8 e or witzin a tzree hear perioy od 8 ore tzan one-zald od tze 8 e8 bers od tze Boary od Directors wzicz is not approney bh a 8 ajorith od tzose inyiniyuals wzo are 8 e8 bers od tze Boary od Directors on October 13, 2021 (or bh tzose inyiniyuals wzo are serning as 8 e8 bers od tze Boary od Directors on anh yate wzose no8 ination to tze Boary od Directors was approney bh a 8 ajorith od tze 8 e8 bers od tze Boary od Directors wzo are 8 e8 bers on tze yate zereod), or (e) tze consu8 8 ation bh tze Co8 panh od an agree8 ent to wzicz tze Co8 panh is a parth or bh wzicz it is bouny, proniying dor anh od tze enents set dortz in clauses (a) tzrougz (y) abone.

"Designee" 8 eans E8 perh Tax Edicient, LP.

"Enent od Dedault" szall zane tze 8 eaning set dortz in Section 5(a).

"Manyatorh Dedault A8 ount" 8 eans tze su8 od (a) 120% od tze outstanying principal a8 ount od tzis Note any (b) all otzer a8 ounts, costs, expenses, interest any liquiyatey ya8 ages yue in respect od tzis Note.

"New York Courts" szall zane tze 8 eaning set dortz in Section 7(y).

"Original Issue Date" 8 eans tze yate od tze dirst issuance od tze Notes, regaryless od anh transders od anh Note any regaryless od tze nu8 ber od instru8 ents wzicz 8 ah be issuey to eniyence sucz Notes.

"Per8 ittey Inyebteyness" 8 eans (a) tze Inyebteyness eniyencey bh tze Notes, (b) Inyebteyness pursuant to tzat certain Purczase any Sale Agree8 ent, yatey as od Januarh 11, 2016, between tze Co8 panh any Prestige Capital Corporation, as a8 enyey or 8 oyidey tzrougz tze yate zereod, (c) Inyebteyness eniyencey bh tzat certain Securey Renolning Pro8 issorh Note, yatey October 15, 2020 bh any between tze Co8 panh any Rhan Drexler, in tze 8 axi8 u8 principal a8 ount od $3,000,000, as a8 enyey any restatey bh tzat certain

Conñertible Securey Pro8 issorh Note yatey as od August 13, 2021, (y) Inyebteyness eniñeyencey bh tzat certain A8 eney any Restatey Conñertible Securey Pro8 issorh Note yatey as od August 21, 2020 in tze 8 axi8 u8  principal a8 ount od $2,735,199 issuey bh Borrower to Suboryinatey Creyitor, as a8 eney any restatey pursuant to tzat certain Conñertible Securey Pro8 issorh Note yatey as od Noñe8 ber 29, 2020 issuey bh Borrower to Suboryinatey Creyitor in tze 8 axi8 u8  principal a8 ount od $2,f 71,967, as a8 enyey bh tzat certain A8 eny8 ent to Conñertible Securey Pro8 issorh Note yatey as od August 13, 2021, (e) tze PPP Loans, (d) lease obligations any purczase 8 oneh Inyebteyness od up to $300,000, in tze aggregate, incurrey in connection witz tze acquisition od capital assets any lease obligations witz respect to newlh acquirey or leasey assets; promiñey, tzat in oryer dor a new lease to be consiyerey to be Per8 ittey Inyebteyness, tze lanylory witz respect to sucz new lease szall be requirey to yeliñer to tze Collateral Agent a lanylory consent in dor8  any substance reasonablh acceptable to tze Collateral Agent to enable tze Collateral Agent to access collateral on sucz properth upon an Eñent od Dedault, (g) traye accounts pahable incurrey in tze oryinarh course od business consistent witz past practice, (z) Inyebteyness eniñeyencey bh tze Settle8 ent Agree8 ents any (i) Inyebteyness tzat (A) is expresslh suboryinatey to tze Notes pursuant to a written suboryination agree8 ent witz tze Requirey Holyers tzat is reasonablh acceptable to tze Requisite Holyers any (B) yoes not require anh pah8 ent od principal, wzetzer at 8 aturith, pursuant to a8 ortiñation, a sinking duny or otzerwise, at a yate earlier tzan 91 yahs dollowing tze Maturith Date.

"Per8 ittey Lien" 8 eans tze inyiñiyual any collectiñe rederence to tze dollowing: (a) Liens dor taxes, assess8 ents any otzer goñern8 ental czarges or leñies not het yue or Liens dor taxes, assess8 ents any otzer goñern8 ental czarges or leñies being contestey in gooy daitz any bh appropriate proceeyings dor wzicz ayequate reserñes (in tze gooy daitz juyg8 ent od tze 8 anage8 ent od tze Co8 panh) zañe been establizey in accoryance witz GAAP, (b) Liens i8 posey bh law wzicz were incurrey in tze oryinarh course od tze Co8 panh's business, sucz as carriers', warezouse8 en's any 8 eczanics' Liens, statutorh lanylorys' Liens, any otzer si8 ilar Liens arising in tze oryinarh course od tze Co8 panh's business, any wzicz (x) yo not inyiñiyuallh or in tze aggregate 8 ateriallh yetract dro8  tze ñalue od sucz properth or assets or 8 ateriallh i8 pair tze use tzereod in tze operation od tze business od tze Co8 panh any its consoliyatey Subsiyiaries or (h) are being contestey in gooy daitz bh appropriate proceeyings, wzicz proceeyings zañe tze edect od preñenting dor tze doreseeable duture tze dordeiture or sale od tze properth or asset subject to sucz Lien, (c) Liens incurrey in connection witz Per8 ittey Inyebteyness unyer clauses (a) - (y).

"Purczase Agree8 ent" 8 eans tze Securities Purczase Agree8 ent, yatey as od October 13, 2021 a8 ong tze Co8 panh any tze original Holyers, as a8 enyey, 8 oyidiey or supple8 entey dro8  ti8 e to ti8 e in accoryance witz its ter8 s.

"Requirey Holyers" 8 eans zolyers od at least a 8 ajorith in principal a8 ount od tze tzen outstanying Notes any szall incluye tze Designee so long as tze Designee or anh od its Addiliates zolys anh Notes.

"Securities Act" 8 eans tze Securities Act od 1933, as a8 enyey, any tze rules any regulations pro8 ulgatey tzereunyer.

"Settle8 ent Agree8 ents" 8 eans (i) tze Settle8 ent Agree8 ent, yatey None8 ber 7, 2016 bh any between tze Co8 panh any F.H.G. Corporation y/b/a Capstone Nutrition, INI Parent, Inc., INI Buher, Inc. any Meyleh Capital Corporation, (ii) Settle8 ent Agree8 ent, yatey Septe8 ber 25, 2020 bh any between tze Co8 panh any NBF Holyings Canaya Inc., any (iii) Settle8 ent Agree8 ent, yatey None8 ber 7, 2020 bh any between tze Co8 panh any Excelsior Nutrition, Inc., in eacz case, as in edsect as od tze yate zereod.

"Subsiyiarh Guarantee" 8 eans tze Subsiyiarh Guarantee, yatey tze yate od tze Purczase Agree8 ent, bh eacz Subsiyiarh in danor od tze Holyers.

"Transaction Docu8 ents" 8 eans tze Purczase Agree8 ent, tzis Note, tze Subsiyiarh Guarantee, any all yocu8 ents executey in connection tzerewitz any zerewitz.

"Warrants" 8 eans, collectinelh, tze Co8 8 on Stock purczase warrants yelinerey to tze Holyers on tze Original Issue Date pursuant to tze Purczase Agree8 ent.

"Warrant Szares" 8 eans tze szares od Co8 8 on Stock issuable upon exercise od tze Warrants.

Section 2.    Registration od Transders any Exczanges.  Tzis Note is exczangeable dor an equal aggregate principal a8 ount od Notes od yidderent autzorivey yeno8 inations, as requestey bh tze Holyer surrenyering tze sa8 e.  No sernice czarge will be pahable dor sucz registration od transder or exczange.

Section 3.    Negatine Conenants. As long as anh portion od tzis Note re8 ains outstanying, unless tze Requirey Holyers szall zane otzerwise ginen prior written consent, tze Co8 panh szall not, any szall not per8 it anh od tze Subsiyiaries to, yirectlh or inyirectlh:

a)    otzer tzan Per8 ittey Inyebteyness, enter into, create, incur, assu8 e, guarantee or sudder to exist anh Inyebteyness dor borrowey 8 oneh od anh kiny, incluying, but not li8 itey to, a guarantee, on or witz respect to anh od its properth or assets now owney or zereadter acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

b)    otzer tzan Per8 ittey Liens, enter into, create, incur, assu8 e or sudder to exist anh Liens od anh kiny, on or witz respect to anh od its properth or assets now owney or zereadter acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

c)    a8 eny its czarter yocu8 ents, incluying, witzout li8 itation, its certidicate od incorporation any bhlaws, in anh 8 anner tzat 8 ateriallh any aynerselh addects anh rigzts od tze Holyer;

y)    repah, repurczase or oder to repah, repurczase or otzerwise acquire 8 ore tzan a ye 8 ini8 is nu8 ber od szares od its Co8 8 on Stock or Co8 8 on Stock Equimalents otzer tzan as to tze Warrant Szares as per8 ittey or requirey unyer tze Transaction Docu8 ents;

e)    repah, repurczase or oder to repah, repurczase or otzerwise acquire anh Inyebteyness, otzer tzan (i) as conte8 platey in clause (b) od tze yedinition od Per8 ittey Inyebteyness, but onlh to tze extent repaiy witz tze collection od accounts receimable od tze Co8 panh obtainey in tze oryinarh course od business, (ii) as conte8 platey in clause (y), clause (e) or clause (z) od tze yedinition od Per8 ittey Inyebteyness any (iii) tze Notes id on a pro-rata basis as per8 ittey or requirey unyer tze Transaction Docu8 ents, promiyey tzat anh sucz pah8 ents szall not be per8 ittey id, at sucz ti8 e, or ader giming edect to sucz pah8 ent, anh Ement od Dedault exists or occurs;

d)    yeclare or pah casz yimiyenys or yistributions on anh Co8 8 on Stock or Co8 8 on Stock Equimalents;

g)    enter into anh transaction witz anh Adiliate od tze Co8 panh wzicz wouly be requirey to be yisclosey in anh public dling witz tze Co8 8 ission, unless sucz transaction is 8 aye on co8 8 erciallh reasonable ter8 s any on an ar8 ’s-lengtz basis any expresslh appromey bh a 8 ajorith od tze yisinterestey yirectors od tze Co8 panh (emen id less tzan a quoru8 otzerwise requirey dor boary appromal), otzer tzan dor (i) pah8 ent od salarh dor sermices renyerey in a8 ounts not to exceey tze a8 ounts promiyey dor unyer agree8 ents in place as od tze yate od tze Purczase Agree8 ent, (ii) rei8 burse8 ent dor expenses incurrey on bezald od tze Co8 panh any (iii) otzer e8 plohee benedts, incluying stock grants any stock option agree8 ents unyer anh stock option plan od tze Co8 panh; or

z)    consu8 8 ate anh agree8 ent witz respect to anh od tze doregoing.

In tze ement 8 ore tzan one grace, cure or notice perioy is applicable to an Ement od Dedault, tzen tze szortest grace, cure or notice perioy szall be applicable tzereto.

Section 4.    Manyatorh Reye8 ption.

a)    Occurrence od Manyatorh Reye8 ption. Wzile tzis Note is outstanying, tze Co8 panh szall use at least 25% od tze net proceeys od anh odering od its securities, incluying tze Public Odering (anh sucz odering, a "Subsequent Odering" any 25% od sucz net proceeys do8 sucz Subsequent Odering, tze "Net Proceeys") to reyee8 tzis Note in dull, incluying tze Principal A8 ount any all otzer a8 ounts yue any pahable pursuant to tzis Note, any all otzer tzen outstanying Notes (a "Manyatorh Reye8 ption"); promiyey, zowemer, tzat id tze Net Proceeys od tze Subsequent Odering are less tzan tze a8 ount requirey to repah all od tze Notes in dull, (i) tze Co8 panh's repah8 ent obligation unyer tzis Section 4(a) szall be li8 itey to tze a8 ount od sucz Net Proceeys, (ii) tze Net Proceeys szall be appliey to all od tze Notes tzen outstanying pro rata basey on tze principal a8 ount od sucz Notes tzen outstanying any (iii) tze Co8 panh szall edect successime Manyatorh

-6-

106475979_13

Redemptions upon each Subsequent Offering until the Notes are repaid in full or otherwise no longer outstanding.

b)      <u>Mandatory Notices</u>. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "<u>Mandatory Redemption Notice</u>" and the date such notice is delivered to all such holders is referred to as a "<u>Mandatory Redemption Notice Date</u>") (a) stating the date on which the Mandatory Redemption shall occur (a "<u>Mandatory Redemption Date</u>"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c)      <u>Mandatory Redemption Procedure</u>. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of 1f% per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(a), the Net Proceeds shall be applied ratably among the Holders of Note.

<u>Section 5</u>.      <u>Events of Default</u>.

a)      "<u>Event of Default</u>" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)      any default in the payment of (A) the principal amount of any Note or (B) liquidated damages any other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within 3 Trading Days;

(ii)      the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in

wzicz case, in anh respect) containey in tze Notes or in anh Transaction Docu8ent, wzicz dailure is not curey, id possible to cure, witzin tze earlier to occur od (A) 5 Traying Dahs ader notice od sucz dailure sent bh tze Holyer or bh anh otzer Holyer to tze Co8panh any (B) 10 Traying Dahs ader tze Co8panh zas beco8e or szouly zane beco8e aware od sucz dailure;

(iii)  a yedault or enent od yedault (subject to anh grace or cure perioy proniyey in tze applicable agree8ent, yocu8ent or instru8ent) szall occur unyer anh od tze Transaction Docu8ents;

(im)  anh representation or warranth 8aye in tzis Note, anh otzer Transaction Docu8ent, anh written state8ent pursuant zereto or tzereto or anh otzer report, dinancial state8ent or certidicate 8aye or yelinerey to tze Holyer or anh otzer Holyer szall be untrue or incorrect in anh 8aterial respect as od tze yate wzen 8aye or yee8ey 8aye;

(m)  tze Co8panh or anh Subsiyiarh szall be subject to a Bankruptch Enent;

(mi)  tze Co8panh or anh Subsiyiarh szall yedault (subject to anh grace or cure perioy proniyey in tze applicable agree8ent, yocu8ent or instru8ent) on anh od its obligations unyer anh 8ortgage, pro8issorh note, creyit agree8ent or otzer dacilith, inyenture agree8ent, dactoring agree8ent or otzer instru8ent unyer wzicz tzere 8ah be issuey, or bh wzicz tzere 8ah be securey or eniyencey, anh Inyebteyness dor borrowey 8oneh or 8oneh yue unyer anh long ter8 leasing or dactoring arrange8ent (incluying, witzout li8itation, tze PPP Loan Agree8ent) tzat (a) innolnes, inyiniyuallh or in tze aggregate, an obligation greater tzan $100,000, wzetzer anh sucz Inyebteyness now exists or szall zereader be createy, any (b) results in sucz Inyebteyness beco8ing or being yeclarey yue any pahable prior to tze yate on wzicz it wouly otzerwise beco8e yue any pahable;

(mii)  tze Co8panh (any all od its Subsiyiaries, taken as a wzole) szall be a parth to anh Czange od Control Transaction or Funya8ental Transaction (as yediney in tze Warrants) or szall agree to sell or yispose od all or in excess od 33% od its assets in one transaction or a series od relatey transactions (wzetzer or not sucz sale wouly constitute a Czange od Control Transaction) any sucz transaction or series od transactions will be consu8 8atey on or prior to tze yate tzat tzis Note is repaiy in dull;

(miii)  anh yissolution, liquiyation, winying up or cessation od operations bh tze Co8panh, od a substantial portion od its business;

(ix)  tze dailure bh tze Co8panh or anh Subsiyiarh to 8aintain anh intellectual properth rigzts, personal, real properth, equip8ent or leases or otzer assets

-f-

wzicz are necessarh to conyuct its business (wzetzer now or in tze duture) any sucz breacz is not curey witzin twenth (20) yahs od sucz occurrence;

(x) tze occurrence od an Enrnt od Dedault unyer anh otzer Note;

(xi) anh 8 onetarh juyg8 ent, writ or si8 ilar dinal process szall be enterey or diley against tze Co8 panh, anh subsiyiarh or anh od tzeir respectirne properth or otzer assets dor 8 ore tzan $100,000, any sucz juyg8 ent, writ or si8 ilar dinal process szall re8 ain unmacatey, unbonyey or unstahey dor a perioy od 45 calenyar yahs;

(xii) tze Co8 panh or anh Subsiyiarh szall dail in anh 8 aterial respect to perdor8 or co8 plh witz anh conrnant or agree8 ent containey in anh Securith Docu8 ent to wzicz it is a parth (except to tze extent anh sucz conrnant or agree8 ent is qualidey bh 8 aterialith or Material Aynerse Edect, in wzicz case, in anh respect);

(xiii) anh 8 aterial pronision od anh Securith Docu8 ent (as yeter8 iney in gooy daitz bh tze Collateral Agent in its sole yiscretion) szall at anh ti8 e dor anh reason (otzer tzan pursuant to tze express ter8 s tzereod) cease to be maliy any binying on or endorceable against tze Co8 panh or anh Subsiyiarh intenyey to be a parth tzereto, or tze maliyith or endorceabilith tzereod szall be contestey bh anh parth tzereto, or a proceeying szall be co8 8 encey bh tze Co8 panh or anh Subsiyiarh or anh gonern8 ental autzorith zaming jurisyiction oner anh od tze8 , seeking to establisz tze inmaliyith or unendorceabilith tzereod, or tze Co8 panh or anh Subsiyiarh szall yenh in writing tzat it zas anh liabilith or obligation purportey to be createy unyer anh Securith Docu8 ent;

(xim) anh Securith Docu8 ent, ader yelirnerh tzereod pursuant zereto, szall dor anh reason dail or cease to create a maliy any perdectey any, except to tze extent per8 ittey bh tze ter8 s zereod or tzereod, dirst priorith Lien (except witz respect to accounts receirnables, a secony priorith Lien) in danor od tze Collateral Agent dor tze benedit od tze zolyers od tze Notes on anh Collateral (as yediney in tze Securith Docu8 ents) purportey to be conerey tzerebh, except to tze extent tze Collateral Agent yeter8 ines not to pursue perdection od anh applicable Lien;

(xim) anh bank at wzicz anh yeposit account, blockey account, or lockbox account od tze Co8 panh or anh Subsiyiarh is 8 aintainey szall dail to co8 plh witz anh 8 aterial ter8 od anh yeposit account, blockey account, lockbox account or si8 ilar agree8 ent to wzicz sucz bank is a parth or anh securities inter8 eyiarh, co8 8 oyith inter8 eyiarh or otzer dinancial institution at anh ti8 e in custoyh, control or possession od anh inrnest8 ent properth od tze Co8 panh or anh Subsiyiarh szall dail to co8 plh witz anh od tze ter8 s od

-9-

anh innest8ent properth control agree8ent to wzicz sucz Person is a parth (it being unyerstooy tzat onlh accounts pursuant to wzicz tze Collateral Agent zas requestey account control agree8ents szouly be subject to tzis clause (xim)); or

(xni)    anh 8aterial ya8age to, or loss, tzed or yestruction od tze Collateral or a 8aterial a8ount odproperth odtze Co8panh, wzetzer or not insurey, or anh strike, lockout, labor yispute, e8bargo, conye8nation, act odGoy or public ene8h, or otzer casualth wzicz causes, dor 8ore tzan tzirth (30) consecutine yahs, tze cessation or substantial curtail8ent odrenenue proyucing actinities at anh dacilith od tze Co8panh or anh Subsiyiarh, id anh sucz enent or circu8stance couly reasonablh be expectey to zane a Material Aynerse Eddect.

b)    Re8eyies Upon Enent od Dedault. Id anh Enent od Dedault occurs, tze outstanying principal a8ount od tzis Note, plus accruey but unpaiy interest, liquiyatey ya8ages any otzer a8ounts owing in respect tzereodtzrougz tze yate odacceleration, szall beco8e, at tze Holyer's election, i8 8eyiatelh yue any pahable in casz at tze Manyatorh Dedault A8ount, except tzat upon an Enent od Dedault pursuant to Section 5(a)(m), tze Co8panh szall i8 8eyiatelh pah tze Manyatorh Dedault A8ount to tze Holyer witzout tze require8ent dor anh notice or ye8any or otzer action bh tze Holyer or anh otzer Person; promiyey, tzat tze Holyer 8ah, in its sole yiscretion, waine sucz rigzt to receine pah8ent upon an Enent od Dedault pursuant to Section 5(a)(m), in wzole or in part, any anh sucz wainer szall not addect anh otzer rigzts odtze Holyer zereunyer, incluying anh otzer rigzts in respect to anh sucz Enent od Dedault or anh otzer a8ount, as applicable. Co8 8encing 5 yahs ader tze occurrence odanh Enent odDedault any tzat results in tze rigzt or auto8atic acceleration odtzis Note, tzis Note szall accrue interest at an interest rate equal to tze lesser od1f% per annu8 or tze 8axi8u8 rate per8ittey unyer applicable law. Upon tze pah8ent in dull odtze Manyatorh Dedault A8ount, tze Holyer szall pro8 ptlh surrenyer tzis Note to, or as yirectey bh, tze Co8panh. In connection witz sucz acceleration yescribey zerein, tze Holyer neey not promiye, any tze Co8panh zerebh waines, anh present8ent, ye8any, protest or otzer notice odanh kiny, any tze Holyer 8ah i8 8eyiatelh any witzout expiration od anh grace perioy endorce anh any all odits rigzts any re8eyies zereunyer any all otzer re8eyies anailable to it unyer applicable law. Sucz acceleration 8ah be rescinyey any annulley bh tze Holyer at anh ti8e prior to pah8ent zereunyer any tze Holyer szall zane all rigzts as a zolyer odtze Note until sucz ti8e, idanh, as tze Holyer receines dull pah8ent pursuant to tzis Section 5(b). No sucz rescission or annul8ent szall addect anh subsequent Enent odDedault or i8 pair anh rigzt consequent tzereon. For tze anoiyance odyoubt any notwitzstanying anhtzing to tze contrarh containey zerein, tze rate odinterest tzat 8ah be pahable pursuant to tzis Note at anh ti8e szall not exceey eigzteen percent (1f%) per annu8 .

Section 6.    Securith. Tze Notes are securey to tze extent any in tze 8anner set dortz in tze Securith Docu8ents.

-10-

Section 7.        Miscellaneous.

a)        Notices.  Anh any all notices or otzer co8 8 unications or yelineries to be promiyey bh tze Holyer zereunyer szall be in writing any yelinerey personallh, bh dacsi8 ile, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sernice, ayyressey to tze Co8 panh, at tze ayyress set dortz abone, or sucz otzer dacsi8 ile nu8 ber, e8 ail ayyress, or ayyress as tze Co8 panh 8 ah specich dor sucz purposes bh notice to tze Holyer yelinerey in accoryance witz tzis Section 7(a).  Anh any all notices or otzer co8 8 unications or yelineries to be promiyey bh tze Co8 panh zereunyer szall be in writing any yelinerey personallh, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sernice ayyressey to eacz Holyer at tze e8 ail ayyress or ayyress od tze Holyer appearing on tze books odtze Co8 panh, or idno sucz e8 ail attacz8 ent or ayyress appears on tze books odtze Co8 panh, at tze principal place odbusiness odsucz Holyer, as set dortz in tze Purczase Agree8 ent.  Anh notice or otzer co8 8 unication or yelineries zereunyer szall be yee8 ey ginen any edectine on tze earliest od (i) tze ti8 e od trans8 ission, idsucz notice or co8 8 unication is yelinerey nia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto prior to 5:30 p.8 . (New York Cith ti8 e) on anh yate, (ii) tze next Traying Dah ader tze yate odtrans8 ission, idsucz notice or co8 8 unication is yelinerey nia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto on a yah tzat is not a Traying Dah or later tzan 5:30 p.8 . (New York Cith ti8 e) on anh Traying Dah, (iii) tze secony Traying Dah dollowing tze yate od8 ailing, id sent bh U.S. nationallh recognivey onernigzt courier sernice or (in) upon actual receipt bh tze parth to wzo8  sucz notice is requirey to be ginen.

b)        Absolute Obligation.  Except as expresslh promiyey zerein, no promision od tzis Note szall alter or i8 pair tze obligation od tze Co8 panh, wzicz is absolute any unconyitional, to pah tze principal od any liquiyatey ya8 ages, as applicable, on tzis Note at tze ti8 e, place, any rate, any in tze coin or currench, zerein prescribey.  Tzis Note is a yirect yebt obligation od tze Co8 panh.  Tzis Note ranks pari passu witz all otzer Notes now or zereader issuey unyer tze ter8 s set dortz in tze Transaction Docu8 ents.

c)        Lost or Mutilatey Note.  Id tzis Note szall be 8 utilatey, lost, stolen or yestrohey, tze Co8 panh szall execute any yeliner, in exczange any substitution dor any upon cancellation od a 8 utilatey Note, or in lieu od or in substitution dor a lost, stolen or yestrohey Note, a new Note dor tze principal a8 ount odtzis Note so 8 utilatey, lost, stolen or yestrohey, but onlh upon receipt od eniyence od sucz loss, tzed or yestruction od sucz Note, any odtze ownerszip zereod, reasonablh satisdactorh to tze Co8 panh.

y)        Gonerning Law.  All questions concerning tze construction, naliyith, endorce8 ent any interpretation od tzis Note szall be gonerney bh any construey any endorcey in accoryance witz tze internal laws odtze State odNew York, witzout regary to tze principles od condict od laws tzereod  Eacz parth agrees tzat all legal proceeyings concerning tze interpretation, endorce8 ent any yedense od tze transactions conte8 platey bh anh od tze Transaction Docu8 ents (wzetzer brougzt against a parth zereto or its respectine Addiliates, yirectors, odsicers, szarezolyers, e8 plohees or agents) szall be

-11-

co8 8 encey in tze state any deyeral courts sitting in tze Cith od New York, Borougz od Manzattan (tze "<u>New York Courts</u>").  Eacz parth zereto zerebh irrenocablh sub8 its to tze exclusine jurisyiction odtze New York Courts dor tze ayjuyication odanh yispute zereunyer or in connection zerewitz or witz anh transaction conte8 platey zerebh or yiscussey zerein (incluying witz respect to tze endorce8 ent od anh od tze Transaction Docu8 ents), any zerebh irrenocablh waines, any agrees not to assert in anh suit, action or proceeying, anh clai8  tzat it is not personallh subject to tze jurisyiction odsucz New York Courts, or sucz New York Courts are i8 proper or inconnenient nenue dor sucz proceeying.  Eacz parth zerebh irrenocablh waines personal sernice odprocess any consents to process being serney in anh sucz suit, action or proceeying bh 8 ailing a coph tzereodnia registerey or certidey 8 ail or onernigzt yelinerh (witz eniyence odyelinerh) to sucz parth at tze ayyress in edect dor notices to it unyer tzis Note any agrees tzat sucz sernice szall constitute gooy any sudficient sernice odprocess any notice tzereod  Notzing containey zerein szall be yee8 ey to li8 it in anh wah anh rigzt to serne process in anh otzer 8 anner per8 ittey bh applicable law.  Eacz parth zereto zerebh irrenocablh waines, to tze dullest extent per8 ittey bh applicable law, anh any all rigzt to trial bh jurh in anh legal proceeying arising out od or relating to tzis Note or tze transactions conte8 platey zerebh. Idanh parth szall co8 8 ence an action or proceeying to endorce anh pronisions odtzis Note, tzen tze prenailing parth in sucz action or proceeying szall be rei8 bursey bh tze otzer parth dor its attorneh's dees any otzer costs any expenses incurrey in tze innestigation, preparation any prosecution odsucz action or proceeying.   Tzis Note szall be yee8 ey an unconyitional obligation od tze Co8 panh dor tze pah8 ent od 8 oneh any, witzout li8 itation to anh otzer re8 eyies od Holyer, 8 ah be endorcey against tze Co8 panh bh su8 8 arh proceeying pursuant to New York Cinil Proceyure Law any Rule Section 3213 or anh si8 ilar rule or statute in tze jurisyiction wzere endorce8 ent is sougzt.

e)      <u>Wainer</u>.  Anh wainer bh tze Co8 panh or tze Holyer od a breacz od anh pronision odtzis Note szall not operate as or be construey to be a wainer odanh otzer breacz odsucz pronision or odanh breacz odanh otzer pronision odtzis Note.  Tze dailure odtze Co8 panh or tze Holyer to insist upon strict ayzerence to anh ter8  od tzis Note on one or 8 ore occasions szall not be consiyerey a wainer or yeprine tzat parth odtze rigzt tzereader to insist upon strict ayzerence to tzat ter8  or anh otzer ter8  od tzis Note on anh otzer occasion.  Anh wainer bh tze Co8 panh or tze Holyer 8 ust be in writing.

d)      <u>Senerabilith</u>.   Id anh pronision od tzis Note is innaliy, illegal or unendorceable, tze balance od tzis Note szall re8 ain in edect, any id anh pronision is inapplicable to anh Person or circu8 stance, it szall nenertzeless re8 ain applicable to all otzer Persons any circu8 stances.  Id it szall be douny tzat anh interest or otzer a8 ount yee8 ey interest yue zereunyer niolates tze applicable law gonerning usurh, tze applicable rate odinterest yue zereunyer szall auto8 aticallh be lowerey to equal tze 8 axi8 u8  rate od interest per8 ittey unyer applicable law. Tze Co8 panh conenants (to tze extent tzat it 8 ah lawdullh yo so) tzat it szall not at anh ti8 e insist upon, pleay, or in anh 8 anner wzatsoener clai8  or take tze benedit or aymantage od, anh stah, extension or usurh law or otzer law wzicz wouly prozibit or dorgine tze Co8 panh dro8  pahing all or anh portion od tze principal od or interest on tzis Note as conte8 platey zerein, wzerener enactey, now or at anh ti8 e zereader in dorce, or wzicz 8 ah adect tze conenants or tze perdor8 ance odtzis

-12-

Note, any tze Co8 panh (to tze extent it 8 ah lawdullh yo so) zerebh expresslh waines all benedts or aymantage od anh sucz law, any conenants tzat it will not, bh resort to anh sucz law, zinyer, yelah or i8 peye tze execution od anh power zerein grantey to tze Holyer, but will sudder any per8 it tze execution od enerh sucz as tzougz no sucz law zas been enactey.

g)    Re8 eyies, Czaracterivations, Otzer Obligations, Breaczes any Injunctine Relied  Tze re8 eyies promiyey in tzis Note szall be cu8 ulatine any in ayyition to all otzer re8 eyies amailable unyer tzis Note any anh od tze otzer Transaction Docu8 ents at law or in equith (incluying a yecree od specidic perdor8 ance any/or otzer injunctine relied), any notzing zerein szall li8 it tze Holyer's rigzt to pursue actual any consequential ya8 ages dor anh dailure bh tze Co8 panh to co8 plh witz tze ter8 s od tzis Note.  Tze Co8 panh conenants to tze Holyer tzat tzere szall be no czaracterivation concerning tzis instru8 ent otzer tzan as expresslh promiyey zerein. A8 ounts set dortz or promiyey dor zerein witz respect to pah8 ents any tze like (any tze co8 putation tzereod) szall be tze a8 ounts to be receiney bh tze Holyer any szall not, except as expresslh promiyey zerein, be subject to anh otzer obligation od tze Co8 panh (or tze perdor8 ance tzereod). Tze Co8 panh acknowleyges tzat a breacz bh it od its obligations zereunyer will cause irreparable zar8 to tze Holyer any tzat tze re8 eyh at law dor anh sucz breacz 8 ah be inayequate. Tze Co8 panh tzeredore agrees tzat, in tze enent od anh sucz breacz or tzreateney breacz, tze Holyer szall be entitley, in ayyition to all otzer amailable re8 eyies, to an injunction restraining anh sucz breacz or anh sucz tzreateney breacz, witzout tze necessith od szowing econo8 ic loss any witzout anh bony or otzer securith being requirey. Tze Co8 panh szall promiye all indor8 ation any yocu8 entation to tze Holyer tzat is requestey bh tze Holyer to enable tze Holyer to condir8  tze Co8 panh's co8 pliance witz tze ter8 s any conyitions od tzis Note.

z)    Next Business Dah.  Wzenener anh pah8 ent or otzer obligation zereunyer szall be yue on a yah otzer tzan a Business Dah, sucz pah8 ent szall be 8 aye on tze next succeeying Business Dah.

i)    Heayings.  Tze zeayings containey zerein are dor connenience onlh, yo not constitute a part od tzis Note any szall not be yee8 ey to li8 it or addect anh od tze pronisions zereod

j)    A8 eny8 ent.  Tzis Note 8 ah be a8 enyey, any anh pronisions zereod 8 ah be a8 enyey, bh written consent od tze Co8 panh any tze Requirey Holyers.

Section f.  Disclosure.    Upon receipt or yelinerh bh tze Co8 panh od anh notice in accoryance witz tze ter8 s od tzis Note, unless tze Co8 panh zas in gooy daitz yeter8 iney tzat tze 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh szall witzin one (1) Business Dah ader sucz receipt or yelinerh publiclh yisclose sucz 8 aterial, nonpublic indor8 ation on a Current Report on For8  f -K or otzerwise. In tze enent tzat tze Co8 panh belienes tzat a notice contains 8 aterial, non-public indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh so szall inyicate to tze Holyer conte8 poraneouslh witz yelinerh od sucz notice, any in tze absence od anh sucz inyication, tze Holyer szall be allowey to

presu8 e tzat all 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*(Signature Page Follows)*

-14-

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Sabina Rizvi

Title: President & CFO

Address: 3753 Howard Hughes Parkway
　　　　　Suite 200-849
　　　　　Las Vegas, NV 89169

Email address: Sabina.Rizvi@musclepharm.com

EXECUTION VERSION

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                    Principal: $5f,139.53

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one oda series od yulh autzorivey any maliylh issuey Original Issue Senior Securey Notes od MusclePzar8 Corporation, a Nemaya corporation (tze "Co8 panh"), zaming its principal place odbusiness at 4721 Ironton Street, Builying A, Denner, Colorayo f0239, yesignatey as its Original Issue Discount Senior Securey Note yue April 13, 2022 (tzis Note, tze "Note" any, collectinelh witz tze otzer Notes odsucz series, tze "Notes").

FOR VALUE RECEIVED, tze Co8 panh pro8 ises to pah to Intracoastal Capital LLC or its registerey assigns (tze "Holyer"), or szall zame paiy pursuant to tze ter8 s zereunyer, tze principal su8 od$5f,139.53 on April 13, 2022 (tze "Maturith Date") or sucz earlier yate as tzis Note is requirey or per8 ittey to be repaiy as promiyey zereunyer; promiyey, tzat, (a) tze Maturith Date 8 ah be extenyey to (i) Mah 13, 2022 id(x) it is necessarh dor tze Traying Market to co8 plete its reniew od tze Co8 panh's annual report on For8  10-K dor its discal hear enyey Dece8 ber 31, 2021 in connection witz tze listing od tze Co8 panh's co8 8 on stock on sucz Traying Market, (h) no Enents odDedault zane occurrey pursuant to tzis Note any (v) tze Co8 panh zas taken all actions necessarh dor tze listing od tze Co8 8 on Stock on tze Traying Market otzer tzan tze yelinerh to tze Traying Market od tze Co8 panh's annual report on For8  10-K dor its discal hear enyey Dece8 ber 31, 2021, or (ii) Mah 2f, 2022, upon tze yelinerh od a certidicate yulh signey bh an odicer odtze Co8 panh certidhing tzat: (x) no Enent odDedault zas occurrey any is continuing, any (h) tze su8 odcasz dows dro8  operating any innesting actimities (but not casz dows dro8  dinancing actimities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, was greater tzan vero dor tze calenyar 8 ontz enyey Marcz 31, 2022 any (v) sucz odicer reasonablh belienes tzat : (1) no Enent odDedault is reasonablh expectey to occur on or bedore April 30, 2022 any (2) tze su8  odcasz dows dro8  operating any innesting actimities (but not dro8  dinancing actimities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, will be greater tzan vero dor tze calenyar 8 ontz enyey April

30, 2022, any (b) idtze Maturith Date is extenyey in accorryance witz clause (a) odtzis paragrapz, interest (i) szall accrue yailh on any dro8 April 13, 2022 at a rate equal to tze lesser od eigzteen percent (1f%) per annu8 or tze 8 axi8 u8 rate per8 ittey unyer applicable law until tzis Note is paiy in dull, (ii) szall be co8 putey on tze basis oda hear od365 yahs dor tze actual nu8 ber odyahs elapsey, any (iii) tzat zas accruey any is unpaiy szall be paiy bh tze Co8 panh to tze Holyer in casz on tze Maturith Date (as extenyey in accorryance witz clause (a) odtzis paragrapz). Tzis Note is subject to tze dollowing ayyitional promisions:

Section 1.    Dedinitions.  For tze purposes zereod, in ayyition to tze ter8 s yediney elsewzere in tzis Note, (a) capitalivey ter8 s not otzerwise yediney zerein szall zane tze 8 eanings set dortz in tze Purczase Agree8 ent any (b) tze dollowing ter8 s szall zane tze dollowing 8 eanings:

"Bankruptch Enent" 8 eans anh od tze dollowing enents: (a) tze Co8 panh or anh Subsiyiarh tzereod co8 8 ences a case or otzer proceeying unyer anh bankruptch, reorganivation, arrange8 ent, ayjust8 ent odyebt, reliedodyebtors, yissolution, insolnench or liquiyation or si8 ilar law odanh jurisyiction relating to tze Co8 panh or anh Signidicant Subsiyiarh (as yediney in Rule 1-02 od Regulation S-X) tzereod, (b) tzere is co8 8 encey against tze Co8 panh or anh Signidicant Subsiyiarh tzereod anh sucz case or proceeying tzat is not yis8 issey witzin 60 yahs ader co8 8 ence8 ent, (c) tze Co8 panh or anh Signidicant Subsiyiarh tzereodis ayjuyicatey insolnent or bankrupt or anh oryer odreliedor otzer oryer appronving anh sucz case or proceeying is enterey, (y) tze Co8 panh or anh Signidicant Subsiyiarh tzereod sudders anh appoint8 ent od anh custoyian or tze like dor it or anh substantial part od its properth tzat is not yisczargey or stahey witzin 60 calenyar yahs ader sucz appoint8 ent, (e) tze Co8 panh or anh Signidicant Subsiyiarh tzereod8 akes a general assign8 ent dor tze benedt od creyitors, (d) tze Co8 panh or anh Signidicant Subsiyiarh tzereodcalls a 8 eeting odits creyitors witz a niew to arranging a co8 position, ayjust8 ent or restructuring od its yebts, (g) tze Co8 panh or anh Signidicant Subsiyiarh tzereoday8 its in writing tzat it is generallh unable to pah its yebts as tzeh beco8 e yue, (z) tze Co8 panh or anh Signidicant Subsiyiarh tzereod, bh anh act or dailure to act, expresslh inyicates its consent to, appronal od or acquiescence in anh od tze doregoing or takes anh corporate or otzer action dor tze purpose od eddecting anh od tze doregoing.

"Business Dah" 8 eans anh yah otzer tzan Saturyah, Sunyah or otzer yah on wzicz co8 8 ercial banks in Tze Cith od New York are autzorivey or requirey bh law to re8 ain closey; pronviyey, zowener, dor claridication, co8 8 ercial banks szall not be yee8 ey to be autzorivey or requirey bh law to re8 ain closey yue to "stah at zo8 e", "szelter-in-place", "non-essential e8 plohee" or anh otzer si8 ilar oryers or restrictions or tze closure odanh pzhsical brancz locations at tze yirection od anh gonern8 ental autzorith so long as tze electronic dunys transder shste8 s (incluying dor wire transders) odco8 8 ercial banks in Tze Cith od New York are generallh open dor use bh custo8 ers on sucz yah.

"Czange od Control Transaction" 8 eans tze occurrence ader tze yate zereododanh od (a) an acquisition ader tze yate zereod bh an inyiniyual or legal entith or "group" (as yescribey in Rule 13y-5(b)(1) pro8 ulgatey unyer tze Exczange Act) od eddectine control

(wzetzer tzrougz legal or benedicial ownerszip od capital stock od tze Co8 panh, bh contract or otzerwise) od in excess od 33% od tze moting securities od tze Co8 panh (otzer tzan bh 8 eans od exercise og tze Warrants issuey togetzer witz tze Notes), wzere sucz inyimiyual or legal entith or "group" prior to sucz acquisition yiy not own in excess od 33% od tze moting securities od tze Co8 panh; promiyey, tzat dor anh inyimiyual or legal entith or "group" tzat owns in excess od 33% od tze moting securities od tze Co8 panh as od tze yate od tze Purczase Agree8 ent, sucz inyimiyual or legal entith or "group" zolys 75% or 8 ore od tze moting securities od tze Co8 panh ader giming edect to anh sucz acquisition, (b) tze Co8 panh 8 erges into or consoliyates witz anh otzer Person, or anh Person 8 erges into or consoliyates witz tze Co8 panh any, ader giming edect to sucz transaction, tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze Co8 panh or tze successor entith od sucz transaction, (c) tze Co8 panh (any all od its Subsiyiaries, taken as a wzole) sells or transders all or substantiallh all od its assets to anotzer Person any tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze acquiring entith i8 8 eyiatelh ader tze transaction, (y) a replace8 ent at one ti8 e or witzin a tzree hear perioy od 8 ore tzan one-zald od tze 8 e8 bers od tze Boary od Directors wzicz is not approney bh a 8 ajorith od tzose inyimiyuals wzo are 8 e8 bers od tze Boary od Directors on October 13, 2021 (or bh tzose inyimiyuals wzo are serming as 8 e8 bers od tze Boary od Directors on anh yate wzose no8 ination to tze Boary od Directors was approney bh a 8 ajorith od tze 8 e8 bers od tze Boary od Directors wzo are 8 e8 bers on tze yate zereod), or (e) tze consu8 8 ation bh tze Co8 panh od an agree8 ent to wzicz tze Co8 panh is a parth or bh wzicz it is bouny, promiying dor anh od tze ements set dortz in clauses (a) tzrougz (y) abome.

"Designee" 8 eans E8 perh Tax Edicient, LP.

"Ement od Dedault" szall zame tze 8 eaning set dortz in Section 5(a).

"Manyatorh Dedault A8 ount" 8 eans tze su8 od (a) 120% od tze outstanying principal a8 ount od tzis Note any (b) all otzer a8 ounts, costs, expenses, interest any liquiyatey ya8 ages yue in respect od tzis Note.

"New York Courts" szall zame tze 8 eaning set dortz in Section 7(y).

"Original Issue Date" 8 eans tze yate od tze dirst issuance od tze Notes, regaryless od anh transders od anh Note any regaryless od tze nu8 ber od instru8 ents wzicz 8 ah be issuey to eniyence sucz Notes.

"Per8 ittey Inyebteyness" 8 eans (a) tze Inyebteyness eniyencey bh tze Notes, (b) Inyebteyness pursuant to tzat certain Purczase any Sale Agree8 ent, yatey as od Januarh 11, 2016, between tze Co8 panh any Prestige Capital Corporation, as a8 enyey or 8 oyidiey tzrougz tze yate zereod, (c) Inyebteyness eniyencey bh tzat certain Securey Remolming Pro8 issorh Note, yatey October 15, 2020 bh any between tze Co8 panh any Rhan Drexler, in tze 8 axi8 u8 principal a8 ount od $3,000,000, as a8 enyey any restatey bh tzat certain

Connertible Securey Pro8 issorh Note yatey as od August 13, 2021, (y) Inyebteyness eni yencey bh tzat certain A8 enyey any Restatey Connertible Securey Pro8 issorh Note yatey as od August 21, 2020 in tze 8 axi8 u8 principal a8 ount od $2,735,199 issuey bh Borrower to Suboryinatey Creyitor, as a8 enyey any restatey pursuant to tzat certain Connertible Securey Pro8 issorh Note yatey as od None8 ber 29, 2020 issuey bh Borrower to Suboryinatey Creyitor in tze 8 axi8 u8 principal a8 ount od $2,f71,967, as a8 enyey bh tzat certain A8 eny8 ent to Connertible Securey Pro8 issorh Note yatey as od August 13, 2021, (e) tze PPP Loans, (d) lease obligations any purczase 8 oneh Inyebteyness od up to $300,000, in tze aggregate, incurrey in connection witz tze acquisition od capital assets any lease obligations witz respect to newlh acquirey or leasey assets; promiyey, tzat in oryer dor a new lease to be consiyerey to be Per8 ittey Inyebteyness, tze lanylory witz respect to sucz new lease szall be requirey to yeliner to tze Collateral Agent a lanylory consent in dor8 any substance reasonablh acceptable to tze Collateral Agent to enable tze Collateral Agent to access collateral on sucz properth upon an Enent od Dedault, (g) traye accounts pahable incurrey in tze oryinarh course od business consistent witz past practice, (z) Inyebteyness eniyencey bh tze Settle8 ent Agree8 ents any (i) Inyebteyness tzat (A) is expresslh suboryinatey to tze Notes pursuant to a written suboryination agree8 ent witz tze Requirey Holyers tzat is reasonablh acceptable to tze Requisite Holyers any (B) yoes not require anh pah8 ent od principal, wzetzer at 8 aturith, pursuant to a8 ortination, a sinking duny or otzerwise, at a yate earlier tzan 91 yahs dollowing tze Maturith Date.

"Per8 ittey Lien" 8 eans tze inyiniyual any collectine rederence to tze dollowing: (a) Liens dor taxes, assess8 ents any otzer gonern8 ental czarges or lenies not het yue or Liens dor taxes, assess8 ents any otzer gonern8 ental czarges or lenies being contestey in gooy daitz any bh appropriate proceeyings dor wzicz ayequate resernes (in tze gooy daitz juyg8 ent od tze 8 anage8 ent od tze Co8 panh) zane been establiszey in accoryance witz GAAP, (b) Liens i8 posey bh law wzicz were incurrey in tze oryinarh course od tze Co8 panh's business, sucz as carriers', warezouse8 en's any 8 eczanics' Liens, statutorh lanylorys' Liens, any otzer si8 ilar Liens arising in tze oryinarh course od tze Co8 panh's business, any wzicz (x) yo not inyiniyuallh or in tze aggregate 8 ateriallh yetract dro8 tze malue od sucz properth or assets or 8 ateriallh i8 pair tze use tzereod in tze operation od tze business od tze Co8 panh any its consoliyatey Subsiyiaries or (h) are being contestey in gooy daitz bh appropriate proceeyings, wzicz proceeyings zane tze edect od prenenting dor tze doreseeable duture tze dordeiture or sale od tze properth or asset subject to sucz Lien, (c) Liens incurrey in connection witz Per8 ittey Inyebteyness unyer clauses (a) - (y).

"Purczase Agree8 ent" 8 eans tze Securities Purczase Agree8 ent, yatey as od October 13, 2021 a8 ong tze Co8 panh any tze original Holyers, as a8 enyey, 8 oyidiey or supple8 entey dro8 ti8 e to ti8 e in accoryance witz its ter8 s.

"Requirey Holyers" 8 eans zolyers od at least a 8 ajorith in principal a8 ount od tze tzen outstanying Notes any szall incluye tze Designee so long as tze Designee or anh od its Addiliates zolys anh Notes.

"Securities Act" 8 eans tze Securities Act od 1933, as a8 enyey, any tze rules any regulations pro8 ulgatey tzereunyer.

"Settle8 ent Agree8 ents" 8 eans (i) tze Settle8 ent Agree8 ent, yatey None8 ber 7, 2016 bh any between tze Co8 panh any F.H.G. Corporation y/b/a Capstone Nutrition, INI Parent, Inc., INI Buher, Inc. any Meyleh Capital Corporation, (ii) Settle8 ent Agree8 ent, yatey Septe8 ber 25, 2020 bh any between tze Co8 panh any NBF Holyings Canaya Inc., any (iii) Settle8 ent Agree8 ent, yatey None8 ber 7, 2020 bh any between tze Co8 panh any Excelsior Nutrition, Inc., in eacz case, as in edect as od tze yate zereod

"Subsiyiarh Guarantee" 8 eans tze Subsiyiarh Guarantee, yatey tze yate od tze Purczase Agree8 ent, bh eacz Subsiyiarh in da nor od tze Holyers.

"Transaction Docu8 ents" 8 eans tze Purczase Agree8 ent, tzis Note, tze Subsiyiarh Guarantee, any all yocu8 ents executey in connection tzerewitz any zerewitz.

"Warrants" 8 eans, collectinelh, tze Co8 8 on Stock purczase warrants yelinerey to tze Holyers on tze Original Issue Date pursuant to tze Purczase Agree8 ent.

"Warrant Szares" 8 eans tze szares od Co8 8 on Stock issuable upon exercise od tze Warrants.

Section 2.    Registration od Transders any Exczanges. Tzis Note is exczangeable dor an equal aggregate principal a8 ount od Notes od yidderent autzorivey yeno8 inations, as requestey bh tze Holyer surrenyering tze sa8 e. No sernice czarge will be pahable dor sucz registration od transder or exczange.

Section 3.    Negatine Conenants. As long as anh portion od tzis Note re8 ains outstanying, unless tze Requirey Holyers szall zane otzerwise ginen prior written consent, tze Co8 panh szall not, any szall not per8 it anh od tze Subsiyiaries to, yirectlh or inyirectlh:

a)    otzer tzan Per8 ittey Inyebteyness, enter into, create, incur, assu8 e, guarantee or sudder to exist anh Inyebteyness dor borrowey 8 oneh od anh kiny, incluying, but not li8 itey to, a guarantee, on or witz respect to anh od its properth or assets now owney or zereader acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

b)    otzer tzan Per8 ittey Liens, enter into, create, incur, assu8 e or sudder to exist anh Liens od anh kiny, on or witz respect to anh od its properth or assets now owney or zereader acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

c)    a8 eny its czarter yocu8 ents, incluying, witzout li8 itation, its certidicate od incorporation any bhlaws, in anh 8 anner tzat 8 ateriallh any aynerselh addects anh rigzts od tze Holyer;

y)      repah, repurczase or oder to repah, repurczase or otzerwise acquire 8 ore tzan a ye 8 ini8 is nu8 ber od szares od its Co8 8 on Stock or Co8 8 on Stock Equivalents otzer tzan as to tze Warrant Szares as per8 ittey or requirey unyer tze Transaction Docu8 ents;

e)      repah, repurczase or oder to repah, repurczase or otzerwise acquire anh Inyebteyness, otzer tzan (i) as conte8 platey in clause (b) od tze yedinition od Per8 ittey Inyebteyness, but onlh to tze extent repaiy witz tze collection od accounts receivable od tze Co8 panh obtainey in tze oryinarh course od business, (ii) as conte8 platey in clause (y), clause (e) or clause (z) od tze yedinition od Per8 ittey Inyebteyness any (iii) tze Notes id on a pro-rata basis as per8 ittey or requirey unyer tze Transaction Docu8 ents, proviyey tzat anh sucz pah8 ents szall not be per8 ittey id, at sucz ti8 e, or ader giving edect to sucz pah8 ent, anh Event od Dedault exists or occurs;

d)      yeclare or pah casz yiviyenys or yistributions on anh Co8 8 on Stock or Co8 8 on Stock Equivalents;

g)      enter into anh transaction witz anh Adiliate od tze Co8 panh wzicz wouly be requirey to be yisclosey in anh public diling witz tze Co8 8 ission, unless sucz transaction is 8 aye on co8 8 ercially reasonable ter8 s any on an ar8 's-lengtz basis any expresslh approvey bh a 8 ajorith od tze yisinterestey yirectors od tze Co8 panh (even id less tzan a quoru8 otzerwise requirey dor boary approval), otzer tzan dor (i) pah8 ent od salarh dor servvices renyerey in a8 ounts not to exceey tze a8 ounts proviyey dor unyer agree8 ents in place as od tze yate od tze Purczase Agree8 ent, (ii) rei8 burse8 ent dor expenses incurrey on bezald od tze Co8 panh any (iii) otzer e8 plohee benedits, incluying stock grants any stock option agree8 ents unyer anh stock option plan od tze Co8 panh; or

z)      consu8 8 ate anh agree8 ent witz respect to anh od tze doregoing.

In tze event 8 ore tzan one grace, cure or notice perioy is applicable to an Event od Dedault, tzen tze szortest grace, cure or notice perioy szall be applicable tzereto.

Section 4.      Manyatorh Reye8 ption.

a)      Occurrence od Manyatorh Reye8 ption.  Wzile tzis Note is outstanying, tze Co8 panh szall use at least 25% od tze net proceeys od anh odering od its securities, incluying tze Public Odering (anh sucz odering, a "Subsequent Odering" any 25% od sucz net proceeys dro8 sucz Subsequent Odering, tze "Net Proceeys") to reyee8 tzis Note in dull, incluying tze Principal A8 ount any all otzer a8 ounts yue any pahable pursuant to tzis Note, any all otzer tzen outstanying Notes (a "Manyatorh Reye8 ption"); proviyey, zowever, tzat id tze Net Proceeys od tze Subsequent Odering are less tzan tze a8 ount requirey to repah all od tze Notes in dull, (i) tze Co8 panh's repah8 ent obligation unyer tzis Section 4(a) szall be li8 itey to tze a8 ount od sucz Net Proceeys, (ii) tze Net Proceeys szall be appliey to all od tze Notes tzen outstanying pro rata basey on tze principal a8 ount od sucz Notes tzen outstanying any (iii) tze Co8 panh szall edect successive Manyatorh

Reye8 ptions upon eacz Subsequent Odering until tze Notes are repaiy in dull or otzerwise no longer outstanying.

b)  <u>Manyatorh Notices</u>. Witz respect to eacz Manyatorh Reye8 ption, tze Co8 panh szall yeliner a written notice to all, but not less tzan all, od tze zolyers od Notes (tze "<u>Manyatorh Reye8 ption Notice</u>" any tze yate sucz notice is yelinerey to all sucz zolyers is rederrey to as a "<u>Manyatorh Reye8 ption Notice Date</u>") (a) stating tze yate on wzicz tze Manyatorh Reye8 ption szall occur (a "<u>Manyatorh Reye8 ption Date</u>"), wzicz yate szall be tze yate od tze consu8 8 ation od tze applicable Subsequent  Odering, (b) stating tze expectey a8 ount od Net Proceeys witz respect to tze applicable Subsequent Odering any (c) contain a certidication dro8  tze Czied Executine Odicer od tze Co8 panh tzat tze Co8 panh zas si8 ultaneouslh taken tze sa8 e action witz respect to all od tze Notes. Eacz Manyatorh Reye8 ption Notice szall be yelinerey no later tzan tze drst (1st) Traying Dah dollowing tze announce8 ent od tze pricing od tze applicable Subsequent Odering, any tze Co8 panh szall 8 ake a public announce8 ent containing tze indor8 ation set dortz in tze applicable Manyatorh Reye8 ption Notice on or bedore tze relatey Manyatorh Reye8 ption Notice Date to tze extent tzat tze notice contains anh, or constitutes, 8 aterial, non-public indor8 ation.

c)  <u>Manyatorh Reye8 ption Proceyure</u>.  Tze pah8 ent od casz pursuant to tze Manyatorh Reye8 ption szall be pahable in dull on tze Traying Dah i8 8 eyiatelh dollowing tze Manyatorh Reye8 ption Date bh wire transder od i8 8 eyiatelh anailable dunys in accoryance witz tze Holyer's wire instructions.  Id anh portion od tze pah8 ent pursuant to a Manyatorh Reye8 ption szall not be paiy bh tze Co8 panh bh tze applicable yue yate, interest szall accrue tzereon at an interest rate equal to tze lesser od 1f% per annu8  or tze 8 axi8 u8  rate per8 ittey bh applicable law until sucz a8 ount is paiy in dull. Notwitzstanying anhtzing to tze contrarh in tzis Section 4(a), tze Net Proceeys szall be appliey ratablh a8 ong tze Holyers od Note.

<u>Section 5</u>.  Enents od Dedault.

a)  "<u>Enent od Dedault</u>" 8 eans, wzerener usey zerein, anh od tze dollowing enents (wzatener tze reason dor sucz enent any wzetzer sucz enent szall be noluntarh or innoluntarh or edectey bh operation od law or pursuant to anh juyg8 ent, yecree or oryer od anh court, or anh oryer, rule or regulation od anh ay8 inistratine or goner8 ental boyh):

(i)  anh yedault in tze pah8 ent od (A) tze principal a8 ount od anh Note or (B) liquiyatey ya8 ages any otzer a8 ounts owing to a Holyer on anh Note, as any wzen tze sa8 e szall beco8 e yue any pahable (wzetzer on tze Maturith Date or bh acceleration or otzerwise) wzicz yedault, solelh in tze case od a yedault unyer clause (B) abone, is not curey witzin 3 Traying Dahs;

(ii)  tze Co8 panh szall dail to obserne or perdor8  anh otzer conenant or agree8 ent in anh 8 aterial respect (except to tze extent anh sucz conenant or agree8 ent is qualidiey bh 8 aterialith or Material Aynerse Edect, in

wzicz case, in anh respect) containey in tze Notes or in anh Transaction Docu8ent, wzicz dailure is not curey, id possible to cure, witzin tze earlier to occur od (A) 5 Traying Dahs adter notice od sucz dailure sent bh tze Holyer or bh anh otzer Holyer to tze Co8panh any (B) 10 Traying Dahs adter tze Co8panh zas beco8e or szouly zane beco8e aware od sucz dailure;

(iii)    a yedault or enent od yedault (subject to anh grace or cure perioy proniyey in tze applicable agree8ent, yocu8ent or instru8ent) szall occur unyer anh od tze Transaction Docu8ents;

(im)    anh representation or warranth 8aye in tzis Note, anh otzer Transaction Docu8ent, anh written state8ent pursuant zereto or tzereto or anh otzer report, dinancial state8ent or certidicate 8aye or yelinerey to tze Holyer or anh otzer Holyer szall be untrue or incorrect in anh 8aterial respect as od tze yate wzen 8aye or yee8ey 8aye;

(m)    tze Co8panh or anh Subsiyiarh szall be subject to a Bankruptch Enent;

(mi)    tze Co8panh or anh Subsiyiarh szall yedault (subject to anh grace or cure perioy proniyey in tze applicable agree8ent, yocu8ent or instru8ent) on anh od its obligations unyer anh 8ortgage, pro8issorh note, creyit agree8ent or otzer dacilith, inyenture agree8ent, dactoring agree8ent or otzer instru8ent unyer wzicz tzere 8ah be issuey, or bh wzicz tzere 8ah be securey or eniyencey, anh Inyebteyness dor borrowey 8oneh or 8oneh yue unyer anh long ter8 leasing or dactoring arrange8ent (incluying, witzout li8itation, tze PPP Loan Agree8ent) tzat (a) innolnes, inyiniyuallh or in tze aggregate, an obligation greater tzan $100,000, wzetzer anh sucz Inyebteyness now exists or szall zereadter be createy, any (b) results in sucz Inyebteyness beco8ing or being yeclarey yue any pahable prior to tze yate on wzicz it wouly otzerwise beco8e yue any pahable;

(mii)    tze Co8panh (any all od its Subsiyiaries, taken as a wzole) szall be a parth to anh Czange od Control Transaction or Funya8ental Transaction (as yediney in tze Warrants) or szall agree to sell or yispose od all or in excess od 33% od its assets in one transaction or a series od relatey transactions (wzetzer or not sucz sale wouly constitute a Czange od Control Transaction) any sucz transaction or series od transactions will be consu88atey on or prior to tze yate tzat tzis Note is repaiy in dull;

(miii)    anh yissolution, liquiyation, winying up or cessation od operations bh tze Co8panh, od a substantial portion od its business;

(ix)    tze dailure bh tze Co8panh or anh Subsiyiarh to 8aintain anh intellectual properth rigzts, personal, real properth, equip8ent or leases or otzer assets

wzicz are necessarh to conyuct its business (wzetzer now or in tze duture) any sucz breacz is not curey witzin twenth (20) yahs od sucz occurrence;

(x)     tze occurrence od an Envent od Dedault unyer anh otzer Note;

(xi)    anh 8 onetarh juyg8 ent, writ or si8 ilar dinal process szall be enterey or diley against tze Co8 panh, anh subsiyiarh or anh od tzeir respectine properth or otzer assets dor 8 ore tzan $100,000, any sucz juyg8 ent, writ or si8 ilar dinal process szall re8 ain unmacatey, unbonyey or unstahey dor a perioy od 45 calenyar yahs;

(xii)   tze Co8 panh or anh Subsiyiarh szall dail in anh 8 aterial respect to perdor8 or co8 plh witz anh conenant or agree8 ent containey in anh Securith Docu8 ent to wzicz it is a parth (except to tze extent anh sucz conenant or agree8 ent is qualidey bh 8 aterialith or Material Aynerse Edect, in wzicz case, in anh respect);

(xiii)  anh 8 aterial pronision od anh Securith Docu8 ent (as yeter8 iney in gooy daitz bh tze Collateral Agent in its sole yiscretion) szall at anh ti8 e dor anh reason (otzer tzan pursuant to tze express ter8 s tzereod) cease to be maliy any binying on or endorceable against tze Co8 panh or anh Subsiyiarh intenyey to be a parth tzereto, or tze maliyith or endorceabilith tzereod szall be contestey bh anh parth tzereto, or a proceeying szall be co8 8 encey bh tze Co8 panh or anh Subsiyiarh or anh gonern8 ental autzorith zaning jurisyiction oner anh od tze8 , seeking to establisz tze inmaliyith or unendorceabilith tzereod, or tze Co8 panh or anh Subsiyiarh szall yenh in writing tzat it zas anh liabilith or obligation purportey to be createy unyer anh Securith Docu8 ent;

(xim)   anh Securith Docu8 ent, ader yelinerh tzereod pursuant zereto, szall dor anh reason dail or cease to create a maliy any perdectey any, except to tze extent per8 ittey bh tze ter8 s zereod or tzereod, dirst priorith Lien (except witz respect to accounts receinables, a secony priorith Lien) in danor od tze Collateral Agent dor tze benedit od tze zolyers od tze Notes on anh Collateral (as yediney in tze Securith Docu8 ents) purportey to be conerey tzerebh, except to tze extent tze Collateral Agent yeter8 ines not to pursue perdection od anh applicable Lien;

(xm)    anh bank at wzicz anh yeposit account, blockey account, or lockbox account od tze Co8 panh or anh Subsiyiarh is 8 aintainey szall dail to co8 plh witz anh 8 aterial ter8 od anh yeposit account, blockey account, lockbox account or si8 ilar agree8 ent to wzicz sucz bank is a parth or anh securities inter8 eyiarh, co8 8 oyith inter8 eyiarh or otzer dinancial institution at anh ti8 e in custoyh, control or possession od anh innest8 ent properth od tze Co8 panh or anh Subsiyiarh szall dail to co8 plh witz anh od tze ter8 s od

-9-

anh innrest8ent properth control agree8ent to wzicz sucz Person is a parth (it being unyerstooy tzat onlh accounts pursuant to wzicz tze Collateral Agent zas requestey account control agree8ents szouly be subject to tzis clause (xim)); or

(xmi)    anh 8aterial ya8age to, or loss, tzedt or yestruction od tze Collateral or a 8aterial a8ount odproperth odtze Co8panh, wzetzer or not insurey, or anh strike, lockout, labor yispute, e8bargo, conye8nation, act odGoy or public ene8h, or otzer casualth wzicz causes, dor 8ore tzan tzirth (30) consecutime yahs, tze cessation or substantial curtail8ent odremenue proyucing actimities at anh dacilith od tze Co8panh or anh Subsiyiarh, id anh sucz enent or circu8stance couly reasonablh be expectey to zame a Material Aymerse Eddect.

b)    Re8eyies Upon Enent od Dedault. Id anh Enent od Dedault occurs, tze outstanding principal a8ount od tzis Note, plus accruey but unpaiy interest, liquiyatey ya8ages any otzer a8ounts owing in respect tzereodtzrougz tze yate odacceleration, szall beco8e, at tze Holyer's election, i8 8eyiatelh yue any pahable in casz at tze Manyatorh Dedault A8ount, except tzat upon an Enent od Dedault pursuant to Section 5(a)(m), tze Co8panh szall i8 8eyiatelh pah tze Manyatorh Dedault A8ount to tze Holyer witzout tze require8ent dor anh notice or ye8any or otzer action bh tze Holyer or anh otzer Person; promiyey, tzat tze Holyer 8ah, in its sole yiscretion, waine sucz rigzt to receime pah8ent upon an Enent od Dedault pursuant to Section 5(a)(m), in wzole or in part, any anh sucz wainer szall not adect anh otzer rigzts odtze Holyer zereunyer, incluying anh otzer rigzts in respect to anh sucz Enent odDedault or anh otzer a8ount, as applicable. Co8 8encing 5 yahs ader tze occurrence odanh Enent odDedault any tzat results in tze rigzt or auto8atic acceleration odtzis Note, tzis Note szall accrue interest at an interest rate equal to tze lesser od1f% per annu8 or tze 8axi8u8 rate per8ittey unyer applicable law. Upon tze pah8ent in dull odtze Manyatorh Dedault A8ount, tze Holyer szall pro8 ptlh surrenyer tzis Note to, or as yirectey bh, tze Co8panh. In connection witz sucz acceleration yescribey zerein, tze Holyer neey not promiye, any tze Co8panh zerebh waines, anh present8ent, ye8any, protest or otzer notice odanh kiny, any tze Holyer 8ah i8 8eyiatelh any witzout expiration odanh grace perioy endorce anh any all odits rigzts any re8eyies zereunyer any all otzer re8eyies amailable to it unyer applicable law. Sucz acceleration 8ah be rescinyey any annulley bh tze Holyer at anh ti8e prior to pah8ent zereunyer any tze Holyer szall zame all rigzts as a zolyer odtze Note until sucz ti8e, idanh, as tze Holyer receimes dull pah8ent pursuant to tzis Section 5(b). No sucz rescission or annul8ent szall adect anh subsequent Enent odDedault or i8pair anh rigzt consequent tzereon. For tze anoiyance od youbt any notwitzstanying anhtzing to tze contrarh containey zerein, tze rate odinterest tzat 8ah be pahable pursuant to tzis Note at anh ti8e szall not exceey eigzteen percent (1f%) per annu8.

Section 6.    Securith. Tze Notes are securey to tze extent any in tze 8anner set dortz in tze Securith Docu8ents.

-10-

<u>Section 7</u>.        <u>Miscellaneous</u>.

a)        <u>Notices</u>.  Anh any all notices or otzer co8 8 unications or yelineries to be promiyey bh tze Holyer zereunyer szall be in writing any yelinerey personallh, bh dacsi8 ile, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sernice, ayyressey to tze Co8 panh, at tze ayyress set dortz abone, or sucz otzer dacsi8 ile nu8 ber, e8 ail ayyress, or ayyress as tze Co8 panh 8 ah specidh dor sucz purposes bh notice to tze Holyer yelinerey in accoryance witz tzis Section 7(a).  Anh any all notices or otzer co8 8 unications or yelineries to be promiyey bh tze Co8 panh zereunyer szall be in writing any yelinerey personallh, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sernice ayyressey to eacz Holyer at tze e8 ail ayyress or ayyress od tze Holyer appearing on tze books odtze Co8 panh, or idno sucz e8 ail attacz8 ent or ayyress appears on tze books odtze Co8 panh, at tze principal place od business od sucz Holyer, as set dortz in tze Purczase Agree8 ent.  Anh notice or otzer co8 8 unication or yelineries zereunyer szall be yee8 ey given any edectine on tze earliest od (i) tze ti8 e od trans8 ission, id sucz notice or co8 8 unication is yelinerey nia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto prior to 5:30 p.8 . (New York Cith ti8 e) on anh yate, (ii) tze next Traying Dah ader tze yate od trans8 ission, id sucz notice or co8 8 unication is yelinerey nia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto on a yah tzat is not a Traying Dah or later tzan 5:30 p.8 . (New York Cith ti8 e) on anh Traying Dah, (iii) tze secony Traying Dah dollowing tze yate od 8 ailing, id sent bh U.S. nationallh recognivey onernigzt courier sernice or (in) upon actual receipt bh tze parth to wzo8  sucz notice is requirey to be given.

b)        <u>Absolute Obligation</u>.  Except as expresslh promiyey zerein, no promision od tzis Note szall alter or i8 pair tze obligation od tze Co8 panh, wzicz is absolute any unconyitional, to pah tze principal od any liquiyatey ya8 ages, as applicable, on tzis Note at tze ti8 e, place, any rate, any in tze coin or currench, zerein prescribey.  Tzis Note is a yirect yebt obligation od tze Co8 panh.  Tzis Note ranks <u>pari passu</u> witz all otzer Notes now or zereader issuey unyer tze ter8 s set dortz in tze Transaction Docu8 ents.

c)        <u>Lost or Mutilatey Note</u>.  Id tzis Note szall be 8 utilatey, lost, stolen or yestrohey, tze Co8 panh szall execute any yeliner, in exczange any substitution dor any upon cancellation od a 8 utilatey Note, or in lieu od or in substitution dor a lost, stolen or yestrohey Note, a new Note dor tze principal a8 ount od tzis Note so 8 utilatey, lost, stolen or yestrohey, but onlh upon receipt od eniyence od sucz loss, tzed or yestruction od sucz Note, any od tze ownerszip zereod, reasonablh satisdactorh to tze Co8 panh.

y)        <u>Governing Law</u>.  All questions concerning tze construction, naliyith, endorce8 ent any interpretation od tzis Note szall be governey bh any construey any endorcey in accoryance witz tze internal laws od tze State od New York, witzout regary to tze principles od condict od laws tzereod.  Eacz parth agrees tzat all legal proceeyings concerning tze interpretation, endorce8 ent any yedense od tze transactions conte8 platey bh anh od tze Transaction Docu8 ents (wzetzer brougzt against a parth zereto or its respectine Adiliates, yirectors, odicers, szarezolyers, e8 plohees or agents) szall be

-11-

co8 8 encey in tze state any deyeral courts sitting in tze Cith od New York, Borougz od Manzattan (tze "<u>New York Courts</u>").  Eacz parth zereto zerebh irrenocablh sub8 its to tze exclusive jurisyiction odtze New York Courts dor tze ayjuyication odanh yispute zereunyer or in connection zerewitz or witz anh transaction conte8 platey zerebh or yiscussey zerein (incluying witz respect to tze endorce8 ent od anh od tze Transaction Docu8 ents), any zerebh irrenocablh waines, any agrees not to assert in anh suit, action or proceeying, anh clai8  tzat it is not personallh subject to tze jurisyiction odsucz New York Courts, or sucz New York Courts are i8 proper or inconnenient nenue dor sucz proceeying.  Eacz parth zerebh irrenocablh waines personal sernice odprocess any consents to process being serney in anh sucz suit, action or proceeying bh 8 ailing a coph tzereodnia registerey or certidey 8 ail or onernigzt yelinerh (witz eniyence odyelinerh) to sucz parth at tze ayyress in eddect dor notices to it unyer tzis Note any agrees tzat sucz sernice szall constitute gooy any sudcicient sernice odprocess any notice tzereod  Notzing containey zerein szall be yee8 ey to li8 it in anh wah anh rigzt to serne process in anh otzer 8 anner per8 ittey bh applicable law.  Eacz parth zereto zerebh irrenocablh waines, to tze dullest extent per8 ittey bh applicable law, any anh all rigzt to trial bh jurh in anh legal proceeying arising out od or relating to tzis Note or tze transactions conte8 platey zerebh. Idanh parth szall co8 8 ence an action or proceeying to endorce anh pronisions odtzis Note, tzen tze prenailing parth in sucz action or proceeying szall be rei8 bursey bh tze otzer parth dor its attorneh's dees any otzer costs any expenses incurrey in tze innestigation, preparation any prosecution odsucz action or proceeying.   Tzis Note szall be yee8 ey an unconyitional obligation od tze Co8 panh dor tze pah8 ent od 8 oneh any, witzout li8 itation to anh otzer re8 eyies od Holyer, 8 ah be endorcey against tze Co8 panh bh su8 8 arh proceeying pursuant to New York Cinil Proceyure Law any Rule Section 3213 or anh si8 ilar rule or statute in tze jurisyiction wzere endorce8 ent is sougzt.

e)  <u>Wainer</u>.  Anh wainer bh tze Co8 panh or tze Holyer od a breacz od anh pronision odtzis Note szall not operate as or be construey to be a wainer odanh otzer breacz odsucz pronision or odanh breacz odanh otzer pronision odtzis Note.  Tze dailure odtze Co8 panh or tze Holyer to insist upon strict ayzerence to anh ter8  od tzis Note on one or 8 ore occasions szall not be consiyerey a wainer or yeprine tzat parth odtze rigzt tzereader to insist upon strict ayzerence to tzat ter8  or anh otzer ter8  od tzis Note on anh otzer occasion.  Anh wainer bh tze Co8 panh or tze Holyer 8 ust be in writing.

d)  <u>Senerabilith</u>.   Id anh pronision od tzis Note is innaliy, illegal or unendorceable, tze balance od tzis Note szall re8 ain in eddect, any id anh pronision is inapplicable to anh Person or circu8 stance, it szall nenertzeless re8 ain applicable to all otzer Persons any circu8 stances.  Id it szall be douny tzat anh interest or otzer a8 ount yee8 ey interest yue zereunyer niolates tze applicable law governing usurh, tze applicable rate odinterest yue zereunyer szall auto8 aticallh be lowerey to equal tze 8 axi8 u8  rate od interest per8 ittey unyer applicable law. Tze Co8 panh conenants (to tze extent tzat it 8 ah lawdullh yo so) tzat it szall not at anh ti8 e insist upon, pleay, or in anh 8 anner wzatsoener clai8  or take tze benedit or ay$\text{nantage od}$ anh stah, extension or usurh law or otzer law wzicz wouly prozibit or dorgine tze Co8 panh dro8  pahing all or anh portion od tze principal od or interest on tzis Note as conte8 platey zerein, wzerener enactey, now or at anh ti8 e zereader in dorce, or wzicz 8 ah addect tze conenants or tze perdor8 ance odtzis

-12-

Note, any tze Co8 panh (to tze extent it 8 ah lawdullh yo so) zerebh expresslh waines all benedts or aymantage odanh sucz law, any conenants tzat it will not, bh resort to anh sucz law, zinyer, yelah or i8 peye tze execution odanh power zerein grantey to tze Holyer, but will sudder any per8 it tze execution odenerh sucz as tzougz no sucz law zas been enactey.

g) Re8 eyies, Czaracterivations, Otzer Obligations, Breaczes any Injunctine Relied  Tze re8 eyies promiyey in tzis Note szall be cu8 ulatine any in ayyition to all otzer re8 eyies amailable unyer tzis Note any anh odtze otzer Transaction Docu8 ents at law or in equith (incluying a yecree odspecidic perdor8 ance any/or otzer injunctine relied), any notzing zerein szall li8 it tze Holyer's rigzt to pursue actual any consequential ya8 ages dor anh dailure bh tze Co8 panh to co8 plh witz tze ter8 s od tzis Note.  Tze Co8 panh conenants to tze Holyer tzat tzere szall be no czaracterivation concerning tzis instru8 ent otzer tzan as expresslh promiyey zerein. A8 ounts set dortz or promiyey dor zerein witz respect to pah8 ents any tze like (any tze co8 putation tzereod) szall be tze a8 ounts to be receimey bh tze Holyer any szall not, except as expresslh promiyey zerein, be subject to anh otzer obligation od tze Co8 panh (or tze perdor8 ance tzereod). Tze Co8 panh acknowleyges tzat a breacz bh it odits obligations zereunyer will cause irreparable zar8 to tze Holyer any tzat tze re8 eyh at law dor anh sucz breacz 8 ah be inayequate. Tze Co8 panh tzeredore agrees tzat, in tze enent odanh sucz breacz or tzreateney breacz, tze Holyer szall be entitley, in ayyition to all otzer amailable re8 eyies, to an injunction restraining anh sucz breacz or anh sucz tzreateney breacz, witzout tze necessith od szowing econo8 ic loss any witzout anh bony or otzer securith being requirey. Tze Co8 panh szall promiye all indor8 ation any yocu8 entation to tze Holyer tzat is requestey bh tze Holyer to enable tze Holyer to condir8 tze Co8 panh's co8 pliance witz tze ter8 s any conyitions odtzis Note.

z) Next Business Dah.  Wzenener anh pah8 ent or otzer obligation zereunyer szall be yue on a yah otzer tzan a Business Dah, sucz pah8 ent szall be 8 aye on tze next succeeying Business Dah.

i) Heayings.  Tze zeayings containey zerein are dor connenience onlh, yo not constitute a part odtzis Note any szall not be yee8 ey to li8 it or addect anh odtze promisions zereod

j) A8 eny8 ent.  Tzis Note 8 ah be a8 enyey, any anh promisions zereod 8 ah be a8 enyey, bh written consent odtze Co8 panh any tze Requirey Holyers.

Section f.  Disclosure.   Upon receipt or yelinerh bh tze Co8 panh od anh notice in accoryance witz tze ter8 s od tzis Note, unless tze Co8 panh zas in gooy daitz yeter8 iney tzat tze 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh szall witzin one (1) Business Dah ader sucz receipt or yelinerh publiclh yisclose sucz 8 aterial, nonpublic indor8 ation on a Current Report on For8  f-K or otzerwise. In tze enent tzat tze Co8 panh belienes tzat a notice contains 8 aterial, non-public indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh so szall inyicate to tze Holyer conte8 poraneouslh witz yelinerh od sucz notice, any in tze absence od anh sucz inyication, tze Holyer szall be allowey to

-13-

presu8 e tzat all 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*(Signature Page Follows)*

-14-

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _Salim Rizvi_
Name: Sabina Rizvi
Title: President & CFO

Address: 3753 Howard Hughes Parkway
          Suite 200-849
          Las Vegas, NV 89169

Email address : Sabina.Rizvi@musclepharm.com

EXECUTION VERSION

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                    Principal: $5f 1,395.35

### ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
### DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one od a series od yulh autzorivey any maliylh issuey Original Issue Senior Securey Notes od MusclePzar8 Corporation, a Nemaya corporation (tze "Co8 panh"), zaming its principal place od business at 4721 Ironton Street, Builying A, Denner, Colorayo f 0239, yesignatey as its Original Issue Discount Senior Securey Note yue April 13, 2022 (tzis Note, tze "Note" any, collectinelh witz tze otzer Notes od sucz series, tze "Notes").

FOR VALUE RECEIVED, tze Co8 panh pro8 ises to pah to Ionic Ventures LLC or its registerey assigns (tze "Holyer"), or szall zame paiy pursuant to tze ter8 s zereunyer, tze principal su8  od $5f 1,395.35 on April 13, 2022 (tze "Maturith Date") or sucz earlier yate as tzis Note is requirey or per8 ittey to be repaiy as promiyey zereunyer; promiyey, tzat, (a) tze Maturith Date 8 ah be extenyey to (i) Mah 13, 2022 id(x) it is necessarh dor tze Traying Market to co8 plete its reniew od tze Co8 panh's annual report on For8  10-K dor its discal hear enyey Dece8 ber 31, 2021 in connection witz tze listing od tze Co8 panh's co8 8 on stock on sucz Traying Market, (h) no Enents od Dedault zame occurrey pursuant to tzis Note any (v) tze Co8 panh zas taken all actions necessarh dor tze listing od tze Co8 8 on Stock on tze Traying Market otzer tzan tze yelinerh to tze Traying Market od tze Co8 panh's annual report on For8  10-K dor its discal hear enyey Dece8 ber 31, 2021, or (ii) Mah 2f , 2022, upon tze yelinerh od a certidicate yulh signey bh an oddicer od tze Co8 panh certiching tzat: (x) no Enent od Dedault zas occurrey any is continuing, any (h) tze su8  od casz dlows dro8  operating any innesting actinities (but not casz dlows dro8  dinancing actinities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, was greater tzan vero dor tze calenyar 8 ontz enyey Marcz 31, 2022 any (v) sucz oddicer reasonablh believes tzat : (1) no Enent od Dedault is reasonablh expectey to occur on or bedore April 30, 2022 any (2) tze su8  od casz dlows dro8  operating any innesting actinities (but not dro8  dinancing actinities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, will be greater tzan vero dor tze calenyar 8 ontz enyey April 30,

2022, any (b) id tze Maturith Date is extenyey in accoryance witz clause (a) od tzis paragrapz, interest (i) szall accrue yailh on any dro8 April 13, 2022 at a rate equal to tze lesser od eig8teen percent (1f%) per annu8 or tze 8 axi8 u8 rate per8 ittey unyer applicable law until tzis Note is paiy in dull, (ii) szall be co8 putey on tze basis oda hear od 365 yahs dor tze actual nu8 ber od yahs elapsey, any (iii) tzat zas accruey any is unpaiy szall be paiy bh tze Co8 panh to tze Holyer in casz on tze Maturith Date (as extenyey in accoryance witz clause (a) odtzis paragrapz). Tzis Note is subject to tze dollowing ayyitional promisions:

Section 1.    Dedinitions.  For tze purposes zereod, in ayyition to tze ter8 s yedney elsewzere in tzis Note, (a) capitalivey ter8 s not otzerwise yedney zerein szall zame tze 8 eanings set dortz in tze Purczase Agree8 ent any (b) tze dollowing ter8 s szall zame tze dollowing 8 eanings:

"Bankruptch Ement" 8 eans anh od tze dollowing ements: (a) tze Co8 panh or anh Subsiyiarh tzereod co8 8 ences a case or otzer proceeying unyer anh bankruptch, reorganivation, arrange8 ent, ayjust8 ent od yebt, relied od yebtors, yissolution, insolment or liquiyation or si8 ilar law od anh jurisyiction relating to tze Co8 panh or anh Signidicant Subsiyiarh (as yedney in Rule 1-02 od Regulation S-X) tzereod, (b) tzere is co8 8 encey against tze Co8 panh or anh Signidicant Subsiyiarh tzereod anh sucz case or proceeying tzat is not yis8 issey witzin 60 yahs ader co8 8 ence8 ent, (c) tze Co8 panh or anh Signidicant Subsiyiarh tzereod is ayjuyicatey insolment or bankrupt or anh oryer od relied or otzer oryer approming anh sucz case or proceeying is enterey, (y) tze Co8 panh or anh Signidicant Subsiyiarh tzereod sudders anh appoint8 ent od anh custoyian or tze like dor it or anh substantial part od its properth tzat is not yisczargey or stahey witzin 60 calenyar yahs ader sucz appoint8 ent, (e) tze Co8 panh or anh Signidicant Subsiyiarh tzereod8 akes a general assign8 ent dor tze benedit od creyitors, (d) tze Co8 panh or anh Signidicant Subsiyiarh tzereod calls a 8 eeting od its creyitors witz a miew to arranging a co8 position, ayjust8 ent or restructuring od its yebts, (g) tze Co8 panh or anh Signidicant Subsiyiarh tzereoday8 its in writing tzat it is generallh unable to pah its yebts as tzeh beco8 e yue, (z) tze Co8 panh or anh Signidicant Subsiyiarh tzereod, bh anh act or dailure to act, expresslh inyicates its consent to, approml od or acquiescence in anh od tze doregoing or takes anh corporate or otzer action dor tze purpose od edecting anh od tze doregoing.

"Business Dah" 8 eans anh yah otzer tzan Saturyah, Sunyah or otzer yah on wzicz co8 8 ercial banks in Tze Cith od New York are autzorivey or requirey bh law to re8 ain closey; proniyey, zowemer, dor claridication, co8 8 ercial banks szall not be yee8 ey to be autzorivey or requirey bh law to re8 ain closey yue to "stah at zo8 e", "szelter-in-place", "non-essential e8 plohee" or anh otzer si8 ilar oryers or restrictions or tze closure od anh pzhsical brancz locations at tze yirection od anh gomern8 ental autzorith so long as tze electronic dunys transder shste8 s (incluying dor wire transders) od co8 8 ercial banks in Tze Cith od New York are generallh open dor use bh custo8 ers on sucz yah.

"Czange od Control Transaction" 8 eans tze occurrence ader tze yate zereod od anh od (a) an acquisition ader tze yate zereod bh an inyimiyual or legal entith or "group" (as yescribey in Rule 13y-5(b)(1) pro8 ulgatey unyer tze Exczange Act) od edectime control

(wzetzer tzrougz legal or benedicial ownerszip od capital stock od tze Co8 panh, bh contract or otzerwise) od in excess od 33% od tze moting securities od tze Co8 panh (otzer tzan bh 8 eans od exercise od tze Warrants issuey togetzer witz tze Notes), wzere sucz inyimiyual or legal entith or "group" prior to sucz acquisition yiy not own in excess od 33% od tze moting securities od tze Co8 panh; promiyey, tzat dor anh inyimiyual or legal entith or "group" tzat owns in excess od 33% od tze moting securities od tze Co8 panh as od tze yate od tze Purczase Agree8 ent, sucz inyimiyual or legal entith or "group" zolys 75% or 8 ore od tze moting securities od tze Co8 panh ader giming edect to anh sucz acquisition, (b) tze Co8 panh 8 erges into or consoliyates witz anh otzer Person, or anh Person 8 erges into or consoliyates witz tze Co8 panh any, ader giming edect to sucz transaction, tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze Co8 panh or tze successor entith od sucz transaction, (c) tze Co8 panh (any all od its Subsiyiaries, taken as a wzole) sells or transders all or substantiallh all od its assets to anotzer Person any tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze acquiring entith i8 8 eyiatelh ader tze transaction, (y) a replace8 ent at one ti8 e or witzin a tzree hear perioy od 8 ore tzan one-zald od tze 8 e8 bers od tze Boary od Directors wzicz is not approney bh a 8 ajorith od tzose inyimiyuals wzo are 8 e8 bers od tze Boary od Directors on October 13, 2021 (or bh tzose inyimiyuals wzo are serming as 8 e8 bers od tze Boary od Directors on anh yate wzose no8 ination to tze Boary od Directors was approney bh a 8 ajorith od tze 8 e8 bers od tze Boary od Directors wzo are 8 e8 bers on tze yate zereod), or (e) tze consu8 8 ation bh tze Co8 panh od an agree8 ent to wzicz tze Co8 panh is a parth or bh wzicz it is bouny, promiying dor anh od tze ements set dortz in clauses (a) tzrougz (y) abome.

"Designee" 8 eans E8 perh Tax Edicient, LP.

"Ement od Dedault" szall zame tze 8 eaning set dortz in Section 5(a).

"Manyatorh Dedault A8 ount" 8 eans tze su8  od (a) 120% od tze outstanying principal a8 ount od tzis Note any (b) all otzer a8 ounts, costs, expenses, interest any liquiyatey ya8 ages yue in respect od tzis Note.

"New York Courts" szall zame tze 8 eaning set dortz in Section 7(y).

"Original Issue Date" 8 eans tze yate od tze dirst issuance od tze Notes, regaryless od anh transders od anh Note any regaryless od tze nu8 ber od instru8 ents wzicz 8 ah be issuey to eniyence sucz Notes.

"Per8 ittey Inyebteyness" 8 eans (a) tze Inyebteyness eniyencey bh tze Notes, (b) Inyebteyness pursuant to tzat certain Purczase any Sale Agree8 ent, yatey as od Januarh 11, 2016, between tze Co8 panh any Prestige Capital Corporation, as a8 enyey or 8 oyidiey tzrougz tze yate zereod, (c) Inyebteyness eniyencey bh tzat certain Securey Remolming Pro8 issorh Note, yatey October 15, 2020 bh any between tze Co8 panh any Rhan Drexler, in tze 8 axi8 u8  principal a8 ount od $3,000,000, as a8 enyey any restatey bh tzat certain

Conmertible Securey Pro8 issorh Note yatey as od August 13, 2021, (y) Inyebteyness eniyencey bh tzat certain A8 enyey any Restatey Conmertible Securey Pro8 issorh Note yatey as od August 21, 2020 in tze 8 axi8 u8 principal a8 ount od $2,735,199 issuey bh Borrower to Suboryinatey Creyitor, as a8 enyey any restatey pursuant to tzat certain Conmertible Securey Pro8 issorh Note yatey as od None8 ber 29, 2020 issuey bh Borrower to Suboryinatey Creyitor in tze 8 axi8 u8 principal a8 ount od $2,f 71,967, as a8 enyey bh tzat certain A8 eny8 ent to Conmertible Securey Pro8 issorh Note yatey as od August 13, 2021, (e) tze PPP Loans, (d) lease obligations any purczase 8 oneh Inyebteyness od up to $300,000, in tze aggregate, incurrey in connection witz tze acquisition od capital assets any lease obligations witz respect to newlh acquirey or leasey assets; promiyey, tzat in oryer dor a new lease to be consiyerey to be Per8 ittey Inyebteyness, tze lanylory witz respect to sucz new lease szall be requirey to yeliner to tze Collateral Agent a lanylory consent in dor8 any substance reasonablh acceptable to tze Collateral Agent to enable tze Collateral Agent to access collateral on sucz properth upon an Enent od Dedault, (g) traye accounts pahable incurrey in tze oryinarh course od business consistent witz past practice, (z) Inyebteyness eniyencey bh tze Settle8 ent Agree8 ents any (i) Inyebteyness tzat (A) is expresslh suboryinatey to tze Notes pursuant to a written suboryination agree8 ent witz tze Requirey Holyers tzat is reasonablh acceptable to tze Requisite Holyers any (B) yoes not require anh pah8 ent od principal, wzetzer at 8 aturith, pursuant to a8 ortimation, a sinking duny or otzerwise, at a yate earlier tzan 91 yahs dollowing tze Maturith Date.

"Per8 ittey Lien" 8 eans tze inyimiyual any collectine rederence to tze dollowing: (a) Liens dor taxes, assess8 ents any otzer gonern8 ental czarges or lemies not het yue or Liens dor taxes, assess8 ents any otzer gonern8 ental czarges or lemies being contestey in gooy daitz any bh appropriate proceeyings dor wzicz ayequate resernes (in tze gooy daitz juyg8 ent od tze 8 anage8 ent od tze Co8 panh) zane been establizey in accoryance witz GAAP, (b) Liens i8 posey bh law wzicz were incurrey in tze oryinarh course od tze Co8 panh's business, sucz as carriers', warezouse8 en's any 8 eczanics' Liens, statutorh lanylorys' Liens, any otzer si8 ilar Liens arising in tze oryinarh course od tze Co8 panh's business, any wzicz (x) yo not inyimiyuallh or in tze aggregate 8 ateriallh yetract dro8 tze malue od sucz properth or assets or 8 ateriallh i8 pair tze use tzereod in tze operation od tze business od tze Co8 panh any its consoliyatey Subsiyiaries or (h) are being contestey in gooy daitz bh appropriate proceeyings, wzicz proceeyings zane tze edect od prenenting dor tze doreseeable duture tze dordeiture or sale od tze properth or asset subject to sucz Lien, (c) Liens incurrey in connection witz Per8 ittey Inyebteyness unyer clauses (a) - (y).

"Purczase Agree8 ent" 8 eans tze Securities Purczase Agree8 ent, yatey as od October 13, 2021 a8 ong tze Co8 panh any tze original Holyers, as a8 enyey, 8 oyidey or supple8 entey dro8 ti8 e to ti8 e in accoryance witz its ter8 s.

"Requirey Holyers" 8 eans zolyers od at least a 8 ajorith in principal a8 ount od tze tzen outstanying Notes any szall incluye tze Designee so long as tze Designee or anh od its Addiliates zolys anh Notes.

"Securities Act" 8 eans tze Securities Act od 1933, as a8 enyey, any tze rules any regulations pro8 ulgatey tzereunyer.

"Settle8 ent Agree8 ents" 8 eans (i) tze Settle8 ent Agree8 ent, yatey None8 ber 7, 2016 bh any between tze Co8 panh any F.H.G. Corporation y/b/a Capstone Nutrition, INI Parent, Inc., INI Buher, Inc. any Meyleh Capital Corporation, (ii) Settle8 ent Agree8 ent, yatey Septe8 ber 25, 2020 bh any between tze Co8 panh any NBF Holyings Canaya Inc., any (iii) Settle8 ent Agree8 ent, yatey None8 ber 7, 2020 bh any between tze Co8 panh any Excelsior Nutrition, Inc., in eacz case, as in edect as od tze yate zereod

"Subsiyiarh Guarantee" 8 eans tze Subsiyiarh Guarantee, yatey tze yate od tze Purczase Agree8 ent, bh eacz Subsiyiarh in dano r od tze Holyers.

"Transaction Docu8 ents" 8 eans tze Purczase Agree8 ent, tzis Note, tze Subsiyiarh Guarantee, any all yocu8 ents executey in connection tzerewitz any zerewitz.

"Warrants" 8 eans, collectine lh, tze Co8 8 on Stock purczase warrants yeline rey to tze Holyers on tze Original Issue Date pursuant to tze Purczase Agree8 ent.

"Warrant Szares" 8 eans tze szares od Co8 8 on Stock issuable upon exercise od tze Warrants.

Section 2.     Registration od Transde rs any Exczanges.  Tzis Note is exczangeable do r an equal aggregate principal a8 ount od Notes od yidde rent autzorivey yeno8 inations, as requestey bh tze Holyer surrenyering tze sa8 e.  No semice czarge will be pahable do r sucz registration od transde r or exczange.

Section 3.     Negatine Conenants.  As long as anh portion od tzis Note re8 ains outstanying, unless tze Requirey Holyers szall zane otzerwise ginen prior written consent, tze Co8 panh szall not, any szall not per8 it anh od tze Subsiyiaries to, yirectlh or inyirectlh:

a)     otzer tzan Per8 ittey Inyebteyness, enter into, create, incur, assu8 e, guarantee or sudde r to exist anh Inyebteyness do r borrowey 8 oneh od anh kiny, incluying, but not li8 itey to, a guarantee, on or witz respect to anh od its properth or assets now owney or zereade r acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

b)     otzer tzan Per8 ittey Liens, enter into, create, incur, assu8 e or sudde r to exist anh Liens od anh kiny, on or witz respect to anh od its properth or assets now owney or zereade r acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

c)     a8 eny its czarter yocu8 ents, incluying, witzout li8 itation, its certidicate od incorporation any bhlaws, in anh 8 anner tzat 8 ateriallh any ayme rselh adde cts anh rigzts od tze Holyer;

y)    repah, repurczase or odder to repah, repurczase or otzerwise acquire 8 ore tzan a ye 8 ini8 is nu8 ber od szares od its Co8 8 on Stock or Co8 8 on Stock Equi8alents otzer tzan as to tze Warrant Szares as per8 ittey or requirey unyer tze Transaction Docu8 ents;

e)    repah, repurczase or odder to repah, repurczase or otzerwise acquire anh Inyebteyness, otzer tzan (i) as conte8 platey in clause (b) od tze yedinition od Per8 ittey Inyebteyness, but onlh to tze extent repaiy witz tze collection od accounts receivable od tze Co8 panh obtainey in tze oryinarh course od business, (ii) as conte8 platey in clause (y), clause (e) or clause (z) od tze yedinition od Per8 ittey Inyebteyness any (iii) tze Notes id on a pro-rata basis as per8 ittey or requirey unyer tze Transaction Docu8 ents, proviyey tzat anh sucz pah8 ents szall not be per8 ittey id, at sucz ti8 e, or adter giving eddect to sucz pah8 ent, anh Event od Dedault exists or occurs;

d)    yeclare or pah casz yiviyenys or yistributions on anh Co8 8 on Stock or Co8 8 on Stock Equi8alents;

g)    enter into anh transaction witz anh Addiliate od tze Co8 panh wzicz wouly be requirey to be yisclosey in anh public diling witz tze Co8 8 ission, unless sucz transaction is 8 aye on co8 8 erciallh reasonable ter8 s any on an ar8 's-lengtz basis any expresslh approvey bh a 8 ajorith od tze yisinterestey yirectors od tze Co8 panh (even id less tzan a quoru8 otzerwise requirey dor boary approval), otzer tzan dor (i) pah8 ent od salarh dor services renyerey in a8 ounts not to exceey tze a8 ounts proviyey dor unyer agree8 ents in place as od tze yate od tze Purczase Agree8 ent, (ii) rei8 burse8 ent dor expenses incurrey on bezald od tze Co8 panh any (iii) otzer e8 plohee benedits, incluying stock grants any stock option agree8 ents unyer anh stock option plan od tze Co8 panh; or

z)    consu8 8 ate anh agree8 ent witz respect to anh od tze doregoing.

In tze event 8 ore tzan one grace, cure or notice perioy is applicable to an Event od Dedault, tzen tze szortest grace, cure or notice perioy szall be applicable tzereto.

Section 4.    Manyatorh Reye8 ption.

a)    Occurrence od Manyatorh Reye8 ption.  Wzile tzis Note is outstanying, tze Co8 panh szall use at least 25% od tze net proceeys od anh oddering od its securities, incluying tze Public Oddering (anh sucz oddering, a "Subsequent Oddering" any 25% od sucz net proceeys dro8 sucz Subsequent Oddering, tze "Net Proceeys") to reye8 tzis Note in dull, incluying tze Principal A8 ount any all otzer a8 ounts yue any pahable pursuant to tzis Note, any all otzer tzen outstanying Notes (a "Manyatorh Reye8 ption"); proviyey, zowever, tzat id tze Net Proceeys od tze Subsequent Oddering are less tzan tze a8 ount requirey to repah all od tze Notes in dull, (i) tze Co8 panh's repah8 ent obligation unyer tzis Section 4(a) szall be li8 itey to tze a8 ount od sucz Net Proceeys, (ii) tze Net Proceeys szall be appliey to all od tze Notes tzen outstanying pro rata basey on tze principal a8 ount od sucz Notes tzen outstanying any (iii) tze Co8 panh szall eddect successive Manyatorh

-6-

Reyemptions upon eacz Subsequent Odering until tze Notes are repaiy in dull or otzerwise no longer outstanying.

b)  <u>Manyatorh Notices</u>. Witz respect to eacz Manyatorh Reyemption, tze Comanh szall yelimer a written notice to all, but not less tzan all, odtze zolyers odNotes (tze "<u>Manyatorh Reyemption Notice</u>" any tze yate sucz notice is yelimerey to all sucz zolyers is rederrey to as a "<u>Manyatorh Reyemption Notice Date</u>") (a) stating tze yate on wzicz tze Manyatorh Reyemption szall occur (a "<u>Manyatorh Reyemption Date</u>"), wzicz yate szall be tze yate od tze consumation od tze applicable Subsequent Odering, (b) stating tze expectey amount od Net Proceeys witz respect to tze applicable Subsequent Odering any (c) contain a certidication dromh tze Czied Executime Odicer od tze Comanh tzat tze Comanh zas simultaneouslh taken tze same action witz respect to all odtze Notes. Eacz Manyatorh Reyemption Notice szall be yelimerey no later tzan tze dirst (1st) Traying Dah dollowing tze announcement odtze pricing odtze applicable Subsequent Odering, any tze Comanh szall make a public announcement containing tze indormation set dortz in tze applicable Manyatorh Reyemption Notice on or bedore tze relatey Manyatorh Reyemption Notice Date to tze extent tzat tze notice contains anh, or constitutes, material, non-public indormation.

c)  <u>Manyatorh Reyemption Proceyure</u>. Tze pahment od casz pursuant to tze Manyatorh Reyemption szall be pahable in dull on tze Traying Dah immeyiatelh dollowing tze Manyatorh Reyemption Date bh wire transder od immeyiatelh amailable dunys in accoryance witz tze Holyer's wire instructions. Id anh portion od tze pahment pursuant to a Manyatorh Reyemption szall not be paiy bh tze Comanh bh tze applicable yue yate, interest szall accrue tzereon at an interest rate equal to tze lesser od 1f% per annum or tze maximum rate permittey bh applicable law until sucz amount is paiy in dull. Notwitzstanying anhtzing to tze contrarh in tzis Section 4(a), tze Net Proceeys szall be appliey ratablh among tze Holyers odNote.

<u>Section 5</u>.  Ements odDedault.

a)  "<u>Ement od Dedault</u>" means, wzeremer usey zerein, anh od tze dollowing ements (wzatemer tze reason dor sucz ement any wzetzer sucz ement szall be moluntarh or inmoluntarh or eddectey bh operation odlaw or pursuant to anh juygment, yecree or oryer od anh court, or anh oryer, rule or regulation odanh ayministratime or gomernmental boyh):

(i)  anh yedault in tze pahment od (A) tze principal amount odanh Note or (B) liquiyatey yamages any otzer amounts owing to a Holyer on anh Note, as any wzen tze same szall become yue any pahable (wzetzer on tze Maturith Date or bh acceleration or otzerwise) wzicz yedault, solelh in tze case od a yedault unyer clause (B) abome, is not curey witzin 3 Traying Dahs;

(ii)  tze Comanh szall dail to obserme or perdorm anh otzer comenant or agreement in anh material respect (except to tze extent anh sucz comenant or agreement is qualidiey bh materialith or Material Aymerse Edect, in

wzicz case, in anh respect) containey in tze Notes or in anh Transaction Docu8ent, wzicz dailure is not curey, id possible to cure, witzin tze earlier to occur od (A) 5 Traying Dahs adter notice od sucz dailure sent bh tze Holyer or bh anh otzer Holyer to tze Co8panh any (B) 10 Traying Dahs adter tze Co8panh zas beco8e or szouly zane beco8e aware od sucz dailure;

(iii)  a yedault or enent od yedault (subject to anh grace or cure perioy proniyey in tze applicable agree8ent, yocu8ent or instru8ent) szall occur unyer anh od tze Transaction Docu8ents;

(im)  anh representation or warranth 8aye in tzis Note, anh otzer Transaction Docu8ent, anh written state8ent pursuant zereto or tzereto or anh otzer report, dinancial state8ent or certidicate 8aye or yelinerey to tze Holyer or anh otzer Holyer szall be untrue or incorrect in anh 8aterial respect as od tze yate wzen 8aye or yee8ey 8aye;

(m)  tze Co8panh or anh Subsiyiarh szall be subject to a Bankruptch Enent;

(mi)  tze Co8panh or anh Subsiyiarh szall yedault (subject to anh grace or cure perioy proniyey in tze applicable agree8ent, yocu8ent or instru8ent) on anh od its obligations unyer anh 8ortgage, pro8issorh note, creyit agree8ent or otzer dacilith, inyenture agree8ent, dactoring agree8ent or otzer instru8ent unyer wzicz tzere 8ah be issuey, or bh wzicz tzere 8ah be securey or eniyencey, anh Inyebteyness dor borrowey 8oneh or 8oneh yue unyer anh long ter8 leasing or dactoring arrange8ent (incluying, witzout li8itation, tze PPP Loan Agree8ent) tzat (a) innolnes, inyiniyuallh or in tze aggregate, an obligation greater tzan $100,000, wzetzer anh sucz Inyebteyness now exists or szall zereadter be createy, any (b) results in sucz Inyebteyness beco8ing or being yeclarey yue any pahable prior to tze yate on wzicz it wouly otzerwise beco8e yue any pahable;

(mii)  tze Co8panh (any all od its Subsiyiaries, taken as a wzole) szall be a parth to anh Czange od Control Transaction or Funya8ental Transaction (as yediney in tze Warrants) or szall agree to sell or yispose od all or in excess od 33% od its assets in one transaction or a series od relatey transactions (wzetzer or not sucz sale wouly constitute a Czange od Control Transaction) any sucz transaction or series od transactions will be consu88atey on or prior to tze yate tzat tzis Note is repaiy in dull;

(miii)  anh yissolution, liquiyation, winying up or cessation od operations bh tze Co8panh, od a substantial portion od its business;

(ix)  tze dailure bh tze Co8panh or anh Subsiyiarh to 8aintain anh intellectual properth rigzts, personal, real properth, equip8ent or leases or otzer assets

wzicz are necessarh to conyuct its business (wzetzer now or in tze duture) any sucz breacz is not curey witzin twenth (20) yahs od sucz occurrence;

(x)  tze occurrence od an Ervnt od Dedault unyer anh otzer Note;

(xi)  anh 8 onetarh juyg8 ent, writ or si8 ilar dinal process szall be enterey or dley against tze Co8 panh, anh subsiyiarh or anh od tzeir respective properth or otzer assets dor 8 ore tzan $100,000, any sucz juyg8 ent, writ or si8 ilar dinal process szall re8 ain unmacatey, unbonyey or unstahey dor a perioy od 45 calenyar yahs;

(xii)  tze Co8 panh or anh Subsiyiarh szall dail in anh 8 aterial respect to perdor8 or co8 plh witz anh conrnant or agree8 ent containey in anh Securith Docu8 ent to wzicz it is a parth (except to tze extent anh sucz conrnant or agree8 ent is qualidey bh 8 aterialith or Material Ayrnerse Eddect, in wzicz case, in anh respect);

(xiii)  anh 8 aterial prorision od anh Securith Docu8 ent (as yeter8 iney in gooy daitz bh tze Collateral Agent in its sole yiscretion) szall at anh ti8 e dor anh reason (otzer tzan pursuant to tze express ter8 s tzereod) cease to be maliy any binying on or endorceable against tze Co8 panh or anh Subsiyiarh intenyey to be a parth tzereto, or tze maliyith or endorceabilith tzereod szall be contestey bh anh parth tzereto, or a proceeying szall be co8 8 encey bh tze Co8 panh or anh Subsiyiarh or anh gorern8 ental autzorith zaring jurisyiction oner anh od tze8 , seeking to establisz tze inmaliyith or unendorceabilith tzereod, or tze Co8 panh or anh Subsiyiarh szall yenh in writing tzat it zas anh liabilith or obligation purportey to be createy unyer anh Securith Docu8 ent;

(xim)  anh Securith Docu8 ent, ader yelinerh tzereod pursuant zereto, szall dor anh reason dail or cease to create a maliy any perdectey any, except to tze extent per8 ittey bh tze ter8 s zereod or tzereod, dirst priorith Lien (except witz respect to accounts receimables, a secony priorith Lien) in danor od tze Collateral Agent dor tze benedit od tze zolyers od tze Notes on anh Collateral (as yediney in tze Securith Docu8 ents) purportey to be conerey tzerebh, except to tze extent tze Collateral Agent yeter8 ines not to pursue perdection od anh applicable Lien;

(xm)  anh bank at wzicz anh yeposit account, blockey account, or lockbox account od tze Co8 panh or anh Subsiyiarh is 8 aintainey szall dail to co8 plh witz anh 8 aterial ter8 od anh yeposit account, blockey account, lockbox account or si8 ilar agree8 ent to wzicz sucz bank is a parth or anh securities inter8 eyiarh, co8 8 oyith inter8 eyiarh or otzer dinancial institution at anh ti8 e in custoyh, control or possession od anh inrest8 ent properth od tze Co8 panh or anh Subsiyiarh szall dail to co8 plh witz anh od tze ter8 s od

-9-

anh innest8ent properth control agree8ent to wzicz sucz Person is a parth (it being unyerstooy tzat onlh accounts pursuant to wzicz tze Collateral Agent zas requestey account control agree8ents szouly be subject to tzis clause (xim)); or

(xmi)    anh 8aterial ya8age to, or loss, tzed or yestruction od tze Collateral or a 8aterial a8ount odproperth odtze Co8panh, wzetzer or not insurey, or anh strike, lockout, labor yispute, e8bargo, conye8nation, act od Goy or public ene8h, or otzer casualth wzicz causes, dor 8ore tzan tzirth (30) consecutine yahs, tze cessation or substantial curtail8ent odrenenue proyucing actinities at anh dacilith od tze Co8panh or anh Subsiyiarh, id anh sucz enent or circu8stance couly reasonablh be expectey to zane a Material Aynerse Edect.

b)    Re8eyies Upon Enent od Dedault. Id anh Enent od Dedault occurs, tze outstanding principal a8ount od tzis Note, plus accruey but unpaiy interest, liquiyatey ya8ages any otzer a8ounts owing in respect tzereodtzrougz tze yate odacceleration, szall beco8e, at tze Holyer's election, i8 8eyiatelh yue any pahable in casz at tze Manyatorh Dedault A8ount, except tzat upon an Enent od Dedault pursuant to Section 5(a)(m), tze Co8panh szall i8 8eyiatelh pah tze Manyatorh Dedault A8ount to tze Holyer witzout tze require8ent dor anh notice or ye8any or otzer action bh tze Holyer or anh otzer Person; proniyey, tzat tze Holyer 8ah, in its sole yiscretion, waine sucz rigzt to receine pah8ent upon an Enent od Dedault pursuant to Section 5(a)(m), in wzole or in part, any anh sucz wainer szall not adect anh otzer rigzts odtze Holyer zereunyer, incluying anh otzer rigzts in respect to anh sucz Enent od Dedault or anh otzer a8ount, as applicable. Co8 8encing 5 yahs ader tze occurrence odanh Enent od Dedault any tzat results in tze rigzt or auto8atic acceleration odtzis Note, tzis Note szall accrue interest at an interest rate equal to tze lesser od1f% per annu8 or tze 8axi8u8 rate per8ittey unyer applicable law. Upon tze pah8ent in dull odtze Manyatorh Dedault A8ount, tze Holyer szall pro8ptlh surrenyer tzis Note to, or as yirectey bh, tze Co8panh. In connection witz sucz acceleration yescribey zerein, tze Holyer neey not proniye, any tze Co8panh zerebh waines, anh present8ent, ye8any, protest or otzer notice odanh kiny, any tze Holyer 8ah i8 8eyiatelh any witzout expiration odanh grace perioy endorce anh any all odits rigzts any re8eyies zereunyer any all otzer re8eyies anailable to it unyer applicable law. Sucz acceleration 8ah be rescinyey any annulley bh tze Holyer at anh ti8e prior to pah8ent zereunyer any tze Holyer szall zane all rigzts as a zolyer odtze Note until sucz ti8e, idanh, as tze Holyer receines dull pah8ent pursuant to tzis Section 5(b). No sucz rescission or annul8ent szall adect anh subsequent Enent od Dedault or i8 pair anh rigzt consequent tzereon. For tze anoiyance odyoubt any notwitzstanying anhtzing to tze contrarh containey zerein, tze rate odinterest tzat 8ah be pahable pursuant to tzis Note at anh ti8e szall not exceey eigzteen percent (1f%) per annu8.

Section 6.    Securith. Tze Notes are securey to tze extent any in tze 8anner set dortz in tze Securith Docu8ents.

-10-

Section 7.        Miscellaneous.

a)        Notices.  Anh any all notices or otzer co8 8 unications or yelimeries to be promiyey bh tze Holyer zereunyer szall be in writing any yelimerey personallh, bh dacsi8 ile, bh e8 ail attacz8 ent, or sent bh a nationallh recogniyey onernigzt courier sermice, ayyressey to tze Co8 panh, at tze ayyress set dortz abome, or sucz otzer dacsi8 ile nu8 ber, e8 ail ayyress, or ayyress as tze Co8 panh 8 ah specidh dor sucz purposes bh notice to tze Holyer yelimerey in accoryance witz tzis Section 7(a).  Anh any all notices or otzer co8 8 unications or yelimeries to be promiyey bh tze Co8 panh zereunyer szall be in writing any yelimerey personallh, bh e8 ail attacz8 ent, or sent bh a nationallh recogniyey onernigzt courier sermice ayyressey to eacz Holyer at tze e8 ail ayyress or ayyress od tze Holyer appearing on tze books odtze Co8 panh, or idno sucz e8 ail attacz8 ent or ayyress appears on tze books odtze Co8 panh, at tze principal place odbusiness odsucz Holyer, as set dortz in tze Purczase Agree8 ent.  Anh notice or otzer co8 8 unication or yelimeries zereunyer szall be yee8 ey gimen any edbectime on tze earliest od (i) tze ti8 e odtrans8 ission, idsucz notice or co8 8 unication is yelimerey mia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto prior to 5:30 p.8 . (New York Cith ti8 e) on anh yate, (ii) tze next Traying Dah adter tze yate odtrans8 ission, idsucz notice or co8 8 unication is yelimerey mia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto on a yah tzat is not a Traying Dah or later tzan 5:30 p.8 . (New York Cith ti8 e) on anh Traying Dah, (iii) tze secony Traying Dah dollowing tze yate od8 ailing, id sent bh U.S. nationallh recogniyey onernigzt courier sermice or (im) upon actual receipt bh tze parth to wzo8  sucz notice is requirey to be gimen.

b)        Absolute Obligation.  Except as expresslh promiyey zerein, no promision od tzis Note szall alter or i8 pair tze obligation od tze Co8 panh, wzicz is absolute any unconyitional, to pah tze principal odany liquiyatey ya8 ages, as applicable, on tzis Note at tze ti8 e, place, any rate, any in tze coin or currench, zerein prescribey.  Tzis Note is a yirect yebt obligation od tze Co8 panh.  Tzis Note ranks pari passu witz all otzer Notes now or zereadter issuey unyer tze ter8 s set dortz in tze Transaction Docu8 ents.

c)        Lost or Mutilatey Note.  Id tzis Note szall be 8 utilatey, lost, stolen or yestrohey, tze Co8 panh szall execute any yeliver, in exczange any substitution dor any upon cancellation od a 8 utilatey Note, or in lieu od or in substitution dor a lost, stolen or yestrohey Note, a new Note dor tze principal a8 ount odtzis Note so 8 utilatey, lost, stolen or yestrohey, but onlh upon receipt od emiyence odsucz loss, tzedt or yestruction odsucz Note, any odtze ownerszip zereod, reasonablh satisdactorh to tze Co8 panh.

y)        Governing Law.  All questions concerning tze construction, maliyith, endorce8 ent any interpretation od tzis Note szall be governey bh any construey any endorcey in accoryance witz tze internal laws odtze State odNew York, witzout regary to tze principles od conflict od laws tzereod.  Eacz parth agrees tzat all legal proceeyings concerning tze interpretation, endorce8 ent any yedense od tze transactions conte8 platey bh anh od tze Transaction Docu8 ents (wzetzer brougzt against a parth zereto or its respectime Addiliates, yirectors, odficers, szarezolyers, e8 plohees or agents) szall be

co8 8 encey in tze state any deyeral courts sitting in tze Cith od New York, Borougz od Manzattan (tze "<u>New York Courts</u>").  Eacz parth zereto zerebh irrenocablh sub8 its to tze exclusine jurisyiction odtze New York Courts dor tze ayjuyication odanh yispute zereunyer or in connection zerewitz or witz anh transaction conte8 platey zerebh or yiscussey zerein (incluying witz respect to tze endorce8 ent od anh od tze Transaction Docu8 ents), any zerebh irrenocablh waines, any agrees not to assert in anh suit, action or proceeying, anh clai8 tzat it is not personallh subject to tze jurisyiction odsucz New York Courts, or sucz New York Courts are i8 proper or inconnenient nenue dor sucz proceeying.  Eacz parth zerebh irrenocablh waines personal sernice odprocess any consents to process being serney in anh sucz suit, action or proceeying bh 8 ailing a coph tzereodnia registerey or certidey 8 ail or onernigzt yelinerh (witz eniyence odyelinerh) to sucz parth at tze ayyress in edect dor notices to it unyer tzis Note any agrees tzat sucz sernice szall constitute gooy any sudicient sernice odprocess any notice tzereod.  Notzing containey zerein szall be yee8 ey to li8 it in anh wah anh rigzt to serne process in anh otzer 8 anner per8 ittey bh applicable law.  Eacz parth zereto zerebh irrenocablh waines, to tze dullest extent per8 ittey bh applicable law, anh any all rigzt to trial bh jurh in anh legal proceeying arising out od or relating to tzis Note or tze transactions conte8 platey zerebh.  Idanh parth szall co8 8 ence an action or proceeying to endorce anh pronisions odtzis Note, tzen tze prenailing parth in sucz action or proceeying szall be rei8 bursey bh tze otzer parth dor its attorneh's dees any otzer costs any expenses incurrey in tze inrestigation, preparation any prosecution odsucz action or proceeying.  Tzis Note szall be yee8 ey an unconyitional obligation od tze Co8 panh dor tze pah8 ent od 8 oneh any, witzout li8 itation to anh otzer re8 eyies od Holyer, 8 ah be endorcey against tze Co8 panh bh su8 8 arh proceeying pursuant to New York Cinil Proceyure Law any Rule Section 3213 or anh si8 ilar rule or statute in tze jurisyiction wzere endorce8 ent is sougzt.

e)    <u>Wainer</u>.  Anh wainer bh tze Co8 panh or tze Holyer od a breacz od anh pronision odtzis Note szall not operate as or be construey to be a wainer odanh otzer breacz odsucz pronision or odanh breacz odanh otzer pronision odtzis Note.  Tze dailure odtze Co8 panh or tze Holyer to insist upon strict ayzerence to anh ter8 odtzis Note on one or 8 ore occasions szall not be consiyerey a wainer or yeprine tzat parth odtze rigzt tzereader to insist upon strict ayzerence to tzat ter8 or anh otzer ter8 od tzis Note on anh otzer occasion.  Anh wainer bh tze Co8 panh or tze Holyer 8 ust be in writing.

d)    <u>Senerabilith</u>.    Id anh pronision od tzis Note is innaliy, illegal or unendorceable, tze balance od tzis Note szall re8 ain in edect, any id anh pronision is inapplicable to anh Person or circu8 stance, it szall nenertzeless re8 ain applicable to all otzer Persons any circu8 stances.  Id it szall be douny tzat anh interest or otzer a8 ount yee8 ey interest yue zereunyer niolates tze applicable law gonerning usurh, tze applicable rate odinterest yue zereunyer szall auto8 aticallh be lowerey to equal tze 8 axi8 u8 rate od interest per8 ittey unyer applicable law. Tze Co8 panh conenants (to tze extent tzat it 8 ah lawdullh yo so) tzat it szall not at anh ti8 e insist upon, pleay, or in anh 8 anner wzatsoener clai8 or take tze benedit or aymantage od anh stah, extension or usurh law or otzer law wzicz wouly prozibit or dorgine tze Co8 panh dro8 pahing all or anh portion od tze principal od or interest on tzis Note as conte8 platey zerein, wzerener enactey, now or at anh ti8 e zereader in dorce, or wzicz 8 ah adect tze conenants or tze perdor8 ance odtzis

-12-

Note, any tze Co8 panh (to tze extent it 8 ah lawdullh yo so) zerebh expresslh waines all benedts or aymantage odanh sucz law, any conenants tzat it will not, bh resort to anh sucz law, zinyer, yelah or i8 peye tze execution odanh power zerein grantey to tze Holyer, but will sudder any per8 it tze execution odenerh sucz as tzougz no sucz law zas been enactey.

g)   Re8 eyies, Czaracterivations, Otzer Obligations, Breaczes any Injunctine Relied   Tze re8 eyies promiyey in tzis Note szall be cu8 ulatine any in ayyition to all otzer re8 eyies amailable unyer tzis Note any anh odtze otzer Transaction Docu8 ents at law or in equith (incluying a yecree odspecidc perdor8 ance any/or otzer injunctine relied), any notzing zerein szall li8 it tze Holyer's rizgt to pursue actual any consequential ya8 ages dor anh dailure bh tze Co8 panh to co8 plh witz tze ter8 s odtzis Note.  Tze Co8 panh conenants to tze Holyer tzat tzere szall be no czaracterivation concerning tzis instru8 ent otzer tzan as expresslh promiyey zerein. A8 ounts set dortz or promiyey dor zerein witz respect to pah8 ents any tze like (any tze co8 putation tzereod) szall be tze a8 ounts to be receimey bh tze Holyer any szall not, except as expresslh promiyey zerein, be subject to anh otzer obligation od tze Co8 panh (or tze perdor8 ance tzereod). Tze Co8 panh acknowleyges tzat a breacz bh it odits obligations zereunyer will cause irreparable zar8 to tze Holyer any tzat tze re8 eyh at law dor anh sucz breacz 8 ah be inayequate. Tze Co8 panh tzeredore agrees tzat, in tze enent odanh sucz breacz or tzreateney breacz, tze Holyer szall be entitley, in ayyition to all otzer amailable re8 eyies, to an injunction restraining anh sucz breacz or anh sucz tzreateney breacz, witzout tze necessith od szowing econo8 ic loss any witzout anh bony or otzer securith being requirey. Tze Co8 panh szall promiye all indor8 ation any yocu8 entation to tze Holyer tzat is requestey bh tze Holyer to enable tze Holyer to condir8  tze Co8 panh's co8 pliance witz tze ter8 s any conyitions odtzis Note.

z)   Next Business Dah.  Wzenener anh pah8 ent or otzer obligation zereunyer szall be yue on a yah otzer tzan a Business Dah, sucz pah8 ent szall be 8 aye on tze next succeeying Business Dah.

i)   Heayings.  Tze zeayings containey zerein are dor connenience onlh, yo not constitute a part odtzis Note any szall not be yee8 ey to li8 it or adect anh odtze promisions zereod

j)   A8 eny8 ent.  Tzis Note 8 ah be a8 endey, any anh promisions zereod 8 ah be a8 endey, bh written consent odtze Co8 panh any tze Requirey Holyers.

Section f.  Disclosure.   Upon receipt or yelinerh bh tze Co8 panh od anh notice in accoryance witz tze ter8 s odtzis Note, unless tze Co8 panh zas in gooy daitz yeter8 iney tzat tze 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh szall witzin one (1) Business Dah ader sucz receipt or yelinerh publiclh yisclose sucz 8 aterial, nonpublic indor8 ation on a Current Report on For8  f-K or otzerwise. In tze enent tzat tze Co8 panh belienes tzat a notice contains 8 aterial, non-public indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh so szall inyicate to tze Holyer conte8 poraneouslh witz yelinerh odsucz notice, any in tze absence odanh sucz inyication, tze Holyer szall be allowey to

-13-

presu8 e tzat all 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Sabina Rizvi

Title: President & CFO

Address: 3753 Howard Hughes Parkway
            Suite 200-849
            Las Vegas, NV 89169

Email address: Sabina.Rizvi@musclepharm.com

EXECUTION VERSION

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: October 13, 2021                    Principal: $5f 1,395.35

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE APRIL 13, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one oda series od yulh autzorivey any maliylh issuey Original Issue Senior Securey Notes od MusclePzar8 Corporation, a Nemaya corporation (tze "Co8 panh"), zaming its principal place odbusiness at 4721 Ironton Street, Builying A, Denner, Colorayo f0239, yesignatey as its Original Issue Discount Senior Securey Note yue April 13, 2022 (tzis Note, tze "Note" any, collectinelh witz tze otzer Notes odsucz series, tze "Notes").

FOR VALUE RECEIVED, tze Co8 panh pro8 ises to pah to L1 Capital Global Opportunities Master Funy or its registerey assigns (tze "Holyer"), or szall zane paiy pursuant to tze ter8 s zereunyer, tze principal su8 od$5f 1,395.35 on April 13, 2022 (tze "Maturith Date") or sucz earlier yate as tzis Note is requirey or per8 ittey to be repaiy as promiyey zereunyer; promiyey, tzat, (a) tze Maturith Date 8 ah be extenyey to (i) Mah 13, 2022 id(x) it is necessarh dor tze Traying Market to co8 plete its reniew od tze Co8 panh's annual report on For8 10-K dor its discal hear enyey Dece8 ber 31, 2021 in connection witz tze listing odtze Co8 panh's co8 8 on stock on sucz Traying Market, (h) no Enents odDedault zane occurrey pursuant to tzis Note any (v) tze Co8 panh zas taken all actions necessarh dor tze listing od tze Co8 8 on Stock on tze Traying Market otzer tzan tze yelinerh to Traying Market odtze Co8 panh's annual report on For8 10-K dor its discal hear enyey Dece8 ber 31, 2021, or (ii) Mah 2f, 2022, upon tze yelinerh oda certidcate yulh signey bh an odficer od tze Co8 panh certidcing tzat: (x) no Enent od Dedault zas occurrey any is continuing, any (h) tze su8 od casz dows dro8 operating any innesting actinities (but not casz dows dro8 dinancing actinities) odtze Co8 panh any its Subsiyiaries, taken as a wzole, was greater tzan vero dor tze calenyar 8 ontz enyey Marcz 31, 2022 any (v) sucz odficer reasonablh belienes tzat : (1) no Enent odDedault is reasonablh expectey to occur on or bedore April 30, 2022 any (2) tze su8 odcasz dows dro8 operating any innesting actinities (but not dro8 dinancing actinities) od tze Co8 panh any its Subsiyiaries, taken as a wzole, will be greater tzan vero dor tze calenyar

8 ontz enyey April 30, 2022, any (b) id tze Maturith Date is extenyey in accoryance witz clause (a) od tzis paragrapz, interest (i) szall accrue yailh on any dro8 April 13, 2022 at a rate equal to tze lesser od eigzteen percent (1f %) per annu8 or tze 8 axi8 u8 rate per8 ittey unyer applicable law until tzis Note is paiy in dull, (ii) szall be co8 putey on tze basis od a hear od 365 yahs dor tze actual nu8 ber od yahs elapsey, any (iii) tzat zas accruey any is unpaiy szall be paiy bh tze Co8 panh to tze Holyer in casz on tze Maturith Date (as extenyey in accoryance witz clause (a) od tzis paragrapz). Tzis Note is subject to tze dollowing ayyitional promisions:

Section 1.    Dedinitions.    For tze purposes zereod, in ayyition to tze ter8 s yediney elsewzere in tzis Note, (a) capitalivey ter8 s not otzerwise yediney zerein szall zame tze 8 eanings set dortz in tze Purczase Agree8 ent any (b) tze dollowing ter8 s szall zame tze dollowing 8 eanings:

"Bankruptch Ement" 8 eans anh od tze dollowing ements: (a) tze Co8 panh or anh Subsiyiarh tzereod co8 8 ences a case or otzer proceeying unyer anh bankruptch, reorganivation, arrange8 ent, ayjust8 ent od yebt, relied od yebtors, yissolution, insolmench or liquiyation or si8 ilar law od anh jurisyiction relating to tze Co8 panh or anh Signidicant Subsiyiarh (as yediney in Rule 1-02 od Regulation S-X) tzereod, (b) tzere is co8 8 encey against tze Co8 panh or anh Signidicant Subsiyiarh tzereod anh sucz case or proceeying tzat is not yis8 issey witzin 60 yahs ader co8 8 ence8 ent, (c) tze Co8 panh or anh Signidicant Subsiyiarh tzereod is ayjuyicatey insolment or bankrupt or anh oryer od relied or otzer oryer approming anh sucz case or proceeying is enterey, (y) tze Co8 panh or anh Signidicant Subsiyiarh tzereod sudders anh appoint8 ent od anh custoyian or tze like dor it or anh substantial part od its properth tzat is not yisczargey or stahey witzin 60 calenyar yahs ader sucz appoint8 ent, (e) tze Co8 panh or anh Signidicant Subsiyiarh tzereod 8 akes a general assign8 ent dor tze benedt od creyitors, (d) tze Co8 panh or anh Signidicant Subsiyiarh tzereod calls a 8 eeting od its creyitors witz a miew to arranging a co8 position, ayjust8 ent or restructuring od its yebts, (g) tze Co8 panh or anh Signidicant Subsiyiarh tzereoday8 its in writing tzat it is generallh unable to pah its yebts as tzeh beco8 e yue, (z) tze Co8 panh or anh Signidicant Subsiyiarh tzereod, bh anh act or dailure to act, expresslh inyicates its consent to, approml od or acquiescence in anh od tze doregoing or takes anh corporate or otzer action dor tze purpose od edecting anh od tze doregoing.

"Business Dah" 8 eans anh yah otzer tzan Saturyah, Sunyah or otzer yah on wzicz co8 8 ercial banks in Tze Cith od New York are autzorivey or requirey bh law to re8 ain closey; promiyey, zowemer, dor claridication, co8 8 ercial banks szall not be yee8 ey to be autzorivey or requirey bh law to re8 ain closey yue to "stah at zo8 e", "szelter-in-place", "non-essential e8 plohee" or anh otzer si8 ilar oryers or restrictions or tze closure od anh pzhsical brancz locations at tze yirection od anh gonern8 ental autzorith so long as tze electronic dunys transder shste8 s (incluying dor wire transders) od co8 8 ercial banks in Tze Cith od New York are generallh open dor use bh custo8 ers on sucz yah.

"Czange od Control Transaction" 8 eans tze occurrence ader tze yate zereod od anh od (a) an acquisition ader tze yate zereod bh an inyimiyual or legal entith or "group" (as yescribey in Rule 13y-5(b)(1) pro8 ulgatey unyer tze Exczange Act) od edectime control

(wzetzer tzrougz legal or beneficial ownerszip od capital stock od tze Co8 panh, bh contract or otzerwise) od in excess od 33% od tze moting securities od tze Co8 panh (otzer tzan bh 8 eans od exercise od tze Warrants issuey togetzer witz tze Notes), wzere sucz inyimiyual or legal entith or "group" prior to sucz acquisition yiy not own in excess od 33% od tze moting securities od tze Co8 panh; promiyey, tzat dr anh inyimiyual or legal entith or "group" tzat owns in excess od 33% od tze moting securities od tze Co8 panh as od tze yate od tze Purczase Agree8 ent, sucz inyimiyual or legal entith or "group" zolys 75% or 8 ore od tze moting securities od tze Co8 panh ader giming edect to anh sucz acquisition, (b) tze Co8 panh 8 erges into or consoliyates witz anh otzer Person, or anh Person 8 erges into or consoliyates witz tze Co8 panh any, ader giming edect to sucz transaction, tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze Co8 panh or tze successor entith od sucz transaction, (c) tze Co8 panh (any all od its Subsiyiaries, taken as a wzole) sells or transders all or substantiallh all od its assets to anotzer Person any tze stockzolyers od tze Co8 panh i8 8 eyiatelh prior to sucz transaction own less tzan 66% od tze aggregate moting power od tze acquiring entith i8 8 eyiatelh ader tze transaction, (y) a replace8 ent at one ti8 e or witzin a tzree hear perioy od 8 ore tzan one-zald od tze 8 e8 bers od tze Boary od Directors wzicz is not approney bh a 8 ajorith od tzose inyimiyuals wzo are 8 e8 bers od tze Boary od Directors on October 13, 2021 (or bh tzose inyimiyuals wzo are serming as 8 e8 bers od tze Boary od Directors on anh yate wzose no8 ination to tze Boary od Directors was approney bh a 8 ajorith od tze 8 e8 bers od tze Boary od Directors wzo are 8 e8 bers on tze yate zereod), or (e) tze consu8 8 ation bh tze Co8 panh od an agree8 ent to wzicz tze Co8 panh is a parth or bh wzicz it is bouny, promiying dr anh od tze ements set dortz in clauses (a) tzrougz (y) abome.

"Designee" 8 eans E8 perh Tax Edicient, LP.

"Ement od Dedault" szall zame tze 8 eaning set dortz in Section 5(a).

"Manyatorh Dedault A8 ount" 8 eans tze su8 od (a) 120% od tze outstanying principal a8 ount od tzis Note any (b) all otzer a8 ounts, costs, expenses, interest any liquiyatey ya8 ages yue in respect od tzis Note.

"New York Courts" szall zame tze 8 eaning set dortz in Section 7(y).

"Original Issue Date" 8 eans tze yate od tze dirst issuance od tze Notes, regaryless od anh transders od anh Note any regaryless od tze nu8 ber od instru8 ents wzicz 8 ah be issuey to eniyence sucz Notes.

"Per8 ittey Inyebteyness" 8 eans (a) tze Inyebteyness eniyencey bh tze Notes, (b) Inyebteyness pursuant to tzat certain Purczase any Sale Agree8 ent, yatey as od Januarh 11, 2016, between tze Co8 panh any Prestige Capital Corporation, as a8 enyey or 8 oyidiey tzrougz tze yate zereod, (c) Inyebteyness eniyencey bh tzat certain Securey Renolming Pro8 issorh Note, yatey October 15, 2020 bh any between tze Co8 panh any Rhan Drexler, in tze 8 axi8 u8 principal a8 ount od $3,000,000, as a8 enyey any restatey bh tzat certain

Connertible Securey Pro8 issorh Note yatey as od August 13, 2021, (y) Inyebteyness eniyencey bh tzat certain A8 eney any Restatey Connertible Securey Pro8 issorh Note yatey as od August 21, 2020 in tze 8 axi8 u8 principal a8 ount od $2,735,199 issuey bh Borrower to Suboryinatey Creyitor, as a8 eney any restatey pursuant to tzat certain Connertible Securey Pro8 issorh Note yatey as od None8 ber 29, 2020 issuey bh Borrower to Suboryinatey Creyitor in tze 8 axi8 u8 principal a8 ount od $2,f 71,967, as a8 enyey bh tzat certain A8 eny8 ent to Connertible Securey Pro8 issorh Note yatey as od August 13, 2021, (e) tze PPP Loans, (d) lease obligations any purczase 8 oneh Inyebteyness od up to $300,000, in tze aggregate, incurrey in connection witz tze acquisition od capital assets any lease obligations witz respect to newlh acquirey or leasey assets; proniyey, tzat in oryer dor a new lease to be consiyerey to be Per8 ittey Inyebteyness, tze lanylory witz respect to succz new lease szall be requirey to yeliner to tze Collateral Agent a lanylory consent in dor8 any substance reasonablh acceptable to tze Collateral Agent to enable tze Collateral Agent to access collateral on succz properth upon an Enent od Dedault, (g) traye accounts pahable incurrey in tze oryinarh course od business consistent witz past practice, (z) Inyebteyness eniyencey bh tze Settle8 ent Agree8 ents any (i) Inyebteyness tzat (A) is expresslh suboryinatey to tze Notes pursuant to a written suboryination agree8 ent witz tze Requirey Holyers tzat is reasonablh acceptable to tze Requisite Holyers any (B) yoes not require anh pah8 ent od principal, wzetzer at 8 aturith, pursuant to a8 ortination, a sinking duny or otzerwise, at a yate earlier tzan 91 yahs dollowing tze Maturith Date.

"Per8 ittey Lien" 8 eans tze inyiniyual any collectine rederence to tze dollowing: (a) Liens dor taxes, assess8 ents any otzer gonern8 ental czarges or lenies not het yue or Liens dor taxes, assess8 ents any otzer gonern8 ental czarges or lenies being contestey in gooy daitz any bh appropriate proceeyings dor wzicz ayequate resernes (in tze gooy daitz juyg8 ent od tze 8 anage8 ent od tze Co8 panh) zane been establiszey in accoryance witz GAAP, (b) Liens i8 posey bh law wzicz were incurrey in tze oryinarh course od tze Co8 panh's business, succz as carriers', warezouse8 en's any 8 eczanics' Liens, statutorh lanylorys' Liens, any otzer si8 ilar Liens arising in tze oryinarh course od tze Co8 panh's business, any wzicz (x) yo not inyiniyuallh or in tze aggregate 8 ateriallh yetract dro8 tze malue od succz properth or assets or 8 ateriallh i8 pair tze use tzereod in tze operation od tze business od tze Co8 panh any its consoliyatey Subsiyiaries or (h) are being contestey in gooy daitz bh appropriate proceeyings, wzicz proceeyings zane tze edect od prenenting dor tze doreseeable duture tze dordeiture or sale od tze properth or asset subject to succz Lien, (c) Liens incurrey in connection witz Per8 ittey Inyebteyness unyer clauses (a) - (y).

"Purczase Agree8 ent" 8 eans tze Securities Purczase Agree8 ent, yatey as od October 13, 2021 a8 ong tze Co8 panh any tze original Holyers, as a8 enyey, 8 oyidiey or supple8 entey dro8 ti8 e to ti8 e in accoryance witz its ter8 s.

"Requirey Holyers" 8 eans zolyers od at least a 8 ajorith in principal a8 ount od tze tzen outstanying Notes any szall incluye tze Designee so long as tze Designee or anh od its Adaliates zolys anh Notes.

"Securities Act" 8 eans tze Securities Act od 1933, as a8 enyey, any tze rules any regulations pro8 ulgatey tzereunyer.

"Settle8 ent Agree8 ents" 8 eans (i) tze Settle8 ent Agree8 ent, yatey None8 ber 7, 2016 bh any between tze Co8 panh any F.H.G. Corporation y/b/a Capstone Nutrition, INI Parent, Inc., INI Buher, Inc. any Meyleh Capital Corporation, (ii) Settle8 ent Agree8 ent, yatey Septe8 ber 25, 2020 bh any between tze Co8 panh any NBF Holyings Canaya Inc., any (iii) Settle8 ent Agree8 ent, yatey None8 ber 7, 2020 bh any between tze Co8 panh any Excelsior Nutrition, Inc., in eacz case, as in edect as od tze yate zereod

"Subsiyiarh Guarantee" 8 eans tze Subsiyiarh Guarantee, yatey tze yate od tze Purczase Agree8 ent, bh eacz Subsiyiarh in danor od tze Holyers.

"Transaction Docu8 ents" 8 eans tze Purczase Agree8 ent, tzis Note, tze Subsiyiarh Guarantee, any all yocu8 ents executey in connection tzerewitz any zerewitz.

"Warrants" 8 eans, collectinelh, tze Co8 8 on Stock purczase warrants yelinerey to tze Holyers on tze Original Issue Date pursuant to tze Purczase Agree8 ent.

"Warrant Szares" 8 eans tze szares od Co8 8 on Stock issuable upon exercise od tze Warrants.

Section 2.    Registration od Transders any Exczanges.  Tzis Note is exczangeable dor an equal aggregate principal a8 ount od Notes od yidderent autzorivey yeno8 inations, as requestey bh tze Holyer surrenyering tze sa8 e.  No sernice czarge will be pahable dor sucz registration od transder or exczange.

Section 3.    Neganine Conenants.  As long as anh portion od tzis Note re8 ains outstanying, unless tze Requirey Holyers szall zane otzerwise ginen prior written consent, tze Co8 panh szall not, any szall not per8 it anh od tze Subsiyiaries to, yirectlh or inyirectlh:

a)    otzer tzan Per8 ittey Inyebteyness, enter into, create, incur, assu8 e, guarantee or sudder to exist anh Inyebteyness dor borrowey 8 oneh od anh kiny, incluying, but not li8 itey to, a guarantee, on or witz respect to anh od its properth or assets now owney or zereander acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

b)    otzer tzan Per8 ittey Liens, enter into, create, incur, assu8 e or sudder to exist anh Liens od anh kiny, on or witz respect to anh od its properth or assets now owney or zereander acquirey or anh interest tzerein or anh inco8 e or prodits tzeredro8 ;

c)    a8 eny its czarter yocu8 ents, incluying, witzout li8 itation, its certidicate od incorporation any bhlaws, in anh 8 anner tzat 8 ateriallh any aynerselh addects anh rigzts od tze Holyer;

-5-

y)       repah, repurczase or oder to repah, repurczase or otzerwise acquire 8 ore tzan a ye 8 ini8 is nu8 ber od szares od its Co8 8 on Stock or Co8 8 on Stock Equimalents otzer tzan as to tze Warrant Szares as per8 ittey or requirey unyer tze Transaction Docu8 ents;

e)       repah, repurczase or oder to repah, repurczase or otzerwise acquire anh Inyebteyness, otzer tzan (i) as conte8 platey in clause (b) od tze yeinition od Per8 ittey Inyebteyness, but onlh to tze extent repaiy witz tze collection od accounts receimable od tze Co8 panh obtainey in tze oryinarh course od business, (ii) as conte8 platey in clause (y), clause (e) or clause (z) od tze yeinition od Per8 ittey Inyebteyness any (iii) tze Notes idon a pro-rata basis as per8 ittey or requirey unyer tze Transaction Docu8 ents, promiyey tzat anh sucz pah8 ents szall not be per8 ittey id, at sucz ti8 e, or ader giming edect to sucz pah8 ent, anh Enent od Deault exists or occurs;

d)       yeclare or pah casz yimiyenys or yistributions on anh Co8 8 on Stock or Co8 8 on Stock Equimalents;

g)       enter into anh transaction witz anh Adiliate od tze Co8 panh wzicz wouly be requirey to be yisclosey in anh public ding witz tze Co8 8 ission, unless sucz transaction is 8 aye on co8 8 erciallh reasonable ter8 s any on an ar8 's-lengtz basis any expresslh appromey bh a 8 ajorith od tze yisinterestey yirectors od tze Co8 panh (emen id less tzan a quoru8 otzerwise requirey or boary approml), otzer tzan or (i) pah8 ent od salarh or serivices renyerey in a8 ounts not to exceey tze a8 ounts promiyey or unyer agree8 ents in place as od tze yate od tze Purczase Agree8 ent, (ii) rei8 burse8 ent or expenses incurrey on bezald od tze Co8 panh any (iii) otzer e8 plohee benedits, incluying stock grants any stock option agree8 ents unyer anh stock option plan od tze Co8 panh; or

z)       consu8 8 ate anh agree8 ent witz respect to anh od tze doregoing.

In tze enent 8 ore tzan one grace, cure or notice perioy is applicable to an Enent od Deault, tzen tze szortest grace, cure or notice perioy szall be applicable tzereto.

Section 4.       Manyatorh Reye8 ption.

a)       Occurrence od Manyatorh Reye8 ption.  Wzile tzis Note is outstanying, tze Co8 panh szall use at least 25% od tze net proceeys od anh odering od its securities, incluying tze Public Odering (anh sucz odering, a "Subsequent Odering" any 25% od sucz net proceeys dro8 sucz Subsequent Odering, tze "Net Proceeys") to reyee8 tzis Note in dull, incluying tze Principal A8 ount any all otzer a8 ounts yue any pahable pursuant to tzis Note, any all otzer tzen outstanying Notes (a "Manyatorh Reye8 ption");  promiyey, zowemer, tzat id tze Net Proceeys od tze Subsequent Odering are less tzan tze a8 ount requirey to repah all od tze Notes in dull, (i) tze Co8 panh's repah8 ent obligation unyer tzis Section 4(a) szall be li8 itey to tze a8 ount od sucz Net Proceeys, (ii) tze Net Proceeys szall be appliey to all od tze Notes tzen outstanying pro rata basey on tze principal a8 ount od sucz Notes tzen outstanying any (iii) tze Co8 panh szall edect successime Manyatorh

-6-

Reye8 ptions upon eacz Subsequent Oddering until tze Notes are repaiy in dull or otzerwise no longer outstanying.

b) <u>Manyatorh Notices</u>. Witz respect to eacz Manyatorh Reye8 ption, tze Co8 panh szall yeliner a written notice to all, but not less tzan all, od tze zolyers od Notes (tze "<u>Manyatorh Reye8 ption Notice</u>" any tze yate sucz notice is yelinerey to all sucz zolyers is rederrey to as a "<u>Manyatorh Reye8 ption Notice Date</u>") (a) stating tze yate on wzicz tze Manyatorh Reye8 ption szall occur (a "<u>Manyatorh Reye8 ption Date</u>"), wzicz yate szall be tze yate od tze consu8 8 ation od tze applicable Subsequent  Oddering, (b) stating tze expectey a8 ount od Net Proceeys witz respect to tze applicable Subsequent Oddering any (c) contain a certidication dro8  Czied Executive Oddicer od tze Co8 panh tzat tze Co8 panh zas si8 ultaneouslh taken tze sa8 e action witz respect to all od tze Notes. Eacz Manyatorh Reye8 ption Notice szall be yelinerey no later tzan tze dirst (1st) Traying Dah dollowing tze announce8 ent od tze pricing od tze applicable Subsequent Oddering, any tze Co8 panh szall 8 ake a public announce8 ent containing tze indor8 ation set dortz in tze applicable Manyatorh Reye8 ption Notice on or bedore tze relatey Manyatorh Reye8 ption Notice Date to tze extent tzat tze notice contains anh, or constitutes, 8 aterial, non-public indor8 ation.

c) <u>Manyatorh Reye8 ption Proceyure</u>.  Tze pah8 ent od casz pursuant to tze Manyatorh Reye8 ption szall be payable in dull on tze Traying Dah i8 8 eyiatelh dollowing tze Manyatorh Reye8 ption Date bh wire transder od i8 8 eyiatelh aniailable dunys in accoryance witz tze Holyer's wire instructions. Id anh portion od tze pah8 ent pursuant to a Manyatorh Reye8 ption szall not be paiy bh tze Co8 panh bh tze applicable yue yate, interest szall accrue tzereon at an interest rate equal to tze lesser od 1f % per annu8  or tze 8 axi8 u8  rate per8 ittey bh applicable law until sucz a8 ount is paiy in dull. Notwitzstanying anhtzing to tze contrarh in tzis Section 4(a), tze Net Proceeys szall be appliey ratablh a8 ong tze Holyers od Note.

<u>Section 5</u>.    Enents od Dedault.

a) "<u>Enent od Dedault</u>" 8 eans, wzerener usey zerein, anh od tze dollowing enents (wzatener tze reason dor sucz enent any wzetzer sucz enent szall be noluntarh or innoluntarh or eddectey bh operation od law or pursuant to anh juyg8 ent, yecree or oryer od anh court, or anh oryer, rule or regulation od anh ay8 inistratine or goner8 ental boyh):

(i) anh yedault in tze pah8 ent od (A) tze principal a8 ount od anh Note or (B) liquiyatey ya8 ages any otzer a8 ounts owing to a Holyer on anh Note, as any wzen tze sa8 e szall beco8 e yue any payable (wzetzer on tze Maturith Date or bh acceleration or otzerwise) wzicz yedault, solelh in tze case od a yedault unyer clause (B) abone, is not curey witzin 3 Traying Dahs;

(ii) tze Co8 panh szall dail to obserne or perdor8  anh otzer conenant or agree8 ent in anh 8 aterial respect (except to tze extent anh sucz conenant or agree8 ent is qualidiey bh 8 aterialith or Material Aynerse Eddect, in

wzicz case, in anh respect) containey in tze Notes or in anh Transaction Docu8ent, wzicz dailure is not curey, id possible to cure, witzin tze earlier to occur od (A) 5 Traying Dahs ader notice od sucz dailure sent bh tze Holyer or bh anh otzer Holyer to tze Co8panh any (B) 10 Traying Dahs ader tze Co8panh zas beco8e or szouly zane beco8e aware od sucz dailure;

(iii)   a yedault or enent od yedault (subject to anh grace or cure perioy proniyey in tze applicable agree8ent, yocu8ent or instru8ent) szall occur unyer anh od tze Transaction Docu8ents;

(iv)   anh representation or warranth 8aye in tzis Note, anh otzer Transaction Docu8ent, anh written state8ent pursuant zereto or tzereto or anh otzer report, dinancial state8ent or certidicate 8aye or yelinerey to tze Holyer or anh otzer Holyer szall be untrue or incorrect in anh 8aterial respect as od tze yate wzen 8aye or yee8ey 8aye;

(v)   tze Co8panh or anh Subsiyiarh szall be subject to a Bankruptch Enent;

(vi)   tze Co8panh or anh Subsiyiarh szall yedault (subject to anh grace or cure perioy proniyey in tze applicable agree8ent, yocu8ent or instru8ent) on anh od its obligations unyer anh 8ortgage, pro8issorh note, creyit agree8ent or otzer dacilith, inyenture agree8ent, dactoring agree8ent or otzer instru8ent unyer wzicz tzere 8ah be issuey, or bh wzicz tzere 8ah be securey or eniyencey, anh Inyebteyness dor borrowey 8oneh or 8oneh yue unyer anh long ter8 leasing or dactoring arrange8ent (incluying, witzout li8itation, tze PPP Loan Agree8ent) tzat (a) innolnes, inyiniyuallh or in tze aggregate, an obligation greater tzan $100,000, wzetzer anh sucz Inyebteyness now exists or szall zereader be createy, any (b) results in sucz Inyebteyness beco8ing or being yeclarey yue any pahable prior to tze yate on wzicz it wouly otzerwise beco8e yue any pahable;

(vii)   tze Co8panh (any all od its Subsiyiaries, taken as a wzole) szall be a parth to anh Czange od Control Transaction or Funya8ental Transaction (as yediney in tze Warrants) or szall agree to sell or yispose od all or in excess od 33% od its assets in one transaction or a series od relatey transactions (wzetzer or not sucz sale wouly constitute a Czange od Control Transaction) any sucz transaction or series od transactions will be consu8 8atey on or prior to tze yate tzat tzis Note is repaiy in dull;

(viii)   anh yissolution, liquiyation, winying up or cessation od operations bh tze Co8panh, od a substantial portion od its business;

(ix)   tze dailure bh tze Co8panh or anh Subsiyiarh to 8aintain anh intellectual properth rigzts, personal, real properth, equip8ent or leases or otzer assets

wzicz are necessarh to conyuct its business (wzetzer now or in tze duture) any sucz breacz is not curey witzin twenth (20) yahs od sucz occurrence;

(x)     tze occurrence od an Enent od Dedault unyer anh otzer Note;

(xi)    anh 8 onetarh juyg8 ent, writ or si8 ilar dinal process szall be enterey or dley against tze Co8 panh, anh subsiyiarh or anh od tzeir respectine properth or otzer assets dor 8 ore tzan $100,000, any sucz juyg8 ent, writ or si8 ilar dinal process szall re8 ain unmacatey, unbonyey or unstahey dor a perioy od 45 calenyar yahs;

(xii)   tze Co8 panh or anh Subsiyiarh szall dail in anh 8 aterial respect to perdor8 or co8 plh witz anh conenant or agree8 ent containey in anh Securith Docu8 ent to wzicz it is a parth (except to tze extent anh sucz conenant or agree8 ent is qualidey bh 8 aterialith or Material Aynerse Edect, in wzicz case, in anh respect);

(xiii)  anh 8 aterial pronision od anh Securith Docu8 ent (as yeter8 iney in gooy daitz bh tze Collateral Agent in its sole yiscretion) szall at anh ti8 e dor anh reason (otzer tzan pursuant to tze express ter8 s tzereod) cease to be maliy any binying on or endorceable against tze Co8 panh or anh Subsiyiarh intenyey to be a parth tzereto, or tze maliyith or endorceabilith tzereod szall be contestey bh anh parth tzereto, or a proceeying szall be co8 8 encey bh tze Co8 panh or anh Subsiyiarh or anh gonern8 ental autzorith zaning jurisyiction oner anh od tze8 , seeking to establisz tze innaliyith or unendorceabilith tzereod, or tze Co8 panh or anh Subsiyiarh szall yenh in writing tzat it zas anh liabilith or obligation purportey to be createy unyer anh Securith Docu8 ent;

(xim)   anh Securith Docu8 ent, ader yelinerh tzereod pursuant zereto, szall dor anh reason dail or cease to create a maliy any perdectey any, except to tze extent per8 ittey bh tze ter8 s zereod or tzereod, dirst priorith Lien (except witz respect to accounts receinables, a secony priorith Lien) in danor od tze Collateral Agent dor tze benedit od tze zolyers od tze Notes on anh Collateral (as yedney in tze Securith Docu8 ents) purportey to be conerey tzerebh, except to tze extent tze Collateral Agent yeter8 ines not to pursue perdection od anh applicable Lien;

(xm)    anh bank at wzicz anh yeposit account, blockey account, or lockbox account od tze Co8 panh or anh Subsiyiarh is 8 aintainey szall dail to co8 plh witz anh 8 aterial ter8 od anh yeposit account, blockey account, lockbox account or si8 ilar agree8 ent to wzicz sucz bank is a parth or anh securities inter8 eyiarh, co8 8 oyith inter8 eyiarh or otzer dinancial institution at anh ti8 e in custoyh, control or possession od anh innest8 ent properth od tze Co8 panh or anh Subsiyiarh szall dail to co8 plh witz anh od tze ter8 s od

-9-

anh innest8ent properth control agree8ent to wzicz sucz Person is a parth (it being unyerstooy tzat onlh accounts pursuant to wzicz tze Collateral Agent zas requestey account control agree8ents szouly be subject to tzis clause (xim)); or

(xmi)    anh 8aterial ya8age to, or loss, tzedt or yestruction od tze Collateral or a 8aterial a8ount odproperth odtze Co8panh, wzetzer or not insurey, or anh strike, lockout, labor yispute, e8bargo, conye8nation, act odGoy or public ene8h, or otzer casualth wzicz causes, dbr 8ore tzan tzirth (30) consecutime yahs, tze cessation or substantial curtail8ent odremenue proyucing actimities at anh dacilith od tze Co8panh or anh Subsiyiarh, id anh sucz enent or circu8stance couly reasonablh be expectey to zame a Material Aymerse Eddect.

b)    Re8eyies Upon Enent od Dedault. Id anh Enent od Dedault occurs, tze outstanying principal a8ount od tzis Note, plus accruey but unpaiy interest, liquiyatey ya8ages any otzer a8ounts owing in respect tzereodtzrougz tze yate odacceleration, szall beco8e, at tze Holyer's election, i8 8eyiatelh yue any pahable in casz at tze Manyatorh Dedault A8ount, except tzat upon an Enent od Dedault pursuant to Section 5(a)(m), tze Co8panh szall i8 8eyiatelh pah tze Manyatorh Dedault A8ount to tze Holyer witzout tze require8ent dbr anh notice or ye8any or otzer action bh tze Holyer or anh otzer Person; promiyey, tzat tze Holyer 8ah, in its sole yiscretion, waine sucz rigzt to receime pah8ent upon an Enent od Dedault pursuant to Section 5(a)(m), in wzole or in part, any anh sucz wainer szall not addect anh otzer rigzts odtze Holyer zereunyer, incluying anh otzer rigzts in respect to anh sucz Enent od Dedault or anh otzer a8ount, as applicable. Co8 8encing 5 yahs adter tze occurrence odanh Enent odDedault any tzat results in tze rigzt or auto8atic acceleration odtzis Note, tzis Note szall accrue interest at an interest rate equal to tze lesser od1f% per annu8 or tze 8axi8u8 rate per8ittey unyer applicable law. Upon tze pah8ent in dull odtze Manyatorh Dedault A8ount, tze Holyer szall pro8 ptlh surrenyer tzis Note to, or as yirectey bh, tze Co8panh. In connection witz sucz acceleration yescribey zerein, tze Holyer neey not promiye, any tze Co8panh zerebh waines, anh present8ent, ye8any, protest or otzer notice odanh kiny, any tze Holyer 8ah ah i8 8 eyiatelh any witzout expiration od anh grace perioy endorce anh any all odits rigzts any re8eyies zereunyer any all otzer re8eyies amailable to it unyer applicable law. Sucz acceleration 8ah be rescinyey any annulley bh tze Holyer at anh ti8e prior to pah8ent zereunyer any tze Holyer szall zame all rigzts as a zolyer odtze Note until sucz ti8e, idanh, as tze Holyer receimes dull pah8ent pursuant to tzis Section 5(b). No sucz rescission or annul8ent szall addect anh subsequent Enent od Dedault or i8 pair anh rigzt consequent tzereon. For tze anoiyance od youbt any notwitzstanying anhtzing to tze contrarh containey zerein, tze rate odinterest tzat 8ah be pahable pursuant to tzis Note at anh ti8e szall not exceey eigzteen percent (1f%) per annu8 .

Section 6.    Securith. Tze Notes are securey to tze extent any in tze 8anner set dortz in tze Securith Docu8ents.

-10-

<u>Section 7</u>.        <u>Miscellaneous</u>.

a)        <u>Notices</u>.  Anh any all notices or otzer co8 8 unications or yelineries to be promiyey bh tze Holyer zereunyer szall be in writing any yelinerey personallh, bh dacsi8 ile, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sernice, ayyressey to tze Co8 panh, at tze ayyress set dortz abone, or sucz otzer dacsi8 ile nu8 ber, e8 ail ayyress, or ayyress as tze Co8 panh 8 ah specidh dor sucz purposes bh notice to tze Holyer yelinerey in accoryance witz tzis Section 7(a).  Anh any all notices or otzer co8 8 unications or yelineries to be promiyey bh tze Co8 panh zereunyer szall be in writing any yelinerey personallh, bh e8 ail attacz8 ent, or sent bh a nationallh recognivey onernigzt courier sernice ayyressey to eacz Holyer at tze e8 ail ayyress or ayyress od tze Holyer appearing on tze books odtze Co8 panh, or idno sucz e8 ail attacz8 ent or ayyress appears on tze books odtze Co8 panh, at tze principal place odbusiness odsucz Holyer, as set dortz in tze Purczase Agree8 ent.  Anh notice or otzer co8 8 unication or yelineries zereunyer szall be yee8 ey ginen any edectine on tze earliest od (i) tze ti8 e odtrans8 ission, idsucz notice or co8 8 unication is yelinerey nia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto prior to 5:30 p.8 . (New York Cith ti8 e) on anh yate, (ii) tze next Traying Dah ader tze yate odtrans8 ission, idsucz notice or co8 8 unication is yelinerey nia e8 ail attacz8 ent to tze e8 ail ayyress set dortz on tze signature pages attaczey zereto on a yah tzat is not a Traying Dah or later tzan 5:30 p.8 . (New York Cith ti8 e) on anh Traying Dah, (iii) tze secony Traying Dah dollowing tze yate od8 ailing, id sent bh U.S. nationallh recognivey onernigzt courier sernice or (in) upon actual receipt bh tze parth to wzo8  sucz notice is requirey to be ginen.

b)        <u>Absolute Obligation</u>.  Except as expresslh promiyey zerein, no promision od tzis Note szall alter or i8 pair tze obligation od tze Co8 panh, wzicz is absolute any unconyitional, to pah tze principal od any liquiyatey ya8 ages, as applicable, on tzis Note at tze ti8 e, place, any rate, any in tze coin or currench, zerein prescribey.  Tzis Note is a yirect yebt obligation od tze Co8 panh.  Tzis Note ranks <u>pari passu</u> witz all otzer Notes now or zereader issuey unyer tze ter8 s set dortz in tze Transaction Docu8 ents.

c)        <u>Lost or Mutilatey Note</u>.  Id tzis Note szall be 8 utilatey, lost, stolen or yestrohey, tze Co8 panh szall execute any yeliner, in exczange any substitution dor any upon cancellation od a 8 utilatey Note, or in lieu od or in substitution dor a lost, stolen or yestrohey Note, a new Note dor tze principal a8 ount odtzis Note so 8 utilatey, lost, stolen or yestrohey, but onlh upon receipt od eniyence odsucz loss, tzed or yestruction odsucz Note, any odtze ownerszip zereod, reasonablh satisdactorh to tze Co8 panh.

y)        <u>Gonerning Law</u>.  All questions concerning tze construction, naliyith, endorce8 ent any interpretation od tzis Note szall be gonerney bh any construey any endorcey in accoryance witz tze internal laws odtze State odNew York, witzout regary to tze principles od condict od laws tzereod  Eacz parth agrees tzat all legal proceeyings concerning tze interpretation, endorce8 ent any yedense odtze transactions conte8 platey bh anh od tze Transaction Docu8 ents (wzetzer brougzt against a parth zereto or its respectine Addiliates, yirectors, odficers, szarezolyers, e8 plohees or agents) szall be

co8 8 encey in tze state any deyeral courts sitting in tze Cith od New York, Borougz od Manzattan (tze "<u>New York Courts</u>").  Eacz parth zereto zerebh irrenocablh sub8 its to tze exclusine jurisyiction odtze New York Courts dor tze ayjuyication odanh yispute zereunyer or in connection zerewitz or witz anh transaction conte8 platey zerebh or yiscussey zerein (incluying witz respect to tze endorce8 ent od anh od tze Transaction Docu8 ents), any zerebh irrenocablh waines, any agrees not to assert in anh suit, action or proceeying, anh clai8  tzat it is not personallh subject to tze jurisyiction odsucz New York Courts, or sucz New York Courts are i8 proper or inconnenient nenue dor sucz proceeying.  Eacz parth zerebh irrenocablh waines personal sernice odprocess any consents to process being serney in anh sucz suit, action or proceeying bh 8 ailing a coph tzereodnia registerey or certidey 8 ail or onernigzt yelinerh (witz eniyence odyelinerh) to sucz parth at tze ayyress in eddect dor notices to it unyer tzis Note any agrees tzat sucz sernice szall constitute gooy any suddicient sernice odprocess any notice tzereod.  Notzing containey zerein szall be yee8 ey to li8 it in anh wah anh rigzt to serne process in anh otzer 8 anner per8 ittey bh applicable law.  Eacz parth zereto zerebh irrenocablh waines, to tze dullest extent per8 ittey bh applicable law, anh any all rigzt to trial bh jurh in anh legal proceeying arising out od or relating to tzis Note or tze transactions conte8 platey zerebh.  Idanh parth szall co8 8 ence an action or proceeying to endorce anh pronisions odtzis Note, tzen tze prenailing parth in sucz action or proceeying szall be rei8 bursey bh tze otzer parth dor its attorneh's dees any otzer costs any expenses incurrey in tze innestigation, preparation any prosecution odsucz action or proceeying.  Tzis Note szall be yee8 ey an unconyitional obligation od tze Co8 panh dor tze pah8 ent od 8 oneh any, witzout li8 itation to anh otzer re8 eyies od Holyer, 8 ah be endorcey against tze Co8 panh bh su8 8 arh proceeying pursuant to New York Cinil Proceyure Law any Rule Section 3213 or anh si8 ilar rule or statute in tze jurisyiction wzere endorce8 ent is sougzt.

e)      <u>Wainer</u>.  Anh wainer bh tze Co8 panh or tze Holyer od a breacz od anh pronision odtzis Note szall not operate as or be construey to be a wainer odanh otzer breacz odsucz pronision or odanh breacz odanh otzer pronision odtzis Note.  Tze dailure odtze Co8 panh or tze Holyer to insist upon strict ayzerence to anh ter8  od tzis Note on one or 8 ore occasions szall not be consiyerey a wainer or yeprine tzat parth odtze rigzt tzereadter to insist upon strict ayzerence to tzat ter8  or anh otzer ter8  od tzis Note on anh otzer occasion.  Anh wainer bh tze Co8 panh or tze Holyer 8 ust be in writing.

d)      <u>Senerabilith</u>.   Id anh pronision od tzis Note is innaliy, illegal or unendorceable, tze balance od tzis Note szall re8 ain in eddect, any id anh pronision is inapplicable to anh Person or circu8 stance, it szall nenertzeless re8 ain applicable to all otzer Persons any circu8 stances.  Id it szall be douny tzat anh interest or otzer a8 ount yee8 ey interest yue zereunyer niolates tze applicable law gonerning usurh, tze applicable rate odinterest yue zereunyer szall auto8 aticallh be lowerey to equal tze 8 axi8 u8  rate od interest per8 ittey unyer applicable law. Tze Co8 panh conenants (to tze extent tzat it 8 ah lawdullh yo so) tzat it szall not at anh ti8 e insist upon, pleay, or in anh 8 anner wzatsoener clai8  or take tze benedit or aymantage od anh stah, extension or usurh law or otzer law wzicz wouly prozibit or dorgine tze Co8 panh dro8  pahing all or anh portion od tze principal od or interest on tzis Note as conte8 platey zerein, wzerener enactey, now or at anh ti8 e zereadter in dorce, or wzicz 8 ah addect tze conenants or tze perdor8 ance odtzis

-12-

Note, any tze Co8 panh (to tze extent it 8 ah lawdullh yo so) zerebh expresslh waines all benedts or aymantage odanh sucz law, any conenants tzat it will not, bh resort to anh sucz law, zinyer, yelah or i8 peye tze execution odanh power zerein grantey to tze Holyer, but will sudder any per8 it tze execution odenerh sucz as tzougz no sucz law zas been enactey.

g)     Re8 eyies, Czaracterivations, Otzer Obligations, Breaczes any Injunctine Relied   Tze re8 eyies promiyey in tzis Note szall be cu8 ulatine any in ayyition to all otzer re8 eyies amailable unyer tzis Note any anh odtze otzer Transaction Docu8 ents at law or in equith (incluying a yecree odspecidc perdor8 ance any/or otzer injunctine relied), any notzing zerein szall li8 it tze Holyer's rigzt to pursue actual any consequential ya8 ages dor anh dailure bh tze Co8 panh to co8 plh witz tze ter8 s od tzis Note.  Tze Co8 panh conenants to tze Holyer tzat tzere szall be no czaracterivation concerning tzis instru8 ent otzer tzan as expresslh promiyey zerein. A8 ounts set dortz or promiyey dor zerein witz respect to pah8 ents any tze like (any tze co8 putation tzereod) szall be tze a8 ounts to be receiney bh tze Holyer any szall not, except as expresslh promiyey zerein, be subject to anh otzer obligation od tze Co8 panh (or tze perdor8 ance tzereod).  Tze Co8 panh acknowleyges tzat a breacz bh it od its obligations zereunyer will cause irreparable zar8 to tze Holyer any tzat tze re8 eyh at law dor anh sucz breacz 8 ah be inayequate. Tze Co8 panh tzeredore agrees tzat, in tze enent od anh sucz breacz or tzreateney breacz, tze Holyer szall be entitley, in ayyition to all otzer amailable re8 eyies, to an injunction restraining anh sucz breacz or anh sucz tzreateney breacz, witzout tze necessith od szowing econo8 ic loss any witzout anh bony or otzer securith being requirey. Tze Co8 panh szall promiye all indor8 ation any yocu8 entation to tze Holyer tzat is requestey bh tze Holyer to enable tze Holyer to condir8  tze Co8 panh's co8 pliance witz tze ter8 s any conyitions od tzis Note.

z)     Next Business Dah.  Wzenener anh pah8 ent or otzer obligation zereunyer szall be yue on a yah otzer tzan a Business Dah, sucz pah8 ent szall be 8 aye on tze next succeeying Business Dah.

i)     Heayings.  Tze zeayings containey zerein are dor conmenience onlh, yo not constitute a part odtzis Note any szall not be yee8 ey to li8 it or addect anh odtze pronisions zereod

j)     A8 eny8 ent.  Tzis Note 8 ah be a8 enyey, any anh pronisions zereod 8 ah be a8 enyey, bh written consent odtze Co8 panh any tze Requirey Holyers.

Section f.  Disclosure.    Upon receipt or yelinerh bh tze Co8 panh od anh notice in accoryance witz tze ter8 s od tzis Note, unless tze Co8 panh zas in gooy daitz yeter8 iney tzat tze 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh szall witzin one (1) Business Dah ader sucz receipt or yelinerh publiclh yisclose sucz 8 aterial, nonpublic indor8 ation on a Current Report on For8  f-K or otzerwise. In tze enent tzat tze Co8 panh belienes tzat a notice contains 8 aterial, non-public indor8 ation relating to tze Co8 panh or its Subsiyiaries, tze Co8 panh so szall inyicate to tze Holyer conte8 poraneouslh witz yelinerh od sucz notice, any in tze absence od anh sucz inyication, tze Holyer szall be allowey to

-13-

presu8 e tzat all 8 atters relating to sucz notice yo not constitute 8 aterial, nonpublic indor8 ation relating to tze Co8 panh or its Subsiyiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____
    Name: Sabina Rizvi
    Title: President & CFO

Address: 3753 Howard Hughes Parkway
          Suite 200-849
          Las Vegas, NV 89169

Email address: Sabina.Rizvi@musclepharm.com

# EXHIBIT 2

# EXHIBIT 2

**EXECUTION VERSION**

# PLEDGE AND SECURITY AGREEMENT

   **PLEDGE AND SECURITY AGREEMENT**, dated as of October 13, 2021 (this "**Agreement**"), made by **MusclePharm Corporation**, a Nevada corporation (the "**Company**"), each Subsidiary of the Company listed on the signature pages hereto (together with the Company, and each additional Person that becomes party to this Agreement by executing a Security Agreement Supplement in the form attached hereto as <u>Exhibit C</u>, each a "**Grantor**" and, collectively, the "**Grantors**"), in favor of **Empery Tax Efficient, LP**, in its capacity as collateral agent (in such capacity, the "**Collateral Agent**") for the Buyers (as defined below) party to the Securities Purchase Agreement, dated as of October 13, 2021 (as amended, restated or otherwise modified from time to time, the "**Securities Purchase Agreement**").

**W I T N E S S E T H:**

   WHEREAS, the Company and each party listed as a "Buyer" on the signature pages thereto (each a "**Buyer**", and collectively, the "**Buyers**") are parties to the Securities Purchase Agreement, pursuant to which the Company shall be required to sell, and the Buyers shall purchase or have the right to purchase, the Notes (as defined in the Securities Purchase Agreement) (as such Notes may be amended, restated, replaced or otherwise modified from time to time in accordance with the terms thereof, collectively, the "**Notes**");

   WHEREAS, it is a condition precedent to the Buyers consummating the transactions contemplated by the Securities Purchase Agreement that each Grantor executes and delivers to the Collateral Agent this Agreement providing for the grant and pledge to the Collateral Agent for the benefit of the Buyers of (a) a security interest in and Lien on the outstanding shares of Equity Interests and indebtedness from time to time owned by such Grantor of each Person now or hereafter existing and in which such Grantor has any interest at any time, and (b) a security interest in all other personal property and fixtures of such Grantors, in each case, to secure all of the Company's obligations under the Securities Purchase Agreement and the Notes issued pursuant thereto and the other Transaction Documents (as defined in the Securities Purchase Agreement);

   WHEREAS, the Grantors (i) are mutually dependent on each other in the conduct of their respective businesses as an integrated operation, with the credit needed from time to time by each Grantor often being provided through financing obtained by the other Grantors and the ability to obtain such financing being dependent on the successful operations of the Grantors as a whole and (ii) will receive a mutual benefit from the proceeds received by the Company in respect of the issuance of the Notes; and

   WHEREAS, each Grantor has determined that the execution, delivery and performance of this Agreement directly benefits, and are in the best interest of the Company and such Grantor.

   NOW, THEREFORE, in consideration of the premises and the agreements herein and in order to induce the Buyers to perform under the Securities Purchase Agreement and to extend the financial accommodations contemplated by the Notes, each Grantor hereby jointly and severally agrees with the Collateral Agent, for the benefit of the Buyers, as follows:

SECTION 1.   Definitions.

(a)      Reference is hereby made to the Securities Purchase Agreement and the Notes for a statement of the terms thereof.  All capitalized terms used in this Agreement and the recitals hereto which are defined in the Securities Purchase Agreement, the Notes or in Article 8 or 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "**Code**"), and which are not otherwise defined herein shall have the same meanings herein as set forth therein; provided that terms used herein which are defined in the Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Collateral Agent may otherwise determine.

(b)      The following terms shall have the respective meanings provided for in the Code:  "Accounts", "Account Debtor", "Cash Proceeds", "Certificate of Title", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Commodity Contracts", "Deposit Account", "Documents", "Electronic Chattel Paper", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Rights", "Noncash Proceeds", "Payment Intangibles", "Proceeds", "Promissory Notes", "Record", "Security Account", "Software", "Supporting Obligations" and "Tangible Chattel Paper.".

(c)      As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"**Additional Collateral**" has the meaning specified therefor in Section 4(a) hereof.

"**Additional Grantor**" has the meaning specified therefor in Section 13(h) hereof.

"**Certificated Entities**" has the meaning specified therefor in Section 5(o) hereof.

"**Collateral**" shall have the meaning set forth in Section 2 hereof.

"**Collateral Agent**" has the meaning specified therefor in the preamble hereof.

"**Copyright Licenses**" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any right to use or sell any works covered by any Copyright (including, without limitation, all Copyright Licenses set forth in Schedule II hereto).

"**Copyrights**" means all domestic and foreign copyrights, whether registered or unregistered, including, without limitation, all copyright rights throughout the universe (whether now or hereafter arising) in any and all media (whether now or hereafter developed), in and to all original works of authorship fixed in any tangible medium of expression (including computer software and internet website content), and all other general intangibles of like nature, now or hereafter owned, acquired, developed, licensed, used or held for use by any Grantor (including, without limitation, all copyrights described in Schedule II hereto), all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Copyright Office or in any similar office or agency of the United States or any

-2-

other country or any political subdivision thereof), and all reissues, divisions, continuations, continuations in part and extensions or renewals thereof.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States of America, any state thereof or the District of Columbia.

"**Excluded Foreign Subsidiary**" means MusclePharm Australia PTY LTD, MusclePharm Holdings Ireland Limited and MusclePharm Ireland Limited.

"**Equity Interests**" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

"**Event of Default**" means (i) any "Event of Default" (as defined in the Notes), (ii) any defined event of default under any one or more of the Transaction Documents, in each instance, after giving effect to any notice, grace, or cure periods provided for in the applicable Transaction Document, or (iii) the breach of any representation, warranty or covenant by any Grantor under this Agreement.

"**Existing Issuer**" has the meaning specified therefor in the definition of the term "Pledged Shares".

"**Foreign Subsidiary**" means any Subsidiary other than a Domestic Subsidiary or an Excluded Foreign Subsidiary.

"**Guarantee**" means the Guarantee Agreement, dated as of the date hereof, by each Guarantor in favor of the Buyers and the Collateral Agent.

"**Grantor**" has the meaning specified therefor in the preamble hereof.

"**Guarantor**" means each Subsidiary of the Company other than an Excluded Foreign Subsidiary.

"**Insolvency Proceeding**" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code (Chapter 11 of Title 11 of the United States Code) or under any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Intellectual Property**" means all Copyrights, Trademarks, Patents and Other Proprietary Rights.

-3-

"**Intellectual Property Security Agreement**" means an Intellectual Property Security Agreement in the form of Exhibit A attached hereto.

"**Licenses**" means the Copyright Licenses, the Trademark Licenses, the Patent Licenses and all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any rights with respect to any Other Proprietary Rights.

"**Lien**" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any capitalized lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"**Obligations**" shall have the meaning set forth in Section 3 hereof.

"**Other Proprietary Rights**" means all inventions, trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how, formulae, rights of publicity and privacy and other general intangibles of like nature, and all other intellectual or proprietary rights, in each case, in any jurisdiction through the world, of any Grantor, now or hereafter owned, acquired, licensed, used or held for use.

"**Patent Licenses**" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any right to manufacture, make, use, offer for sale, sell or import any invention covered by any Patent (including, without limitation, all Patent Licenses set forth in Schedule II hereto).

"**Patents**" means all domestic and foreign letters patent, design patents, utility patents, industrial designs, inventions, trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how, formulae, rights of publicity and other general intangibles of like nature, of any Grantor, now existing or hereafter owned, acquired, licensed, used or held for use (including, without limitation, all domestic and foreign letters patent, design patents, utility patents and industrial designs described in Schedule II hereto), all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office, or in any similar office or agency of the United States or any other country or any political subdivision thereof), and all reissues, divisionals, continuations, continuations in part, reexaminations, or extensions or renewals thereof.

"**Perfection Certificate**" means a certificate in form and substance satisfactory to the Collateral Agent providing information with respect to the property of each Grantor.

"**Permitted Lien**" shall have the meaning set forth in the Notes.

"**Pledged Debt**" means the indebtedness described in Schedule VII hereto and all indebtedness from time to time owned or acquired by a Grantor, the Promissory Notes and other Instruments evidencing any or all of such indebtedness, and all interest, cash, Instruments, Investment Property, financial assets, securities, Equity Interests, stock options and Commodity

-4-

Contracts, notes, debentures, bonds, Promissory Notes or other evidences of indebtedness and all other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such indebtedness.

"**Pledged Interests**" means, collectively, (a) the Pledged Debt, (b) the Pledged Shares and (c) all security entitlements in any and all of the foregoing.

"**Pledged Issuer**" has the meaning specified therefor in the definition of the term "Pledged Shares".

"**Pledged Partnership/LLC Agreement**" has the meaning specified therefor in Section 6(o)(ii) hereof.

"**Pledged Shares**" means (a) the shares of Equity Interests described in Schedule VIII hereto, whether or not evidenced or represented by any stock certificate, certificated security or other Instrument, issued by the Persons described in such Schedule VIII (the "**Existing Issuers**"), (b) the shares of Equity Interests (other than in an Excluded Foreign Subsidiary) at any time and from time to time acquired by a Grantor of any and all Persons now or hereafter existing (such Persons, together with the Existing Issuers, being hereinafter referred to collectively as the "**Pledged Issuers**" and each individually as a "**Pledged Issuer**"), whether or not evidenced or represented by any stock certificate, certificated security or other Instrument, (c) the certificates representing such shares of Equity Interests, all options and other rights, contractual or otherwise, in respect thereof and all dividends, distributions, cash, Instruments, Investment Property, financial assets, securities, Equity Interests, stock options and Commodity Contracts, notes, debentures, bonds, Promissory Notes or other evidences of indebtedness and all other property (including, without limitation, any stock dividend and any distribution in connection with a stock split) from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Equity Interests and (d) without affecting the obligations of any Grantor under any provision prohibiting such action under this Agreement, the Notes or any other Transaction Document, in the event of any consolidation or merger involving any Pledged Issuer and in which such Pledged Issuer is not the surviving entity, all Equity Interests of the successor entity formed by or resulting from such consolidation or merger.

"**Security Agreement Supplement**" has the meaning specified therefor in Section 13(h) hereof.

"**Termination Date**" means the first date on which all of the Obligations have been indefeasibly paid in full in cash (together with any matured indemnification obligations as of the date of such payment, but excluding any inchoate or unmatured contingent indemnification obligations) and the Notes have been terminated in accordance with their terms.

"**Titled Collateral**" means all Collateral for which the title to such Collateral is governed by a Certificate of Title or certificate of ownership, including, without limitation, all motor vehicles (including, without limitation, all trucks, trailers, tractors, service vehicles, automobiles and other mobile equipment) for which the title to such motor vehicles is governed by a Certificate of Title or certificate of ownership.

"**Trademark Licenses**" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensor or licensee and providing for the grant of any right with respect to any Trademark , together with any goodwill connected with and symbolized by any such trademark licenses, contracts or agreements and the right to prepare for sale or lease and sell or lease any and all Inventory now or hereafter owned by any Grantor and now or hereafter covered by such licenses (including, without limitation, all Trademark Licenses described in Schedule II hereto).

"**Trademarks**" means all domestic and foreign trademarks, service marks, collective marks, certification marks, trade names, business names, d/b/a's, Internet domain names, trade styles, designs, logos and other source or business identifiers and all general intangibles of like nature, now or hereafter owned, adopted, acquired, licensed, used or held for use by any Grantor (including, without limitation, all domestic and foreign trademarks, service marks, collective marks, certification marks, trade names, business names, d/b/a's, Internet domain names, trade styles, designs, logos and other source or business identifiers described in Schedule II hereto), all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof), and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by any of the foregoing and all customer lists, formulae and other Records of any Grantor relating to the distribution of products and services in connection with which any of the foregoing are used.

SECTION 2.  Grant of Security Interest.  As collateral security for the payment, performance and observance of all of the Obligations, each Grantor hereby pledges and assigns to the Collateral Agent (and its agents and designees) for the benefit of the Buyers, and grants to the Collateral Agent (and its agents and designees) for the benefit of the Buyers, a continuing security interest in, all personal property and Fixtures of such Grantor, wherever located and whether now or hereafter existing and whether now owned or hereafter acquired, of every kind and description, tangible or intangible, including, without limitation, the following (all being collectively referred to herein as the "**Collateral**"):

    (a)     all Accounts;

    (b)     all Chattel Paper (whether tangible or electronic);

    (c)     the Commercial Tort Claims specified on Schedule VI hereto;

    (d)     all Deposit Accounts, all cash, and all other property from time to time deposited therein or otherwise credited thereto and the monies and property in the possession or under the control of the Collateral Agent or a Buyer or any affiliate, representative, agent or correspondent of the Collateral Agent or a Buyer;

    (e)     all Documents;

    (f)     all Equipment;

    (g)     all Fixtures;

(h)     all General Intangibles (including, without limitation, all Payment Intangibles);

(i)     all Goods;

(j)     all Instruments (including, without limitation, Promissory Notes and each certificated Security);

(k)     all Inventory;

(l)     all Investment Property;

(m)     all Intellectual Property and all Licenses;

(n)     all Letter-of-Credit Rights;

(o)     all Supporting Obligations;

(p)     all Pledged Interests;

(q)     all Additional Collateral;

(r)     to the extent not covered by the preceding clauses of this Section 2, all other tangible and intangible personal property of such Grantor (whether or not subject to the Code), including, without limitation, all bank and other accounts and all cash and all investments therein, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of such Grantor described in the preceding clauses of this Section 2 (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by such Grantor in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, Software, data and computer programs in the possession or under the control of such Grantor or any other Person from time to time acting for such Grantor that at any time evidence or contain information relating to any of the property described in the preceding clauses of this Section 2 or are otherwise necessary or helpful in the collection or realization thereof; and

(s)     all Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral;

in each case, howsoever such Grantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).  Notwithstanding anything herein to the contrary, the term "Collateral" shall not include, and no Grantor is pledging, nor granting a security interest hereunder in (collectively, the "Excluded Property"): (i) any of such Grantor's rights or interest in any contract, lease, permit, license, or license agreement to which such Grantor is a party as of the Closing Date covering real or personal property of any Grantor to the extent, but only to the extent, that under the express terms of such contract, lease, permit, license, or license agreement, or applicable law with respect thereto, the grant of a security interest or Lien therein is prohibited as a matter of law or under the express terms of such contract, lease, permit, license, or license agreement on the Closing Date and such prohibition or restriction has not been waived or the

consent of the other party to such contract, lease, permit, license, or license agreement has not been obtained (provided, that, the exclusions set forth in this clause (i) shall in no way be construed (A) to apply to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408, or 9-409 of the Code or other applicable provisions of the Uniform Commercial Code of any relevant jurisdiction or other applicable law (including the Bankruptcy Code) or principles of equity; provided, that immediately upon the ineffectiveness, lapse, termination or waiver of any such provision, the Collateral shall include, and such Grantor shall be deemed to have granted a security interest in, all such right, title and interest as if such provision had never been in effect, (B) to apply to the extent that any consent or waiver has been obtained that would permit the Collateral Agent's security interest or Lien notwithstanding the prohibition or restriction on the pledge of such contract, lease permit, license or license agreement, or (C) to limit, impair, or otherwise affect the Collateral Agent's unconditional continuing security interest in and liens upon any rights or interests of a Grantor in or to (1) monies due or to become due under or in connection with any described contract, lease, permit, license, or license agreement or Equity Interests (including any Accounts Receivable, proceeds of Inventory or Equity Interests), or (2) any proceeds from the sale, license, lease, or other dispositions of any such contract, lease, permit, license, license agreement, or Equity Interests), (iii) Equity Interests in any Person that is acquired by such Grantor after the Closing Date, to the extent that (I) the granting of a security interest in such Equity Interests is prohibited by the Governing Documents of such Person, and (II) such prohibition was in existence prior to the date of acquisition of such Equity Interests and was not created in connection with, or in contemplation of, such acquisition; provided that (x) immediately upon the ineffectiveness, lapse, termination or waiver of any such provision, the Collateral shall include, and such Grantor shall be deemed to have granted a security interest in, all such right, title and interest as if such provision had never been in effect and (y) the foregoing exclusion shall in no way be construed so as to limit, impair or otherwise affect the Collateral Agent's unconditional continuing security interest in and liens upon any rights or interests of a Grantor in or to the proceeds of, or any monies due or to become due under, any such license, contract or agreement, (iv) any intent-to-use United States trademark applications or service mark applications for which an amendment to allege use or statement of use has not been filed under 15 U.S.C. § 1051(c) or 15 U.S.C. § 1051(d), respectively, or if filed, has not been deemed in conformance with 15 U.S.C. § 1051(a) or examined and accepted, respectively, by the United States Patent and Trademark Office, provided that, upon such filing and acceptance, such intent-to-use applications shall be included in the definition of Collateral and (v) those assets as to which the Collateral Agent reasonably determines that the cost of obtaining or perfecting such security interest in such assets is excessive in relation to the benefits to the Collateral Agent and the Buyers of the security to be afforded thereby.

The Grantors agree that the pledge of assets or property of any Foreign Subsidiary, or the pledge of the shares of Equity Interests of any Pledged Issuer who is a Foreign Subsidiary may, in each case, upon the written request of the Collateral Agent, be supplemented by one or more separate pledge agreements, deeds of pledge, share charges, or other similar agreements or instruments, executed and delivered by the relevant Grantors in favor of the Collateral Agent, which pledge agreements will provide for the pledge of such assets, property or shares of Equity Interests in accordance with the laws of the applicable foreign jurisdiction, unless the Collateral Agent in its sole and reasonable discretion determines that the costs of obtaining such security agreement and/or pledge agreement is excessive in relation to the benefit to the Agents and the Buyers of the security to be afforded thereby.  With respect to such assets, property and shares of

-8-

Equity Interests, the Collateral Agent may, at any time and from time to time, in its reasonable discretion, take actions in such foreign jurisdictions that will result in the perfection of the Lien created in such assets, property and shares of Equity Interests, unless the Collateral Agent in its sole and reasonable discretion determines that the costs of taking such actions in such foreign jurisdictions are excessive in relation to the benefit to the Collateral Agent and the Buyers of the security to be afforded thereby. The Grantors shall provide all necessary documentation and take all other necessary actions under this paragraph within thirty (30) days of the Collateral Agent's written request therefor (or such longer period as the Collateral Agent may agree).

SECTION 3.  Security for Obligations.  The security interest created hereby in the Collateral constitutes continuing collateral security for all of the following obligations, whether now existing or hereafter incurred (collectively, the **"Obligations"**):

(a)    the prompt payment by each Grantor, as and when due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), of all present and future indebtedness, obligations, and liabilities of each Grantor to the Collateral Agent and the Buyers arising under or in connection with this Agreement, the Securities Purchase Agreement, the Notes, the Guarantee or any other Transaction Documents, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any Insolvency Proceeding, including, without limitation, (A) all principal of, interest on and any other amounts due and payable, in each case, in connection with the Notes (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of any Grantor, whether or not the payment of such interest is unenforceable or is not allowable due to the existence of such Insolvency Proceeding), (B) all amounts from time to time owing by such Grantor under the Guarantee or any other guaranty to which it is a party, including, without limitation, all obligations guaranteed by such Grantor, and (C) all interest, fees, commissions, charges, expense reimbursements, indemnifications and all other amounts due or to become due under any of the Transaction Documents (including, without limitation, all interest, fees, commissions, charges, expense reimbursements, indemnifications and other amounts that accrue after the commencement of any Insolvency Proceeding of any Grantor, whether or not the payment of such interest, fees, commissions, charges, expense reimbursements, indemnifications and other amounts are unenforceable or are not allowable, in whole or in part, due to the existence of such Insolvency Proceeding); and

(b)    the due performance and observance by each Grantor of all of its other obligations from time to time existing in respect of any of the Transaction Documents.

SECTION 4.  Delivery of the Pledged Interests.

(a)    All Promissory Notes currently evidencing the Pledged Debt and all certificates representing the Pledged Shares, in each case, as of the date hereof, shall be delivered to the Collateral Agent on or prior to the execution and delivery of this Agreement.  All other Promissory Notes, certificates representing the Pledged Shares and Instruments constituting Pledged Interests from time to time required to be pledged to the Collateral Agent pursuant to the terms of this Agreement or the other Transaction Documents (the **"Additional Collateral"**) shall

be delivered to the Collateral Agent promptly upon, but in any event within fifteen (15) Business Days of, receipt thereof (or such longer period as the Collateral Agent may agree) by or on behalf of any of the Grantors.  All such Promissory Notes, certificates and Instruments shall be held by or on behalf of the Collateral Agent pursuant hereto and shall be delivered in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment or undated stock powers executed in blank, all in form and substance reasonably satisfactory to the Collateral Agent.  If any Pledged Interests consist of uncertificated securities, unless the immediately following sentence is applicable thereto, such Grantor shall promptly notify the Collateral Agent thereof and at the Collateral Agent's request cause the Collateral Agent (or its designated custodian or nominee) to become the registered holder thereof, or cause each issuer of such securities to agree that it will comply with instructions originated by the Collateral Agent with respect to such securities without further consent by such Grantor.  If any Pledged Interests consist of security entitlements, such Grantor shall promptly notify the Collateral Agent thereof and at the Collateral Agent's request transfer such security entitlements to the Collateral Agent (or its custodian, nominee or other designee), or use its commercially reasonable efforts to cause the applicable securities intermediary to agree that it will comply with entitlement orders by the Collateral Agent without further consent by such Grantor.

(b)    Within fifteen (15) Business Days (or such longer period as the Collateral Agent may agree) of the receipt by a Grantor of any Additional Collateral, a pledge amendment duly executed by such Grantor, in substantially the form of <u>Exhibit B</u> hereto (a "**Pledge Amendment**"), shall, unless waived in a signed writing by the Collateral Agent, be delivered to the Collateral Agent, in respect of the Additional Collateral that must be pledged pursuant to this Agreement or the other Transaction Documents.  The Pledge Amendment shall from and after delivery thereof constitute part of Schedules VII and VIII hereto.  Each Grantor hereby authorizes the Collateral Agent to attach each Pledge Amendment to this Agreement and agrees that all Promissory Notes, certificates or Instruments listed on any Pledge Amendment delivered to the Collateral Agent shall for all purposes hereunder constitute Pledged Interests and such Grantor shall be deemed upon delivery thereof to have made the representations and warranties set forth in <u>Section 5</u> hereof with respect to such Additional Collateral.

(c)    If any Grantor shall receive, by virtue of such Grantor being or having been an owner of any Pledged Interests, any Additional Collateral consisting of any (i) Equity Interest certificate (including, without limitation, any certificate representing an Equity Interest dividend or distribution in connection with any increase or reduction of capital, reclassification, merger, consolidation, sale of assets, combination of shares, stock split, spin-off or split-off), Promissory Note or other Instrument, (ii) option or right, whether as an addition to, substitution for, or in exchange for, any Pledged Interests, or otherwise, (iii) dividends or distributions payable in cash (except such dividends and/or distributions permitted to be retained by any such Grantor pursuant to <u>Section 7</u> hereof) or in securities or other property or (iv) dividends, distributions, cash, Instruments, Investment Property and other property in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in surplus (other than any such distributions not prohibited from being retained by such Grantor under the terms of the Notes or the other Transaction Documents), such Grantor shall receive such Equity Interest certificate, Promissory Note, Instrument, option, right, payment or distribution in trust for the benefit of the Collateral Agent, shall segregate it from such Grantor's other property and shall promptly deliver it to the Collateral Agent, in the exact form received, with any necessary

-10-

indorsement and/or instrument of transfer or assignment executed in blank, in form and substance reasonably satisfactory to the Collateral Agent, to be held by the Collateral Agent subject to and in accordance with the terms hereunder as Pledged Interests and as further collateral security for the Obligations.

SECTION 5.   Representations and Warranties.  Each Grantor jointly and severally represents and warrants as follows:

(a)     As of the date of this Agreement, Schedule I hereto sets forth a complete and accurate list as of the date hereof (i) the exact legal name of each Grantor, (ii) the jurisdiction of organization of each Grantor, (iii) the type of organization of each Grantor and (iv) the organizational identification number of each Grantor or states that no such organizational identification number exists. The Perfection Certificate executed by each Grantor, dated as of the date hereof, a copy of which has been previously delivered to the Collateral Agent, is true, complete and correct in all material respects on and as of the date hereof.

(b)     There is no pending or written notice threatening any action, suit, proceeding or claim affecting such Grantor before any governmental authority or any arbitrator, or any order, judgment or award by any governmental authority or arbitrator, that may adversely affect the grant by such Grantor, or the perfection, of the security interest purported to be created hereby in the Collateral, or the exercise by the Collateral Agent of any of its rights or remedies hereunder.

(c)     All Federal, state and local tax returns and other reports required by applicable law to be filed by such Grantor have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon such Grantor or any property of such Grantor (including, without limitation, all federal income and social security taxes on employees' wages) and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with United States generally accepted accounting principles consistently applied ("GAAP").

(d)     All Equipment, Fixtures, Goods and Inventory of such Grantor now existing are, and all Equipment, Fixtures, Goods and Inventory of such Grantor hereafter existing will be, located and/or based at the addresses specified therefor in Schedule III hereto (as amended, supplemented or otherwise modified from time to time pursuant to Section 6(b)), except that such Grantor will give the Collateral Agent not less than 30 days' prior written notice of any change of the location of any such Collateral, other than to locations set forth on Schedule III and with respect to which the Collateral Agent has filed financing statements and otherwise fully perfected its Liens thereon.  Each Grantor's chief place of business and chief executive office, the place where such Grantor keeps its Records concerning Accounts and all originals of all Chattel Paper are located at the addresses specified therefor in Schedule III hereto (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof).   None of the Accounts is evidenced by Promissory Notes or other Instruments that have not been delivered to the Collateral Agent to the extent required hereunder.  Set forth in Schedule IV hereto is a complete and accurate list, as of the date of this Agreement, of (i) each Promissory Note, Security and other Instrument

-11-

owned by each Grantor and (ii) each Deposit Account, Securities Account and Commodities Account of each Grantor, together with the name and address of each institution at which each such Account is maintained, the account number for each such Account and a description of the purpose of each such Account. Set forth in <u>Schedule II</u> hereto is a complete and correct list of each trade name used by each Grantor and the name of, and each trade name used by, each Person from which such Grantor has acquired any substantial part of the Collateral.

(e)    Each Grantor has delivered or made available to the Collateral Agent true, complete and correct copies of each License described in <u>Schedule II</u> hereto (as amended, supplemented or otherwise modified from time to time in accordance with Section 6(i)), including all schedules and exhibits thereto, which represents all of the Licenses existing on the date of this Agreement. Each such License sets forth the entire agreement and understanding of the parties thereto relating to the subject matter thereof, and there are no other agreements, arrangements or understandings, written or oral, relating to the matters covered thereby or the rights of such Grantor or any of its Affiliates in respect thereof. Each material License now existing is, and any material License entered into in the future will be, the legal, valid and binding obligation of the parties thereto, enforceable against such parties in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, suretyship or other similar laws affecting creditors' rights generally and equitable principles (regardless of whether enforcement is sought in equity or in law). No default under any material License by any Grantor party thereto has occurred, nor does any defense, offset, deduction or counterclaim exist thereunder in favor of such other party.

(f)    Each Grantor owns and controls, or possesses a valid and enforceable right to use, all Intellectual Property, and such Intellectual Property constitutes all Trademarks, Patents, Copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity, and other intellectual property or proprietary rights necessary to conduct its business in substantially the same manner as conducted as of the date hereof. <u>Schedule II</u> hereto sets forth a true and complete list of all (i) registered Copyrights, issued Patents, Trademarks (including, without limitation, any Internet domain names and the registrar and expiry date of each such Internet domain name), and all applications for any of the foregoing, owned, used or held for use by such Grantor as of the date hereof and (ii) Licenses. All such Intellectual Property that is material to the business of such Grantor is subsisting and in full force and effect, has not been adjudged invalid or unenforceable, is valid and enforceable and has not been abandoned in whole or in part. Except as set forth in <u>Schedule II</u>, no such Intellectual Property is the subject of any licensing or franchising agreement. To the best knowledge of such Grantor, such Grantor is not now infringing, misappropriating or otherwise in conflict with any trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity, or other intellectual property or proprietary rights of others in any material respect, and to the best knowledge of such Grantor, no other Person is now infringing, misappropriating or otherwise in conflict with, in any material respect, any Intellectual Property that is material to the business of such Grantor. No Grantor has received any written notice that it is infringing, misappropriating or otherwise conflicting with the trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity or other intellectual property or proprietary rights of any other Person.

-12-

(g)    Each Grantor has taken commercially reasonable steps to maintain the confidentiality of and otherwise protect and enforce its rights in all Other Proprietary Rights that is necessary or material to the operation of the business of the Grantors; to the best knowledge of each Grantor, no employee, independent contractor or agent of any Grantor has misappropriated any Other Proprietary Rights of any other Person in the course of the performance of his or her duties as an employee, independent contractor or agent of such Grantor; and, to the best knowledge of each Grantor, no employee, independent contractor or agent of any Grantor is in default or breach of any material term of any material employment agreement, non-disclosure agreement, assignment of inventions agreement or similar agreement, or contract relating in any way to the protection, ownership, development, use or transfer of such Grantor's Proprietary Rights.

(h)    As of the date of this Agreement, the Existing Issuers set forth in Schedule VIII identified as a Subsidiary of a Grantor are each such Grantor's only Subsidiaries (other than the Excluded Foreign Subsidiaries) existing on the date hereof.  The Pledged Shares issued by a Grantor have been duly authorized and validly issued and, in the case of Grantors that are corporations, are fully paid and nonassessable and the holders thereof are not entitled to any preemptive, first refusal or other similar rights.  Except as noted in Schedule VIII hereto, the Pledged Shares constitute 100% of the issued shares of Equity Interests of the Pledged Issuers as of the date hereof.  All other shares of Equity Interests issued by a Grantor constituting Pledged Interests will be duly authorized and validly issued and, in the case of entities that are corporations, fully paid and nonassessable.

(i)    To the best knowledge of the Grantors, the Promissory Notes currently evidencing the Pledged Debt have been, and all other Promissory Notes from time to time evidencing Pledged Debt, when executed and delivered, will have been, duly authorized, executed and delivered by the respective makers thereof, and, to the best knowledge of the Grantors, all such Promissory Notes are or will be, as the case may be, legal, valid and binding obligations of such makers, enforceable against such makers in accordance with their respective terms, except as enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally.

(j)    The Grantors are and will be at all times the sole and exclusive owners of, or otherwise have and will have adequate rights in, the Collateral free and clear of any Liens, except for Permitted Liens.  No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording or filing office except (A) such as may have been filed in favor of the Collateral Agent relating to this Agreement, and (B) such as may have been filed to perfect any Permitted Liens.

(k)    The exercise by the Collateral Agent of any of its rights and remedies hereunder will not contravene any law or any contractual restriction or agreement binding on or otherwise affecting such Grantor or any of its properties and will not result in, or require the creation of, any Lien upon or with respect to any of its properties.

(l)    No authorization or approval or other action by, and no notice to or filing with, any governmental authority or other regulatory body, or any other Person, is required for (i) the due execution, delivery and performance by any Grantor of this Agreement, (ii) the grant by any Grantor, or the perfection, of the security interest purported to be created hereby in the

-13-

Collateral, or (iii) the exercise by the Collateral Agent of any of its rights and remedies hereunder, except (A) for the filing as of the date hereof under the Uniform Commercial Code as in effect in the applicable jurisdiction of the financing statements described in Schedule V hereto, all of which financing statements, have been duly filed (or will be filed substantially concurrently as of the date of this Agreement) and are in full force and effect, (B) with respect to the perfection of the security interest created hereby in the Intellectual Property, for the recording of the appropriate Intellectual Property Security Agreement, as applicable, in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, (C) with respect to the perfection of the security interest created hereby in foreign Intellectual Property, for registrations and filings in jurisdictions located outside of the United States and covering rights in such jurisdictions relating to the Intellectual Property and Licenses (D) with respect to the perfection of the security interest created hereby in Titled Collateral, for the submission of an appropriate application requesting that the Lien of the Collateral Agent be noted on the Certificate of Title or certificate of ownership, completed and authenticated by the applicable Grantor, together with the Certificate of Title or certificate of ownership, with respect to such Titled Collateral, to the appropriate Governmental Authority, (E) with respect to any action that may be necessary to obtain control of Collateral constituting Deposit Accounts, Electronic Chattel Paper, Investment Property or Letter-of-Credit Rights, the taking of such actions, and (F) the Collateral Agent's having possession of all Documents, Chattel Paper, Instruments and cash constituting Collateral (subclauses (A), (B), (C), (D), (E) and (F), each, subject to the following sentence, a "**Perfection Requiremen**t" and collectively, the "**Perfection Requirements**").  Notwithstanding the foregoing, it is agreed and understood that any Grantor with any right, title or interest in a leasehold interest or a Titled Collateral shall not be required to take actions or execute and deliver any documents necessary to perfect the Collateral Agent's security interest in such leasehold interest or Titled Collateral if the Collateral Agent (in its sole and reasonable discretion) has determined that the costs to be incurred by such Grantor to perfect the Collateral Agent's security interest would be unreasonably excessive in relation to the benefits to the Collateral Agent and the Buyers to be derived from such security interest..

(m)     This Agreement creates in favor of the Collateral Agent for the benefit of the Buyers, a legal, valid and enforceable security interest in the Collateral, as security for the Obligations except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws and principles of equity.  The compliance with the Perfection Requirements will result in the perfection of such security interests.  After compliance with the Perfection Requirements, such security interests are, or in the case of Collateral in which such Grantor obtains rights after the date hereof, will be, perfected, first priority security interests, subject in priority only to Permitted Liens and the recording of such instruments of assignment described above. Such Perfection Requirement and all other action necessary or desirable to perfect and protect such security interest have been duly made or taken, except for (i) the Collateral Agent's having possession of Instruments  Documents, Chattel Paper and cash constituting Collateral to the extent required hereunder after the date hereof, (ii) the Collateral Agent's having control of all Deposit Accounts, Electronic Chattel Paper, Investment Property or Letter-of-Credit Rights constituting Collateral after the date hereof and (iii) the other filings and recordations and actions described in Section 4(l) hereof.

(n)     As of the date hereof, no Grantor holds any Commercial Tort Claims reasonably expected to exceed $250,000 in respect of which a claim has been filed in a court of

law or a written notice by an attorney has been given to a potential defendant, except for such claims described in <u>Schedule VI</u>.

(o)    With respect to each Grantor and any of its Subsidiaries that is a partnership or a limited liability company (other than Foreign Subsidiaries), and has irrevocably opted into (and has caused each of its Subsidiaries that is a partnership or a limited liability company, and a Pledged Issuer to opt into) Article 8 of the relevant Uniform Commercial Code (each, a "**Certificated Entity**" and collectively, the "**Certificated Entities**"), such interests are securities for purposes of Article 8 of any relevant Uniform Commercial Code. With respect to each Grantor and its Subsidiaries that is a partnership or a limited liability company (other than Foreign Subsidiaries) and is not a Certificated Entity, the partnership interests or membership interests of each such Person are not (i) dealt in or traded on securities exchanges or in securities markets, (ii) securities for purposes of Article 8 of any relevant Uniform Commercial Code, (iii) investment company securities within the meaning of Section 8-103 of any relevant Uniform Commercial Code or (iv) evidenced by a certificate.

(p)    As of the date hereof (i) the Company is actively and diligently pursuing the deregistration, winding up, dissolution or other similar process of each Excluded Foreign Subsidiary in such Excluded Foreign Subsidiary's jurisdiction of formation, (ii) each Excluded Foreign Subsidiary is dormant and not actively conducting business, and (iii) the aggregate value of assets owned by the Excluded Foreign Subsidiaries taken as a whole is less than $50,000.

SECTION 6.    <u>Covenants as to the Collateral</u>.  At all times until the occurrence of the Termination Date, unless the Collateral Agent shall otherwise consent in writing:

(a)    <u>Further Assurances</u>.  Each Grantor will at its expense, at any time and from time to time, promptly execute, acknowledge and deliver all further instruments and documents and take all further action that the Collateral Agent may reasonably request in order to: (i) perfect and protect, or maintain the perfection of, the security interest and Lien purported to be created, and required to be perfected, hereby; (ii) enable the Collateral Agent to exercise and enforce its rights and remedies hereunder in respect of the Collateral; or (iii) otherwise effect the purposes of this Agreement, including, without limitation:  (A) marking conspicuously all Chattel Paper, Instruments and each License and, at the request of the Collateral Agent, all of its Records pertaining to such Collateral with a legend, in form and substance reasonably satisfactory to the Collateral Agent, indicating that such Chattel Paper, Instrument, License or other Collateral is subject to the security interest created hereby, (B) delivering and pledging to the Collateral Agent hereunder each Promissory Note, other Instrument or Security, Chattel Paper or other Instrument, now or hereafter owned by such Grantor, duly endorsed and accompanied by executed instruments of transfer or assignment, all in form and substance reasonably satisfactory to the Collateral Agent, (C) executing and filing (to the extent, if any, that such Grantor's signature is required thereon) or authenticating the filing of, such financing or continuation statements, or amendments thereto, (D) with respect to Intellectual Property hereafter existing and not covered by an appropriate security interest grant, the executing and recording in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, appropriate instruments granting a security interest, as may be necessary or desirable or that the Collateral Agent may reasonably request in order to perfect and preserve the security interest purported to be created hereby, (E) furnishing to the Collateral Agent from time to time statements and schedules further identifying and describing the

Collateral and such other reports in connection with the Collateral in each case as the Collateral Agent may reasonably request, all in reasonable detail, (F) if any Collateral shall be in the possession of a third party (e.g., a bailee) or if any Collateral shall be located on premises leased by any Grantor, in each case, notifying such Person, landlord, or sub-landlord (as applicable) of such leased location of the Collateral Agent's security interest created hereby and using commercially reasonable efforts to obtain from such Person, landlord, or sub-landlord (as applicable), a written subordination and acknowledgment in form and substance satisfactory to the Collateral Agent from such Person that such Person's interest (if any) in the Collateral is expressly subordinate to the Collateral Agent's interest in such Collateral and, in the case of Collateral in the possession of a third party, that such Person holds possession of the Collateral for the benefit of the Collateral Agent, (G), promptly causing the landlord of such premises to execute and deliver (H) if at any time after the date hereof, such Grantor acquires or holds any Commercial Tort Claim, promptly notifying the Collateral Agent in a writing signed by such Grantor setting forth a brief description of such Commercial Tort Claim and granting to the Collateral Agent a security interest therein and in the proceeds thereof, which writing shall incorporate the provisions hereof and shall be in form and substance reasonably satisfactory to the Collateral Agent, (I)  upon the acquisition after the date hereof by such Grantor of Titled Collateral (other than Equipment that is subject to a purchase money security interest permitted by the Notes), causing the Collateral Agent to be listed as the lienholder on such certificate of title or ownership and delivering evidence of the same to the Collateral Agent; and (J) taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable, in any relevant Uniform Commercial Code jurisdiction, or by other law as applicable in any foreign jurisdiction.   No Grantor shall take or fail to take any action which would in any manner impair the validity or enforceability of the Collateral Agent's security interest in and Lien on any Collateral.

(b)    Location of Equipment and Inventory.  Each Grantor will keep the Equipment and Inventory (other than Equipment out for repair or at employee's homes in the ordinary course of business, Inventory in transit in the ordinary course of business and immaterial assets having value not exceeding $50,000 in the aggregate at any time) at the locations specified in Schedule III hereto or, upon not less than thirty (30) days' (or such shorter period as the Collateral Agent may agree) prior written notice to the Collateral Agent accompanied by a new Schedule III hereto indicating each new location of the Equipment and Inventory, at such other locations in the United States as the Grantors may elect, provided that (i) subject to the Perfection Requirements, all action has been taken to grant to the Collateral Agent a perfected, first priority security interest in such Equipment and Inventory that constitutes Collateral hereunder (subject only to Permitted Liens) in favor of the Collateral Agent, for the benefit of the Collateral Agent and the Buyers, and (ii) the Collateral Agent's rights in such Equipment and Inventory, including, without limitation, the existence, perfection and priority of the security interest created hereby in such Equipment and Inventory, are not adversely affected thereby.

(c)    Condition of Equipment.  Each Grantor will maintain or cause the Equipment which is reasonably necessary or useful to its business to be maintained and preserved in good condition, repair and working order, ordinary wear and tear excepted, and will forthwith, or in the case of any loss or damage to any such Equipment of such Grantor within a commercially reasonable time after the occurrence thereof, make or cause to be made all repairs, replacements and other improvements in connection therewith which are necessary or desirable, consistent with past practice, or which the Collateral Agent may reasonably request to such end.  Such Grantor

-16-

will promptly furnish to the Collateral Agent a statement describing in reasonable detail any such loss or damage to any such Equipment.

(d)     Taxes, Etc.  Each Grantor agrees to pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Equipment and Inventory, except to the extent the validity thereof is being contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves in accordance with GAAP have been set aside for the payment thereof.

(e)     Insurance.

(i)     Each Grantor will, at its own expense, maintain insurance (including, without limitation, commercial general liability and property insurance) with respect to the Collateral in such amounts, against such risks, in such form and with responsible and reputable insurance companies or associations as is required by any governmental authority having jurisdiction with respect thereto or as is carried by such Grantor as of the date hereof and in any event, in amount, adequacy and scope reasonably satisfactory to the Collateral Agent.  Unless otherwise agreed to by the Collateral Agent, each such policy for liability insurance shall provide for all losses to be paid on behalf of the Collateral Agent and such Grantor as their respective interests may appear, and each policy for property damage insurance shall provide for all losses to be adjusted with, and paid directly to, the Collateral Agent.  Unless otherwise agreed to by the Collateral Agent, each such policy shall in addition (A) name the Collateral Agent as an additional insured party thereunder (without any representation or warranty by or obligation upon the Collateral Agent) as their interests may appear via a binding endorsement or other contractual modification to the underlying policy, (B) contain an agreement by the insurer via a binding endorsement or other contractual modification to the underlying policy that any loss thereunder shall be payable to the Collateral Agent on its own account notwithstanding any action, inaction or breach of representation or warranty by such Grantor and otherwise provide that such Grantor be named as lender's loss payable under such policy via a binding endorsement thereto, (C) provide that there shall be no recourse against the Collateral Agent for payment of premiums or other amounts with respect thereto, and (D) provide that at least 30 days' prior written notice of cancellation, lapse, expiration or other adverse change shall be given to the Collateral Agent by the insurer.  Such Grantor will, if so requested by the Collateral Agent, deliver to the Collateral Agent original or duplicate policies of such insurance and, as often as the Collateral Agent may reasonably request, a report of a reputable insurance broker with respect to such insurance.  Such Grantor will also, at the request of the Collateral Agent, execute and deliver instruments of assignment of such insurance policies and cause the respective insurers to acknowledge notice of such assignment.

(ii)     Reimbursement under any liability insurance maintained by a Grantor pursuant to this Section 6(e) may be paid directly to the Person who shall have incurred liability covered by such insurance.  In the case of any loss involving damage to Collateral, any proceeds of insurance maintained by a Grantor pursuant to this Section 6(e) shall be paid to the Collateral Agent (except as to which paragraph (iii) of this Section 6(e) is not applicable), such Grantor will make or cause to be made the necessary repairs to or replacements of such Collateral, and any proceeds of insurance maintained by such Grantor pursuant to this Section 6(e) shall be

-17-

paid by the Collateral Agent to such Grantor as reimbursement for the costs of such repairs or replacements.

          (iii)     All insurance payments in respect of such Collateral shall be paid to the Collateral Agent and applied as specified in Section 7(b) hereof.

          (f)     Provisions Concerning the Accounts and the Licenses.

          (i)     Each Grantor will (A) give the Collateral Agent at least 30 days' prior written notice of any change in such Grantor's name, identity, organizational structure, or chief executive office, as set forth on Schedule I or Schedule III hereto, as applicable (B) maintain its jurisdiction of incorporation as set forth on Schedule I hereto, (C) immediately notify the Collateral Agent upon obtaining an organizational identification number, if on the date hereof such Grantor did not have such identification number, and (D) keep adequate records concerning the Accounts and Chattel Paper and permit representatives of the Collateral Agent during normal business hours on reasonable notice to such Grantor, to inspect and make abstracts from such Records and Chattel Paper.

          (ii)     Each Grantor will, except as otherwise provided in this subsection (f), continue to collect, at its own expense, all amounts due or to become due under the Accounts.  In connection with such collections, such Grantor may (and, at the Collateral Agent's direction upon the occurrence and during the continuance of an Event of Default, will) take such action as such Grantor (or, if applicable, the Collateral Agent) may deem necessary or advisable to enforce collection or performance of the Accounts; provided, however, that the Collateral Agent shall have the right at any time, upon the occurrence and during the continuance of an Event of Default, to notify the Account Debtors or obligors under any Accounts of the assignment of such Accounts to the Collateral Agent and to direct such Account Debtors or obligors to make payment of all amounts due or to become due to such Grantor thereunder directly to the Collateral Agent or its designated agent and, upon such notification and at the expense of such Grantor and to the extent permitted by law, to enforce collection of any such Accounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done until such time as the subject Event of Default ceases to exist.  After receipt by a Grantor of a notice from the Collateral Agent that the Collateral Agent has notified, intends to notify, or has enforced or intends to enforce a Grantor's rights against the Account Debtors or obligors under any Accounts as referred to in the proviso to the immediately preceding sentence, (A) all amounts and proceeds (including Instruments) received by such Grantor in respect of the Accounts shall be received in trust for the benefit of the Collateral Agent hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over to the Collateral Agent or its designee in the same form as so received (with any necessary endorsement) to be held as cash collateral and applied as specified in Section 7(b) hereof, and (B) such Grantor will not adjust, settle or compromise the amount or payment of any Account or release wholly or partly any Account Debtors or obligor thereof or allow any credit or discount thereon.  In addition, upon the occurrence and during the continuance of an Event of Default, the Collateral Agent may (in its sole and absolute discretion) direct any or all of the banks and financial institutions with which such Grantor maintains a Deposit Account, Securities Account or a lockbox or deposits the proceeds of any Accounts to send immediately to the Collateral Agent by wire transfer (to such account as the Collateral Agent shall specify, or in such other manner as the Collateral Agent shall

-18-

direct) all or a portion of such securities, cash, investments and other items held by such institution. Any such securities, cash, investments and other items so received by the Collateral Agent shall (in the sole and absolute discretion of the Collateral Agent) be held as additional Collateral for the Obligations or distributed in accordance with Section 7 hereof.

(iii)    Upon the occurrence and during the continuance of any breach or default under any material License referred to in Schedule II hereto by any party thereto other than a Grantor, the Grantor party thereto will, promptly after obtaining knowledge thereof, give the Collateral Agent written notice of the nature and duration thereof, specifying what action, if any, it has taken and proposes to take with respect thereto and thereafter will take reasonable steps to protect and preserve its rights and remedies in respect of such breach or default, or will obtain or acquire an appropriate substitute License.

(iv)    Each Grantor will, at its expense, promptly deliver to the Collateral Agent a copy of each notice or other communication received by it by which any other party to any material License referred to in Schedule II hereto purports to terminate such License or exercise any of its rights or affect any of its obligations thereunder, together with a copy of any reply by such Grantor thereto.

(v)    Each Grantor will, in its commercially reasonable business judgment, exercise promptly and diligently each and every right which it may have under each material License (other than any right of termination) and will duly perform and observe in all material respects all of its obligations under each material License and will take all action reasonably necessary to maintain such Licenses in full force and effect.  No Grantor will, without the prior written consent of the Collateral Agent, cancel, terminate, amend or otherwise modify in any respect, or waive any provision of, any material License referred to in Schedule II hereto.

(g)    Provisions Concerning the Pledged Interests.  Each Grantor will

(i)    at the Grantors' joint and several expense, promptly deliver to the Collateral Agent a copy of each written notice or other material communication received by it in respect of any redemption, exchange, conversion, tender or recapitalization of any Pledged Interests issued by entities that are not Grantors;

(ii)    at the Grantors' joint and several expense, defend the Collateral Agent's right, title and security interest in and to the Pledged Interests against the claims of any Person;

(iii)    not make or consent to any amendment or other modification or waiver that would be adverse to the Collateral Agent or the Buyers or their interests in the Pledged Interests with respect to any Pledged Interests or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests other than pursuant to the Transaction Documents; and

(iv)    except with respect to issuances of Equity Interests not prohibited under the Transaction Documents, not permit the issuance of (A) any additional shares of any class of Equity Interests of any Pledged Issuer, (B) any securities convertible voluntarily by the holder thereof or automatically upon the occurrence or non-occurrence of any event or condition into, or

-19-

exchangeable for, any such shares of Equity Interests or (C) any warrants, options, contracts or other commitments entitling any Person to purchase or otherwise acquire any such shares of Equity Interests.

(h)     [Reserved].

(i)     Intellectual Property.

(i)     If applicable, each Grantor has duly executed and delivered the applicable Intellectual Property Security Agreement.  Each Grantor (either itself or through licensees) will, and will cause each licensee thereof to, take all action reasonably necessary to maintain all of the Intellectual Property that is material to such Grantor's business in full force and effect, including, without limitation, using the proper statutory notices and markings and using the Trademarks on each applicable trademark class of goods in order to so maintain the Trademarks in full force and free from any claim of abandonment for non-use, and no Grantor will (nor permit any licensee thereof to) do any act or knowingly omit to do any act whereby any such Intellectual Property may become invalidated.

(ii)     Each Grantor will (A) cause to be taken all necessary steps in any proceeding before the United States Patent and Trademark Office and the United States Copyright Office or any similar office or agency in any other country or political subdivision thereof to maintain each registration of the Intellectual Property that is material to such Grantor's business, including, without limitation, filing of renewals, affidavits of use, affidavits of incontestability and opposition, interference and cancellation proceedings and payment of maintenance fees, filing fees, taxes or other governmental fees in the ordinary course of business and (B) take commercially reasonable steps to protect, maintain and enforce all other Intellectual Property that is material to such Grantor's business and Other Proprietary Rights.  If any Intellectual Property that is material to such Grantor's business is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, such Grantor shall (x) upon learning of such infringement, misappropriation, dilution or other violation, promptly notify the Collateral Agent and (y) to the extent such Grantor shall deem appropriate under the circumstances, in the exercise of its reasonable judgment, promptly sue for infringement, misappropriation, dilution or other violation, seek injunctive relief where appropriate and recover any and all damages for such infringement, misappropriation, dilution or other violation, or take such other actions as such Grantor shall deem appropriate under the circumstances, in the exercise of its reasonable judgment, to maintain, enforce and protect such Intellectual Property.

(iii)     Each Grantor shall furnish to the Collateral Agent from time to time upon its request statements and schedules further identifying and describing the Intellectual Property and Licenses material to such Grantor's business and such other reports in connection with the Intellectual Property and such Licenses as the Collateral Agent may reasonably request in writing, all in reasonable detail and promptly upon request of the Collateral Agent, following receipt by the Collateral Agent of any such statements, schedules or reports, such Grantor shall modify this Agreement by amending Schedule II hereto, as the case may be, to include any Intellectual Property and any License material to such Grantor's business, as the case may be, which become part of the Collateral under this Agreement and shall execute and authenticate such documents, including, without limitation, the applicable Intellectual Property Security Agreements, and do such acts as shall be necessary or, in the judgment of the Collateral Agent, desirable to subject such Intellectual

-20-

Property and such Licenses to the Lien and security interest created by this Agreement. Notwithstanding anything herein to the contrary, upon the occurrence and during the continuance of an Event of Default, such Grantor may not abandon or otherwise permit any Intellectual Property material to such Grantor's business to become invalid without the prior written consent of the Collateral Agent, and if any Intellectual Property is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, such Grantor will take such action as the Collateral Agent shall deem appropriate under the circumstances to maintain, enforce and protect such Intellectual Property.

(iv)     Upon (x) the filing of an application for the registration of any Trademark or Copyright or the issuance of any Patent with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, or in any similar office or agency of the United States or any country or any political subdivision thereof or (y) acquiring any registration, or application for the registration, of any Trademark or Copyright, or any issued Patent, or application for any Patent, in each case, such Grantor shall provide the Collateral Agent written notice thereof within thirty (30) days of filing for or acquiring such Trademark, Copyright or Patent, as applicable, and shall execute, authenticate and deliver any and all assignments, agreements, instruments, documents and papers, including, without limitation, the applicable Intellectual Property Security Agreements, as the Collateral Agent may reasonably request to evidence the Collateral Agent's security interest hereunder in the Intellectual Property and the General Intangibles of such Grantor relating thereto or represented thereby, and such Grantor hereby appoints the Collateral Agent its attorney-in-fact to execute and/or authenticate and file all such writings for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed, and such power (being coupled with an interest) shall be irrevocable until the Termination Date.

(j)     <u>Deposit, Commodities and Securities Accounts</u>.   Upon the Collateral Agent's reasonable request and unless otherwise agreed by the Collateral Agent, each Grantor shall cause each bank and other financial institution with an account referred to in <u>Schedule IV</u> hereto to execute and deliver to the Collateral Agent a control agreement, in form and substance reasonably satisfactory to the Collateral Agent, duly executed by such Grantor and such bank or financial institution, or enter into other arrangements in form and substance satisfactory to the Collateral Agent, pursuant to which such institution shall irrevocably agree, <u>inter alia</u>, that (i) it will comply at any time with the instructions originated by the Collateral Agent to such bank or financial institution directing the disposition of cash, Commodity Contracts, securities, Investment Property and other items from time to time credited to such account, without further consent of such Grantor, which instructions the Collateral Agent will not give to such bank or other financial institution in the absence of a continuing Event of Default, (ii) all cash, Commodity Contracts, securities, Investment Property and other items of such Grantor deposited with such institution shall be subject to a perfected, first priority security interest in favor of the Collateral Agent, (iii) any right of set off, banker's Lien or other similar Lien, security interest or encumbrance shall be fully waived as against the Collateral Agent, and (iv) upon receipt of written notice from the Collateral Agent during the continuance of an Event of Default, such bank or financial institution shall immediately send to the Collateral Agent by wire transfer (to such account as the Collateral Agent shall specify, or in such other manner as the Collateral Agent shall direct) all such cash, the value of any Commodity Contracts, securities, Investment Property and other items held by it. Without the prior written consent of the Collateral Agent, such Grantor shall not make or maintain

-21-

any Deposit Account, Commodity Account or Securities Account except for the accounts set forth in Schedule IV hereto.  The provisions of this paragraph 5(i) shall not apply to (i) Deposit Accounts for which the Collateral Agent is the depositary, (ii) Deposit Accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of a Grantor's salaried employees, (iii) Deposit Accounts with account numbers 01822 400-158-2, 00140169976 and 01822 100-007-4 maintained with Royal Bank of Canada so long as the balance for all such Deposit Accounts, excluding all funds held in such Deposit Accounts that are immediately due and payable to Prestige Capital Corporation, does not exceed $50,000 in the aggregate for all such Deposit Accounts at any time; *provided*, that (A) there shall be no Liens securing such Deposit Accounts unless the Collateral Agent is also granted such Liens and (B) there shall be no control granted over such Deposit Accounts (other than control in favor of Prestige Capital Finance, LLC or the Royal Bank of Canada) unless the Collateral Agent is also granted such control.

(k)     [Reserved].

(l)     Control.  Each Grantor hereby agrees to take any or all action that may be necessary or desirable or that the Collateral Agent may reasonably request in order for the Collateral Agent to obtain control in accordance with Sections 9-104, 9-105, 9-106, and 9-107 of the Code with respect to the following Collateral:  (i) Deposit Accounts, (ii) Securities Accounts, (iii) Electronic Chattel Paper, (iv) Investment Property, (v) Pledged Interests and (iv) Letter-of-Credit Rights.  Each Grantor hereby acknowledges and agrees that any agent or designee of the Collateral Agent shall be deemed to be a "secured party" with respect to the Collateral under the control of such agent or designee for all purposes.

(m)     Inspection and Reporting.  After the occurrence and during the continuance of an Event of Default, the Collateral Agent, or any agent or representatives thereof or such professionals or other Persons as the Collateral Agent may designate, shall be authorized at any time and from time to time, upon reasonable prior written notice to such Grantor (i) to examine and make copies of and abstracts from such Grantor's records and books of account, (ii) to visit and inspect its properties, (iii) to verify materials, leases, Instruments, Accounts, Inventory and other assets of such Grantor from time to time, and/or (iv) to conduct audits, physical counts, appraisals and/or valuations, examinations at the locations of such Grantor.  Each Grantor shall also permit the Collateral Agent, or any agent or representatives thereof or such professionals or other Persons as the Collateral Agent may designate to discuss such Grantor's affairs, finances and accounts with any of its officers subject to the execution by the Collateral Agent or its designee(s) of a reasonable and mutually agreeable confidentiality agreement.

(n)     Future Subsidiaries.  If any Grantor shall hereafter create or acquire any Subsidiary, simultaneously with the creation of acquisition of such Subsidiary, such Grantor shall cause such Subsidiary to become a party to this Agreement as an additional "Grantor" hereunder and to become a party to the Guarantee as an additional "Guarantor" thereunder, and to duly execute and/or deliver such opinions of counsel and other documents, in form and substance acceptable to the Collateral Agent, as the Collateral Agent shall reasonably request with respect thereto, including, without limitation, a Security Agreement Supplement.

(o)     Partnership and Limited Liability Company Interests.

-22-

(i)    Except with respect to partnership interests and membership interests evidenced by a certificate, which certificate has been pledged and delivered to the Collateral Agent pursuant to Section 4 hereof, no Grantor that is a partnership or a limited liability company shall, nor shall any Grantor with any Subsidiary that is a partnership or a limited liability company, permit such partnership interests or membership interests to (A) be dealt in or traded on securities exchanges or in securities markets, (B) become a security for purposes of Article 8 of any relevant Uniform Commercial Code, (C) become an investment company security within the meaning of Section 8-103 of any relevant Uniform Commercial Code or (D) be evidenced by a certificate.  Each Grantor agrees that such partnership interests or membership interests shall constitute General Intangibles.

(ii)    Each Grantor covenants and agrees that each limited liability agreement, operating agreement, membership agreement, partnership agreement or similar agreement to which a Grantor is a party and relating to any Pledged Interests (as amended, restated, supplemented or otherwise modified from time to time, a "**Pledged Partnership/LLC Agreement**") is hereby amended by this Section 6(o) to permit each member, manager and partner that is a Grantor to pledge all of the Pledged Interests in which such Grantor has rights and to grant and collaterally assign to the Collateral Agent, for the benefit of itself and the Buyers, a lien on and security interest in the Pledged Interests in which such Grantor has rights without any further consent, approval or action by any other party, including, without limitation, any other party to any Pledged Partnership/LLC Agreement or otherwise.

(iii)    Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent or its designee shall have the right (but not the obligation) to be substituted for the applicable Grantor as a member, manager or partner under the applicable Pledged Partnership/LLC Agreement, and the Collateral Agent or its designee shall have all rights, powers and benefits of such Grantor as a member, manager or partner, as applicable, under such Pledged Partnership/LLC Agreement in accordance with the terms of this Section 6(o).  For avoidance of doubt, such rights, powers and benefits of a substituted member, manager or partner shall include all voting and other rights and not merely the rights of an economic interest holder.

(iv)    During the period from the date hereof until the Termination Date, no further consent, approval or action by any other party, including, without limitation, any other party to the applicable Pledged Partnership/LLC Agreement or otherwise shall be necessary to permit the Collateral Agent or its designee to be substituted as a member, manager or partner pursuant to this Section 6(o).  The rights, powers and benefits granted pursuant to this paragraph shall inure to the benefit of the Collateral Agent, on its own behalf and on behalf of the Buyers, and each of their respective successors, assigns and designated agents, as intended third party beneficiaries.

(v)    Each Grantor and each applicable Pledged Issuer agrees that during the period from the date hereof until the Termination Date, no Pledged Partnership/LLC Agreement shall be amended to be inconsistent with the provisions of this Section 6(o) without the prior written consent of the Collateral Agent.

(p)    <u>Excluded Foreign Subsidiaries</u>. The Company covenants and agrees (i) to complete, within sixty (60) days from the date hereof (or such longer period as the Collateral Agent

may agree), the deregistration, winding up, dissolution or other similar process of each Excluded Foreign Subsidiary in such Excluded Foreign Subsidiary's jurisdiction of formation, (ii) each Excluded Foreign Subsidiary will remain dormant and not conduct business at any time, and (iii) the aggregate value of assets owned by the Excluded Foreign Subsidiaries taken as a whole will not equal or exceed $50,000.

SECTION 7.   Voting Rights, Dividends, Etc. in Respect of the Pledged Interests.

(a)   So long as no Event of Default shall have occurred and be continuing:

(i)   each Grantor may exercise any and all voting and other consensual rights pertaining to any Pledged Interests for any purpose not inconsistent with the terms of this Agreement or the other Transaction Documents; provided, however, that (A) none of the Grantors will exercise or refrain from exercising any such right, as the case may be, if the Collateral Agent gives a Grantor notice that, in the Collateral Agent's reasonable business judgment, such action (or inaction) could reasonably be expected to violate the terms of any Transaction Document or have a Material Adverse Effect and (B) each Grantor will give the Collateral Agent at least 5 Business Days' notice of the manner in which it intends to exercise, or the reasons for refraining from exercising, any such right which could reasonably be expected to have a Material Adverse Effect;

(ii)   each of the Grantors may receive and retain any and all dividends, interest or other distributions paid in respect of the Pledged Interests to the extent not prohibited by the Notes or the other Transaction Documents; provided, however, that any and all (A) dividends and interest paid or payable other than in cash in respect of, and Instruments and other property received, receivable or otherwise distributed in respect of or in exchange for, any Pledged Interests, (B) dividends and other distributions paid or payable in cash in respect of any Pledged Interests in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in surplus, and (C) cash paid, payable or otherwise distributed in redemption of, or in exchange for, any Pledged Interests, together with any dividend, interest or other distribution or payment which at the time of such payment was prohibited by the Notes or the other Transaction Documents, shall be, and shall forthwith be delivered to the Collateral Agent, to hold as, Pledged Interests and shall, if received by any of the Grantors, be received in trust for the benefit of the Collateral Agent, shall be segregated from the other property or funds of the Grantors, and shall be forthwith delivered to the Collateral Agent in the exact form received with any necessary indorsement and/or appropriate instruments of transfer or assignment or undated stock powers duly executed in blank, to be held by the Collateral Agent as Pledged Interests and as further collateral security for the Obligations; and

(iii)   the Collateral Agent will execute and deliver (or cause to be executed and delivered) to a Grantor all such proxies, consents and other instruments as such Grantor may reasonably request for the purpose of enabling such Grantor to exercise the voting and other rights which it is entitled to exercise pursuant to Section 7(a)(i) hereof and to receive the dividends, interest and/or other distributions which it is authorized to receive and retain pursuant to Section 7(a)(ii) hereof.

(b)   Upon the occurrence and during the continuance of an Event of Default:

(i)    all rights of each Grantor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 7(a)(i) hereof, and to receive the dividends, distributions, interest and other payments that it would otherwise be authorized to receive and retain pursuant to Section 7(a)(ii) hereof, shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Interests such dividends, distributions and interest payments, and the Collateral Agent (personally or through an agent) shall thereupon be solely authorized and empowered to transfer and register in the Collateral Agent's name, or in the name of the Collateral Agent's nominee, the whole or any part of the Pledged Interests, it being acknowledged by each Grantor that such transfer and registration may be effected by the Collateral Agent through its irrevocable appointment as attorney-in-fact pursuant to Section 8 hereof;

(ii)    the Collateral Agent is authorized to notify each debtor with respect to the Pledged Debt to make payment directly to the Collateral Agent (or its designee) and may collect any and all moneys due or to become due to any Grantor in respect of the Pledged Debt, and each of the Grantors hereby authorizes each such debtor to make such payment directly to the Collateral Agent (or its designee) without any duty of inquiry;

(iii)    without limiting the generality of the foregoing, the Collateral Agent may at its option exercise any and all rights of conversion, exchange, subscription or any other rights, privileges or options pertaining to any of the Pledged Interests as if it were the absolute owner thereof, including, without limitation, the right to exchange, in its discretion, any and all of the Pledged Interests upon the merger, consolidation, reorganization, recapitalization or other adjustment of any Pledged Issuer, or upon the exercise by any Pledged Issuer of any right, privilege or option pertaining to any Pledged Interests, and, in connection therewith, to deposit and deliver any and all of the Pledged Interests with any committee, depository, transfer agent, registrar or other designated agent upon such terms and conditions as it may determine; and

(iv)    all dividends, distributions, interest and other payments that are received by any of the Grantors contrary to the provisions of Section 7(b)(i) hereof shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other funds of the Grantors, and shall be forthwith paid over to the Collateral Agent as Pledged Interests in the exact form received with any necessary indorsement and/or appropriate instruments of transfer or assignment or undated Equity Interest powers duly executed in blank, to be held by the Collateral Agent as Pledged Interests and as further collateral security for the Obligations.

SECTION 8.    Additional Provisions Concerning the Collateral.

(a)    To the maximum extent permitted by applicable law, and for the purpose of taking any action that the Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Agreement, each Grantor hereby (i) authorizes the Collateral Agent to execute any such agreements, instruments or other documents in such Grantor's name and to file such agreements, instruments or other documents in such Grantor's name and in any appropriate filing office, (ii) authorizes the Collateral Agent at any time, and from time to time, to file one or more Uniform Commercial Code financing or continuation statements, and amendments thereto, relating to the Collateral (including, without limitation, financing statements describing

-25-

the Collateral as "all assets" or "all personal property" or words of similar effect) and (iii) ratifies such authorization to the extent that the Collateral Agent has filed any such financing or continuation statements, or amendments thereto, prior to the date hereof.  A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

(b)    Each Grantor hereby irrevocably appoints the Collateral Agent as its attorney-in-fact and proxy, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, from time to time in the Collateral Agent's discretion, so long as an Event of Default shall have occurred and is continuing, to take any action and to execute any instrument which the Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Agreement (subject to the rights of such Grantor under Section 6 and Section 7(a) hereof), including, without limitation, (i) to obtain and adjust insurance required to be paid to the Collateral Agent pursuant to Section 6(e) hereof, (ii) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any Collateral, (iii) to receive, endorse, and collect any drafts or other Instruments, Documents and Chattel Paper in connection with clause (i) or (ii) above, (iv) to receive, indorse and collect all Instruments made payable to such Grantor representing any dividend, interest payment or other distribution in respect of any Pledged Interests and to give full discharge for the same, (v) to file any claims or take any action or institute any proceedings which the Collateral Agent may reasonably deem necessary or desirable for the collection of any Collateral or otherwise to enforce the rights of the Collateral Agent and the Buyers with respect to any Collateral, (vi) to execute assignments, licenses and other documents to enforce the rights of the Collateral Agent and the Buyers with respect to any Collateral, (vii) to pay or discharge taxes or Liens levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by the Collateral Agent in its sole discretion, and such payments made by the Collateral Agent shall constitute Obligations of such Grantor to the Collateral Agent, due and payable immediately without demand, and (viii) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, assignments, verifications and notices in connection with Accounts, Chattel Paper and other documents relating to the Collateral.  This power is a power of attorney and is coupled with an interest and is irrevocable until the Termination Date.

(c)    For the purpose of enabling the Collateral Agent to exercise rights and remedies hereunder, at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies upon the occurrence and during the continuance of an Event of Default, and for no other purpose, each Grantor hereby grants to the Collateral Agent, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to such Grantor) to use, assign, license or sublicense any Intellectual Property now owned or hereafter acquired by such Grantor, wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof.  Notwithstanding anything contained herein to the contrary, but subject to the provisions of the Transaction Documents that limit the right of such Grantor to dispose of its property and Section 6(h) hereof, so long as no Event of Default shall have occurred and be continuing, such Grantor may exploit, use, enjoy, protect, license, sublicense, assign, sell, dispose of or take other actions with respect to the Intellectual Property in the ordinary course of its business.  In furtherance of the foregoing,

-26-

unless an Event of Default shall have occurred and be continuing, the Collateral Agent shall from time to time, upon the request of a Grantor, execute and deliver any instruments, certificates or other documents, in the form so requested, which such Grantor shall have certified are appropriate (in such Grantor's judgment) to allow it to take any action permitted above (including relinquishment of the license provided pursuant to this clause (c) as to any Intellectual Property). The exercise of rights and remedies hereunder by the Collateral Agent shall not terminate the rights of the holders of any licenses or sublicenses theretofore granted by such Grantor in accordance with the second sentence of this clause (c).  Each Grantor hereby releases the Collateral Agent from, and indemnifies the Collateral Agent against, any claims, causes of action and demands at any time arising out of or with respect to any actions taken or omitted to be taken by the Collateral Agent under the powers of attorney, proxy or license granted herein other than actions taken or omitted to be taken through the Collateral Agent's gross negligence or willful misconduct, as determined by a final determination of a court of competent jurisdiction.

(d)    If a Grantor fails to perform any agreement or obligation contained herein, the Collateral Agent may itself perform, or cause performance of, such agreement or obligation, in the name of such Grantor or the Collateral Agent, and the fees and expenses of the Collateral Agent incurred in connection therewith shall be jointly and severally payable by the Grantors pursuant to Section 10 hereof and constitute Obligations of such Grantor secured by the Collateral, due and payable immediately without demand.

(e)    The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Other than the exercise of reasonable care to assure the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against other parties or any other rights pertaining to any Collateral and shall be relieved of all responsibility for any Collateral in its possession upon surrendering it or tendering surrender of it to any of the Grantors (or whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct).  The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property, it being understood that the Collateral Agent shall not have responsibility for ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Collateral Agent has or is deemed to have knowledge of such matters.  The Collateral Agent shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehouseman, carrier, forwarding agency, consignee or other agent or bailee selected by the Collateral Agent in good faith.

(f)    Anything herein to the contrary notwithstanding (i) each Grantor shall remain liable under the Licenses and otherwise with respect to any of the Collateral to the extent set forth therein to perform all of its obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by the Collateral Agent of any of its rights hereunder shall not release such Grantor from any of its obligations under the Licenses or otherwise in respect of the Collateral, and (iii) the Collateral Agent shall not have any obligation or liability by reason of this Agreement under the Licenses or with respect to any of the other Collateral, nor shall the

-27-

Collateral Agent be obligated to perform any of the obligations or duties of such Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(g)    The Collateral Agent may at any time in its discretion (i) without notice to any Grantor, transfer or register in the name of the Collateral Agent or any of its nominees any or all of the Pledged Interests, subject only to the revocable rights of such Grantor under Section 7(a) hereof, and (ii) exchange certificates or Instruments constituting Pledged Interests for certificates or Instruments of smaller or larger denominations.

SECTION 9.   Remedies Upon Event of Default.  If any Event of Default shall have occurred and be continuing:

(a)    The Collateral Agent may exercise in respect of the Collateral, in addition to any other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party upon default under the Code (whether or not the Code applies to the affected Collateral), and also may (i) take absolute control of the Collateral, including, without limitation, transfer into the Collateral Agent's name or into the name of its nominee or nominees (to the extent the Collateral Agent has not theretofore done so) and thereafter receive, for the benefit of the Collateral Agent and the Buyers, all payments made thereon, give all consents, waivers and ratifications in respect thereof and otherwise act with respect thereto as though it were the outright owner thereof, (ii) require each Grantor to, and each Grantor hereby agrees that it will at its expense and upon request of the Collateral Agent forthwith, assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place or places to be designated by the Collateral Agent that is reasonably convenient to both parties, and the Collateral Agent may enter into and occupy any premises owned or leased by such Grantor where the Collateral or any part thereof is located or assembled for a reasonable period in order to effectuate the Collateral Agent's rights and remedies hereunder or under law, without obligation to such Grantor in respect of such occupation, and (iii) without notice except as specified below and without any obligation to prepare or process the Collateral for sale, (A) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Collateral Agent may deem commercially reasonable and/or (B) lease, license or dispose of the Collateral or any part thereof upon such terms as the Collateral Agent may deem commercially reasonable.  Each Grantor agrees that, to the extent notice of sale or any other disposition of its respective Collateral shall be required by law, at least ten (10) days' prior notice to such Grantor of the time and place of any public sale or the time after which any private sale or other disposition of its respective Collateral is to be made shall constitute reasonable notification.  If the Collateral Agent sells any of the Collateral upon credit, the Grantors will be credited only with payments actually received by the Collateral Agent from the purchaser thereof, and if such purchaser fails to pay for the Collateral, the Collateral Agent may resell the Collateral and the Grantors shall be credited with proceeds of the sale.  The Collateral Agent shall not be obligated to make any sale or other disposition of any Collateral regardless of notice of sale having been given.  The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  Each Grantor hereby waives any claims against the Collateral Agent and the Buyers arising by reason of the fact that the price at which its respective Collateral may have been sold at a private sale was less than the price which

-28-

might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if the Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree, and waives all rights that such Grantor may have to require that all or any part of such Collateral be marshalled upon any sale (public or private) thereof.  Each Grantor hereby acknowledges that (i) any such sale of its respective Collateral by the Collateral Agent shall be made without warranty, (ii) the Collateral Agent may specifically disclaim any warranties of title, possession, quiet enjoyment or the like, (iii) the Collateral Agent may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness), if permitted by law, for the purchase, lease, license or other disposition of the Collateral or any portion thereof for the account of the Collateral Agent (on behalf of itself and each Buyer) and (iv) such actions set forth in clauses (i), (ii) and (iii) above shall not adversely affect the commercial reasonableness of any such sale of Collateral.  In addition to the foregoing, (1) upon written notice to any Grantor from the Collateral Agent, such Grantor shall cease any use of the Intellectual Property or any Trademark similar to any Trademark contained in the Collateral for any purpose described in such notice; (2) the Collateral Agent may, at any time and from time to time, upon 10 days' prior notice to such Grantor, license, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any of the Intellectual Property, throughout the universe for such term or terms, on such conditions, and in such manner, as the Collateral Agent shall in its sole discretion determine to the extent consistent with any restrictions or conditions imposed upon such Grantor with respect to such Intellectual Property by license or other contractual arrangement; and (2) the Collateral Agent may, at any time, pursuant to the authority granted in <u>Section 8</u> hereof (such authority being effective upon the occurrence and during the continuance of an Event of Default), execute and deliver on behalf of such Grantor, one or more instruments of assignment of the Intellectual Property (or any application or registration thereof), in form suitable for filing, recording or registration in any country.

(b)    In the event that the Collateral Agent determines to exercise its right to sell all or any part of the Pledged Interests pursuant to Section 9(a) hereof, each Grantor will, at such Grantor's expense and upon request by the Collateral Agent, do or cause to be done all such acts and things as may be reasonably necessary to make a private sale of such Pledged Interests valid and binding and in compliance with applicable law.  Each Grantor acknowledges the impossibility of ascertaining the amount of damages which would be suffered by the Collateral Agent by reason of the failure by any Grantor to perform any of the covenants contained in this Section 9(b) and, consequently, agrees that, if any Grantor fails to perform any of such covenants, it shall pay, as liquidated damages and not as a penalty, an amount equal to the value of the Pledged Interests on the date the Collateral Agent demands compliance with this Section 9(b); <u>provided</u>, <u>however</u>, that the payment of such amount shall not release any Grantor from any of its obligations under any of the other Loan Documents.

(c)    Notwithstanding the provisions of Section 9(b) hereof, each Grantor recognizes that the Collateral Agent may deem it impracticable to effect a public sale of all or any part of the Pledged Shares or any other securities constituting Pledged Interests and that the Collateral Agent may, therefore, determine to make one or more private sales of any such securities to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such securities for their own account, for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable to the seller than the prices and other terms which might have been obtained at a

-29-

public sale and, notwithstanding the foregoing, agrees that such private sales shall be deemed to have been made in a commercially reasonable manner.

(d)     Any cash held by the Collateral Agent (or its agent or designee) as Collateral and all Cash Proceeds received by the Collateral Agent (or its agent or designee) in respect of any sale of or collection from, or other realization upon, all or any part of the Collateral may, in the discretion of the Collateral Agent (or its agent or designee), be held by the Collateral Agent as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Collateral Agent pursuant to Section 10 hereof) in whole or in part by the Collateral Agent against, all or any part of the Obligations in such order as the Collateral Agent shall elect, consistent with the provisions of the Transaction Documents.  Any surplus of such cash or Cash Proceeds held by the Collateral Agent (or its agent or designee) and remaining after the Termination Date shall be paid over to whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct.

(e)     In the event that the proceeds of any such sale, collection or realization are insufficient to pay all amounts to which the Collateral Agent and the Buyers are legally entitled, the Grantors shall be jointly and severally liable for the deficiency, together with interest thereon at the highest rate specified in any of the applicable Transaction Documents for interest on overdue principal thereof or such other rate as shall be fixed by applicable law, together with the costs of collection and the reasonable fees, costs, expenses and other client charges of any attorneys employed by the Collateral Agent to collect such deficiency.

(f)     Each Grantor hereby acknowledges that if the Collateral Agent complies with any applicable state, provincial, or federal law requirements in connection with a disposition of the Collateral, such compliance will not adversely affect the commercial reasonableness of any sale or other disposition of the Collateral.

(g)     The Collateral Agent shall not be required to marshal any present or future collateral security (including, but not limited to, this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the Collateral Agent's rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent that each Grantor lawfully may, such Grantor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Collateral Agent's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, such Grantor hereby irrevocably waives the benefits of all such laws.

SECTION 10. Indemnity and Expenses.

(a)     Each Grantor agrees, jointly and severally, to defend, protect, indemnify and hold harmless the Collateral Agent, each of the Buyers and all of their respective Affiliates, officers, directors, employees, attorneys, consultants and agents (collectively called the "Indemnitees") from and against any and all claims, damages, losses, liabilities, obligations,

-30-

penalties, fees, costs and expenses (including, without limitation, reasonable legal fees, costs, expenses, and disbursements of such Person's counsel) incurred by such Indemnitees, whether prior to or from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with this Agreement (including, without limitation, enforcement of this Agreement) or any of the transactions related to this Agreement (collectively, the "Indemnified Matters"), except to the extent that any Indemnified Matter is caused solely and directly from such Indemnitee's gross negligence or willful misconduct, as determined by a final non-appealable judgment of a court of competent jurisdiction.

(b)    Each Grantor agrees, jointly and severally, to, upon demand, pay to the Collateral Agent the amount of any and all costs and expenses, including the reasonable fees, costs, expenses and disbursements of counsel for the Collateral Agent and of any experts and agents (including, without limitation, any collateral trustee which may act as agent of the Collateral Agent), which the Collateral Agent may incur in connection with (i) the preparation, negotiation, execution, delivery, recordation, administration, amendment, waiver or other modification or termination of this Agreement subject to and to the extent under Section 5.2 of the Securities Purchase Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any Collateral, (iii) the exercise or enforcement of any of the rights of the Collateral Agent hereunder, or (iv) the failure by any Grantor to perform or observe any of the provisions hereof.

SECTION 11. Notices, Etc.  All notices and other communications provided for hereunder shall be given in accordance with Section 5.4 of the Securities Purchase Agreement.

SECTION 12. Security Interest Absolute; Joint and Several Obligations.

(a)    All rights of the Collateral Agent and the Buyers, all Liens and all obligations of each of the Grantors hereunder shall be absolute and unconditional irrespective of (i) any lack of validity or enforceability of the Securities Purchase Agreement, the Notes or any other Transaction Document, (ii) any change in the time, manner or place of payment of, or in any other term in respect of, all or any of the Obligations, or any other amendment or waiver of or consent to any departure from the Securities Purchase Agreement, the Notes or any other Transaction Document, (iii) any exchange or release of, or non-perfection of any Lien on any Collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations, or (iv) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any of the Grantors in respect of the Obligations.  All authorizations and agencies contained herein with respect to any of the Collateral are irrevocable and powers coupled with an interest.

(b)    Each Grantor hereby waives, to the extent permitted by applicable law (i) promptness and diligence, (ii) notice of acceptance and notice of the incurrence of any Obligation by the Company, (iii) notice of any actions taken by the Collateral Agent, any Buyer, any Guarantor or any other Person under any Transaction Document or any other agreement, document or instrument relating thereto, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Obligations, the omission of or delay in which, but for the provisions of this subsection (b), might constitute grounds for relieving such Grantor of any such Grantor's obligations hereunder and (v) any requirement that the Collateral

-31-

Agent or any Buyer protect, secure, perfect or insure any security interest or other lien on any property subject thereto or exhaust any right or take any action against any Grantor or any other Person or any collateral.

(c)     All of the obligations of the Grantors hereunder are joint and several.  The Collateral Agent may, in its sole and absolute discretion, enforce the provisions hereof against any of the Grantors and shall not be required to proceed against all Grantors jointly or seek payment from the Grantors ratably.  In addition, the Collateral Agent may, in its sole and absolute discretion, select the Collateral of any one or more of the Grantors for sale or application to the Obligations, without regard to the ownership of such Collateral, and shall not be required to make such selection ratably from the Collateral owned by all of the Grantors.  The release or discharge of any Grantor by the Collateral Agent shall not release or discharge any other Grantor from the obligations of such Person hereunder.

SECTION 13. Miscellaneous.

(a)     No amendment of any provision of this Agreement (other than any Schedule attached hereto and amended, supplemented or otherwise modified from time to time in accordance with the terms hereof) shall be effective unless it is in writing and signed by each Grantor and the Collateral Agent, and no waiver of any provision of this Agreement, and no consent to any departure by a Grantor therefrom, shall be effective unless it is in writing and signed by the Collateral Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)     No failure on the part of the Collateral Agent or any Buyer to exercise, and no delay in exercising, any right hereunder or under any of the other Transaction Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Collateral Agent or any Buyer provided herein and in the other Transaction Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Collateral Agent or any Buyer under any of the Transaction Documents against any party thereto are not conditional or contingent on any attempt by such Person to exercise any of its rights under any of the Transaction Documents against such party or against any other Person, including but not limited to, any Grantor.

(c)     No Grantor may exercise any rights that it may now or hereafter acquire against any other Grantor that arise from the existence, payment, performance or enforcement of any Grantor's obligations under this Agreement, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Collateral Agent against any Grantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Grantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until the Termination Date occurs.  If any amount shall be paid to a Grantor in violation of the immediately preceding sentence at any time prior to the Termination Date, such amount shall be held in trust for the benefit of the Collateral Agent and shall forthwith be paid to the Collateral Agent to be credited and applied to the

-32-

Obligations and all other amounts payable under the Transaction Documents, whether matured or unmatured, in accordance with the terms of the Transaction Documents, or to be held as Collateral for any Obligations or other amounts payable under the Transaction Documents thereafter arising.

(d)     Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(e)     This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the Termination Date occurs, and (ii) be binding on each Grantor and all other Persons who become bound as debtor to this Agreement in accordance with Section 9-203(d) of the Code and shall inure, together with all rights and remedies of the Collateral Agent and the Buyers hereunder, to the benefit of the Collateral Agent and the Buyers and their respective successors, transferees and assigns.  Without limiting the generality of clause (ii) of the immediately preceding sentence, without notice to any Grantor, the Collateral Agent and the Buyers may assign or otherwise transfer their rights and obligations under this Agreement and any of the other Transaction Documents, to any other Person and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to the Collateral Agent and the Buyers herein or otherwise.  Upon any such assignment or transfer, all references in this Agreement to the Collateral Agent or any such Buyer shall mean the assignee of the Collateral Agent or such Buyer.  None of the rights or obligations of any Grantor hereunder may be assigned or otherwise transferred without the prior written consent of the Collateral Agent, and any such assignment or transfer without the consent of the Collateral Agent shall be null and void.

(f)     Upon the Termination Date, (i) this Agreement and the security interests and licenses created hereby shall terminate and all rights to the Collateral shall revert to the respective Grantor that granted such security interests hereunder, and (ii) the Collateral Agent will, upon such Grantor's request and at such Grantor's expense, without any representation, warranty or recourse whatsoever (A) return to such Grantor such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof, and (B) execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such termination.  In addition, upon any sale or disposition of any item of Collateral in a transaction not prohibited under the Transaction Documents, the Collateral Agent agrees to execute a release of its security interest in such item of Collateral in form and substance reasonably satisfactory to it, and the Collateral Agent shall, upon the reasonable request of the Grantors and at the Grantors' cost and expense, execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence such release.

(g)     This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should any Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of any Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment or performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such

-33-

payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(h)    Upon the execution and delivery, or authentication, by any Person of a security agreement supplement in substantially the form of Exhibit C hereto (each a "**Security Agreement Supplement**"), (i) such Person shall be referred to as an "Additional Grantor" and shall be and become a Grantor, and each reference in this Agreement to "Grantor" shall also mean and be a reference to such Additional Grantor, and each reference in this Agreement and the other Transaction Documents to "Collateral" shall also mean and be a reference to the Collateral of such Additional Grantor, and (ii) the supplemental Schedules I-VIII attached to each Security Agreement Supplement shall be incorporated into and become a part of and supplement Schedules I-VIII, respectively, hereto, and the Collateral Agent may attach such Schedules as supplements to such Schedules, and each reference to such Schedules shall mean and be a reference to such Schedules, as supplemented pursuant hereto.

(i)    THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, EXCEPT AS REQUIRED BY MANDATORY PROVISIONS OF LAW AND EXCEPT TO THE EXTENT THAT THE VALIDITY AND PERFECTION OR THE PERFECTION AND THE EFFECT OF PERFECTION OR NON-PERFECTION OF THE SECURITY INTEREST CREATED HEREBY, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

(j)    ANY LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY DOCUMENT RELATED THERETO MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS THEREOF, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH GRANTOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH GRANTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION, SUIT OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.

(k)    EACH GRANTOR HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR OTHER ACTION OF THE PARTIES HERETO.

-34-

(l)        Nothing contained herein shall affect the right of the Collateral Agent or any Buyer to serve process in any other manner permitted by law or commence legal proceedings or otherwise proceed against any Grantor or any property of such Grantor in any other jurisdiction.

(m)        Each Grantor irrevocably and unconditionally waives any right it may have to claim or recover in any legal action, suit or proceeding with respect to this Agreement any special, exemplary, punitive or consequential damages.

(n)        Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(o)        This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together constitute one and the same Agreement.   The parties hereto irrevocably and unreservedly agree that this Agreement may be executed by way of electronic signatures and the parties agree that neither this Agreement, nor any part hereof, shall be challenged or denied any legal effect, validity and/or enforceability solely on the ground that it is in the form of an electronic record.

(p)        For purposes of this Agreement, all references to Schedules I - VIII attached hereto shall be deemed to refer to each such Schedule as updated from time to time in accordance with the terms of this Agreement.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, each Grantor has caused this Agreement to be executed and delivered by its officer thereunto duly authorized, as of the date first above written.

**MUSCLEPHARM CORPORATION**

By: *Sabina Rizvi*
    Name: Sabina Rizvi
    Title: President and Chief Financial Officer

**CANADA MUSCLEPHARM ENTERPRISES CORP.**

By: *Sabina Rizvi*
    Name: Sabina Rizvi
    Title: Chief Financial Officer

<u>ACCEPTED BY</u>:

**EMPERY TAX EFFICIENT, LP**,
as Collateral Agent

By: Empery Asset Management, LP, its authorized agent

By: _____
    Name:  Brett Director
    Title:   General Counsel

<u>SCHEDULE I</u>

LEGAL NAMES; ORGANIZATIONAL IDENTIFICATION NUMBERS; STATES OR
JURISDICTION OF ORGANIZATION

| Legal Name | State of Organization | Type of Organization | Organizational Identification Number |
|---|---|---|---|
| MusclePharm Corporation | Nevada | Corporation | NV20061197204 |
| Canada MusclePharm Enterprises Corp. | Ontario, Canada | Corporation | BC0918993 |

SCHEDULE II

INTELLECTUAL PROPERTY AND LICENSES; TRADE NAMES

A.    COPYRIGHTS

None.

B.    PATENTS

None.

C.    TRADEMARKS

| Country | Title | Application or Registration No. | Filing Date | Registration Date |
|---------|-------|-------------------------------|-------------|-------------------|
| USA | BCAA 3:1:2 THE FOUNDATION OF YOUR TEMPLE MP MUSCLEPHARM    4948843 | | 11/21/2013 | 5/3/2016 |
| USA | BIZZY DIET    4125619 | | 10/3/2011 | 4/10/2012 |
| USA | COMBAT 100% WHEY    6072063 | | 3/23/2016 | 6/9/2020 |
| USA | COMBAT BLACK    n/a | | 86512633 | n/a |
| USA | COMBAT 100% CASEIN    4756998 | | 2/21/2014 | 6/16/2015 |
| USA | COMBAT 100% ISOLATE    4913165 | | 7/29/2015 | 3/8/2016 |
| USA | CONFIDENCE BUILT HERE    3969126 | | 5/4/2010 | 5/31/2011 |
| USA | Fitmiss    4444437 | | 1/27/2012 | 12/3/2013 |
| USA | Fitmiss    n/a | | 6/23/2021 | n/a |
| USA | FITMISS BURN    4716743 | | 1/30/2012 | 4/7/2015 |
| USA | FITMISS DELIGHT    4498164 | | 9/7/2013 | 3/18/2014 |
| USA | FUEL THE ATHLETE INSIDE    3969123 | | 5/3/2010 | 5/31/2011 |
| USA | FUEL YOUR ACTIVE LIFESTYLE    4077223 | | 6/9/2011 | 12/27/2011 |
| USA | MP    4186812 | | 1/4/2012 | 8/7/2012 |
| USA | MP (stylized black and white)    5200085 | | 12/22/2016 | 5/9/2017 |
| USA | MP Essentials    5746636 | | 12/19/2017 | 5/7/2019 |

| USA | MP Stealth | n/a | 12/19/2017 | n/a |
|---|---|---|---|---|
| USA | MUSCLEPHARM | 3933441 | 12/8/2009 | 3/22/2011 |
| USA | MUSCLEPHARM SPORTSWEAR | 4077205 | 6/3/2011 | 12/27/2011 |
| USA | MUSCLEPHARM ENERGY SPORT ZERO | 5191681 | 12/23/2014 | 4/25/2017 |
| USA | MP MUSCLEPHARM | 4767066 | 4/29/2014 | 7/7/2015 |
| USA | CREATINE BLACK | 5284138 | 10/10/2016 | 9/12/2017 |
| USA | CLEAN MASS | 5179223 | 2/10/2016 | 4/11/2017 |
| USA | VASO SPORT | 5083129 | 6/22/2015 | 11/15/2016 |
| USA | OXYSPORT | 5032380 | 6/18/2014 | 8/30/2016 |
| USA | #FUELYOURGRIND | 4970643 | 1/23/2015 | 5/31/2016 |
| USA | REAL ATHLETES. REAL SCIENCE. | 4924979 | 11/11/2013 | 3/29/2016 |
| USA | Z-CORE PM | 4922324 | 7/29/2015 | 3/22/2016 |
| USA | CLA CORE | 4913163 | 7/29/2015 | 3/8/2016 |
| USA | CARNITINE CORE | 4913160 | 7/29/2015 | 3/8/2016 |
| USA | THE FOUNDATION OF YOUR TEMPLE | 4891161 | 1/16/2014 | 1/26/2016 |
| USA | BUILD YOUR LEGACY | 4879294 | 1/13/2014 | 1/5/2016 |
| USA | STRONG IS THE NEW SEXY | 4709769 | 4/4/2014 | 3/24/2015 |
| USA | HYBRID SERIES | 4694743 | 4/25/2014 | 3/3/2015 |
| USA | LIVE SHREDDED | 4077218 | 6/9/2011 | 12/27/2011 |
| USA | WEAK ENDS HERE | 4317212 | 9/19/2012 | 4/9/2013 |
| USA | ENERGY ON THE GO | 4131623 | 8/23/2011 | 4/24/2012 |
| USA | RE-CON | 3934299 | 7/19/2010 | 3/22/2011 |
| European Union |  | | 14/05/2014 | |
| European Union |  | 012875985 | 14/05/2014 | 29/06/2017 |
| European Union |  | 012876058 | 14/05/2014 | 09/01/2015 |
| European Union |  | 013713656 | 05/02/2015 | 19/06/2015 |
| European Union |  | 017818048 | 15/02/2018 | 29/01/2019 |
| European | ASSAULT | | 05/02/2015 | |

| Union | | | | |
|-------|---|---|---|---|
| European Union | ASSAULT in Class 5 | | 14/11/2018 | |
| European Union | COMBAT CRUNCH BAR | | 05/02/2015 | |
| European Union | COMBAT PROTEIN POWDER | 013712344 | 05/02/2015 | 24/06/2015 |
| European Union | FITMISS | 014594477 | 24/09/2015 | 12/02/2016 |
| European Union | MUSCLEPHARM | 014580625 | 22/09/2015 | 27/04/2016 |
| European Union | MUSCLEPHARM | 017817867 | 15/02/2018 | 29/01/2019 |

D.    OTHER PROPRIETARY RIGHTS

None.

E.    TRADE NAMES

MusclePharm

MSLP

F.    NAME OF, AND EACH TRADE NAME USED BY, EACH PERSON FROM WHICH A GRANTOR HAS ACQUIRED ANY SUBSTANTIAL PART OF THE COLLATERAL WITHIN THE PRECEDING FIVE YEARS

None.

SCHEDULE III

LOCATIONS

| Grantor | Chief Executive Office | Chief Place of Business | Location | Description (E.g., Books and Records, Inventory, Equipment, etc.) |
|---|---|---|---|---|
| MusclePharm Corporation | 3753 Howard Hughes Pkwy, Ste. 200-849 Las Vegas, NV 89169 | 3753 Howard Hughes Pkwy, Ste. 200-849 Las Vegas, NV 89169 | 3753 Howard Hughes Pkwy, Ste. 200-849 Las Vegas, NV 89169<br><br>JW Nutritional, LLC 601 Century Parkway Suite 300 Allen, TX 75013<br><br>SK Laboratories Inc. 5420 E. La Palma Ave. Anaheim, CA 92807<br><br>Cimetra Warehousing & Distribution LLC 6050 Dana Way, Ste 300 Antioch, TN 37013 | Books and records, inventory and equipment |
| Canada MusclePharm Enterprises Corp. | 170-762 Upper James Street, Hamilton, ON, L9C 3A2 | 170-762 Upper James Street, Hamilton, ON, L9C 3A2 | 170-762 Upper James Street, Hamilton, ON, L9C 3A2 | Books and records |

<u>SCHEDULE IV</u>

PROMISSORY NOTES, SECURITIES, DEPOSIT ACCOUNTS, SECURITIES ACCOUNTS
AND COMMODITIES ACCOUNTS

A.  <u>Promissory Notes</u>:

None.

B.  <u>Securities and Other Instruments</u>:

None.

C.  <u>Deposit Accounts, Securities Accounts and Commodities Accounts</u>:

| Grantor | Name and Address of Institution Maintaining Account | Account Number | Type of Account |
|---|---|---|---|
| Canada MusclePharm Enterprises Corp. | ROYAL BANK OF CANADA P.O. BOX 4047 TERMINAL A TORONTO ON M5W 1L5 | ████-007-4 | Business Account – Non-US Sub and maintained at a Canadian bank |
| Canada MusclePharm Enterprises Corp. | ROYAL BANK OF CANADA P.O. BOX 4047 TERMINAL A TORONTO ON M5W 1L5 | ████158-2 | Business Account - Non-US Sub and maintained at a Canadian bank |
| Canada MusclePharm Enterprises Corp. | ROYAL BANK OF CANADA P.O. BOX 4047 TERMINAL A TORONTO ON M5W 1L5 | ████9976 | Guaranteed Investment Certificate - Non-US Sub and maintained at a Canadian bank |
| MusclePharm Corporation | JPMorgan Chase Bank, N.A. P O Box 182051 Columbus, OH 43218 - 2051 | ████1512 | Commercial Money Market – US Bank Account |
| MusclePharm Corporation | Wells Fargo Bank, N.A. (182) PO Box 63020 San Francisco, CA 94163 | ████4320 | Operating - US Bank Account |
| MusclePharm Corporation | Wells Fargo Bank, N.A. (182) PO Box 63020 San Francisco, CA 94163 | ████4338 | AP - US Bank Account |
| MusclePharm Corporation | Wells Fargo Bank, N.A. (182) PO Box 63020 | ████4353 | Payroll - US Bank Account |

| | San Francisco, CA 94163 | | |
|---|---|---|---|
| MusclePharm Corporation | Wells Fargo Bank, N.A. (182)<br>PO Box 63020<br>San Francisco, CA 94163 | ████ 4361 | Factoring - US Bank Account |

<u>SCHEDULE V</u>

UCC-1 FINANCING STATEMENTS

| Name of Grantor | Filing Locations |
|---|---|
| MusclePharm Corporation | Nevada |
| Canada MusclePharm Enterprises Corp. | Washington, D.C. |

## SCHEDULE VI

## COMMERCIAL TORT CLAIMS

None.

SCHEDULE VII

PLEDGED DEBT

None.

SCHEDULE VIII

PLEDGED SHARES

| Grantor | Name of Pledged Issuer | Number of Shares/Units | Percentage of Outstanding Shares/Units | Class | Certificate Number |
|---|---|---|---|---|---|
| MusclePharm Corporation | Canada MusclePharm Enterprises Corp. | 100,000 | 100% | Common Shares | Not certificated |

<u>EXHIBIT A</u>

<u>[TRADEMARK] [PATENT] [COPYRIGHT] SECURITY AGREEMENT</u>

WHEREAS, _____ (the "**Assignor**") [has adopted, used and is using, and holds all right, title and interest in and to, the trademarks and service marks listed on the annexed <u>Schedule 1A</u>, which trademarks and service marks are registered or applied for in the United States Patent and Trademark Office (the "**Trademarks**")] [holds all right, title and interest in the letter patents, design patents and utility patents, and all applications therefor, listed on the annexed <u>Schedule 1A</u>, which patents are issued or applied for in the United States Patent and Trademark Office (the "**Patents**")] [holds all right, title and interest in the copyrights listed on the annexed <u>Schedule 1A</u>, which copyrights are registered or applied for in the United States Copyright Office (the "**Copyrights**")];

WHEREAS, the Assignor has entered into a Pledge and Security Agreement, dated as of October [__], 2020 (as amended, restated or otherwise modified from time to time the "**Security Agreement**"), in favor of EMPERY TAX EFFICIENT, LP, as collateral agent for certain buyers (the "**Assignee**");

WHEREAS, pursuant to the Security Agreement, the Assignor has assigned and granted to the Assignee for the benefit of the Buyers (as defined in the Security Agreement) a continuing security interest in all personal property and assets of the Assignor, including all right, title and interest of the Assignor in, to and under the [Trademarks, together with, among other things, the good-will of the business symbolized by the Trademarks] [Patents] [Copyrights], including, without limitation, all applications, registrations and recordings thereof, as applicable, and all proceeds thereof, including, without limitation, any and all causes of action which may exist by reason of infringement, misappropriation or other violation thereof and any and all damages arising from past, present and future infringements, misappropriations or other violations thereof (the "**Collateral**"), to secure the payment, performance and observance of the "Obligations" (as defined in the Security Agreement);

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignor does hereby pledge, convey, sell, assign, transfer and set over unto the Assignee and grants to the Assignee for the benefit of the Buyers a continuing security interest in the Collateral.

The Assignor does hereby further acknowledge and affirm that the rights and remedies of the Assignee with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.   In the event of a conflict between any provision of this [Trademark][Patent][Copyright] Security and the Security Agreement, the terms of the Security Agreement shall govern.

IN WITNESS WHEREOF, the Assignor has caused this [Trademark][Patent][Copyright] Security Agreement to be duly executed by its officer thereunto duly authorized as of _____, 20__

**[GRANTOR]**

By:_____
     Name:
     Title:

Exh. A-2

## SCHEDULE 1A TO [TRADEMARK][PATENT][COPYRIGHT] SECURITY AGREEMENT

[Trademarks and Trademark Applications]
[Patent and Patent Applications]
[Copyright and Copyright Applications]
Owned by _____

<u>EXHIBIT B</u>

PLEDGE AMENDMENT

This Pledge Amendment, dated _____ __, 20__, is delivered pursuant to Section 4 of the Pledge and Security Agreement referred to below.  The undersigned hereby agrees that this Pledge Amendment may be attached to the Pledge and Security Agreement, dated as of October [__], 2021, as it may heretofore have been or hereafter may be amended, restated, amended and restated, supplemented, modified or otherwise changed from time to time, including any replacement agreement therefor (the "**Security Agreement**"), and that the promissory notes or shares listed on this Pledge Amendment shall be hereby pledged and collaterally assigned to the Collateral Agent and become part of the Pledged Interests referred to in such Pledge Agreement and shall secure all of the Obligations referred to in such Security Agreement.

| <u>Pledged Debt</u> | | | |
|---|---|---|---|
| <u>Grantor</u> | <u>Name of Maker</u> | <u>Description</u> | <u>Principal    Amount Outstanding as of</u> |
| | | | |
| | | | |

| <u>Pledged Shares</u> | | | | | |
|---|---|---|---|---|---|
| <u>Grantor</u> | Name    of <u>Pledged Issuer</u> | Number    of <u>Shares</u> | Percentage of Outstanding Shares | <u>Class</u> | Certificate <u>Number</u> |
| | | | | | |
| | | | | | |

[GRANTOR]

By:  _____
     Name:
     Title:

EMPERY TAX EFFICIENT, LP,
as the Collateral Agent

By:_____
   Name:
   Title:

<u>EXHIBIT C</u>

## FORM OF SECURITY AGREEMENT SUPPLEMENT

[Date of Security Agreement Supplement]

EMPERY TAX EFFICIENT, LP, as Collateral Agent (the "**Collateral Agent**")
[Address]

Ladies and Gentlemen:

   Reference hereby is made to (i) the Securities Purchase Agreement, dated as of October [__], 2021, by and among **MusclePharm Corporation**, a Nevada corporation (the "**Company**") and each party listed as a "Buyer" on the Schedule of Buyers (as such schedule may be amended, restated or otherwise modified from time to time) attached thereto, each a "**Buyer**", and collectively, the "**Buyers**") and (ii) the Pledge and Security Agreement, dated as of October [__], 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), made by the Grantors from time to time party thereto in favor of the Collateral Agent.  Capitalized terms defined in the Securities Purchase Agreement, the Notes or the Security Agreement and not otherwise defined herein are used herein as defined in the Securities Purchase Agreement, the Notes or the Security Agreement, as applicable.

   SECTION 1. <u>Grant of Security</u>.  The undersigned hereby grants to the Collateral Agent, for the ratable benefit of the Collateral Agent and the Buyers, a security interest in, all of its right, title and interest in and to all of the Collateral (as defined in the Security Agreement) of the undersigned, whether now owned or hereafter acquired by the undersigned, wherever located and whether now or hereafter existing or arising, including, without limitation, the property and assets of the undersigned set forth on the attached supplemental schedules to the Schedules to the Security Agreement.

   SECTION 2. <u>Security for Obligations</u>.  The grant of a security interest in the Collateral by the undersigned under this Security Agreement Supplement and the Security Agreement secures the payment of all Obligations of the undersigned now or hereafter existing under or in respect of the Transaction Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, premiums, penalties, fees, indemnifications, contract causes of action, costs, expenses or otherwise.  Without limiting the generality of the foregoing, each of this Security Agreement Supplement and the Security Agreement secures the payment of all amounts that constitute part of the Obligations and that would be owed by the undersigned to the Collateral Agent or any Buyer under the Transaction Documents but for the fact that such Obligations are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving a Grantor.

   SECTION 3. <u>Supplements to Security Agreement Schedules</u>.  The undersigned has attached hereto supplemental <u>Schedules I</u> through <u>VIII</u> to <u>Schedules I</u> through <u>VIII</u>, respectively, to the Security Agreement, and the undersigned hereby certifies, as of the date first above written, that such supplemental Schedules have been prepared by the undersigned in substantially the form of the equivalent Schedules to the Security Agreement, and such supplemental Schedules include all of the information required to be scheduled to the Security Agreement and do not omit to state any information material thereto.

Exh - C

SECTION 4.  <u>Representations and Warranties</u>.  The undersigned hereby confirms that the representations and warranties set forth in Section 5 of the Security Agreement (as supplemented by the attached supplemental Schedules) are true and correct in all material respects as to the undersigned as of the date hereof, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects on and as of such earlier date).

SECTION 5.  <u>Obligations Under the Security Agreement</u>.  The undersigned hereby agrees, as of the date first above written, to be bound as a Grantor by all of the terms and provisions of the Security Agreement to the same extent as each of the other Grantors.  The undersigned further agrees, as of the date first above written, that each reference in the Security Agreement to an "Additional Grantor" or a "Grantor" shall also mean and be a reference to the undersigned.

SECTION 6.  <u>Transaction Document</u>.  In addition to and without limitation of any of the foregoing, this Security Agreement Supplement shall be deemed to be a Transaction Document within the meaning of the Securities Purchase Agreement.  **SECTIONS 13(i) (*GOVERNING LAW*), 13(j) (*CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE*) AND 13(k) (*WAIVER OF JURY TRIAL, ETC.*) OF THE SECURITY AGREEMENT ARE HEREBY INCORPORATED BY REFERENCE AND MADE A PART HEREOF, *MUTATIS MUTANDIS*.**

Very truly yours,

[NAME OF ADDITIONAL GRANTOR]

By: _____
      Name:
      Title:

Acknowledged and Agreed:

EMPERY TAX EFFICIENT, LP,
as Collateral Agent

By: _____
Name:
Title:

Exh - C

# EXHIBIT 3

# EXHIBIT 3

EXECUTION VERSION

TRADEMARK SECURITY AGREEMENT

**October 13, 2021**

WHEREAS, **MUSCLEPHARM CORPORATION** (the "**Assignor**") has adopted, used and is using, and holds all right, title and interest in and to, the trademarks and service marks listed on the annexed Schedule 1A, which trademarks and service marks are registered or applied for in the United States Patent and Trademark Office (the "**Trademarks**");

WHEREAS, the Assignor has entered into a Pledge and Security Agreement, dated as of October 13, 2021 (as amended, restated or otherwise modified from time to time the "**Security Agreement**"), in favor of **EMPERY TAX EFFICIENT, LP**, as collateral agent for certain buyers (the "**Assignee**");

WHEREAS, pursuant to the Security Agreement, the Assignor has assigned and granted to the Assignee for the benefit of the Buyers (as defined in the Security Agreement) a continuing security interest in all personal property and assets of the Assignor, including all right, title and interest of the Assignor in, to and under the Trademarks, together with, among other things, the good-will of the business symbolized by the Trademarks, including, without limitation, all applications, registrations and recordings thereof, as applicable, and all proceeds thereof, including, without limitation, any and all causes of action which may exist by reason of infringement, misappropriation or other violation thereof and any and all damages arising from past, present and future infringements, misappropriations or other violations thereof (the "**Collateral**"), to secure the payment, performance and observance of the "Obligations" (as defined in the Security Agreement);

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignor does hereby pledge, convey, sell, assign, transfer and set over unto the Assignee and grants to the Assignee for the benefit of the Buyers a continuing security interest in the Collateral.

The Assignor does hereby further acknowledge and affirm that the rights and remedies of the Assignee with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of a conflict between any provision of this Trademark Security and the Security Agreement, the terms of the Security Agreement shall govern.

1

IN WITNESS WHEREOF, the Assignor has caused this Trademark Security Agreement to be duly executed by its officer thereunto as of the date first above written.

**MUSCLEPHARM CORPORATION**

By:_____
*Sabina Rizvi*
         Name: Sabina Rizvi
         Title:   President and Chief Financial Officer

Exh. A-2

SCHEDULE 1A TO TRADEMARK SECURITY AGREEMENT

| Company | Trademark | Serial no. | Reg. no. | Filing Date | Registration Date |
|---------|-----------|------------|----------|-------------|-------------------|
| MusclePharm Corporation | BCAA 3:1:2 THE FOUNDATION OF YOUR TEMPLE MP MUSCLEPHARM | 86125946 | 4948843 | 11/21/2013 | 5/3/2016 |
| MusclePharm Corporation | BIZZY DIET | 85437820 | 4125619 | 10/3/2011 | 4/10/2012 |
| MusclePharm Corporation | COMBAT 100% WHEY | 86950423 | 6072063 | 3/23/2016 | 6/9/2020 |
| MusclePharm Corporation | COMBAT BLACK | 86512633 | n/a | 86512633 | n/a |
| MusclePharm Corporation | COMBAT 100% CASEIN | 86200315 | 4756998 | 2/21/2014 | 6/16/2015 |
| MusclePharm Corporation | COMBAT 100% ISOLATE | 86708823 | 4913165 | 7/29/2015 | 3/8/2016 |
| MusclePharm Corporation | CONFIDENCE BUILT HERE | 85029460 | 3969126 | 5/4/2010 | 5/31/2011 |
| MusclePharm Corporation | Fitmiss | 85527611 | 4444437 | 1/27/2012 | 12/3/2013 |
| MusclePharm Corporation | Fitmiss | 90791364 | n/a | 6/23/2021 | n/a |
| MusclePharm Corporation | FITMISS BURN | 85528908 | 4716743 | 1/30/2012 | 4/7/2015 |
| MusclePharm Corporation | FITMISS DELIGHT | 86058521 | 4498164 | 9/7/2013 | 3/18/2014 |
| MusclePharm Corporation | FUEL THE ATHLETE INSIDE | 85029137 | 3969123 | 5/3/2010 | 5/31/2011 |
| MusclePharm Corporation | FUEL YOUR ACTIVE LIFESTYLE | 85342497 | 4077223 | 6/9/2011 | 12/27/2011 |
| MusclePharm Corporation | MP | 85508691 | 4186812 | 1/4/2012 | 8/7/2012 |
| MusclePharm Corporation | MP (stylized black and white) | 87278024 | 5200085 | 12/22/2016 | 5/9/2017 |
| MusclePharm Corporation | MP Essentials | 87726463 | 5746636 | 12/19/2017 | 5/7/2019 |
| MusclePharm Corporation | MP Stealth | 87726506 | n/a | 12/19/2017 | n/a |
| MusclePharm Corporation | MUSCLEPHARM | 77888944 | 3933441 | 12/8/2009 | 3/22/2011 |
| MusclePharm Corporation | MUSCLEPHARM SPORTSWEAR | 85337821 | 4077205 | 6/3/2011 | 12/27/2011 |
| MusclePharm Corporation | MUSCLEPHARM ENERGY SPORT | 86489535 | 5191681 | 12/23/2014 | 4/25/2017 |

| | | | | |
|---|---|---|---|---|
| | ZERO | | | |
| MusclePharm Corporation | MP MUSCLEPHARM | 86266501 | 4767066 | 4/29/2014 | 7/7/2015 |
| MusclePharm Corporation | CREATINE BLACK | 87197911 | 5284138 | 10/10/2016 | 9/12/2017 |
| MusclePharm Corporation | CLEAN MASS | 86903340 | 5179223 | 2/10/2016 | 4/11/2017 |
| MusclePharm Corporation | VASO SPORT | 86670213 | 5083129 | 6/22/2015 | 11/15/2016 |
| MusclePharm Corporation | OXYSPORT | 86978760 | 5032380 | 6/18/2014 | 8/30/2016 |
| MusclePharm Corporation | #FUELYOURGRIND | 86978759 | 4970643 | 1/23/2015 | 5/31/2016 |
| MusclePharm Corporation | REAL ATHLETES. REAL SCIENCE. | 86115518 | 4924979 | 11/11/2013 | 3/29/2016 |
| MusclePharm Corporation | Z-CORE PM | 86708656 | 4922324 | 7/29/2015 | 3/22/2016 |
| MusclePharm Corporation | CLA CORE | 86708729 | 4913163 | 7/29/2015 | 3/8/2016 |
| MusclePharm Corporation | CARNITINE CORE | 86708691 | 4913160 | 7/29/2015 | 3/8/2016 |
| MusclePharm Corporation | THE FOUNDATION OF YOUR TEMPLE | 86167804 | 4891161 | 1/16/2014 | 1/26/2016 |
| MusclePharm Corporation | BUILD YOUR LEGACY | 86164245 | 4879294 | 1/13/2014 | 1/5/2016 |
| MusclePharm Corporation | STRONG IS THE NEW SEXY | 86242785 | 4709769 | 4/4/2014 | 3/24/2015 |
| MusclePharm Corporation | HYBRID SERIES | 86262648 | 4694743 | 4/25/2014 | 3/3/2015 |
| MusclePharm Corporation | LIVE SHREDDED | 85341869 | 4077218 | 6/9/2011 | 12/27/2011 |
| MusclePharm Corporation | WEAK ENDS HERE | 85732930 | 4317212 | 9/19/2012 | 4/9/2013 |
| MusclePharm Corporation | ENERGY ON THE GO | 85404559 | 4131623 | 8/23/2011 | 4/24/2012 |
| MusclePharm Corporation | RE-CON | 85087605 | 3934299 | 7/19/2010 | 3/22/2011 |

109342972_2

# EXHIBIT 4

# EXHIBIT 4

**EXECUTION VERSION**

PERFECTION CERTIFICATE

October 13, 2021

Reference is made to (i) the Securities Purchase Agreement (the "Securities Purchase Agreement"), dated as of the date hereof, by and among MusclePharm Corporation, a Nevada corporation ("MusclePharm"), and each of the purchasers party thereto (the "Purchasers") and (ii) each of the Notes, dated the date hereof (the "Notes"), by MusclePharm in favor of each of the Purchasers.

MusclePharm and Canada MusclePharm Enterprises Corp. (together with MusclePharm, each a "Company" and, collectively, the "Companies"), on behalf of itself and each of the other Companies, after due investigation, does hereby certify to the Buyers and to Empery Tax Efficient, LP, in its capacity as collateral agent under each of the Securities Purchase Agreement and the Notes (the "Collateral Agent"), as follows:

1. <u>Names</u>. Schedule I sets forth for each Company (a) the full and correct legal name and state of incorporation or organization of such Company (in each case as it appears on its certificate or articles, as the case may be, of incorporation or organization or its certificate of formation), (b) the federal employer identification number for such Company, (c) the organizational identification number for such Company, and (d) each state in which such Company is qualified to do business and states whether such Company is in good standing under the laws of each such state.

2. <u>Other Names</u>. Schedule II sets forth for each Company (a) all names (including trade names and similar appellations) presently used by such Company or any of its divisions or other business units and (b) all names (including former legal names and trade names or similar appellations) used by such Company or any of its divisions or other business units during the past five years.

3. <u>Locations</u>. Schedule III sets forth for each Company (a) the location (including county and zip code) of its chief executive office, (b) the location (including county and zip code) of its chief place of business, (c) each location (including county and zip code) where its books and records are maintained, (d) each location (including county and zip code) where chattel paper, inventory, equipment and/or fixtures are maintained, and (e) each location (including county and zip code) previously maintained by such Company during the past four months (and in the case of its chief executive office, during the past five years) for any of the purposes listed above.

4. <u>Outside Locations of Collateral</u>. Schedule IV sets forth for each Company (a) the name and location (including county and zip code) of each person or entity (other than a Company) that has or may have possession of any inventory, equipment or other assets of such Company, and (b) the name and location (including county and zip code) of each person or entity (other than a Company) that has previously had possession of any inventory, equipment or other assets of such Company during the past four months.

5. <u>Cash/Accounts</u>. Schedule V sets forth for each Company all cash, money, currency and all deposit accounts, including demand, time, savings, passbooks or similar accounts

106929459_8

maintained with banks, savings and loan associations, or other financial institutions of such Company.

6.  <u>Investment Property</u>.  Schedule VI sets forth for each Company all investment property (as defined in the Uniform Commercial Code as in effect in the State of New York), including, without limitation, all securities, security entitlements, security accounts, commodity contracts and commodity accounts (as each such term is defined in the Uniform Commercial Code as in effect in the State of New York), whether or not evidenced by certificates or instruments, and all the certificates and instruments, if any, representing or evidencing such investment property and all security therefor of such Company.

7.  <u>Securities; Instruments; Chattel Paper</u>.  Schedule VII sets forth for each Company all securities (whether debt or equity and whether or not evidenced by a certificate), instruments, tangible chattel paper and electronic chattel paper held by or on behalf of, and all letters of credit issued in favor of, such Company.

8.  <u>Intellectual Property</u>.  Schedule VIII sets forth for each Company (a) all trademarks, service marks, trade names, business names, logos or other business identifiers of like nature, all applications or recordings in respect thereof, and all licenses or contracts in respect of the foregoing, (b) all letters patent, design patents and utility patents, all applications or recordings in respect thereof, and all licenses or contracts in respect of the foregoing, (c) all copyrights, copyright registrations, all applications or recordings in respect thereof, and all licenses or contracts in respect of the foregoing (d) any and all software, including without limitation, (i) all computer programs, including source code and object code versions, (ii) all data, databases and compilations of data, whether machine readable or otherwise and (iii) all documentation, training materials and configurations related to any of the foregoing, in each case whether or not patented, and (e) a true and correct list of all material intellectual property license agreements entered into by each Company.  Please indicate whether any Company derives revenues from copyrights that are not registered with the U.S. Copyright Office.

9.  <u>Real Property</u>.  Schedule IX sets forth for each Company (a) all real property owned or leased by such Company, (b) if such property is leased, the landlord and the term of the lease, and (c) if such property is held in fee, the holder of any lien on such real property.

10. <u>Vehicles</u>.  Schedule X sets forth for each Company all the motor vehicles owned by such Company, identifying (a) the unit and VIN numbers, (b) the state where such vehicle is titled, (c) any existing lienholders and (d) the make, model and year of such vehicle.

11. <u>Other Titled Collateral</u>.  Schedule XI set forth for each Company all aircraft and boats and all other inventory, equipment and other goods of the Company which are subject to any certificate of title or other registration statute of the United States, any state or any other jurisdiction, and provides a description of such goods and indicates the registration system and jurisdiction of such goods.

12. <u>Commercial Tort Claims</u>.  Schedule XII sets forth for each Company all commercial tort claims (as defined in the Uniform Commercial Code as in effect in the State of New York) of such Company.

13. <u>Completeness of Information Presented</u>.  No Company owns any material assets, except as set forth in the Schedules described above.

14.    <u>Acknowledgment</u>.  The undersigned acknowledges that this Perfection Certificate is provided in connection with the Securities Purchase Agreement and the Note, and that the Buyers will rely upon the information contained herein. The undersigned further acknowledges and agrees that the information contained herein shall be deemed to be a representation and warranty under the Securities Purchase Agreement and the Note, and that any material misstatements or material omissions contained herein may constitute a default under the Securities Purchase Agreement and the Note.

[signature page follows]

IN WITNESS WHEREOF, the undersigned has executed this Perfection Certificate as of the date first set forth above.

**MUSCLEPHARM CORPORATION**

By: _Sabina Rizvi_____
      Name:    Sabina Rizvi
      Title:    Chief Financial Officer

**CANADA MUSCLEPHARM ENTERPRISES CORP.**

By: _Sabina Rizvi_____
      Name:    Sabina Rizvi
      Title:    Chief Financial Officer

SCHEDULE I

Persons

| Company Name | State of Organization | Federal Employer I.D. | Organizational I.D. | States where Qualified to do Business |
|---|---|---|---|---|
| MusclePharm Corporation | Nevada | 77-0664193 | NV20061197204 | SOS Annual reports filed in CA, TN, ID, FL, KY, NV, NJ |
| Canada MusclePharm Enterprises Corp. | Ontario, Canada | 803898915 | BC0918993 | |

<u>SCHEDULE II</u>

<u>Other Names</u>

| <u>Company</u> | <u>Present Names</u> | <u>Former Names</u> |
|---|---|---|
| MusclePharm Corporation | MusclePharm; MSLP | Tone in Twenty (Incorporated 8/4/2006); name changed to MusclePharm Corporation 3/1/2010 |

SCHEDULE III

Locations

| Company | Chief Executive Office | Chief Place of Business | Books and Records | Inventory, Equipment, Etc. | Other Locations During Past Fourth Months |
|---|---|---|---|---|---|
| MusclePharm Corporation | 3753 Howard Hughes Pkwy, Ste. 200-849 Las Vegas, NV 89169 | 3753 Howard Hughes Pkwy, Ste. 200-849 Las Vegas, NV 89169 | 3753 Howard Hughes Pkwy, Ste. 200-849 Las Vegas, NV 89169 | 601 Century Parkway Suite 300 Allen, TX 75013

5420 E. La Palma Ave. Anaheim, CA 92807

6050 Dana Way, Ste 300 Antioch, TN 37013 | 4500 Park Granada, Ste. 202, Calabasas, CA 91302 |
| Canada MusclePharm Enterprises Corp. | 170-762 Upper James Street, Hamilton, ON, L9C 3A2 | 170-762 Upper James Street, Hamilton, ON, L9C 3A2 | 170-762 Upper James Street, Hamilton, ON, L9C 3A2 | None | N/A |

SCHEDULE IV
Outside Locations of Collateral

| Company | Outside Locations of Collateral | Type of Collateral (e.g., Inventory, Equipment, Books and Records, etc.)[1] |
|---|---|---|
| MusclePharm Corporation | 3753 Howard Hughes Pkwy, Ste. 200-849 Las Vegas, NV 89169 | Books & Records.  Bank Accounts and Accounts Receivable.  Approx. Value = $5.6M |
| MusclePharm Corporation | JW Nutritional, LLC 601 Century Parkway Suite 300 Allen, TX 75013 | Inventory.  Approx. Value = $1.7M |
| MusclePharm Corporation | SK Laboratories Inc. 5420 E. La Palma Ave. Anaheim, CA 92807 | Inventory.  Approx. Value = $340K |
| MusclePharm Corporation | Cimetra Warehousing & Distribution LLC 6050 Dana Way, Ste 300 Antioch, TN 37013 | Inventory.  Approx. Value = $190K |
| Canada MusclePharm Enterprises Corp. | 170-762 Upper James Street, Hamilton, ON, L9C 3A2 | Books & Records.  Bank Accounts and Account Receivable.  Approx. Value = $670K (Located in Canada) |

---

[1] Inventory values fluctuate and are estimates only.

## SCHEDULE V

## Cash/Accounts

| Company | Bank or Broker | Address | Account No. | Account Type |
|---|---|---|---|---|
| Canada MusclePharm Enterprises Corp. | Royal Bank -Corp (CAD) | ROYAL BANK OF CANADA P.O. BOX 4047 TERMINAL A TORONTO ON M5W 1L5 | ███007-4 | Business Account – Non-US Sub and maintained at a Canadian bank |
| Canada MusclePharm Enterprises Corp. | Royal Bank (USD) | ROYAL BANK OF CANADA P.O. BOX 4047 TERMINAL A TORONTO ON M5W 1L5 | ███158-2 | Business Account - Non-US Sub and maintained at a Canadian bank |
| Canada MusclePharm Enterprises Corp. | Royal Bank GIC (CAD) | ROYAL BANK OF CANADA P.O. BOX 4047 TERMINAL A TORONTO ON M5W 1L5 | ███9976 | Guaranteed Investment Certificate - Non-US Sub and maintained at a Canadian bank |
| MusclePharm Corporation | Chase Deposit | JPMorgan Chase Bank, N.A. P O Box 182051 Columbus, OH 43218 - 2051 | ███1512 | Commercial Money Market – US Bank Account |
| MusclePharm Corporation | WF - Operating (USD) | Wells Fargo Bank, N.A. (182) PO Box 63020 San Francisco, CA 94163 | ███4320 | Operating - US Bank Account |
| MusclePharm Corporation | WF - AP Account (USD) | Wells Fargo Bank, N.A. (182) PO Box 63020 San Francisco, CA 94163 | ███4338 | AP - US Bank Account |
| MusclePharm Corporation | WF - Payroll (USD) | Wells Fargo Bank, N.A. (182) PO Box 63020 San Francisco, CA 94163 | ███4353 | Payroll - US Bank Account |
| MusclePharm Corporation | WF - Factoring (USD) | Wells Fargo Bank, N.A. (182) PO Box 63020 San Francisco, CA 94163 | ███4361 | Factoring - US Bank Account |

SCHEDULE VI

Investment Property

|  | Owner of Record of such Equity Interests | Issuer | Equity Description | No. of Shares (Percentage of Issuer) | Certificate (Indicate No.) |
|---|---|---|---|---|---|
| 1. | MusclePharm Corporation | Canada MusclePharm Enterprises Corp. | Common Shares | 100,000 Common Shares (100%) | Not certificated |

<u>SCHEDULE VII</u>

<u>Securities; Instruments; Chattel Paper</u>

None.

SCHEDULE VIII

Intellectual Property

Trademarks

**U.S. Trademarks:**

| Company | Trademark | Serial no. | Reg. no. | Filing Date | Registration Date | Status |
|---------|-----------|------------|----------|-------------|-------------------|--------|
| MusclePharm Corporation | BCAA 3:1:2 THE FOUNDATION OF YOUR TEMPLE MP MUSCLEPHARM | 86125946 | 4948843 | 11/21/2013 | 5/3/2016 | LIVE |
| MusclePharm Corporation | BIZZY DIET | 85437820 | 4125619 | 10/3/2011 | 4/10/2012 | LIVE |
| MusclePharm Corporation | COMBAT 100% WHEY | 86950423 | 6072063 | 3/23/2016 | 6/9/2020 | LIVE |
| MusclePharm Corporation | COMBAT BLACK | 86512633 | n/a | 86512633 | n/a | LIVE |
| MusclePharm Corporation | COMBAT 100% CASEIN | 86200315 | 4756998 | 2/21/2014 | 6/16/2015 | LIVE |
| MusclePharm Corporation | COMBAT 100% ISOLATE | 86708823 | 4913165 | 7/29/2015 | 3/8/2016 | LIVE |
| MusclePharm Corporation | CONFIDENCE BUILT HERE | 85029460 | 3969126 | 5/4/2010 | 5/31/2011 | LIVE |
| MusclePharm Corporation | Fitmiss | 85527611 | 4444437 | 1/27/2012 | 12/3/2013 | LIVE |
| MusclePharm Corporation | Fitmiss | 90791364 | n/a | 6/23/2021 | n/a | LIVE |
| MusclePharm Corporation | FITMISS BURN | 85528908 | 4716743 | 1/30/2012 | 4/7/2015 | LIVE |
| MusclePharm Corporation | FITMISS DELIGHT | 86058521 | 4498164 | 9/7/2013 | 3/18/2014 | LIVE |
| MusclePharm Corporation | FUEL THE ATHLETE INSIDE | 85029137 | 3969123 | 5/3/2010 | 5/31/2011 | LIVE |
| MusclePharm Corporation | FUEL YOUR ACTIVE LIFESTYLE | 85342497 | 4077223 | 6/9/2011 | 12/27/2011 | LIVE |
| MusclePharm Corporation | MP | 85508691 | 4186812 | 1/4/2012 | 8/7/2012 | LIVE |
| MusclePharm Corporation | MP (stylized black and white) | 87278024 | 5200085 | 12/22/2016 | 5/9/2017 | LIVE |
| MusclePharm Corporation | MP Essentials | 87726463 | 5746636 | 12/19/2017 | 5/7/2019 | LIVE (REVIVED) |

| | | | | | | |
|---|---|---|---|---|---|---|
| MusclePharm Corporation | MP Stealth | 87726506 | n/a | 12/19/2017 | n/a | LIVE |
| MusclePharm Corporation | | 77888944 | 3933441 | 12/8/2009 | 3/22/2011 | LIVE |
| MusclePharm Corporation | MUSCLEPHARM | 85337821 | 4077205 | 6/3/2011 | 12/27/2011 | LIVE |
| MusclePharm Corporation | MUSCLEPHARM SPORTSWEAR | 86489535 | 5191681 | 12/23/2014 | 4/25/2017 | LIVE |
| MusclePharm Corporation | MUSCLEPHARM ENERGY SPORT ZERO | 86266501 | 4767066 | 4/29/2014 | 7/7/2015 | LIVE |
| MusclePharm Corporation | MP MUSCLEPHARM | 87197911 | 5284138 | 10/10/2016 | 9/12/2017 | LIVE |
| MusclePharm Corporation | CREATINE BLACK | 86903340 | 5179223 | 2/10/2016 | 4/11/2017 | LIVE |
| MusclePharm Corporation | CLEAN MASS | 86670213 | 5083129 | 6/22/2015 | 11/15/2016 | LIVE |
| MusclePharm Corporation | VASO SPORT | 86978760 | 5032380 | 6/18/2014 | 8/30/2016 | LIVE |
| MusclePharm Corporation | OXYSPORT | 86978759 | 4970643 | 1/23/2015 | 5/31/2016 | LIVE |
| MusclePharm Corporation | #FUELYOURGRIND | 86115518 | 4924979 | 11/11/2013 | 3/29/2016 | LIVE |
| MusclePharm Corporation | REAL ATHLETES. REAL SCIENCE. | 86708656 | 4922324 | 7/29/2015 | 3/22/2016 | LIVE |
| MusclePharm Corporation | Z-CORE PM | 86708729 | 4913163 | 7/29/2015 | 3/8/2016 | LIVE |
| MusclePharm Corporation | CLA CORE | 86708691 | 4913160 | 7/29/2015 | 3/8/2016 | LIVE |
| MusclePharm Corporation | CARNITINE CORE | 86167804 | 4891161 | 1/16/2014 | 1/26/2016 | LIVE |
| MusclePharm Corporation | THE FOUNDATION OF YOUR TEMPLE | 86164245 | 4879294 | 1/13/2014 | 1/5/2016 | LIVE |
| MusclePharm Corporation | BUILD YOUR LEGACY | 86242785 | 4709769 | 4/4/2014 | 3/24/2015 | LIVE |
| MusclePharm Corporation | STRONG IS THE NEW SEXY | 86262648 | 4694743 | 4/25/2014 | 3/3/2015 | LIVE |
| MusclePharm Corporation | HYBRID SERIES | 85341869 | 4077218 | 6/9/2011 | 12/27/2011 | LIVE |
| MusclePharm Corporation | LIVE SHREDDED | 85732930 | 4317212 | 9/19/2012 | 4/9/2013 | LIVE |
| MusclePharm Corporation | WEAK ENDS HERE | 85404559 | 4131623 | 8/23/2011 | 4/24/2012 | LIVE |
| MusclePharm Corporation | ENERGY ON THE GO | 85087605 | 3934299 | 7/19/2010 | 3/22/2011 | LIVE |
| MusclePharm Corporation | RE-CON | | | | | LIVE |

106929459_8

## Non-U.S. Trademarks:

| Mark | Category | Owner | Country | Class(es) | Status | Filing Date | Registration Date | Renewal Date | App. No. | Reg. No. | File No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DROPZ ENERGY (logo) | Colour Logo | Musclepharm Corporation | European Union | 5 25 32 | OPPOSED | 14/05/2014 | | | 012875746 | | 166970.EM.01 |
| MUSCLEPHARM MP (logo) | Colour Logo | Musclepharm Corporation | European Union | 5 25 32 | REGISTERED | 14/05/2014 | 29/06/2017 | 14/05/2024 | 012875985 | 012875985 | 166972.EM.01 |
| MP (logo) | Colour Logo | Musclepharm Corporation | European Union | 5 25 32 | REGISTERED | 14/05/2014 | 09/01/2015 | 14/05/2024 | 012876058 | 012876058 | 166973.EM.01 |
| COCO PROTEIN (logo) | Colour Logo | Musclepharm Corporation | European Union | 5 32 | REGISTERED | 05/02/2015 | 19/06/2015 | 05/02/2025 | 013713656 | 013713656 | 170674.EM.01 |
| MP (logo) | Colour Logo | Musclepharm Corporation | European Union | 30 | REGISTERED | 15/02/2018 | 29/01/2019 | 15/02/2028 | 017818048 | 017818048 | 166972.EM.04 |
| ASSAULT | Word | Musclepharm Corporation | European Union | 5 | OPPOSED-+ | 05/02/2015 | | | 013710439 | | 170660.EM.01 |
| ASSAULT in Class 5 | Word | Musclepharm Corporation | European Union | 5 | ACCEPTED | 14/11/2018 | | | 017985295 | | 170660.EM.07 |
| COMBAT CRUNCH BAR | Words | Musclepharm Corporation | European Union | 5 30 | OPPOSED | 05/02/2015 | | | 013712443 | | 170673.EM.01 |
| COMBAT PROTEIN POWDER | Words | Musclepharm Corporation | European Union | 5 | REGISTERED | 05/02/2015 | 24/06/2015 | 05/02/2025 | 013712344 | 013712344 | 170671.EM.01 |
| FITMISS | Word | Musclepharm Corporation | European Union | 5 25 30 32 | REGISTERED | 24/09/2015 | 12/02/2016 | 24/09/2025 | 014594477 | 014594477 | 177404.EM.01 |
| MUSCLEPHARM | Word | Musclepharm Corporation | European Union | 5 25 32 | REGISTERED | 22/09/2015 | 27/04/2016 | 22/09/2025 | 014580625 | 014580625 | 177368.EM.01 |
| MUSCLEPHARM | Word | Musclepharm Corporation | European Union | 30 | REGISTERED | 15/02/2018 | 29/01/2019 | 15/02/2028 | 017817867 | 017817867 | 177368.EM.02 |

Patents

None.

Copyrights

None.

106029459_8

Software

None.

Material Intellectual Property License Agreements:

None.

SCHEDULE IX

Real Property

| Company | Location | Leasehold or Fee | Lessor or Mortgagee | Lease or Mortgage Term | Other Liens |
|---------|----------|------------------|---------------------|------------------------|-------------|
| MusclePharm Corporation | 4400 Vanowen St. Burbank, CA 91505 | Lease – No Company assets are on premise as this is a sub-lease. | Landlord- PSIP SN Burbank LLC | 5 year term; ends September 30, 2022. Given we are remote, there is a sub-tenant. | |
| MusclePharm Corporation | 4400 Vanowen St., Burbank, CA 91505 | Sub-Lease - No Company assets are on premise other than Books & Records. | Sublessor- MusclePharm<br><br>Sublessee- LiveGlam, Inc. and Dhar Mann Studios | 2 year and 16 day term; ends September 30, 2022 | |

<u>SCHEDULE X</u>

<u>Motor Vehicles</u>

1.  2015 Dodge Challenger SXT 2 Door
    VIN ████████████6514

## SCHEDULE XI

## Other Titled Collateral

None.

SCHEDULE XII

Commercial Tort Claims

None.

# EXHIBIT 5

# EXHIBIT 5

**EXECUTION VERSION**

## GUARANTEE

GUARANTEE (this "**Guarantee**"), dated as of October 13, 2021, made by each of the undersigned (together with each additional Person that becomes a party to this Agreement each a "**Guarantor**", and collectively, the "**Guarantors**"), in favor of the **Empery Tax Efficient, LP**, in its capacity as collateral agent (in such capacity, the "**Collateral Agent**") for the Buyers (as defined below) party to the Securities Purchase Agreement referenced below.

## W I T N E S S E T H :

WHEREAS, MusclePharm Corporation, a Nevada corporation, (the "**Company**"), and each party listed as a "Buyer" on the signature pages thereto (each a "**Buyer**", and collectively, the "**Buyers**") are parties to that certain Securities Purchase Agreement, dated as of October 13, 2021, (the "**Securities Purchase Agreement**"), pursuant to which, among other things, the Buyers shall purchase from the Company the Notes (as defined in the Securities Purchase Agreement) (as such Notes may be amended, restated, replaced, amended and restated, supplemented or otherwise modified from time to time, the "**Notes**");

WHEREAS, the Buyers have requested, and the Guarantors have agreed, that all existing and future Subsidiaries of the Company shall execute and deliver to the Buyers a guarantee guaranteeing all of the obligations of the Company under the Securities Purchase Agreement, the Notes, the Security Documents, any Perfection Certificate, the other Transaction Documents (as defined in the Securities Purchase Agreement) and any other agreement, instrument, certificate, report or other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Note or any other obligation (collectively, the "**Transaction Documents**");

WHEREAS, pursuant to a Pledge and Security Agreement, dated as of October 13, 2021, (as the same has been, and may be, amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), the Company and the Guarantors (each, a "**Transaction Party**", and collectively, the "**Transaction Parties**") have granted to the Collateral Agent, a security interest in and lien on all or substantially all of its personal property and assets to secure their respective obligations under this Guarantee, the Securities Purchase Agreement, the Notes and the other Transaction Documents; and

WHEREAS, the Company and the Guarantors are mutually dependent on each other in the conduct of their respective businesses as an integrated operation, with the credit needed from time to time by the Guarantors often being provided through financing obtained by the Company and the ability of the Company to obtain such financing being dependent on the successful operations of the Guarantors; and

WHEREAS, each Guarantor has determined that the execution, delivery and performance of this Guarantee directly benefits, and is in the best interest of, such Guarantor.

NOW, THEREFORE, in consideration of the premises and the agreements herein and in order to induce the Buyers to enter into the Securities Purchase Agreement and to buy the Notes, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, each Guarantor hereby agrees with the Collateral Agent as follows:

SECTION 1.    <u>Definitions</u>.  Reference is hereby made to the Securities Purchase Agreement, the Notes and the Security Agreement for a statement of the terms thereof.  All terms used in this Guarantee which are defined in the Securities Purchase Agreement, the Notes or the Security Agreement and not otherwise defined herein shall have the same meanings as set forth therein, as applicable.

SECTION 2.    <u>Guarantee</u>.  The Guarantors, jointly and severally, (i) hereby absolutely unconditionally and irrevocably, guarantee (a) the punctual payment, as and when due and payable, by stated maturity or otherwise, of all Obligations (as defined in the Security Agreement), and (b) the punctual and faithful performance, keeping, observance and fulfillment by the Company of all of the agreements, conditions, covenants and obligations of the Company now or hereafter existing in respect of the Securities Purchase Agreement, the Notes and the other Transaction Documents, and (ii) agree to pay any and all costs and expenses (including reasonable counsel fees and expenses), without duplication, incurred by the Buyers or the Collateral Agent in enforcing any rights under this Guarantee or the other Transaction Documents (all of the foregoing, collectively, the "**Guaranteed Obligations**").  Without limiting the generality of the foregoing, each Guarantor's liability hereunder shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Company to the Collateral Agent and/or the Buyers under the Securities Purchase Agreement, the Notes or any other Transaction Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Transaction Party.

SECTION 3.    <u>Guarantee Absolute; Continuing Guarantee; Assignments</u>.

(a)    The Guarantors, jointly and severally, (i) guarantee that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Transaction Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Collateral Agent or the Buyers with respect thereto and (ii) agree that their guarantee constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by the Collateral Agent or the Buyers to any Collateral.  The obligations of each Guarantor under this Guarantee are independent of the obligations under the Securities Purchase Agreement, the Notes and the other Transaction Documents, and a separate action or actions may be brought and prosecuted against any Guarantor to enforce this Guarantee, irrespective of whether any action is brought against any other Transaction Party or whether any Transaction Party is joined in any such action or actions.  The liability of any Guarantor under this Guarantee shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives, to the extent permitted by law, any defenses it may now or hereafter have in any way relating to, any or all of the following:

(i)    any lack of validity or enforceability of any Transaction Document or any agreement or instrument relating thereto;

(ii)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Transaction Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Transaction Party or otherwise;

(iii)    any taking, exchange, release or non-perfection of any lien on or security interest in any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guarantee, for all or any of the Guaranteed Obligations;

(iv)    the existence of any claim (other than payment in full of the Guaranteed Obligations), set-off, defense or other right that a Guarantor may have against any Person, including, without limitation, the Collateral Agent or any Buyer, whether in connection with this Guarantee or any Transaction Document or the transactions contemplated herein, therein or in any unrelated transaction;

(v)    any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Transaction Party; or

(vi)    any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by the Collateral Agent or any Buyer that might otherwise constitute a defense available to, or a discharge of, any Transaction Party or any other guarantor or surety.

This Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Collateral Agent, any Buyer or any other Person upon the insolvency, bankruptcy or reorganization of any Transaction Party or otherwise, all as though such payment had not been made.

(b)    This Guarantee is a continuing guarantee and shall (i) remain in full force and effect until the indefeasible payment in full in cash of all Guaranteed Obligations, including, without limitation, all obligations under the Notes (together with any matured indemnification obligations as of the date of such payment, but excluding any inchoate or unmatured contingent indemnification obligations) and the payment in full in cash of all other amounts payable under this Guarantee (excluding any inchoate or unmatured contingent indemnification obligations) (the first date on which all of the foregoing shall have finally occurred, the "**Termination Date**"), (ii) be binding upon each Guarantor and its respective successors and assigns and (iii) shall inure to the benefit of and be enforceable by the Collateral Agent and the Buyers and their respective successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (iii), the Collateral Agent and any Buyer may pledge, assign or otherwise transfer all or any portion of its rights and obligations under and subject to the terms of any Transaction Document to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the Collateral Agent or such Buyer herein or otherwise, in each case as provided in the Securities Purchase Agreement or such other Transaction Document.

SECTION 4.    Waivers.    To the extent permitted by applicable law, each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and notice of the incurrence of any Obligation by the Company, (iii) notice of any actions taken by the Collateral Agent or any Buyer under any Transaction Document, (iv) any other notice, demand, protest, or any other formality of every kind in connection with or with respect to any of the Obligations or the Guaranteed Obligations (including enforcement thereof) and this Guarantee, (v) any right to compel or direct the Collateral Agent or any Buyer to seek payment or recovery of any amounts

- 3 -

owed under this Guarantee from any one particular fund or source, (vi) and any requirement that the Buyers or the Collateral Agent exhaust any right or take any action against any Transaction Party or any other Person or any Collateral and (vii) any other defense available to the Guarantor. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this <u>Section 4</u> is knowingly made in contemplation of such benefits.  The Guarantors hereby waive any right to revoke this Guarantee, and acknowledge that this Guarantee is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

SECTION 5.    <u>Subrogation</u>.  No Guarantor may exercise any rights that it may now or hereafter acquire against any Transaction Party or any other guarantor that arise from the existence, payment, performance or enforcement of any Guarantor's obligations under this Guarantee, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Buyers or the Collateral Agent against any Transaction Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Transaction Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until the Termination Date occurs.  If any amount shall be paid to a Guarantor in violation of the immediately preceding sentence at any time prior to the Termination Date, such amount shall be held in trust for the benefit of the Collateral Agent and the Buyers and shall forthwith be paid ratably to the Collateral Agent and the Buyers to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guarantee, whether matured or unmatured, in accordance with the terms of the Transaction Documents, or to be held as collateral for any Guaranteed Obligations or other amounts payable under this Guarantee thereafter arising.  Upon the Termination Date, the Collateral Agent will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

SECTION 6.    <u>Representations, Warranties and Covenants</u>.

(a)    Each Guarantor hereby represents and warrants as follows:

(i)    Each Guarantor (A) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization as set forth on the signature pages hereto, (B) has all requisite corporate, limited liability company or limited partnership power and authority to conduct its business as now conducted and as presently contemplated and to execute and deliver this Guarantee and each other Transaction Document to which the Guarantor is a party, and to consummate the transactions contemplated hereby and thereby and (C) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary except where the failure to be so qualified would not result in a Material Adverse Effect.

(ii)      The execution, delivery and performance by each Guarantor of this Guarantee and each other Transaction Document to which such Guarantor is or will be a party (A) have been duly authorized by all necessary corporate, limited liability company or limited partnership action, (B) do not and will not contravene its charter or by-laws, its limited liability company or operating agreement or its certificate of partnership or partnership agreement, as applicable, or any applicable law or regulation or any contractual restriction binding on the Guarantor or its properties do not and will not result in or require the creation of any lien (other than pursuant to any Transaction Document) upon or with respect to any of its properties, and (C) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any material permit, license, authorization or approval applicable to it or its operations or any of its properties.

(iii)     No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required in connection with the due execution, delivery and performance by the Guarantor of this Guarantee or any of the other Transaction Documents to which the Guarantor is a party (other than as expressly provided for in any of the Transaction Documents).

(iv)     Each of this Guarantee and the other Transaction Documents to which the Guarantor is or will be a party, when executed and delivered, is and will be a legal, valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, suretyship or other similar laws affecting creditor's rights generally and equitable principles (regardless of whether enforcement is sought in equity or at law).

(v)      There is no pending or, to the best knowledge of the Guarantor, threatened claim, action, suit, investigation, litigation or proceeding (including any shareholder or derivative litigation) against the Guarantor or to which any of the properties of the Guarantor is subject, before any court or other governmental authority or any arbitrator that (A) if adversely determined, would reasonably be expected to have a Material Adverse Effect or (B) relates to this Guarantee or any of the other Transaction Documents to which the Guarantor is a party or any transaction contemplated hereby or thereby.

(vi)     The Guarantor (A) has read and understands the terms and conditions of the Securities Purchase Agreement, the Notes and the other Transaction Documents, and (B) now has and will continue to have independent means of obtaining information concerning the affairs, financial condition and business of the Company and the other Transaction Parties, and has no need of, or right to obtain from the Collateral Agent or any Buyer, any credit or other information concerning the affairs, financial condition or business of the Company or the other Transaction Parties that may come under the control of the Collateral Agent or any Buyer.

(b)      The Guarantor covenants and agrees that until the Termination Date, it will comply with each of the covenants (except to the extent applicable only to a public company) which are set forth in Sections 4.8, 4.10, 4.12, 4.13 and 4.14 of the Securities Purchase Agreement as if the Guarantor were a party thereto.

SECTION 7.    <u>Right of Set-off</u>.  Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent and any Buyer may, and is hereby authorized to, at any time and from time to time, without notice to the Guarantors (any such notice being expressly waived by each Guarantor) and to the fullest extent permitted by law, set-off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Collateral Agent or any Buyer to or for the credit or the account of any Guarantor against any and all obligations of the Guarantors now or hereafter existing under this Guarantee or any other Transaction Document, irrespective of whether or not Collateral Agent or any Buyer shall have made any demand under this Guarantee or any other Transaction Document and although such obligations may be contingent or unmatured.  Collateral Agent and each Buyer agrees to notify the relevant Guarantor promptly after any such set-off and application made by such Buyer, provided that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Collateral Agent or any Buyer under this <u>Section 7</u> are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Collateral Agent or such Buyer may have under this Guarantee or any other Transaction Document in law or otherwise.

SECTION 8.    <u>Notices, Etc.</u>  All notices and other communications provided for hereunder shall be given in accordance with <u>Section 5.4</u> of the Securities Purchase Agreement

SECTION 9.    <u>CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE</u>.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTEE OR ANY OTHER TRANSACTION DOCUMENT SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS GUARANTEE, EACH GUARANTOR HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE COLLATERAL AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE THE COLLATERAL AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  EACH GUARANTOR HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND DOCUMENTS IN ANY SUIT, ACTION, OR PROCEEDING BROUGHT IN THE UNITED STATES OF AMERICA ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTEE OR ANY OTHER TRANSACTION DOCUMENT BY THE MAILING (BY REGISTERED MAIL OR CERTIFIED MAIL, POSTAGE PREPAID) OR DELIVERING OF A COPY OF SUCH PROCESS TO THE GUARANTORS, AT THE COMPANY'S ADDRESS FOR NOTICES AS SET FORTH IN SECTION 5.4 OF THE SECURITIES PURCHASE AGREEMENT.  EACH GUARANTOR AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTWITHSTANDING THE FOREGOING, NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE COLLATERAL AGENT AND THE BUYERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST EACH

GUARANTOR IN ANY OTHER JURISDICTION. ANY GUARANTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY GUARANTOR HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH GUARANTOR HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS GUARANTEE AND THE OTHER TRANSACTION DOCUMENTS.

SECTION 10. <u>WAIVER OF JURY TRIAL, ETC</u>. EACH GUARANTOR HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS GUARANTEE OR THE OTHER TRANSACTION DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS GUARANTEE OR THE OTHER TRANSACTION DOCUMENTS, AND AGREES THAT ANY SUCH ACTION, PROCEEDING OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH GUARANTOR CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE COLLATERAL AGENT OR ANY BUYER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE COLLATERAL AGENT OR ANY BUYER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH GUARANTOR HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE COLLATERAL AGENT AND THE BUYERS ENTERING INTO THE TRANSACTION DOCUMENTS.

SECTION 11. <u>Taxes</u>.

(a)    All payments made by any Guarantor hereunder or under any other Transaction Document shall be made in accordance with the terms of the respective Transaction Document and shall be made without set-off, counterclaim, deduction or other defense. All such payments shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, <u>excluding</u> taxes imposed on the net income of any the Collateral Agent or any Buyer by the jurisdiction in which the Collateral Agent or such Buyer is organized or where it has its principal lending office (all such nonexcluded taxes, levies, imposts, deductions, charges, withholdings and liabilities, collectively or individually, "**Taxes**"). If any Guarantor shall be required to deduct or to withhold any Taxes from or in respect of any amount payable hereunder or under any other Transaction Document:

(i)    the amount so payable shall be increased to the extent necessary so that after making all required deductions and withholdings (including Taxes on amounts payable to the Collateral Agent or any Buyer pursuant to this sentence) the Collateral Agent and each Buyer receives an amount equal to the sum it would have received had no such deduction or withholding been made,

(ii)    such Guarantor shall make such deduction or withholding,

(iii)    such Guarantor shall pay the full amount deducted or withheld to the relevant taxation authority in accordance with applicable law, and

(iv)    as promptly as possible thereafter, such Guarantor shall send the Collateral Agent and the Buyers an official receipt (or, if an official receipt is not available, such other documentation as shall be satisfactory to the Collateral Agent and the Buyers, as the case may be) showing payment.  In addition, each Guarantor agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery, registration or enforcement of, or otherwise with respect to, this Guarantee or any other Transaction Document (collectively, "**Other Taxes**").

(b)    Each Guarantor hereby indemnifies and agrees to hold the Collateral Agent and each Buyer (each an "**Indemnified Party**") harmless from and against Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this <u>Section 11</u>) paid by any Indemnified Party  as a result of any payment made hereunder or from the execution, delivery, registration or enforcement of, or otherwise with respect to, this Agreement or any other Transaction Document, and any liability (including penalties, interest and expenses for nonpayment, late payment or otherwise) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.  This indemnification shall be paid within 30 days from the date on which the Collateral Agent or such Buyer makes written demand therefor, which demand shall identify the nature and amount of such Taxes or Other Taxes.

(c)    If any Guarantor fails to perform any of its obligations under this <u>Section 11</u>, such Guarantor shall indemnify the Collateral Agent and each Buyer for any taxes, interest or penalties that become payable as a result of any such failure.  The obligations of the Guarantors under this <u>Section 11</u> shall survive the termination of this Guarantee and the payment of the Obligations and all other amounts payable hereunder.

SECTION 12.    <u>Miscellaneous</u>.

(a)    Each Guarantor will make each payment hereunder in lawful money of the United States of America and in immediately available funds to each Buyer, at such address specified by such Buyer from time to time by notice to the Guarantors.

(b)    Provisions of this Guarantee may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the Collateral Agent.  Any

amendment or waiver effected in accordance with this Section 12 shall be binding upon each Buyer and the Company.

(c)     No failure on the part of the Collateral Agent or any Buyer to exercise, and no delay in exercising, any right hereunder or under any other Transaction Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder or under any Transaction Document preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Collateral Agent and the Buyers provided herein and in the other Transaction Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Collateral Agent and the Buyers under any Transaction Document against any party thereto are not conditional or contingent on any attempt by the Collateral Agent or any Buyer to exercise any of their respective rights under any other Transaction Document against such party or against any other Person.

(d)     Any provision of this Guarantee that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(e)     This Guarantee shall (i) be binding on each Guarantor and its respective successors and assigns, and (ii) inure, together with all rights and remedies of the Collateral Agent and the Buyers hereunder, to the benefit of the Collateral Agent and the Buyers and their respective successors, transferees and assigns.  Without limiting the generality of clause (ii) of the immediately preceding sentence, the Collateral Agent and any Buyer may assign or otherwise transfer its rights and obligations under the Securities Purchase Agreement or any other Transaction Document to any other Person in accordance with the terms thereof, and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to the Collateral Agent or such Buyer, as the case may be, herein or otherwise.  None of the rights or obligations of any Guarantor hereunder may be assigned or otherwise transferred without the prior written consent of each Buyer.

(f)     This Guarantee reflects the entire understanding of the transaction contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, entered into before the date hereof.

(g)     Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(h)     This Guarantee may be executed by each party hereto on a separate counterpart, each of which when so executed and delivered shall be an original, but all of which together shall constitute one agreement.  Delivery of an executed counterpart by facsimile or other method of electronic transmission shall be equally effective as delivery of an original executed counterpart.  The parties hereto irrevocably and unreservedly agree that this Guarantee may be executed by way of electronic signatures and the parties agree that neither this Guarantee, nor any part hereof, shall be challenged or denied any legal effect, validity and/or enforceability solely on the ground that it is in the form of an electronic record

(i)    THIS GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

107631991_4

IN WITNESS WHEREOF, each Guarantor has caused this Guarantee to be executed by its respective duly authorized officer, as of the date first above written.

**MUSCLEPHARM CORPORATION**

By: _Sabina Rizvi_____
Name: Sabina Rizvi
Title:  President and Chief Financial Officer

**CANADA MUSCLEPHARM ENTERPRISES CORP.**

By: _Sabina Rizvi_____
Name: Sabina Rizvi
Title:   Chief Financial Officer

# EXHIBIT 6

# EXHIBIT 6

**UCC FINANCING STATEMENT**

FOLLOW INSTRUCTIONS

| | | |
|---|---|---|
| **Filed in the Office of** | **Initial Filing Number** | |
| *Barbara K. Cegavske* | **2021197657-6** | |
| | **Filed On** | |
| Secretary of State | **October 14, 2021 01:54 PM** | |
| State Of Nevada | **Number of Pages** | |
| | **1** | |

A. NAME & PHONE OF CONTACT AT FILER (optional)
Tracey Dillon                                    212-756-2127

B. E-MAIL CONTACT AT FILER (optional)
tracey.dillon@srz.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Return acknowledgment to:

Capitol Corporate Services, Inc.
P.O. Box 3100     Carson City, NV 89702
800/899-0490

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| MusclePharm Corporation | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 3753 Howard Hughes Pkwy, Ste. 200-849 | Las Vegas | NV | 89169 | | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Empery Tax Efficient, LP, as Collateral Agent | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 1 Rockefeller Plaza, Suite 1205 | New York | NY | 10020 | | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets, including but not limited to all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles (including, without limitation, all payment intangibles), goods, instruments (including, without limitation, promissory notes), inventory, investment property, copyrights, patents and trademarks and licenses, letter-of-credit rights, supporting obligations, proceeds (including cash and noncash proceeds) and products of any of the foregoing collateral.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
CM# 018914.0044  Filed with: NV - Secretary of State                    F#831664
                                                                          A#1141945

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)                    International Association of Commercial Administrators (IACA)

# EXHIBIT 7

# EXHIBIT 7

# WAIVER AND AMENDMENT

This Waiver and Amendment dated as of June 3, 2022 (the "Agreement") is by and between MusclePharm Corporation, a Nevada corporation (the "Company"), and the undersigned, a Purchaser (as defined below) identified on the signature pages hereto. Capitalized terms not defined herein shall have the meanings assigned to them in that certain (i) Securities Purchase Agreement (the "SPA") dated as of October 13, 2021 by and among the Company and each purchaser identified on the signature pages thereto (each, a "Purchaser" and collectively, the "Purchasers"); (ii) Pledge and Security Agreement (the "Security Agreement") dated as of October 13, 2021 by the Company and each Subsidiary of the Company listed on the signature pages thereto in favor of Empery Tax Efficient, LP, in its capacity as collateral agent for the Purchasers; (iii) Original Issue Discount Senior Secured Notes (the "October Notes") dated as of October 13, 2021 issued by the Company to each Purchaser; and (iv) the Common Stock Purchase Warrants (the "October Warrants" and together with the SPA, the Security Agreement and the October Notes, the "Transaction Documents") dated as of October 13, 2021 issued by the Company to each Purchaser.

## WITNESSETH:

**WHEREAS**, on October 13, 2021, the Company entered into the SPA with the Purchasers whereby the Company issued to the Purchasers the October Notes in the aggregate principal amount of $8,197,674.42 (including an original issuance discount) and October Warrants to purchase up to 17,355,700 shares of the Company's common stock;

**WHEREAS**, the Company is contemplating entering into a Subsequent Financing (as defined in the SPA) pursuant to which it intends to sell notes (the "New Notes") in the aggregate principal amount of up to $3,750,000 (including a 20% original issuance discount) and warrants (the "New Warrants") to purchase such number of shares of the Company's common stock equal to 150% of the aggregate principal amount of New Notes divided by the closing sale price of the Company's common stock on the trading day immediately preceding the announcement of the Current Subsequent Financing (as defined below) (the "Warrant Shares" and together with the New Notes and the New Warrants, the "Securities") to be offered to various investors through ROTH Capital Partners, LLC, as placement agent (such Subsequent Financing, the "Current Subsequent Financing"); and

**WHEREAS**, the Company is requesting a waiver from and/or consent to amend certain provisions of the Transaction Documents, in each case as provided in this Agreement, solely in order to enter into and consummate the Current Subsequent Financing.

**NOW, THEREFORE**, in consideration of and for the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1. Waiver of Negative Covenants in October Notes. The Purchaser hereby waives compliance with Sections 3 (a), (b) and (h) of the October Notes solely in connection with the entry into and consummation of the Current Subsequent Financing and issuance of the Securities pursuant to the Current Subsequent Financing.

2. Consent to Amendment of the October Notes.

   a. The Purchaser and the Company hereby agree to amend and restate the first paragraph of the October Notes to read as follows:

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Rd., Ste. 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due April 13, 2022 (this October Note, as amended, the "October Note" and, collectively with the other October Notes of such series, as amended, the "October Notes").

b.   The Purchaser and the Company hereby agree to amend and restate the definition of "Maturity Date" in the October Notes as follows: "the date that is six (6) months from the Subsequent Closing Date (as defined in that certain Amended and Restated Securities Purchase Agreement dated as of June 3, 2022 by and among the Company and the purchasers listed on the signature pages attached thereto (the "A&R SPA"), including those party thereby pursuant to one or more joinder agreements)".

c.   The Purchaser and the Company hereby agree to amend certain definitions in Section 1 of the October Notes as follows:

"Permitted Indebtedness" shall have the meaning ascribed to such term in the New Notes; provided that clause (a) therein shall be amended to refer to the New Notes.

"Permitted Liens" shall have the meaning ascribed to such term in the New Notes.

"Transaction Documents" shall have the meaning ascribed to such term in the A&R SPA.

"Warrants" shall have the meaning ascribed to such term in the A&R SPA.

"Warrant Shares" shall have the meaning ascribed to such term in the A&R SPA.

d.   The Purchaser and the Company hereby agree to amend Section 1 of the October Notes by adding the following definition:

"Indebtedness" shall have the meaning ascribed to such term in the A&R SPA.

"MSLP Note" shall mean one of the MSLP Notes.

"MSLP Notes" shall have the meaning ascribed to such term in the New Notes.

"New Notes" means those certain Original Issue Discount Senior Secured Notes due December 2022 issued by the Company on the Subsequent Closing Date (as defined in the A&R SPA) pursuant to the A&R SPA.

e.   The Purchaser and the Company hereby agree that initial principal amount of the undersigned's October Notes set forth on the undersigned's signature page attached hereto shall be increased to the aggregate principal amount of October Notes set forth on the undersigned's signature page attached hereto.

f.   The Purchaser and the Company hereby agree that each reference to "Note" and/or "Notes" in Sections 3(e)(iii), 4, 5(a)(x), 5(a)(xiv) and 7(b) of the October Notes shall be replaced with a reference to "MSLP Note" or "MSLP Notes", respectively.

g.  The Purchaser and the Company hereby agree that Section 5(a) of the October Notes shall be amended to (1) add the following additional Event of Default as clause (xvi): "Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; provided that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty-five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities, or authority; or", (2) the word "or" at the end of clause (xv) shall be deleted and (3) clause (xvi) shall be renumbered as clause (xvii).

h.  The Purchaser and the Company hereby agree that the amendments set forth in this Section 2 shall only become effective upon the due execution and delivery to the Company of a Waiver and Amendment identical in form and substance to this Waiver and Amendment by all Purchasers; provided that the certain Amended and Restated Securities Purchase Agreement dated as of June 3, 2022 by and among the Company and the purchasers listed on the signature pages attached thereto and those party thereto pursuant to one or more joinder agreements (the "<u>A&R SPA</u>") shall be duly executed and delivered by all parties thereto on or prior to June 3, 2022.

3.  <u>Consent to Amendment of the October Warrants</u>. The Purchaser and the Company hereby agree that the reference to "9.99%" in Section 2(e) of the October Warrants shall be replaced with a reference to "4.99%".

4.  <u>No Implied Waiver or Consent</u>. Except for the specific waiver, amendment and consent set forth above, nothing herein shall be deemed to be a consent to, amendment of or waiver of any covenant or agreement contained in the Transaction Documents, and all covenants and agreements contained in the Transaction Documents, as modified hereby, are hereby confirmed and ratified in all respects and shall remain in full force and effect in accordance with their respective terms.

5.  <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the Company and the Purchaser with respect to the matters covered hereby and supersedes all previous written, oral or implied understandings among them with respect to such matters. The terms set forth in this Agreement may not be amended without the prior written consent of the Company and Purchaser. This Agreement is intended for the benefit of the parties hereto and their respective successors and assigns and is not for the benefit of, nor may any provisions hereof be enforced by, any other person or entity.

6.  <u>Governing Law</u>. This Agreement shall be governed by and construed under the laws of the State of New York without regard to the choice of law principles thereof.

7.  <u>Counterparts</u>. This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. In the event that any signature is delivered by facsimile transmission or by an e-mail which contains an electronic file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing

(or on whose behalf such signature is executed) with the same force and effect as if such facsimile or electronic file signature page (as the case may be) were an original thereof.

8.  <u>Termination</u>. This Agreement shall terminate, be of no further force or effect and be void *ab initio* if the Subsequent Closing (as defined in the A&R SPA) shall not be consummated in accordance with the terms set forth in the A&R SPA on or prior to June 10, 2022.

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first stated above.

**MUSCLEPHARM CORPORATION**

By: _Sabina Rizvi_____
    Name:  Sabina Rizvi
    Title: President and CFO

_____
Name of Purchaser:
Title (if the Purchaser is an entity):

**INITIAL AGGREGATE PRINCIPAL OF OCTOBER NOTES:**
**$**

**AGGREGATE PRINCIPAL OF OCTOBER NOTES AFTER GIVING EFFECT TO SECTION 2(e) OF THIS AGREEMENT:**
**$**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first stated above.

**MUSCLEPHARM CORPORATION**

By:_____
    Name: Sabina Rizvi
    Title: President and CFO

**EMPERY MASTER ONSHORE, LLC**
BY: EMPERY ASSET MANAGEMENT, LP

By: _____
    Name: Brett Director
    Title: General Counsel

**INITIAL AGGREGATE PRINCIPAL OF OCTOBER NOTES:**

$776,744.19

**AGGREGATE PRINCIPAL OF OCTOBER NOTES AFTER GIVING EFFECT TO SECTION 2(e) OF THIS AGREEMENT:**

**$924,712.40**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first stated above.

**MUSCLEPHARM CORPORATION**

By:_____
    Name: Sabina Rizvi
    Title: President and CFO

**EMPERY TAX EFFICIENT, LP**
BY: EMPERY ASSET MANAGEMENT, LP

By: _____
    Name: Brett Director
    Title: General Counsel

**INITIAL AGGREGATE PRINCIPAL OF OCTOBER NOTES:**

**$232,558.14**

**AGGREGATE PRINCIPAL OF OCTOBER NOTES AFTER GIVING EFFECT TO SECTION 2(e) OF THIS AGREEMENT:**

**$276,860.00**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first stated above.

**MUSCLEPHARM CORPORATION**

By:_____
    Name:  Sabina Rizvi
    Title: President and CFO

**EMPERY TAX EFFICIENT III, LP**
BY: EMPERY ASSET MANAGEMENT, LP

By: _____
    Name: Brett Director
    Title: General Counsel

**INITIAL AGGREGATE PRINCIPAL OF OCTOBER NOTES:**

**$269,767.44**

**AGGREGATE PRINCIPAL OF OCTOBER NOTES AFTER GIVING EFFECT TO SECTION 2(e) OF THIS AGREEMENT:**

**$321,157.60**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first stated above.

**MUSCLEPHARM CORPORATION**

By: _____
    Name: Sabina Rizvi
    Title: President and CFO

**EMPERY DEBT OPPORTUNITY FUND, LP**
BY: EMPERY ASSET MANAGEMENT, LP

By: _____
    Name: Brett Director
    Title: General Counsel

**INITIAL AGGREGATE PRINCIPAL OF OCTOBER NOTES:**

**$1,046,511.63**

**AGGREGATE PRINCIPAL OF OCTOBER NOTES AFTER GIVING EFFECT TO SECTION 2(e) OF THIS AGREEMENT:**

**$1,245,870.00**

# EXHIBIT 8

# EXHIBIT 8

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: June 10, 2022                                    $156,250.00.00

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE DECEMBER 10, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Road, Suite 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due December 10, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Altium Growth Fund, LP or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $156,250.00 on December 10, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder. This Note is subject to the following additional provisions:

Section 1. Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X) thereof, (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the

electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes; (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof; (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 in the principal amount of $2.5 million; (d) Indebtedness evidenced by that certain convertible secured promissory note dated November 29, 2020 in the original principal amount of $2.9 million issued to Ryan Drexler, which amended and restated a convertible secured promissory note dated as of August 21, 2020; (e) Indebtedness evidenced by the Unsecured Revolving Promissory Note dated March 8, 2022 issued by the Company in favor of Ryan Drexler, as may be amended to contemplate that such Indebtedness be secured by certain assets of the Company and its subsidiaries; provided, that (1) the principal amount of such Indebtedness is less than or equal to $5 million and (2) such Indebtedness is expressly subordinated to the MSLP Notes pursuant to a written intercreditor agreement in form and substance satisfactory to the Collateral Agent; (f) Indebtedness that may become due or payable to ThermoLife International LLC pursuant to that certain complaint initially filed against the Company by ThermoLife International LLC in Arizona state court; (g) Indebtedness evidenced by certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 in the

maximum principal amount of $8,197,674.42, which principal amount was increased to $9,759,135.00 (including an original issuance discount) contemporaneously with the issuance of the Notes (the "October 2021 Notes" and together with the Notes, the "MSLP Notes"); (h) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default; (i) trade accounts payable incurred in the ordinary course of business consistent with past practice; (j) Indebtedness evidenced by the Settlement Agreements; and (k) Indebtedness that (A) is expressly subordinated to the MSLP Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b), (c), (d), (e), (g) and (h).

"Purchase Agreement" means the Amended and Restated Securities Purchase Agreement, dated as of May 28, 2022 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., and (iv) Settlement Agreement, Covenant Not to Sue and General Release, dated November 2, 2021, by and among the Company, Richard Estalella, Timothy K. Bradley, CPA, Bradley Consulting Group, P.C., Stratagem, P.C. and Applied Economics, LLC, in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2. Registration of Transfers and Exchanges. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be payable for such registration of transfer or exchange.

Section 3. Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a) other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b) other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c) amend its charter documents, including, without limitation, its articles/certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e) repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (e), clause (i) or clause (j) of the definition of Permitted Indebtedness and (iii) the MSLP Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f) declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g) enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h) consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4. Mandatory Redemption.

a) Occurrence of Mandatory Redemption. While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such

offering, a "<u>Subsequent Offering</u>" and 25% of such net proceeds from such Subsequent Offering, the "<u>Net Proceeds</u>") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding MSLP Notes (a "<u>Mandatory Redemption</u>"); <u>provided</u>, <u>however</u>, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the MSLP Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the MSLP Notes then outstanding pro rata based on the principal amount of such MSLP Notes then outstanding and (iii) the Company shall effect successive Mandatory Redemptions upon each Subsequent Offering until the MSLP Notes are repaid in full or otherwise no longer outstanding.

b) <u>Mandatory Notices</u>. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "<u>Mandatory Redemption Notice</u>" and the date such notice is delivered to all such holders is referred to as a "<u>Mandatory Redemption Notice Date</u>") (a) stating the date on which the Mandatory Redemption shall occur (a "<u>Mandatory Redemption Date</u>"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the MSLP Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c) <u>Mandatory Redemption Procedure</u>. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(c), the Net Proceeds shall be applied ratably among the Holders of the MSLP Notes.

<u>Section 5</u>. <u>Events of Default</u>.

a) "<u>Event of Default</u>" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)     any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within three (3) Trading Days;

(ii)    the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) five (5) Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) ten (10) Trading Days after the Company has become or should have become aware of such failure;

(iii)   a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)     any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)     the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)     the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)     the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)     any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)     the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)     the occurrence of an Event of Default under any other MSLP Note;

(xi)     any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

(xii)     the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)     any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)     any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the MSLP Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)      any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xvi)      Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; provided that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities or authority; or

(xvii)      any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

b) <u>Remedies Upon Event of Default</u>. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable. Commencing five (5) days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

<u>Section 6</u>. <u>Security</u>. The Notes are secured to the extent and in the manner set forth in the Security Documents.

Section 7. Miscellaneous.

a) Notices. Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a). Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) Absolute Obligation. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks pari passu with all other MSLP Notes now or hereafter issued under the terms set forth in the Transaction Documents, including the October 2021 Notes.

c) Lost or Mutilated Note. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) Governing Law. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "New York Courts"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the

investigation, preparation and prosecution of such action or proceeding. This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e) <u>Waiver</u>. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion. Any waiver by the Company or the Holder must be in writing.

f) <u>Severability</u>. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) <u>Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) <u>Next Business Day</u>. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) <u>Headings</u>. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) <u>Amendment</u>. This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Ryan Drexler

Title:  Chief Executive Officer

Address: 6728 W. Sunset Road

Suite 130

Las Vegas, NV 89118

Email address:  ryan.drexler@musclepharm.com

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: June 10, 2022                                                     $312,500.00

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE DECEMBER 10, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Road, Suite 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due December 10, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Anson Investment Master Fund LP or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $312,500.00 on December 10, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder.  This Note is subject to the following additional provisions:

Section 1.  Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X) thereof, (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the

electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes; (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof; (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 in the principal amount of $2.5 million; (d) Indebtedness evidenced by that certain convertible secured promissory note dated November 29, 2020 in the original principal amount of $2.9 million issued to Ryan Drexler, which amended and restated a convertible secured promissory note dated as of August 21, 2020; (e) Indebtedness evidenced by the Unsecured Revolving Promissory Note dated March 8, 2022 issued by the Company in favor of Ryan Drexler, as may be amended to contemplate that such Indebtedness be secured by certain assets of the Company and its subsidiaries; provided, that (1) the principal amount of such Indebtedness is less than or equal to $5 million and (2) such Indebtedness is expressly subordinated to the MSLP Notes pursuant to a written intercreditor agreement in form and substance satisfactory to the Collateral Agent; (f) Indebtedness that may become due or payable to ThermoLife International LLC pursuant to that certain complaint initially filed against the Company by ThermoLife International LLC in Arizona state court; (g) Indebtedness evidenced by certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 in the

maximum principal amount of $8,197,674.42, which principal amount was increased to $9,759,135.00 (including an original issuance discount) contemporaneously with the issuance of the Notes (the "October 2021 Notes" and together with the Notes, the "MSLP Notes"); (h) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default; (i) trade accounts payable incurred in the ordinary course of business consistent with past practice; (j) Indebtedness evidenced by the Settlement Agreements; and (k) Indebtedness that (A) is expressly subordinated to the MSLP Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b), (c), (d), (e), (g) and (h).

"Purchase Agreement" means the Amended and Restated Securities Purchase Agreement, dated as of May 28, 2022 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., and (iv) Settlement Agreement, Covenant Not to Sue and General Release, dated November 2, 2021, by and among the Company, Richard Estalella, Timothy K. Bradley, CPA, Bradley Consulting Group, P.C., Stratagem, P.C. and Applied Economics, LLC, in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2. Registration of Transfers and Exchanges. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be payable for such registration of transfer or exchange.

Section 3. Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a) other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b) other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c) amend its charter documents, including, without limitation, its articles/certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e) repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (e), clause (i) or clause (j) of the definition of Permitted Indebtedness and (iii) the MSLP Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f) declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g) enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h) consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4. Mandatory Redemption.

a) Occurrence of Mandatory Redemption. While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such

offering, a "<u>Subsequent Offering</u>" and 25% of such net proceeds from such Subsequent Offering, the "<u>Net Proceeds</u>") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding MSLP Notes (a "<u>Mandatory Redemption</u>"); <u>provided</u>, <u>however</u>, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the MSLP Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the MSLP Notes then outstanding pro rata based on the principal amount of such MSLP Notes then outstanding and (iii) the Company shall effect successive Mandatory Redemptions upon each Subsequent Offering until the MSLP Notes are repaid in full or otherwise no longer outstanding.

b) <u>Mandatory Notices</u>. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "<u>Mandatory Redemption Notice</u>" and the date such notice is delivered to all such holders is referred to as a "<u>Mandatory Redemption Notice Date</u>") (a) stating the date on which the Mandatory Redemption shall occur (a "<u>Mandatory Redemption Date</u>"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the MSLP Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c) <u>Mandatory Redemption Procedure</u>. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(c), the Net Proceeds shall be applied ratably among the Holders of the MSLP Notes.

<u>Section 5</u>. <u>Events of Default</u>.

a) "<u>Event of Default</u>" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)      any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within three (3) Trading Days;

(ii)     the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) five (5) Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) ten (10) Trading Days after the Company has become or should have become aware of such failure;

(iii)    a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)     any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)     the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)     the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)     the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)     any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)     the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)     the occurrence of an Event of Default under any other MSLP Note;

(xi)     any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

(xii)     the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)     any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)     any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the MSLP Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)    any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xvi)    Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; provided that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities or authority; or

(xvii)    any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

b) <u>Remedies Upon Event of Default</u>. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable. Commencing five (5) days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

<u>Section 6</u>. <u>Security</u>. The Notes are secured to the extent and in the manner set forth in the Security Documents.

Section 7. <u>Miscellaneous</u>.

a) <u>Notices</u>. Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a). Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) <u>Absolute Obligation</u>. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks <u>pari passu</u> with all other MSLP Notes now or hereafter issued under the terms set forth in the Transaction Documents, including the October 2021 Notes.

c) <u>Lost or Mutilated Note</u>. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "<u>New York Courts</u>"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the

investigation, preparation and prosecution of such action or proceeding. This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e) Waiver. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion. Any waiver by the Company or the Holder must be in writing.

f) Severability. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) Next Business Day. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) Headings. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) Amendment. This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Ryan Drexler

Title:  Chief Executive Officer

Address: 6728 W. Sunset Road

Suite 130

Las Vegas, NV 89118

Email address:  ryan.drexler@musclepharm.com

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: June 10, 2022          $312,500.00

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
### DUE DECEMBER [ ], 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Road, Suite 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due December 10, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Bigger Capital Fund, LP or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $312,500.00 on December 10, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder. This Note is subject to the following additional provisions:

Section 1. Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X), (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the

electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes; (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof; (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 in the principal amount of $2.5 million; (d) Indebtedness evidenced by that certain convertible secured promissory note dated November 29, 2020 in the original principal amount of $2.9 million issued to Ryan Drexler, which amended and restated a convertible secured promissory note dated as of August 21, 2020; (e) Indebtedness evidenced by the Unsecured Revolving Promissory Note dated March 8, 2022 issued by the Company in favor of Ryan Drexler, as may be amended to contemplate that such Indebtedness be secured by certain assets of the Company and its subsidiaries; provided, that (1) the principal amount of such Indebtedness is less than or equal to $5 million and (2) such Indebtedness is expressly subordinated to the MSLP Notes pursuant to a written intercreditor agreement in form and substance satisfactory to the Collateral Agent; (f) Indebtedness that may become due or payable to ThermoLife International LLC pursuant to that certain complaint initially filed against the Company by ThermoLife International LLC in Arizona state court; (g) Indebtedness evidenced by certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 in the

maximum principal amount of $8,197,674.42, which principal amount was increased to $9,759,135.00 (including an original issuance discount) contemporaneously with the issuance of the Notes (the "October 2021 Notes" and together with the Notes, the "MSLP Notes"); (h) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default; (i) trade accounts payable incurred in the ordinary course of business consistent with past practice; (j) Indebtedness evidenced by the Settlement Agreements; and (k) Indebtedness that (A) is expressly subordinated to the MSLP Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b), (c), (d), (e), (g) and (h).

"Purchase Agreement" means the Amended and Restated Securities Purchase Agreement, dated as of May 28, 2022 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., and (iv) Settlement Agreement, Covenant Not to Sue and General Release, dated November 2, 2021, by and among the Company, Richard Estalella, Timothy K. Bradley, CPA, Bradley Consulting Group, P.C., Stratagem, P.C. and Applied Economics, LLC, in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2. Registration of Transfers and Exchanges. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be payable for such registration of transfer or exchange.

Section 3. Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a) other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b) other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c) amend its charter documents, including, without limitation, its articles/certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e) repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (e), clause (i) or clause (j) of the definition of Permitted Indebtedness and (iii) the MSLP Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f) declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g) enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h) consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4. Mandatory Redemption.

a) Occurrence of Mandatory Redemption. While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such

offering, a "<u>Subsequent Offering</u>" and 25% of such net proceeds from such Subsequent Offering, the "<u>Net Proceeds</u>") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding MSLP Notes (a "<u>Mandatory Redemption</u>"); <u>provided</u>, <u>however</u>, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the MSLP Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the MSLP Notes then outstanding pro rata based on the principal amount of such MSLP Notes then outstanding and (iii) the Company shall effect successive Mandatory Redemptions upon each Subsequent Offering until the MSLP Notes are repaid in full or otherwise no longer outstanding.

b) <u>Mandatory Notices</u>. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "<u>Mandatory Redemption Notice</u>" and the date such notice is delivered to all such holders is referred to as a "<u>Mandatory Redemption Notice Date</u>") (a) stating the date on which the Mandatory Redemption shall occur (a "<u>Mandatory Redemption Date</u>"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the MSLP Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c) <u>Mandatory Redemption Procedure</u>. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of eighteen percent (18%)  per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(c), the Net Proceeds shall be applied ratably among the Holders of the MSLP Notes.

<u>Section 5</u>. <u>Events of Default</u>.

a) "<u>Event of Default</u>" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)        any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within three (3) Trading Days;

(ii)       the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) five (5) Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) ten (10) Trading Days after the Company has become or should have become aware of such failure;

(iii)     a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)     any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)     the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)     the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)     the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)     any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)     the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)     the occurrence of an Event of Default under any other MSLP Note;

(xi)     any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

(xii)     the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)     any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)     any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the MSLP Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)     any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xvi)     Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; provided that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities or authority; or

(xvii)     any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

b) Remedies Upon Event of Default. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable. Commencing five (5) days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

Section 6. Security. The Notes are secured to the extent and in the manner set forth in the Security Documents.

Section 7. Miscellaneous.

a) Notices. Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a). Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) Absolute Obligation. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks pari passu with all other MSLP Notes now or hereafter issued under the terms set forth in the Transaction Documents, including the October 2021 Notes.

c) Lost or Mutilated Note. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) Governing Law. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "New York Courts"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the

investigation, preparation and prosecution of such action or proceeding. This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e) Waiver. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion. Any waiver by the Company or the Holder must be in writing.

f) Severability. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) Next Business Day. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) Headings. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) Amendment. This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Ryan Drexler

Title:  Chief Executive Officer

Address: 6728 W. Sunset Road

Suite 130

Las Vegas, NV 89118

Email address:  ryan.drexler@musclepharm.com

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: June 10, 2022                                                    $312,500.00

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
### DUE DECEMBER 10, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Road, Suite 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due December 10, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to District 2 Capital Fund, LP or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $312,500.00 on December 10, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder.  This Note is subject to the following additional provisions:

Section 1. Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X) thereof, (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the

electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes; (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof; (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 in the principal amount of $2.5 million; (d) Indebtedness evidenced by that certain convertible secured promissory note dated November 29, 2020 in the original principal amount of $2.9 million issued to Ryan Drexler, which amended and restated a convertible secured promissory note dated as of August 21, 2020; (e) Indebtedness evidenced by the Unsecured Revolving Promissory Note dated March 8, 2022 issued by the Company in favor of Ryan Drexler, as may be amended to contemplate that such Indebtedness be secured by certain assets of the Company and its subsidiaries; provided, that (1) the principal amount of such Indebtedness is less than or equal to $5 million and (2) such Indebtedness is expressly subordinated to the MSLP Notes pursuant to a written intercreditor agreement in form and substance satisfactory to the Collateral Agent; (f) Indebtedness that may become due or payable to ThermoLife International LLC pursuant to that certain complaint initially filed against the Company by ThermoLife International LLC in Arizona state court; (g) Indebtedness evidenced by certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 in the

maximum principal amount of $8,197,674.42, which principal amount was  increased to $9,759,135.00 (including an original issuance discount) contemporaneously with the issuance of the Notes (the "October 2021 Notes" and together with the Notes, the "MSLP Notes"); (h) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default; (i) trade accounts payable incurred in the ordinary course of business consistent with past practice; (j) Indebtedness evidenced by the Settlement Agreements; and (k) Indebtedness that (A) is expressly subordinated to the MSLP Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b), (c), (d), (e), (g) and (h).

"Purchase Agreement" means the Amended and Restated Securities Purchase Agreement, dated as of May 28, 2022 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., and (iv) Settlement Agreement, Covenant Not to Sue and General Release, dated November 2, 2021, by and among the Company, Richard Estalella, Timothy K. Bradley, CPA, Bradley Consulting Group, P.C., Stratagem, P.C. and Applied Economics, LLC, in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2. Registration of Transfers and Exchanges. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be payable for such registration of transfer or exchange.

Section 3. Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a) other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b) other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c) amend its charter documents, including, without limitation, its articles/certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e) repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (e), clause (i) or clause (j) of the definition of Permitted Indebtedness and (iii) the MSLP Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f) declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g) enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h) consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4. Mandatory Redemption.

a) Occurrence of Mandatory Redemption. While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such

offering, a "<u>Subsequent Offering</u>" and 25% of such net proceeds from such Subsequent Offering, the "<u>Net Proceeds</u>") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding MSLP Notes (a "<u>Mandatory Redemption</u>"); <u>provided</u>, <u>however</u>, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the MSLP Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the MSLP Notes then outstanding pro rata based on the principal amount of such MSLP Notes then outstanding and (iii) the Company shall effect successive Mandatory Redemptions upon each Subsequent Offering until the MSLP Notes are repaid in full or otherwise no longer outstanding.

b) <u>Mandatory Notices</u>. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "<u>Mandatory Redemption Notice</u>" and the date such notice is delivered to all such holders is referred to as a "<u>Mandatory Redemption Notice Date</u>") (a) stating the date on which the Mandatory Redemption shall occur (a "<u>Mandatory Redemption Date</u>"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the MSLP Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c) <u>Mandatory Redemption Procedure</u>. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(c), the Net Proceeds shall be applied ratably among the Holders of the MSLP Notes.

<u>Section 5</u>. <u>Events of Default</u>.

a) "<u>Event of Default</u>" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)     any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within three (3) Trading Days;

(ii)    the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) five (5) Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) ten (10) Trading Days after the Company has become or should have become aware of such failure;

(iii)   a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)    any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)    the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)    the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement  that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)    the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)    any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)    the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)    the occurrence of an Event of Default under any other MSLP Note;

(xi)    any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

(xii)    the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)    any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)    any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the MSLP Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)    any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xvi)    Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; provided that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities or authority; or

(xvii)    any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

b) Remedies Upon Event of Default. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable. Commencing five (5) days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

Section 6. Security. The Notes are secured to the extent and in the manner set forth in the Security Documents.

Section 7. <u>Miscellaneous</u>.

a) <u>Notices</u>. Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a). Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) <u>Absolute Obligation</u>. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks <u>pari passu</u> with all other MSLP Notes now or hereafter issued under the terms set forth in the Transaction Documents, including the October 2021 Notes.

c) <u>Lost or Mutilated Note</u>. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "<u>New York Courts</u>"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the

investigation, preparation and prosecution of such action or proceeding. This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e) Waiver. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion. Any waiver by the Company or the Holder must be in writing.

f) Severability. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) Next Business Day. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) Headings. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) Amendment. This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Ryan Drexler

Title:  Chief Executive Officer

Address: 6728 W. Sunset Road

Suite 130

Las Vegas, NV 89118

Email address:  ryan.drexler@musclepharm.com

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: June 10, 2022                                                                              $281,250.00

**ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE**
**DUE DECEMBER 10, 2022**

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Road, Suite 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due December 10, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Empery Debt Opportunity Fund, LP or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $281,250.00 on December 10, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder.  This Note is subject to the following additional provisions:

Section 1. Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X) thereof, (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the

electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes; (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof; (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 in the principal amount of $2.5 million; (d) Indebtedness evidenced by that certain convertible secured promissory note dated November 29, 2020 in the original principal amount of $2.9 million issued to Ryan Drexler, which amended and restated a convertible secured promissory note dated as of August 21, 2020; (e) Indebtedness evidenced by the Unsecured Revolving Promissory Note dated March 8, 2022 issued by the Company in favor of Ryan Drexler, as may be amended to contemplate that such Indebtedness be secured by certain assets of the Company and its subsidiaries; provided, that (1) the principal amount of such Indebtedness is less than or equal to $5 million and (2) such Indebtedness is expressly subordinated to the MSLP Notes pursuant to a written intercreditor agreement in form and substance satisfactory to the Collateral Agent; (f) Indebtedness that may become due or payable to ThermoLife International LLC pursuant to that certain complaint initially filed against the Company by ThermoLife International LLC in Arizona state court; (g) Indebtedness evidenced by certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 in the

maximum principal amount of $8,197,674.42, which principal amount was  increased to $9,759,135.00 (including an original issuance discount) contemporaneously with the issuance of the Notes (the "October 2021 Notes" and together with the Notes, the "MSLP Notes"); (h) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default; (i) trade accounts payable incurred in the ordinary course of business consistent with past practice; (j) Indebtedness evidenced by the Settlement Agreements; and (k) Indebtedness that (A) is expressly subordinated to the MSLP Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b), (c), (d), (e), (g) and (h).

"Purchase Agreement" means the Amended and Restated Securities Purchase Agreement, dated as of May 28, 2022 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., and (iv) Settlement Agreement, Covenant Not to Sue and General Release, dated November 2, 2021, by and among the Company, Richard Estalella, Timothy K. Bradley, CPA, Bradley Consulting Group, P.C., Stratagem, P.C. and Applied Economics, LLC, in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2. Registration of Transfers and Exchanges. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be payable for such registration of transfer or exchange.

Section 3. Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a) other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b) other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c) amend its charter documents, including, without limitation, its articles/certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e) repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (e), clause (i) or clause (j) of the definition of Permitted Indebtedness and (iii) the MSLP Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f) declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g) enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h) consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4. Mandatory Redemption.

a) Occurrence of Mandatory Redemption. While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such

offering, a "Subsequent Offering" and 25% of such net proceeds from such Subsequent Offering, the "Net Proceeds") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding MSLP Notes (a "Mandatory Redemption"); provided, however, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the MSLP Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the MSLP Notes then outstanding pro rata based on the principal amount of such MSLP Notes then outstanding and (iii) the Company shall effect successive Mandatory Redemptions upon each Subsequent Offering until the MSLP Notes are repaid in full or otherwise no longer outstanding.

b) Mandatory Notices. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "Mandatory Redemption Notice" and the date such notice is delivered to all such holders is referred to as a "Mandatory Redemption Notice Date") (a) stating the date on which the Mandatory Redemption shall occur (a "Mandatory Redemption Date"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the MSLP Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c) Mandatory Redemption Procedure. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(c), the Net Proceeds shall be applied ratably among the Holders of the MSLP Notes.

Section 5. Events of Default.

a) "Event of Default" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)      any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within three (3) Trading Days;

(ii)     the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) five (5) Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) ten (10) Trading Days after the Company has become or should have become aware of such failure;

(iii)    a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)    any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)    the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)    the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement  that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)    the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)    any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)    the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)    the occurrence of an Event of Default under any other MSLP Note;

(xi)    any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

(xii)    the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)    any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)    any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the MSLP Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)    any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xvi)    Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; provided that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities or authority; or

(xvii)    any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

b) Remedies Upon Event of Default. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable. Commencing five (5) days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

Section 6. Security. The Notes are secured to the extent and in the manner set forth in the Security Documents.

Section 7. Miscellaneous.

a) <u>Notices</u>. Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a). Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) <u>Absolute Obligation</u>. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks <u>pari passu</u> with all other MSLP Notes now or hereafter issued under the terms set forth in the Transaction Documents, including the October 2021 Notes.

c) <u>Lost or Mutilated Note</u>. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "<u>New York Courts</u>"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the

investigation, preparation and prosecution of such action or proceeding. This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e) <u>Waiver</u>. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion. Any waiver by the Company or the Holder must be in writing.

f) <u>Severability</u>. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) <u>Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) <u>Next Business Day</u>. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) <u>Headings</u>. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) <u>Amendment</u>. This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Ryan Drexler

Title:  Chief Executive Officer

Address: 6728 W. Sunset Road

Suite 130

Las Vegas, NV 89118

Email address:  ryan.drexler@musclepharm.com

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: June 10, 2022                                                                                           $208,750.00

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE DECEMBER 10, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Road, Suite 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due December 10, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Empery Master Onshore, LLC or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $208,750.00 on December 10, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder. This Note is subject to the following additional provisions:

Section 1. Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X) thereof, (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the

electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes; (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof; (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 in the principal amount of $2.5 million; (d) Indebtedness evidenced by that certain convertible secured promissory note dated November 29, 2020 in the original principal amount of $2.9 million issued to Ryan Drexler, which amended and restated a convertible secured promissory note dated as of August 21, 2020; (e) Indebtedness evidenced by the Unsecured Revolving Promissory Note dated March 8, 2022 issued by the Company in favor of Ryan Drexler, as may be amended to contemplate that such Indebtedness be secured by certain assets of the Company and its subsidiaries; provided, that (1) the principal amount of such Indebtedness is less than or equal to $5 million and (2) such Indebtedness is expressly subordinated to the MSLP Notes pursuant to a written intercreditor agreement in form and substance satisfactory to the Collateral Agent; (f) Indebtedness that may become due or payable to ThermoLife International LLC pursuant to that certain complaint initially filed against the Company by ThermoLife International LLC in Arizona state court; (g) Indebtedness evidenced by certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 in the

maximum principal amount of $8,197,674.42, which principal amount was increased to $9,759,135.00 (including an original issuance discount) contemporaneously with the issuance of the Notes (the "October 2021 Notes" and together with the Notes, the "MSLP Notes"); (h) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default; (i) trade accounts payable incurred in the ordinary course of business consistent with past practice; (j) Indebtedness evidenced by the Settlement Agreements; and (k) Indebtedness that (A) is expressly subordinated to the MSLP Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b), (c), (d), (e), (g) and (h).

"Purchase Agreement" means the Amended and Restated Securities Purchase Agreement, dated as of May 28, 2022 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., and (iv) Settlement Agreement, Covenant Not to Sue and General Release, dated November 2, 2021, by and among the Company, Richard Estalella, Timothy K. Bradley, CPA, Bradley Consulting Group, P.C., Stratagem, P.C. and Applied Economics, LLC, in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2.  Registration of Transfers and Exchanges. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be payable for such registration of transfer or exchange.

Section 3. Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a) other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b) other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c) amend its charter documents, including, without limitation, its articles/certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e) repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (e), clause (i) or clause (j) of the definition of Permitted Indebtedness and (iii) the MSLP Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f) declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g) enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h) consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4. Mandatory Redemption.

a) Occurrence of Mandatory Redemption. While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such

offering, a "Subsequent Offering" and 25% of such net proceeds from such Subsequent Offering, the "Net Proceeds") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding MSLP Notes (a "Mandatory Redemption"); provided, however, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the MSLP Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the MSLP Notes then outstanding pro rata based on the principal amount of such MSLP Notes then outstanding and (iii) the Company shall effect successive Mandatory Redemptions upon each Subsequent Offering until the MSLP Notes are repaid in full or otherwise no longer outstanding.

b) Mandatory Notices. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "Mandatory Redemption Notice" and the date such notice is delivered to all such holders is referred to as a "Mandatory Redemption Notice Date") (a) stating the date on which the Mandatory Redemption shall occur (a "Mandatory Redemption Date"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the MSLP Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c) Mandatory Redemption Procedure. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(c), the Net Proceeds shall be applied ratably among the Holders of the MSLP Notes.

Section 5. Events of Default.

a) "Event of Default" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)      any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within three (3) Trading Days;

(ii)     the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) five (5) Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) ten (10) Trading Days after the Company has become or should have become aware of such failure;

(iii)    a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)     any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)      the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)     the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)    the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)   any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)     the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)      the occurrence of an Event of Default under any other MSLP Note;

(xi)     any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

(xii)    the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)   any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)    any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the MSLP Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)     any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xvi)    Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; <u>provided</u> that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities or authority; or

(xvii)   any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

b) <u>Remedies Upon Event of Default</u>. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable. Commencing five (5) days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

Section 6. Security. The Notes are secured to the extent and in the manner set forth in the Security Documents.

Section 7. <u>Miscellaneous</u>.

a) <u>Notices</u>. Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a). Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) <u>Absolute Obligation</u>. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks <u>pari passu</u> with all other MSLP Notes now or hereafter issued under the terms set forth in the Transaction Documents, including the October 2021 Notes.

c) <u>Lost or Mutilated Note</u>. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "<u>New York Courts</u>"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the

investigation, preparation and prosecution of such action or proceeding. This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e) <u>Waiver</u>. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion. Any waiver by the Company or the Holder must be in writing.

f) <u>Severability</u>. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) <u>Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) <u>Next Business Day</u>. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) <u>Headings</u>. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) <u>Amendment</u>. This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Ryan Drexler

Title:  Chief Executive Officer

Address: 6728 W. Sunset Road

Suite 130

Las Vegas, NV 89118

Email address:  ryan.drexler@musclepharm.com

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: June 10, 2022                                                      $72,500.00

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE DECEMBER 10, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Road, Suite 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due December 10, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Empery Tax Efficient III, LP or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $72,500.00 on December 10, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder.  This Note is subject to the following additional provisions:

Section 1.  Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X) thereof, (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the

electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes; (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof; (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 in the principal amount of $2.5 million; (d) Indebtedness evidenced by that certain convertible secured promissory note dated November 29, 2020 in the original principal amount of $2.9 million issued to Ryan Drexler, which amended and restated a convertible secured promissory note dated as of August 21, 2020; (e) Indebtedness evidenced by the Unsecured Revolving Promissory Note dated March 8, 2022 issued by the Company in favor of Ryan Drexler, as may be amended to contemplate that such Indebtedness be secured by certain assets of the Company and its subsidiaries; provided, that (1) the principal amount of such Indebtedness is less than or equal to $5 million and (2) such Indebtedness is expressly subordinated to the MSLP Notes pursuant to a written intercreditor agreement in form and substance satisfactory to the Collateral Agent; (f) Indebtedness that may become due or payable to ThermoLife International LLC pursuant to that certain complaint initially filed against the Company by ThermoLife International LLC in Arizona state court; (g) Indebtedness evidenced by certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 in the

maximum principal amount of $8,197,674.42, which principal amount was increased to $9,759,135.00 (including an original issuance discount) contemporaneously with the issuance of the Notes (the "October 2021 Notes" and together with the Notes, the "MSLP Notes"); (h) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default; (i) trade accounts payable incurred in the ordinary course of business consistent with past practice; (j) Indebtedness evidenced by the Settlement Agreements; and (k) Indebtedness that (A) is expressly subordinated to the MSLP Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b), (c), (d), (e), (g) and (h).

"Purchase Agreement" means the Amended and Restated Securities Purchase Agreement, dated as of May 28, 2022 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., and (iv) Settlement Agreement, Covenant Not to Sue and General Release, dated November 2, 2021, by and among the Company, Richard Estalella, Timothy K. Bradley, CPA, Bradley Consulting Group, P.C., Stratagem, P.C. and Applied Economics, LLC, in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2. Registration of Transfers and Exchanges. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be payable for such registration of transfer or exchange.

Section 3. Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a) other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b) other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c) amend its charter documents, including, without limitation, its articles/certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e) repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (e), clause (i) or clause (j) of the definition of Permitted Indebtedness and (iii) the MSLP Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f) declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g) enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h) consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4. Mandatory Redemption.

a) Occurrence of Mandatory Redemption. While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such

offering, a "Subsequent Offering" and 25% of such net proceeds from such Subsequent Offering, the "Net Proceeds") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding MSLP Notes (a "Mandatory Redemption"); provided, however, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the MSLP Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the MSLP Notes then outstanding pro rata based on the principal amount of such MSLP Notes then outstanding and (iii) the Company shall effect successive Mandatory Redemptions upon each Subsequent Offering until the MSLP Notes are repaid in full or otherwise no longer outstanding.

b) Mandatory Notices. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "Mandatory Redemption Notice" and the date such notice is delivered to all such holders is referred to as a "Mandatory Redemption Notice Date") (a) stating the date on which the Mandatory Redemption shall occur (a "Mandatory Redemption Date"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the MSLP Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c) Mandatory Redemption Procedure. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(c), the Net Proceeds shall be applied ratably among the Holders of the MSLP Notes.

Section 5. Events of Default.

a) "Event of Default" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)     any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within three (3) Trading Days;

(ii)    the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) five (5) Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) ten (10) Trading Days after the Company has become or should have become aware of such failure;

(iii)   a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)      any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)      the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)      the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)      the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)      any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)      the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)      the occurrence of an Event of Default under any other MSLP Note;

(xi)      any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

(xii)      the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)      any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)      any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the MSLP Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)    any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xvi)    Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; provided that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities or authority; or

(xvii)    any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

b) Remedies Upon Event of Default. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable. Commencing five (5) days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

Section 6. Security. The Notes are secured to the extent and in the manner set forth in the Security Documents.

Section 7. Miscellaneous.

a) <u>Notices</u>. Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a). Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) <u>Absolute Obligation</u>. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks <u>pari passu</u> with all other MSLP Notes now or hereafter issued under the terms set forth in the Transaction Documents, including the October 2021 Notes.

c) <u>Lost or Mutilated Note</u>. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "<u>New York Courts</u>"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the

investigation, preparation and prosecution of such action or proceeding. This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e) Waiver. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion. Any waiver by the Company or the Holder must be in writing.

f) Severability. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance hereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) Next Business Day. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) Headings. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) Amendment. This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Ryan Drexler

Title:  Chief Executive Officer

Address: 6728 W. Sunset Road

Suite 130

Las Vegas, NV 89118

Email address:  ryan.drexler@musclepharm.com

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: June 10, 2022                                                                          $62,500.00

### ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
### DUE DECEMBER 10, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Road, Suite 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due December 10, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Empery Tax Efficient, LP or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $62,500.00 on December 10, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder.  This Note is subject to the following additional provisions:

Section 1. Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X) thereof, (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the

electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes; (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof; (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 in the principal amount of $2.5 million; (d) Indebtedness evidenced by that certain convertible secured promissory note dated November 29, 2020 in the original principal amount of $2.9 million issued to Ryan Drexler, which amended and restated a convertible secured promissory note dated as of August 21, 2020; (e) Indebtedness evidenced by the Unsecured Revolving Promissory Note dated March 8, 2022 issued by the Company in favor of Ryan Drexler, as may be amended to contemplate that such Indebtedness be secured by certain assets of the Company and its subsidiaries; provided, that (1) the principal amount of such Indebtedness is less than or equal to $5 million and (2) such Indebtedness is expressly subordinated to the MSLP Notes pursuant to a written intercreditor agreement in form and substance satisfactory to the Collateral Agent; (f) Indebtedness that may become due or payable to ThermoLife International LLC pursuant to that certain complaint initially filed against the Company by ThermoLife International LLC in Arizona state court; (g) Indebtedness evidenced by certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 in the

maximum principal amount of $8,197,674.42, which principal amount was  increased to $9,759,135.00 (including an original issuance discount) contemporaneously with the issuance of the Notes (the "October 2021 Notes" and together with the Notes, the "MSLP Notes"); (h) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default; (i) trade accounts payable incurred in the ordinary course of business consistent with past practice; (j) Indebtedness evidenced by the Settlement Agreements; and (k) Indebtedness that (A) is expressly subordinated to the MSLP Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b), (c), (d), (e), (g) and (h).

"Purchase Agreement" means the Amended and Restated Securities Purchase Agreement, dated as of May 28, 2022 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., and (iv) Settlement Agreement, Covenant Not to Sue and General Release, dated November 2, 2021, by and among the Company, Richard Estalella, Timothy K. Bradley, CPA, Bradley Consulting Group, P.C., Stratagem, P.C. and Applied Economics, LLC, in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2. Registration of Transfers and Exchanges. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be payable for such registration of transfer or exchange.

Section 3. Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a) other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b) other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c) amend its charter documents, including, without limitation, its articles/certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e) repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (e), clause (i) or clause (j) of the definition of Permitted Indebtedness and (iii) the MSLP Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f) declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g) enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h) consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4. Mandatory Redemption.

a) Occurrence of Mandatory Redemption. While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such

offering, a "<u>Subsequent Offering</u>" and 25% of such net proceeds from such Subsequent Offering, the "<u>Net Proceeds</u>") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding MSLP Notes (a "<u>Mandatory Redemption</u>"); <u>provided</u>, <u>however</u>, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the MSLP Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the MSLP Notes then outstanding pro rata based on the principal amount of such MSLP Notes then outstanding and (iii) the Company shall effect successive Mandatory Redemptions upon each Subsequent Offering until the MSLP Notes are repaid in full or otherwise no longer outstanding.

b) <u>Mandatory Notices</u>. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "<u>Mandatory Redemption Notice</u>" and the date such notice is delivered to all such holders is referred to as a "<u>Mandatory Redemption Notice Date</u>") (a) stating the date on which the Mandatory Redemption shall occur (a "<u>Mandatory Redemption Date</u>"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the MSLP Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c) <u>Mandatory Redemption Procedure</u>. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(c), the Net Proceeds shall be applied ratably among the Holders of the MSLP Notes.

<u>Section 5</u>. <u>Events of Default</u>.

a) "<u>Event of Default</u>" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)     any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within three (3) Trading Days;

(ii)    the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) five (5) Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) ten (10) Trading Days after the Company has become or should have become aware of such failure;

(iii)   a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)    any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)    the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)    the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)    the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)    any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)    the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)    the occurrence of an Event of Default under any other MSLP Note;

(xi)    any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

(xii)    the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)    any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)    any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the MSLP Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)    any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xvi)   Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; provided that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities or authority; or

(xvii)  any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

b) Remedies Upon Event of Default. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable. Commencing five (5) days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

Section 6. Security. The Notes are secured to the extent and in the manner set forth in the Security Documents.

Section 7. Miscellaneous.

a) <u>Notices</u>. Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a). Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) <u>Absolute Obligation</u>. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks <u>pari passu</u> with all other MSLP Notes now or hereafter issued under the terms set forth in the Transaction Documents, including the October 2021 Notes.

c) <u>Lost or Mutilated Note</u>. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "<u>New York Courts</u>"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the

investigation, preparation and prosecution of such action or proceeding. This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e) <u>Waiver</u>. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion. Any waiver by the Company or the Holder must be in writing.

f) <u>Severability</u>. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) <u>Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) <u>Next Business Day</u>. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) <u>Headings</u>. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) <u>Amendment</u>. This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Ryan Drexler

Title:  Chief Executive Officer

Address: 6728 W. Sunset Road

Suite 130

Las Vegas, NV 89118

Email address:  ryan.drexler@musclepharm.com

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: June 10, 2022                                                              $156,250.00

### ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
### DUE DECEMBER 10, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Road, Suite 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due December 10, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to HB Fund LLC or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $156,250.00 on December 10, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder. This Note is subject to the following additional provisions:

Section 1. Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X) thereof, (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the

electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes; (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof; (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 in the principal amount of $2.5 million; (d) Indebtedness evidenced by that certain convertible secured promissory note dated November 29, 2020 in the original principal amount of $2.9 million issued to Ryan Drexler, which amended and restated a convertible secured promissory note dated as of August 21, 2020; (e) Indebtedness evidenced by the Unsecured Revolving Promissory Note dated March 8, 2022 issued by the Company in favor of Ryan Drexler, as may be amended to contemplate that such Indebtedness be secured by certain assets of the Company and its subsidiaries; provided, that (1) the principal amount of such Indebtedness is less than or equal to $5 million and (2) such Indebtedness is expressly subordinated to the MSLP Notes pursuant to a written intercreditor agreement in form and substance satisfactory to the Collateral Agent; (f) Indebtedness that may become due or payable to ThermoLife International LLC pursuant to that certain complaint initially filed against the Company by ThermoLife International LLC in Arizona state court; (g) Indebtedness evidenced by certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 in the

maximum principal amount of $8,197,674.42, which principal amount was increased to $9,759,135.00 (including an original issuance discount) contemporaneously with the issuance of the Notes (the "October 2021 Notes" and together with the Notes, the "MSLP Notes"); (h) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default; (i) trade accounts payable incurred in the ordinary course of business consistent with past practice; (j) Indebtedness evidenced by the Settlement Agreements; and (k) Indebtedness that (A) is expressly subordinated to the MSLP Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b), (c), (d), (e), (g) and (h).

"Purchase Agreement" means the Amended and Restated Securities Purchase Agreement, dated as of May 28, 2022 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., and (iv) Settlement Agreement, Covenant Not to Sue and General Release, dated November 2, 2021, by and among the Company, Richard Estalella, Timothy K. Bradley, CPA, Bradley Consulting Group, P.C., Stratagem, P.C. and Applied Economics, LLC, in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2. Registration of Transfers and Exchanges. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be payable for such registration of transfer or exchange.

Section 3. Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a) other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b) other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c) amend its charter documents, including, without limitation, its articles/certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e) repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (e), clause (i) or clause (j) of the definition of Permitted Indebtedness and (iii) the MSLP Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f) declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g) enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h) consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4. Mandatory Redemption.

a) Occurrence of Mandatory Redemption. While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such

offering, a "<u>Subsequent Offering</u>" and 25% of such net proceeds from such Subsequent Offering, the "<u>Net Proceeds</u>") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding MSLP Notes (a "<u>Mandatory Redemption</u>"); <u>provided</u>, <u>however</u>, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the MSLP Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the MSLP Notes then outstanding pro rata based on the principal amount of such MSLP Notes then outstanding and (iii) the Company shall effect successive Mandatory Redemptions upon each Subsequent Offering until the MSLP Notes are repaid in full or otherwise no longer outstanding.

b) <u>Mandatory Notices</u>. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "<u>Mandatory Redemption Notice</u>" and the date such notice is delivered to all such holders is referred to as a "<u>Mandatory Redemption Notice Date</u>") (a) stating the date on which the Mandatory Redemption shall occur (a "<u>Mandatory Redemption Date</u>"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the MSLP Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c) <u>Mandatory Redemption Procedure</u>. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(c), the Net Proceeds shall be applied ratably among the Holders of the MSLP Notes.

<u>Section 5</u>. <u>Events of Default</u>.

a) "<u>Event of Default</u>" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)     any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within three (3) Trading Days;

(ii)    the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) five (5) Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) ten (10) Trading Days after the Company has become or should have become aware of such failure;

(iii)   a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)     any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)     the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)     the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)     the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)     any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)     the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)     the occurrence of an Event of Default under any other MSLP Note;

(xi)     any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

(xii)     the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)     any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)     any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the MSLP Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)    any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xvi)    Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; provided that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities or authority; or

(xvii)    any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

b) <u>Remedies Upon Event of Default</u>. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable. Commencing five (5) days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

<u>Section 6</u>. <u>Security</u>. The Notes are secured to the extent and in the manner set forth in the Security Documents.

Section 7. Miscellaneous.

a) <u>Notices</u>. Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a). Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) <u>Absolute Obligation</u>. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks <u>pari passu</u> with all other MSLP Notes now or hereafter issued under the terms set forth in the Transaction Documents, including the October 2021 Notes.

c) <u>Lost or Mutilated Note</u>. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "<u>New York Courts</u>"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the

investigation, preparation and prosecution of such action or proceeding. This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e) <u>Waiver</u>. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion. Any waiver by the Company or the Holder must be in writing.

f) <u>Severability</u>. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) <u>Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) <u>Next Business Day</u>. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) <u>Headings</u>. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) <u>Amendment</u>. This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

*********************

<i>(Signature Page Follows)</i>

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Ryan Drexler

Title:  Chief Executive Officer

Address: 6728 W. Sunset Road

Suite 130

Las Vegas, NV 89118

Email address:  ryan.drexler@musclepharm.com

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: June 10, 2022                                                                 $312,500.00

### ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
### DUE DECEMBER 10, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Road, Suite 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due December 10, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Ionic Ventures LLC or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $312,500.00 on December 10, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder. This Note is subject to the following additional provisions:

Section 1. Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X), (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the

electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes; (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof; (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 in the principal amount of $2.5 million; (d) Indebtedness evidenced by that certain convertible secured promissory note dated November 29, 2020 in the original principal amount of $2.9 million issued to Ryan Drexler, which amended and restated a convertible secured promissory note dated as of August 21, 2020; (e) Indebtedness evidenced by the Unsecured Revolving Promissory Note dated March 8, 2022 issued by the Company in favor of Ryan Drexler, as may be amended to contemplate that such Indebtedness be secured by certain assets of the Company and its subsidiaries; provided, that (1) the principal amount of such Indebtedness is less than or equal to $5 million and (2) such Indebtedness is expressly subordinated to the MSLP Notes pursuant to a written intercreditor agreement in form and substance satisfactory to the Collateral Agent; (f) Indebtedness that may become due or payable to ThermoLife International LLC pursuant to that certain complaint initially filed against the Company by ThermoLife International LLC in Arizona state court; (g) Indebtedness evidenced by certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 in the

maximum principal amount of $8,197,674.42, which principal amount was increased to $9,759,135.00 (including an original issuance discount) contemporaneously with the issuance of the Notes (the "October 2021 Notes" and together with the Notes, the "MSLP Notes"); (h) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default; (i) trade accounts payable incurred in the ordinary course of business consistent with past practice; (j) Indebtedness evidenced by the Settlement Agreements; and (k) Indebtedness that (A) is expressly subordinated to the MSLP Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b), (c), (d), (e), (g) and (h).

"Purchase Agreement" means the Amended and Restated Securities Purchase Agreement, dated as of May 28, 2022 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., and (iv) Settlement Agreement, Covenant Not to Sue and General Release, dated November 2, 2021, by and among the Company, Richard Estalella, Timothy K. Bradley, CPA, Bradley Consulting Group, P.C., Stratagem, P.C. and Applied Economics, LLC, in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2. Registration of Transfers and Exchanges. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be payable for such registration of transfer or exchange.

Section 3. Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a) other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b) other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c) amend its charter documents, including, without limitation, its articles/certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e) repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (e), clause (i) or clause (j) of the definition of Permitted Indebtedness and (iii) the MSLP Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f) declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g) enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h) consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4. Mandatory Redemption.

a) Occurrence of Mandatory Redemption. While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such

offering, a "<u>Subsequent Offering</u>" and 25% of such net proceeds from such Subsequent Offering, the "<u>Net Proceeds</u>") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding MSLP Notes (a "<u>Mandatory Redemption</u>"); <u>provided</u>, <u>however</u>, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the MSLP Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the MSLP Notes then outstanding pro rata based on the principal amount of such MSLP Notes then outstanding and (iii) the Company shall effect successive Mandatory Redemptions upon each Subsequent Offering until the MSLP Notes are repaid in full or otherwise no longer outstanding.

b) <u>Mandatory Notices</u>. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "<u>Mandatory Redemption Notice</u>" and the date such notice is delivered to all such holders is referred to as a "<u>Mandatory Redemption Notice Date</u>") (a) stating the date on which the Mandatory Redemption shall occur (a "<u>Mandatory Redemption Date</u>"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the MSLP Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c) <u>Mandatory Redemption Procedure</u>. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(c), the Net Proceeds shall be applied ratably among the Holders of the MSLP Notes.

<u>Section 5</u>. <u>Events of Default</u>.

a) "<u>Event of Default</u>" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)     any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within three (3) Trading Days;

(ii)    the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) five (5) Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) ten (10) Trading Days after the Company has become or should have become aware of such failure;

(iii)   a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)      any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)      the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)      the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)      the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)      any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)      the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)      the occurrence of an Event of Default under any other MSLP Note;

(xi)      any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

(xii)      the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)      any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)      any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the MSLP Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)    any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xvi)    Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; <u>provided</u> that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities or authority; or

(xvii)    any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

    b) <u>Remedies Upon Event of Default</u>. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable. Commencing five (5) days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

    <u>Section 6</u>. Security. The Notes are secured to the extent and in the manner set forth in the Security Documents.

Section 7. Miscellaneous.

a) <u>Notices</u>. Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a). Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) <u>Absolute Obligation</u>. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks <u>pari passu</u> with all other MSLP Notes now or hereafter issued under the terms set forth in the Transaction Documents, including the October 2021 Notes.

c) <u>Lost or Mutilated Note</u>. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "<u>New York Courts</u>"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the

investigation, preparation and prosecution of such action or proceeding. This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e) Waiver. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion. Any waiver by the Company or the Holder must be in writing.

f) Severability. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) Next Business Day. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) Headings. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) Amendment. This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Ryan Drexler

Title:  Chief Executive Officer

Address: 6728 W. Sunset Road

Suite 130

Las Vegas, NV 89118

Email address:  ryan.drexler@musclepharm.com

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: June 10, 2022                                            $269,375.00

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE DECEMBER 10, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Road, Suite 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due December 10, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Roth Capital Partners, LLC or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $269,375.00 on December 10, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder.  This Note is subject to the following additional provisions:

Section 1. Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X) thereof, (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the

electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes; (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof; (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 in the principal amount of $2.5 million; (d) Indebtedness evidenced by that certain convertible secured promissory note dated November 29, 2020 in the original principal amount of $2.9 million issued to Ryan Drexler, which amended and restated a convertible secured promissory note dated as of August 21, 2020; (e) Indebtedness evidenced by the Unsecured Revolving Promissory Note dated March 8, 2022 issued by the Company in favor of Ryan Drexler, as may be amended to contemplate that such Indebtedness be secured by certain assets of the Company and its subsidiaries; provided, that (1) the principal amount of such Indebtedness is less than or equal to $5 million and (2) such Indebtedness is expressly subordinated to the MSLP Notes pursuant to a written intercreditor agreement in form and substance satisfactory to the Collateral Agent; (f) Indebtedness that may become due or payable to ThermoLife International LLC pursuant to that certain complaint initially filed against the Company by ThermoLife International LLC in Arizona state court; (g) Indebtedness evidenced by certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 in the

maximum principal amount of $8,197,674.42, which principal amount was increased to $9,759,135.00 (including an original issuance discount) contemporaneously with the issuance of the Notes (the "October 2021 Notes" and together with the Notes, the "MSLP Notes"); (h) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default; (i) trade accounts payable incurred in the ordinary course of business consistent with past practice; (j) Indebtedness evidenced by the Settlement Agreements; and (k) Indebtedness that (A) is expressly subordinated to the MSLP Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b), (c), (d), (e), (g) and (h).

"Purchase Agreement" means the Amended and Restated Securities Purchase Agreement, dated as of May 28, 2022 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., and (iv) Settlement Agreement, Covenant Not to Sue and General Release, dated November 2, 2021, by and among the Company, Richard Estalella, Timothy K. Bradley, CPA, Bradley Consulting Group, P.C., Stratagem, P.C. and Applied Economics, LLC, in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2. Registration of Transfers and Exchanges. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be payable for such registration of transfer or exchange.

Section 3. Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a) other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b) other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c) amend its charter documents, including, without limitation, its articles/certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e) repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (e), clause (i) or clause (j) of the definition of Permitted Indebtedness and (iii) the MSLP Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f) declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g) enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h) consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4. Mandatory Redemption.

a) Occurrence of Mandatory Redemption. While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such

offering, a "<u>Subsequent Offering</u>" and 25% of such net proceeds from such Subsequent Offering, the "<u>Net Proceeds</u>") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding MSLP Notes (a "<u>Mandatory Redemption</u>"); <u>provided</u>, <u>however</u>, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the MSLP Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the MSLP Notes then outstanding pro rata based on the principal amount of such MSLP Notes then outstanding and (iii) the Company shall effect successive Mandatory Redemptions upon each Subsequent Offering until the MSLP Notes are repaid in full or otherwise no longer outstanding.

b) <u>Mandatory Notices</u>. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "<u>Mandatory Redemption Notice</u>" and the date such notice is delivered to all such holders is referred to as a "<u>Mandatory Redemption Notice Date</u>") (a) stating the date on which the Mandatory Redemption shall occur (a "<u>Mandatory Redemption Date</u>"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the MSLP Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c) <u>Mandatory Redemption Procedure</u>. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(c), the Net Proceeds shall be applied ratably among the Holders of the MSLP Notes.

<u>Section 5</u>. <u>Events of Default</u>.

a) "<u>Event of Default</u>" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)     any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within three (3) Trading Days;

(ii)    the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) five (5) Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) ten (10) Trading Days after the Company has become or should have become aware of such failure;

(iii)   a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)     any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)     the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)     the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)     the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)     any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)     the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)     the occurrence of an Event of Default under any other MSLP Note;

(xi)     any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

(xii)     the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)     any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)     any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the MSLP Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)  any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xvi)  Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; provided that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities or authority; or

(xvii)  any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

b) Remedies Upon Event of Default. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable. Commencing five (5) days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

Section 6. Security. The Notes are secured to the extent and in the manner set forth in the Security Documents.

Section 7. Miscellaneous.

a) Notices. Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a). Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) Absolute Obligation. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks pari passu with all other MSLP Notes now or hereafter issued under the terms set forth in the Transaction Documents, including the October 2021 Notes.

c) Lost or Mutilated Note. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) Governing Law. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "New York Courts"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or

proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding. This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e) Waiver. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion. Any waiver by the Company or the Holder must be in writing.

f) Severability. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) Next Business Day. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) Headings. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) Amendment. This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**MUSCLEPHARM CORPORATION**

By: _____

Name: Ryan Drexler

Title:  Chief Executive Officer

Address: 6728 W. Sunset Road

Suite 130

Las Vegas, NV 89118

Email address:  ryan.drexler@musclepharm.com

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

Original Issue Date: June 10, 2022                                                                $625,000.00

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE
## DUE DECEMBER 10, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NOTE is one of a series of duly authorized and validly issued Original Issue Senior Secured Notes of MusclePharm Corporation, a Nevada corporation (the "Company"), having its principal place of business at 6728 W. Sunset Road, Suite 130, Las Vegas, NV 89118, designated as its Original Issue Discount Senior Secured Note due December 10, 2022 (this Note, the "Note" and, collectively with the other Notes of such series, the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to Walleye Opportunities Master Fund Ltd. or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of $625,000.00 on December 10, 2022 (the "Maturity Date") or such earlier date as this Note is required or permitted to be repaid as provided hereunder.  This Note is subject to the following additional provisions:

Section 1. Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Subsidiary thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X) thereof, (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors, (f) the Company or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (g) the Company or any Significant Subsidiary thereof admits in writing that it is generally unable to pay its debts as they become due, (h) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the

electronic funds transfer systems (including for wire transfers) of commercial banks in The City of New York are generally open for use by customers on such day.

"Change of Control Transaction" means the occurrence after the date hereof of any of (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 33% of the voting securities of the Company (other than by means of exercise of the Warrants issued together with the Notes), where such individual or legal entity or "group" prior to such acquisition did not own in excess of 33% of the voting securities of the Company; provided, that for any individual or legal entity or "group" that owns in excess of 33% of the voting securities of the Company as of the date of the Purchase Agreement, such individual or legal entity or "group" holds 75% or more of the voting securities of the Company after giving effect to any such acquisition, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company (and all of its Subsidiaries, taken as a whole) sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on October 13, 2021 (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the consummation by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"Designee" means Empery Tax Efficient, LP.

"Event of Default" shall have the meaning set forth in Section 5(a).

"Mandatory Default Amount" means the sum of (a) 120% of the outstanding principal amount of this Note and (b) all other amounts, costs, expenses, interest and liquidated damages due in respect of this Note.

"New York Courts" shall have the meaning set forth in Section 7(d).

"Original Issue Date" means the date of the first issuance of the Notes, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Notes.

"Permitted Indebtedness" means (a) the Indebtedness evidenced by the Notes; (b) Indebtedness pursuant to that certain Purchase and Sale Agreement, dated as of January 11, 2016, between the Company and Prestige Capital Corporation, as amended or modified through the date hereof; (c) Indebtedness evidenced by that certain Secured Revolving Promissory Note, dated October 15, 2020 by and between the Company and Ryan Drexler, in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 in the principal amount of $2.5 million; (d) Indebtedness evidenced by that certain convertible secured promissory note dated November 29, 2020 in the original principal amount of $2.9 million issued to Ryan Drexler, which amended and restated a convertible secured promissory note dated as of August 21, 2020; (e) Indebtedness evidenced by the Unsecured Revolving Promissory Note dated March 8, 2022 issued by the Company in favor of Ryan Drexler, as may be amended to contemplate that such Indebtedness be secured by certain assets of the Company and its subsidiaries; provided, that (1) the principal amount of such Indebtedness is less than or equal to $5 million and (2) such Indebtedness is expressly subordinated to the MSLP Notes pursuant to a written intercreditor agreement in form and substance satisfactory to the Collateral Agent; (f) Indebtedness that may become due or payable to ThermoLife International LLC pursuant to that certain complaint initially filed against the Company by ThermoLife International LLC in Arizona state court; (g) Indebtedness evidenced by certain Original Issue Discount Senior Secured Notes dated as of October 13, 2021 in the

maximum principal amount of $8,197,674.42, which principal amount was increased to $9,759,135.00 (including an original issuance discount) contemporaneously with the issuance of the Notes (the "October 2021 Notes" and together with the Notes, the "MSLP Notes"); (h) lease obligations and purchase money Indebtedness of up to $300,000, in the aggregate, incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets; provided, that in order for a new lease to be considered to be Permitted Indebtedness, the landlord with respect to such new lease shall be required to deliver to the Collateral Agent a landlord consent in form and substance reasonably acceptable to the Collateral Agent to enable the Collateral Agent to access collateral on such property upon an Event of Default; (i) trade accounts payable incurred in the ordinary course of business consistent with past practice; (j) Indebtedness evidenced by the Settlement Agreements; and (k) Indebtedness that (A) is expressly subordinated to the MSLP Notes pursuant to a written subordination agreement with the Required Holders that is reasonably acceptable to the Required Holders and (B) does not require any payment of principal, whether at maturity, pursuant to amortization, a sinking fund or otherwise, at a date earlier than 91 days following the Maturity Date.

"Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP, (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien, (c) Liens incurred in connection with Permitted Indebtedness under clauses (a), (b), (c), (d), (e), (g) and (h).

"Purchase Agreement" means the Amended and Restated Securities Purchase Agreement, dated as of May 28, 2022 among the Company and the original Holders, as amended, modified or supplemented from time to time in accordance with its terms.

"Required Holders" means holders of at least a majority in principal amount of the then outstanding Notes and shall include the Designee so long as the Designee or any of its Affiliates holds any Notes.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Settlement Agreements" means (i) the Settlement Agreement, dated November 7, 2016 by and between the Company and F.H.G. Corporation d/b/a Capstone Nutrition, INI Parent, Inc., INI Buyer, Inc. and Medley Capital Corporation, (ii) Settlement Agreement, dated September 25, 2020 by and between the Company and NBF Holdings Canada Inc., (iii) Settlement Agreement, dated November 7, 2020 by and between the Company and Excelsior Nutrition, Inc., and (iv) Settlement Agreement, Covenant Not to Sue and General Release, dated November 2, 2021, by and among the Company, Richard Estalella, Timothy K. Bradley, CPA, Bradley Consulting Group, P.C., Stratagem, P.C. and Applied Economics, LLC, in each case, as in effect as of the date hereof.

"Subsidiary Guarantee" means the Subsidiary Guarantee, dated the date of the Purchase Agreement, by each Subsidiary in favor of the Holders.

"Transaction Documents" means the Purchase Agreement, this Note, the Subsidiary Guarantee, and all documents executed in connection therewith and herewith.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Holders on the Original Issue Date pursuant to the Purchase Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

Section 2. Registration of Transfers and Exchanges. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be payable for such registration of transfer or exchange.

Section 3. Negative Covenants. As long as any portion of this Note remains outstanding, unless the Required Holders shall have otherwise given prior written consent, the Company shall not, and shall not permit any of the Subsidiaries to, directly or indirectly:

a) other than Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b) other than Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c) amend its charter documents, including, without limitation, its articles/certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d) repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to the Warrant Shares as permitted or required under the Transaction Documents;

e) repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than (i) as contemplated in clause (b) of the definition of Permitted Indebtedness, but only to the extent repaid with the collection of accounts receivable of the Company obtained in the ordinary course of business, (ii) as contemplated in clause (e), clause (i) or clause (j) of the definition of Permitted Indebtedness and (iii) the MSLP Notes if on a pro-rata basis as permitted or required under the Transaction Documents, provided that any such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exists or occurs;

f) declare or pay cash dividends or distributions on any Common Stock or Common Stock Equivalents;

g) enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on commercially reasonable terms and on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval), other than for (i) payment of salary for services rendered in amounts not to exceed the amounts provided for under agreements in place as of the date of the Purchase Agreement, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock grants and stock option agreements under any stock option plan of the Company; or

h) consummate any agreement with respect to any of the foregoing.

In the event more than one grace, cure or notice period is applicable to an Event of Default, then the shortest grace, cure or notice period shall be applicable thereto.

Section 4. Mandatory Redemption.

a) Occurrence of Mandatory Redemption. While this Note is outstanding, the Company shall use at least 25% of the net proceeds of any offering of its securities, including the Public Offering (any such

offering, a "<u>Subsequent Offering</u>" and 25% of such net proceeds from such Subsequent Offering, the "<u>Net Proceeds</u>") to redeem this Note in full, including the Principal Amount and all other amounts due and payable pursuant to this Note, and all other then outstanding MSLP Notes (a "<u>Mandatory Redemption</u>"); <u>provided</u>, <u>however</u>, that if the Net Proceeds of the Subsequent Offering are less than the amount required to repay all of the MSLP Notes in full, (i) the Company's repayment obligation under this Section 4(a) shall be limited to the amount of such Net Proceeds, (ii) the Net Proceeds shall be applied to all of the MSLP Notes then outstanding pro rata based on the principal amount of such MSLP Notes then outstanding and (iii) the Company shall effect successive Mandatory Redemptions upon each Subsequent Offering until the MSLP Notes are repaid in full or otherwise no longer outstanding.

b) <u>Mandatory Notices</u>. With respect to each Mandatory Redemption, the Company shall deliver a written notice to all, but not less than all, of the holders of Notes (the "<u>Mandatory Redemption Notice</u>" and the date such notice is delivered to all such holders is referred to as a "<u>Mandatory Redemption Notice Date</u>") (a) stating the date on which the Mandatory Redemption shall occur (a "<u>Mandatory Redemption Date</u>"), which date shall be the date of the consummation of the applicable Subsequent Offering, (b) stating the expected amount of Net Proceeds with respect to the applicable Subsequent Offering and (c) contain a certification from the Chief Executive Officer of the Company that the Company has simultaneously taken the same action with respect to all of the MSLP Notes. Each Mandatory Redemption Notice shall be delivered no later than the first (1st) Trading Day following the announcement of the pricing of the applicable Subsequent Offering, and the Company shall make a public announcement containing the information set forth in the applicable Mandatory Redemption Notice on or before the related Mandatory Redemption Notice Date to the extent that the notice contains any, or constitutes, material, non-public information.

c) <u>Mandatory Redemption Procedure</u>. The payment of cash pursuant to the Mandatory Redemption shall be payable in full on the Trading Day immediately following the Mandatory Redemption Date by wire transfer of immediately available funds in accordance with the Holder's wire instructions. If any portion of the payment pursuant to a Mandatory Redemption shall not be paid by the Company by the applicable due date, interest shall accrue thereon at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted by applicable law until such amount is paid in full. Notwithstanding anything to the contrary in this Section 4(c), the Net Proceeds shall be applied ratably among the Holders of the MSLP Notes.

<u>Section 5</u>. <u>Events of Default</u>.

a) "<u>Event of Default</u>" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i)     any default in the payment of (A) the principal amount of any Note or (B) liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of a default under clause (B) above, is not cured within three (3) Trading Days;

(ii)    the Company shall fail to observe or perform any other covenant or agreement in any material respect (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect) contained in the Notes or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) five (5) Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) ten (10) Trading Days after the Company has become or should have become aware of such failure;

(iii)   a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any of the Transaction Documents;

(iv)    any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made;

(v)    the Company or any Subsidiary shall be subject to a Bankruptcy Event;

(vi)    the Company or any Subsidiary shall default (subject to any grace or cure period provided in the applicable agreement, document or instrument) on any of its obligations under any mortgage, promissory note, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves, individually or in the aggregate, an obligation greater than $100,000, whether any such Indebtedness now exists or shall hereafter be created, and (b) results in such Indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

(vii)    the Company (and all of its Subsidiaries, taken as a whole) shall be a party to any Change of Control Transaction or Fundamental Transaction (as defined in the Warrants) or shall agree to sell or dispose of all or in excess of 33% of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction) and such transaction or series of transactions will be consummated on or prior to the date that this Note is repaid in full;

(viii)    any dissolution, liquidation, winding up or cessation of operations by the Company, of a substantial portion of its business;

(ix)    the failure by the Company or any Subsidiary to maintain any intellectual property rights, personal, real property, equipment or leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured within twenty (20) days of such occurrence;

(x)    the occurrence of an Event of Default under any other MSLP Note;

(xi)    any monetary judgment, writ or similar final process shall be entered or filed against the Company, any subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

(xii)    the Company or any Subsidiary shall fail in any material respect to perform or comply with any covenant or agreement contained in any Security Document to which it is a party (except to the extent any such covenant or agreement is qualified by materiality or Material Adverse Effect, in which case, in any respect);

(xiii)    any material provision of any Security Document (as determined in good faith by the Collateral Agent in its sole discretion) shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiv)    any Security Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (except with respect to accounts receivables, a second priority Lien) in favor of the Collateral Agent for the benefit of the holders of the MSLP Notes on any Collateral (as defined in the Security Documents) purported to be covered thereby, except to the extent the Collateral Agent determines not to pursue perfection of any applicable Lien;

(xv)    any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xvi)   Sabina Rizvi shall at any time not be serving as the Chief Financial Officer of the Company and as a member of the Board of Directors, in each case for any reason; provided that if Ms. Rizvi resigns as the Chief Financial Officer of the Company and/or as a member of the Board of Directors, in each case without Good Reason (as defined below), the Company shall have forty five (45) days to cure this Event of Default by replacing Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors, in each case that is not objectionable to the Collateral Agent in its sole discretion, provided, however, such approval by the Collateral Agent of the replacement Chief Financial Officer and member of the Board of Directors shall not be unreasonably withheld by the Collateral Agent. "Good Reason" as used above, shall mean a material diminution in her job title, salary, reporting relationships, responsibilities or authority; or

(xvii)  any material damage to, or loss, theft or destruction of the Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than thirty (30) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect.

b) Remedies Upon Event of Default. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount, except that upon an Event of Default pursuant to Section 5(a)(v), the Company shall immediately pay the Mandatory Default Amount to the Holder without the requirement for any notice or demand or other action by the Holder or any other Person; provided, that the Holder may, in its sole discretion, waive such right to receive payment upon an Event of Default pursuant to Section 5(a)(v), in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect to any such Event of Default or any other amount, as applicable. Commencing five (5) days after the occurrence of any Event of Default and that results in the right or automatic acceleration of this Note, this Note shall accrue interest at an interest rate equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to, or as directed by, the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by the Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the rate of interest that may be payable pursuant to this Note at any time shall not exceed eighteen percent (18%) per annum.

Section 6. Security. The Notes are secured to the extent and in the manner set forth in the Security Documents.

Section 7. Miscellaneous.

a) <u>Notices</u>. Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, by email attachment, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number, email address, or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 7(a). Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by email attachment, or sent by a nationally recognized overnight courier service addressed to each Holder at the email address or address of the Holder appearing on the books of the Company, or if no such email attachment or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the time of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on any date, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via email attachment to the email address set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) <u>Absolute Obligation</u>. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and liquidated damages, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks <u>pari passu</u> with all other MSLP Notes now or hereafter issued under the terms set forth in the Transaction Documents, including the October 2021 Notes.

c) <u>Lost or Mutilated Note</u>. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "<u>New York Courts</u>"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred in the

investigation, preparation and prosecution of such action or proceeding. This Note shall be deemed an unconditional obligation of the Company for the payment of money and, without limitation to any other remedies of Holder, may be enforced against the Company by summary proceeding pursuant to New York Civil Procedure Law and Rule Section 3213 or any similar rule or statute in the jurisdiction where enforcement is sought.

e) <u>Waiver</u>. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion. Any waiver by the Company or the Holder must be in writing.

f) <u>Severability</u>. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g) <u>Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h) <u>Next Business Day</u>. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i) <u>Headings</u>. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j) <u>Amendment</u>. This Note may be amended, and any provisions hereof may be amended, by written consent of the Company and the Required Holders.

Section 8. <u>Disclosure</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

*********************

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

MUSCLEPHARM CORPORATION

By: _____

Name: Ryan Drexler

Title:  Chief Executive Officer

Address: 6728 W. Sunset Road

Suite 130

Las Vegas, NV 89118

Email address:  ryan.drexler@musclepharm.com

# EXHIBIT 9

# EXHIBIT 9

**EXECUTION VERSION**

**INTERCREDITOR AND SUBORDINATION AGREEMENT**

This **INTERCREDITOR AND SUBORDINATION AGREEMENT** is made as of October 13, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), among **RYAN DREXLER**, an individual ("Subordinated Creditor"), **MUSCLEPHARM CORPORATION**, a Nevada corporation ("Borrower"), and **EMPERY TAX EFFICIENT, LP**, as representative on behalf of the buyers party to the Securities Purchase Agreement referred to below ("Senior Creditor").

RECITALS

WHEREAS, pursuant to that certain Securities Purchase Agreement among Borrower and each of the buyers party thereto dated as of the date hereof, as amended, restated, amended and restated, supplemented, replaced or otherwise modified from time to time, the "Securities Purchase Agreement"; capitalized terms used in this Agreement without definition shall have the meanings ascribed thereto in the Securities Purchase Agreement), (i) Borrower has agreed to issue and sell to each Purchaser, and each Purchaser, severally and not jointly, has agreed to purchase from the Borrower, securities of the Borrower pursuant to the terms and conditions thereof, including the Notes (as defined in the Securities Purchase Agreement) (such Notes as amended, restated, amended and restated, supplemented, replaced or otherwise modified from time to time, the "Notes") and (ii) the Borrower and each of its present and future subsidiaries have agreed to grant a security interest in and Lien upon, and otherwise pledge, all of its personal property and assets to Senior Creditor to secure the Borrower's obligations under the Securities Purchase Agreement, the Notes and the other Transaction Documents pursuant to the Security Agreement and the other Security Documents;

WHEREAS, Subordinated Creditor has made loans to Borrower pursuant to (i) that certain Secured Revolving Promissory Note dated as of October 15, 2020 issued by Borrower to Subordinated Creditor in the maximum principal amount of $3,000,000, as amended and restated by that certain Convertible Secured Promissory Note dated as of August 13, 2021 and (ii) that certain Amended and Restated Convertible Secured Promissory Note dated as of August 21, 2020 in the maximum principal amount of $2,735,199 issued by Borrower to Subordinated Creditor, as amended and restated pursuant to that certain Convertible Secured Promissory Note dated as of November 29, 2020 issued by Borrower to Subordinated Creditor in the maximum principal amount of $2,871,967, as amended by that certain Amendment to Convertible Secured Promissory Note dated as of August 13, 2021, (collectively, the obligations of the Borrower with respect to the foregoing, in each case as amended, restated, amended and restated, supplemented, replaced or otherwise modified from time to time, the "Subordinated Notes", which, in each case, are secured by a security interest and Lien upon all Borrower's personal property and assets pursuant to that certain Sixth Amended and Restated Security Agreement dated as of November 29, 2020, by and between Subordinated Creditor and Borrower) (as amended, restated, amended and restated, supplemented, replaced or otherwise modified from time to time, the "Subordinated Security Agreement");

WHEREAS, a condition precedent to the effectiveness of the Securities Purchase Agreement is the execution and delivery of this Agreement by Senior Creditor, Subordinated Creditor and the Borrower; and

WHEREAS, the parties hereto desire to enter into this Agreement for the purposes set forth herein;

NOW, THEREFORE, in consideration of the above recitals and the provisions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Senior Creditor, Subordinated Creditor and Borrower hereby agree as follows:

107631993_8

1.      Notwithstanding any provision of the Subordinated Notes, the Subordinated Security Agreement, any other instrument, agreement or other document now or hereafter evidencing or securing the payment of the whole or any part of the indebtedness and other obligations incurred thereunder or any instrument, agreement or other document now or hereafter evidencing or securing any other indebtedness or other obligations incurred from time to time by the Borrower or any of its subsidiaries (all of the foregoing, collectively, the "Subordinated Loan Documents") prohibiting or restricting the following actions, Subordinated Creditor hereby consents to Borrower's and its subsidiaries' execution and delivery of, and performance under, the Securities Purchase Agreement, the Notes and the other Transaction Documents, including the incurrence of the Senior Debt (as defined below) by Borrower (and its subsidiaries, as applicable) pursuant to the Transaction Documents, and the grant by Borrower and its subsidiaries of a security interest and lien on all of its personal property and assets to Senior Creditor to secure the Senior Debt.

2.      Subordinated Creditor hereby subordinates any Lien Subordinated Creditor may have in the Collateral (as defined in the Security Agreement) to any security interest or lien Senior Creditor may have in the Collateral.  Notwithstanding the respective dates of attachment or perfection of the security interest of Subordinated Creditor and the security interest of Senior Creditor, the security interest of Senior Creditor in the Collateral shall at all times be prior to the security interest of Subordinated Creditor in the Collateral until Full Payment (as defined below).  The parties hereto agree that the Subordinated Debt shall not be secured other than as expressly provided in the Subordinated Loan Documents on the date hereof.

3.      All loans, advances, debts, liabilities, obligations, debit balances, covenants and duties at any time or times owed by Borrower or any of its subsidiaries to Subordinated Creditor or to any Person owned or controlled by Subordinated Creditor under the Subordinated Notes, the Subordinated Security Agreement, the other Subordinated Loan Documents or otherwise (collectively, the "Subordinated Debt"), are subordinated in right of payment to (a) all loans, advances, debts, liabilities, obligations, debit balances, covenants and duties at any time or times owed by Borrower or any of its subsidiaries to Senior Creditor under the Securities Purchase Agreement, the Notes or any other Transaction Document (together with the Securities Purchase Agreement and the Notes, collectively, the "Senior Loan Documents"), whether now or hereafter created, incurred or arising, and whether direct or indirect, absolute or contingent, secured or unsecured, primary or secondary, joint or several, liquidated or unliquidated, due or to become due, now existing or hereafter arising, (b) all loans made or credit extended by Senior Creditor to Borrower or any of its subsidiaries during the pendency of any Insolvency Proceeding (as defined below) of Borrower or any of its subsidiaries, (c) all interest, fees, charges, expenses and attorneys' fees for which Borrower or any of its subsidiaries is now or hereafter becomes liable to pay to Senior Creditor under the Senior Loan Documents or by law (including all interest, legal fees and other charges that accrue or are incurred in connection with any of the Senior Debt (as defined below) during the pendency of any Insolvency Proceeding of Borrower or any of its subsidiaries, whether or not Senior Creditor is authorized by 11 U.S.C. Section 506 or otherwise to claim or collect any such interest, legal fees or other charges from Borrower or any of its subsidiaries), (d) any renewals, extensions, replacements or refinancings of any of the foregoing and (e) all costs and expenses at any time incurred by Senior Creditor in connection with its enforcement of rights or exercise of remedies under any of the Senior Loan Documents or applicable law or in equity to collect any of the Senior Debt, enforce any lien or security interest of Senior Creditor or otherwise enforce any provisions of any of the Senior Loan Documents, or protect or preserve any of the Collateral or defend any lien or security interest of Senior Creditor therein against the claims of third parties (clauses (a) through (e) above, collectively, the "Senior Debt").  As used herein, "Insolvency Proceeding" means (x) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors or (y) any general assignment for the benefit of creditors, formal or informal moratorium, composition, marshaling of assets for creditors or

other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors, in each case, undertaken under the Bankruptcy Code or other applicable law.

4.      Subordinated Creditor will not demand or receive from Borrower or any of its subsidiaries (and neither Borrower nor any of its subsidiaries will pay to Subordinated Creditor) all or any part of the Subordinated Debt, by way of payment, prepayment, setoff, lawsuit or otherwise, nor will Subordinated Creditor exercise any right or remedy under any Subordinated Loan Document or with respect to any Collateral, or any other right or remedy available at law or equity, nor will Subordinated Creditor commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against Borrower or any of its subsidiaries, until (a) the Senior Debt has been indefeasibly paid in full in cash, (b) the Transaction Documents have been terminated and (c) no claims, losses or liabilities related to the Senior Debt to which Senior Creditor is entitled to indemnification or reimbursement by Borrower or any of its subsidiaries, whether pending or threatened, remain unresolved (such events described in clauses (a) through (c) above, collectively, "Full Payment").  In furtherance of the foregoing: (r) neither Borrower nor any of its subsidiaries shall, directly or indirectly, make any payment on account of the Subordinated Debt (other than any salary, executive compensation, employee benefits or reimbursement of reasonable expenses, in each case in the ordinary course of business and consistent with past practice, that is owed by Borrower or any of its subsidiaries to Subordinated Creditor in Subordinated Creditor's capacity as a director, officer or employee of the Borrower); (s) Subordinated Creditor shall not demand, collect or accept from Borrower or any of its subsidiaries, or any other Person, any payment on account of the Subordinated Debt or any part thereof; (t) Subordinated Creditor shall not accelerate the maturity or payment of any of the Subordinated Debt, or assert, collect, enforce or seek to enforce any right or remedy with respect to the Subordinated Debt or any part thereof; (u) Subordinated Creditor, the Borrower and its subsidiaries shall not permit the "Maturity Date" (as defined in the Subordinated Loan Documents) or otherwise permit the maturity of any of the Subordinated Debt to be earlier than the date that is 181 days after the latest "Maturity Date" (as defined in the Notes, as such term may be amended  and/or extended from time to time) (the "Outside Maturity Date"), and the Borrower and Subordinated Creditor hereby agree that to the extent any "Maturity Date" (as defined in the Subordinated Loan Documents) occurs on or earlier than the Outside Maturity Date, such "Maturity Date" shall be automatically, and without any further consent or action of any Person, extended to a date that is at least one day after the Outside Maturity Date; (v) Subordinated Creditor shall not exchange, set off, release, convert to equity or otherwise discharge any part of the Subordinated Debt; (w) Subordinated Creditor shall not hereafter give any subordination in respect of the Subordinated Debt or transfer or assign any of the Subordinated Debt to any Person unless the transferee or assignee thereof first agrees in writing with Senior Creditor to be bound by the terms of this Agreement; (x) neither Borrower nor any of its subsidiaries shall hereafter issue any instrument, security or other writing evidencing any part of the Subordinated Debt, and Subordinated Creditor will not receive any such writing, except upon the prior written approval of Senior Creditor or at the request of and in the manner requested by Senior Creditor; (y) Subordinated Creditor shall not commence or join with any other creditor of Borrower or any of its subsidiaries in commencing any Insolvency Proceeding against Borrower or any of its subsidiaries; and (z) neither Subordinated Creditor nor Borrower or any of its subsidiaries otherwise shall take or permit any action prejudicial to or inconsistent with Senior Creditor's priority position over Subordinated Creditor that is created by this Agreement.  Notwithstanding any other provision herein, prior to Full Payment, all accrued and unpaid interest under the Subordinated Loan Documents or in connection with the Subordinated Debt may be capitalized and become part of the applicable principal balance when such interest becomes payable by the Borrower or any of its subsidiaries to the Subordinated Creditor (the "Deferred Interest Payments"). The Deferred Interest Payments shall become due and payable by the Borrower (or, if applicable, its subsidiaries) to the Subordinated Creditor immediately after the occurrence of Full Payment.

5.      Subject to Section 15, Subordinated Creditor may execute, verify, deliver and file any proofs of claim in respect of the Subordinated Debt in connection with any Insolvency Proceeding.

107631993_8

6.      Subordinated Creditor shall promptly deliver to Senior Creditor in the form received (except for endorsement or assignment by Subordinated Creditor where required by Senior Creditor) for application to the Senior Debt any payment, distribution, security or proceeds received by Subordinated Creditor from Borrower or any other Person, or any asset thereof, with respect to the Subordinated Debt until Full Payment.

7.      In the event of any Insolvency Proceeding, Full Payment shall occur before any payment is made to or received by Subordinated Creditor with respect to the Subordinated Debt.

8.      Senior Creditor and Borrower and its subsidiaries are authorized to modify or amend any of the Senior Loan Documents to which they are a party without prior notice to or the consent of Subordinated Creditor.  Subordinated Creditor shall not be authorized to modify or amend any of the Subordinated Loan Documents without the prior written consent of Senior Creditor (other than to reduce the rate of interest or extend the time for payment).

9.      This Agreement shall remain effective until Full Payment.  If at any time after Full Payment any payments of the Senior Debt must be disgorged by Senior Creditor for any reason (including the bankruptcy of Borrower or any of its subsidiaries), this Agreement and the relative rights and priorities set forth herein shall be reinstated as to all such disgorged payments as though such payments had not been made and Subordinated Creditor shall immediately pay over to Senior Creditor all payments received with respect to the Subordinated Debt to the extent that such payments would have been prohibited hereunder.  At any time and from time to time, without notice to Subordinated Creditor, Senior Creditor may take such actions with respect to the Senior Debt as Senior Creditor, in its sole discretion, may deem appropriate, including extending the time of payment, increasing applicable interest rates, renewing, compromising or otherwise amending the terms of any documents affecting the Senior Debt and any collateral securing the Senior Debt, and enforcing or failing to enforce any rights against Borrower or any other Person.  No such action or inaction shall impair or otherwise affect Senior Creditor's rights hereunder.

10.      Subordinated Creditor will not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of the Senior Debt or the Liens of Senior Creditor in respect of any of the Collateral or the provisions of this Agreement.  Senior Creditor will not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of the Subordinated Debt or the Liens of Subordinated Creditor in respect of any of the Collateral or the provisions of this Agreement.  Subordinated Creditor agrees that Subordinated Creditor will not take any action that would interfere with any exercise of rights or remedies undertaken by Senior Creditor under the Senior Loan Documents.  Subordinated Creditor hereby waives any and all rights he may have as a junior creditor or otherwise to contest, protest, object to, or interfere with the manner in which Senior Creditor seeks to enforce its rights and remedies under the Senior Loan Documents, including enforcement of its Liens in any Collateral.

11.      In the event that Senior Creditor releases or agrees to release any of its security interests in any portion of the Collateral on which Subordinated Creditor has a security interest or lien in connection with the sale or other disposition thereof, or any of such Collateral is sold or retained pursuant to a foreclosure or similar action, the liens and security interests of Subordinated Creditor on such Collateral shall be automatically released and Subordinated Creditor promptly shall execute and deliver to Senior Creditor or Borrower, as applicable, such termination statements, releases and other documents as Senior Creditor or Borrower may reasonably request to effectively confirm such release.  In respect of, and to facilitate, the foregoing, to the extent that Subordinated Creditor fails or refuses to provide such lien releases within five (5) Business Days after being requested by Senior Creditor to do so, Senior

Creditor shall be empowered (which power is coupled with an interest and is irrevocable for the terms of this Agreement), as Subordinated Creditor's attorney in fact, to execute and deliver such lien releases for and on behalf of Subordinated Creditor in its name, and to bind Subordinated Creditor accordingly thereby.

12.    Subordinated Creditor hereby waives any rights he/it may have under applicable law to assert the doctrine of marshaling or to otherwise require Senior Creditor to marshal any property of Borrower or any of its subsidiaries for the benefit of Subordinated Creditor or otherwise.

13.    Each of Borrower and Subordinated Creditor hereby represents and warrants that:  (a) it has not relied nor will it rely on any representation or information of any nature made by or received from Senior Creditor relative to Borrower's financial condition, or the existence, value or extent of any Collateral, in deciding to execute this Agreement; (b) no part of the Subordinated Debt is evidenced by any instrument, agreement or other document except the Subordinated Notes and the Subordinated Security Agreement; (c) Subordinated Creditor is the lawful owner of the Subordinated Debt, and the Subordinated Debt under the Subordinated Loan Documents identified in clause (b) above and the organizational documents of Borrower constitutes the only debt, liabilities or obligations owed by Borrower or any of its subsidiaries to Subordinated Creditor; and (e) Subordinated Creditor has not heretofore assigned or transferred any of the Subordinated Debt.

14.    This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding with respect to Borrower or any of its subsidiaries.

15.    In the event of any Insolvency Proceeding with respect to Borrower or any of its subsidiaries:

15.1    Full Payment shall occur before any payment or distribution of cash, securities or other property, by set-off or otherwise, on account of such indebtedness, obligation or security (each, a "Distribution") shall be made to Subordinated Creditor from or on account of Borrower, any other Person or any assets thereof on account of any Subordinated Debt.

15.2    Any Distribution that would otherwise, but for the terms hereof, be payable or deliverable in respect of the Subordinated Debt shall be delivered to Senior Creditor. Subordinated Creditor irrevocably authorizes, empowers, and directs any debtor, debtor-in-possession, receiver, trustee, liquidator, custodian or conservator, or other person having authority, to pay or otherwise deliver all such Distributions to Senior Creditor as set forth above. Subordinated Creditor also irrevocably authorizes and empowers Senior Creditor, in the name of Subordinated Creditor, to demand, sue for, collect and receive any and all such Distributions.

15.3    Subordinated Creditor, agrees not to initiate, prosecute or participate in any claim, action or other proceeding challenging the enforceability, validity, perfection or priority of any portion of the Senior Debt or any liens or security interests securing any portion of the Senior Debt.

15.4    Subordinated Creditor agrees that Senior Creditor may consent to the use of cash collateral of, or provide debtor-in-possession financing to, Borrower or any of its subsidiaries on such terms and conditions and in such amounts as Senior Creditor, in its sole discretion, may decide and, in connection therewith, Borrower or any of its subsidiaries may grant (or continue to grant) to Senior Creditor liens and security interests upon all of the property of Borrower or any of its subsidiaries, which liens and security interests (a) shall secure payment of all Senior Debt owing to Senior Creditor (whether such Senior Debt arose prior to the commencement of such Insolvency Proceeding or at any time thereafter) and all other financing provided by Senior Creditor during such Insolvency Proceeding and (b) shall be superior in priority to all liens and security interests in favor of Subordinated Creditor on the

property of Borrower or any of its subsidiaries. Subordinated Creditor agrees that he/it will not object to or oppose any such cash collateral usage, any debtor-in-possession financing or any sale or other disposition of any property securing all or any part of the Senior Debt free and clear of security interests, liens, or other claims of Subordinated Creditor under Section 363 of the Bankruptcy Code or any other provision of the Bankruptcy Code, if Senior Creditor has consented to such sale or disposition. Subordinated Creditor agrees not to assert any right he/it may have to "adequate protection" in such Insolvency Proceeding and agrees that he/it will not seek to have the automatic stay lifted in any Insolvency Proceeding. Subordinated Creditor agrees that he/it will not provide, or offer to provide, any debtor-in-possession financing to Borrower or any of its subsidiaries without the prior written consent of Senior Creditor.

15.5    Subordinated Creditor agrees not to vote for any plan of reorganization that does not provide for the prior payment in full in cash of the Senior Debt or otherwise vote its claims or interests in such Insolvency Proceeding (including voting for, or supporting, confirmation of any plans of reorganization) in a manner that would be inconsistent with Subordinated Creditor's covenants and agreements contained herein; provided that nothing herein shall prevent Subordinated Creditor from voting in a manner consistent with how Senior Creditor votes in such Insolvency Proceeding.

15.6    The Senior Debt shall continue to be treated as Senior Debt and the provisions of this Agreement shall continue to govern the relative rights and priorities of Senior Creditor and Subordinated Creditor even if all or part of the Senior Debt or the liens or security interests securing the Senior Debt are subordinated, set aside, avoided, invalidated, or disallowed in connection with any such Insolvency Proceeding. This Agreement shall be reinstated if at any time any payment of any of the Senior Debt is rescinded or must otherwise be returned by any holder of Senior Debt or any representative of such holder.

15.7    The parties acknowledge and agree that (a) the claims and interests of Senior Creditor under the Senior Loan Documents are substantially different from the claims and interests of Subordinated Creditor under the Subordinated Debt Documents and (b) such claims and interests should be treated as separate classes for purposes of Section 1122 of the Bankruptcy Code.

16.    If Subordinated Creditor has any claim against Borrower or any of its subsidiaries in any Insolvency Proceeding, Subordinated Creditor hereby irrevocably makes, constitutes and appoints Senior Creditor as Subordinated Creditor's attorney in fact, and grants to Senior Creditor a power of attorney with full power of substitution, in the name of Subordinated Creditor or in the name of Senior Creditor, without notice to Subordinated Creditor, and authorizes Senior Creditor (a) to file, in the name of Subordinated Creditor, such claim on behalf of Subordinated Creditor, if Subordinated Creditor does not do so prior to 10 days before the expiration of the time to file claims in such proceeding and if Senior Creditor elects, in its sole discretion, to file such claim or claims, (b) to enforce such claim, either in its own name or in the name of Subordinated Creditor, by proof of claim, suit or otherwise, (c) to vote such claim to accept or reject any plan of reorganization, and (d) to take any other action in connection with any such Insolvency Proceeding that Subordinated Creditor would be authorized to take but for this Agreement, and any sums received by Senior Creditor in connection with such claim shall be applied to the Senior Debt.  Senior Creditor shall remit to Subordinated Creditor any funds remaining after those sums have been so applied, to the extent permitted by applicable law or the proceedings governing any such bankruptcy.  In no event shall Senior Creditor be liable to Subordinated Creditor for any failure to prove the Subordinated Debt, to exercise any right with respect thereto or to collect any sums payable thereon.

17.    All notices, requests and other communications to or upon a party hereto shall be in writing (including electronic transmission or similar writing) and shall be given to such party at the address set forth in below or at such other address as such party may hereafter specify for the purpose of notice to Subordinated Creditor and Senior Creditor in accordance with the provisions of this Section 17:

If to Senior Creditor:         Empery Tax Efficient, LP
c/o Empery Asset Management, LP,
1 Rockefeller Plaza, Suite 1205
New York, NY 10020
Attn: Brett S. Director
Email: notices@emperyam.com

with a copy to:         Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Attn: Gregory Ruback, Esq.
Email: Gregory.Ruback@srz.com

If to Subordinated Creditor:      Ryan Drexler
89 Olympia Chase Drive
Las Vegas, NV 89141
Attn:  Ryan Drexler
Email:  ryan.drexler@musclepharm.com

Each such notice, request or other communication shall be effective (a) if given by mail, three Business Days after such communication is deposited in the U.S. Mail, with first class postage pre-paid, addressed to the noticed party at the address specified herein, (b) if by nationally recognized overnight courier, when delivered with receipt acknowledged in writing by the noticed party, (c) if given by personal delivery, when duly delivered with receipt acknowledged in writing by the noticed party or (d) given by electronic mail, unless Senior Creditor otherwise prescribes, upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided, however, that if such electronic mail is not sent during the normal business hours of the recipient, such electronic mail shall be deemed to have been sent at the opening of business on the next business day for the recipient.  Any written notice, request or demand that is not sent in conformity with the provisions hereof shall nevertheless be effective on the date that such notice, request or demand is actually received by the individual to whose attention at the noticed party such notice, request or demand is required to be sent.

18.     This Agreement shall bind any successors or assignees of Subordinated Creditor and shall benefit any successors or assigns of Senior Creditor and Subordinated Creditor.  This Agreement is solely for the benefit of Subordinated Creditor and Senior Creditor and not for the benefit of Borrower or any other Person.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to Borrower or any of its subsidiaries shall include Borrower or any of its subsidiaries, as applicable, as debtor and debtor-in-possession and any receiver or trustee for Borrower or any of its subsidiaries (as the case may be) in any Insolvency Proceeding.

19.     This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.  Any signatures delivered by a party by facsimile transmission or by other electronic transmission shall be deemed an original signature hereto.  The parties hereto irrevocably and unreservedly agree that this Agreement may be executed by way of electronic signatures and the parties agree that neither this Agreement, nor any part hereof, shall be challenged or denied any legal effect, validity and/or enforceability solely on the ground that it is in the form of an electronic record.

20.    THIS AGREEMENT SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.

21.    BORROWER AND SUBORDINATED CREDITOR HEREBY CONSENT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK COUNTY, STATE OF NEW YORK AND IRREVOCABLY AGREE THAT, SUBJECT TO SENIOR CREDITOR'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS.    BORROWER AND SUBORDINATED CREDITOR EXPRESSLY SUBMIT AND CONSENT TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVE ANY DEFENSE OF FORUM NON CONVENIENS. BORROWER AND SUBORDINATED CREDITOR HEREBY WAIVE PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON BORROWER AND SUBORDINATED CREDITOR BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER OR SUBORDINATED CREDITOR, AS THE CASE MAY BE, AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE 10 DAYS AFTER THE SAME HAS BEEN POSTED.

22.    BORROWER AND SUBORDINATED CREDITOR HEREBY WAIVE ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT.    BORROWER AND SUBORDINATED CREDITOR HEREBY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH PARTY HERETO HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.    EACH OF BORROWER AND SUBORDINATED CREDITOR HEREBY WARRANTS AND REPRESENTS THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

23.    The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders.  The section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement.  References in this Agreement to "Sections" shall be to the Sections of this Agreement unless otherwise specifically provided. All references in this Agreement to statutes shall include all amendments of same and implementing regulations and any successor statutes and regulations; to any instrument or agreement (including any of the Senior Loan Documents or the Subordinated Loan Documents) shall include any and all modifications and supplements thereto and any and all restatements, extensions or renewals thereof to the extent such modifications, supplements, restatements, extensions or renewals of any such documents are permitted by the terms hereof and thereof; to any Person means and includes the successors and permitted assigns of such Person; or to "including" shall be understood to mean "including, without limitation".  Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  A breach, default or Event of Default (as defined in the Security Agreement) shall be deemed to exist at all times during the period commencing on the date that such breach, default or Event of Default occurs to the date on which such breach, default or Event of Default is waived in writing pursuant to the Senior Loan Documents.

24.    This Agreement represents the entire agreement with respect to the subject matter hereof, and supersedes all prior negotiations, agreements and commitments.  Subordinated Creditor is not relying on any representations by Senior Creditor in entering into this Agreement, and Subordinated Creditor has kept and will continue to keep itself fully apprised of the financial and other condition of Borrower.  No

8

amendment or modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by Subordinated Creditor and Senior Creditor, and, in the case of amendments or modifications that directly affect the rights or duties of Borrower, Borrower.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**SUBORDINATED CREDITOR**:

**RYAN DREXLER**

*Ryan Drexler*
_____

**SENIOR CREDITOR**:

**EMPERY TAX EFFICIENT, LP**

By: _____
    Name:
    Title:

**BORROWER**:

**MUSCLEPHARM CORPORATION**

          *Sabina Rizvi*
By: _____
    Name:  Sabina Rizvi
    Title:  President and Chief Financial Officer

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**SUBORDINATED CREDITOR**:

**RYAN DREXLER**

_____

**SENIOR CREDITOR**:

**EMPERY TAX EFFICIENT, LP**
By: Empery Asset Management, LP, its authorized agent

By: _____
Name:  Brett Director
Title:  General Counsel of Empery Asset Management, LP, its authorized agent_____

**BORROWER**:

**MUSCLEPHARM CORPORATION**

By: _____
Name: _____
Title: _____

# EXHIBIT 10

# EXHIBIT 10

*EXECUTION COPY*

# FIRST AMENDMENT
## TO INTERCREDITOR AND SUBORDINATION AGREEMENT

This FIRST AMENDMENT TO INTERCREDITOR AND SUBORDINATION AGREEMENT (this "Amendment"), dated as of March 8, 2022, is entered into by and between **Ryan Drexler**, an individual ("**Subordinated Creditor**"), **MusclePharm Corporation**, a Nevada corporation (the "**Borrower**") and **Empery Tax Efficient, LP**, as representative on behalf of the buyers party to the Securities Purchase Agreement (as defined in the Intercreditor Agreement referenced below) ("**Senior Creditor**"). Terms used herein without definition shall have the definition assigned to such terms in the Intercreditor Agreement referenced below.

## RECITALS

WHEREAS, Subordinated Creditor desires to extend credit to the Borrower and the Borrower desires to borrow from Subordinated Creditor, pursuant to the terms of the Unsecured Revolving Promissory Note dated as of the date hereof in the form attached hereto as Exhibit A (the "**Promissory Note**" and such indebtedness and obligations to Subordinated Creditor arising under the Promissory Note (whether now existing or hereafter arising), collectively, the "**Promissory Note Debt**");

WHEREAS, the parties hereto desire to amend that certain Intercreditor and Subordination Agreement, dated as of October 13, 2021 (the "**Intercreditor Agreement**"), among Subordinated Creditor, the Borrower and Senior Creditor, in accordance with the terms herein;

**NOW, THEREFORE**, in consideration of the covenants made hereunder, and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.    Amendments to Intercreditor Agreement.    The Intercreditor Agreement shall be amended as follows:

(a)    Section 3 of the Intercreditor Agreement is hereby amended and restated as follows:

"All loans, advances, debts, liabilities, obligations, debit balances, covenants and duties at any time or times owed by Borrower or any of its subsidiaries to Subordinated Creditor, including all obligations of the Borrower under Unsecured Revolving Promissory Note, dated as of March 8, 2022 (the "Permitted Note"), or to any Person owned or controlled by Subordinated Creditor under the Subordinated Notes, the Subordinated Security Agreement, the other Subordinated Loan Documents or otherwise (collectively, the "Subordinated Debt"), are subordinated in right of payment to (a) all loans, advances, debts, liabilities, obligations, debit balances, covenants and duties at any time or times owed by Borrower or any of its subsidiaries to Senior Creditor under the Securities Purchase Agreement, the Notes or any other Transaction Document (together with the Securities Purchase Agreement and the Notes, collectively, the "Senior Loan Documents"), whether now or hereafter created, incurred or arising, and whether direct or indirect, absolute or contingent, secured or unsecured, primary or secondary, joint or several, liquidated or unliquidated, due or to become due, now existing or hereafter arising, (b) all loans made or credit extended by Senior Creditor to Borrower or any of its subsidiaries during the pendency of any Insolvency Proceeding (as defined below) of Borrower or any of its subsidiaries, (c) all interest, fees, charges, expenses and attorneys' fees for which Borrower or any of its subsidiaries is now or hereafter becomes liable to pay to Senior Creditor under the Senior Loan Documents or by law (including all interest, legal fees and other charges that accrue or are incurred in connection with any of the Senior Debt (as defined below) during the pendency of any Insolvency Proceeding of Borrower or any of its subsidiaries, whether or not Senior Creditor is authorized by 11 U.S.C. Section 506 or otherwise to claim or collect any such interest, legal fees or other charges from Borrower or any of its subsidiaries), (d) any renewals, extensions, replacements or refinancings of any of the foregoing and (e) all costs and expenses at any time incurred by Senior Creditor in connection with its enforcement of rights or exercise of

1

remedies under any of the Senior Loan Documents or applicable law or in equity to collect any of the Senior Debt, enforce any lien or security interest of Senior Creditor or otherwise enforce any provisions of any of the Senior Loan Documents, or protect or preserve any of the Collateral or defend any lien or security interest of Senior Creditor therein against the claims of third parties (clauses (a) through (e) above, collectively, the "Senior Debt"). As used herein, "Insolvency Proceeding" means (x) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors or (y) any general assignment for the benefit of creditors, formal or informal moratorium, composition, marshaling of assets for creditors or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors, in each case, undertaken under the Bankruptcy Code or other applicable law. For purposes of this Agreement, reference in this Agreement to (x) any obligations or liabilities owed to the Senior Creditor shall be deemed include all obligations and liabilities owed to all holders of Notes, and (y) any claims and interests of the Senior Creditor shall include claims and interests all holders of Notes."

(b)    Section 4 of the Intercreditor Agreement is hereby amended and restated as follows:

"Subordinated Creditor will not demand or receive from Borrower or any of its subsidiaries (and neither Borrower nor any of its subsidiaries will pay to Subordinated Creditor) all or any part of the Subordinated Debt, by way of payment, prepayment, setoff, lawsuit or otherwise, nor will Subordinated Creditor exercise any right or remedy under any Subordinated Loan Document or with respect to any Collateral, or any other right or remedy available at law or equity, nor will Subordinated Creditor commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against Borrower or any of its subsidiaries, until (a) the Senior Debt has been indefeasibly paid in full in cash, (b) the Transaction Documents have been terminated and (c) no claims, losses or liabilities related to the Senior Debt to which Senior Creditor is entitled to indemnification or reimbursement by Borrower or any of its subsidiaries, whether pending or threatened, remain unresolved (such events described in clauses (a) through (c) above, collectively, "Full Payment"); provided that the Borrower may make Permitted Note Payments to Subordinated Creditor. In furtherance of the foregoing: (r) neither Borrower nor any of its subsidiaries shall, directly or indirectly, make any payment on account of the Subordinated Debt (other than (i) any salary, executive compensation, employee benefits or reimbursement of reasonable expenses, in each case in the ordinary course of business and consistent with past practice, that is owed by Borrower or any of its subsidiaries to Subordinated Creditor in Subordinated Creditor's capacity as a director, officer or employee of the Borrower or (ii) the Permitted Note Payments); (s) Subordinated Creditor shall not demand, collect or accept from Borrower or any of its subsidiaries, or any other Person, any payment on account of the Subordinated Debt or any part thereof, other than the Permitted Note Payments; (t) Subordinated Creditor shall not accelerate the maturity or payment of any of the Subordinated Debt, or assert, collect, enforce or seek to enforce any right or remedy with respect to the Subordinated Debt or any part thereof; (u) Subordinated Creditor, the Borrower and its subsidiaries shall not permit the "Maturity Date" (as defined in the Subordinated Loan Documents) or otherwise permit the maturity of any of the Subordinated Debt to be earlier than the date that is 181 days after the latest "Maturity Date" (as defined in the Notes, as such term may be amended and/or extended from time to time) (the "Outside Maturity Date"), and the Borrower and Subordinated Creditor hereby agree that to the extent any "Maturity Date" (as defined in the Subordinated Loan Documents) occurs on or earlier than the Outside Maturity Date, such "Maturity Date" shall be automatically, and without any further consent or action of any Person, extended to a date that is at least one day after the Outside Maturity Date; (v) Subordinated Creditor shall not exchange, set off, release, convert to equity or otherwise discharge any part of the Subordinated Debt; (w) Subordinated Creditor shall not hereafter give any subordination in respect of the Subordinated Debt or transfer or assign any of the Subordinated Debt to any Person unless the transferee or assignee thereof first agrees in writing with Senior Creditor to be bound by the terms of this Agreement; (x) neither Borrower nor any of its subsidiaries shall hereafter issue any instrument, security or other writing evidencing any part of the Subordinated Debt, and Subordinated Creditor will not receive any such writing, except upon the prior written approval of Senior Creditor or at the request of and in the manner requested by Senior Creditor; (y) Subordinated Creditor shall not commence or join with any other creditor of Borrower or any of its subsidiaries in commencing any Insolvency Proceeding against Borrower or any of its subsidiaries; and (z) neither Subordinated Creditor nor Borrower or any of its subsidiaries otherwise shall take or permit any action

2

prejudicial to or inconsistent with Senior Creditor's priority position over Subordinated Creditor that is created by this Agreement. Notwithstanding any other provision herein, prior to Full Payment, all accrued and unpaid interest under the Subordinated Loan Documents or in connection with the Subordinated Debt may be capitalized and become part of the applicable principal balance when such interest becomes payable by the Borrower or any of its subsidiaries to the Subordinated Creditor (the "Deferred Interest Payments"). The Deferred Interest Payments shall become due and payable by the Borrower (or, if applicable, its subsidiaries) to the Subordinated Creditor immediately after the occurrence of Full Payment." As used herein, "Permitted Note Payments" means, at any time no Event of Default (as defined in the Security Agreement), Event of Default (as defined in the Permitted Note) or Insolvency Proceeding has occurred and is continuing, the repayment by the Borrower to the Subordinated Creditor of the principal portion of the Permitted Note from the proceeds of Costco Account Receivables in connection with the Advance (as defined in the Permitted Note) directly related to such Costco Account Receivables pursuant to the terms therein. For the avoidance of doubt, the Permitted Note Payments shall not be applicable to the repayment of interest, fees, expenses or other amounts under the Permitted Note."

(c)    Section 8 of the Intercreditor Agreement is hereby amended by replacing the second sentence thereof with the following:

"Subordinated Creditor shall not amend, waive or otherwise modify the provisions of any Subordinated Loan Document without the prior written consent of the Senior Creditor (other than to reduce the rate of interest or extent the time for payment)."

SECTION 2.    Conditions to Effectiveness of this Amendment. This Amendment shall become effective upon the receipt by Senior Creditor of counterparts of this Amendment executed by (i) the Borrower, (ii) Subordinated Creditor and (iii) Senior Creditor.

SECTION 3.    Representations and Warranties. The Borrower hereby represents and warrants as follows:

(a)    Authorization; No Contravention. The Borrower has all requisite power and authority to execute, deliver and perform its obligations under this Amendment. The execution, delivery and performance by the Borrower of this Amendment, and the consummation of the transactions contemplated hereby, are within its corporate or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of its charter or bylaws, (b) conflict with or result in any breach or contravention of, any material order, injunction, writ or decree of any governmental authority or any arbitral award to which the Borrower or its property is subject; or (c) violate any law in any material respect.

(b)    Binding Effect. This Amendment has been duly executed and delivered by the Borrower and this Amendment constitutes, a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as such enforceability may be limited by debtor relief laws and by general principles of equity. The Intercreditor Agreement, as amended by this Amendment constitutes, a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as such enforceability may be limited by debtor relief laws and by general principles of equity.

(c)    Government Authorization; Other Consents. No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any governmental authority or any other person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Borrower of this Amendment, or for the consummation of the transactions contemplated hereby, except for (i) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (ii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

3

SECTION 4.    <u>Validity of Obligations and Liens</u>.

(a)    <u>Validity of Obligations</u>.    The Borrower acknowledges and agrees that, both before and after giving effect to this Amendment, Holdings, the Borrower indebted to the Buyers (as defined in the Security Agreement) for the Obligations (as defined in the Security Agreement), and the Borrower hereby ratifies and reaffirms the validity, enforceability and binding nature of such Obligations (as defined in the Security Agreement).

(b)    <u>Validity of Guarantees</u>.    The Borrower hereby (i) acknowledges and agrees to the terms of this Amendment and (ii) confirms and agrees that, after giving effect to this Amendment, its guarantee under that certain Guarantee, dated as of October 13, 2021 (the "<u>Guarantee</u>"), in favor of Senior Creditor shall continue to be, in full force and effect, and shall apply to all Guaranteed Obligations (as defined in the Guarantee) and such guarantee is hereby ratified and confirmed in all respects.

(c)    <u>Validity of Liens and Loan Documents</u>.    The Borrower hereby ratifies and reaffirms the validity and enforceability (without defense, counterclaim or offset of any kind) of the security interests granted to the Senior Creditor for the benefit of the Buyers (as defined in the Security Agreement) to secure any of the Obligations (as defined in the Security Agreement). The Borrower hereby confirms and agrees that notwithstanding the effectiveness of this Amendment, and except as expressly amended by this Amendment, each Transaction Document is, and shall continue to be, in full force and effect and each is hereby ratified and confirmed in all respects, except that, on and after the effectiveness of this Amendment, each reference in the Transaction Documents to the "CEO Intercreditor Agreement", "thereunder", "thereof" (and each reference in the Intercreditor Agreement to this "Agreement", "hereunder" or "hereof") or words of like import shall mean and be a reference to the Intercreditor Agreement as amended by this Amendment. This Amendment shall constitute a "Transaction Document" for purposes of the SPA.

SECTION 5.    <u>Governing Law</u>.    This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 6.    <u>Execution in Counterparts</u>.    This Amendment may be executed in any number of separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.    Delivery by telecopier or electronic PDF of an executed counterpart of a signature page to this Amendment shall be effective as delivery of an original executed counterpart of this Amendment.

SECTION 7. <u>Severability</u>.    If any provision of this Amendment is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Amendment shall not be affected or impaired thereby.

SECTION 8. <u>Integration</u>.    This Amendment, the Intercreditor Agreement, the other Transaction Documents and any separate agreements among the parties hereto or their affiliates or any other agent party to the SPA relating to this Amendment constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

SECTION 9.    <u>WAIVER OF JURY TRIAL</u>.    **EACH PARTY HERETO HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AMENDMENT OR ANY OTHER TRANSACTION DOCUMENT OR IN ANY WAY CONNECTION WITH OR RELATED OR INCIDENTAL TO THE DEALING OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AMENDMENT OR ANY OTHER TRANSACTION DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AMENDMENT MAY FILE AN ORIGINAL**

4

**COUNTERPART OR COPY OF THIS SECTION 10 WITH ANY COURT AS WRITTEN EVIDENCE FO THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

SECTION 10.  <u>Headings</u>.  Section and subsection headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purpose or be given any substantive effect.

SECTION 11.  <u>Successors and Assigns</u>.  This Amendment shall be binding upon and inure to the benefit of the Borrower, Subordinated Creditor and their respective successors and assigns, and upon Senior Creditor and the Buyers (as defined in the Security Agreement) and each of their respective successors and assigns.  Any assignment by any party hereto of its rights and obligations hereunder and any interest therein shall be subject to the provisions of the Transaction Documents.

*[signature pages follow]*

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first set forth above.

**RYAN DREXLER, AN INDIVIDUAL**

*Ryan Drexler*
_____

Address: 89 Olympia Chase Dr. Las Vegas, NV 89141
_____

[Signature Page to First Amendment to Intercreditor Agreement]

**MUSCLEPHARM CORPORATION**

By: _Sabina Rizvi_
            _____
Name: Sabina Rizvi
Title: Chief Financial Officer


Address: 6728 W. Sunset Rd., Suite 130
               Las Vegas, NV 89118

[Signature Page to First Amendment to Intercreditor Agreement]

**EMPERY TAX EFFICIENT, LP**
by: Empery Asset Management, LP, its authorized
agent

By: _____

Name: Brett Director

Title: General Counsel

Address:    c/o Empery Asset Management, LP
1 Rockefeller Plaza, Suite 1205
New York, NY 10020

[Signature Page to First Amendment to Intercreditor Agreement]

EXHIBIT A
FORM OF PROMISSORY NOTE

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAS BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THIS NOTE, THE REPAYMENT OF ALL INDEBTEDNESS EVIDENCED HEREBY AND THE EXERCISE OF ANY RIGHT OR REMEDY HEREUNDER BY THE HOLDER HEREOF ARE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN THAT CERTAIN INTERCREDITOR AND SUBORDINATION AGREEMENT, DATED AS OF OCTOBER 13, 2021 (AS AMENDED BY THAT CERTAIN FIRST AMENDMENT TO INTERCREDITOR AND SUBORDINATION AGREEMENT, DATED AS OF MARCH 8, 2022, THE "*INTERCREDITOR AGREEMENT*"), BY AND BETWEEN EMPERY TAX EFFICIENT, LP, MUSCLEPHARM CORPORATION AND RYAN DREXLER. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF SUCH INTERCREDITOR AGREEMENT AND THIS NOTE, THE TERMS OF THE INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL.

## UNSECURED REVOLVING PROMISSORY NOTE

March 8, 2022

**FOR VALUE RECEIVED**, **MusclePharm Corporation**, a Nevada corporation ("*the Company*"), hereby unconditionally promises to pay to the order of **Ryan Drexler** ("*Lender*"), in lawful money of the United States of America and in immediately available funds, the aggregate unpaid principal amount of all Advances (as defined below) (the "*Revolving Loan*"), together with accrued and unpaid Interest (as defined below) thereon and any Costs of Collection (as defined below), due and payable on the dates and in the manner set forth below in this Unsecured Revolving Promissory Note (the "*Note*").

    **1. Advances.** The Lender may, in its sole discretion, make one or more advances (each, an "*Advance*," and collectively, the "*Advances*") to the Company, and the Company may, to the extent that the Lender permits in his sole discretion, borrow funds from the Lender hereunder. While the decision to make any Advance is at all times within the sole discretion of the Lender, whether the limitation set forth in clause 1(c) below is satisfied or not, it is understood and agreed by the Company that, as further limitations on the making of Advances by the Lender:

        **(a)** each request for an Advance shall be made by the Company in writing, delivered to the Lender at least three (3) business days prior to the requested date of such Advance, and shall specify the date of such Advance and the amount of such Advance,

        **(b)** requests may only be made if no Event of Default (as defined below) has occurred and is continuing,

(c) each request shall be in the amount of at least ten thousand dollars (US$10,000) and shall be in thousand-dollar increments, and

(d) the proceeds of Advances shall be used by the Company solely to finance the production of orders made by Costco Wholesale Corporation or any of its affiliates or subsidiaries, as obligor of accounts receivables with respect to such orders (the "Costco Accounts Receivables").

The Lender shall, and is hereby authorized to, record on the schedule attached hereto the date and amount of each Advance and the date and amount of each principal payment hereunder, ***provided, that,*** the failure of the Lender to record any Advance shall have no effect on the obligation of the Company to repay the Advance or to pay any other amount hereunder.

**2. Interest.**   Simple interest shall accrue on the outstanding principal amount of each Advance from the date of such Advance until payment of such Advance at a rate of eighteen percent (18%) per annum ("***Interest***"), compounding annually.   Interest shall be calculated on the basis of a 365-day year for the actual number of days elapsed.

**3. Costs of Collection.**   If an Event of Default (as defined below) has occurred, the Company shall pay the reasonable costs and expenses (including reasonable attorney's fees) incurred by the Lender in the enforcement of the Lender's rights hereunder ("***Costs of Collection***").

**4. Repayment.**

(a) Each Advance made and not otherwise repaid, if any, all accrued Interest related thereto not otherwise paid, if any, and all accrued Costs of Collection related thereto not otherwise paid, if any (each such amount, the "***Repayment Amount***"), or at the sole discretion of the Lender, any portion of the Repayment Amount, shall be due and payable on the earlier of (a) the Maturity Date, as defined below, and (b) three (3) days following any demand of the Lender (each such date, a "***Repayment Date***").   Demand for payment hereunder shall be made by notice in writing, delivered by overnight courier to the undersigned at 6728 W. Sunset Rd., Suite 130, Las Vegas, NV 89118, or sent by email to Sabina.Rizvi@musclepharm.com or by fax to 800-490-7165 (with such demand being deemed made and effective one (1) business day after being sent via overnight courier, and effective on the same day it was sent (or, if not sent on a business day, on the following business day) if sent via email or fax), setting out details of the amount outstanding and the appropriate method of payment.

(b) The Company shall be entitled to prepay any outstanding principal amount of any Advances without premium or penalty following at least one (1) day's advance written notice to the Lender, ***provided, that,*** any such prepayment shall be accompanied by a payment by the Company of all accrued and unpaid Interest and Costs of Collection on such prepaid principal.

(c) Unless earlier due and payable as provided in Section 4(a), each Repayment Amount shall be due and payable on the earliest of (i) the receipt of collections on the Costco Account Receivable in connection with the Advance related to such Repayment Amount, (ii) immediately upon receipt by the Company of a Notice of Acceleration (as defined below) from

2

the Lender as provided by Section 8(a), and (iii) immediately upon the occurrence of an Event of Default of the type described in Section 7(b) or (c), as provided by Section 8(b) (the earliest such date being the "***Maturity Date***").

(d) All payments by the Company under this Note (including prepayments) shall be made without set-off or counterclaim and be free and clear and without any deduction or withholding for any taxes or fees of any nature whatever, unless the obligation to make such deduction or withholding is imposed by law.  All payments hereunder shall be made in cash in immediately available U.S. Dollars.

(e) The Company and Lender agree that the Company's obligations under the Note with respect to, among other things, right of payment to Lender are subordinate to the payment obligations of the Company pursuant to the Original Issue Discount Senior Secured Notes, dated as of October 13, 2021 (the "Existing Notes"), and any subordination agreement related thereto, and, among other things, no payments shall be made by Company under the Note if the Company is in default under the Existing Notes.

**5. Application of Payments.**   Payments made hereunder shall be applied, first, to accrued but unpaid Costs of Collection, if any; second, to accrued but unpaid Interest, if any; third to unpaid principal on the Revolving Loan, if any (beginning with the earliest Advance for which principal remains unpaid and continuing in chronological order to subsequent Advances). Any excess amounts remaining after such application shall be returned to the Company within three (3) business days.

**6. Reserved.**

**7. Default.**  There shall exist an event of default hereunder (an "***Event of Default***") if

(a) the Company fails to repay or pay any and all unpaid principal, accrued and unpaid Interest, accrued and unpaid Costs of Collection and all other amounts owing under this Note when due and payable pursuant to the terms of this Note unless such failure is cured within three (3) days of the date the Lender has given notice of such breach to the Company;

(b) the Company or any of its subsidiaries files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any general assignment for the benefit of creditors;

(c) an involuntary petition is filed against the Company or any of its subsidiaries (unless such petition is dismissed or discharged within sixty (60) days) under any bankruptcy statute or similar law now or hereafter in effect, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company;

(d) the Company breaches any other material term of this Note (unless, in the case of any curable material breach, such material breach is cured within thirty (30) days of the earlier of the date on which (x) the Lender has given notice of such breach to the Company and (y) the Company has actual knowledge of such breach);

117853531_10

**(e)** the Company amends or modifies the terms of any existing indebtedness in a manner that increases the principal amount thereof or the interest rate applicable thereto, accelerates the maturity of the obligations thereunder or otherwise adversely affects the Lender; *provided, that*, the foregoing shall not constitute an Event of Default if undertaken, caused, approved, consented to or voted in favor of by the Lender in his capacity as an employee, officer or director of the Company;

**(f)** a final judgment or judgments for the payment of money aggregating in excess of $1,000,000 that are not covered by insurance or an indemnity from a creditworthy party are rendered against the Company and/or any of its subsidiaries and which judgments are not, within thirty (30) days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within thirty (30) days after the expiration of such stay;

**(g)** the Company fails to pay, when due, giving effect to any applicable grace period, any payment with respect to any funded indebtedness in excess of $500,000 due to any third party (other than, with respect to unsecured funded indebtedness only, payments contested by the Company in good faith by proper proceedings and with respect to which adequate reserves have been set aside for the payment thereof in accordance with U.S. generally accepted accounting principles) or is otherwise in breach or violation of any agreement for monies owed or owing in an amount in excess of $500,000, other than (i) unsecured trade obligations in the ordinary course of business, which breach or violation permits the other party thereto to declare a default or otherwise accelerate amounts due thereunder or (ii) matters disclosed in the Company's securities filings; *provided, that*, the foregoing shall not constitute an Event of Default if undertaken, caused, approved, consented to or voted in favor of by the Lender in his capacity as an employee, officer or director of the Company; or

**(h)** there exists any circumstances or events that would, with or without the passage of time or the giving of notice, result in a default or event of default under any agreement binding the Company or any subsidiary, which default or event of default would or is likely to have a material adverse effect on the business, assets, operations or financial condition of the Company and its subsidiaries, taken as a whole; *provided, that*, the foregoing shall not constitute an Event of Default if such circumstances or events are undertaken, caused, approved, consented to or voted in favor of by the Lender in his capacity as an employee, officer or director of the Company.

## 8. Acceleration and Remedies.

**(a)** Upon the occurrence and during the continuance of any Event of Default described in clause (a) or clauses (d) through (h) of Section 7 of this Note, the Lender shall be entitled to accelerate the entire indebtedness hereunder, including all principal, all Interest and all Costs of Collection, which shall become due and payable following receipt by the Company of written notice of the occurrence of said Event of Default ("*Notice of Acceleration*").

**(b)** Upon the occurrence and during the continuance of any Event of Default described in clauses (b) or (c) of Section 7 of this Note, the entire indebtedness hereunder, including all principal, all Interest, and all Costs of Collection, shall be automatically accelerated, and shall be immediately due and payable, without any demand, notice, or other

action of the Lender or any other person or entity.

(c) Notwithstanding anything to the contrary in this Note or any other agreement, instrument or document, upon the occurrence and during the continuance of any Event of Default, the Lender may exercise any and all rights and remedies it may have under this Note or applicable law.

**9. [Reserved].**

**10. Waivers.** The Company, for itself and its legal representatives, successors and assigns, hereby expressly waives demand, protest, presentment, notice of dishonor, notice of acceptance, and notice of protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.

**11. Transfer; Successors and Assigns.** The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the Company and the Lender. Notwithstanding the foregoing, the Lender may not assign, pledge or otherwise transfer this Note without the prior written consent of the Company. Subject to the preceding sentence, this Note may be transferred only upon surrender of the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, a new note for the same principal amount and interest will be issued to, and registered in the name of, the transferee. Interest and principal are payable only to the registered holder of this Note.

**12. Governing Law.** This Note shall be governed by and construed in accordance with the laws of the State of Nevada (without giving effect to any conflict of laws principles that would require application of the laws of another jurisdiction).

**13. Jurisdiction.** Each of the Company and the Lender irrevocably submits to the jurisdiction of the courts of the State of Nevada and of the United States sitting in the State of Nevada, and of the courts of its own corporate or individual domicile with respect to actions or proceedings brought against it as a defendant, for purposes of all proceedings. Each of the Company and the Lender irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any proceeding and any claim that any proceeding has been brought in an inconvenient forum. Any process or summons for purposes of any proceeding may be served on the Company or the Lender, as applicable, by mailing a copy thereof by registered mail, or a form of mail substantially equivalent thereto, addressed to it at its address as provided for notices under this Note.

**14. Waiver of Jury Trial.** *Each of the Company and the Lender hereby irrevocably waives any and all right to trial by jury in any proceeding.*

**15. Notices.** Any notice required or permitted by this Note shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email or fax (upon customary confirmation of receipt), or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address or fax number as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent

117853531_10

address set forth in the Company's books and records; ***provided, that,*** any notice to the Company by the Lender also shall be provided to the independent directors of the Board.

**16. Amendments and Waivers.** Any term of this Note may be amended only with the written consent of the Company and the Lender. Any amendment or waiver effected in accordance herewith shall be binding upon the Company, the Lender and each transferee of this Note.

**17. Entire Agreement.** This Note constitutes the entire agreement between the Company and the Lender pertaining to the subject matter hereof, and any and all other written or oral agreements existing between the Company and the Lender are expressly canceled.

**18. Counterparts**. This Note may be executed in any number of counterparts, each of which will be deemed to be an original and all of which together will constitute a single agreement.

**19. Loss of Note**. Upon receipt by the Company of evidence satisfactory to it of the loss, theft, destruction or mutilation of this Note or any Note exchanged for it, and indemnity satisfactory to the Company (in case of loss, theft or destruction) or surrender and cancellation of such Note (in the case of mutilation), the Company will make and deliver in lieu of such Note a new Note of like tenor.

**20. Interest Rate Limitation**. Notwithstanding anything to the contrary contained herein, the interest paid or agreed to be paid under this Note shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "***Maximum Rate***"). If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal amount remaining owed under this Note or, if it exceeds such unpaid principal amount, refunded to the Company. In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, the Lender may, to the extent permitted by applicable law, (i) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of this Note.

**21. Indemnification.** The Company shall, to the fullest extent permitted by law, indemnify (but only to the extent of and out of Company assets) the Lender against all reasonable expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the Lender in connection with any claim, action, suit or proceeding, whether civil, criminal, administrative or investigative, before or by any court or any administrative or legislative body or authority, in which the Lender is involved, as a party or otherwise, or with which the Lender may be threatened, arising in connection with this Note (each, an "**Action**"), except to the extent the same has been finally adjudicated to constitute fraud, gross negligence or willful misconduct of the Lender or a breach by the Lender of this Note. Promptly after receipt by the Lender of notice of the commencement or threatened commencement against it of any third party Action, the Lender will notify the Company. The Company will be entitled to assume the defense of the Action unless the Lender shall have reasonably concluded that a conflict may exist between the Company and the Lender in

conducting the defense of the Action. If the Company assumes the defense of any Action in accordance with the provisions of this Section, it will not be liable to the Lender for any legal or other expenses subsequently separately incurred by the Lender in connection with the defense of such Action.  The Company shall not be liable for any settlement of a third-party Action effected without its written consent, which consent may not be unreasonably withheld.

**22. Severability**.  In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

**23. Publication**.  The Company shall issue a widely disseminated press release by 9:30 a.m. (New York City time) on the trading day of the execution of this Note (or, if the date of execution is not a trading day, on the immediately following trading day, that discloses the material terms of the transactions contemplated by this Note and the intercreditor agreement.

[Remainder of Page Intentionally Left Blank]

117853531_10

**IN WITNESS WHEREOF**, the undersigned have duly executed this Unsecured Revolving Promissory Note as of the date indicated herein.

**MusclePharm Corporation**

By: _____
     Name:_____
     Title:_____

Acknowledged and Agreed:

**Ryan Drexler**

_____

117853531_10

**SCHEDULE OF LOAN AND PAYMENTS OF PRINCIPAL**
**TO UNSECURED REVOLVING PROMISSORY NOTE**
OF MUSCLEPHARM CORPORATION
DATED _____, 2022

| Principal Amount of Advance | Date | Principal Amount Paid | Unpaid Balance |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |