Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV  89101
Telephone:  702.385.5544
Facsimile:  702.385.2741
Attorneys for the Debtor

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | ) Case No.: 22-14422-nmc |
| | ) |
| MUSCLEPHARM CORPORATION, | ) Chapter 11 |
| | ) |
| Debtor. | ) Hearing Date:  June 22, 2023 |
| | ) Hearing Time: 9:30 a.m. |
| | ) |
| | ) |

**DISCLOSURE STATEMENT FOR THE PLAN OF REORGANIZATION OF MUSCLEPHARM CORPORATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE DATED MAY 26, 2023**

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................................9
II.   PRELIMINARY STATEMENT ...........................................................................................9
III.  BACKGROUND ....................................................................................................................10
      A.  THE DEBTOR'S BUSINESS ....................................................................................10
      B.  THE DEBTOR'S FINANCING HISTORY ...............................................................10
      C.  EVENTS LEADING TO BANKRUPTCY ...............................................................12
      D.  THE BANKRUPTCY CASE .....................................................................................13
IV.   EVENTS DURING THE CHAPTER 11 CASE ..................................................................13
      A.  FIRST DAY MOTIONS AND EMPLOYMENT OF PROFESSIONALS ..............13
          1.  Employment of Professionals ..........................................................................13
          2.  Appointment of Committee of Unsecured Creditors its Professionals.........14
          3.  Debtor-in-Possession Financing ......................................................................14
      B.  OTHER EVENTS DURING THE CHAPTER 11 CASE ...........................................14
          1.  Establishment of the Claims Bar Date ...........................................................15
          2.  White Winston Adversary Proceeding ...........................................................15
          3.  Drexler Trustee Motion ...................................................................................15
          4.  Plan Term Sheet and Plan Support Agreement ............................................15
      C.  REORGANIZATION STRATEGY – AUCTION AND SALE OF ASSETS ............16
V.    SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY
      INTERESTS ............................................................................................................................16
      A.  PURPOSE OF THE PLAN OF REORGANIZATION ...............................................16
      B.  UNCLASSIFIED CLAIMS .......................................................................................17
      C.  SECURED AND PRIORITY CLAIMS .....................................................................17
      D.  UNSECURED CLAIMS ............................................................................................20
      1.  GENERAL UNSECURED CLAIMS ..........................................................................20
              2.  White Winston Claims ..............................................................................21
              3.  Equity Interest of the Debtor ...................................................................22
          1.  General Settlement of Claims .........................................................................22
          2.  Restructuring Transactions .............................................................................22
          3.  New Corporate Existence .................................................................................23
          4.  Vesting of Assets in the Litigation Trust ........................................................23
          5.  Vesting of Assets in the Reorganized Debtor ................................................23
          6.  Securities Registration Exemption ..................................................................24
          7.  Issuance and Distribution of New Equity Interests ......................................24
      F.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......26
      A.  ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................27
          1.  Assumption and Rejection of Executory Contracts and Unexpired Leases ................27
          2.  Approval of Assignments (if any) ...................................................................27
          3.  Rejection of Executory Contracts or Unexpired Leases ................................28
      B.  CLAIMS ON ACCOUNT OF THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES ...................28
      C.  CURE OF DEFAULTS FOR ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................28
      G.  RELEASES .................................................................................................................29
          1.  Discharge of Claims and Termination of Interests ........................................29
          2.  Releases of Liens ...............................................................................................30
          3.  Exculpation .......................................................................................................31
          4.  Releases by the Debtor .....................................................................................31
          5.  Injunction ..........................................................................................................32
      H.  PROVISIONS GOVERNING DISTRIBUTIONS .....................................................33
      A.  DISTRIBUTIONS FOR CLAIMS ALLOWED AS OF THE EFFECTIVE DATE ....................................33
      B.  DISTRIBUTIONS ON ACCOUNT OF CLAIMS ALLOWED AFTER THE EFFECTIVE DATE ....................33
          1.  Payments and Distributions on Disputed Claims ..........................................33
          2.  Special Rules for Distributions to Holders of Disputed Claims ....................33
      C.  DELIVERY AND DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS ....................33

    1.   Record Date for Distributions .................................................................... 33
    2.   Delivery of Distributions in General .......................................................... 34
  D.  COMPLIANCE WITH TAX REQUIREMENTS/ALLOCATIONS ................................. 34
  E.  TIMING AND CALCULATION OF AMOUNTS TO BE DISTRIBUTED ....................... 34
  F.  SETOFFS ............................................................................................................ 34
**I.**  **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**
    35
  A.  RESOLUTION OF DISPUTED CLAIMS ................................................................. 35
    1.   Allowance of Claims .................................................................................. 35
    2.   Prosecution of Objections to Claims .......................................................... 35
    3.   Claims Estimation ...................................................................................... 35
    4.   Expungement or Adjustment to Claims Without Objection ......................... 35
    5.   Deadline to File Objections to Claims ....................................................... 35
  B.  DISALLOWANCE OF CLAIMS ........................................................................... 36
  C.  AMENDMENTS TO CLAIMS .............................................................................. 36
**J.**  **CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** .... 36
  A.  CONDITIONS PRECEDENT TO CONFIRMATION .................................................. 36
  B.  CONDITIONS PRECEDENT TO CONSUMMATION ON THE EFFECTIVE DATE ......... 36
  C.  WAIVER OF CONDITIONS ................................................................................. 37
  D.  EFFECT OF NON-OCCURRENCE OF CONDITIONS TO CONSUMMATION ............... 37
**K.**  **SETTLEMENT, RELEASE AND RELATED PROVISIONS** .......................................... 37
  A.  COMPROMISE AND SETTLEMENT ..................................................................... 37
  B.  PRESERVATION OF RIGHTS OF ACTION ........................................................... 37
    1.   Maintenance of Causes of Action ............................................................... 37
    2.   Preservation of All Causes of Action Not Expressly Settled or Released ..... 38
    3.   Limitation of Liability. ............................................................................... 38
**L.**  **BINDING NATURE OF THE PLAN** ........................................................................ 38
**IV.**  **CONFIRMATION AND CONSUMMATION PROCEDURES** ..................................... **39**
  **A.**  **SOLICITATION OF VOTES** ............................................................................... 39
  **B.**  **CONFIRMATION PROCEDURES** ....................................................................... 39
    **1.**   **Confirmation Hearing** ............................................................................. 39
    **2.**   **Confirmation Hearing Notice** ................................................................. 39
    **3.**   **Filing Objections to the Plan** ................................................................. 39
  **C.**  **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** ..................... 40
    **1.**   **Best Interests of Creditors Test/Liquidation Analysis** ............................ 41
    **2.**   **Feasibility** ............................................................................................... 41
    **3.**   **Acceptance by Impaired Classes** ............................................................ 42
    **4.**   **Confirmation Without Acceptance by All Impaired Classes** ................... 42
    **5.**   **No Unfair Discrimination** ....................................................................... 42
    **6.**   **Fair and Equitable Test** .......................................................................... 42
  **D.**  **CONSUMMATION OF THE PLAN** ...................................................................... 43
**V.**  **CERTAIN SECURITIES LAW MATTERS** ............................................................. **43**
  **A.**  **PLAN SECURITIES** ......................................................................................... 43
  **B.**  **ISSUANCE AND RESALE OF SECURITIES** ........................................................ 43
    **1.**   **Exemptions from Registration Requirements of the Securities Act and Applicable State Securities Laws** 43
    **2.**   **Resale of Certain New Equity; Definition of Underwriter** ...................... 44
**VI.**  **PLAN-RELATED RISK FACTORS** ...................................................................... **44**
  **A.**  **CERTAIN BANKRUPTCY LAW CONSIDERATIONS** ............................................ 45
    **1.**   **The Bankruptcy Court May Grant the Trustee Motion.** .......................... 45
    **2.**   **Parties in Interest May Object to the Classification of Claims and Equity Interests.** .... 45
    **3.**   **The Plan May Fail to Satisfy the Vote Requirement** ............................... 45
    **4.**   **The Debtor and the Committee May Not Be Able to Secure Confirmation of the Plan** ........... 45
    **5.**   **Nonconsensual Confirmation of the Plan May be Necessary** .................. 46
    **6.**   **The Debtor May Object to the Amount or Classification of a Claim** ....... 46
    **7.**   **Risk of Non-Occurrence of the Effective Date** ........................................ 46

    **8.**    **Contingencies Will Not Affect Votes of Impaired Classes to Accept or Reject the Plan** ................... 46

  **B.**    **RISK FACTORS THAT MAY AFFECT RECOVERIES UNDER THE PLAN** .................................... 46

    **1.**    **The Bankruptcy Court May Grant the Trustee Motion.** ..................................................... 46

    **2.**    **The Successful Bidder May Not Be Able to Close Its Asset Sale** ...................................... 47

  **C.**    **RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTOR'S BUSINESS** ................ 47

    **1.**    **Prolonged Continuation of the Chapter 11 Case is Likely to Harm the Debtor's Asset Values** ....... 47

    **2.**    **Certain Tax Implications of the Debtor's Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtor** ................................................................................................. 47

    **3.**    **The Debtor May Be Controlled by Significant Holders** .................................................. 47

    **4.**    **The New Equity Is Subject to Dilution.** .......................................................................... 47

  **D.**    **DISCLOSURE STATEMENT DISCLAIMERS** .................................................................. 48

    **1.**    **The Information Contained Herein Is for Soliciting Votes Only** .................................... 48

    **2.**    **This Disclosure Statement Was Not Approved by the Securities and Exchange Commission** ........ 48

    **3.**    **The Disclosure Statement Contains Forward Looking Statements** ................................ 48

    **4.**    **No Legal or Tax Advice is Provided to You by this Disclosure Statement** .................... 48

    **5.**    **No Admissions Are Made by this Disclosure Statement** ................................................ 48

    **6.**    **No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections** 48

    **7.**    **Nothing Herein Constitutes a Waiver of any Rights to Object to Claims or Recover Transfers and Assets** ..................................................................................................................................... 49

    **8.**    **The Information Used Herein Was Provided to the Debtor and Was Relied Upon by the Debtor's Advisors** ................................................................................................................................ 49

    **9.**    **The Potential Exists for Inaccuracies, and the Debtor has no Duty to Update** .............. 49

    **10.**    **No Representations Made Outside of the Disclosure Statement Are Authorized** ........... 49

**VII.**  **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ....................... 49

  **A.**    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE ............................................ 49

  **B.**    FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION ................................................. 49

**VIII.** **RETENTION OF JURISDICTION** .................................................................................... **50**

**IX.**  **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ....................... **51**

  **A.**    **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ......................................... 51

  **B.**    **IN GENERAL** .................................................................................................................. 52

  **C.**    **U.S. HOLDERS OF CLAIMS** ........................................................................................... 52

  **D.**    **NON-U.S. HOLDERS OF CLAIMS** .................................................................................. 52

  **E.**    **IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE** ........................................ 52

**X.**  **GLOSSARY OF DEFINED TERMS** .................................................................................... **53**

**XI.**  **RECOMMENDATION** ........................................................................................................ **60**

**EXHIBITS**

**Exhibit A –** Copy of Proposed Plan of Reorganization

**Exhibit B** – Bidding Procedures

**Exhibit C** – Liquidation Analysis [to be filed and served at a later date, but prior to the Disclosure Statement objection

deadline]

DOCS_SF:108959.5

**THE VOTING DEADLINE IS 5:00 P.M. PREVAILING PACIFIC TIME ON _____, 2023 (UNLESS THE PLAN PROPONENTS EXTEND THE VOTING DEADLINE).**

**TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, STRETTO, INC., THE DEBTOR'S SOLICITATION AND TABULATION AGENT, MUST <u>ACTUALLY</u> RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE AT:**

Stretto, Inc.
MusclePharm Ballot Processing
410 Exchange, Suite 100
Irvine, CA 92602

or via the e-filing portal for electronic submissions at:
https://balloting.stretto.com/

(eligible parties will be supplied with a password to access/submit their ballot via the e-filing portal)

---

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS <u>HIGHLY SPECULATIVE</u>, AND SUCH DOCUMENTS SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO THE DEBTOR OR ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THIS CHAPTER 11 CASE.**

---

**<u>PRESERVATION OF AVOIDANCE ACTIONS UNDER THE PLAN:</u>**

IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, CREDITORS AND INTEREST HOLDERS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTOR WITHIN NINETY (90) DAYS PRIOR TO THE PETITION DATE) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES ALL CAUSES OF ACTION AND THAT THE PLAN AUTHORIZES THE LIQUIDATION TRUSTEE TO PROSECUTE THE SAME.

---

**IMPORTANT INFORMATION FOR YOU TO READ**

**THE PLAN PROPONENTS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE X HEREIN.**

**HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THE DEBTOR URGES EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE COURT'S APPROVAL OF THE ADEQUACY OF THE**

INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTOR'S CHAPTER 11 CASE. ALTHOUGH THE DEBTOR AND THE COMMITTEE BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, HAS PROVIDED THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO ANY APPLICABLE CREDITOR(S) WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE. THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTOR RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTOR'S BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS. WHILE THE DEBTOR AND THE COMMITTEE BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION

CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS AND ITS FUTURE RESULTS AND OPERATIONS. THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTOR (OR ANY OTHER APPROPRIATELY AUTHORIZED ENTITY UNDER THE PLAN) MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIMS ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO MAY BE ELIGIBLE TO SUBMIT BALLOTS BUT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, (THE "SECURITIES ACT") OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE AND TO THE EXTENT THAT SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT, THE EXEMPTION SET FORTH IN SECTION 701 PROMULGATED UNDER THE SECURITIES ACT OR ANOTHER EXEMPTION THEREUNDER. IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTOR AND THEIR OWN ANALYSIS OF THE TERMS OF THE

PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION V HEREIN, "PLAN RELATED RISK FACTORS."


## I.    INTRODUCTION

MusclePharm Corporation ("**MusclePharm**" or the "**Debtor**") submits this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "**Disclosure Statement**"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against the Debtor in connection with the solicitation of votes for acceptance of the *Plan of Reorganization for MusclePharm Corporation Under Chapter 11 of the Bankruptcy Code Dated May 26, 2023* [ECF No. [●]] (as supplemented or amended from time to time, the "**Plan**"), which was approved by the Bankruptcy Court on June [●], 2023 [ECF No. [●]]. A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference.

THE PLAN PROPONENTS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTOR'S ESTATE, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS. THE PLAN PROPONENTS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASE. THE PLAN PROPONENTS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## II.    PRELIMINARY STATEMENT

### A.    Global Settlement and Plan Support Agreement

The Plan is the culmination of month's long negotiations between the Debtor and its main creditor constituencies in its Chapter 11 Case, namely the Committee, Empery, and White Winston. After several months of contentious disputes among the parties that jeopardized the Debtor's ability to monetize its assets and file a chapter 11 plan, the Debtor, the Committee, Empery and White Winston reached a global settlement among them resulting in compromises of millions of dollars of claims that eliminate the major stumbling blocks the Debtor confronted to move its Chapter 11 Case forward.

On May 18, 2023, the Debtor, the Committee, Empery, and White Winston entered into that certain *Plan Support Agreement* [ECF No. 524, Exhibit 1] (the "**Plan Support Agreement**"), which provides the framework for the Plan.

Pursuant to the Plan Support Agreement, the Debtor's largest secured creditor, Empery, as agent for MP Collateral, agreed to cap its prepetition secured claim for the Empery Loans at $18 million and carveout any recovery above $12 million for the benefit of general unsecured creditors, which proceeds will be used in part to establish a litigation trust to pursue the estate's claims against the Debtor's current and former directors and officers, including Ryan Drexler. Moreover, if Empery purchases the Debtor's assets pursuant to a credit bid, general unsecured creditors will receive twenty percent (20.0%) of the equity in the purchaser entity.

Under the terms of the Plan Support Agreement, White Winston has filed a proof of claim for in excess of $8 million, has agreed to forgo any distribution from the proceeds from the sale of the Debtor's assets, and in turn, will receive 100% of the equity interests in the Reorganized Debtor, which will be vested with certain of the estate's causes of action against the Debtor's directors and officers that arose on or before December 31, 2018. General unsecured creditors will receive thirty percent (30%) of any net recoveries obtained by White Winston from such causes of action.

In summary, the Plan Support Agreement and the global settlement contained therein provide for the sale of the Debtor's assets and an agreed upon distribution waterfall of sale proceeds. It also facilitates the filing of the Plan to provide an exit from the bankruptcy process.

### B.  Sale Transaction

In accordance with the Plan Support Agreement, the Debtor will run an auction and sale process on a parallel path with the Plan confirmation process, whereby the Debtor will sell certain of its Assets (except for the Excluded Assets) pursuant to Sections 363 and 1129 of the Bankruptcy Code.

The Assets will be sold pursuant to an auction as set forth in those certain Bidding Procedures, approved by the Bankruptcy Court on _____ ___, 2023 [ECF No. ___], and a copy of which is attached hereto as **Exhibit B** (the "**Bidding Procedures**").

On ____ __, 2023, the Bankruptcy Court approved Force 10 Partners, LLC ("**Force 10**") [ECF No. ___] as the Debtor's investment banker.  Force 10 will extensively market the Assets up to the bid deadline.

In accordance with the Bid Procedures, parties interested in bidding on the sale of the Assets will have until [●], to conduct all due diligence in connection with the Assets, and shall submit a Qualified Bid (as defined in the Bid Procedures) by [●].  On or before [●], the Debtor will file a motion to approve the sale of the Assets, subject to higher and better offers to be presented at the Sale Hearing, which is anticipated to be on [●].

As discussed above, Empery's prepetition secured claims shall be compromised and settled.  Empery shall be permitted to credit bid its claims (the DIP Obligations and prepetition claims as set forth in the Empery Proof of Claim), notwithstanding the WW Adversary Proceeding, and its rights to credit bid its claims will be capped at $14.0 million, subject to increase with the consent of the Committee (but in no event to exceed $18.0 million in the aggregate).  To the extent Empery is the successful bidder, and subject to the confirmation of the Plan consistent with the Plan Support Agreement, Empery shall issue 20% of the purchaser's equity (the "**Contribution**") to the Litigation Trust for the benefit of the general unsecured creditors.

### C.  Summary of Plan

In summary, the Debtor will be conducting an auction and sale of its Assets to the highest and best bidder in order to maximize the value of its estate.  In parallel to the sale process, the Debtor will seek confirmation of the Plan to distribute the proceeds from the sale of Assets.

The proceeds will be distributed in accordance with the terms of the Plan (as detailed herein), whereby Empery will be contributing a significant portion of its *pro rata* portion of the proceeds to the general unsecured creditors.  White Winston, in turn, will not receive any proceeds from the sale on account of its claim (thus removing over $8 million in claims from the pool of general unsecured creditors), but will instead receive 100% of the equity interests in the Reorganized Debtor, which shall be vested with the White Winston D&O Claims.  The Debtor understands that White Winston will also take all appropriate and reasonable steps necessary to preserve the Debtor's prepetition net operating losses.

## III.    BACKGROUND

### A.      THE DEBTOR'S BUSINESS[1]

MusclePharm, formed in 2006 in Nevada, is a scientifically-driven, performance lifestyle company that develops, markets and distributes a range of branded sports nutrition products in 120 countries.  The Debtor is a public company and currently has over a dozen employees, and relationships with dozens of manufacturers, vendors and suppliers.  The Debtor's products are sold through various retailers.

### B.      THE DEBTOR'S FINANCING HISTORY

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in Article IX herein, titled "Glossary of Key Terms."  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the "Glossary of Key Terms" is inconsistent, the definition in the "Glossary of Key Terms" shall control.

In order to fund operations, the Debtor entered into several prepetition financing arrangements between 2015 and 2022, with five (5) different lenders, summarized as follows:

1.    Crown Equipment Corporation Lease.

On December 29, 2015, the Debtor entered into a leasing agreement with Crown Equipment Corporation, f/k/a Crown Credit Company ("**Crown Equipment**"), for the lease of certain equipment used in the Debtor's business. On December 29, 2015, Crown Equipment also filed a UCC-1 financing statement with the Nevada Secretary of State (the "**Filing Office**") encumbering the equipment leased to the Debtor and all proceeds therefrom.  As of the Petition Date, Crown Equipment asserts it is owed $4,831.90.

2.    Prestige Capital Loan.

On December 31, 2015, Prestige Capital Finance, LLC ("**Prestige**") entered into a revolving factoring agreement with the Debtor in the initial amount of $2 million, whereby Prestige Capital would extend credit to the Debtor through the purchase and sale of the Debtor's accounts receivable.  Prior to the Petition Date, Prestige made two additional advances of $1.0 million each (the "**Over Advances**").  The Over Advances were secured by a second lien against all of the Debtor's assets and remained largely unpaid as of the Petition Date.

The Prestige loans are personally guaranteed by Ryan Drexler ("**Drexler**"), an equity holder of the Debtor and the Debtor's former Chief Executive Officer and Chairman of the Board of Directors.

The Debtor and Prestige Capital have done business together for nearly 7 years through the factoring of the Debtor's receivables.  On December 31, 2015, Prestige filed a UCC-1 financing statement with the Filing Office, encumbering all assets of the Debtor.  Subsequent to the filing of this Chapter 11 Case, MP Collateral, LLC acquired Prestige's claims against the Debtor.

3.    Ryan Drexler Loans.

On or about December 7, 2015, Drexler issued a loan to the Debtor in the amount of $6 million, which loan is evidenced by a convertible secured promissory note.  On or about November 8, 2016, Drexler issued a second loan to the Debtor in the amount of $11 million, which loan is evidenced by a convertible secured promissory note.  On or about July 27, 2017, Drexler issued a third loan to the Debtor in the amount of $1 million, which loan is evidenced by a secured demand promissory note.

On or about November 8, 2017, Drexler's three (3) loans were refinanced with an amended and restated promissory note from the Debtor in the original principal amount of $18 million.

On October 13, 2021, Drexler filed a UCC-1 financing statement in the Filing Office, encumbering all assets of the Debtor.

On or about March 8, 2022, the Debtor issued Drexler an unsecured promissory note (the "**Drexler Revolver**") to finance the production of orders from Costco Wholesale Corporation or any of its affiliates or subsidiaries.

Within 1-year prior to the Petition Date, Drexler also received payments from the Debtor in the approximate amount of $6.35 million.

4.    Empery Tax Efficient, LP Loan.[2]

---

[2]    The facts set forth in this Section 4 and in Section C below are provided for the convenience of the parties.  Certain of the facts averred are subject to challenge in the event the Plan is not confirmed and the Effective Date does not occur.  Accordingly, the averments in this Disclosure Statement shall be null, void and of no effect if the Plan is not confirmed.  Nothing in this Disclosure Statement, including as averred in this Section 4 and in Section C below shall be preclusive or shall operate to limit or impair the parties' positions regarding any matter if the Plan is not confirmed.  All parties reserve all rights if the Plan is not confirmed.

On October 13, 2021, Empery Tax Efficient, LP ("**Empery**") and others (together with Empery, the "**October Noteholders**") entered into a Securities Purchase Agreement with the Debtor in the principal amount of $8,197,674.42, with Empery as lead investor and collateral agent for all of the October Noteholders (the "**October 2021 Empery Loan**").

The October 2021 Empery Loan was also evidenced by an Original Issue Discount Senior Secured Note Due April 13, 2022, issued to each of the October Noteholders by the Debtor, a Pledge and Security Agreement, a Trademark Security Agreement, a Perfection Certificate, a Guarantee by the Debtor and Canada MusclePharm Enterprises Corp., and a UCC-1 financing statement dated October 14, 2021, which filing statement was filed in the Filing Office, encumbering all assets of the Debtor.

Also on October 13, 2021, Empery, (on behalf of the October Noteholders), the Debtor and Prestige entered into an Intercreditor Agreement (the "**Prestige Intercreditor Agreement**") which, among other things, established the lien priority against the Debtor's assets between Prestige and Empery.

Also on October 13, 2021, Empery, (on behalf of the October Noteholders) the Debtor and Drexler entered into an Intercreditor Agreement (the "**Drexler Intercreditor Agreement**") which, among other things, established the lien priority against the Debtor's assets between Drexler and Empery.

On November 4, 2021, Empery, the Debtor and Wells Fargo NA entered into that certain Deposit Account and Sweep Investment Control Agreement with respect to the October 2021 Empery Loan.

On June 3, 2022, the Debtor and the October Noteholders entered into a Waiver and Amendment Agreement which, among other matters, extended the maturity date of the October 2021 Empery Loan to December 10, 2022.

On June 3, 2022, the Debtor, the October Noteholders and others (together with the October Noteholders, the "**Secured Noteholders**") entered into an Amended and Restated Securities Purchase Agreement pursuant to which (i) the principal amount under the Empery October 2021 Loan was increased from $8,197,674.42 to $9,759,135.00, and (ii) the Debtor issued notes to Empery and others (the "**June Noteholders**") in the aggregate principal amount of $3,081,875.00 (the "**June 2022 Empery Loan**" and collectively with the October 2021 Empery Loan, the "**Empery Loans**"), which Empery June 2022 Loan is evidenced by a Securities Purchase Agreement and an Original Issue Discount Senior Secured Note Due December 10, 2022, issued to each of the June Noteholders.

## C.    EVENTS LEADING TO BANKRUPTCY

1.    <u>Price of Protein Rise</u>.

The Debtor's main products, branded sports nutrition products and nutritional supplements (the "**Products**"), are largely based on protein.  As a result, the price of protein largely drives the manufacturing cost of the Products and impacts profit margins.

For years, the average price of protein remained around $2.50/pound and the Debtor was able to enjoy years of high revenue and profit based on such price.  Coming out of the Covid-19 pandemic, however, the price of protein more than doubled to approximately $5.50/pound.  As a result of the Debtor's failure to increase prices, the Debtors began selling protein at negative profit margins. Among other reasons, to offset the losses generated by the protein business and fund the launch of energy drinks, the Debtor sought additional financing. After confidentially marketing a financing through investment bank Roth Capital Partners, the Debtor received capital in the form of the Empery Loans.

2.    <u>Alleged Breaches Under the Empery Loans</u>.

Beginning in August 2022 and continuing up to the Petition Date, Empery sent a series of letters to the Debtor in which it purported to allege a number events of default under the Empery Loans.

The Debtor later disputed these defaults after its bank account was frozen, and Empery continued to assert them. On October 3, 2022, Empery issued an Access Termination Notice to the Debtor's bank, Wells Fargo, N.A., forcing Wells Fargo to remit all funds in the Debtor's account to Empery, under the Deposit Account Control Agreement between the parties. On or around November 16, 2022, at the request of the Debtor, Empery released control over the Wells Fargo bank accounts. On October 18, 2022, Empery sent the Debtor a Notification of Disposition of Collateral, pursuant to which Empery stated its intention to sell the collateral for the Empery Loans through a public auction under Article 9 of the Uniform Commercial Code (the "**UCC**") on November 1, 2022 (the "**Initial Sale Notice**").

The Debtor and Empery negotiated for a resolution of the issues at hand. Unfortunately, even after the parties negotiated multiple forbearance arrangements, including the drafting of a fully negotiated Forbearance Agreement, the Debtor did not execute the Forbearance Agreement. After numerous failed attempts, Empery determined a forbearance agreement with the Debtor was not possible, and on November 22, 2022, issued a second Notification of Disposition of Collateral (the "**Second Sale Notice**"), whereby Empery would sell its collateral at public auction on December 15, 2022, at 1:00 p.m. PST.

3.    Prepetition Article 9 Sale

Pursuant to the Second Sale Notice, Empery continued to market its collateral, including the Debtor's most significant asset, its intellectual property, for sale pursuant to an auction on December 15, 2022. The Debtor asked White Winston for assistance in negotiations with Empery. Accordingly, Empery continued to negotiate with the Debtor and White Winston regarding a resolution of the issues.

