**STEINHILBER SWANSON LLP**
MICHAEL P. RICHMAN, ESQ.
*Admitted Pro Hac Vice*
122 W. Washington Ave., Suite 850
Madison, WI 53703
Telephone:    (608) 630-8990
Facsimile:    (608) 630-8991
Email: mrichman@steinhilberswanson.com

**CARLYON CICA CHTD.**
CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
TRACY M. O'STEEN, ESQ.
Nevada Bar No. 10949
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
Telephone:    (702) 685-4444
Facsimile:    (725) 220-4360
Email: ccarlyon@carlyoncica.com
        dcica@carlyoncica.com
        tosteen@carlyoncica.com

*Counsel for Ryan Drexler*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>MUSCLEPHARM CORPORATION,<br><br>Debtor. | Case No.  BK-22-14422-NMC<br>Chapter 11<br><br>**DECLARATION OF<br>MICHAEL P. RICHMAN** |

1.    I am a member of the law firm Steinhilber Swanson LLP. Our firm is co-counsel to Ryan Drexler in the above-captioned proceeding. I make this declaration in support of Ryan Drexler's *Objection to Emergency Motion to Enforce Intercreditor and Subordination Agreement Under Section 510(a) of the Bankruptcy Code*.

2.    Attached hereto is an appendix containing highlighted excerpts of true and correct copies of: (1) the Plan Term Sheet attached as Exhibit 1 to the *Notice of Plan Term Sheet* [ECF No. 478] (excerpts are numbered beginning with letter prefix "A"); (2) the Plan Support Agreement attached as Exhibit 1 to the *Debtor's Motion Pursuant to 11 U.S.C. §§ 105 and 363*

*of the Bankruptcy Code and Bankruptcy Rule 9019 to Approve Settlement and Plan Support Agreement with: (I) the Official Committee of Unsecured Creditors; (II) Empery Tax Efficient, LP, in its Capacity as Collateral Agent and Financing Agent for MP Collateral, LLC; and (III) White Winston Select Asset Funds, LLC* [ECF No. 524] (excerpts are numbered beginning with letter prefix "B"); and (3) *Plan of Reorganization for MusclePharm Corporation Under Chapter 11 of the Bankruptcy Code Dated May 26, 2023* [ECF No. 553] (excerpts are numbered beginning with letter prefix "C").

        3.      I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 14, 2023.

*/s/ Michael P. Richman*
Michael P. Richman

**IN RE MUSCLEPHARM CORPORATION**

**Plan Term Sheet**

**May 8, 2023**

This Plan Term Sheet (the "Term Sheet") is a summary of the material terms to be incorporated into a binding *Plan Support Agreement* ("PSA") to be filed by MusclePharm Corporation (the "Debtor") in the Debtor's chapter 11 case pending in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"). This Term Sheet is proffered by the Official Committee of Unsecured Creditors of the Debtor (the "Committee") in the nature of a settlement proposal in furtherance of settlement discussions and is therefore entitled to protection from any use or disclosure to any person pursuant to Federal Rule of Evidence 408 and any other rule of similar import. This Term Sheet and the information contained herein are strictly confidential and may contain material non-public information. This Term Sheet does not constitute (nor shall it be construed as) an offer with respect to the issuance of any securities, nor is it an offer or solicitation of votes for or against any chapter 11 plan, and is being presented for discussion and settlement purposes only. It is understood that a solicitation of votes in respect of a chapter 11 plan, if any, will be made only in compliance with the applicable provisions of the securities, bankruptcy, and other applicable laws.

Nothing herein shall be deemed to be an admission or evidence of any fact, and this Term Sheet shall not be introduced as evidence for any purpose, including in litigation among the parties hereto. Except as otherwise expressly provided in this Term Sheet, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any party to protect and preserve any of its respective rights, remedies and interests, including without limitation its respective claims against the other or its ability to participate in any proceeding.

| PLAN TERM SHEET | |
|---|---|
| **Term** | **Description** |
| *Parties* | Debtor: MusclePharm Corporation |
| | Committee: Official Committee of Unsecured Creditors of Debtor |
| | Empery: Empery Tax Efficient, LP, in its capacity as Collateral Agent and Administrative Agent, and MP Collateral LLC |
| | White Winston: White Winston Select Asset Funds, LLC and White Winston Select Asset Fund Series Fund MP-18, LLC |
| | Prestige: Prestige Capital Finance, LLC, MP Collateral LLC (as assignee) |
| | Each person executing the PSA (defined below) on behalf of a Party shall represent and warrant to all other Parties to the PSA (defined below) that they have the authority to execute the PSA on behalf of the Parties for whom they are signing (in the case of Empery, for itself, it's participants and MP Collateral). |
| *Asset Sale* | The Debtor shall engage an investment banker selected by the Independent Director, in consultation with the Committee and Empery, and solely to the extent the Independent Director (Nicholas Rubin) determines that an investment banker is necessary to maximize the value of the estate's assets. The Independent Director shall have the sole authority to select the investment banker on or before May 12, 2023. |

**A1**

| PLAN TERM SHEET | |
|---|---|
| **Term** | **Description** |
| | The Debtor shall, in consultation with the Committee and Empery, run a sale process, pursuant to section 363 of the Bankruptcy Code, for the sale of substantially all of its assets (the "<u>Sale</u>"), including cash which will be subject to a customary closing adjustment, pursuant to the following schedule: |

- Indications of interest and Stalking Horse selection in 45-days. The Debtor may select the Stalking Horse Bidder, in consultation with the Committee and Empery (solely to the extent Empery is not the Stalking Horse Bidder). For the avoidance of doubt, the Debtor, with the consent of the Committee, may select Empery as a stalking horse bidder, which bid may include a credit bid in accordance with the terms of this Term Sheet.

- Auction, if any, at least two (2) business days prior to the Sale hearing. The auction shall be held in open court or should the Bankruptcy Court not be available, such other mutual location as the Debtor, the Committee, and Empery may agree.

- Sale hearing in 75-days.

- Closing outside date in 95-days (August 15), or as otherwise mutually agreed to by Empery, the Committee, the Debtor, and the successful bidder.

<u>Excluded Assets</u>:

- <u>IP License</u>. The Sale shall not include the intellectual property for Coco Protein™ which will remain property of the estate (the "<u>Excluded IP</u>"). The estate shall provide the purchaser with an exclusive one-year license of the Excluded IP.

- <u>Causes of Action</u>. The Sale shall not include any of the estate's causes of action, unless otherwise agreed to by the Debtor and the Committee, including, but not limited to, any claims against its current or former directors and officers and any claims arising under chapter 5 of the Bankruptcy Code; *provided, however,* the Sale may include preference claims against going forward trade vendors that, upon determination by the Committee, are less than $100,000 as to each trade vendor; *provided further, however,* that, unless otherwise agreed to by White Winston, the Sale shall not include the White Winston D&O Claims (defined below).

- "<u>White Winston D&O Claims</u>" means the estate's causes of action (and associated rights to director and officer insurance) against directors and officers for breaches of their fiduciary duties of loyalty, care, and good faith that arose on or before December 31, 2018.

<u>Credit Bid Cap</u>. Empery's right to credit bid its claims (DIP Obligations and prepetition notes) will be capped at $14.0 million, subject to increase with the

**A2**

| PLAN TERM SHEET | |
|---|---|
| **Term** | **Description** |
| | consent of the Committee.  To the extent Empery is the successful bidder, and subject to confirmation of a Plan consistent with this term sheet, Empery shall issue 20% of the purchaser's equity to the Liquidation Trust for the benefit of general unsecured creditors.  For the avoidance of doubt, the 20% is pre-money (before any capital raise); *provided, however,* the governing documents shall provide the GUCs a right to participate in any such capital raise on a *pro rata* basis at a minimum (*pro rata* to their initial equity stake in NewCo); *provided further* that any management equity incentive plan shall be allocated solely from Empery's 80% equity share; *provided further* Empery's obligation to issue the purchaser's equity pursuant to this paragraph shall arise on the Closing Date and shall not be subject to confirmation of any Plan or the occurrence of the Plan Effective Date (defined below).  Any bid from Empery shall include cash in the amount of the Wind-down Budget (defined below). |
| | <u>DIP Obligation Payoff</u>.  On or as soon as practicable following the Closing Date, the DIP Obligations (inclusive of Roll-Up) will be paid in full in cash to Empery from the cash proceeds of the Sale.  In no event shall the DIP Obligations (inclusive of the Roll-Up) exceed $6.5 million ($3M DIP / $3M Roll-Up / up to $0.5M of interest, fees, and expenses), subject to increase dollar-for-dollar with any funding under the DIP Inventory Acquisition Line of Credit funded at the request of the Debtor, without the prior written consent of the Committee.[1]  For the avoidance of doubt, the term DIP Obligations includes all principal, fees, interest, and expenses. For clarity, DIP Factoring is not included in the DIP Obligation Payoff. |
| | <u>Cash Collateral</u>.  Prior to approval of PSA, the Debtor, Empery, and the Committee shall mutually agree upon a budget (the "<u>Wind-down Budget</u>") to effectuate the plan of reorganization described in the "Plan" section of this Term Sheet (the "<u>Plan</u>").  For the avoidance of doubt, the Debtor, Empery, and the Committee anticipate that the Sale proceeds will be sufficient to repay the DIP Obligations Payoff and fund the chapter 11 case within the Wind-down Budget through the Plan Effective Date. |
| | <u>Factored Receivables</u>: All accounts receivable will be separately accounted for in the purchase price by the buyer. Empery shall consent to the sale of outstanding postpetition factored accounts receivable (*i.e.*, accounts receivable factored under the DIP Factoring Facility), *provided that* the buyer pays the amount outstanding to the DIP Factoring Agent, including all accrued interest and other amounts chargeable under the DIP Factoring Facility. In addition, the buyer will have the right to pay-off all prepetition accounts receivable owed by Costco and Costco Canada (to the extent they are not paid at the time of the sale). For clarity, the purchase price of the assets will not include accounts receivable (both postpetition factored accounts receivable and prepetition accounts receivable) unless clearly specified by the buyer. Upon repayment in |

---

[1] The cap on the DIP Obligations is premised on the assumption that there will be no further advances under the DIP Note Agreement.  If further advances cause the balance under the DIP Note Agreement to exceed $3.0 Million, then notwithstanding anything in this Term Sheet to the contrary, the DIP Obligations due under this Term Sheet will increase dollar per dollar, as will the Roll-Up, to the extent of such increased lending.

3

**A3**

| PLAN TERM SHEET | |
|---|---|
| **Term** | **Description** |
| | full of the Debtor's obligations to the DIP Factoring Agent, all holdback amounts shall be returned to the Debtor. |
| | "<u>Net Sale Proceeds</u>" shall mean the cash proceeds of the Sale *less* any fees and expenses related to such Sale, *less* the DIP Obligation Payoff, and *less* the Wind-down Budget. The Wind-down Budget shall not exceed $500,000, unless otherwise mutually agreed upon by the Debtor, Empery, and the Committee. |
| | For the avoidance of doubt, the Empery liens shall attach to the cash Sale proceeds until such time as a Plan consistent with the terms of this Term Sheet becomes effective and Empery is irrevocably paid in cash and/or by credit bid, as applicable, the amounts agreed to be paid to Empery pursuant to this Term Sheet. |
| ***Plan*** | The Plan may be modified with respect to the Tax Provisions and Public Entity Provisions (each defined below) pursuant to section 1127 of the Bankruptcy Code, provided that such modifications do not conflict with this Term Sheet in a manner that deprives any Party from the direct benefits to which it is expressly entitled under this Term Sheet (including, but not limited to, rights, economic recoveries, and vesting of assets set forth herein and limitations on risk (including releases) and costs), unless otherwise agreed to by the Parties and are otherwise consistent with this Term Sheet, in which event the Plan as modified shall be the Plan for all purposes of this Term Sheet. |
| | The Debtor, the Committee, and Empery (at its option) (the "<u>Plan Proponents</u>") shall jointly propose the Plan under chapter 11 of Title 11 of the United States Code, and it will be consistent with, and include all of the material and relevant provisions of, this Term Sheet. The Plan Proponents shall regularly consult with White Winston (and in the event Empery is not a Plan Proponent, Empery) on the terms of the Plan and associated documents, including, without limitation, the disclosure statement, Plan, and form of confirmation order. The Plan, the disclosure statement, the form of confirmation order, and all amendments and modifications thereto shall be reasonably acceptable to White Winston (and in the event Empery is not a Plan Proponent, Empery) prior to the time of filing such document(s). In general, the Plan will (1) vest all of the estate's remaining assets, other than the Excluded IP and the White Winston D&O Claims, in a liquidation trust and (2) vest the Excluded IP and the White Winston D&O Claims in MusclePharm as reorganized by the Plan (the "Reorganized Debtor"), the equity of which will be issued to White Winston in full satisfaction of its claims. The Plan Proponents will not file any Plan or any modifications to any such Plan provided such Plan and modifications, if any, are consistent with this Term Sheet, and do not deprive such Party from the direct benefits to which it is expressly entitled under this Term Sheet (including, but not limited to, rights, economic recoveries, and vesting of assets set herein and limitations on risk (including releases) and costs), unless otherwise agreed to by the Parties. |
| | As discussed more fully below, the Plan shall (i) be proposed on a timeline to coincide with the Sale timeline and (ii) provide for the Plan Effective Date on or before August 31, 2023; *provided, however*, that the consummation of the |

**A4**

| PLAN TERM SHEET | |
|---|---|
| **Term** | **Description** |
| | Sale consistent with the Sale timeline is the paramount objective of the Debtor, Committee, and Empery, which objective is acknowledged by White Winston.<br><br>The Plan shall contain standard third-party consensual releases and exculpation clauses.  The Plan will release all of the estate's claims against Empery, Prestige, and White Winston.  In addition, Empery and White Winston shall exchange consensual releases (broad releases, including, but not limited to, all defendants in the adversary proceeding) in form and substance reasonably satisfactory to Empery and White Winston that shall be effective upon the occurrence of the Plan Effective Date, and the exchange of such releases is a condition to confirmation of a Plan and Empery contributing the assets on which it has a lien, provided further, that such releases will become effective upon confirmation of the Plan if White Winston's $8,630,261.00 Class 7 Claim becomes an allowed unsecured claim on such confirmation date. White Winston and Empery shall submit such papers as are reasonably necessary to dismiss the released parties with respect to underlying actions/claims.<br><br>The Plan shall preserve all estate causes of action, including chapter 5 claims (other than chapter 5 claims purchased by the purchaser consistent with this Term Sheet), which (i) other than the White Winston D&O Claims shall vest in the liquidation trust, unless otherwise agreed to by the Committee and the Debtor, or (ii) with respect to the White Winston D&O Claims, shall vest in the Reorganized Debtor.<br><br>For the avoidance of doubt, all claims against the Debtor's current and former directors and officers, including Ryan Drexler, other than the White Winston D&O Claims, shall be preserved and vest in the liquidation trust (to the extent not sold).  The White Winston D&O Claims shall be preserved, shall not be sold (unless otherwise agreed to by White Winston), and shall vest in the Reorganized Debtor.<br><br>Preservation of Tax Attributes and Public Entity Status.  The Plan shall be structured by the Parties consistent with the other terms and conditions contained in this Term Sheet and existing law to contain the provisions proposed by White Winston (and reasonably acceptable to the Debtor, the Committee and Empery) to, and in an effort to effectuate, (i) the preservation of the favorable tax attributes of the Debtor (including all net operating losses) for the benefit of the Reorganized Debtor (such provisions to preserve favorable such tax attributes of the Debtor (including all net operating losses) (the "Tax Provisions") and  (ii) the preservation of the Reorganized Debtor as a public entity (such provisions to preserve the Reorganized Debtor as a public entity (the "Public Entity Provisions"), provided however, that the Bankruptcy Court's preservation of the NOL's subject to the Tax Provisions and the retention of the Debtor as a public entity pursuant to the Public Entity Provisions is not a condition to this Term Sheet. For purposes of the immediately preceding sentence, any provision of the Plan proposed by White Winston shall be deemed reasonably acceptable to the Debtor, the Committee and Empery if the effect of such provision does not deprive a Party from the direct benefits to which it is expressly entitled to under this Term Sheet (including, but not limited to, rights, economic recoveries, and vesting of assets set forth herein and limitations on risk (including releases) and costs), unless |

5

**A5**

| PLAN TERM SHEET | |
|---|---|
| **Term** | **Description** |
| | all expenses incurred related to preserving and maintaining the Debtor's public entity status from and after the effective date of the PSA. In addition, White Winston shall prepare, at its sole cost and expense, all necessary applications, filings, and documents related to maintaining the Reorganized Debtor's public entity status.

