**STEINHILBER SWANSON LLP**
MICHAEL P. RICHMAN, ESQ.
*Admitted Pro Hac Vice*
122 W. Washington Ave., Suite 850
Madison, WI 53703
Telephone:    (608) 630-8990
Facsimile:    (608) 630-8991
Email: mrichman@steinhilberswanson.com

**CARLYON CICA CHTD.**
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
TRACY M. O'STEEN, ESQ.
Nevada Bar No. 10949
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
Telephone:    (702) 685-4444
Facsimile:    (725) 220-4360
Email: dcica@carlyoncica.com
        tosteen@carlyoncica.com

*Counsel for Ryan Drexler*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No.  BK-22-14422-NMC |
| | Chapter 11 |
| MUSCLEPHARM CORPORATION, | |
| | Hearing Date: June 22, 2023 |
| | Hearing Time: 9:30 a.m. |
| Debtor. | |

**OBJECTION TO DEBTOR'S MOTION FOR THE ENTRY OF AN ORDER: (i) APPROVING THE DISCLOSURE STATEMENT; (ii) APPROVING THE FORM OF BALLOTS AND PROPOSED SOLICITATION AND TABULATION PROCEDURES; (iii) FIXING THE VOTING DEADLINE WITH RESPECT TO THE DEBTOR'S CHAPTER 11 PLAN; (iv) PRESCRIBING THE FORM AND MANNER OF NOTICE THEREOF; (v) FIXING THE LAST DATE FOR FILING OBJECTIONS TO THE CHAPTER 11 PLAN; (vi) SCHEDULING A HEARING TO CONSIDER CONFIRMATION OF THE CHAPTER 11 PLAN; AND (vii) APPOINTING STRETTO AS SOLICITATION AND TABULATION AGENT**

Creditor, equity holder, and interested party, Ryan Drexler ("Drexler"), through his Nevada counsel, the law firm of Carlyon Cica Chtd., and co-counsel Steinhilber Swanson LLP, hereby respectfully submits this objection to *Debtor's Motion for the Entry of an Order: (i) Approving the Disclosure Statement; (ii) Approving the Form of Ballots and Proposed Solicitation and Tabulation Procedures; (iii) Fixing the Voting Deadline with Respect to the*

*Debtor's Chapter 11 Plan; (iv) Prescribing the Form and Manner of Notice Thereof; (v) Fixing the Last Date for Filing Objections to the Chapter 11 Plan; (vi) Scheduling a Hearing to Consider Confirmation of the Chapter 11 Plan; and (vii) Appointing Stretto as Solicitation and Tabulation Agent* (the "Motion") [ECF No. 554].

This objection is made and based upon the following points and authorities, as well as Civil Rule[1] 26, made applicable to bankruptcy proceedings pursuant to Bankruptcy Rule 7026, the pleadings, papers, and records on file in this case, of which judicial notice is respectfully requested pursuant to Fed. R. Evid. 201, the declaration of Michael P. Richman ("Richman Decl."), submitted concurrently herewith, and any additional evidence and argument entertained by the Court at the time of the hearing on the Motion.

Respectfully submitted this 14th day of June 2023.

**STEINHILBER SWANSON LLP**

/s/ Michael P. Richman
MICHAEL P. RICHMAN, ESQ.
*Admitted Pro Hac Vice*
122 W. Washington Ave., Suite 850
Madison, WI 53703
Telephone:    (608) 630-8990
Facsimile:    (608) 630-8991
mrichman@steinhilberswanson.com

*Counsel for Ryan Drexler*

---

[1] Unless otherwise indicated, all references to a "Section" or a "Chapter" are to Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"). "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure Rules 1001-9037. "Local Rule" references are to the Local Rules of Bankruptcy Practice for the United States District Court for the District of Nevada. "Civil Rule" references are to the Federal Rules of Civil Procedure. All references to "ECF No." are to the number assigned to the documents filed in the above-captioned bankruptcy case as they appear on the docket maintained by the clerk of court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  SUMMARY OF ARGUMENT

1.       Section 1125 of the Bankruptcy Code requires that MusclePharm Corporation (the "Debtor") propose a disclosure statement that provides "adequate information"—that is, "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records" that would allow a creditor or equity security holder to make an informed judgment whether to accept or reject a plan. 11 U.S.C. § 1125(a)(1). "The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for or against the plan." *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987), *aff'd Unichem Corp. v. Gurtler (In re Unichem)*, 80 B.R. 448 (N.D. Ill. 1987).

2.       But a bankruptcy court should not adjudicate or approve the sufficiency of a disclosure statement, or authorize the commencement of the ensuing expensive balloting, voting, and plan confirmation process where the plan for which voting is proposed to be solicited is patently unconfirmable on its face. In such circumstances, "it is appropriate for the court to deny approval of the disclosure statement describing the nonconfirmable plan." *In re Arnold*, 471 B.R. 578, 586 (Bankr. C.D. Cal. 2012) (quoting *In re Siberkraus*, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000) and citing 7 Collier on Bankruptcy ¶ 1125.03[4] (Alan N. Resnick & Henry J. Sommer, 16th ed)). *See also In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures.") (quoting *In re Eastern Maine Elec. Co-op, Inc.*, 125 B.R. 329, 333 (Bankr. D. Maine 1991)); *In re American Cap. Equipment, LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012) ("[A] bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable"—that is,

"confirmation 'defects [cannot] be overcome by creditor voting results' and [ ] those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'") (quoting *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987)). *See also* 7 Collier on Bankruptcy ¶ 1125.03 n.40 (Alan N. Resnick & Henry J. Sommer, 16th ed 2023), LexisNexis (collecting cases).

