Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
Gabrielle Hamm, Esq.
Nevada Bar No. 11588
ghamm@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544

*Attorneys for the Debtor*

PACHULSKI STANG ZIEHL & JONES LLP
John D. Fiero (admitted *pro hac vice*)
Jason H. Rosell (admitted *pro hac vice*)
One Sansome Street, 34th Floor, Suite 3430
San Francisco, CA 94104
Telephone: 415.263.7000

LARSON & ZIRZOW LLC
Matthew C. Zirzow (Nevada Bar No. 7222)
Zachariah Larson (Nevada Bar No. 7787)
850 East Bonneville Avenue
Las Vegas, NV 89101
Telephone: 702.382.1170

*Counsel to the Official
Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>MUSCLEPHARM CORPORATION,<br><br>Debtor. | Case No.: 22-14422-nmc<br><br>Chapter 11<br><br><br>Hearing Date: June 22, 2023<br>Hearing Time: 9:30 a.m. |

**JOINT REPLY OF THE PLAN PROPONENTS
TO THE OBJECTION TO THE MOTION FOR THE ENTRY OF AN ORDER:
(i) APPROVING THE DISCLOSURE STATEMENT; (ii) APPROVING THE FORM OF
BALLOTS AND PROPOSED SOLICITATION AND TABULATION PROCEDURES;
(iii) FIXING THE VOTING DEADLINE WITH RESPECT TO THE DEBTOR'S
CHAPTER 11 PLAN; (iv) PRESCRIBING THE FORM AND MANNER OF NOTICE
THEREOF; (v) FIXING THE LAST DATE FOR FILING OBJECTIONS TO THE
CHAPTER 11 PLAN; (vi) SCHEDULING A HEARING TO CONSIDER
CONFIRMATION OF THE CHAPTER 11 PLAN; AND (vii) APPOINTING
STRETTO AS SOLICITATION AND TABULATION AGENT**

MusclePharm Corporation, the debtor and debtor-in-possession in the above-referenced Chapter 11 case (the "**Debtor**"), and the Official Committee of Unsecured Creditors of the Debtor (the "**Committee**" and together with the Debtor, the "**Plan Proponents**") hereby file this reply (the "**Reply**") to the Objection (the "**Objection**") [ECF No. 594] of Ryan Drexler ("**Drexler**") to the *Motion for the Entry of an Order: (i) Approving the Disclosure Statement; (ii) Approving the Form of Ballots and Proposed Solicitation and Tabulation Procedures; (iii) Fixing the Voting Deadline*

*with Respect to the Debtor's Chapter 11 Plan; (iv) Prescribing the Form and Manner of Notice Thereof; (v) Fixing the Last Date for Filing Objections to the Chapter 11 Plan; (vi) Scheduling a Hearing to Consider Confirmation of the Chapter 11 Plan; and (vii) Appointing Stretto as Solicitation and Tabulation Agent* (the "**Motion**") [ECF No. 554].[1] In support of this Reply, the Plan Proponents respectfully state as follows:

## PRELIMINARY STATEMENT

1.  Drexler dedicates one page of Objection to the adequacy of information contained in the Disclosure Statement. Rather than focus on the issue that is before the Court – whether the Disclosure Statement contains adequate information – most of Drexler's Objection is directed to various provisions of the Plan that shall be addressed, if necessary, after complete briefing of the issues at *confirmation*. Contrary to Drexler's contentions, and as discussed more fully below, the Plan is not patently unconfirmable and the Court need not hold a mini-confirmation trial in connection with approval of the Disclosure Statement.

2.  Drexler's primary objection is that his secured claim is classified with other secured claims and deemed unimpaired and not entitled to vote, rather than separately classified and deemed impaired and entitled to vote. As an initial matter, the Plan Proponents acknowledge that each secured creditor is entitled to be separately classified. As reflected in the Plan Support Agreement, Class 1 (Other Secured Claims) contained separate subclasses for each secured creditor, as is normal and customary. Inadvertently, this subclass structure was not carried over to the Plan. The Plan will be amended to clarify that Class 1 (Other Secured Claims) will consist of a separate subclass from each holder of a Class 1 Claim. Second, rather than expend estate resources litigating over whether Drexler is impaired or unimpaired, the Plan Proponents will amend the Plan to separately classify Drexler's secured claim as impaired and entitled to vote.

