John D. Fiero (admitted *pro hac vice*)
Jason H. Rosell (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
One Sansome Street, 34th Floor, Suite 3430
San Francisco, CA 94104
Tel: (415) 263-7000
E-mail: jfiero@pszjlaw.com
        jrosell@pszjlaw.com

Matthew C. Zirzow (NV Bar No. 7222)
Zachariah Larson (NV Bar No. 7787)
LARSON & ZIRZOW LLC
850 E. Bonneville Ave.
Las Vegas, NV 89101
Tel: (702) 382-1170
Email: mzirzow@lzlawnv.com
       zlarson@lzlawnv.com

*Counsel to the Official
Committee of Unsecured Creditors*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No. 22-14422-NMC |
| MUSCLEPHARM CORPORATION, | Chapter 11 |
| Debtor. | |

### *EX PARTE* MOTION FOR AN EMERGENCY STATUS CONFERENCE PURSUANT TO SECTION 105(d) OF THE BANKRUPTCY CODE

The Official Committee of Unsecured Creditors ("Committee") of the above-captioned debtor and debtor-in-possession (the "Debtor") respectfully files this motion (the "Motion") to request an emergency status conference, pursuant to section 105(d) of Title 11 of the United States Code (the "Bankruptcy Code"), to address the scheduling of the pending sale-related motions and, if necessary, a motion to convert this chapter 11 case to chapter 7. In support of this Motion, the Committee respectfully states as follows:

### A.     The Sale Timeline

The Committee parachuted into this chapter 11 case under hostile conditions – the Debtor was attempting to restart operations while two of its primary stakeholders, Empery Tax Efficient, LP ("Empery") and White Winston Select Asset Funds, LLC ("White Winston"), were engaged in a struggle over the postpetition financing facility. Despite the historical hostility between Empery and White Winston, the Committee was able to broker a global settlement that was memorialized in a *Plan Support Agreement* dated May 18, 2023. A critical aspect of the global settlement was the immediate implementation of a sale process with a sale hearing in early August. The negotiated sale timeline was designed to provide stability – to the chapter 11 case and to the Debtor's critical vendors that are

extending credit to the Debtor – and preserve estate resources by limiting professional fees. Moreover, the Committee's anticipated negotiations with Ryan Drexler ("Drexler") relied on knowing the value of the Debtor's assets.  The auction was originally contemplated to occur on July 21, 2023 – three weeks from now – at which time the Committee would know with certainty whether Drexler's purported secured claim was "in the money."

Unfortunately, this chapter 11 case and the negotiated sale process has been derailed by Drexler with speculative allegations of price manipulation by the Debtor's current management, critical vendors, secured lender, and members of the Committee – *all without a single piece of evidence substantiating his allegations*.

As a result, Drexler has destabilized the relationship between the Debtor, its critical vendors, and Empery – who is now being asked to fund professional fees to defend a chapter 11 trustee motion without any certainty with respect to a sale of the Debtor's assets.

The Committee files this Motion for an opportunity to discuss putting this case back on the path to a successful exit.  Specifically, the Committee believes that (a) the sale process needs to begin immediately and (b) the chapter 11 trustee motion should be heard no later than the second week of August.  In the absence of an established sale timeline, the Committee believes conversion of the case to chapter 7 is in the best interests of creditors and will avoid unnecessary fees and expenses associated with litigating the chapter 11 trustee motion.

**B.    Recent Developments and the SEC Complaint**

The Committee also files this Motion to bring to the Court's attention recent allegations by the Securities and Exchange Commission (the "SEC") that are relevant to Drexler's character.

Three days ago, on June 27, 2023, the SEC commenced an action against Drexler for, among other things, securities fraud, improper revenue recognition, and aiding and abetting fraud for personal gain.[1]  Perhaps ironically under the circumstances, the SEC asserts that the Debtor – *under Drexler's leadership prior to the Petition Date* – systematically manipulated sales to artificially boost revenue

---

1    Previously undisclosed to this Court or the Parties, Drexler had previously entered into two separate tolling agreements with the SEC that expired in January 2023 and July 4, 2023.

for the purpose of defrauding investors and lenders.[2]  Moreover, the SEC asserts that Drexler "engaged in deceptive conduct and made misleading statements by hiding from investors that a $10 million debt to MusclePharm creditors had been automatically accelerated."  SEC Complaint at 3:22-26.[3]

Unlike Drexler's unsubstantiated allegations with respect to the chapter 11 trustee motion, the SEC's allegations are substantiated and supported by Consent Judgments entered into by certain of the Debtor's former officers and employees, including its former Chief Financial Officer.

The Committee recognizes that the foregoing are only allegations – but they are serious allegations brought by the Securities and Exchange Commission and generally align with the Committee's investigation to date and the contents of its Notice of Circumstances Letter.[4]  At a minimum, the SEC's allegations are cause to reconsider the case timeline – and what is in the best interests of creditors.

For the foregoing reasons, the Committee respectfully requests that the Court schedule a status conference at the Court's earliest convenience to discuss these matters further.

*[Remainder of page intentionally left blank]*

---

[2]    A true and correct copy of the SEC's press release announcing the allegations is attached hereto as <u>Exhibit A</u>.

[3]    A true and correct copy of the complaint in *Securities and Exchange Commission vs. Ryan C. Drexler*, Case No. 2:23-cv-05102 (C.D. Cal. June 27, 2023), is attached hereto as <u>Exhibit B</u> (the "<u>SEC Complaint</u>").

[4]    A true and correct copy of the Notice of Circumstances Letter is attached hereto as <u>Exhibit C</u>.

DOCS_SF:109168.3

Dated:  June 30, 2023

LARSON & ZIRZOW LLC

/s/ Matthew C. Zirzow
Matthew C. Zirzow (NV Bar No. 7222)
Zachariah Larson (NV Bar No. 7787)
850 W. Bonneville Ave.
Las Vegas, NV 89101
Tel:  (702) 382-1170
Email:  mzirzow@lzlawnv.com
            zlarson@lzlawnv.com

- and -

PACHULSKI STANG ZIEHL & JONES LLP
John D. Fiero (admitted *pro hac vice*)
Jason H. Rosell (admitted *pro hac vice*)
One Sansome Street, 34th Floor, Suite 3430
San Francisco, CA  94104
Tel: (415) 263-7000
E-mail:  jfiero@pszjlaw.com
             jrosell@pszjlaw.com

*Counsel to the Official Committee*
*of Unsecured Creditors*

## **EXHIBIT A**

**SEC Press Release**

## Press Release

# SEC Charges Former MusclePharm Executives with Accounting and Disclosure Fraud

**FOR IMMEDIATE RELEASE**
**2023-120**

*Washington D.C., June 27, 2023* — The Securities and Exchange Commission today filed a settled complaint charging Las Vegas-based nutritional supplement company MusclePharm Corp.'s former Executive Vice President of Sales and Operations, Brian H. Casutto, former Vice President of Sales, Matthew J. Zucco, and former contract Chief Financial Officer, Kevin R. Harris, for engaging in improper revenue recognition practices to achieve revenue growth demanded by its former Chief Executive Officer, Ryan C. Drexler. The SEC also separately charged Drexler with fraud in a litigated complaint for disclosure violations and control failures.

The SEC's settled complaint alleges that Casutto, with the assistance of Zucco, engaged in a fraudulent scheme to prematurely recognize revenue for orders that remained in MusclePharm's control. The complaint further alleges that Harris should have known that MusclePharm prematurely recognized certain revenue and that MusclePharm overstated other revenue by misclassifying customer credits as advertising expenses rather than as reductions to revenue. The defendants' misconduct allegedly inflated the company's publicly reported quarterly revenues by as much as 25 percent and gross profits by as much as 49 percent.

The SEC's complaint against Drexler alleges that, while CEO, he misled investors about the catastrophic impact of the company's default with institutional noteholders and that he falsely certified that he evaluated the company's internal controls.

"Honest and transparent financial disclosures are the bedrock of our markets, but as alleged in our complaint, MusclePharm's executives disregarded these fundamental rules by continuously inflating reported revenue," said Jason J. Burt, Regional Director of the SEC's Denver Office. "These actions highlight that the SEC will not hesitate to bring enforcement actions against individuals who threaten the integrity of our markets."

Without admitting or denying the SEC's allegations, Casutto, Zucco, and Harris have each consented to the entry of judgments, subject to court approval, permanently enjoining them from violating the antifraud provisions and other provisions of the federal securities laws; requiring Casutto and Zucco to pay disgorgement with prejudgment interest of $79,760.01 and $15,033.06, respectively; requiring Casutto and Harris to pay a civil penalty of $207,183 and $50,000, respectively, and reserving the issue of Zucco's civil penalty for further determination by the court; and barring Casutto from serving as an officer or director of a public company for five years.

The SEC charged Drexler with violating and/or aiding and abetting violations of the antifraud provisions and other provisions of the federal securities laws and seeks injunctive relief, civil penalties, reimbursement to MusclePharm under SOX 304(a), and an officer and director bar.

Both complaints were filed in the U.S. District Court for the Central District of California.

The SEC's investigation was conducted by Jennifer Turner and Michael D'Angelo and supervised by Mary Brady, Nicholas Heinke, and Jason Burt. The litigation is being led by Zachary Carlyle and Sharan Lieberman and supervised by Mr. Burt, Mr. Heinke, and Gregory Kasper.

