GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6665
E-mail: ggarman@gtg.legal
WILLIAM M. NOALL
Nevada Bar No. 3549
E-mail: wnoall@gtg.legal
TERESA M. PILATOWICZ
Nevada Bar No. 9605
E-mail: tpilatowicz@gtg.legal
DYLAN T. CICILIANO
Nevada Bar No. 12348
E-mail: dciciliano@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Empery Tax Efficient, LP as
Agent and Collateral Agent for certain
Secured Noteholders*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 22-14422-NMC |
| MUSCLEPHARM CORPORATION, | Chapter 11 |
| Debtor. | |

### JOINDER TO *EX PARTE* MOTION FOR AN EMERGENCY STATUS CONFERENCE PURSUANT TO SECTION 105(d) OF THE BANKRUPTCY CODE

Empery Tax Efficient, LP ("Empery"), by its counsel of record, Garman Turner Gordon LLP, respectfully submits it joinder (the "Joinder") to the Ex Parte *Motion for an Emergency Status Conference Pursuant to Section 105(d) of the Bankruptcy Code* (the "Motion")[1], filed by the Official Committee of Unsecured Creditors ("Committee").

This Joinder is made and based upon the following Memorandum of Points and Authorities, the papers and pleadings on file, judicial notice of which is respectfully requested pursuant to Federal Rule of Evidence 201, and such further evidence and argument that may be presented and considered by this Court at any hearing on the Motion.

---

[1] Capitalized terms not otherwise defined herein shall be ascribed the definitions set forth in the Motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.
INTRODUCTION**

On the Petition Date, the Debtor was a non-operational public company, whose CEO Ryan Drexler ("Drexler") and his hand chosen officers and employees were under investigation by the SEC for securities fraud and improper revenue recognition, among other crimes. With Drexler as CEO, the Debtor had ceased operations for months and for years had been systematically manipulating sales to artificially boost revenue for the purpose of defrauding investors and lenders. Over the past week, these facts have now been established through Consent Judgments,[2] in which Drexler's hand chosen team, including his former CFO, "does not deny" they engaged in securities fraud and other misconduct. On Tuesday, the SEC commenced an action against Drexler, alleging that he, inter alia, "Aided and Abetted MusclePharm's Fraud" (Drexler Complaint, p. 17:17) and that he did so for his personal gain. It is beyond ironic that Drexler's Motion for the Appointment of a Chapter 11 Trustee (the "Trustee Motion"), which is supported by nothing more than Drexler's declaration, now claims that Drexler believes Debtor is suppressing revenue, when it was pre-petition Debtor, under Drexler's control, that was falsely manipulating revenue to defraud investors. Drexler's request that his judgment (which fostered securities fraud) should be substituted for that of independent fiduciaries is patently absurd.

The SEC complaints, together with Drexler's actions, have already damaged Debtor's precarious reorganization. It took a monumental effort by the Debtor, its new officers and directors, and its professionals to overcome the operational and financial "catastrophe" created by Drexler. This effort required a new CEO, a new board, and additional capital in the form of DIP financing from Empery. But equally important was regaining the trust of Debtor's vendors and manufacturing partners, who endeared years of lies and contract breaches under the leadership of Drexler. Re-establishing the goodwill required for manufacturers to allocate capacity to the Debtor cannot be understated. The success of these stabilization efforts resulted in the profitable restart of

---

[2] In reality, the consent judgment were agreed to months ago.

the business and a Plan Support Agreement (including a sale process) supported by all constituents except Drexler (whose motives and actions will be the subject of discovery and testimony in the Trustee Motion).