The parties then filed competing temporary restraining orders in New York Superior Court – the Debtor seeking to enjoin Empery's UCC Article 9 sale, and Empery seeking to enjoin the actions contemplated by the WW Settlement Agreement. On the morning of December 15, 2022, a hearing was held on both requests for a restraining order, whereby the New York Superior Court denied the Debtor's motion for an injunction, and granted Empery's motion.

**D.    THE BANKRUPTCY CASE**

On December 15, 2022 (the "**Petition Date**"), minutes before the completion of the UCC Article 9 sale, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**").

**IV.    EVENTS DURING THE CHAPTER 11 CASE**

**A.    FIRST DAY MOTIONS AND EMPLOYMENT OF PROFESSIONALS**

Shortly after the Petition Date, in addition to filing its voluntary petition for relief, the Debtor also filed various motions (collectively, the "**First Day Motions**") with the Bankruptcy Court. The Bankruptcy Court entered several orders to, among other things, ease the strain on the Debtor's relationships with certain essential constituents, and allow the Debtor to retain professionals, including bankruptcy counsel to assist it with the administration of the Chapter 11 Case (each, a "**First Day Order**").

1.    **Employment of Professionals**

Schwartz Law, PLLC ("**Schwartz Law**") serves as the Debtor's general bankruptcy counsel. The Debtor retained Samuel A. Schwartz, Esq., of Schwartz Law, as its general bankruptcy counsel to represent it in the Chapter 11 Case. On January 30, 2023, the Bankruptcy Court entered the Order employing Schwartz Law [ECF No. 165].

Portage Point Partners, LLC ("**Portage Point**") serves as the Debtor's financial advisors. On February 14, 2023, the Bankruptcy Court entered an Order employing Portage Point [ECF No. 227].

Stretto, Inc. ("**Stretto**") serves as the Debtor's claims, noticing and solicitation agent. On January 30, 2023, the Bankruptcy Court entered an Order employing Stretto [ECF No. 166].

Foley & Lardner, LLP ("**Foley & Lardner**") serves as the Debtor's special securities counsel to the Debtor. On March 7, 2023, the Bankruptcy Court entered an Order employing Foley & Lardner [ECF No. 293].

### 2.    Appointment of Committee of Unsecured Creditors its Professionals

On January 4, 2023, the office United States Trustee for Region 17, which includes the District of Nevada (the "**UST**"), filed a notice of appointment regarding the formation of the Official Committee of Unsecured Creditors (the "**Committee**") [ECF No. 49], and supplemented its notice on February 21, 2023 [ECF No. 245], changing the composition of the Committee from three to five members.  The Committee consists of the following unsecured creditors: (i) MHF Opco, LLC f/k/a Mill Haven Foods, LLC; (ii) Atlantic Grain & Trade; (iii) JW Nutritional, LLC; (iv) S.K. Laboratories, Inc.; and (v) Excelsior Nutrition, Inc.

Pachulski Stang Ziehl & Jones LLP ("**PSZJ**") serves as counsel to the Committee.  On February 28, 2023, the Bankruptcy Court entered an Order employing PSZJ [ECF No. 262].

Larson & Zirzow, LLC ("**L&Z**") serves as Nevada counsel to the Committee.  On February 28, 2023, the Bankruptcy Court entered an Order employing L&Z [ECF No. 263].

### 3.    Debtor-in-Possession Financing

On January 3, 2023, the *Debtor filed its Motion for the Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 4001(b) and 4001(d), and Local Rule 4001: (I) Authorizing the Debtor to Obtain Post-Petition Financing, (II) Granting Priming Liens and Administrative Expense Claims, (III) Determining Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [ECF No. 33] (the "**DIP Financing Motion**"), whereby the Debtor sought post-petition financing from White Winston, as lender.

On January 6, 2023, the Debtor filed that certain *Notice of [Proposed] Term Sheet for Debtor-in-Possession Financing and Authorization for Use of Cash Collateral* [ECF No. 65] (the "**Empery Term Sheet**"), whereby the Debtor selected to move forward with proposed debtor-in-possession financing (the "**DIP Financing**") with Empery, as lender, in lieu of White Winston.

On January 13, 2023, the Bankruptcy Court approved the DIP Financing on an interim basis, and authorized the Debtor to borrow up to $150,000 from Empery [ECF No. 74].

On January 23, 2023, the Bankruptcy Court approved the DIP Financing on a second interim basis and authorized the Debtor to: (i) borrow up to $750,000 from Empery, and (ii) factor up to $10,000,000 in receivables (with up to $2,000,000 available for purchase orders) from Empery [ECF No. 139].

On March 8, 2023, the Bankruptcy Court approved the DIP Financing on a final basis, and authorized the Debtor to: (i) borrow up to $4,500,000 from Empery, (ii) factor accounts receivable up to $10,000,000, and (iii) obtain an inventory acquisition line (the "**Inventory Acquisition Line of Credit**") from Empery of up to $1,000,000 (the "**Final DIP Order**") [ECF No. 296].  The DIP Financing is evidenced by: (i) a Debtor-in-Possession Notes Purchase Agreement and Security Agreement (the "**DIP Notes Purchase Agreement**"); and (ii) a Debtor-in-Possession Factoring Purchase and Security Agreement (the "**DIP Factoring Purchase Agreement**" and collectively with the DIP Notes Purchase Agreement, the "**DIP Loan Documents**"), both of which are attached to Final DIP Order [ECF No. 296, pp. 34-156].

In addition, the Final DIP Order authorized a roll-up of the prepetition Empery Loans on a dollar-for-dollar basis of the amounts loaned to the Debtor under the Notes Purchase Agreement, excluding the Inventory Acquisition Line of Credit up to a total roll-up amount of $4,500,000 (the "**Roll-Up**").

 The Final DIP Order also authorized the Debtor's board of directors during its Chapter 11 Case to be composed of three individuals: Paul Karr (a prepetition director of the Debtor), Eric Hillman (the Debtor's chief executive officer), and Nicholas Rubin of Force 10 Partners, LLC (as an independent director).

### B.    OTHER EVENTS DURING THE CHAPTER 11 CASE

1.     **Establishment of the Claims Bar Date**

The general claims bar date was April 19, 2023.  The bar date for governmental units encompassed by Section 101(27) of the Bankruptcy Code to file their claims is June 13, 2023 [ECF No. 3].

2.     **White Winston Adversary Proceeding**

On March 9, 2023, White Winston filed a complaint against Empery and the Secured Noteholders (collectively, the "Empery Parties") and commenced Adversary Case No. 23-01014, entitled *White Winston Select Asset Funds, LLC v. Empery Tax Efficient, LP, et al.* (the "**WW Adversary Proceeding**").  Through the WW Adversary Case, White Winston seeks to challenge the Empery Loans and liens associated with such loans and/or the recharacterization of the Loans and liens as equity.  Empery has not yet responded to the allegations in the WW Adversary Proceeding formally but has informally made clear that it disputes the material averments made by White Winston and that the relief requested by White Winston in the WW Adversary Proceeding should not be granted.  In accordance with the Plan, the WW Adversary Proceeding will be dismissed with prejudice upon the occurrence of the Effective Date, and stayed in the interim.  White Winston and the Empery Parties reserve all rights, claims and defenses if the Plan is not confirmed and/or if the Effective Date does not occur.

On April 4, 2023, the Bankruptcy Court entered an *Order Granting Emergency Motion of the Official Committee of Unsecured Creditors to Intervene in the Adversary Proceeding* [Adv. No. 23-01014, ECF No. 29], which permitted the Committee to be a Plaintiff as if originally designated as such in the complaint.  The Plan provides for a global compromise and settlement of disputes among White Winston, Empery, the Debtor and the Committee.  The Plan accordingly provides that all such parties shall seek to dismiss one another with prejudice and without costs from all pending litigation, including the WW Adversary Proceeding.  Pending the occurrence of the Effective Date, all such parties have agreed to a standstill with respect to such litigation among them, and all parties reserve all rights and claims, and all parties reserve all rights and claims if the Plan is not confirmed or the Effective Date does not occur, as applicable.  To achieve this standstill, forthwith after the occurrence of the Effective Date, the Committee, White Winston and the Empery Parties will take all actions necessary to dismiss White Winston and the Empery Parties from all pending litigation (including the WW Adversary Proceeding and litigation pending in the State of New York) with prejudice and without costs.

3.     **Drexler Trustee Motion**

On April 28, 2023, Drexler filed a *Motion for the Appointment of a Chapter 11 Trustee* [ECF No. 447] (the "**Trustee Motion**").  A status conference on the Trustee Motion will be held on June 15, 2023.  The Trustee Motion seeks the appointment of a Chapter 11 trustee in the Debtor's Chapter 11 Case for cause, alleging, among other things: (i) intense acrimony amongst the parties; (ii) the Debtor is grossly mismanaging the estate and incurring significant professional fees in prosecuting the same; and (iii) at least one member of the Committee is overcharging the Debtor for protein.

The Debtor and the Committee believe the Trustee Motion is without merit and will aggressively oppose the same.  The Debtor also expects the Committee, Empery and other creditors to also oppose the Trustee Motion.

Importantly, on May 15, 2023, Empery filed an *Emergency Motion to Enforce Intercreditor and Subordination Agreement Under Section 510(a) of the Bankruptcy Code* (the "**Enforcement Motion**").  Empery contends that the Drexler Intercreditor Agreement prevents Drexler from taking various actions in the Debtor's Chapter 11 Case, including, among others, filing and prosecuting the Trustee Motion.  The Enforcement Motion is currently set for hearing on June 15, 2023.

In relation to the Enforcement Motion, on May 15, 2023, Empery also filed a complaint against Drexler and commenced Adversary Case No. 23-01093, entitled *Empery Tax Efficient, LP v. Ryan Drexler*.

4.     **Plan Term Sheet and Plan Support Agreement**

Over the past few months, the Debtor engaged in arm's length, good faith negotiations with its main creditor constituencies in this Chapter 11 Case, including the Committee, the Empery Parties and the White Winston Parties,

which resulted in the parties agreeing to that certain plan term sheet (the "**Plan Term Sheet**") on May 7, 2023 [ECF No. 478, Exhibit 1].

In furtherance of the Plan Term Sheet, on May 18, 2023, the Debtor, the Committee, the Empery Parties and the White Winston Parties entered into the Plan Support Agreement.

That same day, the Debtor filed its *Motion Pursuant to 11 U.S.C. §§ 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 to Approve Settlement and Plan Support Agreement With: (I) The Official Committee of Unsecured Creditors; (II) Empery Tax Efficient LP, in its Capacity as Collateral Agent and Administrative Agent for MP Collateral, LLP; and (III) White Winston Select Asset Funds, LLC* [ECF No. 524] (the "**Plan Support Motion**"). The Plan Support Motion seeks Bankruptcy Court approval of the Plan Support Agreement, and is currently set for hearing on May 25, 2023.

The Plan Support Agreement provides, among other things, that the Debtor will sell certain of its Assets (other than the Excluded Assets) pursuant to the Bidding Procedures and through a sale motion before the Bankruptcy Court. The proposed sale process will run concurrently with the Plan confirmation process, whereby the Net Sale Proceeds from the sale will be distributed pursuant to the Plan.

The Plan Support Agreement involves multiple parties and contains numerous compromises of millions of dollars of claims that eliminate major stumbling blocks the Debtor confronted to move its Chapter 11 Case forward. The Plan Support Agreement permits a sale of Assets and an agreed "waterfall" for the distribution of funds from that sale.

In addition, the Plan Support Agreement eliminates the risk the Debtor will be unable to retain its prepetition net operating losses (the "**NOLs**") and related tax attributes because White Winston, a creditor and an equity holder, has agreed to preserve such NOLs post-confirmation.

In sum, the Debtor's key creditor constituencies, including the Committee, the Empery Parties, and the White Winston Parties, all support the transactions outlined in the Plan Support Agreement, which are now memorialized in the Plan and this Disclosure Statement for the sale of the Debtor's Assets and resulting distributions therefrom.

### C.    REORGANIZATION STRATEGY – AUCTION AND SALE OF ASSETS

The Debtor focused on developing and executing a reorganization strategy to: (a) maximize the value of its Estate; (b) address the factors that led to the bankruptcy filing; and (c) allow the Debtor to sell its Assets other than the Excluded Assets for the highest and best value in order to maximize distributions to creditors and parties-in-interest. Pursuant to the Bidding Procedures, the Debtor will conduct an auction for the sale of certain of its Assets for the highest and best value, and distribute the resulting proceeds in accordance with the Plan Support Agreement and as detailed herein.

### V.    SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

> **THIS SECTION III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE <u>MATERIAL TERMS</u> OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL GOVERN.**

### A.    PURPOSE OF THE PLAN OF REORGANIZATION

The Plan constitutes Debtor's chapter 11 plan of reorganization. Except for the Claims addressed in Article II of Plan (or as otherwise set forth therein), all Claims and Equity Interests against the Debtor are placed in Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims and Priority Tax Claims, as described in Article II of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant hereto, and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.:

B.    **UNCLASSIFIED CLAIMS**

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code. They are not considered impaired, and Holders of such Claims do not vote on the Plan. They may, however, object if, in such Claim Holder's view, the treatment under the Plan does not comply with that required by the Bankruptcy Code. As such, the Debtor did *not* place the following Claims in any Class:

1.    **Priority Tax Claims**

Priority Tax Claims are unsecured income, employment and other taxes described by section 507(a)(8) of the Bankruptcy Code. Unless the Holder of such a section 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from the Commencement Date. The Debtor does not have any Priority Tax Claims to be paid pursuant to the Plan. Based on proofs of claim filed in the Debtor's Chapter 11 case, the Debtor estimates its Priority Tax Claims to total approximately $267,000.

2.    **Administrative Claims**

Administrative Claims are Claims for the costs or expenses of administering the Debtor's Chapter 11 Case which are Allowed under section 507(a)(2) of the Bankruptcy Code. Administrative Claims also include the expenses for the value of any goods or services sold to the Debtor in the ordinary course of business. The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

Quarterly fees payable to the Office of the United States Trustee do not require allowance under section 503 and shall not be subject to the Administrative Expense Claim Bar Date.

The following chart lists the Debtor's estimated Priority Tax Claims Administrative Claims, and their proposed treatment under the Plan:

| TYPE | ESTIMATED AMOUNT OWED | PROPOSED TREATMENT |
|---|---|---|
| Priority Tax Claims | $35,000.00 | Paid in full in cash on or as soon as practicable following the Plan Effective Date or otherwise left unimpaired, unless otherwise agreed by such holder. |
| Professional Compensation | 2,200,000.00 | Paid in full in cash on or as soon as practicable following the Plan Effective Date (subject to the Wind-down Budget), unless otherwise agreed by such holder. |
| **TOTAL** | 2,235,000.00 | |

C.    **SECURED AND PRIORITY CLAIMS**

Classes 1 shall consist of Other Secured Claims against the Debtor's Estate, other than the secured claims of Empery and Prestige.  The Other Secured Claims shall be Unimpaired, and paid as set forth in the chart below.

| Class # | Description | Impairment | Amount Owed/Interest | Treatment |
|---------|-------------|------------|----------------------|-----------|
| Class 1 | Other Secured Claims | Unimpaired and not entitled to vote. | $10,800,000.00 | On or as soon as practicable following the Plan Effective Date, each holder of an allowed Other Secured Claim will be paid in full in cash or otherwise realize the value of its collateral, unless otherwise agreed by such holder, and subject to any subordination agreements enforceable pursuant to section 510(a) of the Bankruptcy Code. Class 1 will include separate sub-classes for each applicable secured creditor. For the avoidance of doubt, this class does not include any secured claims of the Empery Parties. |

Class 2 shall consist of Priority Non-Tax Claims against the Debtor's Estate, and shall be Unimpaired and paid as set forth in the chart below.

| Class # | Description | Impairment | Amount Owed/Interest | Treatment |
|---------|-------------|------------|----------------------|-----------|
| Class 2 | Priority Non-Tax Claims | Unimpaired and not entitled to vote. | 212,000.00 | On or as soon as practicable following the Plan Effective Date, each holder of an allowed Priority Non-Tax Claim will be paid in full in cash or otherwise left unimpaired, unless otherwise agreed to by such holder. |

Class 3 shall consist of Empery Prepetition Secured Claim against the Debtor's Estate[3], and shall be treated and in accordance with the following chart:

| Class # | Description | Impairment | Amount Owed/Interest | Treatment |
|---------|-------------|------------|----------------------|-----------|
| Class 3 | Empery Prepetition Secured Claim | Impaired and entitled to vote. | $18,066,579.01 million | Empery shall compromise and settle with the Estate and have an allowed secured claim in the amount of $18 million (the "**Allowed Empery Secured Claim**"), which represents principal and accrued interest and fees through the Petition Date and excludes the Roll-Up.<br><br>On or as soon as practicable following the Plan Effective Date, holders of the Allowed Empery Secured Claim shall receive their *pro rata share* of the Net Sale Proceeds, not to exceed $12.0 million *less* the Roll-Up and *less* the amount of Empery's accepted credit bid, if any (the "**Empery Payoff Amount**"). |

---

[3] The Empery Parties reserve all rights and claims against all non-debtor parties, and any and all such claims against non-debtor parties shall not be impaired by the Plan.

| | | | | Empery shall assign to the Litigation Trust, for the benefit of holders of Allowed Class 5 Claims, the economic interest in the difference between the Allowed Empery Secured Claim and the Empery Payoff Amount (the "**Empery Assigned Claim**"), including, for the avoidance of doubt, any monetary recovery on such Empery Assigned Claim.

To the extent the Net Sale Proceeds (including the amount, if any, of Empery's accepted credit bid) are insufficient to satisfy the Empery Payoff Amount in full, holders of Allowed Empery Secured Claims shall forego any further recovery.

To the extent the Plan does not go effective by Effective Date Deadline, the Debtor and the Committee may extend the Effective Date Deadline by up to thirty (30) calendar days, without the consent of Empery on the condition precedent that the Empery Payoff Amount is paid in full from the Net Sale Proceeds on or before August 31, 2023; *provided*, *however*, to the extent Empery is the successful Purchaser pursuant to a credit bid and the Closing Date has occurred, the Effective Date Deadline may be extended, if necessary, to a date mutually agreed to by the Debtor, the Committee, and Empery.

Empery shall retain its liens on the proceeds of the sale of its collateral until its claims as treated in the Plan and PSA are satisfied in full. |
|---|---|---|---|---|

Class 4 shall consist of the Prestige Prepetition Secured Claim against the Debtor's Estate[4], and shall be treated and paid in accordance with the following chart:

| Class # | Description | Impairment | Amount Owed/Interest | Treatment |
|---|---|---|---|---|
| Class 4 | Prestige Prepetition Secured Claim | Impaired and entitled to vote. | $2.5 million | MP Collateral, as successor in interest to Prestige, shall have an allowed secured claim in the amount of $2,500,000 (the "**Allowed Prestige Secured Claim**"), which represents principal and accrued interest and fees through the Petition Date. The Allowed Prestige Secured Claim shall be subject to reduction from the proceeds of collections on its |

---

[4] The Empery Parties reserve all rights and claims against all non-debtor parties, and any and all such claims against non-debtor parties shall not be impaired by the Plan.

DOCS_SF:108959.5

| | | | | prepetition collateral. As of May 18, 2023, the net reductions are $731,777.<br><br>On or as soon as practicable following the Plan Effective Date, holders of the Allowed Prestige Secured Claim shall receive (a) the return of the pre-petition accounts receivable collateral securing such Allowed Prestige Secured Claim, (b) cash proceeds of the prepetition accounts receivable collateral securing such Allowed Prestige Secured Claim , and (c) cash from the Net Sale Proceeds (if any such cash proceeds remain after paying the Allowed Empery Secured Claim in full). For the avoidance of doubt, the Allowed Prestige Secured Claim shall be subordinate in right to payment of the Empery Assigned Claim, except with respect to prepetition accounts receivable and cash proceeds therefrom.<br><br>Holders of the Allowed Prestige Secured Claim shall retain all rights and causes of action against third parties, including but not limited to the guarantees provided by Drexler. |
|---|---|---|---|---|

### D.    UNSECURED CLAIMS

### 1.    General Unsecured Claims

Class 5 shall consist of non-priority and General Unsecured Claims against the Debtor's Estate, which are not secured by property of the Estate and are not entitled to priority under section 507(a) of the Bankruptcy Code, but are entitled in this case to separate classification in accordance with Section 1122(b) of the Bankruptcy Code. The Debtor estimates that the General Unsecured Claims against the estate total approximately $24,025,970.00, and shall be treated in accordance with the following chart:

| Class # | Description | Impairment | Amount Owed/Interest | Treatment |
|---|---|---|---|---|
| Class 5 | General Unsecured Claims | Impaired and entitled to vote. | $24,025,970 | Class 5 shall consist of all allowed non-priority general unsecured claims. None of the Empery Parties, any defendants in the WW Adversary Proceeding or White Winston Parties (nor any of their affiliates or any of the individual noteholders) shall have a Class 5 Claim.<br><br>The Litigation Trust reserves all rights, claims, and defenses with respect to Class 5 Claims, including all rights to seek subordination of such claims pursuant to section 510 of the Bankruptcy Code and to enforce any applicable subordination agreements pursuant to section 510(a) of the Bankruptcy Code. |

| | | | | Each holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of a beneficial interest in the Litigation Trust. |
| --- | --- | --- | --- | --- |

### 2.    White Winston Claims

Class 6 shall consist of all claims of White Winston (if any) against the Debtor's Estate, including all claims arising from that certain *Settlement Agreement and Release* dated December 5, 2022 (the "**WW Settlement Agreement**"), by and between White Winston, the Debtor and Drexler (collectively, the "**White Winston Claims**"). All White Winston Claims against the Debtor's Estate[5] shall be treated in accordance with the following chart:

| Class # | Description | Impairment | Amount Owed/Interest | Treatment |
| --- | --- | --- | --- | --- |
| Class 6 | White Winston Claims | Impaired and entitled to vote. | $8,630,261.00 | Subject to the occurrence of the Plan Effective Date (or, if both the Effective Date has not occurred and the Empery Payoff Amount is paid in full from the Net Sale Proceeds on or before August 31, 2023, upon entry of the Confirmation Order) the WW Settlement Agreement shall be deemed an executory contract that the Debtor shall reject under the Plan pursuant to section 365 of the Bankruptcy Code.<br><br>White Winston shall have an allowed unsecured claim of $8,630,261.00. The allowed unsecured claim shall be treated as follows:<br><br>a.  100% (or such other amount as White Winston in its sole discretion determines) of the New Equity Interests, or, at White Winston's election, the prepetition equity interests in the Reorganized Debtor, shall be issued to White Winston in full and final satisfaction of the claim in the amount of $4,630,261.00. The rights and powers of holders of New Equity Interests shall be as set forth in the Plan or in related documents by White Winston. It is the intention of the Plan Proponents that the rights and powers of holders of New Equity Interests be determined by White Winston in connection with the "change of ownership" rules of § 382 of the IRS Tax Code, including the exceptions to the ordinary "change of ownership" rules found in sections 382(l)(5) and (6) of the IRS Tax Code. All provisions of the Plan shall operate to effectuate this intention |

---

[5]    White Winston reserves all rights and claims against all non-debtor parties, including under the WW Settlement Agreement, and any and all such claims against non-debtor parties shall not be impaired by the Plan.

| | | | | unless otherwise agreed to by White Winston.<br><br>b. The remaining $4,000,000 of the claim (the "**White Winston Retained Claim**") shall not be discharged and shall remain as a liability of the post-confirmation Reorganized Debtor. For the avoidance of doubt, White Winston shall not have a claim against the Litigation Trust. |

### 3. Equity Interest of the Debtor

Class 7 shall consist of all Equity Interests in the Debtor. On the Effective Date, subject to the treatment of the Class 6 Claims, the Equity Interests in the Debtor shall be cancelled, and the Holders of Class 7 Equity Interests shall not receive any Distribution on account of such Equity Interests. Class 7 is Impaired under this Plan. The Holders of Class 7 Equity Interests are not entitled to vote on this Plan and are deemed to have rejected this Plan pursuant to Section 1126(g) of the Bankruptcy Code.

| Class # | Description | Impairment | Amount Owed/Interest | Treatment |
|---------|-------------|-----------|----------------------|-----------|
| Class 7 | Equity Interests | Impaired, not entitled to vote, and deemed to reject. | 100% of Equity Interests | All existing Equity Interests in the Debtor shall be cancelled and holders of such Equity Interests shall neither receive nor retain anything on account of their existing Equity Interests. |

### E. MEANS FOR IMPLEMENTATION OF THE PLAN

### 1. General Settlement of Claims

Pursuant to sections 363, 1123 and 1124 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, and other benefits provided under the Plan, and as a result of arms' length negotiations among the Debtor and its creditors, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan. Solely to the extent otherwise necessary, Confirmation of the Plan also cures defaults under all prepetition contracts paid or maintained pursuant to this Plan, in accordance with section 1124 of the Bankruptcy Code.

### 2. Restructuring Transactions

Prior to, on or after the Effective Date, and pursuant to the Plan, the Debtor and the Reorganized Debtor may enter into the restructuring transactions that are not inconsistent with the Plan Support Agreement (each, a "**Restructuring Transaction**"), and may take any actions as may be necessary or appropriate to affect a restructuring of its business or the overall organizational structure of the Reorganized Debtor. Provided they are consistent with the Plan Support Agreement, the Restructuring Transactions may include one or more sales, mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be determined by the Debtor or the Reorganized Debtor to be necessary or appropriate. As of the date hereof, the actions to effect the Restructuring Transaction may include:

- the execution and delivery of appropriate instruments of sale, transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree;
- the filing of appropriate certificates or articles of formation, reformation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and
- all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions and the Plan.

The documents and agreements necessary to finalize the Debtor's ultimate Restructuring Transaction shall be set forth in the Plan Supplement.

### 3.    New Corporate Existence

The Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company or limited partnership, with all the powers of a corporation, limited liability company or limited partnership pursuant to laws of the State of Nevada and pursuant to the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other formation documents) are amended by or in connection with the Plan or otherwise and, to the extent such documents are amended, such documents are deemed to be authorized pursuant hereto and without the need for any other approvals, authorizations, actions or consents.

### 4.    Vesting of Assets in the Litigation Trust

Except as otherwise provided herein or in any agreement, instrument or other document relating thereto, on or after the Effective Date, the Litigation Trust shall be created. A litigation trustee (the "**Litigation Trustee**") shall be appointed in the sole discretion of the Committee, and the Litigation Trust shall be governed by a three (3) member oversight committee, which members shall be appointed in the sole discretion of the Committee.

On the Plan Effective Date, the Litigation Trust shall be vested with all assets of the Debtor not sold to the Purchaser, nor paid to MP Collateral, and not transferred to, or vested in, the Reorganized Debtor. The assets transferred to the Litigation Trust shall include all unsold claims, causes of action, and interests of the Debtor, including all rights, claims, and causes of action relating to insurance policies, other than the White Winston D&O Claims.

After the Plan Effective Date, the Reorganized Debtor shall pay the Litigation Trust an amount equal to thirty percent (30%) of the Net Collected Proceeds (defined below) of the White Winston D&O Claims. "**Net Collected Proceeds**" means the gross collected proceeds actually collected by the Reorganized Debtor on account of the White Winston D&O Claims less any fees and expenses incurred by the Reorganized Debtor to recover such proceeds.

On the Plan Effective Date, the Litigation Trust shall receive all cash held by the estate, including the Net Sale Proceeds *less* the Empery Payoff Amount *less* amounts due to the Holders of Class 4 Claims pursuant to the Plan (the "**Litigation Trust Cash Balance**"). For the avoidance of doubt, any remaining funds in the Wind-Down Budget shall vest in the Litigation Trust. To the extent the Litigation Trust Cash Balance is *less than* $500,000 on a net basis after deducting anticipated accrued and unpaid administrative and priority claims (including professional fees), Empery shall fund the difference to the Litigation Trust (the "**Empery Litigation Trust Loan**"). The Empery Litigation Trust Loan shall be repaid from the proceeds of the Litigation Trust Assets ahead of any distributions to holders of Allowed Class 5 Claims. For the avoidance of doubt, Empery's obligation to fund the Empery Litigation Trust Loan shall be a binding obligation upon the Closing Date (*i.e.*, the closing of the Sale) and such amounts shall be paid to the Litigation Trust on the Plan Effective Date, even if such Effective Date Deadline is extended beyond August 31, 2023 as provided in the Plan.