For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, White Winston shall not be responsible for and shall not be required to pay (i) any fees of any of the professional persons representing the Debtor or the Committee and (ii) any amounts that the Debtor is required to pay under applicable law prior to the Plan Effective Date to maintain the Debtor's public entity status; *provided, however*, that in the event any actual and necessary costs of maintaining the Debtor's public entity status (meaning the cost of each action required to be taken as directed by White Winston and/or reasonably determined by Debtor) not included in the Debtor's current budget, then White Winston may elect to fund in advance such costs upon written request and at White Winston's sole option; *provided further, however*, that in the event White Winston declines to advance such costs before such action is taken as requested, then the obligation of any person or entity under this Term Sheet to fund such costs shall cease, with all other obligations of the Parties hereunder remaining intact.

<u>Termination of Security Interests</u>. The Plan shall constitute a termination statement with respect to all liens, security interests and encumbrances that is effective upon the Plan Effective Date pursuant to section 9-513 of the Uniform Commercial Code ("UCC"). The Plan shall provide that all liens, security interests and encumbrances in and to the Debtor's assets shall terminate, be discharged and shall not attach to any assets of the Reorganized Debtor from and after the Effective Date. The Plan shall provide that the Reorganized Debtor is authorized and empowered to record any and all termination statements or similar documents to terminate any and all liens, security interests and encumbrances, including as set forth in section 9-509 of the UCC. Upon request of the Reorganized Debtor, all holders of such liens, security interests and encumbrances shall execute and deliver to the Reorganized Debtor appropriate authorizations to record such termination statements or similar documents including pursuant to section 9-513 of the UCC. |
| ***Certain Other Matters*** | a.  The Debtor shall engage in continuous operations for purposes of Section 382 of the Internal Revenue Tax Code prior to Plan Effective Date. The Plan, the Disclosure Statement, and all other documents filed with the Bankruptcy Court, shall where relevant provide that the Debtor has maintained continuous operations prior to the Plan Effective Date, that the Reorganized Debtor intends to maintain continuous operations from and after the Plan Effective Date, and shall avoid provisions providing that prior to the Plan Effective Date |

8

**A6**

| PLAN TERM SHEET | |
|---|---|
| **Term** | **Description** |
| | the Debtor has or is terminating operations, liquidating, or provisions of similar import. |
| | b.   The Debtor and the Reorganized Debtor shall file federal tax returns that do not elect to forego section 382 (including section 382(l)(5)) of the Internal Revenue Code for the taxable year in which the Plan Effective Date occurs, and that otherwise are as reasonably requested by White Winston. |
| | c.   The Plan Proponents shall serve copies of the Plan, the Disclosure Statement, and all documents, pleadings and notices filed by the Plan Proponents therewith or required by the Plan Proponents to be served on parties in interest pursuant to Fed. R. Bankr. P. 2002 on the United States Internal Revenue Service, taxing authorities for the State of Nevada, taxing authorities for the State of California, and the United States Securities and Exchange Commission. |
| *Classification and Treatment of Claims and Interests* | |
| ***Administrative and Priority Tax Claims*** | On or as soon as practicable following the Plan Effective Date of the Plan, each holder of an allowed administrative or priority tax claim will be paid in full in cash (subject to the Wind-Down Budget) or otherwise left unimpaired, unless otherwise agreed by such holder.<br><br>*Unimpaired and not entitled to vote.* |
| ***Class 1: Other Secured Claims*** | On or as soon as practicable following the Plan Effective Date, each holder of an allowed Other Secured Claim will be paid in full in cash or otherwise realize the value of its collateral, unless otherwise agreed by such holder. Class 1 will include separate sub-classes for each applicable secured creditor. For the avoidance of doubt, this class does not include any secured claims of Empery, Prestige, or Ryan Drexler.<br><br>*Unimpaired and not entitled to vote.* |
| ***Class 2: Priority Claims*** | On or as soon as practicable following the Plan Effective Date of the Plan, each holder of an allowed priority claim will be paid in full in cash or otherwise left unimpaired, unless otherwise agreed to by such holder.<br><br>*Unimpaired and not entitled to vote.* |
| ***Class 3: Empery Prepetition Secured Claim*** | Empery shall compromise and settle with the estate and have an allowed secured claim in the amount of $18 million (the "Allowed Empery Secured Claim"), which represents principal and accrued interest and fees through the Petition Date and excludes the Roll-Up. |

9

**A7**

| PLAN TERM SHEET | |
|---|---|
| **Term** | **Description** |
| | On or as soon as practicable following the Plan Effective Date, holders of the Allowed Empery Secured Claim shall receive their *pro rata share* of the Net Sale Proceeds, not to exceed $12.0 million *less* the Roll-Up and *less* the amount of Empery's credit bid in the aggregate (the "<u>Empery Payoff Amount</u>").<br><br>Empery shall assign to the Liquidation Trust, for the benefit of holders of Allowed Class 5 Claims, the economic interest in the difference between the Allowed Empery Secured Claim and the Empery Payoff Amount (the "<u>Empery Assigned Claim</u>"), including, for the avoidance of doubt, any monetary recovery on such Empery Assigned Claim.<br><br>To the extent the Net Sale Proceeds (including the amount, if any, of Empery's credit bid) are insufficient to satisfy the Empery Payoff Amount in full, holders of Allowed Empery Secured Claims shall forego any further recovery.<br><br>To the extent the Plan does not go effective by the August 31, 2023 deadline, the Debtor and Committee may extend such outside date by up to 30 calendar days, without the consent of Empery, provided that the Empery Payoff Amount is paid in full from the Net Sale Proceeds on or before August 31, 2023; *provided, however,* to the extent Empery is the successful bidder pursuant to a credit bid, the outside date may be extended, if necessary, to a mutually agreed upon date.<br><br>*Impaired and entitled to vote.* |
| *Class 4:  Prestige Prepetition Secured Claim* | Prestige shall have an allowed secured claim in the amount of $2,500,000 (the "<u>Allowed Prestige Secured Claim</u>"), which represents principal and accrued interest and fees through the Petition Date.  The Allowed Prestige Secured Claim shall be subject to reduction from the proceeds of collections on its prepetition collateral.  As of the date of this Term Sheet, the reductions are approximately $700,000.<br><br>The Allowed Prestige Secured Claim shall first be paid from prepetition accounts receivable and second from the Net Sale Proceeds. For the avoidance of doubt, the Allowed Prestige Secured Claim shall be subordinate in right to payment of the Empery Assigned Claim, except with respect to prepetition accounts receivable.<br><br>Holders of the Allowed Prestige Secured Claim shall retain all rights and causes of action against third parties, including but not limited to the guarantee provided by Ryan Drexler.<br><br>*Impaired and entitled to vote.* |
| *Class 5:  General Unsecured Claims* | Class 5 shall consist of all general unsecured claims.  Neither Empery, White Winston, Drexler, nor Prestige (nor any of their affiliates or any of the individual noteholders) shall have a Class 5 Claim. |

**A8**

| PLAN TERM SHEET | |
|---|---|
| **Term** | **Description** |
| | For the avoidance of doubt, all holders of Allowed Class 5 Claims shall receive payment in full on account of their allowed claims prior to any cash distribution to holders of claims in Classes 6, 7, and 8. |
| | Each holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of a beneficial interest in the Liquidation Trust. |
| | *Impaired and entitled to vote.* |
| *Class 6: Drexler Claims* | Class 6 shall consist of all claims (secured and unsecured; prepetition and postpetition) of Ryan Drexler (collectively, the "Drexler Claims"). |
| | On the Plan Effective Date, the Allowed Drexler Claims shall be subordinated to all Allowed Claims, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Claims, and Allowed General Unsecured Claims. |
| | *Impaired and entitled to vote.* |
| *Class 7: White Winston Claim* | Class 7 shall consist of all claims of White Winston (if any), including all claims arising from that certain *Settlement Agreement and Release* dated as of December 5, 2022 (the "Settlement Agreement"), by and between White Winston, the Debtor, and Ryan Drexler (collectively, the "White Winston Claims"). |
| | Subject to the occurrence of the Plan Effective Date (or, if both the Effective Date has not occurred and the Empery Payoff Amount is paid in full) from the Net Sale Proceeds on or before August 31, 2023, upon entry of the confirmation order if the, the Settlement Agreement shall be deemed an executory contract that the Debtor shall reject under the Plan pursuant to section 365 of the Bankruptcy Code. As a result, White Winston shall have an allowed unsecured claim of $8,630,261.00 arising from rejection of the Settlement Agreement. The Claim shall be treated as follows: |
| | a. 100% (or such other amount as White Winston in its sole discretion determines) of the new equity interests or, at White Winston's election, the prepetition equity interests (collectively, the "New Equity"), in the Reorganized Debtor in full and final satisfaction of the claim in the amount of $4,630,261.00. The rights and powers of holders of New Equity shall be as set forth in the Plan or in related documents by White Winston. It is the intention of the parties that the rights and powers of holders of New Equity be determined by White Winston in connection with the "change of ownership" rules of § 382 of the Internal Revenue Tax Code, including the exceptions to the ordinary "change of ownership" rules found in sections 382(l)(5) of the Internal Revenue Tax Code. |

11

**A9**

| PLAN TERM SHEET | |
|---|---|
| **Term** | **Description** |
| | b. The remaining $4,000,000 of the claim (the "White Winston Retained Claim") shall not be discharged and shall remain as a liability of the post-confirmation Reorganized Debtor. For the avoidance of doubt, White Winston shall not have a claim against the Liquidation Trust.<br><br>*Impaired and entitled to vote.* |
| ***Class 8: Interests*** | All existing equity interests in the Debtor shall be cancelled and holders of such equity interests shall neither receive nor retain anything on account of their existing equity interests.<br><br>*Impaired, not entitled to vote, and deemed to reject.* |
| ***Liquidation Trust*** | Liquidation Trustee: Appointed in the sole discretion of the Committee.<br><br>Oversight Committee: Three (3) members appointed in the sole discretion of the Committee.<br><br>Vesting of Assets: On the Plan Effective Date, the Liquidation Trust shall be vested with all assets of the Debtor not sold to the purchaser, not paid to Empery, and not transferred to, or vested in, the Reorganized Debtor, including all claims, causes of action, and interests of the Debtor (including all rights, claims, and causes of action relating to insurance policies) that are not White Winston D&O Claims. The Liquidation Trust shall also be assigned, as described above, all rights, claims, causes of action, and interests of holders of Allowed Empery Secured Claim and Allowed Prestige Secured Claim, solely in their capacity as such.<br><br>Funding: On the Plan Effective Date, the Liquidation Trust shall receive all cash held by the estate, including the Net Sale Proceeds *less* the Empery Payoff Amount (the "Liquidation Trust Cash Balance"). For the avoidance of doubt, any remaining funds in the Wind-down Budget shall vest in the Liquidation Trust. To the extent the Liquidation Trust Cash Balance is *less than* $500,000, Empery shall fund the difference to the Liquidation Trust (the "Empery Liquidation Trust Loan"). The Empery Liquidation Trust Loan shall be repaid from the proceeds of the Liquidation Trust Assets ahead of any distributions to holders of Allowed Class 5 Claims. For the avoidance of doubt, Empery's obligation to fund the Empery Liquidation Trust Loan shall be a binding obligation upon the Closing Date (*i.e.*, the closing of the Sale) and such amounts shall be paid to the Liquidation Trust on the Plan Effective Date (*i.e.*, the effective date of the Plan), even if such Plan Effective Date is delayed beyond the originally contemplated deadline of August 31, 2023. |
| ***Distribution of White Winston D&O Claims*** | After the Plan Effective Date, the Reorganized Debtor shall pay to the Liquidation Trust an amount equal to thirty percent (30%) of the proceeds of the White Winston D&O Claims actually collected by the Reorganized Debtor, |