3.    This is such a case.[2] The disclosure statement submitted by the Debtor and the Official Committee of Unsecured Creditors (the "Committee") (collectively, the "Plan Proponents") proposes a plan that is patently unconfirmable on its face. The facial invalidity of the Proposed Plan is based primarily on a legally improper multi-step treatment of Drexler's secured claim which has the effect of obliterating it:

- In violation of section 1122 of the Bankruptcy Code, Drexler's secured claim (covered by a pledge of all assets) is classified in a class of "other" secured claims that have pledges of different collateral instead of in a separate class of its own. ECF No. 553 at 14 (C36). Relatedly, Empery Tax Efficient, LP's ("Empery") secured claim and the Prestige capital Finance, LLC's ("Prestige") secured claim (now owned by MP Collateral, LLC, for which Empery serves as its financing and collateral agent), which are secured by the same collateral as Drexler's, are placed in a separate class. *Id.* at 14–15 (C36–37).

- In violation of section 1124 of the Bankruptcy Code, Drexler's secured claim is characterized as "unimpaired," notwithstanding that no provision is made for him to receive the proceeds of his collateral and that, in violation of section 363, Drexler's liens do not attach to the proceeds of the sale of his collateral. *Id.* at 14 (C36).

- The Proposed Plan concocts a distinction between the "Allowed Empery Secured Claim" of $18 million and the "Empery Payoff Amount" of $12 million that Empery will accept to be considered paid in full to create an illegal gifting mechanism. *Id.* at 15 (C37). Under the Proposed Plan, Empery will "gift" the value of the "Net Sale Proceeds" (arising from the sale of the collateral that secures ***both*** Empery's and Drexler's claims) which exceed the Empery Payoff Amount (but are below the Allowed Empery Secured Claim) to general unsecured creditors (through a Litigation Trust), skipping Drexler's secured claim in violation of the Bankruptcy Code's priority rules. *Id.* If Empery's claim were allowed in the agreed payoff amount of $12 million, there would be no question that the next proceeds above $12 million would go

---

[2] Drexler has filed a *Declaration of Michael P. Richman in support of Ryan Drexler's Objection to Emergency Motion to Enforce Intercreditor and Subordination Agreement Under Section 510(a) of the Bankruptcy Code*, which provides an appendix of relevant excerpts of the Plan Term Sheet (A1–12), the Plan Support Agreement (the "PSA") (B13–25), and the Proposed Plan (defined below) (C26–50).

to satisfy other creditors holding a security interest in the Debtor's assets, including Drexler.

- Because the Plan Proponents and Empery have violated the foregoing Bankruptcy Code provisions to deprive Drexler of the junior secured status to which he would be entitled under the ISA, it also violates section 1129(a)(3) by not being proposed in good faith, and it violates the best interests of creditors test under section 1129(a)(7). In a chapter 7 liquidation, such gifting, based on a plan's manipulation of claim allowance and payment amounts, would not be possible, and Drexler would be paid his portion of the Net Sale Proceeds on his junior secured claim in the normal "waterfall" of priorities.[3]

- The Debtor, the Committee, Empery, and others have made themselves the beneficiaries of exculpation provisions that would immunize them from liability for this scheme. The exculpation provisions are so impermissibly broad as to constitute yet another reason the proposed plan is unconfirmable on its face. ECF No. 553 at 26–27 (C44–45).

4.    Without the foregoing manipulations, the Debtor's assets could be sold, and the proceeds distributed to classes in normal order of priority. The sole reason for the class-skipping gifting scheme appears to be to deprive Drexler of any recovery on account of his secured claim. Accordingly, the Court should disapprove the disclosure statement because it proposes a plan which is unconfirmable on its face. No matter the disclosures, the solicitation, voting, and conduct of plan confirmation hearings will be a futility.

## II. <u>BACKGROUND</u>

5.    On December 15, 2022, the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code, ECF No. 1, and has since operated as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

6.    Drexler is both a secured and unsecured creditor, as well as the Debtor's largest equity holder. In 2021, Drexler agreed to subordinate his secured claim to new capital to be provided by Empery pursuant to the ISA.

---

[3] In its reply in support of its motion to enforce the ISA, Empery has suggested that the Plan Support Agreement (the "PSA") and the Proposed Plan benefit Drexler because his unsecured claims will be treated as part of the pool of general unsecured creditors who will receive auction sale proceeds. ECF No. 582 at 9–10. It is obviously not a benefit to receive pro rata distributions of lower amounts in a class of unsecured claims where, as here, the Bankruptcy Code requires that a junior secured claim be accorded undiluted distributions as a secured creditor on account of the proceeds of sale of pledged estate assets before any distributions may be made to unsecured claims.