3.  The remainder of the Objection, as discussed more fully below, concerns issues that do not relate to the adequacy of the information contained in the Disclosure Statement, do not render the Plan patently unconfirmable, and are properly addressed at confirmation. For the reasons

---

[1] Capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the Motion or the Objection, as applicable.

DOCS_SF:109073.2 59184/001                                    2

stated herein, the Objection should be overruled and the Disclosure Statement, as amended, should be approved.

**REPLY**

**I.    The Plan is Confirmable.**

4.    The crux of Drexler's Objection is that the Plan is patently unconfirmable, and this Court should reject approval of the Disclosure Statement as a result. *See* Objection, p. 3. In support of his argument, Drexler claims the Plan is unconfirmable because it: (i) improperly classifies Drexler's claim; (ii) improperly characterizes the treatment of Drexler's claim as "unimpaired"; (iii) contains an impermissible "gifting" of Empery's senior secured claim to unsecured creditors; (iv) does not satisfy the best interest of creditors test under Section 1129(a)(7) of the Bankruptcy Code; and (v) contains impermissibly broad exculpation provisions. *Id*. at pp. 4-5.

5.    While each of the above-referenced Plan objections will be addressed herein, all of Drexler's arguments relating to confirmation of the Plan (other than classification of his claim, which is being addressed with an amendment to the Plan) should be made and considered by the Court in connection with confirmation, and not at the approval of the Disclosure Statement. *See*, *e.g.*, *In re Islet Sciences*, Case No. 19-13366-MKN (Bankr. D. Nev. 2019); *In re Am. Capital Equip., LLC*, 668 F.3d 145, 153-54 (3d Cir. 2012) (generally, confirmation issues are reserved for confirmation); *In re Quigley Co., Inc.*, 377 B.R. 110, 112 (Bankr. S.D.N.Y. 2007) (approving the disclosure statement while noting there were serious confirmation issues); *In re Annicotte Excellence, LLC*, 258 B.R. 278, 283 n. 6 (Bankr. M.D. Fla. 2001) (stating that until such time as a debtor is in the process of cramming down a rejecting class of creditors, the rule set forth in *203 N. LaSalle*, 526 U.S. 434 (1999), need not be considered); *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989) (declining to decide issues regarding violations of the absolute priority rule at the disclosure statement hearing); *In re Woodscape Ltd. Partnership*, 134 B.R. 165, 177 (Bankr. D. Md. 1991) (deferring issues regarding feasibility of plan funding, including inadequate attempts to solicit cash commitments, and the proper classification of claims for voting purposes for determination at the confirmation hearing); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1987) (declining to resolve issues regarding classification and treatment of claims of

lender/loan services; violations of cash collateral order; protection of lender's interest in property and plan feasibility at the disclosure statement hearing); *In re Sunshine Precious Metals, Inc.*, 142 B.R. 918, 920 (Bankr. D. Idaho 1992) (deferring issues regarding improper classification of claims for resolution at the confirmation hearing); *In re Monroe Well Service, Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) (deferring to resolve issues regarding the best interests of creditors test, uniform distribution, subordination of certain claims, voluntary releases and substantive consolidation until the confirmation hearing).

6. To the extent Drexler's arguments regarding the Plan are considered notwithstanding the forgoing decades of caselaw, however, the Plan is confirmable and each of Drexler's objections to the Plan should be rejected as set forth below.

**A. <u>The Amended Plan Will Separately Classify Drexler's Secured Claim.</u>**

7. Drexler first argues the Plan is unconfirmable because his secured claims are not separately classified and are deemed unimpaired and not entitled to vote. As discussed above, the Plan Proponents agree that Drexler's secured claim should be separately classified. In fact, the Plan Support Agreement contemplated separately classifying every Class 1 Other Secured Claim utilizing a subclass structure. Inadvertently, the Class 1 subclass structure was omitted from the Plan, but this will be remedied in the amended version of the Plan filed contemporaneously herewith. Moreover, to avoid any confusion, the Plan Proponents will amend the Plan to classify Drexler's secured claim in its own class (not just a separate subclass).