###

## Related Materials

- SEC Complaint - Casutto, Zucco, and Harris
- SEC Complaint - Drexler

**EXHIBIT B**

**SEC Complaint**

ZACHARY T. CARLYLE (*pro hac vice forthcoming*)
CarlyleZ@sec.gov
SHARAN E. LIEBERMAN (*pro hac vice forthcoming*)
LiebermanS@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, Suite 1700
Denver, Colorado 80294-1961
Telephone:   (303) 844-1000
Facsimile:    (303) 297-3529

Local Counsel:
DANIEL BLAU (Cal. Bar No. 305008)
blaud@sec.gov
SECURITIES AND EXCHANGE COMMISSION
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone:   (323) 965-3306
Facsimile:    (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>RYAN C. DREXLER<br><br>Defendant. | Case No. 2:23-cv-05102<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff, United States Securities and Exchange Commission (the "SEC"), for its Complaint against Ryan C. Drexler ("Drexler" or "Defendant"), alleges as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b),

20(d), 20(e), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), 77t(e), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

2.     Drexler, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business set forth in this Complaint.

3.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa]. For the majority of the time period relevant to this Complaint, Drexler resided in Beverly Hills, California, and worked in the headquarters of MusclePharm, Corp. ("MusclePharm"), in Burbank, California, and certain of the acts, practices, transactions, and courses of business alleged in the Complaint occurred within this District.

4.     Drexler entered into a tolling agreement to toll the running of any statute of limitations against him from July 8, 2022, through January 4, 2023. Drexler entered into a second tolling agreement to toll the running of any statute of limitations against him from January 5, 2023 through July 4, 2023.

## SUMMARY

5.     Drexler, during his tenure as Chairman, President, and Chief Executive Officer ("CEO") of MusclePharm, a publicly-traded nutritional supplement company, engaged in a scheme to defraud MusclePharm's investors about the strength of the company's controls over financial reporting and disclosures and the devastating impact of MusclePharm's debt default in the third quarter of 2022. His conduct also ran afoul of critical rules regarding the processes, controls, and procedures that public companies, like MusclePharm, must have in place to provide assurance that their accounting and public reports are accurate.

6.     Drexler's fraudulent and deceptive conduct manifested itself in two specific ways. First, Drexler failed to ensure that, and made false statements about whether, MusclePharm had basic processes, controls, and procedures in place to ensure that its accounting for revenue, profit, and other important financial metrics – all of which was reported to and relied on by investors – was correct.

7.     Drexler was responsible for maintaining appropriate internal control over financial reporting ("ICFR") and disclosure controls and procedures ("DCP") at MusclePharm. Under SEC rules, public companies, such as MusclePharm, are required to maintain ICFR and DCP, which include processes designed to provide reasonable assurance that their financial reporting complies with generally accepted accounting principles ("GAAP") and controls designed to ensure that information is disclosed pursuant to SEC requirements. Drexler failed to ensure that MusclePharm maintained appropriate ICFR and DCP and made false and misleading statements about both.

8.     In every annual and quarterly report that Drexler signed and certified on behalf of MusclePharm between at least year-end 2017 and the third quarter of 2018, Drexler certified that he had evaluated MusclePharm's ICFR and DCP. In fact, he had not performed any evaluation.

9.     Drexler's failure to ensure that MusclePharm maintained ICFR and DCP contributed to MusclePharm reporting inaccurate financial statements for at least the year-end 2017 through the third quarter of 2018.

10.     Second, in the third quarter of 2022, Drexler engaged in deceptive conduct and made misleading statements by hiding from investors that a $10 million debt to MusclePharm creditors had been automatically accelerated and was presently due, resulting in immediate and catastrophic consequences for the company and its investors.

11.     In addition to his fraudulent and deceptive conduct, Drexler also violated critical provisions of the securities laws by directing MusclePharm not to report

COMPLAINT                                3

exceptional turnover in a key financial position, and engaging in conduct that led to MusclePharm underreporting certain perquisite compensation that executives at the company received.

12.     Finally, Drexler did not reimburse MusclePharm for cash bonuses that he received after filing financial statements that were later restated due to misconduct, as required by the Sarbanes-Oxley Act of 2002 ("SOX").

13.     By engaging in this conduct, Drexler is liable, and unless enjoined, is likely to continue to: violate or aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; violate Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 13a-14, 13a-15(b), 13a-15(c), 14a-3, and 14a-9 thereunder [17 C.F.R. §§ 240.13a-14, 240.13a-15(b), 240.13a-15(c), 240.14a-3, and 240.14a-9]; and aid and abet violations of Sections 13(a) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 13a-15(a) thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 13a-15(a)]. Drexler also violated and, unless ordered to comply, is likely to continue to violate, Section 304(a) of SOX [15 U.S.C. § 7243(a)].

## **DEFENDANT**

14.     **Ryan C. Drexler**, 52, currently resides in Las Vegas, Nevada. Until approximately April 2021, Drexler resided in Beverly Hills, California. Drexler was the Chairman of MusclePharm's board of directors from approximately June 2015 to December 2022. He also served as MusclePharm's CEO from approximately March 2016 to December 2022 and as MusclePharm's principal accounting officer ("PAO") and principal financial officer ("PFO") from approximately September 2017 to April 2020. Drexler is also MusclePharm's largest lender and shareholder. From 2015 through 2022, Drexler executed multiple notes to loan MusclePharm more than $28 million; certain of those notes were converted to common stock; and he still holds

secured notes totaling approximately $10 million.

### OTHER RELEVANT ENTITY

15.     **MusclePharm Corp.**, is a Nevada corporation that develops, markets, and distributes branded nutritional supplements. Its current principal place of business is in Las Vegas, Nevada, but it was headquartered in Burbank, California from approximately December 2017 until August 2021. MusclePharm's securities are registered pursuant to Section 12(g) of the Exchange Act and traded on the OTC Link, operated by OTC Markets Group Inc., under the symbol "MSLP" or "MSLPQ." In 2015, MusclePharm settled claims brought by the SEC for violations of Sections 5(a), 5(c), 17(a)(2), and 17(a)(3) of the Securities Act; Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 thereunder; and Rule 302 of Regulation S-T of the Exchange Act (the "2015 SEC Order"). MusclePharm filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Nevada on December 15, 2022.

### FACTS

### I.     BACKGROUND AND FINANCIAL RESTATEMENT.

16.     In August 2015, MusclePharm announced a restructuring plan focused on reducing costs and reallocating the company's resources for profitable growth. In its Form 10-K filed on April 2, 2018, MusclePharm announced that this restructuring plan was substantially complete.

17.     During the earnings call for the fourth quarter of 2017, Drexler highlighted the completion of the restructuring program and proclaimed that the company was now on a path to consistent profitable growth.

18.     In order to achieve consistent growth, Drexler pushed MusclePharm's sales team to meet unrealistic quarterly sales targets, and threatened to, and did, fire employees who challenged him or failed to achieve the targets.

19.     In this environment, MusclePharm reported quarter over quarter revenue growth from the fourth quarter of 2017 through the third quarter of 2018. Drexler

highlighted this achievement in each of the Company's press releases and earnings calls during that period.

20.     MusclePharm reported its financial results for these periods in its Form 10-K for 2017 and Forms 10-Q for the first three quarters of 2018, which Drexler signed and certified as MusclePharm's CEO, President, Chairman of the Board of Directors, Principal Executive Officer ("PEO"), PFO, and PAO.

21.     During its 2018 audit work, the company's external auditor detected that MusclePharm had recognized revenue at the end of the fourth quarter of 2018 that it should have recorded in later periods because certain inventory had been temporarily stored off-site in trailers rather than being shipped to MusclePharm's customers prior to year-end.

22.     The company opened an internal investigation to identify the scope and cause of the errors. The internal investigation uncovered similar errors with unshipped orders impacting the third quarter of 2018, and the company filed a Form 8-K on March 14, 2019, announcing that its previously reported financial statements for the three and nine months ended September 30, 2018, should no longer be relied upon. In April 2019, the company announced on Form NT 10-K that it would be unable to timely file its 2018 annual report, and in May 2019, the company's external auditor resigned without completing the 2018 audit work.

23.     More than a year later, on August 25, 2020, MusclePharm filed a Form 10-K that restated its financial statements for year-end 2017 and the first three quarters of 2018 (the "Restatement Period") and included the overdue financial statements for 2018 and 2019.

24.     The restatement disclosed that, during the Restatement Period, MusclePharm inflated its previously reported quarterly revenues by 9 to 25 percent and materially misstated various other aspects of its financial statements.

25.     MusclePharm disclosed in its August 25, 2020 Form 10-Q that its management concluded that MusclePharm had numerous material weaknesses in its

internal control over financial reporting and that its disclosure controls and procedures were not effective.

26.    Drexler signed and certified MusclePharm's August 25, 2020 Form 10-K as MusclePharm's CEO, President, Chairman of the Board of Directors, and PEO.

27.    The Form 10-K filed on August 25, 2020, included a plan to remediate these material weaknesses, but MusclePharm did not correct the material weaknesses.

28.    According to its most recent quarterly report, filed on Form 10-Q on May 16, 2022, MusclePharm again disclosed material weaknesses in the design and operation of virtually all aspects of its internal controls. Specifically, MusclePharm disclosed that:

> "The Company has deficiencies in the design and operation of its internal controls in the financial processes related to the accounting for cash, accounts receivable, accounts payable, inventory, accrued liabilities, income taxes, debt, equity, revenue, costs of sales, stock-based compensation, and expenses classification. In addition, the Company has insufficient controls over the financial close and reporting process, including account reconciliations and preparation and review of financial statements and related disclosures."

29.    On August 17, 2022, MusclePharm announced on Form NT 10-Q that it would not be able to timely file its quarterly report for the second quarter of 2022. Shortly thereafter, on August 22, 2022, MusclePharm announced in a Form 8-K, signed by Drexler, that its financial statements for the year ended December 31, 2021, and quarter ended March 31, 2022, should no longer be relied upon because they reflected errors resulting in material overstatements to reported revenues.

30.    MusclePharm still has not completed the work necessary to restate its 2021 and first quarter 2022 financial statements.

## II.    DREXLER FAILED TO ENSURE THAT MUSCLEPHARM MAINTAINED APPROPRIATE ICFR AND DCP.

31.    Exchange Act Rule 13a-15(a) requires issuers like MusclePharm to

maintain ICFR and DCP.

32.    ICFR is defined in Exchange Act Rule 13a-15(f) in part as "a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, ... to provide reasonable assurance regarding the reliability of financial reporting and preparation of financial statements for external purposes in accordance with generally accepted accounting principles ...."