While the facts contained in the three Consent Judgments as well as the SEC action against Drexler will have a material impact on the Trustee Motion (as well as the credibility of the unsubstantiated and reckless allegations made by Drexler therein), this Court will ultimately evaluate the evidentiary record (or lack thereof) and determine if Drexler has met the high burden for appointment of a Trustee. The Trustee Motion, however, does not effectuate a stay of proceedings. And unless the Debtor proceeds to sale on a parallel path by employing an investment banker (the Hilco employment motion) and commencing a marketing and sale process (the Bid Procedures Motion), we believe that the Committee intends to seek conversion of this case to a Chapter 7. This estate faces suppliers who are unwilling to make long term commitments to manufacture the Debtor's products without the prospect of a new owner, a DIP Order whose budget expires in July.[3] The uncertainty created by of the Trustee Motion on the estate and its operations and the continuing accrual of unpaid administrative claims in excess of the operational revenue and borrowings will leave this estate hopelessly administratively insolvent.

The "Sales Procedures" are supported by all constituents except Drexler. Although ironically, Drexler claims to support a sale process "in principal" yet opposes the various motions and intends to seek discovery on his objections. To this end, efficiency will be achieved in dual tracking the Trustee Motion with the "Sale Procedures" motions as there will be substantial overlap in discovery. Therefore, Empery joins the Committee's Motion.

…

…

---

[3] The last periodic DIP Financing budget (meaning beyond the initial annual budget) agreed to by Debtor and Empery was dated April 12, 2023. Uncertainty surrounding estate fees, costs and expenses associated with the Trustee Motion and other recent action undertaken by Drexler in the case has raised concerns that the estate will be seriously, administratively insolvent, which in turn has led to an absence of agreement concerning future additional case funding for purposes of the budgeting process.

# II.
# LEGAL AUTHORITY

**A. The Trustee Motion and the Sale Process must Proceed on a Parallel Track to Save this Case**

Debtor's case is fragile. Debtor's revenue generating operations were shut down pre-petition. Its vendors refused to continue dealing with Drexler. Debtor and Drexler had a history of breaching contracts and scorched earth litigation, evidenced by dozens of pre-petition lawsuits [ECF No. 176, pp. 87-114]. Without operations, Debtor's customers would go elsewhere for product. Debtor would need to find new vendors to supply the components for its products and manufacture and ship products to customers. Indeed, at the time of the Prepetition Article 9 sale, what was being sold was almost exclusively Debtor's IP.

Post-petition, all active parties in the case, with the exception of Drexler, have worked very hard to arrive at a consensus on how the case should be reorganized. Suppliers are once again working with Debtor and Debtor is moving toward a successful reorganization. Except for Drexler, everyone agrees on the key issues, including the Plan Support Agreement, the bid procedures, Plan and Disclosure Statement.

The parties have worked to find a path that is economically viable given the limited capital resources available to Debtor. Although Debtor's revenue generating operations were shut down pre-petition by Drexler, the non-Drexler parties agreed to a DIP arrangement to restart Debtor (initially on just a term sheet approved by the Court), with the pre-petition lenders, vendors and others all taking risk to get Debtor's operations restarted and stabilized. Today, the Debtor is operating at a cash flow profit before reorganizational costs, but remains administratively insolvent, a predicament caused in material part by Drexler's actions.

Importantly, the pre-petition marketing of Debtor in connection with scheduled Article 9 sale engendered material interest in Debtor's IP assets. Post-petition, Debtor's new court approved management team has continued to talk to potential buyers about purchasing Debtor's assets. But the Committee and Debtor are concerned that may change with the added uncertainty that comes from delay. We understand that some interested parties are now expressing concern that the

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

uncertainty manifested by the current course of the case is imperiling their perceived value in the Debtor's brand and products. This concern has also been expressed by manufacturing vendors, who have informed the Debtor they may become unwilling to continue supplying Debtor due to the increased case and payment risk, and there are no viable alternatives.

There is little downside to a parallel Trustee Motion/Sale Process. From a fee and cost perspective, the briefing on the Hilco application for employment, the bid procedures and the Plan Support Agreement is complete. Upon approval of Hilco's employment, the Estate will be liable for only $50,000, plus reasonable expenses incurred in connection with the Hilco Agreement not to exceed $10,000 in the aggregate absent Debtor's prior written approval. Hilco is primarily incentivized by a contingent commission arrangement that is dependent on the occurrence of a closed sale.