### 5.    Vesting of Assets in the Reorganized Debtor

Except as otherwise agreed to by White Winston or as provided herein or in any agreement, instrument or other document relating thereto, on or after the Effective Date, the Excluded IP and the White Winston D&O Claims shall vest in the Reorganized Debtor.

### 6. Securities Registration Exemption

The New Equity Interests to be issued pursuant to the Plan and the Plan Support Agreement will be issued without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code.

### 7. Issuance and Distribution of New Equity Interests

To the extent applicable after the Sale, on or immediately after the Effective Date, all New Equity Interests in the Reorganized Debtor shall be issued in accordance with the Plan and the Plan Support Agreement.

All of the New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable. Each distribution and issuance referred to in Article VII hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 8. Certificate of Incorporation and Bylaws

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies and limited partnerships) of the Debtor shall be amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code or as otherwise required by, and in a form reasonably acceptable to the Reorganized Debtor. On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file a new certificate of incorporation or organization with the secretary of state (or equivalent state officer or entity), which, as required by section 1123(a)(6) of the Bankruptcy Code, shall prohibit the issuance of non-voting securities. After the Effective Date, the Reorganized Debtor may file a new, or amend and restate its existing, certificate of incorporation, charter and other constituent documents as permitted by the relevant state corporate law.

### 9. Effectuating Documents, Further Transactions, Exemption from Certain Transfer Taxes

The Debtor and the Reorganized Debtor, as applicable, may take all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto. The secretary and any assistant secretary of the Debtor or Reorganized Debtor, as applicable, shall be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtor shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers or partners of the Debtor, or the need for any approvals, authorizations, actions or consents.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any ad valorem tax, stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the sale of the Assets and issuance of New

Equity Interests, including any Distributions made, or actions undertaken by, the Debtor, the Reorganized Debtor, and/or the Litigation Trustee.

### 10. Preservation of Public Entity Status

On and after the Effective Date, the Reorganized Debtor intends it will continue to exist as a public corporation and in such event shall retain all of the powers of public corporations under applicable non-bankruptcy law, and without prejudice to any right to amend its charter, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence. As of the Effective Date, the Debtor's Articles of Incorporation shall be deemed amended to conform to the requirements of Section 1123(a)(6) of the Bankruptcy Code. Furthermore, as of the Effective Date, the Debtor shall take appropriate action to assure compliance with applicable securities laws.

Pursuant to Section 1145 of the Bankruptcy Code, neither section 5 of the Securities Act of 1933 nor any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer or, underwriter of, or broker or dealer in, a security shall apply to the offer or sale of a security or registration or licensing of the Reorganized Debtor, or an underwriter of, or broker or dealer in, a security of the Reorganized Debtor, including, without limitation, the New Equity and/or the offer of any security of the Reorganized Debtor through any warrant, option, right to subscribe or conversion privilege that is sold in exchange for a claim against the Debtor, including, without limitation, the New Equity. For purposes of section 1145(a)(1)(A) of the Bankruptcy Code, the New Equity shall be deemed to be in exchange for White Winston's claims against the Debtor. Neither the Debtor nor the Reorganized Debtor shall be an underwriter for any purpose under section 2(a)(11) of the Securities Act of 1933 and/or Section 1145 of the Bankruptcy Code. The offer and sale of securities of the kind and in the manner specified under Section 1145(a)(1) of the Bankruptcy Code, including, without limitation, the New Equity, shall be deemed to be a public offering pursuant to section 1145(c) of the Bankruptcy Code.

### 11. Preservation of Tax Attributes

It is the intention of the Plan Proponents that the Debtor's tax attributes, particularly its net operating losses ("**NOL's**"), be preserved for use by the Reorganized Debtor after the Effective Date. Accordingly, the Plan has been structured to comply with 26 U.S.C. §382(l)(5), and the Plan provides it is treated under Internal Revenue Code section 382(l)(5).

Generally, Internal Revenue Code ("**IRC**") section 382 provides that, after an ownership change, the amount of a loss corporation's taxable income for any post-change year that may be offset by pre-change losses shall not exceed the IRC section 382 limitation for that year. Pursuant to IRC Section 382(g), an "ownership change" occurs when, on a particular testing date the percentage stock ownership of one or more 5-percent shareholders has increased by more than 50 percentage points over the lowest percentage stock ownership held by such shareholder at any time during the prescribed "testing period," as defined in IRC section 382(i). A loss corporation is defined in IRC section 382 as a corporation entitled to use an NOL carryover, have an NOL for the taxable year in which the ownership change occurs, or any corporation with a net unrealized built-in loss within the meaning of section 382(h)(3).

IRC section 382(l)(5) provides an exception for ownership changes that occur in Title 11 or similar cases, provided certain qualification requirements (discussed below) are met. If applicable, section 382(l)(5) generally provides that although the loss corporation experiences an ownership change, the section 382 limitation does not apply to limit the tax attributes of the loss corporation. However, any limitation caused by a prior or subsequent ownership change would continue to apply.

There are two statutory requirements which must be satisfied in order for the loss corporation to qualify under section 382(l)(5):

(i)         The old loss corporation (the Debtor) must have been under the jurisdiction of the Bankruptcy Court (which clearly the Debtor has been since the Petition Date), and

(ii)        the former shareholders and qualified creditors of the bankrupt loss corporation (determined immediately before a section 382(g) ownership change) must own (after such ownership change and as a result of

being shareholders or creditors immediately before such change) an amount of stock constituting 50 percent "control" (as defined under section 1504(a)(2)) after the ownership change.

According to the Debtor's 2021 federal tax form 1040, the Debtor identified the following tax attributes:

| | |
|---|---|
| Non-SRLY NOL .............................................. | $15,921,560 |
| Net operating loss carryforward .................... | $107,897,654 |
| Charitable contributions .................................. | $24,031 |
| Sec. 1231 losses .............................................. | $276,583 |
| Disallowed business interest expense ............. | $10,452,345 |
| Total general business credits ......................... | $421,312 |
| Credit for increasing research activities (Form 6765) ... | $421,312 |

As a result of the net operating loss carryforward, general business credit ("**GBC**"), and other tax attributes listed above, the Debtor is "loss corporation" as defined in Treas. Reg. § 1.382-2(a) and Treas. Reg. § 1.1502-91(c).

Early in the Case, the Debtor considered the formulation of a reorganization plan, rather than a liquidating plan based on the use of the Debtor's NOLs. In theory, the Debtor could enter into a transaction whereby a third party would provide consideration to the Debtor in exchange for its corporate shell and NOLs. A potential purchaser's ability to use the Debtor's NOLs, however, was subject to many risk factors and prevailing law that would have reduced or eliminated the utilization of the NOLs under certain circumstances.

Accordingly, to prevent the potential loss of NOLs, on February 8, 2023, the Debtor filed its "*Debtor's Motion Pursuant to 11 U.S.C. 362 & 105(a) for Entry of an Order Establishing Notification and Hearing Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtor's Estate* (ECF 215)" (the "**NOL Motion**"). The relief requested in the NOL Motion was designed to provide the Debtor with advance notice of certain transfers that may jeopardize its NOLs, and to enable the Debtor, if necessary, to obtain substantive relief from this Bankruptcy Court to protect those NOLs.  The Bankruptcy Court allowed the NOL Motion by order dated February 27, 2023 [ECF 259].

 To preserve these NOL's for use by the Reorganized Debtor, the Plan provides that White Winston will receive, in full payment and satisfaction of its Class 7 Allowed Claim to the extent of $4,630,261.00 all of the New Equity in the Debtor.  Thus, White Winston will be the sole shareholder of the Reorganized Debtor.  Generally, this transaction would have triggered an ownership change (as defined in section 382(g) on the Effective Date) with respect to the Debtor's stock.  However, the Plan meets all of the requirements of Internal Revenue Code section 382(l)(5) and thus the NOL's should be preserved. The Debtor shall not make an election under section 382(l)(5)(G) to elect out of the application of Internal Revenue Code section 382(l)(5) such that the provisions of Internal Revenue Code section 382(l)(5) do not apply (see also Treas. Reg. 1.382-9(i)).  Finally, the Debtor shall not take any reporting position otherwise under the Plan Support Agreement.

Pursuant to the Plan Support Agreement, the Plan provides that pursuant to Treas. Reg. § 1.382-2T(k)(3) and Treas. Reg. 1.382-9(d)(1), White Winston has been the holder of all Class 6 Claims continuously for at least 18 months before the Petition Date, thereby satisfying the second condition described above. Further, the Plan provides that no person or entity other than the Reorganized Debtor shall use or impair any of the Debtor's tax attributes determined as of the Petition Date (including the NOL's).

The Plan Proponents make no representation regarding the value of the NOL's to the Reorganized Debtor, or whether the NOL's can be successfully challenged and disallowed in whole or in part by the Internal Revenue Service pursuant to Internal Revenue Code section 269.

## F.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

        1.      Assumption and Rejection of Executory Contracts and Unexpired Leases

        Subject to the right of the Reorganized Debtor to elect to assume any Executory Contract or Unexpired Lease as to which there is no objection to the proposed cure, each Executory Contract or Unexpired Lease identified in the Plan Supplement as an Executory Contract and/or Unexpired Lease not designated for assumption shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease:

        (a)     has been previously assumed by the Debtor by Final Order of the Bankruptcy Court;

        (b)     has been assumed by the Debtor by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date;

        (c)     is the subject of a motion to assume pending as of the Effective Date;

        (d)     is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; or

        (e)     is otherwise assumed pursuant to the terms herein.

        The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  The Debtor reserves the right to amend the schedule of Assumed Executory Contracts and Unexpired Leases at any time before the Effective Date.  To the extent any Executory Contract or Unexpired Lease is not specifically identified and designated as an Executory Contract or Unexpired Lease to be assumed, any such Executory Contract(s) and/or Unexpired Lease(s) shall be deemed to be rejected pursuant to the terms of this Plan and the Confirmation Order.

        2.      Approval of Assignments (if any)

        The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in this Article VI pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption of such Executory Contract or Unexpired Lease will be deemed to have consented to such assumption and assignment of Executory Contracts or Unexpired Leases.

        In the event of an assignment of an Executory Contract or Unexpired Lease, at least ten (10) days prior to the Confirmation Hearing, the Debtor shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will:  (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.  Additionally, the Debtor shall file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts.  Any applicable cure amounts shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

        Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by the Debtor, and its counsel, SL, at least five (5) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

DOCS_SF:108959.5

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assignment.  If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Reorganized Debtor in its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

    3.   <u>Rejection of Executory Contracts or Unexpired Leases</u>

All Executory Contracts and Unexpired Leases not listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement or not assumed and assigned otherwise in accordance with this Plan shall be deemed rejected as of the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in this Article VI pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

B.     *Claims on Account of the Rejection of Executory Contracts or Unexpired Leases*

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against any Debtor, any Reorganized Debtor or Debtor's Estate and property, including the Assets, and the Litigation Trustee, and the Reorganized Debtor or Debtor's Estate and property, including the Assets, and the Litigation Trustee shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.

C.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  At least ten (10) days prior to the Confirmation Hearing, the Debtor shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, which will: (1) list the applicable cure amount, if any; (2) describe the procedures for filing objections thereto; and (3) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtor shall file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assumed and the proposed cure amounts.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by the Debtor, and its counsel, SL, and counsel to the Committee, at least five (5) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  If an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtor in its sole option, may elect to reject such executory contract or unexpired lease in lieu of assuming it.

### G.    RELEASES

The Plan contains certain releases of third parties.  The discharge, release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below. The Plan Proponents believe that all of the Released Parties (defined below) and Exculpated Parties (defined below) made substantial and valuable contributions to the Debtor's restructuring, including the compromising of their Claims, which Claim treatment under the Plan will help maximize and preserve the going-concern value of the Debtor for the benefit of all parties in interest. Accordingly, each of the Released Parties warrants the benefit of the Plan's release provisions.

"**Released Parties**" means, collectively, and in this case in its capacity as such: (a) the Debtor and the Reorganized Debtor; (b) the Committee and each of its respective members (in their capacity as such); (c) the Empery Parties; (d) the White Winston Parties; and (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors (which includes the Secured Noteholders), successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, and attorneys (each in their capacity as such); *provided*, *however*, the Released Parties do not include Drexler, his Affiliates, successors or assigns, or any of the Debtor's prepetition officers and board of directors and their Affiliates, successors or assigns.

"**Exculpated Parties**" means, collectively, and in this case in its capacity as such: (a) the Debtor and the Reorganized Debtor; (b) the Committee and each of its respective members (in their capacity as such); (c) the Empery Parties; (d) the White Winston Parties; and (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors (which includes the Secured Hotelholders), successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, and attorneys (each in their capacity as such); *provided*, *however*, the Exculpated Parties do not include Drexler (on account of his prepetition acts and omissions), his Affiliates, successors or assigns, or any of the Debtor's prepetition officers and board of directors and their Affiliates, successors or assigns.

### 1.    Discharge of Claims and Termination of Interests

The Plan is not a liquidating Plan and does not provide for the liquidation of all or substantially all of the property of the Debtor.  The Reorganized Debtor intends to engage in business after the Effective Date.  Accordingly, the Debtor is entitled to a discharge.  The Plan provides that the Debtor shall receive a discharge to the maximum extent not prohibited by law other than for the White Winston Retained Claim, including pursuant to section 1141(d)(1) of the Bankruptcy Code.  All property dealt with in the Plan, including the Excluded IP and the White Winston D&O Claims and all property vested in the Reorganized Debtor under the Plan, shall be free and clear of all claims and interest of creditors (other than the White Winston Retained Claim), equity security holders and of general partners (if any) in the debtor as set forth in section 1141(c) of the Bankruptcy Code.  Except as otherwise provided herein or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII hereof, all liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate shall be fully released and discharged.

The discharge shall not affect or impair any claims by any person or entity against any non-debtor.

ACCORDINGLY, PURSUANT TO SECTION 1141(d) OF THE BANKRUPTCY CODE, AND EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM AND AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR IN ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, AND EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, THE DISTRIBUTIONS, RIGHTS, AND TREATMENT THAT ARE PROVIDED IN THE PLAN SHALL BE IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE, EFFECTIVE AS OF THE EFFECTIVE DATE, OF CLAIMS (INCLUDING ANY INTERCOMPANY CLAIMS RESOLVED OR COMPROMISED AFTER THE EFFECTIVE DATE BY THE REORGANIZED DEBTOR), INTERESTS, AND

CAUSES OF ACTION OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS OR INTERESTS FROM AND AFTER THE PETITION DATE, WHETHER KNOWN OR UNKNOWN, AGAINST, LIABILITIES OF, LIENS ON, OBLIGATIONS OF, RIGHTS AGAINST, AND INTERESTS IN, THE DEBTOR OR ANY OF ITS ASSETS OR PROPERTIES, REGARDLESS OF WHETHER ANY PROPERTY SHALL HAVE BEEN DISTRIBUTED OR RETAINED PURSUANT TO THE PLAN ON ACCOUNT OF SUCH CLAIMS AND INTERESTS, INCLUDING DEMANDS, LIABILITIES, AND CAUSES OF ACTION THAT AROSE BEFORE THE EFFECTIVE DATE, ANY LIABILITY (INCLUDING WITHDRAWAL LIABILITY) TO THE EXTENT SUCH CLAIMS OR INTERESTS RELATE TO SERVICES PERFORMED BY EMPLOYEES OF THE DEBTOR BEFORE THE EFFECTIVE DATE AND THAT ARISE FROM A TERMINATION OF EMPLOYMENT, ANY CONTINGENT OR NON-CONTINGENT LIABILITY ON ACCOUNT OF REPRESENTATIONS OR WARRANTIES ISSUED ON OR BEFORE THE EFFECTIVE DATE, AND ALL DEBTS OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), OR 502(i) OF THE BANKRUPTCY CODE, IN EACH CASE WHETHER OR NOT: (1) A PROOF OF CLAIM BASED UPON SUCH DEBT OR RIGHT IS FILED OR DEEMED FILED PURSUANT TO SECTION 501 OF THE BANKRUPTCY CODE; (2) A CLAIM OR INTEREST BASED UPON SUCH DEBT, RIGHT, OR INTEREST IS ALLOWED PURSUANT TO SECTION 502 OF THE BANKRUPTCY CODE; OR (3) THE HOLDER OF SUCH A CLAIM OR INTEREST HAS ACCEPTED THE PLAN. EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, ANY DEFAULT OR "EVENT OF DEFAULT" BY THE DEBTOR OR ITS AFFILIATES WITH RESPECT TO ANY CLAIM OR INTEREST THAT EXISTED IMMEDIATELY BEFORE OR ON ACCOUNT OF THE FILING OF THE CHAPTER 11 CASES SHALL BE DEEMED CURED (AND NO LONGER CONTINUING) AS OF THE EFFECTIVE DATE. THE CONFIRMATION ORDER SHALL BE A JUDICIAL DETERMINATION OF THE DISCHARGE OF ALL CLAIMS AND INTERESTS EXCEPT FOR THE WHITE WINSTON RETAINED CLAIM SUBJECT TO THE EFFECTIVE DATE OCCURRING.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, THE WHITE WINSTON RETAINED CLAIM SHALL NOT BE DISCHARGED AND SHALL REMAIN UNIMPAIRED.

2.    **Releases of Liens**

EXCEPT AS OTHERWISE PROVIDED IN THE CONFIRMATION ORDER, THE SALE ORDER, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, ON THE EFFECTIVE DATE AND CONCURRENTLY WITH THE APPLICABLE DISTRIBUTIONS MADE PURSUANT TO THE PLAN AND, IN THE CASE OF A SECURED CLAIM, SATISFACTION IN FULL OF THE PORTION OF THE SECURED CLAIM THAT IS ALLOWED AS OF THE EFFECTIVE DATE, ALL MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS AGAINST ANY PROPERTY OF THE ESTATES SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL OF THE RIGHT, TITLE, AND INTEREST OF ANY HOLDER OF SUCH MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS SHALL REVERT TO THE REORGANIZED DEBTOR AND ITS SUCCESSORS AND ASSIGNS. ANY HOLDER OF SUCH SECURED CLAIM (AND THE APPLICABLE AGENTS FOR SUCH HOLDER) SHALL BE AUTHORIZED AND DIRECTED, AT THE SOLE COST AND EXPENSE OF THE REORGANIZED DEBTOR, TO RELEASE ANY COLLATERAL OR OTHER PROPERTY OF THE DEBTOR (INCLUDING ANY CASH COLLATERAL AND POSSESSORY COLLATERAL) HELD BY SUCH HOLDER (AND THE APPLICABLE AGENTS FOR SUCH HOLDER), AND TO TAKE SUCH ACTIONS AS MAY BE REASONABLY REQUESTED BY THE REORGANIZED DEBTOR TO EVIDENCE THE RELEASE OF SUCH LIEN, INCLUDING THE EXECUTION, DELIVERY, AND FILING OR RECORDING OF SUCH RELEASES. THE PRESENTATION OR FILING OF THE CONFIRMATION ORDER TO OR WITH ANY FEDERAL, STATE, PROVINCIAL, OR LOCAL AGENCY OR DEPARTMENT SHALL CONSTITUTE GOOD AND SUFFICIENT EVIDENCE OF, BUT SHALL NOT BE REQUIRED TO EFFECT, THE TERMINATION OF SUCH LIENS.

THE PLAN SHALL CONSTITUTE A TERMINATION STATEMENT WITH RESPECT TO ALL LIENS, SECURITY INTERESTS AND ENCUMBRANCES THAT IS EFFECTIVE UPON THE PLAN EFFECTIVE DATE PURSUANT TO SECTION 9-513 OF THE UNIFORM COMMERCIAL CODE ("**UCC**"). ALL LIENS, SECURITY INTERESTS AND ENCUMBRANCES IN AND TO THE DEBTOR'S ASSETS SHALL TERMINATE, BE DISCHARGED AND SHALL NOT ATTACH TO ANY ASSETS OF THE REORGANIZED DEBTOR FROM AND AFTER THE EFFECTIVE DATE. THE REORGANIZED DEBTOR IS AUTHORIZED AND EMPOWERED TO RECORD ANY AND ALL TERMINATION STATEMENTS OR SIMILAR DOCUMENTS TO TERMINATE ANY AND ALL LIENS, SECURITY INTERESTS AND ENCUMBRANCES, INCLUDING AS SET FORTH IN SECTION 9-509 OF THE UCC. UPON REQUEST OF THE REORGANIZED DEBTOR, ALL HOLDERS OF SUCH LIENS, SECURITY INTERESTS AND ENCUMBRANCES SHALL EXECUTE AND DELIVER TO THE REORGANIZED DEBTOR APPROPRIATE AUTHORIZATIONS TO RECORD SUCH TERMINATION STATEMENTS OR SIMILAR DOCUMENTS INCLUDING PURSUANT TO SECTION 9-513 OF THE UCC.

### 3. Exculpation

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, AN OFFICIAL ACTION, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, FILING, OR TERMINATION OF THE RESTRUCTURING SUPPORT AGREEMENT AND RELATED PREPETITION TRANSACTIONS, THE DISCLOSURE STATEMENT, THE PLAN, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY EXCULPATED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN, THE FILING OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR ANY OFFICIAL ACTION, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF, AND DISTRIBUTION OF, CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTWITHSTANDING THE FOREGOING, THE EXCULPATED PARTIES DO NOT INCLUDE DREXLER (ON ACCOUNT OF HIS PREPETITION ACTS AND OMISSIONS), HIS AFFILIATES, SUCCESSORS OR ASSIGNS, OR ANY OF THE DEBTOR'S PREPETITION OFFICERS AND BOARD OF DIRECTORS AND THEIR AFFILIATES, SUCCESSORS OR ASSIGNS.

### 4. Releases by the Debtor

PURSUANT TO SECTIONS 105 AND 1123(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE RELEASED PARTIES'

FACILITATION OF THE EXPEDITIOUS REORGANIZATION OF THE DEBTOR, COMPROMISING OF THEIR CLAIMS, AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THIS PLAN, ON AND AFTER THE EFFECTIVE DATE: THE RELEASED PARTIES (EXCEPT FOR THE REORGANIZED DEBTOR WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, WHICH SHALL NOT BE RELEASED) ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTOR, THE REORGANIZED DEBTOR, AND THE ESTATE FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, AVOIDANCE ACTIONS, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR WHICH COULD BE ASSERTED ON BEHALF OF THE DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE DEBTOR, THE REORGANIZED DEBTOR, AND/OR THE ESTATE WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY), OR IN ANY MANNER ARISING FROM ANY MATTER OR TRANSACTION, BASED ON OR RELATING TO, IN WHOLE OR IN PART, THE DEBTOR, THE DEBTOR'S RESTRUCTURING, THE DEBTOR'S CHAPTER 11 CASE, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTOR OR THE REORGANIZED DEBTOR, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY OF THE RELEASED PARTIES, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS BEFORE OR DURING THE CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION OR PREPARATION OF THIS PLAN, THE DISCLOSURE STATEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE RELATING TO THE DEBTOR TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OF THIS PLAN. NOTWITHSTANDING THE FOREGOING, THE RELEASED PARTIES DO NOT INCLUDE DREXLER, HIS AFFILIATES, SUCCESSORS OR ASSIGNS, OR ANY OF THE DEBTOR'S PREPETITION OFFICERS AND BOARD OF DIRECTORS AND THEIR AFFILIATES, SUCCESSORS OR ASSIGNS.

PURSUANT TO SECTIONS 105 AND 1123(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE RELEASED PARTIES' FACILITATION OF THE EXPEDITIOUS REORGANIZATION OF THE DEBTOR AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THIS PLAN, INCLUDING THE COMPROMISING OF THEIR CLAIMS PURSUANT TO THE PLAN, ON AND AFTER THE EFFECTIVE DATE, EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM (WHICH SHALL NOT BE RELEASED), THE RELEASING PARTIES HEREBY RELEASE THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, AVOIDANCE ACTIONS, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR WHICH COULD BE ASSERTED ON BEHALF OF THE DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE.

5.      **Injunction**

EXCEPT WHITE WINSTON, AND SOLELY WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT ARE SUBJECT TO EXCULPATION PURSUANT TO THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTOR, OR THE REORGANIZED DEBTOR: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS.

EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR

ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

### H.    PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided in the Plan, a Final Order, the Litigation Trust Agreement or as agreed to by the relevant parties, the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date; *provided*, *however*, that payments on account of General Unsecured Claims that become Allowed Claims on or before the Effective Date may commence on the Effective Date.

B.    *Distributions on Account of Claims Allowed After the Effective Date*

1.    Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order, the Litigation Trust or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the Disputed Claim becomes an Allowed Claim.

2.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, shall establish appropriate reserves for potential payment of any such Disputed Claims.

C.    *Delivery and Distributions and Undeliverable or Unclaimed Distributions*

1.    Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    Delivery of Distributions in General

Except as otherwise provided herein, the Litigation Trustee shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's or the Litigation Trustee's records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtor, the Reorganized Debtor, or the Litigation Trustee, as applicable; and *provided further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

The Litigation Trustee shall make all distributions in accordance with the terms of the Litigation Trust Agreement.  The Plan provides that the Reorganized Debtor has no obligations of any kind under the Plan to the Litigation Trustee, the Distribution Agent or Agents, any creditor other than White Winston or equity security holder (including, without limitation, on account of claims or equity interests) from and after the Effective Date.

D.    *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Litigation Trustee shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Litigation Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Litigation Trustee reserve the right to allocate all distributions made under the Plan in compliance with all applicable liens and encumbrances.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

E.    *Timing and Calculation of Amounts to Be Distributed*

On the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

F.    *Setoffs*

The Litigation Trustee may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Litigation Trustee may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor and/or Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release, of any such claims, equity interests, rights and Causes of Action that the Debtor or the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, may possess against any such Holder, except as specifically provided herein.

## I.      PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

*A.      Resolution of Disputed Claims*

1.      Allowance of Claims

After the Effective Date, the Litigation Trustee shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

2.      Prosecution of Objections to Claims

After the Confirmation Date the Litigation Trustee shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; provided, however, this provision shall not apply to Fee Claims.  From and after the Effective Date, the Litigation Trustee may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  The Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

3.      Claims Estimation

After the Confirmation Date the Debtor or the Litigation Trustee, as applicable, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Litigation Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

4.      Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Litigation Trustee, and any Claim that has been amended may be adjusted thereon by the Litigation Trustee, in both cases without a claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

5.      Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

B.      *Disallowance of Claims*

All Claims of any Entity from which property is sought by the Debtor or the Reorganized Debtor under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtor or the Reorganized Debtor allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (i) the Entity, on the one hand, and the Debtor, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (ii) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM AND PROOFS OF INTEREST FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS AND EQUITY INTERESTS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS AND EQUITY INTERESTS, UNLESS SUCH LATE PROOF OF CLAIM OR EQUITY INTEREST IS DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER ON OR BEFORE THE LATER OF (1) THE CONFIRMATION HEARING AND (2) 45 DAYS AFTER THE APPLICABLE CLAIMS BAR DATE.**

C.      *Amendments to Claims*

On or after the Effective Date, except as otherwise provided herein, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, and, to the extent such prior authorization is not received, any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

## J.      CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that all provisions, terms and conditions hereof are approved in the Confirmation Order.

B.      *Conditions Precedent to Consummation on the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof.

1.    The Plan and all Plan Supplement documents, including any amendments, modifications or supplements thereto, shall be reasonably acceptable to the Debtor and the Committee.