A10

| PLAN TERM SHEET | |
|---|---|
| **Term** | **Description** |
| | *less* any fees and expenses related to the Reorganized Debtor's efforts to recover proceeds of the White Winston D&O Claims. |
| *Plan Effective Date* | The effective date of the Plan (the "<u>Plan Effective Date</u>") shall be not later than August 31, 2023, unless a different date is otherwise mutually agreed to by the Parties, in which event such different date shall be the Plan Effective Date for all purposes of this Term Sheet. For the avoidance of doubt, the Parties shall use reasonable best efforts to minimize the time between the Sale closing date and the Plan Effective Date, which efforts shall include implementing a Plan timeline that coincides as reasonably as possible with the Sale timeline. The Plan Proponents shall make commercially reasonable efforts to achieve the occurrence of the Plan Effective Date on or before August 31, 2023. |
| *Plan Support Agreement* | <u>White Winston Support</u>. In exchange for the treatment provided White Winston under the terms of this Term Sheet and the Plan, White Winston shall vote in favor of the Plan, shall support the Plan at the Confirmation Hearing, shall not aid, abet or indirectly support any persons or groups objecting to the Plan, shall be precluded from taking any action inconsistent with this Term Sheet, and shall otherwise not object to the Plan, except to the extent the Plan is not consistent with the terms of this Term Sheet. |
| | <u>Empery Support</u>. In exchange for the treatment provided Empery under the terms of this Term Sheet and the Plan, Empery shall vote in favor of the Plan, shall support the Plan at the Confirmation Hearing, shall not aid, abet or indirectly support any persons or groups objecting to the Plan, shall be precluded from taking any action inconsistent with this Term Sheet, and shall otherwise not object to the Plan, except to the extent the Plan is not consistent with the terms of this Term Sheet. For the avoidance of doubt, for purposes of this section, the reference to "Empery" includes in its capacity as assignee of the Allowed Prestige Secured Claims. |
| | Empery shall take all commercially reasonable efforts to exercise its proxy rights under that certain *Intercreditor and Subordination Agreement* dated October 13, 2021 (as amended or otherwise modified from time to time), among Ryan Drexler, the Debtor, and Empery Tax Efficient, LP (the "<u>Drexler Intercreditor Agreement</u>"), and cause the Drexler Claims arising from the Subordinated Debt (as defined in the Drexler Intercreditor Agreement) to vote in favor of the Plan. |
| | This Term Sheet will be formalized in a PSA among the Parties and approved by the Bankruptcy Court on an expedited basis, unless the Parties mutually agree to move forward solely on this Term Sheet, in which case the Debtor will seek approval of the Term Sheet on an expedited basis. For the avoidance of doubt, the Parties shall not directly or indirectly support, vote for, and/or seek confirmation of any chapter 11 plan that differs from the Plan as described in this Term Sheet. |

DOCS_SF:108670.18 59184/001

**A11**

| PLAN TERM SHEET | |
|---|---|
| **Term** | **Description** |
| *Standstill Agreement* | Effective upon the filing of this Term Sheet (and continuing upon the execution of the PSA), the Parties shall take all reasonable and necessary steps to immediately stay all pending litigation between or among the Parties (which shall include all aspects of that certain adversary proceeding captioned *White Winston Select Asset Funds, LLC v. Empery Tax Efficient LP*, Adversary Proceeding No. 23-01014), regardless of venue. Such stay shall remain in place through the earlier of (i) the Plan Effective Date and (ii) twenty-one (21) calendar days following termination of this Term Sheet and the PSA. |

A12

**THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

THIS PLAN SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES. ACCORDINGLY, PRIOR TO MUTUAL EXECUTION OF THIS PLAN SUPPORT AGREEMENT BY THE UNDERSIGNED, THIS PLAN SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

## <u>PLAN SUPPORT AGREEMENT</u>

### May 18, 2023

This PLAN SUPPORT AGREEMENT (as may be amended, modified, or supplemented from time to time in accordance with the terms hereof, this "**Agreement**") is made and entered into as of May 18, 2023 by and among (i) MusclePharm Corporation, as debtor and debtor in possession (the "**Debtor**"); (ii) the Official Committee of Unsecured Creditors of Debtor (the "**Committee**"); (iii) MP Collateral LLC ("**MP Collateral**"), as successor to the claims of (x) the Secured Noteholders (as defined in the Empery Proof of Claim (defined below)) against the Debtor and (y) Prestige Capital Finance, LLC ("**Prestige**") against the Debtor as set forth in the Prestige Proof of Claim (defined below), and Empery Tax Efficient, LP, in its capacity as MP Collateral's Financing Agent and as Collateral Agent ("**Empery**" and collectively with MP Collateral, the "**Empery Parties**"); and (iv) White Winston Select Asset Funds, LLC ("**White Winston**") and White Winston Select Asset Fund Series Fund MP-18, LLC ("**WW Select MP-18**") (each a "**White Winston Party**" and collectively, the "**White Winston Parties**"). The Debtor, the Committee, each of the Empery Parties, and each of the White Winston Parties shall each be referred to as a "**Party**" and collectively as the "**Parties**."

### <u>RECITALS</u>

**WHEREAS**, the Debtor is debtor-in-possession in a case (the "**Chapter 11 Case**") under chapter 11, title 11, United States Code (the "**Bankruptcy Code**"), which Chapter 11 Case was filed on December 15, 2022 (the "**Petition Date**") and is pending in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**") as Case No. 22-14422-NMC;

**WHEREAS,** the Debtor is a scientifically-driven, performance lifestyle company that develops, markets and distributes a range of branded sports nutrition products in 120 countries around the world;

**WHEREAS**, MP Collateral, that acts through its Collateral Agent, Empery, is a creditor of the Debtor. MP Collateral filed a proof of claim in the Chapter 11 Case for the claims it was assigned by the Prepetition Secured Lenders as defined in the Financing Order (defined below)

**B13**

(ii)     Stalking Horse Bids.  Indications of interest in the acquisition of the Assets shall be due and the selection of a stalking horse bidder ("**Stalking Horse Bidder**") shall occur on or before June 22, 2023.  The Debtor may select the Stalking Horse Bidder, in consultation with the Committee and Empery (solely to the extent Empery is not the Stalking Horse Bidder).  For the avoidance of doubt, the Debtor, with the consent of the Committee, may select Empery as the Stalking Horse Bidder, which bid may include a credit bid in accordance with the terms of this Agreement.

(iii)    Auction.  An auction (the "**Auction**"), if any, shall occur on July 21, 2023. The Auction shall be held before the Bankruptcy Court or such other mutual location as the Debtor, the Committee, and Empery may agree.

(iv)     Sale Hearing.  A hearing to approve the Sale shall commence before the Bankruptcy Court ("**Sale Hearing**") on August 9, 2023.

(v)      Closing Date.  The closing of the Sale shall occur on or before August 15, 2023 or immediately upon the order approving the Sale becoming final and non-appealable, or as otherwise mutually agreed to by the Debtor, the Committee, Empery, and the successful bidder at the Auction (the "**Purchaser**"), whichever is earliest, or as otherwise ordered by the Bankruptcy Court.

(b)      Excluded Assets.

(i)      IP License.  The Sale shall not include the intellectual property for Coco Protein™ which will remain property of the estate (the "**Excluded IP**").  The estate shall provide the Purchaser with an exclusive one-year license of the Excluded IP.

(ii)     Causes of Action.  The Sale shall not include any of the estate's causes of action, unless otherwise agreed by the Debtor and the Committee, including, but not limited to, any claims against its current or former directors and officers and any claims arising under chapter 5 of the Bankruptcy Code; *provided, however*, the Sale may include preference claims against going forward trade vendors that, upon determination by the Committee, are less than $100,000 as to each trade vendor; *provided further, however*, that, unless otherwise agreed to by White Winston, the Sale shall not include the White Winston D&O Claims (defined below).

(iii)    "White Winston D&O Claims" means the estate's causes of action (and associated rights to director and officer insurance) against directors and officers for breaches of their fiduciary duties of loyalty, care, and good faith that arose on or before December 31, 2018.

(c)      Credit Bid Cap.  Empery is permitted to credit bid its claims (the DIP Obligations and prepetition claims as set forth in the Empery Proof of Claim), notwithstanding the Adversary Proceeding, and its rights to credit bid its claims will be capped at $14.0 million, subject to increase with the consent of the Committee (but in no event to exceed $18.0 million in the aggregate).  To the extent Empery is the successful bidder, and subject to confirmation of a Plan consistent with this Agreement, Empery shall issue 20% of the purchaser's equity (the "**Contribution**") to the Liquidation Trust (as defined herein) for the benefit of holders of Class 5 Claims (the "**GUCs**"). For the avoidance of doubt, the Contribution is pre-money (before any capital raise); *provided, however*, the governing documents shall provide the GUCs a right to participate in any such capital

6

**B14**

raise on a *pro rata* basis at a minimum (*pro rata* to their initial equity stake in NewCo); *provided further* that any management equity incentive plan shall be allocated solely from Empery's 80% equity share. Any bid from Empery shall include cash in the amount of the Wind-down Budget (defined below).

(d)    DIP Obligation Payoff. On or as soon as practicable following the Closing Date, the DIP Obligations (inclusive of Roll-Up) will be paid in full in cash to Empery from the cash proceeds of the Sale. The DIP Obligations (inclusive of the Roll-Up) shall not exceed $6.5 million (*i.e.*, $3.0 million DIP loan / $3.0 million Roll-Up / up to $0.5 million of interest, fees, and expenses) (the "**DIP Obligations Cap**"), subject to increase dollar-for-dollar with any funding under the DIP Inventory Acquisition Line of Credit funded at the request of the Debtor, without the prior written consent of the Committee. For the avoidance of doubt, the term DIP Obligations includes all principal, fees, interest, and expenses. For clarity, DIP Factoring is not included in the DIP Obligation Payoff. Furthermore, the DIP Obligations Cap is premised on the assumption that there will be no further advances under the DIP Note Agreement. However, it is now anticipated there may need to be additional advances which could cause the balance under the DIP Note Agreement to exceed $3.0 million, in which case, and notwithstanding anything in this Agreement to the contrary, the DIP Obligations due under this Agreement and the DIP Obligations Cap will increase dollar-for-dollar as to such amounts advanced over $3.0 million, as will the amounts of the Roll-Up to the extent of such increased lending.

(e)    Wind-down Budget. Prior to the approval by the Bankruptcy Court of this Agreement, the Debtor, the Committee, and Empery, shall mutually agree to the amount of cash required to fund the estate through the effective date of the Plan (the "**Plan Effective Date**"), inclusive of amounts necessary to pay unclassified claims and Class 2 Claims defined below (such amount of cash, the "**Wind-down Budget**"). For the avoidance of doubt, the Debtor, the Committee, and Empery anticipate that the cash proceeds from the Sale will be sufficient to repay the DIP Obligations Payoff and fund the chapter 11 case within the Wind-down Budget through the Plan Effective Date.

(f)    Factored Receivables. All accounts receivable will be separately accounted for in the purchase price by the Purchaser. Empery shall consent to the sale of outstanding postpetition factored accounts receivable (*i.e.*, accounts receivable factored under the DIP Factoring Facility), *provided that* the Purchaser pays the amount outstanding to the DIP Factoring Agent, including all accrued interest and other amounts chargeable under the DIP Factoring Facility. In addition, the Purchaser will have the right to pay-off all prepetition accounts receivable owed by Costco Canada securing the Allowed Prestige Secured Claim (defined below) to the extent they are not paid at the time of the Sale. For clarity, the purchase price of the Assets will not include accounts receivable (both postpetition factored accounts receivable or prepetition accounts receivable) unless clearly specified by the Purchaser in its offer. Upon repayment in full of the Debtor's obligations to the DIP Factoring Agent, all holdback amounts under the DIP Factoring Facility shall be returned to the Debtor.

(g)    "Net Sale Proceeds" shall mean the cash proceeds of the Sale *less* any fees and expenses related to such Sale, *less* the DIP Obligation Payoff, and *less* the Wind-down Budget. The Wind-down Budget shall not exceed $500,000, unless otherwise mutually agreed upon by the Debtor, Empery, and the Committee

**B15**

(ii)    Oversight Committee:  The Liquidation Trust shall be governed by a three (3) member oversight committee, which members shall be appointed in the sole discretion of the Committee.

(iii)    Vesting of Assets:  On the Plan Effective Date, the Liquidation Trust shall be vested with all assets of the Debtor not sold to the Purchaser, nor paid to MP Collateral, and not transferred to, or vested in, the Reorganized Debtor. The assets transferred to the Liquidation Trust shall include all unsold claims, causes of action, and interests of the Debtor, including all rights, claims, and causes of action relating to insurance policies, other than the White Winston D&O Claims.

(iv)    Distribution of White Winston D&O Claims. After the Plan Effective Date**,** the Reorganized Debtor shall pay to the Liquidation Trust an amount equal to thirty percent (30%) of the Net Collected Proceeds (defined below) of the White Winston D&O Claims. "**Net Collected Proceeds**" means the gross collected proceeds actually collected by the Reorganized Debtor on account of the White Winston &O Claims *less* any fees and expenses incurred by the Reorganized Debtor to recover such proceeds.

(v)    Funding:  On the Plan Effective Date, the Liquidation Trust shall receive all cash held by the estate, including the Net Sale Proceeds *less* the Empery Payoff Amount *less* amounts due to Class 4 pursuant to **Exhibit A** hereto (the "**Liquidation Trust Cash Balance**"). For the avoidance of doubt, any remaining funds in the Wind-down Budget shall vest in the Liquidation Trust. To the extent the Liquidation Trust Cash Balance is *less than* $500,000 on a net basis after deducting anticipated accrued and unpaid administrative and priority claims (including professional fees), Empery shall fund the difference to the Liquidation Trust (the "**Empery Liquidation Trust Loan**"). The Empery Liquidation Trust Loan shall be repaid from the proceeds of the Liquidation Trust Assets ahead of any distributions to holders of Allowed Class 5 Claims. For the avoidance of doubt, Empery's obligation to fund the Empery Liquidation Trust Loan shall be a binding obligation upon the Closing Date (*i.e.*, the closing of the Sale) and such amounts shall be paid to the Liquidation Trust on the Plan Effective Date, even if such Effective Date Deadline is extended beyond August 31, 2023 as provided herein.

(h)    Preservation of Tax Attributes and Public Entity Status.  The Plan shall be structured by the Parties consistent with the other terms and conditions contained in this Agreement and existing law to contain the provisions proposed by White Winston (and reasonably acceptable to the Debtor, the Committee, and Empery) to, and in an effort to effectuate, (i) the preservation of the favorable tax attributes of the Debtor (including all net operating losses) for the benefit of the Reorganized Debtor (such provisions to preserve favorable such tax attributes of the Debtor (including all net operating losses) (the "**Tax Provisions**") and (ii) the preservation of the Reorganized Debtor as a public entity (such provisions to preserve the Reorganized Debtor as a public entity (the "**Public Entity Provisions**"); *provided*, *however*, that the Bankruptcy Court's preservation of the net operating losses subject to the Tax Provisions and the retention of the Debtor as a public entity pursuant to the Public Entity Provisions is not a condition to this Agreement. For purposes of the immediately preceding sentence, any provision of the Plan proposed by White Winston shall be deemed reasonably acceptable to the Debtor, the Committee, and Empery if the effect of such provision does not deprive a Party from the direct benefits to which it is expressly entitled to under this Agreement (including, but not limited to, rights, economic recoveries, and

9

**B16**

date of execution of this Agreement. In addition, except as set forth below, White Winston shall prepare, at its sole cost and expense, all necessary applications, filings, and documents related to maintaining the Reorganized Debtor's public entity status.