7.     On May 8, 2023, ten days after Drexler filed his motion for the appointment of a chapter 11 trustee, ECF No. 447, the Debtor, the Committee, Empery, White Winston Select Asset Funds, and Prestige Capital filed an "agreed upon and approved" Plan Term Sheet (the "Plan Term Sheet") "containing material terms to be incorporated in the Debtor's Chapter 11 plan of reorganization and related plan support agreement between the parties." ECF No. 478 at 1. On May 12, 2023 the Debtor filed a motion to approve a plan support agreement generally consistent with the Plan Term Sheet. ECF No. 524.

8.     On May 26, 2023, the Debtor filed a *Plan of Reorganization for MusclePharm Corporation Under Chapter 11 of the Bankruptcy Code Dated May 26, 2023* (the "Proposed Plan"), ECF No. 553, and a *Disclosure Statement for the Plan of Reorganization for MusclePharm Corporation Under Chapter 11 of the Bankruptcy Code Dated May 26, 2023* (the "Disclosure Statement"), ECF No. 554.

### III.  ARGUMENT

**A.     The Court Should Disapprove of the Disclosure Statement because the Proposed Plan is Unconfirmable on its Face**

    **1.     The Proposed Plan Impermissibly Classifies Drexler's Junior Secured Claim with "Other Secured Claims" in Violation of 11 U.S.C. § 1122, or Improperly Fails to Classify it at All.**

9.     Section 1129(a)(1) requires that a plan comply "with the applicable provisions of" title 11. 11 U.S.C. § 1129(a)(1). "The legislative history suggests that the applicable provisions are those governing the plan's internal structure and drafting[.]" 7 Collier on Bankruptcy ¶ 1129.02[1]. These provisions include section 1122, *In re Islet Sciences, Inc.*, 640 B.R. 425, 457–58 (Bankr. D. Nev. 2022), which provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).  Thus, "[a]s a general rule, each holder of an allowed claim secured by a security interest in specific property of the debtor should be placed in a separate class." 7 Collier on Bankruptcy ¶ 1122.03[4]. *See also In re Com. W. Fin. Corp.*, 761 F.2d 1329, 1338 (9th Cir. 1985).

10.    In this case, there are six separate secured claims:

| Secured Claimant | Collateral Description | Cite |
|---|---|---|
| Blade Funding | Future Receipts | ECF No. 176 at 18. |
| Cloudfund LLC | Future Receipts | ECF No. 176 at 18. |
| Empery Tax Efficient, LP | All Assets | ECF No. 176 at 19. |
| Prestige Capital | Accounts Receivable | ECF No. 176 at 19. |
| Ryan Drexler | All Assets | ECF No. 176 at 19. |
| BJ's Wholesale Club, Inc. | Setoff rights in monies owed to Debtor | Claim No. 41. |

11.     Drexler's secured claim is junior to Empery's on all the same collateral which is proposed to be sold by the Debtor at auction. If the ISA is enforceable, Drexler's claim is entitled to full treatment as a secured claim if Empery's and Prestige's claims are paid in full (which could occur if auction proceeds are high enough). Nonetheless, the Disclosure Statement and Proposed Plan provide for only three classes of secured claims: "Class 1 – Other Secured Claims", "Class 3 – Empery Prepetition Secured Claim", and "Class 4 – Prestige Prepetition Secured Claim." ECF Nos. 552 at 18–22; ECF No. 553 at 14–15 (C36–37). The Plan Proponents conspicuously failed to identify or separately classify Drexler's secured claim at all. The only class where it could conceivably be intended to be placed is Class 1 with "Other Secured Claims" that are secured by different collateral, namely future receipts and setoff rights in monies owed to the Debtor, making this an indisputable violation of section 1122.[4]

12.     The Disclosure Statement provides no explanation for this proposed classification, suggesting that the Plan Proponents and Empery hoped it would simply be overlooked. (If a required class of secured claims is simply obliterated, it "looks" like it was not skipped.) The classification in this manner is clearly meant to be part of the illegal plan

---

[4] We presume that the Plan Proponents and Empery placed Drexler's secured claim in Class I based on the suggested "amount owed" in the Disclosure Statement. ECF No. 552 at 18. *See also* Claim No. 56.

mechanism for skipping Drexler's junior secured claim and gifting proceeds to unsecured creditors.[5]

13.    Despite the indisputable fact that Drexler has a security interest in the same collateral proposed to be sold at auction as Empery, no Net Sale Proceeds of that auction are proposed to be paid to satisfy any of the Class 1 claims, or otherwise be distributed to Drexler on account of his junior secured claim. The Proposed Plan cannot be confirmed with such an improper classification of secured creditors whose collateral is diverse, or by failing to create a class of junior secured claim for Drexler, and therefore the Disclosure Statement should be disapproved.

**2.    The Proposed Plan Deceptively and Improperly Characterizes Drexler's Secured Claim as Unimpaired.**

14.    The Disclosure Statement and Proposed Plan characterize Drexler's secured claim as "[u]nimpaired and not entitled to vote." ECF Nos. 552 at 18 & 553 at 14; C36. This appears designed to deprive Drexler of the ability to be a dissenting class, and to raise cramdown objections. But how can Drexler possibly be unimpaired, where as here, the Net Sales Proceeds of his collateral are to be directed around him to junior classes, his lien rights are destroyed, and nothing of apparent value for distribution would remain?