8. Drexler also asserts that his secured claim should be deemed impaired and entitled to vote. The Plan Proponents dispute this assertion. Drexler's secured claim is in fact being paid, but the proceeds of the claim are being distributed to Empery in accordance with the applicable intercreditor agreement. Rather than litigate this academic issue and allow Drexler to further deteriorate creditor recoveries, however, the amended Plan will deem Drexler's separately classified secured claim as impaired and entitled to vote.

**B. The Plan Satisfies the Best Interests of Creditors Test Pursuant to Section 1129(a)(7) of the Bankruptcy Code.**

9. Drexler further objects to the Disclosure Statement because he claims that in a chapter 7 liquidation he would receive more, because a chapter 7 trustee would not distribute excess Net Sale Proceeds to holders of general unsecured claims ahead of Drexler's junior secured claims. *See* Objection, p. 10.

10. <u>First</u>, Drexler fundamentally misunderstands what is being transferred to the Litigation Trust and for what purpose. Under the Plan, the Net Sale Proceeds and the estate's remaining cash will vest in the Litigation Trust on the effective date of the Plan. This is because the Litigation Trustee is the disbursement agent under the Plan and is responsible for making ***all*** distributions to creditors except Empery and Prestige, who will be paid either upon closing of the sale or immediately upon the effective date of the Plan. In other words, the Net Sale Proceeds must vest in the Litigation Trust to enable the Litigation Trustee to pay administrative claims, priority claims, other secured claims, general unsecured claims, ***and Drexler's claims***. For example, if the Net Sale Proceeds are $20 million after payment of the amounts owing to Empery and Prestige, Drexler's secured claim will be "in the money" and he will receive a disbursement from the Litigation Trustee to the extent his claim is ultimately allowed.

11. Moreover, the Net Sale Proceeds are ***not*** being transferred to the Litigation Trust for the benefit of Class 5 (General Unsecured Claims). Rather, <u>an economic interest in the Allowed Empery Secured Claim</u> is being transferred to the Litigation Trust for the sole benefit of Class 5 (General Unsecured Claims). This is an important distinction. Neither Drexler's collateral nor proceeds of his collateral are being transferred to holders of Class 5 Claims. Instead, ***Empery's property*** – and not the estate's property – is being transferred to holders of Class 5 Claims, which includes Drexler.

12. <u>Second</u>, there is no dispute that Drexler did not object or otherwise challenge the entry of the Final DIP Order, which permitted only the Committee and White Winston to challenge the validity of Empery's secured claim. As a result, in a chapter 7 liquidation, Empery would be entitled to its entire secured claim, which is in excess of $18 million. Accordingly, Drexler is behind

at least $18 million (not including the DIP obligations), whether in chapter 7 or chapter 11.

13. Drexler's secured claim is, in all likelihood, "out of the money," which means Drexler is an unsecured creditor with a general unsecured claim that may make up in excess of 50% of Class 5 (General Unsecured Claim) in dollar amount. Accordingly, Drexler stands to significantly benefit from the assignment of Empery's economic interest in its secured claim to holders of Class 5 Claims. The value of the Empery Assigned Claim is up to $6 million, roughly $3 million of which would be distributed to Drexler if his general unsecured claim is allowed. In a chapter 7 liquidation scenario, however, Empery would collect the full amount of its secured claim and general unsecured creditors would be left with nothing.

14. For the foregoing reasons, and although these issues are properly addressed in connection with confirmation, the Plan complies with the best interests of creditors test under Section 1129(a)(7).

### C. The Plan Does Not Violate the Absolute Priority Rule.

15. Drexler further argues that transferring the Empery Assigned Claim to the Litigation Trust for the sole benefit of holders of Class 5 Claims (General Unsecured Claims) violates the absolute priority rule. As discussed above, the Empery Assigned Claim is property of Empery, not the estate. This is a critical and distinguishing fact from the various cases cited by Drexler that puts this issue beyond the scope of the hearing on the Disclosure Statement and is properly addressed at confirmation.