33.    DCP are defined in Exchange Act Rule 13a-15(e) in part as "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer ... is recorded, processed, summarized, and reported, within the time periods specified in the [SEC's] rules and forms."

34.    ICFR and DCP are the responsibility of a company's PEO and PFO. Throughout the Restatement Period, Drexler was MusclePharm's PEO and PFO. In those roles, Drexler was responsible for ensuring that MusclePharm maintained appropriate ICFR and DCP.

35.    Drexler confirmed this responsibility in each and every quarterly and annual report on Forms 10-Q and 10-K he signed on behalf of MusclePharm during the Restatement Period. The quarterly and annual reports Drexler signed on behalf of MusclePharm during the Restatement Period are comprised of MusclePharm's 2017 Form 10-K filed on April 2, 2018; first quarter 2018 Form 10-Q filed on May 15, 2018; second quarter 2018 Form 10-Q filed on August 14, 2018; and third quarter 2018 Form 10-Q filed on November 14, 2018.

36.    Each one of those filings included a SOX 302 certification, signed by Drexler as MusclePharm's PEO and PFO, which stated that Drexler:

        a.    was "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) ...) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) ...) for [MusclePharm]";

        b.    "[d]esigned such disclosure controls and procedures, or caused

such disclosure controls and procedures to be designed under [his] supervision"; and

c.   "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [his] supervision."

37.   Drexler similarly confirmed his responsibilities for ensuring that MusclePharm maintain ICFR in letters to MusclePharm's external auditor that he signed ("Management Representation Letters"). For example:

a.   on April 2, 2018, Drexler signed a Management Representation Letter in connection with the audit for the year ended December 31, 2017, that asserted that Drexler was "responsible for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with accounting principles generally accepted in the United States" and for "adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud";

b.   on May 15, 2018 and August 14, 2018, Drexler signed Management Representation Letters in connection with the reviews of MusclePharm's financial statements for the quarters ended March 31, 2018 and June 30, 2018 that asserted that Drexler was "responsible for the fair presentation of the financial statements in conformity with accounting principles generally accepted in the United States of America" and "for establishing and maintaining effective internal control over financial reporting"; and

c.   on November 13, 2018, Drexler signed a Management Representation Letter in connection with the review of MusclePharm's financial statements as of September 30, 2018 that

asserted that he was "responsible for the fair presentation ... of financial position, results of operations, and cash flows in conformity with accounting principles generally accepted in the United States of America" and "for the design and implementation of programs and controls to prevent and detect fraud."

38. Despite the assertions made in each of the SOX 302 certifications and Management Representation Letters, Drexler failed to ensure that MusclePharm maintained appropriate ICFR and DCP. Indeed, Drexler never read MusclePharm's ICFR and was not aware of whether MusclePharm had any documented DCP at all.

39. Further, when the company's external auditor resigned in May 2019, it noted that during the 2018 fiscal year "the internal controls necessary for the Company to develop reliable financial statements do not exist."

## III. DREXLER MADE MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING HIS EVALUATION OF ICFR AND DCP DURING THE RESTATEMENT PERIOD.

40. Drexler was MusclePharm's PEO and PFO when he signed each of MusclePharm's quarterly reports on Form 10-Q and its annual report on Form 10-K, as well as SOX 302 certifications for each filing, during the Restatement Period.

41. With respect to ICFR, in each and every SOX 302 certification that Drexler signed as MusclePharm's PEO and PFO during the Restatement Period, he affirmed that he "disclosed, *based on [his] most recent evaluation of internal control over financial reporting*" all significant deficiencies, material weaknesses, and fraud. (Emphasis added).

42. With respect to DCP, in each and every annual and quarterly report that Drexler signed as MusclePharm's PEO and PFO during the Restatement Period, he also affirmed that he "evaluated the effectiveness of [MusclePharm's] disclosure controls and procedures (as defined in Rules 13a-15(e) ...), as of the end of the period" and "[b]ased on such evaluation, [he] has concluded that ... [MusclePharm's]

disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information [the company is] required to disclose in reports that [it] file[s] or submit[s] under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the [SEC], and that such information is accumulated and communicated to [MusclePharm's] management, including [Drexler], as appropriate, to allow timely decisions regarding required disclosure."

43.     Additionally, in each and every SOX 302 certification that Drexler signed as MusclePharm's PEO and PFO during the Restatement Period, he affirmed that he "[e]valuated the effectiveness of [MusclePharm's] disclosure controls and procedures."

44.     A reasonable investor would have understood from these statements that Drexler had evaluated MusclePharm's ICFR and DCP for each reporting period during the Restatement Period, that any significant deficiencies or material weaknesses in ICFR based on his evaluation were identified, and that Drexler had concluded that DCP was designed and effective at a reasonable assurance level based on his evaluation.

45.     In reality, Drexler did not perform an evaluation of MusclePharm's ICFR or DCP during the Restatement Period. Moreover, no one under his direction performed an evaluation of MusclePharm's ICFR or DCP. MusclePharm did not have a sub-certification process in place for testing ICFR and Drexler did not see results from any assessment of ICFR. Moreover, Drexler was unaware of whether MusclePharm had any documented DCP.

46.     Each of the above statements regarding Drexler's evaluation of MusclePharm's ICFR and DCP was false when made, and Drexler knew or was reckless in not knowing, and should have known, that his statements regarding his evaluation of MusclePharm's ICFR and DCP were false and misleading. Drexler, when making statements regarding his evaluation of ICFR and DCP, knew that he

had not performed an evaluation of MusclePharm's ICFR or DCP during the Restatement Period, and had not seen results of any other assessment of ICFR or DCP.

47.    The above misrepresentations regarding Drexler's evaluation of MusclePharm's ICFR and DCP were material because, among other things, investors and potential investors would consider Drexler's statements regarding his evaluation of MusclePharm's ICFR and DCP important when assessing whether MusclePharm's reported financial results were accurate.

## IV.    DREXLER OBTAINED MONEY FOR MUSCLEPHARM BY MEANS OF THESE FALSE AND MISLEADING STATEMENTS.

48.    Drexler obtained money for MusclePharm by means of the misstatements regarding his evaluation of MusclePharm's ICFR and DCP because, from at least June 2018 to May 2019, through private placements, MusclePharm sold (i) restricted stock to board members to pay for board fees, (ii) common stock to plaintiffs engaged in civil litigation with the company to pay for litigation settlements, and (iii) common stock to vendors to pay for invoices. As the CEO and Chairman of the Board of Directors, Drexler voted to approve these private placement sales and was involved in implementing the sales by, for example, signing letters to the stock transfer services company directing them to issue the shares and send stock certificates to the applicable parties.

## V.    DREXLER'S FAILURE TO ENSURE THAT MUSCLEPHARM MAINTAINED ICFR LED TO MATERIALLY FALSE FINANCIAL STATEMENTS.

49.    In the Form 10-K filed on August 25, 2020, MusclePharm restated its financial statements for the Restatement Period. The restatement disclosed that, during the Restatement Period, MusclePharm inflated its previously reported quarterly revenues by 9 to 25 percent, overstated its gross margins by 22 to 49 percent, understated its customer credits by 23 to 38 percent, understated its inventory

by 23 to 34 percent, and overstated its advertising and promotional expenses by 284 to 594 percent.

50.     These errors were caused, in part, by Drexler's failure to implement and maintain ICFR for MusclePharm and the resulting material weaknesses in MusclePharm's internal controls.

51.     MusclePharm disclosed in its August 25, 2020 Form 10-K that its management concluded that eleven "material weaknesses" existed throughout the Restatement Period. The filing states that a material weakness is "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of … annual or interim financial statements will not be prevented or detected on a timely basis." The material weaknesses identified by MusclePharm's management included:

   a.     "Pressure to achieve sales targets gave rise to the premature and/or inappropriate recognition of revenues, typically occurring at or near the end of financial reporting periods";

   b.     "The Company's internal controls failed and/or were not adequate to ensure that there was effective testing of period end sales cutoff, including a proper review and comparison of invoice dates and related proof of delivery";

   c.     "Inadequate segregation of duties, allowing for an improper alignment of sales and operations under common leadership";

   d.     "Management did not maintain an effective control environment, including ensuring that required accounting methodologies, policies, and technical accounting personnel were in place. This control deficiency led to a series of corrections related to the years 2018 and 2017 and resulted in a restatement to the respective previously issued financial statements";

   e.     "The Company did not properly classify payments to customers,

primarily for promotional activity, as a reduction in the transaction price with its customers, instead treating such payments as an advertising and promotions activity, a component of operating expense";

f. "The Company reported certain sales transactions prior to transfer of control of goods, inconsistent with customer sales agreements and the Company's customary practices";

g. "The Company did not properly estimate the expected value of customer payments, in the form of credits, at each quarter period end in 2018. In addition, the Company understated its accrual for customers credits for the year ended December 31, 2017"; and

h. "The Company lacks the proper internal control documentation and testing, and therefore internal controls were not consistently performed."

52. Drexler signed and certified MusclePharm's August 25, 2020 Form 10-K as MusclePharm's CEO, President, Chairman of the Board of Directors, and PEO.

## VI. DREXLER MADE MATERIALLY MISLEADING STATEMENTS ABOUT MUSCLEPHARM'S DEBT.

53. In October 2021 and June 2022, MusclePharm raised over $10 million from a group of institutional investors (the "Noteholders") through the sale of notes and warrants (the "Notes").

54. In August and September 2022, the Noteholders sent letters to the company reserving their rights under the Notes because MusclePharm engaged in conduct that caused two events of default. Specifically, the Noteholders stated that MusclePharm had: (i) provided materially untrue or incorrect financial statements as evidenced by the company's August 22, 2022 announcement that its 2021 and first quarter 2022 financial statements should no longer be relied upon; and (ii) not replaced the resigning CFO with a new CFO who was not objectionable to the

Noteholders.

55. Drexler signed a MusclePharm Form 8-K dated September 19, 2022, disclosing the receipt of these letters, but also assuring investors that "the Noteholders have not accelerated payment of the outstanding balances under the Notes and have not informed the Company that the Noteholders intend to accelerate payment of the outstanding balances under the Notes."