Empery recognizes the clarity of the Court's ruling on the motion to enforce. Drexler has made serious, albeit unsupported, allegations and he will not be silenced by the Intercreditor and Subordination Agreement. But they are just that, "allegations." Drexler has not presented evidence supporting his Trustee Motion. His sworn declaration is mostly, if not entirely, based upon information and belief, hearsay statements from an undisclosed source(s), and Drexler's view of how Debtor was operating pre-petition v. post-petition (a version of fact seriously undermined by the SEC actions and Consent Judgements). Moreover, the vast majority of the claims and allegations, even if true, would not support a Chapter 11 trustee.

Thus, the Court can simultaneously hear the Sale Process matters and allow Hilco to begin the marketing of the assets, with any necessary adjustments to the bid procedure timelines, such that as soon as the Trustee Motion has been presented and determined by the Court, the Court can either appoint a Trustee and stop or delay the sale process, in the event a Trustee Motion is granted, or allow the auction and Sale hearing to immediately occur if the Court denies the Trustee Motion. There is no downside to continuing on parallel tracks. Whereas, in the alternative, there is no option but to seek the conversion of the matter to protect the remaining assets for the benefit of creditors.

…

B. **<u>Drexler is using unsubstantiated allegations to effectuate a stay of the bankruptcy he instituted.</u>**

Under Section 1104, a Chapter 11 trustee may only be appointed "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management," or "if such appointment is in the interests of creditors." 11 U.S.C. § 1104(a). Courts recognize that the very purpose of Chapter 11 would be defeated if trustees were routinely appointed to operate a debtor's business, and trustee appointment is only proper where the party seeking such appointment meets the burden. *See Schuster v. Dragone,* 266 B.R. 268, 271 (D. Conn. 2001).

From the onset and given the burden, it is unlikely that the Trustee Motion will succeed. While Empery understands that the Court takes the allegations raised in the Trustee Motion seriously, the Trustee Motion is also unsubstantiated. [ECF No. 447]. Based on that threadbare motion alone, Drexler contends that the entire case should grind to a halt to allow for months of discovery before the Trustee Motion is heard. That delay, without a corresponding dual sales track, will lead to the conversion of the case. Given the catastrophic result of the delay, Empery believes that the Trustee Motion is being used for the ulterior purposes of obtaining leverage.

Importantly, Drexler offers no credible evidence, much less clear and convincing evidence, of fraud, dishonesty, incompetence, gross mismanagement, or other "cause" that would warrant the appointment of a trustee under Section 1104(a)(1). In fact, the sole support for the Trustee Motion comes in the form of the inadmissible "Declaration of Ryan Drexler in Support of Motion for the Appointment of a Chapter 11 Trustee" [ECF No. 448]. The alleged factual bases for the allegations therein are his "familiarity with the Debtor's business, its suppliers, its customers, and its prospects." [*Id*. at ¶ 4]. Drexler, however, is not operating or working for Debtor, he has no first-hand knowledge of its post-petition operations—only his own pre-petition fraudulent operation of Debtor.

In its totality, Drexler contends that upon information and belief "at least one supplier of protein powder who is a member of the Official Committee of Unsecured Creditors ("Committee") has been charging the Debtor above-market prices, with the Debtor's acquiescence, requiring the

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

Debtor to raise prices to its customers in a manner that renders the Debtor's products uncompetitive with similar products." [*Id*. at ¶ 5]. Drexler fails to explain or disclose the alleged information or belief upon which his knowledge is based. He fails to identify who the alleged supplier is or the basis of the allegation. Likewise, the only other pertinent statements in the declaration are that:

> 6. On information and belief, this practice is an effort to recoup prepetition claims and losses by charging higher post-petition prices.
>
> 7. On information and belief, as a result of this mismanagement, the Debtor has lost profitable accounts and is missing out on valuable sales that could be used to mitigate the Debtor's operational losses.