2.    The Confirmation Order shall have been entered and become a Final Order in a form and in substance reasonably satisfactory to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, the Debtor or the Reorganized Debtor, or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan, and the dismissal all pending litigation between the White Winston Parties and the Empery Parties, with each party to bear its own fees and costs, including the WW Adversary Proceeding and that certain litigation pending before the New York Superior Court entitled *Empery Tax Efficient, LP v. MusclePharm Corporation, et al.*, Index No. 654789/2022.

3.    The Bankruptcy Court shall have entered an order authorizing the Sale of Assets, and the Winning Bidder shall have closed on its acquisition of the Assets.

4.    All documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery and (b) been affected or executed.  All conditions precedent to all such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

5.    All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

*C.    Waiver of Conditions*

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in this Article IX may be waived by the Debtor without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

*D.    Effect of Non-Occurrence of Conditions to Consummation*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtor; (2) prejudice in any manner the rights of the Debtor, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Holders or any other Entity in any respect.

## K.    SETTLEMENT, RELEASE AND RELATED PROVISIONS

*A.    Compromise and Settlement*

Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code or otherwise.  The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Debtor, its Estate and all Holders of Claims and Equity Interests, (2) fair, equitable and reasonable, (3) made in good faith and (4) approved by the Bankruptcy Court pursuant to sections 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  The Confirmation Order shall approve the exculpation and releases by all Entities of all such contractual, legal and equitable subordination rights or Causes of Action that are satisfied, compromised and settled pursuant hereto.

In accordance with the provisions of this Plan, including Article VIII hereof, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (1) the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, may, in their sole and absolute discretion, compromise and settle Claims against them and (2) the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, may, in their sole and absolute discretion, compromise and settle Causes of Action against other Entities.

*B.    Preservation of Rights of Action*

1.    <u>Maintenance of Causes of Action</u>

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, and provided all Allowed non-Insider Claims are paid in full, Litigation Trust shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action except for the White Winston D&O Claims, whether existing as of the Commencement Date or thereafter arising, in any court or other tribunal including, without limitation, in any

adversary proceeding (other than the White Winston Adversary, which shall be dismissed with prejudice) filed in the Chapter 11 Case.

2.    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a claim or Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, exculpated, compromised or settled as set forth in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtor (and to the extent applicable, the Reorganized Debtor) and the Litigation Trust expressly reserve such claim or Cause of Action for later adjudication by the Debtor, the Reorganized Debtor, the Litigation Trust, or, as otherwise appropriate and consistent with the terms of this Plan, the Litigation Trustee (including, without limitation, claims and Causes of Action not specifically identified or of which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to any such claims or Causes of Action (including, without limitation, the White Winston D&O Claims) upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtor, the Reorganized Debtor, and, as otherwise appropriate and consistent with the terms of this Plan, the Litigation Trustee, expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is or could be a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

3.    Limitation of Liability.

The Exculpated Parties will neither have nor incur any liability to any person or entity for any Official Actions in good faith taken or omitted to be taken in connection with or related to the Chapter 11 Case, the investigations of potential claims or the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan or incident to the Chapter 11 Case, provided that, the foregoing shall not exonerate any of the Exculpated Parties from any liability that results from an act or omission to the extent such act or omission is determined by Final Order to have constituted gross negligence or willful misconduct. In addition, notwithstanding any other provision of the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any Exculpated Party for any Official Actions made in good faith from and after the Petition Date through the Confirmation Date in connection with, relating to or arising out of the Chapter 11 case or the consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any transaction or document created or entered into, or any other act taken or omitted to be taken, in connection therewith, except for: (a) the liability of any Exculpated Party that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan, (b) the liability of any Exculpated Party that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, and (c) actions taken by Exculpated Parties who are holders of a Claim and are taking actions in pursuit of their allowance or payment of such Claim; for the avoidance of doubt there shall be no liability limitation for the Debtors, their insiders, and affiliates for their actions or omissions occurring before the Petition Date, or their actions or omissions after the Petition Date that are not Official Actions made in good faith.

L.    **BINDING NATURE OF THE PLAN**

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## IV.    CONFIRMATION AND CONSUMMATION PROCEDURES

### A.    Solicitation of Votes

The process by which the Debtor will solicit votes to accept or reject the Plan is summarized in that certain Solicitation and Procedures Motion (the "**Procedures Motion**"), filed with the Court on May 26, 2023 [ECF No. ____.] On _____, 2023, this Court approved the Procedures Motion.

**PLEASE REFER TO THE PROCEDURES MOTION FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT VOTES ARE PROPERLY AND TIMELY SUBMITTED SUCH THAT THEY ARE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN.**

### B.    Confirmation Procedures

### 1.    Confirmation Hearing

**The Confirmation Hearing will commence at _____.m.  prevailing Pacific Time on _____, 2023.**

**The Plan Objection Deadline is 5:00 p.m., prevailing Pacific Time on _____, 2023.**

All Plan objections must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.

> THE BANKRUPTCY COURT MAY <u>NOT</u> CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.

### 2.    Confirmation Hearing Notice

Following the Disclosure Statement Hearing, the Debtor will serve the Confirmation Hearing Notice on all of the Debtor's creditors, parties in interest and parties which have requested notice pursuant to Bankruptcy Rule 2002, which will contain, among other things, the Plan Objection Deadline, the Voting Deadline and the date that the Confirmation Hearing is scheduled to commence.

### 3.    Filing Objections to the Plan

All objections, if any, must (a) be made in writing, (b) conform to the Bankruptcy Rules and the Local Rules and (c) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that they are **actually received** on or before the Plan Objection Deadline by each of the parties listed in the table below:

| Name: | Contact Information: |
|---|---|
| Debtor's counsel | Schwartz Law, PLLC<br>Attn: Samuel A. Schwartz, Esq.<br>601 East Bridger Ave.<br>Las Vegas, Nevada 89101<br>Fax: (702) 385-5544 |
| Committee's counsel | Pachulski Stang Ziehl & Jones LLP<br>Attn: Jason Rosell<br>One Sansome Street, Suite 3430<br>San Francisco, CA 94104 |

| Empery's counsel | Garman Turner Gordon<br>Attn:  Gregory Garman, William Noall<br>7251 Amigo Street, Suite 210<br>Las Vegas, Nevada 89119 |
| --- | --- |
| White Winston's counsel | Jeffrey D. Sternklar LLC<br>Attn: Jeffrey Sternklar<br>101 Federal Street, Suite 1900<br>Boston, Massachusetts 02110 |

### C.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtor and the Committee believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtor and the Committee believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor and the Committee, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim or Equity Interest has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim or Equity Interests, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims and Equity Interests has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Equity Interest in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan.

- The Debtor has paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtor and the Litigation Trust, as applicable, will pay their respective quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed in the Debtor's Chapter 11 Case for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the case is converted or dismissed, whichever occurs first.

### 1.    Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor is liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must:  (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if the debtor's Chapter 11 Case was converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.  The Debtor's liquidation analysis is attached hereto as **Exhibit C**.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for:  (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the Cash amount that would be available for satisfaction of Claims (other than Secured Claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtor, augmented by the unencumbered Cash held by the Debtor at the time of the commencement of the liquidation.  Such Cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the Debtor's business and the use of chapter 7 for purposes of a liquidation.

The Debtor and the Committee believe that confirmation of the Plan will provide each Holder of an Allowed Claim or Equity Interests with a greater recovery than the value of any distributions if the Chapter 11 Case was converted to a case under chapter 7 of the Bankruptcy Code because, among other reasons, the Debtor does not own significant, tangible assets which could be liquidated.  Additionally, in a chapter 7 liquidation, the Debtor would be subject to the fees and expenses of a chapter 7 trustee which would likely further reduce Cash available for distribution.  In addition, distributions in chapter 7 cases may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions.  In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Case and the Claims and Equity Interests against the Debtor.

### 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtor or the need for further financial reorganization, unless the Plan contemplates such liquidation.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.

The Debtor and the Committee believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successor under the Plan.  In connection with the development of the

Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtor analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources.

Accordingly, the Debtor and the Committee believe that Confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtor.  Therefore, the Debtor and the Committee believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### 3.     Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Classes 3, 4, 5, 6, and 7 are Impaired under the Plan, and as a result, the Holders of Claims in Classes 3, 4, 5, and 6 are entitled to vote to accept or reject the Plan (Class 7 is conclusively deemed to reject the Plan).  Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein.  As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 4.     Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 5.     No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 6.     Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class. The Debtor submits that if the Debtor was to "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it would not "discriminate unfairly" and would satisfy the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims in that Class. The Debtor and the Committee believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**The Debtor and the Committee anticipate they will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.** To the extent that any of the Voting Classes vote to reject the Plan, the Debtor and the Committee reserve the right to seek (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.B. of the Plan.

The Debtor does not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtor and the Committee believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### D.    CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date. For a more detailed discussion of the conditions precedent to consummation of the Plan and the impact of failure to meet such conditions, see Article IX of the Plan.

## V.    CERTAIN SECURITIES LAW MATTERS

### A.    PLAN SECURITIES

The Plan provides for the Reorganized Debtor to distribute, among other things, the New Equity, to certain Holders of Allowed Claims and Equity Interests. The Debtor and the Committee believe that the New Equity will be "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and all applicable state securities laws.

### B.    ISSUANCE AND RESALE OF SECURITIES

### 1.    Exemptions from Registration Requirements of the Securities Act and Applicable State Securities Laws

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property. In reliance upon these exemptions, the Debtor and the Committee believe that the offer, issuance and distribution under the Plan of the New Equity Interests to the Holders of Allowed Claims and Equity Interests entitled to receive the New Equity Interests under the Plan (collectively, the "**New Equity Holders**"), following the filing of the Chapter 11 Cases may be made without registration under the Securities Act or any applicable state securities laws.

It is intended that the offer, issuance and distribution of the New Equity Interests to the New Equity Holders following the filing of the Chapter 11 Cases is covered by section 1145 of the Bankruptcy Code, subject to compliance with the New Organizational Documents, such New Equity Interests may be resold without registration under the

Securities Act or other federal securities laws.,   In addition, such New Equity Interests governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable state securities laws pursuant to various exemptions provided by the applicable states; however, the availability of such exemptions cannot be known unless applicable individual state securities laws are examined.

Recipients of the New Equity Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Bankruptcy Code, the Securities Act and any applicable state securities laws.

### 2.      Resale of Certain New Equity; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.  The Plan provides that neither the Debtor nor the Reorganized Debtor is an underwriter.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Under certain circumstances, holders of such New Equity Interests who are deemed to be "underwriters" may be entitled to resell their New Equity Interests pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if the required holding period has been met and if current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.

Whether any particular person would be deemed to be an "underwriter" (including whether the person is a "Controlling Person") with respect to such New Equity Interests would depend upon various facts and circumstances applicable to that person. Accordingly, neither the Debtor or the Committee express a view as to whether any person other than the Debtor or the Reorganized Debtor would be deemed an "underwriter" with respect to the New Equity Interests issued to the New Equity Holders, and, in turn, whether any person may freely resell such New Equity Interests. The Debtor and the Committee recommend that potential recipients of the New Equity Interests consult their own counsel concerning their ability to freely trade such securities under applicable federal securities law and state securities laws.

## VI.    PLAN-RELATED RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS

> WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD <u>NOT</u> BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

### A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

**1.    The Bankruptcy Court May Grant the Trustee Motion.**

While the Debtor does not believe the Bankruptcy Court will grant Drexler's Trustee Motion, in the event that the Trustee Motion is granted, the appointment of a Chapter 11 Trustee constitutes a default under the: (i) DIP Loan Documents; and (ii) Plan Support Agreement.  As a result, the Plan Proponents expect that the Debtor's Chapter 11 Case would immediately convert to a case under Chapter 7 of the Bankruptcy Code.

**2.    Parties in Interest May Object to the Classification of Claims and Equity Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor and the Committee believe that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

**3.    The Plan May Fail to Satisfy the Vote Requirement**

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtor and the Committee intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan of reorganization. There can be no assurance that the terms of any such alternative chapter 11 plan of reorganization would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan.

**4.    The Debtor and the Committee May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims and Equity Interests.

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 5. Nonconsensual Confirmation of the Plan May be Necessary

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtor and the Committee believe that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. The Debtor May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtor and Reorganized Debtor reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 7. Risk of Non-Occurrence of the Effective Date

Although the Debtor and the Committee believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### 8. Contingencies Will Not Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Court orders certain Allowed Claims or Interests to be subordinated to other Allowed Claims or Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims, Interests, and creditor recoveries that will be forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or Equity Interests may vary from the estimated Claims and Interests contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Interests under the Plan.

### B. RISK FACTORS THAT MAY AFFECT RECOVERIES UNDER THE PLAN

### 1. The Bankruptcy Court May Grant the Trustee Motion.

While the Debtor does not believe the Bankruptcy Court will grant Drexler's Trustee Motion, in the event that the Trustee Motion is granted, the appointment of a Chapter 11 Trustee constitutes a default under the: (i) DIP

Loan Documents; and (ii) Plan Support Agreement. As a result, the Plan Proponents expect that the Debtor's Chapter 11 Case would immediately convert to a case under Chapter 7 of the Bankruptcy Code.

### 2.     The Successful Bidder May Not Be Able to Close Its Asset Sale

The Successful Bidder may not be able to close its sale of the Assets. To the extent the Reorganized Debtor does not sell the Assets, the Reorganized Debtor may lack sufficient liquidity to continue operating as planned after the Effective Date, or may not be able to meet its operational needs. Any one of these failures may preclude the Reorganized Debtor from consummating the Plan. Although the Debtor anticipates that the Assets will be sold through the Sale and Confirmation Hearing, there is no guarantee that the sale of the Assets will be realized.

### C.     RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTOR'S BUSINESS

### 1.     Prolonged Continuation of the Chapter 11 Case is Likely to Harm the Debtor's Asset Values

The Debtor agreed to the Plan Support Agreement and the resulting sale process for certain of the Debtor's Assets in an effort to streamline the Debtor's confirmation process and exit bankruptcy. If, however, the sale and confirmation process is delayed by significant litigation from Drexler, the expense and length of such litigation could harm the Debtor's estate.

A long period of operations under Court protection could have a material adverse effect on the Debtor's business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue past the agreed upon sale and confirmation process set forth in the Plan Support Agreement, management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtor's businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that the public and will lose confidence in the Debtor's ability to reorganize their business successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtor will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, neither the Debtor nor the Committee can predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtor's operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 2.     Certain Tax Implications of the Debtor's Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtor

Holders of Allowed Claims should carefully review Section VIII herein, "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and this Chapter 11 Case may adversely affect the Reorganized Debtor.

### 3.     The Debtor May Be Controlled by Significant Holders

If the Plan contemplating the Restructuring is confirmed and consummated, Holders of the White Winston Claims will own a significant percent, if not all, of the New Equity Interests. If the Holders of the White Winston Claims acquire a significant portion of the New Equity Interests, or the Holders of a significant portion of the New Equity Interests were to act as a group, such Holders would be in a position to control the outcome of actions requiring approval of the equity interest owners. However, under the Plan, the Reorganized Debtor is not responsible for, and is released from, all claims and interests in any event.

### 4.     The New Equity Is Subject to Dilution.

The ownership percentage represented by the New Equity Interests distributed on the Effective Date under the Plan will be subject to dilution by securities that may be issued post-emergence, including any securities issued in connection with the conversion of any other options, warrants, convertible securities, capital calls, or exercisable securities.

### D.    DISCLOSURE STATEMENT DISCLAIMERS

#### 1.    The Information Contained Herein Is for Soliciting Votes Only

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

#### 2.    This Disclosure Statement Was Not Approved by the Securities and Exchange Commission

This Disclosure Statement has not been filed with the Commission or any state regulatory authority. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

#### 3.    The Disclosure Statement Contains Forward Looking Statements

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

#### 4.    No Legal or Tax Advice is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

#### 5.    No Admissions Are Made by this Disclosure Statement

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, Holders of Allowed Claims or Equity Interest or any other parties in interest.

#### 6.    No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtor or the Reorganized Debtor may seek to investigate, File and prosecute Claims and Equity Interest and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims or Objections to Claims.

7.    **Nothing Herein Constitutes a Waiver of any Rights to Object to Claims or Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtor or the Reorganized Debtor (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtor or its Estate are specifically or generally identified herein.

8.    **The Information Used Herein Was Provided to the Debtor and Was Relied Upon by the Debtor's Advisors**

Counsel to the Debtor has relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to the Debtor and the Committee performed certain limited due diligence in connection with the preparation of this Disclosure Statement, neither has verified independently the information contained herein.

9.    **The Potential Exists for Inaccuracies, and the Debtor has no Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor and the Committee, nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtor may subsequently update the information in this Disclosure Statement, neither the Debtor or the Committee has an affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.    **No Representations Made Outside of the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtor, the Chapter 11 Case or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtor, and the United States Trustee.

**VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**A.    Liquidation Under Chapter 7 of the Bankruptcy Code**

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtor's assets. A discussion of the effect that a chapter 7 liquidation would have on the recovery of holders of Claims is set forth in Section IV.C. herein, titled "Statutory Requirements for Confirmation of the Plan." In performing the liquidation analysis, the Debtor has assumed that all Holders of Claims will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation. The Debtor and the Committee believe that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) smaller distributions being made to creditors than those provided in the Plan because the Debtor's only real assets consist of the Receivables and the Medical Services, neither of which have any value in a liquidation, (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtor's operations, and (iv) the failure to realize the greater, going-concern value of all of the Debtor's assets.

**B.    Filing of an Alternative Plan of Reorganization**

If the Plan is not confirmed, the Debtor, the Committee or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of the Assets. During the negotiations prior to the filing of the Plan, the Debtor and the Committee explored various alternatives to the Plan.

The Debtor and the Committee believe that the Plan enables the Debtor to emerge from chapter 11 successfully and expeditiously, preserves its business and allows creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtor would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Although the administrative costs associated with a chapter 11 liquidation may be less than the costs associated with a chapter 7 liquidation, the fact still remains that the Debtor does not own substantial assets that have any value separate and apart from its business. Thus, although creditors would normally receive greater recoveries in a chapter 11 liquidation than in a chapter 7 liquidation, in the present case, creditors would receive little, if any recoveries in either instance. The Debtor and the Committee believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.

## VIII.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor, and the Plan as legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.    resolve any issues related to any matters adjudicated in the Chapter 11 Case;

5.    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtors or, as otherwise consistent and appropriate with the terms of the Plan, the Litigation Trustee after the Effective Date, *provided* that the Reorganized Debtor or, as otherwise consistent and appropriate with the terms of the Plan, the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or the Disclosure Statement;

8.    resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

9.    hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10.    issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

11.    enforce the terms of the Plan;

12.    enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.    resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan, the Disclosure Statement or the Plan Supplement; and

14.    enter an order concluding the Chapter 11 Case.

## IX.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### A.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to Holders of Allowed Claims. This summary is based on the Internal Revenue Code (the "**IRC**"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. No rulings or determinations of the IRS or any other taxing authorities have been sought or obtained with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion is for general information only and does not purport to address all aspects of U.S. federal income taxation that may be relevant to Holders of Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies or regulated investment companies). This discussion only addresses the tax consequences to Holders of Claims who have held such Claims as capital assets within the meaning of the IRC. No aspect of foreign, state, local or estate and gift taxation is addressed.

Importantly, the Debtor anticipates that the Restructuring Transactions (including the Plan itself) will be exempt from taxation pursuant to Section 1146 of the Bankruptcy Code. Accordingly, little or no tax liability will accrue if the Plan is confirmed.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX**

PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NONUNITED STATES TAX CONSEQUENCES OF THE PLAN.

### B.        IN GENERAL

The U.S. federal income tax consequences of the distributions contemplated by the Plan to Holders of Claims will depend upon a number of factors.  The character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided thereby will depend upon, among other things, (i) the manner in which a Holder acquired a Claim, (ii) the length of time the Claim has been Held, (iii) whether the Claim was acquired at a discount, (iv) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, (v) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim (vi) the method of tax accounting of the Holder, and (vii) whether the Claim is an installment obligation for U.S. federal income tax purposes.

For purposes of the following discussion, a "U.S. Holder" is any person (i) who is a citizen resident of the United States; (ii) that is a corporation or partnership created or organized in or under the laws of the United States or any state thereof of the District of Columbia; (iii) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control or (b) that has elected to continue to be treated as United States person for U.S. federal income tax purposes.  A "Non-U.S. Holder" is any person that is not U.S. Holder.  In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership.  Holders who are partnerships or partners in a partnership should consult their tax advisors.

Certain Holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers, and tax-exempt organizations) may be subject to special rules not addressed in this summary of the U.S. federal tax consequences.  There also may be state, local and/or foreign income or other tax considerations or U.S. federal estate and gift tax consideration applicable to Holders of Claims, which are not addressed herein.  EACH HOLDER OF A CLAIM OR EQUITY INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR WITH RESPECT TO DISTRIBUTIONS RECEIVED UNDER THE PLAN.

### C.        U.S. HOLDERS OF CLAIMS

A U.S. Holder should generally recognize capital gain or loss for U.S. income tax purposes in an amount equal to the difference between the amount of Cash (and other consideration received) under the Plan in respect of such Holder's Claim and the Holder's adjusted tax basis in the Claim.  To the extent a U.S. Holder received any Cash (or other consideration) in satisfaction of any accrued and unpaid interest, such Holder may recognize ordinary income or loss to the extent that such Cash (or other consideration) is allocable to the accrued and unpaid interest, unless such Holder has previously included the accrued interest in such Holder's taxable income.

### D.        NON-U.S. HOLDERS OF CLAIMS

A Non-U.S. Holder of a Claim generally will not be subject to the U.S. federal income tax with respect to any income or gain recognized upon the exchange of such Holder's Claim with Cash (or other property) pursuant to the Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain from the exchange is "effective connected" for U.S. federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.  To the extent any cash (or other consideration) is distributed for accrued and unpaid interest, however, a Non-U.S. Holder may be subject to U.S. withholding taxes at (30%) unless such Holder is qualified for the so-called "portfolio interest exemption" or eligible to claim a reduction or exemption under any applicable treaty and complies with certain required certification procedures.

### E.        IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

The U.S. federal income tax consequences to a Holder other than a Holder receiving Cash (or other property) in satisfaction of such Holder's Claim may be different from the tax consequences described above. Holders of each such Claim should consult their tax advisers regarding potential federal income tax consequences.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S., STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## X.    GLOSSARY OF DEFINED TERMS

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (f) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, success fees and Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 327, 328, 330(a), 331, or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date by any Retained Professionals in the Chapter 11 Case, that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been Filed for any such amount.

2.    "*Administrative Claim*" means any Claim for costs and expenses of administration of the Estate and the Chapter 11 Case under sections 327, 328, 330, 331, 1103, 503(b), 507(a), 507(b) or 1114(e)(2) of the Bankruptcy Code (excluding claims under section 503(b)(9) of the Bankruptcy Code), including, without limitation: (a) the actual and necessary costs and expenses incurred after the Commencement Date of preserving the Estate and operating the business of the Debtors; (b) Allowed Professional Compensation; and (c) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code (the Judicial Code), 28 U.S.C. §§ 1911-1930.

3.    "*Administrative Claim Bar Date*" means the end of the first Business Day occurring on or after the thirtieth (30th) calendar day after the Effective Date.

4.    "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

5.    "*Allowed*" means, with respect to Claims or Equity Interests: (a) any Claim or Equity Interest, proof of which is timely Filed by the applicable Claims Bar Date (or which by the Bankruptcy Code or Final Order is not or shall not be required to be Filed); (b) any Claim or Equity Interest that is listed in the Schedules as of the Effective Date as not contingent, not unliquidated and not Disputed (or disputed within the meaning of Section 1111(a)

of the Bankruptcy Code), and for which no Proof of Claim or Interest has been timely Filed; or (c) any Claim or Equity Interest Allowed pursuant to the Plan; *provided*, *however*, that with respect to any Claim or Equity Interest described in clause (a) above, such Claim or Equity Interest shall be considered Allowed only if and to the extent that (x) with respect to any Claim or Equity Interest, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) such an objection is so interposed and the Claim or Equity Interest shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor, the Reorganized Debtor, or the Litigation Trustee and without any further notice to or action, order or approval of the Bankruptcy Court.

6.      *"Allowed Administrative Claim"* means an Administrative Claim as to which no objection has been filed or, if any objection has been filed, has been resolved by the allowance of such Administrative Claim by a Final Order of the Bankruptcy Court; or which requires payment in the ordinary course and as to which there is no Final Order of the Bankruptcy Court in effect which prohibits any such payment.

7.      *"Allowed Professional Compensation"* means all Accrued Professional Compensation Allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

8.      *"Assets"* means all of the Debtor's right, title and interest of any nature in property, interests, assets, and/or effects, real and personal, tangible and intangible, wherever located or situated, as specified in section 541 of the Bankruptcy Code, including, without limitation, Causes of Action, and (for avoidance of doubt) the Avoidance Actions, provided, however, the Excluded Assets shall be specifically excluded from the Assets sold to the Purchaser at the Sale.

9.      *"Avoidance Actions"* means any and all claims and causes of action which any of the Debtor, the debtor in possession, the Estate, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 543, 544, 545, 547 through 553, or 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws, regardless of whether or not such action has been commenced on the Effective Date.

10.     *"Ballot"* means the form of ballot or ballots accompanying, and distributed with, the Disclosure Statement approved by the Bankruptcy Court upon which certain Holders of Impaired Claims (modified, as necessary, based on voting party in accordance with the Disclosure Statement Order) entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

11.     *"Bankruptcy Code"* means the Bankruptcy Reform Act of 1978, Title 11 United States Code, 11 U.S.C. §§ 101-1532 (as now in effect or hereafter amended), as applicable to the Chapter 11 Case.

12.     *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Nevada, having jurisdiction over the Chapter 11 Case , and to the extent of the withdrawal of any reference under section 157 of Title 28 of the United States Code and/or the Order of the United States District Court for the District of Nevada pursuant to section 157(a) of Title 28 of the United States Code, the United States District Court for the District of Nevada.

13.     *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure (collectively), as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

14.     *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)) and specifically excludes any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of Nevada.

15.     *"Cash"* means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and other similar items.

16.    "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Case, including through the Effective Date.

17.    "*Chapter 11 Case*" means the chapter 11 case pending before the Bankruptcy Court for the captioned Debtor under chapter 11 of the Bankruptcy Code.

18.    "*Claim*" means any claim against the Debtors as defined in section 101(5) of the Bankruptcy Code.

19.    "*Claims Bar Date*" means, as applicable, (a) <u>April 19, 2023</u>, as the general claims bar date and (b) the Governmental Bar Date of <u>June 13, 2023</u>, or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Filing such Claim(s).

20.    "*Claims Objection Bar Date*" means, for each Claim, the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims; *provided*, *however*, that in no event shall the Claims Objection Bar Date be greater than 120 days after the Effective Date with respect to any General Unsecured Claim in Class 5.

21.    "*Claims Register*" means the official register of Claims maintained by the Bankruptcy Court.

22.    "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

23.    "*Closing Date*" means the date of the closing of the Sale of the Debtor's Assets.

24.    "*Commencement Date*" means the date on which Debtor commenced the captioned Chapter 11 Case by Filing a voluntary petition for relief under Section 301 of the Bankruptcy Code, <u>December 15, 2022</u>.

25.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case, subject to all conditions specified in Article IX hereof having been: (a) satisfied; or (b) waived pursuant to Article IX.C hereof.

26.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

27.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

28.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

29.    "*Consummation*" means the occurrence of the Effective Date.

30.    "*Creditor*" means a Holder of a Claim.

31.    "*Cure Claim*" means a Claim based upon the Debtor's default on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor under sections 365 or 1123 of the Bankruptcy Code.