(xiv)   For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, White Winston shall not be responsible for and shall not be required to pay (i) any fees of any of the professional persons representing the Debtor or the Committee and (ii) any amounts that the Debtor is required to pay under applicable law prior to the Plan Effective Date to maintain the Debtor's public entity status; *provided*, *however*, that in the event any actual and necessary costs of maintaining the Debtor's public entity status (meaning the cost of each action required to be taken as directed by White Winston and/or reasonably determined by Debtor) not included in the Debtor's current budget, then White Winston may elect to fund in advance such costs upon written request and at White Winston's sole option; *provided further*, *however*, that in the event White Winston declines to advance such costs before such action is taken as requested, then the obligation of any person or entity under this Agreement to fund such costs shall cease, with all other obligations of the Parties hereunder remaining intact.

(xv)   The Debtor shall engage in continuous operations for purposes of Section 382 of the Internal Revenue Tax Code prior to Plan Effective Date.  The Plan, the Disclosure Statement, and all other documents filed with the Bankruptcy Court, shall, where relevant, provide that the Debtor has maintained continuous operations prior to the Plan Effective Date, that the Reorganized Debtor intends to maintain continuous operations from and after the Plan Effective Date, and shall avoid provisions providing that prior to the Plan Effective Date the Debtor has or is terminating operations, liquidating, or provisions of similar import.

(xvi)   The Debtor and the Reorganized Debtor shall file federal tax returns that do not elect to forego section 382 (including section 382(l)(5)) of the Internal Revenue Code for the taxable year in which the Plan Effective Date occurs, and that otherwise are as reasonably requested by White Winston.

(xvii)   The Plan may be modified with respect to the Tax Provisions and Public Entity Provisions (each defined below) pursuant to section 1127 of the Bankruptcy Code, provided that such modifications do not conflict with this Agreement in a manner that deprives any Party from the direct benefits to which it is expressly entitled to under this Agreement (including, but not limited to, rights, economic recoveries, and vesting of assets set forth herein and limitations on risk (including releases) and costs), unless otherwise agreed to by the Parties and are otherwise consistent with this Agreement, in which event the Plan as modified shall be the Plan for all purposes of this Agreement.

(i)   Termination of Security Interests. The Plan shall constitute a termination statement with respect to all liens, security interests and encumbrances that is effective upon the Plan Effective Date pursuant to section 9-513 of the Uniform Commercial Code ("**UCC**"). The Plan shall provide that all liens, security interests and encumbrances in and to the Debtor's assets shall terminate, be discharged and shall not attach to any assets of the Reorganized Debtor from and after the Effective Date.  The Plan shall provide that the Reorganized Debtor is authorized and empowered to record any and all termination statements or similar documents to terminate any and all liens, security interests and encumbrances, including as set forth in section 9-509 of the UCC.  Upon request of

12

**B17**

the Reorganized Debtor, all holders of such liens, security interests and encumbrances shall execute and deliver to the Reorganized Debtor appropriate authorizations to record such termination statements or similar documents including pursuant to section 9-513 of the UCC.

5.    **Support and Cooperation of the Parties.**

(a)    General Support of Transaction.  Subject to the terms and conditions of this Agreement, each Party agrees, severally and not jointly, that, until this Agreement has been terminated in accordance with its terms, and subject to its fiduciary duties, it will:

(i)    negotiate in good faith the terms and conditions of the Plan that (1) incorporates the terms described herein; (2) is otherwise consistent with the terms of this Agreement; and (3) is in form and substance reasonably acceptable to each of the Parties;

(ii)    negotiate in good faith the form and substance of: (1) the Disclosure Statement; (2) a motion seeking approval of such Disclosure Statement; (3) solicitation materials to be distributed to all parties entitled to vote on the Plan; (4) definitive documentation of the transactions contemplated by the Plan; and (5) the Proposed Confirmation Order (each a "**Plan Document**" and collectively, the "**Plan Documents**");

(iii)    not object to, or vote any of its claims or interests to reject, the Plan, or otherwise take any action or commence any proceeding to oppose or seek any modification of the Plan, any Plan Documents, or this Agreement;

(iv)    so long as its vote has been properly solicited pursuant to sections 1125 and 1126 of the Bankruptcy Code, (1) vote all claims held by it to accept the Plan by delivering one or more duly executed and timely completed ballots accepting the Plan, and (2) not change or withdraw such vote(s) (or causing or directing such vote(s) to be changed or withdrawn), *provided*, *however*, that such vote(s) shall immediately be revoked and deemed *void ab initio* upon the termination of this Agreement in accordance with its terms;

(v)    not vote for, consent to, or participate directly or indirectly in the formation of any other plan, including aiding or abetting, or indirectly supporting any persona or groups objecting to the Plan;

(vi)    not take any action that is inconsistent with the terms and conditions of this Agreement, nor take any action that is inconsistent with, or is intended or is likely to interfere with, this Agreement, the fulfilment of their obligations under this Agreement, or confirmation or consummation of the Plan;

(vii)    not take any action to support or assist in, either directly or indirectly, the *Motion for the Appointment of Chapter 11 Trustee* filed by Ryan Drexler in the Chapter 11 Case; and

(viii)    take all other actions reasonably necessary or reasonably requested by the Plan Proponents to facilitate the solicitation, confirmation, and consummation of the Plan, which shall include actively supporting confirmation of the Plan at the Confirmation Hearing.

13

**B18**

(b)     Proxy Support.  Empery shall take all commercially reasonable efforts to exercise its proxy rights under that certain *Intercreditor and Subordination Agreement* dated October 13, 2021 (as amended or otherwise modified from time to time), among Ryan Drexler, the Debtor, and Empery Tax Efficient, LP (the "**Drexler Intercreditor Agreement**"), and cause the Drexler Claims arising from the Subordinated Debt (as defined in the Drexler Intercreditor Agreement) to vote in favor of the Plan.

(c)     Notwithstanding anything to the contrary anywhere in this Agreement, nothing herein is intended to or shall be deemed in any manner to obligate the Parties to waive or forego the exercise of any rights under the Plan or any other Key Transaction Document.

### 6.     Additional Plan Proponent Obligations

(a)     So long as this Agreement has not terminated in accordance with its terms, the Plan Proponents agree, subject to the exercise of their fiduciary duties, to use their commercially reasonable best efforts to confirm and consummate the Plan, including, without limitation, by:

(i)     serving copies of the Plan, the Disclosure Statement, and all documents, pleadings and notices filed by the Plan Proponents therewith or required by the Plan Proponents to be served on parties in interest pursuant to Fed. R. Bankr. P. 2002 on the United States Internal Revenue Service, taxing authorities for the State of Nevada, taxing authorities for the State of California, and the United States Securities and Exchange Commission;

(ii)     obtaining entry of one or more orders of the Bankruptcy Court extending, as necessary, the exclusive periods during which only the Plan Proponents may file or solicit acceptances of a plan of reorganization;

(iii)     not amending or modifying the Plan, in whole or in part, without the prior written consent of the Parties;

(iv)     distributing to all parties entitled to vote on the Plan solicitation materials;

(v)     not proposing or supporting any plan of reorganization or liquidation other than the Plan;

(vi)     taking all reasonable actions necessary to secure entry of the Proposed Confirmation Order as a Final Order;

(vii)     consummating the Plan as expeditiously as practicable in accordance with its terms and the terms of this Agreement; and

(viii)     not taking any action that is inconsistent with, or is intended or is likely to interfere with, this Agreement or confirmation or consummation of the Plan.

### 7.     Standstill Agreement.

The Parties shall take all reasonable and necessary steps to immediately stay all pending litigation between or among the Parties (which shall include all aspects of the Adversary

14

**B19**

### 11.    Nature of Agreement and Plan

This Agreement, the Plan, the Key Transaction Documents are, or are expected to be, the product of good faith, arm's length negotiations among the Parties and their respective representatives. This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of any chapter 11 plan for the purposes of Bankruptcy Code sections 1125 and 1126 or otherwise.

### 12.    Termination

(a)     The following events (each a "**Termination Event**") may serve to terminate this Agreement upon five (5) calendar days' notice to each other Party (the "**Termination Notice Period**"), provided that the Party asserting the Termination Event is not the cause of the occurrence of the Termination Event, *and only if* no other party has advised of its intent to enforce the Agreement consistent with Section 13 herein within the Termination Notice Period:

(i)     any Party shall seek or support others in seeking (1) any modification, vacatur, amendment, or stay of the Financing Order, unless Empery consents; or (2) any order, injunction or other relief that would affect the relief granted under the agreements of the Parties in this Agreement;

(ii)     any of the Plan Proponents shall (1) withdraw the Plan or any Key Transaction Document or any motion, proposed order, or other papers filed in support of the Plan without the consent of the Parties, or (2) publicly announce its intention not to support or pursue the Plan;

(iii)     any Party shall (1) publicly announce its opposition to or its intention not to support the Plan or any of the Key Transaction Documents, or (2) directly or indirectly propose, accept, support, or file a motion, disclosure statement or other pleading with the Bankruptcy Court seeking approval of or supporting a plan of reorganization or liquidation other than the Plan that is inconsistent with this Agreement or the Plan;

(iv)     any of the Key Transaction Documents shall be (1) stayed or vacated or (2) amended or modified in a manner inconsistent with the terms of this Agreement;

(v)     the Bankruptcy Court shall have entered an order, the practical effect of which is to render it highly unlikely that the Plan can be consummated;

(vi)     the breach by any Party of any of the undertakings, representations, warranties, or covenants set forth in this Agreement that would have a material adverse impact on the consummation of the Plan and the other transactions provided in this Agreement; and

(vii)     if the Debtor and the Committee mutually agree to terminate this Agreement.

(b)     This Agreement shall terminate automatically, without further required action or notice, if the Bankruptcy Court enters an order in the Chapter 11 Case: (i) appointing a Chapter 11

16

**B20**

trustee; (ii) converting the case to a case under Chapter 7 of the Bankruptcy Code; or (iii) dismissing the case.

(c)    This Agreement shall terminate automatically, without further required action or notice, upon the consummation of the Plan.

(d)    Upon the termination of this Agreement, this Agreement shall forthwith become void and of no further force or effect, each Party shall be released from its commitments, undertakings, and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party; provided, however, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

## 13.    Specific Performance

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys' fees and costs, as a remedy of any such breach, and each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching Party may be entitled, at law or in equity.

## 14.    Entire Agreement; Prior Negotiations

This Agreement, including all exhibits annexed hereto (and all exhibits and annexes thereto), constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior negotiations and documents reflecting such prior negotiations between and among the Parties (and their respective advisors), with respect to the subject matter hereof, including, but not limited to, that certain *Plan Term Sheet* [Docket No. 478] (the "Term Sheet"), except that to the extent of any conflict between the Term Sheet and this Agreement, (other than with respect to the classification of claims and interests on Exhibit A) this Agreement shall control. This Agreement is the product of negotiation by and among the Parties. Any Party enforcing or interpreting this Agreement shall interpret it in a neutral manner. There shall be no presumption concerning whether to interpret the Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

## 15.    Amendments

Except as otherwise provided in this Agreement, including all exhibits annexed hereto (and all exhibits and annexes thereto), this Agreement may not be modified, amended, or supplemented except by a written agreement signed by each of the Parties.

## 16.    Independent Analysis

Each Party hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it.

17

**B21**

## EXHIBIT A

### Classification and Treatment of Claims and Interests

| Class | Treatment |
|---|---|
| *Administrative and Priority Tax Claims* | On or as soon as practicable following the Plan Effective Date, each holder of an allowed administrative or priority tax claim will be paid in full in cash (subject to the Wind-down Budget) or otherwise left unimpaired, unless otherwise agreed by such holder.<br><br>*Unimpaired and not entitled to vote.* |
| *Class 1: Other Secured Claims* | On or as soon as practicable following the Plan Effective Date, each holder of an allowed Other Secured Claim will be paid in full in cash or otherwise realize the value of its collateral, unless otherwise agreed by such holder, and subject to any subordination agreements enforceable pursuant to section 510(a) of the Bankruptcy Code. Class 1 will include separate sub-classes for each applicable secured creditor. For the avoidance of doubt, this class does not include any secured claims of the Empery Parties.<br><br>*Unimpaired and not entitled to vote.* |
| *Class 2: Priority Claims* | On or as soon as practicable following the Plan Effective Date of the Plan, each holder of an allowed priority claim will be paid in full in cash or otherwise left unimpaired, unless otherwise agreed to by such holder.<br><br>*Unimpaired and not entitled to vote.* |
| *Class 3: Empery Prepetition Secured Claim* | Empery shall compromise and settle with the Estate and have an allowed secured claim in the amount of $18 million (the "**Allowed Empery Secured Claim**"), which represents principal and accrued interest and fees through the Petition Date and excludes the Roll-Up.<br><br>On or as soon as practicable following the Plan Effective Date, holders of the Allowed Empery Secured Claim shall receive their *pro rata share* of the Net Sale Proceeds, not to exceed $12.0 million *less* the Roll-Up and *less* the amount of Empery's credit bid (the "**Empery Payoff Amount**"). |

| Class | Treatment |
|-------|-----------|
|  | Empery shall assign to the Liquidation Trust, for the benefit of holders of Allowed Class 5 Claims, the economic interest in the difference between the Allowed Empery Secured Claim and the Empery Payoff Amount (the "**Empery Assigned Claim**"), including, for the avoidance of doubt, any monetary recovery on such Empery Assigned Claim.<br><br>To the extent the Net Sale Proceeds (including the amount, if any, of Empery's credit bid) are insufficient to satisfy the Empery Payoff Amount in full, holders of Allowed Empery Secured Claims shall forego any further recovery.<br><br>To the extent the Plan does not go effective by Effective Date Deadline, the Debtor and the Committee may extend the Effective Date Deadline by up to thirty (30) calendar days, without the consent of Empery on the condition precedent that the Empery Payoff Amount is paid in full from the Net Sale Proceeds on or before August 31, 2023; *provided*, *however*, to the extent Empery is the successful Purchaser pursuant to a credit bid and the Closing Date has occurred, the Effective Date Deadline may be extended, if necessary, to a date mutually agreed to by the Parties.<br><br>*Impaired and entitled to vote.* |
| *Class 4: Prestige Prepetition Secured Claim* | MP Collateral shall have an allowed secured claim in the amount of $2,500,000 (the "**Allowed Prestige Secured Claim**"), which represents principal and accrued interest and fees through the Petition Date.  The Allowed Prestige Secured Claim shall be subject to reduction from the proceeds of collections on its prepetition collateral.  As of May 16, 2023, the net reductions are $731,777.<br><br>On or as soon as practicable following the Plan Effective Date, holders of the Allowed Prestige Secured Claim shall receive (a) the return of the pre-petition accounts receivable collateral securing such Allowed Prestige Secured Claim, (b) cash proceeds of the prepetition accounts receivable collateral securing such Allowed Prestige Secured Claim , and (c) cash from the Net Sale Proceeds (if any such cash proceeds remain after paying the Allowed Empery Secured Claim in full).  For the avoidance of doubt, the Allowed Prestige Secured Claim shall be subordinate in right to payment of the Empery Assigned Claim, except with |