15.    The Bankruptcy Code provides that a class of claims is only unimpaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or

---

[5] The changing structure from the Plan Term Sheet, to the PSA, to the Proposed Plan demonstrates that the Plan Proponents and Empery intended from the outset to completely deprive Drexler of *any* distributions on account of his secured claims, and until the last iteration in the Proposed Plan, on his unsecured claims as well. First, In the Plan Term Sheet, Drexler was originally placed in his own class, "Class 6: Drexler Claims", which provided that "the Allowed Drexler Claims shall be subordinated to all Allowed Claims" including those of the general unsecured class. ECF No. 479 at 16 (A9). In the PSA, however, the parties omitted any reference to Drexler in the list of classes. ECF No. 524 at 41–44 (B22–25). Second, the Plan Term Sheet and the PSA had previously provided that "Class 1 will include separate sub-classes for each applicable secured creditor." ECF No. 478 at 14 (A7); ECF No. 524 at 41 (B22). The Disclosure Statement also suggests that "Class 1 will include separate sub-classes for each applicable secured creditor", but those "sub-classes" are not set forth elsewhere in the Disclosure Statement or the Proposed Plan. ECF No. 552 at 18; ECF No. 553 at 14–17 (C36–39).

interest entitles the holder of such claim or interest[.]" 11 U.S.C. § 1124(1). "Any alteration of these rights constitutes impairment, even if the value of the rights is enhanced." 7 Collier on Bankruptcy ¶ 1124.03. *See also L&J Anaheim Assocs. v. Kawasaki Leasing Int'l, Inc. (In re L&J Leasing Anaheim Assocs.)*, 995 F.2d 940, 942 (9th Cir. 1993) ("It is well established that, with this language, 'Congress define[d] impairment in the broadest possible terms.'" (quoting *Madison Hotel Assocs.*, 749 F.2d at 418)). "The Bankruptcy Code creates a presumption of impairment so as to enable a creditor to vote on acceptance of the plan." *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 203 (3d Cir. 2003) (quoted source omitted). "The burden is placed on the debtor to demonstrate the plan leaves the creditor's rights unaltered." *Id.*

16.     Here, Drexler's rights as a secured creditor are not just impaired, they are destroyed.[6] The Proposed Plan gifts around him to junior creditors his right to any proceeds arising from the sale of the Debtor's assets which are pledged to him. He will not "be paid in full in cash or otherwise realize the value of [his] collateral", as the Disclosure Statement suggests. ECF No. 552 at 18. *See Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.)*, 166 B.R. 428, 436 (C.D. Cal. 1993) (remanding for further proceedings on compliance with absolute priority rule where senior secured creditor argued "its claim will be impaired by the proposed payments to junior creditors" in violation of the absolute priority rule).

17.     Under section 363 of the Bankruptcy Code, Drexler's liens should attach to the proceeds of any auction sale of his collateral to the extent the proceeds exceed the amounts needed to pay the senior secured claims—including the Empery Allowed Claim. That it does not, and provides instead for Drexler's liens to be extinguished, is another direct impairment of Drexler's secured claim, and is otherwise a violation of the Bankruptcy Code. The Proposed Plan provides that "this Plan shall constitute a termination statement with respect to all liens,

---

[6] Even if the Court determines that the Disclosure Statement may be approved on some basis, it should adjudicate and resolve the disputed characterization of Drexler's secured claim as unimpaired prior to any the commencement of any solicitation and confirmation process, as it affects directly Drexler's rights to vote and object to plan confirmation as a secured creditor.

security interests and encumbrances that is effective upon the plan effective date pursuant to section 9-513 of the Uniform Commercial Code" and that "[a]ll liens, security interests and encumbrances in and to the Debtor's assets shall terminate, be discharged and shall not attach to any assets of the Reorganized Debtor from and after the effective date." ECF Nos. 552 at 30; ECF No. 553 at 26 (C44).

**3.    The Proposed Plan Cannot Satisfy the Best Interests of Creditors Test Set Forth in 11 U.S.C. § 1129(a)(7) as to Drexler's Impaired Junior Secured Claim.**

18.    Section 1129(a)(7)—the "best interests of creditors" test—requires that each holder of a claim in an impaired class (Drexler's secured claim, according to its present treatment) "has accepted the plan" or "will receive or retain under the plan . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]" 11 U.S.C. § 1129(a)(7).

19.    As discussed in detail below, absent the Proposed Plan's manipulation of Empery's Allowed Claim and Payoff Amount, and the gifting of Net Sale Proceeds exceeding Empery's Payoff Amount to the Litigation Trust (funds that would otherwise be paid to Drexler on account of his junior secured claim), Drexler would realize substantially more than zero if the Debtor were liquidated under chapter 7 because he would not have to share his distribution with the general unsecured creditors.[7]

**4.    The Proposed Plan Violates the Absolute Priority Rule set forth in 11 U.S.C. § 1129(b) by Bypassing Drexler's Junior Secured Claim to Gift Value to General Unsecured Creditors.**

20.    Section 1129(b) provides that a plan can be confirmed non-consensually *so long as* "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. §

---

[7] The Debtor and the Committee promised that a liquidation analysis would "be filed and served at a later date, but prior to the Disclosure Statement objection deadline." ECF No. 552 at 5. As of that deadline, today, no liquidation analysis has been filed. For that reason alone, the Court cannot approve the Disclosure Statement.