16. At confirmation, the Plan Proponents will establish that the Plan does not violate the "Absolute Priority Rule," codified at Section 1129(b) of the Bankruptcy Code. Section 1129(b)(2)(B) provides that, with respect to a class of **unsecured claims**, a "plan must provide either (1) that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim or (2) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ." *Todeschi v. Juarez (In re Juarez)*, 603 B.R. 610, 622 (B.A.P. 9th Cir. 2019) (quoting § 1129(b)(2)(B)) (internal

1  quotes omitted). The Absolute Priority Rule "provides that a dissenting class of **unsecured**
2  **creditors** must be provided for in full before any junior class can receive or retain any property
3  under a reorganization plan." *Zachary v. Cal. Bank &Trust*, 811 F.3d 1191, 1194 (9th Cir. 2016)
4  (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988)) (emphasis added). Prior
5  to its statutory incorporation, the "Supreme Court adopted the [A]bsolute [P]riority [R]ule to
6  prevent deals between senior creditors and equity holders that would impose unfair terms on
7  unsecured creditors." *Id*. (quoting *In re Friedman*, 466 B.R. 471, 478 (B.A.P. 9th Cir. 2012)
8  (overruled on other grounds by *Zachary*). In other words, "if a class of **unsecured claims** does not
9  accept a chapter 11 plan by the requisite majorities, the court can confirm it only if the plan either
10 provides for full payment of the dissenting class or provides that no junior class will receive or
11 retain anything under the plan." *Juarez*, 603 B.R. at 622 (emphasis added).

12        17.    Drexler's argument that the transfer of the Empery Assigned Claim to the Litigation
13 Trust for the benefit of holders of Class 5 Claims violates the Absolute Priority Rule must fail. As
14 an initial matter, Section 1129(b)(2)(B) expressly applies to a class of **unsecured claims** – not
15 Drexler's junior secured claim. Instead, Drexler's secured claim is protected by Section
16 1129(b)(2)(A), which requires that holders of secured claims retain their liens securing such claims.
17 Under the Plan (and pending Bid Procedures Motion), Drexler's liens shall attach to the Net Sale
18 Proceeds to the same extent, priority, and validity as of the Petition Date – *i.e.*, such liens are junior
19 to Empery's and Prestige's liens pursuant to applicable intercreditor agreements. To the extent
20 Drexler's secured claim is "in the money" – however, his secured claim will be paid. Accordingly,
21 there is no violation of the Absolute Priority Rule.

22        18.    In support of his argument, Drexler relies on two non-binding, minority view cases:
23 *In re On-Site Sourcing, Inc.*, 412 B.R. 817 (Bankr. E.D. Va. 2009) and *In re DBSD North America,*
24 *Inc.*, 634 F.3d 79 (2d Cir. 2011). While both non-binding cases are distinguished below, Drexler
25 simply glosses over the central class-gifting case and majority view of the issue relied upon by most
26 courts: *Official Unsecured Creditors Committee v. Stern (In re SPM Mfg., Corp.)*, 984 F.2d 1305
27 (1st Cir. 1993). In *SPM*, the First Circuit upheld the validity of a "sharing agreement" under which
28 a substantially undersecured first-priority secured creditor agreed to assign a portion of the proceeds

DOCS_SF:109073.2 59184/001                                    7

of the sale of its collateral to general unsecured creditors, even though priority tax claims were not paid. *Id*. at 1309. Reasoning that the lender was otherwise entitled to the entire amount of any proceeds of the sale of the debtor's assets, the First Circuit wrote that "[w]hile the debtor and the trustee are not allowed to pay nonpriority creditors ahead of priority creditors…, **creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors.**" *Id*. at 1313 (emphasis added).

19.     While *SPM* was a chapter 7 case, several courts have relied on the ruling as authority for confirming a nonconsensual plan in which a senior secured creditor assigns a portion of its recovery to creditors (or equity holders) who would otherwise receive nothing by operation of section 1129(b) and the Bankruptcy Code's priority scheme. *See*, *e.g.*, *In re MCorp. Financial, Inc.*, 160 B.R. 941 (S.D. Tex. 1993); *In re Journal Register Co.*, 407 B.R. 520 (Bankr. S.D.N.Y. 2009); *In re World Health Alternatives, Inc.*, 344 B.R. 291 (Bankr. D. Del. 2006); *In re Union Fin. Servs. Grp.*, 303 B.R. 390 (Bankr. E.D. Mo. 2003); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001); *In re LCI Holding Company*, No. 14-2709, 2015 U.S. App. LEXIS 16306 (3d Cir. Sept. 14, 2015).