56. A reasonable investor would have understood from this disclosure that MusclePharm's debt under the Notes had not been accelerated.

57. The Form 8-K omitted the fact that the Notes included a "right o[f] automatic acceleration," which provided that "the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice [of acceleration] of any kind." As such, MusclePharm's debt was automatically accelerated at the time the event of default occurred, which had an immediate impact on the company's liquidity and triggered its obligation to disclose an acceleration of direct financial obligations under Item 2.04 of Form 8-K.

58. The September 19, 2022 Form 8-K was misleading because it indicated that the company would not suffer any meaningful negative repercussions as a result of the events of default unless and until it received a payment demand from the Noteholders. In fact, the event of default had an immediate negative impact on MusclePharm's liquidity.

59. Drexler's misleading statement about the acceleration of the company's debt was material to reasonable investors because the status of the debt was central to the company's ability to continue normal business operations and maintain control over its assets.

60. On September 22, 2022, just three days after MusclePharm filed the Form 8-K, the Noteholders sent a payment demand letter to Drexler stating that the outstanding balances under the Notes were "immediately due and payable" and that "the Notes have been accruing, and will continue to accrue, Default Interest."

COMPLAINT                                15

61.     Thereafter, the Noteholders exercised their rights under the Notes to secure payment of the debt by sweeping the company's bank accounts in approximately October 2022, causing MusclePharm to cease all normal business operations, and placing the company's assets up for auction in approximately November 2022, forcing MusclePharm to seek bankruptcy protection to halt the asset sale.

62.     Drexler knew or was reckless in not knowing, and should have known, that his statement regarding the acceleration of the company's debt was misleading. The September 19, 2022 Form 8-K included direct quotes from the acceleration provision of the Notes but omitted language from the very same paragraph describing the right of automatic acceleration. This selective citation to the acceleration provision shows that Drexler knew or was reckless in not knowing, and should have known, that the Notes automatically accelerated without notice. Drexler also knew or was reckless in not knowing, and should have known, that acceleration of the Notes would cause immediate and devastating consequences for the company. And, in fact, these consequences came to light just three days later when the Noteholders sent a payment demand, which ultimately resulted in the Noteholders sweeping the company's bank accounts and placing its assets up for auction in an effort to secure payment of the Notes.

## VII.   DREXLER ENGAGED IN FRAUDULENT OR DECEITFUL CONDUCT.

63.     As detailed above, Drexler engaged in deceptive conduct regarding the evaluation of MusclePharm's ICFR and DCP, as well as the status of the company's debt. Among other things, Drexler:

      a.     did not evaluate the effectiveness of the company's ICFR and DCP, despite the requirements to do so in Exchange Act Rules 13a-15(b) and (c);

      b.     signed SOX 302 certifications during the Restatement Period

attesting to the fact that he evaluated MusclePharm's ICFR and DCP when he had not performed any evaluation of the company's ICFR or DCP;

c.   signed each annual and quarterly report during the Restatement Period attesting to the fact that he evaluated MusclePharm's DCP and concluded that they were effective when he had not performed any evaluation of the DCP; and

d.   withheld information from investors about the Notes' right of automatic acceleration and the immediate and catastrophic impact it would have on the company and its investors.

64.   Drexler knew or was reckless in not knowing, and should have known, of his deceptive conduct. Drexler knew or was reckless in not knowing, and should have known, that he had not performed an evaluation of MusclePharm's ICFR or DCP. And Drexler knew or was reckless in not knowing, and should have known, that the Notes automatically accelerated without notice and that acceleration of the Notes would cause immediate and devastating consequences for the company.

## VIII.   DREXLER AIDED AND ABETTED MUSCLEPHARM'S FRAUD.

65.   MusclePharm, through Drexler, engaged in deceptive conduct and made material false and misleading statements by failing to properly evaluate its ICFR and DCP during the Restatement Period and making material misstatements about those evaluations in its Form 10-K and Forms 10-Q. MusclePharm also engaged in deceptive conduct and made material misleading statements by withholding information from investors regarding the acceleration of the company's debt and making misleading statements about the status of the company's debt in its September 19, 2022 Form 8-K.

66.   MusclePharm, through Drexler, knew or was reckless in not knowing, and should have known, that its conduct was deceptive and that its statements were false and misleading.

COMPLAINT                                              17

67.     For the reasons detailed above, Drexler knowingly or recklessly substantially assisted MusclePharm's deceptive conduct and misstatements. Among other things, Drexler (i) acting as MusclePharm's PEO and PFO, did not evaluate the effectiveness of the company's ICFR and DCP, (ii) signed SEC filings on behalf of MusclePharm that contained material misstatements regarding his evaluations of MusclePharm's ICFR and DCP, (iii) withheld information from MusclePharm investors regarding the acceleration of MusclePharm's debt, and (iv) signed the September 19, 2022 Form 8-K on behalf of MusclePharm that contained material misleading statements regarding the status of MusclePharm's debt.

## IX.     DREXLER'S FAILURE TO ENSURE THAT MUSCLEPHARM MAINTAINED DCP LED TO UNDERREPORTED PERQUISITES AND VIOLATIONS OF THE PROXY SOLICITATION PROVISIONS OF THE FEDERAL SECURITIES LAWS.

68.     Accurate disclosure of executive perquisites was the primary focus of the 2015 SEC Order. Pursuant to the 2015 SEC Order, MusclePharm engaged an independent compliance consultant ("ICC") to, among other things, strengthen the disclosure controls and procedures relevant to accurate disclosure of perquisite compensation.

69.     In February 2017, the company certified to the SEC that it had complied with the undertakings in the 2015 SEC Order, in part, by implementing a disclosure control recommended by the ICC to use an "[a]nnual questionnaire[] ... provided to the members of the Board of Directors and executives to identify any perquisites." ("D&O questionnaire").

70.     MusclePharm used a D&O questionnaire in early 2017 to identify 2016 perquisites. But, the very next year, after Drexler took over the PFO and PAO roles in the third quarter of 2017, neither he nor anyone else at the company used a D&O questionnaire, or any other controls, to identify 2017 perquisites for its named executive officers: Drexler and the Executive Vice President of Sales.

COMPLAINT                                    18

71.     MusclePharm's Travel and Expense Policy outlined the procedures for obtaining reimbursement for business expenses, including specifically identifying the business purpose of the expense and submitting original receipts.

72.     During 2017, Drexler disregarded these procedures by seeking reimbursement for expenses that were not supported by any business purpose or appropriate documentation.

73.     Drexler obtained reimbursement for significant commuting expenses and other expenses not integrally and directly related to his job that should have been classified as perquisites.

74.     Based on this conduct, Drexler received undisclosed perquisites in 2017 comprised of approximately $129,200 in personal legal fees, $66,200 of tax gross-ups on restricted stock, $22,800 in commuting and living expenses, $8,300 in furniture expenses, and $4,500 of other personal expenses.

75.     As a result of the conduct described above, MusclePharm materially underreported executive perquisites in its 2017 Form 10-K, which was signed by Drexler, by approximately $231,000 (88 percent) for Drexler and approximately $107,900 (54 percent) for the Executive Vice President of Sales.

76.     MusclePharm filed a definitive proxy statement on October 26, 2018, that it used to solicit proxies in connection with, among other things, the re-election of Drexler to the board of directors and an advisory vote on the executive compensation packages for Drexler and other executive officers.

77.     Drexler, as a director of the company, participated in the solicitation.

78.     Section 14(a) of the Exchange Act makes it unlawful to solicit any proxy with respect to any security (other than an exempted security) registered pursuant to Section 12 of the Exchange Act in contravention of such rules and regulations as the SEC may prescribe. Rule 14a-3 provides that no solicitation of a proxy may occur unless each person solicited is concurrently furnished or has previously been furnished with a proxy statement containing the information specified by Schedule

14A, including executive compensation. Rule 14a-9 prohibits the use of proxy statements containing statements that are materially false or misleading by omission.

79. The proxy statement reported the same executive perquisites as those reported in MusclePharm's 2017 Form 10-K executive compensation disclosures. As a result of Drexler's conduct in connection with the disclosures described above, MusclePharm materially underreported executive perquisites in the October 26, 2018 proxy statement by approximately $231,000 (88 percent) for Drexler and approximately $107,900 (54 percent) for the Executive Vice President of Sales.

80. Accurate and transparent executive compensation disclosures are material because the amounts that executives are paid, as well as the amounts executives are paid as perquisites, are important to an investor's assessment of a company's likely future profitability and the alignment of management's interests with the interests of shareholders.

81. Drexler should have known that the perquisite disclosures in the proxy statement were materially misstated because, among other reasons, he had knowledge of the unreported perquisites he received and he failed to exercise reasonable care with respect to DCP involving executive compensation.

## X. DREXLER DIRECTED MUSCLEPHARM NOT TO FILE REQUIRED CURRENT REPORTS ON FORM 8-K REGARDING MUSCLEPHARM'S PAO.

82. MusclePharm experienced exceptional, undisclosed turnover in the PAO position in the third quarter of 2017. In fact, in just a single quarter, three different people held the position of PAO at MusclePharm. In July 2017, the interim CFO/PAO resigned and was replaced by a new CFO/PAO in August 2017, but he resigned the following month. Whereupon Drexler was appointed as the interim PAO in September 2017.

83. Issuers are required to disclose all changes to the PAO position on Item 5.02 of Form 8-K within four business days of the event.

84. None of the third quarter 2017 changes were timely disclosed.

85. In August and September 2017, Drexler received and reviewed draft Forms 8-K related to one PAO's resignation, but he instructed the company's controller not to file the disclosure.

86. Instead, MusclePharm waited until November 14, 2017, to file a Form 8-K, which Drexler signed, that belatedly disclosed all the changes that occurred in the PAO position in the prior quarter.