[*Id*. at par. 6-7]. On its face, the declaration runs afoul of LR 9014(c)(2)(B), which requires that any declaration in a contested matter "[c]ontain only nonhearsay factual evidentiary matter or expert opinion, conform as far as possible to the requirements of Fed. R. Civ. P. 56(e), and avoid mere general conclusions or argument."

Drexler has failed to come forth with admissible evidence of his allegations. Despite that, he has (or is attempting to) hijacked the case and otherwise prevented its orderly administration. It likewise cannot be ignored that while Drexler is now making the baseless allegations of mismanagement, it was in fact Drexler who directed years of Debtor's securities law violations, including fraud, as well as channel stuffing, manipulation of revenue, and adulteration of products. In the context of the allegations and the party who is making them, the Court should place the Sales Procedures back on calendar to ensure the matter continues moving toward confirmation. Without simultaneously moving the other aspects of the case forward, Debtor is quickly headed toward conversion.

C. **Drexler spent years engaging in securities fraud, embroiling Debtor in valueless litigation, and destroying Debtor's relationship with vendors, suppliers, customers, and lenders.**

Days ago, it was unveiled that Drexler and his handpicked lieutenants are facing undisputed claims by the United States Securities and Exchange Commission ("SEC") in the Central District of California. It is now known that in the months leading up to the bankruptcy Drexler had been in active negotiations with the SEC over his alleged fraud and violations of securities laws.

(S*ecurities Exchange Commission v. Drexler,* Case No. 23-cv-05102, ECF No. 1, at par. 4 (C.D. Cal June 27, 2023), on file herein as ECF No. 637, Exh. B,(noting Drexler's agreement to toll statutes of limitation beginning in June 2022))[4].

Notably, this is not Debtor or Drexler's first run-in with the SEC. On September 5, 2015 the SEC made findings that Debtor "committ[ed] a series of accounting and disclosure violations, including the failure to properly report perks provided to its executives as compensation." September 5, 2015, Order Instituting Cease-and Desist Proceedings Pursuant to Section 8a of the Securities Act of 1933 and Section 21c of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order (the "2015 SEC Order"). The 2015 SEC Order required that Debtor substantially overhaul its reporting and control procedures. Shortly thereafter, on March 16, 2016, Debtor's then-CEO and founder Brad Pyatt was replaced by then-Executive Chairman, Drexler.

On June 27, 2023, the SEC brought two complaints in the United States Central District Court of California, the Drexler Complaint and one against Debtor's prior Executive Vice President of Sale and Operations Brian H. Casutto, Vice President of Sale Matthew J. Zucco, and Chief Financial Officer Kevin R. Harris, CPA, Case No. 23-cv-05104 (the "Sales Fraud Complaint"), both of which relate back to 2017. Importantly, Casutto, Zucco, and Harris entered into consent judgments, agreeing that they do not dispute the allegations in the Sales Fraud Complaint. As such, the Sales Fraud Complaint no longer contains mere allegations but undisputed facts and charges.

The SEC complaints lay bare Debtor's culture under Drexler of pre-petition self-interest and fraud, facts which every constituent group have alleged before this Court, including the Committee, Debtor, White Winston Select Asset Funds, LLC, and Empery.

---

[4] Notably, in MusclePharm's Verified Complaint (verified by Ryan Drexler) against Empery for injunctive and other relief, received by the New York Supreme Court on December 14, 2023 (Index No. 654787/2022), MusclePharm alleged, in paragraphs 29-31 thereof, that MusclePharm's non-disclosure of the 2019 SEC investigation was not a proper basis for Empery to notice a default under the prepetition loan agreements because the 2019 SEC investigation could not be "expected to result in a Material Adverse Effect."

a. **The Sales Fraud Complaint establishes Debtor's pattern and practice under Drexler of fraudulent reporting sales and revenue.**