32.    "*Debtor*" means MusclePharm Corporation, a Nevada Corporation, in its individual capacity as debtor in the Chapter 11 Case.

33.      "*Debtor in Possession*" means the Debtor, as debtor in possession in this Chapter 11 Case.

34.      "*DIP Obligations*" means all amounts due and owing to Empery under the DIP Loan Documents and as authorized by the Final DIP Order.

35.      "*Disclosure Statement*" means the *Disclosure Statement for the Plan of Reorganization of MusclePharm Corporation Under Chapter 11 of the Bankruptcy Code*, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, which is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law.

36.      "*Disclosure Statement Motion*" means that certain *Motion for Order (i) Approving The Disclosure Statement; (ii) Approving The Form Of Ballots And Proposed Solicitation And Tabulation Procedures; (iii) Fixing The Voting Deadline With Respect To The Debtor's Chapter 11 Plan; (iv) Prescribing The Form And Manner Of Notice Thereof; (v) Fixing The Last Date For Filing Objections To The Chapter 11 Plan; (vi) Scheduling A Hearing To Consider Confirmation Of The Chapter 11 Plan; and (vii) Schwartz Law, PLLC as Solicitation and Tabulation Agent,* filed with the Bankruptcy Court on May 26, 2023, as the Motion may be amended from time to time.

37.      "*Disclosure Statement Order*" means that certain *Order (i) Approving The Disclosure Statement; (ii) Approving The Form Of Ballots And Proposed Solicitation And Tabulation Procedures; (iii) Fixing The Voting Deadline With Respect To The Debtor's Chapter 11 Plan; (iv) Prescribing The Form And Manner Of Notice Thereof; (v) Fixing The Last Date For Filing Objections To The Chapter 11 Plan; (vi) Scheduling A Hearing To Consider Confirmation Of The Chapter 11 Plan; and (vii) Appointing The Schwartz Law Firm, Inc. As Solicitation And Tabulation Agent,* approved by the Bankruptcy Court on [INSERT DATE], as the order may be amended from time to time.

38.      "*Disputed Claim*" means, with respect to any Claim or Equity Interests, any Claim or Equity Interests listed on (a) the Claims Register that is the subject of an objection to claim filed with the Bankruptcy Court, or (b) Scheduled as Disputed for which claim a proof of claim was filed.

39.      "*Distribution Agent*" means the Debtor, the Reorganized Debtor, or the Litigation Trustee.

40.      "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

41.      "*Effective Date*" or "*Plan Effective Date*" means the day that is the first Business Day occurring at least 14 days after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article IX.B hereof have been: (i) satisfied; or (ii) waived pursuant to Article IX.C hereof.

42.      "*Effective Date Deadline*" means August 31, 2023, unless extended pursuant to the terms of the Plan Support Agreement.

43.      "*Empery Parties*" means MP Collateral LLC, as successor to the claims of: (i) the Secured Noteholders (as defined in the Empery Proof of Claim); and (ii) Prestige Capital Finance, LLC, and Empery Tax Efficient, LP, in its capacity as MP Collateral's Financing Agent and as Collateral Agent.

44.      "*Empery Prepetition Secured Claim*" means the amount of $18,066,579.01 as set forth on the Empery Proof of Claim.

45.      "*Empery Proof of Claim*" means that certain proof of claim filed by MP Collateral and denominated on the Bankruptcy Court's official claim register as Proof of Claim No. 59 in the amount of $18,066,579.01.

46.      "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

47.    "*Equity Interest*" means any: (a) equity security in the Debtor as defined in Section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of stock, or membership interests in the Debtor, together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto or (b) partnership, limited liability company, or similar interest in the Debtor.

48.    "*Estate*" means, as to the Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

49.    "*Exchange Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local law.

50.    "*Excluded Assets*" means each of the following: (i) the Excluded IP; (ii) the Causes of Action; and (iii) the White Winston D&O Claims.

51.    "*Excluded IP*" means the intellectual property for Coco Protein™ which will remain property of the Estate.  The Estate, however, shall provide the Purchaser with an exclusive one-year license of the Excluded IP.

52.    "*Exculpated Parties*" means, collectively, and in the Chapter 11 Case in its capacity as such: (a) the Debtor and the Reorganized Debtor; (b) the Committee; (c) the Empery Parties, (d) the White Winston Parties; (e) the Retained Professionals, and (f) with respect to each of the foregoing Entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), and such Entity's and its current and former equity holders, officers, directors, managers, principals, members, managing members, employees, agents, advisory board members, subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, accountants, investment bankers, consultants, representatives, and attorneys (again, each in their capacity as such).

53.    "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

54.    "*Fee Claim*" means a Claim under sections 327, 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for Accrued Professional Compensation.

55.    "*File*" or "*Filed*" means file, filed or filing with the Bankruptcy Court or its authorized designee in this Chapter 11 Case.

56.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in the Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, re-argument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, re-argument or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

57.    "*General Unsecured Claim*" means a claim against the Debtors that is not (i) an Administrative Claim, (ii) a Priority Tax Claim, (iii) Priority Non-Tax Claim, (iv) Fee Claim, or (v) Secured Claim.

58.    "*Governmental Bar Date*" means June 13, 2023, or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Filing such Claim(s) by governmental units encompassed by Section 101(27) of the Bankruptcy Code.

59.    "*Holder*" means an Entity holding a Claim or an Equity Interest.

60.     "*Impaired*" means any Claims in an Impaired Class.

61.     "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

62.     "*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when distributions under the Plan shall commence.

63.     "*Insider*" shall have the meaning ascribed to it under Section 101(31) of the Bankruptcy Code.

64.     "*Litigation Trust*" means that certain grantor trust created for the benefits of holders of Class 5 Claims and as further described in Article III(E)(5) of this Disclosure Statement.

65.     "*MP Collateral*" means MP Collateral LLC, as successor to the claims of: (i) the Secured Noteholders (as defined in the Empery Proof of Claim); and (ii) Prestige Capital Finance, LLC.

66.     "*Net Sale Proceeds*" means the cash proceeds from the Sale *less* any fees and expenses related to such Sale, *less* the DIP Obligation Payoff, and *less* the Wind-down Budget.

67.     "*New Equity Interests*" means the equity in Reorganized Debtors to be authorized, issued or reserved on the Effective Date pursuant to the Plan, which shall constitute all of the direct or indirect equity of the Reorganized Debtors.

68.     "*Official Actions*" means actions taken by the Exculpated Parties in their official capacities in the Chapter 11 Case after the Commencement Date through the Confirmation Date.

69.     "*Other Secured Claims*" means all other Secured Claims against the Debtor, other than the Empery Prepetition Secured Claim and the Prestige Prepetition Secured Claim.

70.     "*Periodic Distribution Date*" means, the first Business Day that is as soon as reasonably practicable occurring no later than approximately 180 days after the Initial Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring no later than 180 days after the immediately preceding Periodic Distribution Date.

71.     "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

72.     "*Plan*" means this *Plan of Reorganization of MusclePharm Corporation Under Chapter 11 of the Bankruptcy Code Dated May ]26, 2023*, as amended, supplemented, or modified from time to time, including, without limitation, the Plan Supplement, which is incorporated herein by reference.

73.     "*Plan Administrator*" means the Litigation Trustee or such other Person appointed pursuant to the confirmed Plan and the Bankruptcy Court's order confirming the Plan to administer Plan Holders of Allowed Class 5 General Unsecured Claims.

74.     "*Plan Proponents*" means the Debtor and the Committee.

75.     "*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules.  The Plan Supplement shall be filed by the Debtor on a date that is 14 calendar days prior to the Confirmation Hearing.

76.     "*Prestige Prepetition Secured Claim*" means the amount of $2,737,003.11 and denominated on the Bankruptcy Court's official claim register as Proof of Claim No. 14.

77.    "*Priority Non-Tax Claim*" means any Claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

78.    "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

79.    "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Case.

80.    "*Proof of Interest*" means proof of Equity Interest filed against the Debtor in the Chapter 11 Case.

81.    "*Pro Rata*" means the proportion that an Allowed Claim or Equity Interest in a particular Class bears to the aggregate amount of Allowed Claims or Equity Interests in that Class, or the proportion that Allowed Claims or Equity Interests in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Equity Interest under the Plan.

82.    "*Purchaser*" means the ultimate purchaser of the Debtor's Assets (less the Excluded Assets) at the Sale.

83.    "*Record Date*" means the close of business on June 13, 2023.

84.    "*Released Parties*" means Debtor, the Committee, the Empery Parties, and the White Winston Parties

85.    "*Releasing Parties*" means Debtor, the Committee, the Empery Parties, and the White Winston Parties.

86.    "*Reorganized Debtor*" means the Debtor, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

87.    "*Restructuring Transaction*" means any of those restructuring transactions and alternatives set forth in Article V.

88.    "*Retained Professional*" means any Entity: (a) employed in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

89.    "*Sale*" means the sale of certain of the Estate's Assets (except for the Excluded Assets, which shall not be sold) pursuant to section 363 of the Bankruptcy Code in accordance with the terms of the Plan and the Bidding Procedures.

90.    "*Schedules*" mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

91.    "*Securities Act*" means the United States Securities Act of 1933, as amended.

92.    "*SL*" means Schwartz Law, PLLC.

93.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.  A list of the Debtor's Unexpired Leases appears on Schedule G of the Schedules (*See* ECF Nos. 78 and 116).

94.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

95.    "*Unimpaired Class*" means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

96.    "*Voting Classes*" means Classes 3, 4, 5, and 6.

97.    "*Voting Deadline*" means [INSERT DATE] at 5:00 p.m. prevailing Pacific Time for all Holders of Claims, which is the date and time by which all Ballots must be received by the Debtors in accordance with the Disclosure Statement Order, or such other date and time as may be established by the Bankruptcy Court with respect to any Voting Class.

98.    "*White Winston D&O Claims*" means the Estate's causes of action (and associated rights to director and officer insurance) against directors and officers for breaches of their fiduciary duties of loyalty, care, and good faith that arose on or before December 31, 2018.

99.    "*White Winston Parties*" means White Winston Select Asset Funds, LLC and White Winston Select Asset Fund Series Fund MP-18, LLC.

100.    "*Wind-down Budget*" means that certain budget mutually agreed to between the Debtor, the Committee and Empery regarding the amount of cash required to fund the Estate through the Plan Effective Date, inclusive of amounts necessary to pay unclassified claims and Class 2 Claims.

## XI.    RECOMMENDATION

In the opinion of the Debtor and the Committee, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtor's creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtor and the Committee recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

MusclePharm Corporation

By:    /s/_____
       Eric Hillman
       Its Chief Executive Officer


       /s/ Samuel A. Schwartz_____
       Samuel A. Schwartz, Esq.
       Schwartz Law, PLLC
       Attorneys for the Debtor

# EXHIBIT A

# EXHIBIT A

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.385.2741

Attorneys for the Debtor

John D. Fiero, Esq. (admitted pro hac vice)
jfiero@pszjlaw.com
Jason H. Rosell, Esq. (admitted pro hac vice)
jrosell@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES, LLC
One Sansome Street, 34th Floor, Suite 3430
San Francisco, CA 94104
Telephone: 415.263.7000

Matthew C. Zirzow, Esq.
Nevada Bar No. 7222
mzirzow@lzlawnv.com
Zachariah Larson, Esq.
Nevada Bar No. 7787
zlarson@lzlawnv.com
LARSON & ZIRZOW LLC
850 East Bonneville Avenue
Las Vegas, NV 89101
Telephone: 702.382.1170

Counsel to the Official
Committee of Unsecured Creditors

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re: | ) | Case No.: 22-14422-nmc |
| | ) | |
| MUSCLEPHARM CORPORATION, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**PLAN OF REORGANIZATION FOR MUSCLEPHARM CORPORATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE DATED MAY 26, 2023**

# TABLE OF CONTENTS

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND
DEFINED TERMS ....................................................................................................................... 1
    A.      Rules of Interpretation, Computation of Time and Governing Law .................................. 1
    B.      Defined Terms ................................................................................................................... 1

ARTICLE II. ADMINISTRATIVE AND PRIORITY TAX CLAIMS .......................................................... 9
    A.      Administrative Claims ...................................................................................................... 9
    B.      Priority Tax Claims ......................................................................................................... 10

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY
INTERESTS ................................................................................................................................ 11
    A.      Summary ......................................................................................................................... 11
    B.      Classification and Treatment of Claims and Equity Interests ........................................ 11
    C.      Discharge of Claims ........................................................................................................ 14

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN .............................................................. 14
    A.      Presumed Acceptance of Plan ......................................................................................... 14
    B.      Presumed Non-Acceptance of Plan ................................................................................ 14
    C.      Voting Classes ................................................................................................................ 14
    D.      Acceptance by Impaired Classes of Claims .................................................................... 14
    E.      Cramdown ....................................................................................................................... 15
    F.      Elimination of Vacant Classes ....................................................................................... 15

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................................... 15
    A.      General Settlement of Claims and Interests .................................................................... 15
    B.      Restructuring Transactions .............................................................................................. 15
    C.      New Corporate Existence ................................................................................................ 16
    D.      Vesting of Assets in the Litigation Trust ....................................................................... 16
    E.      Vesting of Assets in the Reorganized Debtor ................................................................ 16
    F.      Securities Registration Exemption .................................................................................. 16
    G.      Issuance and Distribution of New Equity Interests ........................................................ 17
    H.      Certificate of Incorporation and Bylaws ........................................................................ 17
    I.      Effectuating Documents, Further Transactions, Exemption from Certain Transfer Taxes ............ 17
    J.      Preservation of Public Entity Status ............................................................................... 17
    K.      Preservation of Tax Attributes ....................................................................................... 18

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....................... 19
    A.      Assumption and Rejection of Executory Contracts and Unexpired Leases .................... 19
    B.      Claims on Account of the Rejection of Executory Contracts or Unexpired Leases ........ 21
    C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .................. 21

ARTICLE VII. ............................................................................................................................... 21
    A.      Releases .......................................................................................................................... 21

ARTICLE VIII. PROVISIONS GOVERNING DISTRIBUTIONS ............................................................ 25
    A.      Distributions for Claims Allowed as of the Effective Date ............................................ 25
    B.      Distributions on Account of Claims Allowed After the Effective Date .......................... 26
    C.      Delivery and Distributions and Undeliverable or Unclaimed Distributions .................. 26
    D.      Compliance with Tax Requirements/Allocations ........................................................... 26
    E.      Timing and Calculation of Amounts to Be Distributed .................................................. 27
    F.      Setoffs ............................................................................................................................ 27

ARTICLE IX. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED
 CLAIMS ................................................................................................................................ 27
  A. Resolution of Disputed Claims ................................................................................. 27
  B. Disallowance of Claims ............................................................................................ 28
  C. Amendments to Claims ............................................................................................. 29

ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
 PLAN ..................................................................................................................................... 29
  A. Conditions Precedent to Confirmation ..................................................................... 29
  B. Conditions Precedent to Consummation on the Effective Date ................................ 29
  C. Waiver of Conditions ................................................................................................ 29
  D. Effect of Non-Occurrence of Conditions to Consummation .................................... 29

ARTICLE XI. ............................................................................................................................. 30
  A. Compromise and Settlement ..................................................................................... 30
  B. Preservation of Rights of Action .............................................................................. 30

ARTICLE XII. BINDING NATURE OF PLAN ........................................................................ 31

ARTICLE XIII. RETENTION OF JURISDICTION ................................................................. 31

ARTICLE XIV. MISCELLANEOUS PROVISIONS ................................................................ 32
  A. Payment of Statutory Fees ........................................................................................ 32
  B. Modification of Plan ................................................................................................. 32
  C. Revocation of Plan ................................................................................................... 33
  D. Successors and Assigns ............................................................................................ 33
  E. Reservation of Rights ............................................................................................... 33
  F. Section 1146 Exemption ........................................................................................... 33
  G. Further Assurances ................................................................................................... 33
  H. Severability ............................................................................................................... 33
  I. Service of Documents ............................................................................................... 34
  J. Return of Security Deposits ...................................................................................... 34
  K. Filing of Additional Documents ............................................................................... 34
  L. Default ...................................................................................................................... 34

**PLAN OF REORGANIZATION OF MUSCLEPHARM CORPORATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE DATED MAY 26, 2023**

MusclePharm Corporation (the "**Debtor**"), the debtor and debtor-in-possession in the above-captioned chapter 11 case, filed its petition for relief under Chapter 11 of the Bankruptcy Code on December 15, 2022. This Plan of Reorganization (as amended, supplemented, or modified, the "**Plan**") is proposed by the Plan Proponents, for the resolution of Claims against the Debtor pursuant to chapter 11 of the Bankruptcy Code.

The Plan sets forth a proposal for the resolution of all Claims against the Debtor and the Estate pursuant to the terms of this Plan.

PLEASE REFER TO THE SEPARATE DISCLOSURE STATEMENT FOR INFORMATION REGARDING THIS PLAN. THE DEBTOR ENCOURAGES ALL HOLDERS OF CLAIMS AND/OR INTERESTS THAT ARE OTHERWISE ELIGIBLE TO VOTE ON THIS PLAN TO READ <u>BOTH</u> THE DISCLOSURE STATEMENT AND PLAN <u>IN THEIR ENTIRETY</u> BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. QUESTIONS REGARDING YOUR RIGHTS SHOULD BE DIRECTED TO YOUR OWN COUNSEL. NO OTHER MATERIALS OTHER THAN THE DISCLOSURE STATEMENT AND THE VARIOUS EXHIBITS AND SCHEDULES ATTACHED TO OR INCORPORATED BY THE DISCLOSURE STATEMENT AND THE VARIOUS EXHIBITS AND SCHEDULES ATTACHED TO OR INCORPORATED THEREIN HAVE BEEN APPROVED FOR USE IN SOLICITING ACCEPTANCE OR REJECTION OF THE PLAN.

# ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

*A.     Rules of Interpretation, Computation of Time and Governing Law*

1.     For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.     The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

*B.     Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.     "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, success fees and Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and

allowable under sections 327, 328, 330(a), 331, or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date by any Retained Professionals in the Chapter 11 Case, that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been Filed for any such amount.

2.        "*Administrative Claim*" means any Claim for costs and expenses of administration of the Estate and the Chapter 11 Case under sections 327, 328, 330, 331, 1103, 503(b), 507(a), 507(b) or 1114(e)(2) of the Bankruptcy Code (excluding claims under section 503(b)(9) of the Bankruptcy Code), including, without limitation: (a) the actual and necessary costs and expenses incurred after the Commencement Date of preserving the Estate and operating the business of the Debtor; (b) Allowed Professional Compensation; and (c) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code (the Judicial Code), 28 U.S.C. §§ 1911-1930.

3.        "*Administrative Claim Bar Date*" means the end of the first Business Day occurring on or after the thirtieth (30th) calendar day after the Effective Date.

4.        "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

5.        "*Allowed*" means, with respect to Claims or Equity Interests: (a) any Claim or Equity Interest, proof of which is timely Filed by the applicable Claims Bar Date (or which by the Bankruptcy Code or Final Order is not or shall not be required to be Filed); (b) any Claim or Equity Interest that is listed in the Schedules as of the Effective Date as not contingent, not unliquidated and not Disputed (or disputed within the meaning of Section 1111(a) of the Bankruptcy Code), and for which no Proof of Claim or Interest has been timely Filed; or (c) any Claim or Equity Interest Allowed pursuant to the Plan; *provided*, *however,* that with respect to any Claim or Equity Interest described in clause (a) above, such Claim or Equity Interest shall be considered Allowed only if and to the extent that (x) with respect to any Claim or Equity Interest, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) such an objection is so interposed and the Claim or Equity Interest shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor, the Reorganized Debtor, or the Litigation Trustee and without any further notice to or action, order or approval of the Bankruptcy Court.

6.        "*Allowed Administrative Claim*" means an Administrative Claim as to which no objection has been filed or, if any objection has been filed, has been resolved by the allowance of such Administrative Claim by a Final Order of the Bankruptcy Court; or which requires payment in the ordinary course and as to which there is no Final Order of the Bankruptcy Court in effect which prohibits any such payment.

7.        "*Allowed Professional Compensation*" means all Accrued Professional Compensation Allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

8.        "*Assets*" means all of the Debtor's right, title and interest of any nature in property, interests, assets, and/or effects, real and personal, tangible and intangible, wherever located or situated, as specified in section 541 of the Bankruptcy Code, including, without limitation, Causes of Action, and (for avoidance of doubt) the Avoidance Actions, provided, however, the Excluded Assets shall be specifically excluded from the Assets sold to the Purchaser at the Sale.

9.        "*Avoidance Actions*" means any and all claims and causes of action which any of the Debtor, the debtor in possession, the Estate, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 543, 544, 545, 547 through 553, or 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws, regardless of whether or not such action has been commenced on the Effective Date.

10.        "*Ballot*" means the form of ballot or ballots accompanying, and distributed with, the Disclosure Statement approved by the Bankruptcy Court upon which certain Holders of Impaired Claims (modified, as necessary, based on voting party in accordance with the Disclosure Statement Order) entitled to vote shall, among other things,

indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

11.      *"Bankruptcy Code"* means the Bankruptcy Reform Act of 1978, Title 11 United States Code, 11 U.S.C. §§ 101-1532 (as now in effect or hereafter amended), as applicable to the Chapter 11 Case.

12.      *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Nevada, having jurisdiction over the Chapter 11 Case, and to the extent of the withdrawal of any reference under section 157 of Title 28 of the United States Code and/or the Order of the United States District Court for the District of Nevada pursuant to section 157(a) of Title 28 of the United States Code, the United States District Court for the District of Nevada.

13.      *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure (collectively), as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

14.      *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)) and specifically excludes any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of Nevada.

15.      *"Cash"* means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and other similar items.

16.      *"Causes of Action"* means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Case, including through the Effective Date.

17.      *"Chapter 11 Case"* means the chapter 11 case pending before the Bankruptcy Court for the captioned Debtor under chapter 11 of the Bankruptcy Code.

18.      *"Claim"* means any claim against the Debtor as defined in section 101(5) of the Bankruptcy Code.

19.      *"Claims Bar Date"* means, as applicable, (a) <u>April 19, 2023</u>, as the general claims bar date and (b) the Governmental Bar Date of <u>June 13, 2023</u>, or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Filing such Claim(s).

20.      *"Claims Objection Bar Date"* means, for each Claim, the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims; *provided, however*, that in no event shall the Claims Objection Bar Date be greater than 120 days after the Effective Date with respect to any General Unsecured Claim in Class 5.

21.      *"Claims Register"* means the official register of Claims maintained by the Bankruptcy Court.

22.      *"Class"* means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

23.      *"Closing Date"* means the date of the closing of the Sale of the Debtor's Assets.

24.      *"Commencement Date"* means the date on which Debtor commenced the captioned Chapter 11 Case by Filing a voluntary petition for relief under Section 301 of the Bankruptcy Code, <u>December 15, 2022</u>.

25.      *"Committee"* means the Official Committee of Unsecured Creditors for MusclePharm Corporation.

26.　　"*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case, subject to all conditions specified in Article IX hereof having been: (a) satisfied; or (b) waived pursuant to Article IX.C hereof.

27.　　"*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

28.　　"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

29.　　"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30.　　"*Consummation*" means the occurrence of the Effective Date.

31.　　"*Creditor*" means a Holder of a Claim.

32.　　"*Cure Claim*" means a Claim based upon the Debtor's default on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor under sections 365 or 1123 of the Bankruptcy Code.

33.　　"*Debtor*" means MusclePharm Corporation, a Nevada corporation, in its individual capacity as debtor in the Chapter 11 Case.

34.　　"*Debtor in Possession*" means the Debtor, as debtor in possession in this Chapter 11 Case.

35.　　"*DIP Factoring Purchase Agreement*" means that certain Debtor-in-Possession Factoring Purchase Agreement entered into by and between the Debtor and Empery in connection with the DIP Financing.

36.　　"*DIP Financing*" means the post-petition financing between the Debtor, as borrower, and Empery, as lender, which authorizes the Debtor to: (i) borrow up to $4,500,000 from Empery, (ii) factor receivables up to $10,000,000 from Empery, and (iii) obtain an inventory acquisition line from JW Nutritional, LLC up to $1,000,000.

37.　　"*DIP Loan Documents*" means the DIP Notes Purchase Agreement and the DIP Factoring Purchase Agreement, each of which are attached to the Final DIP Order [ECF No. 296, pp. 34-156].

38.　　"*DIP Notes Purchase Agreement*" means that certain Debtor-in-Possession Notes Purchase and Security Agreement entered into by and between the Debtor and Empery in connection with the DIP Financing.

39.　　"*DIP Obligations*" means all amounts due and owing to Empery under the DIP Loan Documents and as authorized by the Final DIP Order.

40.　　"*Disclosure Statement*" means the *Disclosure Statement for the Plan of Reorganization of MusclePharm Corporation Under Chapter 11 of the Bankruptcy Code*, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, which is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law.

41.　　"*Disclosure Statement Motion*" means that certain *Motion for Order (i) Approving The Disclosure Statement; (ii) Approving The Form Of Ballots And Proposed Solicitation And Tabulation Procedures; (iii) Fixing The Voting Deadline With Respect To The Debtor's Chapter 11 Plan; (iv) Prescribing The Form And Manner Of Notice Thereof; (v) Fixing The Last Date For Filing Objections To The Chapter 11 Plan; (vi) Scheduling A Hearing To Consider Confirmation Of The Chapter 11 Plan; and (vii) Schwartz Law, PLLC as Solicitation and Tabulation Agent,* filed with the Bankruptcy Court on May 26, 2023, as the Motion may be amended from time to time.

42. "*Disclosure Statement Order*" means that certain *Order (i) Approving The Disclosure Statement; (ii) Approving The Form Of Ballots And Proposed Solicitation And Tabulation Procedures; (iii) Fixing The Voting Deadline With Respect To The Debtor's Chapter 11 Plan; (iv) Prescribing The Form And Manner Of Notice Thereof; (v) Fixing The Last Date For Filing Objections To The Chapter 11 Plan; (vi) Scheduling A Hearing To Consider Confirmation Of The Chapter 11 Plan; and (vii) Appointing The Schwartz Law Firm, Inc. As Solicitation And Tabulation Agent,* approved by the Bankruptcy Court on [INSERT DATE], as the order may be amended from time to time.

43. "*Disputed Claim*" means, with respect to any Claim or Equity Interests, any Claim or Equity Interests listed on (a) the Claims Register that is the subject of an objection to claim filed with the Bankruptcy Court, or (b) Scheduled as Disputed for which claim a proof of claim was filed.

44. "*Distribution Agent*" means the Debtor, the Reorganized Debtor, or the Litigation Trustee.

45. "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

46. "*Drexler*" means Ryan Drexler, an individual, and the Debtor's former Chief Executive Officer and former Chairman of the Board of Directors.

47. "*Effective Date*" or "*Plan Effective Date*" means the day that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article IX.B hereof have been: (i) satisfied; or (ii) waived pursuant to Article IX.C hereof.

48. "*Effective Date Deadline*" means August 31, 2023, unless extended pursuant to the terms of the Plan Support Agreement.

49. "*Empery*" means Empery Tax Efficient, LP, in its capacity as collateral agent for certain Secured Noteholders (as defined in the Empery Proof of Claim).

50. "*Empery Parties*" means MP Collateral LLC, as successor to the claims of: (i) the Secured Noteholders (as defined in the Empery Proof of Claim); and (ii) Prestige Capital Finance, LLC, and Empery Tax Efficient, LP, in its capacity as MP Collateral's Financing Agent and as Collateral Agent.

51. "*Empery Prepetition Secured Claim*" means the amount of $18,066,579.01 as set forth on the Empery Proof of Claim.

52. "*Empery Proof of Claim*" means that certain proof of claim filed by MP Collateral and denominated on the Bankruptcy Court's official claim register as Proof of Claim No. 59 in the amount of $18,066,579.01.