| Class | Treatment |
|---|---|
| | respect to prepetition accounts receivable and cash proceeds therefrom.<br><br>Holders of the Allowed Prestige Secured Claim shall retain all rights and causes of action against third parties, including but not limited to the guarantees provided by Drexler.<br><br>*Impaired and entitled to vote.* |
| *Class 5: General Unsecured Claims* | Class 5 shall consist of all allowed non-priority general unsecured claims.   None of the Empery Parties, any defendants in the Adversary Proceeding or White Winston Parties (nor any of their affiliates or any of the individual noteholders) shall have a Class 5 Claim.<br><br>The Plan shall provide that the Liquidation Trust reserves all rights, claims, and defenses with respect to Class 5 Claims, including all rights to seek subordination of such claims pursuant to section 510 of the Bankruptcy Code and to enforce any applicable subordination agreements pursuant to section 510(a) of the Bankruptcy Code.<br><br>Each holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of a beneficial interest in the Liquidation Trust.<br><br>*Impaired and entitled to vote.* |
| *Class 6:   White Winston Claim* | Class 6 shall consist of all claims of White Winston (if any), including all claims arising from that certain *Settlement Agreement and Release* dated as of December 5, 2022 (the "**Settlement Agreement**"), by and between White Winston, the Debtor, and Drexler (collectively, the "**White Winston Claims**").<br><br>Subject to the occurrence of the Plan Effective Date (or, if both the Effective Date has not occurred and the Empery Payoff Amount is paid in full from the Net Sale Proceeds on or before August 31, 2023, upon entry of the Confirmation Order) the Settlement Agreement shall be deemed an executory contract that the Debtor shall reject under the Plan pursuant to section 365 of the Bankruptcy Code.   White Winston shall have an allowed |

| Class | Treatment |
|-------|-----------|
| | unsecured claim of $8,630,261.00.  The allowed unsecured claim shall be treated as follows: |
| | a. 100% (or such other amount as White Winston in its sole discretion determines) of the new equity interests or, at White Winston's election, the prepetition equity interests (collectively, the "**New Equity**"), in the Reorganized Debtor shall be issued to White Winston in full and final satisfaction of the claim in the amount of $4,630,261.00. The rights and powers of holders of New Equity shall be as set forth in the Plan or in related documents by White Winston.  It is the intention of the parties that the rights and powers of holders of New Equity be determined by White Winston in connection with the "change of ownership" rules of § 382 of the IRS Tax Code, including the exceptions to the ordinary "change of ownership" rules found in sections 382(l)(v) and (vi) of the IRS Tax Code.   All provisions of the Plan shall operate to effectuate this intention unless otherwise agreed to by White Winston. |
| | b. The remaining $4,000,000 of the claim (the "**White Winston Retained Claim**") shall not be discharged and shall remain as a liability of the post-confirmation Reorganized Debtor.  For the avoidance of doubt, White Winston shall not have a claim against the Liquidating Trust. |
| | *Impaired and entitled to vote.* |
| *Class 7:  Interests* | All existing equity interests in the Debtor shall be cancelled and holders of such equity interests shall neither receive nor retain anything on account of their existing equity interests. |
| | *Impaired, not entitled to vote, and deemed to reject.* |

**B25**

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.385.2741

Attorneys for the Debtor

John D. Fiero, Esq. (admitted pro hac vice)
jfiero@pszjlaw.com
Jason H. Rosell, Esq. (admitted pro hac vice)
jrosell@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES, LLC
One Sansome Street, 34th Floor, Suite 3430
San Francisco, CA 94104
Telephone: 415.263.7000

Matthew C. Zirzow, Esq.
Nevada Bar No. 7222
mzirzow@lzlawnv.com
Zachariah Larson, Esq.
Nevada Bar No. 7787
zlarson@lzlawnv.com
LARSON & ZIRZOW LLC
850 East Bonneville Avenue
Las Vegas, NV 89101
Telephone: 702.382.1170

Counsel to the Official
Committee of Unsecured Creditors

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re: | ) | Case No.: 22-14422-nmc |
| | ) | |
| MUSCLEPHARM CORPORATION, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**PLAN OF REORGANIZATION FOR MUSCLEPHARM CORPORATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE DATED MAY 26, 2023**

**C26**

# TABLE OF CONTENTS

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND
    DEFINED TERMS ............................................................................................................. 1
    A.    Rules of Interpretation, Computation of Time and Governing Law ................................... 1
    B.    Defined Terms ...................................................................................................................... 1

ARTICLE II. ADMINISTRATIVE AND PRIORITY TAX CLAIMS ........................................................ 9
    A.    Administrative Claims .......................................................................................................... 9
    B.    Priority Tax Claims ............................................................................................................. 10

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY
    INTERESTS ...................................................................................................................... 11
    A.    Summary ............................................................................................................................. 11
    B.    Classification and Treatment of Claims and Equity Interests ............................................ 11
    C.    Discharge of Claims ........................................................................................................... 14

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ........................................................... 14
    A.    Presumed Acceptance of Plan ............................................................................................ 14
    B.    Presumed Non-Acceptance of Plan .................................................................................... 14
    C.    Voting Classes .................................................................................................................... 14
    D.    Acceptance by Impaired Classes of Claims ....................................................................... 14
    E.    Cramdown ........................................................................................................................... 15
    F.    Elimination of Vacant Classes ........................................................................................... 15

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ......................................................... 15
    A.    General Settlement of Claims and Interests ....................................................................... 15
    B.    Restructuring Transactions ................................................................................................. 15
    C.    New Corporate Existence ................................................................................................... 16
    D.    Vesting of Assets in the Litigation Trust ........................................................................... 16
    E.    Vesting of Assets in the Reorganized Debtor .................................................................... 16
    F.    Securities Registration Exemption ..................................................................................... 16
    G.    Issuance and Distribution of New Equity Interests ........................................................... 17
    H.    Certificate of Incorporation and Bylaws ........................................................................... 17
    I.    Effectuating Documents, Further Transactions, Exemption from Certain Transfer Taxes ............ 17
    J.    Preservation of Public Entity Status .................................................................................. 17
    K.    Preservation of Tax Attributes ........................................................................................... 18

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............... 19
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ....................... 19
    B.    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases ........... 21
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ...................... 21

ARTICLE VII. ................................................................................................................................................. 21
    A.    Releases ............................................................................................................................... 21

ARTICLE VIII. PROVISIONS GOVERNING DISTRIBUTIONS ........................................................... 25
    A.    Distributions for Claims Allowed as of the Effective Date ................................................ 25
    B.    Distributions on Account of Claims Allowed After the Effective Date .............................. 26
    C.    Delivery and Distributions and Undeliverable or Unclaimed Distributions ..................... 26
    D.    Compliance with Tax Requirements/Allocations ............................................................... 26
    E.    Timing and Calculation of Amounts to Be Distributed ..................................................... 27
    F.    Setoffs ................................................................................................................................. 27

C27

ARTICLE IX. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED
    CLAIMS .............................................................................................................................................. 27
    A.     Resolution of Disputed Claims ........................................................................................ 27
    B.     Disallowance of Claims ................................................................................................... 28
    C.     Amendments to Claims ..................................................................................................... 29

ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
    PLAN ................................................................................................................................................... 29
    A.     Conditions Precedent to Confirmation ............................................................................ 29
    B.     Conditions Precedent to Consummation on the Effective Date ....................................... 29
    C.     Waiver of Conditions ....................................................................................................... 29
    D.     Effect of Non-Occurrence of Conditions to Consummation ........................................... 29

ARTICLE XI. ........................................................................................................................................... 30
    A.     Compromise and Settlement ............................................................................................ 30
    B.     Preservation of Rights of Action ..................................................................................... 30

ARTICLE XII. BINDING NATURE OF PLAN ....................................................................................... 31

ARTICLE XIII. RETENTION OF JURISDICTION ................................................................................ 31

ARTICLE XIV. MISCELLANEOUS PROVISIONS ............................................................................... 32
    A.     Payment of Statutory Fees ............................................................................................... 32
    B.     Modification of Plan ........................................................................................................ 32
    C.     Revocation of Plan ........................................................................................................... 33
    D.     Successors and Assigns .................................................................................................... 33
    E.     Reservation of Rights ....................................................................................................... 33
    F.     Section 1146 Exemption ................................................................................................... 33
    G.     Further Assurances ........................................................................................................... 33
    H.     Severability ...................................................................................................................... 33
    I.     Service of Documents ...................................................................................................... 34
    J.     Return of Security Deposits ............................................................................................. 34
    K.     Filing of Additional Documents ...................................................................................... 34
    L.     Default .............................................................................................................................. 34

**C28**

allowable under sections 327, 328, 330(a), 331, or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date by any Retained Professionals in the Chapter 11 Case, that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been Filed for any such amount.

2.      *"Administrative Claim"* means any Claim for costs and expenses of administration of the Estate and the Chapter 11 Case under sections 327, 328, 330, 331, 1103, 503(b), 507(a), 507(b) or 1114(e)(2) of the Bankruptcy Code (excluding claims under section 503(b)(9) of the Bankruptcy Code), including, without limitation: (a) the actual and necessary costs and expenses incurred after the Commencement Date of preserving the Estate and operating the business of the Debtor; (b) Allowed Professional Compensation; and (c) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code (the Judicial Code), 28 U.S.C. §§ 1911-1930.

3.      *"Administrative Claim Bar Date"* means the end of the first Business Day occurring on or after the thirtieth (30th) calendar day after the Effective Date.

4.      *"Affiliate"* has the meaning set forth at section 101(2) of the Bankruptcy Code.

5.      *"Allowed"* means, with respect to Claims or Equity Interests: (a) any Claim or Equity Interest, proof of which is timely Filed by the applicable Claims Bar Date (or which by the Bankruptcy Code or Final Order is not or shall not be required to be Filed); (b) any Claim or Equity Interest that is listed in the Schedules as of the Effective Date as not contingent, not unliquidated and not Disputed (or disputed within the meaning of Section 1111(a) of the Bankruptcy Code), and for which no Proof of Claim or Interest has been timely Filed; or (c) any Claim or Equity Interest Allowed pursuant to the Plan; *provided*, *however,* that with respect to any Claim or Equity Interest described in clause (a) above, such Claim or Equity Interest shall be considered Allowed only if and to the extent that (x) with respect to any Claim or Equity Interest, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) such an objection is so interposed and the Claim or Equity Interest shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor, the Reorganized Debtor, or the Litigation Trustee and without any further notice to or action, order or approval of the Bankruptcy Court.

6.      *"Allowed Administrative Claim"* means an Administrative Claim as to which no objection has been filed or, if any objection has been filed, has been resolved by the allowance of such Administrative Claim by a Final Order of the Bankruptcy Court; or which requires payment in the ordinary course and as to which there is no Final Order of the Bankruptcy Court in effect which prohibits any such payment.

7.      *"Allowed Professional Compensation"* means all Accrued Professional Compensation Allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

8.      *"Assets"* means all of the Debtor's right, title and interest of any nature in property, interests, assets, and/or effects, real and personal, tangible and intangible, wherever located or situated, as specified in section 541 of the Bankruptcy Code, including, without limitation, Causes of Action, and (for avoidance of doubt) the Avoidance Actions, provided, however, the Excluded Assets shall be specifically excluded from the Assets sold to the Purchaser at the Sale.

9.      *"Avoidance Actions"* means any and all claims and causes of action which any of the Debtor, the debtor in possession, the Estate, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 543, 544, 545, 547 through 553, or 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws, regardless of whether or not such action has been commenced on the Effective Date.

10.     *"Ballot"* means the form of ballot or ballots accompanying, and distributed with, the Disclosure Statement approved by the Bankruptcy Court upon which certain Holders of Impaired Claims (modified, as necessary, based on voting party in accordance with the Disclosure Statement Order) entitled to vote shall, among other things,

indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

11.    *"Bankruptcy Code"* means the Bankruptcy Reform Act of 1978, Title 11 United States Code, 11 U.S.C. §§ 101-1532 (as now in effect or hereafter amended), as applicable to the Chapter 11 Case.

12.    *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Nevada, having jurisdiction over the Chapter 11 Case, and to the extent of the withdrawal of any reference under section 157 of Title 28 of the United States Code and/or the Order of the United States District Court for the District of Nevada pursuant to section 157(a) of Title 28 of the United States Code, the United States District Court for the District of Nevada.

13.    *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure (collectively), as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

14.    *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)) and specifically excludes any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of Nevada.

15.    *"Cash"* means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and other similar items.

16.    *"Causes of Action"* means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Case, including through the Effective Date.

17.    *"Chapter 11 Case"* means the chapter 11 case pending before the Bankruptcy Court for the captioned Debtor under chapter 11 of the Bankruptcy Code.

18.    *"Claim"* means any claim against the Debtor as defined in section 101(5) of the Bankruptcy Code.

19.    *"Claims Bar Date"* means, as applicable, (a) <u>April 19, 2023</u>, as the general claims bar date and (b) the Governmental Bar Date of <u>June 13, 2023</u>, or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Filing such Claim(s).

20.    *"Claims Objection Bar Date"* means, for each Claim, the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims; *provided, however*, that in no event shall the Claims Objection Bar Date be greater than 120 days after the Effective Date with respect to any General Unsecured Claim in Class 5.

21.    *"Claims Register"* means the official register of Claims maintained by the Bankruptcy Court.

22.    *"Class"* means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

23.    *"Closing Date"* means the date of the closing of the Sale of the Debtor's Assets.

24.    *"Commencement Date"* means the date on which Debtor commenced the captioned Chapter 11 Case by Filing a voluntary petition for relief under Section 301 of the Bankruptcy Code, <u>December 15, 2022</u>.

25.    *"Committee"* means the Official Committee of Unsecured Creditors for MusclePharm Corporation.

42.     "*Disclosure Statement Order*" means that certain *Order (i) Approving The Disclosure Statement; (ii) Approving The Form Of Ballots And Proposed Solicitation And Tabulation Procedures; (iii) Fixing The Voting Deadline With Respect To The Debtor's Chapter 11 Plan; (iv) Prescribing The Form And Manner Of Notice Thereof; (v) Fixing The Last Date For Filing Objections To The Chapter 11 Plan; (vi) Scheduling A Hearing To Consider Confirmation Of The Chapter 11 Plan; and (vii) Appointing The Schwartz Law Firm, Inc. As Solicitation And Tabulation Agent,* approved by the Bankruptcy Court on [INSERT DATE], as the order may be amended from time to time.

43.     "*Disputed Claim*" means, with respect to any Claim or Equity Interests, any Claim or Equity Interests listed on (a) the Claims Register that is the subject of an objection to claim filed with the Bankruptcy Court, or (b) Scheduled as Disputed for which claim a proof of claim was filed.