1129(b)(1). To be fair and equitable under the Bankruptcy Code, a chapter 11 plan must satisfy the absolute priority rule. *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005). This rule protects dissenting creditors by "preclud[ing] the bankruptcy court from approving a plan that gives the holder of a claim anything at all unless all objecting classes senior to him have been paid in full." *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1214 (9th Cir. 1994). Thus, a "dissenting secured creditor must ordinarily be paid in full before any junior class may share under the plan." *Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.)*, 166 B.R. 428, 436 (C.D. Cal. 1993); *In re Elijah*, 41 B.R. 348, 352 (Bankr. W.D. Mo. 1984) (denying confirmation of plan subordinating senior lienholder to junior creditors because the "absolute priority rule requires that senior creditors receive the full benefit of their bargain before treatment of junior claims"); *In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937, 941–42 (Bankr. S.D. Fla. 1992) ("The Fair and equitable requirement provides for an absolute rule of priority among creditors and stockholders in reorganization plans, placing secured creditors[ ] rights first, those of unsecured[s] next, and subordinating the interests of stockholders." (quoting *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 511 (Bankr. S.D. Tex. 1989)); *Case v. Los Angeles Lumber Prod. Co.*, 308 U.S. 106, 116 (1939) (noting the "familiar rule that the stockholder's interest in the property is subordinate to the rights of creditors. First, of secured, and then of unsecured, creditors.") (quoted source omitted).

21.    The practice of "vertical gifting"—providing "distribution[s] from a senior class of creditors in a manner that skips over an intermediary junior class of dissenting creditors"—"violates the strict requirements of the absolute priority rule." *Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra Env't Sols., Inc.)*, 590 B.R. 75, 82 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), as amended (Feb. 2, 2021); *see also In re Trib. Co.*, 972 F.3d 228, 232 (3d Cir. 2020) ("'Fair and equitable' . . . should be pictured vertically[.]"). For that reason, a plan which proposed to gift sale proceeds from a secured creditor to a trust for the benefit of unsecured creditors, bypassing intermediate junior classes, cannot be confirmed.

22. Class-skipping gifting is also generally offensive to the Bankruptcy Court's "basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 457 (2017) (rejecting class-skipping in a structured settlement approved by the bankruptcy court). As the Supreme Court instructed: "[s]ecured creditors are highest on the priority list, for they must receive the proceeds of the collateral that secures their debts." *Id.* At the bottom are "low-priority creditors, including general unsecured creditors." *Id.* The Supreme Court also noted that although a chapter 11 plan "may impose a different ordering with *the consent of the affected parties*", a bankruptcy court "cannot confirm a plan that contains priority-violating distributions over the objection of an impaired creditor class." *Id.* (emphasis added) (citing 11 U.S.C. §§ 1129(a)(7), (b)(2)).

23. The scheme attempted by the Plan Proponents and Empery in this case is nearly identical to one that was soundly rejected by the bankruptcy court in *In re On-Site Sourcing, Inc.*, 412 B.R. 817 (Bankr. E.D. Va. 2009). The Bankruptcy Court there struck a provision in a sale agreement which provided for the creation of a general unsecured creditors trust to be funded from the proceeds of a sale of the debtor's assets. *Id.* at 822, 825. The Bankruptcy Court rejected arguments "that the intended payment to the [trust] is really a distribution of [the secured lender's] property and [it] can do anything it likes with its property." *Id.* at 825. The Bankruptcy Court reasoned that "proceeds from the sale of property of the estate *are property of the estate*." *Id.* This result "is not changed by the fact that the property sold is subject to an encumbrance." *Id.* Rather, the proceeds "remain property of the estate", subject to an encumbrance and to the jurisdiction of the Bankruptcy Court. *Id.* The Bankruptcy Court also rejected the "quite disingenuous[ ]" argument that "the payment is a gift from [the secured creditor] to the general unsecured creditors." *Id.* at 826. It observed that such a trust provision "is contrary to the scheme of distribution envisioned in both a chapter 7 and chapter 11 liquidation", effectively "assur[ing] that the general unsecured creditors are paid in advance of the administrative and priority claims." *Id.*

24.     The Proposed Plan here is equally condemnable and unconfirmable.   The Proposed Plan gifts sale proceeds (property of the estate) from Empery to a "Litigation Trust" for the benefit of the general unsecured creditors. ECF No. 553 at 10; C33; *but see* A10, B16 (previously referring to a "Liquidation Trust"). Drexler's junior secured claim is placed in Class 1 with "Other Secured Claims" that are not permitted to share the proceeds of the sale of the Debtor's business (defined in the Plan as "Net Sale Proceeds"). ECF No. 553 at 13; B22, C36; *but see* A9 (previously placing Drexler in Class 6 to be "subordinated to all Allowed Claims").

25.     The Proposed Plan is clearly designed to effectuate illegal gifting in violation of the absolute priority rule. That is the only reason the Proposed Plan manipulates the Allowed Empery Secured Claim and Empery Payoff Amount. The Plan Proponents and Empery want to argue that the Net Sales Proceeds of the auction belong not to the Debtor's bankruptcy estate, but to Empery to "gift" to unsecured creditors. All the foregoing cases stand for the proposition that such an argument should be rejected.