20.     Here, Empery, like the senior secured creditor in *SPM*, is free to do whatever it wishes with its claim or the proceeds of its claim, including the contribution or assignment of an economic interest in its secured claim to holders of Class 5 Claims.

21.     *In re DBSD North America,* on which Drexler relies to support his argument, is the minority view. In *DBSD*, the Second Circuit ruled that a class-skipping gift made by an undersecured creditor to old equity under a plan violated the Absolute Priority Rule. *In re DBSD*, 634 F.3d at 101. While taking a narrower approach to the class-skipping gifting in *DBSD*, the Second Circuit declined to determine whether the creditor, after receiving a distribution under the plan, could in turn distribute a portion of that recovery to old equity "outside the plan." *Id*. at 95.

22.     The other case relied on by Drexler, *In re On-Site Sourcing*, is distinguishable because it involved a 363 sale with a "carve-out" of the secured creditor's collateral and distributions to general unsecured creditors <u>outside of a plan</u>. *On-Site Sourcing, Inc.*, 412 B.R. at 821-22. The United States Bankruptcy Court for the Eastern District of Virginia denied the sale

1  arrangement because the carve-out and funding scheme involved property of the estate and, since a plan had not yet been drafted or proposed, "[t]he provision effectively predetermined, in significant part, the structure of an as yet to be drafted plan of reorganization and effectively evades the 'carefully crafted scheme' of the chapter 11 plan confirmation process." *Id*. at 826.

23. Simply put, the bankruptcy court's concern in *On-Site Sourcing* is not applicable in this case. There, the bankruptcy court denied the Section 363 carve-out because the proposed sale distribution: (i) was made from property of the estate; and (ii) was done outside of a plan. Here, the Debtor is selling its assets pursuant to a sale motion, but then distributing the Net Sale Proceeds under the Plan. Moreover, the Net Sale Proceeds will be distributed to Empery (thus becoming Empery's property and not property of the estate), who, in turn, will make the contribution or assignment to the Litigation Trust. In other words, any Net Sale Proceeds distributed to the Litigation Trust related to the Class 3 Empery Secured Claim will not be property of the estate because they will have already been distributed to Empery. *See In re LCI Holding Company*, No. 14-2709, 2015 U.S. App. LEXIS 16306 (3d Cir. Sept. 14, 2015) (upholding a class-skipping gift where the proceeds were first distributed to the secured creditor and gifted to unsecured creditors pursuant to a settlement agreement that followed entry of the sale order).

24. Accordingly, as set forth above, the assignment of a portion of Empery's secured claim through the Plan does not violate the Absolute Priority Rule and does not render the Plan unconfirmable. Regardless, this is a confirmation issue, and not a Disclosure Statement matter.

### D. The Plan Contains a Permissible Exculpation Provision.

25. Drexler admits that exculpation provisions in Chapter 11 plans are permissible (and commonplace) but argues the Debtor's proposed exculpation provision is too broad and purports to immunize Empery from Drexler's claims that Empery's support of the Plan materially violates its obligations under the parties' intercreditor agreement. *See* Objection, pp. 17-18. Importantly, Drexler cites no specific language of the Plan's exculpation provision to support his argument, but rather, uses vague terms such as "it appears." *Id.* at p. 18.

26. Moreover, "Section 1125(e) limits the liability of a broad array of persons for acts

related to soliciting votes for a plan – regardless of whether the person is an estate fiduciary." *In re Astria Health*, No. 19-01189-WLH11, 2021 WL 237672, at *5 (Bankr. E.D. Wash. Jan. 22, 2021).[2] The Ninth Circuit has stated that "limited exculpatory clauses focused on acts committed as part of the bankruptcy proceedings are . . . a commonplace provision in Chapter 11 plans." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000)); *accord In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 500 (Bankr. S.D. Ohio 2021). The "bankruptcy court . . . ha[s] the authority to approve an exculpation clause intended to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the Plan viable." *Id*. at 1084.

27. Indeed, exculpation of professionals and debtor-in-possession lenders are common practice in this Circuit, and most debtor-in-possession lenders, such as Empery, would not lend needed financing if they were exposed to liability in a Chapter 11 case. Accordingly, Drexler's bald accusation that the exculpation provision is too broad should fall on deaf ears.