## XI. DREXLER FAILED TO REIMBURSE MUSCLEPHARM FOR BONUSES RECEIVED IN THE 12 MONTHS FOLLOWING MISSTATED REPORTS.

87. SOX Section 304(a) requires the CEO and CFO of any issuer required to prepare an accounting restatement due to material non-compliance with financial reporting requirements under the securities laws as a result of misconduct to reimburse the issuer for (i) any bonus or other incentive or equity based compensation received by that person from the issuer during the twelve-month period following the first public issuance or filing with the SEC of the misstated document, and (ii) any profits realized from the sale of securities of the issuer during that twelve-month period.

88. MusclePharm was required to restate its financial statements contained in its Form 10-K for the year ended December 31, 2017, and its Forms 10-Q for the quarters ended March 31, 2018, June 30, 2018, and September 30, 2018, because, as a result of misconduct, its financial statements did not comport with GAAP.

89. MusclePharm's restatements for those periods were disclosed in its Form 10-K filed with the SEC on August 25, 2020.

90. Drexler received bonuses in the 12-month period following the first public issuance or filing with the SEC of the misstated Form 10-K for the year ended December 31, 2017, and one or more of the misstated Forms 10-Q, including a $100,000 cash bonus paid on May 31, 2018, and a $250,000 cash bonus paid on

August 15, 2018.

91.     Drexler has not reimbursed any bonus amount to MusclePharm.

## XII.  DREXLER VIOLATED, OR AIDED AND ABETTED MUSCLEPHARM'S VIOLATIONS OF, REPORTING, CERTIFICATION, REPORTING CONTROLS, AND INTERNAL CONTROLS PROVISIONS OF THE FEDERAL SECURITIES LAWS.

### A.      Drexler Aided and Abetted MusclePharm's Violation of Reporting Provisions of the Federal Securities Laws.

92.     Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, and 13a-13 thereunder require issuers like MusclePharm to file reports with the SEC containing such information as the SEC's rules prescribe. Further, Exchange Act Rule 12b-20 requires that an issuer's statement or report contain such further material information as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

93.     As detailed above, MusclePharm violated these reporting provisions by (i) filing annual and quarterly reports with the SEC that misstated Drexler's evaluation of the company's ICFR and DCP, (ii) filing a current report on September 19, 2022, that contained misleading statements about the Notes acceleration as described above, and (iii) failing to file required current reports regarding PAO turnover.

94.     Also as detailed above, Drexler aided and abetted these violations by knowingly or recklessly providing substantial assistance to MusclePharm's violations. Among other things, Drexler (i) signed and certified each of the annual and quarterly reports that included false and misleading information about his own conduct, (ii) signed the misleading September 19, 2022 current report on Form 8-K, and (iii) directed the company not to timely file a current report regarding the departure of one of the PAOs in third quarter 2017.

**B.** **Drexler Violated the Certification Provision of the Federal Securities Laws.**

95.     Rule 13a-14 of the Exchange Act requires, in pertinent part, that each annual and quarterly report include certifications signed by the issuer's PEO and PFO which include representations that (i) based on the certifier's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report and (ii) the certifier designed and evaluated the effectiveness of the registrant's ICFR and DCP.

96.     Drexler violated Rule 13a-14 by certifying MusclePharm's annual and quarterly reports during the Restatement Period because (i) he signed the certification without a sufficient basis to believe the certifications were accurate and (ii) he knew that the reports included material misstatements or omissions regarding his design and evaluation of ICFR and DCP.

**C.** **Drexler Violated and Aided and Abetted MusclePharm's Violations of the Reporting Controls Provision of the Federal Securities Laws.**

97.     Rule 13a-15(a) of the Exchange Act requires issuers like MusclePharm to maintain DCP and ICFR.

98.     MusclePharm violated Rule 13a-15(a) by failing to maintain DCP or ICFR as required. Specifically, MusclePharm failed to implement DCP concerning the identification and reporting of executive perquisites, and failed to maintain appropriate ICFR to prevent and detect accounting errors during the Restatement Period.

99.     Drexler knowingly or recklessly substantially assisted MusclePharm's violation of Rule 13a-15(a). For example, although the company certified to the SEC staff in February 2017 that it implemented a D&O questionnaire disclosure control, Drexler failed to use D&O questionnaires, or any other controls, to identify 2017

perquisites that he and the Executive Vice President of sales received. Additionally, as set forth above, Drexler failed to ensure that MusclePharm maintained appropriate ICFR and DCP.

100.    Drexler additionally violated Rules 13a-15(b) and 13a-15(c) of the Exchange Act by failing to evaluate the company's ICFR and DCP, as required by those provisions.

**D.      Drexler Aided and Abetted MusclePharm's Violation of the Internal Controls Provision of the Federal Securities Laws.**

101.    Section 13(b)(2)(B) of the Exchange Act requires issuers like MusclePharm to devise and maintain a system of sufficient internal accounting controls.

102.    In violation of Section 13(b)(2)(B), MusclePharm failed to maintain a system of internal accounting controls sufficient to provide reasonable assurance that revenue, customer credits, gross profit margin, advertising and promotional expenses, and inventory complied with GAAP.

103.    In his role as PEO, PFO, and PAO, Drexler was responsible for devising and maintaining MusclePharm's system of internal accounting controls and, by failing to do so, Drexler knowingly or recklessly substantially assisted MusclePharm's violation of Section 13(b)(2)(B) of the Exchange Act.

## FIRST CLAIM FOR RELIEF

**Fraud: Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

104.    The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

105.    Drexler, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security (i) employed devices, schemes, or artifices to defraud, (ii) made untrue statements of material fact or omitted to state a material fact necessary in light of the circumstances

under which they were made, not misleading, and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

106.   By virtue of the foregoing, Drexler, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.C. § 240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF

**Fraud: Aiding and Abetting MusclePharm's Violations of**

**Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Alternatively)**

107.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

108.   MusclePharm, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security (i) employed devices, schemes, or artifices to defraud, (ii) made untrue statements of material fact or omitted to state a material fact necessary in light of the circumstances under which they were made, not misleading, and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

109.   As a result of the conduct alleged herein, Drexler aided and abetted MusclePharm's violations of Section 10(b) of the Exchange Act and Rule 10b-5 by knowingly or recklessly providing substantial assistance to MusclePharm.

110.   By reason of the foregoing, Drexler, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.C. § 240.10b-5] thereunder.

## THIRD CLAIM FOR RELIEF

### Fraud: Section 17(a) of the Securities Act

111.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

112.   Drexler, directly or indirectly, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind (i) employed devices, schemes, or artifices to defraud, (ii) obtained money or property by means of untrue statements of material fact or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and (iii) engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon the purchaser.

113.   By virtue of the foregoing, Drexler, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM FOR RELIEF

### Fraud: Aiding and Abetting MusclePharm's Violations of
### Section 17(a) of the Securities Act
### (Alternatively)

114.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

115.   MusclePharm, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind (i) employed devices, schemes, or artifices to defraud, (ii) obtained money or property by means of untrue statements of material fact or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not

misleading, and (iii) engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon the purchaser.

116. As a result of the conduct alleged herein, Drexler aided and abetted MusclePharm's violations of Section 17(a) of the Securities Act by knowingly or recklessly providing substantial assistance to MusclePharm.

117. By reason of the foregoing, Drexler, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FIFTH CLAIM FOR RELIEF

### False SEC Filings: Aiding and Abetting MusclePharm's Violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder

118. The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

119. MusclePharm, which is an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed materially false and misleading annual, quarterly, and current reports with the SEC that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

120. As a result of the conduct alleged herein, Drexler aided and abetted MusclePharm's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder by knowingly or recklessly providing substantial assistance to MusclePharm.

121. By reason of the foregoing, Drexler, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1,

13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## SIXTH CLAIM FOR RELIEF

### False Certifications: Exchange Act Rule 13a-14

122.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

123.   As a result of the conduct alleged herein, Drexler falsely certified that MusclePharm's quarterly and annual reports (i) did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading and (ii) that he designed and evaluated the effectiveness of the registrant's ICFR and DCP.

124.   By virtue of the foregoing, Drexler, directly or indirectly, violated and, unless restrained and enjoined, will again violate Exchange Act Rule 13a-14 [17 C.F.C. § 240.13a-14].

## SEVENTH CLAIM FOR RELIEF

### Reporting Controls: Aiding and Abetting MusclePharm's Violations of Exchange Act Rule 13a-15(a)

125.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

126.   MusclePharm, which is an issuer of securities pursuant to Section 12 of the Exchange Act and which files annual reports with the SEC pursuant to Section 13(a) of the Exchange Act, failed to maintain required disclosure controls and procedures and internal control over financial reporting in violation of Rule 13a-15(a) of the Exchange Act.

127.   As a result of the conduct alleged herein, Drexler aided and abetted MusclePharm's violations of Rule 13a-15(a) of the Exchange Act by knowingly or recklessly providing substantial assistance to MusclePharm.

128.    By reason of the foregoing, Drexler, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Exchange Act Rule 13a-15(a) [17 C.F.R. § 240.13a-15(a)].

### EIGHTH CLAIM FOR RELIEF

**Reporting Controls: Exchange Act Rules 13a-15(b) and 13a-15(c)**

129.    The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

130.    As a result of the conduct alleged herein, Drexler, violated Rules 13a-15(b) and 13a-15(c) of the Exchange Act by failing to evaluate the effectiveness of MusclePharm's ICFR and DCP.

131.    By reason of the foregoing, Drexler, directly or indirectly, violated and, unless restrained and enjoined, will again violate Rules 13a-15(b) and 13a-15(c) of the Exchange Act [17 C.F.R. §§ 240.13a-15(b) and 240.13a-15(c)].

### NINTH CLAIM FOR RELIEF

**Internal Accounting Controls: Aiding and Abetting MusclePharm's Violation of Section 13(b)(2)(B) of the Exchange Act**

132.    The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

133.    MusclePharm failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and any other criteria applicable to such statements in violation of Section 13(b)(2)(B) of the Exchange Act.