While Drexler touts his expertise and experience with Debtor's operation in the Trustee Motion, the reality is that Debtor under Drexler's control never reported accurate sales figures. As part of the Sales Fraud Complaint, Drexler's accomplices, including Debtor's ex-CFO, Vice President of Sales and Executive Vice President of Sales accepted liability for fifteen claims for relief for fraud, falsified public filings, and false proxy disclosures.[5]

The Sales Fraud Complaint paints a dismal picture of Drexler's directors and lieutenants falsifying Debtor's records to achieve Drexler's goals of showing the greatest revenue possible. There is no doubt Debtor was engaged in rampant channel stuffing and manipulation of sales and revenue figures.

Beginning in 2017, Debtor's officers, directors, and employees "engaged in a variety of improper conduct that materially inflated the reported quarterly revenues and gross profits of [Debtor], by as much as 25 percent and 49 percent, respectively." (Sales Fraud Complaint at ¶ 4). Pre-petition Debtor's scheme was to prematurely recognize millions of dollars of revenue before or at the time of shipment and before delivery. (*Id*. at ¶¶ 5-7). Coincidingly, Debtor would report "discounts" as costs, as opposed to reductions in revenue, all for the purpose of inflating revenue and perceived performance. (*Id*. at ¶ 8).

Using this false information, Drexler publicly "proclaimed that the company was now on a path to consistent profitable growth." (*Id*. at ¶17). But in reality, Drexler pressured Debtor's sales team to meet unrealistic targets and "threatened to, and did, fire employees who challenged him or failed to achieve the targets." (*Id*. at ¶18). As there were no legitimate ways to drive the growth, Drexler resorted to illegitimate means.

---

[5] Specifically violations of Section 10b of the Exchange Act and Rules 10b-5(a) and (c), Section 17(a)(1) of the Securities Act, Sections 17(a)(2) of the Securities Act, Sections 17(a)(3) of the Securities Act, Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13, Violations of Rule 13a-15(a) of the Exchange Act, Violations of Section 13(b)(2)(A) of the Exchange Act, Violations of Section 13(b)(2)(B) of the Exchange Act, Violations of Section 13(b)(5) of the Exchange Act, and Violations of Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9.

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

Debtor's prior officers and directors consented to the fact that Debtor was engaged in channel stuffing—the practice of increasing revenues prior to a reporting period by mischaracterizing unrealized revenue. Amongst the efforts used by Debtor to inflate revenue, Debtor stored products in off-site trailers and recognized revenue when products were shipped, as opposed to when payments were received. (*Id*. at ¶¶ 19, 25-27). This was done to specifically "achieve the CEO's [Drexler's] quarterly sales targets and [to] report consistent sales growth." (*Id*. at ¶¶ 28-29). The Defendants named in the Sales Fraud Complaint admitted that their actions were designed to defraud lenders so that a "funding deal [could get] done." (*Id*. at ¶32).

Diverting product to illegitimately recognize revenue was also done to specifically avoid "audits," deceive auditors, and achieve Drexler's sales targets. (*Id*. at ¶¶ 36-39). Despite being warned that the activity violated GAAP and misstated revenue, Debtor continued the practice. (*Id*. at ¶¶ 55-61).

Debtor and Drexler also ignored SEC orders in order to enrich Drexler and his cronies. As part of the 2015 SEC Order, Debtor further represented that it had complied with the order's requirement that each year executives fill out questionnaires identifying compensation and perquisites. (*Id*. at ¶ 95). Drexler, as well as Debtor's other officers and directors, failed to submit the questionnaires and failed to report perquisites. (*Id*. at ¶ 93-101). This led to Drexler underreporting more than $231,000 in 2018 alone, which included personal legal fees, tax gross-ups, automobile expenses and commuting and living costs. (*Id*. at ¶ 100). Likewise, using the inflated revenue, Drexler and his officers paid themselves bonuses. (*Id*. at ¶¶ 122-123).