53. "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

54. "*Equity Interest*" means any: (a) equity security in the Debtor as defined in Section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of stock, or membership interests in Debtor, together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto or (b) partnership, limited liability company, or similar interest in the Debtor.

55. "*Estate*" means, as to the Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

56. "*Exchange Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local law.

57.    "*Excluded Assets*" means each of the following: (i) the Excluded IP; (ii) the Causes of Action; and (iii) the White Winston D&O Claims.

58.    "*Excluded IP*" means the intellectual property for Coco Protein™ which will remain property of the Estate. The Estate, however, shall provide the Purchaser with an exclusive one-year license of the Excluded IP.

59.    "*Exculpated Parties*" means, collectively, and in the Chapter 11 Case in its capacity as such: (a) the Debtor and the Reorganized Debtor; (b) the Committee; (c) the Empery Parties; (d) the White Winston Parties; and (e) the Retained Professionals; and (f) with respect to each of the foregoing Entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), and such Entity's and its current and former equity holders, officers, directors, managers, principals, members, managing members, employees, agents, advisory board members, subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, accountants, investment bankers, consultants, representatives, and attorneys (again, each in their capacity as such).

60.    "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code. A list of the Debtor's Executory Contracts is included in Schedule G of Debtor's Schedules (ECF Nos. 78 and 116, as applicable).

61.    "*Fee Claim*" means a Claim under sections 327, 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for Accrued Professional Compensation.

62.    "*File*" or "*Filed*" means file, filed or filing with the Bankruptcy Court or its authorized designee in this Chapter 11 Case.

63.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in the Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, re-argument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, re-argument or rehearing being timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

64.    "*Final DIP Order*" means that certain order approving the DIP Financing on a final basis entered by the Bankruptcy Court on March 8, 2023 [ECF No. 296], which authorized the Debtor to: (i) borrow up to $4,500,000 from Empery, (ii) factor receivables up to $10,000,000 from Empery, and (iii) obtain an inventory acquisition line from Empery of up to $1,000,000.

65.    "*General Unsecured Claim*" means a claim against the Debtor that is not (i) an Administrative Claim, (ii) a Priority Tax Claim, (iii) Priority Non-Tax Claim, (iv) Fee Claim, (v) Secured Claim or (vi) Warehouse Claim.

66.    "*Governmental Bar Date*" means June 13, 2023, or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Filing such Claim(s) by governmental units encompassed by Section 101(27 of the Bankruptcy Code.

67.    "*Holder*" means an Entity holding a Claim or an Equity Interest.

68.    "*Impaired*" means any Claims in an Impaired Class.

69.    "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

70.     "*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when distributions under the Plan shall commence.

71.     "*Insider*" shall have the meaning ascribed to it under Section 101(31) of the Bankruptcy Code.

72.     "*Litigation Trust*" means that certain grantor trust created for the benefits of holders of Class 5 Claims and as further described in Article V(E) of this Plan

73.     "*MP Collateral*" means MP Collateral LLC, as successor to the claims of: (i) the Secured Noteholders (as defined in the Empery Proof of Claim); and (ii) Prestige Capital Finance, LLC.

74.     "*Net Sale Proceeds*" means the cash proceeds from the Sale *less* any fees and expenses related to such Sale, *less* the DIP Obligation Payoff, and *less* the Wind-down Budget.

75.     "*New Equity Interests*" means the equity in Reorganized Debtor to be authorized, issued or reserved on the Effective Date pursuant to the Plan, which shall constitute all of the direct or indirect equity of the Reorganized Debtor.

76.     "*Official Actions*" means actions taken by the Exculpated Parties in their official capacities in the Chapter 11 Case after the Commencement Date through the Confirmation Date.

77.     "*Other Secured Claims*" means all other Secured Claims against the Debtor, other than the Empery Prepetition Secured Claim and the Prestige Prepetition Secured Claim.

78.     "*Periodic Distribution Date*" means, the first Business Day that is as soon as reasonably practicable occurring no later than approximately 180 days after the Initial Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring no later than 180 days after the immediately preceding Periodic Distribution Date.

79.     "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

80.     "*Plan*" means this *Plan of Reorganization of MusclePharm Corporation Under Chapter 11 of the Bankruptcy Code Dated May 26], 2023*, as amended, supplemented, or modified from time to time, including, without limitation, the Plan Supplement, which is incorporated herein by reference.

81.     "*Plan Administrator*" means the Litigation Trustee or such other Person appointed pursuant to the confirmed Plan and the Bankruptcy Court's order confirming the Plan to administer payments to Holders of Allowed Class 5 General Unsecured Claims.

82.     "*Plan Proponents*" means the Debtor and the Committee.

83.     "*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules.  The Plan Supplement shall be filed by the Debtor on a date that is fourteen (14) calendar days prior to the Confirmation Hearing.

84.     "*Plan Support Agreement*" means that certain Plan Support Agreement dated May 18, 2023, by and between the Debtor, the Committee, the Empery Parties and the White Winston Parties.

85.     "*Prestige*" means Prestige Capital Finance, LLC.

86.     "*Prestige Prepetition Secured Claim*" means the amount of $2,737,003.11 and denominated on the Bankruptcy Court's official claim register as Proof of Claim No. 14.

87.     "*Priority Non-Tax Claim*" means any Claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

88.     "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

89.     "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Case.

90.     "*Proof of Interest*" means proof of Equity Interest filed against the Debtor in the Chapter 11 Case.

91.     "*Pro Rata*" means the proportion that an Allowed Claim or Equity Interest in a particular Class bears to the aggregate amount of Allowed Claims or Equity Interests in that Class, or the proportion that Allowed Claims or Equity Interests in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Equity Interest under the Plan.

92.     "*Purchaser*" means the ultimate purchaser of the Debtor's Assets (less the Excluded Assets) at the Sale.

93.     "*Record Date*" means the close of business on June 13, 2023.

94.     "*Released Parties*" means Debtor, the Committee, the Empery Parties, and the White Winston Parties

95.     "*Releasing Parties*" means Debtor, the Committee, the Empery Parties, and the White Winston Parties.

96.     "*Reorganized Debtor*" means the Debtor, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

97.     "*Restructuring Transaction*" means any of those restructuring transactions and alternatives set forth in Article V.

98.     "*Retained Professional*" means any Entity: (a) employed in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; or (c) retained pursuant to Section 363(b) of the Bankruptcy Code and to be compensated for services rendered in accordance with compensated in accordance with Sections 330 and 331 of the Bankruptcy Code.

99.     "*Roll-Up*" means that certain roll-up of the prepetition Empery Loans on a dollar for dollar basis of the amounts loaned to the Debtor under the DIP Financing and the DIP Notes Purchase Agreement, up to a total roll-up of $4,500,000.

100.    "*Sale*" means the sale of certain of the Estate's Assets (except for the Excluded Assets, which shall not be sold) pursuant to section 363 of the Bankruptcy Code in accordance with the terms of the Plan and the Bidding Procedures.

101.    "*Schedules*" mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

102.    "*Securities Act*" means the United States Securities Act of 1933, as amended.

103.    "*SL*" means Schwartz Law, PLLC.

104.　　"*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.  A list of the Debtor's Unexpired Leases appears on Schedule G of the Schedules (*See* ECF Nos. 78 and 116).

105.　　"*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

106.　　"*Unimpaired Class*" means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

107.　　"*Voting Classes*" means, Classes 3, 4, 5 and 6.

108.　　"*Voting Deadline"* means [INSERT DATE] at 5:00 p.m. prevailing Pacific Time for all Holders of Claims, which is the date and time by which all Ballots must be received by the Debtor in accordance with the Disclosure Statement Order, or such other date and time as may be established by the Bankruptcy Court with respect to any Voting Class.

109.　　"*WW Adversary Proceeding*" means that certain Adversary Case No. 23-01014, entitled *White Winston Select Asset Funds, LLC v. Empery Tax Efficient, LP, et al.*

110.　　"*WW Settlement Agreement*" means that certain settlement agreement dated December 5, 2022, by and between the Debtor and White Winston.

111.　　"*White Winston*" means White Winston Select Asset Funds, LLC.

112.　　"*White Winston D&O Claims*" means the Estate's causes of action (and associated rights to director and officer insurance) against directors and officers for breaches of their fiduciary duties of loyalty, care, and good faith that arose on or before December 31, 2018.

113.　　"*White Winston Parties*" means White Winston Select Asset Funds, LLC and White Winston Select Asset Fund Series Fund MP-18, LLC.

114.　　"*Wind-down Budget*" means that certain budget mutually agreed to between the Debtor, the Committee and Empery regarding the amount of cash required to fund the Estate through the Plan Effective Date, inclusive of amounts necessary to pay unclassified claims and Class 2 Claims.

# ARTICLE II.

## ADMINISTRATIVE AND PRIORITY TAX CLAIMS

A.　　*Administrative Claims*

Each Holder of an Allowed Administrative Claim shall be paid the full unpaid amount of such Claim in Cash (a) on or as soon as reasonably practicable after the Effective Date, (b) if such Claim is Allowed after the Effective Date, on or as soon as reasonably practicable after the date such Claim is Allowed, or (c) upon such other terms as may be agreed upon by the Debtor or the Reorganized Debtor, the Plan Administrator or the Litigation Trustee, as applicable, and such Holder or otherwise upon an order of the Bankruptcy Court; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case, other than those liabilities constituting or relating to commercial tort claims or patent, trademark or copyright infringement claims, shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents related to such transactions, and Holders of Claims related to such ordinary course liabilities are not required to File or serve any request for payment of such Administrative Claims.

Quarterly fees payable to the Office of the United States Trustee do not require allowance under section 503 and shall not be subject to the Administrative Expense Claim Bar Date.

    1.    <u>Bar Date for Administrative Claims</u>

Except as otherwise provided in this Article II.A hereof, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than forty-five (45) days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims, including, without limitation, Holders of Claims for liabilities constituting or relating to commercial tort claims or patent, trademark or copyright infringement claims who assert that such claims constitute Administrative Claims, that do not File and serve such a request by the applicable Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtor or the Estate and property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Debtor and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by the Bankruptcy Court and/or on motion of a party in interest approved by the Bankruptcy Court.

    2.    <u>Professional Compensation and Reimbursement Claims</u>

Retained Professionals or other Entities asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Debtor or the Litigation Trustee, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than <u>60 days</u> after the Effective Date; *provided* that the Debtor, the Reorganized Debtor or the Litigation Trustee, as applicable, shall pay Retained Professionals or other Entities in the ordinary course of business for any work performed for the Debtor, Reorganized Debtor, or Litigation Trustee, as applicable, after the Confirmation Date. Objections to any Fee Claim must be Filed and served on the Debtor and the requesting party by fourteen (14) days after the Filing of the applicable request for payment of the Fee Claim. To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims. Each Holder of an Allowed Fee Claim shall be paid by the Debtor or the Litigation Trustee, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Fee Claim.

*B.*    *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by the Debtor or the Litigation Trustee, as applicable, and such Holder; *provided, however,* that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtor, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period not more than five years after the Commencement Date, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such claim shall be paid in full in cash in accordance with the terms of any agreement between the Debtor or the Litigation Trustee, and such Holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

*A.    Summary*

    1.    This Plan constitutes Debtor's chapter 11 plan of reorganization.  Except for the Claims addressed in Article II above (or as otherwise set forth herein), all Claims against the Debtor are placed in Classes.  Class 7 consists of Equity Interests.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims and Priority Tax Claims, as described in Article II above.

    2.    The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

    3.    The Allowed Claims and Interests will be paid or satisfied as set forth in Article V.

    4.    <u>Summary of Classification and Treatment of Classified Claims and Equity Interests</u>

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote |
| 2 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote |
| 3 | Empery Prepetition Secured Claim | Impaired | Entitled to Vote |
| 4 | Prestige Prepetition Secured Claim | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | White Winston Claims | Impaired | Entitled to Vote |
| 7 | Equity Interests | Impaired | Deemed to Reject |

*B.    Classification and Treatment of Claims and Equity Interests*

    1.    <u>Class 1 – Other Secured Claims</u>

        (a)    *Classification:* Class 1 consists of the Other Secured Claims against the Debtor, other than the Empery Prepetition Secured Claim and the Prestige Prepetition Secured Claim.

        (b)    *Treatment:*  On or as soon as practicable following the Plan Effective Date, each holder of an allowed Other Secured Claim will be paid in full in cash or otherwise realize the value of its collateral, unless otherwise agreed by such holder, and subject to any subordination agreements enforceable pursuant to section 510(a) of the Bankruptcy Code.

        (c)    *Voting:* Class 1 is an Unimpaired Class, and the Holder of the Class 1 Claim is not entitled to vote to accept or reject the Plan.

    2.    <u>Class 2 – Priority Non-Tax Claims</u>

        (a)    *Classification:* Class 2 consists of Holders of Priority Non-Tax Claims.

(b)  *Treatment:*  On or as soon as practicable following the Plan Effective Date, each holder of an allowed Priority Non-Tax Claim will be paid in full in cash or otherwise left unimpaired, unless otherwise agreed to by such holder.

(c)  *Voting:* Class 2 is an Unimpaired Class, and each Holder of a Class 2 Claim is not entitled to vote to accept or reject the Plan.

3.  Class 3 – Empery Prepetition Secured Claim

(a)  *Classification*: Class 3 consists of the Empery Prepetition Secured Claim.

(b)  *Treatment:* Empery shall compromise and settle with the Estate and have an allowed secured claim in the amount of $18 million (the "**Allowed Empery Secured Claim**"), which represents principal and accrued interest and fees through the Petition Date and excludes the Roll-Up.

On or as soon as practicable following the Plan Effective Date, holders of the Allowed Empery Secured Claim shall receive their *pro rata share* of the Net Sale Proceeds, not to exceed $12.0 million *less* the Roll-Up and *less* the amount of Empery's credit bid (the "**Empery Payoff Amount**").

Empery shall assign to the Litigation Trust, for the benefit of holders of Allowed Class 5 Claims, the economic interest in the difference between the Allowed Empery Secured Claim and the Empery Payoff Amount (the "**Empery Assigned Claim**"), including, for the avoidance of doubt, any monetary recovery on such Empery Assigned Claim.

To the extent the Net Sale Proceeds (including the amount, if any, of Empery's credit bid) are insufficient to satisfy the Empery Payoff Amount in full, holders of Allowed Empery Secured Claims shall forego any further recovery.

To the extent the Plan does not go effective by Effective Date Deadline, the Debtor and the Committee may extend the Effective Date Deadline by up to thirty (30) calendar days, without the consent of Empery on the condition precedent that the Empery Payoff Amount is paid in full from the Net Sale Proceeds on or before August 31, 2023; *provided*, *however*, to the extent Empery is the successful Purchaser pursuant to a credit bid and the Closing Date has occurred, the Effective Date Deadline may be extended, if necessary, to a date mutually agreed to by the Debtor, the Committee, and Empery.

(c)  *Voting:* Class 3 is an Impaired Class, and each Holder of a Class 3 Claim is entitled to vote to accept or reject the Plan.

4.  Class 4 – Prestige Prepetition Secured Claim

(a)  *Classification*: Class 4 consists of the Prestige Prepetition Secured Claim.

(b)  *Treatment*:  MP Collateral, as successor in interest to Prestige, shall have an allowed secured claim in the amount of $2,500,000 (the "**Allowed Prestige Secured Claim**"), which represents principal and accrued interest and fees through the Petition Date.  The Allowed Prestige Secured Claim shall be subject to reduction from the proceeds of collections on its prepetition collateral.  As of May 18, 2023, the net reductions are $731,777.

On or as soon as practicable following the Plan Effective Date, holders of the Allowed Prestige Secured Claim shall receive (a) the return of the pre-petition accounts receivable collateral securing such Allowed Prestige Secured Claim, (b) cash proceeds of the prepetition accounts receivable collateral securing such Allowed Prestige Secured Claim,

and (c) cash from the Net Sale Proceeds (if any such cash proceeds remain after paying the Allowed Empery Secured Claim in full). For the avoidance of doubt, the Allowed Prestige Secured Claim shall be subordinate in right to payment of the Empery Assigned Claim, except with respect to prepetition accounts receivable and cash proceeds therefrom.

Holders of the Allowed Prestige Secured Claim shall retain all rights and causes of action against third parties, including but not limited to the guarantees provided by Drexler.

(c)     *Voting*: Class 4 is an Impaired Class, and each Holder of a Class 4 Claim is entitled to vote to accept or reject the Plan.

5.    Class 5 – General Unsecured Claims

(a)     *Classification*: Class 5 consists of all General Unsecured Claims against the Debtor.

(b)     *Treatment*: Class 5 shall consist of all allowed non-priority general unsecured claims. None of the Empery Parties, any defendants in the WW Adversary Proceeding or White Winston Parties (nor any of their affiliates or any of the individual noteholders) shall have a Class 5 Claim.

The Litigation Trust reserves all rights, claims, and defenses with respect to Class 5 Claims, including all rights to seek subordination of such claims pursuant to section 510 of the Bankruptcy Code and to enforce any applicable subordination agreements pursuant to section 510(a) of the Bankruptcy Code.

Each holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of a beneficial interest in the Litigation Trust.

(c)     *Voting*: Class 5 is an Impaired Class, and each Holder of a Class 5 Claim is entitled to vote to accept or reject the Plan.

6.    Class 6 – White Winston Claims

(a)     *Classification*: Class 6 consists of all claims of White Winston (if any) against the Debtor, including all claims arising from that certain *Settlement Agreement and Release* dated December 5, 2022 (the "**WW Settlement Agreement**"), by and between White Winston, the Debtor and Drexler (collectively, the "**White Winston Claims**"). All White Winston claims against the Debtor shall be treated as set forth in this Class 6.

(b)     *Treatment*: Subject to the occurrence of the Plan Effective Date (or, if both the Effective Date has not occurred and the Empery Payoff Amount is paid in full from the Net Sale Proceeds on or before August 31, 2023, upon entry of the Confirmation Order) the WW Settlement Agreement shall be deemed an executory contract that the Debtor shall reject under the Plan pursuant to section 365 of the Bankruptcy Code.

White Winston shall have an allowed unsecured claim of $8,630,261.00. The allowed unsecured claim shall be treated as follows:

a.     100% (or such other amount as White Winston in its sole discretion determines) of the New Equity Interests or, at White Winston's election, the prepetition equity interests in the Reorganized Debtor shall be issued to White Winston in full and final satisfaction of the claim in the amount of $4,630,261.00. The rights and powers of holders of New Equity Interests shall be as set forth in the Plan or in related documents by White Winston. It is the intention of the parties that the rights and powers of holders of New Equity Interests be determined by White Winston in connection with the "change of

13

ownership" rules of section 382 of the IRS Tax Code, including the exceptions to the ordinary "change of ownership" rules found in sections 382(l)(v) and (vi) of the IRS Tax Code.  All provisions of the Plan shall operate to effectuate this intention unless otherwise agreed to by White Winston.

        b.       The remaining $4,000,000 of the claim (the "**White Winston Retained Claim**") shall not be discharged and shall remain as a liability of the post-confirmation Reorganized Debtor.  For the avoidance of doubt, White Winston shall not have a claim against the Litigation Trust.

    (c)    *Voting*: Class 6 is an Impaired Class, and each Holder of a Class 6 Claim is entitled to vote to accept or reject the Plan.

    7.   Class 7 – Equity Interests

    (a)    *Classification*: Class 7 consists of the Equity Interests of the Debtor.

    (b)    *Treatment*:  Subject to the treatment of the Class 6 Claims, all existing Equity Interests in the Debtor shall be cancelled and holders of such Equity Interests shall neither receive nor retain anything on account of their existing Equity Interests.

    (c)    *Voting*: Class 7 is Impaired under this Plan.  The Holders of Class 7 Equity Interests are not entitled to vote on this Plan and are deemed to have rejected this Plan pursuant to Section 1126(g) of the Bankruptcy Code.

*C.    Discharge of Claims*

Pursuant to section 1141(c) of the Bankruptcy Code, all Claims and Equity Interests that are not expressly provided for and preserved herein shall be extinguished upon Confirmation.  Upon Confirmation, the Debtor and all property dealt with herein, including the Assets, shall be free and clear of all such claims and interests, including, without limitation, liens, security interests and any and all other encumbrances, except as provided in the Plan.

# ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

*A.    Presumed Acceptance of Plan*

Classes 1 and 2 are unimpaired classes of claims, therefore, Classes 1 and 2 are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

*B.    Presumed Non-Acceptance of Plan*

Class 7 is Impaired under the Plan and is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

*C.    Voting Classes*

Each Holder of an Allowed Claim as of the Record Date in each of the Voting Classes (Classes 3, 4, 5, and 6) shall be entitled to vote to accept or reject the Plan.

*D.    Acceptance by Impaired Classes of Claims*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar

amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

E.    *Cramdown*

The Debtor requests Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtor reserves the right to modify the Plan in accordance with Article XIII.B hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

F.    *Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the date of commencement of the Confirmation Hearing by a Holder of an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 (*i.e.*, no Ballots are cast in a Class entitled to vote on the Plan) shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptances or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

# ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *General Settlement of Claims and Interests*

As discussed in detail in Section III(E) of the Disclosure Statement and as described in Article V, Section B pursuant to sections 1123 and 1124 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, and other benefits provided under the Plan, and as a result of arms' length negotiations among the Debtor and its creditors, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan. Solely to the extent otherwise necessary, Confirmation of the Plan also cures defaults under all prepetition contracts paid or maintained pursuant to this Plan, in accordance with section 1124 of the Bankruptcy Code.

B.    *Restructuring Transactions*

Prior to, on or after the Effective Date, and pursuant to the Plan, the Debtor, the Reorganized Debtor and the Litigation Trust may enter into the restructuring transactions that are not inconsistent with the Plan Support Agreement (each, a "**Restructuring Transaction**"), and may take any actions as may be necessary or appropriate to affect a restructuring of its business or the overall organizational structure of the Reorganized Debtor. The Restructuring Transactions, provided they are not inconsistent with the Plan Support Agreement may include one or more sales, mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be determined by the Debtor or the Reorganized Debtor to be necessary or appropriate. As of the date hereof, the actions to effect the Restructuring Transaction may include:

- the execution and delivery of appropriate instruments of sale, transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree;
- the filing of appropriate certificates or articles of formation, reformation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and
- all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions and the Plan.

The documents and agreements necessary to finalize the Debtor's ultimate Restructuring Transaction shall be set forth in the Plan Supplement.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to affect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

C.    *New Corporate Existence*

The Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company or limited partnership, with all the powers of a corporation, limited liability company or limited partnership pursuant to laws of the State of Nevada and pursuant to the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other formation documents) are amended by or in connection with the Plan or otherwise and, to the extent such documents are amended, such documents are deemed to be authorized pursuant hereto and without the need for any other approvals, authorizations, actions or consents.

D.    *Vesting of Assets in the Litigation Trust*

Except as otherwise provided herein or in any agreement, instrument or other document relating thereto, on or after the Effective Date, the Litigation Trust shall be created.  A litigation trustee (the "**Litigation Trustee**") shall be appointed in the sole discretion of the Committee, and the Litigation Trust shall be governed by a three (3) member oversight committee, which members shall be appointed in the sole discretion of the Committee.

On the Plan Effective Date, the Litigation Trust shall be vested with all assets of the Debtor not sold to the Purchaser, nor paid to MP Collateral, and not transferred to, or vested in, the Reorganized Debtor. The assets transferred to the Litigation Trust shall include all unsold claims, causes of action, and interests of the Debtor, including all rights, claims, and causes of action relating to insurance policies, other than the White Winston D&O Claims.

After the Plan Effective Date, the Reorganized Debtor shall pay the Litigation Trust an amount equal to thirty percent (30%) of the Net Collected Proceeds (defined below) of the White Winston D&O Claims.  "**Net Collected Proceeds**" means the gross collected proceeds actually collected by the Reorganized Debtor on account of the White Winston D&O Claims less any fees and expenses incurred by the Reorganized Debtor to recover such proceeds.

On the Plan Effective Date, the Litigation Trust shall receive all cash held by the estate, including the Net Sale Proceeds *less* the Empery Payoff Amount *less* amounts due to Holders of Class 4 Claims pursuant to the Plan (the "**Litigation Trust Cash Balance**").  For the avoidance of doubt, any remaining funds in the Wind-Down Budget shall vest in the Litigation Trust.  To the extent the Litigation Trust Cash Balance is *less than* $500,000 on a net basis after deducting anticipated accrued and unpaid administrative and priority claims (including professional fees), Empery shall fund the difference to the Litigation Trust (the "**Empery Litigation Trust Loan**"). The Empery Litigation Trust Loan shall be repaid from the proceeds of the Litigation Trust Assets ahead of any distributions to holders of Allowed Class 5 Claims.  For the avoidance of doubt, Empery's obligation to fund the Empery Litigation Trust Loan shall be a binding obligation upon the Closing Date (*i.e.*, the closing of the Sale) and such amounts shall be paid to the Litigation Trust on the Plan Effective Date, even if such Effective Date Deadline is extended beyond August 31, 2023 as provided in the Plan.

E.    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise agreed to by White Winston or as provided herein or in any agreement, instrument or other document relating thereto, on or after the Effective Date, the Excluded IP and the White Winston D&O Claims shall vest in the Reorganized Debtor.

F.    *Securities Registration Exemption*

The New Equity Interests to be issued hereunder and pursuant to the Plan Support Agreement will be issued without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code.

G.      *Issuance and Distribution of New Equity Interests*

To the extent applicable after the Sale, on or immediately after the Effective Date, all New Equity Interests in the Reorganized Debtor shall be issued as set forth herein and in the Plan Support Agreement.

All of the New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable. Each distribution and issuance referred to in Article VII hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

H.      *Certificate of Incorporation and Bylaws*

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies and limited partnerships) of the Debtor shall be amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code or as otherwise required by, and in a form reasonably acceptable to the Reorganized Debtor. On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file a new certificate of incorporation or organization with the secretary of state (or equivalent state officer or entity), which, as required by section 1123(a)(6) of the Bankruptcy Code, shall prohibit the issuance of non-voting securities. After the Effective Date, the Reorganized Debtor may file a new, or amend and restate its existing, certificate of incorporation, charter and other constituent documents as permitted by the relevant state corporate law.

I.      *Effectuating Documents, Further Transactions, Exemption from Certain Transfer Taxes*

The Debtor and the Reorganized Debtor, as applicable, may take all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto. The secretary and any assistant secretary of the Debtor or Reorganized Debtor, as applicable, shall be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtor shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers or partners of the Debtor, or the need for any approvals, authorizations, actions or consents.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any ad valorem, stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the sale of the Assets or the issuance of New Equity Interests, including any Distributions made, or actions undertaken by, the Debtor, the Reorganized Debtor, and/or the Litigation Trustee.

J.      *Preservation of Public Entity Status*

On and after the Effective Date, the Reorganized Debtor intends it will continue to exist as a public corporation and in such event shall retain all of the powers of public corporations under applicable non-bankruptcy law, and without prejudice to any right to amend its charter, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence. As of the Effective Date, the Debtor's Articles of Incorporation shall be

deemed amended to conform to the requirements of Section 1123(a)(6) of the Bankruptcy Code.  Furthermore, as of the Effective Date, the Debtor shall take appropriate action to assure compliance with applicable securities laws.

Pursuant to Section 1145 of the Bankruptcy Code, neither section 5 of the Securities Act of 1933 nor any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer or, underwriter of, or broker or dealer in, a security shall apply to the offer or sale of a security or registration or licensing of the Reorganized Debtor, or an underwriter of, or broker or dealer in, a security of the Reorganized Debtor, including, without limitation, the New Equity and/or the offer of any security of the Reorganized Debtor through any warrant, option, right to subscribe or conversion privilege that is sold in exchange for a claim against the Debtor, including, without limitation, the New Equity..  For purposes of section 1145(a)(1)(A) of the Bankruptcy Code, the New Equity shall be deemed to be in exchange for White Winston's claims against the Debtor.  Neither the Debtor nor the Reorganized Debtor shall be an underwriter for any purpose under section 2(a)(11) of the Securities Act of 1933 and/or Section 1145 of the Bankruptcy Code.  The offer and sale of securities of the kind and in the manner specified under Section 1145(a)(1) of the Bankruptcy Code, including, without limitation, the New Equity, shall be deemed to be a public offering pursuant to section 1145(c) of the Bankruptcy Code.