44.     "*Distribution Agent*" means the Debtor, the Reorganized Debtor, or the Litigation Trustee.

45.     "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

46.     "*Drexler*" means Ryan Drexler, an individual, and the Debtor's former Chief Executive Officer and former Chairman of the Board of Directors.

47.     "*Effective Date*" or "*Plan Effective Date*" means the day that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article IX.B hereof have been: (i) satisfied; or (ii) waived pursuant to Article IX.C hereof.

48.     "*Effective Date Deadline*" means August 31, 2023, unless extended pursuant to the terms of the Plan Support Agreement.

49.     "*Empery*" means Empery Tax Efficient, LP, in its capacity as collateral agent for certain Secured Noteholders (as defined in the Empery Proof of Claim).

50.     "*Empery Parties*" means MP Collateral LLC, as successor to the claims of: (i) the Secured Noteholders (as defined in the Empery Proof of Claim); and (ii) Prestige Capital Finance, LLC, and Empery Tax Efficient, LP, in its capacity as MP Collateral's Financing Agent and as Collateral Agent.

51.     "*Empery Prepetition Secured Claim*" means the amount of $18,066,579.01 as set forth on the Empery Proof of Claim.

52.     "*Empery Proof of Claim*" means that certain proof of claim filed by MP Collateral and denominated on the Bankruptcy Court's official claim register as Proof of Claim No. 59 in the amount of $18,066,579.01.

53.     "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

54.     "*Equity Interest*" means any: (a) equity security in the Debtor as defined in Section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of stock, or membership interests in Debtor, together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto or (b) partnership, limited liability company, or similar interest in the Debtor.

55.     "*Estate*" means, as to the Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

56.     "*Exchange Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local law.

57.    "*Excluded Assets*" means each of the following: (i) the Excluded IP; (ii) the Causes of Action; and (iii) the White Winston D&O Claims.

58.    "*Excluded IP*" means  the intellectual property for Coco Protein™ which will remain property of the Estate.  The Estate, however, shall provide the Purchaser with an exclusive one-year license of the Excluded IP.

59.    "*Exculpated Parties*" means, collectively, and in the Chapter 11 Case in its capacity as such: (a) the Debtor and the Reorganized Debtor; (b) the Committee; (c) the Empery Parties; (d) the White Winston Parties; and (e) the Retained Professionals; and (f) with respect to each of the foregoing Entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), and such Entity's and its current and former equity holders, officers, directors, managers, principals, members, managing members, employees, agents, advisory board members, subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, accountants, investment bankers, consultants, representatives, and attorneys (again, each in their capacity as such).

60.    "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.  A list of the Debtor's Executory Contracts is included in Schedule G of Debtor's Schedules (ECF Nos. 78 and 116, as applicable).

61.    "*Fee Claim*" means a Claim under sections 327, 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for Accrued Professional Compensation.

62.    "*File*" or "*Filed*" means file, filed or filing with the Bankruptcy Court or its authorized designee in this Chapter 11 Case.

63.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in the Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, re-argument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, re-argument or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

64.    "*Final DIP Order*" means that certain order approving the DIP Financing on a final basis entered by the Bankruptcy Court on March 8, 2023 [ECF No. 296], which authorized the Debtor to: (i) borrow up to $4,500,000 from Empery, (ii) factor receivables up to $10,000,000 from Empery, and (iii) obtain an inventory acquisition line from Empery of up to $1,000,000.

65.    "*General Unsecured Claim*" means a claim against the Debtor that is not (i) an Administrative Claim, (ii) a Priority Tax Claim, (iii) Priority Non-Tax Claim, (iv) Fee Claim, (v) Secured Claim or (vi) Warehouse Claim.

66.    "*Governmental Bar Date*" means June 13, 2023, or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Filing such Claim(s) by governmental units encompassed by Section 101(27 of the Bankruptcy Code.

67.    "*Holder*" means an Entity holding a Claim or an Equity Interest.

68.    "*Impaired*" means any Claims in an Impaired Class.

69.    "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

70.     "*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when distributions under the Plan shall commence.

71.     "*Insider*" shall have the meaning ascribed to it under Section 101(31) of the Bankruptcy Code.

72.     "*Litigation Trust*" means that certain grantor trust created for the benefits of holders of Class 5 Claims and as further described in Article V(E) of this Plan

73.     "*MP Collateral*" means MP Collateral LLC, as successor to the claims of: (i) the Secured Noteholders (as defined in the Empery Proof of Claim); and (ii) Prestige Capital Finance, LLC.

74.     "*Net Sale Proceeds*" means the cash proceeds from the Sale *less* any fees and expenses related to such Sale, *less* the DIP Obligation Payoff, and *less* the Wind-down Budget.

75.     "*New Equity Interests*" means the equity in Reorganized Debtor to be authorized, issued or reserved on the Effective Date pursuant to the Plan, which shall constitute all of the direct or indirect equity of the Reorganized Debtor.

76.     "*Official Actions*" means actions taken by the Exculpated Parties in their official capacities in the Chapter 11 Case after the Commencement Date through the Confirmation Date.

77.     "*Other Secured Claims*" means all other Secured Claims against the Debtor, other than the Empery Prepetition Secured Claim and the Prestige Prepetition Secured Claim.

78.     "*Periodic Distribution Date*" means, the first Business Day that is as soon as reasonably practicable occurring no later than approximately 180 days after the Initial Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring no later than 180 days after the immediately preceding Periodic Distribution Date.

79.     "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

80.     "*Plan*" means this *Plan of Reorganization of MusclePharm Corporation Under Chapter 11 of the Bankruptcy Code Dated May 26], 2023*, as amended, supplemented, or modified from time to time, including, without limitation, the Plan Supplement, which is incorporated herein by reference.

81.     "*Plan Administrator*" means the Litigation Trustee or such other Person appointed pursuant to the confirmed Plan and the Bankruptcy Court's order confirming the Plan to administer payments to Holders of Allowed Class 5 General Unsecured Claims.

82.     "*Plan Proponents*" means the Debtor and the Committee.

83.     "*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules.  The Plan Supplement shall be filed by the Debtor on a date that is fourteen (14) calendar days prior to the Confirmation Hearing.

84.     "*Plan Support Agreement*" means that certain Plan Support Agreement dated May 18, 2023, by and between the Debtor, the Committee, the Empery Parties and the White Winston Parties.

85.     "*Prestige*" means Prestige Capital Finance, LLC.

86.     "*Prestige Prepetition Secured Claim*" means the amount of $2,737,003.11 and denominated on the Bankruptcy Court's official claim register as Proof of Claim No. 14.

87.    "*Priority Non-Tax Claim*" means any Claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

88.    "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

89.    "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Case.

90.    "*Proof of Interest*" means proof of Equity Interest filed against the Debtor in the Chapter 11 Case.

91.    "*Pro Rata*" means the proportion that an Allowed Claim or Equity Interest in a particular Class bears to the aggregate amount of Allowed Claims or Equity Interests in that Class, or the proportion that Allowed Claims or Equity Interests in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Equity Interest under the Plan.

92.    "*Purchaser*" means the ultimate purchaser of the Debtor's Assets (less the Excluded Assets) at the Sale.

93.    "*Record Date*" means the close of business on June 13, 2023.

94.    "*Released Parties*" means Debtor, the Committee, the Empery Parties, and the White Winston Parties

95.    "*Releasing Parties*" means Debtor, the Committee, the Empery Parties, and the White Winston Parties.

96.    "*Reorganized Debtor*" means the Debtor, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

97.    "*Restructuring Transaction*" means any of those restructuring transactions and alternatives set forth in Article V.

98.    "*Retained Professional*" means any Entity: (a) employed in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; or (c) retained pursuant to Section 363(b) of the Bankruptcy Code and to be compensated for services rendered in accordance with compensated in accordance with Sections 330 and 331 of the Bankruptcy Code.

99.    "*Roll-Up*" means that certain roll-up of the prepetition Empery Loans on a dollar for dollar basis of the amounts loaned to the Debtor under the DIP Financing and the DIP Notes Purchase Agreement, up to a total roll-up of $4,500,000.

100.    "*Sale*" means the sale of certain of the Estate's Assets (except for the Excluded Assets, which shall not be sold) pursuant to section 363 of the Bankruptcy Code in accordance with the terms of the Plan and the Bidding Procedures.

101.    "*Schedules*" mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

102.    "*Securities Act*" means the United States Securities Act of 1933, as amended.

103.    "*SL*" means Schwartz Law, PLLC.

104.     "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.  A list of the Debtor's Unexpired Leases appears on Schedule G of the Schedules (*See* ECF Nos. 78 and 116).

105.     "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

106.     "*Unimpaired Class*" means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

107.     "*Voting Classes*" means, Classes 3, 4, 5 and 6.

108.     "*Voting Deadline*" means [INSERT DATE] at 5:00 p m. prevailing Pacific Time for all Holders of Claims, which is the date and time by which all Ballots must be received by the Debtor in accordance with the Disclosure Statement Order, or such other date and time as may be established by the Bankruptcy Court with respect to any Voting Class.

109.     "*WW Adversary Proceeding*" means that certain Adversary Case No. 23-01014, entitled *White Winston Select Asset Funds, LLC v. Empery Tax Efficient, LP, et al.*

110.     "*WW Settlement Agreement*" means that certain settlement agreement dated December 5, 2022, by and between the Debtor and White Winston.

111.     "*White Winston*" means White Winston Select Asset Funds, LLC.

112.     "*White Winston D&O Claims*" means the Estate's causes of action (and associated rights to director and officer insurance) against directors and officers for breaches of their fiduciary duties of loyalty, care, and good faith that arose on or before December 31, 2018.

113.     "*White Winston Parties*" means White Winston Select Asset Funds, LLC and White Winston Select Asset Fund Series Fund MP-18, LLC.

114.     "*Wind-down Budget*" means that certain budget mutually agreed to between the Debtor, the Committee and Empery regarding the amount of cash required to fund the Estate through the Plan Effective Date, inclusive of amounts necessary to pay unclassified claims and Class 2 Claims.

# ARTICLE II.

## ADMINISTRATIVE AND PRIORITY TAX CLAIMS

A.     *Administrative Claims*

Each Holder of an Allowed Administrative Claim shall be paid the full unpaid amount of such Claim in Cash (a) on or as soon as reasonably practicable after the Effective Date, (b) if such Claim is Allowed after the Effective Date, on or as soon as reasonably practicable after the date such Claim is Allowed, or (c) upon such other terms as may be agreed upon by the Debtor or the Reorganized Debtor, the Plan Administrator or the Litigation Trustee, as applicable, and such Holder or otherwise upon an order of the Bankruptcy Court; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case, other than those liabilities constituting or relating to commercial tort claims or patent, trademark or copyright infringement claims, shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents related to such transactions, and Holders of Claims related to such ordinary course liabilities are not required to File or serve any request for payment of such Administrative Claims.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

*A.    Summary*

1.    This Plan constitutes Debtor's chapter 11 plan of reorganization.  Except for the Claims addressed in Article II above (or as otherwise set forth herein), all Claims against the Debtor are placed in Classes.  Class 7 consists of Equity Interests.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims and Priority Tax Claims, as described in Article II above.

2.    The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

3.    The Allowed Claims and Interests will be paid or satisfied as set forth in Article V.

4.    Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|:---:|:---|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote |
| 2 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote |
| 3 | Empery Prepetition Secured Claim | Impaired | Entitled to Vote |
| 4 | Prestige Prepetition Secured Claim | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | White Winston Claims | Impaired | Entitled to Vote |
| 7 | Equity Interests | Impaired | Deemed to Reject |

*B.    Classification and Treatment of Claims and Equity Interests*

1.    Class 1 – Other Secured Claims

(a)    *Classification:* Class 1 consists of the Other Secured Claims against the Debtor, other than the Empery Prepetition Secured Claim and the Prestige Prepetition Secured Claim.

(b)    *Treatment:*  On or as soon as practicable following the Plan Effective Date, each holder of an allowed Other Secured Claim will be paid in full in cash or otherwise realize the value of its collateral, unless otherwise agreed by such holder, and subject to any subordination agreements enforceable pursuant to section 510(a) of the Bankruptcy Code.

(c)    *Voting:* Class 1 is an Unimpaired Class, and the Holder of the Class 1 Claim is not entitled to vote to accept or reject the Plan.

2.    Class 2 – Priority Non-Tax Claims

(a)    *Classification:* Class 2 consists of Holders of Priority Non-Tax Claims.

(b)      *Treatment:*  On or as soon as practicable following the Plan Effective Date, each holder of an allowed Priority Non-Tax Claim will be paid in full in cash or otherwise left unimpaired, unless otherwise agreed to by such holder.

(c)      *Voting:* Class 2 is an Unimpaired Class, and each Holder of a Class 2 Claim is not entitled to vote to accept or reject the Plan.

3.    Class 3 – Empery Prepetition Secured Claim

(a)      *Classification*: Class 3 consists of the Empery Prepetition Secured Claim.

(b)      *Treatment:* Empery shall compromise and settle with the Estate and have an allowed secured claim in the amount of $18 million (the "**Allowed Empery Secured Claim**"), which represents principal and accrued interest and fees through the Petition Date and excludes the Roll-Up.

On or as soon as practicable following the Plan Effective Date, holders of the Allowed Empery Secured Claim shall receive their *pro rata share* of the Net Sale Proceeds, not to exceed $12.0 million *less* the Roll-Up and *less* the amount of Empery's credit bid (the "**Empery Payoff Amount**").

Empery shall assign to the Litigation Trust, for the benefit of holders of Allowed Class 5 Claims, the economic interest in the difference between the Allowed Empery Secured Claim and the Empery Payoff Amount (the "**Empery Assigned Claim**"), including, for the avoidance of doubt, any monetary recovery on such Empery Assigned Claim.

To the extent the Net Sale Proceeds (including the amount, if any, of Empery's credit bid) are insufficient to satisfy the Empery Payoff Amount in full, holders of Allowed Empery Secured Claims shall forego any further recovery.

To the extent the Plan does not go effective by Effective Date Deadline, the Debtor and the Committee may extend the Effective Date Deadline by up to thirty (30) calendar days, without the consent of Empery on the condition precedent that the Empery Payoff Amount is paid in full from the Net Sale Proceeds on or before August 31, 2023; *provided*, *however*, to the extent Empery is the successful Purchaser pursuant to a credit bid and the Closing Date has occurred, the Effective Date Deadline may be extended, if necessary, to a date mutually agreed to by the Debtor, the Committee, and Empery.

(c)      *Voting:* Class 3 is an Impaired Class, and each Holder of a Class 3 Claim is entitled to vote to accept or reject the Plan.

4.    Class 4 – Prestige Prepetition Secured Claim

(a)      *Classification*: Class 4 consists of the Prestige Prepetition Secured Claim.