26.     Thus, the Proposed Plan states that "Empery shall compromise and settle with the Estate and have an allowed secured claim in the amount of $18 million[.]" ECF No. 553 at 15 (C37). Upon the sale of substantially all of the Debtor's assets, Empery will receive the Empery Payoff Amount: the "Net Sale Proceeds" (defined in Article I.B.74, ECF No. 553 at 10 (C33)), not to exceed $12 million less the Roll-Up (defined in Article I.B.99, ECF No. 553 at 11 (C34)) and less the amount of Empery's credit bid. *Id.* If the Net Sales Proceeds are insufficient to satisfy the Empery Payoff Amount, then Empery will forego any further recovery. *Id.* But, to the extent the proceeds exceed the Empery Payoff Amount, the plan provides for Empery to "assign" such benefits to a Litigation Trust up to the value of Empery's $18 million claim. *Id. See also* C40 ("On the Plan Effective Date, the Litigation Trust shall

1  receive all cash held by the estate, including the Net Sale Proceeds less the Empery Payoff

2  Amount *less* amounts due to [the Prestige Claim] pursuant to the Plan.").[8]

3        27.    Now consider the substance of this "deal," and not its form. In substance

4  Empery has agreed that its secured claim will be satisfied in full with a payment of $12 million.

5  That's the real settlement of the adversary proceeding. Under the Bankruptcy Code, and the

6  ISA, any auction proceeds in excess of that amount should then go to the next priority secured

7  claims, including Drexler's. Until auction proceeds exceed the combined total of the Empery,

8  Prestige, and Drexler secured claims, no proceeds should go to unsecured claims. To make

9  sure that distributions that would otherwise go to Drexler went to unsecured creditors instead,

10  Empery and the Plan Proponents decided that they should have a fictional "allowed" claim in

11  the full amount Empery asserted in litigation and in proofs of claim—$18 million—and then

12  make the argument that property of the estate that consists of the auction proceeds could be

13  gifted by them to the Litigation Trust for unsecured creditors in violation of the absolute

14  priority rule. There is no precedent or principle that would permit a settled and paid off creditor

15  to control distributions that it might have received but for the settlement. And even if Empery

16  had a lawful right to receive as much as $18 million, they cannot skip Drexler and gift any part

17  of it to unsecured creditors. This is a make believe contrivance to damage Drexler's claim, and

18  is exactly what has been condemned and rejected in case after case after case.

19        28.    Furthermore, if Empery is the successful bidder at the sale, Empery is bound by

20  the Plan Support Agreement and Plan to "issue 20% of the purchaser's equity . . . to the

21  [Litigation] Trust . . . for the benefit of holders of [General Unsecured] Claims." ECF No. 524

22  at 21 (B14); ECF No. 553 at 20 (C41) ("[A]ll New Equity Interests in the Reorganized Debtor

23  shall be issued as set forth herein and in the Plan Support Agreement[.]").  This too is an illegal

---

[8] The Proposed Plan and Disclosure Statement do not provide any clear instructions for the distribution of the Net Sale Proceeds to the extent they exceed the Empery Allowed Claim of $18 million and the Class 4 secured claim of Prestige. The failure to classify Drexler's secured claim as next in line for Net Sales Proceeds is fatal to plan confirmation and a further breach by Empery of its ISA obligations to Drexler.

class-skipping gift. Empery can become the successful bidder only by using the economic power conferred on it by the Proposed Plan in relation to the contrived Empery Allowed Claim and its credit bid rights. It is no different than the contrived "assignment" to unsecured creditors of Net Sales Proceeds above the Empery Payoff Amount. Taken together, these provisions provide substantial distributions of estate property to general unsecured creditors by bypassing Drexler's junior secured claim in the collateral/assets to be sold. Structurally, these provisions are substantively equivalent to the subordination of Drexler's junior secured claim to unsecured claims (which was the original intention of the Debtor, the Committee and Empery in the first Plan Term Sheet). This violates the Bankruptcy Code and the ISA.

29.     The Proposed Plan is also legally defective because it does not provide for the appropriate senior secured treatment of Drexler's secured claim in the event this Court holds that the ISA is unenforceable. *See* ECF No. 566 at 15–16. In such an event, the distribution of Net Sale Proceeds should satisfy Drexler's secured claim in full before anything may be distributed to satisfy Empery's secured claim.

30.     In prior pleadings, Empery has made the same argument the Bankruptcy Court rejected in *OnSite Sourcing*, to wit: "[T]he Empery Assigned Claim is not money that would otherwise go to Drexler on account of his secured claim" and "Empery is free to keep or gift/assign all or any portion of its recovery." ECF No. 582 at 9. The cases that Empery has cited for this argument are inapposite. For instance, Empery cites *In re TSIC, Inc.*, 393 B.R. 71 (Bankr. D. Del. 2008), in which the Bankruptcy Court "approved [a] settlement agreement whereby purchaser agreed to fund a trust account for the benefit of general unsecured creditors." ECF No. 582 at 10 n.2. But the settlement agreement in that case did not violate the absolute priority rule because the "gift" was not estate property, but rather property of a non-debtor. *TSIC*, 393 B.R. at 75; *see also Nuverra*, 590 B.R. at 81 (citing bankruptcy court's finding that the gift did not violate the absolute priority rule because it did not come from estate property).