### E. The Plan is Proposed in Good Faith.

28. Finally, Drexler objects to the Disclosure Statement as describing an impermissible plan because his previous objections purportedly demonstrate that the Plan was not proposed in good faith. Drexler could not be more wrong.

29. Indeed, after months of litigation between the Debtor, Empery, the Committee and White Winston, the parties agreed upon certain terms of the Plan, and entered into the Plan Support Agreement, which compromises millions of dollars of claims and provides the Debtor a path towards confirmation and an exit from bankruptcy.

30. As a general rule, a Chapter 11 plan is proposed in good faith if it achieves "a result consistent with the objectives and purposes" of the Bankruptcy Code and exhibits "fundamental

---

[2] 11 U.S.C. § 1125(e) provides:

> A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities."

fairness" in dealing with creditors. *See Marshall v. Marshall (In re Marshall)*, 721 F.3d 1032, 1046 (9th Cir. 2013); *Jorgensen v. Fed. Land Bank of Spokane (In re Jorgensen)*, 66 B.R. 104, 108-09 (B.A.P. 9th Cir. 1986). The totality of the circumstances should be considered in determining good faith. *In re Stolrow's Inc.*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988).

31.  Given the totality of the circumstances in this Chapter 11 Case, the fact that the Debtor negotiated a Plan Term Sheet, a Plan Support Agreement, and the Plan with three of the major creditor constituencies in this case should be evidence itself that the Plan was proposed in good faith. Regardless, this is a confirmation issue and Drexler's argument to the contrary should be rejected today.

## II.     The Disclosure Statement Contains Adequate Information.

32.  After spending nearly 19 pages arguing why the Plan is unconfirmable, Drexler spends approximately one page arguing the Disclosure Statement does not provide adequate information. *See* Objection, pp. 19-20.

33.  The Debtor does agree with Drexler that the Liquidation Analysis is necessary, and the Liquidation Analysis is being filed concurrently with this Reply. The Debtor disagrees with Drexler, however, that it needs to disclose additional risks associated with prosecuting confirmation of its Plan. Importantly, the Plan's risk factors are set forth in Section VI of the Disclosure Statement.

34.  Subsection A of Section VI describes issues under bankruptcy law that may prevent or affect confirmation of the proposed Chapter 11 Plan. Subsection B describes factors that may affect recoveries received under the Plan, including Drexler's pending Trustee Motion. Subsection C describes four separate factors that could negatively impact the Debtor's Chapter 11 case and business, including the length of the Chapter 11 process, certain tax implications, and possible dilution of New Equity in the Reorganized Debtor. Subsection D sets forth the Debtor's disclaimers that limit the information in the Disclosure Statement.

35.  The Disclosure Statement also informs all parties-in-interest that the proposed Plan will be confirmed only at a duly noticed hearing and that a deadline for objection will be established. Indeed, under these circumstances, the Debtor submits that risk information is

adequately disclosed, and no further information is required.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order: (i) granting the Motion; (ii) overruling the Objection; and (iii) granting such other relief as may be fair and equitable.

DATED: June 19, 2023.

Respectfully Submitted,

SCHWARTZ LAW, PLLC

By: /s/ *Samuel A. Schwartz*
Samuel A. Schwartz, Esq.
Bryan A. Lindsey, Esq.
Gabrielle Hamm, Esq.
601 East Bridger Avenue
Las Vegas, NV 89101

*Attorneys for the Debtor*

and

LARSON & ZIRZOW LLC

By: /s/ *Matthew C. Zirzow*
Matthew C. Zirzow (Nevada Bar No. 7222)
Zachariah Larson (Nevada Bar No. 7787)
850 East Bonneville Avenue
Las Vegas, NV 89101
Telephone: 702.382.1170

PACHULSKI STANG ZIEHL & JONES LLP
John D. Fiero (admitted *pro hac vice*)
Jason H. Rosell (admitted *pro hac vice*)
One Sansome Street, 34th Floor, Suite 3430
San Francisco, CA 94104
Telephone: 415.263.7000

*Counsel to the Official
Committee of Unsecured Creditors*