134.    As a result of the conduct alleged herein, Drexler aided and abetted MusclePharm's violation of Section 13(b)(2)(B) of the Exchange Act by knowingly or recklessly providing substantial assistance to MusclePharm.

135.    By reason of the foregoing, Drexler, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of

Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## TENTH CLAIM FOR RELIEF

**Proxy Disclosures: Violation of Section 14(a) of the Exchange Act**
**and Rules 14a-3 and 14a-9 Thereunder**

136.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as through fully set forth herein.

137.   As a result of the conduct alleged herein, Drexler, directly or indirectly, by use of mails, or the means of instrumentalities or interstate commerce or any facility of a national securities exchange, solicited proxies without furnishing each person solicited a proxy statement containing the information specified by the proxy rules, and used proxy statements containing statements which, at the time and in light of the circumstances under which they are made, were false or misleading with respect to a material fact, or omitted to state material facts necessary to make the statement therein not misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

138.   By reason of the foregoing, Drexler violated and, unless restrained and enjoined, will again violate Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

## ELEVENTH CLAIM FOR RELIEF

**Clawback: SOX Section 304(a)**

139.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as through fully set forth herein.

140.    By virtue of the foregoing, MusclePharm filed reports that were in material non-compliance with its financial reporting requirements under the federal securities laws from April 2, 2018, when MusclePharm's Form 10-K for year-end 2017 was filed until November 14, 2018, when MusclePharm's Form 10-Q for the third quarter of 2018 was filed. MusclePharm's material non-compliance with its

financial reporting requirements resulting from misconduct that required the company to prepare accounting restatements for its financial statements for 2017 and the first three quarters of 2018.

141.   Drexler received or obtained, during the statutory time periods established by SOX, bonuses, incentives, and/or equity-based compensation which he failed to reimburse to MusclePharm.

142.   The SEC has not exempted Drexler, pursuant to Section 304(b) of SOX, from its application under Section 304(a).

143.   By reason of the foregoing, Drexler violated and, unless ordered to comply will continue to violate, Section 304(a) of SOX [15 U.S.C. § 7243(a)].

**RELIEF SOUGHT**

**WHEREFORE**, the SEC respectfully requests that this Court:

**I.**

Find that Drexler committed the violations alleged in this Complaint;

**II.**

Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, permanently restraining and enjoining Drexler from violating, directly or indirectly, the laws and rules he is alleged to have violated in this Complaint;

**III.**

Order Drexler to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**IV.**

Order Drexler to reimburse MusclePharm as required by SOX Section 304(a) [15 U.S.C. § 7243(a)].

**V.**

Order, pursuant to the Court's equitable powers, Section 20(e) of the Securities

Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], that Drexler is prohibited, following the date of entry of the order, from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VI.

Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted, June 27, 2023.

*/s/ Daniel Blau*
Daniel Blau
Zachary T. Carlyle
Sharan E. Lieberman
Attorneys for Plaintiff
Securities and Exchange Commission

## EXHIBIT C

**Notice of Circumstances Letter**



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

SAN FRANCISCO, CA
LOS ANGELES, CA
WILMINGTON, DE
NEW YORK, NY
HOUSTON, TX

ONE SANSOME STREET
34th FLOOR, SUITE 3430
SAN FRANCISCO
CALIFORNIA 94104

TELEPHONE: 415.263.7000
FACSIMILE: 415.263.7010

LOS ANGELES
10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067-4003

TELEPHONE: 310.277.6910
FACSIMILE: 310.201.0760

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302.652.4100
FACSIMILE: 302.652.4400

NEW YORK
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212.561.7700
FACSIMILE: 212.561.7777

TEXAS
440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002-1062

TELEPHONE: 713.691.9385
FACSIMILE: 713.691.9407

Jason H. Rosell

June 16, 2023

415.263.7000
jrosell@pszjlaw.com

**Via Email (scane@nvfirm.com)**

MusclePharm Corporation
c/o Schwartz Law, PLLC
Attention: Stephen M. Cane
601 E. Bridger Avenue
Las Vegas, Nevada 89101

Re:  **Request of the Official Committee of Unsecured Creditors of MusclePharm Corporation to Provide Notice of Circumstances Letter to Debtor's D&O Insurance Carriers**

Mr. Cane:

As you are aware, this law firm represents the Official Committee of Unsecured Creditors (the "Committee") of MusclePharm Corporation (the "Debtor").

We understand that the Debtor maintains director and officer liability insurance pursuant to policies issued by (i) StarStone Specialty Insurance Company (Policy No. 80624F221ASP, the "StarStone Policy"), (ii) XL Professional Insurance (Policy No. ELU185052-22, the "XL Policy") and (iii) Arch Insurance Company (Policy No. ABL1000129-00, the "Arch Policy" and together with the StarStone Policy and XL Policy, the "Insurance Policies").

Pursuant to Part 6(D) of the StarStone Policy, we request that you give notice of the specific facts, circumstances, and situations set forth below which could reasonably give rise to a Claim (as defined in the StarStone Policy). You should immediately provide this letter as written notice under said section to the insurer so that the insurer will have the specific facts, circumstances, and situations, the consequences which have resulted or may result therefrom.

We are also providing notice on your behalf to each carrier by copying them on the same notice. However you may still have an obligation to give notice on your own.

**Notice must be provided and received under the Insurance Policies by 12:01 a.m. (Pacific Time) on August 27, 2023**.



PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

MusclePharm Corporation
June 16, 2023
Page 2

1. On December 15, 2022 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Nevada (the "<u>Bankruptcy Court</u>").

2. On January 4, 2023, the United States Trustee filed an *Appointment of Official Committee of Unsecured Creditors* [Docket No. 49] (as amended, the "<u>Notice of Appointment</u>").

3. The Committee and its advisors have been engaged in an investigation of potential claims and causes of action against the Debtor's insiders and others, including, but not limited to, its current and former directors and officers. The Committee commenced this investigation by reviewing documents and other information (i) that are publicly available, including the Debtor's filings with the Securities and Exchange Commission, and (ii) produced by the Debtor on an informal basis, and (iii) produced by certain of the Debtor's lenders pursuant to formal document requests propounded pursuant to the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"). In addition, the Committee has sought and received authorization of the Bankruptcy Court to seek documents and testimony from other persons and entities pursuant to Bankruptcy Rule 2004, including from the Debtor's current and former directors and officers.

4. The Committee has also sent data preservation letters to the Debtor's former accountants and several of its current and former directors and officers. The Committee reserves the right to amend and supplement this letter as additional facts and circumstances surrounding the conduct of the Debtor's directors and officers becomes known.

5. The Debtor is a performance lifestyle company that develops, markets, and distributes worldwide a range of branded sports nutrition products. The company was formed in 2008 by Cory Gregory and Bradley Pyatt. Although the Debtor was once successful, with annual revenues in excess of $85 million, since at least 2018, and due in material part to the facts and circumstances outlined below, the Debtor's business has significantly deteriorated, and, to date, most of its top executives have resigned. During the same period, the Debtor's public accountants - Plante Moran, Moss Adams, and SingerLewak –



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

MusclePharm Corporation
June 16, 2023
Page 3

passed through a revolving door as accounting discrepancies were uncovered.

6.      On its schedules of assets and liabilities in the bankruptcy case [Docket No. 176], the Debtor listed total unsecured prepetition claims arising from the operation of its business of approximately $21 million (exclusive of insider debt), and additional claims have been asserted by creditors who filed proofs of claim with the Bankruptcy Court since the Petition Date. As a result of the mismanagement of the Debtor's business under the direction of the insureds under the Insurance Policies, the Debtor has been damaged insofar as, among other things, it has incurred millions of dollars of obligations to vendors, employees, and others with little means of satisfying those claims.

7.      The Debtor's descent into bankruptcy was preceded by years of mismanagement, insider dealings, lack of accounting controls, mounting losses, and dereliction of duty by the Debtor's directors and officers.

8.      <u>Lack of Corporate Formalities</u>.  The Debtor does not appear to have engaged in ordinary or appropriate corporate formalities. As the Debtor's financial position began to unravel in May 2022 (*i.e.*, as its senior secured debt became due and its relationship with the senior lender soured), the Debtor stopped maintaining corporate minutes. Indeed, despite multiple requests by the Committee, the Debtor has been unable to produce to the Committee any board minutes between May 12, 2022 and December 12, 2022. By failing to adequately maintain corporate records, the Debtor's Board of Directors may have acted in breach of its fiduciary duty of care to the Debtor, which may reasonably give rise to a claim under the Insurance Policies. The extent of these breaches of duty is under continuing investigation.

9.      <u>Turnover of Chief Financial Officers</u>.  During Ryan Drexler's tenure as Chief Executive Officer of the Debtor, the Debtor's Chief Financial Officers resigned at an alarming rate, especially in the two years preceding the Petition Date.



MusclePharm Corporation
June 16, 2023
Page 4

| Chief Financial Officer | Appointment | Resignation |
|---|---|---|
| Allen Sciarillo | 4/20/2020 | Unknown |
| Sabina Rizvi | 4/5/2021 | 7/22/2022 |
| Eric Chin | 7/28/2022 | 8/17/2022 |
| Gary Shirshac | 9/26/2022 | - |

10.    <u>Decision to Litigate Rather Than File Bankrutpcy</u>. The Committee's investigation to date has uncovered a troubling series of decisions by the Debtor's senior executive and Board of Directors that led the Debtor to ignore the advice of its professionals, refuse to file an orderly and consensual chapter 11 case with the support of its senior lender, and instead pursue a scorched-earth litigation strategy that ultimately forced the Company to cease operations. A brief timeline of relevant events is outlined below.

11.    In spring 2021, Mr. Drexler (CEO) and Ms. Rizvi (CFO) set forth a strategy to raise capital from the public markets in the fall of 2021 with the assistance of ROTH Capital Partners, LLC ("<u>Roth Capital</u>"). However, on June 4, 2021, the Company's certifying accountant, SingerLewak LLP, was dismissed by the Audit Committee of the Board of Directors of the Company.[1] Moss Adams LLP replaced SingerLewak LLP as the Company's certifying accountant.