**b. Drexler likewise faces charges that he was engaged in securities fraud or failed as CEO to prevent the fraud from occurring.**

Over dozens of pages, the Drexler Complaint details how Drexler materially supported and oversaw a years-long enterprise of securities fraud designed to enrich Drexler and manipulate sales reports and public disclosures. Eleven claims are pending against Drexler, including Fraud under Section 10(b) of the Exchange Act and Rule 10b-5, Fraud under Section 17(a) of the Securities Act, False SEC Filings under Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13, False Certifications under Act Rule 13a-14, Reporting Controls under Exchange Act

Rule 13a-15(a), Internal Accounts Controls under Section 13(b)(2)(B), Proxy Disclosures for Violations of Section 14(a) of the Exchange Act, and Clawback under SOX Section 304(A).

### c. Drexler's ex-employees have detailed Drexler's fraudulent and extreme business practices.

Employee Janice McCarthy tells a similar story to the SEC. When she was hired in 2021, McCarthy learned that Debtor was "delaying payments to its co-manufacturers (SK Laboratories, JW Nutritional, and Bakey Barn)" and not purchasing raw materials, which led to product shortages. Case No. 22-cv-00170, DKT 3-1 (D. Nev. April 13, 2022). In order to obtain funding from third parties in October 2021, Drexler "engag[ed] in fraudulent and illegal practices" to bolster Debtor's financials.

Amongst the practices, Drexler substituted traditional "protein powder with a much cheaper instantized protein version" without notifying its largest customer Costco. As a result, Costco rejected Debtor's product. In other instances, Drexler purchased inferior resealable bags, and when rejected by Costco, instructed the product be returned to Costco as "replacement product." Drexler also directed McCarthy to place large orders for customers to give the appearance of sales, however, the sales were phony and Debtor would later be forced to repurchase the product, but not until after it booked the sales.

### d. Debtor had no operations or prospects when it filed bankruptcy.

On December 15, 2022 (the "Petition Date"), Drexler caused Debtor to commence this bankruptcy case (the "Chapter 11 Case"). [See ECF No. 1]. On the Petition Date, Debtor was not operating. It had less than $100,000 in inventory, and only around $100,000 of accounts receivable. [ECF No. 176 at p. 14, 17]. Debtor also had hundreds of creditors with tens of millions of dollars in claims. [*Id*. at p. 18-65].

While the Trustee Motion is quick to bolster Drexler's qualifications to operate Debtor, like the SEC and parties that are active in the Bankruptcy, no one else believed that to be true. Debtor had lost its most substantial customer, Costco, and had jeopardized its relationships with all of its critical vendors. Debtor's suppliers refused to work with Debtor so long as Drexler was involved in management. Moreover, Debtor was involved in substantial litigation throughout the

country, most of which involved claims against or by Drexler, individually. [ECF No. 176, pp. 87-114]. Drexler's costly personal litigation was being financed by Debtor, with millions of dollars being spent on counsel, and nearly an equal amount still due and owing to withdrawn counsel—and now creditors of the estate.

The truth is simple, after running Debtor for years as his own personal fiefdom, Drexler's costly battles, expensive tastes and poor business decisions destroyed Debtor's business and led it into insolvency. Now, as third parties fight to save Debtor, Drexler appears to exact revenge and plunge the estate into disarray. While the Trustee Motion is meritless, Empery respectfully submits that while the Trustee Motion is litigated, the Court set Debtor's Hilco and Bid Procedures Motions; or alternatively, convert this case to Chapter 7.

### III. CONCLUSION

For the reasons stated above, Empery joins the Committee's Motion.

DATED this 3rd day of July, 2023.

GARMAN TURNER GORDON LLP

/s/ William M. Noall
GREGORY E. GARMAN, ESQ.
WILLIAM M. NOALL, ESQ.
TERESA M. PILATOWICZ, ESQ.
DYLAN T. CICILIANO, ESQ.
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
*Attorneys for Empery Tax Efficient, LP as Agent and Collateral Agent for certain Secured Noteholders*