K.    *Preservation of Tax Attributes*

It is the intention of the Plan Proponents that the Debtor's tax attributes, particularly its net operating losses ("**NOL's**"), be preserved for use by the Reorganized Debtor after the Effective Date.  Accordingly, the Plan has been structured to comply with 26 U.S.C. §382(l)(5), and the Plan provides it is treated under Internal Revenue Code section 382(l)(5).

Generally, Internal Revenue Code ("**IRC**") section 382 provides that, after an ownership change, the amount of a loss corporation's taxable income for any post-change year that may be offset by pre-change losses shall not exceed the IRC section 382 limitation for that year. Pursuant to IRC Section 382(g), an "ownership change" occurs when, on a particular testing date the percentage stock ownership of one or more 5-percent shareholders has increased by more than 50 percentage points over the lowest percentage stock ownership held by such shareholder at any time during the prescribed "testing period," as defined in IRC section 382(i). A loss corporation is defined in IRC section 382 as a corporation entitled to use an NOL carryover, have an NOL for the taxable year in which the ownership change occurs, or any corporation with a net unrealized built-in loss within the meaning of section 382(h)(3).

IRC section 382(l)(5) provides an exception for ownership changes that occur in Title 11 or similar cases, provided certain qualification requirements (discussed below) are met. If applicable, section 382(l)(5) generally provides that although the loss corporation experiences an ownership change, the section 382 limitation does not apply to limit the tax attributes of the loss corporation. However, any limitation caused by a prior or subsequent ownership change would continue to apply.

There are two statutory requirements which must be satisfied in order for the loss corporation to qualify under section 382(l)(5):

(i)     The old loss corporation (the Debtor) must have been under the jurisdiction of the Bankruptcy Court (which clearly the Debtor has been since the Petition Date), and

(ii)    the former shareholders and qualified creditors of the bankrupt loss corporation (determined immediately before a section 382(g) ownership change) must own (after such ownership change and as a result of being shareholders or creditors immediately before such change) an amount of stock constituting 50 percent "control" (as defined under section 1504(a)(2)) after the ownership change.

According to the Debtor's 2021 federal tax form 1040, the Debtor identified the following tax attributes:

| | |
|---|---|
| Non-SRLY NOL ............................................. | $15,921,560 |
| Net operating loss carryforward .................... | $107,897,654 |
| Charitable contributions ................................. | $24,031 |
| Sec. 1231 losses ............................................. | $276,583 |
| Disallowed business interest expense ............. | $10,452,345 |

| | |
|---|---|
| Total general business credits .......................... | $421,312 |
| Credit for increasing research activities (Form 6765) … | $421,312 |

As a result of the net operating loss carryforward, general business credit ("**GBC**"), and other tax attributes listed above, the Debtor is "loss corporation" as defined in Treas. Reg. § 1.382-2(a) and Treas. Reg. § 1.1502-91(c).

Early in the Case, the Debtor considered the formulation of a reorganization plan, rather than a liquidating plan based on the use of the Debtor's NOLs. In theory, the Debtor could enter into a transaction whereby a third party would provide consideration to the Debtor in exchange for its corporate shell and NOLs. A potential purchaser's ability to use the Debtor's NOLs, however, was subject to many risk factors and prevailing law that would have reduced or eliminated the utilization of the NOLs under certain circumstances.

Accordingly, to prevent the potential loss of NOLs, on February 8, 2023, the Debtor filed its "*Debtor's Motion Pursuant to 11 U.S.C. 362 & 105(a) for Entry of an Order Establishing Notification and Hearing Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtor's Estate* (ECF 215]" (the "**NOL Motion**"). The relief requested in the NOL Motion was designed to provide the Debtor with advance notice of certain transfers that may jeopardize its NOLs, and to enable the Debtor, if necessary, to obtain substantive relief from this Bankruptcy Court to protect those NOLs. The Bankruptcy Court allowed the NOL Motion by order dated February 27, 2023 [ECF 259]. To preserve these NOL's for use by the Reorganized Debtor, the Plan provides that White Winston will receive, in full payment and satisfaction of its Class 7 Allowed Claim to the extent of $4,630,261.00 all of the New Equity in the Debtor. Thus, White Winston will be the sole shareholder of the Reorganized Debtor. Generally, this transaction would have triggered an ownership change (as defined in section 382(g) on the Effective Date) with respect to the Debtor's stock. However, this Plan meets all of the requirements of Internal Revenue Code section 382(l)(5) and thus the NOL's should be preserved. The Debtor shall not make an election under section 382(l)(5)(G) to elect out of the application of Internal Revenue Code section 382(l)(5) such that the provisions of Internal Revenue Code section 382(l)(5) do not apply (see also Treas. Reg. 1.382-9(i)). Finally, the Debtor shall not take any reporting position otherwise under the Plan Support Agreement.

Pursuant to the Plan Support Agreement, this Plan provides that pursuant to Treas. Reg. § 1.382-2T(k)(3) and Treas. Reg. 1.382-9(d)(1), White Winston has been the holder of all Class 6 Claims continuously for at least 18 months before the Petition Date, thereby satisfying the second condition described above. Further, the Plan provides that no person or entity other than the Reorganized Debtor shall use or impair any of the Debtor's tax attributes determined as of the Petition Date (including the NOL's).

The Plan Proponents make no representation regarding the value of the NOL's to the Reorganized Debtor, or whether the NOL's can be successfully challenged and disallowed in whole or in part by the Internal Revenue Service pursuant to Internal Revenue Code section 269.

# ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.*    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Subject to the right of the Reorganized Debtor to elect to assume any Executory Contract or Unexpired Lease as to which there is no objection to the proposed cure, each Executory Contract or Unexpired Lease identified in the Plan Supplement as an Executory Contract and/or Unexpired Lease not designated for assumption shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease:

(a)    has been previously assumed by the Debtor by Final Order of the Bankruptcy Court;

(b)        has been assumed by the Debtor by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date;

(c)        is the subject of a motion to assume pending as of the Effective Date;

(d)        is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; or

(e)        is otherwise assumed pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. The Debtor reserves the right to amend the schedule of Assumed Executory Contracts and Unexpired Leases at any time before the Effective Date. To the extent any Executory Contract or Unexpired Lease is not specifically identified and designated as an Executory Contract or Unexpired Lease to be assumed, any such Executory Contract(s) and/or Unexpired Lease(s) shall be deemed to be rejected pursuant to the terms of this Plan and the Confirmation Order.

    2.    <u>Approval of Assignments (if any)</u>

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in this Article VI pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption of such Executory Contract or Unexpired Lease will be deemed to have consented to such assumption and assignment of Executory Contracts or Unexpired Leases.

In the event of an assignment of an Executory Contract or Unexpired Lease, at least ten (10) days prior to the Confirmation Hearing, the Debtor shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will: (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court. Additionally, the Debtor shall file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts. Any applicable cure amounts shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by the Debtor, and its counsel, SL, at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Reorganized Debtor in its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

    3.    <u>Rejection of Executory Contracts or Unexpired Leases</u>

All Executory Contracts and Unexpired Leases not listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement or not assumed and assigned otherwise in accordance with this Plan

shall be deemed rejected as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in this Article VI pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

B.      *Claims on Account of the Rejection of Executory Contracts or Unexpired Leases*

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against any Debtor, any Reorganized Debtor or Debtor's Estate and property, including the Assets, and the Litigation Trustee, and the Debtor or the Reorganized Debtor and Debtor's Estate and property, including the Assets, and the Litigation Trustee shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least ten (10) days prior to the Confirmation Hearing, the Debtor shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, which will: (1) list the applicable cure amount, if any; (2) describe the procedures for filing objections thereto; and (3) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtor shall file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assumed and the proposed cure amounts.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by the Debtor, and its counsel, SL, and counsel to the Committee, at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. If an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtor in its sole option, may elect to reject such executory contract or unexpired lease in lieu of assuming it.

# ARTICLE VII.

## SETTLEMENT AND RELEASES

A.      *Releases*

This Plan contains certain releases of third parties. The discharge, release, exculpation, and injunction provisions that are contained herein are copied in pertinent part below. The Plan Proponents believe that all of the Released Parties (defined below) and Exculpated Parties (defined below) made substantial and valuable contributions to the Debtor's restructuring, including the compromising of their Claims, which Claim treatment under the Plan will help maximize and preserve the going-concern value of the Debtor for the benefit of all parties in interest. Accordingly, each of the Released Parties warrants the benefit of the Plan's release provisions.

"**Released Parties**" means, collectively, and in this case in its capacity as such: (a) the Debtor and the Reorganized Debtor; (b) the Committee and each of its respective members (in their capacity as such); (c) the Empery Parties; (d) the White Winston Parties; and (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, and attorneys (each in their capacity as such); *provided*, *however*, the Released Parties do not include Drexler, his Affiliates, successors or assigns, or any of the Debtor's prepetition officers and board of directors and their Affiliates, successors or assigns.

"**Exculpated Parties**" means, collectively, and in this case in its capacity as such: (a) the Debtor and the Reorganized Debtor; (b) the Committee and each of its respective members (in their capacity as such); (c) the Empery Parties; (d) the White Winston Parties; and (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, and attorneys (each in their capacity as such); provided however, the Exculpated Parties do not include Drexler (on account of his prepetition acts and omissions), his Affiliates, successors or assigns, or any of the Debtor's prepetition officers and board of directors and their Affiliates, successors or assigns.

1.        **Discharge of Claims and Termination of Interests**

This Plan is not a liquidating Plan and does not provide for the liquidation of all or substantially all of the property of the Debtor.  The Reorganized Debtor intends to engage in business after the Effective Date.  Accordingly, the Debtor is entitled to a discharge.  This Plan provides that the Debtor shall receive a discharge to the maximum extent not prohibited by law other than for the White Winston Retained Claim, including pursuant to section 1141(d)(1) of the Bankruptcy Code.  All property dealt with in the Plan, including the Excluded IP and the White Winston D&O Claims and all property vested in the Reorganized Debtor under the Plan, shall be free and clear of all claims and interest of creditors (other than the White Winston Retained Claim), equity security holders and of general partners (if any) in the debtor as set forth in section 1141(c) of the Bankruptcy Code.  Except as otherwise provided herein or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII hereof, all liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate shall be fully released and discharged.

The discharge shall not affect or impair any claims by any person or entity against any non-debtor.

ACCORDINGLY, PURSUANT TO SECTION 1141(d) OF THE BANKRUPTCY CODE, AND EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIMS AND AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN OR IN ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, AND EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, THE DISTRIBUTIONS, RIGHTS, AND TREATMENT THAT ARE PROVIDED IN THE PLAN SHALL BE IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE, EFFECTIVE AS OF THE EFFECTIVE DATE, OF CLAIMS (INCLUDING ANY INTERCOMPANY CLAIMS RESOLVED OR COMPROMISED AFTER THE EFFECTIVE DATE BY THE REORGANIZED DEBTOR), INTERESTS, AND CAUSES OF ACTION OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS OR INTERESTS FROM AND AFTER THE PETITION DATE, WHETHER KNOWN OR UNKNOWN, AGAINST, LIABILITIES OF, LIENS ON, OBLIGATIONS OF, RIGHTS AGAINST, AND INTERESTS IN, THE DEBTOR OR ANY OF ITS ASSETS OR PROPERTIES, REGARDLESS OF WHETHER ANY PROPERTY SHALL HAVE BEEN DISTRIBUTED OR RETAINED PURSUANT TO THE PLAN ON ACCOUNT OF SUCH CLAIMS AND INTERESTS, INCLUDING DEMANDS, LIABILITIES, AND CAUSES OF ACTION THAT AROSE BEFORE THE EFFECTIVE DATE, ANY LIABILITY (INCLUDING WITHDRAWAL LIABILITY) TO THE EXTENT SUCH CLAIMS OR INTERESTS RELATE TO SERVICES PERFORMED BY EMPLOYEES OF THE DEBTOR BEFORE THE EFFECTIVE DATE AND THAT ARISE FROM A TERMINATION OF EMPLOYMENT, ANY CONTINGENT OR NON-CONTINGENT LIABILITY ON ACCOUNT OF REPRESENTATIONS OR WARRANTIES ISSUED ON OR BEFORE THE EFFECTIVE DATE, AND ALL

DEBTS OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), OR 502(i) OF THE BANKRUPTCY CODE, IN EACH CASE WHETHER OR NOT: (1) A PROOF OF CLAIM BASED UPON SUCH DEBT OR RIGHT IS FILED OR DEEMED FILED PURSUANT TO SECTION 501 OF THE BANKRUPTCY CODE; (2) A CLAIM OR INTEREST BASED UPON SUCH DEBT, RIGHT, OR INTEREST IS ALLOWED PURSUANT TO SECTION 502 OF THE BANKRUPTCY CODE; OR (3) THE HOLDER OF SUCH A CLAIM OR INTEREST HAS ACCEPTED THE PLAN. EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, ANY DEFAULT OR "EVENT OF DEFAULT" BY THE DEBTOR OR ITS AFFILIATES WITH RESPECT TO ANY CLAIM OR INTEREST THAT EXISTED IMMEDIATELY BEFORE OR ON ACCOUNT OF THE FILING OF THE CHAPTER 11 CASES SHALL BE DEEMED CURED (AND NO LONGER CONTINUING) AS OF THE EFFECTIVE DATE. THE CONFIRMATION ORDER SHALL BE A JUDICIAL DETERMINATION OF THE DISCHARGE OF ALL CLAIMS AND INTERESTS EXCEPT FOR THE WHITE WINSTON RETAINED CLAIM SUBJECT TO THE EFFECTIVE DATE OCCURRING.   NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, THE WHITE WINSTON RETAINED CLAIM SHALL NOT BE DISCHARGED AND SHALL REMAIN UNIMPAIRED.

**2.      Releases of Liens**

EXCEPT AS OTHERWISE PROVIDED IN THE CONFIRMATION ORDER, SALE ORDER, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, ON THE EFFECTIVE DATE AND CONCURRENTLY WITH THE APPLICABLE DISTRIBUTIONS MADE PURSUANT TO THE PLAN AND, IN THE CASE OF A SECURED CLAIM, SATISFACTION IN FULL OF THE PORTION OF THE SECURED CLAIM THAT IS ALLOWED AS OF THE EFFECTIVE DATE, ALL MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS AGAINST ANY PROPERTY OF THE ESTATES SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL OF THE RIGHT, TITLE, AND INTEREST OF ANY HOLDER OF SUCH MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS SHALL REVERT TO THE REORGANIZED DEBTOR AND ITS SUCCESSORS AND ASSIGNS. ANY HOLDER OF SUCH SECURED CLAIM (AND THE APPLICABLE AGENTS FOR SUCH HOLDER) SHALL BE AUTHORIZED AND DIRECTED, AT THE SOLE COST AND EXPENSE OF THE REORGANIZED DEBTOR, TO RELEASE ANY COLLATERAL OR OTHER PROPERTY OF THE DEBTOR (INCLUDING ANY CASH COLLATERAL AND POSSESSORY COLLATERAL) HELD BY SUCH HOLDER (AND THE APPLICABLE AGENTS FOR SUCH HOLDER), AND TO TAKE SUCH ACTIONS AS MAY BE REASONABLY REQUESTED BY THE REORGANIZED DEBTOR TO EVIDENCE THE RELEASE OF SUCH LIEN, INCLUDING THE EXECUTION, DELIVERY, AND FILING OR RECORDING OF SUCH RELEASES. THE PRESENTATION OR FILING OF THE CONFIRMATION ORDER TO OR WITH ANY FEDERAL, STATE, PROVINCIAL, OR LOCAL AGENCY OR DEPARTMENT SHALL CONSTITUTE GOOD AND SUFFICIENT EVIDENCE OF, BUT SHALL NOT BE REQUIRED TO EFFECT, THE TERMINATION OF SUCH LIENS.

THIS PLAN SHALL CONSTITUTE A TERMINATION STATEMENT WITH RESPECT TO ALL LIENS, SECURITY INTERESTS AND ENCUMBRANCES THAT IS EFFECTIVE UPON THE PLAN EFFECTIVE DATE PURSUANT TO SECTION 9-513 OF THE UNIFORM COMMERCIAL CODE ("**UCC**"). ALL LIENS, SECURITY INTERESTS AND ENCUMBRANCES IN AND TO THE DEBTOR'S ASSETS SHALL TERMINATE, BE DISCHARGED AND SHALL NOT ATTACH TO ANY ASSETS OF THE REORGANIZED DEBTOR FROM AND AFTER THE EFFECTIVE DATE.  THE REORGANIZED DEBTOR IS AUTHORIZED AND EMPOWERED TO RECORD ANY AND ALL TERMINATION STATEMENTS OR SIMILAR DOCUMENTS TO TERMINATE ANY AND ALL LIENS, SECURITY INTERESTS AND ENCUMBRANCES, INCLUDING AS SET FORTH IN SECTION 9-509 OF THE UCC.  UPON REQUEST OF THE REORGANIZED DEBTOR, ALL HOLDERS OF SUCH LIENS, SECURITY INTERESTS AND ENCUMBRANCES SHALL EXECUTE AND DELIVER TO THE REORGANIZED DEBTOR APPROPRIATE AUTHORIZATIONS TO RECORD SUCH TERMINATION STATEMENTS OR SIMILAR DOCUMENTS INCLUDING PURSUANT TO SECTION 9-513 OF THE UCC.

**3.      Exculpation**

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED

FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, AN OFFICIAL ACTION, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, FILING, OR TERMINATION OF THE RESTRUCTURING SUPPORT AGREEMENT AND RELATED PREPETITION TRANSACTIONS, THE DISCLOSURE STATEMENT, THE PLAN, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY EXCULPATED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN, THE FILING OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR ANY OFFICIAL ACTION, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF, AND DISTRIBUTION OF, CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.  NOTWITHSTANDING THE FOREGOING, THE EXCULPATED PARTIES DO NOT INCLUDE DREXLER (ON ACCOUNT OF HIS PREPETITION ACTS AND OMISSIONS), HIS AFFILIATES, SUCCESSORS OR ASSIGNS, OR ANY OF THE DEBTOR'S PREPETITION OFFICERS AND BOARD OF DIRECTORS AND THEIR AFFILIATES, SUCCESSORS OR ASSIGNS.

4.    **Releases by the Debtor**

PURSUANT TO SECTIONS 105 AND 1123(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE RELEASED PARTIES' FACILITATION OF THE EXPEDITIOUS REORGANIZATION OF THE DEBTOR, COMPROMISING OF THEIR CLAIMS, AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THIS PLAN, ON AND AFTER THE EFFECTIVE DATE: THE RELEASED PARTIES (EXCEPT FOR THE REORGANIZED DEBTOR WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, WHICH SHALL NOT BE RELEASED) ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTOR, THE REORGANIZED DEBTOR, AND THE ESTATE FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, AVOIDANCE ACTIONS, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR WHICH COULD BE ASSERTED ON BEHALF OF THE DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE DEBTOR, THE REORGANIZED DEBTOR, AND/OR THE ESTATE WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY), OR IN ANY MANNER ARISING FROM ANY MATTER OR TRANSACTION, BASED ON OR RELATING TO, IN WHOLE OR IN PART, THE DEBTOR, THE DEBTOR'S RESTRUCTURING, THE DEBTOR'S CHAPTER 11 CASE, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTOR OR THE REORGANIZED DEBTOR, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY OF THE RELEASED PARTIES, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS BEFORE OR DURING THE CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION OR PREPARATION OF THIS PLAN, THE DISCLOSURE STATEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE RELATING TO THE DEBTOR TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OF THIS PLAN.

24

NOTWITHSTANDING THE FOREGOING, THE RELEASED PARTIES DO NOT INCLUDE DREXLER, HIS AFFILIATES, SUCCESSORS OR ASSIGNS, OR ANY OF THE DEBTOR'S PREPETITION OFFICERS AND BOARD OF DIRECTORS AND THEIR AFFILIATES, SUCCESSORS OR ASSIGNS.

PURSUANT TO SECTIONS 105 AND 1123(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE RELEASED PARTIES' FACILITATION OF THE EXPEDITIOUS REORGANIZATION OF THE DEBTOR AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THIS PLAN, INCLUDING THE COMPROMISING OF THEIR CLAIMS PURSUANT TO THE PLAN, ON AND AFTER THE EFFECTIVE DATE, EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM (WHICH SHALL NOT BE RELEASED), THE RELEASING PARTIES HEREBY RELEASE THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, AVOIDANCE ACTIONS, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR WHICH COULD BE ASSERTED ON BEHALF OF THE DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE.

**5.    Injunction**

EXCEPT WHITE WINSTON, AND SOLELY WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT ARE SUBJECT TO EXCULPATION PURSUANT TO THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTOR, OR THE REORGANIZED DEBTOR: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS.

EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

# ARTICLE VIII.

## PROVISIONS GOVERNING DISTRIBUTIONS

*A.    Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided in the Plan, a Final Order, the Litigation Trust or as agreed to by the relevant parties, the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, shall make initial distributions under the Plan on account of Claims Allowed on or as soon as practicable

after the Initial Distribution Date; *provided*, *however*, that payments on account of General Unsecured Claims that become Allowed Claims on or before the Effective Date may commence on the Effective Date.

B.    *Distributions on Account of Claims Allowed After the Effective Date*

    1.    Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order, the Litigation Trust or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the Disputed Claim becomes an Allowed Claim.

    2.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, shall establish appropriate reserves for potential payment of any such Disputed Claims.

C.    *Delivery and Distributions and Undeliverable or Unclaimed Distributions*

    1.    Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

    2.    Delivery of Distributions in General

Except as otherwise provided herein, the Litigation Trustee shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's or the Litigation Trustee's records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtor, the Reorganized Debtor, or the Litigation Trustee, as applicable; and *provided further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

The Litigation Trustee shall make all distributions in accordance with the terms of the Litigation Trust Agreement. The Plan provides that the Reorganized Debtor has no obligations of any kind under the Plan to the Liquidating Trustee, the Distribution Agent or Agents, any creditor other than White Winston or equity security holder (including, without limitation, on account of claims or equity interests) from and after the Effective Date.

D.    *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Litigation Trustee shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Litigation Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable

and appropriate. The Litigation Trustee reserve the right to allocate all distributions made under the Plan in compliance with all applicable liens and encumbrances.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

E.     *Timing and Calculation of Amounts to Be Distributed*

On the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

F.     *Setoffs*

The Litigation Trustee may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Litigation Trustee may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor and/or Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release, of any such claims, equity interests, rights and Causes of Action that the Debtor or the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, may possess against any such Holder, except as specifically provided herein.

# ARTICLE IX.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.     *Resolution of Disputed Claims*

### 1.     Allowance of Claims

After the Effective Date, the Litigation Trustee shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim. All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

### 2.     Prosecution of Objections to Claims

After the Confirmation Date the Litigation Trustee shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; provided, however, this provision shall not apply to Fee Claims. From and

after the Effective Date, the Litigation Trustee may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  The Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

       3.    <u>Claims Estimation</u>

After the Confirmation Date the Debtor, the Litigation Trustee, as applicable, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Litigation Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

       4.    <u>Expungement or Adjustment to Claims Without Objection</u>

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Litigation Trustee, and any Claim that has been amended may be adjusted thereon by the Litigation Trustee, in both cases without a claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

       5.    <u>Deadline to File Objections to Claims</u>

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

*B.*    *Disallowance of Claims*

All Claims of any Entity from which property is sought by the Debtor or the Reorganized Debtor under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtor or the Reorganized Debtor allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (i) the Entity, on the one hand, and the Debtor, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (ii) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM AND PROOFS OF INTEREST FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS AND EQUITY INTERESTS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS AND EQUITY INTERESTS, UNLESS SUCH LATE PROOF OF CLAIM OR EQUITY INTEREST IS DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER ON OR BEFORE THE LATER OF (1) THE CONFIRMATION HEARING AND (2) 45 DAYS AFTER THE APPLICABLE CLAIMS BAR DATE.**

*C.*     *Amendments to Claims*

On or after the Effective Date, except as otherwise provided herein, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, and, to the extent such prior authorization is not received, any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

# ARTICLE X.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

*A.*     *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that all provisions, terms and conditions hereof are approved in the Confirmation Order.

*B.*     *Conditions Precedent to Consummation on the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof.

1.     The Plan and all Plan Supplement documents, including any amendments, modifications or supplements thereto, shall be reasonably acceptable to the Debtor, the Committee and the Plan Sponsor, if any.

2.     The Confirmation Order shall have been entered and become a Final Order in a form and in substance reasonably satisfactory to the Debtor.  The Confirmation Order shall provide that, among other things, the Debtor or the Reorganized Debtor, or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan, and the dismissal all pending litigation between the White Winston Parties and the Empery Parties, with each party to bear its own fees and costs, including the WW Adversary Proceeding and that certain litigation pending before the New York Superior Court entitled *Empery Tax Efficient, LP v. MusclePharm Corporation, et al.*, Index No. 654789/2022.

3.     All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

*C.*     *Waiver of Conditions*

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in this Article IX may be waived by the Debtor without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

*D.*     *Effect of Non-Occurrence of Conditions to Consummation*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtor; (2) prejudice in any manner the rights of the Debtor, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Holders or any other Entity in any respect.

# ARTICLE XI.

## SETTLEMENT, RELEASE AND RELATED PROVISIONS

*A.    Compromise and Settlement*

Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code or otherwise. The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Debtor, its Estate and all Holders of Claims and Equity Interests, (2) fair, equitable and reasonable, (3) made in good faith and (4) approved by the Bankruptcy Court pursuant to sections 363 of the Bankruptcy Code and Bankruptcy Rule 9019. The Confirmation Order shall approve the exculpation and releases by all Entities of all such contractual, legal and equitable subordination rights or Causes of Action that are satisfied, compromised and settled pursuant hereto.

In accordance with the provisions of this Plan, including Article VIII hereof, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (1) the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, may, in their sole and absolute discretion, compromise and settle Claims against them and (2) the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, may, in their sole and absolute discretion, compromise and settle Causes of Action against other Entities.

*B.    Preservation of Rights of Action*

1.    Maintenance of Causes of Action

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, and provided all Allowed non-Insider Claims are paid in full, Litigation Trust shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action except for the WW D&O Claims, whether existing as of the Commencement Date or thereafter arising, in any court or other tribunal including, without limitation, in any adversary proceeding Filed in the Chapter 11 Case.

2.    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a claim or Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, exculpated, compromised or settled as set forth in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtor (and to the extent applicable, the Reorganized Debtor) and the Litigation Trust expressly reserve such claim or Cause of Action for later adjudication by the Debtor, the Reorganized Debtor, the Litigation Trust, or, as otherwise appropriate and consistent with the terms of this Plan, the Litigation Trustee (including, without limitation, claims and Causes of Action not specifically identified or of which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply toany such claims or Causes of Action (including, without limitation, the WW D&O Claims) upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtor, the Reorganized Debtor, and, as otherwise appropriate and consistent with the terms of this Plan, the Litigation Trustee, expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is or could be a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

3.    Limitation of Liability.

The Exculpated Parties will neither have nor incur any liability to any person or entity for any Official Actions in good faith taken or omitted to be taken in connection with or related to the Chapter 11 Case, the investigations of potential claims or the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan or incident to the Chapter 11 Case, provided that, the foregoing shall not exonerate any of the Exculpated Parties from any liability that results from an act or omission to the extent such act or omission is determined by Final Order to have constituted gross negligence or willful misconduct.  In addition, notwithstanding any other provision of the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any Exculpated Party for any Official Actions made in good faith from and after the Petition Date through the Confirmation Date in connection with, relating to or arising out of the Chapter 11 case or the consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any transaction or document created or entered into, or any other act taken or omitted to be taken, in connection therewith, except for: (a) the liability of any Exculpated Party that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan, (b) the liability of any Exculpated Party that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, and (c) actions taken by Exculpated Parties who are holders of a Claim and are taking actions in pursuit of their allowance or payment of such Claim; for the avoidance of doubt there shall be no liability limitation for the  Debtors, their insiders, and affiliates for their actions or omissions occurring before the Petition Date, or their actions or omissions after the Petition Date that are not Official Actions made in good faith.