(b)      *Treatment*:  MP Collateral, as successor in interest to Prestige, shall have an allowed secured claim in the amount of $2,500,000 (the "**Allowed Prestige Secured Claim**"), which represents principal and accrued interest and fees through the Petition Date.  The Allowed Prestige Secured Claim shall be subject to reduction from the proceeds of collections on its prepetition collateral.  As of May 18, 2023, the net reductions are $731,777.

On or as soon as practicable following the Plan Effective Date, holders of the Allowed Prestige Secured Claim shall receive (a) the return of the pre-petition accounts receivable collateral securing such Allowed Prestige Secured Claim, (b) cash proceeds of the prepetition accounts receivable collateral securing such Allowed Prestige Secured Claim,

12

**C37**

and (c) cash from the Net Sale Proceeds (if any such cash proceeds remain after paying the Allowed Empery Secured Claim in full). For the avoidance of doubt, the Allowed Prestige Secured Claim shall be subordinate in right to payment of the Empery Assigned Claim, except with respect to prepetition accounts receivable and cash proceeds therefrom.

Holders of the Allowed Prestige Secured Claim shall retain all rights and causes of action against third parties, including but not limited to the guarantees provided by Drexler.

(c)     *Voting*: Class 4 is an Impaired Class, and each Holder of a Class 4 Claim is entitled to vote to accept or reject the Plan.

5.   Class 5 – General Unsecured Claims

(a)     *Classification*: Class 5 consists of all General Unsecured Claims against the Debtor.

(b)     *Treatment*: Class 5 shall consist of all allowed non-priority general unsecured claims. None of the Empery Parties, any defendants in the WW Adversary Proceeding or White Winston Parties (nor any of their affiliates or any of the individual noteholders) shall have a Class 5 Claim.

The Litigation Trust reserves all rights, claims, and defenses with respect to Class 5 Claims, including all rights to seek subordination of such claims pursuant to section 510 of the Bankruptcy Code and to enforce any applicable subordination agreements pursuant to section 510(a) of the Bankruptcy Code.

Each holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of a beneficial interest in the Litigation Trust.

(c)     *Voting*: Class 5 is an Impaired Class, and each Holder of a Class 5 Claim is entitled to vote to accept or reject the Plan.

6.   Class 6 – White Winston Claims

(a)     *Classification*: Class 6 consists of all claims of White Winston (if any) against the Debtor, including all claims arising from that certain *Settlement Agreement and Release* dated December 5, 2022 (the "**WW Settlement Agreement**"), by and between White Winston, the Debtor and Drexler (collectively, the "**White Winston Claims**"). All White Winston claims against the Debtor shall be treated as set forth in this Class 6.

(b)     *Treatment*: Subject to the occurrence of the Plan Effective Date (or, if both the Effective Date has not occurred and the Empery Payoff Amount is paid in full from the Net Sale Proceeds on or before August 31, 2023, upon entry of the Confirmation Order) the WW Settlement Agreement shall be deemed an executory contract that the Debtor shall reject under the Plan pursuant to section 365 of the Bankruptcy Code.

White Winston shall have an allowed unsecured claim of $8,630,261.00. The allowed unsecured claim shall be treated as follows:

a.     100% (or such other amount as White Winston in its sole discretion determines) of the New Equity Interests or, at White Winston's election, the prepetition equity interests in the Reorganized Debtor shall be issued to White Winston in full and final satisfaction of the claim in the amount of $4,630,261.00. The rights and powers of holders of New Equity Interests shall be as set forth in the Plan or in related documents by White Winston. It is the intention of the parties that the rights and powers of holders of New Equity Interests be determined by White Winston in connection with the "change of

ownership" rules of section 382 of the IRS Tax Code, including the exceptions to the ordinary "change of ownership" rules found in sections 382(l)(v) and (vi) of the IRS Tax Code. All provisions of the Plan shall operate to effectuate this intention unless otherwise agreed to by White Winston.

        b.     The remaining $4,000,000 of the claim (the "**White Winston Retained Claim**") shall not be discharged and shall remain as a liability of the post-confirmation Reorganized Debtor. For the avoidance of doubt, White Winston shall not have a claim against the Litigation Trust.

    (c)    *Voting*: Class 6 is an Impaired Class, and each Holder of a Class 6 Claim is entitled to vote to accept or reject the Plan.

  7.  <u>Class 7 – Equity Interests</u>

    (a)    *Classification*: Class 7 consists of the Equity Interests of the Debtor.

    (b)    *Treatment*: Subject to the treatment of the Class 6 Claims, all existing Equity Interests in the Debtor shall be cancelled and holders of such Equity Interests shall neither receive nor retain anything on account of their existing Equity Interests.

    (c)    *Voting*: Class 7 is Impaired under this Plan. The Holders of Class 7 Equity Interests are not entitled to vote on this Plan and are deemed to have rejected this Plan pursuant to Section 1126(g) of the Bankruptcy Code.

*C.*    *Discharge of Claims*

Pursuant to section 1141(c) of the Bankruptcy Code, all Claims and Equity Interests that are not expressly provided for and preserved herein shall be extinguished upon Confirmation. Upon Confirmation, the Debtor and all property dealt with herein, including the Assets, shall be free and clear of all such claims and interests, including, without limitation, liens, security interests and any and all other encumbrances, except as provided in the Plan.

# ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

*A.*    *Presumed Acceptance of Plan*

Classes 1 and 2 are unimpaired classes of claims, therefore, Classes 1 and 2 are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

*B.*    *Presumed Non-Acceptance of Plan*

Class 7 is Impaired under the Plan and is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

*C.*    *Voting Classes*

Each Holder of an Allowed Claim as of the Record Date in each of the Voting Classes (Classes 3, 4, 5, and 6) shall be entitled to vote to accept or reject the Plan.

*D.*    *Acceptance by Impaired Classes of Claims*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to affect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

C.    *New Corporate Existence*

The Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company or limited partnership, with all the powers of a corporation, limited liability company or limited partnership pursuant to laws of the State of Nevada and pursuant to the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other formation documents) are amended by or in connection with the Plan or otherwise and, to the extent such documents are amended, such documents are deemed to be authorized pursuant hereto and without the need for any other approvals, authorizations, actions or consents.

D.    *Vesting of Assets in the Litigation Trust*

Except as otherwise provided herein or in any agreement, instrument or other document relating thereto, on or after the Effective Date, the Litigation Trust shall be created. A litigation trustee (the "**Litigation Trustee**") shall be appointed in the sole discretion of the Committee, and the Litigation Trust shall be governed by a three (3) member oversight committee, which members shall be appointed in the sole discretion of the Committee.

On the Plan Effective Date, the Litigation Trust shall be vested with all assets of the Debtor not sold to the Purchaser, nor paid to MP Collateral, and not transferred to, or vested in, the Reorganized Debtor. The assets transferred to the Litigation Trust shall include all unsold claims, causes of action, and interests of the Debtor, including all rights, claims, and causes of action relating to insurance policies, other than the White Winston D&O Claims.

After the Plan Effective Date, the Reorganized Debtor shall pay the Litigation Trust an amount equal to thirty percent (30%) of the Net Collected Proceeds (defined below) of the White Winston D&O Claims. "**Net Collected Proceeds**" means the gross collected proceeds actually collected by the Reorganized Debtor on account of the White Winston D&O Claims less any fees and expenses incurred by the Reorganized Debtor to recover such proceeds.

On the Plan Effective Date, the Litigation Trust shall receive all cash held by the estate, including the Net Sale Proceeds *less* the Empery Payoff Amount *less* amounts due to Holders of Class 4 Claims pursuant to the Plan (the "**Litigation Trust Cash Balance**"). For the avoidance of doubt, any remaining funds in the Wind-Down Budget shall vest in the Litigation Trust. To the extent the Litigation Trust Cash Balance is *less than* $500,000 on a net basis after deducting anticipated accrued and unpaid administrative and priority claims (including professional fees), Empery shall fund the difference to the Litigation Trust (the "**Empery Litigation Trust Loan**"). The Empery Litigation Trust Loan shall be repaid from the proceeds of the Litigation Trust Assets ahead of any distributions to holders of Allowed Class 5 Claims. For the avoidance of doubt, Empery's obligation to fund the Empery Litigation Trust Loan shall be a binding obligation upon the Closing Date (*i.e.*, the closing of the Sale) and such amounts shall be paid to the Litigation Trust on the Plan Effective Date, even if such Effective Date Deadline is extended beyond August 31, 2023 as provided in the Plan.

E.    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise agreed to by White Winston or as provided herein or in any agreement, instrument or other document relating thereto, on or after the Effective Date, the Excluded IP and the White Winston D&O Claims shall vest in the Reorganized Debtor.

F.    *Securities Registration Exemption*

The New Equity Interests to be issued hereunder and pursuant to the Plan Support Agreement will be issued without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code.

G.      *Issuance and Distribution of New Equity Interests*

To the extent applicable after the Sale, on or immediately after the Effective Date, all New Equity Interests in the Reorganized Debtor shall be issued as set forth herein and in the Plan Support Agreement.

All of the New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable. Each distribution and issuance referred to in Article VII hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

H.      *Certificate of Incorporation and Bylaws*

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies and limited partnerships) of the Debtor shall be amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code or as otherwise required by, and in a form reasonably acceptable to the Reorganized Debtor. On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file a new certificate of incorporation or organization with the secretary of state (or equivalent state officer or entity), which, as required by section 1123(a)(6) of the Bankruptcy Code, shall prohibit the issuance of non-voting securities. After the Effective Date, the Reorganized Debtor may file a new, or amend and restate its existing, certificate of incorporation, charter and other constituent documents as permitted by the relevant state corporate law.

I.      *Effectuating Documents, Further Transactions, Exemption from Certain Transfer Taxes*

The Debtor and the Reorganized Debtor, as applicable, may take all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto. The secretary and any assistant secretary of the Debtor or Reorganized Debtor, as applicable, shall be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtor shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers or partners of the Debtor, or the need for any approvals, authorizations, actions or consents.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any ad valorem, stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the sale of the Assets or the issuance of New Equity Interests, including any Distributions made, or actions undertaken by, the Debtor, the Reorganized Debtor, and/or the Litigation Trustee.

J.      *Preservation of Public Entity Status*

On and after the Effective Date, the Reorganized Debtor intends it will continue to exist as a public corporation and in such event shall retain all of the powers of public corporations under applicable non-bankruptcy law, and without prejudice to any right to amend its charter, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence. As of the Effective Date, the Debtor's Articles of Incorporation shall be

shall be deemed rejected as of the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in this Article VI pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

B.    *Claims on Account of the Rejection of Executory Contracts or Unexpired Leases*

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against any Debtor, any Reorganized Debtor or Debtor's Estate and property, including the Assets, and the Litigation Trustee, and the Debtor or the Reorganized Debtor and Debtor's Estate and property, including the Assets, and the Litigation Trustee shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  At least ten (10) days prior to the Confirmation Hearing, the Debtor shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, which will: (1) list the applicable cure amount, if any; (2) describe the procedures for filing objections thereto; and (3) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtor shall file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assumed and the proposed cure amounts.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by the Debtor, and its counsel, SL, and counsel to the Committee, at least five (5) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  If an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtor in its sole option, may elect to reject such executory contract or unexpired lease in lieu of assuming it.

# ARTICLE VII.

## SETTLEMENT AND RELEASES

A.    *Releases*

This Plan contains certain releases of third parties.  The discharge, release, exculpation, and injunction provisions that are contained herein are copied in pertinent part below. The Plan Proponents believe that all of the Released Parties (defined below) and Exculpated Parties (defined below) made substantial and valuable contributions to the Debtor's restructuring, including the compromising of their Claims, which Claim treatment under the Plan will help maximize and preserve the going-concern value of the Debtor for the benefit of all parties in interest. Accordingly, each of the Released Parties warrants the benefit of the Plan's release provisions.

"**Released Parties**" means, collectively, and in this case in its capacity as such: (a) the Debtor and the Reorganized Debtor; (b) the Committee and each of its respective members (in their capacity as such); (c) the Empery Parties; (d) the White Winston Parties; and (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, and attorneys (each in their capacity as such); *provided*, *however*, the Released Parties do not include Drexler, his Affiliates, successors or assigns, or any of the Debtor's prepetition officers and board of directors and their Affiliates, successors or assigns.

"**Exculpated Parties**" means, collectively, and in this case in its capacity as such: (a) the Debtor and the Reorganized Debtor; (b) the Committee and each of its respective members (in their capacity as such); (c) the Empery Parties; (d) the White Winston Parties; and (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, and attorneys (each in their capacity as such); provided however, the Exculpated Parties do not include Drexler (on account of his prepetition acts and omissions), his Affiliates, successors or assigns, or any of the Debtor's prepetition officers and board of directors and their Affiliates, successors or assigns.

1.    **Discharge of Claims and Termination of Interests**

This Plan is not a liquidating Plan and does not provide for the liquidation of all or substantially all of the property of the Debtor. The Reorganized Debtor intends to engage in business after the Effective Date. Accordingly, the Debtor is entitled to a discharge. This Plan provides that the Debtor shall receive a discharge to the maximum extent not prohibited by law other than for the White Winston Retained Claim, including pursuant to section 1141(d)(1) of the Bankruptcy Code. All property dealt with in the Plan, including the Excluded IP and the White Winston D&O Claims and all property vested in the Reorganized Debtor under the Plan, shall be free and clear of all claims and interest of creditors (other than the White Winston Retained Claim), equity security holders and of general partners (if any) in the debtor as set forth in section 1141(c) of the Bankruptcy Code. Except as otherwise provided herein or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII hereof, all liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate shall be fully released and discharged.

The discharge shall not affect or impair any claims by any person or entity against any non-debtor.