31.     Empery also relies on the Second Circuit's decision in *In re Iridium Operating LLC*, 478 F.3d 452, 464 (2d Cir. 2007), for its "holding that a 'rigid per se rule' as to the applicability of the absolute priority rule to carve-outs for unsecured creditors did not apply to pre-plan settlements." ECF No. 582 at 10 n.2. Nonetheless, the Second Circuit held in that case that leftover funds from the senior lenders to fund a litigation trust for the benefit of unsecured creditors violated the absolute priority rule and remanded for clarification of why the settlement required deviation from the rule. *Iridium*, 478 F.3d at 459, 464–65.

32.     Whether a plan or settlement impermissibly gifts in violation of the Bankruptcy Code's absolute priority rule necessarily depends on the facts at hand. Central to that inquiry is whether the "gifted" funds are property of the estate. In this regard, the position that the Plan Proponents and Empery advocate here was also forcefully repudiated by *In re DBSD North America, Inc.*, 634 F.3d 79 (2d Cir. 2011). In that case, the Second Circuit reversed the Bankruptcy Court's decision (and District Court's affirmance) that a gift from senior lenders could be provided voluntarily to junior claimants without violating the absolute priority rule. *Id.* at 87, 101. In doing so, the Second Circuit distinguished *SPM Manufacturing*—one of the very few cases that had approved of gifting in the context of a chapter 7 liquidation—as a case that should be limited to its unique facts because it "granted the secured creditor relief from the automatic stay, . . . and treated the [gifted] property in question as no longer part of the estate . . . . Here, however, the relevant property has remained in the estate." *DBSD*, 634 F.3d at 98 (citing *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1309, 1313 (1st Cir. 1993)).

33.     The gift to unsecured creditors of the Net Sale Proceeds exceeding the Empery Payoff Amount—which includes "for the avoidance of doubt, any monetary recovery"— is indisputably a gift of estate property. *On-Site Sourcing*, 412 B.R. at 825 ("[P]roceeds from the sale of property of the estate are property of the estate."); *In re Las Vegas Monorail Co.*, 429 B.R. 317, 328 n.15 (Bankr. D. Nev. 2010) ("[E]ncumbered property is part of the bankruptcy estate under the Code and is subject to bankruptcy court jurisdiction."); *In re MCO Wash, Inc.*, 555 B.R. 159, 163, 165 (Bankr. E.D.N.Y. 2016) (holding that carve-outs of property of the

estate from undersecured creditors must be distributed in accord with chapter 7 priority scheme and rejecting trustee's distinction from absolute priority rule in chapter 11). A gift of estate property directly to unsecured creditors, vertically skipping over Drexler's Junior Secured Claim, violates the absolute priority rule and renders the Proposed Plan unconfirmable on its face.

**5.      The Proposed Plan Contains an Impermissibly Broad Exculpation Provision**

34.      The Proposed Plan proposes to exculpate the Debtor, the Committee, Empery, and White Winston, their "subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, and attorneys (each in their capacity as such)" from:

> Any cause of action for any claim related to any act or omission in connection with, relating to, or arising out of, an Official Action, the chapter 11 case, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any restructuring transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any exculpated party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the chapter 11 case, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or any official action, except for claims related to any act or omission that constitutes actual fraud, willful misconduct, or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the Exculpated Parties do not include Drexler (on account of his prepetition acts and omissions), his affiliates, successors or assigns, or any of the Debtor's prepetition officers and board of directors and their affiliates, successors or assigns.

ECF Nos. 552 at 29, 553 at 26–27 (C44–45).

35.    Whatever else the foregoing exculpation provision means, it appears that it would improperly immunize Empery from Drexler's claims that Empery's support of the Plan Term Sheet, the PSA and the Plan are material violations of its obligations to Drexler under the ISA.  It is equivalent to a non-consensual third-party release.

36.    But these exculpation provisions also appear to include pre-bankruptcy conduct, which is also completely inappropriate. Exculpation provisions are permissible so long as they are "tailored." *Bennetti v. CPESCA Liquidating, Inc. (In re CPESCA Liquidating, Inc.)*, No. CC-21-1123-LGT, 2022 WL 2719642, at *10 (B.A.P. 9th Cir. July 12, 2022) (unpublished) (quoting *Blixseth v. Suisse*, 961 F.3d 1074, 1082 (9th Cir. 2020)). For instance, the Ninth Circuit has approved an exculpation clause which "exclusively exculpate[d] actions that occurred during the bankruptcy proceeding, not before." *Blixseth*, 961 F. 3d at 1081. Here, the exculpation provision extends to prepetition transactions and references a "Restructuring Support Agreement" and "related prepetition transactions" which are not defined or otherwise identified in the Proposed Plan or Disclosure Statement.