12.    As a result of the substitution of the Company's certifying accountants, the Company was able to complete its previous year audit in time to raise capital from the public markets in fall 2021.

13.    In order to meet its short-term working capital obligations, the Company then pivoted from a public offering to a private investment opportunity from Empery Tax Efficient, LP ("<u>Empery</u>"), which was arranged by Roth Capital.

14.    On October 13, 2021, Empery Master Onshore, LLC ("<u>EMO</u>"), Empery, Empery Tax Efficient III, LP ("<u>ETE3</u>"), and Empery Debt Opportunity Fund, LP ("<u>EDOF</u>," and collectively with

---

[1]    Paul Karr was (and remains) the chair of the Audit Committee.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

MusclePharm Corporation
June 16, 2023
Page 5

EMO, Empery and ETE3, the "Empery Noteholders") with ETE as lead investor, and collateral agent for all of the secured noteholders, Ionic Ventures, LLC, Anson Investments Master Fund LP, CVI Investments, Inc., HB Fund LLC, Intracoastal Capital LLC, Bigger Capital Fund, LP, District 2 Capital Fund LP, L1 Capital Global Opportunities Master Fund, and Altium Growth Fund, LP (collectively, the "October Noteholders") entered into a *Securities Purchase Agreement* (the "Securities Purchase Agreement") with the Company.

15.     Each October Noteholder's securities purchase was evidenced by an *Original Issue Discount Senior Secured Note Due April 13, 2022* (collectively, the "October Notes") issued to the October Noteholders by the Company. The October Notes were issued with an original issue discount of 14%, accrued no interest and matured in six months, on April 13, 2022 (subject to extension to May 28, 2022 under certain circumstances). The aggregate principal amount of the October Notes was $8,197,674.42, resulting in gross proceeds to the Company of $7,050,000, exclusive of placement agent commission and fees and other offering expenses.

16.     To secure its obligations under the October Notes and the Securities Purchase Agreement, the Company granted a security interest in substantially all of its assets to the collateral agent for the benefit of the October Noteholders pursuant to a pledge and security agreement.

17.     The Committee's investigation has revealed that, at the time the Board of Directors approved the issuance of the October Notes, the Company had no means (or projected ability) to repay the October Notes upon maturity. Instead, the Company issued such debt with the hope that the October Noteholders would voluntarily agree to convert their debt to equity upon maturity (recognizing the October Noteholders were under no obligation to do so) or somehow refinance the October Notes.

18.     On June 3, 2022, the Company entered into an *Amended and Restated Securities Purchase Agreement* (the "Amended and Restated Securities Purchase Agreement") with certain investors, including certain of the October Noteholders, which amended and restated the Securities Purchase Agreement to, among



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

MusclePharm Corporation
June 16, 2023
Page 6

other things, allow for the issuance of additional senior secured notes and warrants.

19.    On June 10, 2022, the Debtor issued *Original Issue Discount Senior Secured Note Due December 10, 2022* (the "June Notes" and collectively with the October Notes, the "Notes") to Empery Noteholders, Ionic Ventures, LLC, Anson Investments Master Fund LP, HB Fund LLC, Bigger Capital Fund, LP, District 2 Capital Fund LP, Altium Growth Fund, LP, Walleye Opportunities Master Fund Ltd., and Roth Capital Partners, LLC (collectively, the "June Noteholders" and together with the October Noteholders, the "Secured Noteholders") for an aggregate principal amount of $3,081,875, resulting in gross proceeds to the Company of $2,465,500, exclusive of placement agent commission and fees and other offering expenses. The maturity date of the June Notes was December 10, 2022.

20.    In connection with the issuance of the June Notes, the maturity date of the October Notes was extended to December 10, 2022 and the original issue discount on the October Notes was doubled – from 14% to 28%.

21.    Again, the Committee's investigation has revealed that at the time of issuance of the June Notes, the Company had no means (or projected ability) to repay the Notes upon maturity. Instead, the Company issued the debt with the hope that the Secured Noteholders would voluntarily agree to convert their debt to equity upon maturity (recognizing the Secured Noteholders were under no obligation to do so) or refinance the Notes.

22.    Shortly after issuance of the October Notes, the Company's relationship with Empery soured and became hostile. For example, enclosed herewith is an email from Ryan Lane, a principal at Empery, to the Board of Directors blaming CEO Ryan Drexler for the Company's many issues, including bad deals, numerous pending lawsuits (which were not disclosed), and a variety of employee disputes.

23.    On August 22, 2022, the Board of Directors of the Company determined that the Company's financial statements contained in its Annual Report on Form 10-K for the year ended December 31, 2021 and its Quarterly Report on Form 10-Q for the



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

MusclePharm Corporation
June 16, 2023
Page 7

quarter ended March 31, 2022 should no longer be relied upon due to errors in such financial statements, and that a restatement of such financial statements was required.

24.     On August 26, 2022, the Company received a letter (the "August Letter") from Empery, as collateral agent under the Notes (the "Collateral Agent"), pursuant to which Collateral Agent advised the Company of its position that such public disclosure about the non-reliance on, and restatement of the financial statements demonstrated a breach of certain representations under Section 3.1(h) of the Amended and Restated Securities Purchase Agreement.

25.     In the August Letter, Collateral Agent advised further that an event of default under the Notes included a breach of the representations under the Amended and Restated Securities Purchase Agreement.

26.     On September 8, 2022, the Company received a separate letter (the "September Letter") from the Collateral Agent, pursuant to which the Collateral Agent advised the Company of its position that an event of default under the Notes included the fact that Sabina Rizvi was no longer serving as the Company's Chief Financial Officer or as a member of the Company's Board of Directors, unless Ms. Rizvi had resigned without Good Reason (as defined in the Notes) and the Company replaced Ms. Rizvi with another Chief Financial Officer and member of the Board of Directors acceptable to the Collateral Agent within forty five (45) days. The September Letter advised further that such forty five (45) day period had expired and that Ms. Rizvi had not been replaced with another Chief Financial Officer and member of the Board of Directors acceptable to the Collateral Agent.

27.     The Committee understands that, subsequent to the receipt of the September Letter, the Board of Directors thereafter took a "hands off" approach – in what may be a complete dereliction of its fiduciary duties – and deferred to Mr. Drexler on all key decisions leading up to the Company's ultimate demise in December 2022.

28.     For example, despite the tension between CEO Drexler and Mr. Lane of Empery, the Board of Directors allowed Mr. Drexler to lead the workout negotiations on behalf of the Company. In late October 2022, the Company engaged Marc Ross of HBM



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

MusclePharm Corporation
June 16, 2023
Page 8

Management Associates, LLC as a Chief Restructuring Officer at the insistence of Prestige Capital, the Company's factor. At the same time, the Company engaged sophisticated restructuring counsel, Fox Rothschild LLP.

29.　　In late November 2022, Marc Ross and counsel at Fox Rothschild LLP strenuously recommended to the Board of Directors that the Company file a voluntary petition for relief under chapter 11 of the Bankruptcy Code. In addition, the Committee has discovered that, during this same time period, Empery also encouraged the Company to file bankruptcy **on a consensual basis**.

30.　　Against the advice of its professionals, the Board of Directors (led by CEO Drexler) rejected the idea of a voluntary bankruptcy filing - despite there not being any plausible path to satisfying the Company's obligations under the Notes prior to their impending maturity on December 10, 2022.

31.　　Instead, in what may be a complete abandonment of their fiduciary duties to creditors, the Board of Directors pursued an extremely speculative and reckless strategy that amounted to nothing more than aligning with another litigious party, White Winston Select Asset Funds, LLC ("White Winston"), in the hopes of negotiating better terms with Empery. As a result of the Board of Directors' refusal to act in the best interests of the Company's creditors, Marc Ross, the Company's *de facto* Chief Restructuring Officer, and Fox Rothschild, the Company's legal counsel, both resigned.

32.　　Notes Default and White Winston Settlement.　On November 17, 2022, Empery provided an *Additional Events of Default Notice* to Debtor pertaining to various unauthorized financings and cash transfers to Ryan Drexler (presumably approved by the Board of Directors), which were all in violation of the Notes.

33.　　On November 30, 2022, after Marc Ross informed Empery that the Debtor was insolvent and the Board of Directors had adamantly refused to consider a voluntary bankruptcy filing, Empery began a public notice campaign for the sale of substantially all of the Company's assets pursuant to Article 9 of the Uniform Commercial Code on December 15, 2022 at 1:00 p.m. (Pacific Time) (the "Foreclosure Sale") – *5 days after the stated maturity date of the Notes*.



PACHULSKI

STANG

ZIEHL

JONES

L A W   O F F I C E S

MusclePharm Corporation
June 16, 2023
Page 9

34.     Fully aware of the scheduled Foreclosure Sale and the upcoming undisputed maturity date of the Notes, the Board of Directors made the apparently reckless decision against the advice of its professionals to join forces with White Winston, an out of the money equity holder of the Company and a plaintiff against the Company in various legal actions, in the hope of intimidating Empery into negotiating a better deal *for the benefit of Ryan Drexler*.

35.     On December 5, 2022, the Company, White Winston, and Ryan Drexler entered that certain *Settlement Agreement*, pursuant to which the Company agreed to grant White Winston an $8,630,261 debt claim, including a $4,000,000 cash payment, $500,000 of which was to be paid by January 4, 2023, in exchange for White Winston's agreement to drop its claims against Debtor and Drexler.

36.     The circumstances surrounding entry into the Settlement Agreement indicated that the Settlement Agreement was apparently designed to (a) convert White Winston's equity position into a secured claim, (b) give control of the Company to White Winston, (c) provide Company releases to Ryan Drexler and White Winston, and (d) incentivize White Winston to take the litigation laboring oar against Empery and somehow stop the Foreclosure Sale – all to the detriment of the Company's creditors. The Committee also understands that Ryan Drexler did not recuse himself from meetings of the Board of Directors discussing the Settlement Agreement even though his own release was at issue.