# ARTICLE XII.

## BINDING NATURE OF PLAN

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

# ARTICLE XIII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor, and the Plan as legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those

matters related to any amendment to the Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.   resolve any issues related to any matters adjudicated in the Chapter 11 Case;

5.   ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.   decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor or, as otherwise consistent and appropriate with the terms of the Plan, the Litigation Trustee after the Effective Date, _provided_ that the Reorganized Debtor or, as otherwise consistent and appropriate with the terms of the Plan, the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.   enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or the Disclosure Statement;

8.   resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

9.   hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10.  issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

11.  enforce the terms of the Plan;

12.  enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.  resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan, the Disclosure Statement or the Plan Supplement; and

14.  enter an order concluding the Chapter 11 Case.

# ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

A.   *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code after the Effective Date shall be paid prior to the closing of the Chapter 11 Case when due or as soon thereafter as practicable.

B.   *Modification of Plan*

Effective as of the date hereof and subject to the limitations and rights contained in the Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtor or the Reorganized Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance

with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

C.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

D.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

E.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

F.    Section 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan.

G.    Further Assurances

The Debtor or the Reorganized Debtor, as applicable, all Holders of Claims receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

H.    Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted, _provided_ that the Debtor, the Reorganized Debtor or any affected Entity (as applicable) may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing. Notwithstanding any such order by the Bankruptcy Court, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect.  The Confirmation Order shall constitute a judicial

33

determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

I.      *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by overnight mail to:

> MusclePharm Corporation
> c/o Eric Hillman
> 8275 South Eastern Avenue
> Las Vegas, Nevada 89123
>
> **with copies to**:
>
> Schwartz Law, PLLC
> 601 East Bridger Avenue
> Las Vegas, Nevada 89101
>
> and
>
> MHF Opco, LLC (solely in its capacity as Chair of the Committee)
> Attention: Brian Slater, CEO
> Email: brian@millhavenfoods.com
>
> **with copies to**:
>
> Pachulski Stang Ziehl & Jones LLP
> One Sansome Street, Suite 3430
> San Francisco, CA 94104
> Attention: Jason Rosell
> Email: jrosell@pszjlaw.com

J.      *Return of Security Deposits*

Unless the Debtor has agreed otherwise in a written agreement or stipulation approved by the Bankruptcy Court, all security deposits provided by the Debtor to any Person or Entity at any time after the Commencement Date shall be returned to the Reorganized Debtor within twenty (20) days after the Effective Date, without deduction or offset of any kind.

K.      *Filing of Additional Documents*

On or before the Effective Date, the Debtor may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

L.      *Default*

Upon the Effective Date of the Plan, in the event the Debtor or any party hereunder fails to timely perform any of the obligations set forth in the Plan, the Debtor, a creditor, or party-in-interest shall notify the defaulting party, the Debtor and Debtor's counsel of the default in writing in accordance with the notice provisions herein, after which the defaulting party shall have thirty (30) calendar days from the date of written notification to cure the default.  In the event the Debtor defaults, however, and the Debtor requires more than thirty (30) calendar days to cure, so long as: (i) the Debtor initiates steps to cure the default within thirty (30) calendar days of receipt of a notice of a default; (ii) provide notice to the non-defaulting party of the efforts taken to cure within thirty (30) calendar days; and (iii) the Debtor continues to complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical, the Debtor's default shall be deemed cured.  If the Debtor fails to timely cure the default as

provided above, the applicable creditor shall be free to pursue any and all rights it may have under the contract(s) between the parties and/or applicable state law, without further court order or proceeding being necessary.  In the event of litigation with respect to the enforcement of the provisions of this Plan, the non-defaulting party shall be entitled to recover its reasonable legal fees and costs of enforcement, subject to the approval of the Bankruptcy Court or a court of competent jurisdiction.

Dated: May 26, 2023

Respectfully submitted,

MusclePharm Corporation

By:      /s/
Title:    Eric Hillman, Chief Executive Officer

# EXHIBIT B

# EXHIBIT B

## EXHIBIT B

## BIDDING PROCEDURES

The following procedures (the "**Bidding Procedures**") shall govern the submission of bids for the purchase of any or all of the assets, other than the Excluded Assets (defined below) set forth on Schedule 2 annexed hereto (the "**Assets**") of MusclePharm Corporation ("**MusclePharm**" or the "**Debtor**"). The Assets consist of substantially all of Debtor's assets, including various trademarks and domain names used in the branded sports nutrition industry and identified on Schedule 1 annexed hereto. The Assets do not include the assets set forth on Schedule 2 annexed hereto ("**Excluded Assets**"). The Assets will be sold in connection with the Debtor's chapter 11 bankruptcy case, Case No. 22-14422-NMC, pending before the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**").

1.    Auction and Sale Hearing. Subject to the approval of the Bankruptcy Court, the Debtor seeks to sell the Assets at a live (in person) auction sale at the Bankruptcy Court commencing on July 21, 2023 at 9:30 a.m. (Pacific Daylight Time) (the "**Auction**"), with a Bankruptcy Court hearing immediately following the Auction to approve the results of the Auction (the "**Sale Hearing**"). Persons interested in purchasing any of the Assets must submit a Qualifying Bid (as defined herein) in writing to the Notice Parties (as defined below) by July 6, 2023 at 5:00 p.m., (Pacific Daylight Time), (the "**Bid Deadline**"), unless such date is extended in the discretion of the Debtor with the consent of the Official Committee of Unsecured Creditors of the Debtor (the "**Committee**") and Empery Tax Efficient, LP, in its capacity as Collateral Agent and Administrative Agent for MP Collateral, LLC ("**Empery**" and together with the Committee, the "**Consultation Parties**").[1] The Auction sale shall be subject to a determination of the Debtor, in consultation with the Consultation Parties, of the highest and best bid for the Assets. The notice parties (the "**Notice Parties**") are as follows:

| | |
|---|---|
| **Counsel to the Debtor:** | SCHWARTZ LAW, PLLC<br>Attention: Samuel A. Schwartz<br>601 East Bridger Ave., Suite 200<br>Las Vegas, Nevada 89101<br>E-mail: saschwartz@nvfirm.com |
| **Counsel to the Committee:** | PACHULSKI STANG ZIEHL & JONES LLP<br>Attention: Jason H. Rosell<br>One Sansome Street, 34th Floor, Suite 3430<br>San Francisco, CA 94104<br>E-mail: jrosell@pszjlaw.com |

---

[1]    Empery shall cease being a Consultation Party upon submission of a bid on the Assets or being selected as the Stalking Horse Bidder until such time that Empery has both been outbid and indicates it is no longer bidding at the Auction and notwithstanding that Empery is a Backup Bid.

**Counsel to Empery:**     GARMAN TURNER GORDON LLP
Attention: William M. Noall
7251 Amigo Street, Suite 210
Las Vegas, NV 89119
E-mail:  bknotices@gtg.legal and notices@emperyam.com

2.     <u>Expression of Interest</u>.  Any person interested in reviewing information pertaining to the Assets should contact the Debtor's bankruptcy counsel, Samuel A. Schwartz, via email at saschwartz@nvfirm.com.

3.     <u>Due Diligence</u>.  Interested parties shall have until July 3, 2023 (the "**Due Diligence Deadline**"), to review information related to the Debtor or the Assets and to inspect the Assets.  The Debtor shall not be obligated to furnish any due diligence information after the Due Diligence Deadline. The Debtor also reserves the right not to provide due diligence information or access to any interested party that the Debtor concludes in its reasonable business judgment is not likely to become a Qualified Bidder.

4.     <u>Stalking Horse Bidder and Bid Protections</u>.  The Debtor is authorized in the reasonable exercise of its business judgment and in consultation with the Consultation Parties, to enter into a stalking horse agreement with a Qualified Bidder for the sale of Assets (the "**Stalking Horse Bidder**") and provide such Stalking Horse Bidder (i) a break-up fee of up to two percent (2%) of the Stalking Horse Bidder's initial cash bid (the "**Break-Up Fee**") and (ii) reimbursement of the documented reasonable, actual, out-of-pocket costs and expenses paid or incurred by such Stalking Horse Bidder directly incident to, under, or in connection with the negotiation, execution and performance under its stalking horse agreement and the transactions contemplated thereunder (including travel expenses and reasonable fees and disbursements of counsel, accountants and financial advisors) in an amount not to exceed $50,000.00 (the "**Expense Reimbursement**" and together with the Break-Up Fee, the "**Bid Protections**").  Should a Stalking Horse Bidder be selected, the Debtor will file a notice of the selection of the Stalking Horse Bidder with the Bankruptcy Court by June 30, 2023.

5.     <u>Bidder Eligibility; Form and Contents of Bids</u>.

(a)     Any person who desires to bid for the purchase of any of the Assets shall deliver a Qualifying Bid to the Notice Parties by the Bid Deadline.  A bid shall constitute a "**Qualifying Bid**" if such bid includes the following, in form and substance reasonably satisfactory to the Debtor, in consultation with the Consultation Parties:

i.     fully executed transaction documents pursuant to which the bidder proposes to effectuate the sale, including a definitive purchase agreement generally in form and substance similar to the purchase agreement submitted by any selected Stalking Horse Bidder (and marked against the purchase agreement submitted by the Stalking Horse Bidder) setting forth all material terms and conditions of the proposed purchase, including, without limitation, the Asset(s) to be purchased, the

proposed consideration to be paid by the bidder, a customary provision providing for a closing adjustment to account for changes in value between the time of the Auction and the closing of the sale with respect to all purchased cash or accounts receivable, and all other material terms of the proposed transaction (as may be modified by overbids, the "**Transaction Documents**");

ii.      written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization to consummate the proposed transaction; provided, however, that, if the bidder is an entity specially formed for the purpose of effectuating the transaction, then the bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the transaction by the equity holder(s) of such bidder;

iii.      a cash deposit in the amount of ten percent (10%) of the bid's proposed purchase price to a non-interest bearing escrow account to be identified and established by the Debtor (the "**Deposit**"); and

iv.      written evidence that the Debtor reasonably concludes demonstrates that the bidder has the necessary financial ability to close the transaction and provides adequate assurance of future performance under all Designated Contracts (defined below).  Such information should include, *inter alia*, the following:

      a)   contact names and numbers for verification of financing sources;

      b)   evidence of the bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the transaction;

      c)   the bidder's current financial statements (audited if they exist); and

      d)   any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor demonstrating that such bidder has the ability to close the transaction; provided, however, that the Debtor shall determine, in its reasonable discretion, in consultation with the Debtor's advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a bidder's financial qualifications.

(b)      Additionally, in order to constitute a Qualifying Bid:

i.      the transaction proposed by the Transaction Documents may not be subject to any contingencies, including due diligence; *provided, however*, the transaction may be subject to the entry of the order approving the transaction by the Bankruptcy Court; and

ii.      the Transaction Documents shall identify any executory contracts and unexpired leases of the Debtor that the bidder wishes to have assumed and assigned to it pursuant to the transaction (collectively, the "**Designated Contracts**").

(c)      Finally, in order to be deemed a Qualifying Bid, the Definitive Agreement must be accompanied by a letter affirmatively:

i.      setting forth a full disclosure of the identity of the bidder (and any other person(s) subject to any agreement, arrangement or understanding with such bidder in connection with the bid), the contact information for such bidder, and full disclosure of any affiliates or insiders of the Debtor involved in such bid;

ii.      stating that the bidder is prepared to purchase the Asset(s) upon the terms and conditions set forth in its Definitive Agreement;

iii.      summarizing the consideration proposed under the Definitive Agreement (i.e., cash and assumed liabilities);

iv.      stating the value of the consideration allocated to the purchase of accounts receivable (if any);

v.      stating the aggregate value of the proposed consideration (which statement of value shall not be binding on the Debtor or the Bankruptcy Court);

vi.      stating that the bidder's bid shall remain open and binding on the bidder until and unless (A) the Debtor, in consultation with the Consultation Parties, accepts a higher bid as an overbid and (B) such overbid is not selected as a back-up bid;  and

vii.      stating the form of Deposit (either cashier's check or cash) made by the bidder.

(d)      Each bidder who submits a Qualifying Bid shall be deemed a "**Qualified Bidder**."

(e)      Any term in these Bid Procedures to the contrary notwithstanding, Empery shall be allowed to credit bid MP Collateral's secured claim against the Debtor at the Auction for the Assets, consistent with the terms set forth in that certain Plan Term Sheet, filed with the Court on May 8, 2023 at ECF No. 478, <u>Exhibit 1</u> ("**Term Sheet**"), as may be

4

superseded by any subsequent Plan Support Agreement filed with the Court in furtherance of the Term Sheet; *provided*, *however*, that Empery shall comply with all other requirements under these Bidding Procedures, except sections 5(a)(ii)-(iv) and 5(c)(i) and (vii), to be deemed a Qualified Bidder.

6.    <u>Evaluation of Bids</u>. The Debtor, in consultation with the Consultation Parties, shall determine whether a bid is a Qualified Bid, taking into determination any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the estate, including, *inter alia*: (a) the amount and nature of the consideration; (b) the proposed assumption of any liabilities and/or executory contracts or unexpired leases, if any; (c) the ability of the Qualified Bidder to close the proposed transaction; (d) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (e) any purchase price adjustments; (f) the impact of the transaction on any actual or potential litigation; and (g) the net after-tax consideration to be received by the Debtor's estate (collectively, the "**Bid Assessment Criteria**").

7.    <u>Selection of Highest or Best Qualifying Bid</u>. Within seven (7) calendar days of each bidder's timely delivery of all required materials as detailed in the preceding paragraph, the Debtor shall notify each bidder, in writing, as to whether its bid has been deemed a Qualifying Bid. At the conclusion of the bid selection process by the Debtor, which shall be no later than three (3) calendar days prior to the Sale Hearing, the Debtor shall inform each Qualified Bidder of the value of the highest or best Qualifying Bid.

8.    <u>The Sale of the Assets</u>. The Debtor shall file one or more motions to approve the sale(s) of the Asset(s) and the assumption and assignment of Designated Contracts no later than July 10, 2023.

9.    <u>Bidding Restrictions at Auction</u>. Qualified Bidders may submit subsequent bids for the purchase of the Assets at the Auction, provided: (i) the initial bid at the Auction must exceed the highest or best Qualifying Bid (including any applicable Bid Protections) by at least One Hundred Thousand Dollars ($100,000) (the "**Initial Overbid**"); (ii) each subsequent bid must exceed the previous bid by Fifty Thousand Dollars ($50,000) (the "**Bidding Increment**"); and (iii) any Qualified Bidder (other than Empery) who submits a subsequent bid at Auction in excess of its Qualifying Bid must provide evidence that it has the financial capability to consummate the transaction at the new, higher purchase price. The Debtor, in consultation with the Consultation Parties, may modify the Initial Overbid and Bidding Increment (or otherwise amend the Bidding Procedures) at any time during the Auction.

10.    <u>Selection of Winning Bidder and Back-Up Bidder</u>. At the conclusion of Auction, the Debtor, in consultation with the Consultation Parties and subject to the Bankruptcy Court's approval, shall determine (i) which bid constitutes the highest or best offer (the "**Winning Bid**" and such bidder, the "**Winning Bidder**"); and (ii) the next highest or best bid (the "**Back-Up Bid**" and such bidder, the "**Back-Up Bidder**").

11.    <u>Bankruptcy Court Approval of the Winning Bid; Return of Deposits</u>.  Promptly after the Bankruptcy Court's entry of an order approving the sale of the  Assets, the Deposits submitted by all Qualifying Bidders (other than the Winning Bidder and the Back-Up Bidder) shall be returned to the respective Qualifying Bidders.  The Deposit of the Winning Bidder shall be applied to the sale price set forth in the Winning Bidder's Definitive Agreement, as may be modified by the Winning Bid.  If a Winning Bidder fails to consummate the purchase of the Assets designated in its Definitive Agreement, as may be modified by the Winning Bid, and such failure is not caused by the Debtor's failure to meet all closing conditions of the Winning Bidder's Definitive Agreement, the Deposit of such Winning Bidder shall be forfeited to the Debtor. Notwithstanding this forfeiture, the Debtor specifically reserves the right to seek all additional available damages from any defaulting Winning Bidder. In the event the Winning Bidder does not close on the sale of the Assets designated in such Winning Bidder's Definitive Agreement, the Debtor shall pursue a sale of the Assets to the Back-Up Bidder. The Debtor will retain the Back-Up Bidder's Deposit until the sale to the Winning Bidder closes and the Back-up Bidder shall remain obligated to close a sale transaction with the Debtor based on the Back-Up Bidder's Definitive Agreement until the Sale to the Winning Bidder closes. Within seven (7) calendar days of the closing of the Sale to the Winning Bidder, the Debtor shall return the Deposit to the Back-Up Bidder.

12.    <u>Additional Procedures</u>. The Debtor, in consultation with the Consultation Parties, may announce additional procedural rules for the submission of bids that are reasonable under the circumstances so long as such rules are not inconsistent with these Bidding Procedures.

13.    <u>Consent to Jurisdiction</u>. All Qualified Bidders, and all bidders at the Auction, shall be deemed to have consented to the core jurisdiction of the United States Bankruptcy Court for the District of Nevada and waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction, or the construction and enforcement of the Transaction Documents.

## **SCHEDULE 1**

INTELLECTUAL PROPERTY AND LICENSES; TRADE NAMES

A.    COPYRIGHTS

    None.

B.    PATENTS

    None.

C.    TRADEMARKS

| Country | Title | Application or Registration No. | Filing Date | Registration Date |
|---|---|---|---|---|
| USA | BCAA 3:1:2 THE FOUNDATION OF YOUR TEMPLE MP MUSCLEPHARM | 4948843 | 11/21/2013 | 5/3/2016 |
| USA | BIZZY DIET | 4125619 | 10/3/2011 | 4/10/2012 |
| USA | COMBAT 100% WHEY | 6072063 | 3/23/2016 | 6/9/2020 |
| USA | COMBAT BLACK | n/a | 86512633 | n/a |
| USA | COMBAT 100% CASEIN | 4756998 | 2/21/2014 | 6/16/2015 |
| USA | COMBAT 100% ISOLATE | 4913165 | 7/29/2015 | 3/8/2016 |
| USA | CONFIDENCE BUILT HERE | 3969126 | 5/4/2010 | 5/31/2011 |
| USA | Fitmiss | 4444437 | 1/27/2012 | 12/3/2013 |
| USA | Fitmiss | n/a | 6/23/2021 | n/a |
| USA | FITMISS BURN | 4716743 | 1/30/2012 | 4/7/2015 |
| USA | FITMISS DELIGHT | 4498164 | 9/7/2013 | 3/18/2014 |
| USA | FUEL THE ATHLETE INSIDE | 3969123 | 5/3/2010 | 5/31/2011 |
| USA | FUEL YOUR ACTIVE LIFESTYLE | 4077223 | 6/9/2011 | 12/27/2011 |
| USA | MP | 4186812 | 1/4/2012 | 8/7/2012 |
| USA | MP (stylized black and white) | 5200085 | 12/22/2016 | 5/9/2017 |
| USA | MP Essentials | 5746636 | 12/19/2017 | 5/7/2019 |

| USA | MP Stealth | n/a | 12/19/2017 | n/a |
|---|---|---|---|---|
| USA | MUSCLEPHARM | 3933441 | 12/8/2009 | 3/22/2011 |
| USA | MUSCLEPHARM SPORTSWEAR | 4077205 | 6/3/2011 | 12/27/2011 |
| USA | MUSCLEPHARM ENERGY SPORT ZERO | 5191681 | 12/23/2014 | 4/25/2017 |
| USA | MP MUSCLEPHARM | 4767066 | 4/29/2014 | 7/7/2015 |
| USA | CREATINE BLACK | 5284138 | 10/10/2016 | 9/12/2017 |
| USA | CLEAN MASS | 5179223 | 2/10/2016 | 4/11/2017 |
| USA | VASO SPORT | 5083129 | 6/22/2015 | 11/15/2016 |
| USA | OXYSPORT | 5032380 | 6/18/2014 | 8/30/2016 |
| USA | #FUELYOURGRIND | 4970643 | 1/23/2015 | 5/31/2016 |
| USA | REAL ATHLETES. REAL SCIENCE. | 4924979 | 11/11/2013 | 3/29/2016 |
| USA | Z-CORE PM | 4922324 | 7/29/2015 | 3/22/2016 |
| USA | CLA CORE | 4913163 | 7/29/2015 | 3/8/2016 |
| USA | CARNITINE CORE | 4913160 | 7/29/2015 | 3/8/2016 |
| USA | THE FOUNDATION OF YOUR TEMPLE | 4891161 | 1/16/2014 | 1/26/2016 |
| USA | BUILD YOUR LEGACY | 4879294 | 1/13/2014 | 1/5/2016 |
| USA | STRONG IS THE NEW SEXY | 4709769 | 4/4/2014 | 3/24/2015 |
| USA | HYBRID SERIES | 4694743 | 4/25/2014 | 3/3/2015 |
| USA | LIVE SHREDDED | 4077218 | 6/9/2011 | 12/27/2011 |
| USA | WEAK ENDS HERE | 4317212 | 9/19/2012 | 4/9/2013 |
| USA | ENERGY ON THE GO | 4131623 | 8/23/2011 | 4/24/2012 |
| USA | RE-CON | 3934299 | 7/19/2010 | 3/22/2011 |
| European Union |  | | 14/05/2014 | |
| European Union |  | 012875985 | 14/05/2014 | 29/06/2017 |
| European Union |  | 012876058 | 14/05/2014 | 09/01/2015 |
| European Union |  | 013713656 | 05/02/2015 | 19/06/2015 |
| European Union |  | 017818048 | 15/02/2018 | 29/01/2019 |
| European | ASSAULT | | 05/02/2015 | |

| Union | | | | |
|---|---|---|---|---|
| European Union | ASSAULT in Class 5 | | 14/11/2018 | |
| European Union | COMBAT CRUNCH BAR | | 05/02/2015 | |
| European Union | COMBAT PROTEIN POWDER | 013712344 | 05/02/2015 | 24/06/2015 |
| European Union | FITMISS | 014594477 | 24/09/2015 | 12/02/2016 |
| European Union | MUSCLEPHARM | 014580625 | 22/09/2015 | 27/04/2016 |
| European Union | MUSCLEPHARM | 017817867 | 15/02/2018 | 29/01/2019 |

D.    OTHER PROPRIETARY RIGHTS

None.

E.    TRADE NAMES

MusclePharm

MSLP

F.    NAME OF, AND EACH TRADE NAME USED BY, EACH PERSON FROM WHICH A GRANTOR HAS ACQUIRED ANY SUBSTANTIAL PART OF THE COLLATERAL WITHIN THE PRECEDING FIVE YEARS

None.

MusclePharm Case No. 22-1442- NMC

**Domain Names for MusclePharm Corporation**

AMINOONE.COM
COCONUT-PROTEIN.COM
COCONUTPROTEIN.CO
COCONUTPROTEIN.INFO
COCONUTPROTEIN.NET
COCONUTPROTEINDIET.COM
COCONUTPROTEININPOWDER.COM
COCONUTPROTEININSHAKE.COM
COCOPROTEIN.COM
COMBATCRUNCH.COM
COMBATCRUNCH.INFO
COMBATCRUNCH.NET
COMBATCRUNCH.ORG
COMBATPROBAR.COM
COMBATPROTEIN.COM
COMBATPROTEIN.INFO
COMBATPROTEIN.NET
COMBATPROTEIN.ORG
FITFOODS.BIZ
FITFOODS.CO
FITFOODS.RECIPES
FITMISS.COM
FUELSPORT.COM
IAMFITMISS.COM
IAMFITMISS.NET
IAMFITMISS.ORG
IRON-ADDICT.COM
IRONADDICT.BIZ
IRONADDICT.CA
IRONADDICT.CO
IRONADDICT.INFO
IRONADDICT.ORG
IRONADDICT.US
MMAELITEPOWEREDBYMUCLEPHARM.COM
MMAELITEPOWEREDBYMUCLEPHARM.NET
MMAELITEPOWEREDBYMUSCLEPHARM.COM
MMAELITESERIES.COM
MMAELITESERIES.NET
mmusclepharm.com
MPFITFOODS.CA
MPFITFOODS.CO
MPFITFOODS.COM
MPFITFOODS.INFO
MPFITFOODS.NET
MPFITFOODS.ORG
MPFITFOODS.US
mpnatural-series.com
mpnaturalseries.com
MPPOWERED.COM
MPPOWERED.NET
MPSSI.BIZ
MPSSI.CO
MPSSI.COM
MPSSI.NET
MPSSI.ORG
MPTRAINER.COM
musclepharm.com
muscle-pharm.co
muscle-pharm.org
musclephaarm.com
musclepharm.cloud
musclepharm.club
MUSCLEPHARM.COM
musclepharm.info
musclepharm.mobi
musclepharm.net
musclepharm.pro
musclepharm.tech
musclepharm.website
musclepharm.xyz
musclepharmcorp.biz
musclepharmcorp.club
musclepharmcorp.com
MUSCLEPHARMCORP.COM
musclepharmcorp.com.cn
musclepharmcorp.info
musclepharmcorp.mobi
musclepharmcorp.net
musclepharmcorp.net.cn
musclepharmcorp.online
musclepharmcorp.org.cn
musclepharmcorp.shop
musclepharmcorp.us
MUSCLEPHARMCROSSFIT.COM
MUSCLEPHARMED.COM
musclepharmm.com
MUSCLEPHARMPOWERED.COM
MUSCLEPHARMPOWERED.NET
musclepharms.com
MUSCLEPHARMU.BIZ
MUSCLEPHARMU.CO
MUSCLEPHARMU.COM
musclepharrm.com
musclepharm.com
musclepphharm.com
musclephharn.com
musclephaarm.com
MYCOCOPROTEIN.COM
MYCOCOPROTEIN.INFO
MYCOCOPROTEIN.NET
NATURESPORT.CO
NATURESPORT.COM
NATURESPORT.NET
NATURESPORT.ORG
NATURESSPORT.COM
POWEREDBYMP.COM
POWEREDBYMP.NET
POWEREDBYMUCLEPHARM.COM
POWEREDBYMUCLEPHARM.NET
SKINNYMISS.COM
thepharm.la
WORKOUTDRINK.COM
WORKOUTDRINK.NET

## <u>SCHEDULE 2</u>

**Excluded Assets**

1.    The "Coco Protein" trademark and related intellectual property.

2.    Unless otherwise agreed to by the Debtor and the Committee, the estate's causes of action, including, but not limited to, (i) any claims against the Debtor's current and former directors and officers and (ii) any claims arising under chapter 5 of the Bankruptcy Code; *provided*, *however*, the sale may include preference claims against trade vendors that, upon determination by the Debtor and the Committee, are less than $100,000 as to each trade vendor.

3.    Unless otherwise agreed to by White Winston, the estate's causes of action (and associated rights to director and officer insurance) against directors and officers for breaches of their fiduciary duties of loyalty, care, and good faith that arose on or before December 31, 2018.

# EXHIBIT C

**Liquidation Analysis [to be filed and served at a later date, but prior to the Disclosure Statement objection deadline]**