ACCORDINGLY, PURSUANT TO SECTION 1141(d) OF THE BANKRUPTCY CODE, AND EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIMS AND AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN OR IN ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, AND EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, THE DISTRIBUTIONS, RIGHTS, AND TREATMENT THAT ARE PROVIDED IN THE PLAN SHALL BE IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE, EFFECTIVE AS OF THE EFFECTIVE DATE, OF CLAIMS (INCLUDING ANY INTERCOMPANY CLAIMS RESOLVED OR COMPROMISED AFTER THE EFFECTIVE DATE BY THE REORGANIZED DEBTOR), INTERESTS, AND CAUSES OF ACTION OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS OR INTERESTS FROM AND AFTER THE PETITION DATE, WHETHER KNOWN OR UNKNOWN, AGAINST, LIABILITIES OF, LIENS ON, OBLIGATIONS OF, RIGHTS AGAINST, AND INTERESTS IN, THE DEBTOR OR ANY OF ITS ASSETS OR PROPERTIES, REGARDLESS OF WHETHER ANY PROPERTY SHALL HAVE BEEN DISTRIBUTED OR RETAINED PURSUANT TO THE PLAN ON ACCOUNT OF SUCH CLAIMS AND INTERESTS, INCLUDING DEMANDS, LIABILITIES, AND CAUSES OF ACTION THAT AROSE BEFORE THE EFFECTIVE DATE, ANY LIABILITY (INCLUDING WITHDRAWAL LIABILITY) TO THE EXTENT SUCH CLAIMS OR INTERESTS RELATE TO SERVICES PERFORMED BY EMPLOYEES OF THE DEBTOR BEFORE THE EFFECTIVE DATE AND THAT ARISE FROM A TERMINATION OF EMPLOYMENT, ANY CONTINGENT OR NON-CONTINGENT LIABILITY ON ACCOUNT OF REPRESENTATIONS OR WARRANTIES ISSUED ON OR BEFORE THE EFFECTIVE DATE, AND ALL

DEBTS OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), OR 502(i) OF THE BANKRUPTCY CODE, IN EACH CASE WHETHER OR NOT: (1) A PROOF OF CLAIM BASED UPON SUCH DEBT OR RIGHT IS FILED OR DEEMED FILED PURSUANT TO SECTION 501 OF THE BANKRUPTCY CODE; (2) A CLAIM OR INTEREST BASED UPON SUCH DEBT, RIGHT, OR INTEREST IS ALLOWED PURSUANT TO SECTION 502 OF THE BANKRUPTCY CODE; OR (3) THE HOLDER OF SUCH A CLAIM OR INTEREST HAS ACCEPTED THE PLAN. EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, ANY DEFAULT OR "EVENT OF DEFAULT" BY THE DEBTOR OR ITS AFFILIATES WITH RESPECT TO ANY CLAIM OR INTEREST THAT EXISTED IMMEDIATELY BEFORE OR ON ACCOUNT OF THE FILING OF THE CHAPTER 11 CASES SHALL BE DEEMED CURED (AND NO LONGER CONTINUING) AS OF THE EFFECTIVE DATE. THE CONFIRMATION ORDER SHALL BE A JUDICIAL DETERMINATION OF THE DISCHARGE OF ALL CLAIMS AND INTERESTS EXCEPT FOR THE WHITE WINSTON RETAINED CLAIM SUBJECT TO THE EFFECTIVE DATE OCCURRING.    NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, THE WHITE WINSTON RETAINED CLAIM SHALL NOT BE DISCHARGED AND SHALL REMAIN UNIMPAIRED.

2.      **Releases of Liens**

EXCEPT AS OTHERWISE PROVIDED IN THE CONFIRMATION ORDER, SALE ORDER, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, ON THE EFFECTIVE DATE AND CONCURRENTLY WITH THE APPLICABLE DISTRIBUTIONS MADE PURSUANT TO THE PLAN AND, IN THE CASE OF A SECURED CLAIM, SATISFACTION IN FULL OF THE PORTION OF THE SECURED CLAIM THAT IS ALLOWED AS OF THE EFFECTIVE DATE, ALL MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS AGAINST ANY PROPERTY OF THE ESTATES SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL OF THE RIGHT, TITLE, AND INTEREST OF ANY HOLDER OF SUCH MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS SHALL REVERT TO THE REORGANIZED DEBTOR AND ITS SUCCESSORS AND ASSIGNS. ANY HOLDER OF SUCH SECURED CLAIM (AND THE APPLICABLE AGENTS FOR SUCH HOLDER) SHALL BE AUTHORIZED AND DIRECTED, AT THE SOLE COST AND EXPENSE OF THE REORGANIZED DEBTOR, TO RELEASE ANY COLLATERAL OR OTHER PROPERTY OF THE DEBTOR (INCLUDING ANY CASH COLLATERAL AND POSSESSORY COLLATERAL) HELD BY SUCH HOLDER (AND THE APPLICABLE AGENTS FOR SUCH HOLDER), AND TO TAKE SUCH ACTIONS AS MAY BE REASONABLY REQUESTED BY THE REORGANIZED DEBTOR TO EVIDENCE THE RELEASE OF SUCH LIEN, INCLUDING THE EXECUTION, DELIVERY, AND FILING OR RECORDING OF SUCH RELEASES. THE PRESENTATION OR FILING OF THE CONFIRMATION ORDER TO OR WITH ANY FEDERAL, STATE, PROVINCIAL, OR LOCAL AGENCY OR DEPARTMENT SHALL CONSTITUTE GOOD AND SUFFICIENT EVIDENCE OF, BUT SHALL NOT BE REQUIRED TO EFFECT, THE TERMINATION OF SUCH LIENS.

THIS PLAN SHALL CONSTITUTE A TERMINATION STATEMENT WITH RESPECT TO ALL LIENS, SECURITY INTERESTS AND ENCUMBRANCES THAT IS EFFECTIVE UPON THE PLAN EFFECTIVE DATE PURSUANT TO SECTION 9-513 OF THE UNIFORM COMMERCIAL CODE ("**UCC**"). ALL LIENS, SECURITY INTERESTS AND ENCUMBRANCES IN AND TO THE DEBTOR'S ASSETS SHALL TERMINATE, BE DISCHARGED AND SHALL NOT ATTACH TO ANY ASSETS OF THE REORGANIZED DEBTOR FROM AND AFTER THE EFFECTIVE DATE.  THE REORGANIZED DEBTOR IS AUTHORIZED AND EMPOWERED TO RECORD ANY AND ALL TERMINATION STATEMENTS OR SIMILAR DOCUMENTS TO TERMINATE ANY AND ALL LIENS, SECURITY INTERESTS AND ENCUMBRANCES, INCLUDING AS SET FORTH IN SECTION 9-509 OF THE UCC.  UPON REQUEST OF THE REORGANIZED DEBTOR, ALL HOLDERS OF SUCH LIENS, SECURITY INTERESTS AND ENCUMBRANCES SHALL EXECUTE AND DELIVER TO THE REORGANIZED DEBTOR APPROPRIATE AUTHORIZATIONS TO RECORD SUCH TERMINATION STATEMENTS OR SIMILAR DOCUMENTS INCLUDING PURSUANT TO SECTION 9-513 OF THE UCC.

3.      **Exculpation**

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED

FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, AN OFFICIAL ACTION, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, FILING, OR TERMINATION OF THE RESTRUCTURING SUPPORT AGREEMENT AND RELATED PREPETITION TRANSACTIONS, THE DISCLOSURE STATEMENT, THE PLAN, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY EXCULPATED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN, THE FILING OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR ANY OFFICIAL ACTION, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF, AND DISTRIBUTION OF, CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.  NOTWITHSTANDING THE FOREGOING, THE EXCULPATED PARTIES DO NOT INCLUDE DREXLER (ON ACCOUNT OF HIS PREPETITION ACTS AND OMISSIONS), HIS AFFILIATES, SUCCESSORS OR ASSIGNS, OR ANY OF THE DEBTOR'S PREPETITION OFFICERS AND BOARD OF DIRECTORS AND THEIR AFFILIATES, SUCCESSORS OR ASSIGNS.

4.      **Releases by the Debtor**

PURSUANT TO SECTIONS 105 AND 1123(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE RELEASED PARTIES' FACILITATION OF THE EXPEDITIOUS REORGANIZATION OF THE DEBTOR, COMPROMISING OF THEIR CLAIMS, AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THIS PLAN, ON AND AFTER THE EFFECTIVE DATE: THE RELEASED PARTIES (EXCEPT FOR THE REORGANIZED DEBTOR WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, WHICH SHALL NOT BE RELEASED) ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTOR, THE REORGANIZED DEBTOR, AND THE ESTATE FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, AVOIDANCE ACTIONS, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR WHICH COULD BE ASSERTED ON BEHALF OF THE DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE DEBTOR, THE REORGANIZED DEBTOR, AND/OR THE ESTATE WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY), OR IN ANY MANNER ARISING FROM ANY MATTER OR TRANSACTION, BASED ON OR RELATING TO, IN WHOLE OR IN PART, THE DEBTOR, THE DEBTOR'S RESTRUCTURING, THE DEBTOR'S CHAPTER 11 CASE, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTOR OR THE REORGANIZED DEBTOR, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY OF THE RELEASED PARTIES, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS BEFORE OR DURING THE CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION OR PREPARATION OF THIS PLAN, THE DISCLOSURE STATEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE RELATING TO THE DEBTOR TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OF THIS PLAN.

NOTWITHSTANDING THE FOREGOING, THE RELEASED PARTIES DO NOT INCLUDE DREXLER, HIS AFFILIATES, SUCCESSORS OR ASSIGNS, OR ANY OF THE DEBTOR'S PREPETITION OFFICERS AND BOARD OF DIRECTORS AND THEIR AFFILIATES, SUCCESSORS OR ASSIGNS.

PURSUANT TO SECTIONS 105 AND 1123(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE RELEASED PARTIES' FACILITATION OF THE EXPEDITIOUS REORGANIZATION OF THE DEBTOR AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THIS PLAN, INCLUDING THE COMPROMISING OF THEIR CLAIMS PURSUANT TO THE PLAN, ON AND AFTER THE EFFECTIVE DATE, EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM (WHICH SHALL NOT BE RELEASED), THE RELEASING PARTIES HEREBY RELEASE THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, AVOIDANCE ACTIONS, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR WHICH COULD BE ASSERTED ON BEHALF OF THE DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE.

**5.    Injunction**

EXCEPT WHITE WINSTON, AND SOLELY WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT ARE SUBJECT TO EXCULPATION PURSUANT TO THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTOR, OR THE REORGANIZED DEBTOR: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS.

EXCEPT WITH RESPECT TO THE WHITE WINSTON RETAINED CLAIM, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

# ARTICLE VIII.

## PROVISIONS GOVERNING DISTRIBUTIONS

*A.    Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided in the Plan, a Final Order, the Litigation Trust or as agreed to by the relevant parties, the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, shall make initial distributions under the Plan on account of Claims Allowed on or as soon as practicable

after the Initial Distribution Date; *provided*, *however*, that payments on account of General Unsecured Claims that become Allowed Claims on or before the Effective Date may commence on the Effective Date.

B.    *Distributions on Account of Claims Allowed After the Effective Date*

    1.    Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order, the Litigation Trust or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the Disputed Claim becomes an Allowed Claim.

    2.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, shall establish appropriate reserves for potential payment of any such Disputed Claims.

C.    *Delivery and Distributions and Undeliverable or Unclaimed Distributions*

    1.    Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

    2.    Delivery of Distributions in General

Except as otherwise provided herein, the Litigation Trustee shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's or the Litigation Trustee's records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtor, the Reorganized Debtor, or the Litigation Trustee, as applicable; and *provided further,* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

The Litigation Trustee shall make all distributions in accordance with the terms of the Litigation Trust Agreement. The Plan provides that the Reorganized Debtor has no obligations of any kind under the Plan to the Liquidating Trustee, the Distribution Agent or Agents, any creditor other than White Winston or equity security holder (including, without limitation, on account of claims or equity interests) from and after the Effective Date.

D.    *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Litigation Trustee shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Litigation Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable

and appropriate. The Litigation Trustee reserve the right to allocate all distributions made under the Plan in compliance with all applicable liens and encumbrances.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

E.      *Timing and Calculation of Amounts to Be Distributed*

On the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

F.      *Setoffs*

The Litigation Trustee may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Litigation Trustee may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor and/or Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release, of any such claims, equity interests, rights and Causes of Action that the Debtor or the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, may possess against any such Holder, except as specifically provided herein.

# ARTICLE IX.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.      *Resolution of Disputed Claims*

   1.   Allowance of Claims

After the Effective Date, the Litigation Trustee shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim. All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

   2.   Prosecution of Objections to Claims

After the Confirmation Date the Litigation Trustee shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; provided, however, this provision shall not apply to Fee Claims. From and

# ARTICLE XI.

## SETTLEMENT, RELEASE AND RELATED PROVISIONS

*A.   Compromise and Settlement*

Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code or otherwise.  The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Debtor, its Estate and all Holders of Claims and Equity Interests, (2) fair, equitable and reasonable, (3) made in good faith and (4) approved by the Bankruptcy Court pursuant to sections 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  The Confirmation Order shall approve the exculpation and releases by all Entities of all such contractual, legal and equitable subordination rights or Causes of Action that are satisfied, compromised and settled pursuant hereto.

In accordance with the provisions of this Plan, including Article VIII hereof, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (1) the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, may, in their sole and absolute discretion, compromise and settle Claims against them and (2) the Reorganized Debtor or the Litigation Trustee, as otherwise appropriate and consistent with the terms of this Plan, may, in their sole and absolute discretion, compromise and settle Causes of Action against other Entities.

*B.    Preservation of Rights of Action*

    1.   <u>Maintenance of Causes of Action</u>

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, and provided all Allowed non-Insider Claims are paid in full, Litigation Trust shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action except for the WW D&O Claims, whether existing as of the Commencement Date or thereafter arising, in any court or other tribunal including, without limitation, in any adversary proceeding Filed in the Chapter 11 Case.

    2.   <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>

Unless a claim or Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, exculpated, compromised or settled as set forth in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtor (and to the extent applicable, the Reorganized Debtor) and the Litigation Trust expressly reserve such claim or Cause of Action for later adjudication by the Debtor, the Reorganized Debtor, the Litigation Trust, or, as otherwise appropriate and consistent with the terms of this Plan, the Litigation Trustee (including, without limitation, claims and Causes of Action not specifically identified or of which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply toany  such claims or Causes of Action (including, without limitation, the WW D&O Claims) upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the Debtor, the Reorganized Debtor, and, as otherwise appropriate and consistent with the terms of this Plan, the Litigation Trustee, expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is or could be a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

3.    Limitation of Liability.

The Exculpated Parties will neither have nor incur any liability to any person or entity for any Official Actions in good faith taken or omitted to be taken in connection with or related to the Chapter 11 Case, the investigations of potential claims or the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan or incident to the Chapter 11 Case, provided that, the foregoing shall not exonerate any of the Exculpated Parties from any liability that results from an act or omission to the extent such act or omission is determined by Final Order to have constituted gross negligence or willful misconduct.  In addition, notwithstanding any other provision of the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any Exculpated Party for any Official Actions made in good faith from and after the Petition Date through the Confirmation Date in connection with, relating to or arising out of the Chapter 11 case or the consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any transaction or document created or entered into, or any other act taken or omitted to be taken, in connection therewith, except for: (a) the liability of any Exculpated Party that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan, (b) the liability of any Exculpated Party that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, and (c) actions taken by Exculpated Parties who are holders of a Claim and are taking actions in pursuit of their allowance or payment of such Claim; for the avoidance of doubt there shall be no liability limitation for the  Debtors, their insiders, and affiliates for their actions or omissions occurring before the Petition Date, or their actions or omissions after the Petition Date that are not Official Actions made in good faith.

# ARTICLE XII.

## BINDING NATURE OF PLAN

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

# ARTICLE XIII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor, and the Plan as legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those