**6.    The Proposed Plan is Unconfirmable on its Face Because It Was Not Proposed in Good Faith as Required by 11 U.S.C. § 1129(a)(3)**

37.    Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code." *Platinum Capital, Inc. v. Sylmar Plaza LP (In re Sylmar Plaza, LP)*, 314 F.3d 1070, 1074 (9th Cir. 2002) (citing *Ryan v. Loui (In re Corey)*, 892 F.2d 829, 835 (9th Cir. 1989) and *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)). Good faith "also requires a fundamental fairness in dealing with one's creditors." *Stolrow v. Stolrow's, Inc. (In re Stolrow's Inc.)*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988). The Proposed Plan cannot obtain a result consistent with the objectives and purposes of the Code because it does not comply with the Bankruptcy Code. As set forth above, the Proposed Plan impermissibly gifts value to unsecured creditors (in violation of the absolute priority rule) in the form of excess Net Sale Proceeds that should properly be distributed to

Drexler's junior secured claim. The Proposed Plan does not satisfy the best interests of creditors test. The Proposed Plan wrongly classifies Drexler's claim in a makeshift "Other Secured Claims" class, improperly characterizes it as unimpaired, and ignores the distinctions between the collateral underlying those claims. These provisions were intentionally designed to harm Drexler, and do not reflect good faith or fundamental fairness.

**B.    Even if the Plan is Not Facially Unconfirmable, the Disclosure Statement Should be Disapproved.**

**1.    The Debtor and the Committee Must Disclose the Risks Associated with Prosecuting Confirmation of Such a Plan.**

38.    The Disclosure Statement provides cursory and superficial treatment of risk factors, ECF No. 552 at 45–46. The Plan Proponents merely disclose that "Debtor and the Committee May Not Be Able to Secure Confirmation of the Plan", without any reference to any of the issues raised in this Objection. *Id.* at 45.

**2.    The Debtor and the Committee Must Disclose Additional Financial Information.**

39.    Several courts have identified certain information which should be disclosed, including a complete description of the available assets and their value, a liquidation analysis setting forth the estimated return that creditors would receive under chapter 7, and the condition and performance of the debtor while in chapter 11. 7 Collier on Bankruptcy, ¶ 1125.02[2]. *See also In re Budd Co., Inc.*, 550 B.R. 407, 412–13 (Bankr. N.D. Ill. 2016) (aggregating factors); *In re Metrocraft Publ'g Servs.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (noting that a disclosure statement should have a complete description of the available assets and their values); *In re Phoenix Petroleum*, 278 B.R. 385, 406 n.6 (Bankr. E.D. Pa. 2001).

40.    The Disclosure Statement presented at this juncture has no information regarding the value of the Debtor's assets (where distributions under the Proposed Plan will be funded through the sale of those assets) and no information regarding any estimated return that

creditors would receive under chapter 7.[9]  Such a liquidation analysis would necessarily disclose that the Proposed Plan violates the best interests test as to Drexler. Nor is there any illustration of the manner in which the potential $6 million gift to the Litigation Trust would work as compared to a liquidation in chapter 7. There also is no discussion of asset values that would supposedly remain with the Debtor, even though the Proposed Plan appears to provide for the Debtor to continue in business rather than liquidate fully.

41.    No hypothetical investor could make an informed judgment about the Plan without this information. This Court should therefore also deny approval of the disclosure statement due to these informational defects. *Metrocraft*, 39 B.R. 567 (denying approval for inadequate information on asset values, estimated return in liquidation, collectability of accounts receivable).

## IV.  **Reservation of Rights**

42.    Drexler reserves all his rights to assert any additional objections to any amended disclosure statement filed by the Debtor and the Committee. In addition, nothing in this objection should be construed to limit any objections that Drexler may raise in connection with confirmation of the Proposed Plan (or any amended plan).

## V.  **Conclusion**

43.    For the reasons above. Drexler respectfully requests that the Court enter an order denying approval of the Disclosure Statement (ECF No. 552) on the grounds that the Proposed Plan (ECF No. 553) is unconfirmable on its face, and grant such other relief as the Court deems just and appropriate.

Respectfully submitted this 14th day of June 2023.

**STEINHILBER SWANSON LLP**
*/s/ Michael P. Richman*
MICHAEL P. RICHMAN, ESQ.
*Admitted Pro Hac Vice*

---

[9] The lack of disclosure of the values of Debtor's assets and business is particularly concerning where, as here, the Debtor seeks contemporaneously to conduct an auction sale of substantially all its assets. Potential bidders conducting diligence would likely consult the Disclosure Statement for valuation information, and will find none.

## CERTIFICATE OF SERVICE

I am an employee of Carlyon Cica Chtd.  On the date of filing of the foregoing papers with the Clerk of Court I caused a true and correct copy to be served in the following manner:

☒ ELECTRONIC SERVICE:  Pursuant to LR 2002 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed and served on all parties and attorneys who are filing users through the Notice of Electronic Filing automatically generated by the Court.

☐  UNITED STATES MAIL:  By depositing a true and correct copy of the above-referenced document into the United States Mail with prepaid first-class postage, addressed to the parties at their last-known mailing address(es):

☐  OVERNIGHT COURIER:  By depositing a true and correct copy of the above-referenced document for overnight delivery via a nationally recognized courier, addressed to the parties listed below which was incorporated by reference and made final in the w at their last-known mailing address.

☐  FACSIMILE:  By sending the above-referenced document via facsimile to those persons listed on the attached service list at the facsimile numbers set forth thereon.

I declare under penalty of perjury that the foregoing is true and correct.

_/s/ Cristina Robertson_____
An employee of Carlyon Cica Chtd.