37.     On December 14, 2022, Empery filed a complaint in the Supreme Court of the State of New York County of New York ("New York State Court") against Debtor, White Winston, and Drexler, seeking a temporary restraining order and permanent injunction enjoining the consummation of the Settlement Agreement, among other things.

38.     On December 15, 2022, after holding a hearing, the New York State Court entered a temporary restraining order *prohibiting Debtor, White Winston, and Drexler from consummating the Settlement Agreement* and from taking other action to dispose of any Debtor assets.

39.     On December 14, 2022, the Company filed a complaint against Empery in the New York State Court, seeking a



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

MusclePharm Corporation
June 16, 2023
Page 10

preliminary and permanent injunction enjoining and restraining
Empery from accelerating the Notes and proceeding with a sale of the
Company's assets at the Foreclosure Sale on grounds that there were
no defaults under the Notes and, alternatively, that the Foreclosure
Sale was commercially unreasonable.

40.    On December 15, 2022, after holding a hearing, the
New York State Court denied Debtor's request for a preliminary
injunction, thereby allowing the Foreclosure Sale to proceed.

41.    Later that day, and minutes before the Foreclosure
Sale was scheduled to commence, the Company finally filed for
bankruptcy. As a direct result of the reckless decision of the Board of
Directors and the Company's senior management to pursue
speculative litigation against its senior lender, the Company was
forced to cease operations and then file bankruptcy without any
financial support or strategy, thereby destroying any going concern
value of the Company.

42.    The failure of the Board of Directors to delay the
Company's bankruptcy filing until *after* the stated maturity date of
the Notes may be a breach of fiduciary duty because potential legal
defenses to the Notes became more tenuous.

43.    <u>Lack of Internal Controls</u>. Although the Committee's
investigation is ongoing, the Debtor also appears to have failed to
exercise proper management and internal controls by permitting its
senior management to engage in prohibited "channel stuffing." In a
letter dated December 20, 2021, counsel to Janice McCarthy, the
Company's former Vice President of Sales, alleged:

> Ms. McCarthy also quickly learned that MP
> was engaging in fraudulent and illegal
> practices in an effort to artificially increase its
> revenue so it could meet the requirements for
> the $7 million cash infusion it received in late
> October. On numerous occasions throughout
> her tenure, Ms. McCarthy expressed to the
> two of you her serious concerns about those
> business practices.
>
> . . .



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

MusclePharm Corporation
June 16, 2023
Page 11

Ms. McCarthy also objected to MP's plan to outsource storage facilities for several customers (Nutrition Systems, Muscle and Strength, and DNA) to house a new product, Combat Energy, so those customers could place much larger initial orders than they could store at their own facilities. When Ms. McCarthy indicated it would be improper for MP to treat those products as having been sold, Mr. Drexler explicitly instructed her to "do what it takes" to secure those sales. Ms. McCarthy then asked the company's comptroller, Lon Snook, his opinion. Mr. Snook agreed that, as long as the products remained in MP's control (*i.e.*, MP did not transfer control over the goods to the customer), it would be improper to treat them as having been sold or to record the corresponding revenue. When Ms. McCarthy conveyed that information to Mr. Drexler, he suggested having the customer sign a contract with the storage facility to enable MP to pay for the facility and for the customer to place the orders. Ms. McCarthy objected to that plan because it would have constituted fraudulent "channel stuffing." In response, Mr. Drexler became belligerent toward Ms. McCarthy, and reprimanded her for not following his strategy and taking his direction.

44.    In failing to maintain appropriate internal controls, the Board of Directors may have breached their fiduciary of care to the Company.

45.    <u>Transfers to Insiders</u>.  Notwithstanding its liquidity problems in 2021 and 2022, the Debtor continued to make substantial payments to insiders (excluding routine salary payments), including without limitation, in the year prior to the Petition Date, more than $6.3 million paid to Ryan Drexler, the Debtor's Chief Executive Officer, board member, and majority shareholder – without any oversight by the Board of Directors or the Audit Committee. By



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

MusclePharm Corporation
June 16, 2023
Page 12

authorizing and permitting these transfers to be made, the Debtor's officers and Board of Directors may have acted in breach of the their duties of care and loyalty. The extent of these transfers is under continuing investigation.

46.    Based on the information available to us to date, we believe that there are facts, circumstances, or situations that may reasonably give rise to claims may be made on behalf of the Debtor's estate against one or more of the Insureds (as defined in the Insurance Policies) including, without limitation, Ryan Drexler, Paul Karr, Michael Heller, and Sabina Rizvi. To the extent that the Debtor is aware of any other or different officers and/or members of the Board of Directors of the Debtor from January 1, 2018 through the present, the Committee demands that you include the name(s) of such member(s) in notices to the all applicable insurance carriers.

47.    The facts, circumstances, and situations discussed above may reasonably give rise to a claim under the Insurance Policies against the Insured Persons, including but not limited breach of fiduciary duty, breach of the duty of loyalty, negligent management and other related claims. The Committee is providing this notice based on the limited factual information it has received from the Debtor, and its investigation of these matters is ongoing. In particular, the Committee is reviewing other potential claims against the Debtor, the past and present officers and directors of those entities, and third parties, arising from the facts and circumstances described herein, and expressly reserves the right to provide additional notices pertaining to all applicable insurance policies and/or to pursue the prosecution by the appropriate party of any and all claims on behalf of one or more of the Debtor's estate.

Respectfully,



Jason Rosell



MusclePharm Corporation
June 16, 2023
Page 13

cc:     StarStone Specialty Insurance Company
              claims@starstone.com
              ofarashahi@batescarey.com
         XL Specialty Insurance:
              proclaimnewnotices@axaxl.com
              proclaimnewnotices@xlgroup.com
         Arch Insurance Company (claims@archinsurance.com)
         Michael Richman (mrichman@steinhilberswanson.com)
         Jeff Boujoukos (jeff.boujoukos@morganlewis.com)
         Scott Mascianica (scott.mascianica@hklaw.com)
         Samuel Schwartz (sachwartz@nvfirm.com)
         Stephen Cane (scane@nvfirm.com)
         John Fiero (jfiero@pszjlaw.com)

Enclosure: Ryan Lane Email to Board of Directors

| From: | Ryan Lane |
|---|---|
| To: | Paul Karr |
| Cc: | Sabina.Rizvi@musclepharm.com; mheller@talentresources.com; ryan.drexler@musclepharm.com; Tim Silver; Richard Friedman |
| Subject: | Re: Empery Concerns |
| Date: | Friday, July 1, 2022 8:58:46 AM |

Paul,
Thank you for the response and taking oir concerns seriously. We are not interested in adding to the conflict. We would like to be part of a solution.
Kindly,
Ryan

Sent Via Mobile
212-399-3982

On Jul 1, 2022, at 9:39 AM, Paul Karr <pkarr@cfoconsultingpartners.com> wrote:

**[[ External Email ]]**

Dear Mr. Lane,
Thank you for your message.  The independent directors will review and consider the concerns you have raised and will be in touch with you in the near future.
Respectfully, Paul Karr

**From:** Ryan Lane <ryan.lane@emperyam.com>
**Sent:** Thursday, June 30, 2022 5:47 PM
**To:** Paul Karr <pkarr@cfoconsultingpartners.com>; 'Sabina.Rizvi@musclepharm.com' <Sabina.Rizvi@musclepharm.com>; mheller@talentresources.com; 'ryan.drexler@musclepharm.com' <ryan.drexler@musclepharm.com>
**Cc:** Tim Silver <tim.silver@emperyam.com>
**Subject:** Empery Concerns

CAUTION: External Email

Dear Muscle Pharm Board,
In my 15 years running empery with my partner, I have never directly emailed the board of any company. We are passive investors that like to sit back and watch management teams execute. In this case, the empery team has become very concerned about the leadership of Muscle Pharm and the ability of the team to work together effectively.

The intention of adding Sabina to the Board was simply to increase the flow of information to the finance team and give the finance team access to board discussions and thinking. This was my idea and came from a place of a well intentioned investor trying to help make the operations work more efficiently. I am a big believer in trusting your team and all working together to steer and propel the business efficiently using the team members skill sets. As soon as there are factures or distrust among team members, the effectiveness of a team unravels very quickly. We are clearly at that junction inside Muscle Pharm.

Since the lenders recent additional investment, the beverage team has been eliminated, the president and CFO has been sidelined and therefore excluded from almost all meetings and decisions. My colleagues and I sat a dinner with Ryan and explained to him that the number of conflicts and the employee turnover at Muscle Pharm will drain resources and prevent the success of the business. He agreed, yet immediate started creating more issues while he blames everyone else for the problems. I firmly believe the controversies start with Ryan as he is one of the few constants at Muscle Pharm. The bad contracts, the litigation, the employees disputes all point back to Ryan.

Over the years, we have experienced working relationships with several hundred CEOs and executive teams. Never have I seen more controversy or internal conflict than I have witness at Muscle Pharm. It seems now that Ryan is attempting to consolidate power and control the flow of information so he can convince people that everyone else is the issue. Given our experience to date, we can not be in the position where Ryan is the only one feeding us information because we do not trust what he is telling us. As a lender and the collateral agent for all the lenders, we must protect the collateral and we can only do that if we understand what is happening. For some reason Ryan seems paranoid about our intentions and that tell me he has something to hide.

As the board of an insolvent enterprise (liabilities exceed the assets without a reasonable path to repayment) the members have a fiduciary responsibility to the lenders over the equity owners. This is clear and established Delaware law. Accordingly, we would like to open a dialogue with the board to make sure we have a protocol for accurate and current information. We are not suggesting that the board directly needs to have constant communication with us, but we would like the board to help us establish appropriate points of contact for future update calls. However, as a starting point, I would like to have a discussion with the board to further share my concerns and prospective and also hear the board prospective.

I would like to have this call sooner than later since as further deterioration of the business with harm the lenders collateral.

I hope the response to this email is not a forward to Ryan asking him how you should

respond. That would further establish that the lenders should be concerned who the board is protecting.

Respectfully,
Ryan Lane